**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| | ) | |
| **CHMURA ECONOMICS &** | ) | |
| **ANALYTICS, LLC,** | ) | |
| | ) | |
| **Plaintiff/Counterclaim** | ) | |
| **Defendant,** | ) | **Case No. 3:19-cv-813-REP** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RICHARD LOMBARDO,** | ) | |
| | ) | |
| **Defendant/Counterclaim** | ) | |
| **Plaintiff.** | ) | |

**PLAINTIFF AND COUNTERCLAIM DEFENDANT'S MEMORANDUM IN SUPPORT**
**OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................... 1

    I.     Background On Chmura ................................................................... 1

    II.    Lombardo's Offer ............................................................................ 3

    III.   Lombardo's Restrictive Covenant Agreement.................................. 4

    IV.   Lombardo's Job Duties And Performance......................................... 5

    V.    The Winter Of Lombardo's Discontent ............................................ 9

    VI.   Lombardo Strikes Back................................................................... 12

LEGAL STANDARD .......................................................................................... 14

ARGUMENT ....................................................................................................... 14

    I.     Chmura Is Entitled To Summary Judgment On Its Amended Complaint ........... 14

        A.   There Is No Genuine Dispute That Lombardo Breached The Agreement........................................................................ 14

        B.   Chmura Is Entitled To A Declaratory Judgment That The Agreement Is Enforceable.................................................... 18

        C.   Lombardo Undisputedly Converted Chmura's Property ........................ 19

        D.   Lombardo Misappropriated Chmura's Trade Secrets............................. 20

    II.    Chmura Is Entitled To Summary Judgment On Lombardo's Counterclaims...... 24

        A.   Lombardo Is A Highly Compensated Employee Who Is Not Entitled To Overtime ................................................... 24

        B.   No Evidence Supports Lombardo's Retaliation Claim............................ 33

        C.   Chmura Is Entitled To Summary Judgment On Lombardo's Breach Of Contract Claim.................................................... 37

        D.   Lombardo's Ohio Prompt Pay Act Claim Cannot Survive Summary Judgment ............................................................. 40

CONCLUSION.................................................................................................... 40

CERTIFICATE OF SERVICE ............................................................................ 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. G.D.C., Inc.*,
   281 F.3d 452 (4th Cir. 2002) ...............................................................34

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).............................................................................14

*Apollo Enter. Imaging Corp. v. Conyers*,
   2020 WL 1896706 (E.D. Va. Jan. 10, 2020) .....................................23

*Bollman v. Lavery Auto Sales & Serv.*,
   2019 WL 4678289 (Ohio Ct. App. 2019) ...........................................40

*Brainware, Inc. v. Mahan*,
   808 F. Supp. 2d 820 (E.D. Va. 2011) ...........................................16, 18

*Brooklyn Sav. Bank v. O'Neil*,
   324 U.S. 697 (1945).............................................................................24

*Bruzzese v. Chesapeake Expl., LLC*,
   998 F. Supp. 2d 663 (S.D. Ohio 2014) ...............................................38

*Connelly v. Blot*,
   2017 WL 11501501 (E.D. Va. Oct. 18, 2017).....................................17

*Cruz v. Lawson Software, Inc.*,
   764 F. Supp. 2d 1050 (D. Minn. 2011).................................................29

*Cue-Lipin v. Callanwolde Found., Inc.*,
   1 F. Supp. 3d 1359 (N.D. Ga. 2014) ...................................................30

*Darveau v. Detecon, Inc.*,
   515 F.3d 334 (4th Cir. 2008) ..........................................................27, 34

*Daston Corp. v. MiCore Sols., Inc.*,
   80 Va. Cir. 611 (2010) .........................................................................18

*Desmond v. PNGI Charles Town Gaming, L.L.C.*,
   630 F.3d 351 (4th Cir. 2011) ..........................................................25, 32

*DiBlasi v. Liberty Mut. Grp., Inc.*,
   2014 WL 1331056 (D. Mass. Apr. 3, 2014) .......................................27

i

*Dodge v. CDW-Gov't., Inc.*,
  415 F. App'x 485 (4th Cir. 2011) ........................................................................38

*Dowe v. Total Action Against Poverty in Roanoke Valley*,
  145 F.3d 653 (4th Cir. 1998) ..............................................................................36

*E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*,
  688 F. Supp. 2d 443 (E.D. Va. 2009) ..................................................................19

*Ez-XBRL Sols., Inc. v. Chapke*,
  2018 WL 5808724 (E.D. Va. Sept. 25, 2018) .....................................................19

*Filak v. George*,
  267 Va. 612 (2004) ..............................................................................................15

*GMS Indus. Supply, Inc. v. G&S Supply, Inc.*,
  2020 WL 974419 (E.D. Va. Feb. 8, 2020) ...........................................................15

*Gordon v. Pete's Auto Serv. of Denbigh, Inc.*,
  837 F. Supp. 2d 581 (E.D. Va. 2011) ..................................................................19

*Gross v. FBL Fin. Servs.*,
  557 U.S. 167 (2009) .............................................................................................36

*Guyton v. Hensley*,
  1991 WL 23571 (Ohio Ct. App. Feb. 22, 1991) ..................................................39

*Hagan v. Echostar Satellite, L.L.C.*,
  529 F.3d 617 (5th Cir. 2008) ...............................................................................35

*Hantz v. Prospect Mortg., LLC*,
  11 F. Supp. 3d 612 (E.D. Va. 2014) ....................................................................32

*Hines v. State Room, Inc.*,
  665 F.3d 235 (1st Cir. 2011) ...........................................................................27, 28

*Hogan v. Allstate Ins. Co.*,
  361 F.3d 621 (11th Cir. 2004) .........................................................................27, 29

*Holland v. Washington Homes, Inc.*,
  487 F.3d 208 (4th Cir. 2007) ...............................................................................37

*Howell v. Ferguson Enters.*,
  93 F. App'x 12 (5th Cir. 2004) ............................................................................30

*Int'l Union, Sec., Police & Fire Prof'ls of Am., Inc. v. Bogues*,
  2013 WL 3093920 (D. Md. June 14, 2013) .........................................................20

*JDS Uniphase Corp. v. Jennings*,
  473 F. Supp. 2d 697 (E.D. Va. 2007) ....................................................................15

*JetSmarter Inc. v. Benson*,
  2018 WL 2694598 (S.D. Fla. Apr. 6, 2018) .........................................................23

*JTH Tax, Inc. v. Aime*,
  2016 WL 8674623 (E.D. Va. July 1, 2016)...........................................................15

*Leeper v. HealthScope Benefits*,
  2020 WL 1290089 (S.D. Ohio Mar. 18, 2020)......................................................38

*McCrimon v. Inner City Nursing Home, Inc.*,
  2011 WL 4632865 (N.D. Ohio Sept. 30, 2011).....................................................24

*McLaughlin v. Richland Shoe Co.*,
  486 U.S. 128 (1988)...............................................................................................32

*MicroStrategy, Inc. v. Bus. Objects, S.A.*,
  331 F. Supp. 2d 396 (E.D. Va. 2004) .............................................................21, 22

*Minor v. Bostwick Labs., Inc.*,
  669 F.3d 428 (4th Cir. 2012) .................................................................................34

*Omniplex World Servs. Corp. v. U.S. Investigations Servs. Inc.*,
  270 Va. 246 (2005) ................................................................................................18

*OROS, Inc. v. Dajani*,
  2019 WL 2361047 (E.D. Va. June 4, 2019) .........................................................23

*Pappas v. Sol. Start, Corp.*,
  2018 WL 3595001 (W.D.N.C. July 26, 2018).......................................................33

*Pate v. Quick Sols., Inc.*,
  2011 WL 3449619 (Ohio Ct. App. Aug. 9, 2011) .................................................39

*Piscione v. Ernst & Young, L.L.P.*,
  171 F.3d 527 (7th Cir. 1999), *overruled on other grounds by Hill v.
  Tangherlini*, 724 F.3d 965 (7th Cir. 2013)...........................................................27

*Preferred Sys. Sols., Inc. v. GP Consulting, LLC*,
  284 Va. 382 (2012) ................................................................................................17

*Prusin v. Canton's Pearls, LLC*,
  2017 WL 4347867 (D. Md. Sept. 29, 2017) .........................................................33

*Ramos v. Molina Healthcare, Inc.*,
  963 F. Supp. 2d 511 (E.D. Va. 2013) ...................................................................36

*Reich v. John Alden Life Ins. Co.*,
    126 F.3d 1 (1st Cir. 1997) ................................................................................................31

*Roanoake Eng'g Sales Co. v. Rosenbaum*,
    223 Va. 548 (1982) ..........................................................................................................18

*Romero v. Granite Ctr., LLC*,
    2017 WL 2642971 (E.D. Va. June 19, 2017) .................................................................34

*Sanchez v. Caregivers Staffing Servs., Inc.*,
    2017 WL 380912 (E.D. Va. Jan. 26, 2017) ....................................................................34

*Savedoff v. Access Grp., Inc.*,
    524 F.3d 754 (6th Cir. 2008) ..........................................................................................38

*Schaefer-LaRose v. Eli Lilly & Co.*,
    663 F. Supp. 2d 674 (S.D. Ind. 2009), *aff'd*, 679 F.3d 560 (7th Cir. 2012) ..........................31

*Schmidt v. Eagle Waste & Recycling, Inc.*,
    599 F.3d 626 (7th Cir. 2010) ..........................................................................................27

*Semenovich v. Project Performance Co.*,
    2016 WL 1076926 (E.D. Va. Mar. 18, 2016) .................................................................32

*Siji Yu v. Knighted LLC*,
    2019 WL 2085990 (S.D.N.Y. May 13, 2019) .................................................................28

*Smith v. Ochsner Health Sys.*,
    956 F.3d 681 (5th Cir. 2020) ..........................................................................................25

*Sneed v. Am. Bank Stationary Co.*,
    764 F. Supp. 65 (W.D. Va. 1991) ...................................................................................38

*Space Sys./Loral, LLC v. Orbital ATK, Inc.*,
    306 F. Supp. 3d 845 (E.D. Va. 2018) .............................................................................20

*Spirax Sarco, Inc. v. SSI Eng'g, Inc.*,
    122 F. Supp. 3d 408 (E.D.N.C. 2015) ............................................................................21

*Taylor v. J.A.G. Black Gold Mgmt. Co.*,
    2009 WL 2940167 (Ohio Ct. App. Oct. 15, 2009) .........................................................38

*Telogis, Inc. v. InSight Mobile Data, Inc.*,
    2014 WL 7336678 (D. Md. Dec. 19, 2014) ....................................................................21

*Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*,
    57 F.3d 1317 (4th Cir. 1995) ..........................................................................................14

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013)............................................................................................35

*Universal C.I.T. Credit Corp. v. Kaplan*,
    198 Va. 67 (1956) ..............................................................................................19

*Update, Inc. v. Samilow*,
    311 F. Supp. 3d 784 (E.D. Va. 2018) ................................................................18

*Verkuilen v. MediaBank, LLC*,
    646 F.3d 979 (7th Cir. 2011) .............................................................................29

*Verne v. Queen City Roofing & Contracting. Co.*,
    2018 WL 6537138 (W.D. Mo. Dec. 12, 2019) ..................................................33

*Whitt v. Ziegler Tire & Supply Co.*,
    2015 WL 4715605 (N.D. Ohio Aug. 7, 2015) ...................................................40

**Statutes**

18 U.S.C. § 1836 .........................................................................................................20

18 U.S.C. § 1839 ..................................................................................................21, 22

29 U.S.C. § 207 ...........................................................................................................24

29 U.S.C. § 215 ...........................................................................................................35

29 U.S.C. § 255 ...........................................................................................................25

O.R.C. § 4113.15 ........................................................................................................40

**Other Authorities**

29 C.F.R. § 541.200 ....................................................................................................26

29 C.F.R. § 541.201 ..............................................................................................25, 26

29 C.F.R. § 541.202 ..............................................................................................25, 30

29 C.F.R. § 541.601 ....................................................................................................25

69 FR 22122-01 ..............................................................................................26, 30, 31

Fed. R. Civ. P. 56(a) ...................................................................................................14

Restatement (Third) of Unfair Competition § 43, cmt. c............................................24

Plaintiff and Counterclaim Defendant Chmura Economics & Analytics, LLC, by counsel, submits this Memorandum in Support of its Motion for Summary Judgment.

