Exhibit 2

Page 1

1             IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF VIRGINIA

3                    RICHMOND DIVISION

4              ~~~~~~~~~~~~~~~~~~~~~

5    CHMURA ECONOMICS & ANALYTICS, LLC

              Plaintiff

6

            vs.                Case No.  3:19-CV-00813

7

8    RICHARD LOMBARDO

            Defendant

9

10             ~~~~~~~~~~~~~~~~~~~~~

11

12             REMOTE VIDEO DEPOSITION OF:

13              LESLIE PETERSON, VOL. I

14

15                    Taken on:

16                  April 30, 2020

                    2:50 p.m.

17

18

                    Taken at:

19

                McGuire Woods, LLP

20                 Gateway Plaza

                800 East Canal Street

21                  Richmond, VA

22

23

24        Kelliann D. Linberg, RPR, Notary Public

25

Page 2

1   APPEARANCES: (Via Videoconference)
2   On behalf of the Plaintiffs:
3        Koehler Fitzgerald, LLC
         CHRISTINE M. COOPER, ESQ.
4        1111 Superior Avenue E
         Ste 2500
5        Cleveland, OH, 44114
         Ccooper@koehler.law
6        216-539-9370.
7        Thomas J. Powell Law Office
         THOMAS J. POWELL, ESQ.
8        3603 Chain Bridge Rd. Suite D
         Fairfax, VA, 22030
9        Tpowell@tjplaw.com
         703-293-9050.
10
11  On behalf of the Defendants:
12       McGuire Woods, LLP
         HEIDI SIEGMUND, ESQ.
13       Gateway Plaza
         800 East Canal Street
14       Richmond, VA, 23219-3916
         Hseigmund@mcguirewoods.com.
15
16
17  ALSO PRESENT:
18       RICHARD LOMBARDO
19
20
21
22
23
24
25

Page 3

1                         TRANSCRIPT INDEX

2

3    APPEARANCES................................2

4    INDEX OF EXHIBITS.........................4

5    STIPULATION...............................5

6

7    EXAMINATION OF LESLIE PETERSON:

8    BY MS. COOPER.............................6

9

10

11

12

13

14   REPORTER'S CERTIFICATE.................103

15

16

17   EXHIBIT CUSTODY:    RETAINED BY COURT REPORTER

18

19

20

21

22

23

24

25

Page 4

```
 1                    INDEX OF EXHIBITS
 2   Number              Description           Marked
 3   DEFENDANT'S:
     Exhibit A      Copy of Notice of Deposition    13
 4
     Exhibit C      Copy of Articles of             26
 5                  Organization for a Domestic
                    Limited Liability Company,
 6                  Ohio ,Dated 9/2/2011
 7   Exhibit E      Copy of Letter Dated 2/3/15 to  51
                    Richard Lombardo, Bates
 8                  CHMURA000097
 9   Exhibit L      Copy of Email Chain from        62
                    Richard Lombardo, Bates CHMURA
10                  0070222 - 223
11   Exhibit F      Copy of Confidentiality,        67
                    Non-Competition &
12                  Non-Solicitation Agreement
13   Exhibit D      Copy of First Amended           70
                    Complaint
14
     Exhibit G      Copy of Letter Dated 3/28/2019  88
15                  to Mr. Lombardo,
16   Exhibit N      Copy of Email Dated 1/127/2017  96
                    from Leslie Peterson, Bates
17                  Chmura0056740
18
19
20
21
22
23
24
25
```

Page 5

1          COURT REPORTER:  The attorneys

2    participating in this deposition acknowledge that I am

3    not physically present in the deposition room and that

4    I will be reporting this deposition remotely. They

5    further acknowledge that, in lieu of an oath

6    administered in person, the witness will verbally

7    declare her testimony in this matter is under penalty

8    of perjury. The parties and their counsel consent to

9    this arrangement and waive any objections to this

10   manner of reporting.

11          Please indicate your agreement by stating

12   your name, firm name, party represented and your

13   agreement on the record."

14          MS. COOPER:  My name is Christine Cooper

15   and I represent Mr. Lombardo, Richard Lombardo, and I

16   agree.

17          MR. POWELL:  My name is Tom Powell.  I am

18   co-counsel for Mr. Lombardo, and I am with the firm of

19   the Law Offices of Thomas Powell, and I also agree.

20          MS. SIEGMUND:  This is Heidi Siegmund of

21   McGuire Woods, and we also agree.

22          MS. LESLIE PETERSON:  Leslie Peterson of

23   Chmura Economics, and I agree.

24                -   -   -   -   -

25          LESLIE PETERSON, of lawful age, called

Page 6

1   for examination, as provided by the Ohio Rules of Civil

2   Procedure, being by me first duly sworn, as hereinafter

3   certified, deposed and said as follows:

4                   EXAMINATION OF LESLIE PETERSON

5   BY MS. COOPER:

6        Q.   Good afternoon, Ms. Peterson.  My name is

7   Christine Cooper and I represent Richard Lombardo in

8   the case filed by Chmura Economics & Analytics, LLC.

9   Can you state your name for the record?

10       A.   Leslie Peterson.

11       Q.   And what's your address, your residential

12  address?

13       A.   My work address?

14       Q.   No, your residential, your home address.

15       A.   ████████████████████████████.  That's in

16  ████████████████████████.

17       Q.   Have you ever been deposed before?

18       A.   Yes.

19       Q.   When was the last time you were deposed?

20       A.   2010.

21       Q.   How many times before have you been

22  deposed?

23       A.   Once.

24       Q.   What type of case was that?

25       A.   A JobsEQ patent --

Page  7

1            (Reporter asked for clarification).

2                 A JobsEQ patent infringement case.  Is that

3   better?

4        Q.    Do you recall the case name?

5        A.    The official case name?

6        Q.    Yes.

7        A.    I don't.

8        Q.    Were you deposed in your individual

9   capacity?

10        A.    My corporate and individual.

11        Q.    Were you deposed in your corporate capacity

12   on behalf of Chmura Economics & Analytics, LLC?

13        A.    Yes.

14        Q.    Since it's been a while since you have been

15   deposed, I will go over some ground rules with you.

16   First, if you could say yes or no as opposed to head

17   shaking or saying uh-huh or uh-uh, that would be great,

18   so that the court reporter, which is already difficult

19   to do this when we are all in a room together, but now

20   that we are all separate, would appreciate if we could

21   articulate that.  And I will be probably be the biggest

22   offender, but I'll do my best to follow my own rules.

23            If you can wait until I ask the full

24   question before you provide your answer, so that we are

25   not talking over each other.  If you don't understand a

Page 8

1   question I've asked, if I misstated it or it is just

2   confusing, please ask me to repeat or rephrase the

3   question.

4            And if you need a break, by all means say

5   so and we will take a break.  The only request I would

6   have is if there is a pending question, you answer it

7   before we take that break.  Do you understand?

8        A.    I do understand.

9        Q.    Did you bring anything with you to the

10  deposition today, any documents with you?

11       A.    No.

12       Q.    I am going to go into your background a

13  little bit.  Can you tell me a little about your

14  education, your higher education?

15       A.    I went to the University of Virginia,

16  College at Wise, studied chemistry and biology.  And

17  then I later went to Clemsen University and studied

18  marketing.

19       Q.    What degrees did you earn from UVA?

20       A.    Biology.

21       Q.    And did you earn a degree from Clemsen?

22       A.    No.

23       Q.    Tell me again what you were studying at

24  Clemsen.

25       A.    Marketing.

1      Q.    Do you have any certifications?

2      A.    I have IEDC Technology-led Economic

3  Development Certification.

4      Q.    And can you explain what that is?

5      A.    That's a certification within an

6  organization that specializes in the development of

7  economic development practitioners.

8      Q.    And you are currently with Chmura Economics

9  & Analytics, LLC, correct?

10     A.    Correct.

11     Q.    And is it okay if I refer to it as Chmura?

12     A.    We do.

13     Q.    Okay.  How long have you been at Chmura?

14     A.    I started in 2002, May 21st.

15     Q.    Well, you are coming up on an anniversary?

16     A.    I am.

17     Q.    That's great.  Were you employed prior --

18  anywhere prior to starting at Chmura?

19     A.    You want me to go in reverse,

20  chronological, or forward chronological?

21     Q.    Either way you are comfortable doing it.

22     A.    Okay.  So I started with Eastman Kodak,

23  Eastman Chemical.  I started out as a title chemist and

24  worked my way through customer services and then was in

25  worldwide sales.  After that, I took a job at

Page 10

1  Goldschmidt, which is Degussa, and that is a pigment

2  and surfactant manufacturing company in Richmond.  And

3  then I joined Chmura.

4       Q.    And in what capacity did you join Chmura

5  when you started?

6       A.    Director of operations.  I was an employee

7  with the option to become a partner later.

8       Q.    And are you a partner now?

9       A.    Yes.

10      Q.    When did you become a partner?

11      A.    2004.

12      Q.    I am going to go into a little more of

13  this, but I want to state, when we noticed your

14  deposition, we were noticing you -- you were designated

15  as a corporate representative for certain categories of

16  topics.  You are also here to testify individually,

17  correct?

18      A.    Yes.

19      Q.    I would like to start with the corporate

20  representative portion of your deposition and leave the

21  individual portion to the end.

22           MS. SIEGMUND:  Christine?

23           MS. COOPER:  Yes.

24           MS. SIEGMUND:  Sorry to interrupt you, but

25  I just realized that we cannot control exhibits from

1   the way we have this set up, so so I don't interrupt

2   your flow when you start putting up exhibits, we'll

3   take a five minute break and we will get that fixed so

4   that we can use those.

5             MS. COOPER:  That would be fine.  Do you

6   want to do that now?

7             MS. SIEGMUND:  Yeah, let's go ahead and do

8   it now so we don't have to worry about it when you are

9   actually trying to do stuff.

10            MS. COOPER:  Okay.

11                      -    -    -    -    -

12            (Short break off the record.)

13                      -    -    -    -    -

14  BY MS. COOPER:

15       Q.    So -- and I can't remember the last

16  question I asked, so I may be repeating my question

17  again.  But you're testifying as a corporate

18  representative of Chmura today, correct?

19       A.    Right.

20       Q.    Are you an owner of Chmura?

21       A.    Yes.

22       Q.    What is your ownership interest?

23       A.    42.5.

24       Q.    What is your title?

25       A.    President and Chief Strategy Officer.

Page 12

1    Q.    What are your responsibilities at Chmura?

2    A.    I'm involved with the SEA Group, which is

3  Strategic Enterprise Advisers Group.  We meet monthly,

4  sometimes quarterly to do forecasting for the company,

5  talk about hiring strategies, talk about continuous

6  improvements, and performance metrics.  So I pretty

7  much manage the SEA Group process. I am also the head

8  of marketing.  We are a small company, Ms. Cooper, so

9  we wear a lot of hats.

10          I'm also the head of marketing, and

11  developing marketing collateral, which we began to do

12  more as we had the resources to do that.  And as a

13  partner, I have to make a lot of decisions about the

14  direction that the company wants to go and how we want

15  to penetrate market access, when we are changing

16  directions based off competitive analysis, et cetera.

17    Q.    When did you become an owner of Chmura?

18    A.    You already asked that, but do you want me

19  to repeat it?

20    Q.    Yes, please.

21    A.    2004.

22    Q.    Are you being paid for your testimony

23  today?

24    A.    I don't understand that question.

25    Q.    Outside of your normal compensation, are

Page 13

1   you being paid for your testimony today?

2          A.    No.

3          Q.    I am going to show you what's been marked

4   as Defendant's Exhibit A, and I will share that with

5   you in a moment.

6                          -    -    -    -    -

7                (Thereupon, Deposition Exhibit A, Copy

8                of Notice of Deposition, was marked for

9                purposes of identification.)

10                         -    -    -    -    -

11         Q.    I will give you a chance to look at that,

12  and you have control, so you should be able to scroll

13  through it.

14         A.    (Reviewing.)  Okay.

15         Q.    Have you seen this document before?

16         A.    Yes.

17         Q.    And what is it?

18         A.    What is it?

19         Q.    Yes.

20         A.    Is it the interrogatory ones?

21         Q.    I'll represent to you that this is a Notice

22  of Deposition for a 30(b)6 witness, and if you scroll

23  down -- I will take control and I'll just scroll down

24  to the topics.  Have you seen this Exhibit A before?

25         A.    Yes.

Page 14

1      Q.    And you have been designated as a witness

2   on behalf of Chmura for certain of the topics listed on

3   this Exhibit A, correct?

4      A.    Correct.

5      Q.    And we will go through these topics

6   individually, but before we get to that; generally,

7   what did you do to prepare for your deposition today on

8   behalf of Chmura?

9      A.    I reviewed documents that our counsel

10  suggested I review.

11     Q.    What documents did you review?

12     A.    Email, scanned documents from personnel

13  files.

