Exhibit 3

1              ROUGH ASCII - UNPROOFREAD

2      ------------------------------------------

               ROUGH DRAFT DISCLAIMER

3      ------------------------------------------

               IMPORTANT NOTICE TO COUNSEL:

4      ------------------------------------------

5

6    You are receiving a noncertified rough draft copy of a

7    deposition.  This rough draft is being provided at your

8    request for reference purposes only and not as the

9    final certified and sworn testimony.

10

11   You agree not to share, give, copy, scan, fax, or in

12   any way distribute this rough draft in any form

13   (written or computerized) to any party.  However, your

14   own experts, co-counsel and staff may have limited

15   internal use of same with the understanding that you

16   agree to replace it with the final transcript upon its

17   completion.

18

19

20

21

22

23

24

25

Page 2

1          Case:  CHMURA ECONOMICS & ANALYTICS LLC vs.
   RICHARD LOMBARDO

2          Date:  May 6, 2020

3

4                    REPORTER'S NOTE:

5   Since this deposition is in rough draft form, please be

6   aware that there may be a discrepancy

7   regarding page and line number when comparing

8   the rough draft, rough draft disk, and the final

9   transcript.

10  Also, please be aware that the noncertified

11  rough draft transcript may contain untranslated

12  steno, reporter's notes, misspelled proper

13  names, incorrect or missing Q/A symbols or

14  punctuation, and/or nonsensical English word

15  combinations, etc., such entries will be corrected on

16  the final, certified transcript.

17

18

19

20

21

22

23

24

25

1          LESLIE PETERSON, having been previously

2     sworn with the previous agreed upon stipulation

3     regarding the need for this deposition to take place

4     remotely because of the Government's order for social

5     distancing, said as follows:

6     BY MS. COOPER:

7          Q.    Good morning, Ms. Peterson.

8          A.    Good morning.

9          Q.    I want to pick up I think where we left

10    off, at least, there may be some duplication as we pick

11    up where we were.

12               MS. COOPER:  Are you guys having an okay

13    time hearing me?

14               MS. SIEGMUND:  Yes.  I am going to turn you

15    up at bit.  Before you get started , Ms. Peterson has

16    something she wants to correct from her deposition on

17    Thursday that she wanted to correct.

18          A.    On the offer letter, I found an email

19    {technical issue --  indiscernible } signed it.

20               (Reporter asked for clarification).

21          A.    I found an email and I spoke with John

22    Chmura, and he wrote the offer letter.  I reviewed it

23    and said it is good to go.

24          Q.    Did you sign the offer letter?

25          A.    It had my signature on it when I reviewed

Page 4

1    it.

2         **Q.**    I want to turn to -- back to Exhibit A,

3    Defendant's Exhibit A.  I will put that up on the

4    screen.

5         **Q.**    And turning your attention to -- well, let

6    me sort of scroll through it for a second.  This is the

7    notice of deposition that we looked at last week, and

8    as we discussed, you were designated as a corporate

9    representative to testify about certain topics.  I want

10   to turn your attention to Topic Number 12, job duties

11   of account manager and senior account manager between

12   February 1, 2015 and October 31, 2019.  You were

13   designated as the corporate representative to testify

14   on this topic, correct?

15        **A.**    Yes, ma'am.

16        **Q.**    Can you walk me through the job duties of

17   an account manager during that time frame?

18        **A.**    The job duties of an account manager was to

19   prospect potential clients, to set up a demo of JobsEQ,

20   our technology platform, to actually do the demo, to

21   close within a reasonable time, to counsel/advise the

22   client if there was funding issues.  After closing the

23   deal, to appropriately document himself or -- and

24   through the accounting department for details of the

25   license agreement, the regional territory of the

1    license, and the price and the terms of renewal.

2              To contact that client on a quarterly basis

3    to ensure that that client was using the product, and

4    and to determine if that client needed additional

5    training or help in any way from Chmura, and send out a

6    customer satisfaction survey 60 days prior to renewal

7    to determine the satisfaction level of that client with

8    the product and with Chmura, the sales team, and then

9    to ensure that this client renewed.

10        **Q.**   Were there any other job duties of an

11   account manager that you can think of?

12        **A.**   So this was a start up sales team and some

13   of the things that we made decisions around were new.

14   I suppose there was product, but to what -- there was a

15   good deal of travel involved and outward public facing

16   meetings.  So we had to get a comfort level that the

17   account managers could do that.  And, generally, by the

18   time they became a senior account manager, we had the

19   confidence that they could manage all of that on their

20   own.

21        **Q.**   When you say manage all of that on their

22   own, what are they managing on their own?

23        **A.**   Manage the conferences that they wanted to

24   attend, take care of their hotel and registration, to

25   do that in a manner that was ethical and appropriate in

1   terms of how they used the company credit card to pay

2   for travel and conferences, and have, traditionally,

3   maturity and act in a manner that was appropriate and

4   ethical.  And we felt like --

5        **Q.**   Did you not -- I'm sorry, go ahead.

6        **A.**    No, that's fine.  Go ahead.

7        **Q.**   Did you not expect those same expectations

8   out of an account manager?

9        **A.**    After you become comfortable with the

10  product and the culture of Chmura and you prove

11  yourself to be an ethical person, you get more

12  opportunities for independence and to manage more of

13  the functions that operations doesn't have to manage

14  for you.

15       **Q.**   Can you give me some specific examples of

16  things that a senior account manager would manage that

17  an account manager did not manage?

18       **A.**    Account manager went to the conferences

19  that we selected.  A senior account manager was able to

20  advise us on which conferences they chose to attend

21  because they had some senior knowledge and talent

22  around those conferences so that we had the best return

23  on investment possible.

24       **Q.**   Other than choosing conferences, does a

25  senior account manager have any different job duties

1   than that of an account manager?

2        A.    Senior account manager was more intimately

3   involved in marketing.  They were more involved in the

4   innovation.  They brought if more intelligence from the

5   industry about what needed to be added to our internal

6   roadmap because they had more knowledge about the

7   industry and that's why they became a senior account

8   manager over an account manager.

9            When an account manager comes in and they

10  have never sold software, let's say they sold vacuum

11  cleaners or they were in collections, but they had no

12  experienced in software sales, then that person had to

13  be inundated and immersed into the tech world.  And

14  that takes several months to take somebody that maybe

15  takes -- maybe it's been six -- maybe it takes them six

16  years to get a four-year degree, and maybe they moved

17  from collections to sell vacuum cleaners, and to get

18  them ready to be in the tech world, with economists,

19  that's a very sophisticated industry, you are expected

20  to be on point at all times.  There is a point at which

21  you -- being an account manager involves that, step up

22  to that challenge and deliver.

23       Q.    How did the determination to move from --

24  move a salesperson from the account management position

25  to senior account management position be made?

1      A.    At the time that we are talking about,

2  Mr. Lombardo, we did not have product managers, so

3  Austen and Rick were our product advisers, and so we

4  relied heavily on their insight into the clients'

5  needs.  You know, what keeps you up at night, what do

6  you need?  We relied heavily on that intelligence to be

7  more strategic in how we prioritized the roadmap.

8      Q.    But just generally speaking, how would a

9  salesperson move from the account manager position to a

10  senior account manager position?  How would that

11  happen?

12      A.    I don't know what generally speaking means.

13      Q.    When a salesperson is moved from a -- how

14  does Chmura decide when a salesperson was ready for the

15  senior account manager title?

16      A.    Well, in Mr. Lombardo's situation, he asked

17  for it and we talked about it, and we understood that

18  he was ready to move to the next level, and so we all

19  agreed -- it is a consensus based organization.  We

20  don't make decisions by one person.  So we, senior

21  leadership, decided that Rick was valuable to us in

22  terms of adding -- I mean, there are 300 logs of him

23  asking for GDP, 300 logs of that.  So he was our

24  product developer.  In smaller innovations you have to

25  understand we pair a lot of hats.

Page 9

1       **Q.**     I understand that.  I don't think you are

2   answering my question, though, let me take a step back.

3   Was there a written job description for account

4   managers?

5       **A.**     There was not.

6       **Q.**     Was there a written description for senior

7   account managers?

8       **A.**     There was not.

9       **Q.**     Were Mr. Steele and Mr. Lombardo the only

10  two senior account managers during Mr. Lombardo's

11  employment?

12      **A.**     Yes.  To the best of my knowledge, that is

13  true.

14      **Q.**     When did Mr. -- sorry, go ahead.

15      **A.**     No, they were A players.  It was -- we

16  depend on each one of them.  The question that you are

17  asking was May 17 of 2016?

18      **Q.**     Mr. Lombardo became a senior account

19  manager on May 17, 2016?

20      **A.**     To the best of my ability to remember, that

21  is the right month.

22      **Q.**     Who made the decision to give the promotion

23  to senior account manager?

24      **A.**     The SEA Group.

25      **Q.**     I want to step back and walk through these

1  job duties with you.  First, with respect to account

2  manager, you said that one of the job duties was to

3  prospect clients.  Can you explain to me what that is

4  or what that means?

5      A.    That means that you do research to figure

6  out who the person in the organization is that you need

7  to reach out to; that is, so a user of technology that

8  can get to the decision maker to adopt technology.

9  That's what prospecting is.  It is getting to the right

10 person.  Is that your question?  Did I answer your

11 question?

12     **Q.**    Yes, you did.  You did.

13     A.    Okay.

14     **Q.**    And then you said that the account manager

15 was responsible for setting up demos and -- we will

16 just stop at setting up demos.  Can you explain that a

17 little bit further?

18     A.    Setting up demos?  That means getting on

19 the calendar, being prepared to do the demo in a

20 customized manner that answers their pain point, what

21 keeps you up at night.

22     **Q.**    And them you said that an account manager

23 was responsible for doing the demo.  What did that

24 mean?

25     A.    So when you come in from, like, let's say

1   an industry that you have no knowledge of -- economics

2   is a pretty sophisticated social science industry.  And

3   let's say you come from vacuum cleaners or horse

4   medicine or whatever and you have no clue about the

5   differences between a social science and a physical

6   science, like TPHEUP biology, so you have to understand

7   the laws of economics and underlying assumptions, so

8   that's a daunting task for anyone that's never been

9   exposed to understanding economics theory.  Did I

10  answer your question?

11       Q.   I'm not sure.  You mentioned one of the job

12  duties of an account manager is to do the demo.  Isi

13  it --

14       A.   You can't do a demo unless you understand

15  the fundamentals of economics.

16       Q.   I understand that, but what does doing a

17  demo mean?  If an account manager is doing that demo,

18  what does that mean?

19       A.   That means they are on a shared screen and

20  they are going through analytics and our technology

21  platform, which is JobsEQ, and they are doing i tin a

22  manner that answers that client's pain point.

23       Q.   So the demo would be between the account

24  manager and the prospective client; is that correct?

25       A.   We expect that by our six months period.

1  In in the three months, one to three month period, we

2  expect them to be demo ready internally, and then they

3  can demonstrate between three months and six months

4  when they are successfully doing a demo with a client

5  on their own, they don't have to have an economist

6  sitting there with them.

7      **Q.**   Who are the economists at Chmura at the

8  time Mr. Lombardo was employed?

9      **A.**   I'm sorry.  There's some kind of noise.  Do

10  you hear that?  It's like a --

11          MS. SIEGMUND:  Yeah.

12          {Technical issues}.

13      **A.**   Can you repeat the question?  I'm sorry,

14  Christine.

15      **Q.**   I may be moving on to another question, so

16  for give me.  When an account manager is doing a demo,

17  it would be the account manager on their computer doing

18  an demo to a potential customer on the potential

19  customer's computer; is that correct?

20      **A.**   Yes, it's like, Go-to-Meeting or Zoom or

21  anything like that, like we are doing right now.

22      **Q.**   And then you said that one of the

23  expectations for na account manager was that they

24  closed within a reasonable time.  First of all, can you

25  define "closed" for me, what you mean by that?

1          A.     That you won a client.

2          Q.     And what does Chmura consider a reasonable

3    time?

4          A.     Well, that is a great question.  There are,

5    you know, business to government clients.  There are

6    cycles of budgets and depending on when you get that

7    demo completed within the budget process, it could be

8    -- it could be nine months, it could be twelve months,

9    it could be today.  It varies.

10         Q.     So there was no set time as to what Chmura

11   considered a reasonable time to close after a demo;

12   that fair?

13         A.     It depended on the client and if they would

14   be the G to B.  B to B doesn't have those government

15   imposed digitary profcease that B to B has.  B to B

16   does not have those barriers that B to G has.  Let me

17   be --

18         Q.     So what was Chmura's expectations with what

19   you say, B to G?  Is that business to government?

20         A.     Yes.

21         Q.     What was the expectation with the business

22   to government concerning prospects?

23         A.     The expectation was that you understand the

24   B to G business cycle; were they annual?  Did they go

25   January to December?  Did they go July 1 to June 30th?

1   And in that understanding, you had to -- we asked that

2   you get very specific in setting up demos in the

3   budgetary planning process, which can be February to

4   May.

5       **Q.**    And what if --

6       **A.**    If your fiscal year was January -- or July

7   1 to June 30th.

8       **Q.**    And B to B is business to business,

9   correct.

10      **A.**    It is.

11      **Q.**    What was the expectation with respect to a

12  reasonable time to close after a demo with business to

13  business?

14      **A.**    As soon as possible.

15      **Q.**    What was the average close rate or close

16  time between a demo and signing --

17      **A.**    There --

18          MS. SIEGMUND:  Wait.

19      **Q.**    Let me finish my question.  What was the

20  average time between a business to business from a demo

21  to closure, if you know?

22      **A.**    I don't have that number.

23      **Q.**    Were account managers, we had discussed

24  that account managers were doing these demos from their

25  computers.  Were they -- at the time they were doing

1   the demos, were they located in -- I guess, in their

2   office -- in a Chmura office when they were doing these

3   demos?

4        A.    Not always.

5        Q.    Where else would they be if they were doing

6   a demo?

7        A.    They might be at a conference or they might

8   be at the customer's location on site.

9        Q.    How often would an account manager go to an

10  on-site -- go to a client on site?

11       A.    I don't have that number.

12       Q.    You also mention one of the job duties of

13  an account manager was to counsel a client.  Can you

14  explain that a little bit more?

15       A.    As you get inside an organization and you

16  are dealing with the data people that are reporting to

17  their management, to a board, and they don't have a big

18  picture of funding.  So if you are counseling a client

19  that's in workforce, for example, you need to

20  understand the Workforce Investment and Opportunity Act

21  in depth to be able to advise what the law allows in

22  terms of funding for services.

23            And that is a visual -- they might not know

24  that.  They might not know that they can take JobsEQ

25  and put it in something other than administrative

1    funds.  For example program funds, where you have

2    counselors that are seeing job seekers on a daily

3    basis, and that's under the program funds and not in

4    administrative funds.  You need to be able to advise

5    them, hey, you can do that and it is legal.

6        **Q.**   So if --

7        A.    Did you understand that?  Did you

8    understand that?

9        **Q.**    I think I do, but I am asking some

10   follow-up questions on it.

11       A.    Okay.

12       **Q.**    The Workforce Investment Opportunity Act,

13   what is that?

14       A.    That is a federal program under the

15   Department of Labor where funds are snet to the state,

16   each state, and it's based on need.  It's something --

17   some of it you are seeing rightnow with Covid.  But the

18   need is based, traditionally, on unemployment rates.

19            So each state has these funds that come

20   down from the department of labor and they take the 10%

21   to do the administrative piece at the state level.  And

22   the chief locally elected officials, called CLEOs, are

23   responsible for the release of SKREGS AER funds at the

24   local level.  So you can imagine it gets pretty

25   political pretty quickly at the local level.  So you

1   have to know the law, and our folks know that.  They

2   get to be experts in WIOA pretty quickly.

3        **Q.**   And how do they develop, or how do they

4   become experts in that?

5        **A.**   Well, I'm a subject matter expert.  I ran a

6   Workforce Investment for four years, so I am the go-to

7   person at Chmura for that.

8        **Q.**   But the account --

9        **A.**   You learn a lot in conferences.  They learn

10  more at conferences.

11       **Q.**   Would account managers be expected to

12  advise prospective clients as to their legal rights

13  under that workforce investment opportunity act?

14            MS. SIEGMUND:  Object to the form of the

15  question.

16       **A.**   I don't think that that's what we are

17  talking about.  They provide insight into the law, but

18  they do not legally counsel them.

19       **Q.**   Can you describe to me the difference?

20       **A.**   We don't act in a legal capacity with our

21  client.  We are advisers.

22       **Q.**   What type of advice are you -- would an

23  account manager give to a prospective client or clients

24  regarding the workforce investment opportunity act?

25       **A.**   As we discussed earlier, for the awareness

1   of budgetary cycles, an awareness of the barriers that

2   go along with job seekers that are taking advantage of

3   these funds, and it is being able to advise which

4   funding stream that you can put a technology platform

5   under, like JobsEQ, and it satisfies the requirement of

6   the WIOA.

7       **Q.**   And an account manager would be expected to

8   understand the budgetary cycles and categories --

9   categories spending that can be used to purchase JobsEQ

10  is that fair?

11      **A.**    That's up to them.  If they want to be an A

12  player, they will do that.  If they want to be a B

13  player, they won't.

14      **Q.**   And then would na account manager

15  communicate that to the prospective client or client?

16      **A.**    Communicate what?

17      **Q.**   Budgetary cycle or what they understood the

18  budgetary cycle to be?

19      **A.**    There are a lot of clients in WIOA that

20  don't understand WIOA.  It is unfortunate, with our

21  taxpayer money, right?  It is unfortunate, but it

22  happens a lot.

23      **Q.**   So the account manager then would walk them

24  through that; is that fair?

25      **A.**    Walk them through.

1       **Q.**    I think -- are you calling it WIOLA?  Is

2    that how you're saying it?

3       **A.**    WIOA.  That's the industry -- that's how

4    the industry speak.

5       **Q.**    I want to speak like that, so I am going to

6    use it.  So I want to say it, too?

7       **A.**    It's WIOA.

8       **Q.**    WIOA.  I got it.  Would an account manager

9    talk to a prospective client or a client about the

10   budgetary cycle sets forth in WIOA?

11      **A.**    I mean, they -- like I said, if they want

12   to be an A player, they will.  If they are satisfied

13   with the status quo, they might not.  They might just

14   do the same demo that they would do for an economic

15   developer, or that they would do for a workforce

16   client.  It depends on the sophistication of that

17   employee.  There is no requirement there.  Is that

18   clear?  I want to be clear.  Is that clear?

19      **Q.**    It's clear to me, yes.

