# Exhibit 4

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2                  RICHMOND DIVISION

3

    CHMURA ECONOMICS & ANALYTICS,      )
4   LLC,                               )
                                       )
5        Plaintiff/Counterclaim,       )
         Defendant,                    )
6                                      )
         vs.                           )   Case No.
7                                      )   3:19-cv-813-REP
    RICHARD LOMBARDO,                   )
8                                      )
         Defendant/Counterclaim        )
9        Plaintiff.                    )

10

11

12          VIDEOCONFERENCE DEPOSITION OF

13              RICHARD A. LOMBARDO

14                Cleveland, Ohio

15              Monday, May 4, 2020

16

17

18

19

20

21

22

23   Reported by:

24   RACHEL F. GARD, CSR, RPR, CLR, CRR

25   JOB NO. 179622

1                          R. LOMBARDO

2

3

4                          May 4, 2020

5                          9:05 a.m.

6

7          Videoconference deposition of RICHARD A.

8     LOMBARDO in Cleveland, Ohio, pursuant to notice

9     before Rachel F. Gard, Illinois Certified

10    Shorthand Reporter, Registered Professional

11    Reporter, Certified LiveNote Reporter,

12    Certified Realtime Reporter.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          R. LOMBARDO

2   A P P E A R A N C E S:

3        McGUIREWOODS

4        Attorneys for Plaintiff

5             800 Canal Street

6             Richmond, Virginia 23219

7        BY:   RODNEY SATTERWHITE, ESQ.

8             HEIDI SIEGMUND, ESQ.

9             (Videoconference appearance)

10

11

12

13

14       KOEHLER FITZGERALD

15       Attorneys for Defendant

16            1111 Superior Avenue East

17            Cleveland, Ohio 44114

18       BY:   CHRISTINE COOPER, ESQ.

19            (Videoconference appearance)

20

21

22

23

24

25

1                    R. LOMBARDO

2                  I N D E X

3  WITNESS                              PAGE

4  RICHARD LOMBARDO

5      Examination by Mr. Satterwhite        7

6

7              E X H I B I T S

8  DEPOSITION EXHIBIT                    PAGE

9     Exhibit A   Letter, February 3, 2015     9

10
      Exhibit B   Confidentiality,           13
11                Non-Competition &
                  Non-Solicitation Agreement
12

13    Exhibit C   Declaration of Richard J.   203
                  Lombardo
14

15    Exhibit D   Answers to Interrogatories   39

16
      Exhibit E   Email, March 20, 2015       63
17

18    Exhibit G   Redacted letter            69

19
      Exhibit H   Amendment letter, March 28,   76
20                2019

21
      Exhibit I   Resume                      80
22

23    Exhibit J   Email, November 17, 2019     81

24
      Exhibit K   Email, June 4, 2018         96
25

1                    R. LOMBARDO

2                E X H I B I T S

3   DEPOSITION EXHIBIT                          PAGE

4    Exhibit L   Email string                   103

5
     Exhibit M   Emails                         104
6

7    Exhibit N   Email, January 17, 2018        109

8
     Exhibit O   Email, March 26, 2017          115
9

10   Exhibit P   Email, March 11, 2019          117

11
     Exhibit Q   Email, December 4, 2018        120
12

13   Exhibit R   Pricing matrix                 124

14
     Exhibit S   Email, July 10, 2018           126
15

16   Exhibit T   Parking receipts               144

17
     Exhibit U   IEDC Annual Conference         190
18               notes

19
     Exhibit V   License usage spreadsheet      209
20

21   Exhibit W   Email, March 16, 2020          214

22
     Exhibit X   Text messages                  220
23

24   Exhibit Y   Text messages                  226

25

1                          R. LOMBARDO

2                     E X H I B I T S

3    DEPOSITION EXHIBIT                            PAGE

4      Exhibit Z    Text messages                  228

5
       Exhibit AA   Letter, October 21, 2019       236
6

7      Exhibit BB   Text messages                  237

8
       Exhibit CC   Charts provided to Neva        240
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    R. LOMBARDO

 2                    (Witness sworn.)

 3  WHEREUPON:

 4            RICHARD A. LOMBARDO,

 5  called as a witness herein, having been first

 6  duly sworn, was examined and testified as

 7  follows:

 8                    EXAMINATION

 9  BY MR. SATTERWHITE:

10       Q.    Good morning, Mr. Lombardo.

11       A.    Good morning, sir.

12       Q.    As you know, my name is Rod

13  Satterwhite.  I represent Chmura Economics &

14  Analytics in the lawsuit against you.

15       A.    Yes.

16       Q.    This is obviously a little bit

17  different because of the video.  But before we

18  start, I want to cover a couple of rules that

19  will help Rachel, our court reporter, and both

20  of us throughout the day.

21            If you need a break, just let us

22  know and you can take one at any time.  If you

23  don't understand any of my questions, just ask

24  me to rephrase it and I will certainly do so.

25  Please avoid answering questions by nodding
```

```
 1                    R. LOMBARDO
 2    your head.  It makes it very difficult for the
 3    court reporter to take that down, especially on
 4    video.
 5              And most importantly probably for
 6    this format, if you will try to allow me to
 7    finish my question and not interrupt me, I will
 8    try to allow you to finish your answer and not
 9    interrupt you.
10              Does that all make sense?
11         A.   Yes, it does.
12         Q.   Would you state your full name for
13    the record.
14         A.   Richard Anthony Lombardo.
15         Q.   And what's your home address?
16         A.   8341 Sheltered Cove, Mentor, Ohio
17    44060.
18         Q.   Mr. Lombardo, have you ever
19    testified under oath before?
20         A.   I have not.
21         Q.   Is there any reason today that you
22    wouldn't be able to truthfully answer my
23    questions, such as any medication that you
24    might be taking or any physical condition that
25    you might be undergoing?
```

1                    R. LOMBARDO

2        A.    No.

3        Q.    What did you do to prepare for your

4    deposition today, Mr. Lombardo?

5        A.    Spoke with my attorney.

6        Q.    Anything else?

7        A.    No.

8        Q.    You started work at Chmura in

9    February of 2015; is that right?

10       A.    Yes.

11             (Plaintiff's Exhibit A marked for

12             identification.)

13       Q.    I am going to display an exhibit

14    that I'd like you to take a look at.  It has

15    been marked as Plaintiff's A.  Take a look at

16    that document and tell me when you've had a

17    chance to review it.

18       A.    Yes, I am familiar with this

19    document.

20       Q.    What is it?

21       A.    It is my contract.

22       Q.    And if you look over on page 2, can

23    you just confirm that that's your signature at

24    the bottom of the page?

25       A.    Yes.

```
 1                    R. LOMBARDO

 2       Q.    About halfway down the first page,

 3  Mr. Lombardo, there's a section that says

 4  Compensation Overview.  Do you see that?

 5       A.    Yes.

 6       Q.    It indicates an annual base salary

 7  of $55,000 in year 1, and $50,000 in years 2

 8  plus; is that correct?

 9       A.    Yeah.

10       Q.    Was there any discussion around the

11  time that you signed this document about how

12  many hours per week you would be expected to

13  work at Chmura?

14       A.    No.  Not that I recall.

15       Q.    Did you ask anyone any questions

16  when you first became employed at Chmura about

17  how many hours per week you were expected to

18  work?

19       A.    No, I was under the assumption it

20  was a, you know, 40-hour minimum workweek.

21       Q.    Did anybody suggest to you at that

22  time that your salary would vary depending on

23  the number of hours that you worked?

24       A.    No.

25       Q.    And the other part of your
```

```
1                    R. LOMBARDO
2    compensation involved commissions on sales,
3    correct?
4         A.    Yes.
5         Q.    Did anybody at Chmura suggest to you
6    that your commission rate would change
7    depending on the number of hours per week that
8    you worked?
9         A.    No.
10        Q.    What was your understanding of when
11   commissions would be paid?
12        A.    Once the contract was signed, I
13   would be paid the end of the following month.
14        Q.    And the payment that you received in
15   a given month was for all contracts that were
16   signed in the previous month; is that correct?
17        A.    Yes.  Also, it could be renewals as
18   well that may not have signed a contract that
19   month but maybe from the previous year.
20        Q.    All right.  But in terms of the time
21   period that the commission payment covered, it
22   covered activities that occurred in the prior
23   month, correct?
24        A.    Yes.
25        Q.    The commission payment was not
```

Page 12

```
 1                    R. LOMBARDO
 2   broken down by week?
 3        A.    Correct.
 4        Q.    Over on page 2 of this offer letter,
 5   or I'm sorry, the document that's been marked
 6   as Exhibit A, if you look at the paragraph
 7   about the middle of the page, it starts out
 8   with the phrase "Chmura hopes."  Do you see
 9   that?
10        A.    Yes.
11        Q.    And the next-to-the-last line in
12   that paragraph says:  This letter should not be
13   construed as an employment contract.
14              Do you see that?
15        A.    Yes.
16        Q.    What did you understand that
17   language to mean at the time you signed this?
18              MS. COOPER:  Objection.  Calls for
19        legal conclusion.  But you can answer.
20        A.    I'm not sure what I thought at the
21   time.
22        Q.    At some point, did you conclude that
23   this was a contract?
24              MS. COOPER:  Objection.
25        Q.    You can answer.
```

```
 1                    R. LOMBARDO
 2              MS. COOPER:  You can answer.
 3         A.    Yes.
 4         Q.    At what point in time did you reach
 5    that conclusion?
 6         A.    2017.
 7         Q.    So you had not reached that
 8    conclusion at the time you signed this
 9    document?
10         A.    Correct.
11              (Plaintiff's Exhibit B marked for
12              identification.)
13         Q.    All right.  I'm going to pull up
14    another exhibit here, so just bear with me.
15    Mr. Lombardo, I'm going to show you a document
16    that is being marked as Plaintiff's Exhibit B.
17    And after you've had a chance to look at it,
18    tell me if you recognize it?
19         A.    Yes, I do.
20         Q.    And just to make sure that the
21    system is working properly, are you and your
22    counsel able to page through the document on
23    your own once it's displayed?
24         A.    Yes, sir.
25         Q.    Okay.  Let me know obviously if
```

1                    R. LOMBARDO

2    there's a problem with that because I want you

3    to be able to see the whole thing.

4         A.    It's only -- I'm sorry, sir, it's

5    only showing the first page.  If I try to

6    scroll down, it's only the first page.

7         Q.    All right.

8         A.    Maybe it's user error on my part.

9               MR. SATTERWHITE:  Let's go off the

10         record for a second, Rachel, while we try

11         to get this worked out.

12                    (A short break was taken.)

13         Q.    All right.  So, Mr. Lombardo, can

14    you now see all of the pages of the exhibit

15    that you want to look at?

16         A.    Yes, sir.

17         Q.    Great.  Can you tell me if you

18    recognize Exhibit B?

19         A.    Yes, sir.

20         Q.    What is that?

21         A.    The noncompete.

22         Q.    And if you look over on page 6 of

23    the document, is that your signature?

24         A.    Yes.

25         Q.    And you signed this document the

```
 1                    R. LOMBARDO
 2   same day you signed the offer letter that was
 3   marked as Exhibit A, correct?
 4        A.   Yes, sir.
 5        Q.   Did you read this agreement before
 6   you signed it?
 7        A.   I'm sure I perused through it.
 8        Q.   All right.  Let me direct your
 9   attention to page 1, and the section about
10   midway down the first page that starts with the
11   word "Confidentiality."  Do you see that?
12        A.   Yes.
13        Q.   All right.  I'm not going to read it
14   out loud.  But would you please read the first
15   sentence of the second paragraph there,
16   beginning with the word "Accordingly"?
17        A.   Accordingly, employee shall not,
18   during the -- sorry.  Let me scroll.
19             Accordingly, employee shall not
20   during the term of his/her employment and
21   thereafter regardless of the reason for his/her
22   termination reveal or disclose to any person
23   outside of the company or use for his/her own
24   benefit or the benefit of any other person or
25   entity any confidential or proprietary
```

```
 1                     R. LOMBARDO
 2  information concerning the business or affairs
 3  of the company or concerning the company's
 4  customers, clients, or employees.
 5      Q.    And I'm sorry.  I meant to be clear
 6  that you could have just read it to yourself.
 7      A.    Oh, okay.
 8      Q.    But I'm not trying to make you read
 9  to me.
10      A.    It's like 7th grade reading class.
11  Got a little scared there.
12      Q.    I won't do that to you.
13            What did you understand that
14  provision of this agreement to mean?
15            MS. COOPER:  Objection.  Go ahead
16        and answer, if you can.
17      A.    That I couldn't, you know, give any
18  proprietary information of the company away.
19      Q.    And did you have any understanding
20  of what was included in the definition of
21  proprietary information as you just used it?
22      A.    No.
23      Q.    Did you ask anybody any questions
24  about this?
25      A.    I did not.
```

Page 17

1                          R. LOMBARDO

2         Q.    During your employment with Chmura,

3    did you have access to any information that you

4    considered to be confidential?

5         A.    Yes.

6         Q.    And what categories of information

7    did you consider to be confidential?

8         A.    I would say customer, customers,

9    pricing of customers, our roadmap of what we

10   have rolling out or what we had rolling out or

11   they had rolling out.

12        Q.    And other than pricing, is there

13   anything about Chmura's customers that you

14   considered to be confidential information?

15        A.    Yeah, I would say their renewal

16   date, you know, things in their contracts

17   potentially.

18        Q.    Anything else that you considered

19   confidential at your employment with Chmura?

20        A.    Not that I can think of off the top

21   of my head.

22        Q.    I'm going to move us to paragraph 4

23   on page 4 of Exhibit B, and it says Termination

24   and Return of Property.  Do you see that?

25        A.    Yes.

1                          R. LOMBARDO

2       Q.    Take as much time as you need to

3   review this, but what I'm going to ask you to

4   do is read to yourself the very last sentence

5   of paragraph (a).  And that sentence begins

6   with the phrase, "Upon the termination."

7             Do you see that?

8       A.    Yes.  I am going to read that.

9       Q.    Yeah, tell me when you've had a

10  chance.

11      A.    I've read that.

12      Q.    What did you understand that

13  sentence to mean, Mr. Lombardo?

14      A.    To return any company property once

15  I am no longer with the company.

16      Q.    And what about the phrase

17  "immediately and without demand," what did you

18  understand that to mean?

19            MS. COOPER:  Objection.  Go ahead

20       and answer.

21      A.    I would assume right away under any

22  circumstance.

23      Q.    And I'll try to shortcut this.  The

24  same phrase "immediately and without demand"

25  also appears in subparagraph (b).

1                        R. LOMBARDO

2              Do you see that?

3        A.    Yes.

4        Q.    And did you have the same

5    understanding of that phrase with respect to

6    paragraph (b) that you just described with

7    respect to paragraph (a)?

8        A.    Yes.

9        Q.    All right.  I'm going to go

10   backwards here, Mr. Lombardo, to page 3,

11   paragraph 3.  This is a section entitled:

12   Covenants Not to Compete or Interfere.

13              Do you see that?

14       A.    Yes.

15       Q.    Do you remember whether you read

16   this section before signing the agreement?

17       A.    I do not remember.

18       Q.    Other than counsel, did you discuss

19   this language with anybody at the time you

20   signed it?

21       A.    No.  Not that I recall.

22       Q.    Do you recall asking anybody at

23   Chmura any questions about this provision?

24       A.    No.

25       Q.    Did you believe that -- and again

1                    R. LOMBARDO

2    I'm talking about at the time you signed the

3    document -- did you believe that you could work

4    for a competitor after your employment with

5    Chmura ended?

6        A.    No.

7        Q.    And did you believe that you could

8    solicit business from your Chmura customers

9    after your employment ended?

10           MS. COOPER:  Objection as to form.

11       Go ahead.

12           MR. SATTERWHITE:  I didn't hear the

13       objection.

14           MS. COOPER:  I said objection to the

15       form, but go ahead and answer.

16           MR. SATTERWHITE:  Okay.  Sure.

17       A.    I would think, my understanding

18    would depend what it was I was selling.  If I

19    was selling toilet paper, for example, I was

20    under the assumption you can if it's a totally

21    different product.

22       Q.    Fair enough.  Was it your impression

23    you were restricted from soliciting your Chmura

24    clients for the purpose of selling them

25    products that were competitive with Chmura?

1                    R. LOMBARDO

2        A.    Yes.

3        Q.    What job titles did you hold through

4    your career at Chmura?

5        A.    Account manager and senior account

6    manager.

7        Q.    So when you were hired, you were an

8    account manager?

9        A.    Yes, sir.

10       Q.    And then after how long did you

11   become a senior account manager?

12       A.    I'm not sure on the exact time

13   frame.  I believe it was sometime in 2017, but

14   I'm not sure of the exact month.

15       Q.    And can you walk me through the

16   people that were your direct supervisor during

17   your period of employment?

18       A.    Yes.  Leslie Peterson.  Kyle West.

19   Ethan Trombley.  Greg Chmura.  Curtis Monk.

20   Eli Auerbach.

21       Q.    And I'm just going through this

22   list, Mr. Lombardo, and ask you approximate

23   times during which each one of these

24   individuals acted as your supervisor.

25             So starting with Leslie Peterson?

Page 22

```
1                    R. LOMBARDO

2        A.    From when I started there in

3   February of 2015 until, my recollection would

4   have been, early 2017.

5        Q.    How about Kyle West?

6        A.    Kyle West took over from Leslie.  He

7   was, my best assumption we'll say maybe

8   January 2017 through November-ish of 2017.

9        Q.    And Mr. Trombley?

10       A.    Following that, I think there was a

11  break where I just reported to Greg, I believe,

12  for 2 to 3 months.  And I think Ethan was then

13  promoted to overseeing the sales team or be our

14  direct link, maybe January-ish.  Could be

15  December of 2017, somewhere in that area -- I'm

16  sorry, through November of 2018.

17       Q.    And how about Curtis Monk?

18       A.    It was a short time period.  I think

19  it was before Christmas.  Again December

20  through maybe February-ish of 2019.

21       Q.    And after Mr. Monk, was there a

22  period when you went back to reporting to Greg

23  Chmura?

24       A.    Yes.

25       Q.    What was that period?
```

```
 1                    R. LOMBARDO

 2        A.     From whenever Greg left to when they

 3   hired Mr. Auerbach on, I believe, April 1st or

 4   April 6th.

 5        Q.     And then Mr. Auerbach was the

 6   supervisor for the remainder of your time?

 7        A.     Yes.

 8        Q.     What products did you sell for

 9   Chmura?

10        A.     JobsEQ, LaborEQ, RPI, employee firm

11   lists.  Not sure if I actually ever sold a

12   Career Concourse or not.

13        Q.     Can you give me a brief description

14   of what JobsEQ does?

15        A.     Yeah, provides online access to

16   employment, wages, occupations, industry, skill

17   level.  A lot of different economic and labor

18   data information all in one easy-to-use place.

19        Q.     Not the first time you've said that,

20   is it?

21        A.     No.  It's been a while, though.

22        Q.     Without going through each one of

23   the other products individually, is it fair to

24   say they all relate in some way to JobsEQ?  Or

25   is that an oversimplification?
```

```
 1                     R. LOMBARDO

 2        A.    No, that would work.

 3        Q.    So is it correct to say that the

 4   services you performed for Chmura all related

 5   in some way to JobsEQ?

 6        A.    Yes.  Sometimes I would turn

 7   consulting projects over to our consulting

 8   side, our VP of business development.  But I

 9   didn't handle any of those.  Once they kind of

10   came across my desk, I just handed those off.

11        Q.    Did you bring any clients with you

12   to Chmura?

13        A.    No.

14        Q.    Did you have prior experience

15   selling software?

16        A.    No.

17        Q.    Once you started at the company, did

18   you -- were you assigned a specific geographic

19   sales territory?

20        A.    No.

21        Q.    Did you end up at any point having a

22   specific geographic sales territory?

23        A.    Yes.

24        Q.    What was it?

25        A.    It changed a bit over time.  They
```

```
 1                    R. LOMBARDO
 2   added a few.  But I was in charge of Ohio,
 3   Michigan, Illinois, New York, Florida, Texas,
 4   Oklahoma, Louisiana, Washington, Texas --
 5   Washington, California, Wisconsin, Minnesota,
 6   Iowa.  I think that's about all I could
 7   remember.
 8        Q.    And when did you go from not having
 9   any specific territory to having responsibility
10   for those states?
11        A.    I'm not sure.  I want to say it was
12   roughly sometime in 2016.  I believe prior to
13   the hire of Henry Curtis, I think.  It was
14   either right before or after.  Sometime in
15   2016.
16        Q.    And within those states, how did you
17   go about deciding who you were going to try to
18   sell the products to?
19        A.    Since the vast majority of our
20   clientele that I was in charge of reaching out
21   to were government entities, I would just go
22   through and call each individual county based
23   on population with the highest population
24   first.  And then each state had workforce
25   boards broken out, so I would then add all the
```

Page 26

1                        R. LOMBARDO

2    workforce boards to sales force as well, if

3    they were not already there.

4         Q.    And approximately how many potential

5    entities in the states that you were assigned

6    to are there in those categories?

7         A.    Individually or combined?

8         Q.    I'm just looking for a total number.

9         A.    If you're -- that's hard to say.  If

10   you're just counting the workforce boards, I

11   would say there would roughly be 100-ish to 150

12   depending on the state.  But then from there, I

13   was able to sell into individual cities as

14   well, but not every city was necessarily a

15   viable prospect.  So it would go up from 150.

16        Q.    And did you in any way prioritize

17   the prospects that you called on?

18        A.    Mostly by population.

19        Q.    And you made the decision to call

20   on, I assume, the more populous entities first?

21        A.    Yes.

22        Q.    And when you say "contact," are you

23   talking about phone calls?  Emails?  How did

24   you reach out to them?

25        A.    Yes, I would start with an email.  I

```
 1                     R. LOMBARDO
 2   almost always started with an initial email,
 3   and then followed up a few days later based on
 4   that email.
 5        Q.    And when you say "follow up," you're
 6   talking about a phone call?
 7        A.    Yes, sir.
 8        Q.    Did you place those phone calls from
 9   your office phone or your cell phone or both?
10        A.    Both.
11        Q.    When you were in the office, did you
12   generally use your office phone?  Or did you
13   also use your cell phone from that location?
14        A.    I would occasionally use my cell
15   phone, but the vast majority would be the
16   office phone.
17        Q.    And then I take it that you used
18   your cell phone for the times when you were not
19   in the office?
20        A.    Yes.
21        Q.    And using your cell phone, you
22   placed and received calls from prospective
23   clients?
24        A.    Yes.
25        Q.    And using your cell phone, you place
```

```
 1                     R. LOMBARDO
 2   and receive calls to existing clients?
 3        A.    Yes.
 4        Q.    So you had contact information
 5   relating to clients and prospective clients on
 6   your cell phone at various times, right?
 7        A.    Yes.
 8        Q.    When you emailed clients and
 9   prospective clients, did you exclusively use
10   your corporate email account at Chmura?
11        A.    Yes.
12        Q.    Did you ever email a Chmura client
13   or prospect from your personal email account?
14        A.    It may have happened two to three
15   times.  Sometimes people would reach out to me
16   through LinkedIn, and the LinkedIn was
17   connected to my personal email.  But generally
18   from there, I would let them know to reach out
19   through my company email because I wanted to
20   put all those contacts and clients in folders
21   for the clients.
22        Q.    How about text messaging?  Did you
23   ever change text messages with clients or
24   prospects?
25        A.    I can't remember.  I can remember
```

1                    R. LOMBARDO

2   one client that I text messaged.  Yeah, a

3   workforce board in Florida was the only one I

4   text messaged that I can remember.  It may have

5   happened one or two more times, but that was

6   not frequent.

7        Q.    And you mentioned LinkedIn.  You

8   used LinkedIn's message capability from time to

9   time; is that correct?

10       A.    Yes, if they reached out to me

11  through there, maybe a prospect or a client

12  moved and they were looking to get ahold of me,

13  they would reach out to me through LinkedIn.

14       Q.    But you didn't generally initiate

15  communications through LinkedIn?

16       A.    I would not initiate messages

17  through LinkedIn, no.  I would use LinkedIn as

18  a prospecting tool, but I wouldn't reach out to

19  them through LinkedIn.  I would reach out to

20  them via email.

21       Q.    Other than what we discussed,

22  Mr. Lombardo, are there any other methods by

23  which you communicated with Chmura clients or

24  prospective clients?

25       A.    No, but seeing at conferences.

Page 30

1                        R. LOMBARDO

2        Q.    Once you identified someone as a

3   prospect, walk me through the process by which

4   you would try to sell them.

5        A.    I would start -- if by adding them

6   to Salesforce if they are not already in there,

7   I would go to their company webpage.  And

8   because we dealt with a lot of government

9   clients, much of their contact information was

10  able online, which was very nice to have, you

11  know, being in sales before where you didn't

12  have that type of access.

13             So I would add in the company link

14  in the Salesforce.  I would add in all the

15  contact information for maybe the CEO, the vice

16  president, if there's a director of research,

17  and others, I would add the contact in

18  Salesforce.  I would try to do a little bit of

19  research in JobsEQ, add in maybe the population

20  so I know what they're dealing with.  Fill out

21  the information in Salesforce.  I would

22  generally send out an introductory email to the

23  first person I was hoping to connect with, with

24  some references of clients in the home state,

25  and then follow up, you know, 2 to 3 days

1                          R. LOMBARDO

2     later.

3          Q.     Obviously, Mr. Lombardo, you were

4     successful in your sales efforts on behalf of

5     Chmura?

6          A.     Yes.

7          Q.     What factors do you believe made you

8     successful?

9          A.     I think I worked hard and long.

10         Q.     Did you consider it important to try

11    to build relationships with your prospective

12    clients and clients?

13         A.     Yes, very much so.

14         Q.     Did you believe it was important for

15    you to be responsive to them when they reached

16    out to you?

17         A.     Yes.

18         Q.     Why is that?

19         A.     I wanted to keep my clients happy.

20         Q.     Any other factors that you

21    considered important in being a successful

22    account manager?

23         A.     I mean, lots of stuff.  Having some

24    thick skin.  You get told no a lot.  You've got

25    to just work your way through the no's to get

Page 32

1               R. LOMBARDO

2    to the yes's.  Like I said, you know, maintain

3    good quality relationships so you can get

4    referrals from current clients.  It's a small

5    industry.  People talk to each other.  So if

6    you're doing well to them, they will pass it

7    along.

8         Q.    And if a prospect expressed an

9    interest in the product, I take it that you

10   tried to follow up with them as quickly as

11   possible?

12        A.    Yep.

13        Q.    Why?

14        A.    I was hoping to close the sale with

15   them over time.

16        Q.    And in your experience, did your

17   level of responsiveness make a difference?

18        A.    Sometimes yes; sometimes no.

19   Depends how it came in.

20        Q.    But it wasn't your practice to keep

21   prospective clients or clients waiting or

22   failed to return a phone call if you could help

23   it, right?

24        A.    Correct.

25        Q.    Other than just their contact

1                    R. LOMBARDO

2  information, did you make efforts to try to

3  determine what a prospective clients' needs

4  might be with respect to JobsEQ?

5       A.    I would take a look to see in JobsEQ

6  kind of what their industry mix was, to see if

7  maybe they have a lot of manufacturing in the

8  area verse maybe more office space, see how

9  they might utilize it.

10      Q.    And then when you ultimately talked

11  to them, did you try to gather that kind of

12  information as well?

13      A.    Not initially, no.  My first bid was

14  really I didn't try to sell them on really

15  purchasing anything.  My initial thing was just

16  trying to get them to take a look at it before

17  I would get into answering any questions or

18  grilling them.  I just really would present,

19  hey, I've got a product I think it would be

20  great for you to take a look at.

21      Q.    Did that process of trying to

22  determine the potential needs of the customer

23  come at some later point in the sales cycle?

24      A.    Yes, generally on the demo.

25      Q.    Okay.  Tell me about the demo.  How

