# Exhibit 5

1              KYLE WEST

2

3         IMPORTANT NOTICE

4

5      ***PLEASE READ BEFORE USING ROUGH DRAFT***

6

7   AGREEMENT OF PARTIES WORKING WITH ROUGH DRAFTS

8              We, the party working with

9   realtime and rough draft transcripts,

10  understand that if we choose to use the rough

11  draft, or the printout, that we are doing so

12  with the understanding the rough draft is an

13  uncertified copy.

14             We further agree that the

15  uncertified rough draft transcript cannot be

16  quoted in any pleading or for any other purpose

17  and may not be filed with any court.  However,

18  our own experts, witnesses, co-counsel and

19  staff may have limited internal use of same

20  with the understanding that we agree to destroy

21  our rough draft and/or any computerized form,

22  if any, and replace it with the final

23  transcript upon its completion.

24             CASE:  Chmura v. Lombardo

25             WITNESS:  KYLE WEST

1                    KYLE WEST

2

3  DATE:   May 14,2020

4

5

6                 REPORTER'S NOTE:

7            Since this deposition is in rough

8  draft form, please be aware that there may be a

9  discrepancy regarding page and line number when

10  comparing the rough draft, rough draft disk and

11  the final transcript.

12  Also please be aware that the uncertified rough

13  draft transcript may contain untranslated

14  steno, reporter's notes or misspelled proper

15  names, incorrect or missing Q/A symbols or

16  punctuation, and/or nonsensical English word

17  combinations.

18            All such entries will be corrected

19  on the final, certified transcript.

20

21  Monna J. Nickeson CRR, CLR, RPR, CCR License

22  No. 3233

23

24

25

```
 1                   KYLE WEST

 2                   KYLE WEST

 3   Having been first duly sworn, was examined and

 4   testified as follows:

 5                   DIRECT EXAMINATION

 6   BY Mr. MICHALIK:

 7        Q.    Good evening, Mr. -- I guess good

 8   afternoon, where you're at Mr. West, my name is

 9   Chris Michalik.  I'm an attorney for Chmura

10   Analytics.  I'll be taking your deposition

11   today in the litigation dispute between Rick

12   Lombardo and Chmura Analytics.  I'm going to go

13   through some ground rules so you understand how

14   the deposition process works.  First have you

15   ever given a deposition before?

16        A.    No.

17        Q.    Then just briefly give you some

18   background rules to keep in mind.  First of

19   all, you as far as you're under oath so this is

20   like as if you were testifying in a court of

21   law?

22        A.    That's clear, yes.

23        Q.    And there's a court reporter who is

24   going to be taking down what you say and I say.

25   So it's going to be important so she can get
```

```
 1                    KYLE WEST

 2   what we say down that we don't talk over each

 3   other, so if you will let me finish my

 4   questions before you answer, and then I'll let

 5   you finish your answer before I ask another

 6   question, that way she'll be able to get

 7   everything we say down, is that clear?

 8        A.    Roger that.

 9        Q.    And in that same vain, we naturally

10   just in talking sometimes will nod our head up

11   or down or say uh-huh.  Or uh-uh, that's

12   difficult for the court reporter to get down

13   particularly in the circumstances we are in

14   today with the virtual deposition, so just

15   answer audibly, okay?

16        A.    Yes.

17        Q.    And if you don't understand a

18   question -- a question that I say, just let me

19   know and I'll rephrase it.  If you respond I'm

20   going to assume that you understood the

21   question that I asked?

22        A.    Roger that.

23        Q.    One last thing, I don't think we'll

24   be here overly long today, but this is not a

25   marathon so if you need a break we can take a
```

1                      KYLE WEST

2    break I may finish a line of questioning before

3    we go into the break, okay?

4         A.    Thank you.

5         Q.    A couple of other background

6    questions, did you review any documents in

7    preparation for your deposition today?

8         A.    I took a look at the declaration

9    that I signed.

10        Q.    Okay.

11        A.    I reviewed the subpoena I believe it

12   was that I received in the mail one or two

13   weeks ago.

14        Q.    Any other documents other than

15   those?

16        A.    No.  I was not aware of anything

17   that I was supposed to review.

18        Q.    Okay.  And did you talk to anyone in

19   preparation for your deposition today?

20        A.    Aside from Ms. Cooper three to four

21   weeks ago when I prepared the declaration, I

22   apologize if that's not the right term, but the

23   statement that I provided.

24        Q.    Okay.  And in your conversations

25   with Ms. Cooper, what did you and she discuss?

1          KYLE WEST

2          A.    So she confirmed my employment with

3    Chmura in terms of the duration, the various

4    positions that I held, and she asked some, I

5    would say, high-level questions about the

6    extent to which I interacted with Richard

7    Lombardo.

8          Q.    And the declaration that you signed,

9    did you draft that declaration?

10         A.    I asked her if she could draft it

11   and send it to me for review, which she did.

12   And I made edits and returned it to her.  She

13   sent, I'll say, the edited version back to me,

14   I signed it and returned it to her.

15         Q.    Other than Ms. Cooper, have you

16   spoken with anybody else in preparation for

17   your deposition today?

18         A.    No.  My wife.

19         Q.    I'm sorry.  Go ahead?

20         A.    My wife.

21         Q.    Okay.  And anyone other than your

22   wife and Ms. Coopers, have you spoken to

23   anybody in preparation for your deposition

24   today?

25         A.    No.  I wouldn't say in preparation.

1                        KYLE WEST

2    I have a friend here in Spokane who is an

3    attorney.

4         Q.    Okay.

5         A.    That I just asked questions about.

6         Q.    I'm sorry.  I interrupted you.  Go

7    ahead.

8         A.    I asked my friend some basic

9    questions about what to expect, what precisely

10   a deposition was.  Of course the questions that

11   questions that I asked you a few weeks on the

12   phone.

13        Q.    Other than those individuals that

14   you spoke with in preparation for your

15   deposition?

16        A.    No.

17        Q.    Did you speak with Mr. Lombardo in

18   preparation for your deposition?

19        A.    No.

20        Q.    I'm going to ask some background

21   questions about your employment history

22   specifically with Chmura.  Do you recall when

23   you became employed with Chmura?

24        A.    I do.

25        Q.    And when was that?

```
 1                   KYLE WEST

 2       A.    July of 2015.

 3       Q.    And do you recall what position you

 4  were hired for?

 5       A.    I believe the initial title was West

 6  Coast Products director.  It changed within my

 7  first week to applied economics and technology

 8  advisor.

 9       Q.    Okay.  And you said West Coast, I

10  understand that you're on the West Coast today.

11  Have you always been located on the West Coast?

12       A.    No.  I grew up in Illinois, and I've

13  been in the State of Washington since 2001.  I

14  lived in Richmond from roughly July to --

15  Richmond, Virginia, that is, from about July of

16  2015 through Septemberish of 2015.

17       Q.    Okay.  And when you were done living

18  in Richmond, that period did you move back to

19  the State of Washington?

20       A.    Correct.

21       Q.    And have you been in, at least

22  during your employment with Chmura, were you in

23  Washington for the rest of that time period?

24       A.    My residence has always been in

25  Washington.  I'm not sure the level of detail
```

1                    KYLE WEST

2    you want.  Outside of Spokane, my residence

3    address has always been Washington since 2001,

4    yes.

5         Q.    During your time that you were

6    employed by Chmura, except for the period that

7    you referenced the several month period that

8    you referenced when you were in Richmond,

9    Virginia, was your work -- your primary work

10   location located in the State of Washington?

11        A.    Yes, in terms of where I was

12   physically located, yes.

13        Q.    Yes.  Okay.  I just want some brief

14   background about your history before you came

15   to work for Chmura in 2015.  Did you attend

16   post high school education?  Did you go to

17   college?

18        A.    I did.

19        Q.    And where did you go?

20        A.    St. Norbert college.

21        Q.    Do you recall what degree you

22   received?

23        A.    I do.

24        Q.    And what was that?

25        A.    I received a bachelor's degree with

ROUGH TRANSCRIPT

1                    KYLE WEST

2    majors in economics and philosophy.

3         Q.    And did you achieve -- go through

4    any further education?  Did you receive a

5    masters or a Ph.D. or any type of post

6    education degree like that?

7         A.    I did.

8         Q.    And what did you receive?

9         A.    I received a masters of health

10   policy and administration.

11        Q.    And where was that from?

12        A.    Washington State University.

13        Q.    Any other degrees that you received?

14        A.    No.  I was enrolled for one year in

15   a graduate program in philosophy, ^  unified

16   applied ethics at Gonzaga university which is

17   why I moved here in the first place.  And I'm

18   currently enrolled in a master's of business

19   administration program also at Gonzaga.

20        Q.    Before you began working for Chmura,

21   where were you working immediately prior to

22   that?

23        A.    Spokane Area Workforce Development

24   Council.

25        Q.    And what position did you hold?

ROUGH TRANSCRIPT

```
 1                     KYLE WEST

 2       A.    My title, if that's what you're

 3  asking, was business and development manager.

 4       Q.    Can you just very briefly describe

 5  what your job duties entailed?

 6       A.    Yeah.  So I had two major pillars of

 7  my job description, the development side was to

 8  quote-unquote develop resources.  We were a 501

 9  C3 or a nonprofit organization.  So I led

10  efforts to develop and secure resources to

11  launch workforce programs, college and career

12  readiness type programs at local schools or

13  other nonprofit agencies.  It was roughly half

14  my job.  The other part of my job was to

15  prepare and deliver reports, make presentations

16  on labor market information for the greater

17  Spokane region which roughly at the time was

18  considered a three county metro area in eastern

19  Washington.

20       Q.    And how long did you --

21             (Parties speaking simultaneously.)

22       Q.    I'm sorry?

23       A.    Is that a sufficient description?

24       Q.    Absolutely.  How long did you hold

25  that position?
```

1                     KYLE WEST

2        A.    October of 2013 through the time

3   when I joined Chmura, so Junish of 2015.

4        Q.    And your job that you had prior to

5   that that job, was it in a similar type of

6   industry?

7        A.    Yes, it was in the nonprofit sector

8   in more education-related, but there were

9   overlaps with workforce and industry

10  engagement.

11       Q.    And who was that -- who were you

12  employed by at that time?

13       A.    Mobious Spokane M O B I U S.

14       Q.    And how long were you employed with

15  Mobious Spokane?

16       A.    I was an employee from -- I don't

17  recall.  Nearly two years prior to joining

18  their team, they were a client of mine for

19  maybe three to four months.

20       Q.    Okay.  And a client of yours, what

21  was your position before you joined -- who did

22  you work for before you joined Mobious Spokane?

