# Exhibit 11

1

2                UNITED STATES DISTRICT COURT

3                 FOR THE EASTERN OF VIRGINIA

4                 ~~~~~~~~~~~~~~~~~~~~~

5

6    CHMURA ECONOMICS & ANALYTICS, LLC,

7

8              Plaintiff,

9

10       vs.              Case Action No.  3:19cv813

11

12    RICHARD LOMBARDO,

13

14              Defendant.

15              ~~~~~~~~~~~~~~~~~~~~~

16        Remote Video/Stenographic deposition of

17                   ELI AUERBACH

18
                     May 5, 2020
19                    11:35 a.m.

20                    Taken at:
                    Penny Sherman
21           5102 East Farnhurst Road
                   Lyndhurst, Ohio
22

23

24    REPORTER:  Penny Sherman

25    JOB NO. 179590

```
 1

 2    APPEARANCES:

 3         On behalf of the Plaintiff:
                McGuireWoods, by
 4              HEIDI SIEGMUND, ESQ.
                800 East Canal Street
 5              Richmond, Virginia  23219

 6
           On behalf of the Defendant:
 7              Koehler Fitzgerald, by
                CHRISTINE COOPER, ESQ.
 8              1111 Superior Avenue
                Cleveland, Ohio  44114
 9

10         On behalf of the Witness
                Gottschlich & Portune, by
11              TERRY POSEY, ESQ.
                201 East Sixth Street
12              Dayton, Ohio  45402

13

14

15

16                        ~ ~ ~ ~ ~
      ALSO PRESENT:
17
           CHRIS CHMURA
18
                          ~ ~ ~ ~ ~
19

20

21

22

23

24

25
```

1

2                    TRANSCRIPT INDEX

3   APPEARANCES.............................   2

4   INDEX OF EXHIBITS ......................   4

5   EXAMINATION OF ELI AUERBACH
    BY MS. SIEGMUND........................   5
6
    .......................................
7
    EXHIBIT CUSTODY
8
    EXHIBITS RETAINED BY ATTORNEY
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                    INDEX OF EXHIBITS
    NUMBER              DESCRIPTION          MARKED
 3
    Exhibit A   Affidavit of Eli Auerbach.....  62
 4
    Exhibit C   Bates No. Chmura40177........  38
 5
    EXHIBIT B   E-mail......................  40
 6
    Exhibit E   Document marked Highly .......  69
 7              Confidential, Bates-stamped
                CHMURA0201265
 8
    Exhibit F   E-mail......................  84
 9
    Exhibit G   Documented conversation with .  98
10              Rick Lombardo dated October
                17, 2019
11
    Exhibit H   Text messages................ 121
12
    Exhibit I   Documented conversation ...... 125
13              between Mr. Lombardo and Mr.
                Auerbach on October 21st
14
    Exhibit J    Text messages produced by ... 140
15              Mr. Lombardo between himself
                and others
16

17

18

19

20

21

22

23

24

25
```

```
 1                      Auerbach
 2        ELI AUERBACH, of lawful age, called for
 3   examination, as provided by the Ohio Rules of Civil
 4   Procedure, being by me first duly sworn, as
 5   hereinafter certified, deposed and said as follows:
 6              EXAMINATION OF ELI AUERBACH
 7   BY MS. SIEGMUND:
 8              MR. POSEY:  I'd like to just open with
 9         one matter now that we're sworn in.
10              Mr. Auerbach may have some ongoing
11         confidentiality obligations pursuant to a
12         contract arrangement, and we anticipate that
13         Chmura will be maintaining those pursuant to
14         the protective order in this case.  And he's
15         testifying on Chmura's request and pursuant to
16         Chmura's -- his obligations to Chmura.  Chmura
17         will be maintaining those.
18              MS. SIEGMUND:  Okay, thank you.
19    Q.    Mr. Auerbach, have you ever been deposed
20   before?
21    A.    No, I have not.
22    Q.    Okay.  So I'm just going to go over a
23   couple of ground rules with you.  As you know,
24   you're under oath, so it's just like we are sitting
25   in a courtroom with a judge and a jury.
```

```
 1                     Auerbach

 2            We're going to try not to interrupt each

 3   other because Penny is taking down everything we're

 4   saying, so try to allow me to finish my question

 5   before you start talking, and I'll try to allow you

 6   to finish before I start talking.  It is a little

 7   more complicated than usual with lag time through

 8   the technology, but we'll try to muddle through

 9   that.

10            Try and make sure your answers are

11   audible; no huh-huh or uh-huh, so that the court

12   reporter can take everything down.  If you don't

13   understand any of my questions or you if can't hear

14   me or you need me to clarify anything, just feel

15   free to say so and I'll try to rephrase.

16            If you need a break -- I don't think

17   this is going to take all day anyway, but if you

18   need a break, just let me know.

19            And most importantly, you and I have met

20   before, and you have been on calls with

21   Mr. Saterwight (phonetic) and me and other members

22   of Chmura's leadership, and those conversations are

23   attorney-client privilege, and that privilege

24   belongs to Chmura.  You're not entitled to waive

25   that privilege, and I don't want to get into any
```

Auerbach

1

2   conversations that you and I had that will put that

3   advice from Chmura under attorney-client privilege.

4   And so I'll try to stay away from those things, but

5   I'm not trying to get into what Mr. Saterwight and

6   McGuireWoods told me such and such, because all of

7   that is privileged.  And by the same token, I'm

8   not going to try to get into your conversations

9   with Mr. Posey as those are protected by

10  attorney-client privilege as well.

11              Does all of that make sense?

12       A.    Absolutely.

13       Q.    Thank you.  So with that, do you have

14  any medical conditions, or are you on any

15  medications that would prevent you from testifying

16  completely and accurately today?

17       A.    No.

18       Q.    Is there any other reason you can think

19  of why you can't testify truthfully and to the best

20  of your ability today?

21       A.    No.

22       Q.    What did you do to prepare for your

23  deposition today?

24       A.    I had a half-hour conversation with my

25  attorney and that's about it.

```
 1                         Auerbach
 2       Q.     Did you review any documents?
 3       A.     I reviewed the e-mails that were sent
 4  over in relation to this, but that was all I had
 5  done.
 6       Q.     Is that your e-mail as far as our
 7  conversation about setting up the deposition?
 8       A.     That is correct.
 9       Q.     Did you talk to anyone other than your
10  lawyer about today's deposition?
11       A.     No, I did not.
12       Q.     Thank you.  So you started with Chmura
13  in April or so of last year; is that right?
14       A.     Yes.
15       Q.     Do you recall your start date?
16       A.     I think it was something like April 6th.
17  I don't remember the exact date, but I believe it
18  was the beginning of April.
19       Q.     And what was your title when you started
20  with Chmura?
21       A.     Sales manager.
22       Q.     What were your responsibilities as sales
23  manager?
24       A.     Primarily to work with leadership to set
25  goals and benchmarks for sales team regarding new
```

1                          Auerbach

2     accounts, renewals, total sales, new business and

3     to effectively manage the sales team; make sure

4     they are hitting their appropriate benchmarks, in

5     terms of outreach, calls, e-mails, following up

6     with connections made through Linkedin or

7     conferences.

8                And to be there sort of as a mentor.  If

9     they have questions or get stuck with a certain

10    client or prospect, how to work through that.

11         Q.    And we'll follow up on some of those as

12    we go.

13                Did you sign an employment agreement

14    with Chmura?

15         A.    An employ -- I would say, in general,

16    no, I did not.  I signed what was effectively an

17    offer letter.

18         Q.    And did you sign a confidentiality

19    agreement with Chmura?

20         A.    Yes, I did.

21         Q.    And what -- I know Mr. Posey touched on

22    this at the beginning of the call, but what are

23    your understandings as far as your obligations to

24    Chmura regarding confidentiality?

25         A.    Anything that pertains to intellectual

1                         Auerbach

2    property, anything regarding financial information

3    or anything about the client-list prospects,

4    anything related to the software platform itself,

5    none of that can be discussed with, you know,

6    anybody.

7         Q.    Did you work from the office most days

8    when you were a sales manager?

9         A.    Did you say could I or did I?

10        Q.    Did you.

11        A.    Yes.  I would say, almost every day I

12   worked from the office.

13        Q.    And what was your typical schedule?

14        A.    When I first started, I was typically in

15   around 8:00, but I would say within just a few

16   weeks, I started coming in at 7:00, just to have

17   that first hour where there was very little

18   activity.  There was a lot of work I could get done

19   in the morning regarding each individual account

20   manager.  And I would usually stay sometime between

21   4:00 or 5:00, depending on what the end of my day

22   looked like.

23        Q.    Did you ever leave for lunch or to run

24   errands during the day?

25        A.    Sometimes, sure; maybe once or twice a

```
 1                    Auerbach
 2  week, just to be able to get outside and take a
 3  walk.
 4       Q.    But, generally, your schedule was 8:00
 5  to 4:00 or 5:00 and then transitioned to 7:00 to
 6  4:00 or 5:00?
 7       A.    Yes.
 8       Q.    And whenever you came in to Chmura's
 9  office, you had to use a badge to swipe in; is that
10  right?
11       A.    That's right.  Yeah, we had a key pod
12  where you would use to enter, and then you didn't
13  need it to leave.
14       Q.    How often did you travel from the office
15  for conferences?
16       A.    I would say -- I mean, there were some
17  months not at all.  Other months there might be two
18  conferences.  So I would say, during the time, the
19  entire time I was with Chmura, I probably traveled
20  seven or eight times total.  That includes a couple
21  of trips to Richmond to visit the headquarters, if
22  you will, for the company.
23       Q.    And when you would travel either to go
24  to Richmond or go to a conference, how long would
25  you be gone?
```

```
 1                      Auerbach
 2      A.    Probably never more than a few days,
 3  just depending on where it's at, whether we flew,
 4  drove, circumstances, it would be maybe two or
 5  three days.
 6      Q.    Were those usually weekdays, or did you
 7  sometimes travel on the weekend?
 8      A.    I would say the majority were during the
 9  week.  I mean, there might be a travel on Sunday,
10  or coming back later, you know, somebody might come
11  in on a Saturday.  I think one time on a Saturday
12  from a delayed trip, but usually during the week.
13      Q.    And were the account managers that you
14  supervised, were they required to keep particular
15  office hours?
16      A.    In general, yes.  That's the
17  expectation.  I think most people probably worked
18  8:00 to 5:00 on the sales team.  There were a few
19  people that started coming in early, like at 7:00,
20  sometimes earlier, usually with the intent to be
21  able to leave earlier.
22           So there was some leeway; if you came in
23  an hour early, you could leave a little earlier.
24  And likewise, if you came in an hour later, you
25  would stay an hour later.
```

```
 1                        Auerbach
 2        Q.    Was Mr. Lombardo one of the account
 3   managers that tended to come in early?
 4        A.    Yes.  Every single day.
 5        Q.    What time did he usually arrive?
 6        A.    I don't know the exact time.  The only
 7   thing that I do know is, the days he worked in the
 8   office, almost every single time when I arrived by
 9   7:00, he was already there working on his computer.
10        Q.    And you said, the days that you worked
11   in the office, he had an agreement during at least
12   part of your tenure where he would work from home a
13   couple of days a week; is that correct?
14        A.    That is correct.
15        Q.    And how many days a week did he work for
16   home, if you recall?
17        A.    Two days.
18        Q.    So on the three days a week that he was
19   in the office, he normally was there by 7:00; is
20   that right?
21        A.    Yes.  Usually it was before.  But, yes,
22   for sure by 7:00, he was already there.
23        Q.    And was he already working from home two
24   days a week when you started at Chmura, or did that
25   happen under your supervision?
```

```
 1                     Auerbach
 2       A.    If I remember correctly -- I don't
 3  remember exactly -- it was either he had just been
 4  allowed to or shortly after I started I think he
 5  did.
 6       Q.    And Mr. Lombardo was the senior account
 7  manager; is that right?
 8       A.    Yes, that's correct.
 9       Q.    And was he the most senior of all the
10  account managers by the time you started?
11       A.    Yes, that's correct.
12       Q.    What were his job responsibilities as a
13  senior account manager?
14       A.    Primarily to generate new business, make
15  sure he gets a high renewal rate, attend
16  conferences when appropriate.  Those were his
17  primary responsibilities.
18       Q.    Did he have any other responsibilities?
19       A.    I mean, there's some reporting
20  requirements in terms of providing information
21  regarding prospects or, you know, working Stan
22  regarding certain deals or opportunities he was
23  working on.  I mean, but in terms of formal
24  requirements, that was it.  That's the only thing
25  he contributed to.
```

1                          Auerbach

2        Q.    We're going to get into a little more of

3   what he informally did as well, but as far as

4   making sales and generating new business, I want to

5   talk about the pricing a little bit.

6              Mr. Lombardo was authorized to give up

7   to a 30 percent discount to close a deal, correct?

8        A.    That is correct.

9        Q.    What was the average price of the JobsEQ

10  software that he was selling?

11       A.    So it's sort of difficult to answer,

12  because there are a number of tiers.  So some of

13  them could be extremely large deals that would kind

14  of throw off the average.  But, I would say, when

15  you're looking at the most consistent price range,

16  you are probably talking about somewhere between 7-

17  to 10,000.

18       Q.    So a 30 percent discount off of a 7- to

19  $10,000 deal, that would be a couple of thousand

20  dollars per sale; is that fair?  I know that's very

21  -- (inaudible ) -- but is that roughly right?

22       A.    Sure, yes.  That is correct, yes.

23       Q.    And he was not required to ask your

24  permission to get that 30 percent discount,

25  correct?

```
 1                          Auerbach

 2        A.    So, technically, he had been told that

 3   he had the ability to do that, but being very

 4   truthful, oftentimes -- and this predated me,

 5   because this is what was explained to me was that a

 6   lot of times there was pushback regarding giving

 7   the discounts.

 8              So from the time I started until I left,

 9   not only did he never give a discount of that size

10   that I recall, but almost any time he was going to

11   deviate in any way from what the pricing model was,

12   he would always come to me first.

13              And usually it wasn't -- it might be,

14   for example, he might give them an extra user to

15   the platform or a small percent discount that would

16   be equivalent to say what the renewal rate would

17   be.  But never, to my recollection, was he giving

18   substantial 20, 30 percent discounts.

19        Q.    So he did have the authority to give a

20   20 or 30 percent discount, but he usually did not

21   use that authority; is that fair?

22        A.    Yes.  In the vast majority of cases, he

23   would not do that.

