Exhibit 14

1                E. Trombley - Rough Draft

2             UNITED STATES DISTRICT COURT

3             FOR THE DISTRICT OF VIRGINIA

4

5      CHMURA ECONOMICS & ANALYTICS, LLC,

6           Plaintiff,                  Civil Action

7      vs.                              No. 3:19cv813

8      RICHARD LOMBARDO,

9           Defendant.

10      _____/

11

12         VIRTUAL DEPOSITION OF ETHAN TROMBLEY

13                   May 8, 2020

14                    2:00 p.m.

15

16     *** THIS IS AN UNEDITED ROUGH DRAFT AND IS NOT TO BE

17    USED AS A FINAL. ACCEPTANCE OF A ROUGH DRAFT ASSUMES

18    PURCHASE OF A FINAL. ALL ERRORS ON THIS ROUGH WILL BE

19             CORRECTED ON THE FINAL. ***

20

21     Reported by:

22     Anne E. Vosburgh, CSR-6804, RPR, CRR

23     Job No. 179589

24

25

```
 1              E. Trombley - Rough Draft

 2    APPEARANCES:

 3

 4    FOR THE DEFENDANT:

 5        KOEHLER FITZGERALD

 6        By:   CHRISTINE M. COOPER, ESQ.

 7

 8    FOR THE PLAINTIFF:

 9        MCGUIRE WOODS

10        BY:  CHRISTOPHER M. MICHALIK, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        E. Trombley - Rough Draft

 2              Cleveland, Ohio

 3         May 8, 2020, 2:04 p.m.

 4            ---------------

 5              PROCEEDINGS

 6            ---------------

 7         THE REPORTER:  Due to the severity

 8   of COVID-19 and following the practice of

 9   social distancing, I will not be in the

10   same room as the witness and will swear in

11   the witness remotely.

12         Do both parties stipulate to the

13   validity of this transcript and remote

14   swearing, and that it will be admissible

15   in the courtroom as if it had been taken

16   following Rule 30 of the Federal Rules of

17   Civil Procedures and the state rules where

18   this case is pending?

19         MR. MICHALIK:  Yes.

20         MS. COOPER:  Yes.

21         THE COURT REPORTER:  Thank you.

22              ---

23              ETHAN TROMBLEY,

24   having been called as a witness, was

25   duly sworn to testify to the truth by
```

```
 1              E. Trombley - Rough Draft
 2         an authorized notary public and
 3         testified as follows.
 4                      ---
 5                  EXAMINATION
 6   BY MR. MICHALIK:
 7         Q.    Good afternoon, Mr. Trombley.  My
 8   name is Chris Michalik.  I'm an attorney
 9   representing Chmura analytics in a lawsuit
10   against Rick Lombardo.  I'm going to be taking
11   your deposition this afternoon pursuant to a
12   subpoena.  Just as we're getting started, could
13   you state and spell your name for the record.
14         A.    Yes.  Ethan is spelled E-t-h-a-n,
15   Trombley is spelled TRO -m-b-l-e-y.
16         Q.    And have you ever given a deposition
17   before?
18         A.    I have not.
19         Q.    Okay.  I'm going to be over some
20   brief ground rules so you understand the
21   process.  It's even more unusual since we have
22   the issues with technology and sometimes
23   there's trouble hearing, that sort of thing.
24              So first of all, it's under oath so
25   it's like you're testifying in a court of law.
```

Rough Draft

1              E. Trombley - Rough Draft

2              We have a court reporter taking down

3    both what you say, what I say, and also what

4    Mr. Lombardo's counsel says.  So it's going to

5    be important that you let me finish my

6    questions before you answer and I'll let you

7    finish your answers before I ask another

8    question.  That way the court reporter can get

9    everything down.  Just by the nature of this,

10   at some point or another, we're likely to talk

11   over each other, so we may need a reminder, but

12   just so you understand that aspect of it.

13   Also, I'm going to need you to provide audible

14   answers.  It's normal when we're talking to

15   respond with an "uh-huh" or huh-uh or a head

16   shake.  The reporter can't get that down.  Does

17   all of that make sense to you?

18        A.    Makes since.

19        Q.    Okay.

20        Q.    And if I ask a question and you

21   don't understand it, just ask me to rephrase

22   it.  I'll make sure you understand it.  If you

23   answer, I'll assume you understood that

24   question.  Likewise, if there is some issue

25   with the and you can't hear the question fully

1                E. Trombley - Rough Draft

2    or you can't hear me, please speak up and we'll

3    make sure we get the question correct.  I don't

4    expect this to be a very long deposition, but

5    it is more a marathon than a sprint but if at

6    some point you need a break, just let me know.

