# Exhibit 15

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                  RICHMOND DIVISION

4              ~~~~~~~~~~~~~~~~~~~~

5    CHMURA ECONOMICS & ANALYTICS, LLC

                 Plaintiff

6

            vs.              Case No.  3:19-CV-00813

7

8    RICHARD LOMBARDO

            Defendant

9

10             ~~~~~~~~~~~~~~~~~~~~

11

12            REMOTE VIDEO DEPOSITION OF:

13            JOHN L. CHMURA, VOL. I

14

15                 Taken on:

16                April 30, 2020

                  11:30 a.m.

17

18

                  Taken at:

19

20            Home of John Chmura

              3681 Braemar Drive

21         Broadview Heights, Ohio

22

23

24     Kelliann D. Linberg, RPR, Notary Public

25

Page 2

```
 1   APPEARANCES: (Via Videoconference)
 2   On behalf of the Plaintiff:
 3       Koehler Fitzgerald, LLC
         CHRISTINE M. COOPER, ESQ.
 4       1111 Superior Avenue E
         Ste 2500
 5       Cleveland, OH, 44114
         Ccooper@koehler.law
 6       216-539-9370.
 7
 8       Thomas J. Powell Law Office
         THOMAS J. POWELL, ESQ.
 9       3603 Chain Bridge Rd. Suite D
         Fairfax, VA, 22030
10       Tpowell@tjplaw.com
         703-293-9050.
11
12   On behalf of the Defendant:
13       McGuire Woods, LLP
         CHRISTOPHER M. MICHALIK, ESQ.
14       Gateway Plaza
         800 East Canal Street
15       Richmond, VA, 23219-3916
         Cmichalik@mcguirewoods.com
16       804-775-1000.
17
18       HEIDI SIEGMUND, ESQ.
         Gateway Plaza
19       800 East Canal Street
         Richmond, VA, 23219-3916
20       Hseigmund@mcguirewoods.com
21   ALSO PRESENT:
22       RICHARD LOMBARDO.
23       LESLIE PETERSON
24
25
```

1                    TRANSCRIPT INDEX

2

3    APPEARANCES.........................2

4    INDEX OF EXHIBITS...................4

5    STIPULATION.........................5

6

7    EXAMINATION OF JOHN L. CHMURA:

8    BY MS. COOPER.......................6

9

10

11   REPORTER'S CERTIFICATE..............82

12

13

14   EXHIBIT CUSTODY:   RETAINED BY COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                     INDEX OF EXHIBITS

2   Number                 Description              Marked

3   DEFENDANTS:

    Exhibit A       Copy of Notice of Deposition      12

4

    Exhibit Z       Copy of Excel Spreadsheet         20

5                   Titled Lombardo Combined Logs

                    with Parking Receipts

6

    Exhibit AA      Copy of Excel Spreadsheet         21

7                   Titled Lombardo Combined Logs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          Page 5

1              COURT REPORTER:  The attorneys

2     participating in this deposition acknowledge that I am

3     not physically present in the deposition room and that

4     I will be reporting this deposition remotely. They

5     further acknowledge that, in lieu of an oath

6     administered in person, the witness will verbally

7     declare his testimony in this matter is under penalty

8     of perjury. The parties and their counsel consent to

9     this arrangement and waive any objections to this

10    manner of reporting.

11             Please indicate your agreement by stating

12    your name, firm name, party represented and your

13    agreement on the record.

14             MS. COOPER:  My name is Christine Cooper.

15    I represent Richard Lombardo and we agree to taking the

16    deposition in this manner.

17             MR. MICHALIK:  I am Chris Michalik.  We

18    represent Chmura and we agree to the stipulation.

19             MR. POWELL:  And my name is Tom Powell, I

20    am co-counsel with Christine Cooper representing

21    Mr. Lombardo, and I agree.

22             COURT REPORTER:  Will the witness kindly

23    present his government-issued identification by holding

24    it up to the camera for verification?

25             JOHN L. CHMURA:  (Indicating).

                                                    Page 6

1                    -   -   -   -   -

2              JOHN L. CHMURA, of lawful age, called for

3    examination, as provided by the Ohio Rules of Civil

4    Procedure, being by me first duly sworn, as hereinafter

5    certified, deposed and said as follows:

6                    EXAMINATION OF JOHN L. CHMURA

7    BY MS. COOPER:

8         Q.    Good morning, Mr. Chmura.  My name is

9    Christine Cooper and I represent Richard Lombardo in

10   the action between Chmura Economics & Analytics, LLC

11   and Mr. Lombardo.  Thank you for joining us today.  I

12   wanted to let you know Mr. Lombardo is actually present

13   in the room with you with me.  He is not on camera

14   because the camera angle is small, but he is here.

15              Can you please state your full name for the

16   record?

17        A.    John L. Chmura.

18        Q.    And where do you reside?

19        A.    ███████████████████████████████████

20   ████.

21        Q.    Have you ever deposed before?

22        A.    No.

23        Q.    I am going to give you some ground rules as

24   we start.  Please answer the question with full answers

25   and use yes or no as opposed to uh-huh or uh-uh so that

Page 7

1    the court reporter can get it down.  I'd ask that you

2    wait until I ask the whole question before you answer

3    so that we are not talking over one another, which is

4    hard enough when we are all in the room together, but

5    probably even harder when we are by video conference

6    like we are today.

7               If you don't understand a question, please

8    feel free to ask me to repeat it or rephrase it.  If

9    you need a break, just ask.  The only thing I ask is if

10   a question is pending, that you let me finish the

11   question and provide an answer before we take that

12   break.  Do you understand those ground rules?

13        A.    Yes, I understand.

14        Q.    This would make a little more sense if we

15   were in a room, but did you bring anything with you to

16   refer to in your deposition today?  Do you have

17   anything in front of you or on your desk?

18        A.    I mean, my computer.  I have, like, scrap

19   paper.

20        Q.    Okay.  Can you provide a little additional

21   background about yourself?  Can you tell me what -- do

22   you have a college degree?

23        A.    Yes.

24        Q.    And where did you go to school?

25        A.    College?

Page 8

1          Q.      College, yes.

2          A.      Bachelor's Degree from Kent State

3    University and a Master's Degree from Case.

4          Q.      What was your Bachelor's Degree in?

5          A.      Computer -- CIS, Computer Information

6    Systems.

7          Q.      And what was your Master's Degree?

8          A.      Computer Science.

9          Q.      Do you have any additional certifications?

10         A.      No.

11         Q.      How long -- are you currently employed by

12   Chmura?

13         A.      Yes, I am.

14         Q.      So when I refer to Chmura, I am referring

15   to Chmura Economics & Analytics, LLC.  Did I say that

16   correctly?

17         A.      Yes.

18         Q.      Prior to Chmura, where were you employed,

19   if anywhere?

20         A.      Prior to that, it was a company called, IOS

21   Inc.

22         Q.      And what did IOS, Inc. do?

23         A.      It was a software development company.

24         Q.      And what was your role there?

25         A.      I was -- essentially, a programmer.

Page 9

1      Q.    How long have you been with Chmura?

2      A.    I've been full-time with Chmura since 2005.

3      Q.    And did you go immediately from IOS, Inc.

4  to Chmura?

5      A.    Yes.

6      Q.    Did you work anywhere else before IOS,

7  Inc.?

8      A.    Not as -- not as a full-time job.

9      Q.    What is your role at Chmura?

10     A.    I'm the chief technology officer, CTO.

11     Q.    And how long have you been the CTO?

12     A.    I don't remember when we switched my title

13 to that exact definition or that exact title, but, I

14 mean, I have had the same role since 2005.

15     Q.    Now, do you understand that you are here

16 both to testify in your individual capacity as well as

17 a corporate representative?

18     A.    Yes.

19     Q.    I am going to start with your testimony

20 relating to your role as a corporate representative,

21 okay?

22     A.    Okay.

23     Q.    And so you are here to testify on behalf of

24 Chmura, correct?

25     A.    Correct.

Page 10

1      Q.    What is your -- we have your title, you are

2  the chief technology officer, correct?

3      A.    That's correct.

4      Q.    What is -- are you an owner of Chmura as

5  well?

6      A.    Yes.

7      Q.    Are you a member of Chmura?

8      A.    I think so.

9      Q.    Who are the other owners of Chmura?

10     A.    Chris Chmura, Leslie Peterson, Greg Chmura,

11  myself, Sharon Simmons and Xiaobing Shuai.

12     Q.    Could you spell that for me, if you can?

13     A.    I have to write it out.  Hang on.  I can't

14  spell in my head.  X-I-A-O-B-I-N-G.  Last name,

15  S-H-U-A-I.  I hope I got that right.  That's from

16  memory.

17     Q.    What is your ownership interest in Chmura?

18     A.    What do you mean by that?

19     Q.    How much of Chmura do you own?  What

20  percentage of Chmura do you own?

21     A.    I see.  It is about 5%.  Maybe just

22  slightly less than that.

23     Q.    When did you become an owner of Chmura?

24     A.    I'd have to look up the exact year.  It was

25  2006 or 2007.

Page 11

1      Q.    Prior to becoming an owner, you were an
2  employee; is that correct?
3      A.    Yes.
4      Q.    Now, you share the last name with the
5  company.  Are you related to any of the other owners of
6  the company?
7      A.    Yes, I am.
8      Q.    Who are you related to and what's the
9  relation?
10     A.    Chris Chmura is my aunt.  Greg Chmura is my
11  uncle.
12     Q.    And how did you get involved with the
13  business?
14     A.    Chris contacted me when she was starting
15  the company.  She needed some database work done.
16     Q.    When was the company started?
17     A.    She officially started it in '98.  It was
18  '99 that she reached out to me.
19     Q.    And were you actively involved in the
20  company from that point forward in some capacity?
21     A.    Not consistently.
22     Q.    When did you become consistently involved
23  with the company?
24     A.    2005.
25     Q.    Are you being paid for your testimony

Page 12

1   today?

2       A.    No.

3       Q.    I am going to show you what's been marked

4   as Defendant's Exhibit A.

5             Okay.  If I did that right, you should be

6   able to see an Exhibit A on your screen.  No?  Then I

7   did not do that right.

8                        -   -   -   -   -

9             (Thereupon, Deposition Exhibit A, Copy

10            of Notice of Deposition, was marked for

11            purposes of identification.)

12                        -   -   -   -   -

13            MR. POWELL:  We've got it now.

14      A.    Yep.

15      Q.    Okay.  One more button I had to push that I

16  missed.

17            MS. COOPER:  I apologize, before I get --

18  can we go off the record?

19                      -   -   -   -   -

20            (Discussion had off the record.)

21                      -   -   -   -   -

22            MS. COOPER:  Back on the record.

23  BY MS. COOPER:

24      Q.    Mr. Chmura, I am going to give you control

25  of the document to be able to scroll through it on your

Page 13

1  screen.

2          A.    Okay.

3          Q.    And let me know once you have had an

4  opportunity to look at it and I will ask you a few

5  questions.

6          A.    (Reviewing.)

7          Q.    Have you seen this document before?

8          A.    Let me scroll a little farther.  I don't

9  think so.  Let me read it, please.

10          Q.    Sure.  Absolutely.

11          A.    (Reviewing.)

12              MR. MICHALIK:  Christine, if it speeds

13  things up, we will agree that he has been designated as

14  the 30(b)6 representative for Item 23.

15              MS. COOPER:  That's great.  Thank you.

16          A.    Yeah, I have seen this part in a different

17  form, so go ahead.

18          Q.    So you are here to testify about Topic

19  Number 23 on this list today, correct?

20          A.    Correct.

21          Q.    How did you prepare for your deposition on

22  this topic?

23          A.    I read --

24              MR. MICHALIK:  I just want to object to the

25  extent the question asks for any discussions between

Page 14

1    the witness and counsel.  I assume that's not what you

2    were going for, but I want to make sure that that's

3    clear on the record.

4              MS. COOPER:  Not what I was going for.

5         Q.    Any preparation that you had outside of

6    discussions with your counsel.

7         A.    I reviewed the Excel sheet where the data

8    was -- where the computation was done.

9         Q.    What Excel sheet was that?

10        A.    Am I allowed to look at it to see the file

11   name?  On the my computer?

12             MR. MICHALIK:  No.  Ms. Cooper will provide

13   you any documents she wants you to review during the

14   deposition, and she will ask you questions on those

15   documents.

16             THE WITNESS:  Okay.

17        Q.    Are you aware whether the spreadsheet you

18   are referring to was produced in Discovery?

19        A.    I don't know the answer to that.

20        Q.    Can you describe the spreadsheet and what's

21   contained within the spreadsheet?

22        A.    Yes, it contained time stamps from

23   different activities like emails, our key fob system,

24   the security system and phone records.

25        Q.    Do you know who prepared that spreadsheet?

Page 15

1        A.    I did.

2        Q.    Did you look at anything other than the

3   spreadsheet in preparation for today?

4        A.    Outside of things I reviewed with my

5   attorney, is that what you are asking?

6        Q.    No, any documents that you reviewed for

7   your deposition. I don't want to know about the

8   conversation you had with your counsel, but what

9   documents did you review for your deposition?

10       A.    I mean, we reviewed a lot of documents.

11       Q.    Can you describe the categories of

12  documents or the documents themselves?

13       A.    Things related to this lawsuit and to

14  Rick's, you know -- I don't know, Rick's time with

15  Chmura Economics.

16       Q.    Can you give me any specific examples?

17       A.    Well, like this very document, like I said,

18  it was in a different form.

19       Q.    Other than this document, can you give me

20  any specific example?

21       A.    The offer letter that we sent him, for

22  example.

23       Q.    Anything else you can remember looking at?

24       A.    I looked at our non-compete agreement, I

25  forget the title of that document, but it is a

Page 16

1   non-compete.

2          Q.     Anything else?

3          A.     There were others.  I don't have a list on

4   the top of my head.

5          Q.     So the documents that you have listed here

6   are the ones you can remember reviewing; is that

7   correct?

8          A.     Correct.

9          Q.     Did you speak -- did you speak with anyone

10  other than counsel prior to today in preparation for

11  your deposition?

12         A.     In preparation for?  I guess so.  I mean,

13  we have had some -- you know, people were sending me --

14  internal people were sending me these documents.

15         Q.     And who were those internal people?

16         A.     That would be the leadership team, so the

17  owners I mentioned earlier, Chris, Leslie, Sharon,

18  Greg.

19         Q.     Did you speak with any of them about your

20  deposition outside of the --

21         A.     Yes.

22         Q.     Sorry let me clarify.  Outside the presence

23  of counsel, did you speak with any of them about your

24  deposition?

25         A.     Yes.

1       Q.    What was the substance -- who did you speak

2    with specifically?  We will start there.

3       A.    Chris and Leslie.

4       Q.    When you -- were they together when you

5    spoke with them or did you speak with them separately?

6       A.    They were -- I spoke to them together once.

7    I spoke to Chris by herself.

8       Q.    The conversation you had with them

9    together, what was the substance?

10      A.    Basically, just asking how my prep with the

11   attorney went.

12            MR. MICHALIK:  Again, I am going to object

13   to the extent there is any discussion with -- regarding

14   attorney-client communications.  So, John, to the

15   extent you discussed the attorney-client

16   communications, do not share that with counsel in this

17   deposition.

18      A.    Yeah.  That was mostly what we discussed.

19   The only other topic was just that, you know, me

20   expressing I never had been through this before and was

21   nervous.

22      Q.    What was the subject of your conversation

23   with, it was just Chris, Dr. Chmura, right, that you

24   spoke to alone?

25      A.    Correct.

Page 18

1      Q.    What was the --

2      A.    All of those conversations were similar.

3      Q.    Did you speak to Sharon -- and is it Leslie

4   Simmons?  Am I saying that right?

5      A.    Yes, Sharon Simmons.  I did speak to her,

6   again, regarding a question from the attorneys.

7      Q.    And what about with Greg Chmura?

8      A.    Same.

9      Q.    Going back to the spreadsheet that you

10  referenced, can you tell me from your memory what was

11  contained within that spreadsheet?

12     A.    Yes.  So like I mentioned earlier, it had

13  email.  It had time stamps from sent emails.  It had

14  time stamps from our key fob system, from our security

15  system and from our phone system.  And then there were

16  calculations that combined all of those.

