Exhibit 32

2                ROUGH DRAFT TRANSCRIPT

3        VIDEOCONFERENCE DEPOSITION OF ELI AUERBACH

4                   MAY 7, 2020

5        A realtime rough draft is unedited and

6   uncertified and may contain untranslated stenographic

7   symbols, incorrectly translated words, misspelled

8   proper names, nonsensical word combinations and an

9   occasional reporter's note.  Any inaccuracies will be

10  corrected in the final certified transcript of

11  proceedings.

12       By acceptance of a rough draft of proceedings,

13  any party or counsel representing any party to the

14  action understands and agrees that the text of a rough

15  draft may not be quoted or cited in any subsequent

16  court or discovery proceeding, may not be used for

17  impeachment purposes and may not be distributed in any

18  form to any other person or entity.

19       Further, by acceptance of a rough draft of

20  proceedings, any party or counsel representing any

21  party to the action agrees to indemnify and hold

22  harmless the individual court reporter should the

23  final transcript differ in form or content from the

24  rough draft of the proceedings.

25                   - - -

 2          MS. SIEGMUND:  This is Heidi Siegmund

 3     with McGuire Woods, representing the

 4     plaintiff, Chmura.

 5          I'm just noting for the record that all

 6     counsel have stipulated that it's fine that

 7     we're doing this remotely, and that the court

 8     reporter and the witness are not in the same

 9     room, and that no one objects to that

10     arrangement.

11          MR. POSEY:  This is Terry Posey for

12     Mr. Auerbach, we consent the that arrangement.

13          MS. COOPER:  Counsel for Mr. Lombardo,

14     Christine Cooper and we consent, as well.

15  E L I   A U E R B A C H,

16          called as a witness, having been first

17     duly sworn by a Notary Public, was

18     examined and testified as follows:

19  EXAMINATION BY

20  BY MS. SIEGMUND:

21     Q.   Mr. Auerbach, I won't go over the rules

22  again, but, of course, this is all the same as

23  what we were going through on Tuesday, as far as

24  you being under oath and we'll try not to talk

25  over each other and so forth.

ROUGH TRANSCRIPT

2          I just have a very little bit more to go

3     over with you.

4          I think when we left off on Tuesday we

5     were going through your affidavit that you had

6     executed before leaving Chmura, and making sure

7     that we got on the record anything that you no

8     longer think is totally accurate.

9          So I'm going to submit that same exhibit

10    that we used the other day.

11              (Exhibit A previously marked for

12              identification was offered.)

13    Q.    Mr. Auerbach, hopefully these come

14    through a little bit more quickly today, so just

15    let me know when that affidavit comes up for you.

16          I think we had gone through the first

17    page on the record the other day, so I am going to

18    go ahead and skip to Page 2.

19    A.    The computer is still loading.

20    Q.    Mr. Auerbach has that affidavit come

21    through?

22    A.    No, it just shows me, on the right side

23    it says exhibit loading.  Please wait.  There's

24    been no change.

25    Q.    Are you able to go to the exhibit files

2    and see the submitted exhibit?

3        A.    I tried a few times now to do that.  I

4    can see that it's there, but when I go to look at

5    the preview it says error.

6        Q.    Okay.  I did ask the LiveLitigation

7    folks about this, and they said it's just a

8    function of the internet connection.  So sorry for

9    the delay, but just let me know when it comes

10   through.

11             I just submitted it again, and I'll also

12   go ahead and e-mail this to you and Mr. Posey.

13             And I think we all know what we're

14   looking at and maybe that will be faster.

15             This is the only exhibit I'm going to

16   use today, so, hopefully, we won't take up too

17   much time with this.

18             I'm going to go ahead and send this by

19   e-mail.  This won't be the stamped version that's

20   in LiveLitigation, but just so we can move this

21   along.

22        MR. POSEY:  I'll be happy to review it

23      and stipulate that it's the same, once I see

24      your e-mail.

25        MS. SIEGMUND:  All right.  You should

2          all be getting that exhibit by e-mail here in

3          a second.

4     BY MS. SIEGMUND:

5          Q.    Mr. Auerbach, let me know when you get

6       that e-mail, that might be faster.

