Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| **CHMURA ECONOMICS & ANALYTICS, LLC,** | ) | **Case No. 3:19-cv-00813** |
| | ) | **Judge Robert E. Payne** |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| **RICHARD LOMBARDO,** | ) | |
| **Defendant.** | ) | |

**DECLARATION OF RICHARD A. LOMBARDO**

Pursuant to 28 U.S.C. §1746, I hereby declare as follows:

1. I am the Defendant in the above-captioned matter and am competent to give this declaration as I am over eighteen (18) years of age. I am a resident of Mentor, Ohio. The statements set forth in this Declaration are based upon my personal knowledge, and are true and correct to the best of my knowledge, information, and belief.

2. Chmura sells a labor data SaaS called JobsEQ, which is a labor market technology platform.

3. In February 2015, I was offered and accepted a position as an Inside Sales Representative with Chmura in the Cleveland, Ohio office. The offer was memorialized in a letter dated February 3, 2015 and was signed by both Leslie Peterson ("Ms. Peterson"), the President and Chief Strategy Officer of Chmura, and me (the "February 3, 2015 Letter"). A copy of the

February 3, 2015 Letter is attached as Exhibit A. The February 3, 2015 Letter states "[i]t is our pleasure to detail an offer of employment as an Inside Sales Representative (ISR) with Chmura Economics and Analytics, LLC (Chmura) at our Cleveland, Ohio office […]." I signed the February 3, 2015 Letter on February 4, 2015.

4. The February 3, 2015 Letter refers to an "employment agreement." The only document attached to the offer Letter was a Confidentiality, Non-Competition & Non-Solicitation Agreement (the "Agreement"). A copy of the Agreement is attached as Exhibit B. I signed the Agreement on February 4, 2015.

5. I began my employment on or around February 18, 2015. My job was to sell JobsEQ and its add-ons, such as RTI (Real Time Intelligence), Firm List, Extra Seats and LaborEQ across the nation from the Cleveland, Ohio office. My job title was Account Manager.

6. I regularly arrived at the Cleveland office located at 1025 Huron Road East, Cleveland, Ohio at or before 7:00 a.m. and left at or after 5:30 p.m. I would regularly work through lunch.

7. I prospected potential customers across the U.S. and my geographic region included states in other times zones, such as California, Washington, Oklahoma, Texas, Minnesota and Iowa, among others. As some of the clients and prospective clients for which I was responsible were located in other time zones, I made myself available to them during their business hours (i.e. Central, Mountain and Pacific time). I would regularly receive calls on my way home from the office, after I had arrived home, or while out after work. I answered and responded to those calls.

8. I regularly worked more than forty (40) hours each workweek, but I never received any compensation for the hours that I worked over forty (40) hours each workweek.

9. In the fall of 2019, I learned that Chmura was going to make changes to the operations of the inside sales team. Chmura was going to redistribute the customers – i.e. take away customers from me and give them to other sales representatives who did not have as many customers in their book. Because I spent more than four years and many hours, including numerous overtime hours, building my book and closing sales, I would be materially damaged by this change. I was hurt and upset about this change.

10. On October 3, 2019, I met with my supervisor, Sales Manager Eli Auerbach ("Auerbach") to discuss the changes. I asked Auerbach what was going on and why they would make a change that only negatively affected me.

11. I spoke to Auerbach again on October 17, 2019 and was instructed to leave the office for the day. Accordingly, I left the office around 10:00 a.m. on October 17, 2019. Because I had a work issued laptop (the "Laptop"), I decided to work from home and make sure I took care of my customers. Additionally, I had a demo scheduled in the afternoon. By the time I arrived home, I was locked out of Salesforce and had no access to my e-mails. I could no longer do any work. No one told me that Chmura was going to prevent me from doing my job.

12. On October 21, 2019, I spoke with Aisha Ortiz, who works in the Human Resources department at Chmura. During this conversation, I learned that I had been put on unpaid leave on October 17, 2019.

13. On October 31, 2019, Chmura terminated my employment.

14. At the time I was terminated, I was in possession of the Laptop. The Laptop was issued to me during my employment, prior to being placed on unpaid leave, and prior to my termination.

15. The Laptop contained notes from two conferences (the Texas Economic Development Conference and the International Economic Development Council Conference), which included information relating to conversations I had with clients and prospective customers at those conferences (the "Notes").

