**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| CHMURA ECONOMICS & ANALYTICS, LLC, )<br><br>        **Plaintiff/Counterclaim**<br>        **Defendant,** )<br><br>**v.** )<br><br>**RICHARD LOMBARDO,** )<br><br>        **Defendant/Counterclaim**<br>        **Plaintiff.** ) | **Case No. 3:19-cv-813-REP** |

**CHMURA ECONOMICS & ANALYTICS, LLC'S MEMORANDUM IN OPPOSITION
TO RICHARD LOMBARDO'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Chmura Economics & Analytics, LLC, by counsel and pursuant to Fed. R. Civ. P. 56, responds as follows to the Motion of Defendant Richard Lombardo for Summary Judgment Pursuant to Fed. R. Civ. P. 56 (ECF No. 40) and accompanying Memorandum ("Def. Mem.," ECF No. 41).

## INTRODUCTION

Lombardo's summary judgment motion rests on three fundamentally flawed premises. First, Lombardo contends that he should prevail because Chmura cannot hold him to the promises he made to convince Chmura to employ him. Second, Lombardo argues that the threats he made to break those promises, and the chaos he caused, is all water under the bridge because he eventually returned Chmura's computer. Third, Lombardo asserts that because he "regularly" came to work early and left late, Chmura owes him nearly $500,000 in overtime premiums. Though Lombardo is right that these issues involve few disputed material facts, he is wrong that

the law warrants summary judgment in his favor.  To the contrary, the law counsels in favor of validating the legitimate steps Chmura took to protect its business, and against bestowing a windfall on an employee who already took home over $140,000 a year.  The Court should therefore deny Lombardo's summary judgment motion and grant Chmura's.

## **RESPONSE TO LOMBARDO'S STATEMENT OF UNDISPUTED FACTS**

1. Undisputed.[1]

2. Disputed to the extent this paragraph states or implies that Lombardo exclusively worked in Cleveland, Ohio.  Lombardo frequently traveled to conferences and/or to meetings in Richmond. (*E.g.*, Deposition of Richard Lombardo 92:12-19 ("Lombardo Dep.," ECF No. 35-4); Deposition of Eli Auerbach 44:22-45:15 ("Auerbach Dep.," ECF No. 35-11).)  Otherwise undisputed.

3. Disputed to the extent this paragraph states or implies that Lombardo ever held the title "Inside Sales Representative," or that this title is somehow relevant to whether Lombardo was properly classified as exempt.  Chmura's corporate representative testified that the term "inside sales representative" in Lombardo's offer letter came from a recruiter who helped Chmura fill this position.  (Deposition of Leslie Peterson Day 1 52:6-10 ("Peterson 1d Dep.," ECF No. 35-2).) Lombardo's actual title was Account Manager.   (Declaration of Richard Lombardo ¶ 5 ("Lombardo Decl.," ECF No. 41-2).)  Otherwise undisputed.

4. Disputed to the extent this paragraph implies that Lombardo was hired *only* to sell JobsEQ subscriptions.  As Lombardo testified, and as set forth in Chmura's opening Memorandum in Support of its Motion for Summary Judgment ("Pl. Mem.," ECF No. 35) Lombardo's job duties extended far beyond merely making sales. (*E.g.*, Lombardo Dep. 86:19-87:21, 95:3-96:4, 131:11-

---

[1] For ease of reference, the numbered paragraphs in this section correspond to the numbered paragraphs in Lombardo's Memorandum.

16, 136:14-137:10; ECF Nos. 35-17, 35-18, 35-19, 35-20.)

5.   Undisputed.

6.   Undisputed that Lombardo's Confidentiality, Non-Competition and Non-Solicitation Agreement (the "Agreement," ECF No. 35-8) contains the text quoted in this paragraph (emphasis Lombardo's).   Chmura refers to the Agreement for the full content and context of the quoted provision.

7.   Undisputed that the Agreement contains the text quoted in this paragraph (emphasis Lombardo's).   Chmura refers to the Agreement for the full content and context of the quoted provision.

8.   Undisputed that the Agreement contains the text quoted in this paragraph.   Chmura refers to the Agreement for the full content and context of the quoted definition.

9.   Undisputed.

10.   Undisputed that the Agreement contains the text quoted in this paragraph (emphasis Lombardo's).   Chmura refers to the Agreement for the full content and context of the quoted provision.

11.   Undisputed.

12.   Disputed to the extent the phrase "Lombardo's book of business" implies that the business belonged to Lombardo, rather than Chmura.   Lombardo admitted that he had no customers when he arrived at Chmura.   (Lombardo Dep. 24:11-16.)   Further disputed that Lombardo was responsible for "more than half" of all Chmura's sales and renewals.   (Lombardo Dep. 84:3-6.) Otherwise undisputed.