## INTRODUCTION

Richard Lombardo was quite good at his job.  In his four and a half years at Chmura, he earned more money and exercised more authority than any other sales representative the company has ever had.  But his financial ambitions eventually outgrew his success, and he resorted to increasingly dishonest and disruptive measures to force Chmura to pay him to match those ambitions.  First, when Chmura declined to give Lombardo a discretionary raise in early 2019, Lombardo forged a third-party offer letter to try to get more money.  Next, when Chmura decided to "right-size" Lombardo's sales territory to better serve its expanding customer base, Lombardo protested that move as "illegal" and threatened to sue.  Then, when Chmura decided to revamp its commissions structure, Lombardo tried to extort Chmura into a "buyout" of $100,000 for "his" book of clients, in exchange for which he would refrain from violating his restrictive covenant agreement with Chmura (the "Agreement") and attempting to destroy Chmura's business.

In response to these threats, Chmura fired Lombardo and sought to protect itself by suing to enforce the Agreement.  Lombardo then followed through on his threats to try to ruin the company by suing for over $500,000 in overtime premiums, even though he made between $150,000 and $180,000 every year he worked for Chmura.  Discovery has confirmed that Lombardo can neither prove his overtime claims nor refute Chmura's affirmative allegations. Therefore, summary judgment in Chmura's favor is appropriate.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.   Background On Chmura

1.  Chmura's founders are economists, mathematicians, and computer scientists.  Its specialty

is labor market data.  To help its customers understand and use those data, Chmura packages the data in two primary ways:  through software subscriptions and consulting services.  (Declaration of Leslie Peterson ¶ 3 ("Peterson Decl.," Exhibit 1).)  On the software side of the house, Chmura's primary product is a Software-as-a-Service platform called JobsEQ.  (*Id*. ¶ 3.)  JobsEQ is designed to allow Chmura's clients (such as economic developers, governmental entities, and educational institutions) to identify workforce characteristics and trends within their communities.  (*Id*. ¶ 4.)

2.  An initial subscription to JobsEQ costs, on average, about $8,000, but the price can range anywhere from $5,000 to over $30,000, depending on factors such as the client's geographic scope and the data the client wants to purchase.  (*Id*. ¶ 7.)  Chmura's subscription renewal rate is about 83%, and most clients renew their subscriptions for several years.  (*Id*. ¶ 7.)

3.  JobsEQ is a highly technical and customized product, with a number of equally technical add-on features available for purchase.  Chmura's sales representatives (called Account Managers) therefore receive extensive training on not only the software's technical capabilities, but the economics underlying Chmura's data, as well as the procedural intricacies of dealing with Chmura's governmental clients.  (Peterson Decl. ¶ 8.)

4.  For these reasons, Chmura expects new Account Managers to spend their first three months just learning JobsEQ's features and how to "demo" the software for potential customers.  (Deposition of Leslie Peterson 35:22-36:14 ("Peterson Dep.," Exhibit 2); Deposition of Leslie Peterson Day 2 10:22-11:15, 17:22-18:13 ("Peterson 2d Dep.," Exhibit 3).)  Applying this training to create, tailor, and present a demo for a prospective client is typically the most critical aspect of the initial JobsEQ sales process.  (Peterson Decl. ¶ 9.)

5.  As they become more senior, Account Managers also spend much of their time managing Chmura's relationships with existing clients, including by providing guidance on how to use

JobsEQ's features, running reports, providing additional data, obtaining customer feedback, and coordinating responses to complicated questions or complaints.  (Peterson Decl. ¶ 11.)

## II.   **Lombardo's Offer**

6.   Chmura hired Lombardo to be an Account Manager in February 2015.  (Deposition of Richard Lombardo 9:8-10 ("Lombardo Dep.," Exhibit 4).)

7.   Lombardo was the first salesperson that Chmura had ever hired.  (Deposition of Kyle West 18:2-16 ("West Dep.," Exhibit 5).)  Because Chmura was so small, and having a sales team was so new, Chmura very much had a "start-up" mentality, and had to make decisions about how to structure the sales team as it went.  (Peterson Dep. 53:13-54:4; Peterson 2d Dep. 88:16-24.)

8.   During the hiring process, Lombardo signed an offer letter (the "Offer Letter") that outlined his proposed commissions and compensation structure.  (Exhibit 6 (Offer Letter).)  The offer specifically noted, "[t]his letter should not be construed as an employment contract.  Please see the employment agreement attached." (*Id.* at 2.)[1]

9.   The Offer Letter stated that Lombardo would receive a 15% commission on each "initial sale," and 3% commission on each renewal.  (*Id.*)

10. The Offer Letter did not define "initial sale."  However, Chmura's corporate representative testified that an "initial sale" sufficient to earn a full 15% commission included (1) identifying the prospect; (2) performing (or at least organizing) one or more JobsEQ demos for that prospect; and (3) obtaining a signed license agreement.  (Peterson Dep. 58:7-16; Lombardo Dep. 62:15-23; *see also* Exhibit 7 (Commissions Email).)  Chmura provided this explanation to Lombardo in writing in March 2015, about a month after he started the job.  (Ex. 7.)

---

[1] The referenced "employment agreement" was Lombardo's Confidentiality, Non-Compete and Non-Solicitation Agreement, discussed more below.

11. When Lombardo began working for Chmura, he had never sold software before, and did not bring any clients with him.  (Lombardo Dep. 24:11-16.)  So, to help jump-start his sales business, Chmura provided Lombardo a number of "warm leads," which were prospects that previous Chmura employees had identified and, in some cases, provided with demos.  (Peterson Dep. 57:6-18, 63:1-2.)

12. For example, one of the "warm leads" Lombardo inherited had already received a draft subscription agreement from a prior Account Manager.  (Lombardo Dep. 54:6-55:10.)   All Lombardo had to do to close that deal was get the signed contract back from the customer, who had already agreed to purchase the subscription.  (*Id.* 55:3-10.)  Because of his minimal role, Lombardo did not receive a full 15% commission on that deal.  (*Id.* 55:7-15.)

13. Lombardo received a sub-15% on a few other early sales, for similar reasons.  (Lombardo Dep. 49:7-57:2, 59:19-62:5.)   Lombardo also sometimes split commissions with others when multiple Chmura employees worked together to close a sale.  (Peterson 2d Dep. 86:1-11, 91:5-92:9.)  Though Lombardo occasionally grumbled about these commissions, he ultimately accepted them and continued to work at Chmura.  (Lombardo Dep. 49:14-18, 56:11-15, 67:9-18.)

14. Sales of multi-year contracts also led to discord.  Lombardo believed that if a client signed a six-year JobsEQ subscription, he should receive his 15% commission times six.  (Lombardo Dep. 57:3-22.)  Chmura's practice, however, was to provide 15% commission on the first year of a multi-year deal and 3% on later years because of the minimal effort the additional years required. (Peterson Dep. 86:20-88:6.)  Lombardo did not share his interpretation with anyone, and accepted these commissions without complaint.  (Lombardo Dep. 53:19-24, 57:13-59:18, 67:9-18.)

### III.     Lombardo's Restrictive Covenant Agreement

15. As part of his on-boarding process, Lombardo also signed a Confidentiality, Non-

4

Competition, and Non-Solicitation Agreement.  (Exhibit 8 (the "Agreement").)

16. In that Agreement, Lombardo agreed that he would not "reveal or disclose to any person outside of the Company, or use for his[] own benefit or the benefit of any other person or entity, any confidential or proprietary information concerning the business or affairs of the Company, or concerning the Company's customers, clients or employees." (*Id.* at 1.)

17. Lombardo also agreed that "[u]pon the termination of [his] employment, for whatever reason, [he] will promptly deliver to the Company all documents, equipment, property or materials of any type . . . that belong to the Company, and/or that contain, in whole or in part, any Confidential or Proprietary Information[.]" (*Id.* at 2.)  He further promised that, upon his termination, he would "*immediately and without demand* return to the Company all tangible property in his[] possession belonging to the Company (including without limitation electronic equipment)[.]" (*Id.* at 4 (emphasis added).)  Lombardo understood that "immediately and without demand" meant "right away under any circumstance." (Lombardo Dep. 18:16-19:8.)

18. Finally, the Agreement provides that, in the event of any breach, Chmura "shall be entitled to all costs and expenses incurred as a result, including reasonable attorney's fees, in addition to any other remedies to which Company may be entitled." (Ex. 8 at 5.)

## IV.     Lombardo's Job Duties And Performance

19. When Lombardo started at Chmura, his primary duty was selling JobsEQ subscriptions. (Lombardo Dep. 23:8-12.)

20. After about five months, Lombardo began to consistently meet or exceed his sales quota. (Peterson Dep. 65:22-66:4.)  In 2016, his first full calendar year at Chmura, Lombardo's salary and commissions totaled $173,909, which then rose to $175,880 in 2017.  (Peterson Decl. ¶ 13.) Lombardo made $157,619 in 2018 and $150,930 in the first 10 months of 2019.  (*Id.*)

21. As Lombardo's sales grew, so did his other responsibilities.  (Peterson 2d Dep. 6:15-8:25.)

22. According to Lombardo's résumé, by the time he left Chmura, he:

- "Managed clients after making the sale";

- "Provided all Salesforce training and product software training for new hires";

- "Developed and instructed Salesforce and selling best practices for [the] company";

- "Managed and operated 8-10 industry trade shows and conferences per year"; and

- "Developed new marketing and sales processes to improve conference performance (including implementing new giveaways to generate more booth traffic)."

(Exhibit 9 at 2 (Lombardo Résumé).)