14     Q.    Did you review anything else?

15     A.    I went into Salesforce and did some

16  research on some of the questions that Rick had

17  regarding his commission, and then I was able to take

18  that and then back it up with an email so I understood

19  what he was asking.

20     Q.    What type of information did you look at on

21  Salesforce?

22     A.    Contracts.  License agreements.

23     Q.    And what was the purpose of looking at

24  those?

25     A.    I was trying to understand.  Some of his

1    complaints were five years old, so I was trying to

2    understand why he had a complaint about it.

3         Q.    What do you mean by complaint?

4         A.    You know, the documents -- do you know the

5    licenses that he is questioning the commissions on?  To

6    save us some time, are you aware of those?

7         Q.    I am not the one that gets to be asked

8    questions, so you are going to have to answer my

9    question.  Can you explain what you mean by complaint?

10        A.    He had complaints about commissions from

11   some of his early deals.

12        Q.    Did you review anything else?

13        A.    Not that I am aware of or that I can

14   recall.  Mostly emails.

15        Q.    Do you remember any specific emails that

16   you reviewed?

17        A.    I reviewed emails about the license

18   agreements that are in question.  I reviewed emails

19   about the recruiting -- the recruiter that actually

20   brought Rick to the firm, and I also reviewed the

21   emails and the process for Jennifer Ludvik, and I

22   reviewed some invoices.

23        Q.    What kind of invoices?

24        A.    Invoices to clients, they were JobsEQ

25   clients.

Page 16

1    Q.    And you said you also reviewed personnel

2    files.  What personnel files did you review?

3    A.    I reviewed Rick's personnel files.

4    Q.    How was Mr. Lombardo's personnel file kept?

5    A.    Can you repeat the question?

6    Q.    Sure.  How was Mr. Lombardo's personnel

7    file kept?

8    A.    How was it kept?

9    Q.    Yes.

10   A.    It was kept in the H.R. office under lock

11   and key.

12   Q.    Is it a paper file?

13   A.    It's paper and digital file.

14   Q.    What is contained within the paper file?

15   A.    His offer letter, his notes for annual

16   reviews.  We didn't have a formal annual review form

17   like we have now when he first started.  Any complaints

18   that he registered that we talked about were documented

19   in his personnel file.

20   Q.    Is there anything else maintained within

21   his paper file?

22   A.    There is information from GIS Web Tech on a

23   falsified offer letter that that company we have a

24   relationship related to him.  But that falsified letter

25   is in the file.

1      Q.    Anything else in his paper file?

2      A.    I believe there is a file in there that

3   Aisha, our H.R. manager, documented as a result of

4   talking with Rick about his concerns from 2015 to 2019,

5   his complaints and his concern that if the company

6   moves forward and made any kind of changes to the sales

7   commission structure, he complained about that and was

8   very concerned about that.  And that's documented.

9      Q.    When you said "complaints," what type of

10  complaints are you referring to?

11     A.    He complained that he did not get his merit

12  increase every year at his annual review.

13     Q.    Were there any other complaints?

14     A.    To H.R., no.  That's the main one that kept

15  recurring, the concern about the company moving forward

16  with some sort of commission restructuring.

17     Q.    Was there anything else contained within

18  his paper personnel file?  You mentioned he also had a

19  digital file.  What was contained within the digital

20  file?

21     A.    It would be, like, a letter from GIS Web

22  Tech explaining the situation with Rick that was

23  electronically transferred and then printed out and put

24  in his personnel file.  I didn't mean to imply that his

25  personnel file is sitting on an internet server

Page 18

1    somewhere.  They are not.

2         Q.    About how big is Mr. Lombardo's personnel

3    file, if you had to ballpark on size?

4         A.    10 to 12 pages.  I did not count them.

5         Q.    Within in that personnel file, were there

6    any complaints relating to unpaid overtime?

7         A.    No.

8         Q.    And to your knowledge, was Mr. Lombardo's

9    entire personnel file produced in this case?

10        A.    Was his entire personnel file reviewed in

11   this case?

12        Q.    Not reviewed, produced.

13        A.    Yes.

14        Q.    And based on your statement, did you review

15   his entire personnel file?

16        A.    Yes.

17        Q.    Is there anything else that you did to

18   prepare for your deposition today?

19        A.    I prayed.

20        Q.    Did you speak with anyone?

21        A.    I spoke with Chris and Sharon.

22        Q.    And what was the substance of your

23   conversation?

24             MS. SIEGMUND:  Just to the extent that gets

25   into any of your conversations with counsel, I would

Page 19

1   instruct you not to talk about the content of those

2   conversations.

3        A.   I cannot talk about the content of those

4   conversations.

5        Q.   Well, every conversation you had with

6   either Dr. Chmura or Ms. Simmons was a communication

7   from an attorney?

8        A.   We were speaking about the requirements of

9   Exhibit A.

10        Q.   Can you say that again?  I am not sure I

11   understand.

12        A.   We were speaking to each other about the

13   requirements of Exhibit A.

14        Q.   What do you mean by "the requirements of

15   Exhibit A?"

16        A.   We wanted to make sure that we had covered

17   what we needed to explain in this deposition today.

18   That was considered our homework.

19        Q.   Going back to -- well, actually, I am going

20   to move you into the first topic.  So you have been

21   designated to testify regarding Topic Number 1 on

22   Exhibit A, which I think I am still sharing with you,

23   so you can still see it; is that correct?

24        A.   Yes.

25        Q.   And Topic Number 1 is, "Chmura's

Page 20

1    organizational structure, including the physical

2    organization, ownership and supervising, management and

3    reporting structures," correct?

4         A.    Correct.

5         Q.    Now, you testified that you owned 42.5% of

6    Chmura.  Who are the other owners?

7         A.    Chris Chmura and John Chmura.

8         Q.    Does anyone else own any -- does anyone

9    else have an ownership interest in Chmura?

10        A.    They are profit interests, not ownership

11   interests.

12        Q.    Can you explain to me the difference

13   between ownership interests and profit interests?

14        A.    The three partners retain the lionshare of

15   the company with the profit interests folks being able

16   to sit on the board and have voting privileges, and

17   they get a percentage of the company at any time we

18   reach a profit, then they get a percentage of that

19   profit.  And that's Greg, Xiaobing, Sharon.

20        Q.    I am going to slow you down there.  What is

21   Greg's full name?

22        A.    Gregory Chmura.

23        Q.    And what is Xiaobing's full name?

24        A.    Xiaobing Shuai.

25        Q.    Can you spell that for the court reporter?

Page 21

1          A.     X-I-A-O-B-I-N-G.  Shuai, S-H-U-A-I.

2          Q.     And what was Sharon's full name?

3          A.     Sharon Simmons.

4          Q.     And you say that they had a profit

5    interest, correct, the three of them?

6          A.     Yes, I did.

7          Q.     Does anyone else have a profit interest

8    other than the three of them?

9          A.     No, they don't.

10         Q.     And what percentage of ownership does --

11   did Chris Chmura have?

12         A.     51.

13         Q.     That was 5 1 or a 6 1?

14         A.     That's a 5 1.

15         Q.     What percentage of ownership does John

16   Chmura have?

17         A.     5 0.

18         Q.     So the other 2 1/2 % -- I'm sorry --

19   1 1/2%, who owns the last 1 1/2% of the company?

20         A.     The three profit interests folks.

21         Q.     Is that interest split evenly?

22         A.     I believe Greg is a 1/2% more than Xiaobing

23   and Sharon.

24         Q.     Now, Chmura is a limited liability company,

25   correct?

Page 22

1        A.    Correct.

2        Q.    And it was organized under the laws of

3   Virginia; is that correct?

4        A.    Correct.

5        Q.    Do you know when it was formed?

6        A.    1998.

7        Q.    And has it been continuously in operation

8   since then?

9        A.    Yes.

10        Q.    What does Chmura do?

11        A.    We have a consulting side which is made up

12   of economists and mathematicians, and we do consulting

13   work.  And on the other side of the house is

14   technology, JobsEQ is our technology platform.  And

15   then we have some portals that come off of that

16   dashboard that we also provide to our clients.

17        Q.    Can you explain a little bit more about

18   JobsEQ and what it is?

19        A.    JobsEQ is a technology platform.  It is

20   software as a service, it is a SaaS product as opposed

21   to data as a service, which is a DaaS product.  And

22   clients use the labor data information in JobsEQ to

23   make better decisions about their communities.

24        Q.    Who does Chmura sell JobsEQ to?  I don't

25   need specific names.

Page 23

```
 1            Let me rephrase my question so it is fair.
 2   What type of entities does Chmura sell JobsEQ to?
 3        A.    B to B.  B to G.
 4        Q.    Can you break that down for the layman, for
 5   me?
 6        A.    Business to government and business to
 7   business.
 8        Q.    What type of businesses does Chmura sell
 9   to?
10        A.    Corporate organizations.
11        Q.    Will they sell to any corporate
12   organization, or is there a particular type of
13   organization that purchases JobsEQ?
14        A.    It varies.
15        Q.    Could you give me some examples of the
16   industries that JobsEQ is sold to?
17        A.    In which vertical?
18        Q.    Well, why don't we start with explaining
19   what a vertical is.
20        A.    A vertical is a market segmentation based
21   on industry mix.  So a vertical might be corporate.  A
22   vertical is education.  A vertical is economic
23   development.  A vertical is workforce development.  A
24   vertical is site selection and site selection
25   consulting, including corporate real estate.
```

Page 24

1      Q.    All right.  So what industry does -- what

2    industry does JobsEQ sell to within those verticals

3    then?

4      A.    There is a lot of industries.

5      Q.    Is there any industry that JobsEQ -- sorry,

6    let me rephrase that.

7            Is there any industry that Chmura does not

8    sell to?

9      A.    Well, there is over 1100 industries, and

10   then within industries, you have mixed mediation, the

11   types of industries that are within the punitive med

12   code, so we would have to be here for a year to talk

13   about that.  Can you be more specific?

14     Q.    How about just give me broad strokes of the

15   type of industries that Chmura sells to.

16     A.    Healthcare, education, workforce

17   development, corporate real estate, community colleges,

18   four year education -- either a four year college or a

19   two year community college.

20     Q.    Are there any other broad categories you

21   would include?

22     A.    No.

23     Q.    Now, you said that there were -- if I heard

24   correctly, there are portals off the dashboard that

25   would also be sold in addition to JobsEQ by Chmura; is

Page 25

1   that correct?

2         A.    That is correct.

3         Q.    What are those portals?  Do they have --

4   let me ask one question.  Do those portals have names?

5         A.    Have any --

6         Q.    Do those portals have specific names?

7         A.    Yes.  Labor --

8         Q.    What are they?

9         A.    Tell me when you are ready for me to speak.

10        Q.    I'm ready.  Please go ahead and tell me the

11  names.

12        A.    LaborEQ, Career Concourse, Realtime

13  Intelligence, Resume Forensics.

14        Q.    Are there any others?

15        A.    Not that are commercially available at this

16  time.

17        Q.    And are those add-ons to the JobsEQ

18  products?

19        A.    They are upsells.

20        Q.    Prior to being called Chmura Economics &

21  Analytics, LLC, did the company go by a different name?

22        A.    Capital Research & Analytics.

23        Q.    When it was Capital Research & Analytics,

24  did the company do anything different than it does now?

25        A.    It was strictly consulting.

Page 26

1      Q.    When did it change from strictly consulting

2   to also having the tech side?

3      A.    The tech side started emerging in 2002.

4   The name was changed in 2003.

5      Q.    Why did it change its name?  Why was the

6   name changed?

7      A.    Chris' business partner did not want to be

8   in business.  He preferred to be in academia.

9      Q.    I am going to show you what's been marked

10  as Defendant's Exhibit C.  I'll let you page through

11  that for a moment.

12                      -   -   -   -   -

13              (Thereupon, Deposition Exhibit C, Copy

14              of Articles of Organization for a

15              Domestic Limited Liability Company,

16              Ohio, Dated 9/2/2011, was marked for

17              purposes of identification.)

18                      -   -   -   -   -

19              MR. POWELL:  Heidi, this Tom Powell.  In

20  the meantime, I am getting a little reverb on my

21  hearing, and I'm wondering if it's -- do you have two

22  audio lines on in your room or just one, Heidi?

23              MS. SIEGMUND:  No, we're only connected to

24  our speakers.