20      **A.**    Okay.

21      **Q.**    You also said the job requirements for

22   account manager was to document in Salesforce.  Was

23   Salesforce the primary CRM platform that Chmura used?

24      **A.**    Yes.

25      **Q.**    And so was an account manager required to

Page 20

1    put any communications that they had with the

2    prospective client or client in Salesforce?

3         A.    Yes.

4         Q.    What other types of information was am

5    account manager required to document in Salesforce?

6         A.    I don't understand the question.

7         Q.    Was all information pertaining to -- well,

8    let me go back.  How did an account manager use

9    Salesforce?

10        A.    So they documented phone calls, emails,

11   opportunity status, the details of the region.  The

12   status was where they are enclosing any information

13   that is needed to understand the life cycle of that

14   client.

15        Q.    And then another one of the job

16   requirements you mentioned was to -- an account manager

17   was to ensure that the client is using the platform

18   and --

19        A.    Yeah, that's very important, yeah.

20        Q.    And how would an account manager go about

21   doing that?

22        A.    Well, in today's environment, it is going

23   to change, but the account managers have historically

24   enjoyed the Friday morning usage report.  That Friday

25   morning usage report details the usage from all

1    clients.  And each account manager has historically had

2    access to that, and that's changing, but for today,

3    that's the situation.

4         **Q.**   But when Mr. Lombardo was employed, he

5    would have had that Friday morning report?

6         A.    Oh, yeah.  Oh, yeah, he had access to

7    all --

8         **Q.**   What was the expectation for account

9    manager once they got that information, or that usage

10   report, what was the expectation that an account

11   manager would do with that report?

12        A.    If there is no useage and people are not

13   using, you have got to get in there and figure out

14   what's the problem; is it training, isit the wrong

15   person on the platform; how can we get you to use

16   JobsEQ?  Because that's the secret to renewal.  And if

17   you don't have the right person using it, then you need

18   to help them figure out who in their organization is

19   the right person, and it is difficult when you've got a

20   shop of three peopel.

21             You know, when you are a small innovation

22   and you've got a shop of three people, you got to make

23   technology a priority, and they often balance

24   technology an d data with implementation programs.  And

25   that becomes so political.  And so amorphous that it is

1   hard to be data driven in some of these environments

2   that we are in.

3        **Q.**    How would a and account manager, I think

4   your word was, get in there, to ensure that the client

5   was using it, or to -- let me rephrase that.

6             How would an account manager follow-up with

7   a client regarding their usage?

8        **A.**    They have the option to go by email and the

9   phone.  They are also --

10       **Q.**   So --

11       **A.**    They are also on track so they can monitor

12  the questions that are coming in that reflect they

13  don't have a certain level of knowledge or that they

14  are super users and they don't need any help.

15       **Q.**    You also mentioned that one of the job

16  requirements was to obtain a customer satisfaction

17  survey.

18       **A.**    Yes.

19       **Q.**    Can you explain what the customer

20  satisfaction survey is?

21       **A.**    It consist of about 15 questions to

22  determine the characteristics of the user in terms of

23  their knowledge of the platform and their satisfaction

24  with the platform.  It is also a very good way to get

25  information for the roadmap, things that they would

Page 23

1  like to see added.  And so the account managers uses

2  that to ensure that they care enough about that

3  information for the company and for their client to be

4  more strategic.

5      Q.    And you mentioned another one of those type

6  of job duties was episure client renewal.  Can you

7  explain that at bit?

8      A.    You are coming up on 60 days before renewal

9  and you have taken the steps laid out for you, quarter

10  by quarter with touch points to there, so you have

11  confidence that that client is going to renew and you

12  are not surprised when they do not.

13      Q.    How many touch point was am account manager

14  expected to make throughout -- after closing a sale

15  prior to renewal?

16      A.    As we previously discussed, it is

17  quarterly.

18      Q.    You also mentioned that one of the job

19  duties of an account manager was to travel.  And I may

20  not have gotten all of your answer down, but forgive

21  me, where would an account manager travel to?

22      A.    They would travel on-site to client to do

23  demos and they would travel to conferences.  And they

24  would travel between the Cleveland office and the

25  Richmond office.  We had TPELD from it, and they would

Page 24

1  come down for that, and it would be, you know, an

2  immersive experience where we would get to see and hear

3  from them, strategically, what their plans were for the

4  next year in terms of how they were going to manage

5  their -- not manage -- how they were going to manage

6  getting their client and depends on the client.  So it

7  was very personal.  And they got to share with us on a

8  very detailed level what their plans were.  This is

9  their plans, not ours.

10      Q.    Within a year, take 2019 for example, how

11  frequently did an account manager travel to an on-site

12  client visit?

13      A.    So you're a couple steps removed with me on

14  that.  That was -- 2019 was largely stemming through an

15  interim account -- on a interim sales manager to March,

16  our interview with Eli in April.  He got placed with

17  Eli.  So I know that we went from $220,000 to $150,000

18  that year for company profitability reasons.  So it

19  varied.  It varied on, you know, depending on our

20  profit.

21      Q.    What's the 220 to 150,000 number?  What

22  number is that you are going giving me?

23      A.    That's an expenditure number that's on our

24  books based on what we were willing to invest in

25  travel, based on company profit.  And nothing to do

1   with the account managers.

2        **Q.**   I guess my question is, how many onsite

3   visits did account manager's make last year?

4        **A.**   I don't have those numbers, Christine.  I

5   just don't.  You asked me that last week.  I don't have

6   those numbers.

7        **Q.**   What about how many conferences the account

8   managers attended last year?

9        **A.**   Why are we focusing on 2019?

10       **Q.**   I just trying to given you a time frame.

11       **A.**   Well, I mean, let's talk about within the

12   last five years.  We went from attending 25 to 15.  I

13   mean, if the business cycle -- let me help you

14   understand.  Business cycles ebb and flow based upon

15   profits and expenditures.  We added 18 people last

16   year.  We did not have the cash flow to support 25

17   conferences.  So last year it was scaled back a bit.

18   Does that answer your question?

19       **Q.**   I think it does.  So in 2019, the account

20   managers attended approximately 15 conferences?

21       **A.**   I don't know.  I am giving you numbers that

22   I can't support. I am just saying in the business

23   cycle, things ebb and flow in terms of what you can

24   spend on marketing and travel, and so 2019 was not one

25   of our better years.

1      **Q.**    Okay.  As you sit here today, is it fair to

2    say you don't know the specific number of onsite visits

3    the account managers made in 2019?

4      **A.**    No, I did not come prepared to discuss

5    that.

6      **Q.**    And is it fair to say you don't know the

7    specific number of conferences that the account

8    managers attende din 2019?

9      **A.**    I am not prepared to give you a number.

10   Sorry.

11     **Q.**    What about for 2015 through 2018?  Do you

12   have numbers for those years?

13     **A.**    I can give you investment numbers and I

14   gave them to you, but I am happy to repeat them,

15   which mean --

16     **Q.**    Investment numbers?

17     **A.**    Investment numbers?  Expenditures numbers.

18     **Q.**    Okay.

19     **A.**    220,000 is the range to 150,000.  The

20   number of conferences, it changes every year because

21   the account managers come back and they say, let's not

22   do this one next year, or let's do this one next year.

23   And they become advisers to management on what

24   conferences we attend.  Is that helpful?  Does that

25   explain it to you?  I am trying to be precise.

1     **Q.**   You also mentioned that the account

2   managers, one of the jobs duties is public facing

3   meetings.  Can you describe to me what that means?

4       **A.**    The public facing meeting?.  Yeah, sure, I

5   am happy to.  So you are not in the office.  You are at

6   a conference or at a clients lotion, or ina boards room

7   and you're speaking and representing Chmura.  There are

8   a lot of expectations around that in terms of

9   professionalism.

10      **Q.**   And like with the conferences and the

11  on-site visits, do you have a specific number of times

12  you --

13      **A.**    I do not have any numbers.  I do not have

14  any numbers.

15      **Q.**   Again, wait for me to finish my question so

16  the record is clear.  Do you have a specific number for

17  the amount of public facing meetings the account

18  managers attended?

19      **A.**    Finished?  I don't.

20      **Q.**   Are there any other duties as you sit here

21  today you can think of for an account manager before I

22  move onto senior account manager?

23      **A.**    As I told you last week, senior account

24  manager has a certain level of tenure, knowledge and

25  skills and talent; that if you came in from the vacuum

1   cleaners industry or collections industry, you would

2   not have that on day one.  It takes time to develop a

3   senior account manager, and it takes respect and

4   appreciation for what they do to support the company.

5   So we are --

6        Q.    Hold on.  Let me pick that apart a little

7   bit.  Oh, go ahead.

8        A.    No.

9        Q.    Are the jobs -- are the actual job duties

10  of am senior account manager any different thanthe job

11  duties of an account manager, or are they just more

12  senior and experienced than the account manager duties?

13       A.    As we discussed, an entry level account

14  manager is not going to understand the laws of

15  economics, they are not going to understand the client.

16  It takes a while to do that.  And that translates into

17  productivity, and that translates into closing deals.

18  That translates into developing the character of that

19  individual, and in the spirit of continuous

20  improvement, that involves shaping that person's

21  character, helping them shape their character.  And in

22  the situation of Mr. Lombardo, that was a particular

23  challenge.

24       Q.    But their day-to-day activities, what they

25  did, their job duties was a senior account manager's

1  job duties, their actual duties that they did, were

2  they the same as an account manager?

3      A.    No.  I would say that an account manager

4  doesn't get the opportunity to have client facings that

5  a senior account manager has.  There is a reputation

6  risk here.

7      Q.    Okay.  Were there any other differences

8  between a senior account manager and an account

9  manager?

10      A.    There are a lot of difference s.  It has to

11  do with mainly ethics and trust, and those are hard

12  things to measure and hard things to manage.

13      Q.    Now we have gdone through the job duties of

14  an account manager.  We have gone through the job

15  duties of senior account manager.  When Mr. Lombardo

16  was an account manager, the job duties we just

17  discussed, were those Mr. Lombardo's job duties as an

18  account manager?

19      A.    Were those the what.

20      Q.    The job duties.  When Mr. Lombardo was  an

21  account manager at Chmura, were his job duties any

22  different than the ones we just discussed for an

23  account manager?

24      A.    His productivity, efficiency, his

25  knowledge and his skill sets were totally different.  I

1   have been telling you over and over:  Talent,

2   knowledge, tenure.

3        Q.   But when he was an account manager -- can

4   you define for me what you consider a job duty?  I

5   think we are having a little disconnect. I want to

6   understand what your understanding of job duty is.

7        A.   Okay.  Let me try to answer that in a

8   manner that helps you.  This is not a union.  It is not

9   a blue collar organizations.  We don't sell vacuum

10  cleaners.

11            This is a professional business services

12  industry, and with that comes knowledge of the product,

13  knowledge of the industry.  And that can't happen on

14  day one as an account manager.  That takes time to

15  develop.

16            Sorry.  Is Mr. Lombardo in the room?  I see

17  you looking.

18       Q.   He is in the room.  He has been with us for

19  all the depositions, yes.

20       A.   Okay.  Good.  Thank you for letting me

21  know.

22       Q.   Were the job duties you described for an

23  account manager any different than the job duties Mr.

24  Lombardo was expected to perform when Mr. Lombardo had

25  the title of account manager?

Page 31

1        A.    I don't understand that question.  Can you

2    unpack it a different way?

3        Q.    Well, Mr. Lombardo, his title when he start

4    with Chmura was account manager, correct?

5        A.    Yes.

6        Q.    And we just went through, and you listed

7    for me a bunch  of job duties that account managers had

8    at Chmura, correct?

9        A.    Yes.

10       Q.    Were Mr. Lombardo's job duties as account

11   manager when he held that title any different than the

12   job duties you listed for me?

13       A.    As we've discussed, his job duties became

14   more proficient.  He was rewarded for that, highly

15   compensated.

16       Q.    And was he rewarded by given a title,

17   senior account manager?

18       A.    No, he was more immersed in the

19   organizations and he became a vital adviser to the

20   roadmap.

21       Q.    Why don't we talk about the roadmap for a

22   seconds.  What is the roadmap?

23            THE WITNESS:  I need a break.

24            MS. SIEGMUND:  Answer the question and then

25   we can take a break.

Page 32

1      A.    Okay.  As you have had several

2  conversations with Chmura, the roadmap is our plan for

3  innovation for JobsEQ.

4           MS. COOPER:  Okay.  We can take a break.

5  How long would you like to take, five minutes, 10

6  minutes?  Okay.

7                    -    -    -    -    -

8                    (Short recess taken)

9                    -    -    -    -    -

10  BY MS. COOPER:

11      Q.    I think we left -- where we left off before

12  the short break was starting describing what the

13  roadmap was, and I think you described it as a map for

14  innovation.  Can you tell me what -- how -- what was

15  consisted on the roadmap?

16      A.     Future analytics.

17      Q.     What does that mean?

18      A.     Future technology offering.  Future

19  benefits to clients.

20      Q.     Can you tell me the way that something

21  would be put on the roadmap?

22      A.     There is multiple ways.  Account managers

23  are the primary advisers of the roadmap.  There is also

24  KHAFT, customer satisfaction surveys.  Multiple ways.

25      Q.     Were there any standard operating

Page 33

1   procedures regarding the roadmap?

2       A.    Yes.

3       Q.    Can you describe those?

4       A.    No, I couldn't.  I'm not the owner of the

5   roadmap.

6       Q.    Who is the owner of the roadmap?

7       A.    Dave Tarrano.*

8       Q.    I'm sorry.  Can you say that again?

9       A.    Dave Tarrano.

10      Q.    And is he an employee of Chmura?

11      A.    Yes.

12      Q.    When you say, owner of the roadmap, what do

13  you mean by that?

14      A.    He is responsible for the roadmap.

15      Q.    How were items on theroadmap prioritized?

16      A.    I wouldn't pretend to know.  It's --

17      Q.    Did you have any involvement in deciding

18  what on the roadmap would be pursued?

19      A.    Minimal.

20      Q.    Can you describe what your involvement in

21  the roadmap, if any, was?

22      A.    I was kept abreast.

23      Q.    With respect to Mr. Lombardo specifically,

24  did his job duties differ from that of an account

25  manager?

1    A.    I don't think I understand that question.

2    He was an account manager.

3    **Q.**    With respect to a senior account manager, I

4    believe you testified earlier that they had -- you

5    testified they had more intimate knowledge -- sorry,

6    more intimate involvement in marketing.  Can you

7    explain to me what you meant by that?

8    A.    They develop the marketing material.

9    **Q.**    And how would a senior market -- sorry, a

10   senior account manager develop marketing material?

11   A.    They would write down their ideas and

12   suggestions and it would get before the marketing

13   division and be developed based on their needs.

14   **Q.**    So would the marketing -- can I say

15   marketing team, is that fair?  Is there a marketing

16   team or marketing department?

17   A.    Yeah, sure.

18   **Q.**    Would the marketing team -- well, who is on

19   the marketing team?

20   A.    Sometimes I think everybody is.  Everybody

21   thinks they are a marketer, right?  But to answer your

22   question, it would be Leslie, Avery Simmons, Jim Hayes.

23   **Q.**    Now, you said Leslie.  Are you referring to

24   yourself or another Leslie?

25   A.    There is only one at Chmura.

1     **Q.**    And you said that the senior account

2    managers would write down their ideas and suggestions

3    and provide them to the marketing team; is that right?

4         **A.**    Yes.

5         **Q.**    And then what would the marketing team do

6    with those ideas?

7         **A.**    Massage, improve.

8         **Q.**    Can you give me an example of any kind of

9    an idea that an account manager -- sorry -- senior

10   account manager provided to the marketing team that was

11   developed into marketing materials?

12        **A.**    Sure.  Particularly in Mr. Lombardo's case,

13   he needed vertical specific buyerses, so the marketing

14   team went to work to develop ratchet *card at his

15   suggestions.

16        **Q.**    While

17        **A.**    So. Mr. Lombardo provided the suggestion

18   and the marketing team developed the material; is that

19   fair?

20        **A.**    Mr. Lombardo requested the marketing

21   material speak to the vertical of the industry that he

22   was attending a conference for.

23        **Q.**    Did the marketing team, were they required

24   to produce that vertical specific flyer because Mr.

25   Lombardo asked for it?

1      A.     We did everything we could to make Mr.

2  Lombardo happy.

3      Q.     Was the marketing team required to take

4  that suggestion and create the vertical flyer in that

5  instance?

6      A.     There is no requirement.

7      Q.     You also mentions that senior account

8  managers had responsibilities with respect to

9  innovation.  Can you explain that a little bit more?

10      A.     As I said earlier, that has to do with

11  what's on the roadmap.  Priority of what's on the

12  roadmap.

13      Q.     Was there any other job duty of the senior

14  account manager?  Yes, there was, so let me come back

15  to this before I move onto that question.  You said

16  that senior account managers had the job duty of

17  managing conferences.  Can you explain what you mean by

18  managing conferences?

19      A.     So selecting conferences they wanted to

20  attend, booking flights, and in Mr. Lombardo's case,

21  booking everybody's flight, attending the conference,

22  setting up the booth, being prepared to do demos, being

23  prepared to get contacts, being prepared to follow-up

24  on those contacts to prepare a list of the attendees

25  that they had public facing with.  Now, what -- it is

1  very critical that you follow-up on contacts within the

2  week that you get back, otherwise those leads get

3  stale.

4       **Q.**   Did -- fi a senior account manager asked to

5  go a conference, was it automatically approved that

6  they attend?

7       **A.**   It depended on the budget.

8       **Q.**   Was there ever at time that a senior

9  account manager asked to go a conference and they were

10 not permitted to attend?

11      **A.**   I'm not prepared to say that because it

12 changes every year depending on the budget.

13      **Q.**   Who had the final say on what conference

14 the account manager or senior account managers would

15 attend?

16      **A.**   It was pretty much the account managers.

17 We tried to support them in every way we could.

18      **Q.**   Were there meetings regarding conference

19 planning for the year?

20      **A.**   There -- as we grew, yes.  Not initially,

21 but we he evolved to that, yes.

22      **Q.**   Who would be in those meetings?

23      **A.**   That also changed annually.  Different

24 people.

25      **Q.**   Take 2019, who was in the meeting for 2019?

1      A.    Jim Hayes, Avery Simmons, myself.

2   Marketing.  The conferences went under my budget.

3      Q.    Was there anyone else in those meetings?

4      A.    Account managers would be pulled in, of

5   course.  They were central to the whole planning.

6      Q.    Were the account managers there when the

7   decision whether to attend the conference was made?