```
 1                    R. LOMBARDO
 2  did that work?
 3       A.    I would send an invite over.  And
 4  generally pretty much exclusively through Go to
 5  Meetings and we did use Join Meeting before
 6  that.  We'd carve out an hour, and I'd walk
 7  them through each individual analytical of
 8  JobsEQ.
 9       Q.    But then how did you attempt to or
10  did you attempt to extract information about
11  what they liked about the product or didn't
12  like or what you might be able to ultimately
13  sell them?
14       A.    Yeah, I would ask them various
15  questions.  I would just do a lot of listening
16  to see if they had any, you know, oohs or ahs
17  or if they had any questions, I'd kind of drill
18  into that more.
19       Q.    And did you record any of that
20  information anywhere, either in Salesforce or
21  somewhere else?
22       A.    Yes, in Salesforce.
23       Q.    Is there any other information about
24  a client or prospective client that you used
25  during the sales process?
```

1                         R. LOMBARDO

2        A.    Not that I can think of.

3        Q.    And of the information that we've

4    discussed, is there any of it that you consider

5    to be confidential to Chmura?

6             MS. COOPER:  Objection as to form,

7        but go ahead.

8        A.    Not that I could think of.  Like my

9    selling style?

10       Q.    Are you saying that you considered

11   your selling style to be confidential, or are

12   you asking?

13       A.    No, I'm asking is that the question?

14   You're asking me about my selling style, so I

15   wasn't sure if that's what you're asking.  I

16   guess could you rephrase the question?

17       Q.    Sure.  Is there any information you

18   collected during your work at Chmura about

19   clients or prospects that you considered to be

20   confidential?

21             MS. COOPER:  Objection.  It calls

22        for a legal conclusion.  But you can

23        answer.

24       A.    No.

25       Q.    So you felt free to disclose that

```
 1                    R. LOMBARDO
 2   information if you had wanted to to anyone?
 3             MS. COOPER:  Objection.
 4        A.   Well, it depends what information it
 5   would be.  If it was what the client is doing,
 6   you know, what their -- you know, maybe a
 7   project they're working on that they're telling
 8   me about, yeah, I wouldn't think that's
 9   confidential.
10        Q.   Do you consider any of the
11   information about what the client wanted or
12   needed in terms of JobsEQ to be confidential?
13             MS. COOPER:  Objection.
14        A.   No.
15        Q.   Do you consider the terms of a
16   customer's contract with Chmura to be
17   confidential, including pricing?
18        A.   I would think it is.  But also some
19   of those contracts are posted online, so it
20   would be hard to say.
21        Q.   So it would depend on the individual
22   client?
23        A.   Well, I would think it would be
24   confidential, yes.  But they're also available
25   on the Internet.
```

1                          R. LOMBARDO

2        Q.    And I'm just trying to make sure I

3    understand your answer.  Are you saying all of

4    a customer's contracts with Chmura are

5    available on the Internet or some of them are?

6        A.    Some of them are.

7        Q.    So if the terms of a contract are

8    not publicly available, do you consider them

9    confidential?

10              MS. COOPER:  Objection.

11       A.    Yes.

12       Q.    Other than Salesforce and the

13   contact information we discussed about your

14   cell phone, did you have any contact

15   information about prospects or clients stored

16   in any other location?

17       A.    No.

18       Q.    Did you have a desktop computer at

19   Chmura?

20       A.    Yes.

21       Q.    And a laptop?

22       A.    Yes.

23       Q.    Did you use a tablet of any kind?

24       A.    No.

25       Q.    And was your cell phone issued by

```
 1                    R. LOMBARDO
 2   the company or your personal phone?
 3        A.    My personal phone.
 4        Q.    Did you use any -- do you know what
 5   a USB storage device is?
 6        A.    Yes.
 7        Q.    Did you use any of those types of
 8   devices during any of your work at Chmura?
 9        A.    Not that I can -- maybe here or
10   there at a conference because we had USB
11   giveaways.  Sometimes I would store something
12   on there if it was -- I don't remember ever
13   storing anything on there, but ... because on
14   the laptop there, the plug that that goes in, I
15   use for my wireless mouse.
16        Q.    How about do you know what cloud
17   storage is?
18        A.    I mean, kind of.  Like I know it's
19   like JobsEQ, it's a cloud product stored up
20   there somewhere, but I don't know -- I'm not an
21   IT guy.
22        Q.    Let me try to move us along.  Did
23   you ever store work-related documents on
24   anything like Dropbox or Google Docs or Box.com
25   or services like that?
```

Page 39

```
 1                    R. LOMBARDO
 2        A.    Not intentionally if I did.
 3        Q.    So, Mr. Lombardo, I understand that
 4   one of your claims against Chmura is that you
 5   contend it owes you certain commissions that
 6   have not been paid?
 7        A.    Yes.
 8        Q.    Can you tell me generally what your
 9   basis is for that claim?
10        A.    The offer letter and contract that I
11   signed that I was due 15 percent for initial
12   sales and if I didn't get the 15 percent for
13   the initial sale, that would have been the
14   basis for it.
15        Q.    And that offer letter is Exhibit A
16   that we've already gone over, correct?
17        A.    Yes.
18        Q.    Other than that offer letter, is
19   there any other basis for your commission
20   claims?
21        A.    No.
22              (Plaintiff's Exhibit D marked for
23        identification.)
24        Q.    All right.  Mr. Lombardo, hopefully
25   you are looking at what has been marked as
```

```
 1                    R. LOMBARDO

 2  Exhibit D.  Can you see that?

 3       A.    Yeah, I'm working on it.  Okay.  I

 4  have this up.  Okay.  Yes, I have this up.

 5       Q.    Tell me if you recognize that.

 6       A.    I do.

 7       Q.    Those are your written answers to

 8  the written questions that Chmura submitted to

 9  your counsel in this case, correct?

10       A.    Yes, sir.

11       Q.    And over here on page 10, that is

12  your signature, correct?

13       A.    Yes, sir.

14       Q.    And were these answers accurate to

15  the best of your knowledge when it was signed?

16       A.    Yes, sir.

17       Q.    Are they accurate now?

18       A.    To my knowledge, yes.

19       Q.    I'll take us over here to page 4.

20  Tell me if you can see page 4.

21       A.    Yes.

22       Q.    At the very bottom, the last line

23  starts out:  Unpaid commissions in excess of

24  $18,000.  Do you see that?

25       A.    Yes, sir.
```

1                    R. LOMBARDO

2        Q.    And then I'm going to take us to the

3   next page.  And on that page, there's a list of

4   I would estimate maybe a dozen accounts with a

5   dollar figure next to each one.

6             Do you see that?

7        A.    Yes.

8        Q.    And these are the commissions that

9   you contend you're owed that you did not

10  receive; is that right?

11       A.    It's a partial list, yes.

12       Q.    Fair enough, yeah.  In terms of the

13  claims that you made with respect to the offer

14  letter that you just described, these are the

15  unpaid commissions that you're talking about;

16  is that correct?

17       A.    Yes.  These were the ones that I

18  could remember.  I don't believe they're all of

19  them, but yes.

20       Q.    Sitting here today, can you identify

21  any others for me?

22       A.    No, I can't think of any others.

23       Q.    Where did you get the dollar figures

24  that are next to each one of these accounts?

25       A.    What I try to do is remember what

Page 42

```
 1                    R. LOMBARDO

 2   the cost of the agreement was for and what I

 3   remembered my commission being.  But I do not

 4   have the documents for this.  I believe they're

 5   in Salesforce.

 6        Q.    Okay.  And did you rely on any

 7   documents to come up with the dollar figures

 8   that we're seeing here on Exhibit D?

 9        A.    No.

10        Q.    This is all based on memory?

11        A.    Yeah, to the best of -- to the best

12   that I can remember.

13        Q.    All right.  Mr. Lombardo, I'm going

14   to try to do it quickly, but I'd like to walk

15   through these and get a little more about the

16   nature of your claim for each one.

17              So let's start with Oklahoma

18   Department of Commerce.  When did this deal

19   close?

20        A.    I want to say roughly October,

21   between August and October 2017.

22        Q.    And were you paid any commission on

23   the deal at all?

24        A.    I believe I was paid 5 percent.  It

25   was originally zero, and I fought the best I
```

Page 43

1                        R. LOMBARDO

2    could and was able to get 5 percent, to the

3    best of my knowledge.

4        Q.    And you believe you were entitled to

5    15 percent?

6        A.    Yes.

7        Q.    What -- you said you fought.  Who

8    did you fight with or to about getting the

9    5 percent?

10       A.    I spoke with my manager at the time,

11   which I think -- I'm pretty sure it was Kyle

12   West at that point and Leslie Peterson.

13       Q.    And you said it was originally zero.

14   And someone told you that you would get 5

15   instead after you brought it to them.  Is that

16   a fair summary?

17       A.    Yeah.

18       Q.    Who told you that?

19       A.    I believe it was Leslie.

20       Q.    And what did Leslie tell you about

21   the reason that you weren't getting the full

22   15 percent?

23       A.    That it was because it was an RFP.

24       Q.    Is that a request for proposal?

25       A.    Yes, sir.

1                        R. LOMBARDO

2        Q.    And in the context of Chmura, are

3   RFPs sometimes used?

4        A.    Yes.

5        Q.    And -- well, I'm only speaking from

6   my personal knowledge so I'll ask you the

7   question instead.

8              Is an RFP a more formal proposal

9   than just a sales process that may take place

10  over the phone?

11       A.    Yes.  A lot of times with an RFP, it

12  would have to go through a procurement process

13  where they have to show two other bids.

14       Q.    And does an RFP usually involve

15  something in writing, a proposal?

16       A.    Yes.

17       Q.    And do you have -- well, let me ask

18  it like this:  Have you, in the past, put

19  together formal RFPs to make sales at Chmura?

20       A.    Are you asking prior to the Oklahoma

21  Department of Commerce or after that in some

22  fashion?

23       Q.    Either one.  I'm just saying other

24  than this deal, have you been involved in

25  preparing RFPs at Chmura?

Page 45

1                         R. LOMBARDO

2        A.    Yes.  After this took place, I have.

3        Q.    And tell me what that involves, your

4    work on an RFP.

5        A.    If they were real in-depth, I'd work

6    with a manager.  But the ones that I filled out

7    were not very in-depth.  They were maybe 2 to

8    3 pages.  So we'd answer the questions they

9    provided and give them a price quote in a more

10   formalized way.

11       Q.    And other than a manager, is there

12   anybody else at Chmura that you'd worked on

13   RFPs with?

14       A.    Not that I worked with, no.

15       Q.    So let's talk about the Oklahoma

16   Department of Commerce.  Did you complete the

17   RFP for that particular deal?

18       A.    I did not.

19       Q.    Do you know who did?

20       A.    I believe Leslie and her side of the

21   house did.  I'm not sure who else worked on it.

22       Q.    I'm sorry.  What do you mean "her

23   side of the house"?

24       A.    I guess it may have been Sharon and

25   Chris at the time.  I'm not sure.  I know

```
 1                    R. LOMBARDO
 2   people -- the team in Richmond filled it out,
 3   to the best of my knowledge.
 4        Q.    Did you have any role in completing
 5   the RFP?
 6        A.    Other than forwarding it along, I
 7   don't recall adding anything to it.
 8        Q.    And did you at some point have a
 9   conversation with Leslie about your involvement
10   in the RFP?
11        A.    Not that I recall.
12        Q.    Maybe I misheard.  I thought you
13   said earlier that you were told that you were
14   only getting a 5 percent commission because you
15   weren't involved in the RFP?
16        A.    I apologize.  I thought you meant as
17   the RFP came in, had conversations about my
18   role in it.  No.  So yes, my conversations
19   after we won the proposal.
20        Q.    And tell me about those
21   conversations.
22        A.    Well, it was pretty upsetting.  I
23   was working the account for 2 years.  I did, I
24   believe, three demos in my time there.  It was
25   an account that I worked on for, you know, like
```

```
 1                    R. LOMBARDO
 2   I said, many years.  I thought I was going to
 3   get the full 15 percent on it.  We were never
 4   advised anything different for RFPs.
 5              And then I found out we won it in an
 6   email that was forwarded to me from my sales
 7   manager, and I wasn't even included in the
 8   congratulatory email when we won it.  So my
 9   manager at the time, Kyle West, said I don't
10   think you're getting any commission on this.  I
11   asked him why that would be.  He said he wasn't
12   sure.  It looks like I kind of got cut out of
13   that deal, so we set up a call with Leslie to
14   talk about it.
15        Q.    All right.  And tell me about that
16   call.
17        A.    To the best of my knowledge, from
18   what I can recall, she tried to back me into a
19   corner.  And I remember her saying, either I'm
20   calling her a liar if I didn't admit she told
21   me I wouldn't get commission on RFPs.  I
22   remember it being a very uncomfortable
23   conversation because I was not told I would not
24   get commission on RFPs.  And she said she
25   called me, we had a discussion about it, and
```

```
 1                    R. LOMBARDO
 2   that I was calling her a liar if I was saying
 3   that.  So it was an awkward conversation, from
 4   what I remember.
 5        Q.    Let me ask this.  Before this
 6   Oklahoma deal came out, was there a time you
 7   closed the deal and didn't complete the RFP and
 8   got full commission?
 9        A.    No.  I've never -- that was the
10   first one I remember us winning through an RFP
11   process that I was involved with, that I
12   demoed.
13        Q.    So this was really the first time
14   this situation came up, right?
15        A.    Yes.
16        Q.    And so you don't recall any prior
17   discussions with Ms. Peterson -- again, before
18   the Oklahoma Department of Commerce deal --
19   about whether you would or would not get paid
20   on an RFP, correct?
21        A.    Correct.
22        Q.    And do you know how much time, you
23   called them I think the Richmond folks, do you
24   know how much time they spent on the RFP for
25   Oklahoma?
```

Page 49

```
 1                        R. LOMBARDO
 2        A.    I am not familiar.
 3        Q.    Did you have any other conversations
 4   with Ms. Peterson about the Oklahoma deal other
 5   than what you've described?
 6        A.    Not that I can remember.
 7        Q.    All right.  Let's try to keep
 8   rolling here.  The second one on your list in
 9   Exhibit D is identified as Port Authority EDC.
10   Does that be Port Arthur EDC?
11        A.    Yes, it's Port Arthur EDC.
12        Q.    When did this deal close?
13        A.    I believe in April-ish of 2015.
14        Q.    And what, if any, commission did you
15   receive on it?
16        A.    I initially received 3 percent.
17   After an email exchange, I believe it went to
18   7 and a half percent.
19        Q.    And what reason were you given for
20   not getting the full 15 percent?
21        A.    I was told that this was a hot lead
22   that was handed to me.
23        Q.    And what was your understanding of
24   that phrase?
25        A.    I really didn't understand that
```

Page 50

```
 1                    R. LOMBARDO
 2   phrase, to be honest.
 3        Q.    Well, let me ask it a different way.
 4   Was that lead already in Salesforce?
 5        A.    No.
 6        Q.    Had anybody at Chmura had contact
 7   with that lead before you?
 8        A.    At the time I was not aware.  But
 9   after it closed, I was.
10        Q.    And so somebody did.  You just
11   didn't know about it?
12        A.    Correct.
13        Q.    Who had contact with them?
14        A.    From the email I remember, I think
15   Leslie met them at a conference in, like,
16   August of 2014.
17        Q.    And who, if anybody, did the demo,
18   to your knowledge, for Port Arthur?
19        A.    I believe Greg Chmura did.
20        Q.    And did you ever do a demo for Port
21   Arthur?
22        A.    I'm not sure.  It would be in
23   Salesforce.  I think I may have for Renata's
24   boss, but I'm not a hundred percent positive.
25   It would be in Salesforce if I did.
```

```
1                    R. LOMBARDO

2        Q.    And just so I'm clear, this was in

3   2015, right?

4        A.    Yes.

5        Q.    I don't mean this as a challenge at

6   all, Mr. Lombardo.  But how is it that you

7   remember this $375 figure from 5 years ago?

8        A.    Because the pricing at the time was

9   pretty easy.  It was 4,995 for almost all the

10  deals or 9,995.  And I just remember the Port

11  Arthur one specifically because I was so

12  shocked that -- with an email that I received

13  from Leslie with it.  You know, it was one that

14  I found a magazine.  I sent the cold email out.

15  I added them into Salesforce.  I did everything

16  I thought my responsibility was as an account

17  manager.  And then when it came time for

18  commissions, it showed up I was only getting

19  3 percent on it.

20       Q.    You're not disputing that

21  Ms. Peterson had already met this client, Port

22  Arthur, right, before you came to work at

23  Chmura?

24       A.    Correct, yeah.  To my knowledge, I

25  found out afterwards she has.
```

1                    R. LOMBARDO

2        Q.    And we talked a little bit about a

3    demo.  I just want to make sure our timeline is

4    clear.  Did you provide Port Arthur with a demo

5    prior to this deal closing in 2015?

6        A.    I believe I did.  To the best of my

7    knowledge.

8        Q.    Do you remember when?

9        A.    I don't remember when.

10       Q.    Do you remember how many?

11       A.    I believe I would have only given

12   one, I believe.

13       Q.    Do you know if anybody else had

14   given a demo prior to you?

15       A.    I was told afterwards that Rob

16   Macmillan did, but I don't know that.

17       Q.    And was he still there when you

18   started?

19       A.    No.

20       Q.    Okay.  All right.  Let's talk about

21   the next one.  Workforce Intelligence Network.

22       A.    Yeah, that was a 3-year deal.

23       Q.    So it was a 3-year license?

24       A.    Yeah.

25       Q.    And is it your contention that you

Page 53

```
 1                    R. LOMBARDO
 2   should be paid the 15 percent commission for
 3   3 years running on a deal like that?
 4        A.    Yes.
 5        Q.    And is that in any written policy or
 6   anything that you can point me to at Chmura,
 7   that that's the way a 3-year deal is paid out?
 8        A.    No, other than the contract I signed
 9   at the beginning that said 15 percent on the
10   initial sale.
11        Q.    And were you paid anything on this
12   Workforce Intelligence Network?
13        A.    Yes.
14        Q.    How much?
15        A.    I'd have to do the math.  I remember
16   it was -- I don't know the exact amount.  I was
17   paid 15 percent on the first year and 2 percent
18   on years 2 and 3.
19        Q.    And did you talk to anybody about
20   that, that you were dissatisfied with the
21   amount of the commission?
22        A.    I did not.
23        Q.    So were you given a reason?
24        A.    I did not complain to anybody.
25        Q.    When did this one close?  Did you
```

```
 1                    R. LOMBARDO
 2  already answer that?
 3       A.    No.   Again, my best assumption would
 4  be sometime between August and November-ish
 5  maybe of 2015.
 6       Q.    Okay.   The next one is Lea County
 7  EDC.   That one closed in 2015, correct?
 8       A.    Correct.
 9       Q.    And did someone at Chmura have any
10  contact with Lea County before you?
11       A.    Yes.
12       Q.    Who?
13       A.    I believe Rob Macmillan, but I don't
14  know that for certain.   Again, that would be
15  something -- I think that one was in
16  Salesforce, I believe.
17       Q.    I'm sorry.   You said that one was in
18  Salesforce?
19       A.    Yes, sir.
20       Q.    And it was identified as a prospect
21  in Salesforce?
22       A.    Yes.
23       Q.    Or I guess they're opportunities,
24  right?
25       A.    Yeah.   Actually, I do believe the
```

Page 55

1                          R. LOMBARDO

2    contract was even sent out on this one as well.

3        Q.    So there was already a contract in

4    front of the customer when you started as an

5    employee at Chmura?

6        A.    Yes.

7        Q.    And obviously you didn't have

8    anything to do with getting that contract out

9    the door?

10       A.    No.

11       Q.    But it's your position that because

12   the contract was signed after you began working

13   with the client, that you're entitled to the

14   full commission?

15       A.    Yes.

16       Q.    And that's regardless of whether

17   anybody else was involved in the prospecting

18   process or the negotiation process or the demo

19   process, correct?

20       A.    Yes.

21       Q.    Did you complain about Lea County?

22       A.    I did not.

23       Q.    All right.  Kentucky Cabinet --

24       A.    Again, that was --

25             MS. COOPER:  Let him ask the

1                      R. LOMBARDO

2      question.

3      A.    I apologize.

4      Q.    Don't worry about it.  I think we're

5  doing pretty well, actually.

6            Is that another, we'll call it,

7  early account in your career?

8      A.    Yes.

9      Q.    It closed in 2015?

10     A.    Yes.

11     Q.    And you were paid a 5 percent

12  commission?

13     A.    I think it was 5.  And after I spoke

14  with Leslie about it, she did bump it up to

15  10 percent.

16     Q.    What reason were you given for not

17  getting the full 15 percent?

18     A.    That I did not do the demo on it.

19     Q.    Was that true?

20     A.    That is true.

21     Q.    And was this another demo that was

22  done by Rob or somebody else?

23     A.    Yes.

24     Q.    And that happened before you started

25  working at Chmura?

```
 1                    R. LOMBARDO

 2      A.    Yes.

 3      Q.    Sugar Land, Texas, that was a 2019

 4  deal, correct?

 5      A.    Yes.

 6      Q.    And I'll just be frank with you,

 7  Mr. Lombardo.  My information suggests that it

 8  was a $6,000 sale and you were paid $900

 9  commission, which even by my poor math is

10  15 percent.  So what is it that you think you

11  were shorted on this deal?

12      A.    It was actually a 6-year deal.

13      Q.    Ah.  So you believe that you should

14  receive the full 15 percent for the entire

15  6-year period?

16      A.    As it was the initial sale.

17      Q.    That's your contention?  I mean,

18  that's the difference in the math here?

19      A.    Yes, sir.

20      Q.    And did you raise that

21  interpretation with anybody?

22      A.    No.

23      Q.    Onondaga?

24      A.    Good enough for me.

25      Q.    Did I mispronounce it badly?
```

1                         R. LOMBARDO

2          A.    No, I think you hit it on the head.

3          Q.    Sorry.  I lost the screen for a

4     second.

5                 That one closed in 2016?

6          A.    Yeah.

7          Q.    What is the basis for the $1,320 in

8     unpaid commission claims?

9          A.    It was a 2-year deal.

10         Q.    So this is similar to the last one

11    we talked about.  It's your position that

12    because it was over time, you should get the

13    15 percent each year, not just in the first

14    year?

15         A.    Yes.

16         Q.    And without regard to any of these

17    specific deals, did you ever discuss that

18    interpretation with anybody in management at

19    Chmura?

20         A.    I don't recall.  We may have brought

21    it up to sales managers as a team before, but I

22    don't recall any specific conversations about

23    it.

24         Q.    Okay.  So the next one is Workforce

25    Central.

1                        R. LOMBARDO

2        A.    Yes.

3        Q.    Is that one subject to the same

4   issue that we're talking about?

5        A.    Yes, sir.

6              MS. COOPER:  Objection as to form.

7        Go ahead.

8        A.    Yes, sir.

9        Q.    Yeah, that's fair.

10             Is your contention with regard to

11   Workforce Central the same as the last two

12   deals that we've been talking about in terms of

13   multiyear licenses?

14       A.    Yes.

15       Q.    The basis for your claim here is you

16   did not get the full 15 percent for the entire

17   3-year license?

18       A.    Correct.

19       Q.    Virginia Growth Alliance?

20       A.    Yep.

21       Q.    That was an early one, 2015?

22       A.    Yes.

23       Q.    And did you do the demo for this

24   one?

25       A.    No.  If I recall on this one, he

```
 1                    R. LOMBARDO
 2   didn't -- I don't know if he didn't ask for a
 3   demo.  He may have known about Chmura Economics
 4   through Chris speaking or their relationships
 5   in Virginia at the time, but he just called in
 6   and asked for a contract.
 7        Q.    Did -- to your knowledge, did
 8   anybody at Chmura have contact with this
 9   customer before you?
10        A.    To my knowledge, no, no, but I
11   assumed that they did, if that makes sense and
12   all.  My assumption is there was some
13   relationship there.
14        Q.    Because it's not common for somebody
15   to just call up and say send me a contract?
16        A.    I wish it was more common.
17   Especially being down in Virginia and I know
18   that they have strong relationships there, I
19   know they do a lot of good work down there, you
20   know, I'm assuming that's why it came in and
21   very little to do with me.
22        Q.    Did you discuss the Virginia Growth
23   Alliance deal with anybody as to why you didn't
24   get full commission?
25        A.    I can't remember if I did on that
```

1                    R. LOMBARDO

2    one or not.  I may have through an email

3    correspondence in 2015, but I'm not sure.

4         Q.    Gaston College, Mr. Lombardo, is the

5    next one.  And that one was also a to 2015

6    deal, correct?

7         A.    Yes, sir.

8         Q.    And you got a 10 percent commission

9    but not the full 15?

10        A.    I think it's 3 percent, not 15.  To

11   the best of my knowledge.

12        Q.    And had there been some prior

13   contact between this customer and somebody at

14   Chmura before you came on board?

15        A.    Yes.

16        Q.    Did you do the demo?

17        A.    No, I don't believe so.

18        Q.    Radius Indiana, again, that's a 2015

19   deal, correct?

20        A.    Yes.

21        Q.    And did you do the demo for that

22   one?

23        A.    I don't believe so.

24        Q.    And then finally East Central

25   Indiana, that closed in 2015 as well, correct?

Page 62

1                        R. LOMBARDO

2        A.    Yes.

3        Q.    And, again, someone else did the

4    demo for this one?

5        A.    Yes, I believe so.

6        Q.    Okay.  And I'll ask you this

7    question again just having gone through this

8    list.  Are there any other sales that you

9    didn't get paid the full commission on that you

10   can recall sitting here today that are part of

11   your commission claim?

12       A.    Not that I can think of.  That's the

13   best list I can come up with without accessing

14   Salesforce.

15       Q.    When you started, Mr. Lombardo, did

16   anybody ever tell you that there may be

17   situations in which you would not receive a

18   full commission?

19       A.    Yes.

20       Q.    Who told you that?

21       A.    Leslie.

22       Q.    And when did she tell you that?

23       A.    I'm not sure.  Early on.

24       Q.    What did she tell you about the

25   situations in which you may not receive a full

```
 1                    R. LOMBARDO

 2   commission?

 3        A.    That there were, like, some hot

 4   leads apparently, to the best of my knowledge.

 5   I forget exactly how she said it or how it came

 6   about.

 7        Q.    Bear with me.  We're just moving to

 8   the next document.