23       A.    I was a sole proprietor.

24       Q.    What kind of business did you

25  operate?

```
 1                    KYLE WEST

 2        A.    Nonprofit consulting, proposal

 3   writing and research.

 4        Q.    And that would be writing proposals

 5   to get grants and sources of funding, is that

 6   what you were doing?

 7        A.    Correct.

 8        Q.    And is that what you did before

 9   you -- soup until the time you joined Mobious

10   Spokane, is that what you were doing, operating

11   your sole proprietorship?

12        A.    No.  I mean, that's what I was

13   doing, but I also worked at local restaurants.

14        Q.    Turning now to your time with

15   Chmura, I believe, if I have this down

16   correctly, within roughly the first week or so

17   your title in 2015 was applied economics, and

18   did I hear this -- technology advisor?

19        A.    Correct.

20        Q.    Can you briefly describe what that

21   position entailed?

22        A.    Yes.

23        Q.    Would you do that for the record,

24   please?

25        A.    Sure.  So at the time, I'm going to
```

ROUGH TRANSCRIPT

```
 1                    KYLE WEST

 2   break this down into roughly the first few

 3   months, the period of time that I was located

 4   in Richmond, and I'll describe what I did when

 5   I returned to Spokane.  So the time that I

 6   spent in Richmond in those first few months,

 7   you know, aside from getting oriented and

 8   acclimated to Chmura, I worked on several

 9   proposals, competitive bid, if you will.  From

10   what I recall, they were all to local

11   governments and nonprofits.  I remember one to

12   goodwill industries, which would be a

13   nonprofit, and then several to local

14   governments or similar.  I spent a lot of time

15   working with the sales team because I was a

16   user, I was a client of Chmura for almost two

17   years, I believe.  And I was a very active user

18   of their software.  Arguably, more importantly,

19   I was a client of Chmura's main competitor

20   EMSI.  So I spent a lot of time not just with

21   the sales team but with Chmura as a whole

22   developing approaching, what we describe as use

23   cases, so, you know, how does a prospective

24   client or user, how would they apply mainly

25   JobsEQ, also other products, labor EQ and
```

1                    KYLE WEST

2    Career Concourse, but the bulk related to job

3    JobsEQ.  Are you still there, Chris?

4         Q.    I'm still here.  Christine saw this

5    last week for whatever reason, we have

6    periodically my video will cut out, but I am

7    here by audio the entire time.

8         A.    Great.  I just don't want to repeat

9    myself.

10        Q.    So you were describing --

11        A.    Thank you.

12             So I spent a lot of time developing

13   use cases, helping members of the team to

14   understand, I'll say the value of the product

15   through the different audiences that we served,

16   mainly economic developers, work force

17   developers, eventually a little bit of

18   education, the education market.  And like I

19   said I spent a lot of time writing proposals.

20   When I returned to Spokane, we -- the other

21   thing I was doing quite a bit of probably half

22   one month was on onboarding new clients.  So a

23   member of the sales team would close a deal and

24   that new client would receive training.  At the

25   time we provided one-to-one trainings, one

1                    KYLE WEST

2  Chmura staff to one client, which could be four

3  users, that was rare that all the users would

4  show up.  But all of new clients were either

5  referred to me or to Greg Chmura who at the

6  time, you know, I don't recall -- I don't -- I

7  don't think he was the chief quality officer,

8  but he was really I think historically, he and

9  another colleague Allison had been doing all

10  the training.  So I came in and took over, if I

11  recall correctly, I think Allison stopped doing

12  trainings if she was ever doing them in the

13  first place, but I think just given Greg's

14  bandwidth and his increasing responsibilities,

15  I probably started to deliver the bulk of those

16  trainings.  So when I returned to Spokane, I

17  continued to deliver trainings, of course, but

18  what we did was we, you know, we -- it wasn't a

19  hard agreement, but between Greg and I, we

20  tried to arrange things so that I would do the

21  trainings for clients in the mountain and

22  Pacific time zone, maybe clients that weren't

23  available, you know, I guess, at certain hours,

24  I don't recall, but we also hired another

25  inside salesperson in the Spokane office.  And

ROUGH TRANSCRIPT

1                        KYLE WEST

2    that position was more or less dedicated to

3    prospecting western states, maybe some mountain

4    time zone, I don't recall, but, you know,

5    certainly west of the Mississippi.  And

6    Richard -- maybe a gentleman I think his name

7    was James, I forget they had some clients in

8    the western states.

9        Q.    Mr. West, let me just stop right

10   there so the record is clear, when you say

11   Richard, are you referring to Mr. Lombardo?

12       A.    Yes, I'm sorry.  Rick.

13       Q.    And you mentioned Jim?

14       A.    Should I call him Mr. Lombardo or

15   Rick?

16       Q.    Either one is fine.  I just wanted

17   to make sure we knew who you were referencing

18   when you said Richard and so the record would

19   reflect that.

20             You also mentioned a gentleman named

21   James, do you know his last name?

22       A.    I believe it was James Donovan or

23   Jim Donovan.

24       Q.    Sorry to interrupt.  Go ahead.  I

25   just wanted to make sure the record is clear.

1              KYLE WEST

2        A.    So just -- so Jim, if I recall

3   correctly, those two started the inside sales,

4   they were the first two hires when Wesley laid

5   out this, you know, the inside sales team, so

6   Jim was located in Cleveland, alongside Rick.

7   And I think --

8        Q.    And was any -- were they already

9   employed when you became employed or did they

10  become employed after you did?

11       A.    You know, they -- I believe they

12  came on board roughly around February -- I

13  think they were hired at the same time because

14  my impression was the inside sales team was a

15  new thing and it was starting that year, and it

16  was roughly 2015 and I remember this because

17  the first time I met him was at an event

18  with -- where Chris and Leslie were and I

19  believe it was both of them in March, an event

20  that's always in March and I think they were

21  brand-new especially Jim, I remember he was

22  just I think I'd given a presentation with

23  Chris and Jim was just kind of excited and

24  eager to learn and at the time of course I

25  wasn't working for Chmura, but I don't even

```
 1                    KYLE WEST
 2  know if he was doing dome most yet I think he
 3  was, but he wanted to consume a lot of
 4  information and I remember meeting Rick at the
 5  time as well in the booth with I think it was
 6  just Chris and Leslie at the time.
 7       Q.   Okay.  And you described your -- you
 8  were describing your job duties once you got to
 9  Spokane and --
10       A.   Yes.
11       Q.   And with some interruption, were
12  there other job duties you had while you were
13  the applied economics and technology advisor?
14       A.   Yes.  So we hired another inside
15  salesperson to focus on the western state, they
16  were co-located with me here in Spokane, that
17  person's name was Dennis Shell.  And you know,
18  it was my job to train Dennis on how -- you
19  know, on JobsEQ, so I spent a lot of time on
20  training Dennis.  After Dennis, we hired
21  another -- I don't recall the sequence I think
22  we hired a gentleman named Doug Cey, C E Y, the
23  brother, if you're a baseball fan, of Ron --
24  baseman, Ron Cey, so Doug is his brother.  Just
25  for the record, so you spell the last name
```

```
 1                       KYLE WEST

 2   right.  And then we had a gentleman named Brent

 3   last name Keath, K E A T H, and I don't know

 4   who came after Dennis, but so all of those

 5   individuals I trained on JobsEQ.  I worked with

 6   them on their sales script.  I made

 7   introductions, even though I wasn't a member,

 8   per se, of the sales team.  They didn't report

 9   to me and I don't know that I was their

10   supervisor, but I certainly worked with them a

11   lot.  We didn't have a training program in

12   place, I would say, so I spent a lot of time

13   working with the different especially the new

14   sales team members and certainly in the Spokane

15   office, working on their demos and use cases

16   and things of that nature.  And then I also

17   worked on a few projects, client facing

18   projects.  I traveled to, you know, so these

19   would be thanks we would submit a proposal for,

20   you know, through competitive solicitation

21   process and we'd get awarded the contract so I

22   would contribute to those projects.  Sometimes

23   I would travel to different client sites for

24   example Dallas and San Bernardino, California

25   to engage clients during a project or present
```

```
 1                    KYLE WEST

 2   the findings for a project, Denver, Colorado,

 3   actually with a gentleman from your firm, good

 4   guy.  I forget his name.  It was an impact

 5   study.  Anyway, so I would travel to

 6   conferences, I would attend conferences.  We,

 7   you know, we tried to assign me to conferences

 8   that were located in the western states, for

 9   example, in California, but I often attended

10   conferences that were in other places as well

11   as -- especially if they were workforce related

12   like the national institute of workforce boards

13   and I attended economic development type

14   conferences a couple of education conferences

15   so, you know, I feel like I certainly, you

16   know, would represent Chmura at various types

17   of events.  I think that's -- that first job

18   title, I would say that's kind of the general

19   description.

20        Q.   And you had referenced what you were

21   just saying, and I was trying to get it down I

22   may not have gotten down the exact wording, but

23   particularly with new sales associates or

24   account managers you helped them with their

25   sales pitch, did I hear that correctly?
```

1                    KYLE WEST

2        A.    Correct.

3        Q.    And would each person have an

4   individual pitch that would work for them?

5        A.    I don't know if I would go that far.

6   I recall early on at all -- I believe all PE

7   mail correspondence the account managers were

8   to copy Leslie, and I see Leslie is here so she

9   could corroborate this.  And she would I think

10  provide, you know, guidance on the way scripts

11  were, so I don't know -- I wouldn't say that

12  everybody had their voice.  Chmura certainly

13  has a pretty rigid style, if you will, style,

14  voice, identity, and I don't think -- I don't

15  think people just kind of threw their own

16  original scripts out there.  What I did was I

17  really contributed to the use cases, so a lot

18  of the prospecting, if not all of it, is over

19  the phone, through email and you're making

20  hundreds of calls or emails every day.  The

21  script isn't unique.  I mean, every time you're

22  really maybe modifying an existing or

23  underlying script.  So I think there -- you

24  know, in the moment there was probably some

25  flexibility that something would reflect

```
 1                    KYLE WEST
 2   something's voice and of course has unique
 3   personalities, but I don't think they had free
 4   rein to, you know, bend communication that just
 5   reflected their own style and voice.
 6        Q.    During this position, the applied
 7   economics and technology advisor, how much --
 8   what percent of your time would you say you
 9   were spending on interacting with the sales
10   team?
11        A.    At least one-third.
12        Q.    And at some point did you take on a
13   different position at Chmura?
14        A.    I did.
15        Q.    And do you recall when that was
16   roughly?
17        A.    Yeah, so the next position I took on
18   was the managing director of sales roughly
19   February of 2017.
20        Q.    And how did that -- how did your job
21   duties in that position differ from the job
22   duties you had as an applied economics and
23   technology advisor?
24        A.    Well, I mean, they changed quite a
25   bit because I shifted my focus almost entirely
```

ROUGH TRANSCRIPT

Page 24

1                    KYLE WEST

2    to managing a sales team.  And at the time we

3    had hired three new inside salespeople.  I

4    believe they were all -- I believe they were

5    all focused on education, so there was Wilson,

6    Jennifer, and John.  So they were hired before

7    I began, but I recall we had limited bandwidth

8    internally to manage and train and get this

9    team up and running.  So, you know, it was a

10   lot of work to get everybody acclimated, I

11   recall every week we bet virtually because we

12   had Jennifer was in Richmond, Wilson was in

13   Richmond, John was in Cleveland, I was in

14   Spokane, so we bet multiple times per week to

15   do trainings, to practice demos, to ask each

16   other questions, do these things they call rah

17   Robbins, et cetera, and I also started to

18   really leverage our customer relationship

19   management platform called sales force to get a

20   clearer idea of sales team activity, to compare

21   the performance and output of different sales

22   team members, so I would prepare these weekly

23   dashboards and share them with the leadership

24   of Chmura, and I think the sales team was

25   probably on those, you know, correspondence as

```
 1                    KYLE WEST

 2    well.  So I would meet with the sales team

 3    probably two to three times per week and then I

 4    believe I would meet and I met with Leslie at

 5    least once -- scheduled at least once per week

 6    I think on Mondays.  You can look in the

 7    Outlook records, I'm sure.  And then I think we

 8    had a monthly meeting with leadership and sales

 9    I believe.  I'm sure that's in the records,

10    too, but I don't recall.  But I certainly focus

11    add lot more of my team and energy on the sales

12    team and getting them acclimated, up and

13    running.  I still continued to work on a couple

14    of projects.  I remember one in Dallas and then

15    one in California -- or two in St. Cruise and

16    San Bernardino so maybe 75 percent of my time

17    was committed to managing the sales team, 75 to

18    90 percent, I did say.

19         Q.    And you were referencing getting the

20    sales team up and running.  Are those the three

21    individuals that you reference that you hired

22    either right before you started in the position

23    or right after?

24         A.    They were hired before I started in

25    the position.  I have no doubt about that
```

                         KYLE WEST

1

2  because it -- there was just a lot of turmoil,

3  I would say, at the time, and a lot of that was

4  related to these new persons not having

5  guidance or support, not knowing what to do.