24        Q.    And you said, Whenever he deviated from

25   the pricing model, he would come to you first; what
```

```
 1                      Auerbach
 2   did you mean by that exactly?
 3        A.    Essentially, he would come to me and
 4   say, Here is a price that I would like to give, and
 5   here's the reasons why.  We would look at what the
 6   original pricing would be and then evaluate where
 7   he wanted to go.
 8              I would say, a very typical scenario is
 9   just, a client, it's just a little bit above what
10   they can pay for one reason or another, so we would
11   look at what a price would be that would fit their
12   budget.  That's a very common scenario about why he
13   would make an adjustment or ask for an adjustment
14   to the price.
15        Q.    So is it fair to say that he would come
16   to you with a recommendation about what he thought
17   needed to be done on pricing to close a deal?
18        A.    Yes, that's a fair way to say it.
19        Q.    Did you ever tell him, No, I don't think
20   that's appropriate, or did you typically follow his
21   recommendations?
22        A.    In the majority of cases, I followed the
23   recommendation.  There might have been a handful of
24   instances where I might have just had a different
25   perspective on how he could initially approach it.
```

1                         Auerbach

2              Or maybe, oftentimes, if any account

3    manager came to me I would say, Well, I'd be more

4    comfortable lowering the price if they were willing

5    to sign a multiyear deal.  So we would always

6    tackle that first to see if that would work.  And

7    if not, then we'd say, Okay, how can we adjust the

8    first-year pricing.

9              (Discussion off the record.)

10       Q.    So you might provide some additional

11   feedback and suggestions to tweak his

12   recommendations, but in most cases, you went with

13   what you thought was appropriate?

14       A.    That is correct.

15       Q.    And I know you mentioned, he had perhaps

16   received some pushback on discounts in the past.

17   Is it fair to characterize it as, he wanted to keep

18   you abreast of all of the offers he was making as

19   opposed to he formally required to seek permission?

20       A.    Correct.  It was more of a working

21   relationship where you were given freedom of

22   latitude.  And in return, he and I, we worked very

23   closely together to make sure, it was not only a

24   fair deal for the organization, but, you know, and

25   he's getting the maximum opportunity on the

1                          Auerbach

2    commission side, so there's a good balance there.

3    So we worked very closely to do that on most deals.

4         Q.    I mean, he was very motivated to get his

5    commissions, wouldn't you say?

6         A.    Yes.

7         Q.    And so he would have strong opinions

8    about what sort of pricing would be necessary or

9    appropriate to get a deal done; is that fair?

10        A.    No.  I would not say that he had very

11   strong opinions.  I think by the time he would

12   bring a deal to me, he was extremely confident that

13   it was going to close and they would sign a

14   contract.  This was just a function of how to get

15   the price in the appropriate place.  So we know

16   they're interested, we know they want to sign, but

17   there's a lot of different elements at play in

18   determining a price.

19             You know, it's maximizing for the

20   organization, it's maximizing his commission.  It's

21   putting the price in a place where the client can

22   afford to feel comfortable with what they're

23   investing.

24        Q.    And as far as, prior to when he would

25   come to you basically ready to close a deal, was he

1                          Auerbach

2    left pretty much to his own devices as far as how

3    to identify new prospects?

4          A.    How to identify new prospects; is that

5    the question?

6          Q.    Correct.

7          A.    Yes.  Yes, to my knowledge.  Other than

8    opportunities that might have come through, say,

9    the sign-a-page on our web page, he was given

10   complete autonomy to determine how to go out and

11   develop a new book of business or any new

12   prospects.  Whatever opportunities came his way he

13   was permitted to pursue that.

14         Q.    Would he decide how to approach those

15   prospects, like, whether he was going to send an

16   e-mail or make a phone call, or when to follow up,

17   all of that sort of thing?

18         A.    Yes.  So he had the authority to

19   determine that method of how he would work.

20         Q.    And I know that we talked a bit in other

21   depositions about the importance of the demo

22   process; can you explain to me what that is?

23         A.    So the platform is very unique.  There's

24   only a couple of companies that offer it.  So

25   there's a lot for any entity that's seeing this for

1                          Auerbach

2    the first time to absorb.  There's a lot that the

3    platform can do.  So what is offered is a

4    demonstration of what the platform can do that

5    typically, I would say, between 45 to 60 minutes to

6    get through the whole thing.

7               And, essentially, what you're doing,

8    through the many conversations leading up to it,

9    you would craft the demo based on what you know

10   that was what the organization's needs are.

11              Then after the demo is when you sort of

12   follow up with any inquiries.  There might be

13   follow-up demos, just so they understand what the

14   platform can do and that they're comfortable with

15   the idea of using it.

16        Q.    And Mr. Lombardo decided how to craft

17   and tailor those demos based on his conversations

18   with these prospective clients; is that right?

19        A.    Yeah, partly.  So, I mean, there were

20   some standard components that we always wanted to

21   make sure were highlighted.

22              Oftentimes, again, because there was a

23   lot of unique features to the platform, there was a

24   lot that the account managers understood should be

25   presented, so that even if they didn't realize they

1                     Auerbach

2    needed it, once they saw it, they'd understand how

3    it would work for them.

4                So there were a handful of things that

5    really were required to be in there.  There was

6    sort of an order of operation that was designed so

7    that the presentation would flow a certain way.

8                And really, the only difference was, if

9    it were an organization in the private market that

10   had no interest in education, then maybe you would

11   pull back on some of those elements and incorporate

12   other ones that are more ancillary but aligned with

13   what they need.  So that was kind of where the

14   autonomy came in.

15        Q.   So it's fair to say that there were some

16   things and components of the software that you

17   would always cover in a demo, but as far as how to

18   make it the most appealing to a particular client

19   based on his or her needs and the industry, the

20   account manager had the freedom to do that; is that

21   right?

22        A.   Yes.

23        Q.   And we talked a bit about what the

24   account managers did to obtain new business.  What

25   is your understanding of what an account manager

1                        Auerbach

2    had to do to earn a full 15 percent commission on

3    an initial sale?

4         A.    The standard was, they would cultivate a

5    lead, and that lead can come from a number of

6    different sources.  But, once they had a lead in

7    their hands, their responsibility is to pursue it,

8    to put together a software package that meets their

9    needs, whatever additional components might be

10   added to it, and then work to a point where they

11   can fully execute a contract and have our team help

12   them get set up and using the platform.

13        Q.    So if somebody came in and there was

14   already a license agreement in front of the client

15   and that client was kind of handed over to a new

16   account manager, that would not result in a full

17   15 percent commission; is that right?

18        A.    So I think it depends on the

19   circumstance.  So I think there's two different

20   ways you can look at it.

21             One of them is, let's say an account

22   manager, someone left the organization, and the

23   client that had been given a contract prior to that

24   returns it, it's really a judgment call, depending

25   on, you know, what the terms were for that account

1                      Auerbach

2   manager leaving and a bunch of variables.

3            It is possible under that circumstance

4   that an account manager would not get the full

5   amount, but in most other instances, yes, I think

6   that they would get it.

7            So, I mean, it's kind of understood in

8   many cases where, for whatever reason, if there

9   wasn't another account manager tied to it and no

10  reason, like someone else would get that

11  commission, I would say, in most cases, they would

12  get that full commission.

13       Q.    But, it was your understanding that

14  15 percent commission was not guaranteed on every

15  single signature.  There were cases, there was some

16  discussion and adjustment call that occurred; is

17  that right?

18       A.    Yes.  That wasn't the standard, but that

19  did happen.

20       Q.    And, to your knowledge, is there any

21  difference in, as far as calculating commissions

22  based on how the lead was found, like, if it came

23  in through the website versus if it came through an

24  outgoing call, that sort of thing?

25       A.    My understanding was, it would be

1                          Auerbach

2    15 percent regardless.  There might have been some

3    isolated incidents for one reason or the other

4    where they'd say, No, this is not worth 15 percent,

5    it's only worth X.  But, I would say, in the vast

6    majority of the time, in most instances, it was 15

7    percent.

8         Q.    And what was Chmura's policy on how the

9    account managers got the commissions on a multiyear

10   deal?

11        A.    Well, it changed a couple of times.  I

12   think early on, if I remember correctly, they would

13   get paid the full commission.  So if it was

14   15 percent for two years, they would get the full

15   amount.  At some point, I don't recall exactly

16   when, that changed where they get the 15 percent on

17   the new business for just the first year, and then

18   they had to wait the following year to get their

19   renewal commissions.

20        Q.    Was that ever communicated in writing

21   anywhere that you would get the full 15 percent

22   commission for multiple years on a multiyear deal?

23        A.    I'm sorry.  No, no, that's not correct.

24   I don't believe they were getting 15 for both

25   years.  I know that there was discussion about it.

1                          Auerbach

2              Again, prior to it changing, it was

3    never clear to me exactly what it was.  I know that

4    some of the account managers said, previously it

5    was 15 percent for the multiyear.  Then my

6    understanding was, it was 15 percent for the first

7    year, 3 percent for renewals after that, but they

8    would still get that all at once.

9              And then it changed probably later in my

10   tenure being there, where you had to wait each year

11   to get the renewal.  That's where I believe things

12   ended up.  At first it was only verbally relayed.

13   There was a lot of pushback from some of the older

14   account managers.  And then I believe, if I

15   remember correctly, HR wrote it out that every

16   account manager had it and understood what it was

17   going to be.

18       Q.    And who in HR would have done that?

19       A.    I would guess during the time period, it

20   was probably Aisha Ortiz, who's the HR director now

21   --

22              (Discussion off the record.)

23              THE WITNESS:  Aisha, A-I-S-H-A.  I

24        believe the last name is Ortiz, if I remember

25        correctly.

1                          Auerbach

2          Q.    So just to clean that up a little bit.

3    It was never the case that you would get 15 percent

4    on the first year and 15 percent on the second year

5    for a multiyear deal, correct?

6          A.    I don't know that.  It wasn't that way

7    when I was there, but I know that there was

8    discussion by the older account managers that it

9    had been previously, but I don't know for sure one

10   way or the other.

11         Q.    So during your tenure, it was never the

12   case that somebody would get a full 15 percent for

13   a multiple year, correct?

14         A.    I do not believe that instance happened

15   when I was there.  But I think, again, 'cause a lot

16   of things that happened early on, things were in

17   transition when I arrived.  So my understanding

18   was, there was a period of time previously where

19   you could.  From the time I was there, I never saw

20   it happen.

21               And I think, what the agreement was, my

22   understanding was that they would get, if it was a

23   two-year deal, they would get the 15 percent for

24   the first year and the three percent for the

25   second.  And then that changed.

1                      Auerbach

2       Q.    Then, again, just to clarify.  I'm only

3  asking, when you got there, nobody got paid

4  15 percent for both years, correct?

5       A.    That is correct, yes.

6       Q.    Did Mr. Lombardo ever complain to you

7  about not receiving appropriate commissions on

8  deals that closed while you were his supervisor?

9       A.    Just so I understand, while I was there

10  and I was a supervisor, did he ever complain to me

11  about not getting the commissions he should for a

12  deal?

13      Q.    Correct.

14      A.    Okay.  I know that he did, but I can't

15  recall the specific deals in which he was concerned

16  with.  But, I do know, there were a couple of

17  instances he had concerns.

18      Q.    You said, A couple of; do you remember

19  how many?

20      A.    I'd would -- I'd put in a number that I

21  can recall, maybe two or three.

22      Q.    Do you recall what his complaint was,

23  why he thought he had not gotten the full

24  commission?

25      A.    I think, again, if I can recall.  I

```
 1                      Auerbach
 2   don't have any notes pertaining to that time.  But,
 3   I just think it was a function of partial
 4   commissions for one reason or another, or not
 5   getting a full amount on a renewal because -- or an
 6   example would be, if a portion of the renewal
 7   amount was new business, making sure that portion,
 8   you got the full amount versus the renewal on the
 9   original component.  So there was always
10   discussions around that, making sure it was
11   processed correctly.
12        Q.    I'm not sure I heard that before, so
13   explain to me how that works, where you got a
14   renewal --
15        A.    Right.  Potentially, in a nutshell, if,
16   for example, they had a standard package and then
17   for a number of different components they increased
18   what they were working with.  The way it should
19   work is, whatever that up-sale was, you should get
20   the 15 percent, and then you would still get the
21   three percent renewal on the older business.
22              So sometimes those things didn't get
23   calculated appropriately, and then he would express
24   concerns over making sure that was calculated the
25   right way.
```

1                        Auerbach

2        Q.    And do you recall when he complained?

3        A.    To my knowledge, I think, in almost

4   every case.  I mean, there were some where the

5   decision was made maybe a partial or split for one

6   reason or another, and he may not agree with it,

7   but those were usually decisions above my

8   management or my control.

9        Q.    What do you mean when you say, they were

10  partial or split?

11       A.    So there might be a reason that

12  leadership would determine, he's not going to get

13  the full 15.  For example, it might be a lead that

14  was sent to him by someone in leadership who might

15  have met that person somewhere.  So they will

16  determine, Well, we cultivated the initial

17  introduction and all of that, and you might have

18  only done a couple of pieces for it.  And he and

19  another account manager may have a different

20  opinion about that.

21       Q.    But, it was always the practice during

22  your tenure there that if multiple people had done

23  the work -- or what was my example earlier, if

24  someone else had gotten the agreement in front of a

25  client, there would be a judgment call; it was not

```
 1                          Auerbach
 2    an automatic 15 percent every time, correct?
 3         A.    I would say that's fair, yes.  In most
 4    cases, there was a conversation about how to
 5    approach it.
 6         Q.    What about after -- and we're talking
 7    about Mr. Lombardo specifically.  After a deal
 8    closed, did he typically have ongoing contacts with
 9    the client after an initial sale?
10         A.    Absolutely, yes.
11         Q.    It's fair to say, he was the primarily
12    point of contact for his clients going forward?
13         A.    Yes, absolutely.
14         Q.    And does that involve answering
15    questions from clients?
16         A.    Yes.
17         Q.    And did it involve showing clients how
18    to use various features on the software they
19    purchased?
20         A.    Yes.
21         Q.    Did it involve troubleshooting?
22         A.    I think it would depend entirely on what
23    type of troubleshooting you're talking about.  If
24    it was something related to figuring out how to run
25    a query on something or how to access and use
```

1                      Auerbach

2  appropriately certain of the features that were

3  there, then yes, he would do it.  If there was

4  anything technical for one reason or another, that

5  would be sent to the appropriate people in IT.

6        Q.    That's a fair clarification.  So if it

7  needed to be sent to someone else, would he

8  directly coordinate that process?

9        A.    So for quite some time prior to me being

10  there, and even in the beginning, my first couple

11  of months, they would essentially have a direct

12  line of communication.  And oftentimes, they would

13  just send it to someone that they knew would be

14  able to handle it or fix the issue.  They would

15  send it directly.

16            And then a decision was made that there

17  needs to be appropriate channels met to do that.

18  So, essentially, they would be funneled through me,

19  and then I would send it to the appropriate person

20  for review to determine what should be done with

21  it.

22        Q.    And you were saying They there for a

23  minute.  So when you say, They would coordinate

24  directly with whoever needed to resolve the

25  problem, that would be the account managers,

1                          Auerbach

2    correct?

3         A.    Yes, that's correct.

4         Q.    But then that changed to be a bit more

5    formal while you there, that troubleshooting that

6    Mr. Lombardo couldn't handle would specifically go

7    through you; is that right?

8         A.    That's correct.

9         Q.    And did Mr. Lombardo handle some

10   quality-control issues?

11        A.    Can you define what quality control

12   means?

13        Q.    Sure.  I guess it would be related to my

14   previous question.  If a customer was having a

15   problem or if they were unhappy with a particular

16   feature of the product the way it was working, he

17   would either address those questions or coordinate

18   a way to address them; is that right?

19        A.    Yes, I would say that's fair.

20        Q.    Did he ever provide additional data to

21   customers on their request?

22        A.    I would say, sometimes it was usually a

23   function of if they needed something very quickly

24   and the resolution, independent of him just

25   producing it, would take too long, he may help them

1                        Auerbach

2    in that instance, and then he would revisit to help

3    them understand how to do it themselves next time.

4        Q.    And if a customer needed something

5    quickly and he thought it was appropriate to give

6    it to them, did he have to ask your permission to

7    do that?

8        A.    So we had a conversation about it.  He

9    initially came to me and said, How, as a sales

10   manager, do you want to handle it?

11              So my response always was, first and

12   foremost, as long as it's something that's within

13   their software license, I was fine with it.

14              The other thing was, it depended on --

15   you know, I think a part of the reason why they

16   were asking.  If it was just that they didn't want

17   to learn how to do it, then I would encourage him

18   to help them understand it so that they would

19   become more avid users of the platform.

20              But, there were a number of instances --

21   and I think every account manager would have a

22   story of this -- where somebody would have an

23   opportunity to need something or needed data very,

24   very quickly and just didn't have time to be given

25   a tutorial of how to do it.  So they would produce

1                        Auerbach

2    that information so that they'd be able to use that

3    for whatever their presentation is.

4         Q.    And so would he also provide the, sort

5    of, tutorials to how to run particular queries if

6    they had time to do that?

7         A.    Yes.  If it's in the initial -- to just

8    clarify.  In the initial enrollment into the

9    software, there was someone dedicated to doing

10   those trainings.  But, in the course of a year

11   license, what we all understood was, there were

12   some sort of features that were used more often

13   than others.  So three or four months down the

14   road, they might have difficulty remembering how to

15   use some of the other elements, and that's where

16   they would reach out to their account manager and

17   say, Here's what we are trying to do.  Can you help

18   us understand that.

19              And we started to produce, essentially,

20   one pages to distribute to help the account

21   managers be able to walk them through that process.

22        Q.    And I think you mentioned, you were fine

23   with Mr. Lombardo providing data in response to

24   clients' request if it was data within their

25   license.  But, did he also sometimes provide

1                    Auerbach

2    additional data that typically would be additional

3    charge outside the license?

4         A.    Yes.  But, I would also couch that by

5    saying, he would come to me, and we would discuss

6    it every time.  And it was usually for a client

7    that either was, you know, a multiyear client, a

8    very good relationship, or what most of the account

9    managers were given permission to do would be with

10   a prospect, to produce some reports, very broad,

11   high level, just to give them something tangible to

12   be able to walk away with and understand the

13   capacity of the platform.

14        Q.    And so when he would come to you to talk

15   to you about something like that, would he say,

16   Here's what the client wants, and I think we should

17   give it to them; like, did he normally have a

18   recommendation about what needed to be done in

19   those circumstances?

20        A.    So early on, I kind of gave him

21   guidance, to help him sort of understand, these are

22   the parameters that I would be comfortable working

23   in.  So when he would come to me thereafter, it was

24   always in these situations we talked about, this is

25   what we're going to do, 'cause he would say, Hey,

```
 1                    Auerbach
 2   can I go and do this?  And I would say to him,
 3   Sure, absolutely.
 4        Q.    And did he typically ask you in writing
 5   or was that a verbal conversation?
 6        A.    He would always just walk into my
 7   office, and we would talk about it.
 8        Q.    And is it fair to --
 9        A.    Actually -- forgive me.  There were some
10   times where in writing the client or the customer
11   would send something to him with a request.  And
12   then in some of those instances, he would forward
13   it to me and say, What are your thoughts on this,
14   how should we handle this.  But, in the absence of
15   a customer sending it in writing, he would just
16   come and talk to me verbally.
17        Q.    And was Mr. Lombardo also involved in
18   helping the new account managers learn how to use
19   Salesforce and get demos?
20        A.    Yes.
21        Q.    Is it fair to say, he trained them how
22   to use Salesforce efficiently?
23        A.    I would say no.  In general, that wasn't
24   an area that he tutored or mentored the new people
25   coming in with.
```

```
 1                        Auerbach
 2      Q.    Would he be responsive to questions
 3  about how to use Salesforce by the new people?
 4      A.    Yes.
 5      Q.    And is it fair to say, he taught them
 6  how to give demos?
 7      A.    In general, I would say no.  There was a
 8  pretty formal process for training on demos that
 9  heavily included members of leadership.  He might,
10  in the beginning, as all account managers,
11  regardless of whether they were senior or not, they
12  would present demos to the new people, even before
13  they started studying, just to get comfortable with
14  what the content looks like.
15      Q.    And so the purpose of advice and
16  guidance that he provided to them was how to do
17  demos efficiently and appropriately?
18      A.    Yes.
19      Q.    When you started with Chmura, did you
20  ask Mr. Lombardo his process for using Salesforce?
21      A.    Yes.
22      Q.    Let's look at an exhibit.  Let me see if
23  I can do this correctly.
24  (Exhibit C, E-mail Bates No. Chmura40177, was
25  previously marked for purposes of identification.)
```

```
 1                         Auerbach
 2       Q.    If I've done this correctly, you should
 3  be able to see an exhibit.
 4       A.    Yes.
 5       Q.    Take a look at that for a second and let
 6  me know when you've had a chance to read it.
 7             (Discussion off record.)
 8             MS. SIEGMUND:  So we are now, hopefully,
 9       all of us, but at least most of us, are
10       looking at Defendants' Exhibit B, which is
11       Bates Numbered Chmura40177.
12       Q.    And, Mr. Auerbach, that looks like an
13  e-mail from you to Mr. Lombardo on April 9th; is
14  that right?
15       A.    That is correct.
16       Q.    So that would have been close to when
17  you started at Chmura; is that right?
18       A.    That is correct.
19       Q.    And it looks like you are trying to set
20  up some time to learn Mr. Lombardo's Salesforce
21  process; is that fair?
22       A.    Yes.
23       Q.    Why did you want to learn that process
24  from Mr. Lombardo?
25       A.    I wanted to learn it from all of the
```

1                        Auerbach

2   account managers just to understand how it was, the

3   organization was utilizing Salesforce.

4        Q.    And so did you have similar meetings

5   with every account manager?

6        A.    Yes.

7        Q.    And did you take some of the feedback

8   and, sort of, practices that he showed you and use

9   those to create that user guide that you're

10  referring to in this e-mail?

11       A.    Yes.

12       Q.    And did you also consult with him about

13  formalizing the account manager onboarding process?

14       A.    Yes.

15       Q.    We are going to look at another exhibit.

16  (Exhibit B, E-mail, was marked for purposes of

17  identification.)

18            (Discussion off record.)

19            MS. SIEGMUND:  The first exhibit is

20       marked as C (sic).

21            Now we have submitted what is marked as

22       Defendant's Exhibit -- Excuse me --

23       Plaintiff's Exhibit B (sic).  Can everyone see

24       that?

25       Q.    Mr. Auerbach, can you see Exhibit B?