7    I'll I may finish my line of questioning, but

8    we'll take breaks as you need them.

9               I'm going to ask a few other

10   background questions just for purposes of the

11   deposition.

12              Are you on any medications or do you

13   have any medical conditions that would affect

14   your ability to testify today?

15       A.    No.

16       Q.    Any other reason that you can't

17   testify truthfully or to the best of your

18   recollection?

19       A.    No other reasons.

20       Q.    In preparing for your deposition,

21   did you review any documents today?  I'm sorry.

22   Not today.  That was a bad question.

23              In preparing for your deposition

24   today, did you review any documents?

25       A.    I did not.

1              E. Trombley - Rough Draft

2       Q.     And did you speak with anybody in

3    preparation for your deposition today?

4       A.     I did not.

5       Q.     Okay.  I'm going to ask you some

6    questions about your employment with Chmura.

7              Before I get to that, are you aware

8    that there is a lawsuit between Chmura and

9    Mr. Lombardo?

10      A.     Yes.

11      Q.     And how did you become aware of that

12   lawsuit?

13      A.     After it became public, when Rick

14   asked me if I would be okay with being deposed,

15   I found out.

16      Q.     Okay.  And did you speak with

17   Mr. Lombardo about the lawsuit between the two

18   parties?

19      A.     No more than that, just being asked

20   to be deposed.  I said yes, that's fine.

21      Q.     Okay.  Prior to --

22      A.     I'm sorry.  I didn't mean to

23   interrupt you.  Just a general understanding.

24      Q.     That's fine.

25      A.     Yeah.  No, of course, I asked what

1           E. Trombley - Rough Draft

2  is it about.  So I know generally what is it

3  about, but very vague.

4       Q.    When you spoke with Mr. Lombardo,

5  did he talk about his employment with Chmura

6  with you at that time?

7       A.    When we spoke about the case?

8       Q.    Yes, sir.

9       A.    When you say spoke about his

10  employment, in what way do you mean?

11      Q.    Other than telling -- asking you if

12  you were willing to be deposed, did you discuss

13  the background of this case with Mr. Lombardo

14  at all?

15      A.    He just mentioned it had something

16  to do with exempt versus nonexempt or something

17  like that.  That's really the extent of what I

18  recall.

19      Q.    Okay.  Prior to that conversation,

20  you may have answered this question.  Prior to

21  this conversation, had you spoken with

22  Mr. Lombardo previously about, maybe not the

23  case, but a dispute he was having with Chmura

24  after his -- after he no longer worked for

25  Chmura?

 1                 E. Trombley - Rough Draft

 2        A.     Not to my recollection, no.

 3        Q.     And I understand at one point you

 4   were employed by Chmura; is that correct?

 5        A.     Correct.

 6        Q.     And can you tell me roughly when

 7   your employment began?

 8        A.     I believe it was November 2016.

 9        Q.     And what position were you hired

10   into?

11        A.     Data analyst.

12        Q.     And can you tell me -- can you

13   describe your job duties as a data analyst?

14        A.     Mainly focused on identifying issues

15   in our software and figuring out ways to remedy

16   them.

17        Q.     And were you doing coding work or

18   what type of -- how would you characterize that

19   work?

20        A.     More so working hand in hand with

21   coders, the individuals that were building the

22   products.  We would analyze large datasets,

23   figure out issues with what was being built.

24   So it's like a symbiotic relationship between

25   the analysts and the developers.

1              E. Trombley - Rough Draft

2        Q.    While you were a data analysit, did

3    you have regular interaction with the sales

4    department or the sales team?

5        A.    I did not.

6        Q.    Where did you work?  What was your

7    physical location where you worked?

8        A.    I first started -- you're referring

9    to like the Cleveland office?

10        Q.    Yeah.  You were located in

11    Cleveland?

12        A.    Yes.  I was located in Cleveland,

13    working out of the Cleveland office.

14        Q.    Okay.  And there's been prior

15    testimony in this matter that the Cleveland

16    office is a three floored building.  Is that

17    correct?

18        A.    That's correct.

19        Q.    And while you were a data analyst,

20    where in the building were you located?

21        A.    I started on the main level and then

22    spent some time in the basement level.