17     Q.    And do you recall --

18           MS. COOPER:  Let me ask, Chris and Heidi,

19  outside of what was produced to us, which I think is

20  the document he is referring to, outside of what was

21  produced to us under Rule 408, I don't have the

22  spreadsheet, to my knowledge.  Were they produced in

23  Discovery as well?

24           MS. SIEGMUND:  It was produced.  We

25  produced two versions of it, actually.  I think that

1   was in our production on Monday.

2            MS. COOPER:  I am going to ask to take a

3   break to pull that out.  I did not see that in the

4   production.  As I noted earlier, that production was

5   excessively large and served on Monday.  So the only

6   copy of that that was easily accessible was under Rule

7   408, which I knew I could not use today, so, therefore,

8   I would like to take a break to find the spreadsheet

9   and continue the deposition and speak further with

10  Mr. Chmura about that.

11           MR. MICHALIK:  That's fine to take that

12  break.  I wish to say about the excessively large, as

13  you characterized it, excessively large production.

14  That was in response to, as I understand, I was not on

15  the call, but the call at the end of last week between

16  you and Ms. Siegmund and Mr. Satterwhite in which you

17  asked for all the emails.  And the rest of the

18  production was in our clients agreeing to produce all

19  emails.  So with that, I am fine with the break.

20           THE WITNESS:  I have a question before we

21  break.

22           MR. MICHALIK:  Mr. Chmura, we can talk

23  offline as far as that.  Now is not the time for

24  questions.  So I will speak to you offline and answer

25  any logistics questions you may have.

Page 20

```
 1              THE WITNESS:  Okay.

 2              MR. MICHALIK:  Should we keep -- just take

 3    a break and keep the line open?

 4              MS. COOPER:  Let me email you when to dial

 5    back in.  I don't know how long it is going to take me

 6    to find this.  Hopefully, not too long.

 7              MS. SIEGMUND:  Let me look for the Bates

 8    number, too, that should speed it up a little bit.

 9              MS. COOPER:  Well, then let's just keep

10    this open, but go off the record.

11                       -   -   -   -   -

12              (Discussion had off the record.)

13                       -   -   -   -   -

14    BY MS. COOPER:

15         Q.   I am going to show you what has been marked

16    Defendant's Exhibit Z.

17                       -   -   -   -   -

18              (Thereupon, Deposition Exhibit Z, Copy

19              of Excel Spreadsheet Titled Lombardo

20              Combined Logs with Parking Receipts,

21              was marked for purposes of

22              identification.)

23                       -   -   -   -   -

24         Q.   I am also going to give you control of this

25    document.  Actually, let me see if I can move this out
```

Page 21

1    of the way.  Okay.  So you should have control of the

2    document.

3         A.    I do.

4         Q.    Is this one of the spreadsheets you were

5    referring to a moment ago?

6         A.    Let me take a look.  No, this has

7    additional data that I don't recognize.

8         Q.    Did you prepare -- well, let me ask this,

9    did you prepare this spreadsheet?

10        A.    I don't think so.  Like I said, there is

11   stuff on here that I don't recognize.

12        Q.    I will come back to this one.  I am going

13   to show you one that's being marked Exhibit --

14   Defendant's Exhibit AA.

15                      -   -   -   -   -

16             (Thereupon, Deposition Exhibit AA, Copy

17             of Excel Spreadsheet Titled Lombardo

18             Combined Logs, was marked for purposes

19             of identification.)

20                      -   -   -   -   -

21        Q.    Do you recognize this spreadsheet?

22        A.    Yes.

23        Q.    And can you walk me through this

24   spreadsheet, each column of the spreadsheet, what they

25   are?

Page 22

1      A.     Okay.  Column A is the date.  Column B is

2    labeling the day of the week.  One is Sunday and 7 is

3    Saturday.  Column C and D are the time stamps of the

4    first and last email sent through Rick's email account

5    on that day.  Column E is the number of emails that

6    were sent.  Column F and G are, I think, first badge,

7    so that is the key fob system, the first entry and the

8    last entry for that day.

9           Column H is the number of badge entries for

10   that day.  I and J are from our phone system, the first

11   and last call that day.  K is the number of calls on

12   that day.  L and M -- Columns L and M are from the

13   security system, the first and last time the system was

14   armed on that day.  Column N is the number of times it

15   was armed on a given day.  Column O -- is it okay if I

16   look at the formulas here?

17      Q.     Yes.

18      A.     Okay.  Column O then combines all of those

19   previous entries into a, you know, a minimum and a

20   maximum for each day.  Q -- Column Q is just a total of

21   all of the E, H, and K, just totaling up some of the

22   log entries.  R -- then Column R is -- Q, 7 -- Column R

23   then is calculating the difference between P and O;

24   that is, you know, how many hours are in that time

25   range.

1              Column S is -- let's see, comp day.  I

2    think Column S I used to indicate if Rick had marked on

3    his calendar that it was a comp day after a conference

4    or what he called a comp day.  T was days on his

5    calendar that he had marked as being at a conference or

6    travel -- traveling.

7              Column U are days that were either marked

8    on his calendar as a vacation day or that were a

9    company holiday.  Column V then is a column used to

10   assign a minimum of eight hours to any date that met

11   certain criteria.  I'd have to go through this formula,

12   but it would be something like, you know, if it was not

13   a weekend, not a holiday, so, in other words, a

14   workday.

15             Column W is used to estimate time he spent

16   commuting.  Specifically if there was -- well, let me

17   go to X and then I'll come back to W.  So X combines

18   all of that into a number of hours and minutes worked

19   on a given day, bringing in all -- subtracting out the

20   commute time.  So going back to W, then, what's that

21   doing is if there was an activity like an email after

22   the security system was armed, then we know the

23   building was empty and Rick was doing that somewhere

24   else, I assumed from home.

25             And so this deducted 45 minutes from the

Page 24

1    total for that given day.  And then Y is an average.  Z

2    is the numbers I took off of -- yeah, I took these off

3    of an earlier document.  I don't remember if it was the

4    Complaint or -- the original Complaint or some document

5    that I had seen that had some hours from Rick.

6         Q.    And did you create this spreadsheet, this

7    specific spreadsheet?

8         A.    Yes.

9         Q.    And is it a true and accurate -- is it a

10   true and accurate spreadsheet, or Excel spreadsheet?

11        A.    What does that mean?

12        Q.    Well, let me take a step back.  What did

13   you review, specifically, to create this spreadsheet?

14        A.    I reviewed the email sent dates -- the sent

15   emails, their dates and times, the key fob log entries,

16   the phone system log entries, the security system

17   entries and then the calendar.

18        Q.    Can you explain to us the difference

19   between key fob system and a security system?

20        A.    Yes.  Our key fob, we each get a fob, a

21   badge that you have to scan to get into the building,

22   and so it generates a log entry every time you scan

23   that badge.  A security system is just an ADT system

24   that's armed or disarmed.

25        Q.    With the key fob, you have to swipe out as

Page 25

1   well?

2        A.    No, you don't.  Sorry.  No, you do not.

3        Q.    And how was the ADT system set?

4        A.    It has changed over time, but most recently

5   it disarms itself in the morning and then the last

6   employee out of the building would then arm it, with

7   the exception of when our cleaning crew came, they had

8   a code to both disarm and arm it.

9        Q.    What time is the system disarmed in the

10  morning?

11       A.    I would have to go back and review that,

12  but it was either 5 or 6:00 a.m.

13       Q.    And from these calculations, what did you

14  conclude?

15       A.    I mean, I wasn't looking specifically for a

16  conclusion.  It was -- I was combining this at the

17  request of our attorneys.  However, I did --

18            MR. MICHALIK:  Again, I object -- object,

19  just to the extent, don't share any communications you

20  may have had between counsel and yourself regarding

21  this litigation.  You can continue and testify

22  regarding the document.

23            THE WITNESS:  Okay.

24       A.    Well, then any conclusions I made were

25  discussed with the attorneys.

Page 26

1      Q.    Do you believe that this spreadsheet

2   represents all of the time Mr. Lombardo worked while at

3   Chmura?

4            MR. MICHALIK:  Object to the form.  You can

5   answer the question.

6      A.    I don't know.

7      Q.    One of the -- or two of the columns, Column

8   I and Column J are first call and last call.  Do you

9   see that?

10     A.    I see it.

11     Q.    Can you explain how you pulled that

12  information?

13     A.    Yes, our phone system keeps records of all

14  of the calls, and so I exported the data from our phone

15  system.

16     Q.    Would Mr. Lombardo ever make calls on his

17  cell phone, to your knowledge?

18     A.    I'm sure he did.

19     Q.    Would his cell phone calls be included in

20  that first call column?

21     A.    No, I don't have access to his cell phone

22  records.

23     Q.    So that would be the same for the last call

24  column, correct?

25     A.    That's correct.

1    Q.   With respect to the key fob log in, or

2  scanning in, is there any way around the scanning in to

3  enter the building?

4    A.   Yes, you can follow another employee in.

5    Q.   Would there ever be times that that door

6  would be unlocked and you would not need to scan in?

7    A.   No.  The door is locked at all times.  It

8  is not set to automatically unlock.

9    Q.   You testified that if -- that you would

10 subtract 45 minutes if there was a call at home after

11 security was armed -- or an email at home if after

12 security was armed; is that correct?

13   A.   Can I review that column again?

14   Q.   Absolutely.  Absolutely.

15   A.   (Reviewing.)

16        Yes, correct.

17   Q.   How did you determine the 45 minutes?

18   A.   I knew that Rick lived out east, and just

19 through casual conversation, that I thought his commute

20 was about 45 minutes.

21   Q.   In determining this calculation, did you

22 look at any of the Salesforce information?

23   A.   No, I did not.

24   Q.   Why did you not look at that information?

25   A.   I personally don't have access to

Page 28

1   Salesforce, so I just did not bring it into this

2   analysis.

3        Q.   Did Mr. Lombardo -- are you aware whether

4   Mr. Lombardo had access to Salesforce outside of the

5   office?

6        A.   Yes, he did have access to Salesforce.

7        Q.   Would you agree with me that this

8   spreadsheet does not include all of the time

9   Mr. Lombardo worked?

10            MR. MICHALIK:   Objection to the form of the

11   question.   You can answer.

12        A.   I wouldn't really know that.

13        Q.   And why would you not know that?

14        A.   Well --

15            MR. MICHALIK:   Same objection.   You can

16   answer.

17        A.   The data I have is regarding, you know,

18   work at the office and what we believe to be, you know,

19   at home or, you know, emails sent at home.   If he is

20   claiming some other work, I don't have knowledge or

21   records of it.

22        Q.   Are you aware of any time Mr. Lombardo

23   would make phone calls when he was not in the office?

24        A.   I can't recall a specific, but I'm sure

25   that he made calls from conferences.   I am trying to

Page 29

```
 1  think if he and I ever spoke while he was at a

 2  conference.  I mean, after -- after hours, at home?  I

 3  don't -- like I said, I don't have access to his cell

 4  phone, so I can't say for sure.

 5      Q.    Did Mr. Lombardo ever call you from outside

 6  of the office?

 7      A.    Yes, I think so.

 8      Q.    Do you remember any specific times he would

 9  have -- he would have called you?  Do you remember any

10  specific instances?

11      A.    I don't remember --

12            MR. MICHALIK:  I'm sorry, Christine.  You

13  broke up on that.  Would you mind just repeating the

14  last question?

15            MS. COOPER:  Sure.

16      Q.    Do you recall any specific instances in

17  which Mr. Lombardo called you when he was not present

18  in the office?

19      A.    I can't recall a specific instance.

20      Q.    But you believe that he did -- or let me

21  rephrase that.

22            You don't recall any specific instance, but

23  you do recall he contacted you when he was outside of

24  the office for work purposes?

25      A.    Yes, I think he did.
```

Page 30

1      Q.   So, in essence, this spreadsheet is a

2  compilation of data you culled through or went through

3  and put on this spreadsheet; is that correct?

4           MR. MICHALIK:  Object to the form.  You can

5  answer.

6      A.   Yes, that's correct.

7      Q.   And who directed you to put that

8  information on -- into the spreadsheet?

9           MR. MICHALIK:  Object to the form to the

10  extent it seeks communications between counsel and

11  Mr. Chmura.

12      Q.   Did Ms. Peterson direct you to create this

13  spreadsheet?

14      A.   No.

15      Q.   Did Dr. Chmura, Christine Chmura, direct

16  you to create this spreadsheet?

17      A.   No.

18      Q.   Did Greg Chmura direct you to create this

19  spreadsheet?

20      A.   No.

21      Q.   Did you have a conversation with anyone --

22  sorry.  Did you have a conversation with anyone at

23  Chmura about this spreadsheet?

24      A.   Yes.

25      Q.   Who did you speak to?

1      A.    Chris Chmura, Leslie Peterson, Greg Chmura,

2   Sharon Simmons.  I don't recall if I spoke with

3   Xiaobing or not.

4      Q.    With respect to Chris Chmura, what was the

5   conversation you had with her about this spreadsheet?

6      A.    Well, it was -- I mean, it was all related

7   to the request from our attorneys.

8            MR. MICHALIK:  Okay.  Again, I am going to

9   say, just so the record is clear, instruct you not to

10  share any communications for counsel from your outside

11  counsel regarding this litigation.

12     Q.    How about your conversation with

13  Ms. Peterson about this spreadsheet?  What were the

14  substance of those conversations?

15     A.    The same thing.

16     Q.    And with Greg Chmura?

17     A.    Same with Greg.

18     Q.    How about with Ms. Simmons?

19     A.    Same with Sharon Simmons.

20     Q.    Can you describe for me just a general

21  overview of what the spreadsheet depicts?

22     A.    It combines the available data that I had,

23  the start and end time for each workday and then

24  calculate the number of hours worked on a given day.

25     Q.    Is there data you believe is missing from

Page 32

1   this spreadsheet to capture all of the hours

2   Mr. Lombardo worked?

3              MR. MICHALIK:  Object to the form of the

4   question.  You can answer.

5        A.    Cell phone records.

6        Q.    Would there have been -- or let me rephrase

7   that.  Did Chmura lack Mr. Lombardo's login through his

8   computer?

9        A.    We don't have logs of it.  A login is

10  required.  We don't have a log of it.

11       Q.    Would -- for a complete spreadsheet, would

12  you agree with me that the Salesforce logins and log

13  outs would be required as well?

14             MR. MICHALIK:  Object to the form of the

15  question.  You may answer.

16       A.    I would have to do more analysis on those

17  logs before I can really answer that question.

18       Q.    Did Mr. Lombardo have a login -- we haven't

19  talked much about this yet, but a login to a program

20  called, JobsEQ?

21       A.    Yes, he did.

22       Q.    And can you explain a little bit what

23  JobsEQ is for the record?

24       A.    Yes.  JobsEQ is a software product we

25  create and sell at Chmura Economics.

1      Q.     And was that the product -- let me -- so

2    Mr. Lombardo had a login to that product, correct?

3      A.     Yes, correct.

4      Q.     For what purpose would he log in to JobsEQ?

5      A.     To give demos and, you know, I suppose you

6    can also log in to help his customers pull data.

7      Q.     And is that login data -- is that login

8    information, logging in to JobsEQ, factored into this

9    spreadsheet which is Exhibit AA?

10      A.     It is not.

11      Q.     Are there any other electronic log ins or

12    log offs that Mr. Lombardo would have completed that we

13    haven't already covered or discussed?

14      A.     Electronic?

15      Q.     Yes.

16      A.     I don't think so.

17      Q.     Does Chmura track JobsEQ log ins?

18      A.     Yes, we do.

19      Q.     And does it track log offs as well?

20      A.     Not directly.  We -- no, not directly.

21      Q.     Does your spreadsheet, Exhibit AA, does

22    this include time that he was not doing something

23    electronic?

24      A.     What do you -- can you clarify what that

25    means?

Page 34

1          MR. MICHALIK:  Object to the form of the

2     question.

3          Q.    For example, if Mr. Lombardo was preparing

4     an agreement -- let me take a step back.

5          Was Mr. Lombardo preparing the agreements

6     related to the sales of JobsEQ?

7          A.    So I was not involved in the day-to-day of

8     sales, but I assume that he did.

9          Q.    Would that work be factored into the

10    spreadsheet?

11         MR. MICHALIK:  Object to the form of the

12    question.  You may answer.

13         A.    Insofar it happened between the first and

14    last entries we have here, then, yes.

15         Q.    And how would that be captured, or in what

16    column would that be captured?

17         A.    It would not be captured in a column.

18         Q.    How would it then be captured?

19         A.    I don't think I understand the way you are

20    asking.