7          A.    Sorry, I was on mute.  It has arrived.

8          Q.    Excellent.

9               MR. POSEY:  I would stipulate that the

10              document that you e-mailed to Chmura 0000184

11              through 187, which I believe is the same as

12              the submitted Exhibit A.

13         Q.    Super.  Mr. Auerbach, do you have that

14      e-mail, Exhibit A in front of you?

15         A.    I do, yes.

16         Q.    Okay.  So let's look at Page 2.  Take a

17      look at Page 2 for me, please, and let me know if

18      you see anything on Page 2 that you now believe is

19      false.

20         A.    It looks correct to me.

21         Q.    Super.  Let's go to Page 3, take a look

22      at Page 3 and tell me if there's anything you see

23      on here that is false.

24               And that's Chmura -- the number at the

25      bottom is Chmura 0000186?

 2      A.    This looks correct.

 3      Q.    Super.

 4            Let's go to Page 4, that's the last

 5   page, it has your signature on it.

 6            Let me know if you see anything on

 7   Page 4 that you now believe is false.

 8      A.    That is correct.

 9            MS. SIEGMUND:  Super.  That is all I

10      have for you.  Thank you, Mr. Auerbach.

11            I think Ms. Cooper will have some

12      questions for you.

13            MS. COOPER:  Thank you.

14   EXAMINATION

15   BY MS. COOPER:

16      Q.    Good morning, Mr. Auerbach, how are you?

17      A.    Good morning.  Well, thank you.

18      Q.    Good.  I want to ask you a few

19   background questions before I jump into a couple

20   of specifics and go down that path.

21            You were a sales manager at Chmura,

22   right?

23      A.    That is correct.

24      Q.    Did you have any prior management

25   experience?

    2        A.    I had, yes.

    3        Q.    And can you tell me a little about your

    4   management experience prior to joining Chmura?

    5        A.    It was probably three specific positions

    6   I think align closely to what I did at Chmura.

    7              Probably mid 20's, about 15 years ago, I

    8   was a sales manager for a steel company in

    9   Cleveland.  I was there for a few years.

   10              And then there was a position I held

   11   over at the Council of Small Enterprises.

   12              (Discussion held off the record.)

   13              THE WITNESS:  The next position I think

   14        that most closely aligns was a position with

   15        COSE, the Counsel of Smaller Enterprises.

   16        They were a large regional Chamber of

   17        Commerce.  And I was there for three years and

   18        was a manager in their energy program.

   19              And then, after leaving there, I worked

   20        for a company called Echo.  They were an

   21        energy retrofit company, worked with mid- to

   22        medium-sized businesses and I was in

   23        management there as well.

   24        Q.    And approximately how many years of

   25   management experience do you have?

2      A.    I'd say from my first experience until

3   now, about 15 years.

4      Q.    I want to turn your attention to your

5   work at Chmura.

6            What were your job responsibilities?

7      A.    So primarily I was responsible for

8   working with the sales team to cultivate new sales

9   opportunities, new business; to get a high rate of

10  renewal for our existing client base; and also

11  work with account managers to most efficiently and

12  effectively cultivate these opportunities through

13  e-mail campaigns or calling or developing call

14  lists for them to work from.

15           And then, preparing a number of

16  different reports, sometimes weekly, sometimes

17  monthly, to share with leadership to keep them

18  apprized of our progress.

19     Q.    Were you, during the time of your

20  employment, Mr. Lombardo's direct supervisor?

21     A.    I was, yes.

22     Q.    And do you know what his job title was

23  at the time you were his supervisor?

24     A.    Senior account manager.

25     Q.    There's the account manager position and

2    the senior account manager position, correct?

3        A.    That is correct, yes.

4        Q.    What's your understanding of the

5    difference between the two?

6        A.    To be very honest, I don't see there

7    being a difference between the two.

8              My understanding was the increase in

9    that title was developed as a means to appease the

10   older account managers that were there, so that

11   they can be distinguished between newer account

12   managers coming in.

13       Q.    Mr. Lombardo would have been one of

14   those older account managers, right?

15       A.    That is correct, yes.

16       Q.    I want to talk about your observations

17   and your own personal knowledge of the hours

18   Mr. Lombardo worked.

19             First -- and we went through some of

20   this last weak.  I just want to drill down a

21   little bit.