16. I do not recall accessing the Notes after I was sent home on October 17, 2019 and I could not access any other information on the Laptop as of October 17, 2109. I did not use any information contained in the Notes after I was sent home on October 17, 2019.

17. On December 24, 2019, I returned the Laptop to counsel for Chmura.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 15 day of May, 2020.

Richard A. Lombardo



Chmura Economics & Analytics
1309 E Cary St, FL 2
Richmond, VA 23219
804.554.5400
www.chmuraecon.com

February 3, 2015

Exhibit A

Richard A Lombardo
27030 Forestview Ave
Euclid, OH 44132
rck.lmbrd@gmail.com

Dear Rick,

It is our pleasure to detail an offer of employment as an Inside Sales Representative (ISR) with Chmura Economics & Analytics, LLC (Chmura) at our Cleveland, Ohio office, contingent on satisfactory review of your W2's. Chmura would like you to begin on Wednesday, February 18, 2015, or sooner, if possible.

Your offer is as follows:

1. Annual base salary plus commission structure (see below).
2. Eight paid holidays over a typical full calendar year (remaining holiday schedule for 2015).
3. Medical/Vision insurance provided by Anthem and dental insurance provided by MetLife. Chmura pays half of our employee's premium costs for both medical and dental monthly premiums.
4. A review after the first three months that will include input from Leslie Peterson, John Chmura, and Dr. Christine Chmura regarding your progress in acclimating to the portfolio of Chmura IT and data services.

After three months of employment, you will also be eligible for:

- Annual merit increases, upon approved performance by your management;
- Ten days paid vacation per year (vacation accrues at a rate of 0.83 days per month);
- Opportunity to contribute to a Simple IRA plan (Chmura matches up to 3% of salary based on your contribution);

Compensation Overview:

| | |
|---|---|
| Annual base salary | $55,000 (Year 1) and $50,000 (Year 2+) |
| Commission rate on JobsEQ sales | 15% of initial sale<br>3% of annual renewals |
| Quota | 3 sales per month<br>(after a 3-month ramp-up period) |

Rick, your individual sales quota will be monitored on a monthly basis. Every effort will be made to ensure you are equipped with the training you need to effectively demonstrate the features and benefits of our technology platform (JobsEQ) to your prospective clients. Please note, that failure to achieve the agreed upon sales quota levels could result in your employment termination. New sales commissions will transact as client signatures are secured to the JobsEQ license agreement by Chmura's accounting department; payment to you will occur the month following the transact date. While we believe the quota level outlined above is reasonable, Chmura may re-evaluate the quota metric after 6



Chmura Economics & Analytics
1309 E Cary St, FL 2
Richmond, VA 23219
804.554.5400
www.chmuraecon.com

months and make adjustments, as we are a company of continuous process improvement. Sales territory will be determined after your hire is confirmed.

Rick, this offer is designed to allow you to demonstrate your competence and enthusiasm for a challenging position with a professional consulting firm. Chmura is a reputable and credible organization and as such, we employ only 'A-level' professionals who can produce quality results for our customers in a timely manner.

Chmura hopes this proposal meets your expectations. We believe you can make a strong contribution to the firm, and we look forward to working with you. This letter should not be construed as an employment contract. Please see the employment agreement attached.

Please call me at 804-649-1107 (work) or 804-512-7437 (mobile) if you have any questions.

Sincerely,

Leslie Peterson, Partner
President & Chief Strategy Officer

Signing below signifies acceptance of this employment offer:

Richard A Lombardo — 2-4-2015 (date)

Exhibit B

# CONFIDENTIALITY, NON-COMPETITION & NON-SOLICITATION AGREEMENT

This Confidentiality, Invention & Non-Competition Agreement ("Agreement") is made by and between Chmura Economics & Analytics, LLC ("the Company") and Richard A Lombardo (employee) (27030 Forestview Ave, Euclid, OH 44132) (together "the Parties").

## REASONS FOR AGREEMENT

1. The Company is engaged in the business of providing services in the field(s) of economics, workforce development, economic development, strategic planning, and software design and licensing (hereinafter, the "Company's Business").

2. Employee is about to begin or continue his/her employment with the Company and understands its need to limit to some extent Employee's freedom to disclose and use certain information which may come to his/her attention during Employee's employment and to engage in certain activities during employment and certain post-employment activities.