13.   Undisputed that Chmura was considering operational changes to the sales team and changes to its commission structure in early October 2019.   Disputed to the extent this paragraph

implies that these changes had any connection to Lombardo's performance or were intended to "materially disadvantage" him.   As Lombardo's then-manager Eli Auerbach testified, he developed this plan to allow Chmura's sales team to grow, and never wanted or intended to target Lombardo.  (Auerbach Dep. 66:23-67:12, 69:6-18, 100:20-101:3.)

14. Disputed.  Lombardo and Auerbach both testified that they discussed Lombardo's potential separation once in early October, and again on October 17.  (Lombardo Dep. 183:11-187:7, 194:4-13; Auerbach Dep. 99:18-104:11, 109:19-111:16.)  Auerbach recalled only one conversation in between, and Lombardo did not recall any.  (Lombardo Dep. 194:4-13; Auerbach Dep. 109:5-23.)  Undisputed that Lombardo was unhappy about the proposed commission changes.  (Lombardo Dep. 182:21-24.)  In fact, Lombardo was so upset that he repeatedly threatened to "ruin" Chmura.  (*E.g.*, ECF No. 35-26 at 4, 5.)

15. Undisputed.

16. Undisputed that Lombardo was placed on unpaid leave.  However, Chmura placed Lombardo on unpaid leave immediately after his conversation with Auerbach on October 17.  (C. Chmura Dep. 49:9-43:3.)  Chmura also immediately cut off Lombardo's access to Salesforce and JobsEQ, fearful that "he was out of control, belligerent, and there was no way for [Chmura] to know what he would do next."  (*Id.* 43:1-3.)

17. Undisputed.

18. Undisputed.

19. Undisputed that Lombardo (or his counsel) mailed the laptop to Chmura on December 24, 2019.  Disputed only to the extent this paragraph implies that Chmura actually received the laptop that day.

20. Undisputed.  As Lombardo testified, the laptop he took with him when he left Chmura did contain Chmura's confidential customer contact list and time-sensitive conference notes. (Lombardo Dep. 190:6-12, 210:3-211:24.)

21. Disputed.  Lombardo's "retention of the Laptop" and his refusal to return Chmura's trade secret information are unlawful conversion and misappropriation of trade secrets, respectively, as set forth in Chmura's opening Memorandum and in more detail below.  In addition, Lombardo disclosed highly confidential Chmura revenue information to at least one third-party recruiter in his efforts to find a new job, even after he submitted a sworn declaration and interrogatory responses affirming that he had no confidential Chmura information in his possession.  (Lombardo Dep. 240:16-241:14.)

22. Undisputed.

23. Undisputed.

24. Undisputed.

25. Undisputed that Chmura classified Lombardo as exempt.  Disputed to the extent this paragraph implies that Lombardo's sales responsibilities render Chmura's classification improper. Again, Lombardo's responsibilities also included (among other things) numerous aspects of client relationship management, as well as providing feedback and advice regarding product features and marketing initiatives.  (Lombardo Dep. 86:19-87:16; Deposition of Leslie Peterson Day 2 119:4-120:5 (Exhibit A);[2] Deposition of Kyle West 60:25-61:9; 64:25-65:24 (Exhibit B).)

26. Disputed to the extent this paragraph implies that Lombardo always or almost always worked more than 40 hours per week.  Chmura's calculations, based on Lombardo's e-mail

_____

[2] Due to timing constraints, some of the transcripts filed with Chmura's original Motion were rough drafts.  Chmura has attached final versions of those transcripts here.

records, office entry records, vacation and holiday schedule, and office call logs, reflect that Lombardo worked an average of roughly 43 hours per week during his last three years at Chmura. (Exhibit C at 110; Deposition of John Chmura 75:12-16 ("J. Chmura Dep.," ECF No. 35-15).) Lombardo claims that his cell phone records would reflect additional time worked, but produced no such records, despite Chmura's requests. (Lombardo Dep. 152:4-12.) Some weeks, however, Chmura's records reflect that Lombardo worked significantly less than 40 hours. (Ex. C.) Moreover, because Lombardo was exempt from federal and state overtime requirements, this paragraph contains no "material" facts.

27. Disputed to the extent this paragraph implies that Lombardo always or almost always worked from at least 7:00 a.m. EST until 5:30 p.m. EST. As noted above, Lombardo's schedule varied. And, again, because Lombardo was exempt from federal and state overtime requirements, this paragraph contains no "material" facts.