23. Lombardo testified that he also answered client questions after a sale had been made; provided guidance to clients on how to use and maximize various features of their software; fielded client complaints; addressed quality control issues; and provided troubleshooting advice. (Lombardo Dep. 86:11-87:16; Exhibits 10 (Sample Client Emails).)

24. In short, as confirmed by his former supervisors, Lombardo remained the primary point of contact for his clients long after the initial sale.  (Deposition of Eli Auerbach 31:6-13 ("Auerbach Dep.," Exhibit 11); Exhibit 12 (Reference Letter); Declaration of Greg Chmura ¶¶ 15-17 ("G. Chmura Decl.," Exhibit 13).)

25. In addition, Lombardo regularly provided recommendations about product features he thought were beneficial or necessary for Chmura to stay competitive in the market.  (Lombardo Dep. 130:16-131:16, 132:23-134:10, 136:14-137:22; Auerbach Dep. 49:18-22; Deposition of Ethan Trombley 30:14-31:5 ("Trombley Dep.," Exhibit 14); Deposition of John Chmura 96:23-97:20 ("J. Chmura Dep.," Exhibit 15); G. Chmura Decl. ¶¶ 9-13.)

26. Until 2019, Chmura "did not have product managers, so Austen [another Senior Account

Manager] and Rick were [Chmura's] product advisers, and so [Chmura] relied heavily on their insight into the clients' needs."  (Peterson 2d Dep. 8:1-25.)  Lombardo's managers expected him to act as the "voice of the customer," and advise the company on how JobsEQ should progress.  (Trombley Dep. 35:6-12; J. Chmura Dep. 103:5-104:25.; West Dep. 51:15-52:4, 57:4-14.)

27. For example, Lombardo recommended that Chmura add a "clippie" tool, which customers could use to electronically bind multiple data reports together.  (Lombardo Dep. 130:16-131:16.)  Lombardo told Chmura he "thought it would be a good idea to have a competitive product like that" (*Id*. 131:11-16), and recommended it to his manager in 2019 as one of his top priorities for Chmura's roadmap.  (Exhibit 16 (Email RE Roadmap).)

28. As another example, Lombardo advocated revamping "Career Concourse," a Chmura software product that helps college students view career data in their institution's geographic area.  Lombardo was emphatic that he would not be able to successfully sell to the education market unless Chmura improved or updated the Career Concourse product.  (Lombardo Dep. 136:14-137:10; J. Chmura Dep. 97:3-20; G. Chmura Decl. ¶ 10.)

29. Lombardo provided suggestions and advice about Chmura's "roadmap" on a near-weekly basis, of which these are just a few examples.  (Exhibit 17 (Roadmap Emails).)  Lombardo also tracked new features offered by Chmura's main competitor, EMSI, and shared those with Chmura's leadership to inform its product strategy.  (Exhibit 18 (EMSI Features Email).)  Chmura listened to Lombardo's recommendations, and ultimately adopted several features for which he advocated.  (J. Chmura Dep. 96:23-98:11; Trombley Dep. 30:14-31:5; G. Chmura Decl. ¶¶ 9-14.)

30. Lombardo also actively contributed to Chmura's company-wide marketing strategy.  For example, he provided feedback on, and content for, Chmura's promotional materials (Exhibit 19 (Marketing Email)) and on proposed benefits to attract certain categories of clients (Exhibit 20

(Proposed Benefits Email)).

31. In the same vein, Lombardo advised Chmura on which conferences were most valuable, and which he thought Chmura should attend.  (Lombardo Dep. 95:3-96:4; Peterson 2d Dep. 112:17-114:14; Exhibit 21 (Conferences Email); G. Chmura Decl. ¶ 8.)   If Chmura's budget allowed, Chmura generally permitted Lombardo to go to conferences he wanted to attend. (Peterson 2d Dep. 114:15-115:2.)

32. In addition, Lombardo developed his own methods for identifying and approaching clients. (Lombardo Dep. 25:16-27:7.)  No one told Lombardo which customers to approach, how or when to follow up, or which features to emphasize in his demos.  Rather, Lombardo determined on his own how JobsEQ could best help each individual client, and tailored his pitches based on each customer's individual needs.  (Lombardo Dep. 32:25-34:18.)  Lombardo also provided guidance and training on his methods to new Account Managers.  (Exhibit 22 (Guidance Emails).)

33. Lombardo could, and did, offer 10% discounts off Chmura's standard JobsEQ prices without seeking approval from his managers.  (Lombardo Dep. 128:11-25; Trombley Dep. 16:10-21, 39:8-17; Exhibit 23 (Discount Emails).)   When Lombardo did discuss discounts with his managers, he typically came prepared with a recommendation about the pricing he thought was necessary to close a deal.  (Lombardo Dep. 113:5-10; Auerbach Dep. 16:24-17:18.)

34. In 2018, Chmura increased Lombardo's discount authority to 30%.  (Lombardo Dep. 122:14-123:5; Auerbach Dep. 15:6-8; G. Chmura Decl. ¶ 5.)  Chmura allowed Lombardo more discount leeway than other Account Managers because it "trusted him not to go there immediately but to ratchet [the price] down until that was as low as he could go."  (Peterson Dep. 92:11-14.)

35. In some circumstances, Lombardo could even provide add-ons or sublicenses for 50% less than Chmura's normal price.  (Lombardo Dep. 110:13-23.)   In fact, it was Lombardo who

originally proposed Chmura's "sublicense model," which allowed affiliated entities to sublicense JobsEQ from a "parent" licensee for a lower overall price.  (Peterson 2d Dep. 92:11-14.)

36. When Lombardo wanted to provide a discount above his allotted authority, he typically collaborated with his managers on a proposed strategy before making an offer.  (Lombardo Dep. 111:3-6, 113:5-10; Trombley Dep. 18:17-19:16.)   In these circumstances, Lombardo recommended a pricing structure to Chmura's management and explained why Chmura should accept a particular client at Lombardo's proposed price.  (Peterson Dep. 125:24-126:4; Auerbach Dep. 17:15-18; G. Chmura Decl. ¶¶ 6-7.)

37. Chmura almost always followed Lombardo's pricing recommendations—in fact, Lombardo could recall only one instance in his four-and-a-half year tenure in which Chmura did not follow his recommendation on pricing.  (Lombardo Dep. 113:20-114:14; *see also* Trombley Dep. 21:21-22:9; West Dep. 54:25-55:3.)

## V. The Winter Of Lombardo's Discontent

38. In February 2019, Lombardo decided he was overdue for a raise.  (Lombardo Dep. 68:2-15; 69:22-70:2.)  To further his cause, Lombardo presented Chmura with a "doctored" offer letter from one of Chmura's potential business partners.  (*Id.* 68:21-69:3, 70:16-24.)  Lombardo forged the letter's date, purported start date, and compensation amount to show Chmura that "other people would like to employ [him]."  (*Id.* 70:7-72:15.)

39. Chmura's President, suspicious of the letter, reached out to GIS Webtech and confirmed that Lombardo had altered the offer letter.  (Peterson Dep. 83:5-17.)  Chmura then confronted Lombardo, who ultimately admitted that he had falsified the document.  (Lombardo Dep. 74:2-6.)

40. As a result of this incident, Peterson went to Cleveland to fire Lombardo.  (Peterson 2d Dep. 55:25-56:7.)  Peterson ultimately decided to give Lombardo another chance, but he had lost

Chmura's trust.  (Peterson Dep. 84:13-20; Peterson 2d Dep. 56:8-18.)  Chmura asked Lombardo to sign an amendment to his offer letter, which clarified that he would not receive merit increases and adjusted the timing of his commissions.  (Exhibit 24 (Amendment).)  Lombardo did not receive a merit increase, but did receive a cost-of-living increase.  (Peterson 2d Dep. 50:22-51:13.)

41. Later that year, Eli Auerbach, Chmura's new Sales Manager, determined that Chmura should reorganize its sales team to ensure that the team could continue to grow.  (Auerbach Dep. 69:14-19.)  Auerbach decided that Chmura should redistribute the Account Managers' territories, raise their base salaries, and lower their commissions.  (*Id*. 68:21-13.)  Lombardo was very upset about these proposals because they would redistribute the large number of renewals he had amassed, which would lower his compensation.  (Lombardo Dep. 182:13-24.)

42. Lombardo met with Auerbach about these proposed changes on October 3, 2019.  (Exhibit 25 (Auerbach Mtg Notes).)  Lombardo was angry about the new proposed structure, and snapped that Chmura's leadership must want to "get rid of" him.  (Lombardo Dep. 184:23-185:13.)  Auerbach and Lombardo then discussed whether Lombardo might leave voluntarily in exchange for a "buyout."  (*Id*. 185:14-186:16.)  Lombardo suggested that a $100,000 payment would be enough for him to willingly hand off his accounts.  (*Id*. 185:19-186:16.)

43. That same day, Lombardo texted one colleague, "if they don't pay me I will do everything I can to ruin this place[.]"  (Exhibit 26 (Sarah Manfroni Texts) at 4.)  He boasted, "I can f*** [Chmura] at any point… I will just call all my clients and tell them what they did and they should look at EMSI[.]"  (*Id.* at 5.)  Similarly, Lombardo texted another colleague that he was "getting f***ed January 1st so [he] need[ed] to start looking for a new job immediately[.]"  (Exhibit 27 (Kyle West Texts) at 1.)

44. Lombardo and Auerbach met again to revisit the proposed "buyout" on Thursday, October

17. (Ex. 25.)  During that conversation, Lombardo stated that if Chmura would not pay him $100,000 as part of a separation agreement, he was prepared to take several "steps" to disrupt Chmura's business.  (*Id.*)

45. First, Lombardo threatened to sue Chmura for taking away "his" book of business.  (*Id.*; Auerbach Dep. 111:25-112:21.)  Second, Lombardo implied that he would accept a position with EMSI, Chmura's main competitor.  (Lombardo Dep. 197:5-8.)  Lombardo warned that he had "many contacts" in the economic development industry, and that "somebody would want to hire [him] because [he had] so many contacts." (*Id*. 196:4-13.)  (Meanwhile, Lombardo was telling his co-workers that this competitor had already given him a job offer.  (Exhibit 28 (Allison Magee Texts) at 2.)

46. Third, Lombardo warned that he would take "his" clients with him to a competitor.  (Ex. 25.)  Lombardo warned Auerbach, "either Chmura is going to pay me for those relationships or someone else will."  (Lombardo Dep. 196:14-21; Auerbach Dep. 115:5-8.)

47. Auerbach conveyed this conversation to Chmura's leadership team (the "SEA Group," comprised of Chmura's six owners).  (Auerbach Dep. 123:3-18; Peterson Dep. 12:1-6 (defining SEA Group).)  SEA Group concluded that Lombardo intended "to sue the company, he was going to put us under, he was going to sell our lists to the highest bidder[.]"  (Deposition of Christine Chmura 93:6-12 ("C. Chmura Dep.," Exhibit 29).)

48. Fearful that he would execute his threats, Chmura immediately placed Lombardo on leave.  (Auerbach Dep. 120:19-121:3; C. Chmura Dep. 95:7-11, 97:16-98:6.)  Lombardo left the office, taking his Chmura computer with him.  (Lombardo Dep. 198:7-18.)