25              MR. POWELL:  All right.

Page 27

```
 1                    -   -   -   -   -
 2              (Short pause off the record.)
 3                    -   -   -   -   -
 4    BY MS. COOPER:
 5         Q.    Ms. Peterson, have you had a chance to
 6    review Exhibit C?
 7         A.    I am trying to.
 8         Q.    Do you recognize this document?
 9         A.    I do not.
10         Q.    Have you ever seen it before?
11         A.    I have not.  If I have, I don't recall.
12         Q.    Are you aware of whether -- let me rephrase
13    that.
14              Did Chmura, the Virginia company, ever
15    register to do business in Ohio?
16         A.    We did.
17         Q.    Do you recall when that occurred?
18         A.    Should have been in 2005.
19         Q.    When did Chmura open an office in Ohio?
20         A.    2005.
21         Q.    What other location is Chmura located in?
22    Let me rephrase.
23              What other locations does Chmura have
24    offices in?
25         A.    Can you define, office?
```

Page 28

1          Q.     Physical office space.

2          A.     Midlothian Texas.  Rye Cove, Virginia.

3     R-Y-E, C-O-V-E.

4          Q.     And then, also, the location in Cleveland

5     Ohio, correct?

6          A.     Correct.

7          Q.     I want to take a step back for a second and

8     I notice there is a lot of shared names amongst the

9     ownership.  Can you tell me the relationship of the

10    owners of the company, if any?

11         A.     You're talking about a biological

12    relationship?

13         Q.     Yes.

14         A.     Okay.  So Chris is a sister to Greg, and

15    John is a nephew of Chris.

16         Q.     Are you related to any of them?

17         A.     No.

18         Q.     Are any of the other, the profit -- forgive

19    me, I have to go back and look and see what you said

20    they were --

21         A.     Profit interests.

22         Q.     Profit interests.  Are they in any way

23    related, other than Mr. Greg Chmura?

24         A.     No.

25         Q.     How many employees does Chmura currently

Page 29

1   have?

2        A.    It's around 35.

3        Q.    And has it always had about that same

4   number of employees?

5        A.    Can I go back and correct that statement?

6        Q.    Absolutely.

7        A.    It's around 45.

8        Q.    Let's take it a year at a time.

9   Approximately how many employees did Chmura have in

10  2019?

11       A.    Around 45.

12       Q.    Same for 2018?

13       A.    No, we hired 15 people between 2018 and

14  2019.

15       Q.    What was the reason for the additional

16  hiring?

17       A.    When you are growing a technology

18  organization, it has to scale.  And what I mean by

19  scale is if you add inside sales, account managers,

20  outside sales, then you have to add to data governance,

21  then you have to add to your IT staff, and then you

22  have to add marketing people.  So the whole

23  organization must scale.

24       Q.    So did you add positions to all those

25  different categories?

Page 30

1        A.      We have no inside salespeople.

2        Q.      What type of salespeople do you have?

3        A.      Account managers.

4        Q.      Account manager is a title, correct?

5        A.      Well, it is more than a title.  Account

6    managers are client facing; more than an inside

7    salesperson.  Client facing is setting up meetings,

8    going to client sites and doing demos, going to

9    conferences.

10        Q.      The account managers, where are they based?

11    Let me rephrase that.

12                Where does an account manager work from?

13        A.      Right now, everyone is working from home.

14        Q.      In 2019, where did the account managers

15    work from?

16        A.      They worked out of the Richmond office and

17    they worked out of the Cleveland office.

18        Q.      And were they present in those offices,

19    physically present in those offices when they were

20    working?

21        A.      Not always.

22        Q.      Approximately -- take the Richmond office,

23    approximately what percentage of the workday was an

24    account manager present in the Richmond office?

25        A.      Currently, we have got only Wilson there

Page 31

1    and he does a good bit of traveling across Virginia to

2    see the career and technical client.

3          Q.    In 2019, how much time did the account

4    managers in Richmond spend in the office as a

5    percentage -- on a percentage basis?

6          A.    I would have to do that math on that.  I

7    didn't come prepared to do that.

8          Q.    Did they spend more time in the office than

9    outside of the office?

10         A.    Probably, yeah.

11         Q.    What about the account managers in

12   Cleveland?  Did they spend more time in the office than

13   out of the office?

14         A.    Probably.

15         Q.    Would you say that they spend more than 75%

16   of their time -- take the Cleveland office, if you

17   know, would you say that they spend more than 75% of

18   their time in the office?

19         A.    I couldn't put a number like that on it.

20         Q.    What would you need to look at to determine

21   how much time they spent in the office?

22         A.    The way they explain conferences a year.

23   We've got folks traveling all over the country, so I

24   would have to do the math.

25         Q.    What would the account managers be

Page 32

1    traveling for?

2         A.    Conferences and client meetings.

3         Q.    And how frequently would an account manager

4    in 2019 travel for a client meeting?

5         A.    For a client meeting?  Let's see, we did

6    training in Atlanta.  It's not the lionshare of their

7    outside facing time.  It's not a portion of time which

8    would be client meeting.  Client meeting was often held

9    around conferences because it was more convenient.  So

10   they might be at the conference, but they might

11   schedule a meeting in one of the rooms there at the

12   conference hall and have a meeting.

13        Q.    And what would they do at these conference

14   meetings?

15        A.    They would be discovery with the client.

16   They would demo JobsEQ.  They would help in an advisory

17   role in how they can think about their particular

18   industry, especially business to government, on

19   spending cycles and strategies to acquire funds to

20   purchase JobsEQ.

21        Q.    Were these current clients that they were

22   traveling to?

23        A.    Not always.

24        Q.    How frequently were they traveling to speak

25   with a prospective client?

Page 33

```
 1        A.    I am not going to be able to put a number
 2   on that.
 3        Q.    What documents would you need to review to
 4   be able to put a number on that?
 5        A.    I would have to go back and pull everyone's
 6   calendar, align it with the conference calendars.  I
 7   would have to understand that -- why was -- where were
 8   they?  And I'm three steps removed from that.
 9        Q.    At any point in time, did Chmura have an
10   inside sales team?
11        A.    No.
12        Q.    Never?  It never had an inside sales team?
13        A.    We call them account managers.
14        Q.    So an inside sales would have the title of
15   account manager; is that correct?
16        A.    Yes.
17        Q.    Okay.  So an account manager then is doing
18   inside sales, by your testimony, correct?
19              MS. SIEGMUND:  Object to the form of the
20   question.  You can answer.
21        A.    An account manager spends a portion of his
22   time on the phone.
23        Q.    That's not what you just testified to.  You
24   just testified that an account manager is an inside
25   sales representative, correct?
```

Page 34

1      A.     No, I did not.  No, I did not.

2      Q.     Can you define for me what you mean by

3  inside sales?

4      A.     We don't have one, so I really can't.

5      Q.     Well, then --

6      A.     To me, it would be somebody that does not

7  travel.  They don't have the freedom to make decisions

8  and negotiate contracts.  They are never client facing.

9           They are not in an advisory capacity to

10  their client on how to finance deals.  They are not

11  part of the strategy of accomplishing where the company

12  wants to be in five years.  They are not advisors back

13  to the technology group.  They are none of those things

14  that --

15      Q.     But --

16      A.     -- the account managers have the privilege

17  of doing.

18      Q.     So what you are telling me is an inside

19  sales representative would never talk to or face a

20  client?

21           MS. SIEGMUND:  Object to the form of the

22  question.  You can answer.

23      A.     They talk to the client on the phone only.

24      Q.     A moment ago you testified that they would

25  -- they would never be client facing.  What do you mean

Page 35

1    by client facing?

2        A.    Client facing is when you are outside the

3    organization, in the client home base.  You are outside

4    the organization at a conference, meeting clients,

5    exchanging cards, taking breaks together, networking,

6    building relationships with your client that you can't

7    do over the phone.  That's why we have conferences, and

8    that's why we spend a lot of money sending our best

9    folks to conferences.

10       Q.    Do you know how many trips the account

11   managers -- actually, let me retract that question.

12             What are the -- does Chmura have a sales

13   team?

14       A.    Can you repeat that?

15       Q.    Sure.  Does Chmura have a sales team?

16       A.    Yes.

17       Q.    And what are the job titles contained

18   within the sales team?

19       A.    Account manager, senior account manager,

20   territory manager, which we don't have one, and then

21   sales manager.

22       Q.    What was the difference between an account

23   -- or what is the difference between account manager

24   and senior account manager?

25       A.    When an account manager comes on board

Page 36

1   from, oh, let's say, the collections industry and they

2   come into a technology backed platform that is very

3   complex, based on the laws of economics, and they have

4   to learn the platform.  They have to learn the clients.

5   They have to learn to think and talk, to uncover the

6   client's pain points, and they have to be savvy enough

7   in the tool to be able to go into the particular

8   dimensions of the platform to help solve their

9   problems.

10          And you can't do that on day one.  It takes

11  three months to be demo ready.  It takes six months

12  before you can start closing deals, and then even after

13  that time, it takes another, probably, total of 18

14  months to get to where you are really in your groove.

15      Q.    So when do you become a senior account

16  manager?

17      A.    Well, in Rick's case, it was May --

18      Q.    I didn't ask -- hold on.  Answer the

19  question I ask, please.  Ordinarily, when does an

20  account manager become a senior account manager?

21      A.    When their performance is so much more

22  obvious in terms of closed deals, that they are

23  respectful at conferences, they know how to -- they

24  know how to be outward facing and be professional, and

25  they know the tool.

1      Q.    At what point -- is there a very specific

2   time cut off to become a senior account manager?

3      A.    No.

4      Q.    Who makes the decision to move someone from

5   account manager to senior account manager?

6      A.    That decision is typically reviewed by the

7   sales manager with the SEA Group, that's the Strategy

8   Enterprise Advisers Group.

9      Q.    What is the quickest anyone has gone from

10  account manager to senior account manager?

11     A.    18 months.

12     Q.    And who was that?

13     A.    Mr. Lombardo and Austen Steele.

14     Q.    As far as -- you threw a lot at me, so I've

15  got to unpack some of that.  It is going to take me a

16  minute.

17          What metrics are reviewed to determine when

18  an account manager becomes a senior account manager?

19     A.    They are consistently closing three deals a

20  month.  All deals are consistently above the average

21  sales price of $8,500.  They are taking on leadership

22  roles within the sales team.  Examples are,

23  implementation of Salesforce, training new salespeople,

24  exhibiting best practices within the organization,

25  contributing to IT assets and new analytics, bringing

Page 38

1   intelligence from the industry and the marketplaces

2   about what is actually needed.

3        Q.    If an account manager doesn't have an

4   opportunity to interact with clients, how is an account

5   manager ever supposed to be able to achieve those

6   benchmarks?

7        A.    Account managers will be able to achieve

8   the benchmarks as they grow and mature in the product,

9   as they have clients, as they become more familiar.

10       Q.    And one of the -- one of the benchmarks is

11   implementing Salesforce.  What does that mean?

12       A.    We don't restrict new hires to be savvy in

13   Salesforce.  It's a CRM, and there is a lot of them.

14   So sometimes they come in and then they have ACT as

15   their background and CRM, but Salesforce is considered

16   the blue standard, or blue ribbon standard in SaaS

17   products because it itself is a SaaS product.

18            So some people figure that out more quickly

19   than others.  So to be able to say you implemented

20   within the sales team, or the best practices, or

21   Salesforce, that's what that means.

22       Q.    What are the standards that would

23   demonstrate you have now implemented best practices on

24   Salesforce?

25       A.    I'm sorry?  What was the standard?

Page 39

1      Q.    What are the best practices?  You

2  referenced best practices would have affected

3  Salesforce.  What are those best practices?

4      A.    I am not a Salesforce user, but I can tell

5  you that with all of the metrics that are in

6  Salesforce, you can breakout so much information about

7  how quickly the information gets implemented, like,

8  same day, realtime, rather than, like, waiting to

9  Friday to do implementation.  It needs to be realtime.

10  At the same time you are sending an email, you are

11  documenting in Salesforce, and you are leading a phone

12  call.

13      Q.    You are using implementation in a way I

14  never heard it used.  Can you define for me what you

15  mean by implementation?

16      A.    It's a technology platform that has to be

17  implemented across an organization.  So when we first,

18  as the sales team, started using Salesforce, we didn't

19  know how to use it to its fullest potential, and so we

20  never really, fully implemented it to take full

21  advantage of its many, many facets.

22      Q.    I'm still not sure you answered the

23  question as to what you mean by implementing.  I am not

24  following what you mean by implementing Salesforce.

25  What do you mean by implementing?

Page 40

1          A.     Best practices.  So you are trying to set

2     up a demo, that's your goal, right?  And that's the

3     metrics within Salesforce.  So to be very efficient

4     with Salesforce, you need to be able to triangulate

5     your thinking.  And when you triangulate your thinking

6     between email, documentation of Salesforce and making a

7     phone call to get the demo set up, that's a best

8     practice.  And that's implementing the tool further

9     than we can implement it until we learn how to do that.

10         Q.     So really what you are saying is, that as

11    you learn how to use Salesforce -- let me rephrase

12    that.

13              The better you understand how to use the

14    tools within Salesforce, the more likely you are to

15    move from account manager to senior account manager; is

16    that correct?

17         A.     Yes.

18         Q.     Other than increasing your skill set, what

19    -- let me take a step back.