8      A.    So that's kind of hard to do when you have

9   account managers doing demos and doing what their daily

10  routine is in a distributed workforce such as we have

11  at Chmura.

12     Q.    So the answer is no?

13     A.    At times they were, at times they weren't.

14     Q.    When Mr. Lombardo was a senior account

15  manager, were his duties any different than the ones we

16  just discussed?

17     A.    I don't know what you mean by, what we just

18  discussed.

19     Q.    Well, you listed involvement in marketing,

20  innovation and conferences.  Were his job duties, in

21  addition to the account manager job duties, were Mr.

22  Lombardo's senior account manager job duties any

23  different than the ones we just discussed?

24     A.    No.

25     Q.    Did Chmura have an outside sales team?

Page 39

1    A.    No.

2    Q.    One follow up question, did Mr. Lombardo

3  have -- was there a written job description for Mr.

4  Lombardo's position?

5    A.    We addressed that.  Yes.

6    Q.    Was Mr. Lombardo ever provided a written

7  job description?

8    A.    I don't know.  He didn't report to me at

9  that time.

10    Q.    Do you know when a written description was

11  created by Chmura?

12    A.    It was created to recruit other account

13  managers.  I don't know when .

14    Q.    Bear with me for one second.

15          All right.  I want to switch topics.  I am

16  going to show you again, and share my screen and show

17  you what's been marked as exhibit A again.  And you

18  have been designated as the witness, the corporate

19  representative to testify as to Topic Number 16,

20  "Jennifer Ludvik's compensation, or denial of

21  compensation, for over time hours worked"; is that

22  correct?

23    A.    Yes.

24    Q.    Who was Jennifer Ludvik?

25    A.    She is an individual that was in the

1   Richmond area that was an employee of Slait, recruiting

2   services.

3       **Q.**   What was her role at Chmura?

4       **A.**   So the model for this situation was -- it

5   is kind of like test driving a car.  So Slait's model

6   is that this employee remains an employee of Slait

7   until the client, which is Chmura, chooses to employ or

8   not employ that Slait employee.

9       **Q.**   So she was -- well, let me ask this, what

10  job function was she doing at Chmura?  I understand she

11  wasn't an employee of Chmura, but what job function was

12  she doing?

13      **A.**   We were testing her out to be an account

14  manager.

15      **Q.**   And were her job duties those of account

16  manager that we discussed --

17      **A.**   Yes.

18      **Q.**   -- not long ago?

19      **A.**   Yes.

20      **Q.**   And can you say again who she was employed

21  by, or spell it for me so I know for sure what you are

22  saying?

23      **A.**   S L A I T.

24      **Q.**   Okay.  Got it.  Did Ms. Ludvik ever make a

25  claim that she should be paid for more than 40 hours a

1    week?

2         A.    Yes.

3         Q.    How was that handled?

4         A.    She was not an employee of Chmura.  She had

5    been there, maybe, a week and had limited knowledge of

6    JobsEQ, and not only that, but the paperwork was not

7    accurate.  She was billed to us -- she was

8    contractually a salary exempt employee, but when we got

9    the bill, it had overtime hours on it that we did not

10   approve or understand why she needed overtime in this

11   early tenure.

12              And so we confronted Slait, and they

13   acknowledged that they made a mistake and they paid her

14   overtime.  And we decided we didn't want to work with

15   her because she was not transparent.  Just a short

16   tenure.

17        Q.    How short?

18        A.    Real short.  Like three weeks.

19        Q.    Did you have -- or Chmura have any

20   discussions with Slait regarding her status as exempt

21   or non-exempt?

22        A.    No.

23        Q.    And I think you already answered this, so I

24   am going to ask it just to be clear.  Did Chmura pay

25   for the hours above 40?

1      A.    No.

2      Q.    I think you said Slait paid for the hours

3  above 40; is that correct?

4      A.    Yes.

5      Q.    At the time that was going on, did Chmura

6  ever consider reclassifying the account managers from

7  exempt to non-exempt, its own employees?

8      A.    No.

9      Q.    Okay.  Taking you to a new topic, I am

10 going to show you, share my screen again.  You have

11 been designated as a corporate representative to

12 testify as to "Mr. Lombardo's performance, including

13 sales performance, and the methods used to track

14 Mr. Lombardo's performance"; is that correct?

15     A.    Yes.

16     Q.    As stated on here on Exhibit A.

17           How was Mr. Lombardo's sales performance

18 during his tenure at Chmura?

19     A.    Outstanding.

20     Q.    Was he the top sales performer?

21     A.    Yes.

22     Q.    Do you know, over his tenure, what percent

23 of new sales Mr. Lombardo was responsible for

24 generating?

25     A.    Consistently above quota.

1    **Q.**    Do you have a more exact figure?

2    **A.**     I do not.

3    **Q.**    How were his -- let me ask, do you know

4    what Mr. Lombardo's closing percentage was from, if he

5    gave a demo to closing the deal?

6    **A.**     The average close -- demo to close ratio,

7    is 24.1, 25%.

8    **Q.**    Was Mr. Lombardo higher than that?

9    **A.**     It is an average number that we collect for

10    the team.

11    **Q.**    Did you ever evaluat, or did Chmura ever

12    evaluate the individual account manager's, or senior

13    account manager's percentage as to their close rate?

14    **A.**     Not individually.  We operated as a team.

15    **Q.**    How about renewal rates?  How did Mr.

16    lombardo perform with respect to renewal rates?

17    **A.**     89%.

18    **Q.**    Did you say 89?

19    **A.**     I did.

20    **Q.**    Do you know what the average renewal rate

21    percentage was?

22    **A.**     85.

23    **Q.**    How did Chmura track the sales performance

24    of its account managers and senior account managers?

25    **A.**     Based on quota.  Three sales per month.

1      **Q.**   Do you know how much revenue Mr.

2  Lombardo's, take for 2019 -- or a whole year, because

3  he was there for 2018, do you know how much of the

4  revenue for the sale of JobsEQ Mr. Lombardo was --

5  could be attributed to Mr. Lombardo?

6      **A.**   I don't want to say a number.I can give you

7  a percentage.  I think it was 49%.

8      **Q.**   Do you know for 2019?

9      **A.**   No.  He wasn't there the entire year.

10      **Q.**   What other metric was Mr. Lombardo reviewed

11  on?

12      **A.**   I would say Mr. Lombardo's weakest area was

13  in the customer satisfaction survey.

14      **Q.**   And can you give me some examples or an

15  explanation?

16      **A.**   He didn't like to do them, so he often did

17  not do them.

18      **Q.**   To complete a customer satisfaction survey,

19  what does an account manager, or senior account manager

20  have to do?

21      **A.**   Get the survey completed.

22      **Q.**   What was the process, or what -- how would

23  an account manager go about doing that?  I am just

24  looking for how the process worked.

25      **A.**   Well, it's real simple.  You send an email.

1     **Q.**    Did he obtain customer satisfaction

2   surveys, any customer satisfaction surveys?

3     **A.**    A few.  He mostly complained about them.

4     **Q.**    Were there any other metrics Chmura looked

5   at in evaluating Mr. Lombardo?

6     **A.**    In the case of Mr. Lombardo, it was

7   overwhelmingly dealing with the balance of an A player,

8   and when you have an A player, you tolerate a lot.

9     **Q.**    I want to turn to Topic Number 21 on

10  Exhibit A.  You were designated as the corporate

11  representative to testify with regards to "Warnings

12  giving to or disciplinary action taken by Chmura

13  against Mr. Lombardo"; is that correct?

14    **A.**    Yes.

15    **Q.**    Did, Chmura keep a written documentation of

16  any warnings or disciplinary action given to Mr.

17  Lombardo?

18    **A.**    Yes.

19    **Q.**    Can you describe what type of writing

20  exists?

21    **A.**    Emails, handwritten notes, witnesses.

22    **Q.**    Well, the witnesses, were they witness

23  statements?

24    **A.**    Witnesses that sat in on the conversations

25  of a disciplinary manner.

1      **Q.**    But they didn't put anything in writing; is

2  that correct?

3      **A.**    They -- no, they didn't need to do that.

4      **Q.**    And would all of the written materials be

5  found in Mr. Lombardo's personnel file?

6      **A.**    They should be.

7      **Q.**    Can you walk me through what warnings

8  Mr. Lombardo was given during his tenure at Chmura?

9      **A.**    There are so many.  I mean, really?  You

10  want me to do this?

11      **Q.**    Well, were they all in his personnel file?

12      **A.**    No.  You still talking about the personnel

13  file?

14      **Q.**    Let's start there.

15      **A.**    Let's start with the personnel file?  Is

16  that what you said?

17      **Q.**    Yes, please.

18      **A.**    So Mr. Lombardo was notoriously known for

19  his inability to submit a correct reimbursement form

20  for travel.  Mr. Lombardo was notorious for wanting to

21  book everybody's flight on his credit card so that he

22  got points.  Plus, we had to put out policy that all

23  employees had to use their employee credit card because

24  the transactions cost was going out the roof with Mr.

25  Lombardo's practices.

1              So we had to adopt a policy of personal

2    credit cards, and everybody had to book their own

3    flights, their own hotel; however, Mr. Lombardo, as in

4    most cases, ignored policy and did things his own way.

5    So we had to document that.  And Christine Steigmann

6    was responsible for documenting that, and she was

7    sloppy, so I'm not sure that it actually made it

8    entirely into his personnel file, but I know there was

9    documentation handed to her to do that.

10             Mr. Lombardo went to the Texas Economic

11   Development Conference in 2018, and the conference took

12   place at the hotel, and there was a -- there was a

13   charge to valet, a rental car, which was not needed,

14   resulting in transaction costs, and we had to

15   investigate, why did this happen?  And Mr. Lombardo

16   taking his time to respond.  And at that same

17   conference, there was alcohol bills that were not

18   approved because it was not a dinner, it was in a bar.

19             And the problem with that is if you are in

20   a bar drinking at a conference, these bars are very

21   open space, and clients and prospects can say why is he

22   drinking with that client and not drinking with me.  So

23   there was a long discussion about that with Mr.

24   Lombardo with Kyle West and Greg Chmura present.  That

25   went in his personnel file.

1          Do you want me to keep going?

2     Q.    I would like you to list what you believe

3 is in his personnel file, yes.

4     A.    Okay.  Then I won't go to the titty bar

5 conversation he had with one of my clients.

6          There was the matter of the forged offer

7 letter from GIS Web Tech that at one point Mr. Lombardo

8 said there were two letters from GIS Web Tech, and I

9 think in Mr. Lombardo's mind he meant the one that he

10 forged and the original.  Discussions around that, and

11 the time that it took, and the transaction costs to get

12 him to admit that he forged the letter was incredible.

13 That is in his personnel file.

14          The amended offer letter to him to take out

15 the merit increase clause was in his personnel file.

16 His separation notice was in his personnel file.

17 His --

18     Q.    I am going to stop you.

19     A.     Okay.

20     Q.    With respect to the amended offer letter,

21 did that have anything to do with a warning given to

22 Mr. Lombardo?

23     A.     Eli was his supervisor.  I can't speak to

24 that.

25     Q.    Well, you were designated as the corporate

1   representative to speak on it, so to your knowledge was

2   the amended offer letter in any way related to a

3   warning given to Mr. Lombardo?

4        A.    Yes.

5        Q.    And what warning was that?

6        A.    I t had to do with his employee agreement.

7   He violated his employee agreement which you recall,

8   the non-solicitation, non-compete, non-disclosure form.

9        Q.    And that transpired into an amended offer

10  letter, if I am understanding correctly?

11       A.    Yes, it was Section 5 under net paragraph

12  1.  We talked about this last week, Christine.

13       Q.    I am going to show you the amended offer

14  letter here.  Let me pull it up.

15                    -   -   -   -   -

16            (Previously marked Deposition Exhibit

17            G, was shown to the witness.)

18                    -   -   -   -   -

19            MS. COOPER:  I will give you control,

20  Heidi.  There are two names, John Chmura, and then

21  there is you. I don't know if the computer misnamed.

22  Should I give control to you?

23            MS. SIEGMUND:  Yes, you can give it to me.

24            MS. COOPER:  Okay.

25       Q.    If you can take a look at this document.

1         MS. SIEGMUND:  My apologies.  I should have

2   mentioned at the beginning that John is sitting in as a

3   corporate representative.

4         MS. COOPER:  Okay.  So that is Mr. Chmura.

5         THE WITNESS:  He is joining.

6         MR. JOHN CHMURA:  I am here.  Just to get

7   it on the record.  I am here.  I am just on mute.

8         MS. COOPER:  Good morning, Mr. Chmura.

9         MR. JOHN CHMURA:  Good morning.

10  BY MS. COOPER:

11        Q.    And this is marked Exhibit G, Defendant's

12  Exhibit G.  This is the amended offer letter you were

13  referring to just a moment ago, ms. Peterson.

14        A.    Yes, ma'am.

15        Q.    Anywhere in this letter does it make

16  mention of any disciplinary action or warnings?

17        A.    Why would we put that in a an amended offer

18  letter?  I am not following.

19        Q.    Well, I am just simply asking, is there any

20  reference to a warning or disciplinary action?

21        A.    No.

22        Q.    Why did Chmura prepare this amended offer

23  letter?

24        A.    Because Mr. Lombardo falsified a letter

25  from GIS Web Tech offering him certain job benefits and

1  I think, overall, we were real tired of hearing about

2  his requests for merit increase.  It happened at least

3  annually.  And nobody consented to a merit increase,

4  not even me.

5       **Q.**   Mr. Lombardo's original offer letter made

6  reference to annual merit increases, correct?

7       **A.**   Yes, it does.

8       **Q.**   Was that not Chmura's attempt to eliminate

9  that reference in the original offer letter?

10      **A.**   No, it was not an attempt to eliminate

11  that, it was an intnet to clarify what he was eligible

12  for, which is a cost of living increase.  His merit is

13  in his commission.

14      **Q.**   So does this have anything to do with Mr.

15  Lombardo -- with a performance warning?

16           MS. SIEGMUND:  Objection.  Asked and

17  answered.

18      **A.**   I can answer it. I mean, I think we had

19  reached a point with Mr. Lombardo's behavior that we

20  had to clarify why we didn't fire him in March of 2019.

21      **Q.**   So it was deleting the reference to annual

22  merit increase a punishment for what were disciplinary

23  actions?

24      **A.**   No, it was just clarifying.

25      **Q.**   Okay.  So the amended offer letter is in

1    Mr. Lombardo's personnel file, correct?

2        A.    Yes.

3        **Q.**    Is it fair to say that the amended offer

4    letter was not related to any disciplinary action taken

5    by Chmura?

6            MS. SIEGMUND:  Same objection.

7        A.    I don't know what you mean in this

8    situation.

9        **Q.**    I guess I am failing to understand how

10   amending Mr. Lombardo's offer letter in any way relates

11   to a warning or disciplinary action that Chmura

12   instituted against Mr. Lombardo.  I am not -- and if

13   you can explain that to me, that would be appreciated.

14       A.    So Mr. Lombardo came to his annual review

15   with a falsified offer letter from GIS Web Tech that we

16   had been in strategic partnership conversations with,

17   and Mr. Lombardo threw a wrench into the middle of that

18   relationship, which translates into revenue losses in

19   future years.  I think you have been through the

20   present value conversation many times with this topic,

21   so I don't have to give you that definition.

22           But as a result of that, that relationship

23   has never really been repaired.  And so the falsified

24   document precipitated the amended offer letter, so that

25   he would stop hounding us for merit increases.

Page 53

1      **Q.**   How does merit increases -- okay.  So I am

2  still not seeing the connection, but --

3      **A.**   So we went from a request for annual merit

4  increase to providing cost of living increases.  So Mr.

5  Lombardo benefitted from this letter.

6      **Q.**   At the time that Mr. Lombardo signed this

7  amended offer letter, did his base of compensation

8  change?

9      **A.**   He got a cost of living increase.

10     **Q.**   How much was that cost of living increase?

11     **A.**   It is CPI, so I don't know what CPI was

12 last year.

13     **Q.**   Sorry.  Can you say that again?  I just

14 missed it.

15     **A.**   The cost of living is based on CPI.

16     **Q.**   So my question --

17     **A.**   It is a cost of living -- it is a cost of

18 living increase that is built in.

19     **Q.**   Okay, I am following that, but what was the

20 specific cost of living increase Mr. Lombardo received

21 in --

22     **A.**   I don't remember what CPI was.

23     **Q.**   And was the increase for cost of living

24 provided concurrently with the signing of this amended

25 offer letter?

1          MS. SIEGMUND:  Object to the form of the

2    question.  You can answers.

3          A.   I think you have to ask Sharon Simmons

4    that.  I don't know.

5          Q.   I am going to show you a couple of

6    documents here.

7          A.   Okay.

8                    -   -   -   -   -

9               (Thereupon, Deposition Exhibit I, Copy

10              of Handwritten Notes, was marked for

11              purposes of identification.)

12                  -   -   -   -   -

13          Q.   I am going to give you an opportunity to

14    take a look at those.

15          A.   I am familiar with it.

16          Q.   Okay.  What is this document?

17          A.   So in March of 2019, after Mr. Lombardo's

18    falsified offer letter from G.I. Web Tech was presented

19    at his annual review, Chris Chmura and myself traveled

20    to Cleveland to confront Mr. Lombardo about this

21    situation.  My intention was to fire him.  I spent

22    about an hour and a half with Mr. Lombardo getting him

23    to admit that he just used the situation with GIS Web

24    Tech to get a raise.

25          Q.   Who was present in that meeting?

1      A.    John Chmura, Chris Chmura, Greg Chmura and

2  sharon Simmons was on the phone.

3      Q.    Prior to coming up to Cleveland for that

4  meeting from Richmond, did you have a phone call with

5  Mr. Lombardo?

6      A.    I did, and prior to what he said in his

7  deposition, we did not reach any kind of closure in

8  that 10 minute phone call.  So he falsified his

9  statement.

10      Q.    When you say you didn't reach any closure,

11  what do you mean?

12      A.    I could not get him to admit that he

13  falsified the offer letter.

14      Q.    What do you recall of that conversation?

15      A.    I asked him if he falsified this document.

16  He said, no, it was a legitimate offer letter, and he

17  just used it to try to get a raise.  It was legitimate

18  and it was a sincere offer letter.

19      Q.    Now, do you understand that GIS actually

20  did offer him a position?

21      A.    Yes, I had a lengthy conversation with my

22  strategic partner at GIS.

23      Q.    Who initiated those conversations?

24      A.    I did.

25      Q.    And what did you say in those

1   conversations?