 9        A.    Can I X out of this one?

10        Q.    You can.  That's your copy.

11             (Plaintiff's Exhibit E marked for

12             identification.)

13        Q.    All right.  I am showing you what's

14   been marked as Plaintiff's Exhibit E.  Take

15   your time and take a look at that.  It is a

16   one-page document.  Tell me when you've had a

17   chance to look at it.

18             MS. COOPER:  Was this -- I'm going

19             to interject.  Was this produced in

20             discovery, Rod?

21             MR. SATTERWHITE:  It was.  You asked

22             for it in Leslie's deposition, and I

23             believe Heidi sent it to you on Saturday.

24             MS. COOPER:  Okay.  Thank you.

25        Q.    Have you had a chance to look at it,
```

1                    R. LOMBARDO

2    Mr. Lombardo?

3         A.    Give me a minute here and I'll read

4    it.

5         Q.    Take your time.

6         A.    To myself again.  I've read it.

7         Q.    All right.  This is an email from

8    Ms. Peterson to you dated March 20th of 2015,

9    correct?

10        A.    Yep.

11        Q.    And there's another recipient named

12   James Donovan.  Who was that?

13        A.    He was a salesperson, another

14   account manager that was hired maybe 2 to

15   3 weeks-ish after me.

16        Q.    So is it fair to say that at the

17   time you got this email, you were both new

18   account managers at Chmura?

19        A.    Yes, sir.

20        Q.    Okay.  And the email contains three

21   bullet points, each one of which describes a

22   scenario related to commissions; is that

23   correct?

24        A.    Correct.

25        Q.    And the first category is basically

Page 65

1                          R. LOMBARDO

2      if a prospect is identified by someone else and

3      all you do is get the signature, then your

4      commission will be 3 percent.  And I recognize

5      that I'm paraphrasing.  But is that your

6      understanding?

7           A.    Yes.

8           Q.    The second scenario is if the

9      prospect is identified and demoed by somebody

10     else but you do followup work, then the

11     commission on that will be on a judgment basis;

12     is that correct?

13                MS. COOPER:  Objection as to form.

14          Go ahead.

15          A.    Yes.

16          Q.    Is that what essentially the second

17     bullet point says?

18          A.    Yes.

19          Q.    All right.  And then the third

20     category is when you prospect a new client,

21     organize and give the demo, and close the deal,

22     you get the full 15 percent?

23          A.    Yes.

24          Q.    Did you ask anybody any questions

25     about this email when you got it?

1                     R. LOMBARDO

2        A.    I don't recall.

3        Q.    Do you recall whether you disagreed

4    with anything in the email when you got it?

5        A.    I don't recall.  I know I sent

6    another email asking for further explanation on

7    how some of these work.  In the first bullet

8    point, for example, the prospect identified by

9    someone at Chmura different than yourselves,

10   there was no list to go off of, here are the

11   ones that fall into this bucket.

12             So for Port Arthur, for example, I

13   found that one in a magazine, entered it into

14   Salesforce.  And, like I said, I believe I did

15   one of the demos and closed it and then was

16   told it was 3 percent.  So I believe I sent an

17   email to Leslie asking for more clarification

18   on what those were.

19       Q.    So you wanted to figure out how you

20   could learn in advance whether some prospect

21   had already been contacted and might not be

22   subject to the full commission?

23             MS. COOPER:  Objection as to form.

24       You can go ahead.

25       A.    Yeah, so -- yeah, the Port Arthur

```
 1                    R. LOMBARDO
 2  one was the one that just came as a surprise to
 3  me because I remember being what I thought was,
 4  you know, my first or second one that I kind of
 5  did on my own, I was pretty excited about.  So
 6  I was told that wasn't what I believed it was.
 7  I sent Leslie an email asking for more
 8  clarification.
 9       Q.    Okay.  At the time you got this
10  email that's been marked as Exhibit E, you were
11  aware that there were certain situations that
12  would not result in a 15 percent commission,
13  correct?
14            MS. COOPER:  Objection as to form.
15       A.    Yes.
16       Q.    And you chose to continue working at
17  Chmura thereafter?
18       A.    Yes.
19       Q.    Did you have annual reviews of your
20  performance?
21       A.    I don't think I did.
22       Q.    Do you believe that somebody else
23  thinks you did?
24       A.    I believe other people may think
25  that I did.
```

1                    R. LOMBARDO

2       Q.    Okay.  Do you recall meeting with

3   Greg Chmura in February of last year to talk

4   about the possibility of you getting a raise?

5       A.    Yes.

6       Q.    Tell me what you recall about that

7   conversation.

8       A.    I asked for a raise.  I thought I

9   was due.  Was that February of 2019 or 2018?

10      Q.    I'm asking about 2019.

11      A.    Okay.

12      Q.    Is your answer the same?

13      A.    Yeah, I don't remember specifics

14   about it.  But yeah, I remember asking for a

15   raise.

16      Q.    Did you go to him in person or do it

17   by email or ...

18      A.    I believe it was in person.  Most of

19   my interactions with the managers in Cleveland

20   were in person instead of emails.

21      Q.    During your meeting with Mr. Chmura,

22   did you show him a letter that you received

23   from a prospective employer?

24      A.    No, I showed him a doctored letter

25   that I received from an employer.  Technically

1                    R. LOMBARDO

2    it's not the one I received from a potential

3    employer.

4        Q.    Let me try it a different way.  Did

5    you show him a version of a letter that you had

6    received from a potential employer?

7        A.    Yes, sir.

8              (Plaintiff's Exhibit G marked for

9        identification.)

10       Q.    Okay.  I am displaying what has been

11   marked as exhibit G.  Tell me if you've seen

12   that before.

13       A.    Yes.

14       Q.    Is this what you gave to Mr. Chmura?

15       A.    Yes.

16       Q.    Why did you give him this?

17       A.    I wanted to let, I guess, him and

18   management know that, you know, other people

19   would like to employ me.  I felt kind of hurt

20   and kind of taken advantage of the last few

21   years.  I understand I'm highly compensated.  I

22   make a lot of money there.  But what we agreed

23   to was still I would get an increase each year

24   based on my performance.  I thought I was

25   outperforming what I agreed to on my end, and I

1                          R. LOMBARDO

2    felt like they were not living up to theirs.

3          Q.    Is it correct to say that you were

4    using this letter to try to prove your value to

5    the company?

6          A.    Yeah, you could say that.

7          Q.    You used the word "doctored"

8    earlier.  Did you change the date of the

9    letter?

10         A.    Yeah, I made several changes to it.

11   I don't remember what every bit was.  I

12   obviously blacked some out.  Yeah, the date was

13   one of them.

14         Q.    Was the base salary another one?

15         A.    Yes.

16         Q.    And this original letter came from a

17   company called GIS WebTech, correct?

18         A.    Yeah.

19         Q.    And that's one of -- well, what to

20   your knowledge is the relationship between

21   Chmura and GIS?

22         A.    They have some sort of partnership,

23   I believe, that we import our data into GIS's

24   platform when there's mutual customers.

25         Q.    And did some sort of relationship

```
 1                    R. LOMBARDO
 2   like that exist at the time that you gave
 3   Mr. Chmura the letter?
 4        A.    I don't believe so.
 5        Q.    Did any relationship exist, to your
 6   knowledge, between Chmura and GIS at the time
 7   you showed Mr. Chmura this letter?
 8        A.    I know there were talks about some
 9   sort of partnership, but I was not involved in
10   any of those discussions.
11        Q.    And did you know about the talks at
12   the time you gave him the letter?
13        A.    Well, I know that I was aware that
14   management has met with them several times over
15   the last I think it was 2 years at that point,
16   but I don't know what transpired.
17        Q.    Do you remember what the original
18   base salary that GIS actually put in the salary
19   was?
20        A.    It was 57 something, and then they
21   were going to pay me a stipend each month for
22   healthcare because they did not offer it, and
23   then they were going to pay me for retirement
24   because they did not offer that as well.  So
25   that's how I came up with the 70,000.
```

Page 72

```
1                      R. LOMBARDO

2       Q.    And physically what did you do,

3   Mr. Lombardo?  Did you white it out and type it

4   in, or did you use a computer?  How did you

5   make these changes?

6       A.    I think I used a computer.

7       Q.    So we discussed the date of the

8   letter.  We discussed the salary amount being

9   changed.  Were there any other changes that you

10  can recall?

11      A.    Not that I can recall, no.  I know

12  the date and the salary.  Well, I'm sure I

13  would have -- probably the start date I would

14  have assumed as well if I changed the original

15  date up top.

16      Q.    Why would you change the start date?

17      A.    To let management think that I had

18  an opportunity to work for them.

19      Q.    At some point did Chmura question

20  you about the changes to this letter?

21      A.    Yes.

22      Q.    Ms. Peterson and Dr. Chmura came to

23  Ohio, correct?

24      A.    Yes, but that was after they

25  questioned me about the letter.
```

```
 1                    R. LOMBARDO

 2        Q.    Before they came to Ohio, had you

 3   acknowledged the changes that you made to the

 4   letter?

 5        A.    Yes.

 6        Q.    To whom?

 7        A.    Chris, Leslie, and Greg Chmura.

 8        Q.    Was that by phone?

 9        A.    Yes.

10        Q.    So there was a phone call between

11   you, Ms. Peterson, Dr. Chmura, and Mr. Chmura,

12   correct?

13        A.    Yes.

14        Q.    And was Mr. Chmura in the room with

15   you?

16        A.    Yes.

17        Q.    And Ms. Peterson and Dr. Chmura were

18   on the phone?

19        A.    Yes.

20        Q.    How long did the phone call last?

21        A.    Less than 10 minutes.

22        Q.    And the first time that they asked

23   you if you had made the changes to the letter,

24   did you acknowledge that you had?

25        A.    Yeah.
```

1                    R. LOMBARDO

2      Q.    Did they ask you more than one time

3   if you had made the changes to the letter?

4      A.    Once they asked me if I made changes

5   to the letter, I said yes, so they didn't have

6   to ask again.

7      Q.    Had you had any prior conversations

8   with anybody at Chmura in which you denied

9   making the changes to the letter?

10     A.    Not that I can recall.

11     Q.    The ultimate outcome of this

12  incident was that you were put on probation and

13  denied a merit increase; is that correct?

14          MS. COOPER:  Objection to the form.

15     You can go ahead and answer.

16     A.    No, this is the first time I ever

17  heard I was on probation.

18     Q.    When you say "this," you mean

19  sitting here today or this, the lawsuit?

20     A.    No, like sitting here right now.

21     Q.    Well, let me ask it a different way:

22  Did anybody tell you you were being put on

23  probation because of this?

24     A.    No, not that I can recall.

25     Q.    Did anybody tell you that you would

Page 75

1                    R. LOMBARDO

2   be subjected to any discipline because of this

3   incident?

4       A.    Not that I can recall.  I remember I

5   had to, you know, apologize to the GIS WebTech

6   team, apologize to the sales team.

7       Q.    And were there any other

8   repercussions that you know as a result of

9   that?

10      A.    No, not that I can recall.

11      Q.    And did you think it was appropriate

12  to change this letter in order to try to get a

13  raise?

14      A.    No.

15      Q.    Did anybody from Chmura tell you

16  that you could have been terminated?

17      A.    Yes.

18      Q.    Who said that?

19      A.    I believe Leslie.

20      Q.    What else did she say, if you

21  remember anything?

22      A.    She was disappointed.  I was

23  disappointed as well.  You know, they just

24  weren't happy about it.  I don't remember

25  specifics.  I know that she was just

1                        R. LOMBARDO

2    disappointed about it.

3              (Plaintiff's Exhibit H marked for

4         identification.)

5         Q.    All right.  Mr. Lombardo, I'm

6    showing you what's been marked as Exhibit H.

7    Tell me if you recognize that.

8         A.    I do.

9         Q.    What is it?

10        A.    An amendment to our -- to the

11   original contract.

12        Q.    And by "original contract," you're

13   referring to the offer letter that was marked

14   as Exhibit A at the beginning of the day today?

15        A.    Yes, sir.

16        Q.    Okay.  And that's your signature at

17   the bottom of Exhibit H, correct?

18        A.    Correct.

19        Q.    How long after the incident with the

20   GIS letter did this document, was this document

21   presented to you?

22        A.    I don't recall.  I assume a week or

23   two.  2 weeks, 3 weeks.  I don't remember.

24        Q.    And this Exhibit H purports to

25   make -- it says:  The following changes have

Page 77

```
 1                    R. LOMBARDO
 2   been made.  The reference to annual merit
 3   increases is hereby deleted.  What did you
 4   understand that to mean?
 5        A.    It means they were taking away the
 6   merit increases that I never got.
 7        Q.    So was there any practical impact to
 8   that change?
 9        A.    Not that I could tell.  They
10   never -- I was never awarded a merit increase
11   in my 5 years there.
12        Q.    And then the second sentence in that
13   third paragraph on Exhibit H says:  In
14   addition, Chmura would like to clarify that
15   commissions become payable once Chmura receives
16   the payment on the sale.
17              Do you see that?
18        A.    Yes.
19        Q.    Does this affect the timing of your
20   commission payments?
21              MS. COOPER:  Objection.  Go ahead
22        and answer.
23        A.    Yeah, it could.  It did.
24        Q.    I'll just ask it a different way.
25   What was your understanding of this sentence?
```

1                     R. LOMBARDO

2        A.     That if -- that if we did not get a

3    check from the client, I would not get my

4    commission.

5        Q.     And were there any commissions that

6    you did not receive after the date of Exhibit H

7    because the client didn't pay?

8        A.     Not that I can recall.  I remember

9    the one sticking point we had as account

10   managers was even if they paid a multiyear

11   contract up front, so Chmura did receive the

12   full amount, we still did not receive the

13   commission.

14       Q.     Did this change in any way

15   negatively impact the amount of commission that

16   you received?

17       A.     No.

18       Q.     And then the beginning of the last

19   paragraphs say:  All other terms and conditions

20   of the offer letter remain unchanged.  Do you

21   see that?

22       A.     Yes.

23       Q.     Did you ask anybody any questions

24   about that language?

25       A.     The very last part, "all other terms

1                    R. LOMBARDO

2    and conditions" part?

3         Q.    Right.

4         A.    No.

5         Q.    And you chose to continue working at

6    Chmura after you received this document that's

7    been marked as Exhibit H?

8         A.    Yes.

9              MR. SATTERWHITE:  Christine, I'm at

10        a good breaking point if you guys want to

11        take one.

12             MS. COOPER:  Yeah.  5 minutes?

13        10 minutes?  What would you guys like to

14        take?

15             MR. SATTERWHITE:  Let's do 10.

16             MS. COOPER:  Okay.  Sounds good,

17        Rod.

18             MR. SATTERWHITE:  Thanks.  Rachel,

19        we can go off the record.

20                   (A short break was taken.)

21        Q.    Mr. Lombardo, after you were

22    terminated from Chmura, you started looking for

23    other jobs; is that right?

24        A.    Correct.

25        Q.    How soon after your termination?

1                          R. LOMBARDO

2        A.    I don't know the exact amount of

3    days.

4        Q.    Weeks?  Months?

5        A.    Weeks, not months.  My wife would

6    have killed me.

7        Q.    And you prepared a resume to send to

8    prospective employers as a part of that job

9    search?

10        A.    I had the resume on file.  I had

11    paid a professional resume writer back in 2017.

12        Q.    And did you update it?

13        A.    With some numbers, yeah.

14        Q.    When did you update it?

15        A.    Sometime after I left -- my wife's

16    actually really good at that, so she updated it

17    for each job depending on what was in the job

18    description.

19               (Plaintiff's Exhibit I marked for

20               identification.)

21        Q.    Take a look at -- should be showing

22    up as Exhibit I.

23        A.    Yep.

24        Q.    Have you had a chance to look at it?

25        A.    Yep.

Page 81

```
1                         R. LOMBARDO

2        Q.    Exhibit I is a copy of your resume?

3        A.    One of them, yes.

4        Q.    And was this a copy that was sent to

5   prospective employers and recruiters after your

6   separation from Chmura?

7        A.    Yeah, this looks relatively close.

8   Like I said, might change a few things here and

9   there depending on the job.  But yeah, this is

10  the bones of what I had done.

11             (Plaintiff's Exhibit J marked for

12             identification.)

13       Q.    All right.  Let me show you one

14  other document.  Take a look at Exhibit J and

15  tell me when you've had a chance to look at it.

16       A.    Is it just one page?

17       Q.    It's 2 pages, I think.  Oh, this

18  document, I'm sorry, J is just one page, yes.

19       A.    Okay.

20       Q.    The resume is two?

21       A.    Yes, I've looked at both pages of

22  the resume.  I just wanted to make sure there

23  weren't two pages on this.

24       Q.    Jackie Neva is a recruiter that you

25  worked with in your job search?
```

1              R. LOMBARDO

2      A.    Yeah, I worked with her for a short

3  time.

4      Q.    Well, Exhibit I -- I'm sorry,

5  Exhibit J is an email from you to her dated

6  November 17th, correct?

7      A.    Correct.

8      Q.    And your email says:  Please see the

9  attached updated resume for the enterprise

10  account executive opportunity at SharpCloud,

11  correct?

12      A.    Correct.

13      Q.    And Exhibit I is a resume that we

14  received from a subpoena issued to Ms. Neva.

15  Is that the resume that you sent to her?

16      A.    Yeah, looks about right.  I would

17  believe so.

18      Q.    Is the resume accurate?

19      A.    Some stuff is a little fluffed up.

20  I attend about five to seven conferences a

21  year.  I wasn't necessarily the official

22  trainer for new hires for Salesforce, but I

23  would show them around.  Yeah, I believe many

24  of the other things are mostly accurate on

25  here.  Yeah, I'd say they're accurate, mostly

1                      R. LOMBARDO

2    accurate to the best of my knowledge.

3         Q.    You want to be honest with your

4    prospective employers, right?

5         A.    Yes.

6         Q.    So you didn't put any false

7    information in this resume, did you?

8         A.    Yeah, I'm sure some things were

9    fluffed up on the resume.

10        Q.    By "fluffed up," you mean untrue?

11        A.    I mean, I didn't write this.  I paid

12   somebody else to write this, so these were not

13   my words.

14        Q.    You sent it to Ms. Neva, correct?

15        A.    Correct.

16        Q.    Intending for her to share it with

17   prospective employers, correct?

18        A.    Correct.

19        Q.    In an effort to get a job?

20        A.    Correct.

21        Q.    When you sent it to her, did it

22   contain any false information to your

23   knowledge?

24        A.    Yes.

25        Q.    What is false in your resume?

1                    R. LOMBARDO

2        A.    I guess the -- I didn't do eight to

3    ten industry trade shows.  I don't know if this

4    54 percent number was correct.  It could have

5    been within a percentage, couple percentage

6    points of that.  I don't know if we were

7    exactly at 5 million.  I wasn't necessarily the

8    designated trainer for Salesforce.  I think I

9    averaged seven sales a month, but I obviously

10   wasn't able to pull anything to state that.

11       Q.    Anything else you can identify in

12   Exhibit I that is false?

13       A.    Not that I can see.

14       Q.    Let's look at page 2.  And the

15   bottom of this page has a section called Career

16   Progression.

17       A.    Okay.

18       Q.    Do you see that?

19       A.    Yes.

20       Q.    And that describes your work history

21   at Chmura Economics; is that right?

22       A.    Yes.

23       Q.    The dates of this say February of

24   2015 to the present.  Do you see that?

25       A.    Yes.

```
1                         R. LOMBARDO
2         Q.    Is that accurate?
3         A.    No.
4         Q.    This suggests that you were still
5    employed at the time you sent out this resume,
6    correct?
7         A.    Correct.
8         Q.    And that wasn't a true statement?
9         A.    Correct.
10        Q.    Did you tell Ms. Neva that you had
11   been terminated?
12        A.    I don't recall.
13        Q.    What do you recall telling her about
14   your departure from Chmura?
15        A.    That there was a restructuring going
16   on, I was going to lose a lot of my business,
17   and I'm looking elsewhere.
18        Q.    Did you tell her that the owner of
19   Chmura had offered or had reached an agreement
20   to buy you out for $10,000?
21        A.    No.
22        Q.    Did you suggest to her that Chmura
23   was going to buy your book of business?
24        A.    I don't recall.
25        Q.    Did you make any statements to her
```

Page 86

1                          R. LOMBARDO

2    along those lines?

3         A.    I really don't recall much of the

4    conversations with Ms. Neva.

5         Q.    All right.  Let's take a look at

6    your description of your career progression.

7    Do you see the first bullet point under senior

8    account manager, it starts out:  Hired as

9    account manager?

10        A.    Yes.

11        Q.    And midway through that paragraph,

12   there's a sentence that says:  Manages clients

13   after making the sale.

14        A.    Yes.

15        Q.    What did that entail during your

16   employment at Chmura?

17        A.    Try to have them renew business with

18   us.

19        Q.    Did it involve answering clients'

20   questions after the sale had been made?

21        A.    Yes, sometimes.

22        Q.    Did it sometimes involve providing

23   training to clients?

24        A.    I did not do the training.  I would

25   assist them with a question here and there, but

```
 1                    R. LOMBARDO
 2   I did not do training.
 3        Q.    Did it involve instances in which
 4   you would show clients how to use various
 5   features of the software?
 6        A.    Yes.
 7        Q.    Did it involve troubleshooting when
 8   a client was having some sort of problem?
 9        A.    Yes.
10        Q.    Did it involve fielding client
11   complaints?
12        A.    Yes.
13        Q.    Did it involve addressing quality
14   control issues that clients may have been
15   having?
16        A.    Yes.
17        Q.    What else did the process of
18   managing the clients involve?
19        A.    Just keeping them happy and making
20   sure that they renewed with us the following
21   year.
22        Q.    And why did you use the word
23   "manage"?
24        A.    Again, I did not use the word.  I
25   paid a resume writer to do this professionally
```

1                         R. LOMBARDO

2    for me.

3         Q.    Well, you just identified a few

4    aspects of the resume that contained false

5    information and you indicated that everything

6    else looked accurate.  So I'm asking you about

7    the choice of the word "manage."  Why does it

8    say that?

9         A.    I don't know.  That's when I

10   described what I was doing.  That's what the

11   professional resume writing put in there.

12        Q.    And is that an accurate description?

13        A.    Yeah, I would say I maintained the

14   client relationships.

15        Q.    But it doesn't say "maintained."  It

16   says "managed."  Is that an accurate

17   description?

18        A.    I guess I don't know.

19        Q.    If you look at the next bullet point

20   says:  Provides all Salesforce training and

21   product software training for new hires.  This

22   is one of the areas you identified as

23   containing false information in your resume,

24   correct?

25        A.    Yeah.  I wouldn't say I did all the

1                    R. LOMBARDO

2    Salesforce training.

3         Q.    What did you do?

4         A.    I would help them out if they had

5    questions.  We were in a very small room in the

6    back.  So if new people had questions, I would

7    answer those for them.

8         Q.    And was that only face-to-face

9    training, or did you sometimes do remote

10   training for the other salespeople?

11        A.    It would be face-to-face.  I only

12   did the ones for the Cleveland office if they

13   were sitting by me.

14        Q.    And this indicates Salesforce

15   training and product software training.  What

16   was the purpose of the Salesforce training that

17   you provided?

18        A.    Just show them how we utilize

19   Salesforce.

20        Q.    And, again, what's the ultimate

21   purpose of that?

22        A.    I guess to keep it consistent so

23   that people aren't using it different ways.

24        Q.    And what about the training with

25   respect to product software?  That's obviously

1                    R. LOMBARDO

2    referring to JobsEQ?

3         A.    Yes.

4         Q.    Who did you train on JobsEQ?

5              MS. COOPER:  Objection to the form.

6         Go ahead.

7         A.    The new account managers would sit

8    in on our demos.  They would either call in or

9    sit next to our desk and just listen to the way

10   that we do demos.

11        Q.    And did you answer questions from

12   the new account managers about how to use

13   JobsEQ?

14        A.    Yeah.  If they had questions I would

15   answer them.

16        Q.    Did you sometimes show them features

17   one-on-one?

18        A.    Yeah.  If they had questions, I had

19   no problem helping the colleague out.

20        Q.    And how often did you do that?

21        A.    Not often, if they asked.  I

22   definitely didn't do it to everyone.  I did it

23   to the ones that asked and wanted.

24        Q.    Can you estimate for me?  Once a

25   day?  Once a week?  Three times a day?

Page 91

1                      R. LOMBARDO

2       A.    Once a -- less than once a month on

3   average.  Once they were on board, I didn't

4   help them out with stuff like that.  So it was

5   only for new hires.

6       Q.    With respect to new hires that had

7   just come on board, how often did you help them

8   with respect to the JobsEQ training?

9       A.    Well, the manager at the time would

10  assign them to sit in on our demos.  It might

11  be twice a week maybe until they get up and

12  running.  The managers would just assign the

13  new account reps to sit in on whatever demos

14  the current account managers had for that week.

15      Q.    Okay.  Looking back at your resume,

16  the next sentence in the second bullet point

17  says:  Develops and instructs Salesforce and

18  selling best practices for the company.

19            What did that entail?

20      A.    I guess this is stating how we used

21  Salesforce internally or how we have been using

22  Salesforce internally.

23      Q.    Can you give me an example of a

24  Salesforce best practice that you developed?

25      A.    No, not off the top of my head.

1                      R. LOMBARDO

2       Q.    Can you give me an example of a

3   selling best practice that you developed?

4       A.    Other than calling people a lot, not

5   much.  My best practices is just making a lot

6   of phone calls.

7       Q.    Was that statement true,

8   Mr. Lombardo, that you developed and instructed

9   Salesforce and selling best practices for the

10  company?

11      A.    I guess not.

12      Q.    Third bullet point:  Manages and

13  operates eight to ten industry trade shows and

14  conferences per year.  I think you testified

15  that the eight to ten number is inaccurate; is

16  that right?

17      A.    Correct.

18      Q.    What's the accurate number?

19      A.    Probably four to six.

20      Q.    Why did you double it in your

21  resume?

22      A.    I'm not sure.

23      Q.    What does the management and

24  operation of industry trade shows involve?

25      A.    Setting up the booth and just being

1                    R. LOMBARDO

2    at the booth throughout the conference.  We

3    only send -- we generally only send one

4    person to a lot of the smaller conferences.

5    Arrange to send out the booth materials and

6    then set up and tear down the booth.

7        Q.    So setting up the booth, tearing

8    down the booth, and arranging for materials to

9    be shipped; is that right?

10       A.    Yes.

11       Q.    Anything else?

12       A.    Other than talking to prospects and

13   things of that nature there, I was doing what

14   you were supposed to do at the conference.

15       Q.    So it's your testimony that managing

16   and operating industry trade shows involves

17   setting up and tearing down the booth,

18   arranging for materials, and talking to

19   prospects; is that correct?

20       A.    Yes.

21       Q.    Is there anything else that you

22   contend constitutes the management and

23   operation of industry trade shows as it's

24   described in your resume?

25       A.    Not that I can think of.

```
 1                    R. LOMBARDO

 2       Q.    Any particular reason you chose the

 3   word "management" there?

 4       A.    Again, I did not come up with any of

 5   the wording here.  I paid a professional resume

 6   writer to do this.

 7       Q.    I assume you read it before you sent

 8   it out, right?