6  So I spent most of my time with them, but I

7  also spent a tremendous amount of time with as

8  you opportunity virtually as well as Rick.

9       Q.    And who is Austin again, just so

10 record is clear, do you know Austin's last

11 name?

12      A.    That's Austin Steele, S T E E L E, I

13 believe.

14      Q.    And the three individuals that you

15 referenced to were hired shortly before you

16 took over the position or assumed the position,

17 did they have a sales background, do you know?

18      A.    Yes, well, yes, so, yes, Wilson did,

19 John did -- John also had background in maybe a

20 lab industry.  I don't know -- I don't -- I

21 don't recall specifically what he did.

22 Jennifer I never actually knew.  She was hired

23 I believe through like a temp agency.  I'm sure

24 that she was, you know, an experienced inside

25 salesperson.  I don't -- I know that the temp

```
 1                     KYLE WEST

 2   agencies do their vetting and we would

 3   create -- because we did this in Spokane we'd

 4   create a very specific profile of the kind of

 5   candidate that we wanted, so I am certain that

 6   they all had a sales background, yes.

 7        Q.    Did it take a lot of effort on your

 8   part to get those three individuals operating

 9   the way you wanted them to within the Chmura

10   family?

11        A.    Yes.

12        Q.    Roughly, just so we know, is this a

13   lot of effort over a week or two, or are we

14   talking a month time framed to get them how you

15   thought they would?

16        A.    More than a month.

17        Q.    More than a month.  Okay.  And how

18   long were you in that position, do you recall?

19        A.    Well, I mean, I do recall, you know,

20   roughly September 2017.

21        Q.    So is when you switched to a new

22   position?

23        A.    Yeah, I mean, it's not that

24   clear-cut.  I don't know that I had a title

25   change until January of 2018, but I -- my
```

Page 28

```
 1                    KYLE WEST

 2   duties changed.

 3        Q.    Let's address that in two ways,

 4   first of all when you did get a title change,

 5   whenever that was, what was your new title?

 6        A.    Director of workforce development.

 7        Q.    And now the second part of that, you

 8   referenced your job duties change, how did your

 9   job duties change?

10        A.    Well, I believe, and you could of

11   course confirm this, but I believe that Greg

12   Chmura began to kind of take over more of the

13   management of the sales team, and I recall that

14   I started to do some research and develop a

15   plan or blueprints or what would become a

16   web-based training platform for JobsEQ clients,

17   and I don't recall, you know, it wasn't

18   immediate that I stopped, you know, having

19   interactions or, you know, management

20   responsibilities related to the sales, but Greg

21   certainly started to take things over, I would

22   say.  And I can't put a date on that.

23        Q.    Sometime roughly Septemberish -- it

24   began Septemberish of '17?

25        A.    September/October.
```

```
 1                      KYLE WEST

 2       Q.    Okay.  And you mentioned the work

 3   you were doing on the web-based JobsEQ, was

 4   that a substantial project?

 5       A.    Yes.

 6       Q.    And were you successful in

 7   accomplishing that project?

 8       A.    Yes.

 9       Q.    And do you recall roughly how long

10   it took you to get that project completed?

11       A.    Yeah, you mean in terms of duration

12   or hours or --

13       Q.    Duration.  Calendar duration.

14       A.    Yeah, so I delivered the project by

15   November of 2018.

16       Q.    So it was a year long project?

17       A.    Well, not quite, but looking at a

18   calendar year.

19            THE COURT REPORTER:  You're starting

20       to talk over each.

21       Q.    Was it generally a year long

22   project?

23       A.    Based on the calendar, yes, but I

24   wasn't only working on that project in November

25   and December.  Of 2017, I was working on other
```

ROUGH TRANSCRIPT

Page 30

```
 1                    KYLE WEST
 2   things and I was gone for the month of January,
 3   2018 and I was gone for the month of April
 4   2018.  I also worked on a project during, you
 5   know, other projects during that time, but if
 6   you look at calendar, yes, Novemberish to
 7   Novemberish.
 8        Q.    And I just want to make sure I
 9   understand when you say you were gone in
10   January of 2018, were you gone working on
11   another project or were you taking time off
12   from work?  What do you mean you were gone
13   during that period?  It wasn't clear to me.
14        A.    Chmura extended me a leave of
15   absence for two months.
16        Q.    And that leave of absence was, was
17   it a move out in January of 2018 and then the
18   other period you said you were gone was also
19   part of the leave of absence?
20        A.    Correct.
21        Q.    And when was the -- just I'm clear,
22   when was the second period of that leave of
23   absence?
24        A.    The month of April, 2018.
25        Q.    And so you also referenced other
```

ROUGH TRANSCRIPT

                              KYLE WEST

1
2    projects you were working on during that time.

3    Do you recall the types of projects and by that

4    time, I mean from roughly September of 2017

5    until November of '18, other types of projects

6    that you were working on?

7        A.    Yes.  Well, at least one of them was

8    a project for an economic development agency in

9    California, San Bernardino county.

10       Q.    Anything else during this time

11   period that you were focusing your work

12   attention on?

13       A.    Not that I recall.  I mean, I'm sure

14   there were other things, but that was the

15   major -- those were the major things that

16   consumed my time.

17       Q.    The JobsEQ web-based project you

18   were doing and some of the other projects that

19   you mentioned that you were interspersed in

20   there; is that correct?

21       A.    Correct.  I don't recall, but Career

22   Concourse might have been during that time,

23   that might have been when I was managing the

24   sales team.  I don't recall.  It was after -- I

25   believe after I was an applied technology and

ROUGH TRANSCRIPT

1                    KYLE WEST

2   whatever -- applied economics and technology

3   advisor.

4        Q.    So I'm clear, you mentioned Career

5   Concourse, what is Career Concourse?

6        A.    It's a career exploration software.

7   Just another project in the suite of products.

8        Q.    And so you had a project to work on

9   Career Concourse or develop it or what was your

10  project with Career Concourse?

11       A.    I was a contributor to its, I guess,

12  revamping or revitalization.  So John Chmura

13  provided me with mockups, if you will, examples

14  like screen shots and then Greg and I worked on

15  questionnaire, and I went out to campuses and I

16  would ask students, you know, I would basically

17  get their reaction to the mock -- different

18  screen shots, just part of product development.

19  I was a minor contributor, but that was another

20  product at the time.

21       Q.    Were you involved in the decision to

22  revamp Career Concourse at all?

23       A.    Well, I was part of the

24  conversation, yes.  I wouldn't say I was

25  involved in the decision.  The decision was

```
 1                    KYLE WEST
 2  made, I forget the name at the time, but what
 3  is now the SEA Group under the equity partners.
 4  I remember a few conversations, one
 5  specifically because I was commuting to
 6  conference.  I was driving down the freeway, a
 7  state development conference, and we were
 8  having the SEA Group meeting, and one of the
 9  major topics in that meeting was Career
10  Concourse and what to do with it.
11       Q.    And do you recall John Chmura wanted
12  Career Concourse to be basically put out to
13  pasture; is that correct?
14       A.    I definitely had that impression,
15  yes.
16       Q.    Others involved, Mr. Lombardo, for
17  example, really thought Career Concourse was
18  necessary to further Chmura's sales goals,
19  correct?
20       A.    I don't recall that.  I don't recall
21  Rick being very involved in the education,
22  quote-unquote, vertical.  I couldn't say.  I
23  don't think -- I really couldn't say.  I
24  definitely don't recall him being involved in
25  conversations about Career Concourse.  I am
```

```
1                    KYLE WEST

2    inclined to think he would rather not deal with

3    Career Concourse.

4         Q.    And at some point, did your job

5    title change again?

6         A.    Yeah.  Where did we leave it?  It

7    was director of development?

8         Q.    Correct.

9         A.    Yes, it did.

10        Q.    And what did it change to?

11        A.    Director of business development.

12        Q.    And when did that change occur?

13        A.    Again, it's not totally clear but

14   I'm going to say January of 2019, I think it

15   was probably official.  January of -- December

16   2018, January 2019, I'll sure this is in, you

17   know, HR records or something like that, if

18   it's important.

19        Q.    And did your job duties change at

20   that time?

21        A.    They did, yes.

22        Q.    How did your job duties change?

23        A.    I mean, they changed dramatically,

24   you know, through November of 2018, I had been,

25   you know, more than three-quarters of my time
```

1                     KYLE WEST

2    was committed to this training program, so when

3    I changed positions, kind of the administration

4    of this program, are you still there, Chris?

5         Q.    I'm still here.  I just had another

6    incidence where the video cut off.

7         A.    Yeah.  So you know, we were

8    enrolling clients in this program.  So there's

9    some back end kind of admin work besides the

10   troubleshooting because we used different types

11   of soft we are we will platform --

12        Q.    Let me stop you there.  For the

13   record clarity, when you say "this program" is

14   this the web-based JobsEQ?

15        A.    Correct.  It's believe it's called

16   JobsEQ Fit.  So I will refer to it as JobEQ

17   Fit, F I T.

18        Q.    Okay.

19        A.    So I developed the content, I loaded

20   the content onto another vendor's software and

21   then I would enroll users and I would, you

22   know, assign them to courses and make sure that

23   they, you know, they are getting through the

24   content, make sure they are logging, in we had

25   a lot of credential password type issues,

1                    KYLE WEST

2    things like that.  So at some point, in the

3    fall I think in the fall of 2018, we hired a

4    gentleman, I don't know if it was summer or

5    fall, Wesley Michaels was his name and I forget

6    what his title was, I think he was on Greg's

7    team.  I believe he was on data governments.

8    So it was decided that Wesley would take over

9    the administrative aspects of JobsEQ Fit and

10   updating content, things like that.  So I

11   probably spent the month of December and part

12   of January not of the entire four to six weeks

13   but a good chunk of it working with Wesley kind

14   of onboarding him, helping him to get

15   acclimated to the content, how to update it,

16   how to create new content, manage the

17   administration, you know, assigning courses all

18   that stuff, right.  So when he was, I'll say,

19   up and running, I stopped doing all of that.