```
 1                        Auerbach
 2      A.    Yes.
 3      Q.    Do you recognize this document?
 4      A.    I do not.  I don't recall it
 5 specifically, but I mean, it seems like something I
 6 would send.
 7      Q.    Down at the bottom of the e-mail --
 8      A.    Yeah.  I'm just saying, I think I am
 9 missing part of this, and I don't know why.
10            Okay, hold on.  Is it possible there's
11 more -- oh, I see.  I'm sorry.  It wasn't scrolling
12 at first.
13      Q.    Just let me know when you're ready.
14      A.    Sure, okay.  I finished reading it.
15            I have a vague recollection of this.  I
16 mean, I know that I sent the onboarding document to
17 all the account managers.  I vaguely recall him
18 writing this in response.
19      Q.    So you were dropping an onboarding
20 process for new account managers, and you were
21 asking Mr. Lombardo and Austin Steel and Wilson Cox
22 for feedback on how this process should go; is that
23 basically what this e-mail is?
24      A.    Yes, that is correct.
25      Q.    And Mr. Lombardo wrote back and gave you
```

1                       Auerbach

2    one suggestion about moving Data Explorer to later

3    in the onboarding process; is that right?

4        A.    Yes.

5        Q.    And what is Data Explorer?

6        A.    It's a tool that allows the user to

7    build tables with a host of different variables, to

8    give them a chance to read a whole host, an

9    innumerable number of variables in one table --

10       Q.    And is that a tool that the account

11   managers use?

12       A.    Use in what way?

13       Q.    I don't know.  I mean, perhaps that's

14   not the right word.  So explain to me how one uses

15   Data Explorer.

16       A.    So let me clarify what the onboarding

17   document was.  I think that's where some of the

18   confusion might be.

19            The onboarding document was very

20   inclusive of a lot of different components that the

21   new account managers needed to understand.  There

22   were elements, you know, in the beginning that

23   broke down standard operating procedures.  Some of

24   them related to the organization as a whole, but

25   there were many, many, many pages that explained

1                     Auerbach

2    how they should conduct themselves and everything

3    that goes along with being an account manager.

4               The second component was a demo guide

5    that was put together with feedback from many

6    different stakeholders, to best understand how to

7    go about presenting the software to prospects.

8               So all of that was combined in one

9    master document during the lofty 90-day onboarding

10   process, everything that they should be comfortable

11   with, familiar with and need to know to be

12   successful in the position.

13   Q.    So where did Data Explorer fit into that

14   process?

15   A.    So in the demo guide, so there's both a

16   specific order that they wanted to present each of

17   the different analytics.  And within there is Data

18   Explorer.  So it's obviously, based on this e-mail,

19   you can tell, a lot of different conversation about

20   what the appropriate order is, based both on

21   experience of the account managers, as well as what

22   leadership was looking to see.

23              So data Explorer was just one of the

24   tools that were highlighted in the demo guide.

25   Q.    Okay.  So he is just thinking that that

```
 1                    Auerbach
 2   should come later in the process; is that right?
 3        A.    Correct.
 4        Q.    And did you, in fact, follow his advice
 5   on that, as far as how Data Explorer should fit
 6   into the demo bag?
 7        A.    I don't recall the exact order we ended
 8   up with.  But, if I remember correctly, because of
 9   the importance and the widespread usage of Data
10   Explorer, I think the intent by leadership was to
11   move it up and to highlight almost immediately into
12   the demo the power of the tool and what it can do.
13             So I think, if I remember correctly, in
14   terms of the first five or six analytics you
15   showed, I do believe Data Explorer was toward the
16   front, but I can't recall specifically.
17        Q.    Okay.  So you're not sure whether this
18   change actually ended up in the final version of
19   the user guide?
20        A.    My recollection is that his specific
21   suggestion did not.  We did not put it at the back,
22   if I remember correctly.
23        Q.    Did Mr. Lombardo's job also require him
24   to travel regularly to conferences?
25        A.    I don't know how you define regularly,
```

```
 1                        Auerbach
 2    but I would say, on average, he probably went once
 3    a month to a conference, some months more,
 4    depending on the season.  You know, he might go two
 5    months without anything, and he have two months
 6    where he goes to four different, five different
 7    places.  So it just depended on the time of year
 8    and what the needs were.
 9         Q.    Are the conferences more seasonal, or
10    are they all year round?
11         A.    They're basically all year round, since
12    they're all over the country, different places at
13    different times.
14         Q.    By your recollection, he would go, let's
15    say, average of once a month; is that right?
16         A.    I would say that's fair, yes.
17         Q.    And what -- well, let me ask this first.
18              When Mr. Lombardo went to conferences,
19    did you normally go with him or did he typically go
20    by himself?
21         A.    I would say, in most cases, he went by
22    himself.
23         Q.    And what were his responsibilities while
24    he was at a conference like that?
25         A.    I would say, the primary responsibility
```

1                         Auerbach

2    was to set up a booth where he would try to attract

3    potential prospects to the table and introduce them

4    to the software platform.

5         Q.    Did he also meet with clients and

6    prospects while he was there?

7         A.    Yes.  He would make a very concerted

8    effort to be able to meet with as many clients

9    while he was there face to face.  He might send an

10   e-mail prior to say, This is where I'll be located.

11   Would you want me to stop by.

12        Q.    And did you direct him as far as, you

13   know, I think you should meet with this client at

14   this particular time, and I think you should meet

15   with this other client at this time, or did he

16   decide the best way to approach that when he was at

17   the conferences?

18        A.    He approached it however he felt it was

19   appropriate.

20        Q.    And I'm guessing that he typically went

21   to the conferences by himself.  You didn't tend to

22   keep track of what type of hours he was working at

23   those conferences; is that right?

24        A.    Not formally.  But when he traveled, we

25   touched based pretty often.  So, you know, with any

1                        Auerbach

2    account manager that was traveling, we would almost

3    always touch base in the morning and then have a

4    conversation at the end of the day.

5        Q.    Just to kind of, you know, recap, This

6    is what happened today or this is what the plans

7    are for today, that sort of thing?

8        A.    Correct.

9        Q.    Did Mr. Lombardo ever present at

10   conferences, to your knowledge?

11       A.    Not to my knowledge, no.

12       Q.    Did Mr. Lombardo provide feedback to you

13   or to other members of Chmura's leadership as to

14   which conferences he thought were best and which he

15   thought were not worth Chmura's time and money?

16       A.    Yes.  That was the standard process for

17   all account managers to put out their thoughts on

18   that.

19       Q.    And were you aware of any circumstances

20   where Chmura either decided to go to a conference

21   or decided not to go to a conference based on Mr.

22   Lombardo's recommendation?

23       A.    Not often, no.

24       Q.    But sometimes?

25       A.    Sometimes.

```
 1                      Auerbach
 2       Q.     And after Mr. Lombardo returned from a
 3   conference, would he typically take the following
 4   day off?
 5       A.     No.
 6       Q.     Did Chmura allow for a rest day after
 7   traveling to conferences?
 8       A.     It was an option for the account
 9   managers, yes.
10       Q.     But, in your experience, Mr. Lombardo
11   did not always take that rest day?
12       A.     Yeah, I can't specifically think of any
13   instance where he did.  I mean, it's very possible
14   he did, but I just don't recall.  He almost always
15   worked the next day.
16       Q.     After Mr. Lombardo returned from a
17   conference, how quickly would you expect him to
18   follow up with prospects and clients that he met
19   with at the conference?
20              I mean, you would want him to do that
21   right away, right?
22       A.     Yeah.  I would say, within a couple,
23   three days, he should have reached out to the
24   people he connected with.
25       Q.     And following up that week or within the
```

```
 1                      Auerbach

 2   week is important to making sure that Chmura can

 3   close those deals; is that right?

 4        A.    That is correct, yes.

 5        Q.    And did you have a sense of what

 6   Chmura's closing rate is for clients to express

 7   interest and request a demonstration at

 8   conferences?

 9        A.    That's a good question.  I don't recall

10   the specific number, no.

11        Q.    Do you have a sense of -- let me put it

12   this way.  Most clients stay with JobsEQ for

13   multiple years; is that right?

14        A.    I would say that's correct, yes.

15        Q.    Did Mr. Lombardo ever meet in person

16   with clients other than at conferences?

17        A.    Not to my knowledge, no.

18        Q.    Is it fair to say that he also provided

19   suggestions and recommendations about JobsEQ

20   features that he thought Chmura needed to be

21   competitive?

22        A.    Yes.

23        Q.    I'm going to walk through a couple of

24   examples of these.  And I don't know if all of

25   these were during your tenure, so just let me know
```

1                        Auerbach

2    one way or another.

3              Are you familiar with Career Concourse?

4              (Discussion off the record.)

5        Q.    Answer, Yes, right?

6        A.    Yes.

7        Q.    Explain to me a little bit what that is.

8        A.    So Career Concourse includes four

9    different functions.  There's a couple of surveys

10   included.  One, if I recall exactly, was to help to

11   guide students to specific career paths.  The other

12   one, I think, was more cultural sort of

13   expectations where they can match up with.

14             And then, the two other features, one

15   was putting in your degree or MA degree, to see

16   what jobs could be paired up with that in the open

17   market.  And then, if I remember correctly, there

18   was one for military exits where they'd be able to

19   put in their equivalent of their rank and position

20   and see how that correlates to jobs in the market.

21       Q.    And do you know when Chmura implemented

22   that as a feature or as an add-on to JobsEQ?

23       A.    I don't remember exactly.  I feel like

24   it was maybe roughly three years ago, maybe four.

25       Q.    So that was before your time at Chmura?

1                          Auerbach

2       A.    That is correct.

3       Q.    Do you happen to know whether

4  Mr. Lombardo had anything to do with Chmura adding

5  that feature?

6       A.    I don't have any firsthand knowledge of

7  that.

8       Q.    Do you know what Megatable is?

9       A.    What?

10       Q.    Megatable.

11       A.    Yes.  I don't think it was a feature

12  that was employed before I left, but I have some

13  familiarity with what it's supposed to be.

14              (Discussion off record.)

15       Q.    Was that something that was, sort of, in

16  the pipeline while you were at Chmura?

17       A.    If I recall correctly, yes.

18       Q.    And do you know whether Mr. Lombardo

19  made any recommendations about whether Chmura

20  should implement or add a Megatable feature?

21       A.    I don't have any knowledge about that.

22       Q.    What about Cliepy; do you know what

23  Cliepy is?

24       A.    I've only heard about it.  Yes, I've

25  only heard about it.

1                         Auerbach

2              (Discussion off record.)

3        Q.    You said you do know what it is, but it

4   wasn't anything that was in play while you worked

5   at Chmura?

6        A.    I don't believe it was.  I actually

7   don't even know what it was supposed to be.

8        Q.    Okay.  What about Firm List; do you know

9   what that is?

10             (Discussion off record.)

11       A.    Yes.

12       Q.    And do you know whether Mr. Lombardo had

13  any recommendations about whether that was

14  something that Chmura should offer?

15       A.    I can't say I have any direct knowledge

16  about that.  I believe, if I remember correctly,

17  Firm List was something offered prior to me being

18  there, so I don't know with any firsthand knowledge

19  how it came about.

20       Q.    But you said that Mr. Lombardo did make

21  some recommendations about features; can you

22  remember any that he did advocate for or recommend?

23       A.    I would say, the number one thing he

24  regularly came to me regarding was the reports that

25  included both the layout information that it

1                    Auerbach

2   included.

3        Q.   Can you explain that to me a little bit

4   more; what kind of report?

5        A.   So there were several automatically

6   generated reports that came standard with the

7   package where you could select essentially a

8   region, and you can get a report on a host of

9   economic-related data, workforce development.

10  There was an education report and then an industry

11  spotlight that would essentially focus exclusively

12  on a particular industry.

13       Q.   What exactly was he pushing for with

14  regard to this report?

15       A.   Not all of them, 'cause not all

16  pertained to the clients he worked with.  But, the

17  economic development and the workforce development,

18  he felt that the layout and the format and how it

19  was designed was a bit antiquated.  And the content

20  that was included didn't give as much flexibility

21  to the clients as they had been asking for.

22       Q.   And do you know whether that was

23  something that he also brought up with Chmura's

24  leadership?

25       A.   Yes, I would think so.  That was

Page 54

1                         Auerbach

2    something that he regularly assessed.

3         Q.    And do you know, did Chmura make any

4    updates to those reports in accordance with his

5    recommendation?

6         A.    No, no.  Maybe a couple of small things,

7    but he had very substantial lists of suggestions,

8    and the vast, vast majority was never adhered to.

9         Q.    Okay.  But, is it fair to say that he

10   did get a couple of the things that he wanted?

11        A.    Well, ironically, for the majority of

12   the time I was there, there were no changes that

13   were made, or very insignificant sort of surface

14   changes.  The substantive changes that were being

15   discussed that he was suggesting were essentially

16   the same as all the account managers.

17             And so I would say, about six weeks or

18   so before he was no longer with the organization,

19   there was a meeting with the entire sales team

20   about the these suggestions.  And so he was

21   included in that dialogue, and there was a

22   consensus that as a group we came to that was then

23   presented to leadership.

24        Q.    And that consensus, did that result in

25   any changes?

1                          Auerbach

2        A.    So what I will say is that I do not

3   recall those updates to the reports being completed

4   prior to me leaving, but while we were there

5   discussing it, there was not a lot of appetite to

6   make any changes to those reports.  So the

7   significant number of suggestions were not

8   incorporated.

9        Q.    But it was something that was under

10  consideration at least?

11       A.    So, again, I would say that most of the

12  suggestions were dismissed, and what was under

13  consideration were a handful of more format-related

14  changes.  What happened since I was fired, I do not

15  know.

16       Q.    And did Mr. Lombardo ever come to you

17  with suggestions about features that he thought

18  Chmura should retire, other than the report

19  features that we've just talked about that needed

20  to be updated?

21       A.    There might have been one or two

22  specific ones that he felt probably no longer had a

23  role, but there weren't many.

24       Q.    We talked a little bit about

25  Mr. Lombardo's schedule already.  When he was

1                    Auerbach

2    working from home, was he required to check in with

3    you to say, Here are the hours that I'm working

4    today when I'm working from home?

5        A.    He was not required, no.

6        Q.    So did you have any sense of how many

7    hours a day he did work when he worked from home?

8        A.    Sure.  He and I talked very regularly

9    throughout the day, both while he was in the office

10   and while he was home.  I would know anecdotally.

11   You know, we would often have calls earlier in the

12   day and again touch base at the end of it.

13              But, also I was able to track all of the

14   account managers' activities based on what they

15   were doing in Salesforce.  So I would be able to

16   get a good idea based on the timestamps on a lot of

17   their activities when they were working and perhaps

18   when they were not.

19       Q.    Does every entry in Salesforce show what

20   time it was added?

21       A.    So if you create some sort of a new

22   record in Salesforce, at the time you created it,

23   it will say what the time and date was.  Sometimes

24   the account managers would send their time early in

25   the morning or at the end of the day updating those

1                        Auerbach

2    records.

3            So the timestamps for them, that might

4    show that.  But, perhaps in their notes or when

5    they send e-mails to the Salesforce, you can also

6    see when those e-mails were sent or responses or

7    what it is.

8            So there was a lot of paper trail that

9    showed when he started working and what he was

10   doing throughout the day and when that day ended.

11   Q.    So let me break that down a little bit.

12          So for Salesforce, with the timestamps

13   on the entries, I think I understood you to say

14   that it would show -- the timestamp would be

15   whenever the entry was added or whenever it was

16   last modified; is that right?

17   A.    That is correct.

18   Q.    So it doesn't show that someone made

19   this change at this time and then made this change

20   at this time; it just says, This is when it was

21   updated?

22   A.    It depends on what the change was.  So

23   the overall record will show you when it was last

24   modified.  But, if you're putting attachments in,

25   specifically like e-mails, so the general practice

Page 58

1                     Auerbach

2    was, every call and every e-mail would be logged.

3    So if they had an e-mail, they would put the entire

4    content, including the header, the date and time

5    into the e-mail.

6              So you might have three separate

7    contacts, e-mails going back and forth with a

8    client in the course of an hour.  Only the last

9    time you access the record would that show.  But,

10   all of the e-mails would then keep track of that

11   dialogue that was occurring.

12        Q.    So you would tend to check on account

13   managers' hours by looking at what time they

14   modified things and so forth and by what time they

15   sent e-mails; is that right?

16        A.    That's correct, yes.

17              (Discussion off the record.)

18              (A recess was taken.)

19        Q.    Mr. Auerbach, when you were in the

20   office with Mr. Lombardo, I know you said he

21   typically was in by 7:00.  About what time did he

22   physically leave?

23        A.    I know antidotally that it was close to

24   6 o'clock every night.  He always stayed later than

25   I did.  There was a never a day I left where he had

1                          Auerbach

2   left before me unless there was a doctor's

3   appointment or something like that.  But, I would

4   generally say, to my knowledge, he would stay to

5   about 6 o'clock at night.

6        Q.    You say, Antidotally.  Is that because

7   other account managers told you; what is the basis

8   for your knowledge on that?

9        A.    Well, I know that oftentimes he would

10  carpool with his wife, so she wouldn't leave work

11  'til about 5:00, and by the time she made it over

12  to him, he would be leaving close to 6:00.

13       Q.    But that was typically after you left?

14       A.    That is correct.

15       Q.    Did Mr. Lombardo ever take a break for

16  breakfast or for lunch during the day?

17       A.    Once in a while he would go locally and

18  get like a breakfast burrito.  But, other than

19  that, I can't specifically recall a time I saw him

20  during the workday stop to take to lunch or

21  anything like that unless we as a group, as the

22  sales team, were going out.

23       Q.    About how often would he leave to get

24  breakfast?

25       A.    Maybe once a week that I would know of.

Page 60

 1                        Auerbach

 2        Q.    And then how long would that take would

 3   you say?

 4        A.    I don't really know because he would not

 5   often go after I left.  So a lot of the times he

 6   would have already gone by the time I get there.

 7        Q.    Did he ever run any errands during the

 8   day, like go to the post office or anything like

 9   that?

10        A.    Sometimes.  I didn't really track his

11   whereabouts, but I don't recall it being a regular

12   thing.

13        Q.    Did Mr. Lombardo ever take vacation

14   days?

15        A.    Sometimes; not often.  I definitely

16   think he took less than most people did.

17        Q.    Do you know if he worked while he was on

18   vacation?

19        A.    Yeah.  I mean there were -- I remember

20   one trip.  I think it was, for example, prior to a

21   conference in California, like let's say he was

22   there Tuesday, Wednesday and Thursday.

23              I remember one specific time that he

24   went out early with his wife.  I think he went like

25   Sunday and then was there Monday.  And I know that

1                         Auerbach

2     he would send me e-mails and communicate in advance

3     of going to the conference.

4          Q.    If he did not have a conference coming

5     up, do you know if he specifically worked on

6     vacation?

7          A.    I would say it would be pretty common.

8     I know if he took a day off here and there, he was

9     still answering e-mails and responding.  I'd even,

10    on Saturdays, just on the weekend, I've seen in

11    Salesforce that he had done work.

12         Q.    Any idea how many hours he would

13    typically work on a vacation day?

14         A.    Oh, I wouldn't be able to determine

15    that.

16         Q.    What about on a Saturday; do you have

17    any sense of whether he would just go in and make a

18    couple of updates and then be done or whether was

19    he working all day?

20         A.    I think it just depended.  I mean, I

21    don't -- again, it was something that I would see

22    when I would pull Salesforce reports.  I would see

23    that he had activity on the weekends, but I

24    sincerely don't know exactly how much time that

25    included.