23        Q.    And just for clarification,

24    understand if we're going from lowest to

25    highest, the first floor would be the basement,

```
 1                  E. Trombley - Rough Draft
 2    then there's a second floor, and then a third
 3    floor, which would be the second floor
 4    aboveground.
 5                 Which floor are you referring to as
 6    the main level?
 7         A.    Gotcha.  So I started on the second
 8    level and then moved down to the first level.
 9         Q.    Okay.  And who did you report to
10    while you were a data analyst?
11         A.    Greg Chmura.
12         Q.    And do you know Greg Chmura's title?
13         A.    At that time, I believe he was vice
14    president of data governs or head of data
15    governance, something along those lines.
16         Q.    And did it change, if you know,
17    during the time of your employment?
18         A.    It did, yes.
19         Q.    And -- go ahead.
20         A.    Go ahead.  I was going to say,
21    something got append on to it when he took on
22    the additional role of -- I believe we call it
23    VP of sales.  So he was both VP of governance,
24    VP of sales.
25         Q.    Okay.  And how would you describe
```

```
1                E. Trombley - Rough Draft

2   Chmura as far as size of the company?  Would

3   you describe, you know, was it a large company?

4   Small company?  How would you describe it?

5        A.    Small company, yeah.  Less than 15

6   employees at the time.

7        Q.    I didn't catch -- did you say less

8   than 15 or less than 50?

9        A.    50.

10       Q.    And during your time with Chmura,

11  was it growing?  Was it increasing in size?

12       A.    Yes.  There were other hires made.

13       Q.    Was it rapidly increasing in size?

14  How would you characterize the company's growth

15  during your time?

16       A.    It was growing at a steady rate.

17       Q.    Okay.  At some point, did your job

18  title switch or change?

19       A.    It did.  So similar to Greg, it was

20  kind of having something append onto it.  I

21  also took on the role of being a sales

22  coordinator.

23       Q.    And do you recall when that was?

24       A.    I believe either late August or

25  early September of 2017.
```

1           E. Trombley - Rough Draft

2       Q.    And so did you remain a data analyst

3   when you also had the sales coordinator title,

4   I think you said, append onto your title?

5       A.    I did technically, but I did off

6   load a lot of duties associated with the

7   previous data analyst role.  It took on a

8   different form, focusing more on sales data.

9       Q.    Can you describe your job duties

10  once you had this new responsibility?  How

11  would you describe your job at that time?

12      A.    Sure.  My job was kind of to act as

13  a middleman between the sales team and other

14  departments within the company.  Leadership, of

15  course, enrichment.  Greg, being the VP of

16  sales, the product team that developed it, the

17  support teams.

18      Q.    So as I understood your testimony,

19  you acted as almost a go between between the

20  sales team and the product team?  And I didn't

21  hear the other teams you referenced?

22      A.    Product team, leaderships, which --

23  when I say leader ships, I think Greg Chmura,

24  John Chmura, Leslie Peterson, Chris Chmura, and

25  the support team individuals, finances,

1                   E. Trombley - Rough Draft

2    occasionally, to handle subscription renewals.

3         Q.    And let's talk about your role and

4    what you did with regard to functioning between

5    the sales team and the product team.  What type

6    of things would that require?

7         A.    That one wasn't a huge time

8    commitment.  I remember one thing we did was we

9    built process to get customer requests for the

10   product onto a roadmap that the product team

11   was tracking.

12        Q.    Can you explain that for me in more

13   detail?

14        A.    Sure.  So say we have an existing

15   customer.  They want something in the product

16   that doesn't exist yet.  They request it to

17   sales and then sales takes information, passes

18   it along to the product team.  They document it

19   in a product load map and we track it overtime

20   to see which requests for features are the most

21   popular, then we can prioritize development

22   based off that.

23        Q.    So would -- the sales team would get

24   requests.  Would they then contact you?

25        A.    At first they would.  Then we built

1             E. Trombley - Rough Draft

2   a process where we had them send it directly to

3   members of the product team.  It was just

4   easier that way.

5        Q.    Okay.  So once that was built, it

6   kind of -- you were no longer in that process,

7   it was directly between sales and the product

8   team?

9        A.    Yes.

10       Q.    And do you recall when that change

11  took place?

12       A.    Oh, gosh, no.  That would be hard to

13  remember.

14       Q.    Okay.  Did you have that function

15  for very long ones you took on this new role?

16       A.    Honestly, I can't remember.

17       Q.    Okay.  And you indicated that you

18  also functioned in a roll functioning between

19  the sales team and the leadership team.  Can

20  you describe that job duty -- or those job

21  duties?

22       A.    Sure.  So I still reported to Greg

23  at the time.  So let's say a deal is being

24  worked by the sales team and the sales team

25  needs to get discounting for a deal, they would

```
1              E. Trombley - Rough Draft
2    first discuss it with me, and then I would go
3    discuss it with Greg to get further approval.
4    And then if we needed -- the there wasn't like
5    a lot of concrete rules but if it was a very
6    large discount, we would take it to the
7    leadership team in Richmond to get final
8    approval.  So it was kind of a step ladder of
9    approval along the way.
10        Q.    And while you were with the company,
11   did the senior account managers, they had a
12   10 percent discount they could give at their
13   discretion; is that correct?
14        A.    Yeah.  It was actually -- I was
15   trying to remember that the other day.  I don't
16   know if we ever put it in writing.  I want to
17   give you a straight answer, I'm just trying to
18   remember for sure.  I want to say yes, at some
19   point we instituted a -- at some point I
20   believe we gave them 10 percent discounting
21   leeway.
22        Q.    Okay.  So --
23        A.    I want to go reference the old Word
24   document we built up for that.
25        Q.    And they think other situations, if
```

1          E. Trombley - Rough Draft

2   it was more than 10 percent, they would come to

3   you for approval; is that correct?