21         Q.    Let me ask a different question.

22         Was any of the time Mr. Lombardo spent at

23    conferences included in that spreadsheet?

24         A.    No.  So if he sent emails while he was

25    there, that was captured.  And if I can review the

Page 35

1  spreadsheet real quick.  (Reviewing.)

2              No, unless there was a call or an email, it

3  would not be captured here.  That is assuming it was a

4  weekend.  If it were a weekday, then we are

5  automatically allocating eight hours.

6      Q.    And what's the basis for allocating eight

7  hours?

8      A.    That's our standard, you know, in our -- I

9  don't know the official title of the document, but our,

10 like, employee handbook.  It is eight hours plus an

11 hour lunch.

12     Q.    What if Mr. Lombardo worked 10 hours at a

13 conference, how would that time be calculated?

14     A.    I wouldn't know based on this data unless

15 he sent emails or calls during that time.

16     Q.    Was Mr. Lombardo's travel time to or from

17 conferences calculated into this spreadsheet?

18     A.    Not specifically, no.

19     Q.    So is it fair to say that this spreadsheet

20 does not include all of the time Mr. Lombardo worked?

21              MR. MICHALIK:  Object to the form of the

22 question.

23     A.    So I am confused.  You are asking if it

24 included -- can you repeat the question?

25     Q.    Yes, I can repeat the question.  Is it fair

Page 36

```
 1   to say that this spreadsheet does not include all of

 2   the time Mr. Lombardo spent working for Chmura?

 3                MR. MICHALIK:  Object to the form of the

 4   question.  You may answer.

 5        A.    I think that's fair to say.  It includes

 6   all of the information that I have data for.

 7        Q.    And that was data that was requested of

 8   you, correct?

 9                MR. MICHALIK:  Object to the form of the

10   question.

11        A.    That's correct.

12                MS. COOPER:  Can we take a short break for

13   a moment?  I think I am done with the 30(b)6, but I

14   want to take another look at this.

15                MR. MICHALIK:  Five minutes?

16                MS. COOPER:  Five minutes is fine.  Great.

17                Thank you, guys.

18                        -   -   -   -   -

19                (Short break off the record.)

20                        -   -   -   -   -

21                MS. COOPER:  Back on the record.

22   BY MS. COOPER:

23        Q.    In creating this spreadsheet, Mr. Chmura,

24   did you create any hidden column or hidden rows within

25   here?
```

Page 37

1      A.    I don't think so.  Can I review it real

2  quick?

3      Q.    Of course.  Let me give you control.

4      A.    (Reviewing.)

5            No, I don't think I have any hidden

6  columns.

7      Q.    No hidden rows either?

8      A.    I don't think so.  If I did, it probably

9  wasn't intentional.

10      Q.    Okay.  Did -- and I will come back to the

11  spreadsheet in a second.  Did Chmura use any time --

12  time clock system for their employees to punch in and

13  punch out?

14      A.    No.

15      Q.    I just want to sort of slowly go through

16  the columns so I fully understand what you did, what

17  you looked at in creating this.  So if we could start

18  with Column A, just -- that's the date that the

19  information on the spreadsheet pertains to; is that

20  correct?

21      A.    Correct.

22      Q.    And you explained the day of the week, each

23  day had a number.  I believe you said -- tell me again

24  what day Number 1 was.

25      A.    1 would be Sunday, 7 would be Saturday.

Page 38

1      Q.    If you look at the first email column here,
2  how did you pull that information?
3      A.    So I looked at the emails in his sent items
4  and took the sent date or time stamp off those emails.
5      Q.    So that was solely based on the sent
6  emails; is that correct?
7      A.    Correct.
8      Q.    Did you look at any emails that he read --
9  opened and read?
10     A.    I did not.
11     Q.    And on the last email column, Column E of
12  Exhibit AA, what did you look at to populate that
13  column?
14     A.    Same thing.
15     Q.    So you looked at emails sent by
16  Mr. Lombardo on that given day to populate that column?
17     A.    Correct.
18     Q.    And the email -- let me take a step back.
19  So you did not look at any emails he would have opened
20  and read; is that correct?
21     A.    That's correct.
22     Q.    What was your calculation for the email
23  count number?
24     A.    That's the number of -- I think it was the
25  number of distinct entries I had for a given day; that

Page 39

1    is, time stamps.

2         Q.    Can you explain that at bit for me?  I am

3    not as tech savvy.  So what do you mean by time stamps?

4         A.    The sent date of each email.  I am calling

5    them time stamps.

6         Q.    I'm sorry.  Let me let you finish.  I broke

7    my own rule.  I'm sorry.  So let me reask the question.

8              What emails are counted in the email count

9    column, Column E on Exhibit AA?

10        A.    Sent emails.

11        Q.    Would those include reply emails?

12        A.    Yes.

13        Q.    As well as emails that Mr. Lombardo would

14   have drafted for the first time to someone; is that

15   correct?

16        A.    That's correct.

17        Q.    And what email account were you looking at

18   for that purpose?

19        A.    His account, the

20   Rick.Lombardo@Chmuraecon.com.

21        Q.    Did Mr. Lombardo use any other email

22   addresses for work-related communications, to your

23   knowledge?

24        A.    I don't know.

25        Q.    To access his emails on his computer, would

Page 40

1    he have had to log in?

2          A.    Ultimately, some type of authentication

3    would have been required, yes.

4          Q.    Did you look at any authentication records

5    to determine any time Mr. Lombardo was working?

6          A.    I did not because, for example, your phone

7    when you set up the account, would do some

8    authentication.  That wouldn't give me as accurate as a

9    time stamp of when the individual's emails were sent.

10         Q.    Do you know on what devices Mr. Lombardo

11   had access to email?

12         A.    I believe he had access through his

13   workstation at the office.  He could have used any

14   workstation at the office, including the conference

15   room computer.  He also had it set up on his -- he had

16   email set up on his cell phone.

17         Q.    What email provider does Chmura use?

18         A.    Microsoft Office 365.

19         Q.    Would Mr. Lombardo have had access to his

20   email as well through a browser?

21         A.    Yes.

22         Q.    And did Microsoft Office 365 track all of

23   the user's usage of the Office 365 app?

24         A.    I am not sure actually.

25         Q.    Does Chmura use Office 365 for anything

Page 41

1    other than email?

2         A.    Yes.  We license our office applications

3    through that, Word, for example, Excel.  Some of us use

4    the, you know, other -- there is a lot of tools in that

5    suite, so there are various adoption of those tools

6    throughout the company.

7         Q.    Did you look at any Office 365 logs in

8    preparing this spreadsheet?

9         A.    No.

10        Q.    Would, to your knowledge, Mr. Lombardo text

11   any -- any other employees or customers pertaining to

12   work-related matters?

13        A.    I think he did.  We didn't have an

14   official, like a company-owned cell phone for him, so

15   I, you know, don't have access to track that, but I

16   think that he did.

17        Q.    Did you include anything pertaining to

18   Mr. Lombardo texting on the spreadsheet, the

19   Exhibit AA?

20        A.    No, I don't have access to that data.

21        Q.    With respect to the first badge column on

22   Exhibit AA, Column F, how did you pull that

23   information?

24        A.    That was exported from the access control

25   system that runs the badge system.

1      Q.    And I notice that in 2015 up until -- one

2   minute, I'm going to expand that column so we can see

3   what's in there.

4             There are days up to April 6, 2015 in that

5   column that do not have anything.  Do you know why

6   there is nothing in that column from, let me say, Row

7   Number 2 to Row Number 47?

8      A.    Yes.  So 4/6/2015 was the earliest record I

9   had.  I don't remember if -- I don't remember if it

10   wasn't recording before that or if that's when we

11   installed the system.

12      Q.    And so as of April 6, 2015, you had the

13   information from that badge system, correct?

14      A.    Correct.

15      Q.    And you have a last badge column in there,

16   too, correct?

17      A.    That's correct.

18      Q.    And what did -- what's the basis for that

19   last badge column?

20      A.    Some days had more than one entry logged,

21   badge logged, so, for example, if one of us leaves the

22   building and comes back in, you'd have the badge to get

23   back in, and that could generate more than one log on

24   that day.

25      Q.    And how did Column G factor into your

Page 43

 1   calculation of the hours Mr. Lombardo worked for that

 2   day?

 3        A.    Can I review the document?

 4        Q.    Yes.

 5        A.    (Reviewing).

 6             So, quick review here, it appears that I

 7   used that towards the maximum -- Column P, the

 8   calculated maximum.  That is the latest entry we have

 9   for any activity.

10        Q.    Can you explain that at bit more for me?

11        A.    Which part?

12        Q.    The calculated maximum.  How you use that

13   in the calculated -- how you use Column G in the

14   calculated maximum.

15        A.    Okay.  So if he badged in at 12:50 p.m.

16   Let's take Row 51 as an example.  If he badged in at

17   12:50 p.m., then we know he was at the office.  So,

18   therefore, I put the end of the workday, at least, at

19   12:50 p.m.

20        Q.    Okay.  But you didn't -- you based it on

21   the last -- did you base that calculation on the last

22   badge in, or that's for calculated max?  But if he

23   badged in at 12:50, how -- I think I am going to need

24   you take me through that one more time so I am

25   following. I don't think I'm following for -- it is not

Page 44

1    making sense to me, I think.

2            If Mr. Lombardo swipes in at 7:55 in the

3    morning, take the row that you are on, Row 51, it shows

4    Mr. Lombardo swiped in at 7:55 in the morning, correct?

5        A.    Correct.

6        Q.    And then shows he swiped in again at 12:50,

7    April 9, 2015 in that Row 51, correct?

8        A.    Correct.

9        Q.    So can you walk me through, again,

10   Column P, how you -- how that last badge in calculated

11   into Column P?

12       A.    So the last badge, 12:50 p.m. in that

13   example was used to -- it was used towards that

14   maximum, or think of it as an end time.  So the fact

15   that he badged in at 12:50 means that his workday

16   lasted, at a minimum, until 12:50.  Now, I don't know,

17   ultimately, that he was working between 7:55 and

18   12:50 p.m.

19       Q.    But you just said that there was -- you

20   testified there was no swiping out, correct?

21       A.    That's correct.  That's why I say --

22       Q.    What --

23       A.    Correct.  That's why I say at a minimum,

24   12:50, because I don't have exit data.

25       Q.    Well, would it make sense for Mr. Lombardo

Page 45

1    to swipe in at 12:50 and immediately leave?

2         A.    No.  I am not claiming that he did.

3         Q.    But in your calculation, as part of your

4    calculation, his last badge swipe for the day, badge

5    swipe in for the day could be calculated as a time of

6    departure is that -- is my understanding correct?

7         A.    That would be correct if there was no other

8    activity after that; meaning, if he didn't send any

9    email, didn't make any calls after that badge, you are

10   correct that the max then could be set to 12:50;

11   however, in the final calculation, I still applied an

12   eight hour minimum.

13        Q.    What was your basis for finding an eight

14   hour minimum?

15        A.    Like I said earlier, that's in our -- our

16   handbook document that -- I don't recall the specific

17   language, but we talked about, you know, nine hours --

18   or our eight hour work day with an hour for lunch, nine

19   hours total.

20        Q.    But what if Mr. Lombardo didn't work eight

21   hours that day?

22        A.    I still give him eight hours in this

23   calculation for weekdays.

24        Q.    Can you walk me through how you ultimately

25   calculated the time worked for a given day?  Walk me

Page 46

1    through the calculated, that Column O, calculated min,

2    to start, and how you get to that time.

3           A.    Okay, Column O and --

4           Q.    And let's use Row 51 while we are on it as

5    an example.  So if you walk me through how you got to

6    April 9, 2015, 7:55 a.m. the calculated min for that

7    day.

8           A.    Okay.  I am going to scroll left so we can

9    see Column C.  So Column O will take the earliest entry

10   of Column C, F, I, and I think L.  Let me check.

11          Well, technically, the formula includes C

12   and D, F and G, I and J.  But it is looking for the

13   earliest entry of almost all of those.

14          Q.    So what does calculated min, what does that

15   time represent?

16          A.    That represents the earliest time stamp we

17   have for activity on that given day in that

18   spreadsheet.

19          Q.    Okay.  So take me through Column P,

20   calculated max, in the same way.

21          A.    Okay.

22          Q.    What is that?  How do you get April 9, 2015

23   at 8:57 p.m.?

24          A.    So Column P takes the latest time stamp

25   from these activities; that is, Column C, E, F and G, I

Page 47

1   and J.

2        Q.    Now -- okay, I see.  So the last one in

3   this instance would have been an email at 8:57 p.m.

4   sent on April 9, 2015?

5        A.    Correct.

6        Q.    How did you use these two columns further

7   in your calculation?  First Column O, how is this

8   column used, or is it used in the spreadsheet for

9   further calculation?

10        A.    It is.  It should be used in Column R.  So

11   it is used for a preliminary calculation of the number

12   of hours of work done that day.

13        Q.    And in this instance, it's 13 hours and 2

14   minutes on Row 51 of Exhibit AA; is that correct?

15        A.    That's correct.

16        Q.    And how is that -- how was that calculated?

17   How did you get the 13 hours and 2 minutes?

18        A.    Column P minus Column O.

19        Q.    So if I am understanding this correctly, if

20   Mr. Lombardo clocked in at 7:55 a.m. and then swiped

21   his badge again at 12:50 p.m. and had no other -- had

22   no sent emails and no calls from his Chmura work phone,

23   then that time would have shown, roughly -- in total

24   time in Column R, would have shown roughly -- let me do

25   the quick math, I'm sorry.  Five hours; is that

Page 48

1   correct?

2        A.    No, we do not have a time clock system, so

3   I don't have clock-in data on this.

4        Q.    I meant badge swipe.  So let me -- let me

5   rephrase.  Let me -- if we assume -- let me get it

6   right.  I want to get it right.

7              We assume here -- well, not assume.  You

8   show that Mr. Lombard swiped his badge in at 7:55 a.m.

9   on April 9th, and you show in the last badge, Column G

10  for that same row, 51, that he swiped in again on

11  April 9, 2015 at 12:50 p.m.  If he did not have any

12  sent emails, so there would be no first and no last

13  emails, correct, if he didn't have any sent emails?

14       A.    Correct.

15       Q.    And he didn't have a first call and last

16  call because he didn't use his Chmura work phone that

17  day, he wouldn't have anything in Columns I or J,

18  correct?

19       A.    Correct.

20       Q.    Then that calculated time in Row R would be

21  the hours between 7:55 a.m. in Column F, Row 51, and

22  12:50 p.m. in Column G of Row 51; is that correct?

23       A.    Correct.

24       Q.    But instead, based on the fact he sent an

25  email at 8:57 p.m., you calculated the difference

Page 49

1    between 7:55 a.m. when he swiped the badge in, when it

2    shows that badge was swiped on Row 51 and that last

3    email time to arrive at 13 hours and 2 minutes in total

4    time in Column R, correct?

5         A.    Correct.

6         Q.    Okay.  So to go back to these -- to the

7    columns here.  I got a little off track, but that's

8    okay.  That was very helpful.  Your call count -- oh,

9    we already talked about call count, I believe -- no, we

10   didn't.  We a talked email count.  So let me take a

11   step back.

12              So first call in Row I -- wait, going back

13   further, I'm sorry.  I am looking at these, so Column G

14   is the badge count.  Can you explain what the badge

15   count column is?

16        A.    Yeah, that's number of log entries on that

17   day.

18        Q.    So that would be the number of times

19   Mr. Lombardo swiped his badge to get into Chmura?

20        A.    Correct.

21        Q.    So how -- moving onto Column I.  In the

22   first call column, what was the basis for the

23   information in that column?

24        A.    That's from records of our phone system.

25        Q.    And what phone system does Chmura use?

Page 50

1        A.      It as called Simplicity.

2        Q.      Is it like a voice over the internet phone

3   service?

4        A.      Yes.

5        Q.      Through Simplicity does Mr. Lombardo have

6   the ability to forward calls to his cell phone?

7        A.      Yes.

8        Q.      And if those calls came in to the office

9   and were forwarded to his cell phone, would those be

10  picked up by your spreadsheet?

11       A.      If he was using the Simplicity app, it

12  would.  If it was simply forwarded to his cell phone

13  number, I don't know off the top of my head.

14       Q.      Do you know if Mr. Lombardo used the

15  Simplicity app?

16       A.      I can't say specifically.  I think we

17  talked about it, but I don't remember if he set it up

18  or not.