22             Did you spend most workdays in the

23   office?

24       A.    I did, yes.

25       Q.    And did you -- you didn't -- I'm sorry.

2    let me rephrase that.

3            You didn't travel as a substantial part

4    of your job responsibilities, did you?

5        A.    No, it wasn't a substantial part.

6        Q.    In your experience, did Mr. Lombardo

7    spend most of his workdays in the office?

8        A.    That is correct, yes.

9        Q.    Was Mr. Lombardo required to travel

10   substantially for work?

11           MS. SIEGMUND:  Object to the form of the

12       question.

13           You can answer.

14           THE WITNESS:  I think it was a regular

15       component, but I would not say substantial.

16       Q.    Can you put a number on that for me?  In

17   any given month, how frequently would Mr. Lombardo

18   travel?

19       A.    I think is fair representation would be

20   one trip a month for about three days each time.

21       Q.    And were those to -- where was he

22   traveling to?

23       A.    The primary reason for traveling would

24   be to attend different conferences or trade shows.

25       Q.    Did you ever have to communicate with

2   Mr. Lombardo in the evenings, after leaving the

3   office?

4       A.    Yes, that was a pretty frequent

5   occurrence.

6       Q.    And approximately what time would you

7   communicate with him?

8       A.    If I had to put an average on it, it

9   would usually be somewhere probably between 7 or

10  8:00 at night.

11      Q.    And when you would call him at 7 or 8:00

12  at night, were you able to get ahold of him?

13      A.    Every time, yes.

14      Q.    Do you know how frequently those phone

15  calls would occur?

16      A.    I would say, just based on averages, it

17  was probably weekly.  There might be some weeks,

18  not at all, other weeks we had to talk regularly.

19  But, I would say probably average weekly.

20            I know that, when he would go to

21  conferences, as with all of the account managers,

22  we would touch base pretty often, just to get an

23  understanding of how things were going while they

24  were there.

25      Q.    Would you ever have reason to call if

ROUGH TRANSCRIPT

2   Mr. Lombardo wasn't at a conference?

3       A.     Absolutely, yes.

4       Q.     What was your understanding of

5   Mr. Lombardo's employment responsibilities while

6   as a senior account manager?

7       A.     The significant majority of his time

8   went toward pursuing new business opportunities,

9   and working very closely with his existing client

10  base, just to make sure the platform was working

11  for them the way that they wanted.  As well as

12  answering any questions they may have regarding

13  how to maximize the platform and their use of it.

14      Q.     Was Mr. Lombardo ever responsible for

15  supervising other employees?

16      A.     No.

17      Q.     Was he responsible for making decisions

18  about company strategy?

19      A.     No.

20             MS. SIEGMUND:  Object to the form of the

21      question.

22             You can answer.

23             THE WITNESS:  No, he was not.

24      Q.     Was he responsible for setting spending

25  priorities?

2       A.    No.

3       Q.    Was he responsible for establishing

4    policies or procedures for the company?

5             MS. SIEGMUND:  Object to the form of the

6       question.

7             You may answer.

8             THE WITNESS:  No.

9       Q.    Was he responsible for any form of

10   compliance?

11      A.    Can you define "compliance," please?

12      Q.    Sure.  Was he -- fair question.

13            Was he responsible for any legal

14   compliance activities at Chmura?

15      A.    The one singular thing that I think

16   might qualify is submitting to the client, and

17   then providing to leadership the contract for the

18   platform itself.  But I think the best way to

19   describe that was an intermediary between the two

20   parties.

21      Q.    Okay.  Did Mr. Lombardo ever decide what

22   conferences or trade shows he would attend?

23      A.    No.

24      Q.    Was Mr. Lombardo allowed to decide

25   whether he would drive or fly to the conferences?

2      A.    I would say the best way to explain that

3  is he was permitted to give input, and sometimes

4  leadership would agree with it, other times not.

5      Q.    Who decided which conferences and trade

6  shows Mr. Lombardo would attend?

7      A.    I would say leadership was largely

8  responsible.

9      Q.    Who made decisions on -- let me go back

10  for a second.