3. These restrictions are for the purpose of enabling the Company to preserve its competitive status in the industry and to protect the integrity and future of the Company and to protect the employment opportunities of Employee's fellow employees by protecting the Company's confidential and/or proprietary information, its goodwill and its trade secrets.

NOW, THEREFORE, in consideration of the employment of Employee (including any continuation of employment of Employee with the Company) and other good and valuable consideration, the adequacy and sufficiency of which are hereby acknowledged, the parties agree as follows:

## TERMS OF AGREEMENT

1. **Confidentiality**. Employee recognizes that, by virtue of his/her employment with the Company, s/he will have access to confidential and/or proprietary information relating to the Company's business. Employee agrees that this information is a valuable and unique asset of the Company and, if divulged to others, could cause irreparable harm to the Company's business. Employee recognizes and acknowledges that such information may include data or material that may not technically qualify as a trade secret, but in which the Company nevertheless has a legitimate business interest in protecting its confidentiality.

Accordingly, Employee shall not, during the term of his/her employment and thereafter regardless of the reason for his/her termination, reveal or disclose to any person outside of the Company, or use for his/her own benefit or the benefit of any other person or entity, any confidential or proprietary information concerning the business or affairs of the Company, or concerning the Company's customers, clients or employees ("Confidential and Proprietary Information"). For purposes of this Agreement, Confidential and Proprietary Information includes, but is not limited to the Company's financial information or plans; sales and marketing information or plans; business or strategic plans; salary, bonus or other personnel information of any type; information concerning methods of operation; proprietary systems or software; legal or regulatory information; cost and pricing information or policies; information concerning new or potential products or markets; models, practices, procedures, strategies or related information; research and/or analysis; and information concerning new or potential investors, customers, or

clients. Confidential and Proprietary Information does not include information already available to the public through no act of Employee, nor does it include salary, bonus or other personnel information specific to Employee. Notwithstanding the above, the use or disclosure of Confidential and Proprietary Information shall not be deemed a violation of this Section of the Agreement if such use or disclosure is made in the ordinary course of business, within the usual scope of Employee's duties and serves the best interests of the Company.

Employee further understands and agrees that all Confidential and Proprietary Information, however or whenever produced, will be the Company's sole property. Upon the termination of Employee's employment, for whatever reason, Employee will promptly deliver to the Company all documents, equipment, property or materials of any type, including any copies thereof, in Employee's possession, custody or control that belong to the Company, and/or that contain, in whole or in part, any Confidential or Proprietary Information in accordance with Section 3 of this Agreement.

2. **Work Related Intellectual Property.** Employee shall disclose fully to the Company any and all intellectual property (including, without limitation, designs, inventions, mask works, ideas, processes, operating and production methods and efficiencies, pricing, customer lists, formulae, data and computer programs (including source and object codes), patents, trademarks, trade secrets, know-how, improvements and enhancements to any of the foregoing, related documentation and all other forms of copyrightable subject matter) which Employee conceives, develops or makes or is exposed to during the term of his/her employment or for six (6) months thereafter and which in whole or in part result from or relate to Employee's work for the Company (collectively, "Work Related Intellectual Property"). Any such disclosure shall be made promptly after each item of Work Related Intellectual Property is conceived, developed or made by Employee, whichever is sooner. Employee covenants and agrees that s/he shall not, at any time during or following the term of his/her employment, directly or indirectly, divulge or disclose any of such Work Related Intellectual Property, or any of the Confidential and Proprietary Information, which has been obtained by or disclosed to him as a result of employment by the Company.

Employee agrees that all Work Related Intellectual Property shall be owned by the Company and that Employee shall execute and deliver any and all documents (including, without limitation, assignments and patent applications), take all actions and render any and all assistance which may be reasonably requested by the Company to establish, evidence or perfect the Company's ownership of, or to enable the Company to obtain patents or register copyrights with respect to Work Related Intellectual Property, provided, however, that the Company shall bear all expenses related thereto.

Employee acknowledges that all Work Related Intellectual Property that is copyrightable subject matter and which qualifies as "work made for hire" shall be automatically owned by the Company. Further, Employee hereby assigns to the Company any and all rights which Employee has or may have in Work Related Intellectual Property which is copyrightable subject matter and which, for any reason, does not qualify as "work made for hire." If any Work Related Intellectual Property embodies or reflects any preexisting rights of Employee, Employee shall promptly disclose such preexisting rights to Company. Employee hereby grants to the Company the irrevocable, perpetual, nonexclusive, worldwide, and royalty-free license to

use, reproduce, display, perform, distribute copies of and prepare derivative works based upon the preexisting rights described in the preceding sentence and to authorize others to do any or all of the foregoing.