28. Undisputed. Indeed, Lombardo testified that when he started working at Chmura, he could sell to clients wherever he found them. (Lombardo Dep. 24:17-20.) Because Lombardo was exempt from federal and state overtime requirements, this paragraph contains no "material" facts.

29. Disputed. Lombardo's salary and commissions compensated him for all hours worked. (Lombardo Dep. 10:6-11:9.) Further disputed to the extent this paragraph implies that Lombardo always or almost always worked more than 40 hours per week, in light of Chmura's calculations described above. Because Lombardo was exempt from federal and state overtime requirements, this paragraph contains no "material" facts.

## **ARGUMENT**

**I.   Lombardo's Agreement Is Enforceable**

    **A.   Lombardo's Non-Competition And Non-Solicitation Obligations Are Enforceable**

Virginia courts will enforce non-competition and non-solicitation obligations that are tailored to protect an employer's legitimate interests, do not unduly burden an employee's ability to earn a living, and do not offend public policy—in short, restrictions that are "reasonable" under the circumstances. *Capital One Fin. Corp. v. Kanas*, 871 F. Supp. 2d 520, 530 (E.D. Va. 2012). Factors relevant to reasonableness include the function, geographic scope, and duration of any restriction. *Simmons v. Miller*, 261 Va. 561, 581 (2001). Restrictions that are two years or less, and geographically co-extensive with the employer's business, trend toward reasonable. *E.g.*, *JTH Tax, Inc. v. Frashier*, 2009 WL 10689306, at *3 (E.D. Va. Apr. 15, 2009) (finding a two-year non-compete provision reasonable); *Roanoke Eng'g Sales Co. v. Rosenbaum*, 223 Va. 548, 551 (1982) (upholding a non-compete encompassing all "territory covered by" the employer because the employee had company-wide knowledge that would enable nationwide competition).

Importantly, extensive customer contacts and access to confidential information also tend to weigh in favor of reasonableness. *Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick*, 239 Va. 369, 372-73 (1990) (noting that "non-competition agreements are also justified where the employee comes into personal contact with his employer's customers"); *Meissel v. Finley*, 198 Va. 577, 583 (1956) (finding that "possession of trade secrets and confidential information is an important consideration in testing the reasonableness of a restriction on competition"); *see also* 6 Williston on Contracts § 13:13 (4th ed.) (noting that when an employee, "by leaving, threatens to siphon off the former employer's customers or goodwill, the law typically permits greater restrictions to be imposed by contract"). This is so because an employer has a legitimate business

7

in preventing employees from using information such as "lists of customers, lists of suppliers, detailed knowledge of overhead factors, pricing policies, and bidding techniques." *Roanoke Eng'g*, 223 Va. at 553.

The restrictive covenants[3] in Lombardo's Agreement pass this test. First considering the non-competition provision, there is no dispute that the geographic and temporal limitations on that provision are reasonable. The provision appropriately limits Lombardo's competitive activity to two years, and only in places where he provided services on Chmura's behalf. (Agreement § 3(b).) Further, the non-compete is functionally reasonable because it only prohibits Lombardo from performing services that are "the same, similar or substantially similar" to those Lombardo provided to Chmura in his last year of employment—in other words, services that directly compete with those Lombardo performed for Chmura. The pertinent provision provides that Lombardo may not:

> directly or indirectly, perform, whether as an employee, independent contractor, consultant, agent, or owner, *the same, similar, or substantially similar job duties or services as s/he performed for the Company on the date of his/her termination or within the one (1) year period preceding the date of his/her termination for* or on behalf of any person or entity that engages in the Company's Business in any geographic areas serviced by Employee or in which Employee provided goods or services on behalf of the Company during his/her employment with the Company[.]

(Agreement § 3(b) (emphasis added)).

Lombardo's motion ignores the italicized restriction, which substantially narrows and limits the definition of "Company's Business" with which Lombardo takes issue. (Def. Mem. at 11-12.) Lombardo admitted that all the "services" he provided to Chmura all related to JobsEQ,

---

[3] Lombardo challenges only two of the five independent covenants found in Section 3 of the Agreement. The remaining provisions prohibit Lombardo from soliciting Chmura employees, interfering with its contractual relationships, and owning or managing any entities that compete with Chmura. (Agreement §§ 3(a), (d), (e).) All three fall well within the reasonableness parameters discussed above.

Chmura's labor data Software-as-a-Service (SaaS) platform.  (Lombardo Dep. 24:3-10 (Q. "So is it correct to say that the services you performed for Chmura all related in some way to JobsEQ? A.  Yes.")  Thus, under the Agreement's non-competition provision, Lombardo can do whatever he wants for whomever he wants, as long as he is not selling or marketing labor data via SaaS subscriptions.