49. The following Monday, Chmura sent Lombardo a cease-and-desist letter reminding him of his obligations and warning him against the violations he had threatened.  (Exhibit 30 (C&D Ltr).)

50. The same day, Auerbach discussed the letter with Lombardo by phone.  (Auerbach Dep. 130:5-24; Exhibit 31 (10/21 Call Notes).)  Auerbach offered to return Lombardo's personal effects as soon as Lombardo returned Chmura's property, including its computer.  (Deposition of Eli Auerbach Day 2 19:5-11 ("Auerbach 2d Dep.," Exhibit 32); Lombardo Dep. 202:11-21.)

51. Chmura also offered Lombardo a $10,000 separation contract.  (Auerbach Dep. 127:10-12; C. Chmura Dep. 95:4-6; 97:19-22.)  By this point, Chmura had determined that its relationship with Lombardo was irreparable, but hoped that Lombardo would "do the right thing" and leave willingly.  (C. Chmura Dep. 97:23-98:6.)

**VI.     Lombardo Strikes Back**

52. Lombardo, by counsel, responded to Chmura's cease and desist letter on October 25, 2019. (Exhibit 33 (Response to C&D).)   In that letter, however, Lombardo failed to provide the information Chmura's letter had requested, and expressed no intent to do so.

53. Lombardo also failed to return Chmura's computer—his response letter did not even mention it.  (*Id.*)  Chmura was anxious to have the computer back because it contained the only copy of meeting summaries from two conferences Lombardo had recently attended.  (C. Chmura Dep. 18:14-19:19.)   The notes described numerous meetings with current and prospective customers that had occurred at the conferences, including the names of the individuals with whom Chmura had met and information about which prospects were interested in receiving demos. (Exhibit 34 (Conference Notes).)  Chmura expects Account Managers to follow up on notes like these within a few days of arriving home from a conference.  (Auerbach Dep. 48:16-49:4.)

54. The computer also contained a copy of a confidential "License Usage" spreadsheet, which identifies all of Chmura's clients, the contact information for all authorized JobsEQ users, and data about each client's subscription usage.  (Lombardo Dep. 209:11-211:14; Exhibit 35 (License

Usage Spreadsheet).)

55. Chmura takes significant steps to protect the confidentiality of its information. Specifically, Chmura:

- Requires employees to sign confidentiality agreements and return its property upon termination (*e.g.*, Ex. 8; Peterson Decl. ¶ 6);

- Uses password protection to limit access to sensitive information (Lombardo Dep. 149:20-150:11);

- Requires all employees to present a badge to gain access to its Cleveland office (Lombardo Dep. 148:3-6);

- Expects all employees to review and acknowledge its information security policy (Peterson Decl. ¶ 6); and

- Limits access to customer sales data to those with a business need to know.  (Peterson Decl. ¶ 6; *see also* J. Chmura Dep. 27:21-28:6 (noting that only the sales team has access to Salesforce).)

56. Lombardo did not accept Chmura's proposed separation agreement.  Therefore, based on the threats he had made (which only served to reinforce Chmura's concerns about his prior dishonest and disruptive conduct), SEA Group decided to terminate his employment effective October 31.  (Peterson 2d Dep. 141:19-23, 142:9-13; C. Chmura Dep. 92:23-93:12, 94:1-4.)

57. The same day, Chmura filed this lawsuit, seeking to enforce its Agreement with Lombardo. (ECF No. 1.)  Lombardo moved to dismiss, and Chmura filed its Amended Complaint on December 9, alleging breach of contract, conversion, and misappropriation of trade secrets.  (ECF No. 12.)  Still Lombardo refused to return Chmura's computer and confidential information.  (ECF No. 15-1 (noting that Lombardo's attorney still had the computer as of December 15, 2019).)

58. Lombardo finally returned Chmura's computer and confidential information on Christmas Eve.  (C. Chmura Dep. 40:3-7.)  Chmura immediately instructed its Account Managers to follow up on the leads identified in the conference notes, but it was too late.  (*Id*. 58:17-59:2.)  Historically,

Chmura closes deals with about 24% of prospective customers who receive demos.  (*Id*. Dep. 49:8-14.)  In this case, however, Chmura has been unable to make sales to any of the potential customers identified at the conferences.  (*Id*. 58:17-59:2.)  Chmura therefore seeks damages and attorneys' fees arising out of Lombardo's breach of his Agreement and wrongful retention of Chmura's property.  (Amended Complaint ("Am. Compl.," ECF No. 12).)

## LEGAL STANDARD

Summary judgment is appropriate where the record demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine issue of material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) (emphasis omitted).  However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to survive summary judgment. *Id*. at 252.  Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995).

## ARGUMENT

### I.    Chmura Is Entitled To Summary Judgment On Its Amended Complaint

Chmura's Amended Complaint alleges that Lombardo breached his Agreement with Chmura, converted Chmura's property, and misappropriated Chmura's trade secrets.  (Am. Compl. ¶¶ 44-48, 65-81.)  Though the legal elements vary, as set forth below, a common nucleus of undisputed facts warrants summary judgment in Chmura's favor on all three of these claims.  The terms of the Agreement also warrant summary judgment on Chmura's declaratory judgment claim.

### A.    There Is No Genuine Dispute That Lombardo Breached The Agreement

To prevail on its breach of contract claim, Chmura will show: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by breach of the obligation." *Filak v. George*, 267 Va. 612, 619 (2004).[2]  Chmura addresses each of these elements in turn.

### 1.    The Agreement Is Enforceable

First, the Agreement creates legally enforceable obligations.[3]  Most pertinently for this Motion, the Agreement prohibits Lombardo from sharing any "confidential or proprietary" information except as needed to do his job.  (Ex. 8 at 1.)  "Confidential and Proprietary Information" includes Chmura's "financial information or plans" and "salary, bonus or other personnel information[.]"  (*Id.*)  The Agreement specifically excludes from this definition (1) personnel information related only to Lombardo; and (2) information that has otherwise become public.  (*Id.* at 2.)  Finally, the Agreement states that on termination of Lombardo's employment, Lombardo "shall immediately and without demand return to the Company" (1) all Confidential and Proprietary information in Lombardo's possession; and (2) "all tangible property . . . belonging to the Company (including without limitation electronic equipment)[.]"  (*Id.* at 4.)

Virginia courts have routinely recognized the enforceability of similar confidentiality provisions.  *E.g.*, *GMS Indus. Supply, Inc. v. G&S Supply, Inc.*, 2020 WL 974419, at *8 (E.D. Va. Feb. 8, 2020) (upholding a confidentiality provision that protects "confidential and/or propriety information" and collecting cases supporting the same); *JTH Tax, Inc. v. Aime*, 2016 WL 8674623, at *2 (E.D. Va. July 1, 2016) (granting a temporary restraining order because the defendants "failed

---

[2] Because the Agreement contains a Virginia choice-of-law provision (Ex. 8 at 5), whether Lombardo breached it is a question of Virginia law.  *JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 697, 702 (E.D. Va. 2007) (noting that Virginia generally enforces choice-of-law provisions).

[3] For purposes of Count I, the provisions of primary importance are those governing the use and return of Chmura's confidential information.  (Ex. 8 at 1 and 4.)  As discussed further below, the Agreement's restrictive covenants are also enforceable.

to return Plaintiff's property, such as computers, records, and customers lists," in violation of contractual post-termination provision). Such decisions uniformly recognize an employer's strong and legitimate interests in protecting its confidential business information. *E.g.*, *Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 828-29 (E.D. Va. 2011) (observing an employer's interest in ensuring that confidential information related to a former employee's work did not end up in third party hands). Based on this precedent, the Agreement obligated Lombardo to maintain the secrecy of Chmura's confidential information and to return it to Chmura, "immediately and without demand," upon his separation.

### 2.     Lombardo Breached the Agreement

Lombardo cannot avoid his failure to meet these obligations. Lombardo does not dispute that the laptop he held hostage housed information about Chmura's customer contacts and their JobsEQ usage patterns, along with time-sensitive and confidential meeting notes that required immediate follow-up. (Exs. 34 & 35; Lombardo Dep. 187:24-190:12, 209:11-212:4.) All of this information is "Confidential and Proprietary Information" as defined in the Agreement—even Lombardo acknowledged that Chmura's customer contract information and license usage data is confidential. (Lombardo Dep. 211:25-212:4.) And, of course, the computer itself is tangible Chmura property. Lombardo's supervisor first asked Lombardo to return that property no later than October 21. Chmura reiterated this demand in its letter the same day. (Ex. 30.) Chmura again emphasized the need for Lombardo to return the computer in its Amended Complaint filed on December 9. (ECF No. 12.) But Lombardo did nothing to ensure the return of the computer (or the information on it) until late December, over two months after Chmura's initial demands. (C. Chmura Dep. 40:3-7; ECF No. 15-1 at 6.)

### 3.     Chmura Has Suffered Damages

Third, Lombardo's actions have caused Chmura substantial damage in attorneys' fees and

lost profits.[4]  Had Lombardo merely kept his contractual promises, this dispute could have been resolved months ago.  Instead, Lombardo refused to comply and refused to provide the information Chmura requested, forcing Chmura to file this lawsuit, and now to defend his counterclaims.  As noted above, the Agreement allows Chmura to recover any attorneys' fees caused by Lombardo's breaches.  *Cf. Connelly v. Blot*, 2017 WL 11501501, at *2 (E.D. Va. Oct. 18, 2017) (noting that an attorneys' fee provision creates a "substantive contractual right to certain damages and therefore constitutes an element of damages," which must be proven like any other damages).

Moreover, Lombardo's refusal to return the conference notes—which identified over 20 prospective customers who had requested JobsEQ demos—has cost Chmura business.  Chmura consistently closes sales with 24% of customers who receive demos.  The vast majority of those sales lead to four to five years of subscriptions.  But, as in any sales business, timely follow-up is critical.  Lombardo is well aware of this; he testified that he typically followed up with prospective clients "as quickly as possible" to close sales.  (Lombardo Dep. 32:8-15; *see also* Auerbach Dep. 48:16-49:4.)  In this case, Chmura's inability to perform that follow-up on Lombardo's leads for several weeks hobbled its ability to make sales to the interested customers he identified.  (C. Chmura Dep. 58:17-59:2.)  Chmura instructed its Account Managers to reach out to the identified prospects as soon as it received the notes from Lombardo, but it was already too late.  (*Id*. 58:17-59:2.)  Chmura made no sales based on these leads, well below its historical 24% average.  (*Id*. 58:21-59:2.)  These lost sales (which translate to a net present value of roughly $149,000) are therefore directly traceable to Lombardo's breaches.  *Cf. Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 400 (2012) (noting that lost profits are recoverable in breach of

---

[4] Chmura is seeking summary judgment only on Lombardo's liability, and intends to reserve the issue of a specific damages award for trial.

contract actions, and "calculation of lost profits based on the track record of profits in established companies has long been an accepted method of estimating damages awards"). These damages are sufficient to prove Lombardo's liability as a matter of law.