20              What I am hearing you say is an account

21    manager is, essentially, a new employee, or an employee

22    that is not well versed in the technology that Chmura

23    uses.  Is that a fair representation of what an account

24    manager would be defined as?

25         A.     There are more functions than that, but

Page 41

1   those are key functions.

2        Q.    So a senior account manager is someone who

3   has both spent time at Chmura to learn both the product

4   as well as the technology used to sell the product; is

5   that fair?

6        A.    It is not fair because you are leaving out

7   the public facings, client facing piece of that, which

8   put them on the outside of the organization.

9        Q.    So an account manager is never allowed to

10  travel anywhere; is that correct?

11            MS. SIEGMUND:  Object to the form of the

12  question.  You can answer.

13       A.    It varies by person.

14       Q.    Well, even an account manager could leave

15  the office to do something relating to their sales

16  position; is that correct?

17       A.    I don't understand.

18       Q.    I am trying to understand the difference

19  between an account manager and a senior account

20  manager.

21            Putting it simply, as simply as you can,

22  what is the difference between an account manager and a

23  senior account manager?

24       A.    Talent, knowledge, tenure.

25       Q.    I'm sorry, what was the last one?

Page 42

1        A.      Tenure.

2        Q.      Okay.  Who supervises account managers?

3        A.      Sales managers.

4        Q.      Who supervises senior account managers?

5        A.      Sales managers.

6        Q.      Since 2015, who were the account managers

7    at Chmura, both current and former?

8        A.      Are you speaking for one year, 2015?

9        Q.      Since 2015.  So from 2015 forward, can you

10   please name the account managers that are either

11   current employees or former employees of Chmura?

12       A.      So there was Rick Lombardo, Huey

13   Dandee(ph), James Donovan, then there was David

14   Aultman, Wilson Cox Jennifer Ludvik.  Oh, I left out

15   Austen Steele.  And Doug Cey, C-E-Y.

16       Q.      In my count, that was eight account

17   managers since 2015; is that correct?

18       A.      I don't know if that's the correct number.

19   I am speaking from memory.

20       Q.      Okay.  How many of the ones that you listed

21   are still currently employed at Chmura?

22       A.      Wilson Cox.  Oh, I left out the new sales

23   team.  Sorry.  Can I go back and add to the other

24   people?

25       Q.      Of course.

Page 43

1        A.     And do you need the managers names?

2        Q.     Let's start with the account managers

3    first.

4        A.     Okay.  So there's Stephanie Wiley, Sarah

5    Manfroni, Anthony Marchetto, and Derrick Reese.  I am

6    not sure if I got Derrick's name right.  He is the

7    latest that's come in.

8        Q.     Of the four you just named, who is still

9    employed at Chmura?

10       A.     Of the last four I just named?

11       Q.     Yes.

12       A.     All of them.

13       Q.     Does Chmura currently have any senior

14   account managers?

15       A.     We have one.

16       Q.     And who is that?

17       A.     Stephanie Wiley.

18       Q.     How long has Stephanie Wiley been a senior

19   account manager?

20       A.     She was a senior account manager from

21   November -- I'm sorry, December until April, at which

22   time she was put on a performance improvement plan and

23   demoted back to account manager.  So she is not

24   traveling.

25       Q.     So currently -- well, let me take a step

Page 44

1   back.   In 2019, how many senior account managers did
2   Chmura have?
3        A.    Two.
4        Q.    And who were they?
5        A.    Mr. Lombardo and Austen Steele.
6        Q.    Was -- when did Mr. Lombardo become a
7   senior account manager?
8        A.    On May 18, 2017.
9        Q.    When did Mr. Steele, Austen Steele, become
10  a senior account manager?
11       A.    At the same time.
12       Q.    When was Mr. Lombardo hired by Chmura?
13       A.    February 18, 2015.
14       Q.    And what about Mr. Steele?
15       A.    In August of the next year.
16       Q.    Who -- can you name the sales managers that
17  have held the sales management position at Chmura since
18  2015?
19       A.    Is that somehow different than the account
20  managers?
21       Q.    You testified earlier that account managers
22  reported to sales managers.
23       A.    Oh, I'm sorry.  Yes, correct.  I thought
24  you said sales manager as in managing account.
25       Q.    Can you --

Page 45

1          A.     So that would be --

2          Q.     I'm sorry.  I was just going to repeat my

3     question, but go ahead.

4          A.     Leslie Peterson, Kyle West, Greg Chmura,

5     Curtis Monk, Eli Auerbach, and now interim is Dr. Bryan

6     Shelly.

7          Q.     From what period of time were you a sales

8     manager?

9          A.     February 2015 until October 2017.

10         Q.     And Mr. West, from what period of time was

11    he a sales manager?

12         A.     He was -- to the best of my knowledge, he

13    was there in like -- like nine months, and so he wasn't

14    there a full year.

15         Q.     And did he start immediately after you

16    moved to a different position?

17         A.     Do you mind repeating that question?

18         Q.     Did he take on the sales manager role in

19    concurrence with you taking on a new role in October of

20    2017?

21         A.     He took on that role because I needed to

22    move more into marketing and strategy development.

23         Q.     And that was in October of 2017, right?

24         A.     I don't know if I have that exact month

25    correct.  I know we had a conversation in October.

Page 46

1      Q.    Do you know approximate dates that Greg

2   Chmura was a sales manager?

3      A.    That was around July 8, 2018.

4      Q.    And how long was he a sales manager for?

5      A.    He was a sales manager until -- let's see.

6   Let me go back and go through the series of events.  So

7   Kyle came in in October, and then when we got to be to

8   December, he wanted to go to Italy with his wife.  So

9   he was gone for two months, and then he came back in

10  May of 2018.

11           At that point, we had to put him on a

12  different path because he couldn't manage the sales

13  team from Italy.  So that's when Greg took over.  So

14  sometime around January 2018 was Greg.

15           And Greg kept it until Mr. Monk came

16  because we needed Greg to get more focused on -- we

17  needed Greg to be more focused on data governance.  And

18  that's when Mr. Monk came in, in, like, October.

19     Q.    Was that October of 2018?

20     A.    Yes.

21     Q.    And how long was Mr.  Monk a sales manager

22  for Chmura?

23     A.    He left in February -- February 1st of

24  2019.

25     Q.    And then did Mr. Auerbach -- Eli Auerbach,

Page 47

1  when was he a sales manager?  When did he start as a

2  sales manager?

3        A.    He was April 15, 2019.

4        Q.    And when did he move on from the sales

5  manager position?

6        A.    It was in November of 2019.

7        Q.    Is he currently employed by Chmura?

8        A.    No.

9        Q.    Is Curtis Monk currently employed by

10  Chmura?

11        A.    No.

12        Q.    Greg Chmura is still employed at Chmura,

13  correct?

14        A.    Yes.  He's a profit interest partner.

15        Q.    Is Mr. West still employed by Mr. Chmura?

16        A.    No, he left April 15th of this year.

17        Q.    And the last one you said, I believe, was

18  Dr. Bryan Shelly; is that correct?

19        A.    Shelly.  S-H.

20        Q.    And is he currently employed at Chmura?

21        A.    He is.

22        Q.    During Mr. Lombardo's employment at Chmura,

23  of the list of sales managers you just listed, who did

24  he report to?

25        A.    All of them.

Page 48

1    Q.    Did he report to Mr. -- Dr. Shelly?

2    A.    No.

3    Q.    Mr. Lombardo reported to you, correct?

4    A.    Yes.

5    Q.    And then he reported to Mr. West?

6    A.    Yes.

7    Q.    And then to Greg Chmura?

8    A.    Yes.

9    Q.    And then to Mr. Monk?

10   A.    Yes.

11   Q.    And, finally, to Mr. Auerbach; is that

12 correct?

13   A.    Yes.

14   Q.    Other than the sales managers -- let me

15 rephrase.

16         There were account managers, senior account

17 managers and sales managers within the sales team,

18 correct?

19   A.    Correct.

20   Q.    Were there any other --

21   A.    Yes, sales support coordinators.

22   Q.    And what did the sales support coordinator

23 do?

24   A.    She is supporting roles for all of the

25 account managers and senior account managers that

Page 49

1   ranged from expediting paperwork, researching industry,

2   providing support on the license agreements when

3   needed.  She organized some outside bills, listing

4   tours.  So she was our ad man.

5        Q.    And you are referring to she.  Who is that?

6        A.    Samantha Solintics.

7        Q.    Is she still employed --

8        A.    S-O-L-I-N-T-I-C-S.

9        Q.    And is she currently employed by Chmura?

10       A.    No, she left at the end of April.

11       Q.    Does Chmura currently have a sales support

12  coordinator?

13       A.    We do not.

14       Q.    Was she there during the entirety of

15  Mr. Lombardo's employment?

16       A.    No, she was not.  She came in after Eli

17  took over the management role.  He hired her.

18       Q.    Was there a sales support coordinator hired

19  prior to Samantha?

20       A.    There was a sales, SDR, sales development

21  person that would -- that could participate in

22  commissions if they were prospecting and set the demo

23  up, and then the account manager or senior account

24  manager took that demo to close, and they got a small

25  portion of the total commission.  We only had one of

Page 50

1    those, and he really didn't perform, so we moved away

2    from that S D R model to the sales --

3            Q.    Who was that?  Sorry.  Who was that?

4            A.    Josh Jones.

5                        -   -   -   -   -

6            (Short pause off the record.)

7                        -   -   -   -   -

8            MS. COOPER:  Back on the record.

9    BY MS. COOPER:

10           Q.    Ms. Petersen, I am going to share my screen

11   again and move on to the next topic here.  I am going

12   to move down to Topic Number 11.  It states, "The

13   negotiation, drafting and terms of the documents

14   attached as Exhibit A, the February 3, 2015 letter;

15   Exhibit B, the Confidentiality, Non-Competition,

16   Non-Solicitation Agreement; and Exhibit C,

17   March 28, 2019, Amendment to the Counterclaim."

18           You were designated as the corporate

19   representative to testify on this topic; is that your

20   understanding?

21           A.    It is.

22           Q.    I am going to show you what's been marked

23   as Defendant's Exhibit E.

24                        -   -   -   -   -

25           (Thereupon, Deposition Exhibit E, Copy

Page 51

1            of Letter Dated 2/3/15 to Richard

2            Lombardo, Bates CHMURA000097, was

3            marked for purposes of identification.)

4                        -   -   -   -   -

5            MS. COOPER:  Heidi, I will send this to you

6     as well.

7        A.    (Reviewing.)

8        Q.    Do you recognize this document?

9        A.    I do.

10       Q.    And what is it?

11       A.    It's an offer of employment, a letter.

12       Q.    And it's directed to Mr. Lombardo, correct?

13       A.    Yes.

14       Q.    And if you turn to the second page, is that

15    your signature under, Sincerely?

16       A.    Yes.

17       Q.    Is this a true and accurate copy of the

18    February 3, 2015 letter to Mr. Lombardo?

19       A.    It appears to be.

20       Q.    If you go back up to Page 1, there is some

21    handwriting on this page.  Is that your handwriting?

22       A.    No.

23       Q.    Do you know whose handwriting that is?

24       A.    I don't.

25       Q.    Now, if you look at this letter, it says,

Page 52

1   "It is our pleasure to detail an offer of employment as

2   an inside sales representative with Chmura Economics &

3   Analytics at our Cleveland, Ohio office."  Do you see

4   that at the very top?

5        A.    I can.

6        Q.    So the offer to Mr. Lombardo, should he

7   accept, was to be an inside sales representative at

8   Chmura, correct?

9        A.    That was the language that was given to us

10  by the recruiter.

11       Q.    Did -- who prepared this letter?

12       A.    The recruiter.

13       Q.    The recruiter is -- sorry, go ahead and

14  finish that.

15       A.    It was transferred to our letterhead.

16       Q.    This -- was it a recruiter you were working

17  with?

18       A.    No, John was working with Jennifer.

19       Q.    But it was a recruiter who was acting on

20  behalf of Chmura?

21       A.    Working on behalf of Mr. Lombardo and

22  Chmura.

23       Q.    Did you retain a recruiter to fill a

24  certain position?

25       A.    We did.

Page 53

1      Q.    And was the recruiter that you retained the

2   recruiter who prepared the letter?

3      A.    It is my understanding that that's where

4   that came from, the details of it.

5      Q.    So your testimony is that a recruiter

6   decided on Mr. Lombardo's title at Chmura upon hiring?

7      A.    That's my understanding because there was

8   some forms that came in and they asked about exempt and

9   non-exempt, and we chose exempt, and Jennifer said,

10  perfect.

11     Q.    Who is Jennifer?

12     A.    She was the recruiter.

13     Q.    So your testimony is that Chmura let a

14  recruiter determine what position would be filled; is

15  that correct?