2          A.     I asked if they made Mr. Lombardo an offer

3   letter dated the end of December and they said, no.

4   They made an offer letter in October and they had

5   rescinded the offer letter, and then they sent me the

6   offer letter.  So I went to Cleveland with everything I

7   needed to fire Mr. Lombardo.

8          Q.    Why didn't you fire him?

9          A.     Because I said he is a bad boy, but he is

10  my bad boy and I am going to help him.

11         Q.    What did you mean by that?

12         A.     He is a problem.  He is an ethical problem.

13  He is has no moral fiber, no moral backbone.  He will

14  say and do anything to get what he wants, and those

15  characteristics make him very good as an A player.  So

16  as I said earlier, you have to overlook things when you

17  have an A player when you shouldn't.  I should have

18  fired him in March.

19         Q.    Well, turning back to Exhibit I,

20  Defendant's Exhibit I, there seems to be two different

21  handwriting on this document; is that right?

22         A.     Yes.

23         Q.    Who -- if you could, just go line by line

24  and tell me whose handwriting is whose.

25         A.     Sure.  Number one is me.  Number two is me.

1   And when I decided, internally, I wasn't going to fire

2   him -- he finally admitted that he did falsify the

3   letter, we got to the hour and a half mark, and I asked

4   him to write 3, 4, and 5  . Those are my words, and he

5   wrote them.  I asked him to sign this document.  I

6   realize it is not dated.

7        Q.    And it is a little hard to see, but your

8   signature is on this document, correct?

9        A.    Yes.  So is Mr. Lombardo.

10       Q.    His is underneath yours, correct?

11       A.    Yes.

12       Q.    If you can, go back up on that.

13       A.    (Indicating).

14       Q.    It says, "Just used the situation, GIS Web

15   Tech."  What does that refer to?

16       A.    That was what Mr. Lombardo said.

17       Q.    What is, "I don't want to go anywhere"?

18       A.    That was Mr. Lombardo saying he wanted to

19   work for Chmura.

20       Q.    Were those Mr. Lombardo's words or your

21   words?

22       A.    Those were Mr. Lombardo's words.

23       Q.    And number 3, 4 and 5 -- sorry.  Go ahead.

24       A.    I was going to clarify 3, 4 and 5 are my

25   words.

Page 58

1    **Q.**   Okay.  Understood.  And what did you mean

2    by, "Do the right thing every day"?

3    **A.**   I used to say that to my children.

4    **Q.**   Okay.  Number 5, I think, says, tell me if

5    I am wrong, "Approach GIS Web Tech and take

6    responsibility for my action with the offer letter."

7    What was meant by that?

8    **A.**   I wanted him to repair the damage he had

9    done.

10   **Q.**   So what did you ask him to do?

11   **A.**   Apologize and accept the fact that he

12   falsified their document.

13   **Q.**   Who was he supposed to apologize to?

14   **A.**   Ron Bertasi.

15   **Q.**   And he is at GIS WebTech; is that right?

16   **A.**   Yeah, it is a small shop.  There's only

17   three of them.

18   **Q.**   And did Mr. Lombardo call them to

19   apologize?

20   **A.**   I never got any information back on that.

21   **Q.**   You weren't present during any

22   conversation, though; is that fair?

23   **A.**   No, no.

24   **Q.**   I am going to show you what's been marked

25   as Defendant's Exhibit R.  Take a minute to take a look

1    at it.

2                              -   -   -   -   -

3              (Thereupon, Deposition Exhibit R, Copy

4              of    , was marked for purposes of

5              identification.)

6                              -   -   -   -   -

7         A.    (Reviewing.)

8              Okay.  Thanks.

9         Q.    Do you recognize this document?

10        A.    Yes, ma'am.

11        Q.    And what is it?

12        A.    It is an email between Rick and the people

13   that -- their transaction costs related to incorrect

14   expense report, reimbursable.

15        Q.    And this was an email string between you

16   and Mr. Lombardo as well as Christine Steigmann?

17        A.    Steigmann.

18        Q.    This is an email correspondence between

19   you, Mr. Lombardo and Ms. Steigmann, correct?

20        A.    If you scroll back up, I do believe that

21   Greg and Kyle were on there.

22        Q.    Greg and Kyle, of course, were on the top?

23        A.    And the date is August 25, 2017.  And Kyle

24   was his direct supervisor.

25        Q.    And on Page 5 of the 6 pages, I think at

Page 60

1   the bottom it says Mr. Lombardo is submitting an

2   expense report to Ms. Steigmann, correct?

3        A.   Yes.

4             MS. SIEGMUND:  I think it is faster if you

5   go.  I have a lag on my screen.

6             MS. COOPER:  Okay.  Not a problem.  All

7   right.

8        Q.   And this is Mr. Lombardo submitting an

9   expense report to Ms. Steigmann and to you as well?

10       A.   Yeah.

11       Q.   Did you review all expense reports for the

12  account managers and senior account managers?

13       A.   Yes.

14       Q.   And can you tell me what Ms. Steigmann's

15  position was?

16       A.   Finance manager.

17       Q.   Is she still with the company?

18       A.   She is not.

19       Q.   And you wrote back to Mr. Lombardo in

20  response that this hotel was pretty pricey, was that

21  the conference rate, do you see that?

22       A.   Yes, ma'am.

23       Q.   And then he provided an explanation,

24  correct?

25       A.   Yes, he did.

1     **Q.**   Do you know if prior to booking his hotel

2  room, Mr. Lombardo would have sought approval from

3  anyone?

4     A.    2017?  He would have gone through Christine

5  at that point.

6     **Q.**   Okay.

7     A.    And now it's -- that's Sharon.

8     **Q.**   And if I scroll up here a little further,

9  we are on page 3 of the 6 pages, this is an email, I

10  believe, sent from -- your name carries on to Page 3

11  here, but it comes from Leslie Peterson to Rick

12  Lombardo and other copies on this email, Chris Chmura,

13  Kyle West, Ms. Steigmann, Greg Chmura.  Can you read

14  this email and tell me what time -- you bring up issues

15  with alcohol charges.  And can you tell me a little

16  more about that and why it was a concern?

17     A.    Our policy on alcohol is that you have

18  alcohol only at a meal, and only if the client orders

19  alcohol first, then you may order alcohol with that

20  client.

21     **Q.**   And were you responsible for helping

22  prepare that company policy?

23     A.    I basically borrowed that policy from

24  Eastman Kodak.

25     **Q.**   And why was that the policy of the company?

1    A.    We want our business transactions to be

2  sober.

3    Q.    But the company was okay with an alcoholic

4  beverage at dinner, with food, I guess I should say; is

5  that correct?

6    A.    Yes, ma'am.

7    Q.    What if a client ask an account manager to

8  go out for a drink and talk business?  What was an

9  account manager required to do under those

10  circumstances?

11    A.    Not go out for drinks.  Go out for dinner.

12    Q.    What if the account -- or, what if the

13  potential client didn't have time for dinner?

14    A.    Then they didn't have time for alcohol, or

15  she.

16    Q.    Do you attend these conferences that

17  account managers attend?

18    A.    Some of them.

19    Q.    And when you are at those conferences, do

20  you see other attendees in the restaurant bar -- or I'm

21  sorry -- in the hotel bar?

22    A.    No.

23    Q.    None?

24    A.    I don't go to hotel bars.

25    Q.    Okay.  Do you ever walk past the hotel bar

1    to get to your room or to conference rooms?

2         A.    Oh, yeah, the bars in conferences are wide

3    open.  You can see everybody that's in there.

4         Q.    And have you observed anything at these

5    conferences with respect to the people in these bars?

6              MS. SIEGMUND:  Object to the form of the

7    question.

8         A.    I have.  Of course I have.

9         Q.    And have you ever observed any attendees in

10   the bar, in the hotel bars?

11        A.    Yeah, I have.  I have seen them coming out.

12        Q.    Okay.  Is it your understanding that --

13   well, let me rephrase.  At these conferences, there is

14   a lot of opportunity, or there is opportunity to

15   interface with potential clients, or existing clients,

16   correct?

17        A.    That's the reason we go.

18        Q.    And isn't some of that interaction in these

19   hotel bars?

20        A.    We have our own policies and standards.  We

21   don't conform to the status quo of the masses.

22        Q.    Okay.  This email references Laura Leigh.

23   Who is Laura Leigh.

24        A.    Laura Leigh Savage.  Previous employee,

25   director of operations.

1    **Q.**    And you reference -- you say, "below is the

2    policy on entertainment you signed with Laura Leigh".

3    Where would that policy be found?

4    **A.**    Onstage.

5    **Q.**    Was it a separate policy from the employee

6    handbook?

7    **A.**    No, it was in the employee handbook.

8    **Q.**    And Mr. Lombardo, he provided -- if we

9    scroll up -- an explanation to you, correct?

10    **A.**    Are you referencing the email I am looking

11    at?

12    **Q.**    Yes.  And if you want me to scroll down, or

13    you want to scroll down, either way.

14    **A.**    (Reviewing.)

15        Okay.

16    **Q.**    Mr. Lombardo provided an explanation to

17    you, correct?

18    **A.**    Of course.

19    **Q.**    Did Chmura ultimately reimburse him for the

20    beverages that he purchased for himself and his client?

21    **A.**    I don't remember.

22    **Q.**    Or clients?

23    **A.**    I would hope not.

24    **Q.**    Do you know whether Mr. Lombardo asked his

25    supervisor, Mr. West at the time, before he took the

1    client out as to whether he could take that client out?

2        A.    Is that supposed to be separate from our

3    policy?  I don't know.  I don't know if he did or not

4    but we have a policy, so he was bound to that policy.

5        Q.    And I believe this occurred, based on the

6    email, in 2017.  Do you have a copy of the employee

7    handbook as it stood in 2017?

8        A.    I was told not to bring anything to this

9    deposition.

10       Q.    I don't mean right now.  Does the company

11   have a copy of the policy that was in effect at the

12   time of this email?

13       A.    Yes.

14       Q.    Do you know if it was produced in

15   Discovery?

16       A.    I think it was, yes.

17       Q.    I will represent to you that I have a copy

18   of -- that I can show you, Exhibit Q, the July 19, 2019

19   employee handbook.  I will pull that up.  But that is

20   the only handbook I was able to find in the production.

21                   -   -   -   -   -

22             (Previously marked Deposition Exhibit

23             Q, was shown to the witness.)

24                   -   -   -   -   -

25       A.    It think we are talking about 2017, and you

1   are asking me to look at something that's for 2019, and

2   I am focused on 2017, so why are you asking me to look

3   at something that could have evolved?

4       **Q.**   Just take a look at this exhibit.  This is

5   Defendant's Exhibit Q.

6           MS. SIEGMUND:  Christine, I will note that,

7   of course, Dr. Chmura was asked on the handbook and on

8   the training on the handbook, so to the extent we are

9   getting into that, that's fine --

10      **A.**   Yeah, I did not prepare for this.

11      **Q.**   But you did prepare to testify regarding

12  disciplinary actions taken against Mr. Lombardo, and

13  you have testified that there was a company policy that

14  was -- that Mr. Lombardo did not adhere to when he

15  bought company drinks, so I am going to ask you to take

16  a look at this exhibit, Exhibit Q.

17          MS. SIEGMUND:  Christine, can we go off the

18  record for one second?

19          MS. COOPER:  Yes.

20              -   -   -   -   -

21          (Discussion had off the record.)

22              -   -   -   -   -

23          MS. SIEGMUND:  Is there a particular page

24  you would like me to go to that would speed this up a

25  little bit.

1           MS. COOPER:  Well, I want her to be

2    familiar with the document, but we are going to look at

3    Page 5 -- well, really Page 6.

4           A.    (Reviewing.)

5           **Q.**    Do you recognize this document,

6    Ms. Peterson?

7           A.    Yes, ma'am.

8           **Q.**    And what is it?

9           A.    It's an employee handbook.

10          **Q.**    And is it the employee handbook that was

11   put in place as of July 19, 2019; is that correct?

12          A.    I don't know.  I have to go back to the

13   top.

14          **Q.**    Can you see the dates on there, July 19,

15   2019?

16          A.    I can.

17          **Q.**    I am going the take you to Page 6.  Do you

18   see the entertainment section in the handbook?

19          A.    Okay.  This is about picking out a

20   restaurant for dinner and having alcohol, yes.

21          **Q.**    Is this the policy you were referring to --

22   well, let me ask this.  Has this policy changed between

23   2017, the date of the email that we were just looking

24   at, and 2019?  Are you aware of any changes to this

25   part of the employee handbook?

Page 68

1        A.     Does it end on Page 6?  (Reviewing).

2               Yes, that's the same policy.

3        Q.     Is this the policy you were pointing Mr.

4    Lombardo to in your email?

5        A.     Yes, ma'am.

6        Q.     Is there any parts of employee handbook --

7    let me ask this, does this provision in the handbook

8    prevent an employee from taking a client out to -- for

9    a drink at a bar or -- let me stop there.

10       A.     I don't see the word, bar, in that

11   paragraph.

12       Q.     Does it prevent an account manager, or

13   senior account manager, from having a drink with a

14   client or potential client?

15       A.     No.

16       Q.     Is there any part of the employee handbook,

17   to your knowledge as it existed in 2017, that prevented

18   an account manager or senior account manager from

19   having a drink with a client or potential client?

20       A.     If in a restaurants and the client orders

21   alcohol, then the account manager can certainly follow

22   suit.

23       Q.     Is there anything preventing them or

24   barring them from having a drink with a client if it is

25   not at a restaurants over dinner?

1      A.    It is not stated that way.

2      Q.    Other than the email we just looked at and

3  the handwritten sheet of paper that we looked at a

4  moment ago, are there any other written -- to your

5  knowledge, did in Mr. Lombardo's personnel file that

6  pertain to any disciplinary actions or warning, in the

7  offer letter -- sorry, in the amended offer letter from

8  your testimony -- let me restate my question.

9           MS. SIEGMUND:  Yeah, I got lost.  I'm

10 sorry.

11     Q.    In the amended offer letter, Exhibit I,

12 which is the handwritten document we went over, and

13 Exhibit R, which is the email, are you aware of any

14 other written documentation pertaining to any warning

15 on disciplinary action with respect to Mr. Lombardo in

16 his personnel file?

17     A.    In 2016, the anual review was conducted

18 between Mr. Lombardo and Laura Leigh Savage, Leslie

19 Peterson, and there were some, continues improvement

20 suggestion around ethical and more or less moral

21 behavior that were documented and handed off to, I

22 believe that was, Christine Steigmann at the time.

23     Q.    And are you aware of whether those are

24 still in Mr. Lombardo's personnel file?

25     A.    I'm not.  We are not allowed to really see

Page 70

1   personnel files.  That's just within H.R.

2       Q.   So your -- you don't have access to the

3   personnel files?

4       A.   We don't access personnel files.  That's

5   within the control of H.R.

6       Q.   But you would have access to it if you

7   wanted to see them; is that fair?  Let me ask you, are

8   you prohibited from looking at the personnel files?

9       A.   I don't know.  I don't think so, but I

10  don't know.  I don't look at people's personnel files.

11      Q.   Did you look at Mr. Lombardo's personnel

12  files to prepare for this deposition?

13      A.   I did not.

14      Q.   Then how can you testify regarding what's

15  contained -- what warnings -- let me rephrase that.

16           What disciplinary action, if any, was taken

17  against Mr. Lombardo during his tenure there?

18      A.   Life coaching.

19      Q.   Can you explain what you mean by that?

20      A.   Do you play sports?

21      Q.   I did, yes.

22      A.   You look like an athlete.

23           So the role of the coach is to continuously

24  improve the players in order to win games.  As his

25  coach, I was continuously working on his behavior to

1   make -- help him become a better player.  If you see

2   that as disciplinary, I see it as disciplinary.  If you

3   see it as coaching, then it is coaching.

4       **Q.**   Other than coaching, is there any other

5   disciplinary action that Chmura took?

6       **A.**   No.

7       **Q.**   We are going to change topics

8   substantially, so if we want to take a short break now

9   or keep moving forward, I just want to be flexible to

10  that.  Now would be good time if anybody needs a break.

11      **A.**   I don't.

12          MS. SIEGMUND:  You want to keep going?

13          THE WITNESS:  Okay.

14      **Q.**   Okay.  I am going to turn your attention to

15  Topic Number 25 on Exhibit A, "The calculation of

16  commissions paid to Mr. Lombardo."  You are the

17  designated corporate representative to testify on this

18  topic, correct?

19      **A.**   Yes, ma'am.

20      **Q.**   I am going to put up two documents,

21  Defendant's Deposition Exhibit J and K.

22                      -   -   -   -   -

23          (Thereupon, Deposition Exhibit J, Copy

24          of    , was marked for purposes of

25          identification.)

Page 72

```
 1                    -   -   -   -   -
 2                       -   -   -   -   -
 3              (Thereupon, Deposition Exhibit K, Copy
 4              of    , was marked for purposes of
 5              identification.)
 6                       -   -   -   -   -
 7      Q.    I am going to give you control.
 8      A.    What does, produced natively mean?
 9            MS. SIEGMUND:  That just means we produced
10  it as an Excel spreadsheet and so there is a place
11  holder in our production, so it doesn't have a Bates
12  number at the bottom.
13            THE WITNESS:  Okay.
14      Q.    If you can go ahead and scroll through
15  Exhibits J, and scroll through Exhibit K and
16  familiarize yourself with these.
17      A.    (Reviewing.)
18            So I am only commission numbers.
19      Q.    Are you ready?
20      A.    Yes, ma'am.
21      Q.    Okay.  Turning to exhibit J first.  Do you
22  recognize this document?
23      A.    It look like a commission report.
24      Q.    And do you know when this commission report
25  was assembled?
```

1      A.    That's evolved over time.  What time period

2   do you want me to speak to.

3      **Q.**    Well, I mean, this specific document.  Do

4   you know how this specific document was put together.

5      A.    2016?  That would have been Ms. Steigmann

6   individually reaching out to the account managers and

7   preparing what she had on the books as their

8   commissions.  They reviewed it, edited it, pushed it

9   back to Christine Steigmann which recorded those edits

10  and then pushed it to me to review.

11     **Q.**    Does Exhibit J accurately reflect the

12  commissions that is Mr. Lombardo was paid from October

13  2015 through february 2017?

14     A.    I can't remember that.  If this is an

15  approved expenditure or commission report, then I would

16  have to say, yeah.

17     **Q.**    Who, ultimately, approved the amount of

18  commissions that would be paid during this time period,

19  October 2015 to February 2017?

20     A.    Me.

21     **Q.**    If we go up, I am going to take that up to

22  the first page up here (indicating) and shrink it a

23  little bit..  Is that still clear?