 9       A.    Yes.

10       Q.    Is there any reason you didn't

11   change the word "management"?

12       A.    No.  I went with what they -- the

13   professional resume writer thought was best.

14       Q.    How long did these conferences

15   usually last?

16       A.    Could be as short as 1 day, as long

17   as 3 days, maybe 4 for one.  But usually 1 to

18   3 days maybe.

19       Q.    Are they spread out through the

20   entire year, or is it seasonal?

21       A.    Spread out over the entire year.

22       Q.    When you gave me the number of four

23   to six, is that the number that you attended?

24       A.    Yes, that's the number that I

25   personally attended.  The company as a whole
```

1                    R. LOMBARDO

2    attended more.

3         Q.    And I take it that some conferences

4    are better than others in terms of being able

5    to get prospects?

6         A.    Yeah.

7         Q.    Did you -- well, in what way?

8         A.    Well, it would really depend.  I

9    always thought NAWB was the best conference,

10   the National Association of Workforce Boards,

11   it kind of brought in a lot of different

12   people, whereas the IEDC conference kind of had

13   the same people at it every year.  I personally

14   liked the smaller conferences, the state

15   conferences.  They were a smaller group, and it

16   was able to interact with people.

17        Q.    And did you ever discuss your

18   opinion with anybody at Chmura about these

19   conferences?

20        A.    Yes, they would ask for feedback on

21   the conferences.

22        Q.    And did you provide that feedback?

23        A.    Yes.

24        Q.    And did Chmura make any changes

25   about what conferences it attended based on

1                        R. LOMBARDO

2    your feedback?

3        A.    Not that I can recall.  I'm sure

4    sometimes they did.

5        Q.    The next line in your resume says:

6    Developed new marketing and sales processes to

7    improve conference performance.

8              What did that entail?

9        A.    I'm sorry?

10       Q.    Sure.  Can you see what I've

11   highlighted?  If you can't see it --

12             MS. COOPER:  He's just clicking

13        through to get to it.  Just bear with him.

14       Q.    Tell me when you're there.

15       A.    Yep.

16       Q.    So the language I read was:

17   Developed new marketing and sales processes to

18   improve conference performance.

19             What did that entail?

20       A.    I'm not sure.

21       Q.    Well, if you don't know what it

22   means, can you tell me whether it's accurate?

23       A.    I guess not.

24             (Plaintiff's Exhibit K marked for

25        identification.)

1                    R. LOMBARDO

2        Q.    All right.  I am sending you what

3   has been marked as Exhibit K.  I show it as

4   being 2 pages long.  So take a look at it and

5   let me know when you're ready to talk about it.

6        A.    Okay.

7        Q.    This is an email between you and a

8   client named Christian Duran; is that right?

9        A.    Yep.

10       Q.    And it's dated at least at the top

11  of the last email, June 4th, 2018?

12       A.    Yep.

13       Q.    The bottom of page 1 has an email

14  that starts out:  Rick, thank you again so very

15  much for these specialty requests.

16             Do you see that?

17       A.    Yes.

18       Q.    What specialty requests is he

19  referring to?

20       A.    I'm not sure.

21       Q.    Do you know what specialty requests

22  are generally in the course of Chmura's

23  business?

24       A.    No.

25       Q.    Not a term of art of any kind?

1                    R. LOMBARDO

2        A.     I don't know what it would have

3    been.

4        Q.     Do you know what, in any context, he

5    is thanking you for here in the bottom email of

6    Exhibit K?

7        A.     Looks like data that I provided.

8        Q.     So tell me a little bit more about

9    that.  A JobsEQ client purchases a

10   subscription?

11       A.     Yes.

12       Q.     And in what situation would a client

13   then reach out to you to ask for data?

14       A.      If it was something outside of their

15   region.

16       Q.     And do the subscriptions, are they

17   based generally on region?

18       A.     Yes.

19       Q.     So if a client buys a subscription

20   that covers Region A and they want a piece of

21   data from Region B, that might be a situation

22   where they would reach out to you and ask you

23   to provide it?

24            MS. COOPER:  Objection as to form.

25       But go ahead.

1                    R. LOMBARDO

2        A.    Yes.

3        Q.    And can you tell by the content or

4    context of this email if that's what was going

5    on here in Exhibit K?

6        A.    Yes.

7        Q.    And if you read on in the email at

8    the bottom of page 1, it says:  Below are the

9    details of the further needed information.  And

10   then he lists several locations.  Do you see

11   that?

12       A.    Yes.

13       Q.    Do you know what he was asking for

14   in that email?

15       A.    Looks like data.

16       Q.    And how often did this occur that a

17   client would reach out to you with a data

18   request?

19       A.    Occasionally.

20       Q.    Did you ultimately provide -- is it

21   Mr. Duran or Ms. Duran?

22       A.    Mr. Duran.

23       Q.    Did you ultimately provide Mr. Duran

24   with what he was asking for here?

25       A.    It appears so.

```
 1                      R. LOMBARDO

 2      Q.    Did you charge him a fee?

 3      A.    I don't -- I'm not aware.

 4      Q.    Is it common to charge a client for

 5  a fee for a data request like this?

 6            MS. COOPER:  Objection.  Answer, if

 7      you can.

 8      A.    No.

 9      Q.    Is this one of the things that you

10  did to help build your relationship with your

11  clients?

12            MS. COOPER:  Objection.  Go ahead.

13      A.    Well, yes.  If I got management

14  approval.

15      Q.    Who did you seek approval from with

16  respect to this request?

17      A.    Most likely would have been Ethan

18  Trombley based on the date.

19      Q.    And how did you seek that approval?

20  Verbally or in writing?

21      A.    Almost everything with the managers

22  in Cleveland were verbal.  I would just walk in

23  to his office or have him come back to my desk.

24      Q.    And did you memorialize the

25  authority that Mr. Trombley gave you to provide
```

```
 1                    R. LOMBARDO

 2    the data recorded in Salesforce, anything like

 3    that?

 4         A.    I'm not sure.  I would just ask him

 5    for approval.

 6         Q.    And is that the same process that

 7    you followed with all of your other supervisors

 8    that you described earlier in the day?

 9         A.    Yes.  The vast majority of it, have

10    a conversation with them if the client wanted

11    something.

12         Q.    And is that the process that you

13    followed each time you got a request from a

14    client for data?

15         A.    To my knowledge, yes.

16         Q.    Is there a policy anywhere that you

17    can identify that requires you to get prior

18    approval before giving data to a client for a

19    request like this?

20         A.    No.

21         Q.    Did anybody specifically tell you at

22    any point during your employment that you were

23    required to get approval from your manager in

24    order to satisfy a client request for data?

25         A.    Yes, it would have been Leslie
```

```
 1                    R. LOMBARDO
 2   because there's a charge to it, because there
 3   is a cost.  I would have to get approval to not
 4   charge them that cost.
 5        Q.    And how is that recorded in any of
 6   Chmura's systems, if you know?
 7        A.    I do not know.
 8        Q.    When did Ms. Peterson tell you that
 9   you had to get prior approval for any data
10   requests?
11        A.    I believe it was in a sales team
12   meeting.  I'm not sure when.
13        Q.    Do you remember what year?
14        A.    No.
15        Q.    Where was the meeting?
16        A.    I would have been in Cleveland.
17        Q.    Who else was there?
18        A.    Austin Steele, I'm sure, was there.
19   I'm not sure what time frame it was.  All the
20   account managers at the time.
21        Q.    And to the best of your
22   recollection, Mr. Lombardo, what did
23   Ms. Peterson say about this subject?
24        A.    To get prior approval from your
25   management.
```

1                      R. LOMBARDO

2        Q.    Did you ask her any questions about

3    it?

4        A.    Not that I can recall.

5        Q.    Do you recall any instance in which

6    that instruction, that you needed to get prior

7    approval from management before answering a

8    data request, was ever put in writing?

9        A.    Not that I could recall.

10              (Plaintiff's Exhibit L marked for

11              identification.)

12       Q.    I'm going to show you what I am

13    marking as Exhibit L.  All right.  Tell me if

14    you can see Exhibit L.  And that one has got

15    4 pages, Mr. Lombardo, so make sure you peruse

16    the whole thing.

17       A.    Okay.

18       Q.    Exhibit L is another series of email

19    exchanges between you and Mr. Duran?

20       A.    Yep.

21       Q.    And this looks like another data

22    request; is that correct?

23       A.    Yes.

24       Q.    Do you specifically remember

25    obtaining approval from someone at Chmura

1                        R. LOMBARDO

2    before satisfying this data request?

3         A.    I don't remember specifics on it.

4         Q.    Is there anything that would refresh

5    your recollection about whether or not you

6    specifically requested approval for this?

7         A.    Not that I could think of.

8              (Plaintiff's Exhibit M marked for

9         identification.)

10        Q.    Okay.  I'm going to show you what

11   I'm marking as Exhibit M, as in Mary.  Can you

12   see Exhibit M?

13        A.    It did not load up yet.  There it

14   is.

15        Q.    Let me preface this a little bit

16   before you start to look at it.  This is a

17   series of what appear to be unrelated emails

18   between you and someone named Samantha

19   Solanics.

20        A.    Uh-huh.

21        Q.    Take as much time as you want to

22   look through these, but I'm going to ask you

23   the same general questions about all of the

24   messages.

25        A.    Okay.  I've read through.

1                    R. LOMBARDO

2       Q.      Who is Samantha?

3       A.      She was the sales support

4    coordinator.

5       Q.      And why did you send her these

6    messages?

7       A.      She's the one that had to make

8    changes to the platform.

9       Q.      And what changes in general terms

10   were you asking her to make with respect to

11   these messages?

12      A.      Adding or subtracting users, setting

13   up a license, things of that nature.

14      Q.      Did she also satisfy the data

15   requests that we were just talking about?

16      A.      No, not to my knowledge.

17      Q.      So let's take as an example the

18   first page, then.  You send her a message that

19   says:  Can you please add the entire state of

20   Washington to the Pacific Mountain Workforce

21   Development Board account, right?

22      A.      Yeah.

23      Q.      Is that something that the client

24   paid for?

25      A.      I don't recall if this client --

1                    R. LOMBARDO

2        Q.    I'm sorry, Mr. Lombardo.  I lost

3   you, your audio there for a second.

4        A.    I don't recall.

5        Q.    And I'll ask the same questions --

6   well, let's just qualify this.  The other

7   emails are requests that are similar in nature

8   with respect to specific licenses, right?

9             MS. COOPER:  Objection as to form.

10        But go ahead and answer.

11        A.    Yes.

12        Q.    And do you know if any of these

13   changes that are requested in your emails were

14   paid or unpaid?

15        A.    I do not know.

16        Q.    Do you specifically recall getting

17   any prior approval for requesting these changes

18   for Ms. Solanics?

19        A.    No, I don't remember specifics on

20   these.

21        Q.    And I'll ask you the same question

22   that we asked about the data requests.  Was

23   there a written policy that required you to get

24   prior manager approval before requesting

25   changes like those that are reflected in

1                        R. LOMBARDO

2     Exhibit M?

3         A.    No, I'm not familiar with a written

4     policy.

5         Q.    And did anybody tell you verbally

6     that you couldn't make these requests without

7     prior management approval?

8         A.    Again, just the conversation in the

9     sales meeting.

10        Q.    So this is the same conversation

11    that you referenced earlier with respect to

12    data requests?

13        A.    Yes.

14        Q.    And was that only conveyed to you

15    one time during your employment?

16        A.    No.

17        Q.    When else were you told that you had

18    to get prior management approval?

19        A.    I mean, from our managers as well,

20    you know.  The managers had come to them for

21    issues like this.

22        Q.    When you say "come to them," did

23    they specifically say that you needed to get

24    prior approval?  Or were they offering to help

25    you out with this issues?

```
 1                      R. LOMBARDO
 2        A.    Prior to sending stuff like this
 3   out, management would want to know first.
 4        Q.    Now, who said that and when?
 5        A.    I remember Kyle saying that.  I
 6   don't remember the date.  And Eli would say
 7   that as well because that way if there was any
 8   blow-back it would be on him so they would kind
 9   of shield the sales team from leadership being
10   potentially upset.
11        Q.    Did any of your managers ever refuse
12   a request that you made to either provide data
13   or to add to a license for a client?
14             MS. COOPER:  Objection to the form.
15        But go ahead and answer.
16        Q.    Did you understand my question?
17        A.    I don't recall any specific.
18        Q.    Let me just clean that up.
19             You said that one time, Ms. Peterson
20   indicated that you had to get prior management
21   approval in order to provide additional data or
22   additional licensing for the software, correct?
23        A.    Yes.
24        Q.    And your individual managers told
25   you that you could come to them with issues
```

```
1                    R. LOMBARDO
2    like this so that the leadership would not
3    become upset; is that right?
4         A.    Yeah.
5         Q.    And it's your testimony that you did
6    take these issues to your managers just as they
7    had requested?
8         A.    Yeah.
9         Q.    During your entire employment at
10   Chmura, did any of your managers reject any of
11   those requests?
12        A.    I can't recall.
13        Q.    You can't, sitting here today, cite
14   any examples of any of your requests or
15   recommendations in that regard being rejected,
16   correct?
17        A.    Correct.
18              (Plaintiff's Exhibit N marked for
19        identification.)
20        Q.    All right.  Mr. Lombardo, I'm
21   showing you hopefully what's been marked as
22   Exhibit N, a 2-page document.  Take your time
23   and tell me when you've had a chance to look at
24   it.
25        A.    I've read it.
```

1                      R. LOMBARDO

2        Q.    This is an email exchange between

3    you and someone named Michelle Bauer in

4    January 2018; is that right?

5        A.    Yes.

6        Q.    Was she a client or prospect at that

7    time?

8        A.    I believe they were already a

9    client, I believe.

10        Q.    But you were discussing an

11    additional purchase with her?

12        A.    Yes.

13        Q.    And your email, sort of the second

14    one from the top there says:  Hi Michelle and

15    Robin, the additional cost for an API feed is

16    $4,350.  And then skipping onto the next

17    sentence you say:  This is a 50 percent

18    nonprofit discount on the setup fee and an

19    additional discount due to the pre-existing

20    relationship you already have.  Obviously I'm

21    not reading the whole thing.  But you wrote

22    that, correct?

23        A.    Correct.

24        Q.    Do you recall what the additional

25    discount was?

1                     R. LOMBARDO

2        A.    I do not.

3        Q.    How did you arrive at these discount

4    amounts that you put in this email?

5        A.    I would have worked with Ethan and

6    Greg at that point to come up with the pricing.

7        Q.    Did you recommend a number different

8    than the 50 percent?

9        A.    I don't recall.

10       Q.    Do you recall who among the three of

11   you, Ethan, Greg, and yourself, arrived at the

12   number 50 percent?

13       A.    I do not.

14       Q.    You don't know who made the

15   suggestion?

16       A.    I don't recall.

17       Q.    Could have been you?

18             MS. COOPER:  Objection.  You can

19       answer.

20       Q.    Right?

21       A.    I don't believe so.

22       Q.    Why not?

23       A.    I didn't have the authority to make

24   decisions like that.

25       Q.    Did you make recommendations about

```
1                        R. LOMBARDO
2    discounts?
3         A.    I would talk to them about the
4    situation.
5         Q.    And you told them what you thought
6    would be necessary in order to win the
7    business, right?
8               MS. COOPER:  Objection to form.  It
9         calls for speculation too.
10        Q.    You can answer.
11              MS. COOPER:  You can answer.
12        A.    Yes.
13        Q.    That was part of your job as an
14   account manager, right?
15              MS. COOPER:  Objection.
16        A.    Yes, I was the one speaking with the
17   client, so I would let them know what happened
18   in the conversation.
19        Q.    And didn't you also tell them what
20   you thought would be necessary in order to get
21   the sale?
22        A.    I would pass on the information that
23   the client would provide me.
24        Q.    And did you make recommendations
25   about what discount would be necessary in your
```

```
1                        R. LOMBARDO
2    mind in order to win business?
3         A.    I would pass along the information I
4    have.
5         Q.    Well, that's not exactly my
6    question.  My question is:  Did you make
7    recommendations about what level of discount
8    you thought would be necessary to win the
9    business?
10        A.    Yes.
11        Q.    And how did you come up with those
12   recommendations?
13        A.    Based on conversations with the
14   client.
15        Q.    And based on your prior experience?
16              MS. COOPER:  Objection.  Go ahead
17        and answer.
18        A.    Well, based on whatever the client's
19   and my conversation was.
20        Q.    Did you ever recommend a discount
21   that was rejected by your management?
22        A.    Yes.
23        Q.    Can you provide me with specifics on
24   when that happened?
25        A.    The one that comes to mind is AECOM,
```

```
 1                    R. LOMBARDO

 2    A E C O M.  They flat out told me EMSI quoted

 3    them 18,000.  We were well above 25,000.  I

 4    remember speaking with Greg and Ethan at the

 5    time stating they will go with us if we matched

 6    the 18,000.  Leslie -- they then approached

 7    Leslie with it because they did not have the

 8    authority to do that, and Leslie came down to

 9    22,000, and they ended up going with EMSI.

10        Q.    Any other examples you can provide

11    in which your discount recommendation was

12    rejected by management?

13        A.    Not that I could think of off the

14    top of my head.

15        Q.    With respect to Exhibit N, and I

16    apologize if I asked this earlier, do you

17    specifically recall seeking approval from

18    someone in order to offer the 50 percent

19    discount that's identified here?

20        A.    I'm sure I would have spoke with

21    Greg and Ethan about that.

22        Q.    Are you answering based on what you

23    think happened or what you specifically recall

24    happening?

25        A.    What I recall happening.
```

1                        R. LOMBARDO

2        Q.    So do you specifically recall

3    discussing this account with Ethan and Greg in

4    January 2018?

5        A.    Well, all API discussions were -- we

6    had with Greg because this was new at the time.

7        Q.    I understand.  I'm asking you about

8    your specific memory of a conversation in which

9    this 50 percent discount was discussed.  Do you

10   remember such a conversation?

11       A.    I don't remember specifics about the

12   conversation, no.

13             (Plaintiff's Exhibit O marked for

14             identification.)

15       Q.    Showing you what's been marked as

16   Exhibit O, tell me when you've had a chance to

17   take a look at that.

18       A.    Yes, I'm familiar with that.

19       Q.    This is an email exchange between

20   you and someone named Richard Williams?

21       A.    Yep.

22       Q.    March of 2017?

23       A.    Yes.

24       Q.    And you are discussing with

25   Mr. Williams the purchase of a license for

```
1                    R. LOMBARDO

2   JobsEQ, correct?

3        A.    Correct.

4        Q.    And then down in the third

5   paragraph, again, you're offering him a

6   50 percent discount off the second license if

7   somebody else also purchases; is that right?

8        A.    Well, that was actually our standard

9   pricing as an umbrella package.

10       Q.    Okay.  So did you -- you didn't have

11  to obtain prior approval on this one because it

12  was part of the standard pricing?

13       A.    If they both moved forward, yes,

14  that's how it worked.

15       Q.    Did you talk with anybody in

16  management about this specific offer that you

17  made?

18       A.    I would have spoke with Kyle West

19  about it.

20       Q.    And, again, I'm not asking so much

21  what you would have done.  I'm asking what you

22  specifically recall doing.  And I know that's a

23  subtle difference, but it's important.

24       A.    I don't recall specifics.

25       Q.    You don't recall a specific
```

```
 1                    R. LOMBARDO

 2   conversation with anybody at Chmura prior to

 3   making this offer about the 50 percent discount

 4   to this client, right?

 5            MS. COOPER:  Objection.  You can

 6        answer.

 7        A.    No.

 8            (Plaintiff's Exhibit P marked for

 9        identification.)

10        Q.    Showing you what's been marked as

11   Exhibit P, Mr. Lombardo, this one is a little

12   bit longer.  I think it's 5 pages.  So take

13   your time, and tell me when you've had a chance

14   to look at it.  If it helps, I'm going to ask

15   you about the third page, but you look at

16   whatever you need to.

17        A.    Okay.  Yes.  I see that.

18        Q.    This is another email exchange with

19   a client in which you're quoting her certain

20   pricing; is that correct?

21        A.    Correct.

22        Q.    And there is a reference to

23   20 percent discount on the third page of

24   Exhibit P.  Do you see that?

25        A.    I do.
```

```
 1                    R. LOMBARDO

 2        Q.    What was the basis for that

 3   discount?

 4        A.    I worked with Greg Chmura to come up

 5   with pricing for this client specifically.

 6        Q.    Okay.  Did you recommend the

 7   20 percent discount to Greg?

 8        A.    No.

 9        Q.    How did the number 20 percent come

10   up?  How did you get there?

11        A.    That would have came from Greg.

12        Q.    Do you specifically remember talking

13   with Greg about this 20 percent discount offer?

14        A.    Greg's the one that put together the

15   pricing.  I don't remember specifics.

16        Q.    All right.  Let's break that down.

17              Greg's role at Chmura was to put

18   together pricing; is that what you're saying?

19        A.    At this time, yes.  I think this was

20   between when Curtis Monk left and when Eli

21   arrived, so I had to work with Greg to get

22   approval.

23        Q.    Okay.  And then back to my original

24   question:  Do you specifically remember

25   conversations with Greg about this offer, the
```

```
 1                   R. LOMBARDO
 2   20 percent discount?
 3        A.   Yes.
 4        Q.   Tell me where those conversations
 5   occurred and what you specifically remember
 6   about them?
 7             MS. COOPER:  Objection as to form.
 8        But go ahead.
 9        A.   They occurred in his office.  I let
10   him know that two of these are already current
11   clients of ours, and they wanted to have
12   upwards of eight licenses and what he would
13   recommend for pricing.
14        Q.   So you went to him and asked him
15   what he would recommend for pricing, and his
16   response was 20 percent?
17        A.   I don't think he had an answer for
18   me at that point.  I think I provided him
19   information and then he thought about it and
20   maybe the next day or so, we came up with a
21   pricing model.
22        Q.   Did you make any recommendations to
23   him about what kind of discount you thought
24   should be provided?
25        A.   No.
```

1                        R. LOMBARDO

2        Q.    Did you express any concerns about

3   the 20 percent number to Greg?

4        A.    Not that I recall.

5        Q.    Did you indicate to him whether you

6   thought that would be an acceptable number to

7   the client?

8        A.    I don't recall.

9        Q.    Is there anything else about the

10  conversation that you recall?

11       A.    No, just that I informed him two of

12  these groups were clients, so to take that into

13  consideration when filling out the rest of the

14  pricing.

15            (Plaintiff's Exhibit Q marked for

16            identification.)

17       Q.    I am showing what I am marking as

18  Exhibit Q, and tell me when you've had a chance

19  to look at that.

20       A.    Okay.  I've had a chance to look at

21  it.

22       Q.    And, again, I'm just focused on the

23  first page, and I suspect you know what

24  questions I'm going to ask.  But this is a

25  situation where you're offering someone a

1                          R. LOMBARDO

2     discount on JobsEQ, correct?

3          A.    Correct.

4          Q.    And the same discussion we've been

5     having with respect to the others:  How did you

6     get to the point of offering these numbers?

7          A.    Yeah, met with management about this

8     again.  The reason it was this number is

9     because they worked closely with a client

10    that's a neighbor of them, and they knew what

11    they were paying.

12         Q.    All right.  So, again, you said

13    "would have talked to management."  Do you

14    specifically recall talking to anyone in

15    management about this offer?

16         A.    I don't recall a specific

17    conversation.

18         Q.    Do you know who came originally with

19    the idea of a $5,500 license fee for this

20    client?

21         A.    It would have been to match what

22    they're currently -- what Mobile County was

23    currently paying.

24         Q.    So that was something that they told

25    you and you brought back to Chmura?

1                    R. LOMBARDO

2        A.    Yes.   I remember -- I think his name

3    was Tanner worked closely with them, so they

4    knew what they were currently paying and they

5    wanted to get that rate.  So I would have then

6    asked management at that time with the approval

7    to move forward with the old rate.

8        Q.    And, again, sort of same question

9    we've been discussing, Mr. Lombardo, do you

10   specifically recall who in management you

11   asked?

12       A.    No, I do not remember a specific

13   conversation on this one.

14       Q.    Okay.  Do you have, in your mind,

15   any authority to offer a discount without

16   management approval?

17       A.    I was told I was, but I didn't feel

18   like I actually had the discretion.

19       Q.    Who told you?

20       A.    I am not even sure -- I don't

21   recall.

22       Q.    What were you told?

23       A.    We were told 10 percent.

24       Q.    And was that number ever changed?

25       A.    Yes.

1                    R. LOMBARDO

2        Q.    What was it changed to?

3        A.    I don't recall.  I think it may have

4   changed a couple of times.  I'm not sure.  I

5   think I was told 30 at one point.

6        Q.    Okay.  Do you know if that

7   30 percent also applied to another rep named

8   Austin Steele?

9        A.    I don't know.  I assume so, but I

10  don't know.

11       Q.    But I guess do you know if you were

12  both told that at the same time?  Were you in

13  the room together or something like that?

14       A.    I don't -- I don't recall.

15       Q.    Do you remember who it was that told

16  you that you had authority to offer up to a

17  30 percent discount?

18       A.    No, I don't recall.

19       Q.    Do you remember when you were told

20  that you had the authority to offer up to a

21  30 percent discount?

22       A.    I don't recall.

23       Q.    Do you remember if that was told to

24  you in person or over the phone?

25       A.    I really don't recall.

```
 1                    R. LOMBARDO
 2        Q.    Anything else you do recall about
 3   being told you could offer up to a 30 percent
 4   discount?
 5        A.    No.
 6        Q.    And you said that the number started
 7   out at some point at 10 percent.  Do you
 8   remember when that was?
 9        A.    I don't.  And that may have been if
10   they signed a 3-year contract.  I don't recall.
11        Q.    And if I asked, I apologize.  But do
12   you remember when your authority was changed to
13   30 percent?
14             MS. COOPER:  Objection as to form.
15        A.    I do not recall.
16             (Plaintiff's Exhibit R marked for
17        identification.)
18        Q.    Showing you what's being marked as
19   Exhibit R.  And I will tell you if it helps in
20   reviewing this document, this document was
21   originally produced as a spreadsheet but it's
22   been converted from Excel to this format to
23   make it easier to show.  So it may look a
24   little different, but go ahead and take a look
25   at it.
```

```
 1                    R. LOMBARDO

 2        A.    Okay.

 3        Q.    Do you recognize it, Exhibit R?

 4        A.    Yes.

 5        Q.    What is that?

 6        A.    One of our pricing matrices.

 7        Q.    And what is a pricing matrix as

 8  opposed to a price list, as I would probably

 9  call it?

10        A.    I'm not real sure.

11        Q.    Is it basically the price list for

12  JobsEQ?

13        A.    Yes.

14        Q.    Okay.  And you mentioned something I

15  think in response to my last couple of

16  questions about a discount for multiyear

17  contracts?

18        A.    Yes.

19        Q.    If you take a look at Exhibit R,

20  under the heading Discounting Tools, the first

21  one there references multiyear discounts.  Is

22  that what you were talking about earlier?