20   So you know, my job description really changed

21   quite a bit.  I remember in the middle of

22   January, I believe, 2019, I traveled to

23   Richmond.  There was a meeting.  I remember it

24   was kind of put together hosted by a gentleman

25   named Curtis Monk who I -- I don't know what

ROUGH TRANSCRIPT

1                    KYLE WEST

2   his title was, but he was kind of an interim

3   type, I mean, he managed the sales team, right.

4   So I think he was brought in to, you know, kind

5   of on a temporary basis, he was retired, I

6   believe, but I remember coming to Richmond in

7   January and I had laid out kind of my plan, my

8   business development plan, and I had, you know,

9   I had some feedback from Leslie because I

10  recall I shared elements of the plan

11  beforehand, so really in January, after that

12  meeting in January of 2018, I think you could

13  say I was just about fully committed to

14  business development.  And what that entailed

15  was prospecting for partners, vendors, the

16  partners including vendors and like

17  professional organizations, member-based

18  organizations, entities that you know, we have

19  a potential synergy with, so a professional

20  association, let's just say of educators.

21  There may be a lack of awareness amongst

22  educators about our software.  So rather than

23  try to engage thousands of educators, if we

24  engaging an association, we can leverage the

25  association to make our products visible to

ROUGH TRANSCRIPT

Page 38

```
1                    KYLE WEST
2    their membership.  Vendors we had some, you
3    know, we had some historical correspondence
4    with a couple of vendors, for example, GIS web
5    tech would be one, so, you know, their a
6    complement vendor, they are in the same space
7    serving a shared audience, but not directly
8    competitors with us.  So vendors like that I
9    approached several basically as, you know, with
10   the exception of them, several others that I
11   prospected to see if they were interested in
12   possibly working together.  We had plans and we
13   did execute, we had plans for me to travel to
14   different parts of the country where we had a
15   high concentration of JobsEQ users.  So I
16   remember, you know, I went to the Carolinas,
17   Charlotte, North Carolina and the greater -- I
18   went from Charlotte to Raleigh and visited
19   clients in between, I visited about ten clients
20   on that trip over four days.  I did something
21   similar in Dallas with a colleague, and I think
22   that we had planned on doing three of those
23   events if I recall correctly.  We only did two.
24   But the planning and the execution, you know,
25   certainly was part of my job description.  I
```

ROUGH TRANSCRIPT

1                     KYLE WEST

2   was involved in some aspects of the planning

3   for the user conference in 2019.  That was in

4   Orlando, working with another colleague, Kim.

5   You know, I think that's roughly about it.  I

6   still prepared a few proposals, project

7   proposals or bids.  I don't recall -- I was

8   working on one before my last job change to a

9   community in Texas, middle Rio Grande or Grand,

10  I forget.  But I really I would say focused

11  more on the -- and I still wrote proposals I

12  wrote a lot of proposals to present at

13  conferences and I continued to travel to a few

14  conferences and I would make presentations on

15  research that folks in Richmond had done but I

16  started to travel less.

17       Q.   Do you know who was managing the

18  sales team at that time?

19            THE COURT REPORTER:  You spoke over

20       each other.

21       Q.   Just so I'm clear on my question I

22  know you mentioned Mr. Monk, but I thought you

23  indicated that he was in a room or some type of

24  position, was Mr. Monk the manager, do you

25  know, of the sales team at that time?

```
 1                    KYLE WEST

 2      A.    For a period, yes.  I don't --

 3      Q.    And that's -- you --

 4      A.    You have to -- I'm sure there's a

 5  record I don't know if he retired as interim.

 6  That was my impression.  I can't say for sure.

 7  I went back from Mr. Monk back to Greg and then

 8  we hired Ely, I forget his last name.  I don't

 9  know if Greg was between Ely and Mr. Monk I

10  think Mr. Monk left abruptly.  So I have to

11  think that Greg took over between Mr. Monk and

12  Ely.

13      Q.    And were you -- was the director of

14  business development, was that your job title

15  under the end of your employment with Chmura?

16      A.    No.

17      Q.    What was your next job position with

18  Chmura?

19      A.    Interim business analyst.  I don't

20  recall.

21      Q.    Do you recall roughly when --

22  your --

23            (Parties speaking simultaneously.)

24      Q.    Do you recall roughly when your job

25  title switched or changed?
```

```
 1                    KYLE WEST

 2      A.    Maybe March.  The title changed

 3  after the duties.

 4      Q.    And when you say in March, when you

 5  say in March, would that be of 2019 or 2020?

 6      A.    2020.

 7      Q.    And how did you -- you referenced

 8  that before that, your job duties a changed,

 9  how did your job duties change?

10      A.    Well, some of the things that I had

11  been working on were reassigned to other

12  people, you know, prior to the official change,

13  and I started to participate in some aspects of

14  a new job, but I don't believe my title was

15  actually changed.

16      Q.    What were those aspects of the new

17  job that you were referring to?

18      A.    For example, on Monday mornings,

19  there's a standing meeting or a ceremony, we

20  call it, a product communications team, and

21  it's a, you know, largely a product development

22  ceremony that I started to participate in, you

23  know, maybe mid January, I don't recall.

24      Q.    Okay.  And at some point did your

25  employment with Chmura end?
```

```
 1                    KYLE WEST
 2      A.    It did.
 3      Q.    And do you recall when that was?
 4      A.    So my resignation date was April
 5  15th.
 6      Q.    April 15th of 2020?  April 15th of
 7  this year?
 8      A.    Correct.
 9      Q.    And you said your resignation date,
10  so it was a voluntary resignation?
11      A.    Yes.
12      Q.    And are you currently employed?
13      A.    Yes.
14      Q.    And where are you employed with whom
15  are you employed?
16      A.    Big Brothers Big Sisters of the
17  Inland Northwest.
18      Q.    Of the Inland Northwest?
19      A.    Correct.
20      Q.    And what is your position with Big
21  Brothers Big Sisters?
22      A.    I'm the chief executive officer.
23      Q.    And during your time when you were,
24  again, discounting or not including the time
25  that you spent in Richmond, Virginia, other
```

```
1                    KYLE WEST

2   than that, you referenced a Spokane office,

3   were you always -- did you change office, did

4   you work from home, what was your work

5   arrangement like in Spokane?

6        A.    We had three different offices.

7        Q.    In different times?

8        A.    Correct.

9        Q.    Was there ever a time you were

10  working from home or was there always a

11  physical office to go into?

12       A.    There was always a physical office

13  to go into.

14       Q.    And I know you've had a bunch of

15  different job titles with different job duties,

16  was there a general normal workday while you

17  were employed with Chmura?  In other words,

18  time that you'd go into the office, time that

19  you'd leave or did it change depending on the

20  job title?

21       A.    Yeah, I mean, it definitely changed

22  so.  The expectation was that I would be at the

23  office until 5:00 p.m. my time to support

24  virtual chat, so if somebody's using our

25  software and they have a question, everybody,
```

```
 1                    KYLE WEST

 2   you know, everybody else is in the eastern time

 3   zone, so I'd be the last person there Monday

 4   through Friday.  I typically arrived between

 5   7:00 and 8:00 a.m. local time, sometimes a lot

 6   earlier.  When I started working with the

 7   product team this year, they were like, for

 8   example, those Monday meetings, product

 9   communication team meetings, those are 6:00

10   a.m. meetings for me, so every Monday, at least

11   for 2020, I started my workday at 6:00 and I

12   would leave at 3:00 p.m., which is not

13   something that, you know, had historically had

14   not been my schedule.  But, you know, roughly,

15   say, 7:30 or 8 to 5:00.

16        Q.    Monday through Friday?

17        A.    Correct.  And, you know, travel

18   sometimes as needed on weekends -- if we

19   traveled on a weekend, we could take, I think,

20   what's called a comp day, we could take a

21   weekday off to be with family or whatever, run

22   errands.

23        Q.    I wanted to go back through -- you

24   talked about your different positions and

25   talked about your interaction with Mr. Lombardo
```

```
1                        KYLE WEST
2   during each of those positions, so if you'll
3   bear with me.
4             Starting when you were manager,
5   director of sales how regularly were you
6   interacting with Mr. Lombardo?
7       A.    Gosh, between email and phone, maybe
8   20 times a business day.
9       Q.    Okay.  And was that primarily by
10  email, primarily by phone, how would that break
11  down?
12      A.    Primarily by phone.  I don't -- you
13  know, I couldn't provide you a reliable
14  breakdown, but I would say primarily by phone.
15      Q.    And when you were interacting with
16  him by phone, would that be, you would use your
17  office phone, how would you communicate or how
18  would you call Mr. Lombardo?
19      A.    Both office and mobile.
20      Q.    And if you can break it down, would
21  it be primarily one or primarily the other or
22  just depended?
23      A.    Well, definitely, you know, during
24  business hours, my office phone.  By he got to
25  the office or, you know, after he left the
```

```
 1                    KYLE WEST
 2   office, my mobile phone generally.
 3        Q.    And how often would there be --
 4   would you have calls with him either before you
 5   got to the office or after he left the office?
 6        A.    Probably four days a week.
 7        Q.    What would those calls consist of?
 8   What would you guys be discussing on those
 9   calls?
10        A.    Any number of things.
11        Q.    And do you know roughly how long the
12   calls would last?
13        A.    Well, when I moved my office, so
14   June of 2019, I shortened my commute, and, you
15   know, before that, I would talk to Rick
16   regularly probably for a bit longer, you know,
17   so I would talk to him pretty regularly on my
18   way to work.
19        Q.    Mr. West, let me stop you there so
20   we can have the record clear.  I'm talking
21   right now just solely about your time as
22   managing director of sales.  So that would be
23   February of '17 through I think it was roughly
24   September or October of '17.
25        A.    Oh, gosh.  I don't recall the
```

                          KYLE WEST

1    duration of calls, but I certainly talked to

2    him on a regular basis before and after work.

3        Q.   And would you talk to him about

4    social matters, in other words, non-work

5    matters?  Did you consider Rick a friend?

6        A.   Yeah, I mean, you know, we're not

7    co-located but we're colleagues and, you know,

8    we see each other once or twice a year but I

9    certainly considered him a friend, yeah, we

10   talked about sports.  We talked about eating

11   quite a bit.  We talked about stuff that

12   friends talk about.

13       Q.   Again during this roughly six, seven

14   month period in 2017, setting aside the

15   non-work-related calls, how regularly would you

16   speak with Mr. Lombardo by phone when -- after

17   he had left the office?

18       A.   I don't recall, two or three times a

19   week, maybe.  I would think you could look at

20   phone records.  I don't know, but I know that

21   if he didn't, you know, he would either call me

22   from his mobile or I would call and if he's not

23   at the office I would call his mobile, vice

24   versa, but I couldn't say.

1                    KYLE WEST

2      Q.    And do you recall the standard type

3  of thing work-related-wise that you would talk

4  about after basically during his after hours

5  when he'd left the office?