```
1                    Auerbach
2       Q.    I'm going to show you Plaintiff's
3   Exhibit A, hopefully.
4   (Exhibit A, Affidavit of Eli Auerbach, was marked
5   for purposes of identification.)
6       Q.    Take your time and take a look at that
7   when it comes through.  Let me know when you're
8   ready.
9       A.    It's still loading on my end.
10      Q.    Has it come through?
11      A.    No.  It still says, File loading.
12      Q.    Should be four pages.  Mr. Auerbach,
13  your internet connection might be -- it looks like
14  you're frozen on my screen.
15      A.    Let me see if I can just download it.
16            MR. POSEY:  The presented version only
17        showed the first page.
18            MS. SIEGMUND:  That may be.  Let's go
19        off the record for a second, Penny.
20            (Discussion off the record.)
21      A.    I've read the second page.
22      Q.    Okay.  And, actually, that should work
23  for now.  We'll come back to this later.
24            But, as for these first two pages -- let
25  me back up even further.  Do you recognize this
```

1                     Auerbach

2    document?

3         A.    I do, yes.

4         Q.    What is it?

5         A.    This was the affidavit that leadership

6    asked me to sign off on regarding the case with

7    Rick Lombardo.

8         Q.    And did you review it before you signed

9    it and make sure everything was accurate?

10        A.    Yes, I did review it.  And to my

11   understanding of what was in here, this was

12   accurate.

13        Q.    So of these first two pages that you

14   looked at, is everything in here accurate?

15        A.    The only thing I would clarify is, some

16   of the stuff talking about his discretion and

17   things of that nature were things included, like,

18   the first page was basically written up,

19   leadership, their attorneys, whomever, kind of

20   setting the stage.

21             So a lot of that I didn't really amend,

22   because it looked at the totality of Rick's tenure

23   there.  And some of this when he first started, I

24   would have no knowledge of.

25        Q.    Did you see anything that was untrue?

1                        Auerbach

2       A.     Not in this version, but in the previous

3   one, there was a specific statement that I felt was

4   applied directly to me that was inaccurate.

5       Q.     So you did have the opportunity to make

6   changes to make sure you were comfortable with it,

7   right?

8       A.     Correct.

9       Q.     And looking at this today, is there

10  anything in here that, to your knowledge, is false?

11      A.     Not that I can say for sure.  The part

12  about the 30 percent, as with the rest of what's on

13  this page here, again, that was prepared for me.

14  And so, to the best of my knowledge, all of that is

15  true.

16      Q.     And we have looked at the second page,

17  and you've confirmed that there's nothing false on

18  this page either, correct?

19      A.     Correct, I think that's accurate.

20      Q.     We will come back to the rest of this

21  exhibit later.  I'm going to stop it for now.

22             Did Mr. Lombardo ever say anything to

23  you before his termination about Chmura owing him

24  overtime compensation?

25             (Discussion off record.)

1                          Auerbach

2        A.    I do not recall having a conversation

3   with him about that.

4        Q.    So if Mr. Lombardo testified that he

5   told you that he was due overtime, you have no

6   recollection of that?

7        A.    I can't -- I don't recall him sharing

8   that with me.  I recall the first time being made

9   aware of this was by leadership.  I honestly can't

10  remember if he brought it up.  He may have.  I

11  honestly can't recall a day where we talked about

12  that.

13       Q.    If he had brought it up, would you have

14  said something to HR or to leadership?

15       A.    Well, that's a tough question.  I guess

16  it depends on how it was presented.  But, from how

17  I later learned it was, to me, I didn't -- I didn't

18  understand at first the overtime issue.  It became

19  very, very complicated.  So I don't know that I

20  would have initially recognized it as a problem.

21  But, again, I think it depends entirely on the way

22  it was presented.

23            Like I said, when I first understood it,

24  there was such a complicated formula involved in it

25  that I didn't really pay much attention to it.

1                       Auerbach

2        Q.    But, to your recollection, the first

3   time you first learned about this potentially being

4   an issue, that came from leadership, not from Rick,

5   right?

6        A.    To my knowledge, yes.  That's the first

7   time I distinctly recall hearing about it and

8   understanding what it meant.

9        Q.    And sitting here today, you cannot

10  remember a specific conversation with Mr. Lombardo

11  where he said, I need to be paid overtime?

12       A.    I -- the only thing that I firmly

13  remember is discussions about the commission

14  structure, and if he were to walk away, what would

15  that look like.  Those were the conversations that

16  were had.

17       Q.    Okay.  So just to clean that up a little

18  bit.

19             Sitting here today, you do not have any

20  recollection of a specific conversation where

21  Mr. Lombardo said to you that he was due overtime,

22  correct?

23       A.    I do not recall that.

24       Q.    So let's talk about those conversations

25  about the commissions issue and needing a buyout.

1                        Auerbach

2              So at some time during your tenure with

3    Chmura, Chmura decided to revamp its account

4    manager commission structure; is that right?

5        A.    Yes.

6        Q.    Tell me a little bit about that

7    reorganization plan.

8        A.    Well, there were a few primary

9    components to it.  The first one were the

10   territories that each account manager would get.

11   And then the other component was the structure of

12   salary and commissions and how they would be

13   compensated.

14       Q.    Let's talk about each of those.  What

15   was the plan as far as the territories?

16       A.    So the idea was to equitably divide up

17   the entire country based on both population as well

18   as total number of existing clients in those

19   territories.

20       Q.    And how is that different from what

21   Chmura had been doing before?

22       A.    So, basically, what they had done for a

23   while was, they had two different verticals that

24   they focused on.  So the first one included

25   economic development and workforce development, and

Page 68

1                        Auerbach

2     the second bucket was exclusively education.

3              And what they did was, they effectively

4     divided the country into two different territories

5     for each of the different verticals.  So you had

6     two people, one including Rick that was in

7     economics and workforce development that split the

8     country in two.  And then when I came on, we would

9     have only one person working in education.

10             So given the structure of territories,

11    in order for new account managers coming on to be

12    able to have a region with prospects, we needed to

13    restructure the territories and divide them

14    equitably.

15        Q.    So, and in other words, the way it was

16    previously set up, there really wasn't room for any

17    more account managers; is that right?

18        A.    Yes.  Based on the setup at the time, it

19    made it problematic to move in new account

20    managers.

21        Q.    And you said, the second part of the

22    reorganization plan was changing the salary and

23    compensation structure.  What were the proposed

24    changes on the compensation?

25        A.    So all of the account managers would be

1                       Auerbach

2    moved into a $60,000 base.  All of the senior

3    account managers would be given 65.  And then the

4    commissions were going to be changed to 12 percent

5    on all new business.  And I believe it stayed at 3

6    percent for renewal business in that territory.

7         Q.    And did you have any role in coming up

8    with that plan?

9         A.    I would say, I was the primary author to

10   it.  I initially designed a compensation structure

11   that I'd shared with all of the sales team members,

12   got their feedback on it and then came up with that

13   new structure and new territory.

14        Q.    Was that your idea, or did somebody say,

15   We really need to reorganize things so that we can

16   hire more account managers?

17        A.    That was primarily from me.  That was a

18   problem that I saw, and I was developing a

19   solution.

20             MS. SIEGMUND:  We're going to look at

21             another exhibit.  And Christine, this is one

22             of the exhibits that's been marked attorneys'

23             eyes only.  Hopefully, this will load better

24             than the last one.

25   (Exhibit E, Document marked Highly Confidential,

1                      Auerbach

2    Bates-stamped CHMURA0201265, was marked for

3    purposes of identification.)

4              MS. SIEGMUND:  Penny, we are marking

5         this as Plaintiff's Exhibit E as in elephant.

6         Q.    Mr. Auerbach, let me know if this comes

7    through to you.  And if it doesn't, I can just flip

8    through it on my screen.

9              Are you able to access that document?

10        A.    I am not.  It hasn't loaded yet on my

11   side.

12        Q.    And are you able to see it yet on the

13   screen what I am displaying?

14        A.    I am not.  It is loading now.

15              I have on the first page -- I have one

16   page in front of me.

17        Q.    Are you able to see the second page that

18   I am now displaying on the screen?

19        A.    No.  I'm only seeing the one that says,

20   New Sales Structure.

21        Q.    I'm going to flip over -- are you able

22   to see anything that I am displaying here?

23        A.    I only see something that says New Sales

24   Structure.  It's a box with Needed Characteristics.

25   I think it says, Key Features, and I can't read it.

1                          Auerbach

2    I only see this one page.

3         Q.    Let's give it a minute.  I'll go to the

4    page that I want to use, and let's see if it shows

5    up on your screen.  And the worst-case scenario, we

6    can e-mail this.

7         A.    Okay.  It was there and it's gone.

8               Okay.  I have a table that shows 2020

9    Sales Compensation Plan - Proposed Structure.

10        Q.    Excellent.  So I know that we're having

11   some technical difficulties with seeing all the

12   pages, but do you recognize this document?

13        A.    I do, yes.

14        Q.    And did you make this?

15        A.    Yes, I believe so.

16        Q.    What is -- so this is originally a power

17   point that we have converted to PDF to be able to

18   use it today.  But, why did you make that power

19   point?

20        A.    If I remember my intent correctly, it

21   was to show what the compensation would look like

22   if we approached hiring new people.  Basically, if

23   we went under this new structure with the $60,000

24   base initially, and we revised the commission

25   12 percent for new, two percent, what it would look

1                          Auerbach

2    like in total business and what percentage would go

3    to compensation versus what the revenues would be

4    for the organization.

5        Q.    And then did you come up with the

6    $60,000 base and 12 percent commission numbers?

7        A.    I believe those were the original

8    numbers that I came up with.  There was definitely

9    discussion with leadership.

10             I mean, I don't have the authority to

11   approve this, so there was discussions back and

12   forth first with the sales team and then with

13   leadership regarding this table.

14       Q.    Tell me how you arrived at needing to

15   change to a base salary of $60,000 and a 12 percent

16   commission rate.

17       A.    The original amount that account

18   managers was getting was 50,000.  So I felt like

19   that in the initial year that they start -- I'm

20   sorry -- they get 55,000 the first year and then

21   drop to 50.

22             So my initial thought was, if you offset

23   the commission rate from 15 to 12, give them a bump

24   up in salary, from a total compensation

25   perspective, the leadership of the organization and

1                         Auerbach

2    the leadership as a whole would gain more.  But, it

3    would give more of a financial cushion to the newer

4    hires to be able to live off of a decent salary

5    while it took them the better part of a year to

6    build up their book of business.

7         Q.    And in this page that we're looking at,

8    it looks like on the left-hand side you have listed

9    Rick, Wilson, Sarah, Stephanie, Logan; are those

10   the current account managers that Chmura had at the

11   time?

12        A.    Yes, that is correct.

13        Q.    And then you listed some new hires.  And

14   then everyone except for Rick has a base salary

15   listed and a commission rate listed, but Rick's row

16   of this chart is blank, and it just says, Total

17   compensation $80,000.

18             Can you tell me why that says $80,000

19   for Rick?

20        A.    Correct.  Because at this point, there

21   was already discussions, if I remember correctly

22   when this was revised, about how to manage the

23   situation with Rick.  We knew going into this

24   proposed structure, to be quite blunt about it, he

25   was going to take a very, very significant hit to

1                    Auerbach

2    his total compensation.

3              So he had been pushing back in the

4    beginning, as had some of the older account

5    managers, but Rick was the one that stood to lose

6    the absolute most.

7              So by the time this was put together, if

8    I remember correctly, the $80,000 was essentially

9    the initial proposed settlement amount that I had

10   presented to leadership to say, Even if you paid

11   him the 80,000, if you looked at what the rest of

12   the projections are and you stay on course for, the

13   organization would still come out much, much

14   further ahead and wouldn't have to risk any

15   additional expenditures in things like lawsuits.

16        Q.    And I know that this is going to get

17   tricky, but I'm going to remind you to try to stay

18   away as much as possible from getting into

19   conversations with McGuireWoods.

20             So with that said, how did you come up

21   with $80,000?

22             Did Rick suggest that to you or was that

23   the number that you came up with on your own?

24        A.    That was essentially the number I came

25   up with on my own, but it was a combination of a

```
 1                        Auerbach
 2   number of discussions.  So I had talked with Rick,
 3   as well, about what, in his mind, would be a
 4   reasonable severance package given what his
 5   contribution has been.  And his idea of what he
 6   thinks, you know, his value has been, what he can
 7   do to assist in terms of transitioning everything
 8   out.
 9            So I kind of sat down -- I knew he was
10   looking in upwards to 100.  I figured he would
11   never get the entire amount he was requesting.  But
12   after sitting down and factoring what, if he had
13   stayed for the rest of the year, for example --
14   because this was a ways from being implemented.
15   But, if he stayed for the rest of the year, what
16   was the projected new business revenue, the new
17   business he would get, his salary.  When you factor
18   all of that in, it wasn't that much more to get to
19   80.
20            So I figured 80 would be a number that
21   both leadership and Rick would be willing to come
22   to an agreement on for him to be able to exit the
23   organization with his severance package.
24   Q.    Do you recall exactly when you put this
25   document together?
```

1                        Auerbach

2        A.    I honestly can't.  I feel like -- we

3   started looking at these proposed structures.  Or,

4   at least I started designing them probably August

5   of last year, as we were looking to hire new people

6   come the fall.  So we were trying to map out, if we

7   were going to do that and restructure things, what

8   did that look like.

9             So I think this version was probably

10  sometime in October because that's when these

11  discussions started to really ramp up.

12       Q.    And I think you said that by the time

13  you drafted this, you already knew that you had to

14  somewhat manage the situation with Mr. Lombardo

15  because he had been pushing back on this plan.

16            Tell me about your conversations with

17  Mr. Lombardo prior to this document.

18       A.    So he was the last one that I spoke to

19  regarding the territory redistribution and the

20  compensation plan because he was the only one that

21  was going to actually lose in the end in terms of

22  what his compensation is.

23            So I first presented this to all the

24  other account managers to understand their

25  perspective and to see if there was any pushback or

1                        Auerbach

2   concerns on their part.  When there wasn't, or if I

3   was kind of able to explain this so that they were

4   in agreement with it, Rick was the last one I

5   finally spoke to.  So --

6       Q.    Let me interrupt you for a second.

7             Did you intentionally exclude Rick from

8   that meeting with all the other account managers?

9       A.    It wasn't a meeting.  I spoke to each

10  account manager one on one.  I brought them in,

11  showed them the proposed territories, asked them

12  their thoughts on it and then reviewed what the

13  compensation would look like.  And knowing that the

14  commissions were going to go down, but the base was

15  going to go up, mathematically, did they think that

16  that was fair and were they comfortable with it.

17            Rick, because I've already done the math

18  a number of different ways, there just wasn't a

19  realistic path for him to make even on the low end

20  of what he had typically earned.  So I saved the

21  conversation with him for last because I knew it

22  was going to be the most challenging.

23            So he and I -- and he understood exactly

24  what this meant when he looked at it.  And so the

25  first handful of conversations were really

1                          Auerbach

2    revolving around, Is there a way to structure this

3    so that he doesn't have to lose what he had.  The

4    only viable solution that would have worked is

5    really dramatically increasing his base salary,

6    which, I didn't know, but I was confident the

7    organization just wouldn't do.

8                    And when it finally got to the point

9    where we realized, there just wasn't much more room

10   to try to figure this out, you know, that's when he

11   kind of felt he was being excluded from this, and,

12   essentially, in his words, being pushed out,

13   because they were really leaving him very little

14   choice, in his mind.

15        Q.    When you first created this plan, there

16   was no intention of firing Mr. Lombardo, was there?

17        A.    I don't believe so, no.  I think this

18   was before he was even asked to leave.  I think

19   this was in the initial stages of developing this

20   structure.

21        Q.    So did you include this $80,000 number

22   because you just assumed that he would refuse to

23   buy into the new salary and commission structure?

24        A.    I don't think -- I think that row, if I

25   remember correctly, was originally populated to

```
 1                     Auerbach
 2   show Rick what his total compensation would be.
 3   And the initial conversation that ensued was, is it
 4   realistic to the new business income that I was
 5   proposing was very, very substantial.
 6             And even then, it wasn't really likely
 7   he'd get to the salary compensation he was getting
 8   currently.  So that's where the conversation began.
 9   If I remember correctly, the initial row for Rick
10   was populated.  But then, again, there was no way
11   to bridge the gap barring a dramatic increase in
12   base salary.
13             And to his point, which I agreed with,
14   where he'd be working in his industry, he really
15   saturated it, and he had been there for so many
16   years.  And neither one of us could really see a
17   viable pathway to how to get those commissions up.
18   It was just an unrealistic expectation.
19             So that's when I think -- I don't
20   remember exactly the period, you know, but with the
21   discussions of, Well, maybe there can be a
22   severance package, that's when I believed I
23   transitioned this to say, Okay.  Knowing on the --
24   if you look at the renewal business, that's
25   essentially being divided between -- including his
```

```
 1                     Auerbach

 2   portfolio being divided between the other account

 3   managers, to say, Okay, we have to do something

 4   with his book; what would that look like in

 5   transferring it over, and then what would a

 6   severance for him appear to be.

 7            If I remember the order of operations, I

 8   believe that's how it went.

 9       Q.    And what sort of reaction did you get

10   from leadership to this $80,000 proposal?

11       A.    If I remember correctly, I believe I

12   went to Greg Chmura first, 'cause I technically

13   reported directly to him.  And I explained the

14   situation and we talked about it pretty rationally.

15   And I said, I think this is the number that would

16   work.  And he was a little taken aback by this, but

17   I think, my impression was, he understood the

18   necessity to do this.

19            I guess I'm -- am I allowed to discuss

20   in detail what these discussions were?  I mean, am

21   I allowed to get into those specifics?  I mean,

22   this had nothing to do with any legal issue; this

23   was just, sort of, strategy, if you will.