4        A.    So the thing was, I didn't have the

5   authority to approve something over 10 percent

6   either.  What we would do is the 10 percent

7   would come to me, we would discuss the deal,

8   and then basically package up the argument to

9   get the discount for leadership.  So we

10   would -- I would work with the salespeople to

11   where I think that proposed deal to the

12   leadership to get final approval.  I had

13   limited authority in that regard.

14        Q.    And for the deals that -- or the

15   discounts that were larger than 10 percent,

16   where he would meet with the -- or work with

17   the salesperson who wanted the larger discount,

18   you said, work it up.  What would you do to

19   work it up?

20        A.    Pretty simple.  I would say, okay.

21   Explain to me where we're at with the deal.

22   What are the benefits of bringing this customer

23   on at this price, you know, there's certain --

24   we don't want to sell it for free, but what are

25   the merits of having this company as a

Page 18

1                    E. Trombley - Rough Draft

2      customer.  That's it.  It was different for

3      every single deal.  Every company is different

4      you try to sell it.  It wasn't like a formal

5      process.

6           Q.    Sure.  And I apologize.  Your

7      picture is frozen on the screen.  So if it

8      seems like I'm talking over you some, it's

9      because I'm just going off the phone.  So I

10     apologize the couple of times I'm talking over

11     you.

12          A.    Is it unfroze now?

13          Q.    Yes.

14          A.    Sorry about that.

15          Q.    No, like I said, the Joyce of

16     virtual deposition.

17               And you were talking about for the

18     discounts that were larger than 10 percent, you

19     would work with the account manager you said

20     basically to develop the case for a larger

21     discount.  Is that a fair way of describing it?

22          A.    Yeah.  Make a business case for it.

23     And sometimes in the conversations, we would

24     bring Greg in the immediate -- not the

25     immediate, but initial steps because we knew we

```
 1              E. Trombley - Rough Draft
 2   had to take it to Leslie and Chris to get final
 3   approval.
 4              If we knew right off the gate it was
 5   going to be 20 percent, the three of us would
 6   meet in Greg's office and we would discuss it.
 7        Q.   And you had mentioned -- that brings
 8   me back to something you had mentioned.  Once
 9   you had the new position, did Greg continue to
10   be your new supervisor?
11        A.   He did, yes.
12        Q.   And was he your supervisor during
13   the entirety of your employment at Chmura?
14        A.   He was.
15        Q.   And how would you describe your
16   relationship working with Greg?
17        A.   Positive.
18        Q.   And while we're talking about it, at
19   some point your employment with Chmura ended;
20   is that correct?
21        A.   Correct.
22        Q.   And when did that happen?
23        A.   It was sometime during the month of
24   November 2018, I believe.
25        Q.   And did you voluntarily resign or
```

1            E. Trombley - Rough Draft

2    how did the termination come about?  How did

3    your employment end?

4        A.    I voluntarily resigned.

5        Q.    And did you resign for subsequent

6    employment?

7        A.    Yes.

8        Q.    And where was that?

9        A.    With Keyfactor or in independence

10   Ohio.

11       Q.    Key, KEY, key factor?

12       A.    Yeah.  One word, key factor.

13       Q.    And are you still employed with key

14   factor?

15       A.    Yes.

16       Q.    We were talking about Mr. Chmura.

17   So if it was a particularly large discount, you

18   would bring him in early?  Did I understand

19   that correct?

20       A.    That's correct.

21       Q.    And you, Mr. Chmura, and the

22   salesperson, would work on building the

23   business case.  Is that a correct understanding

24   of how it would work?

25       A.    I mean, yeah.  I don't want to make

1              E. Trombley - Rough Draft

2    like a blanket statement because it wasn't a

3    very formal process, but, yeah.  Any time there

4    was something over 10 percent, neither the

5    salesperson or I could approve that so we had

6    to talk about that with Greg or Leslie or

7    Chris.

8         Q.    And in your years of working with

9    Greg, did he listen to your recommendation and

10   take them into account?

11        A.    Yeah.  Greg is a great listener.

12        Q.    And we also do with same with the

13   account manager?