19       Q.      With respect to Column I, that first call

20  column, is that the -- when you say first call, is that

21  the first call received?

22       A.      I would have to go back to the logs to

23  verify that.  I don't recall.

24       Q.      So would it -- is it possible it is the

25  first call sent -- sorry, not sent, that would be

Page 51

1  email -- first call made, that he made, that

2  Mr. Lombardo made?

3       A.    I would have to go back to the logs to

4  check.

5       Q.    But as you sit here today, you don't know

6  whether that first call column contained outgoing

7  calls, correct?

8       A.    So I don't know if it's outgoing only or if

9  is it both, incoming and outgoing.  That's what I would

10  have to check on.

11       Q.    So you know for sure those are outgoing

12  calls; is that correct?

13       A.    I'd want to consult, you know, the original

14  logs just to verify that.

15       Q.    And what about Column J, the last call

16  column there?  Can you explain the basis for that

17  column?

18       A.    So it's the same as I, except that we are

19  looking for the latest entry on a given day.

20       Q.    And do you know whether that Column

21  contains both outgoing and incoming calls?

22       A.    I'd have to check the original logs to

23  verify that.

24       Q.    And unless Mr. Lombardo was using

25  Simplicity app on his cell phone, his cell phone calls

Page 52

1    would not be tracked in either Column I or J, correct?

2              MR. MICHALIK:  Object to the form of the

3    question.  You can answer.

4         A.    I have to doublecheck on a forwarding

5    situation.  I don't recall if that's included in these

6    or not.

7         Q.    Column K is call count, can you explain

8    what's included in the call count?

9         A.    That's the number of log entries for that

10   day.

11        Q.    What constitutes a log entry?

12        A.    Well, that's what I would have to go back

13   and verify, is it incoming and outgoing, or outgoing

14   only, or what.

15        Q.    Did you ever have an opportunity -- let me

16   rephrase that.

17              Did you ever compare Mr. Lombardo's call

18   volume to any of the other sales reps or account

19   managers, or senior account managers at Chmura?

20        A.    Not directly.  I -- you know, I am not

21   involved in day-to-day sales, but certainly as a member

22   of the leadership team, we would get reports on

23   activity levels.

24        Q.    And what did you observe when you would

25   review those reports?

1      A.    I mean --

2      Q.    Was Mr.  Lombardo's call volume higher than

3  the other account managers and senior account managers?

4      A.    He was one of the higher, yeah.  I mean, on

5  a -- you know, a specific instance, I can't tell you.

6      Q.    Other than days that Mr. Lombardo was on

7  vacation or at a conference -- let me rephrase that.

8            Was Mr. Lombardo's call volume routinely

9  higher than other account managers and senior account

10  managers?

11      A.    That's my general impression.

12      Q.    With respect to the Column L, the first

13  arm, it starts on Row 119, with that field being

14  populated, do you see that?

15      A.    I do.

16      Q.    Why is that field not populated for any

17  time frame before March 12, 2018?

18      A.    I didn't have data prior to that.

19      Q.    I just want to take a step back for a

20  second and follow-up on something you said about -- it

21  was -- and I don't want to put words in your mouth.

22  But regarding Mr. Lombardo's call volume, those reports

23  that you received, what was contained within the

24  reports?

25      A.    Well, we see a lot of reports in the

Page 54

1    leadership group, but what comes to mind is -- it's

2    like activity levels.  So I think it is all generated

3    out of Salesforce, but logs, emails, demos.

4         Q.   Can you explain logs?  Do you just mean

5    logging in and out of Salesforce, or what -- can you

6    explain logs?

7         A.   Sorry, I meant call logs.

8         Q.   Was Mr. Lombardo consistently higher

9    than the other account managers and senior account

10   managers with respect to his call log numbers?

11        A.   My observation of those is he was

12   consistently high.  Higher?  I can't say specifically.

13        Q.   What about -- I don't want -- I think you

14   said emails, as well, was a metric that was tracked on

15   the report?

16        A.   Yeah, I believe that's on the report,

17   emails.

18        Q.   And was -- does this report have a title?

19   Let me ask that.

20        A.   I refer to it as the weekly -- it's an

21   email that I get every week with summary data.  Is that

22   where it is included?  I don't know the title off the

23   top of my head.

24        Q.   Was Mr. Lombardo consistently -- and I am

25   using your words -- higher?  Was Mr. Lombardo

Page 55

1   consistently -- we already talked about call logs.  Was

2   Mr. Lombardo consistently higher in his email numbers

3   on that report?

4              MR. MICHALIK:  I object to the form of the

5   question.

6        A.    I don't know specific.  I'd have to go back

7   and look at the data.  You know, again, I am not

8   day-to-day sales, so I don't examine it at that level,

9   but my impression was that he was consistently -- had

10  consistently high activity.

11       Q.    What about with respect to demos?  Was

12  Mr. Lombardo performing more demos than, or a higher

13  number of demos consistently than the other account

14  managers and senior account managers?

15       A.    I'd have to look at the report.

16       Q.    Do you review this report with the other --

17  the other leadership?

18       A.    The weekly report that I am thinking of,

19  not necessarily.  We each, you know, look at it on our

20  own.  They have a weekly -- I'm sorry -- a monthly

21  sales metrics presentation that they -- they being the

22  sales group -- presents to leadership, and for that

23  one, we are all together.

24       Q.    How long have those meetings been going on?

25       A.    I don't recall when they started

Page 56

1 specifically.

2      Q.    Did they occur throughout Mr. Lombardo's

3 employment -- his entire employment?

4      A.    I can't say for sure, but I don't think

5 they started -- I don't think we were doing them before

6 we hired Rick.

7      Q.    So they might have started sometime after

8 Mr. Lombardo started; is that correct?

9      A.    That's possible.  I'd have to review.  I

10 don't know.  I am trying to see when the first one was

11 on the calendar.

12      Q.    And what was -- would you -- during those

13 meetings, what would be presented to you?  What

14 information would be presented to you?

15      A.    They could have changed over time, but,

16 generally, it was activity levels of the account

17 managers.  There would be data on sales, prospects,

18 what they were expecting to come in, what had closed.

19 There was some data on marketing activities, meaning

20 like -- we called them inbounds.  There was a forecast.

21          And then the account managers would each --

22 they called it, word on street.  So they would tell us

23 things they were hearing, or features that our

24 competitors have that our customers were asking for.

25 Stuff like that.

Page 57

1      Q.    And who would do the presentation?  Who

2   would do the presenting?

3      A.    That varied over time as well.  It was

4   generally the sales manager.  Greg Chmura, I think, ran

5   them for a while.  He always ran the forecast part of

6   it.  And then, actually, you know, each of the

7   departments would have a slide to bring up topics.  So

8   like even I would have a few minutes to talk about

9   things.

10     Q.    Was the sales team present during these

11  meetings?

12     A.    Yes.

13     Q.    And by sales, you mean account managers and

14  senior account managers as well?

15     A.    Yes.

16          MR. MICHALIK:  Christine, if you would have

17  a second, to be clear, and it's fine if you -- if

18  you've now switched to going to him as a fact witness

19  as opposed to 30(b)6 -- to be clear, he is only

20  designated as 30(b)6 with regard to Item 23.

21          MS. COOPER:  Correct.

22          MR. MICHALIK:  So I am assuming you have

23  moved to him as a fact witness, but I want the record

24  to be clear that anything outside -- your questions

25  outside of Item 23, you are talking to him as a fact

Page 58

1   witness.

2            MS. COOPER:  I will come back to the

3   reports.  That is correct.

4            But I will be come back to the report.

5   We'll go back to the spreadsheet and try to break it up

6   more clearly than that.

7   BY MS. COOPER:

8        Q.   Going back to the spreadsheet, we were

9   talking about Column L, the first arm.  Can you explain

10  where that data came from in that Column?

11       A.   Yes, when our security system is armed, it

12  generates a notification email, and that email has a

13  time stamp, date time stamped.

14       Q.   Does it state who armed the system?

15       A.   It states the code that was used.  Not

16  everyone in our office has a unique code.

17       Q.   Did Mr. Lombardo have a code?

18       A.   He did have a code. I can't say whether it

19  was unique to him or if others also have that code.

20       Q.   So this Column L would then pull the data

21  from every code?

22       A.   Yes.  So the building was only armed by the

23  last person out.

24       Q.   So from Column L, you -- well, first, we

25  are talking about first arm.  So Column L would be

Page 59

1    first arm.  It would be the first person in; is that

2    correct?

3            A.    No.  So Column L would be, generally

4    speaking, the last employee to leave.  The reason that

5    we have -- well, that's what Column L is.

6            Q.    Then what's Column M?

7            A.    Column M is if the system was armed more

8    than once in a day.  For example, if the cleaning

9    people came in, they would come at night.  So you would

10   have -- the employee would leave, they would arm the

11   system.  The cleaning people would arrive, they would

12   disarm the system and then they would re-arm it when

13   they were done.  That re-arm would be Column M.

14           Q.    How frequently did the cleaning people

15   come?

16           A.    Twice a week.

17                  (Reporter technical issues).

18                      -   -   -   -   -

19                  (Short break off the record.)

20                      -   -   -   -   -

21                  MS. COOPER:  Okay.  Ready to go back on the

22   record.

23   BY MS. COOPER:

24           Q.    So we were talking about the spreadsheet.

25   I want to go back to the crux of the spreadsheet.

Page 60

1         We were on Column L and Column M.  And so

2    if we could, if we could look at Column L --

3         MS. COOPER:  Oh, I apologize.  If we can go

4    off the record for just one second.  I wanted to

5    address something.

6                   -   -   -   -   -

7         (Discussion had off the record.)

8                   -   -   -   -   -

9         MS. COOPER:  Back on the record.

10   BY MS. COOPER:

11        Q.    Mr. Chmura, we were talking about columns L

12   and M on this Exhibit AA, and you were explaining

13   how -- the basis for the -- the base in times in Column

14   L.  Could you walk me through that again, how you

15   populated those cells?

16        A.    Column L?

17        Q.    Yes, please.

18        A.    Yeah, so Column L is the first log entry I

19   have that the system was armed on a given day.  So,

20   generally, that is when the last employee leaves for

21   the day, they arm the system, whoever that happens to

22   be.

23        Q.    And Column M, can you explain Column M

24   again?

25        A.    Column M is if the system was armed more

Page 61

1   than once, for whatever reason, M is basically the last

2   log entry on a given day that we have.

3        Q.    And that could be an employee, correct,

4   logging -- sorry, could be an employee arming the

5   system, correct?

6        A.    Correct.

7        Q.    Or it could be the cleaning people arming

8   the system?

9        A.    Could be the cleaning people, correct.

10        Q.    Could it be anybody else?

11        A.    There were a couple of days that we had

12   some construction.  I'd have to review if we gave them

13   codes or if I armed them in that case.  But, no,

14   otherwise, employees and the cleaning people were the

15   only ones that had codes.

16             MR. MICHALIK:  Christine, sorry.  This is

17   Chris again.  It looks like we may have lost the court

18   reporter.

19             COURT REPORTER:  I'm still here.  No video,

20   just audio for the moment.

21             MR. MICHALIK:  I just wanted to make sure

22   that the court reporter can at least still hear us.

23             MS. COOPER:  Thank you, Chris.

24   BY MS. COOPER:

25        Q.    How did -- Mr. Chmura, how did Column L

Page 62

1    factor in here, into further calculations on this

2    spreadsheet?

3           A.    Can I review the spreadsheet for a second?

4           Q.    Yes, let me -- I might need to give you

5    control.

6           A.    Okay.  Thank you (Reviewing.)

7                 So Column L was used if we had, what I will

8    call, an activity entry.  No, I'm sorry, it is

9    specifically email.  If there was an email sent after

10   the arm log entry in Column L, then we assume that was

11   done outside of the office because this system was

12   armed.  And then what I did is deduct 45 minutes for

13   the commute home.

14          Q.    And so built into your Column R total time

15   -- I'm sorry.  Tell me again what other columns L is

16   used in.

17          A.    Well, Column L is only directly used in

18   Column W, which is this commuting time.

19          Q.    And you use that Column L to trigger an

20   entry of either 0 or 45 minutes; is that correct?

21          A.    That's correct.

22          Q.    And 45 minutes --

23          A.    In Column L.

24          Q.    And that 45 minutes represents the -- your

25   estimate of Mr. Lombardo's commuting time, correct?

Page 63

1        A.      Correct.

2        Q.      So how did you use Column M?

3        A.      I don't believe Column M is used.  Let me

4    review these formulas to be sure.  (Reviewing).

5                It doesn't look like Column M is used.

6        Q.      And what is Column N?  What is that

7    calculating?

8        A.      Column N is the number of the log entries

9    we had for that day.  So, roughly, the number of times

10   the system was armed.

11       Q.      But the system would take -- Row 123, there

12   is a 3 in Column N, so the system was armed three

13   times, correct?

14       A.      Are you talking about March 16, 2018?

15       Q.      Row 123.  Is that Row 123?  Yeah.

16       A.      Row 1123, the one I just highlighted.

17       Q.      Yes.

18       A.      Repeat the question, please?

19       Q.      So there is a 3 in Column N.  That would be

20   three times that the system was armed that day,

21   correct?

22       A.      IT actually means that I had 3

23   notifications, which should mean, yes, that the system

24   was armed three times.

25       Q.      Did either L or M -- let's start with L.

Page 64

1    Did L factor into Column O or P?  Let's take a step

2    back. Does Column L factor into Column O?

3         A.    No.

4         Q.    So if Mr. Lombardo had put in his code to

5    disarm the system and say, as an example, in Row 1123

6    that we're in, if Mr. Lombardo had disarmed the system

7    at 6:14 p.m., that 6:14 p.m. is not used as a basis for

8    calculating the end of his workday; is that correct?

9         A.    There is no disarm data in this analysis.

10        Q.    I'm sorry.  If Mr. Lombardo armed the

11   system at 6:14 p.m. on March 15, 2018, that 6:14 p.m.

12   is not used as an end time for his workday in this

13   spreadsheet; is that correct?

14        A.    It's not used in Column P.  It's not

15   specifically used as an end time except to trigger that

16   commuting.

17        Q.    So it was only used when there was an email

18   that is later than the time that the system was armed,

19   correct?

20        A.    Correct, that's what these formulas look

21   like, that's my recollection of setting this up.

22        Q.    What about if there was a phone call that

23   occurred after the system was armed?  Is that

24   calculated -- does that trigger the 45 minutes or zero

25   commute time?

Page 65

1      A.     It does not.

2      Q.     Did you prepare all the formulas for this

3  spreadsheet?

4      A.     I did.

5      Q.     We talked about the calculated end time and

6  calculated max time in columns O and P.  Can you

7  explain what Column Q is?

8      A.     Column Q is a summation of the activity

9  counts of Columns E, H and K, which would be the email

10  count, the badge count, and the call count.

11      Q.     Why did you add up those three fields?

12      A.     It's just something we do in our line of

13  work.  We total up everything, whether it is used or

14  not.

15      Q.     Are the email counts, badge counts and call

16  counts related in some way?

17      A.     No.

18      Q.     So if we move over to -- within Column Q,

19  that -- take that 114.  I saw that you are on the 114,

20  activities.  Do you use that metric for any purpose

21  normally within the business?

22           MR. MICHALIK:  Object to the form of the

23  question.

24      Q.     Let me re phrase.  Are you ordinarily

25  adding up email counts, badge counts and call counts

Page 66

1  for metrics at Chmura?

2          MR. MICHALIK:  I object.

3      Q.    You can answer, if you know.

4      A.    No, I do not.

5      Q.    If we move over to Column R, total time,

6  and we can stay within Row 1123 just for ease of

7  reference and having an actual number, can you tell me

8  how you calculated that time?

9      A.    Yeah, so this is columns T minus Column O,

10  which would give us, you know, a number of hours.  And

11  it looks like I actually did use Column Q here, simply

12  to say if there was zero activities, meaning there

13  wasn't an activity in the call, the email or the badge,

14  then we blank this out.  But, otherwise, we would

15  display P minus O.

16      Q.    By "blank out," you mean the cell would

17  have no number value in it, no time value in it?

18      A.    Yes, correct.  That's an Excel thing.  If

19  you don't, it gives you, you know, an error or some

20  ugly value, so.

21      Q.    Sure.

22          MR. MICHALIK:  Christine, Leslie is here

23  now, so -- and it is about two o'clock.  Do you want to

24  -- I guess, let's go off the record.