11           Who made the ultimate decision on how

12  Mr. Lombardo would travel?

13      A.    I would say that was leadership.

14      Q.    Did Mr. Lombardo ever visit clients on

15  site?

16      A.    Not to my knowledge, no.

17      Q.    Can you describe what it was like

18  managing Mr. Lombardo?

19      A.    I would say overall it was a very good

20  experience.  I think we had some growing to do

21  together in the first weeks I was there, but I

22  think afterwards, we had excellent communication

23  with each other.

24           Mr. Lombardo was always very helpful,

25  not just to me when I was first coming on, but he

ROUGH TRANSCRIPT

2   always took a vested interest in helping to guide

3   and mentor some of the newer account managers that

4   came on.

5          But, he was always someone I could count

6   on to produce at a high level every month.  He did

7   just about everything I would ask him to do.  He

8   took suggestions very well.  He was a very good

9   quality account manager for the organization.

10   Q.    Would you have described him as

11   difficult to manage?

12   A.    No.

13   Q.    I'm going to show you what has been

14   marked previously as -- bear with me while I pull

15   it up here -- as Plaintiff's Exhibit I?  I'll try

16   to submit it through this.  I have not done this

17   before and perhaps I should e-mail it to everybody

18   as well, since we're having some difficulty.  Let

19   me see if I can.

20          That did not work.  Okay.

21          Did I lose -- I think I lost everybody.

22          If you can hear me, you can't see me?

23          MS. COOPER:  If we could go off the

24   record one minute while I hook myself back up.

25                 (Recess taken from 10:24 a.m. to

ROUGH TRANSCRIPT

2          10:27 a.m.)

3                    (Exhibit I Plaintiff's previously

4                    marked for identification was

5                    offered.)

6    BY MS. COOPER:

7          Q.    Mr. Auerbach, I believe you were shown

8    this document the last -- the other day.  It's

9    marked as Plaintiff's Exhibit I.

10                Can you identify this document?

11         A.    Yes, this was a phone conversation I was

12   asked to document by leadership at Chmura.

13         Q.    And did you prepare this document?

14         A.    I did, yes.

15         Q.    And it pertains to a phone conversation

16   you had with Mr. Lombardo, correct?

17         A.    That is correct.

18         Q.    And when was the phone conversation?

19         A.    I believe it is correctly stated as

20   October 21st.

21         Q.    Do you recall when you prepared the

22   notes?

23         A.    I do not recall the exact date.

24                If I had to venture a guess, I would

25   probably say within a week of this conversation

2    happening.

3        Q.    Did you prepare these notes in the

4    ordinary course of your responsibilities at

5    Chmura?

6        A.    I certainly interpret it that way.

7        Q.    And did you maintain this document with

8    the other business documents you maintained for

9    Chmura?

10       A.    No, I did not.

11       Q.    How did you keep this document -- let me

12   ask, did you keep this document?

13       A.    I believe I did, and I believe there was

14   a separate folder I created specific to everything

15   related to the separation of Mr. Lombardo from

16   Chmura.

17       Q.    Did you provide this document to others

18   at Chmura?

19       A.    I only gave it to leadership.

20       Q.    To your knowledge, was this document

21   relied upon at Chmura, at least in part, to make

22   business decisions with respect to Mr. Lombardo's

23   employment status?

24       A.    I do not know.  I'm not sure what

25   leadership -- how they interpreted this

2    conversation.

3        Q.    To your knowledge, when you spoke to

4    Mr. Lombardo on October 21st, 2019, had he already

5    received a cease and desist letter from Chmura's

6    attorneys?

7        A.    Yes, I believe that was what the impetus

8    of the conversation was.

9        Q.    I want to look at the last full

10   paragraph above where it says "*that was the end

11   of our call."  If you could just take a quick read

12   through that paragraph.

13       A.    Okay.

14       Q.    And it says that -- I'll put the quote

15   in there, "I reminded Rick that we would need to

16   make a hand-off to provide him his personal

17   effects from the Cleveland office, in exchange for

18   the items that belonged to Chmura, such as the

19   conference materials, laptop and conference

20   notes."

21            Do you see that?

22       A.    I do, yes.

23       Q.    Do you recall the specifics of that part

24   of the conversation, exactly what was said?