For the avoidance of doubt, Employee agrees and acknowledges that the trademarks and the brands of the Company and its parent, affiliates and subsidiaries are valuable assets and the promotion, management and use of such trademarks and brands will be an important part of his/her duties and responsibilities. Employee agrees to use his/her best efforts to protect the trademarks and brands of the Company and its parent, affiliates and subsidiaries and will conduct himself and his/her business activities in compliance with the Company's policies and procedures as they relate to such brands and trademarks.

3. <u>Covenants Not to Compete or Interfere</u>. For a period beginning on the Effective Date of this Agreement and ending two (2) years after the employment relationship between Employee and the Company terminates for any reason whatsoever ("the Restricted Period"), Employee shall not:

(a) own or acquire an interest in or participate in the management or control of any entity that competes against the Company by engaging in the Company's Business in geographic areas in which the Company does business;

(b) directly or indirectly, perform, whether as an employee, independent contractor, consultant, agent, or owner, the same, similar, or substantially similar job duties or services as s/he performed for the Company on the date of his/her termination or within the one (1) year period preceding the date of his/her termination for or on behalf of any person or entity that engages in the Company's Business in any geographic areas serviced by Employee or in which Employee provided goods or services on behalf of the Company during his/her employment with the Company;

(c) directly or indirectly, on behalf of himself or any other person, partnership, company, corporation or other entity, solicit or attempt to solicit for purposes of providing products or services that are the same or substantially similar to the Company's Business any individual or entity to whom Employee provided products or services at any time during the period of his/her employment with the Company, to whom Employee pursued on behalf of the Company, or of whom Employee had knowledge based on his/her employment with the Company because the Company provided products or services to or actively pursed the individual or entity during Employee's employment;

(d) directly or indirectly, on behalf of himself/herself or any other person, partnership, company, corporation or other entity, divert, take away, or interfere with or attempt to divert, take away or interfere with the Company's business relationship with its then existing suppliers, licensors, licensees, franchisees or other business relations; or

(e) directly or indirectly, on behalf of himself or any other person or entity, recruit, solicit, or hire any employee of the Company, or attempt to do the same, or induce or encourage any employee, contractor, or supplier of the Company to terminate their employment or other business relationship with the Company.

Notwithstanding the foregoing, Employee may own not more than five percent (5%) of any class of securities registered pursuant to the Securities Exchange Act of 1934, as amended, of any corporation engaged in competition with the Company, so long as Employee does not otherwise (i) participate in the management or operation of any such business, or (ii) violate any other provision of this Agreement.

Employee acknowledges that the restrictions, prohibitions and other provisions herein, including, without limitation, the Restricted Period, are reasonable, fair and equitable in terms of duration and scope, are necessary to protect the legitimate business interests of the Company, and are a material inducement to the Company to enter into this Agreement.

4. Termination and Return of Property.

(a) Return of Confidential and Proprietary Information and Work Related Intellectual Property Upon Termination. Employee understands and agrees that all printed and electronic files, records, documents, reports, audits, projections, forecasts, business plans, correspondence, manuals, computer code, pricing data, sources of supply, customer lists, databases, and similar items relating to the business of the Company, the Confidential and Proprietary Information and/or the Work Related Intellectual Property, whether prepared by Employee or otherwise coming into Employee's possession, shall remain the exclusive property of the Company, whether in original or reproduced form. Upon the termination of Employee's employment for any reason whatsoever, Employee shall immediately and without demand return to the Company all of the aforementioned information in Employee's possession or under Employee's control belonging to the Company, and immediately thereafter Employee shall have no further right of access to or any right to obtain any of such records and materials or copies thereof, or any information contained therein.

(b) Return of Tangible Property. Upon termination of Employee's employment for any reason whatsoever, Employee shall immediately and without demand return to the Company all tangible property in his/her possession belonging to the Company (including without limitation electronic equipment), in good condition, ordinary wear and tear excepted.

5. Survival of Obligations. Employee's obligations under Sections 1, 2 and 3 of this Agreement shall survive the termination of his/her employment, regardless of the reason for or method of termination. Each of the provisions in these Sections shall be enforceable independently of every other provision, and the existence of any claim or cause of action Employee may have against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of these Sections of the Agreement by the Company.