Under Virginia law, that prohibition is enforceable.  *See Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 791 (E.D. Va. 2018) (Ellis, J.) (enforcing non-compete clause prohibiting the defendant from performing "the same or similar services as those that [he] provided to the plaintiff" during his employment for any entity that "provides legal staffing, managed review, legal consulting, information governance, electronic data discovery and litigation support services"); *NVR, Inc. v. Nelson*, 2017 WL 631684, at *1, 6 (E.D. Va. Feb. 14, 2017) (upholding a non-compete provision that broadly defined the employer's services as the "residential homebuilding, mortgage financing, or settlement services business," but limited the restriction to services directly competitive with those performed for the plaintiff employer); *Blue Ridge Anesthesia*, 239 Va. at 369 (enforcing a non-competition agreement that prohibited work for any company that "render[ed] the same or similar services" as the plaintiff, provided that the defendant could perform noncompetitive work for those companies).  Chmura's niche target market and Lombardo's extensive familiarity with Chmura's products, customers, pricing, and strategy further underscore the reasonableness of the Agreement's restrictions.  *Cf. Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 827 (E.D. Va. 2011) (finding that the plaintiff's "small product line and [the defendant's] extensive knowledge of Brainware's business strategy, customer accounts, and pricing, among other confidential information" supported a finding that non-compete was reasonable).

The Agreement's non-solicitation provision likewise incorporates appropriate limitations in light of Lombardo's extensive exposure to Chmura clients.  Like the non-compete provision, the non-solicitation provision continues for only two years.  *Cf. TechINT Sols. Grp. LLC v. Sasnett*, 2019 WL 4935432, at *10-11 (W.D. Va. Oct. 7, 2019) (granting summary judgment to plaintiff-employer on its breach of contract claim against a former employee and upholding a two-year non-solicitation provision).  Moreover, like other non-solicitation provisions that Virginia courts have enforced, the Agreement's non-solicitation provision only applies to customers whom Lombardo personally served or knew about through his Chmura employment.  *Cf. Advanced Marine Enters., Inc. v. PRC Inc.*, 256 Va. 106, 119 (1998) (upholding as valid a non-solicitation clause that prohibited employee from soliciting customers with whom he had worked and customers within a 50-mile radius of former employer).  In any event, Lombardo is free to solicit those customers, so long as the products or services he is selling are not related to Chmura's business.  (Agreement § 3(c).)  Lombardo understood this.  (Lombardo Dep. 20:7-21 ("Q. And did you believe that you could solicit business from your Chmura customers after your employment ended? . . . A. I would think, my understanding would depend on what it was I was selling.")  The Agreement's non-solicitation obligations are therefore reasonably tailored to protect Chmura's interests.

Enforcing these obligations is particularly important given that, by Lombardo's account, "his" customers comprised over half of Chmura's business.  (Def. Mem. at 6); *see also Devnew v. Flagship Grp., Ltd.*, 75 Va. Cir. 436 (2006) (enforcing non-solicitation provision where the former employee "was privy to confidential information for all of Flagship's customers and accounts").  Lombardo's threats that "either Chmura is going to pay me for those relationships or someone else will" and "if they don't pay me I will do everything I can to ruin this place" are exactly the type

of unfair competition this provision was designed to prevent.  (Lombardo Dep. 196:14-21; ECF No. 35-26 at 4.)  The Court should therefore enforce Lombardo's non-solicitation obligations.

### B.     Lombardo's Confidentiality Obligations Are Enforceable

Lombardo's efforts to evade his confidentiality obligations are similarly unpersuasive.  It is well settled that an employer can require its employees to protect the secrecy of its confidential information.  *GMS Indus. Supply, Inc. v. G&S Supply, LLC*, 2020 WL 974419, at *7-8 (E.D. Va. Feb. 28, 2020) (enforcing a confidentiality provision that protected all "information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company").  In fact, this continuing duty of confidentiality exists even without contractual reminders.  *See Peace v. Conway*, 246 Va. 278, 282 (1993) (discussing an employee's obligation to protect his employer's confidential information during and after his employment) (citing Restatement (2d) of Agency § 396 (1958)).

Lombardo's contrary position misapprehends both the Agreement and the law that governs it.  Most fundamentally, Lombardo is wrong that the Agreement's prohibitions on publishing Chmura's confidential information are subject to the same scrutiny that Virginia courts apply to other restrictive covenants.  (Def. Mem. at 12-14.)  All of the authority on which Lombardo relies to support this misapprehension can be traced directly to the Fairfax County Circuit Court's 2009 decision in *Lasership, Inc. v. Watson*, in which the court determined that the Virginia Supreme Court applies the same standards to non-competition and confidentiality agreements.  79 Va. Cir. 205, 212 (2009).  The *Lasership* court did not say when the Virginia Supreme Court had propounded this rule, however, and as best Chmura can tell, it has never even addressed the question.  Based on this flawed comparison, Lombardo asserts that Chmura cannot protect its

confidential information unless that protection includes a predetermined expiration date.   (Def. Mem. at 12-14.)