**B.      Chmura Is Entitled To A Declaratory Judgment That The Agreement Is Enforceable**

The Agreement's other key provisions likewise create enforceable obligations. In Virginia, a non-competition or non-solicitation agreement "will be enforced if the contract is narrowly drawn to protect the employer's legitimate business interest, is not unduly burdensome on the employee's ability to earn a living, and is not against public policy." *Omniplex World Servs. Corp. v. U.S. Investigations Servs. Inc.*, 270 Va. 246, 249 (2005). The Supreme Court of Virginia has consistently enforced provisions that prohibit "a former employee who had frequent direct customer contact . . . from contacting the employer's customers" and has "consistently upheld restrictions on trade that protect the employer from direct competition by former employees." *Daston Corp. v. MiCore Sols., Inc.*, 80 Va. Cir. 611 (2010) (internal citations omitted).

The Agreement's two-year non-competition provision (Ex. 8 at 3) falls within these boundaries because it "does not prevent [Lombardo] from providing services to competitor companies provided those services fall outside the scope of [his] former role" at Chmura. *Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 791 (E.D. Va. 2018); *see also Roanoake Eng'g Sales Co. v. Rosenbaum*, 223 Va. 548, 552 (1982) (finding a period of three years and a geographic limit defined by the "territory covered by [employer]" to be reasonable). Likewise, a non-solicitation provision that prevents Lombardo from pursuing customers that he served or solicited at Chmura, for purposes of selling products or services similar to JobsEQ, is reasonable under Virginia law. *Cf. Brainware, Inc.*, 808 F. Supp. 2d at 828 (upholding a non-solicitation provision that "limits the restriction on solicitation only to those clients who were contacted, solicited, or served" by the

employee).   Accordingly, and for the reasons set forth above, Chmura is entitled to a declaratory judgment on Count II of the Amended Complaint.

### C.   Lombardo Undisputedly Converted Chmura's Property

The same facts that prove Lombardo's breach of the Agreement also prove Chmura's conversion claim:  Lombardo does not dispute that the laptop in his possession was Chmura's; he had no right to keep it after his termination; yet, he did so for weeks, to Chmura's detriment.  Under Virginia law, these facts are dispositive.

Virginia courts employ an "expansive definition" of conversion, which encompasses "*any act of dominion* wrongfully exerted over property in denial of, or inconsistent with, the owner's rights[.]"  *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 455 (E.D. Va. 2009) (quoting *Simmons v. Miller*, 261 Va. 561, 582 (2001).)  Any such act "may be treated as a conversion and it is not necessary that the wrongdoer apply the property to his own use." *Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67, 76 (1956).  Thus, where there is no dispute that (1) the property in question belonged to the plaintiff; and (2) the defendant exerted control over it without permission, judgment in the plaintiff's favor is warranted.  *E.g.*, *Ez-XBRL Sols., Inc. v. Chapke*, 2018 WL 5808724, at *7 (E.D. Va. Sept. 25, 2018) (granting default judgment on conversion claim against former employee who took the plaintiff's software and "instructed or allowed [other] former employees to keep Plaintiff-provided laptops"); *Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 837 F. Supp. 2d 581, 586 (E.D. Va. 2011) (finding summary judgment appropriate on conversion claim where the plaintiff undisputedly owned the vehicle in question and the defendant transferred title to itself).

These basic principles mandate judgment in Chmura's favor.  There is no dispute that the laptop Lombardo retained belonged to Chmura.  And, Lombardo expressly promised to return all of Chmura's tangible property, including electronic equipment, upon his termination "immediately

and without demand." (Ex. 8 at 4.) Chmura asked Lombardo to comply with that promise both verbally and in writing. (Exs. 30 & 31.) Lombardo knew that Chmura wanted its laptop back, but even after Chmura's cease-and-desist letter, a lawsuit, and an Amended Complaint seeking the return of its property, he still did nothing. (Lombardo Dep. 201:14-18; ECF Nos. 1, 12.) In fact, Lombardo filed a declaration noting that his attorney still had Chmura's laptop in mid-December. (ECF No. 15-1.) Yet, neither he nor his attorney returned the computer until Christmas, over two months after the original request. (C. Chmura Dep. 40:3-7.)

Under these circumstances, Lombardo is liable for conversion as a matter of law. *Cf. Int'l Union, Sec., Police & Fire Prof'ls of Am., Inc. v. Bogues*, 2013 WL 3093920, at *7 (D. Md. June 14, 2013) (granting summary judgment for former employer on conversion claim where former employees refused to return phones, laptops, and business records for weeks after they were no longer employees). Therefore, summary judgment is appropriate on Count II.

### D.  Lombardo Misappropriated Chmura's Trade Secrets

Chmura likewise is entitled to summary judgment on its claim for trade secret misappropriation under the Defend Trade Secrets Act ("DTSA"). To prevail on this claim, Chmura must establish (1) its ownership of a "trade secret"; and (2) the "misappropriation" of that trade secret by Lombardo. 18 U.S.C. § 1836; *Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 854 (E.D. Va. 2018). Chmura satisfies both elements.

#### 1.  The Documents On The Chmura Computer That Lombardo Took Were Trade Secrets

First, Lombardo cannot dispute that the documents on Chmura's laptop were trade secrets. Under the DTSA, a "trade secret" is any "financial, business, scientific, technical, economic, or engineering information," provided that (1) "the owner thereof has taken reasonable measures to keep such information secret;" and (2) "the information derives independent economic value,

actual or potential," from its secrecy.  18 U.S.C. § 1839(3).  "The case law is clear that just about anything can constitute a trade secret under the right set of facts" as long as it meets these two elements.  *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004).[5] Courts consistently have held that customer lists, price and cost reports, and data regarding current and prospective customers are trade secrets.  *E.g., id.*, at 424-25 (ruling that a list of current and prospective customers was a trade secret); *Spirax Sarco, Inc. v. SSI Eng'g, Inc.*, 122 F. Supp. 3d 408, 426 (E.D.N.C. 2015) (ruling that a customer list, "old and new product prices," and other information related to product requests were trade secrets); *Telogis, Inc. v. InSight Mobile Data, Inc.*, 2014 WL 7336678, at *3 (D. Md. Dec. 19, 2014) (finding that "customer lists, client contact information, contract terms, and pricing information" qualify as trade secrets).

The Chmura computer Lombardo took after the end of his employment contained just this kind of highly valuable information.  Specifically, it contained notes from two conferences that Lombardo had recently attended, which identified prospective customers who had requested JobsEQ demonstrations and described their software needs.  (Ex. 34.)  He deprived Chmura of this information, and Chmura lost sales as a result.  (C. Chmura Dep. 19:13-21:3.)  A competitor with access to those notes would know not only which prospective customers Chmura had identified, but to whom specifically Chmura had spoken, who the "decision-makers" were, what their specific labor data needs were, and details of their budgetary constraints.  (Ex. 34.)

The computer also contained a list of authorized users for Chmura's software, including detailed information on customers' usage of the software.  Lombardo admitted that he used this list to identify customers' main users and to make sure that he was "reaching out to the appropriate

---

[5] The DTSA's standards are essentially identical to those under the Virginia Uniform Trade Secrets Act (the "VUTSA").  Accordingly, cases applying the VUTSA are also instructive.

people." (Lombardo Dep. 200:17-202:12.)  Lombardo considered this document both valuable and confidential.  (*Id.*)  As such, he cannot dispute that it would be valuable in the hands of a competitor.

Lombardo similarly cannot dispute that Chmura took reasonable steps to maintain the secrecy of its information.  In addition to requiring Lombardo and other employees to sign confidentiality and return-of-property agreements, Chmura uses password protection to limit access to sensitive information, requires all employees to present valid identification to physically access its offices, asks all employees to review and acknowledge its information security policy, and provides access to customer sales data on a need-to-know basis only.  (Peterson Decl. ¶ 6.) Chmura's efforts are more than sufficient as a matter of law to maintain trade secret protection. *E.g., MicroStrategy, Inc.*, 331 F. Supp. 2d at 416 ("Only reasonable efforts must be taken to maintain secrecy. Restricting access to information, implementing confidentiality agreements, and providing physical barriers to access are all reasonable efforts.").  Thus, the undisputed facts establish the first element of Chmura's DTSA claim:  its ownership of "trade secrets."

### 2. Lombardo Misappropriated Chmura's Trade Secrets

The undisputed facts also establish the second element of Chmura's DTSA claim: Lombardo's misappropriation.  Misappropriation includes acquisition of a trade secret through "improper means," which, in turn, include theft or breach of a duty to maintain secrecy.  18 U.S.C. §§ 1839(5); (6).  That is precisely what happened here.

As discussed above, Lombardo was contractually required to "promptly deliver to the Company all documents, equipment, property or materials of any type, including any copies thereof, in [his] possession custody or control that belong to the Company, and/or that contain, in whole or in part, any Confidential or Proprietary Information."  (Ex. 8 at 2.)  Lombardo breached this duty when, despite Chmura's repeated requests, he took and refused to return Chmura's

computer.  Moreover, Lombardo did not simply take copies of documents Chmura could access elsewhere—he took the only existing copy of Chmura's conference notes, which prevented Chmura from capitalizing on those notes until it was too late.  (C. Chmura Dep. 19:13-21:3.)  These actions constitute unlawful misappropriation as a matter of law.  *OROS, Inc. v. Dajani*, 2019 WL 2361047, at *5 (E.D. Va. June 4, 2019) (finding misappropriation where, despite his termination and the plaintiff's requests, the defendant refused to return the plaintiff's trade secrets); *Apollo Enter. Imaging Corp. v. Conyers*, 2020 WL 1896706, at *4 (E.D. Va. Jan. 10, 2020) (finding that the defendant "acquired [the trade secrets] through improper means, namely breach of his duty to identify them, return them to [the plaintiff], and maintain their secrecy"); *see also JetSmarter Inc. v. Benson*, 2018 WL 2694598, at *5 (S.D. Fla. Apr. 6, 2018) (finding misappropriation where "by retaining the Customer List following his termination, Defendant ignored his obligations under the Award Agreement and, therefore, knowingly misappropriated the list by improper means.").[6]

Lombardo's actions are all the more egregious in light of his simultaneous threats to destroy Chmura's business.  Specifically, Lombardo threatened to accept a position with one of Chmura's competitors, with whom he already had discussed potential employment.  (Lombardo Dep. 196:4-21, 197:5-8; Ex. 25.)  He also threatened to contact all of Chmura's customers and encourage them to take their business elsewhere.  (Ex. 25.)  As he warned Auerbach, "either Chmura is going to pay me for those relationships, or someone else will."  (Auerbach Dep. 115:5-8; Lombardo Dep. 196:14-21.)  He repeated these threats to co-workers, warning that he would "ruin" Chmura if events did not unfold to his satisfaction.  (Lombardo Dep. 230:15-18; Ex. 26 at 4.)  These circumstances—which Lombardo does not, and cannot, dispute— further confirm the

---

[6] Even assuming Lombardo at one time had rightful control over Chmura's laptop, his refusal to the trade secrets it contained after his termination constitutes acquisition through improper means. *OROS, Inc.*, 2019 WL 2361047, at *5.

impropriety of his acquisition of Chmura's trade secrets.  *Cf.* Restatement (Third) of Unfair Competition § 43, cmt. c (Am. Law Inst. 1995) (noting that the "propriety of the acquisition [of a trade secret] must be evaluated in light of all the circumstances of the case").