16     A.    Chmura gave a description of the -- a job

17  description of the need so that an ad could be placed,

18  and in that ad, there was the need for a sales

19  representative.  However, before we ever went to the

20  recruiter, we met with ComDoc, ComDoc in Cleveland, to

21  get an understanding of how they grew from a very small

22  start-up LLC to a very large one.  So that was our

23  vision for our sales team, was to start very small and

24  grow and increase our technology sales.

25            So we took that model from ComDoc and

Page 54

1    explained that to Jennifer.  And this was John doing

2    all this.  And then from there, the ad was placed and

3    the information was conveyed back and forth between

4    Jennifer and John.

5          Q.    And when you refer to John, you are

6    referring to John Chmura?

7          A.    Yes, because he was in Cleveland.

8          Q.    And in accordance with this offer letter,

9    Chmura offered Mr. Lombardo an annual base salary plus

10   commission as the compensation structure, correct?

11         A.    Yes, that's the compensation structure that

12   we took from ComDoc.

13         Q.    And you earlier testified that it was a

14   true and accurate copy of the letter, correct?

15         A.    It looks like it.

16         Q.    Is there anything about this letter that's

17   inaccurate?

18         A.    Well, I don't know whose handwriting that

19   is, and there was a typo on there, merit increases.

20   That was never put in any sales account manager's offer

21   letter.  That was a carry over from somewhere.

22         Q.    Can you point me, or read the language that

23   you are referring to in the letter?

24         A.    Certainly.  "After three months employment,

25   you will also be eligible for annual merit increases

Page 55

1   upon approved performance by your management."  And

2   that's not in any other account manager's letter.

3        Q.    Did you review this letter before you

4   signed it?

5        A.    I don't think I did.  I think we just had

6   it done in Cleveland and they got my signature on it.

7        Q.    Do you think this offer -- well, let me

8   look at the offer.  Chmura was offering eight paid

9   holidays over a typical full calendar year, correct?

10       A.    At that time, it was eight.  Now it is 10.

11       Q.    It was 10, but it says 8?  Sorry.  You said

12  it was 10 paid holidays; is that correct?

13       A.    It became 10 in 2020.  We added another

14  holiday in 2020.

15       Q.    I am not asking about 2020.  I am asking

16  about what this letter says.  You were offering

17  Mr. Lombardo eight paid holidays, correct?

18       A.    We were offering eight at that time, yes.

19       Q.    And you earlier testified that the

20  signature on this letter was yours, correct?

21       A.    It is my electronic signature.

22       Q.    So did you electronically sign this

23  document?

24       A.    I don't remember.

25       Q.    Are you now stating that your signature is

Page 56

1  not authentic on this document?

2       A.    My signature is authentic on the document.

3  That is my electronic signature.

4       Q.    So other than the language that you read

5  about the opportunity for -- I am looking for it here.

6  You read from it.  So bullet point -- where is the

7  language that you read that you said was inaccurate?

8       A.    "Annual merit increases upon approved

9  performance by your management."  That's not the model

10 from ComDoc.  The model from ComDoc is that your base

11 will go from 55 to 50 in year two with the

12 understanding and expectation that your commissions

13 would more than offset a drop in base.

14      Q.    Other than that, is there anything else

15 inaccurate in that letter?  Other than the reference to

16 annual merit increase, is there anything else

17 inaccurate in the letter?

18      A.    I am reading it.

19      Q.    I'm sorry.  What else is inaccurate?

20      A.    I don't see --

21           THE WITNESS:  Keep going down.  There is

22 something else down there.

23           MS. SIEGMUND:  (Indicating).

24      A.    Nothing else is inaccurate.

25      Q.    So Chmura agreed to pay Mr. Lombardo

Page 57

1   $55,000 annual base salary for year one, correct?

2        A.    Correct.

3        Q.    And $50,000 for year two and forward --

4   going forward, correct?

5        A.    Correct.

6        Q.    And the commission rate on initial sales

7   was 15%, correct?

8        A.    This is -- that is -- that was the details

9   of the offer.  The details of how that came about had

10  to do with transitioning from business development

11  manager to a sales team.  But not all leads were 100%

12  available.  I only took over 15%, but there were just a

13  few of those.

14       Q.    But this letter states that Mr. Lombardo

15  would be paid 15% of any initial sales of JobsEQ,

16  correct?

17       A.    Some of the sales that were handed to Rick

18  were sales that other people had made --

19       Q.    That's not my -- Ms. Peterson, I'd like you

20  to answer my question, which is a simple yes or no

21  question.  This letter states that Mr. Lombardo was to

22  be paid 15% of initial sales as the commission rate on

23  JobsEQ sales, correct?

24       A.    Correct.

25       Q.    What is your definition of an initial sale?

Page 58

1       A.    Of an initial sale?

2       Q.    Yes.

3       A.    Where is that term used?

4       Q.    Well, that would be 15% of initial sales as

5    the commission Mr. Lombardo was --

6       A.    Oh, I see, yeah, initial sale.

7       Q.    What is an initial sale?

8       A.    15% of initial sale means that that client

9    has been prospected by the account manager, has set up

10   a demo with the account manager, and did the demo by

11   themselves and did not have anyone in the room helping

12   them do that demo.  They closed that sale, they did the

13   paperwork for that sale, they invoiced properly in

14   Salesforce and invoiced properly with the accounting

15   department, and they have had four touch points for the

16   next year in order to qualify for the 10% renewal.

17      Q.    Was that written in any documentation

18   provided to Mr. Lombardo?

19      A.    Yes.

20      Q.    What documentation?

21      A.    It's in an email in March.

22      Q.    Ms. Petersen, you said it was documented in

23   March.  March of what year?

24      A.    2015.

25      Q.    March --

1     A.   Rick was still in training.

2     Q.   What written document exists defining that

3 -- defining initial sale as you did?

4     A.   It's in a written document to Rick Lombardo

5 and James Donovan transitioning from Rob McMillin, who

6 was business development, to the new sales team that we

7 were just setting up.  So we had to think about this as

8 a start-up.

9     Q.   Was that document produced in Discovery?

10     A.   I did not do Discovery.  Sharon put all

11 that together.

12     MS. COOPER:  Can we get a copy of that as I

13 think it goes directly to calculating commissions?

14     MS. SIEGMUND:  Yes, and I will tell you,

15 not to -- but we learned about that yesterday.  So we

16 will certainly get you a copy.

17     MS. COOPER:  Thank you.

18     Q.   And according to this document,

19 Mr. Lombardo was to be paid 3% of annual renewals,

20 correct?

21     A.   Yes.

22     Q.   The document you referenced in March, did

23 Mr. Lombardo sign that document?

24     A.   We didn't typically have employees sign

25 documents.  Our policies do not require that you sign

Page 60

1    them, except for the employee handbook.  And the

2    policies are not in the employee handbook.

3         Q.    So is it your position that Chmura can

4    change the compensation structure at any point on its

5    own accord?

6         A.    We can.

7         Q.    What gives you the right -- what gives

8    Chmura the right to change the compensation structure?

9              MS. SIEGMUND:  Object to the form of the

10   question.  You can answer.

11        A.    A business ebbs and flows, and employees

12   come and go.  And if we don't take the steps of

13   prospecting, setting up demos, doing demos, closing the

14   sale, executing appropriate paperwork in a manner

15   that's not sloppy, and working within that process, you

16   don't get the 15%.  You have to earn it.  And so in

17   some situations, the level of effort they put into a

18   renewal might be the same level of effort that was put

19   into a new sale, simply because those steps were not

20   completed.

21        Q.    So even though the renewal would go

22   through, what you are saying is, Chmura wouldn't pay

23   for that, wouldn't pay the account manager for that

24   renewal because it didn't like the way the renewal was

25   handled; is that correct?

Page 61

1      A.    No, that's not what I'm saying.

2      Q.    Well, can you repeat what you were saying

3  and -- help me understand what you were saying.

4      A.    I'm trying to help you understand the

5  difference between an initial sale and the steps that

6  are involved in the initial sale as compared to 3%

7  renewal.  And the steps are very discreet.  And if you

8  don't complete all the steps for the initial sale, then

9  we look at the level of effort that it does equate to,

10  and that's how -- and doesn't last long, it should be

11  two or three months.

12      Q.    What might be two or three months?

13      A.    These warm leads that somebody else did the

14  demos, was somebody else's investment in -- the

15  intellectual investment in doing the demo and

16  proficiency was not done by that -- particularly people

17  that were in training that just inherited other

18  people's work.

19      Q.    So if there was a lead that was two or

20  three months old, but you closed the deal on that, that

21  sale -- that account manager wouldn't get the 15%

22  commission, correct?

23      A.    I don't understand how you're articulating

24  that.  Two or three months' deal?  That's not what I --

25  not what I just articulated.  You have to prospect --

Page 62

1      Q.    Well --

2      A.    -- demo, schedule the demo, do the demo

3    yourself.  You can't have Rick or Chmura do your demo

4    for you.  And then you have -- those are the steps that

5    merit on an initial sale.

6      Q.    Okay.  So you get 15% for that initial

7    sale.  How do you earn the 3% for annual renewal?

8      A.    You have to have quarterly touch points

9    with each account, client.  You have to, 60 days out,

10   complete a customer satisfaction survey, and that's how

11   you earn that renewal.  It is called, retention.

12     Q.    I am going to show you what's been marked

13   Defendant's Exhibit L.

14                        -   -   -   -   -

15              (Thereupon, Deposition Exhibit L, Copy

16              of Email Chain from Richard Lombardo,

17              Bates CHMURA 0070222 - 223, was marked

18              for purposes of identification.)

19                        -   -   -   -   -

20     Q.    If you could, take a look at this document.

21     A.    (Reviewing.)  Yeah.

22     Q.    Do you recognize this document?

23     A.    Yes.

24     Q.    What is it?

25     A.    It's communications between when Rick

Page 63

1    started.  Chris turned over some leads to him in which

2    he had given demos.

3         Q.    And you are copied on this -- well, you

4    communicate through this email chain, correct?

5         A.    I do.

6         Q.    And is it a true and accurate copy of the

7    emails going back and forth in May of 2015?

8         A.    Looks like it.

9         Q.    Now, the leads that are referenced in this

10   email that were provided to Mr. Lombardo, how old were

11   those leads?

12        A.    So I am trying to see where the Park City

13   Conference was.  I think August.

14        Q.    I'll point you to, labeled at the bottom,

15   the very first page, Chmura 0070222.  If you look at

16   your first email there.  If you would read through

17   that.

18        A.    Rick's email or mine?

19        Q.    Yours.  Yours to Mr. Lombardo.

20             THE WITNESS:  I don't know which one she --

21             MS. SIEGMUND:  Christine, are you referring

22   to this one (indicating), the one I put on the screen

23   here, or the older one?

24             MS. COOPER:  Yeah, yeah, that one.  The one

25   you have on right now.

                                                    Page 64

1          A.     (Reviewing).

2          Q.     Does that refresh your recollection of when

3    that contact was made between Chris --

4          A.     Yes.

5          Q.     When was that?

6          A.     The Park City Conference in 2014, I

7    believe, was in August.

8          Q.     So as I read this email, it looks like you

9    were stating that the August 2014 contact would still

10   be a warm lead in May of 2015; is that correct?

11         A.     Because we followed up with this particular

12   client -- potential client at IEDC, which would have

13   been in October of 2014.  Rob McMillin, our business

14   development person, gave her a demo, but did not -- he

15   did not document and use Salesforce correctly, which

16   is -- that was a problem when Rick joined because the

17   information that he had in there was incomplete.  And

18   so I think she had three demos from us before she had

19   any contact with Rick.  And we had --

20         Q.     And -- I'm sorry.  Go ahead.

21         A.     We were helping her talk to her boss, our

22   board, to get payment.

23         Q.     Do you have any documentation showing those

24   contacts?

25         A.     Showing her the contract; is that what you

Page 65

1  said?

2       Q.    No.   Do you have any documentation showing

3  the date of those demos that you just mentioned?

4       A.    Yes, I am sure Chris has that on her sheet.

5       Q.    On what sheet?

6       A.    The one that she emailed to Rick.

7       Q.    What sheet did she email to Rick?  Can you

8  be more specific?

9       A.    Rob McMillin was not using Salesforce

10 correctly, or at all, and he was at conferences with

11 Chris, and this particular client had been shown JobsEQ

12 three times.  Rob was working with her, and it

13 sometimes takes, as Rick can tell you, up to a year to

14 get funding before you can purchase something.  The

15 cycle times are pretty long for government entities to

16 be able to purchase, and that was the situation.

17      Q.    The Salesforce does not reflect any of this

18 information you are testifying to right now; is that

19 correct?

20      A.    No, that particular individual, who is no

21 longer with us, refused to use Salesforce.

22      Q.    Going back to Exhibit E for a moment.  In

23 the offer letter, it states that Mr. Lombardo's quota

24 was three sales per month.  Do you see that, after the

25 three month ramp-up period, correct?