24     A.    Can you move the right column to the

25  left -- my left so I can see the comments on the right,

1    or is this a scanned document?

2         **Q.**    This is a PDF version of the excel

3    spreadsheet that was produced.

4         **A.**    Well, without comments on the right, I'm

5    not familiar, but I will do my best.

6         **Q.**    Do you believe there were comments on this

7    particular spreadsheet of the February --

8         **A.**    I am used to seeing comments on the right,

9    yes, ma'am.

10         **Q.**    Okay.  Give me one moment here.  See if we

11    can do it this way (indicating).

12              MS. COOPER:  Let's go off the record.

13                   -   -   -   -   -

14              (Short recess taken).

15                   -   -   -   -   -

16              (Thereupon, Deposition ExhibitAG , Copy

17              of    , was marked for purposes of

18              identification.)

19                        -   -   -   -   -

20    BY MS. COOPER:

21         **Q.**    Okay.  I am going to give you control of

22    this.  I will represent to you this is the native

23    version, or excel version of what I had marked as

24    Defendants Exhibit Deposition Exhibit J.  This one is

25    marked as defendant's exhibit AG, and the place holder

Page 75

1   is Chmura 000131.  And I will give you an opportunity

2   to manipulate this and take a look at it.

3          A.    (Reviewing.)

4                 If you could move to the left, row A and

5   then freeze B --

6          Q.    Do you want me to freeze Row B?

7                 MS. SIEGMUND:  Yes.

8          A.    Yes, I want to see the name as we scroll

9   across.

10         Q.    (Indicating).  Okay.  You should be able

11   to now.

12         A.    Okay.

13         Q.    Do you recognize this document?

14         A.    Yes, ma'am.

15         Q.    What is it?

16         A.    It looks like commission reports from

17   November 2016.

18         Q.    And did you prepare this report?

19         A.    No.

20         Q.    To the best of your knowledge, is that a

21   true and accurate copy of the 2016 commission report?

22         A.    To the best of my knowledge, yes.

23         Q.    And there are some other tabs at the

24   bottom.  There is February 2017, January 2017, December

25   2016, November 2016, October 2016, correct?

Page 76

1       A.    Correct.

2       Q.    And do you want to page through those and

3  tell me if those are also accurate to the pest of your

4  knowledge?

5       A.    (Reviewing.)

6            Looks accurate.

7       Q.    Do you know who prepared this spreadsheet?

8       A.    Christine Steigmann.

9       Q.    And how was this -- how would the

10  information get onto this spreadsheet?

11      A.    Sure.  As I said earlier, Christine

12  Steigmann would start on the month of commissions in

13  front of each account manager what was on the books,

14  and ten any correction that needed to be made, the

15  account managers work with Christine on that until they

16  got it to where they felt like it was right, and then

17  it came to me.

18      Q.    And then what would you do once it came to

19  you?

20      A.    I would review each transaction and if I

21  had a question, I would go direct to the account

22  manager, senior account manager and seek clarification

23  if it wasn't properly noted in the comment section, row

24  -- Column K.

25      Q.    Would you ever make adjustments to

1  commission percentages?

2      A.   No.

3      Q.   Would you make adjustments to the

4  commission dollar amount?

5      A.   No.

6      Q.   Who would do that?

7      A.    Christine Steigmann.

8      Q.   Would she do that at your direction?

9      A.    Yes.

10      Q.   Now, what were the -- take the November '16

11  tab you were on on exhibit AG, are these the

12  commissions for Mr. Lombardo?

13      A.   Yes, it says RL, Column G.

14      Q.   Let's walk through them.  I going the take

15  us up so we can see the header here.  Walk through the

16  columns with me.  So it has, Opportunity Name.  Can you

17  explain what that column is?

18      A.    The opportunity is the language that's used

19  in Salesforce to be tied with a client's name.

20      Q.   And the Type, can you explain, what -- I

21  missed one.  If we go to -- well, let's fin this up

22  firstist.  The Commission, can you explain to me the

23  Commission column?

24      A.    Oh, there's Type.  Should we do Type since

25  we are here?

1      Q.    Yes, please.

2      A.    It would be either new business or it would

3 be a contract that was a renewal -- a license that was

4 renewing.

5      Q.    And what's the amount next to it?

6      A.    Amount next to it, if it's a renewal,

7 represents 3% of that opportunity.

8      Q.    So if we look at, once you get back to the

9 top there, Column C says, Amount.  What was that

10 amount?

11      A.    If it says renewal, it is 3% of -- that is

12 the amount of the contract, excuse me, yes.

13      Q.    And the next column is -- yeah, the next

14 column is really Columns C and E combined, says

15 Commission.  And the first column there of the

16 commission has the percentage in it.  What did that

17 percentage represent?

18      A.    If itis a renewal, it is 3% of the amount.

19 If it is new business, it is 15% of the amount with

20 certain caveats.

21      Q.    And the not dollar value next to the

22 percentage amount, what does that represent?

23      A.    The commission.

24      Q.    On the right hand side.  Let me rephrase

25 that so it is clear for the record.

1          To the right-hand side under the Commission

2  Column, ther eis a dollar value next to percentage.

3  What does that represent?

4          A.    Commission.

5          **Q.**    And then there is a Renewal Date Column.

6  What is the Renewal Date column?

7          A.    That is the date that the license agreement

8  is renewed.

9          **Q.**    And then there is a Column H that says --

10  i'm sorry, Opportunity Owner is Column G and it has

11  some initials there, RL.  What is an Opportunity Owner?

12          A.    That's just a designated account manager.

13          **Q.**    So in this instance, R L would stand for

14  Richard Lombardo, correct?

15          A.    Yes.

16          **Q.**    And then Column H says Demo, question mark.

17  What is that column?

18          A.    That says who did the demo.

19          **Q.**    And if it has and NA in that column, do you

20  know what that means?

21          A.    Typically N A means, not applicable.

22          **Q.**    So, for example, in the rlow trhat you are

23  in, in row 5, it was a renewal and so it has an N A in

24  Demo.  I take it there wouldn't usually be a demo for a

25  renewal; is that fair.

Page 80

1       A.      Yeah, absolutely.

2       Q.      And then Column I says, Survey Sent,

3   question mark.  What survey is that column referring

4   to?

5       A.      Customer satisfaction survey.

6       Q.      And there are dates in there, so did that

7   represent the date that the survey was sent?

8       A.      That's what the header says in Column I.

9       Q.      And if there is answer N A in the field

10  underneath that Column, what did that N A stand for?

11      A.      Typically N A means not applicable.

12      Q.      And then there is a Note column, Column J,

13  correct?  It  doesn't look like there is any not e --

14      A.      Yes.

15      Q.      I'm sorry, I broke my own rules.  It'

16  doesn't look like there are any notes in thi s

17  particular one, but what type of notes would there be

18  in that field?

19      A.      Any information that was needed to

20  clarify any of the previous columns, to clean up J.

21      Q.      And then Column K says Paid, question mark.

22  What is that column?

23      A.      That indicates the date that we received

24  payment for that license agreement from that

25  Opportunity Name.

1    Q.    So it doesn't refer to the date that the

2    account manager may receive the commission in their

3    pay, correct?

4        A.    Correct.

5        Q.    And so if we look at Row 9 and 10 on the

6    November 5, 2016 tab of Exhibit A G, there is a as

7    yellow dot in K with no date in it.  Doe s that mean

8    that commission -- sorry, that the contract had not

9    been paid by the client at that point?

10       A.    I used to get these from Christine, and it

11   looked like an artifact to me.

12       Q.    But if there is no date in that column,

13   then what your understanding would be is that that

14   client hadn't paid that commission yet -- not the

15   commission, hadn't paid on the contract yet, correct?

16       A.    If there is not a date in there, then we

17   are still waiting on payment.

18       Q.    Okay.  Continue.

19       A.    And at that point we went ahead and paid

20   whether we had been paid or not.

21       Q.    At some point, that changed, correct, how

22   the commission was paid, the timing of the payment of

23   commissions was changed, correct?

24       A.    Yes.

25       Q.    And can you explain what change was made?

Page 82

1        A.     We paid commissions when we receive payment

2    from the client.

3        Q.     When Mr. Lombardo first started working for

4    Chmura, what percent was paid on -- well, let me

5    rephrase that.

6               What constituted new business?  What would

7    be included in new business?

8        A.     This was a new opportunity

9        Q.     And how was that defined?

10       A.     I'm sorry?  How was that defined?

11       Q.     Yes.

12       A.     New business means that it is a new client.

13       Q.     Do you know if there are records for the

14   commissions paid to Mr. Lombardo in 2015?

15       A.     Sorry, could you restate that?  You were

16   turning your head and I couldn't hear you.

17       Q.     I'm sorry.  Yeah, absolutely.  I said, are

18   you aware of whether there are any records for

19   commissions paid to Mr. Lombardo in 2015?

20       A.     There would be records in QuickBook.

21       Q.     And do you know if those were produced, his

22   commission records were produced in Discovery?

23       A.     I do not.  In 2015?

24       Q.     Yes.

25       A.     I do not.

1    **Q.**   Do you know when the change was made on the

2    time of commission payments?

3    **A.**   In early 2019.

4    **Q.**   I am going to show you what's been marked

5    as Exhibit AH, it is aother spreadsheet.

6                    -   -   -   -   -

7                (Thereupon, Deposition Exhibit AH, Copy

8                of   , was marked for purposes of

9                identification.)

10                   -   -   -   -   -

11    **Q.**   If you can take a look at this.

12    **A.**   (Reviewing.)

13                That was an interim.  We were getting into

14    situations where clients weren't paying and we paid out

15    commissions, and we had to have fiduciary

16    responsibility within the account managers to earn

17    their renewal, so they needed to track down those past

18    due notices, and that's what that Row 1 is about.

19    **Q.**   Do you recognize this spreadsheet?

20    **A.**   Yes, ma'am.

21    **Q.**   And what is it?

22    **A.**   It appears to be a commission report.

23    **Q.**   It goes from march of 2017  through

24    September of 2019, correct?

25    **A.**   That's what the tabs indicate at the

1    bottom.

2         Q.    And these are Mr. Lombardo's -- pertain to

3    Mr. Lombardo's opportunities, correct?

4         A.    I am used to seeing all of them together,

5    so, if this is a commission report, it should have

6    everybody in there, not just Mr. Lombardo.

7         Q.    Well, does this one contain everybody as

8    you look through it?

9         A.    Well, I can only see Rows 1 through 19.

10   This appears to be something that was prepared in

11   production for this case, so I would not say it was --

12   no.

13        Q.    Did you prepare it?

14        A.    No.

15        Q.    Do you know who did prepare it?

16        A.    Sharon Simmons most likely, or Hanna

17   Weisenhart *.

18        Q.    Did you review it for your deposition

19   today?

20        A.    I did not.

21        Q.    I am going to show you the first

22   spreadsheet here and ask you a few questions on it.

23   You will see on Row 18, this is tab March 7, 2017 of

24   exhibit A H, and if you look at Row 18 in the Admission

25   column --

Page 85

1      A.    Do you mind highlighting that for me, put

2  your cursor on it?

3      Q.    Sure.

4      A.    I have a little bit of astigmatism.

5      Q.    In the Commission Percent column, you see a

6  7 1/2 %?

7      A.    Uh-huh.

8      Q.    Why isit 7 1/2 and not either 15 or --

9  well, let me take a step bpack.  Row 18 shows the type,

10  New Business, correct?

11     A.    Yes, ma'am.

12     Q.    And it shows in the commission Column, the

13  7 1/2 %,  correct?

14     A.    It does.

15     Q.    And why would that be at a 7 1/2% versus a

16  15%?

17     A.    In March of 2017, that would have been Kyle

18  West in the supervisory role and more than likely it

19  says in Column J that Rick and Austen worked on this

20  together, so they split the commission.

21     Q.    So was that common, then, that splitting

22  commission if two account managers worked on an

23  opportunity together?

24     A.    Is your use of word, common, frequent, or

25  is your use of the word, common, a policy manner?

1  **Q.**   Let me rephrase that.  Thank you.  Was it

2  policy to split the commission if more than one account

3  manager worked on an opportunity?

4  **A.**   Absolutely.  They worked as a team.  Those

5  are the two meteorites working together on that one.

6  **Q.**   Did they -- well, who decided the split on

7  the commission if two account managers worked on an

8  opportunity together?

9  **A.**   I probably did.

10  **Q.**   Would you ultimately apporove it or not?

11  **A.**   Absolutely.  Absolutely.

12  **Q.**   How were -- if, for example, there was new

13  business that signed a multi-year contract, and paid

14  that multi-year contract upfront, how were commissions

15  calculated on that basis?

16  **A.**   So let me give you that in a why response

17  and not a how, is that okay?

18  **Q.**   You can give me whatever response you give

19  me and I will listen to you and follow-up.

20  **A.**   Okay.  So would you restate the question?

21  You want to know how multi-years deals were handled in

22  terms of commissions when the entire multi-year deal

23  was paid in year X?

24  **Q.**   Correct.

25  **A.**   Because the client, particularly the B to B

1   client, can cancel at any time, there is not a

2   guaranteed 3% deal.  Now, if they pay upfront, we still

3   have to get those renewals, right?  Which means if you

4   get 15% commission, you really need to follow-up with

5   those touch points every quarter.  You can kind of let

6   that one slide because you already got your commission

7   for it.  So to make sure those touch points that were

8   required for renewal, you have to make sure that you

9   take the 12 month commission and a 3% renewal

10  thereafter.

11      Q.    Was it standard policy at Chmura for

12  account managers and senior account managers to not

13  have any touch points with a client that signed a

14  multi-year -- signed and paid a multi-year contract?

15      A.    So it is Chmura, not Shmura, if you don't

16  mind.  Dr. Chen, Chmura.

17          At Chmura, we did everything we could to

18  incentivize our account managers to take care of your

19  client.  So rather than pay 15% up front, we take 15%,

20  renewal. 15%, renewal, renewal, renewal.  Depends on

21  the terms, but you wanted that client to renew.

22          Did I answer your question?  Was it a

23  standard practice question or policy question?

24      Q.    Was the standard policy on a contract, on a

25  multi-year contract that was fully paid upfront for an

1  account manager and senior account manager to have no

2  touch points with that client after that contract was

3  paid?

4      A.   No, we would never encourage no touch

5  points.  The whole thing I just went through was the 3%

6  commission.

7      Q.   Okay.  Was it ever put in writing that a

8  multi-year contract, fully paid, would be paid out in

9  commissions at 15% on the first year and 3% on the

10  years thereafter?

11     A.   That was recorded on the standard operating

12  procedures?

13     Q.   When were those standard operating

14  procedures adopted?

15     A.   Under Greg Lodge * in 2017.

16     Q.   So what about commissions prior to the

17  standard operating procedures?

18     A.   Well, generally, thing go like this,

19  Christine, is you have a year and you develop the Best

20  Practices and that would have been 2015 through 2016.

21  Once you get through all the kinks of a start-up

22  department, then you organize standard operating

23  procedures based on best practices and those experience

24  continuous improvement.

25     Q.   How were -- let me ask this:  Were

1  commissions paid differently on multi-year contracts in

2  2015 and 2016 than they were in 2017 going forward?

3      A.    That's not to my understanding, no.

4      Q.    When an account manager started at Chmura,

5  how were they paid for -- well, let me rephrase that.

6  If an account manager, let's say, inherited an

7  opportunity from a prior account manager and ultimately

8  closed the deal, how were commissions paid on that deal

9  to the new account manager?

10     A.    What year are you in?  When you said

11 started --

12     Q.    Well, new --

13     A.    And the account manager -- can you be more

14 specific about what you mean by new account manager --

15     Q.    If Chmura hired a new account manager --

16 when Chmura --

17     A.    When?

18     Q.    In 2015.  Who inherited an opportunity and

19 ultimately closed that opportunity, how were they --

20 what percentage of commission were they paid?

21     A.    As we discussed last week, there were

22 practices in place that if they prospected that client,

23 they did -- they set up the demo, they actually did the

24 demo on their own without the help of an economist or

25 statistician to close that deal, they did the paperwork

Page 90

1   properly in Salesforce -- the documentation, excuse me,

2   and then they correctly reported information to the

3   Accounting Department, that constituted a complete 15%

4   initial sales cycle.  If they inherited that, then we

5   have to look at how they inherited that, who did the

6   demo, was there supporting staff on that demo?  Did

7   they close, et cetera, et cetera?

8               So you have to be able to understand the

9   full sales cycle.  So if they just got a wet signature

10  on a license agreement, that's the equivalent to the

11  level of effort of a renewal, so that was 3%.  If they

12  didn't --

13      Q.   Did they -- sorry.

14      A.   No, go ahead.

15      Q.   Was there ever an instance in which an

16  account manager only had to procure a signature on a

17  contract and still got paid the 15% commission between

18  2015 and today?

19      A.   Not that I'm aware of.

20      Q.   To your knowledge, did you ever approve the

21  commission in that instance, at 15%?

22      A.   What is the 15%, the complete sales

23  cycle?

24      Q.   No, in the instance in which a contract --

25  where is the demo had already been completed and the

Page 91

1    contract was about to be inked, I think were your

2    words.  Had you ever approved a 15% commission for an

3    account manager who inherited it in that status?

4          A.    I have no recall of doing that.

5          Q.    I want to turn your attention to this

6    November 2017 tab on AH.  And if you look at Row 5, you

7    will see under Commission there is 5%.  Can you explain

8    in this instance why a 5% commission was paid on new

9    business instead of 15%?

10         A.    So this was under Greg in 2017, November of

11   2017.  He could took over October 1 of 2017.  So let me

12   see what's in that -- are we on Row 5 is that the

13   timeline we're in?

14         A.    Yes.

15         Q.    Cuyahoga County?  Oh, my gosh.  I'll never

16   forget that one.  Yeah, Cuyahoga County is our office

17   county for our headquarters in Cleveland.  And Cuyahoga

18   County came in to the Cleveland office, and the only

19   demo was given by Greg.  The paperwork to get Cuyahoga

20   County as a new client was unbelieveable.  I believe

21   that our Operations Department worked on that for six

22   months before we were able to get it in.

23               So Rick got 5% in that situation because he

24   didn't do the demo, he didn't do the paperwork.  It

25   falls into that 5% category of -- pretty much a

1    judgment call, but that would have been Greg's call.

2    And it was an RFP, so he wouldn't have filled out the

3    RFP -- I think that's a very generous commission for

4    the level of effort that he had to do.