23        A.    Yes.

24        Q.    All right.  And then what I wanted

25  to ask you about is No. 2, which says:  Can
```

1                     R. LOMBARDO

2   take up to 10 percent off the list price but

3   never drops lower than 5,000.

4             Do you see that?

5        A.    Yes.

6        Q.    What did you understand that to

7   mean?

8        A.    That I had a 10 percent authority in

9   the pricing.

10       Q.    And that applied to all account

11  managers?

12       A.    To my knowledge, yes.

13       Q.    And did you use -- I'm sorry.  Go

14  ahead.

15       A.    I see on the pricing matrix, it

16  would be for all account managers.

17       Q.    Understood.  And you considered --

18  when it was 10 percent, you considered this to

19  be 10 percent that you could offer in order to

20  win business, right?

21            MS. COOPER:  Objection as to form.

22       Go ahead.

23       A.    Yes.

24            (Plaintiff's Exhibit S marked for

25       identification.)

```
 1                     R. LOMBARDO

 2      Q.    All right.  I'm showing you Exhibit

 3   S, as in Sam.  I lost you, Mr. Lombardo.

 4            MS. COOPER:  Yeah.  Can we go off

 5        the record for a minute so I can get this

 6        back up.

 7            MR. SATTERWHITE:  Sure.

 8            THE WITNESS:  Apologies.

 9            MR. SATTERWHITE:  No problem.  I'll

10        do it before the end of the day, I'm sure.

11                 (A short break was taken.)

12            MR. SATTERWHITE:  So we're going

13        back on, Rachel.

14      Q.    Back on the record, Mr. Lombardo.

15   I'm showing you what has been marked Exhibit S,

16   as in Sam.  Take a look at that.

17      A.    Okay.

18      Q.    Again, you can read the whole thing.

19   It's 13 pages.  I'm only going to ask you about

20   page 1.

21      A.    I see that.

22      Q.    This is an email from you to Hannah

23   Whisenant on July 10, 2018, correct?

24      A.    Correct.

25      Q.    It's about an invoice to a client?
```

1                    R. LOMBARDO

2        A.    Correct.

3        Q.    And you tell Hannah -- who is

4   Hannah, by the way?

5        A.    She was the finance

6   manager/accounting person at the time.

7        Q.    So you're asking her to get an

8   invoice out to one of your clients basically,

9   right?

10       A.    Yes.

11       Q.    And you say in the last paragraph of

12  this email:  I used my allotted 10 percent

13  discount to cover the 1 percent fee when they

14  pushed back on it.

15             Do you see that?

16       A.    Yes.

17       Q.    And the allotted 10 percent discount

18  that you're referring to in this email, is that

19  the 10 percent discount that we just discussed

20  in the pricing matrix?

21       A.    Yes.  Yes.

22       Q.    Did you get any advanced approval in

23  order to apply your allotted 10 percent

24  discount here?

25       A.    Not that I can recall.

1                      R. LOMBARDO

2      Q.    When you say "when they pushed back

3  on it," do you remember what you were referring

4  to there?

5      A.    I think a quarterly fee that we

6  would charge them if they paid quarterly.

7      Q.    And when you say "pushed back," I

8  take it the client didn't want to pay the fee?

9      A.    Yeah, from what I can recall.

10     Q.    And you decided to apply your

11  discount so they wouldn't have to pay it,

12  right?

13     A.    Apparently.

14     Q.    And that was your decision?

15     A.    Yes.

16          MR. SATTERWHITE:  Christine, I'm at

17     a break.  It's 12:05.  We can either keep

18     going or I don't know where you land on

19     lunch.

20          THE WITNESS:  I'd push through.

21          MS. COOPER:  I don't know how much

22     longer you have, and I won't put you on the

23     spot.  If you want to keep going, we're

24     fine moving forward.

25          MR. SATTERWHITE:  I've got several

1                    R. LOMBARDO

2        more hours, so I suspect you're going to

3        want to take a break at some point.

4             MS. COOPER:  Then I think a lunch

5        will be good.

6             MR. SATTERWHITE:  Okay.  How much do

7        you need?

8             MS. COOPER:  30 minutes.  That

9        should give us enough time.

10            MR. SATTERWHITE:  Sounds good to me.

11       All right.  We're off the record.  You guys

12       have a good lunch.

13                    (A lunch break was taken.)

14            MR. SATTERWHITE:  All right.  Back

15       on the record.

16       Q.    Mr. Lombardo, are you familiar with

17   a product called Clippy, C L I P P Y?

18       A.    No.  But in JobsEQ?

19       Q.    No, I believe it's a product or a

20   feature of one of your competitors.

21       A.    Oh, yeah.

22       Q.    What is it?

23       A.    I think it's a tool that's used to

24   bind reports together, if I remember correctly.

25       Q.    And whose tool is it?

1                    R. LOMBARDO

2        A.    EMSI's, I believe.

3        Q.    Did you ever talk with anybody at

4   Chmura about the possibility of Chmura

5   developing a similar tool to use with JobsEQ?

6        A.    Yes.

7        Q.    Is that something that you brought

8   back to Chmura as a result of your interaction

9   with customers?

10       A.    Yes.

11       Q.    And did you tell Chmura that you

12  thought it would be a good idea to have a

13  competitive product like that?

14       A.    Yes.  I believe it was AIDT that

15  didn't go with us at the time because they said

16  they used that tool regularly.

17       Q.    And do you know whether Chmura is in

18  the process of developing a similar product?

19       A.    Not that -- it was on the roadmap.

20  I don't know where it would be.

21       Q.    When you say "on the roadmap," what

22  do you mean?

23       A.    When I was there, there was a list

24  of features to add, and there was 400 -- I

25  think 3- to 400 different features to add over

```
 1                    R. LOMBARDO
 2   time.
 3       Q.    So is it your understanding that
 4   this, I'll call it a Clippy competitor, that
 5   this feature was ultimately added to the
 6   roadmap after you brought it to the company's
 7   attention?
 8       A.    I don't know if it was on their --
 9   it may have been on there prior to me bringing
10   it up, but I remember adding to that.
11       Q.    I'm sorry.  When you say adding to
12   that, what do you mean?
13       A.    They would keep a running list of
14   every time a client or prospect would request
15   something, we would pass that along and would
16   add, like, a notch to it.  And the more
17   requests that came from clients or prospects,
18   the higher it would move up on the list.
19       Q.    Do you remember any specific
20   conversations with anybody at Chmura about this
21   tool?
22       A.    No, not that I can remember.
23       Q.    How about something called Firm
24   List/Employer Database, do you know what that
25   is?
```

1                         R. LOMBARDO

2          A.    Yep.

3          Q.    Is that also a competitor's product,

4    or is that a Chmura product?

5          A.    It was a Chmura product, and it was

6    a competitor product.

7          Q.    In very brief terms, what does it

8    do?

9          A.    It provides a firm list of employers

10   in the area.

11         Q.    And did you ever -- how long has

12   Chmura had that product, do you know?

13         A.    I believe they added it in the last

14   year I was there.

15         Q.    And is this another feature that you

16   reported back to Chmura about that you thought

17   the customers wanted?

18         A.    Yes.  People have been asking for

19   that since I started there.

20         Q.    And do you know when Chmura

21   developed it?  I think you said the last year

22   of your employment.  Can you be any more

23   specific?

24         A.    I don't remember specifics.  I don't

25   believe they developed it.  I believe they

1                   R. LOMBARDO

2    partnered with Info Group, I believe.

3         Q.    But they ultimately added the

4    feature, right?

5         A.    Yes.

6         Q.    Do you remember any conversations

7    with anybody at Chmura about adding that

8    feature?

9         A.    No specific conversations.  I had

10   several of them over in my tenure there.

11        Q.    You did?

12        A.    Yes.  I would report back if we lost

13   a deal or if, you know, if clients were

14   requesting it, I would pass that information

15   along.

16        Q.    So when you lost a deal, did you try

17   to analyze why you lost the deal?

18        A.    Yeah, if the client didn't go with

19   us, I would ask, you know, what made you either

20   not go with us, go with a competitor and get

21   the information from them and provide feedback

22   as necessary.

23        Q.    Did the clients always tell you why

24   they didn't go with you?

25        A.    Not always.

1                    R. LOMBARDO

2        Q.    And did you still try to figure it

3   out?

4        A.    Yeah.

5        Q.    How did you go about that?

6        A.    I would just ask them -- you know, I

7   don't really know.  I would send emails and

8   things of that nature, but a lot of times they

9   wouldn't respond once they said no to us or

10  once they did not renew with us.

11       Q.    And did you take any other steps at

12  that point to try to understand why you lost

13  that particular piece of business?

14       A.    I'm not sure what you mean by the

15  question.

16       Q.    You indicated there were times when

17  you lost business to a competitor, right?

18       A.    Yep.

19       Q.    And you'd follow up with the client

20  to try to find out why you didn't get the

21  business, correct?

22       A.    Yes.

23       Q.    And sometimes the client would tell

24  you why they didn't give you the business, and

25  sometimes they wouldn't, right?

1                     R. LOMBARDO

2           MS. COOPER:  Objection as to form.

3      Go ahead.

4      A.    Yes.

5      Q.    And I'm asking you about those times

6    when the client did not report to you why you

7    didn't get the business, did you take any

8    steps -- you, Mr. Lombardo -- take any steps to

9    try to further understand why you did not win

10   that particular deal?

11     A.    I would continue to reach out to the

12   client to get ahold of them to see what their

13   response was.

14     Q.    Let me ask you about something

15   called Career Concourse.  I think you may have

16   mentioned that at the beginning of the day this

17   morning.

18     A.    Yes.

19     Q.    What is that?

20     A.    A tool college students use to pick

21   careers.

22     Q.    And was that an existing Chmura

23   product when you started?

24     A.    I believe they had something of

25   that.  I'm not sure.  I don't believe I ever

1                          R. LOMBARDO

2    sold that.

3         Q.    Did you tell anybody that you would

4    have difficulty selling to the educational

5    market unless that tool were improved or

6    updated?

7              MS. COOPER:   Objection as to form.

8         But go ahead.

9         A.    Yes.  A lot of the community

10   colleges that were also using a competitor were

11   using that tool.

12        Q.    So what did you tell Chmura about

13   that product or need associated with that

14   product?

15        A.    I passed along what was, you know,

16   told to me from clients, that it was a product

17   that they used.

18        Q.    Anything else?

19        A.    That they would -- you know, that we

20   would need to get that to be competitive, I

21   think.  We were losing a lot of deals over

22   that, I believe, at the time.

23        Q.    Did you pursue business in the

24   education market before the product was

25   updated, the Career Concourse tool was updated?

1                    R. LOMBARDO

2        A.    I'm not sure when it was updated.

3        Q.    Have you always pursued business in

4   the education market when you were at Chmura?

5        A.    Not always, no.

6        Q.    When did that start?

7        A.    I started in education in 2015.  It

8   was when we were able to go after everything.

9   We then moved into verticals.  And then in

10  early 2017, they parsed out the education piece

11  to other -- other account reps.

12       Q.    So you were in the market from 2015

13  to 2017?

14       A.    Yes, sir.  Part of what I sold to.

15       Q.    Did it become a greater part of what

16  you sold over that 2-year period?

17             MS. COOPER:  Objection as to form.

18       A.    Between 2015 and 2017?

19       Q.    Yes.

20       A.    I don't think it was the majority of

21  what I sold to, no.

22       Q.    And my question is:  Did -- as a

23  percentage, did your sales in the education

24  market increase over that period?

25       A.    I'm not sure.

1                      R. LOMBARDO

2        Q.    Did anybody disagree with you about

3    the need to update the Career Concourse tool?

4    Anybody at Chmura?

5              MS. COOPER:   Objection.  Go ahead.

6        A.    Not that I can recall.

7        Q.    Do you remember having any

8    discussions with John Chmura about whether that

9    update was necessary?

10       A.    I don't remember any specifics.  I

11   remember he said it had been moved up on his

12   agenda, but I don't remember specifics about

13   it.

14       Q.    Do you remember there being any

15   disagreement about what kind of priority that

16   project should receive?

17       A.    I don't remember.

18       Q.    And ultimately the product was

19   updated within Chmura, correct?

20       A.    Correct.  I'm not sure when.

21       Q.    Do you know what GDP is?

22       A.    Yes.

23       Q.    All right.  What is it?

24       A.    Gross domestic product.

25       Q.    In the context of the JobsEQ

1                    R. LOMBARDO

2    product, does it mean the same thing?

3         A.    Yes.

4         Q.    And have you had discussions about

5    whether or not it was necessary for you to have

6    that, for Chmura to have the GDP data in order

7    to sell JobsEQ?

8         A.    Yeah, along with many others, I

9    would pass along requests from clients as they

10   came in.

11        Q.    Do you remember characterizing the

12   GDP dataset as being critical to selling

13   JobsEQ?

14        A.    Not that I can recall.

15        Q.    Do you remember specific discussions

16   with anybody in which you recommended that

17   Chmura purchase the GDP dataset?

18        A.    I didn't even know it was a purchase

19   piece.  I thought it was something we would

20   develop.

21        Q.    Maybe I misspoke.  But in terms of

22   the need for the GDP dataset, do you remember

23   having any specific discussions with anyone at

24   Chmura about that need?

25        A.    I don't remember any specific

1                      R. LOMBARDO

2    conversations.

3         Q.    And did the company eventually

4    either develop or otherwise acquire it?

5         A.    Yes.

6         Q.    Last question or last topic on this

7    front, are you familiar with something called

8    Mega Table?

9         A.    Yes.

10        Q.    What is that?

11        A.    For a very large dataset.

12        Q.    Did you have discussions with anyone

13   at Chmura about having Chmura develop something

14   similar for its own use?

15        A.    Yes.

16        Q.    Who did you talk to about that?

17        A.    Greg Chmura.

18        Q.    And what was the nature of those

19   discussions?

20        A.    He sat in on a demo with me that I

21   prospected at EMSI, and they were showing this

22   Mega Table, and they told us that this is

23   something they would need for some datasets.

24        Q.    And did you reach any conclusions

25   about whether that was a good idea?

1                           R. LOMBARDO

2          A.     I thought it would be a good idea.

3          Q.     Did you tell anybody that?

4          A.     I'm sure I passed it along.

5          Q.     To whom?

6          A.     Through the channels, I would have

7     spoke with Greg about that.  Generally I would

8     speak with Greg about most additions to the

9     platform.

10         Q.     And do you know what, if any,

11    actions the company took after those

12    discussions happened?  Excuse me.

13         A.     I don't.  I know that Greg looked

14    into it.  And they had other discussions about

15    it, but I don't know what happened with it.

16         Q.     Mr. Lombardo, how far is your house

17    from your office or from the office where you

18    worked for Chmura in Cleveland?

19         A.     Maybe a little less than 30 minutes.

20         Q.     And was that your average commute

21    each way?

22         A.     Yeah.

23         Q.     I assume it varied some with

24    traffic?

25         A.     Yes.

1                    R. LOMBARDO

2        Q.    How many days a week did you

3    typically go into the office to work?

4        A.    Every day from 2015 through 2018,

5    and then the beginning part of 2019.  Then I

6    was allowed to work from home 2 days a week in

7    2019.  I'm not sure the exact month.

8        Q.    No problem.  Did you work the same

9    hours every day?

10       A.    Not the exact same hours.

11       Q.    What was the cause of a variance

12   between -- well, strike that.

13             What caused your hours to change

14   from one day to the next?

15       A.    They would fluctuate within

16   30 minutes of each other.

17       Q.    But, I mean, why would you come in

18   at a different time one day than you did the

19   next day?  What caused the differences?

20       A.    How fast I would get ready.

21       Q.    Anything else?

22       A.    Not that I can think of.

23       Q.    Did you have set work hours?

24       A.    We were supposed to be in at 8:00

25   a.m. and leave at 5:00 p.m.

```
 1                        R. LOMBARDO

 2              (Plaintiff's Exhibit T marked for

 3        identification.)

 4        Q.    I'm showing you what's been marked

 5   Exhibit T, as in Tom.

 6        A.    Okay.

 7        Q.    Tell me if you can see it, and tell

 8   me if you recognize it once you've had a chance

 9   to look at it.

10              MS. COOPER:  It hasn't been uploaded

11        yet.  I think we have a little lag time.

12              MR. SATTERWHITE:  There you go.  I

13        think you have it now.  It's a larger

14        document.

15        A.    I see those.

16        Q.    Do you recognize them?

17        A.    Yes.

18        Q.    What are they?

19        A.    Parking receipts.

20        Q.    And what do they reflect?

21        A.    Times I've been in the office.

22   Times I would exit the parking garage and leave

23   the parking garage.

24        Q.    So these are all receipts from the

25   parking deck that you used when you went to
```

1                    R. LOMBARDO

2    work?

3         A.    Yes.

4         Q.    They don't cover parking for any

5    other reasons other than going into the office

6    and returning from the office, right?

7         A.    No.

8         Q.    And there's -- I think there's an in

9    and out time on these.  I forgot specifically

10   what they're called, but ...

11        A.    Yeah.

12        Q.    Entry time and exit time, right?

13        A.    Yes.

14        Q.    And that reflects when you pulled

15   into the parking deck, and it reflects when you

16   pulled out of the parking deck?

17        A.    Yes.

18        Q.    And you used -- did you use the same

19   parking deck throughout your employment with

20   Chmura?

21        A.    No.

22        Q.    Are all of your -- is this -- are

23   these receipts from multiple parking decks?

24        A.    Yes.

25        Q.    So are these all the receipts that

```
1                    R. LOMBARDO

2    you have from your parking during your work at

3    Chmura?

4         A.    I found one stuffed in a nightstand,

5    but other than that, yes.

6         Q.    Most all?

7         A.    Yes.

8         Q.    How far -- how many different

9    parking decks did you use?

10        A.    It ranged -- once they upped the

11   price, I found a cheaper lot.  In the total

12   times I parked there, downtown I used at least

13   four different lots and would park on the

14   street as well occasionally.

15        Q.    So how far was the closest lot to

16   the Chmura office?

17        A.    Right across the street.

18        Q.    And how far was the farthest lot to

19   the Chmura office?

20        A.    Maybe a block-and-a-half down.

21        Q.    So can you give me --

22        A.    The one that's a block-and-a-half

23   down, the furthest one, they didn't have

24   receipts.  You paid a person.

25        Q.    Can you just give me a range of how
```

```
1                    R. LOMBARDO
2    long it took you to walk from the parking deck
3    to office, depending on which deck you were
4    using?
5         A.    3 minutes.
6         Q.    And did you always go straight into
7    the office, or did you stop for coffee or
8    breakfast or anything like that in the morning?
9         A.    I usually go to the office first
10   thing.
11        Q.    Did you then later go out for coffee
12   and get breakfast?
13        A.    I'd grab breakfast at Yours Truly
14   next door on occasion.
15        Q.    So that would be -- and just make
16   sure I understand this, the chronology here.
17   You drive to the parking deck.  You'd go
18   immediately from the parking deck to your
19   office.  But sometimes you would then go back
20   out of the office in order to get breakfast
21   next door.  Did I get that right?
22        A.    Yeah, next door.  Yeah, I would call
23   it in and go pick it up.
24        Q.    But you didn't eat there; you'd just
25   pick it up and bring it back to the office?
```

```
 1                    R. LOMBARDO

 2       A.    Yes.

 3       Q.    When you got to the office, did you

 4  have to swipe in with some sort of security

 5  card?

 6       A.    Yes.

 7       Q.    And did you do that pretty

 8  regularly?

 9       A.    Yes.

10       Q.    Every day?

11       A.    I want to say every day.  I'm sure

12  there might have been a time where I came in

13  with somebody else and they had the door open

14  for me or I may have forgotten my buzzer.

15       Q.    And same sort of question,

16  Mr. Lombardo.  For the end of your workday, did

17  you go straight from the office back to the

18  parking deck?  Or did you ever take a detour

19  for any reason?

20       A.    No, I'd go straight to the parking

21  deck.

22       Q.    You did not have to swipe to get

23  out, right?

24       A.    Correct.

25       Q.    And were you ever responsible for
```

```
 1                   R. LOMBARDO
 2   setting or disarming the alarm at the office?
 3        A.    Yes.
 4        Q.    Under what circumstances?
 5        A.    If I was the last one in the office,
 6   I would set it on my way out.
 7        Q.    So walk me through your usual
 8   routine when you got into the office.  Did you
 9   have to log into a computer?  Did you do
10   something to get settled in?  Did you go make
11   yourself a cup of coffee?  What was your
12   typical routine like?
13        A.    Get in the office.  I'd immediately
14   go to my computer.  I'd log into my email.
15   Salesforce, typically JobsEQ, and my LinkedIn.
16        Q.    So when you say "I logged in to" --
17   I'm sorry.  Did I interrupt you?  I was
18   writing.
19        A.    No.
20        Q.    Okay.  You identify four different
21   things that you say you logged into:  email,
22   Salesforce, JobsEQ, and LinkedIn?
23        A.    Yes.
24        Q.    Each one of those required a
25   separate login?
```

1                    R. LOMBARDO

2       A.    Yes.

3       Q.    Did you also have a login for your

4   computer?

5       A.    Yes.

6       Q.    And obviously you had to use that

7   first?

8       A.    Yes.

9       Q.    And are we talking about your

10  desktop computer?

11      A.    Yes.

12      Q.    So then in terms of your next set of

13  tasks, what was your actual work like after you

14  got logged into these systems?

15      A.    I would start game planning my day

16  out.  If I had demos, I would start researching

17  the areas for the demos.  I would print maps

18  out of those areas.  I would research the

19  people on the demo to see if they may have

20  worked at another firm that might have been a

21  client of ours in the past.  Kind of did

22  homework on the demos and would do homework on,

23  you know, prospects, important prospects I'd be

24  calling that day as well.

25      Q.    And in terms of communications with

```
1                    R. LOMBARDO

2    prospects and communications with clients, how

3    did those transpire during the workday?

4         A.    Either through email or telephone.

5         Q.    And I think we covered this.  But

6    most of your calls when you were in the office

7    were on your office phone, right?

8         A.    Yes, the vast majority.

9         Q.    Okay.  So on the days when you came

10   into the office, did you typically do any work

11   before you actually arrived at the office?

12        A.    No, unless an email came in or phone

13   call came in, but that was rare for that early

14   in the morning.

15        Q.    Okay.  And same question for the

16   evenings.  After you --

17        A.    Yeah.

18        Q.    Sorry.  After you left the

19   parking -- wait.  Are you talking to me or

20   talking to him?

21              MS. COOPER:  No, I was talking to

22        him, not you.  Sorry.

23        Q.    Let me ask it again so we have a

24   clean record.  When you left for the day, after

25   you, let's say, exited the parking deck, did
```

1                    R. LOMBARDO

2   you perform any work?

3        A.    Yes.

4        Q.    Typically what work were you

5   performing after you exited the parking deck?

6        A.    Answering client phone calls, client

7   emails.  Talking to potential colleagues.

8        Q.    So when you're talking about client

9   calls at this point, you're talking about on

10  your cell phone, right?

11       A.    Yes, I would have my work phone

12  forwarded to my cell phone.

13       Q.    Okay.  Did you take phone calls in

14  the car on your way home?

15       A.    Yes, if they came in.

16       Q.    And did you take phone calls at home

17  after you arrived home?

18       A.    Yes.

19       Q.    How frequently did this happen?

20       A.    Just phone calls?

21       Q.    Starting with phone calls.  I'm

22  going to try to walk through everything, but

23  I'm going to take it one category at a time.

24       A.    I'd say several times a week.

25       Q.    And on average, how long would you

```
1                    R. LOMBARDO
2    say these phone calls were?
3         A.    15 minutes maybe with clients.
4         Q.    And I'm assuming and hoping that you
5    didn't answer client emails while you were in
6    the car on the way home?
7         A.    I did my best not to, unless there
8    was a traffic jam.
9         Q.    And how often did you send or
10   receive client emails after you left the
11   office?
12        A.    That was more frequently.
13        Q.    And let me correct that question.
14   How often did you send or receive work-related
15   emails after you left the office?
16        A.    Any time they came in.  I don't know
17   the exact number.
18        Q.    Can you estimate?
19        A.    No.
20        Q.    All of those emails would have
21   either been sent from or received into your
22   work email account, though, right?
23        A.    Yes, sir.
24        Q.    Other than phone calls and emails,
25   did you perform any other Chmura work after you
```

1                     R. LOMBARDO

2   left the office?

3       A.    If I needed a contract or things of

4   that nature, yes.  It really depended on the

5   task that was requested of me by phone call or

6   email.

7       Q.    And you said one potential task was

8   that a client needed a contract?

9       A.    Yeah, that could be one of them.

10      Q.    Can you identify any others?

11      A.    If they needed a sole-source letter

12  is another one.  If they just needed some

13  documents of some kind.

14      Q.    So these tasks would generally be in

15  response to a request that you got from a

16  client?

17      A.    Correct.

18      Q.    And did you always work on them the

19  same night?  Or if they weren't urgent, would

20  you wait until the next day sometimes?

21      A.    Yeah, I didn't answer every single

22  email that night.

23      Q.    You evaluated whether you needed to

24  get back to the client right away and decided

25  when to respond; is that fair to say?

1                     R. LOMBARDO

2       A.    It depended what the request was,

3   yes.

4       Q.    Okay.  So you mentioned a couple

5   different examples of types of requests that

6   you would get from a client, sole-source

7   letter.  I think you said they might need a

8   contract.  In terms of responding to those

9   requests, would it have usually required you to

10  work on the computer?

11      A.    Yes, if it was needing to put a

12  contract together or something of that nature,

13  if it was just a question of some kind, I would

14  be able to respond through email on my phone or

15  a phone call.

16      Q.    All right.  And then if it did

17  require work on a computer, what computer would

18  you use?

19      A.    The Chmura laptop.

20      Q.    And did you have to go through the

21  same process of logging into that that you

22  described for your desktop?

23      A.    Yes.

24      Q.    And any emails that you would have

25  sent or received from the laptop would be in

1                    R. LOMBARDO

2   your work email account, correct?

3        A.    Yes.

4        Q.    In terms of the work that you

5   performed after you left the office, Mr.

6   Lombardo, how long would you estimate you

7   performed work on any given night?

8        A.    Yeah, I really don't know.  I

9   wouldn't be able to estimate that.

10       Q.    It varied?

11       A.    Yes.

12       Q.    Can you provide any kind of range?

13       A.    Not really.

14       Q.    Were there nights when you didn't

15   work at home?

16       A.    I'm sure where there were some

17   nights where I did not have anything come in.

18       Q.    I mean, can you estimate the number

19   of those?

20       A.    No.

21       Q.    Do you have a sense of what the

22   latest in any given evening that you would have

23   worked, latest time?

24       A.    Yeah, it could be -- it could be

25   late.  I had Washington and California, so it

                         R. LOMBARDO

1

2    just depended what times emails came in or

3    phone calls came in from them.

4         Q.    So would there be some nights when

5    you would get home, not do work for some period

6    of time, and then you'd get a client request

7    later in the evening that you would respond to?

8         A.    It's a potential.

9         Q.    Can you estimate how often that

10   happened?

11        A.    I can't.

12        Q.    Okay.  Did you typically eat dinner

13   with your family when you got home?  Was that

14   part of your routine?

15        A.    It would be.  My wife actually cried

16   in multiple restaurants because I wouldn't put

17   my phone down.  She was not a fan.

18        Q.    And did you eat at home most of the

19   time in terms of dinner, or did you eat out?

20        A.    No, I would eat out a lot.

21        Q.    How often?

22        A.    I don't know.

23        Q.    In terms of the work that you may

24   have done when you were having dinner out, that

25   would have only been a phone call or an email;

```
 1                       R. LOMBARDO
 2    is that correct?
 3         A.    Yes.
 4         Q.    You're not sitting at a restaurant
 5    working on your laptop most of the time, right?
 6         A.    No.
 7         Q.    When you were in the office, did you
 8    take lunch?
 9         A.    Very rarely.
10         Q.    So did you actually pack a lunch, or
11    did you just not eat?
12         A.    I generally didn't eat.
13         Q.    How often in a given week would you
14    eat lunch?
15         A.    Less than once.
16         Q.    How about in a given month?
17         A.    Handful, maybe.  Two, three.  It
18    would be hard to estimate.
19         Q.    Did you ever run errands during the
20    day out of the office?
21         A.    Rarely.  Sometimes I'd have to take
22    stuff to FedEx.
23         Q.    Did you belong to a gym or anything
24    like that that you went to regularly?
25         A.    Obviously this is in person still.
```

```
 1                    R. LOMBARDO

 2   But no.

 3        Q.    I can empathize.

 4              Let me turn your attention, I think

 5   you said the latter part -- actually, I'm not

 6   going to try to remember.  I want to turn your

 7   attention to the period of time when you

 8   started working from home 2 days a week.  And

 9   remind me again when that started.