6      A.    Yeah, I mean, he had most of the

7  clients in the western states, so, you know,

8  there are some clients in the western states

9  that I might interact with in the virtual chat

10  especially some that were high maintenance, you

11  know, and I would contact Rick certainly to let

12  him know that I spoke to a certain client or

13  something like that, you know, things of that

14  nature.

15      Q.    Anything else or any other specific

16  types of work calls that you recall contacting

17  him after he left the office?  During -- again

18  so we're clear during, this time that you were

19  the managing director of sales.

20      A.    I can't recall specifics, no.

21      Q.    Okay.  And now turning to --

22      A.    I can recall calls about clients.  I

23  can recall a number of calls.  I can't recall

24  specifics, other than client stuff.

25      Q.    Okay.  And by client stuff, you

ROUGH TRANSCRIPT

Page 49

```
1                      KYLE WEST
2    don't recall specific names of clients; is that
3    correct?
4         A.    I mean, I can recall some names of
5    clients.  Do you want those?
6         Q.    Who do you recall?
7         A.    Well, definitely Soua Vang from San
8    Bernardino, S O U A, last name Vang, V A N G.
9    Definitely Ellie Chambers.
10        Q.    Are these individuals -- are these
11   individuals or are they entities?
12        A.    Well, I'm giving you specific
13   individuals employed by entities who were
14   clients or prospects.
15        Q.    Okay.
16        A.    What's your question?
17        Q.    So for Ms. Vang, what do you recall
18   talking with Mr. Lombardo about?
19        A.    So Ms. Vang might come into chat or
20   she would actually call my desk phone and she
21   would have an issue, she doesn't now how to run
22   a query in one of our analytics.  So I would
23   help her, I'd spent her time on the phone,
24   maybe I'd set up a virtual screen share to show
25   her how to do something and I would call Rick
```

ROUGH TRANSCRIPT

Page 50

```
1                    KYLE WEST
2    and tell him what happened so he could
3    obviously it's his client so he's aware and he
4    could record those things in sales force, our
5    relationship management platform.
6         Q.    And are those the type of calls that
7    you were referring to that you recall?
8         A.    Yes, generally.
9         Q.    Do you recall, and I know every call
10   is different, do you recall roughly how long
11   the call you just mentioned roughly how long
12   that call would last?
13        A.    I don't know.  I mean, we would, you
14   know, talk about all kinds of other stuff.
15        Q.    And once you switched jobs and job
16   responsibilities to director of workforce
17   development, I understood your testimony at
18   that time you were focused on developing JobEQ
19   Fit and a few other projects.
20             Did your interaction with Mr.
21   Lombardo decrease when you were in that
22   position?
23        A.    It definitely decreased but it was
24   still consistent.
25        Q.    And would you still speak with him
```

1                    KYLE WEST

2   after he left the office from time to time?

3        A.    Yes.

4        Q.    Would that be less frequently than

5   you were speaking with him when you were direct

6   manager of sales?

7        A.    Yes, I think so.

8        Q.    And why would you be speaking work

9   related-wise, I don't need to know any personal

10  conversations you had, but why would you be

11  speaking with Mr. Lombardo on a regular basis

12  in your new position?  When I say in your new

13  position when were director of workforce

14  development.

15       A.    I mean, you've got to understand

16  that Rick and Austin had more clients than

17  anyone else.  So not only am I reporting to

18  them about my interactions with their clients

19  with our clients, but I'm also getting

20  information from them because I'm working on a

21  training platform.  So, hey, who is a good

22  resource to talk about supply chain, you know,

23  how -- what do you hear from your users about

24  X, Y, Z.  How does this sound?  I think I was

25  really kind of on an island working on these

                           KYLE WEST
1
2   project, so the sales team was a good resource

3   for me to, you know, maybe get an introduction

4   to a user or to bounce an idea off of.  You

5   know, plus, members of the sales team are

6   people that I had worked with on a pretty

7   intense level the year prior, so, you know,

8   they had become my friends, so you could talk

9   about music, you could talk about football.

10  We're remote.  So it's a way of breaking up the

11  day.  So I mean I continued to talk to Rick,

12  you know, on a regular basis, as well as other

13  members of the sales team.

14       Q.    You mentioned --

15       A.    I continued to work like virtual

16  chat, for example, and had a lot of

17  interactions with clients and users.

18       Q.    And you mentioned Rick, Mr.

19  Lombardo, he was a senior account manager,

20  correct?

21       A.    Yeah, I think he became the senior

22  account manager around I believe that happened

23  when I was managing the sales team, I believe,

24  that him and Austin became the senior account

25  managers.

1                     KYLE WEST

2      Q.    And during your time managing the

3  sales team, were you able to observe Mr.

4  Lombardo's performance as an account manager?

5      A.    Yeah, I mean, that's what I did.

6      Q.    Did you consider him to be a good

7  account manager?

8      A.    Well, I thought Mr. Lombardo was the

9  best account manager, yes.

10     Q.    He understood the best way to sell

11  Chmura's products, in your view?

12     A.    Well, I don't know if he understood

13  the best way to Chmura's products, I think that

14  depends on your perspective, but he knew how

15  to -- he knew how to perform at high level.

16  Rick recorded more activities than his peers.

17  So I always call him a freak.  The guy was like

18  an auto baton, it was really, when you

19  looked --

20     Q.    Mr. West, I'll let you know that

21  your screen -- your screen has popped off.

22  There you go.

23     A.    So, you know, every week, I would

24  prepare these dashboards, and they were bar

25  charts basically every account manager, the

1                        KYLE WEST

2   Valium of his total activity, whether it's a

3   phone call or an email and Rick bars were

4   consistently well to the right of other members

5   of the sales team.  The only person that ever

6   came close to matching his output in terms of

7   activities was Mr. Steele.  But in, you know,

8   let's say the 40 weeks that I -- I'm sorry,

9   what is --

10       Q.    I don't know.  Let's continue.

11       A.    Okay.  So the, you know, in the

12   40ish weeks that I prepared threes dashboards I

13   recall maybe twice that Austin either matched

14   or surpassed Rick and I suspect that's probably

15   because Rick was, you know, on vacation or

16   basically wasn't in the office performing his

17   usual routine.  The other account managers at

18   the time maybe hit half to three-quarters the

19   output as Rick.  So he was the high performing,

20   absolutely.  I would not say that, you know,

21   he -- you know, it was clear to me that

22   leadership didn't like Rick's style, so I would

23   never say that he came in the best way to sell

24   products that Chmura way.

25       Q.    Did you trust his judgment when it

ROUGH TRANSCRIPT

```
 1                     KYLE WEST
 2   came to selling?
 3        A.    Absolutely.
 4        Q.    And -- I apologize.  Hang on.  Now
 5   it's my computer.  Bear with me for a second.
 6   Can you guys hear me?
 7        A.    Yes.
 8              THE COURT REPORTER:  The court
 9        reporter can.
10        Q.    We have a problem here.  It is not
11   letting me plug back in.  Can we take a
12   five-minute break?  Is everybody okay with that
13   while I try to figure out what is going on.
14              (A recess was taken.)
15   BY Mr. MICHALIK:
16        Q.    Before we had the technology
17   interruption, you were talking about you and I
18   don't want to put words in your mouth, it was
19   something to trusting Rick's --  Mr. Lombardo's
20   judgment with regards to sales.
21              Did you take advantage of his
22   expertise in that area when you were working on
23   the JobsEQ Fit?
24        A.    Advantage of his expertise in sales?
25        Q.    Well, you indicated as I recall you
```

ROUGH TRANSCRIPT

```
 1                         KYLE WEST

 2   were testifying when you had the new position,

 3   the director of workforce development, you were

 4   still bouncing stuff off of Mr. Lombardo and

 5   Mr. Steele.  Was that based off of their

 6   knowledge and expertise as salespeople that you

 7   had observed when you managed them?

 8        A.    I'm sorry.  I don't understand your

 9   question.

10        Q.    So you were -- you testified earlier

11   that when you were director of workforce

12   development, you were still interacting with

13   Mr. Lombardo, correct?

14        A.    Correct.

15        Q.    And some of that interaction was of

16   a personal and friendly nature, correct?

17        A.    Correct.

18        Q.    And you indicated that you were also

19   kind of an on island so you would bounce ideas

20   off of Mr. Lombardo and Mr. Steele, correct?

21        A.    Amongst other people, yes.

22        Q.    And my question was, in bouncing off

23   ideas off of Mr. Steele and Mr. Lombardo, did

24   you decide to bounce ideas off of them because

25   of their expertise or what you observed in
```

ROUGH TRANSCRIPT

Page 57

1                    KYLE WEST

2    their ability to complete sales?

3         A.    No.

4         Q.    Why did you bounce ideas off of

5    those two individuals?

6         A.    Well, one, because they were

7    accessible; and two, because I felt they were

8    the closest to the client, so I felt like they

9    were a good resource to bounce ideas off of

10   because they have the most correspondence with

11   our clients.

12        Q.    And were these ideas related to the

13   JobsEQ Fit project that you were working on?

14        A.    At sometimes, yes.

15        Q.    And some of the other projects you

16   were working on during that roughly year

17   period?

18        A.    Yes, I suppose so.  I don't-I'm not

19   clear what you mean by their sales expertise.

20   I don't understand how -- I wasn't selling

21   anything, to JobsEQ Fit I would argue is a more

22   technical product, demonstrating how to use

23   something, not trying to sell anything.

24        Q.    As I understand your testimony you

25   would bounce things off those two individuals

1                          KYLE WEST

2    because they had the -- they were closest to

3    the customers, something to that effect.  I

4    understood it wasn't their sales expertise.  It

5    was their interaction and relationship with the

6    customers; is that correct?

7          A.    Correct.  They also tasked with

8    selling enrollments to the program for

9    registrations.

10         Q.    And so I understood your testimony

11   there and I'd asked if you were bouncing ideas

12   off of those individuals related to the work

13   you were doing on JobsEQ and I understood that

14   you said you were, correct?

15         A.    Correct.  Amongst other people.

16         Q.    And then the line of questioning

17   that I was asking was were you also doing that

18   bouncing ideas after of those individuals

19   related to other projects you were working on

20   besides JobsEQ?