24       Q.    So let's take it conversation by

25   conversation.
```

1                          Auerbach

2              So what was your conversation with Greg

3     where you presented it?

4                  First of all, when was that

5     conversation?

6         A.    Well, I know -- working backwards, I

7     know that, I think it was the 17th of October was

8     Rick's last day, so I think maybe this was at the

9     very, very end of September, beginning of October.

10    I mean, things happened very quickly.  But, I

11    remember presenting this and saying -- 'cause there

12    was a lot of things on the table, obviously all

13    predicated on the new territories, the new

14    commission structure, trying to hire people, which

15    we were actively doing.  So there was a lot of

16    things in there that we were juggling.

17              So I recall presenting this to Greg.

18    Again, I don't remember the first time he might

19    have seen a version of this table or anything like

20    that.  There was other, obviously, slides included.

21    But I remember the conversation as it pertained to

22    Rick.  And I felt that my argument to Greg was, I

23    know that it's a difficult number to kind of

24    swallow.  It's very unpalatable.  But, this is by

25    far, in my opinion, the path of least resistance.

1                          Auerbach

2              A lot of this 80,000 was related to what

3    he would have already gotten if he had just stayed

4    for the rest of the year.  And this ensured a real

5    smooth transition so that there's no disruption in

6    our renewals or anything like that.

7              I had the impression at the end of the

8    conversation, Greg was in favor of doing this, but,

9    of course, we needed to have a follow-up

10   conversation that included the entire leadership

11   team.  So that was the next conversation I recall

12   having --

13        Q.    Just a second.  Let me parse that out a

14   little bit.

15             So you went to Greg end of September,

16   very beginning of October, and you said, I feel

17   like the only viable path was for Rick to leave,

18   and I think you should pay him to leave; is that a

19   fair summary of your side of that conversation?

20        A.    I would say yes, that's a close

21   representation.

22        Q.    And you said that you were under the

23   impression that Greg agreed.  So what did he

24   actually say?

25        A.    I think at first -- I don't remember the

Page 83

1                        Auerbach

2    exact language.  I know that I recall, at first, he

3    was put off by the idea.  But, again, I have a very

4    detailed explanation why I felt this way.  And I

5    think -- again, I don't remember the exact language

6    in the conversation, but I remember the impression

7    I had was that he wasn't opposed to the idea.  I

8    don't know that he was set on 80,000, but I think

9    he understood the value of having some sort of a

10   severance package and ensuring a smooth transition.

11       Q.    And did you share this particular slide

12   that we are looking at with Mr. Lombardo that had

13   the $80,000 number on it?

14       A.    I don't recall showing him the slide,

15   not to say that I didn't.  But, I do think I had a

16   conversation with him where I said something to the

17   effect of, If the number fell in somewhere like

18   $80,000, is that something that you would be

19   comfortable with.

20             And I recall him saying that that, in

21   his mind, would be a fair trade.

22       Q.    Did you suggest to him that you thought

23   $80,000 was fair?

24       A.    Not so much.  I mean, I didn't really

25   have an opinion one way or the other.  This was

1                         Auerbach

2   more so, basically, what I thought that leadership

3   would agree to.  I didn't give him any suggestions

4   on what I thought the number should be or what he

5   deserved, just what I thought leadership would

6   agree to.

7        Q.   So before we move off of this first

8   conversation with Greg, I'm going to try to show

9   you another exhibit.

10             MS. SIEGMUND:  Penny, this is going to

11        be Plaintiff's Exhibit F as in Frank.

12   (Exhibit F, E-mail, was marked for purposes of

13   identification.)

14             MS. SIEGMUND:  This one is not attorneys

15        eyes only, so I think we're good.  Thank you.

16        Give me one minute.

17             Okay, thanks.

18        Q.   Eli, let me know when that comes through

19   for you.

20        A.   Okay.  I think it just takes a while for

21   it to load.  It is loading now.

22             This is just one e-mail?

23        Q.   So I have gone to the bottom of the

24   e-mail chain here to save us a little time on

25   reading the string.  So let me know when you're

1                          Auerbach

2    ready for me to go back to the previous page.

3         A.    Okay.

4         Q.    So does this refresh your recollection

5    about when you and Greg first discussed this

6    proposed structure that we were just looking at?

7         A.    Yeah.  I mean, like I indicated, it was

8    the end of September, roughly that period of time.

9         Q.    Let me know when this next page shows

10   up.  I've gone down to the bottom, and I will go up

11   so we can read the e-mails in order.

12              Mr. Auerbach, can you see those two

13   e-mails at the bottom of this screen where it says,

14   MARAZ201439?

15              Are you ready for me to move up?

16        A.    Just a moment.  Okay.

17        Q.    And to sum up those two e-mails at the

18   bottom of this page, these are Greg's responses to

19   your proposal on the commission structure; is that

20   a fair summary?

21        A.    I believe so, yes.

22        Q.    And moving up to the top, let me know

23   when you've had a chance to read through this

24   e-mail.

25        A.    This one is my response to Greg?

1                          Auerbach

2        Q.    Correct.

3        A.    Yes, I've read this one.

4        Q.    And this was on Tuesday, October 1st,

5   correct?

6        A.    Yes.

7        Q.    And you are -- well, let me not put

8   words in your mouth.

9              So what were you discussing with this

10   e-mail?

11        A.    So I had sent over the proposed

12   commission structure.  Greg provided commentary in

13   whether the power point in Excel that I had sent

14   him as an attachment -- it's not included here --

15   and he gave his perspective, whether it was, you

16   know, optimistic direction we move in or a

17   pessimistic one.

18              And so my response was answering the

19   concerns he has regarding hiring and whether the

20   business was there or not, whether people get

21   promoted.  And, essentially, my answer was, if the

22   new business isn't there, then we simply don't hire

23   new people, and that people getting promoted or new

24   hires coming on should be directly correlated to

25   the amount of business that we're doing.

```
 1                       Auerbach
 2              The last paragraph was essentially
 3    trying to get approval to move forward with this
 4    quickly.  We were in the process of finalizing
 5    hiring a couple of new people.  And what I didn't
 6    want to have happen was for people to be offered
 7    positions under current commission structure and
 8    then immediately changed after they were hired.
 9              So I was hoping that the following
10    conversation with leadership, a decision would be
11    made quickly so that we could have it in place when
12    we're interviewing potential new hires.
13         Q.   And in this last paragraph of your
14    e-mail, you say, However, I still -- it is
15    necessary that we present a clear and definitive
16    direction for the account managers once Rick is
17    gone.
18              Do you see that?
19         A.   Yes.
20         Q.   Why did you say, Once Rick is gone?
21         A.   Leadership made it clear that they did
22    not want to continue with Rick moving forward.
23         Q.   And so that was prior to October 1st,
24    they made that clear that they wanted him to not
25    continue?
```

1                          Auerbach

2        A.    Yes.  Yes, very emphatically, actually.

3        Q.    And who specifically said that and what

4   did they say?

5        A.    It's hard to attribute what anyone said,

6   'cause a lot of these conversations occurred with

7   multiple people.  I knew that the general consensus

8   was that they were moving into a new direction that

9   just wasn't going to include Rick.

10            The conversations with Rick regarding

11   some sort of a severance package, if I remember

12   correctly on the timing, had already started

13   occurring here, so that the expectation was that he

14   was not going to continue being there.

15            In fact, there was discussion on whether

16   he would be in attendance for the annual conference

17   that the organization put on, as well as other

18   potential conferences that were coming up in, I

19   guess, September and October.

20        Q.    Okay.  So let me back that up a little

21   bit.

22            So you had testified earlier that before

23   you talked to anyone else about this, you spoke to

24   Greg.  So that would have been sometime around

25   September 25th, correct?

1                           Auerbach

2          A.      Well, in terms of what I submitted to

3    him is one thing.  I'd had a lot of conversations

4    with Greg that were just verbally relayed.  So if

5    there was concerns or issues with the sales team

6    regarding their feelings or thoughts on the

7    commission structure or anything like that, I would

8    have already presented it to Greg.  I would have

9    already gone to his office and talked to him.

10         Q.      So the conversation you mentioned

11   earlier where you told Greg, I think the best

12   option is to buy Rick out, when did that occur in

13   this chronology?

14         A.      I'll be honest, I don't recall the exact

15   timetable for how all this played out.  I remember

16   the individual parts.  I just don't remember

17   specifically the order of operations.

18         Q.      And you mentioned that you felt like

19   leadership thought that the company was moving in a

20   direction that did not include Mr. Lombardo.

21              Was that because of the need for the new

22   commission structure and to hire new people?  Why

23   did they think that direction would not include Mr.

24   Lombardo?

25         A.      So, to be honest about how this came

```
 1                        Auerbach
 2   about, the seeds of it were planted from the time I
 3   started.  There were, I can think of definitively
 4   no less than two specific occasions well in advance
 5   of any of this, where there was an intent to let
 6   Rick go.  And where in both of those instances,
 7   I fought heavily to avoid that from happening.
 8              But, it was made abundantly clear to me
 9   from the moment I started that this was the
10   direction they wanted to go, and this was their
11   opportunity to get there.
12        Q.    So you said, there were two instances
13   where it was very clear somebody was trying to fire
14   Rick; when was the first instance?
15        A.    The first one, I would say it was -- it
16   was definitely April of last year.  It was within
17   the first month that I started.  Even back when I
18   initially interviewed, there were statements made
19   regarding the challenges they were having with him.
20   And a good part of my interview process was how to
21   manage and deal with it.
22              Once I had started, it was Leslie
23   Peterson by phone, we had spoken and discussed.
24   And her concerns -- discussed her concerns
25   regarding Rick.  And she had made it clear then
```

1                          Auerbach

2    that frankly, once the sales team grew enough that

3    she really wanted him to be gone.  The next --

4    unless you have questions on that, I'll...

5         Q.    Yes.  Let's talk about that one a little

6    bit more.

7               So that first conversation with Leslie

8    was over some time in April; is that correct?

9         A.    That's correct, yes.

10        Q.    Forgive me if I am misquoting you here,

11   but I think you said something like, She made clear

12   that she wanted him gone.

13              Why did she want him gone?

14        A.    I would say that the best way to

15   describe it is just that there was a lot of

16   conflict between Rick Lombardo's leadership, the

17   vast majority of which -- the vast majority

18   occurred while I was there.  I heard specific

19   incidences that were of concern.  I heard it from

20   both sides.  I mean, both sides told a very

21   accurate assessment of it.  But, there was a lot of

22   animosity and bad feelings between the two

23   entities.

24        Q.    So let me ask a better question.

25              What did Leslie say during that call

1                          Auerbach

2    about why she wanted Mr. Lombardo gone?

3         A.    So just prior to me starting, they were

4    dealing with an incident regarding Rick Lombardo

5    and a potential offer from another company that had

6    nothing to do with me.  I wasn't involved in it.

7    It predated me, but I do know that for quite some

8    time after it occurred, leadership was extremely,

9    extremely angry about it.

10              And with bringing me on, you know,

11   Leslie essentially said, The goal here is to

12   continue to capitalize on the success we've had, to

13   build out the team, to hire more people.  And

14   essentially, in her words, if Rick doesn't come on

15   board and do the things they wanted him to do and

16   act the way they want him to act, she'll have no

17   problem getting rid of him.

18        Q.    And the incident you're referring to is

19   where Mr. Lombardo forged an offer letter from

20   another company, correct?

21        A.    That's my understanding, yes.

22              MS. COOPER:  Objection as to, he has no

23        personal knowledge.  He testified he wasn't

24        there when that occurred.

25        Q.    But that's your understanding of the

```
 1                    Auerbach
 2   situation, correct, Mr. Auerbach?
 3        A.    As my understanding is, yes, I had no
 4   direct relation to it.
 5        Q.    And so is it fair to say that Ms.
 6   Peterson was saying that she wanted Mr. Lombardo
 7   gone because he had doctored this offer letter?
 8             MS. COOPER:  Objection.
 9        A.    No, I don't --
10        Q.    You can answer.
11        A.    Well, I was going to say, I don't think
12   -- that certainly wasn't the caveat.  I think this
13   was -- you know, again, I was not involved.  Prior
14   to me starting, obviously, I can only extrapolate
15   off of the things I saw when I was there.  But,
16   there was a lot of conflict over a host of issues,
17   you know, that ranged from how and when
18   compensations and commissions are paid, which
19   conferences to attend.  There was always this
20   conflict that existed between them.  So --
21        Q.    Mr. Auerbach, I'm going to try to focus
22   you on this particular call with Ms. Peterson.
23             Was the offer-letter incident, was that
24   her primary motivation for, as you say, wanting
25   Mr. Lombardo gone, during that call or --
```

1                           Auerbach

2          A.     She never --

3                 MS. COOPER:   Object.   Hold on.   Before

4          we all talk over one another, let Ms. Siegmund

5          finish her question.

6                 I would like to object to it, and then

7          you can answer.

8                 I'm going to object on the grounds that

9          he has no personal knowledge as to what Ms.

10         Peterson's motivations were.

11                MS. SIEGMUND:   That's fair.   I'm just

12         asking what she actually said.

13         A.     Yeah.   So there was no specific

14   motivation that she gave.   There wasn't a specific

15   incident that she cited or anything like that.   It

16   was just her desire for him not to be with the

17   organization any longer.

18         Q.     And you mentioned that you fought to

19   prevent Mr. Lombardo from being fired.   What did

20   you do in response to that conversation with Ms.

21   Peterson to prevent Mr. Lombardo from being fired?

22         A.     Well, essentially, what I had conveyed

23   was, I had just started, and I just wanted an

24   opportunity, you know, before any changes were

25   made, just to get to know everybody and understand

 1                        Auerbach

 2    what their working style was and to see if he and I

 3    could develop a cordial enough relationship where

 4    he would be the team player that they were looking

 5    for and what they defined as being acceptable.

 6          Q.    And Mr. Lombardo obviously was not fired

 7    at that point, correct?

 8          A.    Correct.

 9          Q.    And then you mentioned there was a

10    second instance prior to October 2019, when this

11    came up; when was that second instance?

12          A.    I don't remember the exact timeframe,

13    but I feel like it was somewhere around August of

14    last year where I had made a trip -- yes, it was

15    August because it was immediately following the

16    resignation of our second-most tenured account

17    manager.  So I was traveling to Richmond to spend a

18    day with that account manager to transition over

19    his accounts.

20                The night before, I went to Leslie

21    Peterson and Chris Chmura's house for dinner.  And

22    while dinner was being prepared and we were

23    discussing various points of strategy, we had only

24    been in the infancy at that point, as I had said,

25    regarding commissions.  And I did express that

```
 1                    Auerbach
 2  there were concerns by Mr. Lombardo.
 3            And the immediate reaction from both
 4  Chris Chmura and Leslie Peterson was, they would be
 5  happy to fire him right then and there.
 6            And my immediate response was, I don't
 7  think that's necessary.  I think that, you know,
 8  Rick and I need to talk this through.  I don't
 9  believe, at that point, I had even brought up the
10  idea to the account managers about the -- actually,
11  it was a different structure entirely.
12            What was shown here was what evolved a
13  month or so later.  The original plan was
14  dramatically different, but regardless, it was
15  going to mean moving territory for Rick.
16       Q.    So was it your understanding from that
17  conversation that they would be willing to fire him
18  if he would not agree to a new structure?
19       A.    No.  They were saying, if I wanted to, I
20  have the latitude to go and fire him that day if I
21  wanted.
22       Q.    Did they say why?
23       A.    I think the -- this was in the
24  context -- I can't say what their specific
25  motivation was.  This was in the context of talking
```

1                          Auerbach

2    about the need to transition to a new territory and

3    commission structure.

4               And I had expressed that in the course

5    of these conversations that had just started to

6    come about, in the course of these conversations,

7    you know, Rick is a very smart guy and understood

8    what the map would look like, and understood that

9    in any scenario where we're reducing territory were

10   reducing his opportunity to gain commission.

11              So once I had explained his feelings on

12   this, their response was, If you want to, you can

13   go ahead and fire him right now, to which I said,

14   No, that won't be necessary.

15        Q.    And is that because you wanted to try

16   and fit him in to this new commission structure?

17        A.    Absolutely.  I wanted to do everything I

18   could to try and make it work.

19        Q.    So what prompted you to then change

20   yours to proposing $80,000?

21        A.    That came far, far later.  When this

22   conversation first happened we were just exploring

23   what a potential new structure would look like.  I

24   hadn't even formally presented it to the sales team

25   yet.  That was the next morning actually.

```
 1                        Auerbach

 2            So we had a number of conversations,

 3   countless conversations regarding this and trying

 4   to negotiate, discuss how to make it fair and

 5   equitable for Mr. Lombardo, and that's where we

 6   just couldn't, kind of, bridge that gap.

 7       Q.    And we've mentioned a couple of times

 8   your conversations with Mr. Lombardo.  I want to

 9   focus specifically on a conversation you had with

10   Mr. Lombardo on October 3, 2019.

11            Do you recall having a conversation with

12   him about the commission structure on that date?

13       A.    I don't deny that I might have; I don't

14   have a specific recollection of that.

15       Q.    I'm going to show you a new exhibit.

16   (Exhibit G, Documented conversation with Rick

17   Lombardo dated October 17, 2019, was marked for

18   purposes of identification.)

19            MS. SIEGMUND:  This will be Plaintiff's

20            Exhibit G.

21       Q.    Mr. Auerbach, let me know when you are

22   able to view this exhibit.