14        A.    He would hear them out if he had the

15   time to take a meeting.

16        Q.    Okay.

17        A.    It doesn't mean approval would

18   always happen right there in that meeting, but

19   he would always be willing to hear a business

20   case.

21        Q.    And as far as with Mr. Chmura -- I

22   mean, Mr. Lombardo, are you aware of any

23   situations in which Greg Chmura rejected the

24   discount that Mr. Lombardo requested?

25        A.    Yeah.  I mean, it must have happened

ROUGH DRAFT

1              E. Trombley - Rough Draft

2   at least ones.  I wish I could cite a specific

3   deal, but a while back.  Yeah.  It wasn't

4   always a go every time.  They've gotta make

5   money.

6        Q.   But normally, he would work with you

7   and Mr. Lombardo to try to get the discount

8   Mr. Lombardo requested.  Only if it made sense

9   for Chmura, the company.

10       Q.   And you mentioned being a liaison

11  between the sales team and leadership.  You

12  mentioned Mr. Chmura.  Did you have any

13  involvement with Leslie or Chris Chmura?

14       A.   Yeah.  We would speak occasionally.

15       Q.   Was most of your interaction with

16  Greg?

17       A.   Yes.

18       Q.   And when your position changed, did

19  your location within the building that you were

20  located, did that change?

21       A.   Yes.  I had moved to the third

22  level.

23       Q.   Okay.  So just so I have it clear,

24  when you started as a data analyst, you were on

25  the second level, then you moved down to the

```
1              E. Trombley - Rough Draft
2    basement level for a period of time.  And when
3    you got the new position, you moved to the
4    third level; is that correct?
5         A.    Correct.
6         Q.    And did you work from the office
7    most days?
8         A.    Yes.
9         Q.    Did you travel much for your job?
10        A.    Not often.
11        Q.    And I assume you didn't work from
12   home regularly?
13        A.    Rarely ever.
14        Q.    Once you had the new position, so
15   the sales coordinator, data analyst position,
16   what was your interaction with the account
17   managers?  Were you interacting with them on a
18   daily basis, weekly basis?  What amount would
19   you interact with them?
20        A.    Daily basis.
21        Q.    And I apologize, if you'll bear with
22   me, it looks like I've been knocked off the
23   screen again.
24              (Off-the-record discussion held.)
25
```

1              E. Trombley - Rough Draft

2    BY MR. MICHALIK:

3         Q.   Did you have a regular schedule when

4    you had the sales coordinator position?

5         A.   By regularly scheduled, you mean,

6    the hours that I worked every day?

7         Q.   Yes, sir.

8         A.   Yes.  I usually got in some time

9    between 8:30 a.m., 845, this then I would work

10   at the office until about anywhere between

11   5:45 p.m., 7:00 p.m. which varied a little bit,

12   but it was mostly that kind of range.

13        Q.   Okay.  And were you frequently the

14   last person at the office?

15        A.   It was a mix.  Some days yes, some

16   days no.

17        Q.   If you were the last person, would

18   you set the alarm on your way out?

19        A.   Yes.

20        Q.   Okay.  And specifically with regard

21   to Mr. Lombardo, did you interact with

22   Mr. Lombardo regularly?

23        A.   Yes.

24        Q.   And once you had the sales

25   coordinator position, what was your observation

1              E. Trombley - Rough Draft

2    of, first of all, how frequently he was in the

3    office?

4        A.    He was always there before me in the

5    morning.  But I'm not sure what time he got in.

6    And at the end of the day, either -- a lot of

7    times either I would be one of the last people

8    leaving the office or he would be one of the

9    last few people leaving the office.  It was a

10   mix.

11             So it seemed like he was typically

12   there sometime between before 8:30 and 5:30,

13   6:30, 7:00.  So, yeah, eight, nine, 10 hours a

14   day.

15       Q.    Okay.  And did you have lunch with

16   Mr. Lombardo on a regular basis?

17       A.    No.  I haven't been one for lunches.

18       Q.    Did you observe if Mr. Lombardo went

19   to lunch?

20       A.    He wasn't one for lunches either,

21   only occasionally.

22       Q.    And where -- once you moved up to

23   the third floor -- or the top floor, is that

24   the floor Mr. Lombardo was on?

25       A.    Yes.  He was in the third level.

1              E. Trombley - Rough Draft

2        Q.     And did you have an office or a

3   cubicle?  What location did you have?

4        A.     I had an office.

5        Q.     And where was your office in

6   comparison to where Mr. Lombardo sat?

7        A.     It was -- I'm trying to describe it.

8   It was pretty far away actually.  It was on the

9   opposite end of the third floor, closer to

10  where John Chmura and Greg Chmura sat.