25                  -   -   -   -   -

Page 67

1          (Discussion had off the record.)

2                      -   -   -   -   -

3          MS. COOPER:  Back on the record.

4    BY MS. COOPER:

5          Q.    Mr. Chmura, I want to finish up going over

6    this spreadsheet with you, and I am going to share it.

7          MR. MICHALIK:  Leslie is the corporate

8    representative, and since she is here, she is going to

9    be sitting in.  So the court reporter can get that,

10   and, Christine, so you are aware.

11         MS. COOPER:  Okay.  Thank you.

12   BY MS. COOPER:

13         Q.    We were talking about the spreadsheet and

14   how you were calculating the total time in that Column

15   R.  I wanted to talk a little bit more about Column W

16   and how that 45 minutes versus 0 minutes was

17   calculated.  If Mr. Lombardo was taking a call in his

18   car, you know, he was working, would he still be, in

19   your calculation, charged for that 45 minutes?

20         A.    There is no call -- can you give me control

21   again so I can check the formula?  Oh, I still have it.

22   There is no call data used in that calculation.

23         Q.    So if we look at phone out there, I am not

24   sure what Column S is?

25         A.    Did you say S as in Sam?

Page 68

1          Q.    S as in Sam.  What is a comp day?

2          A.    So when I went through his calendar, Rick

3    had certain days just marked off as comp days, and so I

4    put a 1 there to indicate that he was not at the

5    office.

6          Q.    And did you know what Mr.  Lombardo meant

7    by comp day?

8          A.    I assume he meant the -- like after a

9    conference, that was a day that he took off.

10         Q.    Did you ever have a discussion with

11   Mr. Lombardo about what comp day meant?

12         A.    Not that I recall.

13         Q.    On those comp days, are you aware whether

14   Mr. Lombardo was still fielding -- was still working by

15   taking calls?

16         A.    I didn't look at the logs that closely.

17         Q.    What about sending or receiving emails on

18   days he took a comp day?

19         A.    Same thing, I didn't look at the logs that

20   closely.

21         Q.    And if he had comp day on his calendar, how

22   did that affect your calculation?

23         A.    Let me check these formulas.  (Reviewing).

24               So if it was marked as a comp day, his

25   calculation did not give him the automatic eight hour

Page 69

1  minimum, but it would still -- if there was any

2  reported activity, emails or calls, it would still

3  total those up.

4      Q.    I am going to expand Column V here for a

5  second so we can see it entirely.  The row that you are

6  on, which I believe is 1137.  The first 1 is blocked

7  out on my screen, but I believe it is 1137; is that

8  correct?

9      A.    Yes.

10      Q.    And this is on Exhibit AA.  There is a --

11  there is a total activity Column Q of 1, correct?

12      A.    Correct.

13      Q.    But the total minutes are 0.  Do you see

14  that?

15      A.    I see it.

16      Q.    Can you explain why that would be?

17      A.    I am going to scroll to the left to see the

18  other columns here (indicating).  Yes, there was a

19  single email sent, so since there was only one email

20  sent that didn't produce a range, start minus N then is

21  zero.

22      Q.    So your calculation, this spreadsheet --

23  let me say that again.

24          This spreadsheet, Exhibit AA, does not

25  account for any drafting time of emails, correct?

Page 70

1      A.    That's correct.  Yeah, not directly.  I

2  mean, they -- in the course of a workday, that would be

3  built in, but in this situation, no, that's not

4  accounted for.

5      Q.    So you said not directly, but, in fact, in

6  that instance, it was not calculated for, correct?

7      A.    Correct.

8      Q.    So if you -- what is Column T,

9  conference/travel?  Can you explain that column?

10      A.    That was days on his calendar that he had

11  put on his calendar that he was at a conference or, you

12  know, indicated that he was traveling.

13      Q.    And how did that column factor into your

14  calculation?

15      A.    Let me check the formulas again.

16  (Reviewing.)

17            It looks like the only place it is used is

18  in Column X in, specifically -- I'd have to go through

19  my formulas more specifically, but I think what we were

20  trying to do here is -- what I was trying to do is not

21  deduct that lunch hour.  You know, so I mentioned we

22  have the eight hours, but we also have an hour lunch.

23  So I was not deducting that if he was at a conference

24  or traveling.

25      Q.    When you would deduct for the hour for

Page 71

1    lunch, would that bring the hours down to seven hours

2    or how -- let me rephrase that.

3              How did that deduction factor into your

4    calculation for lunch?

5         A.    Yeah, so that deduction would be applied on

6    a weekday and would only bring it down to eight hours.

7    So there was still an eight hour minimum on a weekday.

8         Q.    And so for the conference time, you were

9    not deducting that one hour; is that correct?

10        A.    That's what it looks like this formula is

11   doing. I'd have to work through the numbers to verify

12   that to be sure.

13        Q.    And what does Column U, which is

14   holiday/vacation, how did that factor into your

15   calculation?

16        A.    Let me check these formulas again.

17   (Reviewing.).

18             So if it was a holiday or vacation, it is

19   being used in Column V to not apply the eight hour

20   minimum.

21        Q.    What did it apply?

22        A.    It looks like that's the only place it is

23   used.

24        Q.    Did Mr. Lombardo have paid vacation, to

25   your knowledge?

1        A.    So I don't know the H.R., like, you know,

2   official classifications of paid vacation or PTO or all

3   that stuff, but we all had a certain number of days

4   that, yeah, we were paid for when we used them.

5        Q.    And what about paid holiday time?

6        A.    We had -- when he was first hired, I forget

7   if we had seven or eight holidays, company holidays.

8   We added one, at least one later on.

9        Q.    Does that factor into your calculation, you

10  got paid vacation -- start with paid vacation.  Did

11  paid vacation factor into your calculation?

12       A.    So anywhere on his calendar that he had

13  marked a vacation day, or if it was a day that was one

14  of our, you know, official company holidays, that's

15  what I indicated in Column U.

16       Q.    And how is that then used to -- in other

17  calculations on this spreadsheet?

18       A.    That was used then in Column V, which

19  specifically then was saying, it's not a day at the

20  office, so we are not applying the eight hour minimum.

21       Q.    Which column did you say?  Did you --

22       A.    V as in Victor.

23       Q.    V as in Victor?  Okay.  Sorry, I misheard.

24  Can you explain Column V, the minimum hours to the day?

25  What's the basis for that column?

1          A.     Yeah, the basis is that if it's a day that,

2    you know, that we are at the office and it is not a

3    holiday, not a vacation day, it applies a minimum of

4    eight hours.

5          Q.     Applies eight hours to what?

6          A.     Well, it basically -- that means that

7    taking out commuting or taking out a lunch hour, I am

8    not letting it -- I am not letting the total for that

9    day go below eight hours.  Or, for example, if he only

10   logged one call, you know, as we discussed, that would

11   show up as a zero.  So I am using that eight hours as a

12   minimum to say, okay, I don't have any logs for that

13   day, so we will use eight hours.

14         Q.     But you didn't use eight hours if he just

15   had one call logged, correct?

16         A.     Are you referring to Row 1137?

17         Q.     Yes.

18         A.     That's correct for Row 1137 because that is

19   either a holiday or a vacation day.

20         Q.     How is the minimum hours per day -- how did

21   that -- where is that number used in another

22   calculation?  Is it used in another column?

23         A.     It should be used in Column X.  Let me

24   check.

25                Yes, so after -- in this formula, after

Page 74

1   everything is taken out, that means after I take out

2   the hour for lunch, after we take out the commute, if

3   applicable, after we, you know, compute the min and max

4   of the activities, it is then applied as a minimum.

5        Q.   What was your basis for taking out an hour

6   for lunch?

7        A.   That's mentioned in our handbook.  I

8   believe that's -- again, I can't remember the exact

9   language, but, you know, there is -- that we work eight

10  hours plus an hour for lunch.

11       Q.   So the total minutes column, Column X, how

12  did you calculate the total minutes?

13       A.   Column X is the difference between the min

14  and max time columns, O and P, and then we subtract out

15  based on those various rules we just discussed.  We are

16  going to subtract out the lunch, also subtract out the

17  commute, and then we will apply that minimum of eight

18  hours.

19       Q.   And what is the Column Y, the weekly hours

20  column?

21       A.   That is an average of -- I know.  It's a

22  total hours per week.  So a sum of the values in Column

23  X for that week.  And it looks like I put it on Sunday.

24       Q.   In Column V there says, Rick claim.  Do you

25  know what that column is?

1      A.    Yes.  When I put the spreadsheet together,

2   if I scroll down a little bit, just out of curiosity, I

3   copied some of the numbers from Rick's -- I don't know

4   the title of the document, but it was one of his claims

5   that had -- you know, his -- what he was claiming he

6   worked per week.  So I put it there for comparison.

7      Q.    I want to-- let's go to the very bottom of

8   this here.  And you have sort of bridging -- well, it's

9   Row 704 -- I'm sorry, probably 1704; is that correct?

10  It has, average last three years, do you see that?

11     A.    I see it.

12     Q.    Can you explain to me what the average last

13  three years calculation is and how you derive that?

14     A.    So -- let me check the formula.  It is an

15  average of the weekly totals for, roughly, a three year

16  time period.

17     Q.    I want to move back to what was marked as

18  Defendant's Exhibit Z, which is the other spreadsheet.

19  And I am going to drag that into the screen, and I am

20  going to minimize this one (indicating).

21          Now, earlier you testified that you didn't

22  recognize this, and it is very small, but you didn't

23  recognize this spreadsheet.  I wanted to have you take

24  another look at it.  So give yourself a minute to do

25  that and let me know if it looks familiar to you now.

Page 76

1        A.      (Reviewing.)

2              Well, columns A through Y certainly are, or

3    A through Z.

4        Q.    Did you review any parking receipts that

5    Mr. Lombardo provided in Discovery?

6        A.    No.

7        Q.    Okay.  So anything -- so Column AA, for

8    example, you did not populate that column?

9        A.    No.

10       Q.    Do you know who did?

11       A.    No.

12       Q.    I just have a couple of follow-up questions

13   and then take a short break and come back on and we

14   will likely be finished for the day.

15             Why didn't you review the JobsEQ data for

16   creating Exhibit AA?  And I will just go back to that.

17       A.    I don't recall if it was asked for or not.

18   I suspect it wasn't asked for.  My opinion on using it

19   or not is that it would already be covered by other

20   activity.  The nature of JobsEQ is that we are not

21   logged in, necessarily, all day.  Account managers are

22   logged in more than other employees, but, certainly, in

23   my opinion, email would cover a broader range than the

24   JobsEQ activity.

25       Q.    Why would JobsEQ -- or what was -- what

Page 77

1   were account managers using JobsEQ for?

2        A.    Well, they would use it to give demos.  In

3   Rick's case, I know that he -- he would also field a

4   lot of calls from customers that had questions, so he

5   would use it outside of demos to -- whether it was

6   helping them, you know, navigate it, or pull some data

7   for them or whatever, like that kind of thing.

8        Q.    Would he also use it to prepare for demos?

9        A.    I can't say specifically if he did or not.

10       Q.    Do you know how much time Mr. Lombardo

11  spent actively using JobsEQ?

12       A.    Can I correct my last answer?

13       Q.    Yes.  So I'll hold my question.  Go ahead.

14       A.    I actually do know that he would prepare

15  for demos in JobsEQ because I know that he would print,

16  often, a map, like of the area he would be demoing.

17       Q.    Do you know how much time Mr. Lombardo

18  spent using JobsEQ?

19       A.    Not off the top of my head.

20       Q.    Why didn't you review the Office 365 logs

21  in preparing this spreadsheet, Exhibit AA?

22            MR. MICHALIK:  Object to the form of the

23  question.  You may answer.

24       A.    I don't know how to access them, and so if

25  it wasn't requested, I didn't dig in to how to get to

Page 78

them.

Q.    I think you already answered this, but why
didn't you use the Salesforce data in calculating -- or
I'm sorry -- in Exhibit AA?

A.    Same thing.  I don't have direct access to
Salesforce and so if it wasn't asked of me, I didn't
dig into how to get it.

Q.    So did you do exactly what was asked of you
in creating the spreadsheet?

MR. MICHALIK:  Object to the form of the
question.

Q.    You can still answer.

A.    Repeat the question one more time, please?

Q.    Did you do exactly what you were asked to
in creating this spreadsheet?

MR. MICHALIK:  Same objection.

A.    Well, I added in, I think, a little extra;
for example, Column Z.  It was not specifically asked
that I bring that in.  Z as in zebra.

Q.    Got it.  Are there any other calculations
or columns that you added that were not asked of you?

A.    I'd have to go back and review.
Specifically what was asked I don't remember.

Q.    Okay.  Did you prepare or create any other
documents with respect to the topics set forth in

Page 79

1    Number 23 of the Notice of Deposition?

2              MR. MICHALIK:  Object to the extent it

3    calls for any communications with outside counsel.

4    Subject to that objection, you can answer.

5         A.    I didn't prepare anything that wasn't

6    shared with counsel.

7         Q.    Did you prepare any other spreadsheets?

8              MR. MICHALIK:  Same objection.

9         A.    No, not that I recall.

10        Q.    Is this the only spreadsheet that you

11   prepared?

12             MR. MICHALIK:  Object to the form of the

13   question.  You can answer.

14        A.    I don't recall one way or the other.  There

15   is, possibly, a draft version of this.  I don't

16   remember.

17             MS. COOPER:  Can we take a short break and

18   go off the record?

19             MR. MICHALIK:  Sure.

20             MS. COOPER:  Thank you.

21                  -   -   -   -   -

22             (Discussion had off the record.)

23                  -   -   -   -   -

24             MS. COOPER:  Go back on.

25             I don't have any other questions pertaining

Page 80

1    to the 30(b) portion of Mr. Chmura's deposition, and as

2    I understand it, we are going to continue his

3    individual deposition until next Tuesday and pick up

4    back there by agreement of the attorneys.

5              MR. MICHALIK:  That is correct.  And I

6    assume now you want to go on to Ms. Peterson?

7              MS. COOPER:  Yes.  Could I have just a few

8    minutes to get a drink?

9              MR. MICHALIK:  Absolutely.

10

11     (Whereupon, deposition was adjourned at 2:45 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 81

1    Whereupon, Counsel was requested to give instruction

2   regarding the witness's review of the transcript

3   pursuant to the Civil Rules.

4

5                            SIGNATURE:

6

7     Transcript review was requested pursuant to the

8   applicable Rules of Civil Procedure.

9

10                          TRANSCRIPT DELIVERY:

11   Counsel was requested to give instruction regarding

12   delivery date of transcript.

13                            Ms. Cooper, Original transcript,

14   and rough transcript, yes.

15                            Mr.Michalik , Certified transcript,

16   and rough transcript, yes.

17

18

19

20

21

22

23

24

25

Page 82

1                    REPORTER'S CERTIFICATE

2

3    The State of Ohio,    )

4                                      SS:

5    County of Cuyahoga.   )

6

7              I, KELLIANN D. LINBERG, RPR, a Notary Public

8    within and for the State of Ohio, duly commissioned and

9    qualified, do hereby certify that the within named

10   witness, JOHN L. CHMURA, was by me first duly sworn to

11   testify the truth, the whole truth and nothing but the

12   truth in the cause aforesaid; that the testimony then

13   given by the above-referenced witness was by me reduced

14   to stenotypy in the presence of said witness;

15   afterwards transcribed, and that the foregoing is a

16   true and correct transcription of the testimony so

17   given by the above-referenced witness.

18             I do further certify that this deposition was

19   taken at the time and place in the foregoing caption

20   specified and was completed WITH ADJOURNMENT.

21

22

23

24

25

Page 83

1          I do further certify that I am not a

2     relative, counsel or attorney for either party, or

3     otherwise interested in the event of this action.

4

5          IN WITNESS WHEREOF, I have hereunto set my

6     hand and affixed my seal of office at Cleveland, Ohio,

7     on this 11th day of May, 2020.