25       A.    I remember in a very general sense.

2     But, I know that because Rick was asked to leave

3     very abruptly, none of his personal effects at his

4     desk did he take with him.

5              After he was officially fired, I was

6     told to pack up his desk and set it aside.

7              And then, the leadership team said that

8     Rick would be able to get his personal effects

9     when he signed off on their termination agreement

10    and settlement amount, as well as him returning

11    the -- any materials that belonged to Chmura.

12    Q.    To your knowledge did Mr. Lombardo ever

13    receive his personal effects back?

14    A.    No, not that I know of.

15    Q.    And it is stated, the -- the *then

16    sentence in that paragraph says, I reminded him

17    that none of that could be discussed until he had

18    finished reviewing the legal documentation and

19    signed off on the agreement."

20             Do you said that?

21    A.    Yes.

22    Q.    What did you mean by that?

23    A.    It was my understanding that the

24    leadership team wasn't going to make the exchange

25    of his personal effects, first and foremost

 2   because Rick still had property that they felt

 3   belonged to Chmura.

 4           But, in addition, leadership concluded

 5   that if he were to sign off on the agreement and

 6   return the belongings, they would also immediately

 7   return his personal effects.

 8       Q.    Did you instruct him during that call to

 9   return the laptop or the conference notes or the

10   conference material?

11       A.    I did not instruct him to do so.  I

12   simply reiterated for him what leadership was

13   asking about.

14       Q.    Was it your understanding that it would

15   be a mutual exchange, he would get his personal

16   effects back and the laptop would be exchanged at

17   the same time?

18       A.    That would have been my understanding,

19   yes.

20       Q.    Do you recall -- changing topics a

21   little bit here.

22           Do you recall a conversation you had

23   with Mr. Lombardo regarding him notifying you that

24   he was entitled to any overtime compensation?

25       A.    Yeah.  This was a question I was asked a

ROUGH TRANSCRIPT

2    couple days ago, that I did not recall.

3            But I remember, after thinking it

4    over -- I don't remember exactly when, I believe

5    it was definitely before the Indianapolis trip.

6    Well, it had to have been prior to the trip to

7    Indianapolis.  But I remember him saying something

8    in passing about having been owed overtime.

9        Q.    When was the Indianapolis trip?

10       A.    I think roughly it was the second week

11   of October.

12       Q.    Okay.  Do you recall any specifics about

13   the conversation?

14       A.    It was something -- I recall the concept

15   of what he was presenting, but it was something

16   that I didn't clearly understand, it didn't

17   resinate with me, so I really quickly forgot it.

18           He -- the extent of the content of what

19   I remember was just that he felt there was a

20   substantial amount of overtime he had worked, that

21   he was never compensated for.

22       Q.    Did you tell anybody about that

23   conversation at Chmura?

24       A.    I did not, no.

25       Q.    And why not?

2      A.     It was not at the time something that I

3   thought was a consequential statement that he had

4   made.

5      Q.     Okay.  Did you -- I think you stated

6   this the other day in your testimony -- did you

7   look at the information coming out of Salesforce?

8      A.     While I was at Chmura?

9      Q.     Yes.

10     A.     Yes, on a very regular basis.  It was

11  one of the primary components of my job.

12     Q.     And did it track the account manager's

13  and senior account manager's activities?

14     A.     In detail, yes.

15     Q.     And of the sales -- I'm sorry -- of the

16  account managers and senior account managers who

17  were there at the time of your employment, did

18  Mr. Lombardo have the highest level of activity?

19     A.     Yes, he consistently out performed all

20  other members of the sales team.

21     Q.     Do you know how -- if you could but a

22  number on it, say calls, for example, how many

23  more calls was Mr. Lombardo making on average,

24  than the other account managers or senior account

25  managers?

ROGER TRANSCRIPT

2      A.     I think if we're talking about the

3  number of phone calls, it would be easy a 2 to 1

4  margin in favor of Mr. Lombardo.

5      Q.     What about any e-mails sent?

6      A.     I would say e-mails, because

7  Mr. Lombardo, the majority of his time were phone

8  calls, I would say he was either even with or

9  maybe slightly behind some of the other account

10 managers.