6. Representations and Warranties. Employee represents and warrants to the Company: (a) that s/he has the full power and authority to enter into this Agreement without the consent or approval of any other person, including any present or previous employer; (b) that his/her execution, delivery and performance of this Agreement will not violate or cause a breach of any existing employment or any other agreement, covenant, promise or any other duties by which Employee is bound, including confidentiality obligations or covenants not to compete; and (c) that there are no pending or threatened claims of breach of contract, misappropriation of

intellectual property or misappropriation of confidential information against Employee and, to the best of Employee's knowledge, no events or conduct that would give rise to such a claim.

7. Governing Law. This Agreement, and all disputes arising under or related to it, shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Virginia, without regard to the conflict of laws rules contained therein.

8. Jurisdiction and Venue. The parties irrevocably and unconditionally consent to the exclusive jurisdiction and venue of the Circuit Court for the City of Richmond, Virginia and/or the United States District Court for the Eastern District of Virginia, Richmond Division in connection with any suit, action or proceeding relating to this Agreement and agree not to commence any suit, action or proceeding relating thereto except in such courts.

9. Assignment. This Agreement may be assigned by the Company to a successor in interest, including but not limited to a wholly owned subsidiary or parent of the Company, or in connection with the sale to any person, partnership, corporation or other entity of the assets of the Company. Employee's rights hereunder are personal and non-assignable.

10. Enforcement and Severability. Employee agrees that a breach of any of the covenants set forth in Sections 1, 2 and 3 would result in immediate irreparable injury and damage to the Company for which the Company would have no adequate remedy at law. In the event of a breach or a threatened breach by Employee of any of the provisions of Sections 1, 2, or 3 of this Agreement, the Company shall be entitled to a temporary restraining order and/or a preliminary or permanent injunction restraining Employee from breaching the same. However, nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach, including the recovery of damages from Employee. Employee further agrees that in the event of any such breach, Company shall be entitled to all costs and expenses incurred as a result, including reasonable attorney's fees, in addition to any other remedies to which Company may be entitled. If Employee breaches Section 3 of this Agreement, the duration of the Restricted Period shall be computed from the date s/he resumes compliance with the covenant or from the date the Company is granted injunctive or other equitable relief by a court of competent jurisdiction enforcing the covenant, whichever shall first occur, reduced by either the number of days Employee was not in breach of the covenant after termination of employment, or any delay in filing suit, whichever is greater.

If any provision of this Agreement is deemed void or unenforceable, such provision shall not be deemed part of this Agreement, which otherwise shall remain in full force and effect. Moreover, if any one or more of the provisions contained in this Agreement is held to be excessively broad as to duration, activity or subject, such provision will be construed by limiting or reducing it so as to be enforceable to the maximum extent compatible with applicable law. A waiver by the Company or Employee of a breach of any provision of this agreement by the other party shall not operate or be construed as a waiver of any subsequent breach by the other party. Employee shall pay the Company all reasonable attorneys' fees incurred in enforcing its rights under this Agreement.

11. Remedies. In the event of a breach or a threatened breach of this Agreement by Employee, the Company shall be entitled to an injunction restraining Employee from breaching

the same. Nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or threat of breach. This includes, but is not limited to, the recovery of any monetary damages caused by Employee's breach or threatened breach.

12. **Consultation with Counsel; No Representations**. Employee acknowledges and agrees that s/he has had a full and complete opportunity to consult with counsel of his/her own choosing concerning the terms of this Agreement, and that the Company has made no representations or warranties to Employee concerning the terms of this Agreement other than as are reflected in this Agreement.

13. **Entire Agreement**. This instrument contains the entire agreement between the Parties, supersedes any prior or other agreement between the Parties and may be changed only by an agreement in writing signed by the party against whom the enforcement of any waiver, change, modification, extension or discharge is sought. Both Parties agree and acknowledge that they have read these terms, have had the opportunity to consult counsel, and fully understand and freely and voluntarily agree to the provisions set forth herein.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the dates shown below.

| EMPLOYEE | CHMURA ECONOMICS & ANALYTICS, LLC |
| --- | --- |
| [signature] | By: [signature] |
| Richard A Lombardo | Leslie Peterson<br>President and Chief Strategist |
| Date: 2-4-2015 | Date: February 3, 2015 |