That cannot be right.  If it were, every roadside rest stop would by now have Coca-Cola's top-secret recipe.  *Cf. Home Funding Grp., LLC v. Myers*, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006) (noting that "a trade secret, once lost is, of course, lost forever").  To the contrary, "it is appropriate for an employer to restrict a former employee's ability to use confidential information in perpetuity since that is a legitimate business interest of an employer which, in and of itself, is not unduly burdensome on the employee's ability to earn a living."  *Omnisec Int'l Investigations, Inc. v. Stone*, 101 Va. Cir. 376 (2019) (holding that "[d]espite the perpetual bar on non-disclosure, the court finds that this prohibition does not impair [the employee's] ability to earn a living and is thus enforceable"); *see also GMS Indus. Supply*, 2020 WL 974419, at *8 (declining to follow *Lasership* and rejecting the defendant's argument that indefinite duration of a confidentiality clause rendered the agreement unenforceable); *McElmurry v. Alex Fergusson, Inc.*, 2006 WL 572330, at *14 (M.D.N.C. Mar. 8, 2006) (enforcing a confidentiality agreement and finding that it was not a "restraint of trade" because it did not "seek to prevent a party from engaging in a similar business in competition with the promisee").   Thus, the Agreement's confidentiality provision is enforceable even though it does not place an end date on Chmura's ability to keep its confidential information secret.

In any event, the Agreement does not require Lombardo to keep "all" Chmura information confidential "forever."   (Def. Mem. at 13-14.)   For one thing, unlike the agreements found unenforceable in the cases Lombardo cites, the Agreement does not seek to protect "all information" related to Chmura.  Rather, the Agreement protects only "confidential or proprietary information" that is not "salary, bonus or other personnel information specific to [Lombardo]."

12

(Agreement § 1.)  For another, the Agreement does not apply to any information that becomes public through no fault of Lombardo's.  (*Id.*)  In other words, the Agreement only protects information that is confidential, and only for as long as Chmura keeps it that way.  This provision[4] is therefore enforceable as a matter of law.

### C.    Lombardo Breached The Agreement

Lombardo next contends, in cursory fashion, that the Court should grant him summary judgment on Chmura's breach of contract claim because (1) the Agreement is not enforceable; (2) he ultimately returned Chmura's property; and (3) Chmura has alleged no damages.  All three contentions can be dispatched in equally short order.  First, Chmura's claim specifically concerns the Agreement's confidentiality and return of property provisions.  Lombardo's quarrels with those provisions are unavailing for the reasons discussed above.  (*See also* Pl. Mem. at 15-16.)  Second, the Agreement required Lombardo to return Chmura's property "immediately and without demand" upon his separation.  Lombardo testified that he understood this to mean he needed to give Chmura's property back "right away under any circumstance."  (Lombardo Dep. 18:2-22.) Returning Chmura's property after two months of repeated demands plainly does not satisfy this obligation.  And, third, Chmura has alleged damages in the form of lost profits and attorneys' fees. (Pl. Mem. at 16-18; Deposition of Christine Chmura 58:17-59:2 ("C. Chmura Dep.," ECF No. 35-29).)

---

[4] The Agreement's confidentiality provision may stand even if the Court declines to enforce Lombardo's other restrictive covenants (as may the return of property provision, the enforceability of which Lombardo does not contest).  *E.g.*, *Roto-Die Co., Inc. v. Lesser*, 899 F. Supp. 1515, 1522 (W.D. Va. 1995) (enforcing confidentiality and non-solicitation provisions and severing unenforceable non-competition provision in the same agreement).  As the *Roto-Die* court noted, the Court may "constru[e] independent clauses independently" without "blue pencil[ing]," *i.e.*, editing or revising otherwise unenforceable provisions.  *Id.* at 1523.  That is particularly true where, as here, the parties agreed to a severability provision.  (Agreement § 10.)

Therefore, summary judgment in Chmura's favor on Lombardo's liability for breach of contract is appropriate.