Consequently, Chmura is entitled to judgment as a matter of law on its DTSA claim.

## II.  Chmura Is Entitled To Summary Judgment On Lombardo's Counterclaims

Lombardo's Counterclaim seeks damages from Chmura for (1) failing to pay him overtime, in violation of the FLSA and the Ohio Minimum Fair Wage Standards Act (Counts One and Five);[7] (2) retaliation, in violation of the FLSA (Count Two); (3) breach of contract (Count Three); and (4) violation of the Ohio Prompt Pay Act (Count Four).  For the reasons that follow, Lombardo has not presented a triable issue of fact on any of these claims.  Chmura addresses each in turn.

### A.    Lombardo Is A Highly Compensated Employee Who Is Not Entitled To Overtime

Lombardo's claims for overtime compensation must fail because he is exempt from overtime requirements under the FLSA.  That statute was designed to "aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1945).  To further those objectives, the FLSA provides that employees who work more than 40 hours in a seven-day workweek generally must receive overtime premiums.  29 U.S.C. § 207.  This rule, however, has numerous exemptions.  As applicable here, an employee is exempt from the FLSA's overtime rule as a "highly compensated employee" if (1) he earns at least $100,000 per year in total compensation, which

---

[7] The analysis of Lombardo's FLSA claims also mandates summary judgment on his claims under the Ohio Minimum Fair Wage Standards Act.  *Cf. McCrimon v. Inner City Nursing Home, Inc.*, 2011 WL 4632865, at *4 (N.D. Ohio Sept. 30, 2011) (noting that the overtime standards are the same under Ohio law and the FLSA).  Therefore, Chmura addresses these two claims together.

must include at least $455 per week ($23,660 per year) guaranteed salary; (2) he "customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee," and (3) his "primary duty includes performing office or non-manual work." 29 C.F.R. § 541.601. The FLSA's regulations emphasize that a "high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." 29 C.F.R. § 541.601(c). In other words, the "level of compensation is the principal consideration." *Smith v. Ochsner Health Sys.*, 956 F.3d 681, 688 (5th Cir. 2020) (affirming summary judgment in an employer's favor based on application of the highly compensated exemption).

Here, there is no dispute that Lombardo far exceeded the exemption's monetary threshold. He received an annual $50,000 salary each year in question[8] and an additional $100,000 or more in commissions. (Peterson Decl. ¶ 13; Ex. 6.) Nor is there any dispute that Lombardo's primary duties did not involve manual labor. Thus, only remaining issue for resolution is whether he performed at least one exempt function on a "regular" basis. Importantly, the exempt function need not be Lombardo's primary duty; Chmura need only show that he performed at least one exempt function "regularly." DOL Opinion Letter FLSA 2019-8 (July 1, 2019). Such functions include (1) "the performance of work directly related to … the business operations of the employer or the employer's customers," 29 C.F.R. § 541.201, and (2) "the exercise of discretion and independent judgment with respect to matters of significance[,]" 29 C.F.R. § 541.202. Lombardo satisfies each of these independent criteria, particularly given the relaxed standard that his

---

[8] The statute of limitations for FLSA violations is typically two years, meaning a prevailing employee can recover two years' unpaid wages. 29 U.S.C. § 255(a). "Willful" violations can add a third year. *E.g.*, *Desmond*, 630 F.3d at 359. As discussed further below, Lombardo has presented no evidence of a willful violation. But, even if he had, his compensation exceeded $100,000 for the past three years.

compensation level warrants.

### 1.   Lombardo Performed Work Directly Related To Chmura's Management and Operations

First, Lombardo's duties extended well beyond making sales, and were "directly related to management or general business operations" of Chmura and its customers. The applicable regulation provides that "[w]ork directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management . . . and similar activities." 29 C.F.R. § 541.201(b). These categories encompass tasks such as "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 69 FR 22122-01, 2004 WL 865626, at *22138. Although traditional "off the rack" retail sales roles typically do not meet this requirement,[9] sales positions that involve product research and development, ongoing customer service, and/or generalized marketing activities do. *Cf. id.* at 22146 (noting that "many financial services employees qualify as exempt administrative[10] employees, even if they are involved in some selling to consumers" because "[s]ervicing existing

---

[9] The regulation attempts to distinguish "work directly related to assisting with the running or servicing of the business," which is exempt, from "for example, …working on a manufacturing production line or selling a product in a retail or service establishment[,]" which is not. 29 C.F.R. § 541.201(a). Though this distinction might seem to imply that sales employees are never exempt, the DOL has emphasized that it did not intend to exclude all sales and promotional roles from the administrative exemption. 69 FR at *22140. Rather, the DOL advised the regulation's comparison should be used "as a tool toward answering the ultimate question, whether work is 'directly related to management policies or general business operations,' not as an end in itself." *Id.* at *22141.

[10] The two exempt characteristics at issue—Lombardo's independent judgment and his work "directly related" to Chmura's general operations—both find their origin in the FLSA's "administrative" exemption. *See generally* 29 C.F.R. §§ 541.200 *et seq.* Because highly compensated employees rarely litigate overtime, most of the cases cited here address the application of the administrative exemption. Thus, it is important to bear in mind that the logic in these cases applies with even greater force to Lombardo, given the relaxed standard that governs highly compensated employees.

customers, promoting the employer's financial products, and advising customers on the appropriate financial product to fit their financial needs are duties directly related to the management or general business operations of their employer or their employer's customers"). For example, courts have applied this exemption to employees who, in addition to making sales:

- "developed advertising and marketing plans[ and] managed customer complaints," *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 633 (7th Cir. 2010);

- "spent the majority of their time servicing existing customers," *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 627 (11th Cir. 2004);

- "worked to establish long-term relationships, to keep clients happy and to maintain the overall reputation of their employers," *Hines v. State Room, Inc.*, 665 F.3d 235, 243 (1st Cir. 2011);

- "made suggestions to clients regarding how they could improve their efficiency" and "served as the primary contact for several clients," *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 539 (7th Cir. 1999), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013); or

- were required to "analyze the competitive landscape for [the company's] products in [the employee's] assigned states and make recommendations regarding whether and how [the employer] should respond to trends in those markets," *DiBlasi v. Liberty Mut. Grp., Inc.*, 2014 WL 1331056, at *8 (D. Mass. Apr. 3, 2014).

The Fourth Circuit has embraced this broad view of sale-adjacent activities that are "directly related" to an employer's "general business operations." Most pertinently, it found that a senior sales employee satisfied the "directly related to business operations" requirement where:

the company empowered Darveau [the employee] to approach current and potential clients, discern the possible range of their wireless telecommunications needs[,] . . . integrate this technical information with a pricing structure he was provided and construct a formal proposal that he would polish and present to the potential client. If the client expressed interest, Darveau would work with other members of [the company's] management team to negotiate some of the terms of the contract and conclude the sale. . . . [Darveau also] presented sales status reports that recommended strategies to develop additional business in the telecommunications market, identifying major accounts and proposing specific steps for advancing [the company's] share in those industry segments.

*Darveau v. Detecon, Inc.*, 515 F.3d 334, 339 (4th Cir. 2008).

Lombardo's role, like those of the exempt sales representatives in these cases, extends far beyond merely exchanging products for money.  For one thing, Lombardo cannot dispute that he helped to shape Chmura's product strategy through his contributions to the roadmap.  (*E.g.*, Exs. 16 & 17; Lombardo Dep. 130:16-133:19, 136:14-137:11; J. Chmura Dep. 96:23-97:1; Peterson 2d Dep. 8:1-7.)  Chmura did not have a product development team until 2019, so relied on its Account Managers to be "product advisers," representing the "voice of the customer" and recommending features that Chmura should add or update to outpace its competition.  (Trombley Dep. 35:6-12; Peterson Dep. 8:1-25; J. Chmura Dep. 96:23-97:6; 103:5-13.)  Lombardo also served as a sounding board for marketing materials and other company-wide sales initiatives.  (West Dep. 57:4-14, 61:2-22; Exs. 19 & 20.)  These activities are textbook examples of "promoting sales generally," rather than advancing any particular sale.  *E.g.*, *Siji Yu v. Knighted LLC*, 2019 WL 2085990, at *8 (S.D.N.Y. May 13, 2019) (finding that providing recommendations to improve the efficiency of an employer's software product was an exempt function as a matter of law).

For another, Lombardo's own words prove that he managed every aspect of Chmura's client relationships from beginning to end:  from representing Chmura at conferences (Lombardo Dep. 94:22-96:4); to identifying prospective clients (*id.* 25:16-26:3); to creating tailored demos based on each client's individual needs (*id.* 32:25-34:18); to closing deals (*id.* 32:8-15); to answering client questions and coordinating responses from others when he could not answer them himself (*id.* 87:3-16, 24:3-10); to ensuring that Chmura maximized client retention.  (*Id.* 86:11-18; Ex. 9.)  In other words, Lombardo "focused on more than simple individual sales transactions[;]" rather, he "worked to establish long-term relationships, to keep clients happy and to maintain the overall reputation of [his] employer[.]"  *Hines*, 665 F.3d at 242-43.  The maintenance of those long-term customer relationships links directly to the core of Chmura's business:  maximizing the

28

Case 3:19-cv-00813-REP   Document 35   Filed 05/15/20   Page 36 of 48 PageID# 339

value of its labor data. *E.g.*, *Hogan*, 361 F.3d at 627 (finding that "servicing existing customers" through activities such as "promoting sales, advising customers, [and] adapting policies to customer's [sic] needs" was an administrative function).

As Judge Posner aptly explained, an "account manager is not a salesman for Best Buy or a technician sitting at a phone bank fielding random calls from her employer's customers—instead she's on the customer's speed dial during the testing and operation of the customer's [Chmura] software." *Verkuilen v. MediaBank, LLC*, 646 F.3d 979, 982 (7th Cir. 2011); *see also Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1066 (D. Minn. 2011) (finding that the plaintiffs' duties were directly related to their employer's general business operations where they "advise[d] clients about how to configure and modify Lawson software to run their business"). The Seventh Circuit found the plaintiff exempt as a matter of law because the job involved "answering questions when she can and when she can't taking them back to [the employer's] software developers, and then explaining their answers to the customer and showing the customer how to implement the answers in its [company] software." *Verkuilen*, 646 F.3d at 982.

So too here: Lombardo's own résumé touts that he "managed clients after making the sale." (Ex. 9 at 2.) That function, and all it entails, relates directly to the core of Chmura's business. Lombardo cannot run from his own words to avoid summary judgment. In short, he is the "picture perfect example of a worker for whom the Act's overtime provision is not intended." *Id.* at 981. Summary judgment on his overtime claims is therefore appropriate.