Page 66

1      A.    Yes.

2      Q.    Did Mr. Lombardo make his quota each month?

3      A.    Mr. Lombardo started making quota in his

4   fifth month.

5      Q.    Did you -- sorry, hard to hear numbers on

6   the computer.  Did you say fifth, F-I-F-T-H?

7      A.    Yes, I did.

8      Q.    And do you have documentation to show that

9   he did not start hitting quota until the fifth month of

10   employment?

11      A.    It's in Salesforce, but I don't have it

12   with me today.

13      Q.    Were those documents produced in Discovery?

14           So did you answer?  Were they produced in

15   Discovery?

16      A.    I didn't do those documents.  I didn't

17   produce the documents in Salesforce.  Somebody else did

18   that, so I really don't know.

19      Q.    But if I were to -- documents that I would

20   need to verify your testimony would be found within

21   Salesforce; is that correct?

22      A.    It should be.

23      Q.    If you turn to Page 2, I will scroll down

24   quickly there.  Mr. Lombardo signed this offer as well,

25   correct?

Page 67

```
 1        A.    Yes.

 2        Q.    And do you recognize his signature?

 3        A.    No.

 4        Q.    So you don't know whether the signature on

 5   this document is his or not?

 6        A.    Well, it says it is.  I mean, I can kind of

 7   read the -- read it.  I have no reason to believe it is

 8   not.

 9        Q.    Okay.  I want to move on to Deposition

10   Exhibit -- Defendant's Deposition Exhibit F.

11                         -   -   -   -   -

12              (Thereupon, Deposition Exhibit F, Copy

13               of Confidentiality, Non-Competition &

14               Non-Solicitation Agreement, was marked

15               for purposes of identification.)

16                         -   -   -   -   -

17        A.    (Reviewing.)

18        Q.    Do you recognize this document?

19        A.    Yes.

20        Q.    What is it?

21        A.    Our employee agreement.

22        Q.    And is that your signature on the sixth

23   page that you have up here of Exhibit F?

24        A.    Yes.

25        Q.    Did you sign this document?
```

Page 68

1          A.    Yes.

2          Q.    Let's scroll all the way back to the top.

3     You can do it, or I can do it.

4               MS. SIEGMUND:  I think it is faster if you

5     do it.  We have a little bit of a lag.

6               MS. COOPER:  Okay.

7          Q.    Having reviewed it, is this a true and

8     accurate copy of this agreement?

9          A.    It looks like it.

10         Q.    And it's titled, Confidentiality,

11    Non-Competition and Non-Solicitation Agreement; is that

12    correct?

13         A.    Yes.

14         Q.    And you referred to it as an employment

15    agreement.  Can you explain why you call it an

16    employment agreement?

17         A.    It is an internal term we use to describe

18    the document so we don't have to say Confidential,

19    Non-Competition and Non-Solicitation Agreement.  That's

20    very long.

21         Q.    Who prepared this agreement?

22         A.    McGuire Woods.

23         Q.    I want to go through the terms -- a few of

24    the terms of this agreement with you.  If you page just

25    down a little bit -- I will page down here for you, the

Page 69

1   Confidential Section, Section 1, do you see that?

2        A.    Yes, I do.

3        Q.    According to the terms of Section 1,

4   "Employee", who is Mr. Lombardo, correct?

5        A.    Correct.

6        Q.    "Shall not, during the term of his/her

7   employment, and thereafter, regardless of the reason

8   for his/her termination, reveal or disclose to any

9   person outside of the company, or use for his/her own

10  benefit or the benefit of any other person or entity,

11  any confidential or proprietary information concerning

12  the business or affairs of the company, or concerning

13  the company's customers, clients or employees."

14            Do you see that?

15       A.    Yes.

16       Q.    And, company, is Chmura, correct?

17       A.    Yes.

18       Q.    This Section 1 requires Mr. Lombardo to

19  keep what is defined as confidential and proprietary

20  information, confidential indefinitely; is that

21  correct?

22       A.    Yes.

23       Q.    And if you flip to the next page here, it

24  says, "Confidential and Proprietary" at the top.

25  "Confidential and proprietary information does not

Page 70

1   include information already available to the public

2   through no act of employee, nor does it include salary,

3   bonus or other personnel information specific to the

4   employee."  Do you see that?

5       A.    Yes.

6       Q.    So would you agree with me that this carves

7   out compensation information and personnel information

8   pertaining to Mr. Lombardo?

9       A.    Yes.

10      Q.    In your amended -- in Chmura's Amended

11  Complaint, Chmura alleges that Mr. Lombardo -- let me

12  pull up the complaint here.

13            I am going to show you what's been marked

14  as Defendant's Deposition Exhibit D.

15                    -   -   -   -   -

16            (Thereupon, Deposition Exhibit D, Copy

17            of First Amended Complaint, was marked

18            for purposes of identification.)

19                    -   -   -   -   -

20      Q.    You can go ahead and take a look at that.

21      A.    (Reviewing.)

22      Q.    Do you recognize that document?

23      A.    Yes.

24      Q.    What is it?

25      A.    It's the Complaint.

Page 71

1      Q.   And this is the Complaint that Chmura filed

2   -- it is the First Amended Complaint that Chmura filed

3   against Mr. Lombardo, correct?

4      A.   Correct.

5      Q.   And in this Complaint, Mr. -- I'm sorry --

6   Chmura alleges that Mr. Lombardo retained certain

7   confidential information in violation of Exhibit F,

8   what you refer to as the employee agreement, correct?

9      A.   Correct.

10     Q.   What confidential information do you allege

11   Mr. Lombardo retained?

12          MS. SIEGMUND:   And just to jump in quickly.

13   I know that Dr. Chmura has been designated on all of

14   the trade secrets and so forth that Mr. Lombardo

15   retained.  Of course, you are welcome to ask her about

16   this in her professional capacity, but just wanted to

17   clarify.

18          You can answer the question.

19     A.   I am not sure what it was.  It was about

20   the last topic.

21     Q.   What information do you purport -- sorry.

22   What confidential and proprietary information is it

23   that you purport Mr. Lombardo retained?

24     A.   Prospects and client information from two

25   conferences that would constitute prospects and

Page 72

1   renewals.

2       Q.   To your knowledge, did Mr. Lombardo -- let

3   me take a step back.  Is there any other confidential

4   information, to your knowledge, that is at issue in

5   this case?

6       A.   I don't know what's on it.  I haven't seen

7   it.

8       Q.   What's on what?

9       A.   The laptop.

10      Q.   To your knowledge, did Mr. Lombardo --

11  well, let me ask a different question first.  What are

12  the two conferences you refer to with respect to the

13  prospects and clients information?

14      A.   I'm a couple of steps removed, but I

15  believe it was the Texas Economic Development

16  Conference, and the International Economic Development

17  Conference in Indianapolis.

18      Q.   As you sit here today, are you aware of any

19  confidential information that Mr. Lombardo revealed or

20  disclosed to anyone?

21      A.   I would have to know who the anyone was.

22      Q.   As you sit here today, are you aware -- I'm

23  sorry.  As you sit here today, are you aware of any

24  confidential information that Mr. Lombardo revealed or

25  disclosed to anyone in the world?

Page 73

1          MS. SIEGMUND:  Objection to the form of the

2    question.  You can answer.

3          A.    Sorry did you end that with, "the world?"

4          Q.    Yes.

5          A.    I don't know how to answer that question.

6          Q.    Are you aware of any confidential

7    information that Mr. Lombardo revealed or disclosed at

8    any point in time?

9          MS. SIEGMUND:  Same objection.  You can

10   answer.

11         A.    Mr. Lombardo operates out of a different

12   location than I do, and I wasn't at either one of those

13   conferences.  I'm sometimes at conferences sharing a

14   booth with him, but I wasn't at either one of those

15   conferences, so at this time, no.

16         Q.    After Mr. Lombardo's position, or his

17   employment was terminated, are you aware of any

18   confidential information that Mr. Lombardo revealed or

19   disclosed to anyone?

20         A.    No.

21         Q.    Are you aware of any confidential

22   information that Mr. Lombardo used for his own benefit

23   after his termination?

24         A.    I'm aware of some data that Mr. Lombardo

25   has possession of that may have been used to solicit

Page 74

1   employment.

2        Q.    What data is that?

3        A.    Data from JobsEQ.

4        Q.    What type of data from JobsEQ?

5        A.    JobsEQ is a collection of charts, graphs,

6   tables, information that is in some graphic way

7   presented about the data -- underlying data.  And what

8   I saw was extracts of the data and applications for

9   them.

10       Q.    Do you know for certain that Mr. Lombardo

11  has that information?

12       A.    I have no reason to suspect that he

13  doesn't.

14       Q.    And what specific information are you

15  referring to?  You cast a broad category, but is it a

16  specific document you are referring to?

17       A.    What I was shown was a document.

18       Q.    I'm sorry.  Can you say that again?

19       A.    A document that represents an extract of

20  data from JobsEQ.

21       Q.    What specific data did that extract have?

22       A.    I did not memorize what the data was.  I

23  see it all the time.  I recognize it as JobsEQ output.

24       Q.    When did Mr. Lombardo come into possession

25  of this data, or this document?

Page 75

1          A.    I wasn't involved in the forensic analysis
2     of that, so I can't give you a date.
3          Q.    Are you aware of any confidential
4     information that Mr. Lombardo used for the benefit of
5     another after his termination?
6                MS. SIEGMUND:   Objection to the form of the
7     question.   You can answer.
8          A.    I don't know.   No, I'm not aware.
9          Q.    Going back to the JobsEQ data that you
10    referred to just a moment ago, is the data itself
11    confidential?
12         A.    Yes, our data are confidential.
13         Q.    Has the document that you are referring to
14    been produced?
15         A.    Yes.
16         Q.    And what format was the JobsEQ document you
17    are referring to?
18         A.    A scan I believe.   I didn't pay attention
19    to the format when I saw it.
20         Q.    Was it an Excel spreadsheet?
21         A.    No.
22         Q.    Was it a chart?
23         A.    It had charts, graphs, and tables.
24         Q.    So you don't remember what specific
25    information was contained within that document,

Page 76

1  correct?

2        A.    I didn't spend much time with that

3  document.  I just recognized it as JobsEQ.

4        Q.    I want to go back to Exhibit F and go --

5  page down to Section 3.  Section 3 is, "Covenants Not

6  to Compete or Interfere," do you see that?

7        A.    Yes.

8        Q.    And I want to go through each one of these

9  subsections.

10            The first one, 3a, says that, "Employees

11 shall not own or acquire an interest in or participate

12 in the management or control of any entity that

13 competes against the company by engaging in the

14 company's business in geographic areas in which the

15 company does business."  Do you see that?

16       A.    I do.

17       Q.    Are you aware of -- let me rephrase that.

18 To your knowledge, did Mr. Lombardo -- has Mr. Lombardo

19 owned or currently owned or acquired an interest in or

20 participated in the management or control of any entity

21 that competes against the company by engaging in the

22 company's business in geographic areas in which the

23 company does business?

24       A.    What is "interest in"?  How do you define

25 interest?

Page 77

1      Q.    Well, this is a document you signed,

2   correct?

3      A.    I'm not understanding the question.  I'm

4   sorry.

5      Q.    Well, you see the language on this page,

6   right?  It says that an "Employee shall not own or

7   acquire an interest in or participate in a management

8   or control of any entity that competes against the

9   company by engaging in the company's business in

10  geographic areas in which the company does business,"

11  correct?

12     A.    Correct.

13     Q.    What does "interest" in that sentence mean

14  to you?

15     A.    Employed.

16     Q.    Okay.  Are you aware or do you have any --

17  let me rephrase.

18          To your knowledge, is Mr. Lombardo -- well,

19  I want to step back.  You say "employed."  So you think

20  interest means employed?  That's your understanding of

21  what interest in this paragraph means?

22          MS. SIEGMUND:  Object to the form of the

23  question.  You can answer.

24     A.    I probably don't know exactly what it

25  means.  I am not an attorney.  I didn't write it.

Page 78

1      Q.    Well, you -- let's take a step back.   You

2  own an interest in Chmura, correct?

3      A.    Well, that has a tangible stock associated

4  with it.

5      Q.    Okay.  Well, assume -- well no, I don't

6  want you to assume anything.

7            Do you have any reason to believe

8  Mr. Lombardo owns a company that competes against

9  Chmura?

10     A.    No, I don't.

11     Q.    Do you have any reason to believe that

12  Mr. Lombardo owns a part of a company that competes

13  with Chmura?