5         Q.   Was there a written policy of reducing the

6    commission from 15% to a lesser amount if an R F P was

7    involved?

8         A.   Yes, he should have an email on that from

9    me.

10         Q.   Do you recall when you would have sent that

11   email?

12         A.   I was the only one that sent the email.

13   Was that the question?

14         Q.   No.  Do you recall when you would have sent

15   that email?

16         A.   Oh, I think it was March of 2015.

17         Q.   And do you know if that email was produced

18   in Discovery?

19         A.   Yes.

20         Q.   Was it?

21         A.   Yes.

22         Q.   I am going to show you, or direct your

23   attention to the October 2017 tab on Exhibit AH.  The

24   Opportunity Name is Entergy Mississippi and it has a 6%

25   commission in the Commission column.  Can you explain

Page 93

1    why this one has a 6% commission in tha t column?

2         A.    That would be Greg's judgment, but I can

3    tell you when Entergy was being managed by Rob

4    McMillin, they were a former client, and I don't know

5    the details behind this one.

6         Q.    Did you approve the 6% commission?

7         A.    No, that would have been Greg.

8         Q.    You mentioned earlier that Greg took over.

9    What did Greg take over?

10        A.    He took over Kyle's supervisory role of the

11   sales team because Kyle --

12        Q.    Go ahead.  You can finish your thought.

13   What did Kyle --

14        A.    No, no. I just -- Kyle had other plans.

15        Q.    What were Kyle's other plans?

16        A.    He wanted to go to Italy with his wife.

17        Q.    Okay.  How long -- and Kyle is Mr. West,

18   right, Kyle West?

19        A.    Yes, ma'am.

20        Q.    Kyle -- how long was Mr. West in Italy for?

21        A.    The month of January 2018, the month of

22   April and half of May of 2018.

23        Q.    And did he come back to work in May of

24   2018?

25        A.    He did.

1    **Q.**   I am going to show you the tab so we can go

2    to a concrete example.  (Indicating).  Okay.  I froze

3    the first column here.  We are on the April 2019, the

4    April 2019 tab of Exhibit AH, and I want to direct your

5    attention to Row 11 and 12.  I highlighted Row 11.  If

6    you could just take a look at those two rows for us for

7    a minute and tell me when you are ready.

8         **A.**    (Reviewing.)

9         **Q.**   Are you familiar with the "Workforce

10   Solution, South Plains 3 year agreement opportunity"?

11        **A.**    That was a mouthfull.  Somewhat, yeah.

12        **Q.**   And there is a note in this particular row

13   that states, if you want to scroll over for a moment,

14   "Rick was paid for all three years at the new business

15   rate.  Only the 12 months should be paid at that rate."

16   Do you see that?

17        **A.**    Yes, ma'am.

18        **Q.**   Do you know who made that note?

19        **A.**    It was either Sharon or Hanna.

20        **Q.**   And we talked about how the 15% commission

21   would be paid on the first year and then the 3% would

22   be paid on the remaining years on the contract that was

23   paid in full, correct?  We already talked about that?

24        **A.**    Yes, ma'am.

25        **Q.**   Is this one of the instances in which Mr.

Page 95

1   Lombardo would have been paid commission on the first

2   year at 15% and then the remaining paid at 3%?

3        A.   Yes.

4        Q.   Who, in this instance, the -- let me

5   rephrase.

6             Did you approve payment on this one at the

7   rate of 15% for the first year and 3% for the remaining

8   years?

9        A.   That would have been April '19.  That would

10  have been early in Eli's tenure, so I imagine he was

11  just learning, so this probably went to Sharon after

12  Eli glanced at it.  He wouldn't have known enough at

13  that time to -- I mean, he may have.  Talking about Eli

14  here.  So I don't know about this one.  I am aware that

15  that adjustment was made.

16       Q.   Okay.  To your knowledge, was -- we looked

17  at the spreadshea AG, which was October 2016 to

18  February 2017.  Was the spreadsheet we are looking at

19  now, A H, did it pull information from a different

20  source than spreadsheet A G?

21       A.   No, everything came from QuickBooks and

22  backed up by Salesforce.

23       Q.   So we talked about opportunity.  We talked,

24  multi-year contracts, talked about commissions when

25  more than one account manager worked on opportunities.

1    Were there any other instances in which a commission

2    would be adjusted?

3         A.    No, unless there was a mistake like this

4    one appears to be a mistake.

5         Q.    Well, this was -- you are talking,

6    Workforce Solutions on tabs -- on the April 2019 tab,

7    correct?

8         A.    Yes.  Any time you see something in red

9    with a negative on it, it is an adjustment and

10   somebody's mistake.

11        Q.    But this was an adjustment for a multi-year

12   paid contract, correct?

13        A.    Yes, ma'am.

14        Q.    I want to change topics now and close this

15   out.  I am going back to Exhibit A, Notice of

16   Deposition.  You were designated as the corporate

17   representative to speak about "Eli Auerbach's

18   termination, including the decision to terminate,

19   reason for termination and notice to Mr. Auerbach of

20   his termination"; is that correct?

21        A.    Yes.

22        Q.    When was Mr. Auerbach terminated?  When was

23   his employment terminated?

24              That was a poorly worded question.

25        A.    December of 2019.

1   **Q.**   What were the circumstances surrounding his

2   employment termination?

3   **A.**   He wasn't meshing with leadership in terms

4   of direction we wanted to go.  He had a different

5   direction he wanted to take the sales team and the

6   level of conflict that was creating for the sales team

7   wasn't necessary.

8   **Q.**   What direction did he want to take the

9   sales team?

10   **A.**   He wanted to, basically, raise their base

11   salary and lower their commissions, which was creating

12   anxiety for them.

13   **Q.**   After Mr. Auerbach was terminated, did

14   Chmura make adjustments to the commission structure?

15   **A.**   So we got kind of caught -- blindsided with

16   two new hires that came in that December, and

17   unbeknownst to us, Mr. Auerbach had designed their

18   offer letters, signed it himself, sent it out.  And so

19   they came in under, here is the structure, and that was

20   never approved by leadership.  So we were pretty much

21   stuck.  So we had some bumps there, bumps in the road.

22   And, I mean, he didn't have the the authority to sign

23   an offer letter.

24   **Q.**   So Mr. -- Mr. Auerbach did not have

25   authority to -- let me ask, who does have authority to

1    sign an offer letter?

2          A.    Me, Sharon Simmons, Chris.

3          Q.    And in these two instances, you didn't?

4          A.    Can I correct my testimony?  John Chmura

5    and Greg Chmura can sign for their people.

6          Q.    And then, also, the others you listed can

7    sign for account managers, is that right?  Ms. Simmons,

8    and was there somebody else you mentioned as well?

9          A.    Chris Chmura, but I don't believe there is

10   any situation where Sharon or Chris signed.  It was

11   usually me.

12         Q.    And in these two instances, you didn't

13   review the offer letter before they went out to these

14   new account manangers?

15         A.    No, I didn't see them.

16         Q.    When did you discover that these offer

17   letters had gone out in the form that they did?

18         A.    When the decision was made between Eli and

19   Aisha to hire them, I got to see the letter then, and

20   it was the new sales structure that we hadn't even

21   approved.

22         Q.    Were those letters already signed by the

23   new employees?

24         A.    When I saw them?

25         Q.    Yes.

Page 99

1      A.    I don't remember.

2      Q.    Is the sales team currently being paid on a

3  different commission structure than was in effect when

4  Mr. Lombardo was employed?

5      A.    Yes.

6      Q.    And is it the structure that Mr. Auerbach

7  proposed?

8      A.    Yes.

9      Q.    When was that change made?

10     A.    December 1, 2019.

11     Q.    And was leadership involved in that

12 decision?

13     A.    We had to deal with the situation of two

14 employees coming in with a different sales structure

15 than the remaining employees.

16     Q.    Why was the decision made to alter the

17 existing -- alter the structures of existing employees

18 as opposed to the new employees?

19     A.    Some members of leadership felt like the

20 new structure was good and that it was more manageable

21 and sustainable over time, but we shot ourselves in the

22 foot on FMLA by raising somebody from 50,000 to 60 in

23 terms of hitting that high income target.

24     Q.    Prior to mr. Auerbach's termination, did

25 Chmura have him sign an affidavit pertaining to this

Page 100

1   case, Mr. Lombardo's case?

2         A.    Eli was eager to sign that affidavit, yes.

3         Q.    Who prepared that affidavit?

4               MS. SIEGMUND:  I would object to -- or

5   instruct you not to answer to the extent that gets into

6   attorney-client communications.

7         Q.    Are you not going to answer that question?

8         A.    I am not.

9         Q.    Let me ask this, did you prepare that

10  affidavit?

11        A.    No.

12        Q.    Did you reveiw the affidavit before it was

13  provided to Mr. Auerbach?

14        A.    Yes.

15        Q.    And that affidavit was -- let me ask this,

16  who handed the affidavit to Mr. Auerbach for his

17  signature, if you know?

18        A.    Greg Chmura.

19        Q.    And Mr. Auerbach ultimately signed the

20  affidavit, correct?

21        A.    Yes.

22        Q.    And the date he turned that affidavit back

23  to the company, he was terminated; is that correct?

24        A.    Yes.

25        Q.    Who had the discussion with Mr. Auerbach

1    regarding his termination, if there was anything?

2        A.    Greg Chmura.

3        Q.    Were you present either by phone or in

4    person when Mr. Auerbach was terminated?

5        A.    No.

6        Q.    Was leadership in agreement on terminating

7    Mr. Auerbach?

8        A.    Yes.

9        Q.    I am going to turn your attention back to

10   Exhibit A just for a second.  I think we are on our

11   last topic here.  You were designated as the

12   representative regarding Topic Number 32,

13   Mr. Lombardo's personnel file; is that correct?

14       A.    Yes.

15             MS. SIEGMUND:  I think we went through a

16   lot of this on Thursday, so, hopefully, we can

17   fasttrack this.

18             MS. COOPER:  We did.  I think I only have

19   one question on this, maybe two, but we already went

20   through a lot today as well.

21       Q.    Earlier today you testified you did not

22   review his personnel file prior to this deposition,

23   correct?

24       A.    Correct.

25       Q.    When was the last time you did review this

Page 102

1   personnel file?

2          A.    I don't know.

3                MS. COOPER:  If we can take a break for a

4   moment.  I think this concludes the 30(b) portion of

5   the deposition, but I want to page through.  Let's take

6   a short break.

7                MS. SIEGMUND:  Do you want to take a lunch,

8   or do you want a short break and keep going?

9                THE WITNESS:  At this point, keep going.

10               MS. SIEGMUND:  Okay.

11               MS. COOPER:  Go to take five.

12                      -   -   -   -   -

13                      (Short recess taken).

14                      -   -   -   -   -

15  BY MS. COOPER:

16         Q.    I'd like to go onto the individual part of

17  this deposition and move away from the 30(b)

18  deposition.  Some of the topics may sound a little

19  similar, Ms. Peterson, but I will try to ask different

20  questions, even though there is some overlapping in the

21  way the topic designation is in the Notice of

22  Deposition.

23               With respect to payment of commissions,

24  when Mr. Lombardo first started, I think you already

25  testified, that you would review and approve those

Page 103

1   commission; is that correct?

2       A.    Yes.

3       Q.    And when he first started with the company,

4   he was -- some of his commission rates were changed

5   based on status of opportunity provided to him; is that

6   correct?

7       A.    Yes.

8       Q.    Can you tell me a little more about those

9   changes in commission rates if you recall?

10      A.    Yes.  I can tell you the same thing I told

11  you several times.  Do you want me to go through it

12  again?

13      Q.    Just as to when he first started, yes,

14  please.

15      A.    So prior to Mr. Lombardo's employment, we

16  had Robert McMillin.  He was -- he was more of a

17  business development person for JobsEQ, and so he had

18  gone to several conferences.  He was prospecting.  He

19  was getting license agreements in place, and then left.

20          And so about two months later, we had gone

21  to ComDoc and got an understanding of what a sales team

22  for technology looked like.  And when Mr. Lombardo came

23  on, there were several deals amongst -- close, or even

24  closed in the case of Berea * county, I know they had

25  already been closed in Salesforce.

Page 104

1          So we had that policy that I told you about

2    before, the total initial sales cycle for 15% starts at

3    prospecting and ends with the closed deal.  If he

4    didn't hit all of the points in that process, then the

5    commission rates were calculated due to what we

6    considered level of effort.

7          Q.    When did Mr -- is it McMillin?  Is that

8    right?

9          A.    Yes.

10         Q.    When did Mr. McMillin leave the company?

11         A.    November of 2014.

12         Q.    And Mr. Lombardo started in February of?

13         A.    February 18, 2015, yes.

14         Q.    And just so it is clear, because I had a

15   hard time -- 2015 Mr. Lombardo started, correct?

16         A.    Yes.

17         Q.    And so some of the leads that were turned

18   over to Mr. Lombardo were leads from Mr. McMillin,

19   correct?

20         A.    Leads from Chris Chmura.

21         Q.    I want to focus just for a moment on the

22   leads from Mr. McMillin if we could.

23         A.    Sure.

24         Q.    Are they -- are the leads from Mr. McMillin

25   different than from Dr. Chmura?

Page 105

1       A.    No.

2       Q.    So they were the same leads?

3       A.    I thought you meant prospect.

4       Q.    No, no.  Were actual leads handed over to

5    Mr. Lombardo pertaining to Mr. McMillin different leads

6    than those that Dr. Chmura had worked on?

7       A.    Yes.  As far as I can remember, yes.

8       Q.    With respect to the leads that were from

9    Mr. McMillin, are you aware of any contact between

10   those leads when Mr. McMillin left and when Mr.

11   Lombardo started?

12      A.    I can't be specific, but I know there was

13   ongoing dialogue with opportunities before the sales

14   team was organized.

15      Q.    Can you be more specific?  What do you mean

16   by, before the sales team was organized?

17      A.    So Mr. McMillin had a series of very warm

18   leads, unsigned agreements that were already out there

19   in the hands of the potential client.  So they varied.

20      Q.    What, if any, of Mr. McMillin's leads

21   closed between the time he left the company and the

22   time Mr. Lombardo started?

23      A.    I know -- say that again?

24      Q.    What leads, if any, closed between the time

25   Mr. McMillin left the company and the time Mr. Lombardo

1    started?

2         Q.    So I know in Salesforce there is a signed

3    agreement with Leigh Towsey *with Mr. McMillin's name

4    on it.

5         Q.    Did Mr. McMillin close that?

6         A.    Did Mr. McMillin sign it?  He did.

7         Q.    So he would have been there at the time --

8    he would have been employed by Chmura at the time that

9    that was signed, correct?

10        A.    Not necessarily.  You can have a license

11   agreement waiting on a signature.

12        Q.    So does Chmura sign -- or a representative

13   of Chmura, sign the agreement before it is sent to a

14   prospective client?

15        A.    Yes, yes.

16        Q.    How many warm leads, or very warm leads

17   were handed to Mr. Lombardo that were generated by

18   Mr. McMillin?

19        A.    I don't know the number.

20        Q.    Would that information be documented

21   anywhere?

22        A.    Salesforce, if it is properly documented.

23        Q.    Could you ballpark how many:  10, 20, 100?

24        A.    I don't want to do that.  That's guessing.

25        Q.    How long is a lead very warm for?

1        A.    Varies by client.

2        Q.    What would be the range?

3        A.    One day to one year.

4        Q.    How was that determined, that length of

5   time?

6        A.    So -- money.  Budget.

7        Q.    Can you explain how?

8        A.    As we discussed last week, our business to

9   government client had longer sales cycles, typically,

10  than our business to business client.  That's driven by

11  policy and practicality.

12       Q.    The current sales team at Chmura, have they

13  been hitting their quotas from the time Mr. Lombardo

14  left to the current time?

15       A.    They have not.

16       Q.    Do you know the reason they haven't been

17  hitting those quotas?

18       A.    They're very young.

19       Q.    Are they inexperienced?

20       A.    Very.

21       Q.    Does the company currently have any senior

22  account managers?

23       A.    No.

24       Q.    Were there any warm leads after -- that Mr.

25  Lombardo had that were distributed after his

1    termination?

2         A.    I'm sure there were, but I am not aware of

3    what they are.

4         Q.    Are you aware of whether anyone worked

5    those leads?

6         A.    I am sure they did that under Dr. Shelly's

7    watch and he is making sure that everything is in

8    place.

9         Q.    What is Dr. Shelly's background?

10        A.    He is a Ph.D, a Harvard Fellow.  He was a

11   professor at Wake Forrest, and now he works for Chmura.

12        Q.    And what's his title at Chmura?

13        A.    Right now he is the director of sales and

14   education specialist.

15        Q.    And you probably have already answered

16   this, but does Chmura currently have a sales manager?

17        A.    That's Dr. Shelly.  He is an interim.  We

18   are interviewing.

19        Q.    Does he have any background in sales?

20        A.    He was an entrepreneur for a couple years,

21   so, yeah, he had to survive.

22        Q.    Does he have any sales management

23   experience?

24        A.    He is getting that now.

25        Q.    I want to show you what's been marked as

Page 109

1   Defendant's Exhibit, I believe it is, V.

2              MS. COOPER:  I am going to email Exhibit V

3   to you, Kelli.  I'll represent that it's the Responses

4   to the Interrogatories.  I did not have the

5   verification page attached to the original version that

6   I sent to you, Kelli, so I am going to send it with the

7   verification sheet attached.

8                      -   -   -   -   -

9              (Thereupon, Previously Marked

10             Deposition Exhibit V, With the

11             Verification Page Now Attached, was

12             shown to the witness.)

13                     -   -   -   -   -

14       Q.    I am showing you what's been marked as

15   Defendant's Exhibit V, and I will hand over control.

16       A.    (Reviewing.)

17       Q.    Have you seen this document before, Ms.

18   Peterson?

19       A.    Yes, ma'am.

20       Q.    Did you have, or did you assist in the

21   preparation of the responses to these interrogatories?

22       A.     Yes, ma'am.

23       Q.    If you can go to the very last page, and I

24   can scroll down there. (Indicating).  Is this

25   Dr. Chmura's signature?

Page 110

1          A.    It is.

2          Q.    I want to direct your attention to Number

3     17.  If you just read through that and then the

4     substance of the response as well.

5          A.    (Reviewing.)

6          Q.    Have you had a chance to review it?

7          A.    Yes.

8          Q.    I just want to look at Number 2 for a

9     moment here, the company's position that Mr. Lombardo,

10    quote, regularly exercised significant discretion when

11    performing his job duties.