10        A.    Maybe March of this year.

11        Q.    You mean 2019 or ...

12        A.    Yeah.

13        Q.    It would have to be.

14              So when you worked from home during

15   this period, just describe for me your usual

16   routine.  When did you start working, what did

17   you do, when did you stop work?

18        A.    I think it varied more at home than

19   it did in the office.  You know, could be as

20   early as 7:00.  You know, sometimes it might be

21   7:30, 8:00 o'clock.  It really depended on the

22   day.

23        Q.    And did you work consistently from a

24   set time and stop working at a set time on

25   Chmura matters?  Do you understand that
```

1                      R. LOMBARDO

2    question?

3         A.     I do not.

4         Q.     Yeah, I don't either.

5                Did you work all day straight

6    through the day when you were working at home,

7    or did you stop and do other things that

8    weren't related to Chmura?

9         A.     I'm sure there may have been times

10   when I stopped and did other things.

11        Q.     And can you give me a couple of

12   examples of that?

13        A.     Lifting laundry.

14        Q.     Can you estimate for me how much

15   time during your work-at-home days you spent

16   performing non-Chmura tasks?

17        A.     No, I can't.  I'm not sure.

18        Q.     Did you take breaks and eat lunch

19   when you were working at home?

20        A.     I'm not a big lunch eater.  I'm sure

21   I occasionally had some food here and there,

22   but ... I didn't have a standard hour lunch

23   that I would take every day.

24        Q.     Would you say, Mr. Lombardo, that

25   you had a standard schedule when you worked at

1                    R. LOMBARDO

2    home?  Or did your start and stop times vary

3    there as well?

4              MS. COOPER:  Objection as to form.

5         Go ahead.

6         A.    They would vary.  I didn't think of

7    it as punching in and punching out of a clock

8    at 5:00 o'clock as I'm done.

9         Q.    When you worked at home, were other

10   family members with you?  Or, I'm sorry, were

11   other family members also there?

12        A.    Occasionally my wife would work from

13   home, but not very often.

14        Q.    Do you have children?

15        A.    We do not.

16        Q.    Were you eligible for vacation at

17   Chmura?

18        A.    Yes.

19        Q.    How much did you get?

20        A.    I believe 3 weeks the last year I

21   was there.  I'm not sure when it changed from

22   2 to 3.

23        Q.    And did you take the vacation that

24   you were eligible for?

25        A.    No, I never used all of it.

```
 1                    R. LOMBARDO

 2        Q.    You were there for about 4 years

 3   total?

 4        A.    Yes.

 5        Q.    So in your --

 6        A.    4 and a half.

 7        Q.    Fair enough.

 8        A.    Closer to 5.

 9        Q.    And I'm just trying to get an

10   estimate, if you recall, how many weeks of

11   vacation approximately did you use during each

12   of those 4 years.  And I recognize it may be an

13   estimate.

14        A.    I'm not sure.  I think when I left,

15   I think I still had over 3 weeks available to

16   me, so I may have used 2 or less vacation weeks

17   a year.

18        Q.    And you had to designate your time

19   out of the office or your time off as vacation

20   when you took it, right?

21        A.    Yes.

22        Q.    You had to tell somebody you were

23   going on vacation?

24        A.    Yes.

25        Q.    Did you work on vacation?
```

```
1                    R. LOMBARDO
2       A.    Yes.
3       Q.    How often?
4       A.    Often.
5       Q.    And on an average vacation day, how
6   many hours would you estimate you performed
7   work for Chmura?
8       A.    I'm not sure.  It varies.
9       Q.    Can you give me a range?
10      A.    I really wouldn't know.  It would be
11  anywhere from -- go ahead.
12      Q.    No, you go ahead.  I'm sorry.
13      A.    It could be anywhere from 1 to
14  6 hours.
15      Q.    Were there vacation days where you
16  performed no work?
17      A.    I'm not sure.
18      Q.    Did you take your laptop on
19  vacation?
20      A.    Yes.
21      Q.    So you would have -- if you were
22  performing work, you would have logged into
23  that laptop while you were on vacation?
24      A.    If it required a computer.  But if
25  not, a lot of them would be responding to
```

```
 1                    R. LOMBARDO
 2   emails and phone calls.
 3        Q.    And so, again, that phone would be
 4   your cell phone?
 5        A.    Yes.
 6        Q.    And the emails would be your Chmura
 7   email account?
 8        A.    Yes.
 9        Q.    Did you work weekends?
10        A.    I rarely work weekends.
11        Q.    Did you say rarely?  I'm sorry, I
12   was looking down.
13        A.    Yeah, I rarely worked weekends.
14        Q.    Did you work over holidays?
15        A.    If things came in, yes.
16        Q.    How frequently did that happen?
17        A.    I'm not sure.
18        Q.    Would you characterize it as
19   happening regularly or every once in a while?
20        A.    I would say every once in a while on
21   holidays.  I wasn't getting a lot of emails on
22   Christmas or, you know, Thanksgiving.
23        Q.    What was your typical schedule when
24   you attended conferences for Chmura?
25        A.    They would start pretty early in the
```

1                         R. LOMBARDO

2    morning.  A lot of times around 7:00 for a

3    breakfast.  Obviously this would vary until --

4    the booth would be open sometimes until 5:00,

5    and there might be a reception afterwards.

6         Q.    And when you say it would vary, did

7    it vary from day-to-day at a given conference

8    or from one conference to the next or both?

9         A.    Both.

10        Q.    Did you -- obviously you had to

11   travel to these conferences, right?

12        A.    Yes.

13        Q.    Did you fly or drive usually?

14        A.    Usually would fly, but I have driven

15   to a couple.

16        Q.    And when you fly, do you usually fly

17   during the workday?  Or did you fly at night?

18        A.    I don't recall.

19        Q.    I'm just talking about generally.

20   Do you usually fly during business hours, or do

21   you work and then get on a plane?

22        A.    I typically would be -- like taking

23   the first flight out, so I was always trying to

24   get a 6:00 a.m. flight.  I always like taking

25   the first flight out in the morning.  Keeps you

1                     R. LOMBARDO

2    from having delays usually.

3         Q.    And we talked about this.  I don't

4    want to duplicate.  But in terms of your

5    physical tasks that you performed at a

6    conference or an event, you said you set up and

7    break down the booth.  And then what else were

8    you physically doing other than meeting with

9    clients at the booth or prospective clients at

10   the booth?

11        A.    That would really be it.  You know,

12   other than client interaction and setting up

13   the booth and tearing down the booth, that's

14   pretty much the majority is trying to interact

15   with clients and prospects, either at the

16   booth, at the lunches, at the receptions.

17        Q.    And were there any gaps during the

18   workday at the conferences where you took a

19   break or did something non-work related?

20        A.    Not that I could recall.

21        Q.    I think you told me what time you

22   usually started working at conferences.  What

23   time did it usually wrap up?

24        A.    It really depended on -- each

25   conference is different, so it's really hard to

1                    R. LOMBARDO

2    put a time on it.  Sometimes they could go as

3    late as 7:00 o'clock for the booth.  It all

4    depends on what the exhibit hours were for each

5    conference.

6         Q.    Did Chmura provide a rest day for

7    employees who attended conferences?

8         A.    Yes.

9         Q.    How did that work?

10        A.    If you were traveling over the

11   weekend, you would get one rest day.

12        Q.    And did you take those?

13        A.    I have.  But you only got one even

14   if it was for 2 days.  So even if you left on a

15   Saturday and it went through Sunday, it still

16   was one day.  So it wasn't comped for each

17   individual day.

18        Q.    Were the conferences during the week

19   or on weekends or both?

20        A.    Both.  A lot of times they would

21   start potentially on a Sunday.

22        Q.    Mr. Lombardo, have you looked to see

23   if you have your invoices or cell phone records

24   from your carrier, your provider?

25        A.    No.

1                      R. LOMBARDO

2        Q.    Since you filed the counterclaim in

3    this case, have you taken any steps to preserve

4    your cell phone records or your cell phone

5    contents?

6        A.    Yes.

7        Q.    What have you done?

8        A.    Nothing.

9        Q.    So what steps have you taken to

10   preserve the data on your cell phone?  Let's

11   break it down.

12       A.    Making sure I did not delete

13   anything.

14       Q.    Have you continued to use your cell

15   phone?

16       A.    Yes.

17       Q.    Is that the same cell phone that

18   you've had throughout -- that you had

19   throughout your employment with Chmura?

20       A.    No.

21       Q.    When did you get the one that you

22   currently have?

23       A.    I'm not sure.

24       Q.    Can you estimate for me?

25       A.    I really don't know.

1                    R. LOMBARDO

2        Q.    I mean, did you get it last month?

3   Did you get it a couple years ago?  Can you

4   provide me with any information about how long

5   you've had your current cell phone?

6        A.    Maybe a year.  I don't know.  I

7   don't know when I got a new one.

8        Q.    Do you get the bills for your cell

9   phone usage?

10       A.    I'm not sure.  It's on auto pay and

11  I was under -- a friend of mine, it was under

12  his account, family plan.

13       Q.    Who's the provider?

14       A.    Verizon.

15       Q.    When did you first believe that you

16  were entitled to overtime?

17       A.    2017.

18       Q.    What caused you to form that belief?

19            MS. COOPER:  I'm going to object to

20       the extent it gets into any attorney-client

21       privileged conversation.

22            MR. SATTERWHITE:  Sure.

23       Q.    Can you answer without revealing

24  attorney-client privileged information?

25       A.    No.

1                   R. LOMBARDO

2        Q.    Did you discuss your entitlement to

3    overtime with anyone other than counsel in

4    2017?

5        A.    No.

6        Q.    To the extent you discussed any such

7    issues with counsel, did you ever do so when a

8    third party was present?

9        A.    No.

10       Q.    Did you formally retain counsel for

11   any reason in 2017?

12            MS. COOPER:  I'm going to object to

13       the extent we get to attorney-client

14       privileged information.

15            MR. SATTERWHITE:  I don't believe

16       that question qualifies.  I haven't asked

17       for any communications.  Are you

18       instructing him not to answer?

19            MS. COOPER:  No, I was not

20       instructing him that.

21       A.    What was the question?

22       Q.    Did you retain counsel in 2017 for

23   any reason?

24       A.    Yes.

25       Q.    When?

1              R. LOMBARDO

2      A.    I don't know the exact date.

3      Q.    Did you express to anyone else your

4   belief that you were entitled to overtime in

5   2017?

6      A.    Yes.

7      Q.    I'm not asking for any

8   communications with counsel.  I'm sorry.  I

9   should have qualified that.  Who did you

10  express it to?

11     A.    Austin Steele.

12     Q.    What did you tell him?

13     A.    That I -- that we were due overtime.

14     Q.    And what did he say?

15     A.    I don't remember the conversation.

16     Q.    Did he ask you why?

17     A.    I don't recall.

18     Q.    Did you tell Mr. Steele anything

19  that your counsel may have told you about your

20  entitlement to overtime?

21     A.    No, not that I recall.

22     Q.    Was Mr. Steele in any supervisory

23  role over you at that time?

24     A.    No.

25     Q.    He was another account manager?

1                         R. LOMBARDO

2          A.    Yes.

3          Q.    Did you complain to anyone at Chmura

4    about the fact that you thought you were

5    entitled to overtime?  And I'm not limiting

6    that to 2017.

7          A.    Yes.

8          Q.    How many times?

9          A.    Twice, at least twice.

10         Q.    To whom did you complain on each of

11   those occasions?

12         A.    Eli Auerbach.

13         Q.    Have you complained to anyone in

14   management at Chmura other than Mr. Auerbach

15   about overtime or your entitlement to overtime?

16         A.    No.

17         Q.    When was the first time you

18   complained to Mr. Auerbach about overtime?

19         A.    I believe it was sometime in August.

20         Q.    Of 2019?

21         A.    I believe so.  I'm not sure on the

22   exact date.

23         Q.    I'm just asking about the year.  I'm

24   trying to narrow it down.

25         A.    Yes, 2019.

```
 1                    R. LOMBARDO

 2      Q.    When was the second time?

 3      A.    My last day of employment.  My last

 4   day in the office.

 5      Q.    October 17th?

 6      A.    Yeah, sounds about right, give or

 7   take a day.

 8      Q.    Let's start with the August of 2019

 9   conversation.  Where did that take place?

10      A.    In his office.

11      Q.    Was the complaint verbal or written?

12      A.    Verbal.

13      Q.    What time of day was it?

14      A.    I don't recall.

15      Q.    Was anybody else in the room?

16      A.    No.

17      Q.    What exactly did you say?

18      A.    I don't remember the exact words.

19      Q.    Tell me what you do remember.

20      A.    Just letting you know that I am due

21   overtime.

22      Q.    So you walked in Mr. Auerbach's

23   office and said, "Eli, I'm due overtime"; is

24   that correct?

25                 MS. COOPER:  Objection.  Go ahead
```

1               R. LOMBARDO

2       and answer, if you can.

3       A.    I don't remember the exact wording.

4       Q.    How did it come up?

5       A.    I don't remember.

6       Q.    What did he say?

7       A.    I don't remember.  I don't think

8   he -- we didn't have a long discussion about

9   it.  I don't remember.

10      Q.    What else did you say other than

11  "I'm due overtime"?

12      A.    I don't remember.

13      Q.    What caused you to raise this in

14  August of 2019 if you formed the belief that

15  you were due overtime 2 years earlier?

16      A.    I don't know what made me do it that

17  day.

18      Q.    What else did you and Mr. Auerbach

19  talk about in August 2019 when you raised the

20  overtime issue with him?

21      A.    I'm not sure what else took place in

22  that conversation.  I had a lot of

23  conversations with him.  I don't remember.

24      Q.    A lot of conversations generally or

25  a lot of conversations about overtime?

1                      R. LOMBARDO

2         A.    Generally.

3         Q.    And what is it that makes this

4   conversation in August stick out in your mind

5   as being the times that you complained about

6   overtime?

7         A.    I'm not sure.  I just remember it

8   being the first time I brought it up.

9         Q.    Was there anything different about

10  this conversation than the other conversations

11  you said you had with them that caused you to

12  raise the issue?

13              MS. COOPER:  Objection.  Go ahead

14        and answer, if you can.

15        A.    No, not that I can remember.

16        Q.    Did you ask Eli to do anything about

17  your concerns that you were entitled to

18  overtime?

19        A.    No, I don't believe I did.

20        Q.    Did you tell him why you thought you

21  were entitled to overtime?

22        A.    I don't remember.

23        Q.    So the only thing you remember about

24  this conversation in August is that it was

25  between you and Eli in your office and you said

1                    R. LOMBARDO

2   you were due overtime; is that correct?

3            MS. COOPER:  Objection.  Objection

4        to the form.  But go ahead.

5   A.    Yes.

6   Q.    Did you make any notes of the

7   conversation?

8   A.    I did not.

9   Q.    Did you record the conversation?

10  A.    I did not.

11  Q.    How long did the conversation last?

12  A.    I don't recall.  I don't think very

13  long.  I don't recall.

14  Q.    Was it a scheduled meeting or an

15  impromptu meeting?

16  A.    I don't recall if it was -- how the

17  meeting came about.

18  Q.    Anything else, Mr. Lombardo, that

19  you can tell us about the August 2019 meeting?

20  A.    Nope.

21  Q.    Moving on to the October 17th, 2019,

22  conversation, what did you tell Mr. Auerbach

23  about overtime in that meeting?

24  A.    That I was due overtime.

25  Q.    What specific words did you use, if

```
 1                    R. LOMBARDO

 2   you remember?

 3        A.   I don't remember the specifics.

 4        Q.   Did that take place in his office?

 5        A.   It took place near my desk.

 6        Q.   Anybody else around?

 7        A.   No.  It was early in the morning.

 8        Q.   I assume it was verbal and not in

 9   writing?

10        A.   Correct.

11        Q.   And did you ever memorialize this

12   complaint in writing with a followup email or

13   anything like that?

14        A.   No, not that I can remember.

15        Q.   When you told Mr. Auerbach that you

16   were entitled to overtime in October of last

17   year, what was his response?

18        A.   I don't remember his response.

19        Q.   Why did you raise this with him at

20   that time?

21        A.   In October?

22        Q.   Yes, sir.

23        A.   That was in the midst of discussions

24   about me leaving the organization.

25        Q.   And what did your entitlement to
```

1                    R. LOMBARDO

2    overtime have to do with that?

3         A.    He mentioned a buyout and if there

4    was a buyout, I would drop those claims.

5         Q.    What claims?  Claims for overtime?

6         A.    Yes.

7         Q.    Did you also discuss with

8    Mr. Auerbach your claims regarding the

9    commissions that you thought you were owed?

10        A.    No.

11        Q.    Did you talk to Mr. Auerbach about

12   claims for breach of contract in any sense?

13             MS. COOPER:  Objection as to form.

14        But go ahead and answer, if you can.

15        A.    I believe we talk about the

16   3 percent renewal.

17        Q.    What do you remember about that?

18        A.    I didn't know if that was legal or

19   not.

20        Q.    Did you ask him?

21        A.    I don't remember if I asked him.

22        Q.    After you formed the belief that you

23   were entitled to overtime in 2017, did you

24   start keeping any records of your overtime

25   hours worked?

1                    R. LOMBARDO

2     A.    No, other than the parking receipts.

3     Q.    Why not?

4     A.    I thought the parking receipts

5  demonstrated the hours that I worked.

6     Q.    Did you keep any of your parking

7  receipts before you formed this belief?  Was

8  that your regular practice?

9     A.    No.

10     Q.    So you started keeping parking

11  receipts in 2017 because that's when you

12  believed you were entitled to overtime?

13     A.    Yes.

14     Q.    Did you ever raise your concerns

15  about overtime with Chmura's human resources

16  department?

17     A.    Not that I recall.

18     Q.    Why not?

19     A.    I wanted to keep my job.  I thought

20  that if I raised it, they would get rid of me.

21     Q.    Are you aware of anybody else that

22  raised concerns and were terminated?

23     A.    For overtime?  No.

24     Q.    And you didn't raise these concerns

25  with any of Chmura's leadership?

1                        R. LOMBARDO

2        A.    No.  Just my direct supervisor.

3        Q.    So let me back up a little bit in

4    terms of your conversations with Mr. Auerbach.

5             At some point in October of last

6    year, you and Mr. Auerbach started talking

7    about the issue of territory restructuring; is

8    that a fair statement?

9        A.    Yes.

10        Q.    When did that start?

11        A.    I'm not sure when it started.

12        Q.    What's the first conversation you

13    remember with him about that issue?

14        A.    I really don't remember the first

15    conversation.

16        Q.    And I'm not looking for a date.  I

17    just want to ask you about -- I mean, when was

18    the first time you communicated with

19    Mr. Auerbach about this territory restructuring

20    issue?

21        A.    Well, he communicated some things to

22    me, I remember, on a car ride back from

23    Columbus, at the Ohio Economic Development

24    Conference that he was looking to go towards

25    territories instead of verticals, but I don't

```
 1                    R. LOMBARDO
 2   know the date of when that was.
 3       Q.    Maybe I'm using the wrong term.
 4   There came a time in the fall of last year when
 5   you became concerned that your commissions
 6   would be adversely affected by some structural
 7   changes at the company; yes?
 8       A.    Yes.
 9       Q.    When did you first hear about those
10   issues that led to your concerns?
11       A.    I want to say the end of
12   September-ish actually.
13       Q.    Where did you hear that?
14       A.    Well, there was always some
15   discussions going on from Eli, but I heard from
16   a colleague that Eli had separate meetings with
17   everybody else stating that this was going to
18   be the new plan of action.  So one of those
19   employees pulled me to the side and told me,
20   hey, this is going -- this is the new plan, you
21   know.  You're not even supposed to know about
22   it at this point.
23       Q.    Who was that that told you?
24       A.    Sarah.
25       Q.    What's her last name?
```

```
 1                    R. LOMBARDO

 2       A.    Manfroni.

 3       Q.    What was her position at the

 4  company?

 5       A.    An account executive.

 6       Q.    Do you know if she's still there?

 7       A.    I believe so, but I don't know.

 8       Q.    So tell me again what it is that she

 9  told you was the proposed change and how did

10  you react to it.

11             MS. COOPER:  Objection to the form.

12       But go ahead and answer.

13       A.    That they were going to take all the

14  accounts away -- well, re-distribute all the

15  accounts equally to every account rep and go to

16  territories.  So each of the new account reps

17  would get a portion of the current book of

18  business I helped build.

19       Q.    So that would adversely affect you?

20       A.    Yes.

21       Q.    So what was your reaction to this

22  news?

23       A.    I was not very happy.  To be honest,

24  I was really hurt by it.

25       Q.    And did you convey that to Eli,
```

```
 1                      R. LOMBARDO

 2   Mr. Auerbach?

 3        A.    No, not at that point.

 4        Q.    At some later point?

 5        A.    Yes.

 6        Q.    When?

 7        A.    I don't know the exact date.

 8        Q.    So Ms. Manfroni --

 9        A.    Uh-huh.

10        Q.    -- told you about this situation.

11   How long before you talked to Mr. Auerbach

12   about it?

13        A.    I think it may have been a couple

14   days.

15        Q.    Did you approach him?

16        A.    I did.

17        Q.    Tell me about that conversation.

18        A.    They had a meeting to talk about the

19   new sales areas or the new territories, and

20   they scheduled that while I was on a demo.  So

21   the rest of the sales team were talking about

22   what's happening moving forward with the new

23   territories, new alignment, discussing what

24   territories they wanted, while I was on a demo.

25   So I don't know if it was the next day or maybe
```

1                    R. LOMBARDO

2    later that day, I approached him and asked him

3    what's going on.

4         Q.    What did he say?

5         A.    Yeah, this is the direction that

6    management wanted to go.

7         Q.    So he told you at that time that

8    that was the direction that management wanted

9    to go?

10        A.    Correct.

11        Q.    Did he indicate that leadership had

12   approved of a specific plan or that this was

13   something that was being contemplated?  Or did

14   he tell you?

15             MS. COOPER:  Objection as to form.

16        A.    They were still ironing out some

17   issues, but things were going to be changing

18   and this was the route that it was going to go.

19   I was going to lose accounts.  I would not be

20   compensated for those, and he said yes, this is

21   going to -- you're the only one this is going

22   to affect negatively.

23        Q.    Did you say anything about whether

24   leadership wanted to get rid of you in that

25   conversation?

1              R. LOMBARDO

2         A.    Yes, yes.  I said this is -- they

3    obviously must be wanting to push me out

4    because I don't understand why they would want

5    to treat me like this.  I've worked my butt off

6    for them in at this point 4 and a half years,

7    and at this point, they're going to put me on

8    par with somebody that just started 3 months

9    ago.  I had 10 years of sales experience.  I

10   worked really hard there to get them to where

11   they were at.  And now pretty much three people

12   off the street were going to be at the same

13   income and account levels as I was.

14        Q.    What did Mr. Auerbach say?

15        A.    He brought up a potential buyout.

16        Q.    How did he characterize it?

17        A.    I don't know the exact words that he

18   used.

19        Q.    Did you and he discuss numbers in

20   that meeting?

21        A.    Yes.

22        Q.    What did you discuss?

23        A.    I told him 100,000.

24        Q.    Was that the first number you told

25   him?

```
 1                     R. LOMBARDO
 2        A.     No.  I think I said 50,000
 3   originally, then came back later on with
 4   100,000.
 5        Q.     And what were you proposing to do in
 6   return for the payment?  Did you offer
 7   anything?
 8        A.     Yeah, so I would have stayed on with
 9   the company through the end of the year.  Hand
10   off the accounts.  I would be able to close the
11   accounts I had in my pipeline because I had
12   many accounts that were closing within the next
13   month or two.  And as the renewals come up,
14   hand off the accounts to the new reps and then
15   I would leave on December 31st or January 1st,
16   whatever date.
17        Q.     How did you come up with 100,000?
18        A.     Randomly out of the top of my head.
19   I was trying to figure out, I would need to
20   move to another industry and it would take me
21   some time to do that.  But I didn't really put
22   a lot of thought into it.  It was that same
23   day.  It's just, I don't know, a number I came
24   up with that --
25        Q.     I'm sorry.  Finish, please.
```

```
 1                    R. LOMBARDO

 2        A.    I said it's just a number I felt

 3   comfortable with.

 4        Q.    Where did you and Mr. Auerbach leave

 5   things?

 6        A.    He said he's going to speak with

 7   management about it.

 8        Q.    And then am I correct that you then

 9   left to attend a couple of conferences?

10        A.    Correct.

11        Q.    What conferences did you go to?

12        A.    The Texas Economic Development

13   Conference and the IEDC Conference,

14   International Economic Development Conference.

15        Q.    Was that, the second one in

16   Indianapolis?

17        A.    Yes, it was.

18        Q.    And at those, both of those

19   conferences, I assume you did what you

20   described as your normal duties at a

21   conference:  You met with prospects, met with

22   clients, worked the booth?