21         A.    Not that I recall.

22         Q.    Go ahead.

23         A.    I don't understand the inside sales

24   team didn't have a lot of -- they would prefer

25   projects to it, opportunities say, but they

ROUGH TRANSCRIPT

Page 59

```
1                      KYLE WEST

2    weren't involved -- they weren't involved with

3    consulting projects; you know, aside from just,

4    you know, referring their client to us because

5    their client had a question or they've got, you

6    know, a bid that they are going to release,

7    they regularly did that, but they didn't have

8    any kind of -- they were never involved in

9    executing a project.

10        Q.    Mr. West, that wasn't my question.

11   I had simply -- you had testified as I

12   understood it and I just want to make sure that

13   I was clear on your testimony, that you would

14   bounce ideas off of Mr. Steele and Mr.

15   Lombardo, did I understand your testimony

16   correctly?

17        A.    Correct, with respect to JobsEQ and

18   perhaps I misunderstood but I thought I heard

19   you ask if I would consult with them on

20   projects outside of JobsEQ.

21        Q.    I did.  So -- I didn't use the word

22   consult.  I used your word, would you bounce

23   ideas off of those two individuals related to

24   other projects beside JobsEQ Fit?

25        A.    No.  Only if it was a referral from
```

ROUGH TRANSCRIPT

Page 60

```
 1                    KYLE WEST

 2   an account manager.

 3        Q.    Now moving to essentially your last

 4   pox position I know you health a position of

 5   senior analyst for a short period of time but

 6   your position as director of business

 7   development, how regularly would you interact

 8   with Mr. Lombardo for work purposes ^  in that

 9   position?

10        A.    I wouldn't say on a daily basis but

11   a weekly basis, I would estimate ten to 15

12   times per week.

13        Q.    What would you be interact with Mr.

14   Lombardo about on those occasions?

15        A.    I don't recall specific details,

16   but, you know, generally, we may have clients

17   or prospects who are using a product from a

18   prospective partner or maybe, you know, they

19   were a conference where we wanted to attend --

20   one of the things I asked for the account

21   managers was to send me, you know, this was

22   mainly Austin and Rick, but send me, you no,

23   we'd look at a map of users and we'd pin

24   locations of accounts, the high concentration

25   of users in the state of Florida or in the
```

                        KYLE WEST

1
2    Carolinas or in Texas, so I would rely heavily

3    on the account managers, I'd like, Rick, I'd

4    send him a lit of 60 accounts in Texas and ask

5    him, you know, of these accounts, who are the

6    high value accounts, who should I try to

7    prioritize, reaching if we're going to be in

8    the greater Dallas metro or greater char local

9    region or this may of 2020 I was supposed to be

10   in Florida which was another state where

11   account -- account managers have 50 pus clients

12   so I would have regular interaction, they may

13   have questions about how is the -- how is the

14   fact that JobsEQ data are featured in the other

15   client's product, what does the client get from

16   that product that they also get from JobsEQ or

17   how are they different, how can I describe the

18   relationship with this vendor, you know,

19   sometimes they might ask me to take a call or

20   do a demo or a specialized clients but I

21   couldn't say -- I couldn't get much more

22   specific than that.

23       Q.    Thank you.  And during this time, so

24   again while you're director of business

25   development, would you interact with Mr.

Rough Transcript

Page 62

```
 1                    KYLE WEST

 2  Lombardo after he had left for the office for

 3  the day or left the office for the day?

 4       A.    Sometimes.  Not nearly as much, I

 5  did continue to support the virtual chat, but,

 6  you know, I didn't talk to him anywhere as near

 7  as much as I had historically.

 8       Q.    At some point, did you become aware

 9  that Mr. Lombardo's employment with Chmura had

10  terminated?

11       A.    Yeah, I don't know the official

12  termination date.  It wasn't clear to me if he

13  was terminated or if he quit -- it wasn't

14  clear, but I did become aware that he was --

15  actually, I guess I wasn't sure that he was

16  terminated.  My impression was that he didn't

17  sign an employment offer or something.  I

18  don't -- at some point I became aware but it

19  wasn't clear to me I'd say for a number of

20  weeks.

21       Q.    Regardless of how it terminated but

22  you became aware that his employment with

23  Chmura ended, correct?

24       A.    Correct.

25       Q.    And at some point did Mr. Lombardo
```

ROUGH TRANSCRIPT

```
 1                        KYLE WEST
 2    ask you to provide him with a letter of
 3    reference?
 4         A.    Yes.
 5         Q.    And did you understand that the
 6    purpose of that letter was to go to prospective
 7    employers that he was looking to obtain
 8    employment with?
 9         A.    Well, I assume that was the case,
10    just that's what we typically use those letters
11    of recommendations for, that was my impression,
12    yes.
13         Q.    And did you provide him with a
14    letter of recommendation -- a reference letter?
15         A.    I did.
16         Q.    And bear with me.  We get to see if
17    technology works again.  I'm going to hopefully
18    get this to pop up on the screen so bear with
19    me.
20              Hopefully, do you see a document on
21    the screen now?
22         A.    I see it.  The font is very small so
23    I'll try to enlarge it.
24         Q.    I'm going to try to blow it up for
25    you there.
```

ROUGH TRANSCRIPT

Page 64

```
 1                     KYLE WEST

 2      A.    I think I can do it.  Yep.

 3      Q.    It's been marked as Kyle West

 4   Exhibit A and just so we have it for the

 5   record, it has a Bates Number at the bottom

 6   Chmura 0151954 and please take a moment and

 7   review this document.

 8      A.    What -- what is it -- what am I

 9   looking for?  Oh, I see it.

10      Q.    Yeah, this is -- I'll just ask you

11   about this and move on to the document I was

12   going to -- intended to ask you about.  Do you

13   recognize this document?

14      A.    Do I recognize it?  Yes.  It appears

15   to be an email.

16      Q.    Yes, it appears to be an email from

17   you to Austin Steele dated February 18, 2019.

18      A.    Yeah, that's clear.

19      Q.    And so do you recognize this

20   document?

21            THE COURT REPORTER:  You spoke over.

22      Q.    Do you remember sending this email?

23      A.    Well, I mean, I trust you that I

24   sent this email, yes.

25      Q.    Okay.
```

Rough Transcript

```
1                     KYLE WEST

2       A.    I mean it's certainly my signature

3   and I've got a whole bunch of people, you know,

4   the people -- yes, I recognize it.  I don't

5   recall writing it.  It's more than, you know, a

6   year ago, but...

7       Q.    I'm going to --

8       A.    But.

9             THE COURT REPORTER:  I'm sorry, I

10       didn't understand the answer.

11      A.    I recognize it, I don't think it's

12  not mine.

13      Q.    Just so we're clear, Mr. West, you

14  used a double negative.  You don't think it's

15  not yours, meaning you think it was an email

16  that was sent by you?

17      A.    Correct.  I don't understand why

18  you're asking me if I recognize it.

19      Q.    Okay.

20      A.    I mean, it's obvious that it's an

21  email that I sent.

22      Q.    Bear with me.  I'll try to pull up

23  the document that I wanted.  Hang on, guys, it

24  did it again.  Bear with me.  Our IT is coming.

25  It will just be a moment.  Mr. West, I now have
```

```
 1                    KYLE WEST

 2  a document that has been marked as West Exhibit

 3  B, I'm doing to try to blow it up so hopefully

 4  you can see it.

 5       A.    I can expand it.

 6       Q.    Can you see that?

 7       A.    Yes.

 8       Q.    And do you recognize this document?

 9       A.    Yes.

10       Q.    And is this the reference letter

11  that you drafted for Mr. Lombardo?

12       A.    It certainly looks like it.

13       Q.    If you scroll down to the bottom, is

14  that your signature at the bottom?

15       A.    Yes.

16       Q.    In drafting this letter, did you --

17  is everything in that letter true to the best

18  of your knowledge?

19       A.    Yes.

20       Q.    From time to time, did you engage in

21  text messages with Mr. Lombardo?

22       A.    Yes.

23       Q.    Again so the record is clear, your

24  letter -- moving to the next?

25            Mr. MICHALIK:  Let's take a
```

1                    KYLE WEST

2        five-minute break while I get the technical

3        person in here so I can get the document on

4        the screen.

5            (A recess was taken.)

6        Q.    Mr. West, you should now have on

7   your screen a document that has been marked as

8   West Exhibit C.  And it's a five-page document:

9   Are you able to see that?

10       A.    Yes.

11       Q.    And if you take a moment and look

12  through the pages, tell me if you recognize

13  this document.

14       A.    Well, it looks like a text message

15  and I have one page.

16       Q.    Okay.

17       A.    Can you point anything ought

18  specific.

19       Q.    I'm trying to get it -- okay.  So

20  here's the second page.

21       A.    Yeah.

22       Q.    And --

23       A.    Go ahead.

24       Q.    And do you recall texting with Mr.

25  Lombardo on Saturday, November 23rd and Sunday,

ROUGH TRANSCRIPT

Page 68

```
 1                      KYLE WEST
 2   November 24th?
 3        A.    I don't recall, but if that's what
 4   this is, clearly, it happened.
 5        Q.    And if you will look at the second
 6   page, the page we're on now, you see at the top
 7   it has TO.Kylewest@gmail.com, it says, no, I
 8   have to type it at work.  Midafternoon probably
 9   unless our 9:00 gets canceled and then I can
10   type it at that time and have it to you by
11   noon.  Is that the reference correct?  Is that
12   the reference letter that you just reviewed?
13        A.    That would make sense to me, yes.
14        Q.    If you scroll down on this page,
15   there's a text from Mr. Lombardo that says,
16   other letter went out.  Do you know what letter
17   he's referring to?
18        A.    Other letter went out.  I do not,
19   and I don't know who Butch is.
20        Q.    Okay.  And then from your tag -- I'm
21   going to call it your tag line, the
22   To.Kylewest@gmail.com says, "I'm on the phone
23   again.  And then there's a response from that
24   that says check your email.  Do you recall
25   receiving an email from Mr. Lombardo at this
```

ROUGH TRANSCRIPT

```
 1                     KYLE WEST

 2   time?

 3        A.    No.

 4        Q.    And then we'll go to the next page,

 5   and this is text stream dated Friday, January

 6   31, 2020, and there is got our court date in

 7   blue and then under your identifier, it's oh,

 8   wow, does that mean Allison and the others will

 9   get deposed, do you know texting with Mr.

10   Lombardo specifically texting with Mr. Lombardo

11   at that time?

12        A.    I don't recall, but, again, clearly

13   it happened.

14        Q.    Going to Page 4, it goes down to a

15   date of Friday, February 7, 2020, and there's

16   the text that says how did it go?  And a

17   response from you, just dropped the mic, check

18   your email?

19        A.    Yes.

20        Q.    Do you recall that exchange with Mr.

21   Lombardo?

22        A.    Yes.

23        Q.    Before we get to that, at the top,

24   there we go, at the top, this is back to the

25   January 31st date or 30th date where it was
```

```
 1                    KYLE WEST

 2   referencing a text about we got our court date,

 3   and you say, I could call you back in a few

 4   minutes.  And the text in blue says just call

 5   me in a few, do you recall having a

 6   conversation with Mr. Lombardo on the date that

 7   he announced he got his court date?

 8       A.    No.

 9       Q.    Mr. West, I now have a 10-page

10   document in front of you that's been marked as

11   West Exhibit D.  Do you recognize -- I'll let

12   you look through this document.  Do you

13   recognize this document, the first page of this

14   document?

15       A.    Well, again, it appears to be a text

16   message.

17       Q.    And we're on -- I'm sorry.  So do

18   you recall texting with Mr. Lombardo on October

19   2nd of 2019?

20       A.    No.

21       Q.    Do you recall him informing you that

22   he believed Wilson and he were not going to be

23   treated well, I don't need to say the word

24   that's on there, related to a restructuring in

25   the sales team?
```

```
 1                    KYLE WEST

 2     A.     Yes.

 3     Q.     And before he informed you of that

 4  were you aware that Chmura was considering

 5  restructuring the salespeople?

 6     A.     Yeah, in some ways, you know, again,

 7  it was vague.  Roughly summer of 2019, maybe

 8  even spring of 2019, there were kind of I'll

 9  say conversations about updating the different

10  sales territories.  I don't recall if we'd

11  already hired new staff but certainly there

12  were plans I believe to hire additional staff,

13  but I don't recall all the specifics, they were

14  definitely conversations around that, yes.

15     Q.     Were you involved in the decisions

16  on what to do with the sales team?

17     A.     No.

18     Q.     Okay.  And did Mr. Lombardo let it

19  be known to you that he was unhappy with the

20  potential changes?

21     A.     I don't think it was clear -- I

22  don't recollect, you know, obviously what does

23  he say we're going to get fucked, so I would

24  interpret that as being unhappy.  That's pretty

25  clear.
```

1                        KYLE WEST

2         Q.    And I'm just going to ask, make sure

3    you recognize or that the subsequent pages are

4    texts between you and Mr. Lombardo.  Do you

5    recognize the second page?