23       A.    Sure.

24       Q.    Mr. Auerbach, has that document come

25   through?
```

Page 99

1                           Auerbach

2        A.    Yes, I am reading it now.

3              Okay.

4        Q.    Do you recognize this document?

5        A.    I do, yes.

6        Q.    And did you write this document?

7        A.    I did, yes.

8        Q.    And does this refresh your recollection

9    about whether you had a conversation with

10   Mr. Lombardo on October 3rd about the commission

11   structure?

12       A.    Yeah, I recall most of the content here.

13   I'll assume that it was, in fact, October 3rd.

14       Q.    You have no reason to doubt that this

15   was inaccurate -- excuse me.

16             You have no reason to doubt that this

17   was accurate when you wrote it, correct?

18       A.    I would say so, yes, that's correct.

19       Q.    So let's talk about the content of that

20   conversation with Mr. Lombardo on October 3rd.

21             What did you tell him about the

22   commission structure changes?

23       A.    Well, essentially, the territories would

24   be redistributed.  And then over a period of time,

25   whatever renewal accounts were in each territory,

1                        Auerbach

2   whomever the account manager was in that new

3   territory would absorb those renewal accounts.

4            This was the primary point of concern

5   because the majority of the commissions that

6   Mr. Lombardo was getting was from his renewal book

7   of business.  So his concern was that if his

8   territory was being sliced into multiple different

9   components, he was going to lose all of those

10  renewal commissions in any territory that wasn't

11  his.  So this was the point of contention we

12  continually spoke about.

13       Q.   And what did you say to him in response

14  to his concerns about his renewal commissions?

15       A.   All I could tell him was, he was

16  100 percent right, that based on the new structure,

17  there would be -- barring him being given a

18  substantial higher-based salary, there was nothing

19  in this commission structure that would afford him

20  the opportunity to gain what he was earning before.

21       Q.   But based on our conversation earlier, I

22  mean, there was never any intention to purposefully

23  drag him out.  It sounded to me like you were just

24  trying to create more opportunities for growth for

25  the company and creating that commission schedule;

1                        Auerbach

2    is that fair?

3        A.    Correct.  It was never my intention to

4    push Rick out.

5              I was in a difficult situation because

6    we were bringing on new people, and in order for

7    them to be able to build their own book, we had to

8    redistribute the territories.  It was an

9    unavoidable consequence the reduced commissions

10   that Rick was going to then get.

11       Q.    And did you explain to him that there

12   was no way to allow a new account manager to have

13   any real opportunity without taking away some of

14   his renewal commission?

15       A.    Yes, I did make that clear.

16       Q.    And what was his response to that?

17       A.    He completely understood.  But, his

18   point was more from a business-related perspective,

19   which was, he would not be able to produce at the

20   same level given such a dramatically reduced

21   territory and that the organization as a whole

22   would lose out because of that, especially because

23   it takes a really long time to build a book of

24   business.  You're talking, 12 to 18 months.

25             So he felt that there was, frankly,

1                       Auerbach

2    other ways to approach them than to go in the

3    direction we were going.

4        Q.    Did Mr. Lombardo say anything about

5    thinking that leadership wanted to get rid of him?

6        A.    I think it was this conversation, 'cause

7    we had already spoken about this multiple times.  I

8    think, you know, we got to the realization

9    collectively between the two of us, there just

10   wasn't anything within the structure that

11   leadership was going to be willing to do.  And

12   that's when he said that, to him, it appears they

13   were trying to push him out.

14              And he expressed to me at that time that

15   he felt like the work he put in over those number

16   of years, the clients he brought on, the renewal

17   business he retained, he felt that there was a

18   value there that he was owed for doing all that

19   work.

20       Q.    And so first, let me back up further.

21             Did you all talk about potential buyout

22   during this conversation?

23       A.    To my recollection, yes, we did.

24       Q.    Who raised that idea first; you or

25   Mr. Lombardo?

1                          Auerbach

2        A.    I had actually already been thinking

3    about it as a potential solution.  And he said --

4    you know, essentially, the idea of putting together

5    a severance package to ask him to leave.  And

6    that's where the conversation first started

7    regarding that.

8        Q.    And did he propose a number about what

9    he thought would be fair to induce him to leave?

10       A.    He didn't.  I asked him.  I said, If

11   this was something that we pursued and leadership

12   was in favor of it, you know, what would be a

13   number that you would think was acceptable.

14             And so he very quickly said 50,000.

15             I told him, you know, This is kind of an

16   important decision.  There's huge stakes involved.

17   So I said, Why don't you go think about it and come

18   to me at the end of the day.

19             He came back pretty quickly thereafter

20   and said, Based on a host of variables, commissions

21   that were paid, new business that was still in the

22   pipeline, you know, the value of doing a really

23   smooth transition and minimizing attrition and

24   renewals, he felt that 100,000 was a reasonable

25   number.

1                          Auerbach

2              And if remember correctly, it may have

3    been that conversation or another one, I said --

4    think it was that conversation -- I told him I

5    would present it, but I also cautioned him that

6    it's not going to go over too well initially.  Let

7    me see what I can do and what the appetite by

8    leadership would even entertain this.

9         Q.    So where did you leave things at the end

10   of this conversation?

11        A.    At this point it was, I needed to go

12   talk to leadership and see what happens here.

13        Q.    And to your recollection, Mr. Lombardo

14   did not say anything about being owed overtime

15   compensation during this conversation; is that

16   correct?

17        A.    Not at all that I recall, no.

18              I mean, this conversation -- again,

19   there was two parts to it.  Initially it was, this

20   was like a last attempt to come to some sort of

21   agreement to make the commission structure work.

22   We both understood that it just wasn't going to

23   happen.  And that's when he said, you know,

24   basically, let's come up with a number for

25   severance and be done with it, which I had already

```
1                          Auerbach
2    been planning down that track to see if that was
3    something we could do.
4         Q.    Did you talk to Chmura's leadership
5    about this conversation?
6         A.    I did, yes.
7         Q.    What was their reaction?
8         A.    I don't -- I honestly don't recall what
9    their initial reaction was.  I just remember -- you
10   know, I remember they asked me to write this down
11   and to document it, but I don't even remember who I
12   first told.  I don't recall what their initial
13   reaction was.
14        Q.    Did they seem amenable to the idea of a
15   buyout, or were they just totally not on board with
16   that at all?  I mean, do you have a general sense
17   of --
18        A.    So, yeah.  Yes.  There was one
19   comprehensive conversation that included all of
20   leadership I was involved with, where there was a
21   really intense discussion back and forth about this
22   very thing.
23              And there was a divide.  Part of
24   leadership found it to be unpalatable to have to do
25   it, but certainly felt like this was the path to
```

1                          Auerbach

2    least resistance and the best way to approach it.

3    And I was 100 percent in favor of that.

4              My outlook was, I didn't necessarily

5    care one way or the other.  It was more, so what's

6    the path of least resistance; how do we ensure a

7    smooth transition; how do we avoid any additional

8    conflict or issues later on.

9              There was a general understanding that

10   there would be some sort of severance package that

11   was put together, but there wasn't really specifics

12   on what that number would look like.

13             My understanding, the impression that I

14   had was, they were leaning toward doing some sort

15   of a package that would be amenable to Mr. Lombardo

16   that they felt was appropriate given the

17   circumstances.  But, that feeling, so to speak,

18   dissipated pretty quickly.

19        Q.    Did you tell the leadership that you

20   thought Mr. Lombardo could file a wrongful

21   termination lawsuit?

22        A.    That's part of what I had introduced

23   was, there was a lot of ambiguity well out outside

24   of my understanding as to what he was or was not

25   entitled to, as well as whatever ownership, if at

```
 1                      Auerbach
 2   all, he has over his book of business or any of
 3   those logistics.
 4             And my argument was, regardless of who
 5   is right or wrong, this is the simplest, quickest
 6   and least expensive way to resolve this for
 7   everyone involved.
 8       Q.    So just to clarify, you did tell someone
 9   in leadership that you thought Mr. Lombardo might
10   be able to file a wrongful termination lawsuit?
11       A.    I simply said that if -- I didn't
12   specifically state like wrongful termination or
13   anything like that.  My point was simply, not what
14   I thought what he would do, but if he decided to
15   file a lawsuit, there is intrinsically time and
16   effort and cost, opportunity cost involved in that.
17   Everything that would go along with that would
18   detract from the business and the core operation.
19             So my argument was, if there is a
20   pathway to resolve this right now and never deal
21   with it again, this would be appropriate action to
22   take.
23       Q.    And you mentioned that you weren't sure
24   what Mr. Lombardo would be "entitled to"; was that
25   in reference to his commissions, and then you
```

1                              Auerbach

2     mentioned his customers, as well?

3          A.    It was just more general.  Like, I don't

4     know anything about the law.  So I have no idea

5     from, you know, employment-law standpoint what is

6     or isn't appropriate.

7                My whole argument included in this whole

8     conversation was, you know, technically, there were

9     still commissions owed to him, both for new

10    business that had come in, renewal business and

11    then new business that was coming down in the next

12    month or two.

13               So part of my argument was, in terms of

14    a settlement amount that there was already a

15    portion of that that he was owed anyway.  So, you

16    know, there wasn't that much of a gap to fill at

17    that point.  I was simply saying, being very

18    conservative, whatever he plans on doing, there

19    will be some sort of a cost expended.  It's not

20    worth it, was essentially my message.

21         Q.    And though this is all at the very

22    beginning of October when we talked about your

23    conversation with Mr. Lombardo on October 3rd,

24    after this initial conversation about the

25    commission structure, did you and Mr. Lombardo go

1                          Auerbach

2    to a conference together?

3        A.    Yeah.  I believe it was after October

4    3rd, as indicated here.  I think we were both in

5    Indianapolis for a conference.

6        Q.    And did this issue of a potential buyout

7    come out at the conference?

8        A.    It was a brief moment where he pulled me

9    aside and simply asked, Have you had an opportunity

10   to talk to leadership and what was their

11   determination.

12            Truth be told, at that point, my

13   understanding was, they had absolutely no intention

14   of doing a buyout anywhere near what he -- they

15   weren't going to do it, essentially.  So I didn't

16   feel comfortable telling him that.  I didn't think

17   it was appropriate, so I essentially said, To my

18   knowledge, it's ongoing.  And I avoided answering

19   it one way or the other.

20       Q.    Other than this brief discussion in

21   Indianapolis, when was the next time you spoke to

22   Mr. Lombardo about his proposed departure?

23       A.    I would have to go with what's on this

24   statement here, which was October 17th.  At that

25   point, you know, every conversation I was having

1                         Auerbach

2      with him as it pertains to this, I was talking with

3      leadership in an ongoing attempt to try to get to

4      some sort a fair reconciliation.

5                So the second part of this documented

6      conversation is clearly the next time I spoke with

7      him.

8           Q.    Where did this conversation on

9      October 17th occur; was it in your office, was it

10     somewhere else?

11          A.    I think -- so my office is just off to

12     the side of where the sales team worked, so it was

13     in that open area there.  It was still pretty early

14     in the day, so he and I were the only ones that

15     were there at the time.

16          Q.    And who initiated that conversation?

17          A.    I think he had asked me for the update.

18     And, again, because I already knew at that point

19     that they had no intention of doing it, once again,

20     I didn't think it was appropriate, so I didn't give

21     him a clear answer on it.  But, I think he sort of

22     had a suspicion maybe that I did know.

23          Q.    And so let's unpack that a little bit

24     more.

25                So what did he -- how did he initiate

1                          Auerbach

2    that conversation?

3         A.    He just simply asked, Do you have any

4    updates regarding your conversations with

5    leadership.  And I didn't have one that I was going

6    to volunteer at the time.

7         Q.    And this was on October 17th.  Did you

8    tell Mr. Lombardo that Chmura was considering a

9    separation agreement that included a payout?

10        A.    Yes.  I mean, this wasn't news.  I

11   essentially said, there's only one of two ways that

12   this can play out.  They're either going to offer

13   him, regardless of the amount of money, some sort

14   of severance package, or they were going to say,

15   no, we are just going to move along with the

16   revised territory and commission structure and he

17   can make his own decision.

18        Q.    Did you tell Mr. Lombardo how much money

19   was potentially on the table at that point?

20        A.    I don't think so, because I knew it

21   wasn't anywhere remotely close to what he was

22   looking for, and I just didn't think there was a

23   point of agitating him or upsetting him by even

24   bringing it up.

25        Q.    Did Mr. Lombardo say that he was

```
 1                    Auerbach

 2    thinking about suing Chmura for taking away his

 3    commission?

 4         A.    Yes.  He alluded to the fact that he

 5    felt that, essentially, they were going back on

 6    what the agreement was when he started, and for all

 7    account managers was essentially that, you know, he

 8    worked to build this book.  And the way it states

 9    is that, essentially, in perpetuity, as long as

10    he's managing those accounts and his clients, he

11    gets the commission.  And because they were

12    effectively, in his words, taking that away, he was

13    owed some sort of remuneration.  He worked for

14    those, and now they were handing it over to other

15    people who had done nothing for those commissions.

16         Q.    Did he mention any other reason why he

17    thought he might sue Chmura?

18         A.    I mean, not that I can recall.  I mean,

19    the big thing for him was there was a significant

20    portion of his commission being taken away.  That

21    was my understanding.

22         Q.    And did he tell you that he met with a

23    competitor of Chmura while you had been in

24    Indianapolis?

25         A.    He did, yes.
```

1                            Auerbach

2        Q.    What did he say about that?

3        A.    That was the extent of it, that, you

4   know, he spoke to a competitor, just said hello,

5   shook his hand.  That was the extent of it.  But, I

6   think, you know, it was something that I think

7   maybe he felt might have had some sort of

8   strengthening in his argument regarding the

9   compensation that he was owed.

10       Q.    And was that because he thought he might

11  go work for that competitor?

12            MS. COOPER:  Objection; he has no

13       personal knowledge as what to Mr. Lombardo

14       thought.

15            MS. SIEGMUND:  You can object to the

16       form and he can ask me to clarify if he

17       doesn't understand the question.

18       Q.    Go ahead, Mr. Auerbach.

19       A.    I don't -- I would be -- it would be

20  unlikely, I think that would be the implication,

21  because I think he knew, as did everybody, that

22  there was a noncompete.  So he knew he couldn't go

23  and work there.  I don't think that was a thought

24  that he had.  He certainly never shared that with

25  me.

1                         Auerbach

2       Q.    Did you -- so in response to his

3   mentioning meeting with a competitor in

4   Indianapolis, did you say anything about his

5   noncompete agreement?

6       A.    No.

7       Q.    And did he talk about moving his clients

8   over to a competitor?

9       A.    Not directly.  I think what he had said

10  was, you know, he has a very close relationship

11  with all of these clients.  And the implication was

12  that they renewed Rick-Chmura because of him.  And

13  in the absence of him, they're not going to stay.

14          So the point to that was, going back to

15  what we were initially talking about, the idea of a

16  smooth transition.  We knew, given the volume of

17  the book of business, if he just walked away, if

18  there was absolutely no assistance to transition,

19  we would lose a number of clients because of his

20  relationships.

21          So the point that he was trying to

22  convey was, you know, if he didn't cooperate in

23  transition, or if, you know, there wasn't some sort

24  of an agreement and a settlement that included

25  that, his absence of contributing to that

```
 1                    Auerbach

 2   transition over would result in a lot of people

 3   leaving and going to a competitor because of that.

 4            (Discussion off record.)

 5       Q.    Did Mr. Lombardo say anything to the

 6   effect of "Either Chmura is going to pay me for

 7   those relationships or someone else will"?

 8       A.    Yes.

 9       Q.    And how did you interpret that?

10       A.    Well, you know, these relationships he'd

11   developed, it was unlike any other relationships

12   with the other account managers.  I mean, he knew

13   these people on a personal level.

14            Everybody, again, clearly understood, it

15   was made abundantly clear by leadership about the

16   noncompete, the inability, you know, to contact

17   these clients after they left.  But, eventually

18   that noncompete would expire, and these

19   relationships would still exist.

20            It's not like he can't go to them after

21   the noncompete is over and say, Hey, I'm with this

22   company now, I'd love to talk to you.

23            My opinion -- and this is what I tried

24   to express repeatedly -- was that he had that sort

25   of ability with these relationships that not only
```

1                        Auerbach

2   would there be a significant loss in attrition by

3   just the virtue of him leaving, that at some point,

4   he would be able to capitalize those relationships

5   elsewhere, and that would be another wave of loss

6   that we would experience.

7        Q.    And in this document that we're looking

8   at, I'm looking at the end of the second to last

9   full paragraph.  It says, "Rick said he would reach

10  out to not only his clients but all clients of

11  Chmura, to sign them over to a competing company."

12            Is that an accurate statement of what

13  Mr. Lombardo said?

14       A.    Yes, that is correct.

15            MS. SIEGMUND:  Okay, Penny.  We can take

16       a break.

17            (A recess was taken.)

18            MS. SIEGMUND:  And I'm putting up

19       Exhibit B back up as well.

20       Q.    So, Mr. Auerbach, when Mr. Lombardo said

21  that he would reach out to clients of Chmura and

22  sign them over to a competing company, did you

23  think that was something that you (sic) would

24  actually do?

25       A.    In the immediate time of him exiting,

```
 1                         Auerbach
 2   no, I didn't really think so.
 3        Q.    So when you say in this document, Rick
 4   said he would reach out to not only his clients,
 5   but all clients of Chmura to sign them over to the
 6   competing companies.
 7             Are you saying you didn't believe him
 8   when he said that?
 9        A.    No, not at all.
10        Q.    Forgive me, that was a bad question.
11   No, you didn't believe him or, no, you didn't think
12   he would do that?
13        A.    Neither.  I didn't believe that he
14   thought he would do it, nor did I think that he was
15   going to do it.
16        Q.    Sorry, that was another bad question.
17             So what was your understanding, based on
18   this conversation, what Mr. Lombardo would do if he
19   did not receive an adequate severance payment?
20        A.    Well, it would be two primary things --
21   well, I guess three.  But, his opinion, he would
22   file a lawsuit.  He felt he was owed money because
23   of the book that he built.  He would not do
24   anything to help with a smooth transition through
25   his exit.
```