11       Q.     Okay.  And you mentioned when

12  Mr. Lombardo spoke to you about whether you

13  would be willing to sit for a deposition, he

14  referenced exempt/nonexempt.

15             While you were employed at Chmura,

16  did Mr. Lombardo ever speak to you about

17  overtime?

18       A.     No.

19       Q.     And I wanted to talk some more just

20  about your -- your position when you were the

21  sales coordinator.  You were dealing with

22  discounts when that would come up.  You've

23  already testified about that.  What were some

24  of the other things that would come up that

25  would require your involvement?

1            E. Trombley - Rough Draft

2        A.    Things that related to our customer

3    relationship management system.  We used Sales

4    Force.  A big part of my job was making that

5    system fit process better, optimizing it, and

6    having it produce data for analysis.  And that

7    would be given to leadership to make decisions.

8        Q.    So that had a data analytics expect

9    to it, correct?

10       A.    Yes.

11       Q.    And would you also do things -- were

12   you involved in running maybe specials and

13   sending out enhanced discounts to certain

14   customers if they attended certain events or

15   things like that?

16       A.    Enhanced discounts -- what do you

17   mean by "enhanced discounts"?

18       Q.    Are there situations that you recall

19   where the company decided to give either

20   certain prospects or certain conducts either a

21   20 percent discount on particular software or

22   attending certain conferences?

23       A.    I don't specifically recall the

24   program, but I did help run the MailChimp

25   account which we sent mass emails out of.  So I

```
 1              E. Trombley - Rough Draft
 2    may have helped with one of the emails that
 3    went out.
 4        Q.    Okay.  And could you spell that just
 5    so I get that correct?
 6        A.    Sure.  M-a-i-l-C-h-i-m-p.
 7        Q.    Gotcha.
 8              And would you have any involvement
 9    on licensing agreements or anything of that
10    sort?
11        A.    Yeah.  I'm trying to remember what
12    the process was.  I would help take the
13    information from a fully executed license
14    agreement and then document it in sales force
15    so we can track renewals.  If -- I remember I
16    would often be the liaison between sales and
17    legal if the customer needed to redline any
18    documents.  So occasionally I would have to
19    project manager a little bit, make sure that
20    sales and legal can work together, get the
21    redlines figured out.  There was often version
22    control issues, which I'm sure you deal with on
23    the daily.
24        Q.    I thankfully do not do that type of
25    law?
```

1             E. Trombley - Rough Draft

2        A.    Yeah.  It's agonizing.

3        Q.    When you say between sales and

4    legal, would that be the account manager and

5    whoever you guys were using as outside counsel?

6        A.    Yeah.  So I guess legal is probably

7    the wrong word.  We didn't have in-house

8    counsel at the time, but Sharon Simmons in

9    Richmond would help with like licensing

10   agreement reviews.  I know Leslie would help

11   from time to time as well.  So we kind of had

12   like a pseudo legal time, but not lawyers.

13       Q.    And would that be situations where

14   the salesperson may want something particular

15   in a license agreement and it was whether

16   Sharon Simmons or Leslie would agree to that?

17       A.    Usually it wasn't the salesperson

18   wanting anything in there.  It would be the

19   prospect or the customer requesting something

20   in there.

21       Q.    And in your position, would you be

22   involved in identifying new markets or groups

23   of prospects for the sales team to focus their

24   attention on?

25       A.    Sure.

1          E. Trombley - Rough Draft

2      Q.    And in doing that, did you work with

3  the account managers?

4      A.    Sure.

5      Q.    And specifically with regard to

6  Mr. Lombardo, in your opinion, was he a good

7  sales -- or account manager/salesperson?

8      A.    I thought he was a great account

9  manager.

10     Q.    And did you believe he had good

11  instincts for the job?

12     A.    I think so.  He also had quite a bit

13  of experience as well.  That helped.

14     Q.    And would you value the

15  recommendations he had on the areas to focus on

16  as far as new markets or new areas?

17     A.    They were certainly worth listening

18  to.

19     Q.    And would you seek out Mr. Lombardo

20  and get his opinion on matters like that?

21     A.    Sometimes, you know, but you're

22  gathering ideas from everyone in the company,

23  right?

24     Q.    And were there certain segments in

25  which Mr. Lombardo had a particular expertise

1              E. Trombley - Rough Draft

2     within the company?

3          A.    He was pretty well versed with

4     economic development, workforce development as

5     well.

6          Q.    Would he be the -- okay.

7                How about the education realm?  Was

8     that an area he wanted to move into?

9          A.    It wasn't a big focus for him, at

10    least while I was working with him.

11         Q.    Do you recall, and I don't know if

12    this took place while you were there, but a

13    revamping of concourse?