8

9

10

11

12

13          Kelliann D. Linberg, R.P.R.,

14          Notary Public within and for

15          the State of Ohio

16

17     My commission expires May 25, 2024.

18

19

20

21

22

23

24

25

Page 88

1              IN THE UNITED STATES DISTRICT COURT
2              FOR THE EASTERN DISTRICT OF VIRGINIA
3                     RICHMOND DIVISION
4               ~~~~~~~~~~~~~~~~~~~~
5   CHMURA ECONOMICS & ANALYTICS, LLC
                 Plaintiff
6
                vs.               Case No.  3:19-CV-00813
7
8   RICHARD LOMBARDO
              Defendants
9
10               ~~~~~~~~~~~~~~~~~~~~~
11
12              REMOTE VIDEO DEPOSITION OF:
13               JOHN L. CHMURA, VOL. II
14
15                    Taken on:
16                    May 5, 2020
                      9:00 a.m.
17
18
                      Taken at:
19
20               Home of John Chmura
                 3681 Braemar Drive
21              Broadview Heights, Ohio
22
23
24        Kelliann D. Linberg, RPR, Notary Public
25

```
 1   APPEARANCES: (Via Videoconference)
 2   On behalf of the Plaintiffs:
 3        Koehler Fitzgerald, LLC
          CHRISTINE M. COOPER, ESQ.
 4        1111 Superior Avenue E
          Ste 2500
 5        Cleveland, OH, 44114
          Ccooper@koehler.law
 6        216-539-9370.
 7
 8   On behalf of the Defendants:
 9        McGuire Woods, LLP
          CHRISTOPHER M. MICHALIK, ESQ.
10        Gateway Plaza
          800 East Canal Street
11        Richmond, VA, 23219-3916
          Cmichalik@mcguirewoods.com
12        804-775-1000.
13
14
15   ALSO PRESENT:
16        RICHARD LOMBARDO
17        LESLIE PETERSON, via Zoom
18
19
20
21
22
23
24
25
```