11     Q.     Okay.  With respect to -- I want to turn

12 to just a few last questions.  I just want to turn

13 back to the laptop for a moment and Mr. Lombardo's

14 departure.

15            Who instructed him to leave the office?

16 I believe it was -- well, let me ask this:  Was

17 Mr. Lombardo's last day present in the office

18 October 17th of 2019?

19     A.     I believe that's correct.

20     Q.     And were you present there that day?

21     A.     I was, yes.

22     Q.     Who instructed Mr. Lombardo to leave?

23     A.     I received a phone call from Chris

24 Chmura who instructed me to have Mr. Lombardo

25 leave immediately.

2      Q.    Did Mr. Lombardo take a laptop with him

3   that day?

4      A.    To the best of my recollection, I

5   believe the laptop was in his car, which it might

6   have very well been at home, I don't recall.  But

7   I believe, to my recollection, he left with

8   nothing in his hands.

9      Q.    Did you instruct him to bring the laptop

10   back that day?

11      A.    I did not, no.

12      Q.    Were you at all concerned about the

13   laptop that day?

14      A.    In truth, I do not recall if that was a

15   concern being discussed.

16          I know that at the time I asked him to

17   leave, I wasn't aware that there was a laptop in

18   his possession.

19      Q.    Did leadership, prior to instructing you

20   to have him leave for the day, did they tell you

21   to get back any possessions of Chmura's from

22   Mr. Lombardo?

23      A.    I don't have a recollection of them

24   asking me to do that.

25      Q.    Okay.

2          MS. COOPER:  Those are all of the

3      questions that I have.  Thank you,

4      Mr. Auerbach.

5          MS. SIEGMUND:  Do you mind if we take a

6      quick break?  I don't think I have anything

7      further, but I just want to make sure I have

8      all of my notes in order.

9          MR. POSEY:  Sure thing.

10          MS. SIEGMUND:  Let's take five minutes.

11          (Recess taken from 10:39 a.m. to

12      10:44 a.m.)

13  BY MS. SIEGMUND:

14      Q.    This is very quick, couple of additional

15  questions, Mr. Auerbach.

16          I know when we spoke on Tuesday you did

17  not recall Mr. Lombardo ever mentioning anything

18  about overtime, but you thought it over since

19  Tuesday and now you do recall him saying something

20  about overtime.

21          Was there anything in particular that

22  prompted you to remember that conversation?

23      A.    No.  I was just reviewing the questions

24  I had been asked, and it was, I would say, a

25  fleeting recollection from all of the different

2    conversations I had had over the last five or six

3    weeks that Mr. Lombardo was at Chmura.

4         Q.    Did you review any documents that helped

5    you remember that conversation?

6         A.    I did not.

7         Q.    Did you review the statement that you

8    had provided to Ms. Cooper?

9         A.    I did not.

10        Q.    But, there was not nothing in the

11   affidavit that you provided to Chmura about this

12   conversation, correct?

13        A.    That is correct.

14        Q.    And you provided that affidavit to

15   Chmura a few weeks after Mr. Lombardo is

16   terminated, correct?

17        A.    Yes, that is correct.

18        Q.    And you provided the affidavit to

19   Ms. Cooper after you were fired from Chmura,

20   correct?

21        A.    That is correct.

22             MS. SIEGMUND:  That's all I have.  Thank

23        you.

24             MR. POSEY:  We will read, just to make

25        sure the exhibits are properly included.

ROUGH TRANSCRIPT

2          COURT REPORTER:  I have McGuire Woods

3    has a standing order.  Do you still want your

4    standing order.

5          MS. SIEGMUND:  I don't know about a

6    standing order, but we would like a rough

7    draft.

8          COURT REPORTER:  Yeah, that's in the

9    standing order.

10          MS. SIEGMUND:  That's good then.

11          COURT REPORTER:  Ms. Cooper, do you want

12    a copy of this transcript?

13          MS. COOPER:  Yes, please.

14          COURT REPORTER:  Do you know what format

15    you want it in?

16          MS. COOPER:  Just the mini script or the

17    ordinary electronic transcript.

18          COURT REPORTER:  Mr. Posey, do you want

19    a copy this transcript?

20          MR. POSEY:  No, thank you.

21

22

23

24

25