## II.     Lombardo Is Not Entitled To Summary Judgment On Chmura's Trade Secrets Claim

Although Lombardo correctly recites the legal elements of Chmura's DTSA claim, his application of those elements to the facts quickly veers astray.  (Def. Mem. at 16 (noting that Chmura must prove that "(1) it own[ed] a trade secret; (2) the trade secret was misappropriated; and (3) the trade secret implicates interstate or foreign commerce") (citation omitted).)   The undisputed facts establish that Lombardo misappropriated Chmura's trade secrets.  As such, not only does Lombardo's motion for summary judgment fail, but Chmura prevails on its DTSA claim as a matter of law.

### A.     The Documents on the Chmura Computer That Lombardo Took Were Trade Secrets

Lombardo's assertion that the documents he misappropriated are not trade secrets is meritless.  "The case law is clear that just about [any information] can constitute a trade secret under the right set of facts" as long as the information (1) is the subject of reasonable measures to maintain its secrecy and (2) derives independent economic value from its secrecy.  *MicroStrategy, Inc. v. Bus. Objects, S.A.,* 331 F. Supp. 2d 396, 416 (E.D. Va. 2004); 18 U.S.C. § 1839(3).  The documents Lombardo took—(1) a list of the authorized users of Chmura's software (*i.e.*, customers) and (2) Lombardo's and other Account Managers' contact reports from two conferences Lombardo attended on Chmura's behalf—satisfy both elements.

First, Lombardo does not challenge Chmura's efforts to maintain the secrecy of its information and therefore concedes that those efforts are reasonable as a matter of law.  Second, Lombardo fails to address, and therefore does not dispute, the trade secret status of the list of

authorized users of Chmura's software (including detailed information on customer usage).  (ECF No. 38-2.)  Nor can he dispute that this list is a trade secret.  Lombardo admitted under oath that this list is both valuable and confidential.  (Lombardo Dep. 200:17-202:12.)

Finally, Lombardo's claim that the conference notes are not a trade secret because they contain only publicly available contact information for the prospective customers he met at the conference simply is false.  The notes identified not only the prospects who requested JobsEQ demonstrations, but also their "decision-makers," software needs, and budgetary constraints.  (ECF No. 38-1.)  A competitor with access to this information would know exactly who to target and how to do so.  That, by definition, is a trade secret.  *See e.g., MicroStrategy*, 331 F. Supp. 2d at 424-25 (finding that a list of current and prospective customers qualified as a "trade secret" because it "would be of value to a competitor that could determine where to apply its resources and who [sic] to target."); *Spirax Sarco, Inc. v. SSI Eng'g, Inc.*, 122 F. Supp. 3d 408, 426 (E.D.N.C. 2015) (ruling that information related to products offered to or requested by previous customers constituted qualified as a "trade secret.").

Moreover, the mere fact that these customers and contacts attended a trade show does not render the details about those customers' needs and purchase criteria public.  (Def. Mem. at 18.)  Chmura paid Lombardo to interact with customers and prospects, gather information about their specific needs, and compile that information in a document that it could use to pursue that business (unaware, of course, that Lombardo would then hold that information hostage for two months).  It is precisely this kind of time and effort that qualifies such information as a trade secret.  *Cf. Fid. Glob. Brokerage Grp., Inc. v. Gray*, 2010 WL 4646039, at *2 (E.D. Va. Nov. 9, 2010) (discussing the value of, and effort associated with creating, a customer list); *MicroStrategy*, 331 F. Supp. 2d at 417 (noting that "a compilation of public facts can also constitute a trade secret if the compilation

itself has remained confidential"); *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1322 (N.D. Ill. 1990) (noting that the "effort of compiling useful information is, of itself, entitled to protection even if information is otherwise generally known").

### B.    Lombardo Misappropriated Chmura's Trade Secrets

Lombardo's argument that he did not misappropriate Chmura's trade secrets likewise ignores the undisputed facts.  The DTSA defines "misappropriation" broadly to include not only disclosure or use of a trade secret but also its mere acquisition by "improper means."  18 U.S.C. § 1839(5).  The statute's definition of "improper means" is similarly broad.  Contrary to Lombardo's assertion, "improper means" are not limited to "acts such as uploading, copying, selling, altering and concealing a company's trade secrets."  (Def. Mem. at 17.)  Instead, "improper means" include any "breach[es] of confidence … and other means either wrongful in themselves or wrongful under the circumstances of the case."  Restatement (Third) of Unfair Competition § 43 (1995). Courts in the Fourth Circuit have therefore found "misappropriation" where, as here, the employee unlawfully retained his employer's property after the end of his employment.  18 U.S.C. § 1839(6); *Haught v. Louis Berkman LLC*, 417 F. Supp. 2d 777, 783-84 (N.D.W. Va. 2006) (granting summary judgment for the employer where the employee admitted keeping the employer's documents for five days after her termination instead of returning them); *OROS, Inc. v. Dajani*, 2019 WL 2361047, at *5 (E.D. Va. June 4, 2019) (finding misappropriation where, despite his termination and the employer's requests, the employee refused to return the employer's trade secrets); *Apollo Enter. Imaging Corp. v. Conyers*, 2020 WL 1896706, at *4 (E.D. Va. Jan. 10, 2020) (finding misappropriation where the employee breached his contractual duty to identify and return the employer's information).  It bears emphasis that Lombardo did not merely keep

information to which Chmura had ready access elsewhere—he kept the *only* copy of Chmura's conference notes, and did so for months.