## 2.  Lombardo Exercised Discretion On Matters Of Significance

Lombardo's discretion also provides a second, independent reason to deny his overtime claims. In assessing whether an employee exercises "discretion and independent judgment" under the FLSA, factors for consideration include:

whether the employee carries out major assignments in conducting the operations

> of the business . . . whether the employee has authority to commit the employer in
> matters that have significant financial impact; whether the employee has authority
> to waive or deviate from established policies and procedures without prior approval
> . . . whether the employee provides consultation or expert advice to management;
> [and] whether the employee is involved in planning long- or short-term business
> objectives.

29 C.F.R. § 541.202(b).

Other factors that courts have found relevant to an employee's discretion include "troubleshooting or problem-solving activities on behalf of management, use of personalized communication techniques . . . responsibility for assessing customer needs, primary contact to public or customers on behalf of the employer, [and] the duty to anticipate competitive products or services and distinguish them from competitors' products or services[.]"  69 FR at *22144. Importantly, the regulation goes on to clarify that:

> [T]he term "discretion and independent judgment" does not require that the
> decisions made by an employee have a finality that goes with unlimited authority
> and a complete absence of review.  The decisions made as a result of the exercise
> of discretion and independent judgment may consist of recommendations for action
> rather than the actual taking of action.  The fact that an employee's decision may
> be subject to review and that upon occasion the decisions are revised or reversed
> after review does not mean that the employee is not exercising discretion and
> independent judgment.

29 C.F.R. § 541.202(c).

Courts applying this rule frequently find that an employee's authority to offer discounts on an employer's products or services qualifies as "independent judgment" on "matters of significance" under this regulation.  *E.g.*, *Howell v. Ferguson Enters.*, 93 F. App'x 12, 14–15 (5th Cir. 2004) (a salesman's exempt duties "included . . . managing and promoting sales to Gilbert [a major customer], and offering Gilbert discretionary discounts on Ferguson products"); *Cue-Lipin v. Callanwolde Found., Inc.*, 1 F. Supp. 3d 1359, 1362 (N.D. Ga. 2014) (finding that the plaintiff's "authority to offer some discounts to customers who paid upfront" weighed in favor of exemption).

30

A salesperson's authority to locate his own target markets and customers, and tailor sales methods to those markets and customers, also implicates exempt discretion. *E.g.*, *Schaefer-LaRose v. Eli Lilly & Co.*, 663 F. Supp. 2d 674, 689-90 (S.D. Ind. 2009), *aff'd*, 679 F.3d 560 (7th Cir. 2012).

Lombardo handily clears this bar. As discussed above, he had the authority to offer up to 30% less than Chmura's standard price to close deals, and could offer up to 50% off on certain arrangements. (Lombardo Dep. 110:13-23, 123:2-5, 126:6-23, 128:11-25.) Lombardo admitted that he had this authority and exercised it on at least some occasions without seeking approval. (*Id.*) When he consulted with management regarding proposed offers, he made recommendations with which Chmura's leadership almost never disagreed. (Lombardo Dep. 113:6-114:14; Auerbach Dep. 17:15-25.) Further, Lombardo exercised independent judgment in approaching clients, using "personalized communication techniques" to market JobsEQ to address clients' individual needs, "assessing customer needs" both before and after an initial sale, and coordinating responses to client questions. 69 FR at *22144; *see also Schaefer-LaRose*, 679 F.3d at 581. Lombardo also shaped Chmura's long-term business objectives and exercised discretion in recommending product features and obtaining research about upcoming competitive developments. *E.g.*, *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 13 (1st Cir. 1997) (finding that marketing representatives exercised discretion when they "anticipate[d] the competing products that the agent's customers might be considering, and distinguished John Alden's offerings from those of competitors").

Any one of these aspects of Lombardo's position is sufficient to carry him over the low threshold of the highly compensated exemption. No reasonable jury could find otherwise. Therefore, Chmura is entitled to summary judgment on Lombardo's overtime claims.

### 3.    Any FLSA Violation Was Not Willful

Even if the Court finds that Lombardo's substantial discretion and authority do not render

him exempt from the FLSA's overtime requirements, the Court must limit his recovery to two years because any violation of the FLSA was not willful. "FLSA provides two potential limitations periods. For non-willful FLSA violations, a two-year statute of limitations applies. When the violation is willful, a three-year statute of limitations applies." *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 357 (4th Cir. 2011) (internal citations omitted).

The plaintiff bears the burden of proving that an alleged violation of the FLSA was willful. *Id.* at 358. To establish willfulness, an employee must show that his employer either knew or showed reckless disregard for whether its conduct violated the FLSA. *Semenovich v. Project Performance Co.*, 2016 WL 1076926, at *6 (E.D. Va. Mar. 18, 2016) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132 (1988)). An employer who "acted without a reasonable basis for believing that it was complying with the [FLSA]" is merely negligent, not willful. *McLaughlin*, 486 U.S. at 134-35. A willful violation generally requires evidence that an employer "ignored specific warnings that they were out of compliance, destroyed or withheld records to block investigations into their employment practices, or split employees' hours between two companies' books to conceal their overtime work." *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 617 (E.D. Va. 2014) (collecting cases).

Lombardo has no such evidence. It is undisputed that Chmura treated its Account Managers as exempt simply because it viewed them no differently than other highly sophisticated members of its team. (C. Chmura Dep. 66:7-15.) In essence, Chmura believed that Account Managers should not receive overtime because they were educated, highly trained, and played an important role in the company. (*Id.* 66:16-67:7.) Chmura did not rely on any legal advice or other outside information in making this decision; it simply treated all employees the same. (*Id.* 68:13-69:1.) Before this lawsuit, no Chmura employee had ever complained to leadership about his or

32

her wages, and Chmura had never been investigated for any FLSA violations.[11]  In fact, Chmura did not pay overtime compensation to any employees during Lombardo's tenure—the only people who received any overtime pay were interns.  (*Id.* 69:25-70:8.)

In short, although Chmura was aware of the concept of overtime, the thought that that concept might apply to Lombardo was not even on Chmura's radar.  Those circumstances are insufficient to survive summary judgment.  *E.g.*, *Pappas v. Sol. Start, Corp.*, 2018 WL 3595001, at *3 (W.D.N.C. July 26, 2018) (finding insufficient evidence of willfulness because the defendant paid all employees a salary and believed they were all exempt as highly trained computer professionals); *Prusin v. Canton's Pearls, LLC*, 2017 WL 4347867, at *3 (D. Md. Sept. 29, 2017) (granting summary judgment on willfulness where the defendants "had a limited understanding" of their FLSA obligations "but believed they were in compliance with those laws").  Given how much money Lombardo made, and how much influence he exercised within the company, Chmura's decision not to pay him overtime was not unreasonable, much less willful.  *Cf. Verne v. Queen City Roofing & Contracting. Co.*, 2018 WL 6537138, at *10 (W.D. Mo. Dec. 12, 2019) (noting that "a close question of law or fact" on exemption "precludes a finding here that [the employer] willfully violated the FLSA").  Therefore, to the extent Lombardo's overtime claims survive summary judgment, they cannot look back more than two years.

### B.   No Evidence Supports Lombardo's Retaliation Claim

For his retaliation claim to survive summary judgment, Lombardo must offer proof that (1)

---

[11] The only other time anyone ever broached the subject of overtime with Chmura was in 2017, when Chmura received a request for overtime from a staffing agency whose employee had worked at Chmura less than three weeks.  (Peterson 2d Dep. 40:24-42:1.)  Chmura spoke with the agency, determined that the agency had made a mistake, did not pay the overtime, and ended the engagement.  (*Id.*)  Because that individual was not even a Chmura employee, it never crossed anyone's mind that her request should impact Account Managers' compensation, much less that it should change how Chmura paid a senior employee like Lombardo.  (*Id.* 42:5-8.)

he engaged in protected activity; (2) he suffered adverse employment action at or after the protected activity occurred; and (3) a "causal connection" exists between the protected activity and the adverse action. *Darveau*, 515 F.3d at 340. Under the familiar *McDonnell-Douglas* burden-shifting framework, if the Court finds that Lombardo has met these elements, Chmura must then articulate legitimate, non-retaliatory reasons for his termination. *E.g.*, *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 458 (4th Cir. 2002). The burden then shifts back to Lombardo to prove Chmura's proffered rationale was merely a pretext for unlawful retaliation.[12] *Id.* Because Lombardo cannot support two of the three elements of his *prima facie* case, his retaliation claim cannot proceed.

### 1.   Lombardo Did Not Engage In Protected Activity

Under the FLSA, an internal verbal complaint may constitute protected activity. *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 439 (4th Cir. 2012). Importantly, however, "'some degree of formality' is required for an employee complaint to constitute protected activity, 'certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand that matter as part of its business concerns.'" *Id.* (quoting *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011).) Therefore, this Court has held that a "mere request for overtime pay without more details or reasoning as to why the employee is entitled to overtime compensation is not protected activity." *Sanchez v. Caregivers Staffing Servs., Inc.*, 2017 WL 380912, at *3 (E.D. Va. Jan. 26, 2017); *see also Romero v. Granite Ctr., LLC*, 2017 WL 2642971, at *3 (E.D. Va. June 19, 2017) (finding no protected activity under the FLSA where the plaintiff "complained on several occasions [] that he was not paid for all of the hours he worked, but he failed to complain that a specific statute was violated").

---

[12] As a practical matter, this framework often becomes redundant:   Lombardo cannot show that protected activity caused his termination largely because Chmura fired him for other, legitimate reasons.   Therefore, Chmura addresses Lombardo's failure to prove causation and its legitimate reasons for terminating Lombardo simultaneously.

Lombardo's vague allusions to overtime do not meet this standard. Lombardo testified that, sometime in 2019, he announced to Auerbach that he was "due overtime[.]" (Lombardo Dep. 173:17-21.) But Lombardo could offer no details about exactly what he said; what Auerbach said in response; what caused him to raise the issue; whether he said why he believed he was owed overtime; or even whether he said *anything* to Auerbach other than "I'm due overtime." (*Id*. 173:17-176:5.) Auerbach vaguely recalled that Lombardo had mentioned this issue "in passing," but "quickly forgot about it" and did not tell anyone. (Auerbach 2d Dep. 21:3-17.) Lombardo also claims that he alluded to overtime during one of his conversations with Auerbach in October, but he has offered no details about that discussion, and Auerbach neither remembered it nor reported it. (Lombardo Dep. 176:21-177:3; Auerbach 2d Dep. 21:12-22:4.)

This passing reference to overtime, the details of which neither participant can even remember and which never made its way to any Chmura decisionmaker or HR representative, is insufficient to alert Chmura that Lombardo was alleging an FLSA violation. *Cf. Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 626 (5th Cir. 2008) (noting that not all "abstract grumblings or vague expressions of discontent" are protected) (internal quotations omitted). Therefore, Lombardo has presented no triable fact issue on his retaliation claim.