14     A.    No.

15     Q.    Moving on to Section B under 3, Section 3b.

16  "The employee shall not directly or indirectly perform,

17  whether as an employee, independent contractor,

18  consultant, agent or owner, the same, similar or

19  substantially similar job duties or services as she/he

20  performed for the company on the date of his/her

21  termination or within the one year period preceding

22  date of his/her termination, for or on behalf of any

23  person or entity that engages in the company's business

24  in any geographic areas serviced by employee or in

25  which employee provided goods or services on behalf of

Page 79

1    the company during his/her employment with the

2    company." Do you see that?

3        A.    I see it.

4        Q.    Do you have any reason to believe

5    Mr. Lombardo is in violation of Section 3b as I just

6    read it?

7        A.    I don't know what Mr. Lombardo is doing.

8        Q.    Do you have any basis for believing that he

9    is employed by a competitor of Chmura?

10       A.    I wouldn't know.  I know what his LinkedIn

11   said.  It wasn't a competitor.

12       Q.    Did you say it wasn't a competitor?

13       A.    No, not to my knowledge.

14       Q.    Do you have -- look at Section 3c.  Do you

15   have any basis for asserting that Mr. Lombardo

16   solicited or attempted to solicit for purposes of

17   providing products or services that are the same or

18   substantially similar to the company's business, any

19   individual or entity to whom Mr. Lombardo provided

20   products or services at any time during the period of

21   his/her employment with the company -- I'm sorry --

22   with his employment with the company?

23           MS. SIEGMUND:  Object to the form of the

24   question.  You can answer.

25       A.    I don't know how to answer that because it

Page 80

1   sounds like three questions to me.  Is that one

2   question?

3        Q.   I'll break it down.  That was a fair

4   comment.  Absolutely fair comment.

5            Do you have any basis for asserting that

6   Mr. Lombardo has solicited any of Chmura's customers

7   after his termination?

8        A.   Not after.

9        Q.   Did Mr. Lombardo solicit customers outside

10  of his job responsibilities during his employment?

11       A.   Yes.

12       Q.   Who did he solicit while he was employed?

13       A.   GIS Web Tech.

14       Q.   And what is GIS Web Tech?

15       A.   GIS Web Tech is a provider of -- it's

16  geolocation maps for regions that want to promote their

17  buildings in Skype.  And more and more of the location

18  providers are wanting to put labor data in the

19  shapefiles, or in the layers of their maps, and GIS Web

20  Tech is the first provider of those web services

21  through our client at South Carolina Power, and that's

22  how we met them.

23       Q.   Why do you purport -- what product or

24  services that are the same or substantially similar to

25  Chmura's was Mr. Lombardo attempting to sell to GIS?

Page 81

1        A.     Himself.  He was attempting to get a job

2   there.

3        Q.     I am going to have you take a look at

4   Section C, read through Section C.  I will give you a

5   moment.

6        A.     (Reviewing.)

7        Q.     Just tell me when you are done.

8        A.     That's a very -- I need to unpack that.

9   That's a very dense paragraph.

10       Q.     Well, you were designated to testify as to

11   the terms of this agreement, correct?

12       A.     I was, but, you know, I am not sure what

13   you are asking of me.

14       Q.     What I am asking you is how was

15   Mr. Lombardo -- how was Mr. Lombardo seeking employment

16   at GIS a violation of Section 3c of the agreement?

17       A.     It did not.  That's not.  That's services,

18   through product.  That's not employment.

19       Q.     Do you have any basis for asserting that

20   Mr. Lombardo -- and I will start one at a time, so we

21   are not packing so much in.

22              Do you have any basis for asserting

23   Mr. Lombardo directly or indirectly diverted -- take a

24   look at D while I read through it as well, and we'll

25   work through this one together.

Page 82

1       A.    (Reviewing.)

2       Q.    Just let me know when you are done.

3       A.    I am finished.

4       Q.    Do you have any basis for asserting that

5  Mr. Lombardo diverted Chmura's business away from

6  Chmura?

7             MS. SIEGMUND:  Objection to the form of the

8  question.  You can answer.

9       A.    So suppliers, licensors, licensees,

10  business relations, there is a lot of damage done

11  between Chmura and GIS Web Tech.  That did divert --

12      Q.    How did it -- okay, so walk back on that.

13  So Mr. Lombardo applying to GIS, how did that violate

14  Section D of Exhibit F -- Section 3d of Exhibit F?

15             MS. SIEGMUND:  Object to the form of the

16  question.  You can answer.

17      A.    That's a how question and not a what

18  question?

19      Q.    Yes, how did Mr. Lombardo's application, or

20  applying for a position at GIS violate Section 3d of

21  Exhibit F?

22      A.    So we were planning a longstanding

23  relationship with GIS Web Tech in this industry that

24  could lead to, and we had planned for leading to,

25  sales.  And because of the damage that occurred when

Page 83

1   GIS Web Tech offered him a job and the way that we

2   found out about that caused us a lot of damage and

3   trust between Chmura and GIS Web Tech, damaging future

4   business relationships.

5        Q.    What -- did you have conversations with GIS

6   regarding Mr. Lombardo's potential employment at GIS?

7        A.    I did.

8        Q.    What were those conversations?

9        A.    We were presented with a falsified offer

10  letter at Mr. Lombardo's review that -- excuse me?  Did

11  somebody object?

12       Q.    No.  Continue.

13       A.    Because the fonts were different, and it

14  was obvious that it was a small company that we knew

15  pretty well who it was, so I did move forward to find

16  out if they are the company that offered this letter to

17  Rick, and they confirmed they were.

18       Q.    Okay.  How was -- how did that -- how did

19  Mr. Lombardo applying, or how did Mr. Lombardo being

20  considered for employment by GIS affect Chmura?

21            MS. SIEGMUND:  Object to the form of the

22  question.  You can answer.

23       A.    So GIS Web Tech, and like all these other

24  map providers, want to get to your clients.  They want

25  to leverage their relationship with you to get to your

Page 84

1  clients, then they don't have to have as many inside

2  salespeople.  So we are not going to hand out our

3  client list to these people.  Rick had intimate

4  knowledge of where to take GIS Web Tech in this

5  industry.  And that caused damages between GIS Web Tech

6  and Chmura.

7          Q.    So Mr. Lombardo -- but what I am hearing

8  you testify is that Mr. Lombardo, by seeking a position

9  at GIS, damaged Chmura?

10         A.    I believe the way it was explained to me is

11  that GIS Web Tech was seeking a position for Rick

12  within their organization.

13         Q.    So GIS solicited Mr. Lombardo for

14  employment; is that correct?

15         A.    That's my understanding of what happened

16  over a dinner conversation.  But the offer letter, as

17  we discussed today, is very important in determining

18  the reality of the facts.  And the offer letter was

19  doctored and changed, which made us not trust Rick or

20  GIS Web Tech.  Those are damages.

21         Q.    Well, you could have continued to do work

22  with GIS, correct?  Sorry.  Chmura could have continued

23  to do work with GIS, correct?

24         A.    We have not wanted to move forward with

25  them since that happened, and so the communication is

Page 85

1    strained, not going where it was supposed to go before

2    this incident.

3            Q.    Is GIS a current client of Chmura's?

4            A.    This is an interesting sort of

5    intergrained[sic] situation, if you can let me explain

6    it.  Maybe this would help you understand.

7                 So in this situation, GIS Web Tech was a

8    client to South Carolina Power who was a client to

9    Chmura.  But in order for GIS Web Tech to get its

10   business revenues of South Carolina Power, we had to

11   send our data to GIS Web Tech, which means we had a

12   binding relationship with them that they could not do

13   anything else with our data.

14                So we had a contractual relationship.  The

15   flow of money, it's more like an Evergreen.  It flows

16   through the client to Chmura, and data flows from

17   Chmura to GIS Web Tech.  It is complicated.

18           Q.    But Chmura ultimately decided -- let me

19   rephrase that.

20                GIS has not decided not to do business with

21   Chmura, correct?

22           A.    GIS continues to want to do business with

23   Chmura.  Chmura does not feel that they can trust GIS

24   Web Tech to do that.

25           Q.    So Chmura is making the choice not to work

Page 86

1   with GIS Web Tech; is that correct?

2           MS. SIEGMUND:  Object to the form of the

3   question.  You can answer.

4       A.    It's in a situation of trying to repair the

5   relationship, so we are not moving forward.

6       Q.    But the repair, if I understand your

7   testimony, has to occur on GIS' end, not on Chmura's

8   end; is that correct?

9           MS. SIEGMUND:  Object to the form of the

10  question.

11      A.    No, that is not correct.

12      Q.    Other than the strained relationship

13  between GIS and Chmura, are you contending that there

14  are any other violations of Section 3d of Exhibit F?

15      A.    I am not.

16      Q.    Moving on to Section 3e.  Do you have any

17  basis for asserting that Mr. Lombardo directly or

18  indirectly on behalf of himself or any other person or

19  entity, recruited, solicited or hired any employee of

20  the company?  Of Chmura?

21      A.    He was not hiring.  He was not in a

22  position to hire anyone, so, no.

23      Q.    Okay.  Do you have any basis for asserting

24  that Mr. Lombardo violated Section 3e of Exhibit F in

25  any manner?

Page 87

1      A.    I do.

2      Q.    What is your basis for believing that a

3 violation occurred?

4      A.    So we hired a person in Ohio, and the last

5 name is not popping out right now, his name is Henry.

6 And we noticed that Henry was not making any progress

7 at all in his outreach to prospective clients.  And

8 when we had a confidential conversation with him about

9 that, he said, When I got here, Rick said that he would

10 have the rest of the country locked down in a year and

11 he was wasting his time being there.  So he was totally

12 demoted by what Rick had said, and we lost that

13 employee.

14     Q.    Can you explain to me how that is a

15 violation of Section 3e of Exhibit F?

16     A.    He induced or encouraged any employer to

17 terminate their employment.  That's exactly what he

18 did.  He said, you are not going to make it here, I am

19 going to have everything locked down.

20     Q.    Did this Henry, whose last name we don't

21 know, was he -- how was he terminated?  How --

22     A.    What --

23     Q.    Let me -- did Chmura fire Mr. Henry,

24 whatever his last name might be?

25     A.    Yes.

Page 88

1    Q.   So Henry did not voluntarily leave

2  employment?

3    A.   No.

4    Q.   And did Henry -- was he solicited to go to

5  anyone -- to a competitor of Chmura?

6    A.   I don't know where Henry is.  I didn't keep

7  up with him.

8    Q.   I want to turn your attention to Exhibit G.

9                    -   -   -   -   -

10               (Thereupon, Deposition Exhibit G, Copy

11               of Letter Dated 3/28/2019 to Mr.

12               Lombardo, was marked for purposes of

13               identification.)

14                    -   -   -   -   -

15    A.   (Reviewing.)

16    Q.   Do you recognize this document?

17    A.   I do.

18    Q.   What is it?

19    A.   It's an amendment to his original offer

20  letter.

21    Q.   Is that your signature on this letter?

22    A.   Yes, it is.

23    Q.   Is it a true and accurate copy of the

24  amendment?

25    A.   Looks like it.

Page 89

1       Q.    Was Mr. Lombardo provided anything in

2    return for signing this agreement?

3             MS. SIEGMUND:  Object to the form of the

4    question.  You can answer.

5       A.    I don't understand the question.

6       Q.    Was Mr. Lombardo provided anything in

7    return for signing this amendment?

8             MS. SIEGMUND:  Same objection.  You can

9    answer.

10      A.    I don't know what you are looking for.  He

11   had a cost of living increase rather than a merit

12   increase.  That may be what you are looking for.

13      Q.    How much was the cost of living increase?

14      A.    It varied by COLA and the cost of living in

15   2019.  I don't know what it was.

16      Q.    Was it a one time cost of living increase?

17      A.    It was going to be a cost of living

18   increase going forward.

19      Q.    Does this letter make any reference to cost

20   of living increase?

21      A.    It doesn't.

22      Q.    This letter states that, "The reference to

23   annual merit increases is hereby deleted," do you see

24   that?

25      A.    Yes.  That was a point of contention.

Page 90

1      Q.    And that's referring to annual merit

2  increases that was set forth in Exhibit E, correct?

3      A.    Yes.

4      Q.    And it states, "All other terms and

5  conditions of the offer letter remain unchanged."  Do

6  you see that?

7      A.    I do.

8      Q.    And Mr. Lombardo would still be entitled to

9  15% in commission on initial sales, correct?

10      A.    A company cannot lock themselves into a

11  situation where they cannot adjust to changes in

12  business climate, so I cannot say that I agree with

13  that.

14      Q.    Well, this states, "All other terms and

15  conditions of the offer letter remain unchanged,"

16  correct?

17      A.    At that time, they did.

18      Q.    And the term of the offer, Exhibit E, was a

19  15% commission on initial sales, correct?

20      A.    Correct.

21      Q.    And a 3% commission on annual renewals,

22  correct?