12               Can you describe for me what your

13    understanding of his discretion is?

14         A.    He was allowed the opportunity to prospect

15    in the whole United States in the manner that met his

16    goals, his percentage goals.  Nobody prospected for

17    him.  He managed the prospecting prospects.

18         Q.    Okay.  Any other discretion?

19         A.    Any other discretion?

20         Q.    Yes.

21         A.    He had a lot of liberty in choosing

22    conferences to attend.  He was, basically, a product

23    development adviser because he was battle tested and

24    knew what the clients needed more than we did.

25         Q.    Anything else?

Page 111

1          A.     I mean, we can move on.

2          Q.     Well, I am just asking is that all the

3     discretion -- are those all the categories of

4     discretion that you believe Mr. Lombardo regularly

5     exercised?

6          A.     I agree with everything in Paragraph 2.

7          Q.     And Paragraph 2 -- well, let's see, it

8     says, "offering substantial discounts to customers."

9     So is that another area where he exercised significant

10    discretion, according to you?

11         A.     Yes.

12         Q.     So going to the first category of

13    discretion you mentioned was prospecting the whole

14    United States, correct?

15         A.     Correct.

16         Q.     Did any account -- let me ask this.  Did he

17    have discretion to prospect the whole U.S. throughout

18    his entire time at Chmura?

19         A.     No.

20         Q.     When did that change?  Or let me rephrase.

21    How did it start?  What was his discretion, and then,

22    how did it change?

23         A.     As the business grew, the plan was always

24    to add additional sales -- account managers to manage

25    sales.  So as the business --

Page 112

1    **Q.**   So at the -- I'm sorry.  Go ahead.

2    **A.**   From 2015 until 2019, markets changed, so

3    did territory.

4    **Q.**   So early on in his tenure with Chmura, he

5    prospected the whole U.S.; is that correct?

6    **A.**   As I previously stated, yes.

7    **Q.**   And then as time went on, was his territory

8    limited?

9    **A.**   It was changed.

10   **Q.**   Who made that change?

11   **A.**   I'm sorry?  Who made the change?

12   **Q.**   Yes.

13   **A.**   It was SEA Group.

14   **Q.**   And Mr. Lombardo would have been informed

15   of this new territory; is that right?

16   **A.**   Yeah.

17   **Q.**   I think we already talked about choosing

18   conferences, which is the second area of discretion on

19   your list, but do you have any specific recollection of

20   conferences Mr. Lombardo recommended Chmura attend?

21   **A.**   Texas Economic Development Conference was

22   his favorite.  He had a lot of clients in Texas.

23   **Q.**   Was he the first account manager to attend

24   the Texas Economic Development Conference?

25   **A.**   Yes.

1    **Q.**    Do you know how he learned about that

2    conference?

3    **A.**    Through his clients.

4    **Q.**    Prior to -- well, let me ask this, was he

5    allowed to attend that conference?

6    **A.**    Yes.

7    **Q.**    Was there any discussion prior to his

8    attendance -- let me rephrase that.

9         Was there any discussion regarding whether

10   a representative of Chmura should attend that

11   conference?

12        MS. SIEGMUND:  Object to the form of the

13   question.  You can answer.

14   **A.**    Rick came to us and said, I am going to

15   this conference.  And we said, great, go bring them in.

16   **Q.**    Did Mr. Lombardo ask permission to attend

17   that conference?

18   **A.**    Well, he was an employee.

19   **Q.**    So what does that mean?

20   **A.**    There is a chain of command.  You go

21   through that when you are spending company's money.

22   **Q.**    So he went up the chain of command before

23   attending the conference?

24   **A.**    No, he let us know he was attending it and

25   we thought it was great.

Page 114

1      Q.    So when you say we, who is "we"?

2      A.    SEA Group.

3      Q.    So the SEA Group approved him attending

4  that conference?

5      A.    SEA Group was excited about it, yeah.

6      Q.    If SEA Group hadn't been excited about it,

7  would he still be permitted to go?

8            MS. SIEGMUND:  Object to the form of the

9  question.  You can answer.

10     A.    So we are a consensus based organization

11 and, ultimately, if Rick wanted to go to that

12 conference, I would have been the voice of the business

13 reasons behind that and he would have gone and SEA

14 Group would have been fine with that.

15     Q.    Okay.  Was there ever a time Mr. Lombardo

16 asked to go to a conference, to your recollection, that

17 he was denied permission to attend?

18     A.    In 2018, we did the most conferences we had

19 ever done, and we had to scale back in 2019 due to the

20 fact we had added 18 employees in 2018.  So we had to

21 make budget decisions and cut back on conferences.

22 Mr. Lombardo was not given permission to do that.

23     Q.    So Mr. Lombardo did ask to attend certain

24 conferences, at least in 2019, where he was not given

25 permission to attend; is that correct?

1    A.    Where no one was given permission to

2  attend, that's correct, not just Mr. Lombardo.

3    Q.    Now, you said that he also exercised

4  discretion with respect to product development, being a

5  product develoment adviser.  Can you explain that a

6  little bit more?

7    A.    Sure.  In July of 2019, we actually brought

8  on a product manager.  Prior to that, we were very

9  dependent on the account managers to bring back

10  innovative ideas from the field.

11    Q.    What was the product manager's main, or

12  primary responsibility as of 2019 going forward?

13    A.    Run the roadmap.  Build news cases and all

14  the things they never had anybody to do for us before,

15  but you'd have to talk to John about that, John Chmura.

16    Q.    So prior to Chmura retaining or hiring a

17  product manager, what specifically did Mr. Lombardo do

18  to assist with product development?

19    A.    He often made ethic -- you know, there is

20  300 logs of him asking for GDP, for example.  He worked

21  closely with I.T. to set the priorities of the roadmap.

22    Q.    When you say 300 logs, what you do you mean

23  by 300 logs?

24    A.    Those are requests that are logged on

25  Onstage.

Page 116

1    **Q.**    Was GDP ever developed by Chmura?

2    A.    Yes.

3    **Q.**    When was it developed?

4    A.    See, I can't remember that date.

5    **Q.**    Has GDP -- sorry, had GDP been pushed to

6    market?

7    A.    It's commercially available in JobsEQ.

8    **Q.**    And Mr. Lombardo had asked 300 times prior

9    to it being pushed commercially; is that right?

10    A.    No, that's just a number of times that he

11    recorded that we needed it, and a lot of people needed

12    it.  So we were just playing catch-up, actually, with

13    GDP.  It was a lot to bring that particular analytics

14    to the tool.

15    **Q.**    So what recording?  You said he would

16    record it.  What recordings was he doing?

17    A.    I am sure that's a combination of

18    Salesforce, roadmap, postings, Onstage, sales meetings.

19    **Q.**    Was GDP Mr. Lombardo's independent idea?

20    MS. SIEGMUND:  Object to the form of the

21    question.  You can answer.

22    A.    Mr. Lombardo is not an economist, nor is he

23    an I.T. person.  The answer is, no.

24    **Q.**    Looking back at this Exhibit V, as in

25    Victor, Number 2, I want to turn to talking about where

Page 117

1  it says, 'Regularly exercised significant discretion by

2  offering substantial discounts to customers.'  Do you

3  see that?

4       A.    Yes, ma'am.

5       Q.    What does that mean?

6       A.    So rick is the one that developed the

7  sublicense model.

8       Q.    What is the sublicense model?

9       A.    He was able to understand the business and

10  value proposition of aligning multiple clients under

11  one contract.

12       Q.    Had that ever been done before Mr. Lombardo

13  started at the company?

14       A.    No, that was created by Rick -- sorry, Mr.

15  Lombardo.

16       Q.    Can you explain what you mean by aligning

17  multiple -- I apologize, I am going to ask you to say

18  it again.  Sorry, let me rephrase.

19            The sublicense model you are talking about,

20  can you explain how the pricing would work on that?

21       A.    50% discount if you are a sublicensee.

22       Q.    What is a sublicensee?

23       A.    someone that has come under a master

24  license or a parent.

25       Q.    Would these, the licensee and sublicensee

Page 118

1    be related entities?

2         A.    There is a value proposition for them to be

3    brought together.

4         Q.    Was the pricing for this model set before

5    Mr. Lombardo started at Chmura?

6         A.    No.

7         Q.    Chmura has what are called pricing

8    matrixes, correct?

9         A.    Correct.

10        Q.    How are pricing matrixes developed?

11        A.    The pricing committee sit down and do --

12        Q.    Who's on the -- sorry.

13        A.    -- do a lot of math analysis of

14   populations, analysis of demographics, competitive

15   analysis.  And the pricing committee largely is driven

16   by Greg Chmura, develop the matrices with input from

17   the account managers, of course.

18        Q.    Who sits on the pricing committee?

19        A.    Greg Chmura, Sharon Simmons, Leslie

20   Peterson.

21        Q.    How many -- let me rephrase that.

22              When was the first pricing matrix put out

23   by Chmura?

24        A.    I don't remember.

25        Q.    Would it have been before Mr. Lombardo

1   started with the company?

2        A.    No, no.

3        Q.    When Mr. Lombardo started, then, how was

4   Mr. Lombardo supposed to know how supposed to price the

5   product?

6        A.    We just had two price points based on

7   population, 8995 * and 9995.

8        Q.    How many pricing matrices since the

9   beginning -- or let me ask this: Are they numbered, the

10  pricing matrices, if they change?

11       A.    Of course.

12       Q.    What number is chmura up to on their

13  pricing matrix?

14       A.    You know, I think it is around 24, 25.

15       Q.    And each different pricing matrix would

16  have a change in price on it, correct?

17       A.    There are some things would have changed.

18       Q.    Okay.  What other things could change on a

19  pricing matrix?

20       A.    I think the first or second iteration we

21  added 75-mile radius.  There is an MSA version, there

22  is a county version, there as regional version, there

23  is an opportunity version.  Businesses evolve over

24  time.

25       Q.    Is there one matrix used in any given point

Page 120

1    in time or -- let me re-ask that.

2                Is there one matrix used at any point in

3    time?

4        A.    I don't understand that question.  Sorry.

5        Q.    That's okay.  I will rephrase it.

6                So you have approximately 24 pricing

7    matrices currently.  Can an account manager price based

8    on any one of those, or only based on the most current

9    pricing matrix?

10       A.    The most current, but that's not to say

11   that a deal will come in that gets priced based on a

12   previous one.

13       Q.    Is that because that the deal could already

14   have gone out before -- be quoted and gone out before

15   the new pricing matrix went into effect?

16       A.    Yes.

17       Q.    I am going to show you what's been

18   marked -- actually two documents, what's been marked

19   Exhibit AA.  We will start with A A.

20                      -   -   -   -   -

21                (Previously marked Deposition Exhibit

22                AA, was shown to the witness.)

23                      -   -   -   -   -

24       A.    (Reviewing.)

25       Q.    Do you recognize this document?  I will

Page 121

1     take let you look at it.

2          A.    I recognize it, but I can't read it.  It is

3     too small.

4          Q.    Okay.  (Indicating).   Is that better?

5          A.    Yes.

6          Q.    Do you know what this is?

7          A.    That's a typical pricing matrix.  I don't

8     know which version it is.

9          Q.    You already answered my question.

10               Okay.  In using this pricing matrix as an

11    example, it contains -- actually, if you could walk me

12    through it a little bit.  It has, Post Secondary, Not

13    EDO at the very top.  What does that refer to?

14         A.    If it is a post secondary, it is education

15    and not an economic developments organizations.

16         Q.    And so would you look at that top line

17    where it says, ENR equals less than 5000 -- 5 to

18    10,000, 10 to 20,000, 20,000 and up, are those the

19    columns you would look down to price for post

20    secondary?

21         A.    You are asking me to look at the five 5K

22    columns, or asking me --

23         Q.    How would I -- I am going to ask a more

24    general question.  I think it would be easier than me

25    trying to guess.

1          Walk me through using this pricing matrix.

2     If I were am account manager working for Chmura, how

3     would I use this pricing matrix?

4          A.    Well, for one thing, I would have rows and

5     columns in there so I know which row I'm on, and these

6     -- I guess this is scanned.  So the biggest driver in a

7     pricing matrix in an organization is price and

8     population per capita, and this would spell it out into

9     easy to use, user type.

10         Q.    And what are the user types on, if you can

11    point me to the user type on this particular pricing

12    matrix.

13         A.    Well, you can have, say, economic

14    development orgainizations, you can have private

15    consultants, you can have University, economic

16    development organizations, utility companies.  And that

17    last Column is Rick Lombardo's column.

18         A.    He is the one that -- was strategic enough

19    to go after the small counties that our competition was

20    ignoring.

21         Q.    And then tell me how to use this.  If I

22    were pricing, let's take an example -- if I were

23    pricing to a utility company, how would I know what to

24    charge for a new contract for JobsEQ?

25         A.    So you work with the primary region and

1   then you use the factors that are laid out under

2   utilities.

3        **Q.**    And what are those?

4        **A.**    They may just want -- they might want zip

5   code level data, they might want to add additional

6   states, they might want to add additional counties,

7   they might want the whole nation.  They can add

8   additional seats.

9        **Q.**   So let's say I was the utility company or

10  i'm selling to the utility company that wnats s just

11  their region.

12       **A.**    What do you mean by region?  Region is

13  anything lower than a state.

14       **Q.**    Okay.  Well, I am just trying to understand

15  how to use this, that's all.  I am trying to understand

16  from the account manager perspective how would I go

17  about pricing.  And I you can give me any example you

18  want to give me, but if you can show me how to use this

19  to price a particular product, how would I go about

20  doing that?

21       **A.**    So let's you are Scott County Virginia and

22  your population is less than $50,000 and you want zip

23  code level data for Scott County, then you are going to

24  have a price that the population is not going to

25  support that price, but it is under 50k population, so

Page 124

1   it is $5,000.

2        Q.   Okay.  Now, underneath the chart, there is

3   a section called, Discounting Tools, "that discounts

4   cannot be combined", do you see that?

5        A.   Yes, ma'am.

6        Q.   Can you explain to me what that is?

7        A.    It's multi-year discount that can be either

8   two years -- if it's two years, 5% off of each year.

9   It can be a three year which gets you 7% off of each

10  year.

11       Q.   And then number two under Discounting Tools

12  says, can take up to 10% off the list price, but the

13  price never drops lower than 5,000; is that correct?

14       A.   Yes, that's driven bythat single counties

15  rate.

16       Q.   And the list price is what's in the chart

17  above; is that correct?

18       A.   Yes.

19       Q.   And then there is a sublicense Number 3,

20  that says 20% off the price of that sublicense had the

21  sublicensee purchased the package on their own.  Parent

22  license is undiscounted and is defined as the highest

23  priced individual package.  All sublicense's must sign

24  up at the original point of purchase."  Is that the

25  sublicense model you were talking about earlier?

Page 125

1      A.    That is the sublicense model that I

2   believed -- I mean, I haven't looked at this in years.

3   I don't pay attention to this.  My understanding of it,

4   it was a 50% discount, so -- I may be wrong.

5      Q.    But that's the model you were referring

6   to -- regardless of percentage, that was the model,

7   correct?

8      A.    Yes.

9      Q.    Outside of these discounts -- well, let me

10  ask, how could account managers use these discounting

11  tools?

12     A.    So they would start with list, which is

13  where they want to get because they get the biggest

14  commissions there, and then in the process of

15  discovery, they discover what their price point is.

16  But based on price point and based on region and based

17  on user stype, you begin to discount.  You might start

18  with 1%, you might start with 2%.  And Rick was very

19  good at this.  He was very good at helping the company

20  maximize that opportunity.

21     Q.    When you say, the company, do you mean

22  Chmura or -- who are you referring to as the company?

23     A.    Chmura.

24     Q.    To your knowledge, did Mr. Lombardo seek

25  approval prior to offering a discount?

Page 126

1        A.    I mean, he often came to me with a reason

2   why we had to go with a certain product, and I always

3   said, how do you recommends, Rick?  And then that's

4   what we would go with.

5        Q.    But he would come to you before offering it

6   to the potential client or clients, right?

7              MS. SIEGMUND:  Object to the form of the

8   question.  You can answer.

9        A.    He had the freedom to take discountns

10  without coming to me.

11       Q.    And those are the discounts that are set

12  out on the pricing matrix; is that correct?

13       A.    On this particular one, yes, but I don't

14  know which version this is.  I know they have up to 30%

15  discretion now.

16       Q.    And would that 30% be found on a pricing

17  matrix?

18       A.    Yes.

19       Q.    I am going to show you what's been marked

20  as Exhibit AB, probably too small.  I will make it

21  bigger.

22                   -   -   -   -   -

23             (Previously marked Deposition Exhibit

24             AB, was shown to the witness.)

25                   -   -   -   -   -

1      **Q.**   Is this also a pricing matrix?

2      **A.**    Just aversion of it.

3      **Q.**   Do you know which version this is, which

4  number?

5      **A.**   I do not, no.

6      **Q.**   And I assume this works in the same manner

7  as the last pricing matrix that we looked at?

8      **A.**   Yes.

9      **Q.**   And,again, you don't recall which version

10  this pricing matrix that's in front of you now, Exhibit

11  AB, is; is that correct?

12      **A.**   I do not know which version this is.

13      **Q.**   If an account manager wanted to offer a

14  discount, and maybe I already asked this, so forgive

15  me.  If an account manager wanted to offer a discount

16  beyond what's listed under these Discounting Tools in

17  either Exhibit AB or AA, or whatever the current matrix

18  as it exist, would they have to seek approval from

19  someone?

20      **A.**   Well, two eyes are always better than one.

21      **Q.**   So the answer is, yes, they would have to

22  seek approval?

23      **A.**   They would want to.

24      **Q.**   Well, would they have to?  Were they

25  directed to?

1       A.    Yes.

2       Q.    And would that have also applied to Mr.

3    Lombardo when he was employed?

4       A.    Yes.

5       Q.    Going back to you testifying that Mr.

6    Lombardo developed a sublicense model, do you remember

7    when he developed that?

8       A.    2015.

9       Q.    And did you have personal discussions with

10   him regarding that model?

11      A.    Yes.

12      Q.    And do you recall the substance of those

13   communications?

14      A.    The substance of them?

15      Q.    Yes.

16      A.    Yes.  It was brilliant.

17      Q.    What was the actual substance of the

18   conversation you had with him regarding the sublicense

19   model?

20      A.    He began to see in Salesforce how to set up

21   a parent account, and then how to set up each child and

22   he bridged that model into the industry that he was --

23   industries that he was prospecting to and was able to

24   act as an adviser, a trusted adviser to his client

25   about how they can come together and work together and

1  at a better price point than if they were individually

2  licensed.