23        A.    Yes, sir.

24        Q.    When you talked to a client or a

25   prospect at the conference, did you make notes
```

1                      R. LOMBARDO

2    of those conversations?

3         A.    Yes.

4         Q.    How did you do that physically?  Did

5    you -- well, we'll leave it there.

6         A.    I would jot notes on the back of

7    business cards if it was busy.  Then when there

8    was available time, I would type up the note.

9         Q.    And were there other Chmura

10   employees at those conferences?

11        A.    Not at the Texas Economic

12   Development Conference, but there were several

13   at the IEDC conference.

14        Q.    Other account managers?

15        A.    Yes.

16        Q.    And I assume they also talked to

17   prospective and actual clients while they were?

18             MS. COOPER:  Objection.  You can

19        answer, if you know.

20        A.    Yeah, I'm sure they spoke with a

21   few.

22        Q.    Did they work the booth with you?

23        A.    Partially.

24        Q.    Did you see them talking to clients

25   and prospects while they were at the booth with

```
 1                      R. LOMBARDO
 2   you?
 3        A.    Yes.
 4        Q.    Did you have any role in typing up
 5   their notes from the II -- IEDC conference?
 6        A.    I don't believe so.  I don't recall.
 7        Q.    You typed the notes for your own
 8   conversations on your laptop, correct?
 9        A.    Yes.
10        Q.    At any point did you let anyone else
11   use your laptop while you were at the
12   conference?
13        A.    Yes.
14        Q.    Who?
15        A.    I'm not sure.  I believe that Logan
16   may have used it.  Leslie may have used it.
17   Eli may have used it.  I'm not sure exactly.
18        Q.    And where did you save your notes on
19   the laptop?
20        A.    I don't know.  I believe it was a
21   Word document, but I'm not positive.
22        Q.    Did you save it locally on the
23   laptop?
24        A.    I don't know.  I just hit Save As in
25   a Word document.  I don't know where that saves
```

1                        R. LOMBARDO

2    to.

3          Q.    Did you email a copy of your notes

4    back to anyone at Chmura?

5          A.    No, I don't believe so.

6          Q.    So as far as you know, the only copy

7    of your notes was on your laptop?

8          A.    I'm not sure.

9          Q.    You didn't make any copies --

10         A.    Make any copies?

11         Q.    -- of your notes.

12         A.    No.

13         Q.    And you're not aware of anybody else

14   making copies of your notes?

15         A.    I'm not sure.  I don't believe so.

16         Q.    So, again, as far as you know, the

17   only copy of your notes was what you saved on

18   your laptop, correct?

19         A.    Yes.

20               (Plaintiff's Exhibit U marked for

21         identification.)

22         Q.    Showing you what's been marked as

23   Exhibit U, has that come through for you guys

24   yet?

25         A.    It usually takes another 15 seconds

1                        R. LOMBARDO

2    for it.

3         Q.     There it is.

4         A.     There we go.

5         Q.     Take a look at that and tell me if

6    you recognize all or part of it.

7         A.     Yep.

8         Q.     What is Exhibit U?

9         A.     It's notes from a conference.

10        Q.     Do you know which conference --

11   sorry?

12        A.     Multiple conferences, it looks like.

13        Q.     From the notes, can you tell which

14   conferences these cover?

15        A.     Yes.

16        Q.     Which ones?

17        A.     I'll start at the beginning.  The

18   IEDC Annual Conference.

19        Q.     And is that the one you attended in

20   Indianapolis that you were just telling me

21   about?

22        A.     Yes.

23               The IEDC Leadership Summit.  Another

24   one from the IEDC Leadership Summit.

25        Q.     Was that another one that was part

1                     R. LOMBARDO

2    of the IEDC Conference or a separate one?

3         A.    That's a separate one.

4         Q.    Do you know when that took place?

5         A.    I believe January.  I think January,

6    if it was the one in Fort Lauderdale.  I'm not

7    sure.

8         Q.    Are these your notes?

9         A.    Not all of them, no.

10        Q.    Can you tell me which ones are yours

11   and which ones are not?

12        A.    Do you want me to go by page?

13        Q.    Whatever's easiest for you, but that

14   works for me.

15        A.    Page 1 is mine.  Page 1 through --

16   page 1 through 8 is mine.

17        Q.    Any others?

18        A.    Make that 1 through 14 is mine.  15,

19   16, and 17 are not mine.  18 is not mine.  19

20   is not mine.  20 and 21 appear to be mine.  And

21   then 22 through 25 are mine.

22        Q.    And what was your normal procedure,

23   Mr. Lombardo, when you go to a conference like

24   this, talk to clients, take notes, and then how

25   did you get that information back to Chmura?

1                        R. LOMBARDO

2        A.      Send it in an email.

3        Q.      To whom?

4        A.      The sales team and leadership.

5        Q.      And did you ever send any of the

6    notes in Exhibit U to anyone else at Chmura via

7    email?

8        A.      There's a potential Kyle West may

9    have been added to it.  I'm not sure if I added

10   John or Greg Chmura in 2012.  They may have

11   been added.

12       Q.      So you emailed these notes to

13   someone at Chmura after the IEDC Conference?

14       A.      No, these are from multiple

15   conferences.  So some of them, I believe, were

16   emailed.  So all these notes were from multiple

17   different conferences.

18       Q.      Fair enough.

19       A.      The IEDC --

20       Q.      Yeah, it was a sloppy question.  I'm

21   sorry.

22               So did you ever email the IEDC notes

23   from the October IEDC conference to anyone at

24   Chmura?

25       A.      No.

1                        R. LOMBARDO

2        Q.    Those notes were on your laptop?

3        A.    Yes.

4        Q.    So switching back to your

5    discussions with Mr. Auerbach, when was the

6    next time you had a conversation with him about

7    this notion of a buyout or the sales territory

8    restructuring?

9              MS. COOPER:   Objection as to form.

10        Go ahead.

11        A.    I think it was the day -- the first

12    full day back in the office after the

13    conference.

14        Q.    And where did that discussion take

15    place?

16        A.    At my desk.

17        Q.    Did -- I take it he approached you?

18        A.    Yes.

19        Q.    Was anybody else around?

20        A.    No, it was early in the morning.

21        Q.    What did he say?

22        A.    That he didn't think leadership

23    wanted to pay for a buyout.

24        Q.    And how did you react to that?

25        A.    Not happy.

1                         R. LOMBARDO

2        Q.     What did you say?

3        A.     I don't remember everything that

4    I've said.  I'm sure I said a lot.  The

5    conversation was probably 30 minutes.

6        Q.     I'm sorry.  How long?

7        A.     Maybe 30 minutes.  Overall.

8        Q.     Did you tell him that you had met

9    with a competitor in Indianapolis?

10       A.     Yes.

11       Q.     Did you talk to him about moving

12   your book of business to a competitor?

13       A.     I wouldn't say me moving my book of

14   business.

15       Q.     Did you tell him that if the company

16   did not buy you out, you would take your book

17   of business to a competitor, or words to that

18   effect?

19              MS. COOPER:  Objection to the form.

20       Q.     You can answer.

21       A.     No, no.

22       Q.     Did you say anything about moving

23   your clients or telling your clients to go to a

24   competitor?

25              MS. COOPER:  Objection to the form.

1                    R. LOMBARDO

2         Go ahead.

3         A.    Not that I -- not that I recall.

4         Q.    What do you recall about the

5    conversation?

6         A.    In that form?

7         Q.    In any form.

8         A.    He asked what I would do.  I said I

9    would look at other people in economic

10   development because I have so many contacts in

11   there, and that's where I've been working the

12   last 5 years, that somebody would want to hire

13   me because I have so many contacts.

14        Q.    Did you tell him that, quote, either

15   Chmura is going to pay me for those

16   relationships or someone else will?

17        A.    I'm not sure if that was a quote.

18        Q.    I'm asking you if that's what you

19   said?

20        A.    I don't recall if that's the exact

21   language that I used.

22        Q.    Did you tell him that you had an

23   offer from a competitor?

24        A.    No.

25        Q.    Did you talk any more about payment

```
 1                    R. LOMBARDO
 2   amounts during that conversation?
 3        A.    I don't recall there were payment
 4   amounts discussed there.
 5        Q.    What else do you remember about that
 6   conversation, Mr. Lombardo?
 7        A.    He asked me if I would go work for
 8   EMSI, and I said if it was the best offer.
 9        Q.    Anything else?
10        A.    Just kind of voiced how upset and
11   hurt that I was that this was happening.  I
12   didn't really ever want to leave Chmura.  I was
13   happy there.  I liked the people I worked with.
14   And I just didn't understand why they were
15   doing this.  I worked really hard for them for
16   a long time, and this feels like they're just
17   spitting in my face.  I don't understand it.
18        Q.    What did you mean when you told him
19   that you would go to work for EMSI if they had
20   the best offer?
21        A.    I meant I would go work for EMSI if
22   it was a reasonable offer of employment.
23        Q.    How did that meeting end or
24   conversation?
25        A.    I'm not exactly sure how it ended.
```

```
 1                    R. LOMBARDO
 2   From what I recall, we were the only two back
 3   there and he kind of would come out, talk to
 4   me, kind of go back to his office, come back
 5   out and talk to me.  So I don't know exactly
 6   when it ended.
 7        Q.    Did you go home early that day?
 8        A.    I did.
 9        Q.    Did he tell you to?
10        A.    He did.
11        Q.    Did you have your laptop in the
12   office when you had the meeting with
13   Mr. Auerbach?
14        A.    I don't recall.  I may have.
15        Q.    Did you take it home with you?
16        A.    Yes.  Yeah, I did have it in the
17   office because I remember I logged into it in
18   my kitchen.
19        Q.    Why?
20        A.    I had a demo that day.  So at that
21   point, I wasn't aware that I wasn't able to log
22   in so I was going home to continue doing my
23   work for the day.  I had a lot of calls to
24   make.  I took a phone call on the way home from
25   a current client, and then I had a demo I was
```

```
 1                    R. LOMBARDO
 2   going to prepare for later that afternoon.
 3        Q.    You logged in at your kitchen at
 4   home, right?
 5        A.    I guess I should rephrase that.  I
 6   tried to log in at home.  Once I got home and
 7   tried to log in, I realized I didn't have
 8   access.
 9        Q.    Did you tell anybody about your
10   conversation with Mr. Auerbach?
11        A.    I don't recall who I spoke with.
12   I'm sure I told my wife.
13        Q.    Did you discuss the issue with any
14   other Chmura employees?
15        A.    I don't -- I don't recall.  I'm
16   sure, sure I did.
17        Q.    Did you tell anybody that you had
18   already gotten a job offer from EMSI?
19        A.    I think I did.
20        Q.    Who?
21        A.    I don't -- I don't know if it was --
22   I think maybe Allison.
23        Q.    What's her last name?
24        A.    Magee.
25        Q.    Had you already received a job offer
```

```
1                    R. LOMBARDO

2   from EMSI?

3        A.    I did not.

4        Q.    So that wasn't true?

5        A.    Correct.

6        Q.    Why did you tell her something that

7   wasn't true?

8        A.    I'm not sure.

9        Q.    Did you -- and I apologize in

10  advance for my language to everybody on the

11  call, but did you tell anyone, quote:  I can

12  fuck Chmura at any point.  I will just call all

13  my clients and tell them what they did and they

14  should look at EMSI?

15       A.    No, I don't remember saying that.

16       Q.    Did you tell anybody at Chmura that

17  they would be collateral damage when you left

18  and took your clients?

19       A.    Not that I recall.

20       Q.    When was the next time you spoke

21  with Mr. Auerbach?

22       A.    I communicated with him I don't know

23  how many times exactly, but a few times.  I

24  think I left on a Thursday.  I think a

25  Thursday, and we communicated a bit on -- when
```

```
 1                    R. LOMBARDO
 2   I left that Thursday and I think Friday.
 3       Q.    And in any of those communications,
 4   did Mr. Auerbach tell you that you needed to
 5   return your laptop?
 6       A.    He actually told me to keep -- he
 7   said we needed to exchange the laptop for the
 8   stuff at my desk, but not to do that until I
 9   signed the letter from the attorney.
10       Q.    When did he -- I'm sorry.  When did
11   he tell you that?
12       A.    It was the following week.  I'm not
13   sure of the exact date.
14       Q.    Did you become aware at some point
15   that Chmura wanted you to return the laptop?
16       A.    Yes.
17       Q.    When?
18       A.    Correspondence with my attorney.
19       Q.    And do you remember the approximate
20   date of that correspondence?
21       A.    I don't.
22       Q.    When you --
23       A.    Go ahead.
24       Q.    No, go ahead if you need to finish
25   your answer.
```

```
 1                    R. LOMBARDO

 2        A.    I would say sometime at the end of

 3   October, but I'm not sure of the exact date.

 4        Q.    So you knew by the end of October

 5   that Chmura wanted you to return the laptop?

 6        A.    No.  I was told to hang on to it

 7   until I signed the letter.

 8        Q.    Now, we need to walk back through

 9   the last few questions.  I misunderstood your

10   answer.

11             When did you become aware that

12   Chmura wanted you to return its property?

13        A.    Eli told me that he wanted to

14   exchange the computer for the stuff I have in

15   the office but not to do that or we couldn't do

16   that until I signed the letter that I believe

17   you sent me.

18        Q.    And at some later point, did you

19   become aware that Chmura wanted the laptop

20   returned immediately?

21        A.    I don't recall the time frame.

22        Q.    Again, I'm may be misunderstanding.

23   I thought you said something about the letters

24   from attorneys when I asked you the question

25   previously.  And if I got it wrong, I
```

1                     R. LOMBARDO

2    apologize.

3         A.    Yeah, I'm not sure if the letter was

4    before Eli told me about holding on to it until

5    I signed that letter.

6         Q.    Did you have any other conversations

7    with Mr. Auerbach about the laptop?

8         A.    No.

9         Q.    When did you give the laptop to your

10   counsel?

11        A.    I don't know the exact date.

12        Q.    Which counsel did you give it to?

13        A.    My current counsel.

14        Q.    Do you remember the approximate

15   date?

16        A.    I don't.

17              (Plaintiff's Exhibit C marked for

18        identification.)

19        Q.    I have displayed what's been marked

20   as Exhibit C because I skipped it earlier

21   today.  That's why it's letter C.  Take a look

22   when it comes up, and let me know when you've

23   had a chance to review it.

24        A.    I see it.

25        Q.    Do you know what this is,

```
 1                    R. LOMBARDO
 2    Mr. Lombardo?
 3         A.    Yes.
 4         Q.    It's an affidavit you submitted to
 5    the Court either -- late last year on or around
 6    December 15th, right?
 7         A.    Yes.
 8         Q.    Your signature is on the last page?
 9         A.    Yes, sir.
10         Q.    And the affidavit was accurate when
11    you signed it?
12         A.    To the best of my knowledge, yes.
13         Q.    And to the best of your knowledge,
14    it's accurate now, right?
15         A.    Yes.
16         Q.    I really have just one quick
17    question about this.  It's on page 6,
18    paragraph 30, which I'm displaying here.  I
19    don't know if you can see it.
20         A.    Yeah.
21         Q.    Second sentence of paragraph 30
22    says:  On October 21st, 2019, I told my
23    attorney that I had the laptop and
24    miscellaneous items and would give it back to
25    Chmura whenever it wished.
```

```
 1                     R. LOMBARDO

 2              Are you talking about your current

 3   counsel there or your prior counsel?

 4        A.    My prior counsel.

 5        Q.    You mentioned that when you went

 6   home after your meeting with Mr. Auerbach, you

 7   tried to log into your laptop in your kitchen,

 8   right?

 9        A.    Yes.

10        Q.    And that was the same day that

11   Mr. Auerbach sent you home?

12        A.    Yes.

13        Q.    Did you turn on or otherwise use the

14   computer on the following day?

15        A.    I'm not sure.  I may have turned it

16   on or used it.  I'm not sure.

17        Q.    Did you attach any storage devices,

18   memory cards -- memory cards, thumb drives,

19   external hard drives, anything like that to the

20   laptop after Mr. Auerbach sent you home?

21        A.    No, the only thing that would have

22   been attached there is a wireless mouse.

23        Q.    Did you copy any information from

24   the laptop to any other destination?

25        A.    No.
```

```
 1                    R. LOMBARDO
 2        Q.    Did you send anything from the
 3   laptop to any email account?
 4        A.    No.
 5        Q.    In any way, did you duplicate any of
 6   the information that was contained on that
 7   computer?
 8        A.    No.
 9        Q.    At the time Mr. Auerbach sent you
10   home -- well, after he sent you home, you
11   became aware that you were locked out of
12   Chmura's systems, right?
13        A.    Yes.
14        Q.    Did you have any copies of your
15   client list in your possession at that time?
16        A.    I'm sorry?
17        Q.    Did you have any copies of any
18   client list of yours at that time?
19        A.    Yes.
20        Q.    Where?
21        A.    There was some -- I had one in my
22   email.
23        Q.    Your work email?
24        A.    Yeah.  It may have been saved on the
25   laptop.  I'm not sure.
```

```
1                        R. LOMBARDO
2        Q.    The desktop computer or the desktop
3   screen on the laptop?
4        A.    Yeah, I'm sorry.  On the laptop.
5   I'm sorry.  I'm not good with my computer
6   terms.
7        Q.    So you had a copy of your client
8   list on the laptop?
9        A.    Yeah, I believe they -- I believe
10  so, yes.
11       Q.    Let me show you and see if we're
12  talking about the same thing.
13       A.    After this, may I have a quick potty
14  break?
15       Q.    Actually, we can do it now.  I'm
16  still pulling up the document.  I'll have it
17  ready when everyone gets back.  Want to take 5?
18       A.    Yeah, that will be fine.
19            MR. SATTERWHITE:  All right.  Go off
20       the record.  Back in 5 minutes.
21                    (A short break was taken.)
22  BY MR. SATTERWHITE:
23       Q.    Before we went off the record,
24  Mr. Lombardo, we were talking about your client
25  list that was on your laptop.
```

```
 1                      R. LOMBARDO

 2        A.    Uh-huh.

 3        Q.    Do you remember what format that was

 4   in?

 5        A.    I believe it's Excel when you

 6   download it.  It would just be a usage report.

 7   I didn't have my client list.  It was just the

 8   usage report.

 9        Q.    I've got a pretty large exhibit

10   that's processing.  Has it showed up yet?

11               MS. COOPER:  No.

12               MR. SATTERWHITE:  It may take a

13          little while.

14               MS. COOPER:  Yours has popped up on

15          the screen, but it hasn't popped up in the

16          submitted documents yet.

17        Q.    All right.  Mr. Lombardo, I will

18   just give you a little background on this.

19   This was a spreadsheet.  We converted it to a

20   PDF in order to display it today.

21        A.    Okay.

22        Q.    I will gladly scroll through --

23               MR. SATTERWHITE:  Actually,

24          Christine, if you'd like, I think I have

25          the ability to let you scroll through it
```

```
1                        R. LOMBARDO

2         and maybe that will be a little quicker.

3         If you can change the pages.  It's

4         150 pages long so ...

5              MS. COOPER:  Let me see if I can

6         make it bigger.  See if you can manipulate

7         from there, and then you can page through

8         page by page.

9              (Plaintiff's Exhibit V marked for

10         identification.)

11         Q.    Do you recognize Exhibit V, as in

12    Victor?

13         A.    Yes.

14         Q.    Is the client list that you were

15    just talking about or, to be more precise, the

16    client usage report?

17         A.    Yes.

18         Q.    And what does this show generally?

19         A.    The users of JobsEQ and when they

20    logged in and the time.

21         Q.    So this is not limited to your

22    clients, correct?

23         A.    Correct.

24         Q.    The original spreadsheet shows tabs

25    for each one of the account managers?
```

1                    R. LOMBARDO

2        A.    Yes.

3        Q.    So this is a list of all JobsEQ

4    users?

5              MS. COOPER:  Objection.  There's no

6        scope on that.  We don't know when this is

7        from.

8        Q.    Is this a list of all JobsEQ users,

9    yes or no?

10       A.    Yes.

11       Q.    Okay.

12       A.    Most likely, according to, you know,

13   the usage report.

14       Q.    And this appears to show in bold

15   letters the individual company name that

16   licensed the product?

17       A.    Yes.

18       Q.    And then under each heading, it

19   shows the first and last name of individuals at

20   that company who are using the product?

21       A.    Yes.

22       Q.    Do you see that some of the fields

23   are marked in red?

24       A.    Yes.

25       Q.    Do you know what those fields or

1                    R. LOMBARDO

2    those cells represent?

3         A.    It looks like people that never

4    logged in.

5         Q.    And then the column to the right of

6    that is entitled Logins; so I assume that's the

7    number of times each user has logged in, if you

8    know?

9         A.    Yes.

10        Q.    And then the final column is Time

11   Online, which I again am assuming it's pretty

12   self-explanatory.   It's the amount of time each

13   user has spent online?

14        A.    To my knowledge.

15        Q.    Did you -- how did you get this

16   report?

17        A.    It was emailed to us on Fridays.

18        Q.    And why was it on the desktop screen

19   of your laptop?

20        A.    A lot of times I would pull it up so

21   that when I'm talking to a current client, I'm

22   able to see, you know, when their usage was,

23   who their main users are to make sure I'm

24   reaching out to the appropriate people.

25        Q.    Did you consider this document

```
1                    R. LOMBARDO
2    confidential?
3         A.    Yeah, I would consider this
4    confidential.
5         Q.    Why?
6         A.    It has the users on it.
7              THE COURT REPORTER:  I'm sorry,
8         could you repeat the answer?
9                    (Discussion off the record.)
10        A.    It has the client list on it.
11        Q.    Did you have any other copies of
12   this client list in your possession as of the
13   day that Mr. Auerbach sent you home?
14        A.    No.
15        Q.    Did you have client contact
16   information in any format in your possession
17   the day he sent you home?
18        A.    This will on the laptop so, I mean,
19   I would have it.  I would also have some phone
20   numbers in my cell phone if I was talking to
21   them that day or if I had incoming calls from
22   them.
23        Q.    Were your clients saved as contacts
24   in your cell phone?
25        A.    No.
```

1                    R. LOMBARDO

2        Q.    What -- Chmura used Outlook for its

3   email, right?

4        A.    Yes.

5        Q.    On your laptop when you opened

6   Outlook, there's a tab for emails and a tab for

7   calendar and a tab for contacts.  Are you

8   familiar with that?

9        A.    Yes.

10        Q.    When you clicked on the tab for

11   contacts, did your client information appear

12   either in whole or in part in Outlook?

13        A.    I'm not sure.  I never used Outlook

14   for contacts.  I always used Salesforce.

15        Q.    Did any of the data from Salesforce

16   sync up to your cell phone?

17        A.    No.  I had the Salesforce app, so I

18   would have had to log in to Salesforce to use

19   it.

20        Q.    So, again, regardless of any format,

21   did you have any other client list in your

22   possession after Mr. Auerbach sent you home

23   other than Exhibit C?

24        A.    No.

25

1                    R. LOMBARDO

2            (Plaintiff's Exhibit W marked for

3        identification.)

4        Q.    All right.  Showing you Exhibit W,

5   and it looks like that's been made available to

6   you.  Take a look at that and tell me when

7   you've had a chance to look it over.

8        A.    I'm familiar with this.

9        Q.    What is it?

10       A.    It's a communication with me and

11   Josh Wright from EMSI.

12       Q.    And that is Chmura's primary

13   competitor, correct?

14       A.    Correct.

15       Q.    If we go to the second page, it

16   looks like the first email is from you dated

17   October 17th to Josh; is that correct?

18       A.    Correct.

19       Q.    You asked him if he had time for a

20   quick chat today?

21       A.    Correct.

22       Q.    What did you want to chat about?

23       A.    Essential opportunities.

24       Q.    And this was the same day

25   Mr. Auerbach sent you home?

1                    R. LOMBARDO

2       A.    Yes.

3       Q.    10:02 a.m. is when you sent the

4  email?

5       A.    Yes.

6       Q.    Was that after he sent you home?

7       A.    I don't remember.

8       Q.    Was it after you had the

9  conversation with him?

10      A.    Yes.

11      Q.    Did your conversation with

12  Mr. Auerbach cause you to send this email in

13  any way?

14      A.    Yes.

15      Q.    You say:  I hope you had a safe trip

16  back from Indianapolis.  Had you met him in

17  Indianapolis at the IEDC conference?

18      A.    I saw him there.  It's not where I

19  met him.

20      Q.    Did you talk with him at the

21  conference?

22      A.    Yes.

23      Q.    For how long?

24      A.    5 minutes maybe.

25      Q.    About a job opportunity?

```
 1                    R. LOMBARDO

 2      A.    No.

 3      Q.    Did that subject come up at the

 4  conference?

 5      A.    The job opportunity?

 6      Q.    I'll rephrase.

 7            Did you and Josh talk about the

 8  possibility of employment at EMSI in any

 9  context at the IEDC conference?

10      A.    Yes.

11      Q.    What did you say and what did he

12  say?

13            MS. COOPER:  Objection as to form.

14      Go ahead.

15      A.    If I was ever to leave Chmura, if he

16  would be open to a conversation.

17      Q.    What did you say?

18      A.    That's what I said.

19      Q.    Oh, you initiated it.  I

20  misunderstood.

21      A.    Correct.

22      Q.    Did you seek him out at the

23  conference?

24      A.    No.

25      Q.    You just bumped into him?
```

1                    R. LOMBARDO

2      A.    Yes.  I see him at many conferences.

3      Q.    And you asked him when you bumped

4    into him at the conference if there would ever

5    be an opportunity at EMSI if you left Chmura;

6    is that correct?

7      A.    Yes.

8      Q.    What did he say?

9      A.    His eyes just got real big and to

10   reach out if it was to happen.

11     Q.    Did you have --

12     A.    And said he'd love to have a

13   conversation.

14     Q.    I'm sorry.  Part of your answer got

15   cut off because I was talking over you, and I

16   apologize.  Can you repeat your answer?

17     A.    Yeah, he said he would love to have

18   a conversation.

19     Q.    Which of the two conferences were

20   first, the IEDC or the Texas conference?

21     A.    The Texas conference.

22     Q.    Why did you ask Josh about the

23   possibility of employment?

24     A.    Because I was worried I was going to

25   be pushed out from Chmura.

```
 1                    R. LOMBARDO

 2        Q.    Were you concerned about your

 3   noncompete agreement?

 4        A.    Yeah.  When -- yeah.

 5        Q.    And you approached him anyway?

 6        A.    From my understanding, you're

 7   allowed to work for a competitor.  You're just

 8   not allowed to do it in the same role.

 9        Q.    And other than from counsel, how did

10   you obtain that understanding?

11        A.    Well, Chmura's hired people from

12   EMSI before and other people have left Chmura

13   for EMSI, so they have traded employers

14   before -- employees, I apologize.

15        Q.    Did you and Josh have any other

16   discussions at the conference other than what

17   you've already described?

18        A.    Talked about Chiefs.  He's a big

19   Kansas City Chiefs fan.  And travel.  Nothing

20   other than that.

21        Q.    So Exhibit W is a series of emails

22   primarily trying to set up a phone call.  Is

23   that a fair characterization?

24        A.    Yes.

25        Q.    Did you ultimately get on the phone
```

1              R. LOMBARDO

2    with Josh after you sent Exhibit W?

3         A.    Yes.

4         Q.    When did that happen?

5         A.    I'm not sure of the exact date.  I'm

6    sure it's in here, but I don't know the exact

7    date.

8         Q.    How long did the phone call with

9    Josh last?

10        A.    Under 10 minutes.

11        Q.    What did you say on that call?

12        A.    That it looks like I'm not going to

13   be with Chmura in the near future and if

14   there's any opportunities ...

15        Q.    And what was his response?

16        A.    He asked if I had a noncompete.  I

17   told him that we did, that I did.  And he said

18   at this point, you know, he was only in charge

19   of the economic development and workforce

20   piece, and that's primarily what I worked in so

21   it won't be a match.

22        Q.    Anything else you recall about your

23   conversation with Josh?

24        A.    No.  It didn't last very long.

25        Q.    And so you never got a job offer

```
 1                    R. LOMBARDO

 2   from EMSI?