6         A.    Page 67?

7         Q.    Yes.

8         A.    With the dogs.

9         Q.    Yes, Kyle West WTF and then Butch,

10   that's what we post online?

11        A.    Yes.

12        Q.    And same thing, and maybe if -- do

13   you recognize the third page of these documents

14   as being texts between you and Mr. Lombardo?

15        A.    I don't.

16        Q.    Okay.  And you recall Mr. Lombardo

17   texting you, I'm now on Page 4, that at the

18   bottom it has Page 72, Lombardo 000483, texting

19   you when they shut off -- they being Chmura

20   shut off his JobsEQ email and sales force?

21        A.    Yes, I do.

22        Q.    Same question with number -- the

23   next page, do you recognize this page?

24        A.    Page 73?

25        Q.    Yes, sir.

1                    KYLE WEST

2       A.    Sorry.  I'm scrolling.  Yes.

3       Q.    And do you have the ability to

4   scroll to the next page or do I need to do that

5   for you?

6       A.    I can't get past Page 73.

7       Q.    All right.  We'll just do it this

8   way.  Same question, I just want to know if

9   this is more of the same text thread between

10  you and Mr. Lombardo.

11      A.    Okay.

12      Q.    Do you recognize this being

13  additional text thread between you and Mr.

14  Lombardo?

15      A.    Well, it sure looks like it.  I

16  mean, I don't believe that you fabricated this.

17      Q.    And so the record is clear I'm going

18  to ask you the same question with regard to

19  Page 7.

20      A.    What's the question?

21      Q.    Is this part of a -- more of a text

22  thread between you and Mr. Lombardo?

23      A.    It looks like it, yes.

24      Q.    Again same question with Page 8,

25  just so we have a clear record?

ROUGH TRANSCRIPT

```
 1                     KYLE WEST
 2      A.     It looks like it, yes.
 3      Q.     And Page 9?
 4      A.     Yes.
 5      Q.     And then the last page, Page 10?
 6      A.     Yes.
 7      Q.     Now, earlier in your testimony you
 8  referenced a declaration that you gave to Ms.
 9  Cooper?  Do you recall your testimony regarding
10  a declaration?
11      A.     Yes.  I can't hear you, Chris.
12      Q.     I'm bringing it up on the screen.
13  Can you see the document that's now been marked
14  as west Exhibit E?
15      A.     Yes.
16      Q.     And take -- I'm going to turn to
17  turn to Page -- we've gone through page 2 and
18  we're now on Page 3, and you see paragraph 17?
19      A.     Yes.
20      Q.     And it says, I never had a
21  discussion with Mr. Lombardo regarding limiting
22  his work hours or not exceeding a certain
23  number of hours.  Mr. Lombardo was permitted to
24  work as many hours as he wanted."
25      A.     Yes.
```

ROUGH TRANSCRIPT

Page 75

1                        KYLE WEST

2        Q.    Did you ever have any conversations

3    with Mr. Lombardo while he was at Chmura

4    employee about overtime or his receiving

5    overtime?

6        A.    Not that I recall.  There were

7    conversations about overtime, but I don't

8    recall having one with Rick.

9        Q.    Okay.  And when you say there were

10   conversations about overtime, there were

11   conversations -- what conversations do you

12   recall about overtime?

13       A.    We had an inside salesperson her

14   name was Jennifer Ludvik.  L U D V I K, I

15   believe, who was at least my understanding was

16   she was terminated for working overtime and

17   billing us, you know, for time and a half or

18   double time, I don't recall, but we -- you

19   know, it was an issue at the time and then it

20   came up, I believe, in the wake of Rick's

21   departure or maybe before Rick's departure,

22   limiting the hours of sales team members not to

23   exceed 40 hours and I think they were

24   prohibited from traveling, you know, so I don't

25   know if that was the summer of 2019 or the fall

1                    KYLE WEST

2    of, again, I don't know if it was before or

3    after Rick left, but...

4        Q.    Okay.  And were you involved in the

5    decision regarding the individual you just

6    referenced.  -- I didn't catch her last name.

7        A.    No, not at all.  I don't recall if I

8    had already become the manager of sales, but

9    that was a Richmond issue.  It was handled in

10   Richmond from what I recall.

11       Q.    You had no involvement with that

12   matter?

13       A.    Not the decision to -- I had very

14   limited information.  I just remember that

15   there was an issue with the contract from the

16   temp agency and us not knowing that she was

17   going to earn overtime.  I'm not -- you know,

18   I'm not certain of the specifics.

19       Q.    Okay.  And with regard to other

20   salespeople, you don't recall if the company's

21   decision on how to portion out hours for those

22   salespeople, if that was when Rick was employed

23   or after he left, when I say Rick, I mean Mr.

24   Lombardo?

25       A.    I don't recall and even know what

```
 1                    KYLE WEST

 2   was ultimately decided.  I'm not sure.

 3        Q.    I apologize.  You kind of went very

 4   quiet.  I couldn't hear very good the last

 5   better.  What did you say?

 6        A.    I don't know -- I don't recall what

 7   was ultimately decided.

 8        Q.    Okay.

 9        A.    Can I turn Leslie's screen off?

10        Q.    I think it's just up there.  So I'm

11   going to go through and introduce a few more

12   exhibits and just see if you recognize them.

13   So bear with me.  You should have a document on

14   your screen that's been marked as West Exhibit

15   F.  Do you see that document, Mr. West?

16        A.    Yes.

17        Q.    And I know we have to go page by

18   page, but do you recognize the first page?

19        A.    Well, I can't seem to expand this

20   page to zoom in, like I could the others, so,

21   but it does look like an email.

22        Q.    Can you see it now?  Did it expand

23   for you?

24        A.    It did not.

25        Q.    Still no luck in the expanding?
```

```
 1                       KYLE WEST

 2       A.     No, I'm fine if you can read.

 3       Q.     From Kyle West at

 4   Kyle.west@chmura.eccon.com Monday June 5, 2017

 5   to Greg Chmura, Leslie Peterson, Chris Chmura,

 6   et cetera --

 7       A.     You don't have to read, I can see

 8   the names I can't really read the sentences.

 9       Q.     It says, Rick, please see the string

10   below for some background.  If you feel there's

11   an appetite for this, then would you please

12   reach out to the Omaha Chamber and the

13   Charlotte Regional Partnership to discover if

14   they would be willing to provide us with some

15   feedback developing out widget solution.  If so

16   then you can just coordinate with Greg and

17   John, but please keep me in the loop.  Thanks,

18   Kyle.

19             Do you recall a situation working

20   with widgets and having Mr. Lombardo reach out

21   to the Omaha chamber and the Charlotte regional

22   partnership?

23       A.     I do recall asking Mr. Lombardo to

24   reach out to different clients.  I don't recall

25   this specific instance.
```

ROUGH TRANSCRIPT

1                        KYLE WEST

2         Q.    You have to reason to dispute that

3    this is an email that was sent by you?

4         A.    No.

5         Q.    We have one last one, so bear with

6    me.  You should now have in front of you a

7    document, an email that's been marked as West

8    Exhibit G?

9         A.    Yeah, I mean, again, I can see it.

10   It's very small, so if you wouldn't mind

11   reading the sentence, that would helpful.

12        Q.    Sure.  You can see the people it's

13   from Rick Lombardo to you, subject is re:

14   Follow-up and it just says good morning, sir, I

15   was just trying to send you the conferences

16   that we can add to our list and make the

17   decision on which one to attend I would prefer

18   Texas but it is three days after the career

19   source conference in Florida, and that was a

20   response to your email dated February 24, 2017

21   to Rick saying good morning to you, too, Rick.

22   I imagine Texas is a better event for us than

23   the Ohio one, question mark, or would you

24   recommend we send reps to both, question mark?

25               Do you recall making a decision on

ROUGH TRANSCRIPT

1                         KYLE WEST

2    where to send what conferences to send reps to,

3    whether Texas or Ohio?

4         A.    Okay.  I'm sure we wound up in Texas

5    but we would convene as a committee, I think it

6    was called a conference planning committee.

7    So, you know, I don't recall the specific

8    decision, but, yes, I asked these sorts of

9    questions of the account managers, you know, on

10   maybe twice a year.

11        Q.    Okay.  And any reason-

12        A.    I've been on -- I'm sorry, I

13   participated in the conference planning

14   committee for probably at least three years, I

15   believe.

16        Q.    No reason to dispute that this is an

17   email chain between you and Mr. Lombardo?

18        A.    No.

19        Q.    Okay.

20             Mr. MICHALIK:  I think I have no

21        further questions subject to rebuttal.

22             THE WITNESS:  Thanks.

23             MS. COOPER:  I have a few questions,

24        this is Christine Cooper.

25        Q.    And just picking up where we left

ROUGH TRANSCRIPT

                              KYLE WEST

1

2    off here can you describe what the conference

3    planning committee is or was?

4         A.    Sure.  So you know, I can recall

5    back to Laura Lee Savage who I believe was the

6    director of operations, I think she left in

7    2017, but I don't recollect precisely.  I bring

8    Laura Lee up because I remember as far as back

9    I can remember convening this group.  It was

10   Leslie, myself, Laura Lee who eventually became

11   Sharon Simmons.  I don't recall if Sharon was

12   always part of committee, but definitely the

13   core group of Leslie, myself and then recently

14   Avery Simmons, no relation to Sharon.  She came

15   onboard sometime last year and kind of joined

16   this committee and roughly we might meet in the

17   fall and then maybe in the spring roughly and

18   there's a Google Doc going back at least four

19   years I think it even goes back further than

20   that.  And it's basically an inventory of all

21   conferences that we were aware of, conferences

22   that we either attended or chose not to attend

23   and, you know, there's some notes like the size

24   of the event, the audience that attend the he

25   tend, maybe it's real estate or workforce or

ROUGH TRANSCRIPT

Page 82

1                    KYLE WEST

2    economic development.  Who is the PO C for the

3    event, is there an opportunity to submit a

4    proposal to present, et cetera, et cetera.