```
1                      Auerbach
2              And my understanding was, and he clearly
3    understood that there was a noncompete.  He knew he
4    couldn't reach out, but he also knew that that
5    would eventually expire.  And then any client of
6    Chmura, any relationship that he had would be
7    essentially fair game.
8         Q.   Did he say anything during this
9    conversation of, I will sign clients over to a
10   competitor after my noncompete expires, or did he
11   just not mention the noncompete one way or the
12   other?
13        A.   I don't recall the noncompete being
14   mentioned in that conversation.  I don't recall him
15   specifically saying that.
16        Q.   So he said, I will sign new clients over
17   to a competitor.  And your interpretation of that
18   was that he would do that after his noncompete
19   expired; is that right?
20        A.   Yeah.  I think -- like I said, everybody
21   very clearly understood that a noncompete existed.
22   There was something -- there were some revisions
23   made to the employment agreements to really
24   specifically highlight that.  It was something that
25   was discussed often.  I have no doubt that he
```

1                    Auerbach

2   completely understood that.

3        Q.   Did you send Mr. Lombardo home after

4   this conversation?

5        A.   It was not that long after this when I

6   had spoken again to leadership.  I don't recall who

7   specifically I talked to and expressed that, you

8   know, this was becoming a disruption and we needed

9   a solution.  It was shortly thereafter, I received

10  a call directly from Chris Chmura telling me to

11  send him home immediately.

12       Q.   And what did she say during that call

13  other than, Send him home immediately?

14       A.   There was very, very little discussed.

15  It was an extremely short call.  She simply said,

16  He needs to go home right now, this moment.

17            That was it.  That was the extent of

18  what was said.

19       Q.   And to back up a little bit, you

20  mentioned that after you had this conversation with

21  Mr. Lombardo, you conveyed that to leadership; is

22  that right?

23       A.   Yes, that is correct.

24       Q.   And what did you tell leadership during

25  that conversation?

1                         Auerbach

2        A.    I don't remember the specific content.

3   I believe it was essentially related to this.

4             And my point being, we had people that

5   were slated to start in the very near future, and I

6   just felt as though this needed all of these

7   things, but Rick concluded we needed resolutions to

8   all of this because it was just becoming

9   problematic.

10       Q.   And what was the -- first of all, who in

11  leadership was on that call?

12       A.    I don't believe it was a call.  I don't

13  believe this was a call.  I don't remember exactly

14  whom I spoke to and the specifics.

15            I believe I spoke to Greg Chmura because

16  he was in the office with me.  I think I went over

17  to talk to him.  I don't recall being on a call

18  regarding this on this day.

19       Q.   So you spoke to Mr. Lombardo and then

20  you went and relayed that conversation to Greg,

21  correct?

22       A.    Correct.

23       Q.   And then the next --

24       A.    To the best of my knowledge.

25       Q.   And then Chris Chmura called you and

1                            Auerbach

2    told you to send to Mr. Lombardo home, correct?

3        A.    Correct.  As far as I remember, yes.

4        Q.    Did you instruct anyone to cut off

5    Mr. Lombardo's Salesforce access?

6        A.    I don't think that was a decision that I

7    would make.  Everything, I think, related to that

8    would have come from leadership.

9        Q.    To your knowledge, was Mr. Lombardo's

10   Salesforce access terminated on this date, on

11   October 17th?

12       A.    I can't say for sure, but I believe so.

13   If it wasn't that day, it was very shortly

14   thereafter.

15       Q.    And, to your knowledge, did Mr. Lombardo

16   raise this issue as potentially taking his clients

17   elsewhere; did he raise that with other employees,

18   to your knowledge?

19       A.    I have absolutely no idea.

20       Q.    I'm going to show you an exhibit which

21   hopefully we can get up and running here fairly

22   quickly.

23            MS. SIEGMUND:  I am marking this as

24        Plaintiff's Exhibit H.

25   (Exhibit H, Text messages, was marked for purposes

1                          Auerbach

2    of identification.)

3         Q.     Let me know when that shows up,

4    Mr. Auerbach.  Are you able to view this document?

5         A.     It's still loading.

6         Q.     Has that come through?

7         A.     Yes, I just finished reading it.

8         Q.     Super.  So I'll represent to you that

9    these are text messages that Mr. Lombardo produced.

10   I know that it says, Butch on the right-hand side

11   above the blue text, but we did verify yesterday

12   that that is, in fact, Mr. Lombardo.

13              So does this look familiar to you as the

14   texting between you and Mr. Lombardo?

15        A.     Vaguely.

16        Q.     And it looks like the gray text on the

17   left are yours, and the blue on the right are Mr.

18   Lombardo's, correct?

19        A.     That is correct.

20        Q.     So I want to focus on the first text

21   from you on Thursday, October 17th at 11:10 a.m.,

22   you say, I'm on the phone with Richmond now.  Give

23   me some time to talk through this with them before

24   you take any steps.

25              Do you see that, Mr. Auerbach?

```
 1                         Auerbach
 2       A.    I do, yes.
 3       Q.    And so, does that refresh your
 4  recollection about whether you had a call with
 5  folks in Richmond on October 17th, after your
 6  conversation with Mr. Lombardo?
 7       A.    I don't -- I mean, I have no doubt that
 8  there were a number of calls that day.  There was a
 9  lot happening.  It was very unexpected, so I don't
10  have a perfect recollection of everything.  I have
11  somewhat of a recollection of this text chain.
12       Q.    But, you have no reason to doubt,
13  sitting here today, that when you were texting
14  Mr. Lombardo that you were on the phone with
15  Richmond, you were, in fact, on the phone with
16  Richmond, right?
17       A.    I would say that's probably accurate,
18  yes.
19       Q.    And you said, Mr. Lombardo, Give me some
20  time to talk through this with them before you take
21  any steps.
22             What did you mean when you said, Before
23  you take any steps?
24       A.    I didn't want him to file a lawsuit.  I
25  was afraid if the lawsuit was filed, it would
```

1                      Auerbach

2   adversely affect the ability to give him some sort

3   of a settlement.

4        Q.    And were you also concerned about him

5   contacting Chmura's clients?

6        A.    No.  I had no doubt he wasn't going to

7   do that.

8        Q.    What other steps were you concerned that

9   he might take?

10        A.    Just filing a lawsuit.  It was the one

11   thing he talked about repeatedly and I wanted to

12   avoid happening.

13        Q.    When you spoke to Mr. Lombardo on

14   October 17th, do you recall whether you mentioned

15   asking him to do anything in particular with his

16   computer?

17        A.    My vague recollection, I don't remember

18   specifically, and I don't remember what day.  I

19   think he might have still had a laptop in his

20   possession.  I don't remember.  Again, there was a

21   lot of things happening all at once, a lot of

22   questions back and forth.  I don't specifically

23   remember that.

24        Q.    At any point, did you tell him to do

25   anything in particular with his laptop?

1                          Auerbach

2        A.    I can't specifically recall, I really

3    don't.  I don't remember.

4        Q.    So after Mr. Lombardo was sent home,

5    when was the next time you spoke to him about his

6    employment status?

7        A.    I feel like there was a phone call

8    following these texts, but I don't remember

9    specifically.  I think there was maybe a 30-second

10   phone call where he was just looking for an

11   explanation as to what was going on.  I don't know

12   if it was the 17th or maybe the 18th.

13              I think the extent of what I said was,

14   I'm still trying to figure out what happened here.

15   This was unexpected.  And I just need to see, like,

16   I don't know what's going on.  And I don't recall

17   there was a time after that where we contacted each

18   other about this.

19       Q.    I'm going to show you another exhibit

20   which I'm marking Plaintiff's Exhibit I.

21   (Exhibit I, Documented conversation between

22   Mr. Lombardo and Mr. Auerbach on October 21st, was

23   marked for purposes of identification.)

24       Q.    Let me know when that comes through.

25       A.    It's in the loading process now.

```
 1                      Auerbach

 2              It just came up.  I am going to read it

 3      now.

 4              Okay, I'm finished.

 5         Q.   Do you recognize this document?

 6         A.   Yes, I do.

 7         Q.   What is it?

 8         A.   This is a documented conversation with

 9      Mr. Lombardo on October 21st.

10         Q.   And you wrote this document, correct?

11         A.   I did, yes.

12         Q.   And was it an accurate summary of the

13      conversation when you wrote it?

14         A.   Yes, I believe so.

15         Q.   So there's nothing in this document,

16      sitting here today, that you think is incorrect?

17         A.   I think this is accurate.

18         Q.   So is this October 21st phone call, the

19      phone call that you were referring to a moment ago?

20         A.   I think so, yes.

21         Q.   Does this refresh your recollection a

22      bit about what transpired in that call?

23         A.   Yes, I would say so.

24         Q.   So did you discuss the proposed

25      separation agreement with Mr. Lombardo at that
```

1                          Auerbach

2    time?

3         A.    Yeah.  I think I walked through some of

4    these logistics.  He hadn't read it yet.  He only

5    knew that it was a separation letter.  So I kind of

6    walked through what some of the highlighted

7    features were going to be.

8         Q.    And did he discuss a proposed buyout

9    amount?

10        A.    Well, the offer that they had was

11   $10,000.  So that was what was offered in the

12   separation letter.

13        Q.    And how did he react to that?

14        A.    He wasn't happy.  I mean, the number

15   itself as a minimum was considerably less than just

16   the commissions he was still owed.  So he was kind

17   of confused as to why that would be the number, and

18   why it was $10,000.  So he was pretty upset about

19   that part.

20        Q.    Did you talk to Mr. Lombardo about

21   transferring his client accounts to another account

22   manager?

23        A.    Yeah, a little bit.  He and I had talked

24   about a handful -- so my understanding -- I don't

25   remember the specifics in the agreement.  I'm not

1                        Auerbach

2   sure what commissions he was entitled to.  I just

3   don't recall.

4             But, I remember at the end of the

5   conversation, I had said to him, My goal would be

6   to try to get him as much of the commissions as

7   possible.  And, you know, I think I might have

8   alluded to, If you sign off on this, I'm sure

9   they'll pay it for you and anything else you still

10  have coming.

11            So we did review a number of new

12  business opportunities that he expected to come

13  through, and we walked through what needed to be

14  done with those.

15  Q.    Did Mr. Lombardo talk about prospective

16  clients that he met with during the Indianapolis

17  conference during this call?

18  A.    I am inclined to say no, just because

19  the only thing we discussed were deals that were

20  actively about to close.  And I don't recall

21  anybody from Indianapolis that was just a week

22  earlier that he might have been at that point with.

23  Q.    And at the top of the letter -- I'm

24  going to paraphrase here, but, you say that

25  Mr. Lombardo didn't understand why Chmura thought

1                          Auerbach

2    that your conversation with him on October 17th was

3    being used as extortion.

4                And you said, "I asked Rick if he could

5    explain how else it can be perceived".

6                Do you see that?

7        A.    Yes.

8        Q.    So at the time, did you view your

9    October 17th conversation with Mr. Lombardo where

10   he was demanding $100,000 in exchange for certain

11   debts, did you consider that to be extortion?

12       A.    Not even a little bit, no.

13       Q.    So why did you say, I asked Rick if he

14   could explain how else it could be perceived?

15       A.    Because the separation letter and cease

16   and desist came from Chmura, not from me.  And he

17   said he was surprised how they could perceive it as

18   being extortion.

19                And my response to him was, to think

20   about it in terms of, well, how else would

21   leadership take this.

22                So based on the conversation, this was

23   what their perception of it was.

24       Q.    So this was not personally your

25   perception, but it was your understanding that

1                        Auerbach

2    Chmura's leadership viewed it as extortion; is that

3    correct?

4        A.    Yes, of course.  Absolutely.

5        Q.    And did you talk to Mr. Lombardo about

6    what would happen if he did not accept the

7    separation agreement?

8        A.    I don't know that I clearly understood

9    what would happen, to be honest.  I only knew that

10   he intended to take legal action if he didn't

11   accept it.  So I was really trying to push away

12   from that direction.

13       Q.    And during this conversation, did you

14   remind Mr. Lombardo that he needed to return

15   Chmura's property, including his laptop?

16       A.    I believe that was included at the end,

17   which was asked of me to convey by Chmura.

18       Q.    Who at Chmura asked you to do that?

19       A.    I'm sure it was somebody from

20   leadership, but I don't remember who.

21       Q.    After this call on October 21st, did you

22   speak with Mr. Lombardo again before Chmura

23   officially terminated his employment?

24       A.    I sincerely don't recall.

25       Q.    Have you spoken to Mr. Lombardo since

```
 1                      Auerbach

 2    Chmura terminated his employment?

 3         A.    I have, yes.

 4         Q.    When did you speak with him?

 5         A.    There was -- both his wife and my wife

 6    worked for the same company, and there was a

 7    holiday party.  We had very little conversation,

 8    almost virtually nothing, just said, kind of, the

 9    hi and hello.  That's it, but we saw each other

10    there.

11         Q.    Were there any other times since he left

12    Chmura that you spoke to him?

13         A.    After I was fired, I don't remember

14    exactly when, he -- I believe he called me just to

15    ask if I would be willing to make a statement and

16    that he got me in contact with his attorneys, and

17    we went from there.

18         Q.    Which attorney did he put you in contact

19    with; is that Ms. Cooper?

20         A.    I believe -- yes, I believe that was the

21    first person I spoke to.

22         Q.    And when did you speak with Ms. Cooper?

23         A.    I'm going to take a guess and say maybe

24    January.  I don't remember the exact date.

25         Q.    And what was the substance of that
```

1                         Auerbach

2    conversation?

3         A.    I don't think it would be appropriate

4    for me to share.

5         Q.    Have you officially retained Ms. Cooper

6    as counsel?

7         A.    I have not.

8         Q.    Okay.  Then I am going to instruct you

9    that it is fair to answer the question.  There's no

10   attorney-privileged communication there.

11             So what did you say on your call with

12   Ms. Cooper?

13        A.    Essentially she asked me a series of

14   questions about what I knew and understood around

15   the circumstances for Mr. Lombardo being fired, and

16   I shared what information I had.

17        Q.    What specifically did you tell her?

18        A.    I would say a majority of what was

19   discussed already is what was covered in that

20   conversation.  It was really just fact orientated,

21   that kind of --  as we've been doing here, went

22   through step by step what happened over the last

23   few months of Rick's tenure at Chmura.

24        Q.    Is there anything that you discussed

25   that we have not already discussed today?

1                          Auerbach

2          A.    I mean, I can't think off the top of my

3     head.  I know that there was quite a bit that was

4     discussed.  A lot of it has already been covered

5     here.  I would not be surprised if there were other

6     things, but I would say, anything that's of

7     consequence, we have covered it here.

8          Q.    How long was that conversation with Ms.

9     Cooper?

10         A.    If I had to take an estimate, I'd say

11    maybe 30 minutes.

12         Q.    And have you spoken with Ms. Cooper

13    again since that conversation in January?

14         A.    I think only in relation to the subpoena

15    I received for this.  I mean, there might have --

16    maybe there was a followup conversation regarding

17    signing my statement and just the logistics around

18    that.  And I think there was a brief followup

19    regarding the logistics for this.

20         Q.    What statement are you referring to?

21         A.    I believe there was a statement that I

22    made that was submitted to the federal courts as

23    part of this case.

24         Q.    So did you sign an affidavit that Ms.

25    Cooper prepared?

1                     Auerbach

2     A.    I did, yes.

3           MS. SIEGMUND:  Christine, do we have

4     that?

5           MS. COOPER:  You don't.  It has not been

6     filed.  It has not been used, and I don't

7     believe it's been requested.

8           MS. SIEGMUND:  I believe we requested

9     everything related to the allegations in the

10    counterclaim and the complaint, so would you

11    mind sending that over to us?

12          MS. COOPER:  I'm not going to commit to

13    that on the record, but I'll look at it.

14    Q.    So I think you said you had one followup

15    call, Mr. Auerbach, with Ms. Cooper about this

16    statement; is that right?

17    A.    That is correct.

18    Q.    What does the statement say?

19    A.    I mean, essentially, it was a summary of

20    the conversation that Ms. Cooper and I had had.  I

21    don't remember every specific point to it.  But, it

22    was essentially, again, a lot of what was discussed

23    here.  The facts were essentially the same

24    regarding what had transpired over the last couple

25    of months, and then basically what had transpired

1                          Auerbach

2   following Rick's exit and the implementation of a

3   new, I guess you would say, an employment agreement

4   for the account managers and the new structure that

5   ended up getting put into place prior to me getting

6   fired.

7        Q.    Okay.  So walk me through what you

8   remember exactly about what that statement says.

9        A.    Again, there was a summary of the new

10  commission structure being proposed.  All of what

11  we've covered thus far regarding Rick's feelings

12  about it; trying to get to a reconciliation and

13  then essentially, you know, not getting there; he

14  being fired; subsequently filing a lawsuit, and

15  then following that lawsuit, a lot of changes that

16  were made regarding how the sales team would

17  function.

18        Q.    What changes for the sales team did you

19  cover in this statement?

20        A.    So this included reporting criteria for

21  anybody that wasn't a senior account manager.

22  Really, for the entire organization was my

23  understanding that they would all have to begin

24  tracking hours and stay under 40 hours, as well as

25  whatever the new commission structure would be and

1                          Auerbach

2     just how the distribution worked with the existing

3     sales team that remained.

4          Q.    And what was the new commission

5     structure that you walked through in this

6     statement?

7          A.    It was basically the same as what was

8     presented earlier.  The one difference, if I

9     recall, was that the senior account managers were

10    being giving $65,000 as a base as opposed to 60.

11    Otherwise, I believe everything else in there was

12    correct when it was finally signed into...

13         Q.    Okay.  So when were those changes

14    actually implemented?

15         A.    Officially, I think they were -- I mean,

16    I think the start date was November 1st for the

17    commission structure and territories.  The

18    organization didn't actually have the employment

19    agreements in place until I think December 1st.

20    But, during that window of time, they also

21    instituted that the majority of the organization,

22    as well, had to start tracking hours to stay

23    beneath the 40-hour threshold.

24         Q.    And you mentioned something about new

25    employment agreements.  What new employment

1                          Auerbach

2   agreements are you referring to?

3        A.    So every person on the sales team signed

4   a new agreement with the organization that

5   essentially outlined what their new base salary

6   would be, what their commission structure would be.

7   And I think there were a few other things added in

8   by HR.  I don't remember exactly.  I think it was

9   something to the effect of, how many hours I think

10  you can work or something to that effect, and

11  something to do with conferences.

12       Q.    So was this a new offer letter or was it

13  a new contract?

14       A.    So to be perfectly honest, I don't know

15  the correct answer to that.  I think it depends on

16  who you ask.

17             I think the sales team collectively

18  always viewed it as a contract.  But, leadership

19  made it abundantly clear that it is not.  And I

20  believe, in the revised agreement, they explicitly

21  say that these are not a term full of contracts.

22       Q.    So you mentioned in this statement, you

23  walked through the new commission structure trying

24  to get a reconciliation, the changes to the

25  reporting criteria for 40 hours and the new offer

1                       Auerbach

2     letters.

3               Was there anything else that's covered

4     in that statement that you signed for Ms. Cooper?

5     A.     Those are the majority of things that I

6     can recall.

7     Q.     Is there anything else that you can

8     recall?

9     A.     Not at this time.

10    Q.     So we discussed -- I think you said you

11    had two conversations with Rick -- Mr. Lombardo,

12    excuse me -- at the Christmas party and then one

13    where he connected you with Ms. Cooper; is that

14    correct?

15    A.     That is correct.

16    Q.     Have you had any other conversations

17    with Mr. Lombardo since his termination?

18    A.     Other than those, not to my

19    recollection.

20    Q.     And we discussed two conversations with

21    Ms. Cooper.  You mentioned that there was a third

22    conversation when you got this subpoena.  When did

23    -- well, that would only have happened after you

24    got the subpoena.  What did that conversation

25    entail?

1                           Auerbach

2         A.    I think it was just an e-mail.  I don't

3    think we spoke by phone.  I just sent an e-mail

4    saying that I had received this and that any

5    guidance would be helpful.

6         Q.    And what did she say in response?

7         A.    Essentially made a recommendation for a

8    different attorney, which I then pursued, and we

9    had no further contact that I can recall since

10   then.

11        Q.    Have you ever spoken to anyone else at

12   Ms. Cooper's law firm before today?

13        A.    Not to my recollection.

14        Q.    Have you ever spoken -- Mr. Lombardo

15   also has a local counsel; his name is Tom Powell.

16              Have you ever spoken to Mr. Tom Powell?

17        A.    No, I have not.

18        Q.    Have you ever spoken to Mr. Lombardo's

19   prior counsel; her name was Ann Marie Ahern?

20              I'm not sure I'm pronouncing that right.

21        A.    Not to my recollection, no.

22        Q.    Were there any conversations or

23   communications between you and Ms. Cooper that we

24   have not already discussed?

25        A.    Not to my recollection.

1                              Auerbach

2        Q.    Have you ever reached out to any other

3   current or former account managers to let them know

4   that you think they might have viable legal claims

5   against Chmura?

6              MR. POSEY:  Objection.

7              You can answer.

8        A.    The only one that I can recall is, after

9   I was fired, I believe I had reached out to one of

10  the former account managers to say that I thought

11  he was in the same boat as Rick and that's somebody

12  he might want to talk to.

13       Q.    And who did you reach out to?

14       A.    Austin Steel.

15       Q.    We're going to look at another exhibit.

16  (Exhibit J, Text messages produced by Mr. Lombardo

17  between himself and others, was marked for purposes

18  of identification.)

19             MS. SIEGMUND:  This will be Plaintiff's

20        Exhibit J.

21       Q.    Mr. Auerbach, let me know when that

22  becomes visible for you.

23       A.    It is loading now.

24       Q.    And this is 15 pages.  Are you able to

25  view the other pages, or are you only able to see