14         A.    Hmm, a revamping.  When I started in

15    the sales coordinator role, it had already

16    existed as a tool, but I don't recall a lot

17    of -- I don't recall any major modifications

18    being made to it during my time as a sales

19    coordinator.

20         Q.    And when you were -- bear with me

21    for a second.

22         A.    Yep.

23         Q.    In your position did you work with

24    the account managers or receive their

25    suggestions on software features that they

```
1              E. Trombley - Rough Draft
2    thought might improve sales?
3         A.   If they had a feature request, we
4    had that process where they would pass it to
5    the product team.
6         Q.   Okay.  That's one of the ones you
7    were talking about earlier where, after a short
8    time, they didn't go through you, they went
9    directly to the product team?
10        A.   Correct.
11        Q.   Okay.  At some point do you remember
12   Chmura revamping its sales templates?
13        A.   Sales templates.  Could you be more
14   specific?
15        Q.   Yes.  Bear with me.  And it may
16   be -- Christine, I'm going to introduce a
17   document.  We may want to take a quick
18   five-minute break just so I can make sure I've
19   got the system ready to go to introduce the
20   document, if that's okay.
21             MS. COOPER:  That's fine by me.
22        We'll take five.
23             MR. MICHALIK:  Okay.
24             (Recess taken from 2:45 p.m. to 2:53
25             p.m.)
```

```
 1              E. Trombley - Rough Draft

 2   BY MR. MICHALIK:

 3       Q.    Mr. Trombley, you should have

 4   visible on your screen and if you're going by

 5   your computer, you should have it also in your

 6   exhibit box, a document that's been marked as

 7   Exhibit A.  Can you see that?

 8       A.    I can see it, yes.

 9       Q.    And if you could take a moment just

10   read -- it's a multi-page exhibit, and just

11   read through it.

12       A.    Okay.

13       Q.    And let me know when you've done so.

14              (Email chain, "FW: Please Review re:

15              Subscription Agreements," Bates

16              Number CHMURA0136714, marked as

17              Exhibit A.)

18   BY MR. MICHALIK:

19       Q.    And do you recognize this document?

20       A.    I don't recall this particular email

21   thread.  Let's see if I can jog my memory by

22   reading it.

23       A.    Okay.  I've read it.

24       Q.    Does that refresh your recollection

25   at all?
```

```
1              E. Trombley - Rough Draft
2         A.    I mean, vaguely.  I don't remember
3    what came out of this or what happened next.
4         Q.    Was -- to your recollection, was
5    Chmura revamping some sales templates?
6         A.    The subscription agreements, the
7    language we had in them?
8         Q.    Yes.  I'm sorry.  The subscription.
9    agreements.
10        A.    I don't remember any big changes,
11   especially around this time period, around
12   December.  I would have been on the job -- in
13   that role for a few months at that time.  I
14   don't recall any significant changes to it.
15        Q.    But you would agree you were copied
16   on this email chain?
17        A.    Yeah.
18        Q.    And there's Austen referenced,
19   Austen Steele.  Who is Austen Steele?
20        A.    He is one of the account managers
21   that worked out of the Richmond office.
22        Q.    And would Greg or others consult
23   with Mr. Steele and Mr. Lombardo when making
24   changes like this?
25        A.    When making changes to the
```

1          E. Trombley - Rough Draft

2   subscription agreement?  Not typically, no.

3      Q.    Making changes to when they were

4   considering making product changes, giving

5   input to the sales team?

6      A.    They would definitely ask Rick or

7   Austen what their customers had been requesting

8   or what their customers were saying were pain

9   points.

10          So Rick and Austen were kind of like

11   the voice of the customer.  So they were the

12   best way to get that information.

13      Q.    Now, you worked with Greg the

14   entirety of your Chmura employment.

15          Do you still keep in touch with

16   Mr. Chmura?

17      A.    I do not.  But I believe -- I don't

18   want to put words in your mouth.  I believe he

19   said he was a good supervisor to work for or

20   something to that effect.  Is that correct?