Page 90

1                        TRANSCRIPT INDEX

2

3    APPEARANCES.........................89

4    INDEX OF EXHIBITS...................91

5

6

7    EXAMINATION OF JOHN L. CHMURA:

8    BY MS. COOPER.......................92

9

10

11   REPORTER'S CERTIFICATE.............139

12

13

14   EXHIBIT CUSTODY:   RETAINED BY COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25

Page 91

```
 1                    INDEX OF EXHIBITS

 2

 3   Number              Description              Marked

 4

 5   Defendant's:

     Exhibit X      Previously Marked Highly        132

 6               Confidential Copy of Email

                   Dated 10/2/2019 Bates

 7               CHMURA0201264-269

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 92

1              JOHN L. CHMURA, being previously sworn, and

2    with the previous agreed upon stipulation regarding the

3    need for this deposition to take place remotely because

4    of the Government's order for social

5    distancing, said as follows:

6              EXAMINATION OF JOHN L. CHMURA, Vol. 2

7    BY MS. COOPER:

8         Q.    Good morning, Mr. Chmura.

9         A.    Good morning.

10        Q.    Well, where we left off in the deposition,

11   I completed your corporate representative testimony and

12   we are moving into your individual testimony this

13   morning.  So I am going to start with just asking a few

14   background questions, and some of it may be ground we

15   already covered, but just where we left off --

16             MR. MICHALIK:  Christine, can you turn your

17   volume up?  I think -- I hear everybody else clearly,

18   but like last time, we have a little bit of trouble

19   hearing on your end.

20             MS. COOPER:  Yes, let me see if I can put

21   it closer as well.  Okay, that should be better.  Is

22   that better?

23             MR. MICHALIK:  Yes, perfect.

24        Q.    Mr. Chmura, you are a member Chmura

25   Economics & Analytics, LLC, correct?

Page 93

1      A.     Correct.

2      Q.     And I believe your earlier testimony, we

3  went through who the other members were.  With respect

4  to control of the company, which of the members have --

5      A.     I'm sorry.  I am getting a lot of echo and

6  it is hard to understand what you are saying.

7      Q.     With respect to the members, is there a

8  hierarchy amongst them?

9            MR. MICHALIK:  And just to be clear,

10  Christine, this is for him as a fact witness not as a

11  30(b)(6) designee?

12            MS. COOPER:  That is correct.

13            MR. MICHALIK:  Okay.

14      A.     Yes, we have an org chart if that's what

15  you are asking.

16      Q.     And what does the org chart show?

17      A.     Chris Chmura, CEO and Leslie Peterson are

18  at the top, and then underneath them are people like me

19  and Greg, you know, department heads.  And then we have

20  various teams under us.

21      Q.     Are Dr. Chmura and Ms. Peterson the

22  ultimate decision makers for the company?

23      A.     Yes.

24            MR. MICHALIK:  Object to the form of the

25  question.  You can answer.

Page 94

1        A.     Yes, they are.

2        Q.     What types of decisions are they

3    responsible for?

4        A.     Ultimately, I mean, they can decide, you

5    know, corporate -- they do decide corporate level

6    decisions.

7        Q.     Could you describe what a corporate level

8    decision is?

9        A.     Sure, things like financial, you know,

10   hiring, firing, I suppose they have the ultimate say on

11   that.  These kind of broader decisions that affect the

12   whole company.

13       Q.     Did either one of them ever make smaller

14   decisions?

15       A.     Sure.

16       Q.     How frequently -- well, let me ask this:

17   To your knowledge, did either Dr. Chmura or

18   Ms. Peterson make decisions relating to the sales team?

19              MR. MICHALIK:  Object to the form of the

20   question.  You can answer.

21       A.     I am not involved with the day-to-day

22   sales, so I can only answer through SEA Group, the

23   leadership group, and, yes.

24       Q.     And what types of decisions would

25   Dr. Chmura make pertaining to the sales team?

Page 95

1      A.    I don't keep a log of all the specific

2   decisions.

3      Q.    What about --

4      A.    Hiring.

5      Q.    Okay, hiring.  And I think you mentioned

6   firing.  Did they also make decisions with respect to

7   firing as far as --

8      A.    Yes.

9      Q.    It is my understanding that Chmura had

10   something called a road map.  Is my understanding

11   correct?

12      A.    Yes, correct.

13      Q.    Can you explain what the road map is?

14      A.    Yes, the road map is a list of feature

15   requests, or changes that we want to make to our

16   products, or even new products.  And it is what we use

17   to track those requests and then prioritize the work.

18      Q.    How does an item end up on the road map?

19      A.    Well, it can come in through several

20   channels.  It may come internally from -- from

21   leadership, or from any employee.  It may come from a

22   support request from a user, and it may come through

23   sales; you know, they would hear them from users

24   directly or in their prospecting work and in their

25   selling work.

1      Q.     Any other ways that something might end up

2   on the road map?

3      A.     We don't put restrictions on ways things

4   can end up there.

5      Q.     How are items on the road map prioritized?

6      A.     So they are prioritized by the number of

7   requests for a particular item.  They are prioritized

8   by level of effort and possible impact to the product

9   offering, and then they are prioritized based on input

10  from leadership.

11     Q.     I want to take a step back and talk a

12  little bit more about how these items come in.  You

13  mentioned that they could be listed on the road map

14  from an internal source.  Can you explain a little more

15  by what you mean by internal and how that would end up

16  on the road map?

17     A.     Well, sure.  All of our -- I shouldn't say

18  all of employees, but a lot of employees use the

19  products, whether it is testing or to do their work,

20  and in the process of that, have ideas of changes to

21  make and new features, so they do submit those and we

22  track them on the road map.

23     Q.     Did Mr. Lombardo, to your knowledge, ever

24  either bring to you or bring to leadership an idea, an

25  internal idea that he had?

Page 97

1          A.     Yes.

2          Q.     What idea -- or what ideas were those?

3          A.     So he was a strong advocate for things like

4    the Career Concourse, which is a product offering.  He

5    also -- let's see, there was a data set that we created

6    called GDP.  He was a strong advocate of that as well.

7    There was a feature called Clippy(ph).  I'd have to

8    look at the road map to be more specific.

9          Q.     With respect to Career Concourse, you said

10   he was an advocate.  Was this his idea?

11         A.     No.  No, it was an existing product and

12   what was on the table was, should we revamp and build a

13   new version of it or not.

14         Q.     And he was an advocate of rebuilding a new

15   version of that, correct?

16         A.     Yes, correct.  So, again, I wasn't involved

17   in the day-to-day of sales, but my recollection of it

18   was that, you know, he was telling us that it was

19   something that he needed to be able to sell to the

20   education sector.

21         Q.     Did he actually develop Career Concourse?

22         A.     No.

23         Q.     Who did?

24         A.     My development team.

25         Q.     Do you know whether -- let me re-ask that.

1   At the time Mr. Lombardo was an advocate for Career

2   Concourse, was it something that was already on the

3   road map?

4           A.    I don't recall.

5           Q.    And the next product you mentioned, it

6   was -- and forgive me if I get it wrong -- but it was

7   GDP?

8           A.    Yes, GDP.

9           Q.    And you said Mr. Lombardo advocated for

10  GDP, correct?

11          A.    Correct.

12          Q.    Can you tell me a little about what GDP is?

13          A.    So GDP is a data set that we compute the

14  GDP, the gross domestic product, for an individual

15  region, which is not something that is otherwise

16  available.  And I am trying to recall back to when we

17  were discussing this, but I believe there was a

18  prospect in particular that really needed us to have

19  this data set in order for them to buy JobsEQ, and

20  that's, I think where a lot of Rick's -- you know, his

21  support behind GDP was coming from that, that he needed

22  it to close that sale.

23          Q.    So would this have been a product or an

24  idea that Mr. Lombardo -- well, let me step back.  Who

25  would Mr. Lombardo send -- with respect to GDP, who did

Page 99

1   Mr. Lombardo send -- or, that's not fair.

2            How did Mr. Lombardo bring -- who did

3   Mr. Lombardo bring this idea to?

4        A.   I don't recall specifically with that one.

5   I mean, in general, we would capture these -- he may

6   have just walked down the hall and told myself or Greg

7   Chmura about it.  Otherwise, we would capture them

8   through -- like, they would log them in their notes in

9   Salesforce and then we certainly would have a

10  discussion around them at that monthly sales meeting I

11  mentioned where they would go around the table and talk

12  about things they are hearing from customers.

13       Q.   Was GDP an instance where Mr. Lombardo

14  would have been passing through a request from a

15  potential client or clients?

16           MR. MICHALIK:  Object to the form of the

17  question.  You can answer.

18       A.   If my recollection is correct, in this case

19  it was a prospect.

20       Q.   Did Mr. Lombardo help develop GDP?

21       A.   No.

22       Q.   You also mentioned Clippy.  Can you explain

23  what Clippy is?

24       A.   A Clippy is a feature on our road map

25  currently that is still kind of conceptual, but would

Page 100

1    allow our users to create a customer board based on the

2    data in JobsEQ.

3         Q.    And how was this idea brought to your

4    attention?

5         A.    I don't remember where it originated, but

6    Rick would bring it up often.  It's something that our

7    competitor has.

8         Q.    Now, you said that there were other ways

9    for items to get on the road map, which were support

10   requests, correct?

11        A.    That's correct.

12        Q.    Can you explain that a little bit further?

13        A.    Sure.  If a user has -- they can't --

14   let's, just for example, say they can't find some data

15   they need, they may initiate a support request, which

16   means they may open a chat window with our support

17   team.  They may call or email their account manager and

18   would say, you know, do you have GDP data.  And, you

19   know, so in some cases, the answer would be, no, we

20   don't.  But whoever was receiving that request then

21   would take some information and we would get it logged

22   onto the road map.

23        Q.    And then you also mentioned that the sales

24   team would hear from users or prospects, correct?

25        A.    Correct.

Page 101

1    Q.   And how were those filtered -- who were

2    those requests filtered to?

3         MR. MICHALIK:  Object to the form of the

4    question.  You can answer.

5    A.   So I don't know if sales had an official

6    procedure on how those were to be reported.  There were

7    instances where Rick would, you know, tell them to Greg

8    or myself directly, and then like I said, I would also

9    hear them through that monthly sales meeting.

10   Q.   Do you recall any specific items on the

11   road map that, other than Career Concourse, GDP and

12   Clippy, that Mr. Lombardo brought to management -- or

13   brought to leadership's attention?

14   A.   There was one that we call, Employer

15   Database, or Firm List -- we've called it both

16   things -- which was another that a competitor has.  It

17   was a feature that -- we have it now, too, but it was a

18   feature that they had and, you know, Rick would come to

19   us with prospects that were asking for it or saying

20   that they needed it in order to switch to JobsEQ.

21   Q.   Did Mr. Lombardo have any hand in

22   developing Employer -- Employer or Firm List, is that

23   what it is called?

24   A.   Employer Database is --

25   Q.   Okay.  Let me re-ask my question then.

Page 102

1          Did Mr. Lombardo have any hand in

2    developing Employer Database?

3               MR. MICHALIK:   Object to the form.

4         A.    I have to review my notes on that.   So

5    there were some features where we needed some

6    additional specifications of what the users really

7    needed, and in the those cases, we would often leverage

8    the account manager to connect us with customers, or

9    facilitate a conversation with those customers so that

10   we could capture those requirements.   I don't recall if

11   Employer Database was one of those or not.

12        Q.    But it is possible you may have asked

13   Mr. Lombardo to reach out to his contacts to get

14   feedback; is that fair?

15        A.    Yeah, that's fair.

16        Q.    Was Mr. Lombardo present in any meetings

17   where the priority of the items on the road map were

18   discussed?

19        A.    If he was, I don't recall.

20        Q.    And you testified that the road map was

21   prioritized by the number of requests and the level of

22   effort, correct?

23        A.    Well, those were two factors, correct.

24        Q.    What other factors were there?

25        A.    So, also if it could be to a large sale, we

1    may give that more weight, may have given it more

2    weight.  And then, also, things like availability of

3    resources.

4         Q.    Was Mr. Lombardo involved in the decision

5    -- let me rephrase.  Was Mr. Lombardo involved in the

6    prioritization of the items on the road map?

7              MR. MICHALIK:  Object to the form.

8         A.    I think so.  His input, especially with

9    regard to the prospects, you know, and if it would help

10   close a large deal, was critical.

11        Q.    So leadership factored in his input; is

12   that correct?

13        A.    Yes.

14        Q.    Did Mr. Lombardo have the ultimate decision

15   making authority to determine what items on the road

16   map would be prioritized?

17        A.    No.

18        Q.    Can you think of any instances in which

19   Mr. Lombardo pressed for a particular item on the road

20   map to move forward and as a result of his requests,

21   that occurred?

22        A.    Yes, GDP.  Like I said, he was a strong

23   advocate for that.  Career Concourse.  And I actually

24   was against redoing the Career Concourse.  I wanted to

25   retire it, but, you know, we gave some strong weight to

Page 104

1    Rick's input that we should revamp it so that we can

2    sell it.

3         Q.    Could Rick -- could Mr. Lombardo

4    independently decide the priority of the project on

5    road map?

6         A.    No.

7         Q.    Beyond being an advocate, did Mr. Lombardo

8    have any other role in the road map?

9         A.    Yes.  Until recently, I didn't have a

10   product management team, and so the account managers

11   kind of served as -- you know, they would gather data

12   from customers to help make these, kind of what we call

13   a product decision, or road map decision.  And so Rick

14   was really good at identifying what the customers were

15   looking for and what the competitors had that we needed

16   to add.

17        Q.    But Mr. Lombardo didn't actually do the

18   adding of the product, correct?

19        A.    What do you mean by the adding?

20        Q.    Well, I think that was your word.  I guess

21   let me restate.

22              So Mr. Lombardo's role so far was

23   advocating on behalf of projects on the road map,

24   correct?

25        A.    Yes.

Page 105

1        Q.    And gathering information from clients or

2    prospects to bring to you or others in leadership about

3    projects on the road map; is that correct?

4        A.    Road map, yes.

5        Q.    Did Mr. Lombardo do anything else with

6    respect to the road map?

7        A.    Yes.  Like I said, if we needed additional

8    specifications -- so once we, you know, were seriously

9    thinking about an item on the road map, if we needed

10   additional specifications, Rick would help us get

11   those, whether that was facilitating a call with the

12   user or, you know, just going out and getting that

13   information directly.

14       Q.    Would he be directed to do that by someone?

15       A.    Yeah, we would send a request to him.

16       Q.    Now, you were based in the Cleveland

17   office, correct?

18       A.    Correct.

19       Q.    And Mr. Lombardo was also based in the

20   Cleveland office, right?

21       A.    That's correct.

22       Q.    Did you interact with Mr. Lombardo

23   routinely?

24       A.    Yes.

25       Q.    How would you describe Mr. Lombardo's work

Page 106

1   habits?

2         A.    In terms of what?

3         Q.    Did you have the opportunity to observe him

4   routinely throughout the week?

5         A.    No.  So his office was across -- he was in

6   the back of the building and I was in the front.  So I

7   wasn't there routinely.

8         Q.    How frequently would you see him in any

9   given week?

10        A.    Well, I would see him every day he is in

11  the office.  I mean, the walls are glass, so.

12        Q.    All right.  Could you see each other from

13  your respective offices?

14        A.    No, if I was sitting in my -- at my desk, I

15  could not see him, but if I got up, you know, to walk

16  around, then, yeah, I could see him at his desk.

17        Q.    So -- do you have an office at Chmura, like

18  a physical office with walls?

19        A.    Yes.

20        Q.    Was Mr. Lombardo also in an office?

21        A.    Not in the sense that it was a private

22  office.  He was in -- we had a space just for Sales and

23  he was at that, at a workstation in that space.

24        Q.    Can you describe the space?

25        A.    Yeah, it is in the back of the building on

1    the second floor.  There is a glass wall and a glass

2    door, and there is a -- a four-seat workstation.  We

3    later added a private office in that space for the

4    sales manager.

5            Q.    How many floors does Chmura have at the

6    building in Cleveland?

7            A.    Three floors.

8            Q.    Were you and Mr. Lombardo on the same

9    floor?

10           A.    Yes.

11           Q.    Of those three floors, were you on the

12   first floor, second floor or third floor?

13           A.    The second floor, which is the top floor.

14   There is a lower level.

15           Q.    Okay.  How tall is the building?

16           A.    Two stories.

17           Q.    So it had a basement, first floor, and

18   second floor; is that correct?

19           A.    Correct.

20           Q.    What was on the third floor?

21           A.    That's the roof.

22           Q.    Sorry.  I'm sorry.  Forgive me.  What was

23   on the first floor?

24           A.    The first floor, there are some developers

25   -- so there are work stations there.  It is a mix of

Page 108

1    developers and data governance.  We also have a kitchen

2    on the first floor, conference room, and a little,

3    like, not reception, but like some chairs when you --

4    like a little lobby area.

5         Q.    And what was in the basement?

6         A.    More workstations, a ping-pong table,

7    bathroom, and our servers.

8         Q.    What time did you typically -- what time do

9    you typically arrive at work?

10        A.    It's changed over time.  I used to get in

11   really early at 6:00 to 6:30.  Lately, I have been

12   getting in around 7:00.  Well, lately, I have been

13   working from home, but prior to that, 7:00.

14        Q.    Sure.  When did you change from getting in

15   between 6:00 and 6:30 to getting in around 7:00?

16        A.    It was the spring of 2018.  I was getting

17   in early because I did a yoga practice in the morning.

18   I had a knee injury that spring and stopped doing yoga.

19        Q.    Would you observe Mr. Lombardo arrive at

20   work?

21        A.    Not usually.  At that point, I was seated

22   at my desk, so I couldn't see, you know, when he would

23   come in.

24        Q.    Do you have any sense of when Mr. Lombardo

25   would begin his workday?

1      A.    I mean, my impression was he was there in

2    the seven o'clock hour.  I didn't pay close enough

3    attention to say specifically.

4      Q.    And what leads you to that impression?

5      A.    I would usually get up from my desk at some

6    point in that seven o'clock hour and would see him

7    there.

8      Q.    And that was pretty regular that you would

9    see him there in the seven o'clock hour?

10     A.    That's my impression.

11     Q.    What time did you regularly leave the

12    office?

13     A.    Between 5:00 and 5:30.

14           MS. COOPER:  And I just want the record to

15    reflect that Mr. Lombardo was not here this morning,

16    but he is now joining us.  He is now present in the

17    room.

18     Q.    Would you see -- would you interact with

19    Mr. Lombardo before you left for the day?

20     A.    Yes, if he was there, I would usually wave

21    to everyone on my way out.

22     Q.    Was Mr. Lombardo regularly still there when

23    you would leave for the day?

24     A.    I can't remember specifically enough to say

25    regularly.  I mean, I definitely would see him at times

Page 110

1    and wave.

2          Q.    Do you know how many times?

3          A.    I didn't keep track.

4          Q.    Did you observe Mr. Lombardo's lunch

5    habits?

6          A.    No.

7          Q.    You mentioned that there was a ping-pong

8    table in the office.  Do people use it?

9          A.    Yes.

10         Q.    When do people play ping-pong in the

11   office?

12         A.    Between 12:00 and 1:00 -- noon and

13   1:00 p.m.

14         Q.    Did Mr. Lombardo ever play ping-pong

15   between 12:00 and 1:00?

16         A.    Not regularly, but we did have some, like,

17   office-wide tournaments that he participated in.

18         Q.    How often would those tournaments occur?

19         A.    A few times a year.

20         Q.    The calculation that we -- the spreadsheet

21   that we went over last week, do you believe that

22   accurately reflects all of the hours Mr. Lombardo

23   worked?

24         A.    I believe it's an estimate based on data

25   that was available to me.

1      Q.    Do you believe that estimate is accurate?

2      A.    Based on data, yes.

3      Q.    How about based on your observation?

4      A.    It's consistent with my observations.

5      Q.    What are your daily job duties?  What makes

6 your typical day?

7      A.    Sure.  So, ultimately, it all centers

8 around the software products.  So I -- at the beginning

9 of the day, I would catch up on some emails, maybe

10 address any operational -- that is, software

11 operational issues.  I would have a daily stand-up

12 meeting at the 10o'clock hour with our development team

13 and with our data teams, and then the rest of the day

14 would be, you know, meeting with individual developers

15 and with product managers, working on some code,

16 perhaps doing deployments.

17      Q.    Tell me about your -- well, do you have a

18 name for your department?

19      A.    We refer to it as the I.T. Department.

20      Q.    Who makes up your I.T. Department and what

21 are their positions?

22      A.    You want a list of every name?

23      Q.    Names or, really, more job function.

24      A.    Job functions?  Sure.  So as it exists

25 today, I have the -- I have what I call the App, A-P-P,

Page 112

1    Development Team that is made up of various software

2    developers.  So it could be anybody from a senior

3    software developer to a front-end developer.

4              There is a Data Team.  That team is made up

5    -- we -- the title we give them is data scientists,

6    but, essentially, another type of developer.  And then

7    we have the product team, which is our product manager

8    and product owner.

9         Q.    What does the product manager do?

10        A.    So the product manager is now responsible

11   for organizing all those requests we talk about that go

12   into the road map, organizing all of those, specking

13   them out, facilitating the conversation between the

14   various stakeholders; so, leadership, sales, support,

15   marketing.

16             Can we pause for one second?

17        Q.    Sure.

18                       -   -   -   -   -

19                   (Short recess taken).

20                       -   -   -   -   -

21   BY MS. COOPER:

22        Q.    And you said there was a product -- what

23   was the other title under that team, under the product

24   team?

25        A.    Product owner.

Page 113

1      Q.    What do they do?

2      A.    The product owner?  You can think of it as

3   being below the product manager, but they -- they

4   handle more of the actual -- like the actual

5   implementation.  So that is taking the specifications

6   and relaying those to the development team, or what I

7   call the app team.

8      Q.    Who handles the day-to-day, just general

9   technology needs of the employees of the company?

10     A.    I handle that, somewhat.  I did have an --

11  I don't know what you would call it, like an I.T. guy.

12  We call it a deadlocks, but I did have someone for a

13  while that was helping with that.

14     Q.    Do you currently have anyone?

15     A.    No.

16     Q.    Do you work with any outside vendors?

17     A.    Yeah, I mean, we use cloud based services,

18  like our phone system.  We don't work that ourselves,

19  the service.

20     Q.    Do you work with any I.T. management

21  companies to assist?

22     A.    No, no.

23     Q.    Was Mr. Lombardo issued a laptop computer

24  by Chmura?

25     A.    Not specifically for him.  We had some

Page 114

1    laptops that were shared and that anyone could use.

2         Q.    Was he allowed to take one of those out of

3    the office?

4         A.    Yes.

5         Q.    What programs did Mr. Lombardo have access

6    to on that laptop -- well, let me ask that again.

7              How many laptops, shared laptops are there?

8         A.    It varied over time.  At one point, there

9    was maybe three.

10        Q.    And was Mr. Lombardo granted access to all

11   three of them?

12        A.    He could have.  I think there was some that

13   were preferred by people, like certain people preferred

14   certain laptops.  One of them was kind of old, so

15   nobody liked that one.

16        Q.    Fair enough.  Turning your attention to

17   late summer or fall of 2019, Mr. Lombardo was working

18   with -- or had access to a particular laptop; is that

19   correct?

20        A.    Yes, I believe he was using one of our Dell

21   laptops.

22        Q.    And would he, in that period of time, use

23   the same laptop?

24        A.    I can't say for sure.  We don't have a log,

25   you know, like a sign in/out log.

Page 115

1      Q.    How would an employee get access, or -- how

2  would an employee get access to a laptop?

3      A.    They were in the -- we generally kept them

4  in the conference room, so they could just take them

5  from there.

6      Q.    Did they have to ask anyone to take one?

7      A.    No.  I mean within sales.  I don't know if

8  they had a policy for that.  You know, from the I.T.

9  standpoint, I didn't require any kind of sign out.

10     Q.    Are you aware that one particular laptop is

11 at issue in this case?

12     A.    Yes.

13     Q.    With respect to that laptop, did it have a

14 name or number assigned to it?

15     A.    I'm sure it had a name assigned to it.  I

16 don't recall what it was.

17     Q.    I am going to refer to it for purposes of

18 our next set of questions here, just as 'the laptop';

19 is that okay?

20     A.    Okay.  That's fine.

21     Q.    On the laptop, what programs did

22 Mr. Lombardo have access to?

23     A.    We set those up with Microsoft Windows,

24 beyond that, we generally gave the employees -- they

25 would have to request this, but I would generally set

Page 116

1    them up with admin access to that specific device so

2    that they can install anything they need.  Most people

3    install Microsoft Office.  I don't recall if that

4    laptop had it or not.

5         Q.    Would Mr. Lombardo have done the

6    installation of the apps that he needed on that laptop?

7         A.    He could have.  I mean, to say that he had

8    the access to do that, I don't recall if I helped him

9    or my I.T. administrator helped him.

10        Q.    Do you know specifically what programs

11   Mr. Lombardo had access to on that laptop?

12        A.    No.

13        Q.    Would he have had, or did he have a profile

14   on that laptop?

15        A.    Yes.  When he would log in, I mean, Windows

16   would automatically create a profile, if that's what

17   you mean.

18        Q.    Was that laptop connected to the servers in

19   some way?

20        A.    Yeah, so, ultimately, the authentication,

21   the user name and password for that device was

22   controlled by our servers.

23        Q.    Was it possible for you, or someone on your

24   team, to change the password remotely to that computer?

25        A.    So we could change the password on the

Page 117

1   server, but it wouldn't change on that specific

2   computer.  I would have to research this further, but I

3   don't think it would change on that computer until it

4   was brought back to the office and reconnected to the

5   network.

6        Q.    Did that laptop have any software installed

7   on it that would allow remote access?

8        A.    Well, remote desktop is built into Windows,

9   but we did not install any kind of remote, you know,

10   like, management software.

11       Q.    Do you have any personal knowledge of what

12   programs Mr. Lombardo accessed on that laptop?

13       A.    No.

14       Q.    Does Chmura utilize any type of office --

15   is Chmura a B.Y.O.D, or bring your own device, with

16   respect to cell phones?

17       A.    We don't have a policy one way or another.

18       Q.    Does Chmura use any type of mobile device

19   management?

20       A.    No.

21       Q.    For either cell phones or -- sorry, with

22   regard to mobile devices -- actually, let me take that

23   back.

24            With respect to the laptops, was there any

25   kind of multi-factor authentication either used to

1    access -- well let me start with, was there any

2    multi-factor authentication to log in to the computer?

3         A.    Not to log in to the computer, no.

4         Q.    How about to log in to any of the apps that

5    could have been on the computer?

6         A.    Yes.  I don't remember when we implemented

7    that, but at a certain point, we started using

8    multi-factor to access any of the Office 365 based

9    services, so, primarily, email.

10        Q.    And what MFA was used?

11        A.    The user could pick between -- they could

12   get a text message, they could use an app, they could

13   have a voice call come through.  I think those were the

14   only three options.  Technically, there is a key fob

15   option, but we didn't have that set up.

16        Q.    Other than Office 365, did any of the other

17   apps require a multi-factor authentication?

18        A.    That's the only one that I managed that had

19   it turned on.

20        Q.    Was somebody else managing the other apps?

21        A.    Some of them.  So, specifically,

22   GoToMeeting and Salesforce, those were handled by

23   someone else.  I mean, you know, I could get in.  If

24   they would give me their password, I could get in to

25   help, but I didn't generally get into those.

Page 119

1      Q.    Who was managing GoToMeeting?

2      A.    For a time it was Greg Chmura.

3      Q.    What about Salesforce?

4      A.    Same. I helped set that up originally but

5   then handed it off to the various sales managers.  I

6   don't spend a lot of time with Greg.

7      Q.    When you would log in to Salesforce using

8   somebody else's password to help them, do you recall

9   being asked for some additional authentication method?

10     A.    Yeah, so Salesforce, I think, would send an

11  email with a code or something that you have to put in.

12     Q.    Now, Mr. Lombardo's employment was

13  terminated by Chmura, correct?

14     A.    Yes, that's my understanding.

15     Q.    At the time of his termination, did you

16  take any action with respect to the laptop issued by

17  Chmura?

18     A.    Not specifically the laptop.

19     Q.    Why don't you walk me through -- what

20  actions did you take when Mr.  Lombardo was terminated?

21     A.    So the kind of shut down checklist I follow

22  is we disable their network accounts.  So, again,

23  that's what's used to log in to the laptop.  And when

24  that laptop is synced with the server, at some point it

25  should turn off.

1        We lock down the Office 365 account as well

2   and then turn off things like the other various apps,

3   so GoToMeeting, JobsEQ.  Well, Greg would do

4   GoToMeeting.  I would turn off JobsEQ.  Greg would do

5   Salesforce.  I would disable the key fob to the

6   building.

7        Q.    And did you do all those things with

8   respect to Mr. Lombardo?

9        A.    I believe so.

10        Q.    Do you recall when you did that?

11        A.    Not specifically.

12        Q.    Once those steps were taken, what would

13   Mr.  Lombardo have had access to on the laptop?

14        A.    He would still be able to access any files

15   he had on that laptop.  The email, I'm not quite sure.

16   I'd have to research that.  My understanding is that

17   once we disabled his email account, that he wouldn't be

18   able to -- he wouldn't be able to run Outlook, but on

19   the same token, like, we didn't -- we didn't mandate

20   any encryption on those laptops, so the files would

21   still be there.

22        Q.    Why did Chmura not mandate encryption on

23   the laptop?

24        A.    We don't have an I.T. Department in the

25   traditional sense.  We are a software development

1  company, so, you know, we just operate pretty lean as

2  far as I.T., you know, that kind of I.T. Department

3  stuff is concerned.

4        Q.    Were cell phones required to be encrypted?

5        A.    No.

6        Q.    I think you mentioned that Chmura has

7  servers, on-site servers; is that correct?

8        A.    Correct.

9        Q.    What data is stored on those servers?

10       A.    There are some shared drives where various

11 members store files just related to, you know, our

12 work.  And then the on-site servers are all of our

13 development resources, so all the data we use to build

14 JobsEQ.

15       Q.    That's not stored in the cloud, the data

16 for JobsEQ?

17       A.    Some of it is.  The majority of it is

18 stored on-site.  And then one additional thing that's

19 stored on site is our key fob system.  You know, it is

20 specific to the building.  That's stored on-site as

21 well.

22       Q.    With respect to JobsEQ, when a customer

23 purchases JobsEQ, what are they actually purchasing?

24 What do they get and how do they access it?

25       A.    Generally, they are purchasing an annual

1    subscription.  The terms of that kind of vary, but --

2    so they get a login, or they -- well, they get -- a

3    license includes -- they get the standard four -- I

4    don't know if they changed that -- four logins.  So

5    they get a login and that let's them access that

6    software until the subscription is canceled or ends, or

7    whatever.

8           Q.    How do they access the software?  Is it

9    online, or is it -- are they given software?  How did

10   that work?

11          A.    It is web based, so online.

12          Q.    So if they didn't pay for their service,

13   Chmura could turn it off remotely, correct?

14          A.    Correct.

15          Q.    In JobsEQ, is it really a database, is that

16   what's behind the software?

17          A.    What's behind the software?  I -- yeah, the

18   database.

19          Q.    So is that the data that's stored on your

20   -- mostly on the servers?

21          A.    Oh, I see what -- well, are you speaking

22   about the on-site servers?

23          Q.    Yes, yes.

24          A.    Yes, but also all -- so we utilized a lot

25   of various input to build our data sets, raw data.  So

Page 123

1    all of those raw data, which the customers can't access

2    directly, are on our servers.

3         Q.    Were you involved in the production of the

4    documents in this case?

5         A.    Somewhat.  So since I manage Office 365, I

6    did some exports from the email system, and then I also

7    pulled some of the -- like the key fob logs.  You know,

8    basically, the logs that I had access to.

9         Q.    With respect to the Office 365 export, what

10   did you search specifically?

11        A.    So there was -- our attorneys requested

12   certain email accounts --

13             MR. MICHALIK:  I am going to object.  I am

14   going to object to any inquiry into communications

15   between Mr. Chmura and counsel and instruct him not to

16   divulge any communication you had with outside counsel,

17   or with other people within Chmura who were reporting

18   the advice or requests of the outside counsel.  So

19   please do not divulge those communications.

20             THE WITNESS:  Understood.

21        Q.    Let me ask a new question.  You said you

22   exported information out of the Office 365; is that

23   correct?

24        A.    Correct.

25        Q.    Did you look at certain custodians to

Page 124

1   export that information?

2        A.    I don't know what that means.

3        Q.    Did you look at certain users to export

4   that information?

5        A.    Yes.

6        Q.    Which users did you review?

7        A.    So I exported Rick and Eli and their --

8   like their entire mailbox.

9        Q.    Anybody else?

10       A.    And then I exported -- I don't remember if

11  it was specific users, or if we did everyone based on

12  on key words.

13       Q.    Who provided those key words?

14             MR. MICHALIK:  Again, I am going to object

15  to the extent it calls for any communications between

16  outside counsel and either yourself, Mr. Chmura, or as

17  that advice or communications were relayed to you by

18  other people within Chmura, the company, and instruct

19  you not to answer that.

20             MS. COOPER:  I think as to who produced or

21  who requested it of him is not an attorney-client

22  confidence. I didn't ask what was requested or what the

23  conversation was.  I asked who.

24             MR. MICHALIK:  I disagree.  I think that

25  that does get into attorney-client communications.  You

Page 125

1   are more than entitled, and you have gotten into what

2   he searched and what he provided to be produced, but

3   the communications that led to that search or that

4   production, particularly if it was with outside

5   counsel, is absolutely privileged, and is black letter

6   privileged.

7           MS. COOPER:  I disagree, but I will move

8   on.

9       Q.   Other than Office 365, did you review any

10  other -- or did you pull any other -- from any other

11  sources?

12      A.   Yes, the key fob logs, the phone system

13  logs and the ADT security notifications.

14      Q.   What is Onstage portal?

15      A.   It's a messaging platform.

16      Q.   And how does Chmura use that?

17      A.   Some of our documents are stored there; for

18  example, road map was stored there for a time.

19      Q.   Did you search Onstage portal in producing

20  documents?

21      A.   I did not.

22      Q.   Do you know if anyone did?

23      A.   I don't know that.

24      Q.   Who has access to Onstage portal?

25      A.   All Chmura employees have access.

Page 126

1     Q.    Do you know what type of information is

2   stored on it?

3     A.    There is a large amount of information.

4     Q.    Is Onstage portal a cloud-based service?

5     A.    No.

6     Q.    Is Onstage portal system -- the information

7   within there, is that stored on the on-site servers?

8     A.    No, it is not stored on on-site servers.

9     Q.    Where is it stored?

10    A.    It is stored in our production servers.

11    Q.    And where are the production servers?

12    A.    They are located in a data center offsite.

13    Q.    Is there anything else located in that data

14  center?

15    A.    Yeah, it's a co-location space, so it's --

16    Q.    Anything else from Chmura located on that

17  offsite data server?

18    A.    Yes, so all of our -- anything we consider

19  production is -- I take that back because some of is

20  cloud based.  JobsEQ.  The primary JobsEQ application

21  and database is stored there.

22    Q.    Once you had collected the information from

23  Office 365, what did you do with it?

24    A.    I am not sure I can answer that.  It

25  involves communication with my attorney.

1      Q.    Okay.  Did you review those documents?

2      A.    I did not.

3      Q.    Did you just do the document pull?

4      A.    Correct.

5      Q.    Did you work, generally, with the account

6   managers?

7      A.    No.  What does "generally" mean?

8      Q.    Did you have any interaction with the

9   account managers?

10      A.    Yeah, insofar as we are in the same

11   building.

12      Q.    Do you -- are you aware of what the job

13   duties of an account manager are?

14      A.    In a general sense.  I wasn't involved with

15   the specifics of it.

16      Q.    What was your general sense?

17      A.    Ultimately, their job was to sell JobsEQ,

18   but that involved prospecting, you know, and various

19   forms of prospecting and renewals, because it is a

20   subscription platform.

21      Q.    And the account managers, where did they,

22   or -- where were they doing most of their selling from?

23      A.    I mean, a lot of it was done over -- you

24   know, like the demos are done over GoToMeeting, so they

25   would do a lot of it from their desk.  Various account

Page 128

1  managers would go to conferences as well.

2        Q.    And they were making phone calls from their

3  desks, too, correct?

4        A.    Yes.

5        Q.    And Mr. Lombardo was an account manager; is

6  that correct?

7        A.    Yes.

8        Q.    Do you know the distinction between an

9  account manager and a senior account manager?

10        A.    No.

11        Q.    How often would you interact with the

12  account managers?

13        A.    Depends on the day and if anything was

14  broken.

15        Q.    Fair enough.

16        A.    Or if the phones went out.

17        Q.    I think I can relate.  How often would

18  Mr. Lombardo interact with you in a business sense?

19        A.    Sure.  I didn't keep track specifically.  I

20  mean, he always had feedback, you know, like I

21  mentioned.  I didn't -- for a long time, I didn't have

22  a product management team, so I depended on those

23  account managers to hear what the customers were

24  saying.

25        Q.    And then did you also help him with his

Page 129

1    I.T. issues?

2         A.    Yeah.  As I mentioned, we are pretty lean

3    on I.T., traditional I.T., so if there was issues, I

4    would help, you know.  Like, we also always -- for

5    whatever reasons, we always had printer problems, so,

6    that kind of stuff.

7         Q.    Did you interact with Mr. Lombardo outside

8    of the office?

9         A.    Not on a regular basis.  You know, we had

10   like a couple company parties, Christmas things.  He

11   came to a fund raiser that I was having for my son

12   once.

13        Q.    Were you involved in the decision to

14   terminate Mr. Lombardo?

15        A.    No.  I mean, leadership, you know, met on

16   it, but, ultimately, that is not part of my

17   responsibility in I.T.

18        Q.    And tell me, you may have already told me

19   this last week, but can you tell me who constitutes

20   leadership?

21        A.    Yeah.  The leadership team is Chris Chmura,

22   Leslie Peterson, myself, Greg Chmura, Sharon Simmons

23   and Xiaobing Shuai.

24        Q.    Who made the ultimate decision to terminate

25   Mr. Lombardo?

1      A.    I don't know if it was Chris or Leslie.

2      Q.    What was your understanding of the reason

3  why Mr. Lombardo was terminated?

4      A.    My understanding is he was threatening to

5  -- threatening something, to give away information, or

6  work with our competitors.

7      Q.    Do you know when he was terminated?

8      A.    End of October 2019.

9      Q.    And what, if any, involvement did you have

10  with that decision?

11      A.    My involvement was through the leadership

12  team.

13      Q.    Did you have any communications with the

14  leadership team regarding his termination?

15      A.    Yeah, I mean, we -- we -- I am sure we met

16  via phone.  I don't know off the top of my head, but

17  I'm certain there were communications there.

18      Q.    Do you recall any specific discussions?

19      A.    No.  I mean, there were phone calls, but

20  I'd have to -- not off the top of my head.

21      Q.    Did you agree with the decision to

22  terminate Mr. Lombardo?

23      A.    Yes.

24      Q.    And why?

25      A.    I mean, at that point, that put at risk

Page 131

1    everything we have built, so I don't see how -- even

2    though Rick was one of the top performers, we had to

3    look past that and do what was right for the company.

4         Q.    Do you have a sense for the performance of

5    the sales team now that Mr. Lombardo is not employed at

6    Chmura?

7         A.    Only in the sense that I get a weekly email

8    report with new business -- or like, deals closed.  It

9    is hard to compare because of Covid.

10        Q.    Is Covid affecting Chmura's JobsEQ side of

11   the business?

12        A.    I don't know, and I haven't gotten into the

13   weeds enough to know if it is Covid or the sales team

14   or what.

15        Q.    Is performance down since Mr. Lombardo's

16   departure?

17        A.    My sense is, yes, but I don't -- I honestly

18   don't look at the numbers close enough to say, you

19   know, for sure.

20             MS. COOPER:  I am going to excuse

21   Mr. Lombardo from the room because I am going to show

22   what's been marked as a highly confidential document.

23                       -   -   -   -   -

24             (Short recess taken).

25             (Mr. Lombardo exited the room).

Page 132