In short, Lombardo cannot dispute that he deprived Chmura of confidential and valuable information, and that he did so at the same time he was threatening to "f*ck [Chmura]" by calling "all [his] clients" and sending them to a competitor if Chmura did not pay him.  (ECF No. 35-26 at 5.)  This months-long delay contravened both Lombardo's legal obligations and Chmura's repeated requests.  (Lombardo Dep. 196:4-21, 197:5-8, 230:15-18; Auerbach Dep. 115:5-8).  Stated simply, "by not returning [the computer] upon [his] termination [Lombardo] did not act as authorized by [Chmura.]"  *Haught*, 417 F. Supp. 2d at 783-84.  His actions are therefore "misappropriation" as a matter of law and common sense.  *Id.*; *see also Dajani*, 2019 WL 2361047, at *5 ("Even assuming [the employee] at one time would have rightfully had control over [the trade secret] information as the company's president, his refusal to return that information after he was terminated is enough to qualify as acquisition through improper means …."); *Apollo Enter.*, 2020 WL 1896706, at *4 ("[The employer's trade secrets] appear to have been misappropriated by [the employee] under DTSA . . . because he acquired them through improper means," including breach of his duty to return them).

The undisputed facts in this case establish all elements of Chmura's DTSA claim.  Consequently, Lombardo's motion for summary judgment on Chmura's DTSA claim fails.  Instead, Chmura is entitled to judgment as a matter of law in its favor.

## III.    Lombardo Cannot Defeat Chmura's Conversion Claim

Lombardo's opposition to Chmura's conversion claim is even flimsier.   Lombardo contends he has prevailed on this claim because (1) he eventually gave Chmura's computer back;

17

and (2) the Virginia Uniform Trade Secrets Act ("VUTSA") preempts Chmura's conversion claim. Both arguments fail.

First, it is black-letter law that "any act of dominion" that is "inconsistent with" the plaintiff's property rights is a conversion. *Simmons*, 261 Va. at 582. The property deprivation need not be permanent to support a conversion claim. *E.g.*, *Cardoza v. Med. Device Bus. Servs., Inc.*, 389 F. Supp. 3d 399, 408 (W.D. Va. 2019) (finding that allegations that the defendants "returned [the plaintiff's property] only after lengthy delays" could state a conversion claim); *see also Christie v. Nat'l Inst. for Newman Studies*, 2019 WL 1916204, at *17 (D.N.J. Apr. 30, 2019) (noting that a claim for conversion of the plaintiff's computer "d[id] not extinguish simply because the property was returned to the rightful owner"); *Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 589-90 (S.D.N.Y. 2015) (granting summary judgment for the plaintiff on its conversion claim because "that the funds were ultimately returned does not render the withholding not conversion," even if the defendant was waiting on counsel's advice). Put more concretely, Lombardo's "subsequent return" of Chmura's computer "does not negate the initial act of conversion." *Sirona Dental, Inc. v. Smithson*, 2018 WL 1567370, at *11 (W.D.N.C. Mar. 30, 2018) (denying a former employee's motion for summary judgment on the plaintiff-employer's claim for conversion of its computer). Lombardo does not, and cannot, offer any authority to the contrary. That he returned Chmura's computer months after Chmura first asked therefore does not warrant summary judgment in his favor—just the opposite.

Second, the VUTSA does not preclude Chmura's conversion claim. As this Court has noted, the VUTSA preempts only those claims "predicated 'entirely' upon [the defendant's] alleged misappropriation of trade secrets." *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 452 (E.D. Va. 2009) (holding that the VUTSA did not preempt claims for

18

conversion of copies of confidential documents). Conversely, a conversion claim that alleges deprivation of non-trade secret confidential information and/or tangible property is not preempted. *E.g.*, *AWP, Inc. v. Commonwealth Excavating, Inc.*, 2013 WL 3830500, at *7 (W.D. Va. July 24, 2013) (declining to apply VUTSA preemption where the complaint alleged "not only theft of trade secrets but conversion of [the plaintiff's] equipment, [and] misuse of other confidential business information which may not qualify as a trade secret"). Here, Chmura's claim is not preempted because Lombardo undisputedly took Chmura's laptop computer, and failed to return it despite repeated requests.[5] (Lombardo Dep. 198:11-18, 225:25-226:3; Lombardo Decl. ¶¶ 14, 17; ECF No. 35-31; ECF No. 35-30 at 3 (demanding return of all Chmura property and information); C. Chmura Dep. 40:3-7.) And, needless to say, the computer itself is not a trade secret. Therefore, preemption does not apply, and Lombardo's own evidence proves Chmura's conversion claim as a matter of law.