### 2.     Chmura Did Not Terminate Lombardo Because He Complained About Overtime

Even if Lombardo had engaged in protected activity, he cannot prove unlawful retaliation because nothing happened as a result of his alleged complaints. To satisfy the causation element of his *prima facie* case, Lombardo must prove that Chmura terminated him "because" he engaged in protected activity. 29 U.S.C. § 215(a)(3). The Supreme Court has consistently interpreted "because" in similar statutory contexts to require but-for causation. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) (holding that "because" in Title VII's retaliation provision

requires proof of but-for causation); *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176 (2009) (finding

that the use of "because" in the ADEA requires but-for causation).  Thus, Lombardo must prove

that had he not told Auerbach he was "due overtime," he would still be employed with Chmura.

Lombardo cannot satisfy this standard, for two related reasons.

First, it is undisputed that no member of Chmura's leadership team knew about

Lombardo's alleged requests for overtime.  This alone defeats Lombardo's retaliation claim

because "by definition, an employer cannot take action because of a factor of which it is unaware,

[so] the employer's knowledge that the plaintiff engaged in a protected activity is absolutely

necessary to establish the third element of the prima facie case." *Dowe v. Total Action Against

Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (collecting cases).  Conversely, if

an employee "has not proffered any evidence to establish that [the decisionmaker] had knowledge

of" the engagement in the protected activity, his retaliation claim cannot survive summary

judgment. *Ramos v. Molina Healthcare, Inc.*, 963 F. Supp. 2d 511, 528 (E.D. Va. 2013).

Lombardo has no such evidence.  It is undisputed that Chmura's leadership team made the

decision to terminate Lombardo.  (Peterson 2d Dep. 142:9-13.)  But, by Lombardo's own account,

he voiced his overtime requests only to Auerbach.  (Lombardo Dep. 172:13-16.)  He never told

anyone in Human Resources or any of Chmura's leaders.  (*Id.*)  Only Auerbach vaguely recalled

that Lombardo had mentioned overtime once, "in passing."  (Auerbach Dep. 20:22-21:8.)  But,

Auerbach did not tell anyone because "[i]t was not at the time something that [he] thought was a

consequential statement that [Lombardo] had made." (*Id.* 21:22-22:4.)  Because no one involved

in the decision to terminate Lombardo even knew about his alleged demands for overtime before

they sent him home, his retaliation claim cannot survive summary judgment.

Second, Lombardo cannot prove retaliation because he cannot dispute that Chmura fired

him for threatening to destroy the company.  By the time Lombardo started making those threats, he was already on thin ice for having forged an offer letter six months earlier.  (Peterson Dep. 84:15-20; Peterson 2d Dep. 56:11-18.)  Chmura's leadership was also upset with Lombardo for spreading unpleasant rumors among the sales team.  (C. Chmura Dep. 94:11-25; Peterson 2d Dep. 143:16-21.)  So, when Lombardo started "running around telling people he was going to sue the company, he was going to put us under, he was going to sell our lists to the highest bidder," that was the last straw.  (C. Chmura Dep. 93:6-12; *see also* Ex. 25.)  By that point, Lombardo's only options were to accept the separation agreement and leave peacefully, or to be fired.  (C. Chmura Dep. 97:16-98:12.)  He chose the latter.  Thus, Lombardo's threats simultaneously defeat his claim of causation and provide Chmura's legitimate, non-retaliatory catalyst for the decision to terminate him.  *Cf. Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (affirming summary judgment because the employer's belief that an employee had threatened the company's vice-president was a legitimate reason for termination).

In short, Lombardo's retaliation claim (like his overtime claims) is an afterthought, and he has no evidence to support it.  The Court should therefore dismiss it.

## C.    Chmura Is Entitled To Summary Judgment On Lombardo's Breach Of Contract Claim

Lombardo's quarrels with Chmura's commissions structure are equally unavailing.  Lombardo alleges that the Offer Letter created a contract, which Chmura breached when it paid less than 15% commission on certain sales (or paid him 15% commission for only one year of multi-year deals).  (Counterclaim ¶¶ 22, 66-72.)  This claim is fatally flawed, for two reasons.

First, Lombardo's contract claim fails because the Offer Letter is not a contract.  "To establish a breach of contract claim in Ohio, a plaintiff must prove, by a preponderance of the evidence, 'the existence of a contract, performance by the plaintiff, breach by the defendant, and

37

damage or loss to the plaintiff.'" *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (citing *Jarupan v. Hanna*, 173 Ohio App. 3d 284, 294 (2007).)[13]  Proof of a contract requires a plaintiff to satisfy the traditional criteria:  "offer, acceptance, contractual capacity, consideration, manifestation of mutual assent, and legality of object and of consideration."  *Bruzzese v. Chesapeake Expl., LLC*, 998 F. Supp. 2d 663, 669 (S.D. Ohio 2014).  And, it is well-settled that an offer letter that expressly disclaims any intent to create a contractual relationship cannot be an employment contract because it does not manifest mutual assent.  *See Leeper v. HealthScope Benefits*, 2020 WL 1290089, at *7-8 (S.D. Ohio Mar. 18, 2020) (finding that an offer letter containing an express disclaimer was not a contract for employment); *Taylor v. J.A.G. Black Gold Mgmt. Co.*, 2009 WL 2940167, at *5 (Ohio Ct. App. Oct. 15, 2009) (same).

This rule squarely forecloses Lombardo's contract claim.  The Offer Letter plainly states that it "should not be construed as an employment contract."  (Ex. 6 at 2.)  And, Lombardo has no evidence that Chmura ever altered the non-binding nature of the original Offer Letter.  Therefore, the Offer Letter did not create a contractual right to certain levels of commissions.  *Cf. Dodge v. CDW-Gov't., Inc.*, 415 F. App'x 485, 486 (4th Cir. 2011) (reversing judgment in employee's favor on allegedly owed commissions where the offer stated that it did "not constitute or represent any contractual commitments").  Even Lombardo testified that he did not consider the Offer Letter to be a contract until years after he signed it.  (Lombardo Dep. 12:11-13:10.)

Second, even if the Offer Letter did create a contractual right to 15% commissions, Chmura

---

[13] The Offer Letter, unlike the Agreement, does not contain a choice-of-law provision.  Under Virginia choice of law rules, however, a Virginia court would likely apply Ohio law to this claim because Lombardo signed the Offer Letter in Ohio and performed most of his Account Manager duties there.  *E.g.*, *Sneed v. Am. Bank Stationary Co.*, 764 F. Supp. 65, 67 (W.D. Va. 1991) (noting that under Virginia choice of law rules, a breach of contract claim is "regulated by the law of the place of performance").  In any event, Ohio and Virginia law are similar in all respects material to this motion.

was free to elaborate on and/or modify the Offer Letter's terms.  "In an at-will employment relationship, an employer may unilaterally decide to modify the terms of employment . . . Upon notification of the modification, the employee ultimately has two choices:  quit or accept the new terms."  *Pate v. Quick Sols., Inc.*, 2011 WL 3449619, at *4 (Ohio Ct. App. Aug. 9, 2011) (internal citation omitted); *see also Guyton v. Hensley*, 1991 WL 23571, at *1 (Ohio Ct. App. Feb. 22, 1991) (noting that an employer could modify an at-will employment arrangement "as to plaintiff's compensation for any reason which is not contrary to law").  "An employee who continues working after receiving notice of the changed terms has assented to the modification."  *Pate*, 2011 WL 3449619, at *4 (collecting cases).

These principles likewise foreclose Lombardo's commission claims.  There is no dispute that Chmura explained its criteria for receiving a full 15% commission in writing no later than March 2015, roughly a month after Lombardo started.  (Ex. 7.)  Specifically, Peterson told Lombardo that situations where Lombardo's "role was basically to get a signature" on a license agreement would earn 3% commission; other situations would be addressed "on a judgment basis." (*Id.*)  Peterson also clarified that to earn "full commissions," Lombardo would need to "prospect a new client, organize the demo (eventually GIVE the demo) and close the deal[.]"  (*Id.*)  Since it hired Lombardo, Chmura has consistently interpreted the phrase "initial sale," as used in the Offer Letter, to incorporate all of these requirements.  (Peterson Dep. 58:7-16.)  Lombardo has no evidence that he was deprived of any commissions before Chmura made these expectations clear.

Most importantly, it is undisputed that Lombardo continued to work at Chmura after receiving this explanation and after receiving less than 15% commissions on what he personally deemed an "initial sale."  By doing so, Lombardo accepted Chmura's terms.  Lombardo cannot now recover for commissions that he already accepted simply because he has harbored resentment

over their calculation for the past five years.  Lombardo's breach of contract claim therefore presents no triable issue for the jury.

### D.     Lombardo's Ohio Prompt Pay Act Claim Cannot Survive Summary Judgment

Finally, Lombardo's Ohio Prompt Pay Act ("OPPA") claim fails as derivative of his other unsuccessful claims.  Where a plaintiff's claim under the OPPA is based on the defendant's alleged failure to pay proper overtime compensation, that claim necessarily fails if the overtime pay claim fails.  *E.g.*, *Whitt v. Ziegler Tire & Supply Co.*, 2015 WL 4715605, at *8 (N.D. Ohio Aug. 7, 2015) (granting the defendant's motion for summary judgment on the plaintiff's O.R.C. § 4113.15 claim where it was "contingent upon [his federal and state overtime pay claim]," which failed as a matter of law).  This claim also fails to the extent it is based on the alleged failure to pay commissions because commissions are not "wages" governed by the OPPA.  *Bollman v. Lavery Auto Sales & Serv.*, 2019 WL 4678289, at *4 (Ohio Ct. App. 2019).  Thus, the Court should grant summary judgment in Chmura's favor on Count Five of the Counterclaim.

## <u>CONCLUSION</u>

Lombardo threatened, in writing, that "if they don't pay me I will do everything I can to ruin this place."  His breaches of his legal obligations, along with his meritless counterclaims, are nothing more than his efforts to carry out those threats.  He should not be allowed to do so.  Thus, for the reasons above, Chmura requests that the Court grant its Motion for Summary Judgment.

Dated:  May 15, 2020

> _____/s/_____
> Rodney A. Satterwhite (VA Bar No. 32907)
> Christopher M. Michalik (VA Bar No. 47817)
> Heidi E. Siegmund (VA Bar No. 89569)
> McGuireWoods LLP
> Gateway Plaza
> 800 East Canal Street
> Richmond, Virginia  23219
> (Office) (804) 775-1000
> (Fax) (804) 698-2158
> rsatterwhite@mcguirewoods.com
> cmichalik@mcguirewoods.com
> hsiegmund@mcguirewoods.com
>
> *Counsel for Plaintiff/Counterclaim Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of May, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send a notification of such filing (NEF) to all counsel of record.

> _____/s/_____
> Heidi E. Siegmund (VSB No. 89569)
> McGuireWoods LLP
> Gateway Plaza
> 800 East Canal Street
> Richmond, VA 23219
> Tel:    (804) 775-1000
> Fax:    (804) 775-1061
> hsiegmund@mcguirewoods.com
>
> *Counsel for Plaintiff/Counterclaim Defendant*