23      A.    Correct.

24      Q.    And this letter is dated March 28, 2019,

25  Exhibit G -- let me get back to it.  Exhibit G is dated

Page 91

1    March 28, 2019, correct?

2         A.    Correct.

3         Q.    This letter also -- or this amendment also

4    clarifies, according to the language, it says, clarify

5    -- "In addition, Chmura, would like to clarify that

6    commissions become payable once Chmura receives the

7    payment on the sale."  Do you see that?

8         A.    Yes, ma'am.

9         Q.    How was payment be made prior to this

10   amendment?

11        A.    In real time.

12        Q.    What does that mean?

13        A.    If it closed in April, the commissions were

14   paid out in May whether we had payment from the client

15   or not.  The precedent for changing that was we had

16   turnover, and when we had turnover and it was paid in

17   realtime, the client did not pay, so we had no recourse

18   to get that commission back.

19        Q.    How did this affect multi-year deals, this

20   amendment?

21             MS. SIEGMUND:  Object to the form of the

22   question.  You can answer.

23        A.    Multi-year deals is one of the areas the

24   account managers and senior account managers had the

25   most flexibility to negotiate on their own.  Multi-year

Page 92

1   deals are always 15% on year one.  Years 2 and 3 are

2   treated as renewals because you have those touch points

3   to retain that client.  Even though it is a three-year

4   deal, you still have to go through the process of the

5   four touch points, the customer satisfaction survey, to

6   earn your commission.

7        Q.   Now, you say in a multi-year deal, account

8   managers and senior account managers have the most, I

9   am not sure what word you used, ability to negotiate on

10  their own.  What did you mean by that?

11       A.   Rick had the ability to take 30% off of a

12  list price, and he was empowered to do that knowing

13  that we trusted him not to go there immediately, but to

14  ratchet it down until that was as low as he could go.

15       Q.   At what point in his employment with Chmura

16  did Mr. Lombardo, according to you, attain the ability

17  to give that discount?

18       A.   I don't know, but by that point, I wasn't

19  in there every day.  The day-to-day tasks, I wasn't in

20  there.  I just know it happened.

21       Q.   Who gave him permission to do that?

22       A.   SEA Group.

23       Q.   I'm sorry, can you say that again?

24       A.   SEA Group, S E A, Strategic Enterprise

25  Advisers.  That's a group within Chmura.  It's senior

Page 93

1   leadership.

2       Q.   So what is your basis for your statement

3   that Mr. Lombardo was permitted to give a 30% discount?

4           MS. SIEGMUND:   Object to the form of the

5   question.   You can answer.

6       A.   Because he was our top performer.   He was

7   our no-huddle quarterback.   He was very good.

8   No-huddle quarterback, like Peyton Manning.

9       Q.   Got it.

10      A.   Omaha.   That was Rick.   He i s very good at

11  what he does, so we wanted to give him that much

12  freedom.

13      Q.   And you don't recall when he was given that

14  authority or permission?

15      A.   Not at this time.

16      Q.   What's the source of your knowledge that he

17  could give a 30% discount?

18      A.   The pricing matrix, the requests of SEA

19  Group to allow that -- and Rick generally maintained

20  the commission documents, terms of prices.   So it might

21  have happened under his watch.

22      Q.   So did Mr. Lombardo have a different

23  pricing matrix than the other account managers or the

24  senior account managers?

25      A.   They all had the same -- they all had the

Page 94

1   same -- no.

2            MS. SIEGMUND:  Make sure you let her

3   finish.

4        Q.   Are you finished?

5        A.   I did.

6        Q.   Was the 30% discount, the authority -- or,

7   sorry.  Was Mr. Lombardo's ability to give a 30%

8   discount ever put in writing?

9        A.   It's in the pricing matrix, I think.

10        Q.   Did Chmura produce the pricing matrix or

11   matrices?

12        A.   Yes.

13        Q.   How was the pricing matrix stored?

14        A.   On Onstage.  It's a project collaborative

15   tool.

16        Q.   To your knowledge, was Onstage searched for

17   the discovery production in this case?

18        A.   I don't know about anything to do with

19   Discovery.

20        Q.   So do you know for certain that the pricing

21   matrix was produced?

22        A.   I don't.

23        Q.   Do you know for certain that 30% discount

24   is noted on the pricing matrix?

25        A.   I don't, but I am assuming that's where it

Page 95

1   is because that's where discounts were always stored.

2       Q.    You said that Mr. Lombardo was the only one

3   who could give that discount, correct?

4       A.    No, he is not the only one that could give

5   the discount.  He just was very good at getting that

6   discount in a measured way that helped the company and

7   helped them.  He would not go from list to 30.  He

8   would ratchet it down.  He was good at that.

9       Q.    So you are saying, if I'm understanding

10  correctly, that the other account managers and senior

11  account managers could give a 30% discount, correct?

12          MS. SIEGMUND:  Objection to form. You can

13  answer.

14      A.    This occurred after I was no longer his

15  supervisor, so I don't want to misspeak.

16      Q.    So do you not know?

17      A.    I have internal working knowledge of that,

18  but I can't point you to the sale matrix, the pricing

19  matrix where that is.  That's not something I reviewed.

20      Q.    When did you stop being involved in the

21  day-to-day of the sales team?

22      A.    I want to say October of 2017.

23      Q.    So while under your -- while you were in

24  charge of sales, did these account managers and senior

25  account managers have discretion to give discounts?

Page 96

1          A.     They were able to get them in -- I got

2     calls on almost a daily basis from Rick.  He would say,

3     they can't afford that, this is what they can afford.

4     And my typical response was, what do you recommend,

5     Rick?  He would give me his recommendation, and we

6     would go with that.

7          Q.     But he had to ask your permission to give

8     the discount, correct?

9          A.     Under my watch, he did.  I don't know if

10    that was continued, but -- it is not like he didn't

11    come -- he came with a recommendation.

12         Q.     I am going to show you what's being marked

13    as Deposition Exhibit N.

14                              -   -   -   -   -

15                (Thereupon, Deposition Exhibit N, Copy

16                of Email Dated 1/127/2017 from Leslie

17                Peterson, Bates Chmura0056740, was

18                marked for purposes of identification.)

19                              -   -   -   -   -

20         A.     (Reviewing.)  That was for the new hires.

21         Q.     Do you recognize this document?

22         A.     I do.

23         Q.     And what is it?

24         A.     It's an internal email about the new hires.

25         Q.     And this is an email you sent, correct?

Page 97

1          A.    This is for the benefit of the new hires,

2    not Rick.

3          Q.    Let me -- let me -- answer my questions.

4    Let's get through my questions first.

5                This is an email that you sent, correct?

6          A.    Correct.

7          Q.    And it is dated January 17, 2017, correct?

8          A.    Correct.

9          Q.    And it is addressed to Mr. Lombardo,

10   correct?

11         A.    Well, it is addressed to the sales team.

12         Q.    And that sales team consisted of

13   Mr. Lombardo, Mr. Steele, Ms. Ludvik, Mr. Grebenc and

14   Mr. Cox; is that correct?

15         A.    That is correct.  Kyle West is on there for

16   some reason, I don't know why it is.

17         Q.    And the subject line says, JobsEQ --

18         A.    Oh, I guess that's probably because he was

19   the manager at that time.  So, correct.

20         Q.    So the subject line says, "JobsEQ

21   Discounts," correct?

22         A.    Correct.

23         Q.    And the email states, "This is a reminder

24   to and new information for the new additions to the

25   sales organization," correct?

Page 98

1      A.    New hires, yes.

2      Q.    Well, the language says, "This is a

3   reminder to and new information for the new additions

4   to the sales organization", correct?

5      A.    Correct.

6      Q.    What -- so what you're saying is, this only

7   applies to new hires, this email?

8      A.    It was for the new hires to understand how

9   that discount could be applied.  They had not --

10     Q.    Well -- sorry, go ahead.

11     A.    No, you go ahead.

12     Q.    Well, this email continues to state,

13   "Discounts beyond those documented in the sales matrix

14   pricing sheet need to be individually approved by me,"

15   correct?

16     A.    Correct.

17     Q.    And "me" refers to you, Ms. Peterson,

18   correct?

19     A.    Yes, ma'am.

20     Q.    Why would you -- and it goes on to say,

21   "That translates into a case-by-case pre-approval

22   process before communicating pricing to the client,"

23   correct?

24     A.    Correct.

25     Q.    And, "No exceptions, even when you think we

Page 99

1    have established a precedent," correct?

2         A.    Correct.

3         Q.    Now, you earlier testified that this

4    applied only to new hires, correct?

5         A.    This was to get the information to new

6    hires.  This is a reminder.

7         Q.    So it was a reminder to new hires; is that

8    correct?

9         A.    That's correct because they -- as a team,

10   they often went to Rick for advice, and he was the

11   go-to person in the team.  So this is a reminder that

12   we need to make sure that we are starting at list

13   price.

14        Q.    Now, you testified that Mr. Lombardo always

15   came to you with a discount, correct?

16        A.    He came to me with a situation analysis:

17   This is what they can afford, this is their situation,

18   this is my recommendation.

19        Q.    Did Mr. Lombardo ever give a discount or

20   take a lower list -- a lower price off the list price

21   or below the list price without checking with you first

22   while you were his manager?

23             MS. SIEGMUND:  Object to the form of the

24   question.  You can answer.

25        A.    So my understanding is he always came to me

Page 100

1    with a recommendation.  Yes.  That's what I recall.

2         Q.    But your testimony is also that these new

3    employees, these new sales managers -- I'm sorry -- the

4    new account managers would go to Mr. Lombardo and ask

5    his opinion, correct?

6         A.    That's my understanding.  He was a leader,

7    yeah, he was their leader.

8         Q.    Do you have any reason to believe

9    Mr. Lombardo wouldn't have advised them to come to you

10   as he did?

11        A.    I'm not sure where this questioning is

12   going or what it is you want me to say.

13             MS. SIEGMUND:  Just answer the questions.

14        A.    No, I don't think so.

15        Q.    Let me re-ask the question.

16             Do you have any reason to believe

17   Mr. Lombardo would have advised the new hires to do

18   anything other than to reach out to you regarding

19   discounts or price changes?

20        A.    No.

21        Q.    I am going to show you what's been marked

22   as Deposition Exhibit -- actually, hold that thought

23   for a moment.

24             MS. COOPER:  We can take a break, if you'd

25   like, for a moment.

Page 101

```
 1                       -   -   -   -   -

 2             (Discussion had off the record.)

 3                       -   -   -   -   -

 4             MS. COOPER:  Counsel have talked off the

 5    the record, and we have agreed to end the deposition

 6    for this evening and continue it at 9 o'clock on

 7    Wednesday, May 6th in the morning, and keep the

 8    deposition open until the time that it is closed.

 9             Heidi, I don't know if you have anything

10    else to add to that.

11             MS. SIEGMUND:  No, that's fine, thank you.

12             MS. COOPER:  Thank you, both.

13

14       (Whereupon, deposition was adjourned at 6:25 p.m)

15

16

17

18

19

20

21

22

23

24

25
```

Page 102

1   Whereupon, Counsel was requested to give instruction

2   regarding the witness's review of the transcript

3   pursuant to the Civil Rules.

4

5                       SIGNATURE:

6

7    Transcript review was requested pursuant to the

8   applicable Rules of Civil Procedure.

9

10                      TRANSCRIPT DELIVERY:

11   Counsel was requested to give instruction regarding

12   delivery date of transcript.

13           Ms. Cooper, Original transcript, and rough

14   transcript, yes.

15           Ms. Siegmund, Certified transcript, and rough

16   transcript, yes.

17

18

19

20

21

22

23

24

25

Page 103

1                    REPORTER'S CERTIFICATE

2

3   The State of Ohio,    )

4                                    SS:

5   County of Cuyahoga.   )

6

7            I, KELLIANN D. LINBERG, RPR, a Notary Public

8   within and for the State of Ohio, duly commissioned and

9   qualified, do hereby certify that the within named

10  witness, LESLIE PETERSON, was by me first duly sworn to

11  testify the truth, the whole truth and nothing but the

12  truth in the cause aforesaid; that the testimony then

13  given by the above-referenced witness was by me reduced

14  to stenotypy in the presence of said witness;

15  afterwards transcribed, and that the foregoing is a

16  true and correct transcription of the testimony so

17  given by the above-referenced witness.

18            I do further certify that this deposition was

19  taken at the time and place in the foregoing caption

20  specified and was completed WITH ADJOURNMENT.

21

22

23

24

25

Page 104

1          I do further certify that I am not a

2   relative, counsel or attorney for either party, or

3   otherwise interested in the event of this action.

4

5          IN WITNESS WHEREOF, I have hereunto set my

6   hand and affixed my seal of office at Cleveland, Ohio,

7   on this 11th day of May, 2020.

8

9

10

11

12

13          Kelliann D. Linberg, R.P.R.,

14          Notary Public within and for

15          the State of Ohio

16

17   My commission expires May 25, 2024.

18

19

20

21

22

23

24

25