3       Q.   Who made the determination that 50% would

4  be the proper discount?

5       A.   Mr. Lombardo.

6       Q.   Did someone have to approve that discount?

7       A.   No, It became a new model, a sublicense

8  mole, it is on the pricings matrix.

9       Q.   Did Mr. Lombardo put it on the pricing

10  matrix?

11       A.   Oh, no, I am sure that was Greg, Greg

12  Chmura.

13       Q.   You said earlier there was a pricing

14  committee?  Mr. Lombardo was not on that pricing

15  committee, correct?

16       A.   He was an adviser to that committee.

17       Q.   Did he sit on the committee?

18       A.   They brought him in often, yeah, set up

19  a --

20       Q.   Was Mr. Lombardo a named member of that

21  committee?

22       A.   No.

23       Q.   And I apologize, do you recall when?  I

24  think I already asked this, but do you recall

25  approximately when Chmura first introduced the pricing

Page 130

1    matrix?

2        A.    No, I don't.

3        Q.    I am going to show you what has been marked

4    as Defendant's Exhibit N, and I think we already went

5    through this the other day, but I just want to take one

6    more look at it here.

7                    -   -   -   -   -

8              (Previously marked Deposition Exhibit

9              N, was shown to the witness.)

10                   -   -   -   -   -

11       Q.    Do you recognize this document?

12       A.    Yes, ma'am.

13       Q.    Is this -- it is an email from you to Mr.

14   Lombardo, Mr. Steele, Ms. Ludvik Mr. Grebenc?

15       A.    And Mr. Cox, correct.  Yes, we talked about

16   it last week.

17       Q.    Okay.  I thought we had, but that was last

18   week, so forgive me.  My brain is tired.  But as sales

19   matrix -- your email here, you drafted this email,

20   correct?

21       A.    Yes.

22       Q.    And it says, "discounts beyond those

23   documented in the sales matrix pricing sheet need to be

24   individually approved by me," correct?

25       A.    Yes.

Page 131

1     **Q.**   So at least as of 2017, there was a sales

2  matrix pricings sheet, correct?

3     **Q.**   Do you recall if the first pricing matrix

4  was in 2016?

5     **A.**   I don't want to commit to that because I

6  don't recall.

7     **Q.**   Was the sublicensing model we have been

8  talking about on the first pricing matrix?

9     **A.**   Yes.

10     **Q.**   And Mr. Lombardo, according to you,

11  developed that in 2015, correct?

12     **A.**   Correct.

13     **Q.**   So isit possible that the first pricing

14  matrix came out in 2015?

15     **A.**   Not going to commit to that.  I don't know.

16     **Q.**   Do you know who is responsible for

17  preparing the pricing matrix?

18     **A.**   Greg Chmura.

19     **Q.**   I am going to show you what's been marked

20  Defendant's Exhibit S, and full-time to go ahead and

21  look at this.

22                    -   -   -   -   -

23              (Thereupon, Deposition Exhibit S, Copy

24              of    , was marked for purposes of

25              identification.)

Page 132

```
1                        -   -   -   -   -

2         A.    (Reviewing.)

3         Q.    Ready?

4         A.    Yes.

5         Q.    Do you recognize this document?

6         A.    I know what it is.  A disappointment.

7         Q.    Well, what is it?  Other than a

8   disappointment, your words, not mine, what is it?

9         A.    It's standard operating procedures for the

10  sales team --

11        Q.    And that's --

12        A.    -- for the technology department.

13        Q.    Sorry.  And this was dated April 5, 2019,

14  correct?

15        A.    Yes.

16        Q.    To your knowledge, were there standard

17  operating procedures that predated the april 5, 2019

18  version?

19        A.    Yes, 2017.

20        Q.    Was that when they were implemented?

21        A.    Yes.

22        Q.    Do you know who prepared the April 5, 2019

23  version?

24        A.    Mr. Auerbach.

25        Q.    When did Mr. Auerbach begin working for
```

Page 133

1    Chmura?

2        A.    In April 2019, and that was his first

3    assignment.

4        Q.    Was this version of the standard operating

5    procedures implemented?

6        A.    I don't think so.  I don't recognize that

7    date that was April whatever it was.  This appears to

8    me to be more in line with what we adopted in 2017.  So

9    I don't know why there is a date change, but this is

10   not what I thought you were going to show me.

11       Q.    Let me show you another document and we can

12   come back to this one.  I am going to show you what's

13   been marked as an exhibit, I think this might help.

14   Exhibit T.  It has an email in the front, but if you

15   scroll down, and I will let you take a look at it.  You

16   will see one,a standard operativing procedures dated

17   July 10, 2019.  This may be the one you are referring

18   to.

19                      -    -    -    -    -

20             (Previously marked Deposition Exhibit

21             T, was shown to the witness.)

22                      -    -    -    -    -

23       A.    Okay.

24       Q.    I will have you take look at that at your

25   leisure.

1          A.     (Reviewing.)

2              MS. SIEGMUND:  We are ready.

3          Q.     Do you recognize this document?

4          A.     Yes.

5          Q.     What is this?

6          A.     It's the latest version of the standard

7     operating procedures.

8          Q.     And was this version adopted by --

9     implemented by Chmura?

10         A.     I don't know.  All I heard is complaints

11    about it, so I guess it was.

12         Q.     And do you know who prepared this version?

13         A.     Mr. Auerbach.

14         Q.     And the exhibit S we were just looking at,

15    and you have control, so you can scroll back to it if

16    you want to look at it.  Exhibits S was not prepared by

17    Mr. Auerbach; is that correct?

18         A.     No.

19         Q.     And this would be --

20         A.     I don't know why it has that date, but no.

21         Q.     So Exhibit S looks more like the original

22    version of the standard operating procedures; is that

23    right?

24         A.     I mean, I can't respond by just giving you

25    a yes based on looking at the table of contents.

Page 135

1  **Q.** Would Mr. Lombardo -- let me rephrase that.

2    If you look at Exhibit S for a moment,

3 let's switch back to Exhibit S.

4  **A.** (Indicating).

5  **Q.** These standard operating procedures, they

6 govern the sales team, correct?

7  **A.** They govern the processes.

8  **Q.** And what type of processes are set forth in

9 the standard operating procedures of Exhibit S?

10  **A.** The processes are what make us productive.

11 So the processes are there to reduce waste, increase

12 productivity, reduce transaction costs.

13  **Q.** And Mr. Lombardo would have been expected

14 to follow these standard operating procedures, correct?

15  **A.** Correct.

16  **Q.** And this one is dated April 5, 2019.  It

17 has details surrounding a variety of different items,

18 including -- well, why don't you tell me.  Does this --

19 what does this standard operating procedures encompass?

20  **A.** So are we on Exhibit S or T?

21  **Q.** Let's stick with S for now.  We will stick

22 with that.

23  **A.** What's the date on S?  I am sorry.  Is sit

24 April?  Yes, it is.

25  **Q.** Yes, it is April 5, 2019.

Page 136

1        A.    Okay.  And the question is what do they do?

2        Q.    Yes.

3        A.    They represent and reflect the health of

4    the organization.  And when I say that, I mean, sales

5    and client, marketing, finance and the clients.  So

6    those work together under the standard operating

7    procedures to reduce waste in the system, to allow for

8    a spirit of continuous improvement and to reflect the

9    transaction cost from one side of the house to the

10   other in terms of the dimensions of change.

11            Does that help?

12       Q.    It does, yes.  If you would gurn to Page

13   16 -- it's actually Bates labeled -- 16 of the

14   document, but Bates labeled Chmura 0040753.  And at the

15   very top is Section 6, Price Negotiations.

16       A.    (Indicating).

17       Q.    I will let you take a look at this section.

18       A.    (Reviewing.)

19       Q.    And we'll just stick on this page for a

20   moment.

21       A.    Okay.

22       Q.    My first question is, what are contingency

23   responsible parties?

24       A.    Well, contingency is plan B.

25       Q.    So what does contingency responsible

Page 137

1    parties mean in this context?

2         A.    Subject matter expert.

3         Q.    And what subject matter were these

4    responsible parties experts in?

5         A.    What subject matter?

6         Q.    Yes.

7         A.    Well, I would be the subject matter expert

8    for sales, and Dr. Chmura would be the finance subject

9    matter expert.

10        Q.    And this page is labeled, price

11   negotiations.  It sets forth procedures with respect to

12   price negotiations, correct?

13        A.    Not just price, but everything about it.

14        Q.    What do you mean by that?

15        A.    Pricing matrix, pricing exceptions,

16   additional sales.

17        Q.    And mr. Lombardo would have been -- let me

18   rephrase.

19             The account managers would have been

20   required to follow the standard operating procedures

21   with respect to price negotiations, correct?

22        A.    Correct.

23        Q.    And Mr. Lombardo also would have been

24   required to follow these standard operating procedures

25   with respect to price negotiations, correct?

Page 138

1      A.    So this is a perfect world, and we don't

2   live in a perfect world, so I can't make that -- I

3   can't say yes to that statement because you are asking

4   from paper, but then when it comes to reality, it often

5   changes.

6      Q.    Was Mr. Lombardo required to follow the

7   standard operating procedures set forth in Section 6?

8      A.    Yes.

9      Q.    I want to turn to the next page,

10  conferences and travel.

11     A.    (Reviewing.)

12     Q.    If you go up to just under Procedures, let

13  me rephrase.

14          These procedures, pertain to standard

15  operating procedures regarding conferences and travel

16  at Chmura, right?

17     A.    Yes.

18     Q.    And under Procedures, it has, Responsible

19  Party and Action Step, Conference Selection, do you see

20  that?

21     A.    Yes.

22     Q.    And the Event Group comprised of CC.  Is CC

23   Dr. Chmura?

24     A.    Yes.

25     Q.    And LP is you, correct?

Page 139

1          A.    Yes.

2          Q.    And BK stands for bookkeeper?

3          A.    Yes.

4          Q.    And SM is for sales manager?

5          A.    Yes.

6          Q.    And is SS Ms. Simmons?

7          A.    Yes.

8          Q.    And KQ would be Mr. West, correct?

9          A.    Correct.

10         Q.    And so Event Group under the standard

11    operating procedures was tasked with researching and

12    selecting conferences for Chmura employees to attend,

13    correct?

14         A.    Correct.

15         Q.    Was Mr. Lombardo part of that Event Group?

16         A.    No.  He invited himself out of it because

17    he had unethical travel behaviors.  So he was no longer

18    invited.  I think it was 2018 or is this the 2019

19    version?  Yes, he was not in it.  This would be -- most

20    of these exists because of Mr. Lombardo.

21         Q.    So your testimony is that the standard

22    operating procedures exists because of Mr. Lombardo?

23              MS. SIEGMUND:  Object to the form of the

24    question.

25         A.    Some of the things that are in the standard

Page 140

1  operating procedures under conference travel are as a

2  result of mistakes by Mr. Lombardo.

3      Q.   Well, we weren't talking about the travel.

4  We were just talking about the conference selection.

5  Mr. Lombardo was not part of the event group selecting

6  conferences, at least as of April 2019, correct?

7      A.   Correct.

8      Q.   All right.  I want to turn to Exhibit T and

9  move away from Exhibit S. I think you earlier testified

10 that Mr. Auerbach prepared this version.  Tell me

11 again, are you aware whether this version was

12 implemented, Exhibit T?

13     A.   This must have been implemented because I

14 heard complaints about it, particularly from finance.

15     Q.   Was there any other version after Exhibit

16 T's date, whether it was July -- i have to scroll back

17 up to know for sure -- July 10, 2019 --

18     A.   Well --

19     Q.   Let me finish my question, only so we have

20 a clear record, please.  Was there any other version

21 after this July 10, 2019 version that would have been

22 implemented at the time of Mr. Lombardo's employment?

23     A.   I'm not aware.

24     Q.   What is it, or what complaints have you

25 heard about this particular version?

Page 141

1      A.    So there is a lot of concern around how

2  invoices get generated from Salesforce information to

3  the finance managers.  So sloppy Best Practices are

4  existing, such as including an upsell, which is a

5  separate transaction following a JobsEQ license,

6  bundling those into one price and then you go into the

7  record, into Saas optics, and it shows up as two

8  products with one price, for example.

9      Q.    That sounds confusing a little bit.

10          Okay, I want to turn to Mr. Lombardo's

11  termination.  You testified earlier that back in

12  March -- I am going to stop sharing, so I can actually

13  see the screen.  You testified back in March that you

14  were prepared to fire Mr. Lombardo, correct?

15      A.    Yes.

16      Q.    And then you decided against doing that,

17  right?

18      A.    Yes.

19      Q.    What led to Mr. Lombardo's termination --

20  first of all, do you recall what date Mr. Lombardo was

21  terminated?

22      A.    October 30 or 31st, the last day of

23  October in 2017.

24      Q.    Do you recall what --

25      A.    Let me correct that.  2019.

Page 142

1          Q.    Do you recall what led to his termination?

2          A.    Yes.

3          Q.    And what was that?

4          A.    So the information that I have on that

5    largely comes from Mr. Auerbach.

6          Q.    Okay.  Were you part of the decision to

7    terminate Mr. Lombardo?

8          A.    I was.

9          Q.    Was there a primary decision maker who

10   decided to terminate him?

11         A.    SEA Group decided to terminate him, and I

12   was the one that, I think I stated before, I was still

13   not ready to fire Rick.  I was the last holdout.

14         Q.    And what --

15         A.    And then Greg --

16         Q.    So go ahead and finish.

17         A.    Then Greg was -- I am not in Cleveland, so

18   I don't see the drama that's going on.  Greg felt very

19   strongly that the sales department had been through so

20   much with Mr. Lombardo, so much emotion and so much

21   drama and so much foul language and unnecessary

22   attempts to take management down, and Mr. Auerbach was

23   part of that drama.

24         Q.    And how was he part of that problem?

25         A.    I would describe him as a mark.

Page 143

1    **Q.**    Okay.  Can you think of a specific example,

2  just so I understand?

3    **A.**    Yes.  I mean he is middle managements,

4  rights?  Middle managements is supposed to be the

5  champion between account manager and management, a job

6  they are supposed to play.  And that job was never

7  clear to me, maybe because I wasn't in Cleveland, but

8  Mr. Auerbach seemed to play both sides against the

9  middle.

10    **Q.**    Prior to Mr. Lombardo's termination, did

11  you have any internal discussions regarding his

12  termination?

13    **A.**    Yes, we did.

14    **Q.**    What was the substance of those

15  discussions?

16    **A.**    Protecting the sales team that was in place

17  was the substance of those discussions.

18    **Q.**    Can you explain that a little bit further?

19    **A.**    So the sales team is very young and Mr.

20  Lombardo would take them one by one to lunch and feed

21  them with reasons to not want to respect management.

22    **Q.**    Do you have any personal knowledge of the

23  conversations that Mr. Lombardo had with those account

24  managers?

25    **A.**    I have information from one of the account

Page 144

1   managers that I'm drawing from largely.

2        Q.   And which account manager is that?

3        A.   Stephanie Wiley.

4        Q.   Did Mr. Lombardo ever take Stephanie Wiley

5   to lunch, to your knowledge?

6        A.   Yes.

7        Q.   Do you know if he was directed to take the

8   account managers to lunch?

9        A.   No, I got a call from Eli and he said is it

10  okay if Rick takes Stephanie to lunch today, and I said

11  I would prefer another account manager be with her,

12  especially a female.

13       Q.   Okay.

14       A.   Just coming out of the me too movement, so

15  I i did not want to put her in that situation.  And

16  they went by themselves.

17       Q.   Did Mr. Lombardo have a history of any

18  inappropriate contact?

19       A.   No, that's just the way that I was taught

20  at Eastman Kodak, you never put yourself in a situation

21  to be one-on-one, female to male.

22       Q.   So you were sensitive to what was going on

23  in current events; is that fair?

24       A.   Yes.

25       Q.   Who did you have discussions with

Page 145

1    regarding -- let me put a time frame on this.  In

2    October, who were discussing Mr. Lombardo's employment

3    with, outside of counsel, if you had any conversations

4    with counsel?

5        A.    SEA Group was meeting on it.

6        Q.    And tell me, again, who is in SEA Group?

7        A.    You want names or the number?

8        Q.    Names, please.

9        A.    Chris Chmura, Leslie Peterson, John Chmura,

10   Greg Chmura, Sharon Simmons, Xiaobing Shuai.

11       Q.    At the time Mr. Lombardo was terminated,

12   Chmura had an H.R. director, correct?

13       A.    Yes.

14       Q.    Was that Aisha Ortiz?

15       A.    Ortez.  Yeah, Ortez.

16       Q.    What was her role with respect to Mr.

17   Lombardo's termination?

18       A.    She was an adviser to SEA group.

19       Q.    And what advice did she provide?

20       A.    We want to be able to separate from Mr.

21   Lombardo with the least amount of damage.

22       Q.    Okay.  And how did Chmura propose going

23   about that?

24       A.    Didn't propose.  It came from Mr. Auerbach.

25       Q.    What Did Mr. Auerbach propose?

Page 146

1      A.    He proposed a buyout.

2      Q.    And did the SEA Group take at that advice?

3            MS. SIEGMUND:  Object to the form of the

4   question.  You can answer.

5      A.    We thought about it.

6      Q.    And what did you ultimately decide to do?

7      A.    Not do that.

8      Q.    And why?

9      A.    We had never given a buyout to anybody we

10  terminated, why would we do it for Mr. Lombardo?

11     Q.    Was there any discussion regarding trying

12  to get Mr. Lombardo to resign?

13     A.    No.

14     Q.    Were you involved in the decision to put

15  Mr. Lombardo on unpaid leave in October of 2019?

16     A.    I know about it, with a recommendation

17  between Aisha and Operation, Sharon.  I knew about it.

18  I was aware.

19     Q.    You were aware.  Did you have any further

20  involvement other than just aware of it?

21     A.    No.

22            MS. COOPER:  Can we take a short break ?

23            MS. SIEGMUND:  Sure.  Five minutes, 10

24  minutes?

25            MS. COOPER:  Five minutes is good.

Page 147

```
 1                  -   -   -   -   -

 2                  (Short recess taken).

 3                  -   -   -   -   -

 4          MS. COOPER:  Ms. Peterson, I do not have

 5  any more questions for you.  I want to thank you for

 6  your time.

 7          THE WITNESS:  You're welcome.

 8          MS. SIEGMUND:  I don't have any questions.

 9  Rough for us, please.

10          MS. COOPER:  Standard transcript

11          MS. SIEGMUND:  She will read.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```