 3        A.    Correct.

 4              (Plaintiff's Exhibit X marked for

 5        identification.)

 6        Q.    Showing you what's been marked as

 7   Exhibit X, Mr. Lombardo.  It's probably going

 8   to take a few seconds to come up.  After you've

 9   had a chance to look at it, just let me know.

10        A.    Okay.  It did not come through yet.

11        Q.    Yeah, it's slow on my end as well.

12   All right.  It just finished for me, so it may

13   be a few seconds for you.  Did you get it?

14              MR. SATTERWHITE:  Christine, did it

15        come through for you guys?

16              MS. COOPER:  It did.  We just got it

17        and got it opened.

18              MR. SATTERWHITE:  Okay.  Great.

19        A.    Okay.

20        Q.    Exhibit X is a series of text

21   messages between you and Allison, is it Magee?

22        A.    Magee.

23        Q.    It's probably the more common way of

24   pronouncing it, sure.

25              Your text messages are in blue and
```

```
 1                    R. LOMBARDO
 2   hers are in gray; is that right?
 3        A.    Yes.
 4        Q.    Why do yours have the name Butch
 5   above them?
 6        A.    I actually did not know that either.
 7   I'm not sure.  I must have been doing something
 8   with my phone and texting myself something
 9   where I store my own numbers at.
10        Q.    Okay.  So if I could direct your
11   attention to the second page of the exhibit,
12   which is page 149 of the document, on Sunday,
13   October 13th, you texted her and said:  So
14   guess who just offered me a job the day I
15   leave/get fired?
16              Her response is:  LOL, was it Ethan?
17              And your reply is:  EMSI.
18              Correct?
19        A.    Correct.
20        Q.    But that wasn't true, right?
21        A.    Correct.
22        Q.    What was the purpose in telling her
23   that you had an offer from EMSI?
24        A.    I think that was at the conference
25   after I had my chat with him, I thought I would
```

```
1                     R. LOMBARDO
2    be able to get a job there and I thought, like,
3    his response indicated he would love to talk to
4    me.
5         Q.    Your next text says:  I sure hope
6    they fire me on Thursday.
7              The "they" in that sentence is
8    Chmura, right?
9         A.    Yep.
10        Q.    Why did you hope to be fired?
11        A.    Because everything that was going
12   on, it was a very rough 2-week period for me.
13        Q.    So at the time you sent this text --
14   I'm so sorry.  Go ahead.
15        A.    I kind of wanted this all to come to
16   an end.  I was traveling the country going to
17   all these conferences, knowing that it seemed
18   like the company was planning on getting rid of
19   me.  It was pretty hurtful.  I just wanted it
20   all to end.
21        Q.    So at the time you sent this text
22   message to Ms. Magee, did you expect to
23   continue your employment with Chmura?
24        A.    Yes.
25        Q.    If we go down to page 157 -- I'll
```

```
 1                    R. LOMBARDO

 2   tell you which page of the document it is when

 3   I get there.  It's page 10 of the exhibit.  Can

 4   you see that?

 5        A.    Yes.

 6        Q.    The next-to-last text on the page

 7   says:  Just let the attorney deal with it at

 8   this point.  I have a call with EMSI at 6:00

 9   o'clock.

10             Was that the call you just described

11   with Josh?

12        A.    Yes.

13        Q.    Did you have any other calls with

14   EMSI during this period other than what you've

15   already testified to?

16        A.    No.

17        Q.    If you flip over to the next page,

18   Ms. Magee texts you:  I don't understand how

19   they have any grounds for that when it's just

20   Eli's word.

21             And you may need to go back a page.

22   But my question is, what is she talking about

23   here, if you know?

24        A.    I'm not sure.

25        Q.    Your response is:  10 percent chance
```

```
 1                    R. LOMBARDO

 2   he recorded me.  Just my guess.  If not, they

 3   are fucked.

 4              What did you mean by that?

 5        A.    I'm not sure.  I don't remember it

 6   without the context.

 7        Q.    You don't remember why you might

 8   have been concerned about whether Eli recorded

 9   you?

10        A.    I'm not sure the context of this.

11        Q.    So if we go down to page 182, on

12   page 182, it looks like there are two identical

13   texts from Ms. Magee dated November 19th asking

14   you if they provided you a computer.  Do you

15   see that?

16        A.    Yes.

17        Q.    And then moving over to the next

18   page -- well, let me ask this:  Did you have

19   any understanding of why Ms. Magee was asking

20   you about the computer?

21        A.    No.

22        Q.    If you go on the next page, 183

23   there, about the middle of the page, you say:

24   Why do you ask?  I actually told my attorney I

25   would be happy to drop it off weeks ago, but
```

```
 1                      R. LOMBARDO
 2   they told me to hold tight.
 3              Do you see that?
 4        A.    Yes.
 5        Q.    Which attorney are you talking about
 6   here?
 7        A.    My previous attorney.
 8        Q.    What did your attorney tell you
 9   about holding onto the laptop or holding tight
10   with respect to the laptop?
11              MS. COOPER:  I'm going to object on
12         the grounds of attorney-client privilege.
13              MR. SATTERWHITE:  And we'd assert
14         this is a subject matter waiver.  Are you
15         going to instruct him not to answer?
16              MS. COOPER:  Unless we're limiting
17         it to that specific topic, no.
18        Q.    Okay.  What did your attorney tell
19   you about holding tight?
20        A.    He just said hold tight.  I told him
21   I'd return the computer at any point.  I sent
22   him an email with that, sent him an email
23   stating that, and told him I'd turn it over
24   whenever.  He said just hold tight.
25        Q.    So did you understand at this point
```

```
 1                    R. LOMBARDO

 2   that Chmura wanted its laptop back?

 3        A.    Well, according to my attorney, I

 4   guess.

 5              (Plaintiff's Exhibit Y marked for

 6        identification.)

 7        Q.    All right.  Processing Exhibit Y.

 8   Let me know when it comes up and you've had a

 9   chance to look at it.

10        A.    Okay.

11        Q.    Exhibit Y is a series of text

12   messages between you and Kyle West, correct?

13        A.    Yes.

14        Q.    And just as with the previous

15   exhibit, your texts are in blue or I think

16   sometimes in green if you scroll down.  His are

17   in green, correct?

18        A.    Yes.

19        Q.    And I just want to ask you about the

20   second text that you send over on the first

21   page here.  It starts out:  Found out Wilson

22   and I.  Do you see that?

23        A.    Yep.

24        Q.    I think I can avoid reading it out

25   loud.
```

1                    R. LOMBARDO

2             What were you talking about in that

3    text message?

4        A.    I think that was either after a

5    conversation with either Wilson or could have

6    been after the conversation with Eli that I was

7    told this is the way that the company is going

8    now.

9        Q.    And you're referring to the

10   restructuring territory issues that we've been

11   discussing, right?

12       A.    Yes, sir.

13       Q.    And what conversation did you have

14   with Wilson?

15       A.    He was in on that meeting that I was

16   not a part of.

17       Q.    Is this Wilson Cox?

18       A.    Yes.

19       Q.    What did he tell you about the

20   meeting?

21       A.    He told me that the team was picking

22   their territories and this is the direction

23   it's headed, and it's going to be implemented

24   January 1st.

25       Q.    Anything else?

1                    R. LOMBARDO

2        A.    Not that I can recall.

3        Q.    Did you have any discussions with

4   Wilson about what you would do if you were

5   dissatisfied with the way Chmura treated you?

6        A.    Not that I can recall.

7              (Plaintiff's Exhibit Z marked for

8        identification.)

9        Q.    I am displaying Exhibit Z, which

10  should come up for you to be able to look

11  through in just a few seconds.  Take a look at

12  that exhibit and tell me when you've had a

13  chance to do so.

14       A.    Okay.

15       Q.    Exhibit Z is a series of text

16  messages between you and Sarah Manfroni?

17       A.    Yes.

18       Q.    And remind me of her position at the

19  company?

20       A.    She's an account manager.

21       Q.    And you worked with her in

22  Cleveland?

23       A.    Yes.

24       Q.    And the same as with the other text

25  messages we've been looking at, yours are in

1                    R. LOMBARDO

2      blue, hers are in gray, right?  Is that right?

3          A.    Yeah, yeah.

4          Q.    So starting on page N of the texts,

5      it's the third page of the exhibit here, the

6      one that says at the top:  It's just a nail

7      appointment downtown.  Tell me when you see

8      that.

9          A.    I see that.

10         Q.    So I'm trying to find a date

11     reference.  All of these are on October 3rd up

12     until this point; is that correct?

13         A.    Yes, I believe so.

14         Q.    And at the bottom of this page, your

15     next-to-last text says:  I'm the only one that

16     doesn't fall in line with what he has planned.

17               What are you referring to there?

18         A.    For the new vertical alignment.  I'm

19     the only one that doesn't make out in that, I

20     believe.

21         Q.    And when you're talking about the

22     "he" in that sentence, is that Mr. Auerbach or

23     somebody else?

24         A.    I believe Mr. Auerbach.

25         Q.    And on the next page at the top, you

                         R. LOMBARDO

1

2    say:  I'm actually fine with that.  If they

3    don't pay me, I will do everything I can to

4    ruin this place.

5              Do you see that?

6        A.   I do.

7        Q.   And by "this place," you're

8    referring to Chmura?

9        A.   Yes.

10       Q.   And when you say "I'm actually fine

11   with that," what are you talking about that?

12       A.   A buyout, the buyout that was

13   referenced earlier in the text message, I would

14   assume.

15       Q.   So your statement here is if they

16   don't pay me the buyout, you will do everything

17   you can to ruin Chmura, correct?

18       A.   That's the statement.

19       Q.   If we go to the next page, page 12,

20   if you look at your second-to-last text, you

21   say:  Oh, I can fuck them at any point.  I will

22   just call all my clients and tell them what

23   they did and they should look at EMSI.

24             Do you see that?

25       A.   I do.

1                       R. LOMBARDO

2       Q.    And the "them" in that sentence,

3   you're referring to Chmura, right?

4       A.    I assume so, yes.

5       Q.    Is there anybody else that you think

6   you might have been referring to other than

7   Chmura in that text, Mr. Lombardo?

8       A.    No, sir.

9       Q.    So at this point, did you think that

10  you would still be staying at Chmura at the

11  time you sent this text?

12      A.    I was hoping.  I mean, like I said,

13  I never really wanted to leave.  I wanted

14  things to continue to go on.  I liked it there,

15  but everything that was kind of going on at

16  that point, it was a pretty emotional time,

17  finding out that the whole sales team was

18  maneuvering behind my back.  I'm the only one

19  left out of this.  I was the one there the

20  longest, and I was left out of everything.  It

21  was a pretty rough time for me.

22      Q.    All right.  Turning to page 14, this

23  is dated October 17th.  And there's a text from

24  you that says:  So Eli and I talked this

25  morning.  Do you see that?

1                    R. LOMBARDO

2        A.    Yes.

3        Q.    That's the conversation you and Eli

4    had that you've already testified about, right?

5             MS. COOPER:  Objection.  What

6        conversation?  There were multiple

7        conversations with --

8             MR. SATTERWHITE:  You can just

9        object to the form, and I'll be happy to

10       rephrase it if he doesn't understand it.

11       Q.    Do you understand my question,

12   Mr. Lombardo?

13       A.    Yes.

14       Q.    So what's the answer to my question?

15       A.    Yeah.  Like I said, we had multiple

16   conversations of him kind of coming over to my

17   desk and leaving and coming over to my desk and

18   leaving.  So one of those, I would presume.

19       Q.    And her response, Ms. Manfroni's

20   response is:  So now they're not getting rid of

21   you?  That makes no sense.  You can't threaten

22   someone's job like that and then be, like, oh,

23   just kidding.  What are you going to do?

24             Your response is:  Oh, no, I am

25   still gone, but they need to figure out if they

1                    R. LOMBARDO

2    are going to pay me and I go peacefully or they

3    fire me and try to deal with the consequences.

4              Do you see that?

5         A.    I do.

6         Q.    So as of this point, Thursday,

7    October 17th at 8:41 a.m., you knew that your

8    employment with Chmura was ending, correct?

9         A.    No.

10        Q.    What did you mean by "oh, no, I am

11   still gone"?

12        A.    I mean, I assumed that something was

13   going to happen, but I was not sure.

14        Q.    Well, this says:  I'm still gone,

15   but they need to figure out if they're going to

16   pay me and I go peacefully or they fire me and

17   deal with the consequences.

18              Doesn't this mean that you believed

19   your employment was going to end one way or the

20   other?

21        A.    I'm not sure.  I don't recall

22   exactly what I was thinking or feeling when

23   that text was done.

24        Q.    But you wrote it?

25        A.    Yes.

1                        R. LOMBARDO

2        Q.    What did you mean by "consequences"?

3        A.    As I stated, I was going to go after

4    my overtime wages I believed I was entitled to.

5    I didn't --

6        Q.    Does that appear anywhere in your

7    text messages with Ms. Manfroni, this notion of

8    overtime that you know of?

9        A.    No, not that I see.

10       Q.    So if we go over to page 16, at

11   11:43 a.m., Ms. Manfroni says:  They're turning

12   off your Salesforce.

13             And your reply is:  They already did

14   and my email.

15             Do you see that?

16       A.    Yes.

17       Q.    And she says:  If you want a report

18   of your clients, I will run one for you.  Do

19   you see that?

20       A.    Yes.

21       Q.    And your response is:  I'm good

22   there.  What did you mean by that?

23       A.    I'm not sure.

24       Q.    Did it mean that you were good there

25   because you already had a client list

1                    R.  LOMBARDO

2    somewhere?

3         A.    No.

4         Q.    Then what did it mean?

5         A.    I'm not sure.

6         Q.    You then say:  But I might need your

7    Salesforce to pull my sales numbers for me --

8    I'm sorry, over time for my next job.

9              Do you see that?

10        A.    Yeah.

11        Q.    Did you ever ask anyone to do that

12   for you?

13        A.    Yes.

14        Q.    Who?

15        A.    I asked Wilson Cox.

16        Q.    And did he ultimately do it?

17        A.    No.

18        Q.    Did you ask anybody else?

19        A.    No.

20        Q.    Did you at any time after your

21   employment with Chmura ended ever receive from

22   any source a copy of your, quote, sales numbers

23   over time?

24        A.    No.

25

1                      R. LOMBARDO

2             (Plaintiff's Exhibit AA marked for

3         identification.)

4        Q.    Mr. Lombardo, I'm showing you

5    Exhibit AA, which should be coming through for

6    you.  And we talked about this document, but I

7    just want to get it into the record.  Tell me

8    when you've had a chance to look at it.

9        A.    Okay.  I'm familiar with this.

10        Q.    Exhibit AA is the letter you

11    received from this law firm at the beginning of

12    this dispute, right?

13        A.    Yes, sir.

14        Q.    And you received it on or around

15    October 21st?

16        A.    Yes, I believe so.

17        Q.    All right.  And if I could just

18    direct your attention to page 3 of the letter,

19    I have one quick question, if I can make this

20    work.  Nope.  Well, I'll do it the hard way,

21    then.

22             Do you see this top paragraph on

23    page 3 of the letter has a number of clauses

24    with Roman numerals in them?

25        A.    I do.

```
 1                    R. LOMBARDO

 2        Q.    Okay.  Can you direct your attention

 3   to Roman numeral IV.  It says:  Confirms that

 4   you have returned all company property and have

 5   no company information in your possession.

 6        A.    Yes.

 7        Q.    What did you understand that to

 8   mean?

 9              MS. COOPER:  Objection as to form.

10        A.    Return any of their -- any of the

11   stuff that I have.

12        Q.    And did you understand that to

13   include the laptop?

14        A.    Yes.

15        Q.    Do you know when your counsel

16   actually returned Chmura's laptop?

17        A.    I do not know the exact date.

18        Q.    Do you know if it was before or

19   after Chmura filed a lawsuit?

20        A.    I do not know.

21              (Plaintiff's Exhibit Number BB

22        marked for identification.)

23        Q.    All right.  You should have in front

24   of you Exhibit BB.  This is bravo bravo.  Tell

25   me when you've had a chance to look at that.
```

1                      R. LOMBARDO

2            Exhibit BB is a copy of some text

3    messages between you and Wilson Cox, correct?

4         A.    Correct.

5         Q.    And it's the same format as the

6    other texts we've been looking at:  yours are

7    in blue and his are in gray, correct?

8         A.    Correct.

9         Q.    If I could direct your attention

10   over to the page that's got a 42 at the bottom,

11   it's the third page of the exhibit.  Do you see

12   the texts that begin on Monday, October 28th,

13   at 5:48 p.m.?

14        A.    Uh-huh, I do.

15        Q.    There's a text from you to him

16   saying:  Hey, can we connect at some point to

17   get my sales numbers.  I'm going to start to

18   put my resume together.

19            Do you see that?

20        A.    Uh-huh, I do.

21        Q.    This was approximately 1 week after

22   you received the letter from our law firm that

23   we just reviewed, correct?

24        A.    Correct.

25        Q.    And you're asking to connect with

```
 1                    R. LOMBARDO
 2    Mr. Cox in order to obtain sales numbers
 3    relating to your work at Chmura; is that
 4    correct?
 5         A.    Yes.
 6         Q.    Did you ultimately meet with Mr. Cox
 7    or connect with him?
 8         A.    No.
 9         Q.    Why not?
10         A.    I'm not sure.
11         Q.    So he never got you a copy of your
12    sales numbers?
13         A.    No.
14         Q.    Did anybody else?
15         A.    No.
16         Q.    The next page involves texts
17    relating to scheduling.  Do you see where I'm
18    talking about?
19         A.    Yes.
20         Q.    And he says at 5:51 p.m.:  Yep, I'll
21    put it on my calendar now.  And then he adds,
22    personal calendar, LOL.
23               Do you see that?
24         A.    Yes.
25         Q.    And you said:  Yeah, not the best
```

1                       R. LOMBARDO

2    for Outlook.

3            Why did you say that?

4        A.    I don't think management wanted

5    anyone there to even talk to me.

6        Q.    Were you concerned at all about the

7    fact that you were asking Mr. Cox to bring you

8    information from Chmura?

9        A.    I was not.

10           (Plaintiff's Exhibit CC marked for

11           identification.)

12       Q.    Okay.  Showing you what's been

13   marked as Exhibit CC, tell me when you've had a

14   chance to look at it.

15       A.    Yes.

16       Q.    Exhibit CC is a document that you

17   provided to Neva Recruiting in conjunction with

18   your resume and job search; is that correct?

19       A.    Yes.

20       Q.    Where did you get this document?

21       A.    I had that myself from 2017.  It was

22   from Salesforce.

23       Q.    Where physically was it?

24       A.    It was in a folder of paper

25   documents from 2017.

```
 1                    R. LOMBARDO

 2       Q.    Where was the folder?

 3       A.    At my house.

 4       Q.    What else was in the folder?

 5       A.    These three -- these documents here,

 6  some numbers from my last job and then numbers

 7  from my job before that.

 8       Q.    This document, Exhibit CC, shows the

 9  volume for all Chmura account managers; is that

10  correct?

11       A.    Correct.

12       Q.    And then it's broken down by

13  individual account manager, right?

14       A.    Yes.

15       Q.    So it also shows the total revenue

16  figures for the company?

17       A.    No.

18       Q.    Is it possible to derive the total

19  revenue figures for the company by adding up

20  the total sales for each of its account

21  managers?

22       A.    No.

23       Q.    Why not?

24       A.    There's other aspects of the

25  business.
```

1                    R. LOMBARDO

2        Q.    Is it possible to derive the total

3    revenue from the sales of JobsEQ from this

4    document?

5              MS. COOPER:  Objection.  No scope

6         assignment question.

7        Q.    You can answer.

8        A.    Can you ask the question one more

9    time?  I apologize.

10       Q.    Sure.  Is it possible to determine

11   the total sales or total revenue associated

12   with JobsEQ from this document?

13       A.    I don't think so.

14       Q.    Why not?

15       A.    There would be other products in

16   there as well.

17       Q.    When you sent this document to Neva

18   Recruiting, did you ask them not to disclose it

19   to any third parties?

20       A.    No, I don't believe I did.

21       Q.    Did you take any steps to ensure

22   that it wasn't disclosed to any further third

23   parties?

24       A.    I did not.

25       Q.    Do you know to whom Neva Consulting

1                    R. LOMBARDO

2    disclosed this document?

3         A.    I believe it was SharpCloud.

4         Q.    Are they a software company?

5         A.    Yes.

6         Q.    And do you know if when they

7    disclosed the document to SharpCloud, they

8    asked SharpCloud to keep it confidential?

9         A.    I do not know that.

10        Q.    Did you send this document to anyone

11   other than Neva Recruiting after your

12   termination?

13        A.    No.

14        Q.    Did you take any steps to determine

15   whether disclosing this document would violate

16   your confidentiality agreement?

17        A.    No.

18        Q.    Mr. Lombardo, at any time before

19   your separation from Chmura, did you tell any

20   clients that you were considering leaving the

21   company?

22        A.    No.  Not to my knowledge.

23        Q.    Before you left the company, did you

24   suggest to any clients that you were

25   dissatisfied at Chmura?

```
 1                    R. LOMBARDO

 2       A.    No.

 3       Q.    Have you had any contact with Chmura

 4   clients since your termination?

 5       A.    No.

 6       Q.    Where are you currently working?

 7       A.    I'm currently unemployed.

 8       Q.    Are you furloughed or permanently

 9   laid off, to your knowledge?

10       A.    Permanently laid off, to my

11   knowledge.  I was selling software in the

12   hospitals, which wasn't doing so great the last

13   month and a half.

14       Q.    Sure.  What company were you working

15   for?

16       A.    Complion.

17       Q.    And you said that was software

18   sales?

19       A.    Yes.

20       Q.    When did you start working for them?

21       A.    January 6th.

22       Q.    And when was your last day?

23       A.    I believe April 7th.

24       Q.    Did you have a written employment

25   agreement with Complion?
```

1                        R. LOMBARDO

2        A.    I believe so.

3        Q.    What was your compensation while you

4    were there?

5        A.    It was a base of 65,000 and then

6    commissions.

7        Q.    What was your commission percentage?

8        A.    It changed to 6 percent overall.

9        Q.    6?

10       A.    Yes.

11       Q.    And what was it before it was

12   changed to 6?

13       A.    It got changed on like my fourth day

14   there, so I'm not exactly sure.  It was a

15   tiered structure based on how much you sell.

16   If you -- I don't know.  These are madeup

17   numbers.  If you sell 200,000, you get

18   5 percent.  Sell 400,000, 7 percent.  The

19   percentage went up with the more you sold.

20       Q.    What kind of software was it?

21       A.    Regulatory compliance software for

22   medical research centers for hospitals.

23       Q.    Had you started to look for any

24   other jobs before you were laid off on

25   April 7th?

1                         R. LOMBARDO

2        A.    Yeah.

3        Q.    Why?

4        A.    A lot of things changed at the

5    company, at Complion when I started.  My hiring

6    manager, he was the one who I did all my

7    interviews with, he was removed from the sales

8    manager role the first week that I was there.

9    I was also told during interviews I was

10   replacing somebody that was doing so well in

11   the biz market that they moved him to

12   enterprise.  And they walked me through kind of

13   how to move throughout the organization, that I

14   could get to the enterprise level within

15   6 months, and that's where you could make X, Y,

16   and Z.

17               I found out after a few weeks there,

18   he never sold anything.  The company in general

19   had not made any significant sales over 10,000

20   in the last, you know, 4 to 6 months.  So a lot

21   of things that I was told during the interview

22   ended up not being true.

23        Q.    Can you approximate your total

24   compensation that you received from Complion

25   while you were there?

```
 1                    R. LOMBARDO
 2        A.    I was making $65,000 a year,
 3   whatever divided by, you know, a fourth of
 4   that.  I was also getting a $2,000 a month
 5   ramp-up bonus for the first 6 months there.
 6        Q.    Did you earn any actual commissions
 7   under the program?
 8        A.    No.
 9        Q.    Who is Jennifer Ludwig?
10        A.    She was an account manager at
11   Chmura.
12        Q.    In Cleveland?
13        A.    In Richmond.
14        Q.    Did you ever meet her?
15        A.    Not in person.
16        Q.    Talk to her on the phone?
17        A.    Yes.
18        Q.    How many times?
19        A.    I'm not sure.
20        Q.    Did you ever discuss compensation or
21   overtime pay with her?
22        A.    No, not to my knowledge.
23        Q.    Do you have any personal knowledge
24   of her compensation?
25        A.    No.
```

1                          R. LOMBARDO

2        Q.    Do you have any personal knowledge

3    of her employment status at Chmura?

4        A.    Currently?

5        Q.    At any time.

6        A.    I'm not sure what you mean by that

7    question.  I knew when we hired her and when

8    she left.  I don't know if that's what you

9    meant.

10       Q.    Let me rephrase it.

11             Do you have any knowledge whether

12   she was a Chmura employee or an independent

13   contractor at the time she performed services

14   for Chmura?

15       A.    No.

16       Q.    Did you ever discuss her

17   compensation or her entitlement to overtime

18   with anyone at Chmura?

19       A.    No.

20       Q.    Did you ever hear anyone else

21   discuss those subjects?

22       A.    Not to my knowledge.

23       Q.    Did you discuss whether or not

24   Jennifer Ludwig was entitled to overtime?

25       A.    Not that I can remember.

```
 1                    R. LOMBARDO
 2        MR. SATTERWHITE:  Why don't we take
 3   a short break, Christine.  I'll look over
 4   my notes, figure out where we go from here.
 5        MS. COOPER:  Sounds good.  Do you
 6   want to take 5, 10?
 7        MR. SATTERWHITE:  Let's take 10.
 8        MS. COOPER:  Thanks, Rod.
 9             (A short break was taken.)
10        MR. SATTERWHITE:  Back on the
11   record, Rachel.  We don't have any other
12   questions for Mr. Lombardo at this time.
13        MS. COOPER:  Oh.  Well, that's a
14   surprise.  Thank you.  He will read.
15             (Witness excused, 3:40.)
16
17             ------------------------
18             RICHARD A. LOMBARDO
19
20   Subscribed and sworn to before me
21   this _____ day of _____ 2020.
22
23             ------------------------
24
25
```

```
 1                        R. LOMBARDO

 2                  C E R T I F I C A T E

 3    STATE OF ILLINOIS  )
                         ) ss.:
 4    COUNTY OF COOK     )

 5         I, RACHEL F. GARD, CSR, RPR, CLR, CRR,

 6    within and for the State of Illinois do hereby

 7    certify:

 8         That RICHARD LOMBARDO, the witness whose

 9    deposition is hereinbefore set forth, was

10    duly sworn by me and that such deposition

11    is a true record of the testimony given by

12    such witness.

13         I further certify that I am not

14    related to any of the parties to this

15    action by blood or marriage; and that I am

16    in no way interested in the outcome of this

17    matter.

18         IN WITNESS WHEREOF, I have hereunto

19    set my hand this 6th day of May, 2020.

20                    Rachel F Gard

21    _____

22    RACHEL F. GARD, CSR, RPR, CLR, CRR

23

24

25
```