5    It's a pretty robust document.  So we would

6    huddle through a virtual for me a virtual

7    meeting and review upcoming conferences,

8    evaluate, you know, kind of pros and cons of

9    different conferences and decide what to

10   attend.  And update the document, if we

11   submitted a proposal to submit at a conference

12   and it was accepted, great.  You know, it's

13   more likely that we may attend that or it will

14   affect who we send because we have to send

15   somebody who can present.  If it's not

16   accepted, maybe, you know, we'll send somebody

17   else.  So that was kind of the platform for

18   discussion, I would say, is that that Google

19   Doc, and I think -- I don't recall a

20   specific -- we didn't meet every month, we

21   didn't meet once a quarter but we met twice a

22   year I would say and we would revisit it based

23   on maybe budgetary constraints or new

24   conferences that we became aware of, so pretty

25   common for an account manager to send us, you

```
 1                    KYLE WEST

 2   know, an email maybe forward an email from one

 3   of their prospects or client inviting us to a

 4   different conference generally in their region

 5   or maybe it's for an association that the

 6   client belongs to or maybe they think this

 7   would be a good association that's been hard

 8   for us to target they have 10,000 educators

 9   that belong, et cetera, it, so we would discuss

10   all those things and take it into consideration

11   to, you know, make decisions around what to

12   attend, who to send, how long to stay there.

13        Q.    Was Mr. Lombardo on that committee

14   at any point in time?

15        A.    No, no.

16        Q.    Would he ever decide what convention

17   or conference to attend?

18        A.    I mean, not that I was part of.  I

19   think he was certainly, you know, the sales

20   team is definitely was, again, a resource to

21   make us aware of certain opportunities or

22   conferences, but I don't -- he didn't have

23   decision-making, I don't know, authority.  You

24   know, you couldn't just like book a conference

25   or definitely it went to the conference
```

1                         KYLE WEST

2    committee or maybe directly to Leslie or

3    something.

4         Q.    I want to ask you about a couple of

5    I'm going to say products but that's probably

6    the right word so you can correct my language.

7    There's been some testimony in the deposition

8    so far about Mr. Lombardo's involvement with

9    several different products.  And I'm going to

10   start with one that I think was brought up

11   today which is Career Concourse.  Do you know

12   if Mr. Lombardo had any involvement in

13   developing Career Concourse?

14        A.    Not to my knowledge.  I was -- I

15   contributed to, you know, certain aspects of

16   that and I never -- I don't recall interacting

17   with Rick.  It was mainly with John and -- John

18   Chmura and Greg Chmura.

19        Q.    What about an, tell me if this is

20   not a product but a program or product called

21   Clippy?

22        A.    So Clippy tool is a feature, well, I

23   should say a -- it's a potential feature, it's

24   on what we call the roadmap, so this is a, you

25   know, a large inventory of features to be

```
 1                    KYLE WEST

 2   developed and it got, you know -- my audio

 3   is -- so Clippy tool is, you know, one amongst

 4   probably more than 150 product features that

 5   are in our roadmap and what the roadmap is

 6   doing, it's based on feedback from clients and

 7   internal staff including the sales team, chat

 8   team members, so if I'm monitoring chat and I

 9   get a request from a client, like, hey, why

10   can't I get historical occupation wages, for

11   example, then I can tag that chat, because it's

12   a product request, right, so I can tag that,

13   export it and it will go to the product

14   development team, or it will go the a few

15   different people I think it goes to Greg who

16   technically might not be in technical

17   involvement, anyway.  Clippy tool is a, you

18   know, it's a potential feature and so my

19   knowledge -- it's definitely still on the

20   roadmap and it's been, gosh, there for at least

21   three years, maybe.  We developed something

22   called a quick link that was a kind of a

23   holdover to Clippy tool.  That's probably way

24   too much information, but, yes, I'm aware of

25   Clippy tool it's a feature of job JobsEQ
```

ROUGH TRANSCRIPT

Page 86

```
 1                    KYLE WEST

 2   potential feature.

 3        Q.    Do you know --

 4              THE COURT REPORTER:  Can.

 5        Q.    Do you know how Clippy, ended up on

 6   the roadmap?

 7        A.    I've got a good idea.  I mean, it's

 8   a -- it's what we would call a competitive gap

 9   so it's a feature that we know our main

10   competitor EMSI in this case has in their -- in

11   whatever their platform is called.  A

12   competitor to JobsEQ analyst, at least that's

13   what it was called when I used I so it's been a

14   competitive gap since I used the products side

15   by side more than five years ago.  So, you

16   know, I mean, there's any number of -- if I

17   look at the product roadmap, so we have a

18   software called Prod Pad and it's relatively

19   new in the past few months when I joined the

20   product development team.  We had this

21   inventory of product features that we aimed to

22   develop and there's a column for feedback, so

23   you've got the number of persons, whether

24   internal or external, who have requested that

25   feature or at least we have interpreted their
```

```
 1                    KYLE WEST

 2   request and this could be by email, it could be

 3   by phone, it could be by chat.  We have

 4   interpreted their request as a request for

 5   historic wages or Clippy.  So I do know, I

 6   mean, I clearly recall that Clippy had, you

 7   know, it's a -- it's one of those product

 8   features with more requests in terms of the

 9   volume of feedback than the vast majority.  I

10   would make a very educated guess that it's in

11   the top 20 of more than 150 features on the

12   roadmap in terms of volume of feedback.

13        Q.   Do you know what Mr. Lombardo's

14   involvement if any was in getting Clippy on the

15   roadmap?

16        A.   I don't know, but I think -- I would

17   assume that he, you know, shared amongst the X

18   number of feedbacks, he, you know, he is

19   represented in that pool of feedback given all

20   the clients that he served basically, I'm sure

21   of that.

22        Q.   Would he have any decision making

23   authority in terms of developing or producing

24   Clippy?

25        A.   Not to my knowledge, absolutely not.
```

1          KYLE WEST

2       Q.     With respect to the roadmap, did Mr.

3   Lombardo have any input into prioritizing

4   what's at the top of that list?

5       A.     I mean, based on my understanding of

6   how things get prioritized, no, aside from

7   contributing to feedback and informing what we

8   call or what we refer to as the use case, so if

9   he, you know, or somebody has a prospect or a

10  client who says, hey, we really like your tool,

11  but what we really need is wages by ethnicity

12  or something like that, so, you know, Rick

13  would -- it would be incumbent on Rick or the

14  account manager whoever it may be to get more

15  information to answer the question of, well,

16  why do they want this, why does it serve

17  economic developers, et cetera, it, et cetera

18  so I think you could say that by contributing

19  to the content that is recorded in our, you

20  know, literally archived in prod pad on product

21  management software, he has influenced the --

22  what features make the roadmap, but there is an

23  actual process, well, kind of, we have a

24  process for assigning scores based on the

25  impact, the level of effort and the value of a

```
 1                    KYLE WEST

 2   feature.  So it's a very specific process.  And

 3   it's a group.

 4        Q.    So, I'm sorry.  Go ahead.

 5        A.    There's a group that assigns values,

 6   I shouldn't say values, just, I don't want to

 7   create confusion, but there's a team that

 8   assigns values linked to the level of effort

 9   required and the value of the feature, so that

10   group makes decisions, however, the roadmap

11   gets presented, I believe, on a quarterly basis

12   to the SEA Group, and the priorities that come

13   through the SEA Group don't always align to the

14   priorities assigned by the product development

15   team.  Does that make sense?

16        Q.    Yes.  Was Mr. Lombardo ever part of

17   the group that assigns values?

18        A.    I don't believe so, but you'd

19   have -- you know, well, I -- I don't believe

20   so, not when I was involved.

21        Q.    Was Mr. Lombardo ever part of the

22   SEA Group?

23        A.    Definitely not.

24        Q.    Can you describe -- well, first of

25   all, the term leadership has been used quite a
```

ROUGH TRANSCRIPT

```
 1                    KYLE WEST

 2   bit throughout this matter, can you describe

 3   for me who constitutes leadership?

 4        A.    Well, from my perspective, I think

 5   of leadership as the SEA Group.  I forget what

 6   the acronym stands for, that's who I think of

 7   as Chmura's leadership.  I don't know, you

 8   know, behind the scenes whether they vote or

 9   how many -- how votes are weighted.  I have no

10   idea.  But that is certainly my impression is

11   that that's where decisions get made and I

12   believe that Chris has the most influence.  My

13   impression is that even if a majority of the

14   SEA Group did not agree with something or want

15   to pursue something, my impression is that

16   Chris could override that, but I am not

17   certain.

18        Q.    And by Chris, you're referring to

19   Dr. Chris Chmura; is that correct?

20        A.    Chris Chmura, yes, yes.

21        Q.    Were you on SEA Group or part of SEA

22   Group?

23        A.    No.

24        Q.    Bear with me for one second.  As far

25   as leadership management style or C group's
```

```
1                       KYLE WEST

2   management style, can you describe that?

3       A.    Off the cuff, no, I can't,

4   inconsistency, intimidating; threatening,

5   insecure.  I mean, I could go on with --  I'd

6   be happy to prepare something in writing, but I

7   think I would just be rambling, I could go on

8   with easily 15 or 20 descriptors.

9           MS. COOPER:  I don't have any more

10      questions for you, Mr. West.  I appreciate

11      your time.

12  BY Mr. MICHALIK:

13      Q.    West, I have just a real quick

14  follow-up.

15      A.    Okay.

16      Q.    Can everybody hear me okay.  I was

17  getting some feedback.

18      A.    Okay.

19      Q.    You were talking about this group or

20  team that assigns values for the roadmap, were

21  you ever on that team?

22      A.    Yes.

23      Q.    And what period of time were you on

24  that team?

25      A.    Roughly mid February to my
```

```
 1                    KYLE WEST

 2   resignation early April.

 3        Q.    So just so we're clear, so mid

 4   February of 2020, you submitted your

 5   resignation? ^

 6        A.    Correct, when I became the senior

 7   business analyst.

 8        Q.    And I'm taking it from what you were

 9   just saying in response to opposing counsel's

10   questions, would it be fair to say you're not a

11   fan of -- were not a fan of Chmura analytics at

12   the time you resigned your employment?

13        A.    I don't think that would be fair.

14        Q.    Were you unhappy with Chmura's

15   leadership at that time?

16        A.    I do feel like leadership failed,

17   yes, but Chmura leadership is, I would

18   characterize it as dichotomis ^ .  So I really

19   enjoyed work working with certain members of

20   leadership and I really did not enjoy working

21   with others.  So I experienced a string of

22   specific incidents that led me to a tipping

23   point and when I reported that to Chris, the

24   CEO, she told me to move on, and I didn't

25   appreciate that, but I wouldn't say -- I
```

ROUGH TRANSCRIPT

1                    KYLE WEST

2    wouldn't say it made me unhappy, you know, the

3    style is such over time that I wasn't surprised

4    by her response, but I definitely felt like it

5    was time for me to move on which I felt for,

6    you know, probably more than a year, but I

7    think to their credit, maybe they sensed that

8    maybe they really wanted to keep me around, but

9    as you can tell I rotated jobs quite a bit,

10   but, you know, I had some -- I think at the

11   latest transition occurred a few months

12   beforehand, I would still be employed if, but,

13   you know, the string of incidents that I

14   experienced just kind of hardened my resolve to

15   move on and my mind was made up, so I wouldn't

16   say I was unhappy.  I think I was pretty well

17   over it by the time I resigned, but I don't

18   feel like I was unhappy.  I think if you asked

19   me colleagues if I was unhappy, I don't think

20   anybody would, any honest person would say they

21   detected that in my mood or persona.

22             Mr. MICHALIK:  No further questions.

23

24

25