```
 1                     Auerbach
 2   what I'm displaying right now?
 3       A.    Just what you are displaying.
 4       Q.    All right.  Well, let's start there.
 5   Let me know when you've had a chance to read
 6   through this page.
 7       A.    Okay.
 8       Q.    I'll represent to you that this is a
 9   text chain that Mr. Lombardo produced between
10   himself and Allison Magee.
11             (Discussion off record.)
12             MS. COOPER:  I'm objecting on the
13        grounds of relevance and personal knowledge.
14             MS. SIEGMUND:  You can object to the
15        form of the questions if I ask something
16        that's not fair.
17       Q.    So I'm asking --
18             MS. COOPER:  I object to the personal
19        knowledge and as to the relevance, and I make
20        those two objections.
21       Q.    Mr. Auerbach, at the top of this first
22   page here, Ms. Magee says to Mr. Lombardo, I just
23   heard Eli say, "He could very easily file a
24   wrongful termination suit."
25             Do you see that?
```

1                       Auerbach

2        A.    I see that, yes.

3        Q.    Is that an accurate quote to your

4   recollection?

5        A.    I don't know, to be honest with you.  I

6   don't recall having said that.

7        Q.    So you wouldn't recall what your basis

8   might have been for thinking that Mr. Lombardo

9   could file a wrongful termination suit, other than

10  the commission issue that we've already talked

11  about?

12       A.    Yeah.  I don't know anything about the

13  statement that Ms. Magee is referring to, so I

14  don't know the context in which it might have been

15  said, if it was at all.

16       Q.    I'm going to skip a few pages here in

17  the interest of time.

18       A.    I'm not even sure I can read that.

19       Q.    I'm zooming in.  I'm hoping we can read

20  it together.  I think we all have to individually

21  zoom on it.

22             Mr. Auerbach, are you able to zoom in on

23  that?

24       A.    I was, and then it just disappeared.  So

25  I'm still waiting for it to come up.

```
 1                          Auerbach

 2              Oh, I see.

 3       Q.     Are you able to read that, Mr. Auerbach?

 4       A.     I am reading it now.  Okay.

 5       Q.     This is what appears to be a screen shot

 6   of a message from you.  Does that look familiar?

 7       A.     It does, yes.

 8       Q.     And is that a copy of the message that

 9   you sent to Austin Steel that we were discussing a

10   moment ago?

11       A.     I believe so, yes.

12       Q.     Why did you feel the need to reach out

13   to Austin about this?

14       A.     Because I felt -- I felt the same viable

15   case that Rick had was applicable for Austin, and I

16   thought he should be aware.

17       Q.     Did Austin respond to this message?

18       A.     He did not.  Not to my recollection, no.

19       Q.     Did you have any other communications

20   with him after this?

21       A.     I don't believe so, no.

22       Q.     And you say "In short, he had a very

23   legitimate case."

24              Without getting into what the substance

25   of any communications with McGuiwireWoods was, why
```

```
 1                      Auerbach

 2   did you say that?

 3       A.    I don't think there's a way I can answer

 4   that without divulging any information I was party

 5   to in those conversations with the attorneys.

 6       Q.    Did you think it was appropriate to

 7   share what the attorneys had told you with

 8   Mr. Steel?

 9             MR. POSEY:  Objection.

10       A.    This was not -- this was not based on

11   what the attorneys told me.

12       Q.    So is it fair to say, this was based off

13   your communications with Chmura?

14       A.    I would say, this was based off of my

15   understanding of the lawsuit that Mr. Lombardo had

16   filed.  Based on the statements he was making in

17   the lawsuit, I felt it was a very viable argument

18   that he was making.

19       Q.    Did you have any independent -- I mean,

20   I know we talked about earlier, you didn't really

21   know what overtime was, and you would not have

22   necessarily known that asking for overtime was a

23   problem.

24             Did you have any independent basis to

25   state that Mr. Lombardo had a legitimate case
```

1                         Auerbach

2    against Chmura?

3         A.    At the point where we found out that

4    account manager positions were nonexempt, that's

5    when I knew this was a viable case.

6         Q.    So your conclusion that the case was

7    viable was based on the fact that Chmura had

8    started asking account managers not to work

9    overtime; is that right?

10        A.    Oh, no.  That was before I knew.

11              The moment I knew was when the two

12   elements came together.  We saw the lawsuit and

13   understood what he was stating in the lawsuit, as

14   well as the understanding that account manager

15   positions are nonexempt, which means, the statement

16   he was making in filing that lawsuit was completely

17   accurate.

18        Q.    Why do you say, Account managers were

19   nonexempt; what's your basis for believing that?

20        A.    Because the organization said so.

21        Q.    And so that is part of, after

22   Mr. Lombardo left, the organization began treating

23   certain account managers as nonexempt; is that

24   right?

25        A.    They started following the rules as it

1                     Auerbach

2    pertains to nonexempt.  Prior to that, they did

3    not.

4        Q.    So it was that change that led you to

5    believe that account managers were nonexempt; is

6    that right?

7        A.    No, not at all.  HR had said well before

8    the necessity to document hours, when they were

9    looking into the initial lawsuit filed, the

10   understanding, the explanation was, senior account

11   managers were considered exempt, myself included as

12   management, and account managers were considered

13   nonexempt.

14            So there was a host of things owed to

15   them regarding things like overtime because they

16   were nonexempt.

17       Q.    But, all of this was after Mr. Lombardo

18   was gone, correct?

19       A.    To my recollection, I believe the

20   lawsuit was filed after he was initially fired.

21       Q.    So none of these changes or this

22   discussion among Chmura's leadership and with HR

23   were ever applied to Mr. Lombardo, correct?

24       A.    Correct.

25       Q.    And you haven't done any independent

1                    Auerbach

2   legal research or anything like that about the

3   legitimacy of Mr. Lombardo's claim or about why

4   account managers are exempt or nonexempt, correct?

5              MR. POSEY:  Objection.

6        A.    I would say, just from my own

7   edification, I might have done some Google

8   searches, or if there were attorneys that I know,

9   just to understanding, just out of curiosity, what

10  the viability of it is.

11       Q.    Okay.  So you did a little asking

12  around?

13       A.    Correct.

14       Q.    Okay.  Is there any other basis besides

15  the communication from HR and Rick's counterclaim

16  and your own research that led you to believe that

17  Rick's lawsuit was legitimate?

18       A.    No.  That's it.

19       Q.    Now I want to talk a little bit about

20  your departure from Chmura.  You've mentioned a

21  couple of times that you were fired, correct?

22       A.    That is correct, yes.

23       Q.    When were you fired?

24       A.    I believe the date was December 16th.

25       Q.    And tell me about how that came about.

1                          Auerbach

2        A.     Well, there was statement prepared on my

3    behalf, which we saw part of in the first couple of

4    pages.  Leadership sent it to me the Friday before,

5    so I guess that would have been the 13th.  I was

6    asked to review it and get it notarized over the

7    weekend.

8              There were some errors in the document

9    so I took some time reviewing it.  I came in on the

10   morning of the 16th.  I hadn't yet gotten it

11   notarized.

12             Greg Chmura came over asking me to get

13   it done when the bank first opened, so I did.  And

14   then I went and handed him the notarized statement,

15   and he immediately handed me a termination letter.

16        Q.     Did he say why you were being

17   terminated?

18        A.     I asked him.  And the only thing he said

19   was, We were hoping that you would have meshed

20   better with leadership at this point and you

21   didn't.  So that was the rationale given.

22        Q.     And was that effective immediately?

23        A.     It was, yes.

24        Q.     Did you have any other conversations

25   with anyone at Chmura to try to figure out why this

                          Auerbach

1

2    was happening?

3        A.    No.   I mean, there was nobody that

4    wasn't leadership, and I don't recall having spoken

5    to leadership since.

6        Q.    Have you found new employment since you

7    left Chmura?

8        A.    I have not.

9        Q.    And I do --

10            MS. SIEGMUND:  Christine, I'm almost

11       done.  I think I'll have you out of here by

12       4:00.

13            MS. COOPER:  I would still like to keep

14       the deposition open.  I would not finish in

15       the half an hour allowed.  There's some

16       questions I would like to ask Mr. Auerbach as

17       well.

18            MR. POSEY:  If you're going to continue

19       much longer, I join the agreement to

20       reschedule.

21       Q.    And Mr. Auerbach, you mentioned a minute

22   ago that there were some errors in this statement

23   that leadership asked you to sign and that you took

24   the time over the weekend and made some changes.

25            Were you able to make all the changes

```
 1                        Auerbach
 2   that you felt were appropriate to make sure that
 3   that statement was accurate?
 4        A.    I took out the one big issue that I had
 5   that I was pretty animate about, that not being
 6   included.  There were other areas I felt
 7   uncomfortable about, but really felt compelled to
 8   sign it as is, so I did.
 9        Q.    But, you felt comfortable making some
10   changes, right?
11        A.    Only on the one thing that I felt
12   definitively, if it was submitted to the court, I
13   could not testify to it as being true.
14        Q.    Okay.  So let's look at that again
15   because I do want to make sure we walk through all
16   of it.  And if there's anything in here, sitting
17   here today, that you say is not true, I want to
18   make sure we get that on the record.
19             So earlier, we had looked at the first
20   two pages, and you testified that there was nothing
21   in there that was untrue.
22             So I think -- I guess I am going to have
23   to walk through each of these on my screen for you
24   to be able to see them.  But, I do want to go
25   through this whole thing and make sure we cover any
```

```
 1                        Auerbach

 2  areas that you don't believe are accurate.

 3        A.     It's not that I don't believe are

 4  accurate.  I think it's the context around some of

 5  it.  If it's not presented in a way where there's

 6  maybe an explanation, it could be interpreted more

 7  than one way.

 8              I didn't feel I was given the

 9  opportunity, given how quickly they wanted to move

10  forward, to be able to have this conversation with

11  leadership.  And evidently it was because the

12  decision was made to fire me, and I would never

13  have had that opportunity to review it.

14        Q.     Okay.  So is it fair to say that there

15  are some areas where you would have preferred to

16  provide additional context in this affidavit, but

17  there's nothing in here that's untrue?

18        A.     I would say that that's accurate.

19        Q.     Let's go through page by page and just

20  make sure that that's still the case that there's

21  nothing in here that's inaccurate.  And then I

22  think --

23              MS. COOPER:  I do have to say, I

24        absolutely have to end it at 4:00 today.  And

25        if we're going to carry on past that, like I
```

1                        Auerbach

2        said, I want to keep the deposition open

3        anyhow.  If we can pick a new time to

4        continue, that would be ideal.

5              MS. SIEGMUND:  Okay.  I hope we can -- I

6        hope this will not take more than five minutes

7        and then we'll pick a good time to continue.

8        A.    So, for example, No. 3 -- sorry.

9        Q.    I know we discussed earlier that you

10   said there was nothing on the first two pages that

11   was inaccurate; is that still right?

12        A.    Well, so let me clarify.  For No. 3, for

13   example, where it says, When Lombardo started with

14   Chmura in 2015, he had never worked in the industry

15   before and had no preexisting customer

16   relationships.

17              I don't discernibly know that.  I have

18   no idea, but, that's what leadership wanted

19   included.  I presumed they know that to be

20   accurate.

21              Let's see if there's anything else.

22   Yeah.  So the other part where it says that

23   30 percent off Chmura's regular subscription price

24   and frequently did so.

25              He did not frequently do that.  He might

1                        Auerbach

2    have done that prior to me being there, but I don't

3    think there's even one example of my time there

4    where that happened.

5            But, again, this wasn't something I felt

6    comfortable arguing with leadership because I knew

7    it would not result in a good outcome for me.

8        Q.    When they presented this statement to

9    you, did they tell you that you needed to make sure

10   it was true?

11       A.    That really wasn't their concern.  In

12   fact, I don't think anybody said, Make sure it's

13   completely true.

14           The direction I got from Greg Chmura

15   was, review it, sign it, get it notarized and bring

16   it in Monday.

17           I had reached out to him over the

18   weekend to express concerns saying that there were

19   things in there I did not agree with and things

20   that I thought were flat out wrong.

21           His response was very short with me to

22   simply say, Make the corrections you need to make

23   and then bring it in on Monday.

24           So I had made the one big correction I

25   knew definitively needed to be deleted.  And then I

 1                          Auerbach

 2    intended to speak with him on Monday, and he was

 3    not interested in having the conversation, because

 4    again, they had already intended on shutting off my

 5    access and letting me go.

 6              So there wasn't the opportunity for me

 7    to express for No. 3 or No. 5 reservations I had.

 8    I felt very, very pressured to go and get it signed

 9    that morning.  And, of course, as I stated, when I

10    did and returned it, they immediately fired me,

11    which indicates why they were so reluctant to have

12    a more in-depth conversation with me about this

13    statement.

14        Q.    Okay.  So we just discussed No. 3 and

15    the word, Frequently, and No. 5 that you don't have

16    personal knowledge of or not comfortable with,

17    respectfully.

18              Is there anything else on this first

19    page that you are not comfortable with?

20        A.    On the first page?  No.

21              MS. COOPER:  Can we break at this point?

22              I really do have to get on another -- I have a

23              really important meeting I have to attend.

24              And I apologize for that, but I have a hard

25              stop at 4:00.

```
 1                      Auerbach

 2          MS. SIEGMUND:  I'm sorry.  We really

 3     need to finish this part today.  We didn't

 4     know ahead of time that you had a 4 o'clock

 5     stop, so --

 6          MS. COOPER:  Well, I didn't think this

 7     deposition -- the problem is, you sent out

 8     subpoenas and didn't confirm with me at all

 9     before picking a time.  And we're up against

10     deadlines and everything else.  I absolutely

11     have to get on a call at 4 o'clock and cannot

12     continue.

13          MS. SIEGMUND:  Let's have --

14          MS. COOPER:  I can resume at 5:30.  I

15     cannot continue right now.

16          And I would like to ask Mr. Auerbach

17     some questions as well, which even with his

18     hard stop, there would not be time for.

19          MS. SIEGMUND:  Is Mr. Powell able to sit

20     in just for -- I just need him to finish

21     reading this thing going through, making sure

22     that the rest of it is accurate.

23          MS. COOPER:  I don't know, and I don't

24     have time to contact him.  I don't think he

25     does -- I don't think he can, though.  And
```

```
 1                    Auerbach

 2    he's local counsel without a whole lot of

 3    knowledge on this yet.  So he has been acting

 4    as traditional local counsel.

 5         MS. SIEGMUND:  Mr. Auerbach, I know you

 6    said you have a 4:30 stop.  I don't want to

 7    impose on your time, but I do just want to

 8    finish this part of this today.

 9         MR. POSEY:  Would it be possible just to

10    resume tomorrow?

11         MS. SIEGMUND:  Probably so.

12         Mr. Auerbach, what is your availability

13    tomorrow?

14         THE WITNESS:  I would say basically the

15    same window.  I have a hard stop tomorrow at

16    4:00.  I'd prefer not to start earlier than

17    10:00, but I'm available as needed.

18         MS. SIEGMUND:  Okay.  We have Ms.

19    Peterson's deposition in the morning, right?

20         MS. COOPER:  Can we go off the record?

21         MS. SIEGMUND:  Penny, let's go off the

22    record.

23         (Discussion off the record.)

24         MS. SIEGMUND:  Penny, I'd like a rough

25    draft.
```

1                    Auerbach

2        MR. POSEY:  We are going to be reading,

3    just to make sure that the exhibits are making

4    it into the deposition.

5        MS. SIEGMUND:  So obviously, we are

6    leaving the deposition open so that we can

7    finish and Ms. Cooper can finish.

8        MS. COOPER:  Thank you all very much.  I

9    have to leave.

10

11                - - -

12        (Deposition concluded at 4:02 p.m.)

13        (Signature was not waived.)

14        (See attached errata sheet.)

15                - - -

16

17

18

19

20

21

22

23

24

25

1                        Auerbach

2                    CERTIFICATE

3    State of Ohio,      )
                          ) SS:
4    County of Cuyahoga.)

5         I, Penny Sherman, a Notary Public in and for
     the state of Ohio, duly commissioned and qualified,
6    do hereby certify that the within-named witness,
     ELI AUERBACH, was by me first duly sworn to testify
7    the truth, the whole truth and nothing but the
     truth in the cause aforesaid; that the testimony
8    then given by him was by me reduced to stenotypy in
     the presence of said witness, afterwards
9    transcribed by means of computer-aided
     transcription, and that the foregoing is a true and
10   correct transcript of the testimony as given by him
     as aforesaid.

11
          I do further certify that this deposition
12   was taken at the time and place in the foregoing
     caption specified, and was completed without
13   adjournment.

14        I do further certify that I am not a
     relative, employee or attorney of any party, I am
15   not, nor is the court reporting firm with which I
     am affiliated, under contract as defined in Civil
16   Rule 28(D), or otherwise interested in the event of
     this action.

17
          IN WITNESS WHEREOF, I have hereunto set my
18   hand and affixed my seal of office at Cleveland,
     Ohio, on this 13th day of May 2020.

19

20

21

22   _____

     Penny Sherman
23   Notary Public in and for
     The State of Ohio.

24

25   My Commission expires October 6, 2023.