21      Q.    Correct.

22      A.    He was.

23      Q.    And you talked about interactions,

24   he would be there with you, and that you had

25   with the sales team.

```
 1              E. Trombley - Rough Draft

 2              In your observation, did he value

 3    the sales team's input?

 4         A.    To an extent, you know.  I mean, he

 5    would definitely hear them.  He would listen to

 6    their input.

 7         Q.    And we give weight to their

 8    recommendations?

 9         A.    Some weight.  But he would weigh

10    what he was hearing from the sales and the

11    customers.  He would weigh what he was hearing

12    from the IT and the tech side, saying they

13    could build.  He was weighing everyone's input

14    to make a decision.

15         Q.    And are you personal friends with

16    Mr. Lombardo?

17         A.    Yes.

18         Q.    And do you socialize outside of

19    work?  In other words, do you socialize

20    currently with Mr. Lombardo?

21         A.    Yes.

22         Q.    How frequently do you guys see each

23    other on a personal level?

24         A.    Well, see each other, not often now,

25    but --
```

```
1              E. Trombley - Rough Draft

2       Q.    Let me -- pre-COVID-19, how

3  frequently would you see each other on a

4  personal level?

5       A.    We probably see each other in person

6  once every few months and then communicate over

7  text, I don't know, a couple times a month.

8       Q.    And have you communicated with

9  Mr. Lombardo about this case via text?

10      A.    I don't believe so.  It would only

11 be related to whether or not I would be able to

12 do the deposition.

13      Q.    And if I recall from one of the

14 earlier depositions, does Mr. Lombardo's wife

15 work at your current employer?

16      A.    She does.

17      Q.    And do you work with her at your

18 current employer?  Meaning, do you guys

19 interact at work?

20      A.    Yeah.  We interact.

21      Q.    And how frequently do you interact

22 with Ms. Lombardo?

23      A.    At least twice a week.

24      Q.    And have you discussed this case at

25 all with Ms. Lombardo?
```

```
 1                E. Trombley - Rough Draft

 2       A.    The only thing we discussed is when

 3  the deposition would occur.  That's it.

 4       Q.    Okay.  If I can have five more

 5  minutes, this may be a short deposition on my

 6  part.  So if you'll bear with me.

 7                MS. COOPER:  Okay.

 8                (Recess taken from 3:01 p.m. to 3:11

 9                p.m.)

10  BY MR. MICHALIK:

11       Q.    Mr. Trombley have you spoken with

12  Ms. Cooper, Mr. Lombardo's attorney.

13       A.    I have not.

14                MR. MICHALIK:  I don't have any

15                further questions, subject to whatever you

16                may ask him, Christine.

17                MS. COOPER:  I just have a few

18                questions.

19                Going back to the 10 percent

20                discount that was referenced earlier, did

21                Mr. Lombardo ask you before giving a

22                10 percent?

23                THE WITNESS:  You mean like if he

24                was within the bounds of the 10 percent?

25
```

1           E. Trombley - Rough Draft

2    BY MR. MICHALIK:

3        Q.    Yeah.

4        A.    I really don't ask if he had

5    approval to do it.  I'm confused by the

6    question.

7        Q.    Let me rephrase my question.

8             If Mr. Lombardo was going to give

9    any discount to a potential customer, would he

10   first seek your approval when you were his

11   manager?

12       A.    Hmm.  That's a little difficult to

13   answer because I don't remember when the

14   10 percent leeway was put in place.  Once the

15   10 percent leeway was put in place, he no

16   longer had to ask for approval since it was

17   built into the discounting model internally.

18   But if that leeway wasn't in place, yes, he

19   would come and ask me.  But I didn't have the

20   authority to approve either.  We would have to

21   take it up the chain to Greg.

22       Q.    Was that leeway on something called

23   a pricing matrix, to your recollection?

24       A.    Yeah.  It was like in a spreadsheet.

25       Q.    Were there instances in which a

1                  E. Trombley - Rough Draft

2     customer that had a subscription agreement

3     would want information outside of their

4     subscription agreement?

5          A.    Like data outside their subscription

6     agreement?  Yeah.  If that happened, we would

7     try to upsell them, of course, for more data.

8          Q.    Prior to giving a customer any data

9     outside of your subscription agreement, if it

10    wasn't part of an upsell, would Mr. Lombardo

11    seek approval from you as his manager?

12         A.    Yes.

13         Q.    And you referenced correct Chmura

14    quite a bit throughout your deposition.  Did

15    you consider him the primary decision maker for

16    the sales team?

17         A.    I think, no, because it was split

18    between Greg and Leslie.

19         Q.    Okay.

20         A.    Like Greg, you know, made quite a

21    few decisions, but there were some we had to

22    get Leslie's approval as well.  I don't want to

23    say primary, but it wasn't the majority of the

24    decisions.

25         Q.    But it was Mr. Chmura and

1              E. Trombley - Rough Draft

2    Ms. Peterson, correct?

3         A.    Correct.

4              MS. COOPER:  That's all I have.

5              THE COURT REPORTER:  I have standing

6         orders noted for both of you.  Did either

7         of you need to change anything from your

8         standing order?

9              MS. COOPER:  No.  I think that's

10        fine.

11             MR. MICHALIK:  Yes.  Standing order

12        the fine.  Thank you.

13             (The deposition was concluded at

14             3:16 p.m.)

15

16

17

18

19

20

21

22

23

24

25