```
 1                         -   -   -   -   -
 2    BY MS. COOPER:
 3          Q.    I am going to show you what's been marked
 4    as Defendant's Exhibit X.  If you could, just take a
 5    look at this document.
 6                              -   -   -   -   -
 7                    (Thereupon, Previously Marked Exhibit
 8                    X, Copy Highly Confidential Copy of
 9                    Email Dated 10/2/2019 Bates
10                    CHMURA0201264-269, was shown for
11                    purposes of identification.)
12                              -   -   -   -   -
13                    MR. MICHALIK:  Christine, can you email
14    that to me also so I can have it?
15                    MS. COOPER:  I will.  Give me one moment so
16    I can have control of the screen.
17          Q.    Do you recall seeing this document?
18          A.    The email?
19          Q.    Keep going.  Keep going, I'm sorry.  Page
20    through and after you've had a chance to look at it, I
21    will ask you my questions.
22          A.    (Reviewing.)
23                    Up to this point, (indicating), yes, this
24    looks like Salesforce data, some things.  Should I keep
25    going?
```

Page 133

1      Q.    Yeah, go ahead and page through it.  Just

2   tell me when you are ready and I will ask you some

3   questions on it.  Of course, it's upside down, as well

4   (indicating).

5            Have you seen this before?

6      A.    So this all looks familiar up to Page 9.

7   It is possible I saw that stuff after Page 9.

8      Q.    I am going to steal control for a second

9   here.

10            This is an email sent from Greg Chmura to,

11   it looks like, Chris Chmura, Leslie Peterson, you,

12   Sharon Simmons and Eli Auerbach; is that correct?

13      A.    Yes, that's what it looks like.

14      Q.    And it is regarding a proposed

15   reorganization structure, correct?

16      A.    That's my understanding.

17      Q.    Were you involved in the discussions

18   regarding a reorganization of the sales team?

19      A.    I don't recall.  There was a presentation

20   that that is referencing, and I don't remember if I was

21   in that presentation, or if I saw that content when it

22   was emailed out here.

23      Q.    Do you have any involvement with the

24   decision making of the reorganizations of the sales

25   team?

Page 134

1      A.    Not directly.  Leadership -- the leadership

2   team discussed it, then I likely was involved in that.

3   I don't remember.

4      Q.    Do you have any specific recollection of

5   any conversations about it?

6      A.    No.

7      Q.    Do you remember any discussions around this

8   time regarding the termination of Mr. Lombardo?

9      A.    Not specifically.  I vaguely recall there

10   was a concern that, you know, not all of the account

11   managers would be happy about this change.  I am sure

12   we were thinking of Rick being one of the top

13   performers.

14      Q.    Do you recall why they wouldn't -- why did

15   account managers, or potential -- do you remember why

16   some of the account managers may not have been happy

17   about this change?

18      A.    Yeah, I -- again, I'm not in the day-to-day

19   sales, so this is kind of my general sense of it, but

20   any time you are messing with the territories or the

21   structure of the sales department, people get upset.

22      Q.    Did Mr. Lombardo ever speak to you about

23   the restructure?

24      A.    I don't recall.

25      Q.    Was the sales team, to your knowledge,

Page 135

1    ultimately restructured?

2         A.    I don't think it was.

3         Q.    Do you recall anything else about the sales

4    team restructuring?

5              MR. MICHALIK:   Object to the form of the

6    question.

7         A.    No, not specifically.

8         Q.    Was Chmura concerned -- Chmura, the

9    business, or anyone at it, concerned about the costs of

10   the sales team, the compensation costs of the sales

11   team?

12        A.    If that came up in leadership, I don't

13   recall the specifics.  So I can answer for myself, no,

14   they -- you know, if they are selling, then they are

15   commission based, that means they are closing deals and

16   bringing in revenue.

17        Q.    And to your knowledge, was Mr. Lombardo one

18   of the top performing sales reps?

19        A.    Yes.

20        Q.    Sorry, let me use the right term, and I

21   talked over you.

22              Was Mr. Lombardo one of the top performing

23   account managers?

24        A.    I believe he was, yeah.

25        Q.    Was there a vote amongst leadership to

Page 136

1    terminate Mr. Lombardo?

2        A.    Hmm, I don't remember one way or another.

3        Q.    Do you recall any discussion about getting

4    Mr. Lombardo to resign?

5        A.    No.  I think Eli maybe was proposing

6    something.  And, again, I don't remember if it was

7    during this meeting or something that came to

8    leadership, but I don't recall any specifics.

9            MS. COOPER:  All right.  I am going to put

10   this back and go off the record.

11                   -   -   -   -   -

12                  (Short recess taken.

13           Mr. Lombardo rejoined the deposition.)

14                   -   -   -   -   -

15           MS. COOPER:  Okay.  I am just going to go

16   through my outline quickly, but I think I am about done

17   here.

18           MR. MICHALIK:  Christine, do you want five

19   minutes to do that, so I can step away for a second?

20           MS. COOPER:  Yeah, that would be great.

21   That would be fine.

22                   -   -   -   -   -

23               (Short recess off the record.)

24                   -   -   -   -   -

25           MS. COOPER:  Mr. Chmura, I want to thank

Page 137

1    you for your time.  I don't have any further questions

2    for you.

3                    THE WITNESS:  Okay.

4                    MR. MICHALIK:  I have no questions for

5    Mr. Chmura.  We would like to read and sign, and, also,

6    as with the other depositions, a rough.

7

8        (Whereupon, deposition was concluded at 10:37 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 138

1    Whereupon, Counsel was requested to give instruction

2   regarding the witness's review of the transcript

3   pursuant to the Civil Rules.

4

5                          SIGNATURE:

6

7    Transcript review was requested pursuant to the

8   applicable Rules of Civil Procedure.

9

10                       TRANSCRIPT DELIVERY:

11   Counsel was requested to give instruction regarding

12   delivery date of transcript.

13                  Mr. Michalik, Rough and Original

14   transcript, yes.

15                  Attorney Cooper deferred at the time of the

16   deposition.

17

18

19

20

21

22

23

24

25

Page 139

1              REPORTER'S CERTIFICATE

2

3    The State of Ohio,    )

4                                    SS:

5    County of Cuyahoga.   )

6

7              I, KELLIANN D. LINBERG, RPR, a Notary Public

8    within and for the State of Ohio, duly commissioned and

9    qualified, do hereby certify that the within named

10   witness, JOHN L. CHMURA, was by me first duly sworn to

11   testify the truth, the whole truth and nothing but the

12   truth in the cause aforesaid; that the testimony then

13   given by the above-referenced witness was by me reduced

14   to stenotypy in the presence of said witness;

15   afterwards transcribed, and that the foregoing is a

16   true and correct transcription of the testimony so

17   given by the above-referenced witness.

18             I do further certify that this deposition was

19   taken at the time and place in the foregoing caption

20   specified and was completed without adjournment.

21

22

23

24

25

Page 140

1          I do further certify that I am not a

2  relative, counsel or attorney for either party, or

3  otherwise interested in the event of this action.

4

5          IN WITNESS WHEREOF, I have hereunto set my

6  hand and affixed my seal of office at Cleveland, Ohio,

7  on this 14th day of May, 2020.

8

9

10

11

12

13          Kelliann D. Linberg, R.P.R.,

14          Notary Public within and for

15          the State of Ohio

16

17   My commission expires May 25, 2024.

18

19

20

21

22

23

24

25