## IV. Lombardo Has Not Prevailed On His Overtime Claims

Chmura does not dispute that generally, the FLSA requires employers to pay overtime to employees who work more than 40 hours per week. (Def. Mem. at 21.) Nor does it dispute that Lombardo was an "employee" of an "enterprise engaged in commerce" during his last three years at Chmura. (Def. Mem. at 22.) Chmura does not even dispute that Lombardo was one of its most successful Account Managers. (*Id.*) What Lombardo carefully omits, however, is any mention of the money and responsibility that came with that success.

As explained in Chmura's opening Memorandum, the money and the responsibility are dispositive, and warrant summary judgment in Chmura's favor. (Pl. Mem. at 24-31.) Lombardo

---

[5] Lombardo also cannot have it both ways—if the information he took was not trade secrets (Def. Mem. at 18) and holding it hostage was not "misappropriation" (Def. Mem. at 17), then Chmura's claim is not preempted.

made between $140,000 and $180,000 per year in his last three years at Chmura.  (Declaration of

Leslie Peterson ¶ 13 ("Peterson Decl.," ECF No. 35-1).)  This alone "is a strong indicator of

[Lombardo's] exempt status, thus eliminating the need for a detailed analysis of [his] job duties."

29 C.F.R. § 541.601.

Moreover, Lombardo's own descriptions of his performance (as confirmed by his

managers' testimony) prove that his "duties were far more extensive than just sales[.]" *Tilchen v.

CEMD Elevator Corp.*, 2019 WL 4640184, at *5 (S.D.N.Y. Sept. 24, 2019) (granting summary

judgment to employer because highly compensated employee's job included "negotiating with

CEMD's customers . . . handling client relations, determining whether client problems were

covered under agreements with CEMD, coordinating with departments within CEMD to ensure

completion of work, [and] following up with internal stakeholders to determine that work was

completed").  Lombardo undisputedly decided how to identify prospective customers and tailor

his pitches to those customers' needs; managed Chmura's existing client relationships; provided

feedback and advice to upper-level management on product features that he thought Chmura

should implement; and took initiative to develop "selling best practices for [the] company."  (ECF

No. 35-9 at 2; *see also* Pl. Mem. at 5-8.)  Thus, any "minimization of the level of [Lombardo's]

work [in his summary judgment filings] is directly contradicted by his own assessment of his

accomplishments."  *Mock v. Fed. Home Loan Mortg. Corp.*, 2014 WL 3545096, at *2 (E.D. Va.

July 15, 2014); *see also Brooks v. Healthcare-Iq, Inc.*, 2019 WL 497693, at *8 (M.D. Fla. Feb. 8,

2019) (noting that "plaintiffs who exercise their own judgment to tailor or mold solutions or

approaches for clients and customers tend to exercise sufficient discretion to qualify for an

overtime exemption").

Because Lombardo is an exempt, highly compensated employee, he is not entitled to overtime under the FLSA or Ohio law. The Court should therefore deny Lombardo's summary judgment motion on these claims and grant Chmura's.

## **CONCLUSION**

For the reasons above, Chmura requests that the Court deny Lombardo's Motion for Summary Judgment and grant summary judgment in Chmura's favor on all issues raised in that Motion.

Dated: May 29, 2020

<div align="right">

_____/s/_____
Rodney A. Satterwhite (VA Bar No. 32907)
Christopher M. Michalik (VA Bar No. 47817)
Heidi E. Siegmund (VA Bar No. 89569)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
(Office) (804) 775-1000
(Fax) (804) 698-2158
rsatterwhite@mcguirewoods.com
cmichalik@mcguirewoods.com
hsiegmund@mcguirewoods.com

*Counsel for Plaintiff/Counterclaim Defendant*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of May, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send a notification of such filing (NEF) to all counsel of record.

<div style="margin-left:40%">

/s/
_____
Heidi E. Siegmund (VSB No. 89569)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel:    (804) 775-1000
Fax:    (804) 775-1061
hsiegmund@mcguirewoods.com

*Counsel for Plaintiff/Counterclaim Defendant*

</div>