# Exhibit A

Page 109

1              IN THE UNITED STATES DISTRICT COURT
2              FOR THE EASTERN DISTRICT OF VIRGINIA
3                      RICHMOND DIVISION
4              ~~~~~~~~~~~~~~~~~~~~~
5   CHMURA ECONOMICS & ANALYTICS, LLC
                 Plaintiff
6
                 vs.              Case No.  3:19-CV-00813
7
8   RICHARD LOMBARDO
                 Defendants
9
10             ~~~~~~~~~~~~~~~~~~~~~
11
12             REMOTE VIDEO DEPOSITION OF:
13              LESLIE PETERSON, VOL. II
14
15                     Taken on:
16                     May 6, 2020
                       9:00 a.m.
17
18
                       Taken at:
19
                   McGuire Woods, LLP
20                   Gateway Plaza
                 800 East Canal Street
21                   Richmond, VA
22
23
24        Kelliann D. Linberg, RPR, Notary Public
25

Page 110

```
 1   APPEARANCES: (Via Videoconference)
 2   On behalf of the Plaintiffs:
 3        Koehler Fitzgerald, LLC
          CHRISTINE M. COOPER, ESQ.
 4        1111 Superior Avenue E
          Ste 2500
 5        Cleveland, OH, 44114
          Ccooper@koehler.law
 6        216-539-9370.
 7
 8
 9   On behalf of the Defendants:
10        McGuire Woods, LLP
          HEIDI SIEGMUND, ESQ.
11        Gateway Plaza
          800 East Canal Street
12        Richmond, VA, 23219-3916
          Hseigmund@mcguirewoods.com.
13        804-775-100
14
15   ALSO PRESENT:
16        RICHARD LOMBARDO
17        JOHN CHMURA, via Zoom
18
19
20
21
22
23
24
25
```

1                     TRANSCRIPT INDEX

2

3     APPEARANCES.............................110

4     INDEX OF EXHIBITS.......................112

5

6     EXAMINATION OF LESLIE PETERSON:

7     BY MS. COOPER...........................114

8     .

9

10

11

12

13    REPORTER'S CERTIFICATE..................262

14

15

16    EXHIBIT CUSTODY:    RETAINED BY COURT REPORTER

17

18

19

20

21

22

23

24

25

Page 112

```
 1                     INDEX OF EXHIBITS
 2    Number              Description           Marked
 3    Defendant's
      Exhibit G      Previously Marked Copy of      161
 4                   Letter Dated 3/28/2019 to Mr.
                     Lombardo
 5
      Exhibit I      Copy of Handwritten Notes      166
 6
      Exhibit R      Copy of Email Dated 8/31/2017  171
 7                   Bates Labled CHMURA000083-88
 8    Exhibit Q      Previously Marked Copy of      177
                     Employee Handbook
 9
      Exhibit J      Copy of Richard Lombardo       184
10                   Commission Report 10-16 to
                     02-17, Bates  CHMURA000131
11
      Exhibit K      Copy of Richard Lombardo Sales 184
12                   Commission, Bates
                     CHMURA000132
13
      Exhibit AG     Copy of Excel/Native Version   186
14                   of Exhibit J, Placeholder,
                     CHMURA000131
15
      Exhibit AH     Copy of Excel Spreadsheet for  195
16                   March 2017 through September
                     2019
17
      Exhibit V      Copy of Chmura Economics &     221
18                   Analytics, LLC's Objections
                     and Responses to Richard
19                   Lombardo's First
                     Interrogatories with
20                   Verification Page
21    Exhibit AA     Confidential Copy of Pricing   233
                     Matrix Bates CHMURA0204226
22
      Exhibit AB     Confidential Copy of Pricing   239
23                   Matrix Bates CHMURA0204227
24
25
```

Page 113

| 1 | Exhibit N | Previously Marked Copy of | 243 |
| | | Email Dated 1/127/2017 from | |
| 2 | | Leslie Peterson, Bates | |
| | | Chmura0056740 | |
| 3 | | | |
| | Exhibit S | Previously Marked Copy of | 244 |
| 4 | | Standard Operating Procedures | |
| | | Dated 4/5/2019 | |
| 5 | | | |
| | Exhibit T | Previously Marked Copy of | 246 |
| 6 | | Email with Standard Operating | |
| | | Procedures Dated 7/10/2019 | |
| 7 | | Attached | |

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 114

1          LESLIE PETERSON, being previously sworn and

2    with the previous agreed upon stipulation regarding the

3    need for this deposition to take place remotely because

4    of the Government's order for social distancing, said

5    as follows:

6          EXAMINATION OF LESLIE PETERSON, VOL. II

7    BY MS. COOPER:

8          Q.    Good morning, Ms. Peterson.

9          A.    Good morning.

10         Q.    I want to pick up, I think, where we left

11   off, at least.  There may be some duplication as we

12   pick up where we were.

13              MS. COOPER:  Are you guys having an okay

14   time hearing me?

15              MS. SIEGMUND:  Yes.  I am going to turn you

16   up at bit.  Before you get started, Ms. Peterson has

17   something she wants to correct from her deposition on

18   Thursday that she wanted to correct.

19         A.    On the offer letter, I found an email and

20   talked with {audio distortion issue --  indiscernible }

21   and I signed it.

22              (Reporter asked for clarification).

23         A.    I found an email, and I spoke with John

24   Chmura, and he wrote the offer letter.  I reviewed it

25   and said it is good to go.

Page 115

1      Q.    Did you sign the offer letter?

2      A.    It had my signature on it when I reviewed

3   it.

4      Q.    I want to turn to -- back to Exhibit A,

5   Defendant's Exhibit A.  I will put that up on the

6   screen.

7      Q.    And turning your attention to -- well, let

8   me sort of scroll through it for a second.  This is the

9   Notice of Deposition that we looked at last week, and

10  as we discussed, you were designated as a corporate

11  representative to testify about certain topics.  I want

12  to turn your attention to Topic Number 12, "Job duties

13  of account manager and senior account manager between

14  February 1, 2015 and October 31, 2019."  You were

15  designated as the corporate representative to testify

16  on this topic, correct?

17     A.    Yes, ma'am.

18     Q.    Can you walk me through the job duties of

19  an account manager during that time frame?

20     A.    The job duties of an account manager was to

21  prospect potential clients, to set up a demo of JobsEQ,

22  our technology platform, to actually do the demo, to

23  close within a reasonable time, to counsel/advise the

24  client if there was funding issues.  After closing the

25  deal, to appropriately document himself or -- and

Page 116

1    through the accounting department, the details of the

2    license agreement, the regional territory of the

3    license, and the price and the terms of renewal.

4              To contact that client on a quarterly basis

5    to ensure that that client was using the product, and

6    and to determine if that client needed additional

7    training or help in any way from Chmura.  And send out

8    a customer satisfaction survey 60 days prior to renewal

9    to determine the satisfaction level of that client with

10   the product and with Chmura, the sales team, and then

11   to ensure that this client renewed.

12        Q.    Were there any other job duties of an

13   account manager that you can think of?

14        A.    So this was a start-up sales team and some

15   of the things that we made decisions around were new.

16   I suppose there was product, but to what -- there was a

17   good deal of travel involved and outward public facing

18   meetings.  So we had to get a comfort level that the

19   account managers could do that.  And, generally, by the

20   time they became a senior account manager, we had the

21   confidence that they could manage all of that on their

22   own.

23        Q.    When you say, manage all of that on their

24   own, what are they managing on their own?

25        A.    Manage the conferences that they wanted to

1    attend, take care of their hotel and registration, to

2    do that in a manner that was ethical and appropriate in

3    terms of how they used the company credit card to pay

4    for travel and conferences, and have, traditionally,

5    maturity and act in a manner that was appropriate and

6    ethical.  And we felt like --

7         Q.    Did you not -- I'm sorry, go ahead.

8         A.    No, that's fine.  Go ahead.

9         Q.    Did you not expect those same expectations

10   out of an account manager?

11        A.    After you become comfortable with the

12   product and the culture of Chmura, and you prove

13   yourself to be an ethical person, you get more

14   opportunities for independence and to manage more of

15   the functions that Operations doesn't have to manage

16   for you.

17        Q.    Can you give me some specific examples of

18   things that a senior account manager would manage that

19   an account manager did not manage?

20        A.    Account managers went to the conferences

21   that we selected.  A senior account manager was able to

22   advise us on which conferences they chose to attend

23   because they had some senior knowledge and talent

24   around those conferences, so that we had the best

25   return on investment possible.

Page 118

1      Q.    Other than choosing conferences, does a

2   senior account manager have any different job duties

3   than that of an account manager?

4      A.    A senior account manager was more

5   intimately involved in marketing.  They were more

6   involved in the innovation.  They brought in more

7   intelligence from the industry about what needed to be

8   added to our internal road map because they had more

9   knowledge about the industry, and that's why they

10  became a senior account manager over an account

11  manager.

12           When an account manager comes in and they

13  have never sold software, let's say they sold vacuum

14  cleaners, or they were in collections, but they had no

15  experience in software sales, then that person had to

16  be inundated and immersed into the tech world.  And

17  that takes several months to take somebody that maybe

18  takes -- maybe it's been six -- maybe it takes them six

19  years to get a four-year degree, and maybe they moved

20  from collections to sell vacuum cleaners.  And to get

21  them ready to be in the tech world, with economists,

22  that's a very sophisticated industry, you are expected

23  to be on point at all times.  There is a point at which

24  you -- being an account manager involves that, step up

25  to that challenge and deliver.

1      Q.    How did the determination to move from --

2  move a salesperson from the account management position

3  to senior account management position be made?

4      A.    At the time that we are talking about,

5  Mr. Lombardo, we did not have product managers, so

6  Austen and Rick were our product advisers.  And so we

7  relied heavily on their insight into the clients'

8  needs.  You know, what keeps you up at night, what do

9  you need?  We relied heavily on that intelligence to be

10  more strategic in how we prioritized the road map.

11      Q.    But just generally speaking, how would a

12  salesperson move from the account manager position to a

13  senior account manager position?  How would that

14  happen?

15      A.    I don't know what "generally speaking"

16  means.

17      Q.    When a salesperson is moved from a -- how

18  does Chmura decide when a salesperson was ready for the

19  senior account manager title?

20      A.    Well, in Mr. Lombardo's situation, he asked

21  for it and we talked about it, and we understood that

22  he was ready to move to the next level.  And so we all

23  agreed -- it is a consensus based organization.  We

24  don't make decisions by one person.

25            So we, senior leadership, decided that Rick

1    was valuable to us in terms of adding -- I mean, there

2    are 300 logs of him asking for GDP, 300 logs of that.

3    So he was our product developer.  In smaller

4    innovations, you have to understand we wear a lot of

5    hats.

6         Q.    I understand that.  I don't think you are

7    answering my question, though.  Let me take a step

8    back.  Was there a written job description for account

9    managers?

10        A.    There was not.

11        Q.    Was there a written description for senior

12   account managers?

13        A.    There was not.

14        Q.    Were Mr. Steele and Mr. Lombardo the only

15   two senior account managers during Mr. Lombardo's

16   employment?

17        A.    Yes.  To the best of my knowledge, that is

18   true.

19        Q.    When did Mr. -- sorry, go ahead.

20        A.    No, they were A players.  It was -- we

21   depend on each one of them.  The question that you are

22   asking was May 17 of 2016?

23        Q.    Mr. Lombardo became a senior account

24   manager on May 17, 2016?

25        A.    To the best of my ability to remember, that

Page 121

1   is the right month.

2       Q.    Who made the decision to give the promotion

3   to senior account manager?

4       A.    The SEA Group.

5       Q.    I want to step back and walk through these

6   job duties with you.  First, with respect to account

7   manager, you said that one of the job duties was to

8   prospect clients.  Can you explain to me what that is

9   or what that means?

10      A.    That means that you do research to figure

11  out who the person in the organization is that you need

12  to reach out to; that is, a user of technology that can

13  get to the decision maker to adopt technology.  That's

14  what prospecting is.  It is getting to the right

15  person.  Is that your question?  Did I answer your

16  question?

17      Q.    Yes, you did.  You did.

18      A.    Okay.

19      Q.    And then you said that the account manager

20  was responsible for setting up demos and -- we will

21  just stop at setting up demos.  Can you explain that a

22  little bit further?

23      A.    Setting up demos?  That means getting on

24  the calendar, being prepared to do the demo in a

25  customized manner that answers their pain point, what

Page 122

1   keeps you up at night.

2        Q.    And then you said that an account manager

3   was responsible for doing the demo.  What did that

4   mean?

5        A.    So when you come in from like, let's say an

6   industry that you have no knowledge of -- economics is

7   a pretty sophisticated social science industry.  And

8   let's say you come from vacuum cleaners or horse

9   medicine, or whatever, and you have no clue about the

10  differences between a social science and a physical

11  science, like chemistry and biology, so you have to

12  understand the laws of economics and underlying

13  assumptions.  So that's a daunting task for anyone

14  that's never been exposed to understanding economics

15  theory.  Did I answer your question?

16       Q.    I'm not sure.  You mentioned one of the job

17  duties of an account manager is to do the demo.  Is

18  it --

19       A.    You can't do a demo unless you understand

20  the fundamentals of economics.

21       Q.    I understand that, but what does doing a

22  demo mean?  If an account manager is doing that demo,

23  what does that mean?

24       A.    That means they are on a shared screen and

25  they are going through analytics and our technology

1   platform, which is JobsEQ, and they are doing it in a

2   manner that answers that client's pain point.

3         Q.    So the demo would be between the account

4   manager and the prospective client; is that correct?

5         A.    We expect that by our six months period.

6   In the three months, one to three month period, we

7   expect them to be demo ready internally, and then they

8   can demonstrate between three months and six months

9   when they are successfully doing a demo with a client

10  on their own.  They don't have to have an economist

11  sitting there with them.

12        Q.    Who are the economists at Chmura at the

13  time Mr. Lombardo was employed?

14        A.    I'm sorry, there's some kind of noise.  Do

15  you hear that?  It's like a --

16              MS. SIEGMUND:  Yeah.

17              {Technical issues addressed}.

18        A.    Can you repeat the question?  I'm sorry,

19  Christine.

20        Q.    I may be moving on to another question, so

21  forgive me.

22              When an account manager is doing a demo, it

23  would be the account manager on their computer doing a

24  demo to a potential customer on the potential

25  customer's computer; is that correct?

Page 124

1        A.    Yes, it's like, GoToMeeting or Zoom or

2   anything like that, like we are doing right now.

3        Q.    And then you said that one of the

4   expectations for an account manager was that they

5   closed within a reasonable time.  First of all, can you

6   define "closed" for me, what you mean by that?

7        A.    That you won a client.

8        Q.    And what does Chmura consider a reasonable

9   time?

10        A.    Well, that is a great question.  There are,

11   in our business to government clients, there are cycles

12   of budgets.  And depending on when you get that demo

13   completed within their budget process, it could be --

14   it could be nine months, it could be 12 months, it

15   could be today.  It varies.

16        Q.    So there was no set time as to what Chmura

17   considered a reasonable time to close after a demo; is

18   that fair?

19        A.    It depended on the client and if they would

20   be G to B.  B to B doesn't have those government

21   imposed budgetary profit fees that G to B has.  B to B

22   does not have those barriers that B to G has.  Let me

23   be --

24        Q.    So what was Chmura's expectations with what

25   you say, B to G?  Is that business to government?

1     A.    Yes.

2     Q.    What was the expectation with the business

3  to government concerning prospects?

4     A.    The expectation was that you understand the

5  B to G business cycle:  Were they annual?  Did they go

6  January to December?  Did they go July 1 to June 30th?

7            And in that understanding, you had to -- we

8  asked that you get very specific in setting up demos in

9  the budgetary planning process, which can be February

10  to May.

11     Q.    And what if --

12     A.    Or if your fiscal year was January -- or

13  July 1 to June 30th.

14     Q.    And B to B is business to business,

15  correct?

16     A.    It is.

17     Q.    What was the expectation with respect to a

18  reasonable time to close after a demo with business to

19  business?

20     A.    As soon as possible.

21     Q.    What was the average close rate or close

22  time between a demo and signing --

23     A.    There --

24            MS. SIEGMUND:  Wait until --

25     A.    There is not --

Page 126

1        Q.    Yeah, let me finish my question.  What was

2    the average time between a business to business from a

3    demo to closure, if you know?

4        A.    I don't have that number.

5        Q.    Were account managers -- we had discussed

6    that account managers were doing these demos from their

7    computers.  Were they -- at the time they were doing

8    the demos, were they located in -- I guess, in their

9    office -- in a Chmura office when they were doing these

10   demos?

11       A.    Not always.

12       Q.    Where else would they be if they were doing

13   a demo?

14       A.    They might be at a conference or they might

15   be at the customer's location on site.

16       Q.    How often would an account manager go to an

17   on-site -- go to a client on site?

18       A.    I don't have that number.

19       Q.    You also mention one of the job duties of

20   an account manager was to counsel a client.  Can you

21   explain that a little bit more?

22       A.    As you get inside an organization and you

23   are dealing with the data people that are reporting to

24   their management, to a board, and they don't have a big

25   picture of funding.  So if you are counseling a client

1   that's in workforce, for example, you need to

2   understand the Workforce Investment and Opportunity Act

3   in depth to be able to advise what the law allows in

4   terms of funding for services.

5            And that is a visual -- they might not know

6   that.  They might not know that they can take JobsEQ

7   and put it in something other than administrative

8   funds; for example, program funds, where you have

9   counselors that are seeing job seekers on a daily

10  basis.  And that's under the program funds and not the

11  administrative funds.  You need to be able to advise

12  them, Hey, you can do that and it is legal.

13       Q.   So if --

14       A.   Did you understand that?  Did you

15  understand that?

16       Q.   I think I do, but I am asking some

17  follow-up questions on it.

18       A.   Okay.

19       Q.   The Workforce Investment Opportunity Act,

20  what is that?

21       A.   That is a federal program under the

22  Department of Labor where funds are sent to the state,

23  each state, and it's based on need.  It's something --

24  some of it you are seeing right now with Covid.  But

25  the need is based, traditionally, on unemployment

Page 128

1    rates.

2            So each state has these funds that come

3    down from the Department of Labor, and they take the

4    15% to do the administrative piece at the state level.

5    And the chief locally elected officials, called CLEOs,

6    are responsible for the release of fiduciary

7    disbursement of those funds at the local level.  So you

8    can imagine it gets pretty political pretty quickly at

9    the local level.  So you have to know the law, and our

10   folks know that.  They get to be experts in WIOA pretty

11   quickly.

12       Q.   And how do they develop, or how do they

13   become experts in that?

14       A.   Well, I'm a subject matter expert.  I ran a

15   Workforce Investment for four years, so I am the go-to

16   person at Chmura for that.

17       Q.   But the account --

18       A.   You learn a lot in conferences.  They learn

19   more at conferences.

20       Q.   Would account managers be expected to

21   advise prospective clients as to their legal rights

22   under that Workforce Investment Opportunity Act?

23            MS. SIEGMUND:  Object to the form of the

24   question.

25       A.   I don't think that that's what we are

Page 129

1    talking about.  They provide insight into the law, but

2    they do not legally counsel them.

3         Q.    Can you describe to me the difference?

4         A.    We don't act in a legal capacity with our

5    client.  We are advisers.

6         Q.    What type of advice are you -- would an

7    account manager give to a prospective client, or

8    clients, regarding the Workforce Investment Opportunity

9    Act?

10        A.    As we discussed earlier, for the awareness

11   of budgetary cycles, an awareness of the barriers that

12   go along with job seekers that are taking advantage of

13   these funds, and it is being able to advise which

14   funding stream that you can put a technology platform

15   under, like JobsEQ, and it satisfies the requirement of

16   WIOA.

17        Q.    And an account manager would be expected to

18   understand the budgetary cycles and categories --

19   category spending that can be used to purchase JobsEQ;

20   is that fair?

21        A.    That's up to them.  If they want to be an A

22   player, they will do that.  If they want to be a B

23   player, they won't.

24        Q.    And then would an account manager

25   communicate that to the prospective client, or client?

1     A.     Communicate what?

2     Q.     The budgetary cycle, or what they

3 understood the budgetary cycle to be?

4     A.     There are a lot of clients in WIOA that

5 don't understand WIOA.  It is unfortunate, with our

6 taxpayer money, right?  It is unfortunate, but it

7 happens a lot.

8     Q.     So the account manager then would walk them

9 through that; is that fair?

10     A.     Walk them through.

11     Q.     I think -- are you calling it WIOLA?  Is

12 that how you're saying it?

13     A.     WIOA.  That's the industry -- that's how

14 the industry speak.

15     Q.     I want to speak like that, so I am going to

16 use it.  So I want to say it, too.

17     A.     It's WIOA.

18     Q.     WIOA.  I got it.  Would an account manager

19 talk to a prospective client, or client, about the

20 budgetary cycles set forth in WIOA?

21     A.     I mean, they -- like I said, if they want

22 to be an A player, they will.  If they are satisfied

23 with the status quo, they might not.  They might just

24 do the same demo that they would do for an economic

25 developer, or that they would do for a workforce

                                                      Page 131

1    client.  It depends on the sophistication of that

2    employee.  There is no requirement there.  Is that

3    clear?  I want to be clear.  Is that clear?

4          Q.    It's clear to me, yes.

5          A.    Okay.

6          Q.    You also said the job requirements for

7    account manager was to document in Salesforce.  Was

8    Salesforce the primary CRM platform that Chmura used?

9          A.    Yes.

10         Q.    And so was an account manager required to

11   put any communications that they had with a prospective

12   client, or client, in Salesforce?

13         A.    Yes.

14         Q.    What other types of information was an

15   account manager required to document in Salesforce?

16         A.    I don't understand the question.

17         Q.    Was all information pertaining to -- well,

18   let me go back.  How did an account manager use

19   Salesforce?

20         A.    So they documented phone calls, emails,

21   opportunity status, the details of the region.  The

22   status was where they are enclosing any information

23   that is needed to understand the life cycle of that

24   client.

25         Q.    And then another one of the job

Page 132

1    requirements you mentioned was to -- an account manager

2    was to ensure that the client is using the platform

3    and --

4            A.    Yeah, that's very important, yeah.

5            Q.    And how would an account manager go about

6    doing that?

7            A.    Well, in today's environment, it is going

8    to change, but the account managers have historically

9    enjoyed the Friday Morning Usage Report.  That Friday

10   Morning Usage Report details the usage from all

11   clients.  And each account manager has historically had

12   access to that, and that's changing, but for today,

13   that's the situation.

14           Q.    But when Mr. Lombardo was employed, he

15   would have had that Friday Morning Report?

16           A.    Oh, yeah.  Oh, yeah, he had access to

17   all --

18           Q.    What was the expectation for an account

19   manager once they got that information, or that usage

20   report, what was the expectation that an account

21   manager would do with that report?

22           A.    If there is no useage and people are not

23   using, you have got to get in there and figure out

24   what's the problem.  Is it training, is it the wrong

25   person on the platform?  How can we get you to use

Page 133

1   JobsEQ?

2           Because that's the secret to renewal.  And

3   if you don't have the right person using it, then you

4   need to help them figure out who in their organization

5   is the right person.  And it is difficult when you've

6   got a shop of three people.

7           You know, when you are a small innovation

8   and you've got a shop of three people, you've got to

9   make technology a priority, and they often balance

10  technology and data with implementation programs.  And

11  that becomes so political and so amorphous, that it is

12  hard to be data driven in some of these environments

13  that we are in.

14      Q.   How would an account manager, I think your

15  word was, get in there, to ensure that the client was

16  using it, or to -- let me rephrase that.

17           How would an account manager follow-up with

18  a client regarding their usage?

19      A.   They have the option to go by email and the

20  phone.  They are also --

21      Q.   So --

22      A.   They are also on track so they can monitor

23  the questions that are coming in that reflect they

24  don't have a certain level of knowledge or that they

25  are super users and they don't need any help.

1      Q.    You also mentioned that one of the job

2  requirements was to obtain a customer satisfaction

3  survey.

4      A.    Yes.

5      Q.    Can you explain what the customer

6  satisfaction survey is?

7      A.    It consist of about 15 questions to

8  determine the characteristics of the user in terms of

9  their knowledge of the platform and their satisfaction

10  with the platform.  It is also a very good way to get

11  information for the road map, things that they would

12  like to see added.  And so the account manager uses

13  that to ensure that they care enough about that

14  information for the company and for their client to be

15  more strategic.

16      Q.    And you mentioned another one of those type

17  of job duties was ensure client renewal.  Can you

18  explain that a little bit?

19      A.    You are coming up on 60 days before

20  renewal, and you have taken the steps laid out for you,

21  quarter by quarter, with touch points to there, so that

22  you have confidence that client is going to renew and

23  you are not surprised when they don't.

24      Q.    How many touch points was an account

25  manager expected to make throughout -- after closing a

Page 135

1   sale prior to renewal?

2       A.   As we previously discussed, it is

3   quarterly.

4       Q.   You also mentioned that one of the job

5   duties of an account manager was to travel.  And I may

6   not have gotten all of your answer down, but forgive

7   me, where would an account manager travel to?

8       A.   They would travel onsite to clients to do

9   demos, and they would travel to conferences.  And they

10   would travel between the Cleveland office and the

11   Richmond office.  We had sales summits, and they would

12   come down for that, and it would be, you know, an

13   immersive experience where we would get to see and hear

14   from them, strategically, what their plans were for the

15   next year in terms of how they were going to manage

16   their -- not manage -- how they were going to manage

17   getting their client and retaining clients.

18       So it was very personal.  And they got to

19   share with us on a very detailed level what their plans

20   were.  This is their plans, not ours.

21       Q.   Within a year, take 2019 for example, how

22   frequently did an account manager travel to an onsite

23   client visit?

24       A.   So you're a couple of steps removed with me

25   on that.  That was -- 2019 was largely coming through

Page 136

1  an interim account -- an interim sales manager to

2  March, our interview with Eli in April.  He got placed

3  with Eli.

4           So I know that we went from $220,000 to

5  $150,000 that year for company profitability reasons.

6  So it varied.  It varied on, you know, depending on our

7  profit.

8       Q.    What's the 220 to 150,000 number?  What

9  number is that you are going giving me?

10      A.    That's an expenditure number that's on our

11  books based on what we were willing to invest in travel

12  based on company profit, and nothing to do with the

13  account managers.

14      Q.    I guess my question is, how many onsite

15  visits did account managers make last year?

16      A.    I don't have those numbers, Christine.  I

17  just don't.  You asked me that last week.  I don't have

18  those numbers.

19      Q.    What about how many conferences the account

20  managers attended last year?

21      A.    Why are we focusing on 2019?

22      Q.    Just trying to give you a time frame.

23      A.    Well, I mean, let's talk about within the

24  last five years.  We went from attending 25 to 15.  I

25  mean, if the business cycle -- let me help you

Page 137

1    understand.  Business cycles ebb and flow based upon

2    profits and expenditures.

3              We added 18 people last year.  We did not

4    have the cash flow to support 25 conferences.  So last

5    year it was scaled back a bit.  Does that answer your

6    question?

7        Q.    I think it does.  So in 2019, the account

8    managers attended approximately 15 conferences?

9        A.    I don't know.  I am giving you numbers that

10   I can't support. I am just saying in the business

11   cycle, things ebb and flow in terms of what you can

12   spend on marketing and travel, and so 2019 was not one

13   of our better years.

14       Q.    Okay.  As you sit here today, is it fair to

15   say you don't know the specific number of onsite visits

16   the account managers made in 2019?

17       A.    No, I did not come prepared to discuss

18   that.

19       Q.    And is it fair to say you don't know the

20   specific number of conferences that the account

21   managers attended in 2019?

22       A.    I am not prepared to give you a number.

23   Sorry.

24       Q.    What about for 2015 through 2018?  Do you

25   have numbers for those years?

Page 138

1      A.    I can give you investment numbers, and I

2   gave them to you, but I am happy to repeat them,

3   which mean --

4      Q.    Investment numbers?

5      A.    Investment numbers.  Expenditures numbers.

6      Q.    Okay.

7      A.    220,000 is the range, to 150,000.  The

8   number of conferences, it changes every year because

9   the account managers come back and they say, let's not

10  do this one next year, or let's do this one next year.

11  And they become advisers to management on what

12  conferences we attend.  Is that helpful?  Does that

13  explain it to you?  I am trying to be precise.

14     Q.    You also mentioned that the account

15  managers, one of the job duties is public facing

16  meetings.  Can you describe to me what that means?

17     A.    The public facing meeting?  Yeah, sure, I

18  am happy to.  So you are not in the office.  You are at

19  a conference or at a client's location, or in a board

20  room and you're speaking and representing Chmura.

21  There are a lot of expectations around that in terms of

22  professionalism.

23     Q.    And like with the conferences and the

24  onsite visits, do you have a specific number of times

25  you --

Page 139

1      A.    I do not have any numbers.  I do not have

2  any numbers --

3      Q.    Again, wait for me to finish my question so

4  the record is clear.

5            Do you have a specific number for the

6  amount of public facing meetings the account managers

7  attended?

8      A.    Finished?

9            I don't.

10     Q.    Are there any other duties, as you sit here

11 today, you can think of for an account manager before I

12 move on to senior account manager?

13     A.    As I told you last week, senior account

14 manager has a certain level of tenure, knowledge and

15 skills and talent; that if you came in from the vacuum

16 cleaners industry or collections industry, you would

17 not have that on day one.  It takes time to develop a

18 senior account manager, and it takes respect and

19 appreciation for what they do to support the company.

20 So we are --

21     Q.    Let me pick that apart a little bit -- oh,

22 go ahead.

23     A.    No.

24     Q.    Are the jobs -- are the actual job duties

25 of a senior account manager any different than the job

Page 140

1   duties of an account manager, or are they just more

2   senior and experienced than the account manager duties?

3        A.   As we discussed, an entry level account

4   manager is not going to understand the laws of

5   economics, they are not going to understand the client.

6   It takes a while to do that.  And that translates into

7   productivity, and that translates into closing deals.

8             That translates into developing the

9   character of that individual.  And in the spirit of

10  continuous improvement, that involves shaping that

11  person's character, helping them shape their character.

12  And in the situation of Mr. Lombardo, that was a

13  particular challenge.

14       Q.   But their day-to-day activities, what they

15  did, their job duties, was a senior account manager's

16  job duties, their actual duties that they did, were

17  they the same as an account manager?

18       A.   No.  I would say that an account manager

19  doesn't get the opportunity to have client facings that

20  a senior account manager has.  There is a reputation

21  risk here.

22       Q.   Okay.  Were there any other differences

23  between a senior account manager and an account

24  manager?

25       A.   There are a lot of differences.  It has to

1  do with, mainly, ethics and trust.  And those are hard

2  things to measure and hard things to manage.

3      Q.    Now, we have gone through the job duties of

4  an account manager.  We have gone through the job

5  duties of a senior account manager.  When Mr. Lombardo

6  was an account manager, the job duties we just

7  discussed, were those Mr. Lombardo's job duties as an

8  account manager?

9      A.    Were those the what?

10     Q.    The job duties.  When Mr. Lombardo was an

11  account manager at Chmura, were his job duties any

12  different than the ones we just discussed for an

13  account manager?

14     A.     His productivity, efficiency, his

15  knowledge and his skill sets were totally different.  I

16  have been telling you over and over:  Talent,

17  knowledge, tenure.

18     Q.    But when he was an account manager -- can

19  you define for me what you consider a job duty?  I

20  think we are having a little disconnect. I want to

21  understand what your understanding of job duty is.

22     A.    Okay.  Let me try to answer that in a

23  manner that helps you.  This is not a union.  It is not

24  a blue collar organization.  We don't sell vacuum

25  cleaners.

1           This is a professional business services

2     industry, and with that comes knowledge of the product,

3     knowledge of the industry.  And that can't happen on

4     day one as an account manager.  That takes time to

5     develop.

6           Sorry.  Is Mr. Lombardo in the room?  I see

7     you looking.

8        Q.    He is in the room.  He has been with us for

9     all the depositions, yes.

10       A.    Okay.  Good.  Thank you for letting me

11    know.

12       Q.    Were the job duties you described for an

13    account manager any different than the job duties

14    Mr. Lombardo was expected to perform when Mr. Lombardo

15    had the title of account manager?

16       A.    I don't understand that question.  Can you

17    unpack it a different way?

18       Q.    Well, Mr. Lombardo, his title when he

19    started at Chmura, was account manager, correct?

20       A.    Yes.

21       Q.    And we just went through, and you listed

22    for me a bunch of job duties that account managers had

23    at Chmura, correct?

24       A.    Yes.

25       Q.    Were Mr. Lombardo's job duties as account

Page 143

1   manager, when he held that title, any different than

2   the job duties you listed for me?

3       A.   As we've discussed, his job duties became

4   more proficient.  He was rewarded for that, highly

5   compensated.

6       Q.   And was he rewarded by being given the

7   title, senior account manager?

8       A.   No, he was more immersed in the

9   organization.  He became a vital adviser to the road

10  map.

11      Q.   Why don't we talk about the road map for a

12  second.  What is the road map?

13              THE WITNESS:  I need a break.

14              MS. SIEGMUND:  Answer the question and then

15  we can take a break.

16      A.   Okay.  As you have had several

17  conversations with Chmura, the road map is our plan for

18  innovation for JobsEQ.

19              MS. COOPER:  Okay.  We can take a break.

20              How long would you like to take, five

21  minutes, 10 minutes?

22              THE WITNESS:  Just need to go to the

23  bathroom.

24                      -   -   -   -   -

25              (Short recess taken).

Page 144

```
 1                     -   -   -   -   -
 2   BY MS. COOPER:
 3        Q.    I think we left -- where we left off before
 4   the short break was describing what the road map was.
 5   And I think you described it as a map for innovation.
 6   Can you tell me what -- how -- what was consisted on
 7   the road map?
 8        A.    Future analytics.
 9        Q.    What does that mean?
10        A.    Future technology offering.  Future
11   benefits to clients.
12        Q.    Can you tell me the way that something
13   would be put on the road map?
14        A.    There are multiple ways.  Account managers
15   are the primary advisers of the road map.  There is
16   also chat and other, customer satisfaction surveys.
17   Multiple ways, yes.
18        Q.    Were there any standard operating
19   procedures regarding the road map?
20        A.    Yes.
21        Q.    Can you describe those?
22        A.    No, I couldn't.  I'm not the owner of the
23   road map.
24        Q.    Who is the owner of the road map?
25        A.    Dave Terrano.
```

Page 145

1      Q.    I'm sorry, can you say that again?

2      A.    Dave Terrano.

3      Q.    And is he an employee of Chmura?

4      A.    Yes.

5      Q.    When you say, owner of the road map, what

6   do you mean by that?

7      A.    He is responsible for the road map.

8      Q.    How were items on the road map prioritized?

9      A.    I wouldn't pretend to know.  It's --

10      Q.    Did you have any involvement in deciding

11   what on the road map would be pursued?

12      A.    Minimal.

13      Q.    Can you describe what your involvement in

14   the road map, if any, was?

15      A.    I was kept abreast.

16      Q.    With respect to Mr. Lombardo specifically,

17   did his job duties differ from that of an account

18   manager?

19      A.    I don't think I understand that question.

20   He was an account manager.

21      Q.    With respect to a senior account manager, I

22   believe you testified earlier that they had -- you

23   testified they had more intimate knowledge -- sorry,

24   more intimate involvement in marketing.  Can you

25   explain to me what you meant by that?

Page 146

1      A.     They develop the marketing material.

2      Q.     And how would a senior market -- sorry, a

3   senior account manager develop marketing material?

4      A.     They would write down their ideas and

5   suggestions and it would get before the marketing

6   division and be developed based on their needs.

7      Q.     So would the marketing -- can I say

8   marketing team?  Is that fair?  Is there a marketing

9   team or marketing department?

10     A.     Yeah, sure.

11     Q.     Would the marketing team -- well, who is on

12   the marketing team?

13     A.     Sometimes I think everybody is.  Everybody

14   thinks they are a marketer, right?

15            But to answer your question, it would be

16   Leslie, Avery Simmons, Jim Hayes.

17     Q.     Now, you said Leslie.  Are you referring to

18   yourself or another Leslie?

19     A.     There is only one at Chmura.

20     Q.     And you said that the senior account

21   managers would write down their ideas and suggestions

22   and provide them to the marketing team; is that right?

23     A.     Yes.

24     Q.     And then what would the marketing team do

25   with those ideas?

Page 147

1      A.    Massage, improve.

2      Q.    Can you give me an example of any kind of

3   an idea that an account manager -- sorry -- senior

4   account manager provided to the marketing team that was

5   developed into marketing materials?

6      A.    Sure.  Particularly in Mr. Lombardo's case,

7   he needed vertical specific buyers, so the marketing

8   team went to work to develop scratch cards at his

9   suggestion.

10     Q.    So Mr. Lombardo provided the suggestion and

11  the marketing team developed the material; is that

12  fair?

13     A.    Mr. Lombardo requested the marketing

14  material speak to the vertical of the industry that he

15  was attending a conference for.

16     Q.    Did the marketing team, were they required

17  to produce that vertical specific flyer because

18  Mr. Lombardo asked for it?

19     A.    We did everything we could to make

20  Mr. Lombardo happy.

21     Q.    Was the marketing team required to take

22  that suggestion and create the vertical flyer in that

23  instance?

24     A.    There is no requirement.

25     Q.    You also mentioned that senior account

Page 148

1   managers had responsibilities with respect to

2   innovation.  Can you explain that a little bit more?

3        A.    As I said earlier, that has to do with

4   what's on the road map, priority of what's on the road

5   map.

6        Q.    Was there any other job duty of the senior

7   account manager?  Oh, yes, there was, so let me come

8   back to this before I move onto that question.

9             You said that senior account managers had

10  the job duty of managing conferences.  Can you explain

11  what you mean by managing conferences?

12       A.    So selecting conferences they wanted to

13  attend, booking flights, and in Mr. Lombardo's case,

14  booking everybody's flight, attending the conference,

15  setting up the booth, being prepared to do demos, being

16  prepared to get contacts, being prepared to follow-up

17  on those contacts to prepare a list of the attendees

18  that they had public facing with.  Now, what -- it is

19  very critical that you follow up on contacts within the

20  week that you get back, otherwise, those leads get

21  stale.

22       Q.    Did -- if a senior account manager asked to

23  go a conference, was it automatically approved that

24  they attend?

25       A.    It depended on the budget.

Page 149

1      Q.    Was there ever at time that a senior

2   account manager asked to go a conference and they were

3   not permitted to attend?

4      A.    I'm not prepared to say that because it

5   changes every year depending on the budget.

6      Q.    Who had the final say on what conference

7   the account manager or senior account managers would

8   attend?

9      A.    It was pretty much the account managers.

10   We tried to support them in every way we could.

11      Q.    Were there meetings regarding conference

12   planning for the year?

13      A.    There -- as we grew, yes.  Not initially,

14   but we evolved to that, yes.

15      Q.    Who would be in those meetings?

16      A.    That also changed annually.  Different

17   people.

18      Q.    Take 2019, who was in the meeting for 2019?

19      A.    Jim Hayes, Avery Simmons, myself.

20   Marketing.  The conferences went under my budget.

21      Q.    Was there anyone else in those meetings?

22      A.    Account managers would be pulled in, of

23   course.  They were central to the whole planning.

24      Q.    Were the account managers there when the

25   decision whether to attend the conference was made?

Page 150

1        A.    So that's kind of hard to do when you have

2   account managers doing demos and doing what their daily

3   routine is in a distributive workforce such as we have

4   at Chmura.

5        Q.    So the answer is no?

6        A.    At times they were, at times they weren't.

7        Q.    When Mr. Lombardo was a senior account

8   manager, were his duties any different than the ones we

9   just discussed?

10        A.    I don't know what you mean by, "what we

11   just discussed."

12        Q.    Well, you listed involvement in marketing,

13   innovation and conferences.  Were his job duties, in

14   addition to the account manager job duties, were

15   Mr. Lombardo's senior account manager job duties any

16   different than the ones we just discussed?

17        A.    No.

18        Q.    Did Chmura have an outside sales team?

19        A.    No.

20        Q.    One follow-up question, did Mr. Lombardo

21   have -- was there a written job description for

22   Mr. Lombardo's position?

23        A.    We evolved to that, yes.

24        Q.    Was Mr. Lombardo ever provided a written

25   job description?

Page 151

1      A.    I don't know.  He didn't report to me at

2   that time.

3      Q.    Do you know when a written description was

4   created by Chmura?

5      A.    It was created to recruit other account

6   managers.  I don't know when .

7      Q.    Bear with me for one second.

8            All right.  I want to switch topics.  I am

9   going to show you again, and share my screen and show

10  you what's been marked as Exhibit A again.  And you

11  have been designated as the witness, the corporate

12  representative to testify as to Topic Number 16,

13  "Jennifer Ludvik's compensation, or denial of

14  compensation, for overtime hours worked"; is that

15  correct?

16     A.    Yes.

17     Q.    Who was Jennifer Ludvik?

18     A.    She is an individual that was in the

19  Richmond area that was an employee of SLAIT, recruiting

20  services.

21     Q.    What was her role at Chmura?

22     A.    So the model for this situation was -- it

23  is kind of like test driving a car.  So SLAIT's model

24  is that this employee remains an employee of SLAIT

25  until the client, which is Chmura, chooses to employ or

Page 152

1    not employ that SLAIT employee.

2         Q.   So she was -- well, let me ask this, what

3    job function was she doing at Chmura?  I understand she

4    wasn't an employee of Chmura, but what job function was

5    she doing?

6         A.   We were testing her out to be an account

7    manager.

8         Q.   And were her job duties those of account

9    manager that we discussed --

10        A.   Yes.

11        Q.   -- not long ago?

12        A.   Yes.

13        Q.   And can you say again who she was employed

14   by, or spell it for me so I know for sure what you are

15   saying?

16        A.   S-L-A-I-T.

17        Q.   Okay.  Got it.  Did Ms. Ludvik ever make a

18   claim that she should be paid for more than 40 hours a

19   week?

20        A.   Yes.

21        Q.   How was that handled?

22        A.   She was not an employee of Chmura.  She had

23   been there, maybe, a week and had limited knowledge of

24   JobsEQ, and not only that, but the paperwork was not

25   accurate.  She was billed to us -- she was,

Page 153

1   contractually, a salary exempt employee, but when we

2   got the bill, it had overtime hours on it that we did

3   not approve or understand why she needed overtime in

4   this early tenure.

5           And so we confronted SLAIT, and they

6   acknowledged that they made a mistake, and they paid

7   her overtime.  And we decided we didn't want to work

8   with her because she was not transparent.  Just a short

9   tenure.

10      Q.    How short?

11      A.    Real short.  Like three weeks.

12      Q.    Did you have -- or Chmura have any

13  discussions with SLAIT regarding her status as exempt

14  or non-exempt?

15      A.    No.

16      Q.    And I think you already answered this, so I

17  am going to ask it just to be clear.  Did Chmura pay

18  for the hours above 40?

19      A.    No.

20      Q.    I think you said SLAIT paid for the hours

21  above 40; is that correct?

22      A.    Yes.

23      Q.    At the time that was going on, did Chmura

24  ever consider reclassifying the account managers from

25  exempt to non-exempt, its own employees?

Page 154

1          A.    No.

2          Q.    Okay.  Taking you to a new topic, I am

3     going to show you -- share my screen again.  You have

4     been designated as a corporate representative to

5     testify as to "Mr. Lombardo's performance, including

6     sales performance, and the methods used to track

7     Mr. Lombardo's performance"; is that correct?

8          A.    Yes.

9          Q.    As stated on here, on Exhibit A.

10               How was Mr. Lombardo's sales performance

11    during his tenure at Chmura?

12         A.    Outstanding.

13         Q.    Was he the top sales performer?

14         A.    Yes.

15         Q.    Do you know, over his tenure, what percent

16    of new sales Mr. Lombardo was responsible for

17    generating?

18         A.    Consistently above quota.

19         Q.    Do you have a more exact figure?

20         A.    I do not.

21         Q.    How were his -- let me ask, do you know

22    what Mr. Lombardo's closing percentage was from -- if

23    he gave a demo to closing the deal?

24         A.    The average close -- demo to close ratio is

25    24.1, 25%.

1      Q.    Was Mr. Lombardo higher than that?

2      A.    It is an average number that we collect for

3 the team.

4      Q.    Did you ever evaluate, or did Chmura ever

5 evaluate the individual account manager's, or senior

6 account manager's percentage as to their close rate?

7      A.    Not individually.  We operated as a team.

8      Q.    How about renewal rates?  How did

9 Mr. Lombardo perform with respect to renewal rates?

10     A.    89%.

11     Q.    Did you say 89?

12     A.    I did.

13     Q.    Do you know what the average renewal rate

14 percentage was?

15     A.    85.

16     Q.    How did Chmura track the sales performance

17 of its account managers and senior account managers?

18     A.    Based on quota.  Three sales per month.

19     Q.    Do you know how much revenue

20 Mr. Lombardo's -- take for 2019, or a whole year,

21 because he was there for 2018 -- do you know how much

22 of the revenue for the sale of JobsEQ Mr. Lombardo was

23 -- could be attributed to Mr. Lombardo?

24     A.    I don't want to say a number.  I can give

25 you a percentage.  I think it was 49%.

Page 156

1      Q.    Do you know for 2019?

2      A.    No.  He wasn't there the entire year.

3      Q.    What other metric was Mr. Lombardo reviewed

4  on?

5      A.    I would say Mr. Lombardo's weakest area was

6  in the customer satisfaction survey.

7      Q.    And can you give me some examples or an

8  explanation?

9      A.    He didn't like to do them, so he often did

10  not do them.

11      Q.    To complete a customer satisfaction survey,

12  what does an account manager, or senior account manager

13  have to do?

14      A.    Get the survey completed.

15      Q.    What was the process, or what -- how would

16  an account manager go about doing that?  I am just

17  looking for how the process worked.

18      A.    Well, it's real simple.  You send an email.

19      Q.    Did he obtain customer satisfaction

20  surveys, any customer satisfaction surveys?

21      A.    A few.  He mostly complained about them.

22      Q.    Were there any other metrics Chmura looked

23  at in evaluating Mr. Lombardo?

24      A.    In the case of Mr. Lombardo, it was

25  overwhelmingly dealing with the balance of an A player,

                                                  Page 157

1   and when you have an A player, you tolerate a lot.

2        Q.    I want to turn to Topic Number 21 on

3   Exhibit A.  You were designated as the corporate

4   representative to testify with regards to, "Warnings

5   given to, or disciplinary action taken by Chmura

6   against Mr. Lombardo"; is that correct?

7        A.    Yes.

8        Q.    Did Chmura keep a written documentation of

9   any warnings or disciplinary action given to

10  Mr. Lombardo?

11       A.    Yes.

12       Q.    Can you describe what type of writing

13  exists?

14       A.    Emails, handwritten notes, witnesses.

15       Q.    Well, the witnesses, were they witness

16  statements?

17       A.    Witnesses that sat in on the conversations

18  of a disciplinary manner.

19       Q.    But they didn't put anything in writing; is

20  that correct?

21       A.    They -- no, they didn't need to do that.

22       Q.    And would all of the written materials be

23  found in Mr. Lombardo's personnel file?

24       A.    They should be.

25       Q.    Can you walk me through what warnings

Page 158

1   Mr. Lombardo was given during his tenure at Chmura?

2         A.    There are so many.  I mean, really?  You

3   want me to do this?

4         Q.    Well, were they all in his personnel file?

5         A.    No.  You just want what went into his

6   personnel file?

7         Q.    Let's start there.

8         A.    Let's start with the personnel file, is

9   that what you said?

10        Q.    Yes, please.

11        A.    So Mr. Lombardo was notoriously known for

12  his inability to submit a correct reimbursement form

13  for travel.  Mr. Lombardo was notorious for wanting to

14  book everybody's flight on his credit card so that he

15  got points.  Plus, we had to put out policy that all

16  employees had to use their employee credit card because

17  the transaction costs was going out the roof with

18  Mr. Lombardo's practices.

19             So we had to adopt a policy of personal

20  credit cards, and everybody had to book their own

21  flights, their own hotel.  However, Mr. Lombardo, as in

22  most cases, ignored policy and did things his own way.

23  So we had to document that.  And Christine Steigmann

24  was responsible for documenting that, and she was

25  sloppy, so I'm not sure that it actually made it

Page 159

1  entirely into his personnel file, but I know there was

2  documentation handed to her to do that.

3         Mr. Lombardo went to the Texas Economic

4  Development Conference in 2018, and the conference took

5  place at the hotel, and there was a -- there was a

6  charge to valet, a rental car, which was not needed,

7  resulting in transaction costs.  And we had to

8  investigate, why did this happen?  And Mr. Lombardo

9  taking his time to respond.  And at that same

10  conference, there was alcohol bills that were not

11  approved because it was not a dinner, it was in a bar.

12         And the problem with that is if you are in

13  a bar drinking at a conference, these bars are very

14  open space, and clients and prospects can say, why is

15  he drinking with that client and not drinking with me?

16  So there was a long discussion about that with

17  Mr. Lombardo with Kyle West and Greg Chmura present.

18  That went in his personnel file.

19         Do you want me to keep going?

20     Q.    I would like you to list what you believe

21  is in his personnel file, yes.

22     A.    Okay.  Then I won't go to the titty bar

23  conversation he had with one of my clients.

24         There was the matter of the forged offer

25  letter from GIS Web Tech that at one point Mr. Lombardo

1    said there were two letters from GIS Web Tech, and I

2    think in Mr. Lombardo's mind he meant the one that he

3    forged and the original.  Discussions around that, and

4    the time that it took, and the transaction costs to get

5    him to admit that he forged the letter was incredible.

6    That is in his personnel file.

7              The amended offer letter to him to take out

8    the merit increase clause was in his personnel file.

9    His separation notice was in his personnel file.

10   His --

11         Q.    I am going to stop you.

12         A.    Okay.

13         Q.    With respect to the amended offer letter,

14   did that have anything to do with a warning given to

15   Mr. Lombardo?

16         A.    Eli was his supervisor.  I can't speak to

17   that.

18         Q.    Well, you were designated as the corporate

19   representative to speak on it, so to your knowledge,

20   was the amended offer letter in any way related to a

21   warning given to Mr. Lombardo?

22         A.    Yes.

23         Q.    And what warning was that?

24         A.    It had to do with his employee agreement.

25   He violated his employee agreement, which you recall,

Page 161

1    is the Non-Solicitation, Non-Compete, Non-Disclosure

2    Form.

3         Q.    And that transpired into an amended offer

4    letter, if I am understanding correctly?

5         A.    Yes, it was Section 5 under that Paragraph

6    1.  We talked about this last week, Christine.

7         Q.    I am going to show you the amended offer

8    letter here.  Let me pull it up.

9                    -   -   -   -   -

10                   (Previously Marked Deposition Exhibit

11                   G, Copy of Letter Dated 3/28/2019 to

12                   Mr. Lombardo, was shown to the

13                   witness.)

14                   -   -   -   -   -

15                   MS. COOPER:  I will give you control.

16   Heidi, there are two names, John Chmura, and then there

17   is you. I don't know if the computer misnamed.  Should

18   I give control to you?

19                   MS. SIEGMUND:  Yes, you can give it to me.

20                   MS. COOPER:  Okay.

21        Q.    If you can take a look at this document.

22                   MS. SIEGMUND:  My apologies.  I should have

23   mentioned at the beginning that John is sitting in as a

24   corporate representative.

25                   MS. COOPER:  Okay.  So that is Mr. Chmura?

1          THE WITNESS:  He is joining.

2          MR. JOHN CHMURA:  I am here.  Just to get

3    it on the record.  I am here, I am just on mute.

4          MS. COOPER:  Good morning, Mr. Chmura.

5          MR. JOHN CHMURA:  Good morning.

6    BY MS. COOPER:

7          Q.    And this is marked Exhibit G, Defendant's

8    Exhibit G.  This is the amended offer letter you were

9    referring to just a moment ago, Ms. Peterson.

10         A.    Yes, ma'am.

11         Q.    Anywhere in this letter does it make

12   mention of any disciplinary action or warnings?

13         A.    Why would we put that in an amended offer

14   letter?  I am not following.

15         Q.    Well, I am just simply asking, is there any

16   reference to a warning or disciplinary action?

17         A.    No.

18         Q.    Why did Chmura prepare this amended offer

19   letter?

20         A.    Because Mr. Lombardo falsified a letter

21   from GIS Web Tech offering him certain job benefits

22   and, I think, overall, we were real tired of hearing

23   about his requests for merit increase.  It happened, at

24   least, annually.  And nobody consented to a merit

25   increase, not even me.

Page 163

1    Q.   Mr. Lombardo's original offer letter made

2  reference to annual merit increases, correct?

3    A.   Yes, it did.

4    Q.   Was this not Chmura's attempt to eliminate

5  that reference in the original offer letter?

6    A.   No, it was not an attempt to eliminate

7  that, it was an intent to clarify what he was eligible

8  for, which is a cost of living increase.  His merit is

9  in his commission.

10    Q.   So does this have anything to do with

11  Mr. Lombardo, with a performance warning?

12         MS. SIEGMUND:  Objection.  Asked and

13  answered.

14    A.   I can answer it. I mean, I think we had

15  reached a point with Mr. Lombardo's behavior that we

16  had to clarify why we didn't fire him in March of 2019.

17    Q.   So was deleting the reference to annual

18  merit increase a punishment for -- or disciplinary

19  actions?

20    A.   No, it was just clarifying.

21    Q.   Okay.  So the amended offer letter is in

22  Mr. Lombardo's personnel file, correct?

23    A.   Yes.

24    Q.   Is it fair to say that the amended offer

25  letter was not related to any disciplinary action taken

                                                      Page 164

1    by Chmura?

2              MS. SIEGMUND:   Same objection.

3         A.   I don't know what you mean in this

4    situation.

5         Q.   I guess I am failing to understand how

6    amending Mr. Lombardo's offer letter in any way relates

7    to a warning or disciplinary action that Chmura

8    instituted against Mr. Lombardo.  I am not -- and if

9    you can explain that to me, that would be appreciated.

10        A.   So Mr. Lombardo came to his annual review

11   with a falsified offer letter from GIS Web Tech that we

12   had been in strategic partnership conversations with,

13   and Mr. Lombardo threw a wrench into the middle of that

14   relationship, which translates into revenue losses in

15   future years.  I think you have been through the

16   present value conversation many times with this topic,

17   so I don't have to give you that definition.

18             But as a result of that, that relationship

19   has never really been repaired.  And so the falsified

20   document precipitated the amended offer letter, so that

21   he would stop hounding us for merit increases.

22        Q.   How does merit increases -- okay.  So I am

23   still not seeing the connection, but --

24        A.   So we went from a request for annual merit

25   increase to providing cost of living increases.  So

Page 165

1   Mr. Lombardo benefitted from this letter.

2         Q.    At the time that Mr. Lombardo signed this

3   amended offer letter, did his base of compensation

4   change?

5         A.    He got a cost of living increase.

6         Q.    How much was that cost of living increase?

7         A.    It is CPI, so I don't know what CPI was

8   last year.

9         Q.    Sorry.  Can you say that again?  I just

10  missed it.

11        A.    The cost of living is based on CPI.

12        Q.    So my question --

13        A.    It is a cost of living -- it is a cost of

14  living increase that is built in.

15        Q.    Okay, I am following that, but what was the

16  specific cost of living increase Mr. Lombardo received

17  in --

18        A.    I don't remember what CPI was.

19        Q.    And was the increase for cost of living

20  provided concurrently with the signing of this amended

21  offer letter?

22             MS. SIEGMUND:  Object to the form of the

23  question.  You can answer.

24        A.    I think you have to ask Sharon Simmons

25  that.  I don't know.

Page 166

```
 1        Q.    I am going to show you a couple of
 2   documents here.
 3        A.    Okay.
 4                          -   -   -   -   -
 5              (Thereupon, Deposition Exhibit I, Copy
 6              of Handwritten Notes, was marked for
 7              purposes of identification.)
 8                          -   -   -   -   -
 9        Q.    I am going to give you an opportunity to
10   take a look at those.
11        A.    I am familiar with it.
12        Q.    Okay.  What is this document?
13        A.    So in March of 2019, after Mr. Lombardo's
14   falsified offer letter from G.I. Web Tech was presented
15   at his annual review, Chris Chmura and myself traveled
16   to Cleveland to confront Mr. Lombardo about this
17   situation.  My intention was to fire him.  I spent
18   about an hour and a half with Mr. Lombardo getting him
19   to admit that he just used the situation with GIS Web
20   Tech to get a raise.
21        Q.    Who was present in that meeting?
22        A.    John Chmura, Chris Chmura, Greg Chmura and
23   Sharon Simmons was on the phone.
24        Q.    Prior to coming up to Cleveland for that
25   meeting from Richmond, did you have a phone call with
```

Page 167

1    Mr. Lombardo?

2         A.    I did, and prior to what he said in his

3    deposition, we did not reach any kind of closure in

4    that 10 minute phone call.  So he falsified his

5    statement.

6         Q.    When you say you didn't reach any closure,

7    what do you mean?

8         A.    I could not get him to admit that he

9    falsified the offer letter.

10        Q.    What do you recall of that conversation?

11        A.    I asked him if he falsified this document.

12   He said, no, it was a legitimate offer letter, and he

13   just used it to try to get a raise.  It was legitimate

14   and it was a sincere offer letter.

15        Q.    Now, do you understand that GIS actually

16   did offer him a position?

17        A.    Yes, I had a lengthy conversation with my

18   strategic partner at GIS.

19        Q.    Who initiated those conversations?

20        A.    I did.

21        Q.    And what did you say in those

22   conversations?

23        A.    I asked if they made Mr. Lombardo an offer

24   letter dated the end of December and they said, no,

25   they made an offer letter in October, and they had

Page 168

1    rescinded the offer letter.  And then they sent me the

2    offer letter.  So I went to Cleveland with everything I

3    needed to fire Mr. Lombardo.

4         Q.    Why didn't you fire him?

5         A.    Because I said he is a bad boy, but he is

6    my bad boy and I am going to help him.

7         Q.    What did you mean by that?

8         A.    He is a problem.  He is an ethical problem.

9    He is has no moral fiber, no moral backbone.

10             He will say and do anything to get what he

11   wants, and those characteristics make him very good as

12   an A player.  So as I said earlier, you have to

13   overlook things when you have an A player when you

14   shouldn't.  I should have fired him in March.

15        Q.    Well, turning back to Exhibit I,

16   Defendant's Exhibit I, there seems to be two different

17   handwriting on this document; is that right?

18        A.    Yes.

19        Q.    Who -- if you could, just go line by line

20   and tell me whose handwriting is whose.

21        A.    Sure.  Number one is me.  Number two is me.

22   And when I decided, internally, I wasn't going to fire

23   him -- he finally admitted that he did falsify the

24   letter, we got to the hour and a half mark, and I asked

25   him to write 3, 4, and 5.  Those are my words, and he

Page 169

1    wrote them.  I asked him to sign this document.  I

2    realize it is not dated.

3         Q.   And it is a little hard to see, but your

4    signature is on this document, correct?

5         A.   Yes.  So is Mr. Lombardo.

6         Q.   His is underneath yours, correct?

7         A.   Yes.

8         Q.   If you can, go back up on that.

9         A.   (Indicating).

10        Q.   It says, "Just used the situation, GIS Web

11   Tech."  What does that refer to?

12        A.   That was what Mr. Lombardo said.

13        Q.   What is, "I don't want to go anywhere"?

14        A.   That was Mr. Lombardo saying he wanted to

15   work for Chmura.

16        Q.   Were those Mr. Lombardo's words or your

17   words?

18        A.   Those were Mr. Lombardo's words.

19        Q.   And number 3, 4 and 5 -- sorry.  Go ahead.

20        A.   I was going to clarify, 3, 4 and 5 are my

21   words.

22        Q.   Okay.  Understood.  And what did you mean

23   by, "Do the right thing every day"?

24        A.   I used to say that to my children.

25        Q.   Okay.  Number 5, I think, says, tell me if

Page 170

1    I am wrong, "Approach GIS Web Tech and take

2    responsibility for my action with the offer letter."

3    What was meant by that?

4            A.    I wanted him to repair the damage he had

5    done.

6            Q.    So what did you ask him to do?

7            A.    Apologize and accept the fact that he

8    falsified their document.

9            Q.    Who was he supposed to apologize to?

10           A.    Ron Bertasi.

11           Q.    And he is at GIS WebTech; is that right?

12           A.    Yeah, it is a small shop.  There's only

13   three of them.

14           Q.    And did Mr. Lombardo call them to

15   apologize?

16           A.    I never got any information back on that.

17           Q.    You weren't present during any

18   conversation, though; is that fair?

19           A.    No, no.

20           Q.    I am going to show you what's been marked

21   as Defendant's Exhibit R.  Take a minute to take a look

22   at it.

23                    -    -    -    -    -

24                (Thereupon, Deposition Exhibit R, Copy

25                of Email Dated 8/31/2017 Bates Labled

Page 171

```
 1            CHMURA000083-88, was marked for

 2            purposes of identification.)

 3                       -   -   -   -   -

 4      A.    (Reviewing.)

 5            Okay.  Thanks.

 6      Q.    Do you recognize this document?

 7      A.    Yes, ma'am.

 8      Q.    And what is it?

 9      A.    It is an email between Rick and the people

10   that -- transaction costs related to incorrect expense

11   report, reimbursable.

12      Q.    And this was an email string between you

13   and Mr. Lombardo as well as Christine Steigmann and --

14      A.    Steigmann.

15      Q.    This is an email correspondence between

16   you, Mr. Lombardo and Ms. Steigmann, correct?

17      A.     If you scroll back up, I do believe that

18   Greg and Kyle were on there.

19      Q.    And Greg and Kyle, as well, were cc'd

20   towards the top.

21      A.    And the date is August 25, 2017.  And Kyle

22   was his direct supervisor.

23      Q.    And on Page 5 of the 6 pages, I think at

24   the bottom it says Mr. Lombardo is submitting an

25   expense report to Ms. Steigmann, correct?
```

Page 172

1        A.    Yes.

2              MS. SIEGMUND:  I think it is faster if you

3    go.  I have a lag on my screen.

4              MS. COOPER:  Okay.  Not a problem.

5        Q.    All right.  And this is Mr. Lombardo

6    submitting an expense report to Ms. Steigmann and to

7    you as well?

8        A.    Yeah.

9        Q.    Did you review all expense reports for the

10   account managers and senior account managers?

11       A.    Yes.

12       Q.    And can you tell me what Ms. Steigmann's

13   position was?

14       A.    Finance manager.

15       Q.    Is she still with the company?

16       A.    She is not.

17       Q.    And you wrote back to Mr. Lombardo in

18   response that "the hotel was pretty pricey, was that

19   the conference rate."  Do you see that?

20       A.    Yes, ma'am.

21       Q.    And then he provided an explanation,

22   correct?

23       A.    Yes, he did.

24       Q.    Do you know if prior to booking his hotel

25   room, Mr. Lombardo would have sought approval from

Page 173

1    anyone?

2         A.    2017?  He would have gone through Christine

3    at that point.

4         Q.    Okay.

5         A.    And now it's -- that's Sharon.

6         Q.    And if I scroll up here a little further,

7    we are on Page 3 of the 6 pages.  This is an email, I

8    believe, sent from -- your name carries on to Page 3

9    here, but it comes from Leslie Peterson to Rick

10   Lombardo and other copies on this email, Chris Chmura,

11   Kyle West, Ms. Steigmann, Greg Chmura.

12             Can you read this email and tell me what

13   time -- you bring up issues with alcohol charges.  And

14   can you tell me a little more about that and why it was

15   a concern?

16        A.    Our policy on alcohol is that you have

17   alcohol only at a meal, and only if the client orders

18   alcohol first, then you may order alcohol with that

19   client.

20        Q.    And were you responsible for helping

21   prepare that company policy?

22        A.    I basically borrowed that policy from

23   Eastman Kodak.

24        Q.    And why was that the policy of the company?

25        A.    We want our business transactions to be

Page 174

1    sober.

2        Q.    But the company was okay with an alcoholic

3    beverage at dinner, with food, I guess I should say; is

4    that correct?

5        A.    Yes, ma'am.

6        Q.    What if a client asks an account manager to

7    go out for a drink and talk business?  What was an

8    account manager required to do under those

9    circumstances?

10       A.    Not go out for drinks.  Go out for dinner.

11       Q.    What if the account -- or, what if the

12   potential client didn't have time for dinner?

13       A.    Then they didn't have time for alcohol.  Or

14   she.

15       Q.    Do you attend these conferences that

16   account managers attend?

17       A.    Some of them.

18       Q.    And when you are at those conferences, do

19   you see other attendees in the restaurant bar -- or,

20   I'm sorry -- in the hotel bar?

21       A.    No.

22       Q.    None?

23       A.    I don't go to hotel bars.

24       Q.    Okay.  Do you ever walk past the hotel bar

25   to get to your room or to the conference rooms?

Page 175

1        A.    Oh, yeah, the bars in conferences are wide

2    open.  You can see everybody that's in there.

3        Q.    And have you observed anything at these

4    conferences with respect to the people in these bars?

5              MS. SIEGMUND:  Object to the form of the

6    question.

7        A.    I have.  Of course I have.

8        Q.    And have you ever observed any attendees in

9    the bar, in the hotel bars?

10       A.    Yeah, I have.  I have seen them coming out.

11       Q.    Okay.  Is it your understanding that --

12   well, let me rephrase.  At these conferences, there is

13   a lot of opportunity, or there is opportunity to

14   interface with potential clients, or existing clients,

15   correct?

16       A.    That's the reason we go.

17       Q.    And isn't some of that interaction in these

18   hotel bars?

19       A.    We have our own policies and standards.  We

20   don't conform to the status quo of the masses.

21       Q.    Okay.  This email references Laura Leigh.

22   Who is Laura Leigh?

23       A.    Laura Leigh Savage.  Previous employee,

24   director of operations.

25       Q.    And you reference -- you say, "Below is the

Page 176

1   policy on entertainment you signed with Laura Leigh".

2   Where would that policy be found?

3        A.    Onstage.

4        Q.    Was it a separate policy from the employee

5   handbook?

6        A.    No, it was in the employee handbook.

7        Q.    And Mr. Lombardo, he provided -- if we

8   scroll up -- an explanation to you, correct?

9        A.    Are you referencing the email I am looking

10  at?

11       Q.    Yes.  And if you want me to scroll down, or

12  you want to scroll down, either way.

13       A.    (Reviewing.)

14             Okay.

15       Q.    Mr. Lombardo provided an explanation to

16  you, correct?

17       A.    Of course.

18       Q.    Did Chmura ultimately reimburse him for the

19  beverages that he purchased for himself and his client?

20       A.    I don't remember.

21       Q.    Or clients?

22       A.    I would hope not.

23       Q.    Do you know whether Mr. Lombardo asked his

24  supervisor, Mr. West at the time, before he took the

25  client out as to whether he could take that client out?

Page 177

1       A.    Is that supposed to be separate from our

2   policy?  I don't know.  I don't know if he did or not,

3   but we have a policy, so he was bound to that policy.

4       Q.    And I believe this occurred, based on the

5   email, in 2017.  Do you have a copy of the employee

6   handbook as it stood in 2017?

7       A.    I was told not to bring anything to this

8   deposition.

9       Q.    I don't mean right now.  Does the company

10  have a copy of the policy that was in effect at the

11  time of this email?

12      A.    Yes.

13      Q.    Do you know if it was produced in

14  Discovery?

15      A.    I think it was, yes.

16      Q.    I will represent to you that I have a copy

17  of -- that I can show you Exhibit Q, the July 19, 2019

18  employee handbook.  I will pull that up.  But that is

19  the only handbook I was able to find in the production.

20                      -  -  -  -  -

21              (Previously Marked Deposition Exhibit

22              Q, Copy of  Employee Handbook, was

23              shown to the witness.)

24                      -  -  -  -  -

25      A.    It think we are talking about 2017, and you

1   are asking me to look at something that's for 2019, and

2   I am focused on 2017, so why are you asking me to look

3   at something that could have evolved?

4          Q.    Just take a look at this exhibit.  This is

5   Defendant's Exhibit Q.

6               MS. SIEGMUND:  Christine, I will note that,

7   of course, Dr. Chmura was asked on the handbook and on

8   the training on the handbook, so to the extent we are

9   getting into that, that's fine, but --

10         A.    Yeah, I did not prepare for this. I did not

11  prepare for this.

12         Q.    But you did prepare to testify regarding

13  the disciplinary actions taken against Mr. Lombardo,

14  and you have testified that there was a company policy

15  that was -- that Mr. Lombardo did not adhere to when he

16  bought company drinks.  So I am going to ask you to

17  take a look at this exhibit, Exhibit Q.

18              MS. SIEGMUND:  Christine, can we go off the

19  record for one second?

20              MS. COOPER:  Yes.

21                    -   -   -   -   -

22              (Discussion had off the record.)

23                    -   -   -   -   -

24              MS. SIEGMUND:  Is there a particular page

25  you would like me to go to that would speed this up a

1    little bit?

2              MS. COOPER:  Well, I want her to be

3    familiar with the document, but we are going to look at

4    Page 5 -- well, really, Page 6.

5    BY MS. COOPER:

6         Q.    Do you recognize this document,

7    Ms. Peterson?

8         A.    Yes, ma'am.

9         Q.    And what is it?

10        A.    It's an employee handbook.

11        Q.    And it is the employee handbook that was

12   put in place as of July 19, 2019; is that correct?

13        A.    I don't know.  I have to go back to the

14   top.

15        Q.    Can you see the date on there,

16   July 19, 2019?

17        A.    I can.

18        Q.    I am going to take you to Page 6.  Do you

19   see the entertainment section in the handbook?

20        A.    Okay.  This is about picking out a

21   restaurant for dinner and having alcohol, yes.

22        Q.    Is this the policy you were referring to --

23   well, let me ask this:  Has this policy changed between

24   2017, the date of the email that we were just looking

25   at, and 2019?  Are you aware of any changes to this

Page 180

1  part of the employee handbook?

2       A.    Does it end on Page 6?  (Reviewing).

3             Yes, that's the same policy.

4       Q.    Is this the policy you were pointing

5  Mr. Lombardo to in your email?

6       A.    Yes, ma'am.

7       Q.    Is there any part of the employee handbook

8  -- let me ask this, does this provision in the handbook

9  prevent an employee from taking a client out to -- for

10  a drink at a bar or -- let me stop there.

11      A.    I don't see the word, bar, in that

12  paragraph.

13      Q.    Does it prevent an account manager, or

14  senior account manager, from having a drink with a

15  client or potential client?

16      A.    No.

17      Q.    Is there any part of the employee handbook,

18  to your knowledge as it existed in 2017, that prevented

19  an account manager or senior account manager from

20  having a drink with a client or potential client?

21      A.    If in a restaurant and the client orders

22  alcohol, then the account manager can certainly follow

23  suit.

24      Q.    Is there anything preventing them or

25  barring them from having a drink with a client if it is

Page 181

1  not at a restaurant over dinner?

2       A.    It is not stated that way.

3       Q.    Other than the email we just looked at and

4  the handwritten sheet of paper that we looked at a

5  moment ago, are there any other written documents, to

6  your knowledge, in Mr. Lombardo's personnel file that

7  pertain to any disciplinary actions or warning -- and

8  the offer letter.  I'm sorry, the amended offer letter

9  from your testimony.  Let me restate my question.

10            MS. SIEGMUND:  Yeah, I got lost.  I'm

11  sorry.

12       Q.    In the amended offer letter, Exhibit I,

13  which is the handwritten document we went over, and

14  Exhibit R, which is the email, are you aware of any

15  other written documentations pertaining to any warnings

16  or disciplinary action with respect to Mr. Lombardo in

17  his personnel file?

18       A.    In 2016, the annual review was conducted

19  between Mr. Lombardo and Laura Leigh Savage, Leslie

20  Peterson, and there were some, continues improvement

21  suggestions around his ethical and moral behavior that

22  were documented and handed off to, I believe that was,

23  Christine Steigmann at the time.

24       Q.    And are you aware of whether those are

25  still in Mr. Lombardo's personnel file?

Page 182

1      A.    I'm not.  We are not allowed to really see

2   personnel files.  That's just within H.R.

3      Q.    So your -- you don't have access to the

4   personnel files?

5      A.    We don't access personnel files.  That's

6   within the control of H.R.

7      Q.    But you would have access to it if you

8   wanted to see them; is that fair?  Let me ask you, are

9   you prohibited from looking at the personnel files?

10     A.    I don't know.  I don't think so, but I

11  don't know.  I don't look at people's personnel files.

12     Q.    Did you look at Mr. Lombardo's personnel

13  files to prepare for this deposition?

14     A.    I did not.

15     Q.    Then how can you testify regarding what's

16  contained -- what warnings -- let me rephrase that.

17           What disciplinary action, if any, was taken

18  against Mr. Lombardo during his tenure there?

19     A.    Life coaching.

20     Q.    Can you explain what you mean by that?

21     A.    Do you play sports?

22     Q.    I did, yes.

23     A.    You look like an athlete.

24           So the role of the coach is to continuously

25  improve the players in order to win games.  As his

Page 183

1   coach, I was continuously working on his behavior to

2   make -- help him become a better player.  If you see

3   that as disciplinary, I see it as disciplinary.  If you

4   see it as coaching, then it is coaching.

5        Q.    Other than coaching, is there any other

6   disciplinary action that Chmura took?

7        A.    No.

8        Q.    We are going to change topics

9   substantially, so if we want to take a short break now

10  or keep moving forward, I just want to be flexible to

11  that.  Now would be good time if anybody needs a break.

12            MS. SIEGMUND:  You want to keep going?

13            THE WITNESS:  Okay.

14       Q.    Okay.  I am going to turn your attention to

15  Topic Number 25 on Exhibit A, "Calculation of

16  commissions paid to Mr. Lombardo."  You are the

17  designated corporate representative to testify on this

18  topic, correct?

19       A.    Yes, ma'am.

20       Q.    I am going to put up two documents,

21  Defendant's Deposition Exhibit J and K.

22                     -   -   -   -   -

23            (Thereupon, Deposition Exhibit J, Copy

24            of Richard Lombardo Commission Report

25            10-16 to 02-17, Bates  CHMURA000131,

Page 184

1           was marked for purposes of

2           identification.)

3                      -   -   -   -   -

4                  -   -   -   -   -

5           (Thereupon, Deposition Exhibit K, Copy

6           of Richard Lombardo Sales Commission,

7           Bates  CHMURA000132, was marked for

8           purposes of identification.)

9                  -   -   -   -   -

10      Q.    I am going to give you control.

11      A.    What does, produced natively, mean?

12           MS. SIEGMUND:  That just means we produced

13   it as an Excel spreadsheet and so there is a place

14   holder in our production, so it doesn't have a Bates

15   number at the bottom.

16           THE WITNESS:  Okay.

17      Q.    If you can, go ahead and scroll through

18   Exhibit J, and scroll through Exhibit K and familiarize

19   yourself with these.

20      A.    (Reviewing.)

21      Q.    Are you ready?

22      A.    Yes, ma'am.

23      Q.    Okay.  Turning to Exhibit J first.  Do you

24   recognize this document?

25      A.    It looks like a commission report.

Page 185

1          Q.    And do you know when this commission report

2     was assembled?

3          A.    That's evolved over time.  What time period

4     do you want me to speak to?

5          Q.    Well, I mean, this specific document.  Do

6     you know how this specific document was put together?

7          A.    2016?  That would have been Ms. Steigmann

8     individually reaching out to the account managers and

9     preparing what she had on the books as their

10    commissions.  They reviewed it, edited it, pushed it

11    back to Christine Steigmann who recorded those edits,

12    and then pushed it to me to review.

13         Q.    Does Exhibit J accurately reflect the

14    commissions that is Mr. Lombardo was paid from October

15    2015 through February 2017?

16         A.    I can't remember that.  If this is an

17    approved expenditure or commission report, then I would

18    have to say, yeah.

19         Q.    Who, ultimately, approved the amount of

20    commissions that would be paid during this time period,

21    October 2015 to February 2017?

22         A.    Me.

23         Q.    And if we can go up, I am going to take us

24    up to just the first page up here (indicating), and

25    shrink it a little bit.  If it gets too small, tell me.

Page 186

1   Is that still clear?

2       A.    Can you move the Type column to the left,

3   my left, so I can see the comments on the right, or is

4   this a scanned document?

5       Q.    This is a PDF version of the excel

6   spreadsheet that was produced.

7       A.    Well, without comments on the right, I'm

8   not familiar, but I will do my best.

9       Q.    Do you believe there were comments on this

10  particular spreadsheet of the February --

11      A.    I am used to seeing comments on the right,

12  yes, ma'am.

13      Q.    Okay.  Give me one moment here.  See if we

14  can do it this way (indicating).

15          MS. COOPER:  Let's go off the record.

16                    -   -   -   -   -

17              (Short recess taken).

18                    -   -   -   -   -

19              (Thereupon, Deposition Exhibit AG ,

20              Copy of Excel/Native Version of Exhibit

21              J, Placeholder, CHMURA000131, was

22              marked for purposes of identification.)

23                    -   -   -   -   -

24  BY MS. COOPER:

25      Q.    Okay.  I am going to give you control of

Page 187

1  this.  I will represent to you this is the native

2  version, or Excel version of what I had marked as

3  Defendants Exhibit J.  This one is marked as

4  Defendant's Exhibit AG, and the place holder is Chmura

5  000131.  And I will give you an opportunity to

6  manipulate this and take a look at it.

7          A.    (Reviewing.)

8                If you could move to the left, Row A and

9  then freeze B --

10         Q.    Do you want me to freeze Row B?

11               MS. SIEGMUND:  Yes.

12         A.    Yes, I want to see the name as we scroll

13  across.

14         Q.    (Indicating).  Okay.  You should be able to

15  now.

16         A.    Okay.

17         Q.    Do you recognize this document?

18         A.    Yes, ma'am.

19         Q.    What is it?

20         A.    It looks like Commission Report from

21  November 2016.

22         Q.    And did you prepare this report?

23         A.    No.

24         Q.    To the best of your knowledge, is that a

25  true and accurate copy of the 2016 commission report?

Page 188

1      A.    To the best of my knowledge, yes.

2      Q.    And there are some other tabs at the

3  bottom.  There is February 2017, January 2017, December

4  2016, November 2016, October 2016, direct?

5      A.    Correct.

6      Q.    And do you want to page through those and

7  tell me if those are also accurate to the best of your

8  knowledge?

9      A.    (Reviewing.)

10           Looks accurate.

11     Q.    Do you know who prepared this spreadsheet?

12     A.    Christine Steigmann.

13     Q.    And how was this -- how would the

14  information get on to this spreadsheet?

15     A.    Sure.  As I said earlier, Christine

16  Steigmann would start on the month of commissions and

17  put in front of each account manager what was on the

18  books, and then any corrections that needed to be made,

19  the account managers worked with Christine on that

20  until they got it to where they felt like it was right,

21  and then it came to me.

22     Q.    And then what would you do once it came to

23  you?

24     A.    I would review each transaction, and if I

25  had a question, I would go direct to the account

Page 189

1    manager or senior account manager and seek

2    clarification if it wasn't properly noted in the

3    comment section, row -- Column K.

4         Q.    Would you ever make adjustments to the

5    commission percentages?

6         A.    No.

7         Q.    Would you make adjustments to the

8    commission dollar amount?

9         A.    No.

10        Q.    Who would do that?

11        A.    Christine Steigmann.

12        Q.    Would she do that at your direction?

13        A.    Yes.

14        Q.    Now, what were the -- take the November '16

15   tab you were on on Exhibit AG, are these the

16   commissions for Mr. Lombardo?

17        A.    Yes, it says RL, Column G.

18        Q.    Let's walk through them.  I am going to

19   take us up so we can see the header here.  Walk through

20   the columns with me.  So it has, Opportunity Name.  Can

21   you explain what that column is?

22        A.    The opportunity is the language that's used

23   in Salesforce to be tied with a client's name.

24        Q.    And the Type, can you explain what -- I

25   missed one.  If we go to -- well, let's finish this up

Page 190

1    first.  The Commission, can you explain to me the

2    Commission column?

3         A.    Oh, there's Type.  Should we do Type since

4    we are here?

5         Q.    Yes, please.

6         A.    It would be either new business or it would

7    be a contract that was a renewal -- license that was

8    renewing.

9         Q.    And what's the amount next to it?

10        A.    The amount next to it, if it's a renewal,

11   represents 3% of that opportunity.

12        Q.    So if we look at, once you get back to the

13   top there, Column C says, Amount.  What was that

14   amount?

15        A.    If it says renewal, it is 3% of -- that is

16   the amount of the contract, excuse me, yes.

17        Q.    And the next column is -- yeah, the next

18   column is really Columns C and E combined, says

19   Commission.  And the first column there of the

20   commission has the percentage in it.  What did that

21   percentage represent?

22        A.    If it is a renewal, it is 3% of the amount.

23   If it is new business, it is 15% of the amount with

24   certain caveats.

25        Q.    And the dollar value next to the percentage

Page 191

1     amount, what does that represent?

2          A.    The commission --

3          Q.    On the right hand side.  Let me rephrase

4     that so that this is clear for the record.

5               To the right-hand side under the Commission

6     Column, there is a dollar value next to the percentage.

7     What does that represent?

8          A.    Commission.

9          Q.    And then there is a Renewal Date column.

10    What is the Renewal Date column?

11         A.    That is the date that the license agreement

12    renewed.

13         Q.    And then there is a Column H that says --

14    I'm sorry, Opportunity Owner is Column G and it has

15    some initials there, RL.  What is an Opportunity Owner?

16         A.    That's just the designated account manager.

17         Q.    So in this instance, R L would stand for

18    Richard Lombardo, correct?

19         A.    Yes.

20         Q.    And then Column H says Demo, question mark.

21    What is that column?

22         A.    That says who did the demo.

23         Q.    And if it has an NA in that column, do you

24    know what that means?

25         A.    Typically N A means, not applicable.

Page 192

1      Q.    So, for example, in the row that you are

2  in, in Row 5, it was a renewal, and so it has an N A in

3  Demo.  I take it there wouldn't usually be a demo for a

4  renewal; is that fair?

5      A.    Yeah, absolutely.

6      Q.    And then Column I says, Survey Sent,

7  question mark.  What survey is that column referring

8  to?

9      A.    Customer satisfaction survey.

10      Q.    And there are dates in there, so did that

11  represent the date that the survey was sent?

12      A.    That's what the header says in Column I.

13      Q.    And if there is an N A in the field

14  underneath that column, what did that N A stand for?

15      A.    Typically N A means not applicable.

16      Q.    And then there is a Note column, Column J,

17  correct?  It doesn't look like there is any note --

18      A.    Yes.

19      Q.    I'm sorry, I broke my own rules.

20          It doesn't look like there are any notes in

21  this particular one, but what type of notes would there

22  be in that field?

23      A.    Any information that was needed to clarify

24  any of the previous columns to Column J.

25      Q.    And then Column K says Paid, question mark.

Page 193

1   What is that column?

2        A.   That indicates the date that we received

3   payment for that license agreement from that

4   Opportunity Name.

5        Q.   So it doesn't refer to the date that the

6   account manager may receive the commission in their

7   pay, correct?

8        A.   Correct.

9        Q.   And so if we look at Row 9 and 10 on the

10  November 5, 2016 tab of Exhibit AG, there is a yellow

11  dot in K with no date in it.  Does that mean that the

12  commission -- sorry, that the contract had not been

13  paid by the client at that point?

14       A.   I used to get these from Christine, and it

15  looked like an artifact to me.

16       Q.   But if there is no date in that column,

17  then what your understanding would be is that that

18  client hadn't paid that commission yet -- not the

19  commission -- hadn't paid on the contract yet, correct?

20       A.   If there is not a date in there, then we

21  are still waiting on payment.

22       Q.   Okay.  Continue.

23       A.   And at that point, we went ahead and paid

24  whether we had been paid or not.

25       Q.   At some point, that changed, correct, how

Page 194

1    the commission was paid, the timing of the payment of

2    commissions was changed, correct?

3         A.    Yes.

4         Q.    And can you explain what change was made?

5         A.    We paid commissions when we received

6    payment from the client.

7         Q.    When Mr. Lombardo first started working for

8    Chmura, what percent was paid on -- well, let me

9    rephrase that.

10              What constituted new business?  What would

11   be included in new business?

12        A.    It was a new opportunity.

13        Q.    And how was that defined?

14        A.    I'm sorry?  How was that defined?

15        Q.    Yes.

16        A.    New business means that it is a new client.

17        Q.    Do you know if there are records for the

18   commissions paid to Mr. Lombardo in 2015?

19        A.    Sorry, could you restate that?  You were

20   turning your head and I couldn't hear you.

21        Q.    I'm sorry.  Yes, absolutely.  I said, are

22   you aware of whether there are any records for

23   commissions paid to Mr. Lombardo in 2015?

24        A.    There would be records in QuickBook.

25        Q.    And do you know if those were produced, his

Page 195

1    commission records were produced in Discovery?

2         A.    I do not.  In 2015?

3         Q.    Yes.

4         A.    I do not.

5         Q.    Do you know when the change was made on the

6    time of commission payments?

7         A.    In early 2019.

8         Q.    I am going to show you what's been marked

9    as Exhibit AH.  It is another spreadsheet.

10                        -    -    -    -    -

11              (Thereupon, Deposition Exhibit AH, Copy

12              of Excel Spreadsheet for March 2017

13              through September 2019, was marked for

14              purposes of identification.)

15                        -    -    -    -    -

16         Q.    If you can take a look at this.

17         A.    (Reviewing.)

18              That was an interim, yep.  We were getting

19    into situations where clients weren't paying and we

20    paid out commissions, and we had to have fiduciary

21    responsibility within the account managers to earn

22    their renewal.  So they needed to track down those past

23    due notices, and that's what that Row 1 is about.

24         Q.    Do you recognize this spreadsheet?

25         A.    Yes, ma'am.

Page 196

1      Q.    And what is it?

2      A.    It appears to be a commission report.

3      Q.    It goes from March of 2017 through

4  September of 2019, correct?

5      A.    That's what the tabs indicate at the

6  bottom.

7      Q.    And these are Mr. Lombardo's -- pertain to

8  Mr. Lombardo's opportunities, correct?

9      A.    I am used to seeing all of them together,

10  so if this is a commission report, it should have

11  everybody in there, not just Mr. Lombardo.

12      Q.    Well, does this one contain everybody as

13  you look through it?

14      A.    Well, I can only see Rows 1 through 19.

15  This appears to be something that was prepared in

16  production for this case, so I would not say it was --

17  no.

18      Q.    Did you prepare it?

19      A.    No.

20      Q.    Do you know who did prepare it?

21      A.    Sharon Simmons most likely, or Hannah

22  Whisenant.

23      Q.    Did you review it for your deposition

24  today?

25      A.    I did not.

```
                                            Page 197
 1        Q.    I am going to show you the first
 2   spreadsheet here and ask you a few questions on it.
 3   You will see on Row 18, this is tab March 7, 2017 of
 4   Exhibit AH, and if you look at Row 18, in the
 5   Commission column --
 6        A.    Do you mind highlighting that for me, put
 7   your cursor on it?
 8        Q.    Sure.
 9        A.    I have a little bit of astigmatism.
10        Q.    In the Commission Percent column, you see a
11   7.5%?
12        A.    Uh-huh.
13        Q.    Why is it 7.5 and not either 15 or -- well,
14   let me take a step back.  Row 18 shows the type, New
15   Business, correct?
16        A.    Yes, ma'am.
17        Q.    And it shows in the Commission column, the
18   7.5 %,  correct?
19        A.    It does.
20        Q.    And why would that be at a 7.5% versus a
21   15%?
22        A.    In March of 2017, that would have been Kyle
23   West in the supervisory role, and more than likely --
24   it says in Column J that Rick and Austen worked on this
25   together, so they split the commission.
```

1    Q.    So was that common, then, that splitting

2  commission if two account managers worked on an

3  opportunity together?

4    A.    Is your use of the word common, frequent?

5  Or is your use of the word common, a policy manner?

6    Q.    Let me rephrase that.  Thank you.

7         Was it policy to split the commission if

8  more than one account manager worked on an opportunity?

9    A.    Absolutely.  They worked as a team.  Those

10  are the two meteorites working together on that one.

11    Q.    Did they -- well, who decided the split on

12  the commission if two account managers worked on an

13  opportunity together?

14    A.    I probably did.

15    Q.    Would you ultimately approve it or not?

16    A.    Absolutely.  Absolutely.

17    Q.    How were -- if, for example, there was new

18  business that signed a multi-year contract and paid

19  that multi-year contract upfront, how were commissions

20  calculated on that basis?

21    A.    So let me give you that in a why response

22  and not a how, is that okay?

23    Q.    You can give me whatever response you give

24  me and I will listen to you and follow up.

25    A.    Okay.  So would you restate the question?

Page 199

1  You want to know how multi-year deals were handled in

2  terms of commissions when the entire multi-year deal

3  was paid in year X?

4       Q.    Correct.

5       A.    Because the client, particularly the B to B

6  client, can cancel at any time, there is not a

7  guaranteed 3% deal.  Now, if they pay upfront, we still

8  have to get those renewals, right?  Which means if you

9  get 15% commission, you really need to follow-up with

10 those touch points every quarter, you can kind of let

11 that one slide because you already got your commission

12 for it.  So to make sure those touch points that were

13 required for renewal, you have to make sure that you

14 take a 12 month commission and a 3% renewal thereafter.

15      Q.    Was it standard policy at Chmura for

16 account managers and senior account managers to not

17 have any touch points with a client that signed a

18 multi-year -- signed and paid a multi-year contract?

19      A.    Okay, so it is Chmura, not Shmura, if you

20 don't mind.  Dr. Chen, Chmura.

21           At Chmura, we did everything we could to

22 incentivize our account managers to take care of our

23 client.  So rather than pay 15% upfront, we pay 15%,

24 renewal, renewal.  15%, renewal, renewal, renewal.

25 Depending on the terms.  But you wanted that client to

Page 200

1    renew.

2         Did I answer your question?  Was it a

3    standard practice question or policy question?

4         Q.   Was the standard policy on a contract, on a

5    multi-year contract that was fully paid upfront for an

6    account manager and senior account manager to have no

7    touch points with that client after that contract was

8    paid?

9         A.   No, we would never encourage no touch

10   points.  That's the whole thing I just went through

11   with the 3% commission.

12        Q.   Okay.  Was it ever put in writing that a

13   multi-year contract, fully paid, would be paid out in

14   commissions at 15% on the first year and 3% on the

15   years thereafter?

16        A.   That was recorded on the standard operating

17   procedures.

18        Q.   When were those standard operating

19   procedures adopted?

20        A.   Under Greg's watch in 2017.

21        Q.   So what about commissions prior to the

22   standard operating procedures?

23        A.   Well, generally, things go like this,

24   Christine, is you have a year and you develop Best

25   Practices, and that would have been 2015 through 2016.

Page 201

1   Once you get through all the kinks of a start-up

2   department, then you organize standard operating

3   procedures based on best practices, and there is a

4   spirit of continuous improvement.

5        Q.    How were -- let me ask this:  Were

6   commissions paid differently on multi-year contracts in

7   2015 and 2016 than they were in 2017 going forward?

8        A.    That's not to my understanding, no.

9        Q.    When an account manager started at Chmura,

10  how were they paid for -- well, let me rephrase that.

11        If an account manager, let's say, inherited

12  an opportunity from a prior account manager and

13  ultimately closed the deal, how were commissions paid

14  on that deal to the new account manager?

15        A.    What year are you in?  When you said

16  started --

17        Q.    Well, new --

18        A.    And the account manager -- can you be more

19  specific about what you mean by new account manager?

20        Q.    If Chmura hired a new account manager --

21  when Chmura --

22        A.    When?

23        Q.    In 2015.  Who inherited an opportunity and

24  ultimately closed that opportunity, how were they --

25  what percentage of commission were they paid?

Page 202

```
 1        A.    As we discussed last week, there were

 2   practices in place that if they prospected that client,

 3   they did -- they set up the demo, they actually did the

 4   demo on their own without the help of an economist or

 5   statistician to close that deal, they did the paperwork

 6   properly in Salesforce -- the documentation, excuse

 7   me -- and then they correctly reported information to

 8   the Accounting Department, that constituted a complete

 9   15% initial sales cycle.

10             If they inherited that, then we have to

11   look at how they inherited that, who did the demo, was

12   there supporting staff on that demo?  Did they close,

13   et cetera, et cetera.  So you have to be able to

14   understand the full sales cycle.

15             So if they just got a wet signature on a

16   license agreement, that's the equivalent to the level

17   of effort of a renewal, so that was 3%.  If they

18   didn't --

19        Q.    Did they -- I'm sorry.

20        A.    No, go ahead.

21        Q.    Was there ever an instance in which an

22   account manager only had to procure a signature on a

23   contract and still got paid the 15% commission between

24   2015 and today?

25        A.    Not that I'm aware of.
```

Page 203

1      Q.    To your knowledge, did you ever approve the
2   commission in that instance, at 15%?
3      A.    What instance of 15%, the complete sales
4   cycle?
5      Q.    No, in the instance in which a contract --
6   where the demo had already been completed and the
7   contract was about to be inked, I think were your
8   words.  Had you ever approved a 15% commission for an
9   account manager who inherited it in that status?
10      A.    I have no recall of doing that.
11      Q.    I want to turn your attention to this
12   November 2017 tab on AH.  And if you look at Row 5, you
13   will see under Commission there is 5%.  Can you explain
14   in this instance why a 5% commission was paid on new
15   business instead of 15%?
16      A.    So this was under Greg in 2017, November of
17   2017.  He took over October 1 of 2017.  So let me see
18   what's in that -- are we on Row 5?  Is that the one,
19   the timeline we're in?
20      Q.    Yes.
21      A.    Cuyahoga County?  Oh, my gosh.  I'll never
22   forget that one.  Yeah, Cuyahoga County is the county
23   for our headquarters in Cleveland.  And Cuyahoga County
24   came in to the Cleveland office, and the original demo
25   was given by Greg.

Page 204

1          And the paperwork to get Cuyahoga County as

2     a new client was unbelievable.  I believe that our

3     Operations Department worked on that for six months

4     before we were able to get it in.  So Rick got 5% in

5     that situation because he didn't do the demo, he didn't

6     do the paperwork.

7          It falls into that 5% category of -- pretty

8     much a judgment call, but that would have been Greg's

9     call.  And it was an RFP, so he wouldn't have filled

10    out the RFP.  I think that's a very generous commission

11    for the level of effort that he had to do.

12         Q.   Was there a written policy of reducing the

13    commission from 15% to a lesser amount if an RFP was

14    involved?

15         A.   Yes, he should have an email on that from

16    me.

17         Q.   Do you recall when you would have sent that

18    email?

19         A.   I was the only one that sent the email, was

20    that the question?

21         Q.   No, do you recall when you would have sent

22    that email?

23         A.   Oh, I think it was March of 2015.

24         Q.   And do you know if that email was produced

25    in Discovery?

1       A.    Yes.

2       Q.    Was it?

3       A.    Yes.

4       Q.    I am going to show you, or direct your

5  attention to the October 2017 tab on Exhibit AH.  The

6  Opportunity Name is Entergy Mississippi and it has a 6%

7  commission in the Commission column.  Can you explain

8  why this one has a 6% commission in that column?

9       A.    That would be Greg's judgment, but I can

10 tell you when Entergy was being managed by Rob

11 McMillin, that they were a former client, and I don't

12 know the details behind this one.

13      Q.    Did you approve this 6% commission?

14      A.    No, that would have been Greg.

15      Q.    You mentioned earlier that Greg took over.

16 What did Greg take over?

17      A.    He took over Kyle's supervisory role of the

18 sales team because Kyle --

19      Q.    Go ahead, you can finish your thought.

20 What did Kyle --

21      A.    No, no. I just -- Kyle had other plans.

22      Q.    What were Kyle's other plans?

23      A.    He wanted to go to Italy with his wife.

24      Q.    Okay.  How long -- and Kyle is Mr. West,

25 right, Kyle West?

Page 206

1          A.     Yes, ma'am.

2          Q.     Kyle -- how long was Mr. West in Italy for?

3          A.     The month of January 2018, the month of

4     April and half of May of 2018.

5          Q.     And did he come back to work in May of

6     2018?

7          A.     He did.

8          Q.     I am going to show you the tab so we can go

9     to a concrete example.  (Indicating).

10               Okay, I froze the first column here.  We

11    are on the April 2019, the April 2019 tab of Exhibit

12    AH, and I want to direct your attention to Row 11 and

13    12.  I highlighted Row 11.  If you could just take a

14    look at those two rows for us for a minute and tell me

15    when you are ready.

16         A.     (Reviewing.)

17         Q.     Are you familiar with the "Workforce

18    Solution, South Plains 3-year Agreement" opportunity?

19         A.     That was a mouthful.  Somewhat, yeah.

20         Q.     And there is a note in this particular row

21    that states -- if you want to scroll over for a moment

22    -- "Rick was paid for all three years at the new

23    business rate.  Only the 12 months should be paid at

24    that rate." Do you see that?

25         A.     Yes, ma'am.

1          Q.    Do you know who made that note?

2          A.    It was either Sharon or Hannah.

3          Q.    And we talked about how 15% commission

4    would be paid on the first year and then the 3% would

5    be paid on the remaining years on a contract that was

6    paid in full, correct?  We already talked about that?

7          A.    Yes, ma'am.

8          Q.    Is this one of the instances in which

9    Mr. Lombardo would have been paid commission on the

10   first year at 15% and then the remaining paid at 3%?

11         A.    Yes.

12         Q.    Who, in this instance -- let me rephrase.

13         Did you approve payment on this one at the

14   rate of 15% for the first year and 3% for the remaining

15   years?

16         A.    That would have been April '19.  That would

17   have been early in Eli's tenure, so I imagine he was

18   just learning.  So this probably went to Sharon after

19   Eli glanced at it.

20         He wouldn't have known enough at that time

21   to -- I mean, he may have.  Talking about Eli here.  So

22   I don't know about this one.  I am aware that that

23   adjustment was made.

24         Q.    Okay.  To your knowledge, was -- we looked

25   at the spreadsheet AG, which was October 2016 to

1  February 2017.  Was the spreadsheet we are looking at

2  now, AH, did it pull information from a different

3  source than spreadsheet AG?

4       A.    No, everything came from QuickBooks and

5  backed up by Salesforce.

6       Q.    So we talked about opportunity.  We talked

7  multi-year contracts, talked about commissions when

8  more than one account manager worked on opportunities.

9  Were there any other instances in which a commission

10  would be adjusted?

11       A.    No, unless there was a mistake like this

12  one appears to be a mistake.

13       Q.    Well, this was -- you are talking,

14  Workforce Solutions on tab -- on the April 2019 tab,

15  correct?

16       A.    Yes.  Any time you see something in red

17  with a negative on it, it is an adjustment and

18  somebody's mistake.

19       Q.    But this was an adjustment for a multi-year

20  paid contract, correct?

21       A.    Yes, ma'am.

22       Q.    I want to change topics now and close this

23  out.  I am going back to Exhibit A, Notice of

24  Deposition.  You were designated as the corporate

25  representative to speak about "Eli Auerbach's

Page 209

1   termination, including the decision to terminate,

2   reason for termination and notice to Mr. Auerbach of

3   his termination"; is that correct?

4        A.    Yes.

5        Q.    When was Mr. Auerbach terminated?  When was

6   his employment terminated?

7              That was a poorly worded question.

8        A.    December of 2019.

9        Q.    What were the circumstances surrounding his

10  employment termination?

11       A.    He wasn't meshing with leadership in terms

12  of direction we wanted to go.  He had a different

13  direction he wanted to take the sales team, and the

14  level of conflict that was creating for the sales team

15  wasn't necessary.

16       Q.    What direction did he want to take the

17  sales team?

18       A.    He wanted to, basically, raise their base

19  salary and lower their commissions, which was creating

20  anxiety for them.

21       Q.    After Mr. Auerbach was terminated, did

22  Chmura make adjustments to the commission structure?

23       A.    So we got kind of caught -- blindsided with

24  two new hires that came in that December, and

25  unbeknownst to us, Mr. Auerbach had designed their

Page 210

1   offer letters, signed it himself, sent it out.  And so

2   they came in under, here is the structure.  And that

3   was never approved by leadership.

4          So we were pretty much stuck.  So we had

5   some bumps there, bumps in the road.  And, I mean, he

6   didn't have the the authority to sign an offer letter.

7       Q.    So Mr. -- Mr. Auerbach did not have

8   authority to -- let me ask, who does have authority to

9   sign an offer letter?

10      A.    Me, Sharon Simmons, Chris.

11      Q.    And in these two instances, you didn't?

12      A.    Can I correct my testimony?  John Chmura

13  and Greg Chmura can sign for their people.

14      Q.    And then, also, the others you listed can

15  sign for account managers; is that right?  Ms. Simmons,

16  and was there somebody else you mentioned as well?

17      A.    Chris Chmura, but I don't believe there is

18  any situation where Sharon or Chris signed.  It was

19  usually me.

20      Q.    And in these two instances, you didn't

21  review the offer letter before they went out to these

22  new account managers?

23      A.    No, I didn't see them.

24      Q.    When did you discover that these offer

25  letters had gone out in the form that they did?

Page 211

1      A.    When the decision was made between Eli and

2   Aisha to hire them, I got to see the letter then, and

3   it was the new sales structure that we hadn't even

4   approved.

5      Q.    Were those letters already signed by the

6   new employees?

7      A.    When I saw them?

8      Q.    Yes.

9      A.    I don't remember.

10     Q.    Is the sales team currently being paid on a

11  different commission structure than was in effect when

12  Mr. Lombardo was employed?

13     A.    Yes.

14     Q.    And is it the structure that Mr. Auerbach

15  proposed?

16     A.    Yes.

17     Q.    When was that change made?

18     A.    December 1, 2019.

19     Q.    And was leadership involved in that

20  decision?

21     A.    We had to deal with the situation of two

22  employees coming in with a different sales structure

23  than the remaining employees.

24     Q.    Why was the decision made to alter the

25  existing -- alter the structures of existing employees

Page 212

1   as opposed to the new employees?

2        A.    Some members of leadership felt like the

3   new structure was good and that it was more manageable

4   and sustainable over time, but we shot ourselves in the

5   foot on FMLA by raising somebody from 50,000 to 60 in

6   terms of hitting that high income target.

7        Q.    Prior to Mr. Auerbach's termination, did

8   Chmura have him sign an affidavit pertaining to this

9   case, Mr. Lombardo's case?

10       A.    Eli was eager to sign that affidavit, yes.

11       Q.    Who prepared that affidavit?

12             MS. SIEGMUND:  I would object to -- or

13   instruct you not to answer to the extent that gets into

14   attorney-client communications.

15       Q.    Are you not going to answer that question?

16       A.    I am not.

17       Q.    Let me ask this, did you prepare that

18   affidavit?

19       A.    No.

20       Q.    Did you review the affidavit before it was

21   provided to Mr. Auerbach?

22       A.    Yes.

23       Q.    And that affidavit was -- let me ask this,

24   who handed the affidavit to Mr. Auerbach for his

25   signature, if you know?

Page 213

1          A.    Greg Chmura.

2          Q.    And Mr. Auerbach ultimately signed the

3    affidavit, correct?

4          A.    Yes.

5          Q.    And the date he turned that affidavit back

6    to the company, he was terminated; is that correct?

7          A.    Yes.

8          Q.    Who had the discussion with Mr. Auerbach

9    regarding his termination, if there was any?

10         A.    Greg Chmura.

11         Q.    Were you present, either by phone or in

12   person, when Mr. Auerbach was terminated?

13         A.    No.

14         Q.    Was leadership in agreement on terminating

15   Mr. Auerbach?

16         A.    Yes.

17         Q.    I am going to turn your attention back to

18   Exhibit A just for a second.  I think we are on our

19   last topic here.  You were designated as the

20   representative regarding Topic Number 32,

21   "Mr. Lombardo's personnel file"; is that correct?

22         A.    Yes.

23               MS. SIEGMUND:  I think we went through a

24   lot of this on Thursday, so, hopefully, we can fast

25   track this.

Page 214

1          MS. COOPER:  We did.  I think I only have

2     one question on this, maybe a few, don't hold me to

3     one, but we already went through a lot today as well.

4          Q.    Earlier today you testified you did not

5     review his personnel file prior to this deposition,

6     correct?

7          A.    Correct.

8          Q.    When was the last time you did review this

9     personnel file?

10         A.    I don't know.

11         MS. COOPER:  If we can just take a break

12    for a moment.  I think that concludes the 30(b) portion

13    of the deposition, but I want to just page through.

14              Let's take a short break.

15         MS. SIEGMUND:  Sure.  Do you want to take a

16    lunch, or do you want to just do a short break and keep

17    going?

18         THE WITNESS:  I want to keep going.

19         MS. SIEGMUND:  Okay.

20         MS. COOPER:  We're going to take five.

21                    -   -   -   -   -

22              (Short recess taken).

23                    -   -   -   -   -

24    BY MS. COOPER:

25         Q.    I'd like to go on to the individual part of

Page 215

1   this deposition and move away from the 30(b)

2   deposition.  Some of the topics may sound a little

3   similar, Ms. Peterson, but I will try to ask different

4   questions, even though there is some overlapping in the

5   way the topic designation is in the Notice of

6   Deposition.

7           With respect to payment of commissions,

8   when Mr. Lombardo first started, I think you already

9   testified, that you would review and approve those

10  commissions; is that correct?

11      A.   Yes.

12      Q.   And when he first started with the company,

13  he was -- some of his commission rates were changed

14  based on status of opportunity provided to him; is that

15  correct?

16      A.   Yes.

17      Q.   Can you tell me a little more about those

18  changes in commission rates, if you recall?

19      A.   Yes.  I can tell you the same thing I told

20  you several times.  Do you want me to go through it

21  again?

22      Q.   Just as to when he first started, yes,

23  please.

24      A.   So prior to Mr. Lombardo's employment, we

25  had Robert McMillin.  He was -- he was more of a

Page 216

1    business development person for JobsEQ, and so he had

2    gone to several conferences.  He was prospecting.  He

3    was getting license agreements in place, and then left.

4              And so about two months later, we had gone

5    to ComDoc and got an understanding of what a sales team

6    for technology looked like.  And when Mr. Lombardo came

7    on, there were several deals amongst -- close, or even

8    closed in the case of, I believe, counties.  I know

9    they had been closing them in Salesforce.

10             So we had the policy that I told you about

11   before, the total initial sales cycle for 15% starts at

12   prospecting and ends with the closed deal.  If he

13   didn't hit all of the points in that process, then the

14   commission rates were calculated due to what we

15   considered level of effort.

16        Q.    When did Mr -- is it McMillin?  Is that

17   right?

18        A.    Yes.

19        Q.    When did Mr. McMillin leave the company?

20        A.    November of 2014.

21        Q.    And Mr. Lombardo started in February of?

22        A.    February 18, 2015, yes.

23        Q.    And just so it is clear, because I had a

24   hard time -- 2015 Mr. Lombardo started, correct?

25        A.    Yes.

1      Q.    And so some of the leads that were turned

2   over to Mr. Lombardo were leads from Mr. McMillin,

3   correct?

4      A.    Leads from Chris Chmura.

5      Q.    I want to focus just for a moment on the

6   leads from Mr. McMillin if we could.

7      A.    Sure.

8      Q.    Are they -- are the leads from Mr. McMillin

9   different than from Dr. Chmura?

10     A.    No.

11     Q.    So they were the same leads?

12     A.    I thought you meant prospects.

13     Q.    No, no.  Were actual leads handed over to

14  Mr. Lombardo pertaining to Mr. McMillin, different

15  leads than those that Dr. Chmura had worked on?

16     A.    Yes.  As far as I can remember, yes.

17     Q.    With respect to the leads that were from

18  Mr. McMillin, are you aware of any contact between

19  those leads when Mr. McMillin left and when

20  Mr. Lombardo started?

21     A.    I can't be specific, but I know there was

22  ongoing dialogue with opportunities before the sales

23  team was organized.

24     Q.    Can you be more specific?  What do you mean

25  by, "before the sales team was organized"?

Page 218

1      A.    So Mr. McMillin had a series of very warm

2  leads, unsigned agreements that were already out there

3  in the hands of the potential client.  So they varied.

4      Q.    What, if any, of Mr. McMillin's leads

5  closed between the time he left the company and the

6  time Mr. Lombardo started?

7      A.    I know -- say that again?

8      Q.    What leads, if any, closed between the time

9  Mr. McMillin left the company and the time Mr. Lombardo

10  started?

11      A.    So I know in Salesforce there is a signed

12  agreement with lead Telsey (ph) with Mr. McMillin's

13  name on it.

14      Q.    Did Mr. McMillin close that?

15      A.    Did Mr. McMillin sign it?  He did.

16      Q.    So he would have been there at the time --

17  he would have been employed by Chmura at the time that

18  that was signed, correct?

19      A.    Not necessarily.  You can have a license

20  agreement waiting on a signature.

21      Q.    So does Chmura sign -- or a representative

22  of Chmura sign the agreement before it is sent to a

23  prospective client?

24      A.    Yes, yes.

25      Q.    How many warm leads, or very warm leads

Page 219

1   were handed to Mr. Lombardo that were generated by

2   Mr. McMillin?

3        A.    I don't know the number.

4        Q.    Would that information be documented

5   anywhere?

6        A.    Salesforce, if it is properly documented.

7        Q.    Could you ballpark how many?  10, 20, 100?

8        A.    I don't want to do that.  That's guessing.

9        Q.    How long is a lead very warm for?

10       A.    Varies by client.

11       Q.    What would be the range?

12       A.    One day to one year.

13       Q.    How was that determined, that length of

14   time?

15       A.    Well, money.  Budget.

16       Q.    Can you explain how?

17       A.    As we discussed last week, our business to

18   government client had longer sales cycles, typically,

19   than our business to business client.  That's driven by

20   policy and practicality.

21       Q.    The current sales team at Chmura, have they

22   been hitting their quotas from the time Mr. Lombardo

23   left to the current time?

24       A.    They have not.

25       Q.    Do you know the reason they haven't been

Page 220

1    hitting those quotas?

2          A.    They're very young.

3          Q.    Are they inexperienced?

4          A.    Very.

5          Q.    Does the company currently have any senior

6    account managers?

7          A.    No.

8          Q.    Were there any warm leads after -- that

9    Mr. Lombardo had that were distributed after his

10   termination?

11         A.    I'm sure there were, but I am not aware of

12   what they are.

13         Q.    Are you aware of whether anyone worked

14   those leads?

15         A.    I am sure they did that under Dr. Shelly's

16   watch, and he is making sure that everything is in

17   place.

18         Q.    What is Dr. Shelly's background?

19         A.    He is a Ph.D, a Harvard Fellow.  He was a

20   professor at Wake Forrest, and now he works for Chmura.

21         Q.    And what's his title at Chmura?

22         A.    Right now he is the Director of Sales and

23   Education Specialist.

24         Q.    And you probably have already answered

25   this, but does Chmura currently have a sales manager?

Page 221

1        A.    That's Dr. Shelly.  He is an interim.  We

2    are interviewing.

3        Q.    Does he have any background in sales?

4        A.    He was an entrepreneur for a couple years,

5    so, yeah, he had to survive.

6        Q.    Does he have any sales management

7    experience?

8        A.    He is getting that now.

9        Q.    I want to show you what's been marked as

10   Defendant's Exhibit -- I believe it is -- V.

11             MS. COOPER:  I am going to email Exhibit V

12   to you, Kelli.  I'll represent that it's the Responses

13   to the Interrogatories.  I did not have the

14   verification page attached to the original version that

15   I sent to you, Kelli, so I am going to send it with the

16   verification sheet attached.

17                      -   -   -   -   -

18             (Thereupon, Deposition Exhibit V, Copy

19             of Chmura Economics & Analytics, LLC's

20             Objections and Responses  to Richard

21             Lombardo's First Interrogatories with

22             Verification Page, was marked for

23             purposes of identification.)

24                      -   -   -   -   -

25        Q.    I am showing you what's been marked as

Page 222

1   Defendant's Exhibit V, and I will hand over control.

2           A.    (Reviewing.)

3           Q.    Have you seen this document before,

4   Ms. Peterson?

5           A.    Yes, ma'am.

6           Q.    Did you have, or did you assist in the

7   preparation of the responses to these Interrogatories?

8           A.    Yes, ma'am.

9           Q.    If you can go to the very last page, and I

10  can scroll down there, (indicating).  Is this

11  Dr. Chmura's signature?

12          A.    It is.

13          Q.    I want to direct your attention to

14  Number 17.  If you just read through that and then the

15  substance of the response as well.

16          A.    (Reviewing.)

17          Q.    Have you had a chance to review it?

18          A.    Yes.

19          Q.    I just want to look at Number 2 for a

20  moment here, the company's position that Mr. Lombardo,

21  quote, Regularly exercised significant discretion when

22  performing his job duties.

23               Can you describe for me what your

24  understanding of his discretion is?

25          A.    He was allowed the opportunity to prospect

Page 223

1   in the whole United States in the manner that met his

2   goals, his percentage goals.  Nobody prospected for

3   him.  He managed the prospecting prospects.

4           Q.    Okay.  Any other discretion?

5           A.    Any other discretion?

6           Q.    Yes.

7           A.    He had a lot of liberty in choosing

8   conferences to attend.  He was, basically, a product

9   development adviser because he was battle tested and

10  knew what the clients needed more than we did.

11          Q.    Anything else?

12          A.    I mean, we can move on.

13          Q.    Well, I am just asking, is that all the

14  discretion -- are those all the categories of

15  discretion that you believe Mr. Lombardo regularly

16  exercised?

17          A.    I agree with everything in Paragraph 2.

18          Q.    And Paragraph 2 -- well, let's see.  It

19  says, "Offering substantial discounts to customers."

20  So is that another area where he exercised significant

21  discretion, according to you?

22          A.    Yes.

23          Q.    So going to the first category of

24  discretion you mentioned, was prospecting the whole

25  United States, correct?

Page 224

1      A.    Correct.

2      Q.    Did any account -- let me ask this, did he

3  have discretion to prospect the whole U.S. throughout

4  his entire time at Chmura?

5      A.    No.

6      Q.    When did that change?  Or let me rephrase.

7            How did it start?  What was his discretion,

8  and, then, how did it change?

9      A.    As the business grew, the plan was always

10  to add additional sales -- account managers to manage

11  sales.  So as the business --

12     Q.    So at the -- I'm sorry.  Go ahead.

13     A.    From 2015 until 2019, markets changed, so

14  did territory.

15     Q.    So early on in his tenure with Chmura, he

16  prospected the whole U.S.; is that correct?

17     A.    As I previously stated, yes.

18     Q.    And then as time went on, was his territory

19  limited?

20     A.    It was changed.

21     Q.    Who made that change?

22     A.    I'm sorry?  Who made the change?

23     Q.    Yes.

24     A.    It was SEA Group.

25     Q.    And Mr. Lombardo would have been informed

Page 225

1    of this new territory; is that right?

2        A.    Yeah.

3        Q.    I think we already talked about choosing

4    conferences, which is the second area of discretion on

5    your list, but do you have any specific recollection of

6    conferences Mr. Lombardo recommended Chmura attend?

7        A.    Texas Economic Development Conference was

8    his favorite.  He had a lot of clients in Texas.

9        Q.    Was he the first account manager to attend

10   the Texas Economic Development Conference?

11       A.    Yes.

12       Q.    Do you know how he learned about that

13   conference?

14       A.    Through his clients.

15       Q.    Prior to -- well, let me ask this, was he

16   allowed to attend that conference?

17       A.    Yes.

18       Q.    Was there any discussion prior to his

19   attendance -- let me rephrase that.

20             Was there any discussion regarding whether

21   a representative of Chmura should attend that

22   conference?

23             MS. SIEGMUND:  Object to the form of the

24   question.  You can answer.

25       A.    Rick came to us and said, I am going to

Page 226

1  this conference.  And we said, great, go bring them in.

2       Q.    Did Mr. Lombardo ask permission to attend

3  that conference?

4       A.    Well, he was an employee.

5       Q.    So what does that mean?

6       A.    There is a chain of command.  You go

7  through that when you are spending company's money.

8       Q.    So he went up the chain of command before

9  attending the conference?

10      A.    No, he let us know he was attending it and

11  we thought it was great.

12      Q.    So when you say we, who is "we"?

13      A.    SEA Group.

14      Q.    So the SEA Group approved him attending

15  that conference?

16      A.    SEA Group was excited about it, yeah.

17      Q.    If SEA Group hadn't been excited about it,

18  would he still be permitted to go?

19           MS. SIEGMUND:  Object to the form of the

20  question.  You can answer.

21      A.    So we are a consensus based organization

22  and, ultimately, if Rick wanted to go to that

23  conference, I would have been the voice of the business

24  reasons behind that, and he would have gone, and SEA

25  Group would have been fine with that.

Page 227

1      Q.    Okay.  Was there ever a time Mr. Lombardo

2   asked to go to a conference, to your recollection, that

3   he was denied permission to attend?

4      A.    In 2018, we did the most conferences we had

5   ever done, and we had to scale back in 2019 due to the

6   fact we had added 18 employees in 2018.  So we had to

7   make budget decisions and cut back on conferences.

8   Mr. Lombardo was not given permission to do that.

9      Q.    Okay.  So Mr. Lombardo did ask to attend

10  certain conferences, at least in 2019, where he was not

11  given permission to attend; is that correct?

12     A.    Where no one was given permission to

13  attend, that is correct, not just Mr. Lombardo.

14     Q.    Now, you said that he also exercised

15  discretion with respect to product development, being a

16  product development adviser.  Can you explain that a

17  little bit more?

18     A.    Sure.  In July of 2019, we actually brought

19  on a product manager.  Prior to that, we were very

20  dependent on the account managers to bring back

21  innovative ideas from the field.

22     Q.    What was the product manager's main, or

23  primary responsibility as of 2019 going forward?

24     A.    He owns the road map, and he builds new

25  cases, and all the things that we never had anybody to

Page 228

1    do for us before.  But you'd have to talk to John about

2    that, John Chmura.

3          Q.    So prior to Chmura retaining or hiring a

4    product manager, what specifically did Mr. Lombardo do

5    to assist with product development?

6          A.    He often made ethic -- you know, there is

7    300 logs of him asking for GDP, for example.  He worked

8    closely with I.T. to set the priorities of the road

9    map.

10         Q.    When you say 300 logs, what you do you mean

11   by 300 logs?

12         A.    Those are requests that are logged on

13   Onstage.

14         Q.    Was GDP ever developed by Chmura?

15         A.    Yes.

16         Q.    When was it developed?

17         A.    See, I can't remember that date.

18         Q.    Has GBP -- sorry -- GDP been pushed to

19   market?

20         A.    It's commercially available in JobsEQ.

21         Q.    And Mr. Lombardo had asked 300 times prior

22   to it being pushed commercially; is that right?

23         A.    No, that's just a number of times that he

24   recorded that we needed it, and a lot of people needed

25   it.  So we were just playing catch-up, actually, with

Page 229

1   GDP.  It was a lot to bring that particular analytics

2   to the tool.

3        Q.    So what recording?  You said he would

4   record it.  What recording was he doing?

5        A.    I am sure that's a combination of

6   Salesforce, road map, postings Onstage, sales meetings.

7        Q.    Was GDP Mr. Lombardo's independent idea?

8        MS. SIEGMUND:  Object to the form of the

9   question.  You can answer.

10       A.    Mr. Lombardo is not an economist, nor is he

11   an I.T. person.  The answer is, no.

12       Q.    Looking back at this Exhibit V, as in

13   Victor, Number 2, I want to turn to talking about where

14   it says, "Regularly exercised significant discretion by

15   offering substantial discounts to customers."  Do you

16   see that?

17       A.    Yes, ma'am.

18       Q.    What does that mean?

19       A.    So Rick is the one that developed the

20   sublicense model.

21       Q.    What is the sublicense model?

22       A.    He was able to understand the business and

23   value proposition of aligning multiple clients under

24   one contract.

25       Q.    Had that ever been done before Mr. Lombardo

Page 230

1   started at the company?

2        A.    No, that was created by Rick -- sorry, Mr.

3   Lombardo.

4        Q.    Can you explain what you mean by aligning

5   multiple -- I apologize, I am going to ask you to say

6   it again.  Sorry, let me rephrase.

7             The sublicense model you are talking about,

8   can you explain how the pricing would work on that?

9        A.    50% discount if you are a sublicensee.

10       Q.    What is a sublicensee?

11       A.    Someone that has come under a master

12  license or a parent.

13       Q.    Would these, the licensee and sublicensee

14  be related entities?

15       A.    There is a value proposition for them to be

16  brought together.

17       Q.    Was the pricing for this model set before

18  Mr. Lombardo started at Chmura?

19       A.    No.

20       Q.    Chmura has what are called pricing

21  matrixes, correct?

22       A.    Correct.

23       Q.    How are pricing matrixes developed?

24       A.    The Pricing Committee sit down and do --

25       Q.    Who's on that -- sorry.

Page 231

1       A.     -- do a lot of math analysis of

2  populations, analysis of demographics, competitive

3  analysis.  And the Pricing Committee, largely driven by

4  Greg Chmura, develop the matrices with input from the

5  account managers, of course.

6       Q.     Who sits on the Pricing Committee?

7       A.     Greg Chmura, Sharon Simmons, Leslie

8  Peterson.

9       Q.     How many -- let me rephrase that.

10       When was the first pricing matrix put out

11  by Chmura?

12       A.     I don't remember.

13       Q.     Would it have been before Mr. Lombardo

14  started with the company?

15       A.     No, no.

16       Q.     When Mr. Lombardo started, then, how was

17  Mr. Lombardo supposed to know how supposed to price the

18  product?

19       A.     We just had two price points based on

20  population, 7995 and 9995.

21       Q.     How many pricing matrices since the

22  beginning -- or let me ask this: Are they numbered, the

23  pricing matrices, if they change?

24       A.     Of course.

25       Q.     What number is Chmura up to on their

Page 232

1    pricing matrix?

2         A.    You know, I think it is around 24, 25.

3         Q.    And each different pricing matrix would

4    have a change in price on it, correct?

5         A.    There are some things would have changed.

6         Q.    Okay.  What other things could change on a

7    pricing matrix?

8         A.    I think the first or second iteration we

9    added 75-mile radius.  There is an MSA version, there

10   is a county version, there is a regional version, there

11   is an opportunity version.  Businesses evolve over

12   time.

13        Q.    Is there one matrix used in any given point

14   in time or -- let me re-ask that.

15              Is there one matrix used at any point in

16   time?

17        A.    I don't understand that question.  Sorry.

18        Q.    That's okay.  I will rephrase it.

19              So you have approximately 24 pricing

20   matrices currently.  Can an account manager price based

21   on any one of those, or only based on the most current

22   pricing matrix?

23        A.    The most current, but that's not to say

24   that a deal will come in that gets priced based on a

25   previous one.

Page 233

1      Q.    Is that because the deal could already have

2  gone out before -- be quoted and gone out before the

3  new pricing matrix went into effect?

4      A.    Yes.

5      Q.    I am going to show you what's been

6  marked -- actually two documents, what's been marked

7  Exhibit AA.  We will start with AA.

8                       -   -   -   -   -

9              (Thereupon, Confidential Deposition

10             Exhibit AA, Copy of Pricing Matrix

11             Bates CHMURA0204226, was marked for

12             identification.)

13                     -   -   -   -   -

14     A.    (Reviewing.)

15     Q.    Do you recognize this document?  I will let

16  you take a look at it.

17     A.    I recognize it, but I can't read it.  It is

18  too small.

19     Q.    Okay.  I'll see if I can help with that.

20  (Indicating).  Is that better?

21     A.    Yes.

22     Q.    Do you know what this is?

23     A.    That's a typical pricing matrix.  I don't

24  know which version it is.

25     Q.    You already answered my question.

Page 234

1          Okay.  In using this pricing matrix as an
2     example, it contains -- actually, if you could walk me
3     through it a little bit.  It has, Postsecondary, not
4     EDO, at the very top.  What does that refer to?
5          A.    If it is a post secondary, it is education
6     and not an economic development organization.
7          Q.    And so would you look at that top line
8     where it says, ENR equals less than 5000, 5 to 10,000,
9     10 to 20,000, 20,000 and up?  Are those the columns you
10    would look down to price for postsecondary?
11         A.    You are asking me to look at the 5K
12    columns, or asking me --
13         Q.    How would I -- I am going to ask a more
14    general question.  I think it would be easier than me
15    trying to guess.
16              Walk me through using this pricing matrix.
17    If I were an account manager working for Chmura, how
18    would I use this pricing matrix?
19         A.    Well, for one thing, I would have rows and
20    columns in there so I know which row I'm on, and these
21    -- I guess this is scanned.  So the biggest driver in a
22    pricing matrix in an organization is price and
23    population per capita.  And this breaks this all out
24    into easy to use, user type.
25         Q.    And what are the user types on, if you can

Page 235

1    point me to the user type on this particular pricing

2    matrix.

3         A.    Well, you can have, state economic

4    development organizations, you can have private

5    consultants, you can have university economic

6    development organizations, utility companies.  And that

7    last column is Rick Lombardo's column.  He is the one

8    that -- was strategic enough to go after the small

9    counties that our competition was ignoring.

10        Q.    And then tell me how to use this.  If I

11   were pricing, let's take an example.  If I were pricing

12   to a utility company, how would I know what to charge

13   for a new contract for JobsEQ?

14        A.    So you work with the primary region and

15   then you use the factors that are laid out under

16   utilities.

17        Q.    And what are those?

18        A.    They may just want -- they might want zip

19   code level data.  They might want to add additional

20   states.  They might want to add additional counties.

21   They might want the whole nation.  They can add

22   additional seats.

23        Q.    So let's say I was the utility company, or

24   I'm selling to the utility company that wants just

25   their region.

Page 236

1      A.    What do you mean by region?  Region is

2  anything lower than a state.

3      Q.    Okay.  Well, I am just trying to understand

4  how to use this, that's all.  I am trying to understand

5  from the account manager perspective how would I go

6  about pricing.  And you can give me any example you

7  want to give me, but if you can show me how to use this

8  to price a particular product, how would I go about

9  doing that?

10      A.    So let's say you are Scott County, Virginia

11  and your population is less than $50,000 and you want

12  zip code level data for Scott County, then you are

13  going to have a price that the population is not going

14  to support that price, but it is under 50k population,

15  so it is $5,000.

16      Q.    Okay.  Now, underneath the chart, there is

17  a section called, "Discounting Tools -- discounts

18  cannot be combined".  Do you see that?

19      A.    Yes, ma'am.

20      Q.    Can you explain to me what that is?

21      A.    It's a multi-year discount that can be

22  either two years -- if it's two years, there's 5% off

23  of each year.  It can be a three year which gets you 7%

24  off of each year.

25      Q.    And then Number 2 underneath Discounting

1   Tools says, "Can take up to 10% off the list price, but

2   the price never drops lower than 5,000"; is that

3   correct?

4        A.    Yes, that's driven by that single county

5   rate.

6        Q.    And the list price is what's in the chart

7   above; is that correct?

8        A.    Yes.

9        Q.    And then there is a Sublicense, Number 3,

10  that says, "20% off the price of that sublicense had

11  the sublicensee purchased the package on their own.

12  Parent license is undiscounted and is defined as the

13  highest priced individual package.  All sublicensees

14  must sign up at the original point of purchase."  Is

15  that the sublicense model you were talking about

16  earlier?

17       A.    That is the sublicense model that I believe

18  -- I mean, I haven't looked at this in years.  I don't

19  pay attention to this.  My understanding of it is a 50%

20  discount, so I may be wrong.

21       Q.    But that's the model you were referring

22  to -- regardless of percentage, that was the model,

23  correct?

24       A.    Yes.

25       Q.    Outside of these discounts -- well, let me

Page 238

1   ask, how could account managers use these discounting

2   tools?

3         A.    So they would start with list, which is

4   where they want to get because they get the biggest

5   commissions there, and then in the process of

6   discovery, they discover what their price point is.

7   But based on price point and based on region and based

8   on user type, you begin to discount.  You might start

9   with 1%, you might start with 2%.  And Rick was very

10  good at this.  He was very good at helping the company

11  maximize that opportunity.

12        Q.    When you say, "the company," do you mean

13  Chmura or -- who are you referring to as the company?

14        A.    Chmura.

15        Q.    To your knowledge, did Mr. Lombardo seek

16  approval prior to offering a discount?

17        A.    I mean, he often came to me with a reason

18  why we had to go with a certain price, and I always

19  said, what do you recommend, Rick?  And then that's

20  what we would go with.

21        Q.    But he would come to you before offering it

22  to the potential client, or client, right?

23              MS. SIEGMUND:  Object to the form of the

24  question.  You can answer.

25        A.    He had the freedom to take discounts

Page 239

1   without coming to me.

2        Q.    And those are the discounts that are set

3   out on the pricing matrix; is that correct?

4        A.    On this particular one, yes, but I don't

5   know which version this is.  I know they have up to 30%

6   discretion now.

7        Q.    And would that 30% be found on a pricing

8   matrix?

9        A.    Yes.

10       Q.    I am going to show you what's been marked

11  as Exhibit AB, probably too small.  I will make it

12  bigger.

13                              -   -   -   -   -

14            (Thereupon, Confidential Deposition

15            Exhibit AB, Copy of Pricing Matrix

16            Bates CHMURA0204227, was marked for

17            identification.)

18                              -   -   -   -   -

19       Q.    Is this also a pricing matrix?

20       A.    Just a version of it.

21       Q.    Do you know which version this is, which

22  number?

23       A.    I do not, no.

24       Q.    And I assume this works in the same manner

25  as the last pricing matrix that we looked at?

Page 240

1        A.     Yes.

2        Q.     And, again, you don't recall which version

3  this pricing matrix that's in front of you now, Exhibit

4  AB, is; is that correct?

5        A.     I do not know which version this is.

6        Q.     If an account manager wanted to offer a

7  discount, and maybe I already asked this, so forgive

8  me.

9             If an account manager wanted to offer a

10  discount beyond what's listed under these Discounting

11  Tools in either Exhibit AB or AA, or whatever the

12  current matrix as it exists, would they have to seek

13  approval from someone?

14        A.     Well, two eyes are always better than one.

15        Q.     So the answer is, yes, they would have to

16  seek approval?

17        A.     They would want to.

18        Q.     Well, would they have to?  Were they

19  directed to?

20        A.     Yes.

21        Q.     And would that have also applied to

22  Mr. Lombardo when he was employed?

23        A.     Yes.

24        Q.     Going back to you testifying that Mr.

25  Lombardo developed a sublicense model, do you remember

Page 241

1    when he developed that?

2         A.    2015.

3         Q.    And did you have personal discussions with

4    him regarding that model?

5         A.    Yes.

6         Q.    And do you recall the substance of those

7    communications?

8         A.    The substance of them?

9         Q.    Yes.

10        A.    Yes.  It was brilliant.

11        Q.    What was the actual substance of the

12   conversation you had with him regarding the sublicense

13   model?

14        A.    He began to see in Salesforce how to set up

15   a parent account, and then how to set up each child,

16   and he bridged that model into the industry that he was

17   -- industries that he was prospecting to and was able

18   to act as an adviser, a trusted adviser, to his client

19   about how they can come together and work together and

20   at a better price point than if they were individually

21   licensed.

22        Q.    Who made the determination that 50% would

23   be the proper discount?

24        A.    Mr. Lombardo.

25        Q.    Did someone have to approve that discount?

Page 242

1          A.     No, It became a new model, a sublicense

2     model.  It is on the pricing matrix.

3          Q.     Did Mr. Lombardo put it on the pricing

4     matrix?

5          A.     Oh, no, I am sure that was Greg, Greg

6     Chmura.

7          Q.     You said earlier there was a Pricing

8     Committee.  Mr. Lombardo was not on that Pricing

9     Committee, correct?

10         A.     He was an adviser to that committee.

11         Q.     Did he sit on the committee?

12         A.     They brought him in often, yeah, set up

13     a --

14         Q.     Was Mr. Lombardo a named member of that

15     committee?

16         A.     No.

17         Q.     And I apologize, do you recall when -- I

18     think I already asked this, but do you recall

19     approximately when Chmura first introduced the pricing

20     matrix?

21         A.     No, I don't.

22         Q.     I am going to show you what has been marked

23     as Defendant's Exhibit N, and I think we already went

24     through this the other day, but I just want to take one

25     more look at it here.

Page 243

```
 1                    -   -   -   -   -

 2              (Previously Marked Deposition Exhibit

 3              N, Copy of Email Dated 1/127/2017 from

 4              Leslie Peterson, Bates Chmura0056740,

 5              was shown to the witness.)

 6                    -   -   -   -   -

 7      Q.    Do you recognize this document?

 8      A.    Yes, ma'am.

 9      Q.    Is this -- it is an email from you to

10   Mr. Lombardo, Mr. Steele, Ms. Ludvik, Mr. Grebenc?

11      A.    And Mr. Cox, correct.  Yes, we talked about

12   it last week.

13      Q.    Okay.  I thought we had, but that was last

14   week, so forgive me, my brain is tired.  But as sales

15   matrix -- on your email here -- you drafted this email,

16   correct?

17      A.    Yes.

18      Q.    And it says, "Discounts beyond those

19   documented in the sales matrix pricing sheet need to be

20   individually approved by me," correct?

21      A.    Yes.

22      Q.    So at least as of 2017, there was a sales

23   matrix pricing sheet, correct?

24      A.    Yes.

25      Q.    Do you recall if the first pricing matrix
```

Page 244

1   was in 2016?

2        A.    I don't want to commit to that because I

3   don't recall.

4        Q.    Was the sublicensing model we have been

5   talking about on the first pricing matrix?

6        A.    Yes.

7        Q.    And Mr. Lombardo, according to you,

8   developed that in 2015, correct?

9        A.    Correct.

10       Q.    So is it possible that the first pricing

11  matrix came out in 2015?

12       A.    Not going to commit to that.  I don't know.

13       Q.    Do you know who is responsible for

14  preparing the pricing matrix?

15       A.    Greg Chmura.

16       Q.    I am going to show you what's been marked

17  Defendant's Exhibit S, and if you want to go ahead and

18  look at this.

19                        -   -   -   -   -

20              (Thereupon, Previously Marked Exhibit

21              S, Copy of Standard Operating

22              Procedures Dated 4/5/2019, was shown

23              for purposes of identification.)

24                        -   -   -   -   -

25       A.    (Reviewing.)

Page 245

1      Q.    Ready?

2      A.    Yes.

3      Q.    Do you recognize this document?

4      A.    I know what it is.  A disappointment.

5      Q.    Well, what is it?  Other than a

6   disappointment, your words, not mine, what is it?

7      A.    It's standard operating procedures for the

8   sales team --

9      Q.    And that's --

10     A.    -- for the technology department.

11     Q.    Sorry.  And this was dated April 5, 2019,

12  correct?

13     A.    Yes.

14     Q.    To your knowledge, were there standard

15  operating procedures that predated the April 5, 2019

16  version?

17     A.    Yes, 2017.

18     Q.    Was that when they were implemented?

19     A.    Yes.

20     Q.    Do you know who prepared the April 5, 2019

21  version?

22     A.    Mr. Auerbach.

23     Q.    When did Mr. Auerbach begin working for

24  Chmura?

25     A.    In April 2019, and that was his first

Page 246

1    assignment.

2        Q.    Was this version of the standard operating

3    procedures implemented?

4        A.    I don't think so.  I don't recognize that

5    date that was April whatever it was.  This appears to

6    me to be more in line with what we adopted in 2017.  So

7    I don't know why there is a date change, but this is

8    not what I thought you were going to show me.

9        Q.    Let me show you another document and we can

10   come back to this one.  I am going to show you what's

11   been marked as an exhibit.  I think this might help.

12   Exhibit T.  It has an email in the front, but if you

13   scroll down, and I will let you take a look at it.  You

14   will see one -- a standard operating procedures dated

15   July 10, 2019.  This may be the one you are referring

16   to.

17                    -   -   -   -   -

18              (Previously Marked Deposition Exhibit

19              T, Copy of Email with Standard

20              Operating Procedures Dated 7/10/2019

21              Attached, was shown to the witness.)

22                    -   -   -   -   -

23       A.    Okay.

24       Q.    I will have you take look at that at your

25   leisure.

Page 247

1       A.      (Reviewing.)

2               MS. SIEGMUND:  We are ready.

3       Q.      Do you recognize this document?

4       A.      Yes.

5       Q.      What is this?

6       A.      It's the latest version of the standard

7    operating procedures.

8       Q.      And was this version adopted by --

9    implemented by Chmura?

10      A.      I don't know.  All I heard is complaints

11   about it, so I guess it was.

12      Q.      And do you know who prepared this version?

13      A.      Mr. Auerbach.

14      Q.      And the Exhibit S we were just looking at,

15   and you have control so you can scroll back to it if

16   you want to look at it.  Exhibits S was not prepared by

17   Mr. Auerbach; is that correct?

18      A.      No.

19      Q.      And this would be --

20      A.      I don't know why it has that date, but, no.

21      Q.      So Exhibit S looks more like the original

22   version of the standard operating procedures; is that

23   right?

24      A.      I mean, I can't respond by just giving you

25   a yes based on looking at the table of contents.

Page 248

1      Q.    Would Mr. Lombardo -- let me rephrase that.

2            If you look at Exhibit S for a moment,

3    let's switch back to Exhibit S.

4      A.    (Indicating).

5      Q.    These standard operating procedures, they

6    govern the sales team, correct?

7      A.    They govern the processes.

8      Q.    And what type of processes are set forth in

9    the standard operating procedures of Exhibit S?

10     A.    The processes are what make us productive.

11   So the processes are there to reduce waste, increase

12   productivity, reduce transaction costs.

13     Q.    And Mr. Lombardo would have been expected

14   to follow these standard operating procedures, correct?

15     A.    Correct.

16     Q.    And this one is dated April 5, 2019.  It

17   has details surrounding a variety of different items,

18   including -- well, why don't you tell me.  I mean, does

19   this -- what does this -- the standard operating

20   procedures encompass?

21     A.    So are we on Exhibit S or T?

22     Q.    Let's stick with S for now.  We will stick

23   with that.

24     A.    What's the date on S?  I am sorry.  Is it

25   April?  Yes, it is.

Page 249

1      Q.     Yes, it is April 5, 2019.

2      A.     Okay.  And the question is what do they do?

3      Q.     Yes.

4      A.     They represent and reflect the health of

5  the organization.  And when I say that, I mean, sales

6  and client, marketing, finance and the clients.  So

7  those work together under the standard operating

8  procedures to reduce waste in the system, to allow for

9  a spirit of continuous improvement and to reflect the

10  transaction costs from one side of the house to the

11  other in terms of the dimensions of change.

12         Does that help?

13      Q.     It does, yes.  If you would turn to Page

14  16 -- it's actually Bates labeled -- 16 of the

15  document, but Bates labeled Chmura 0040753.  And at the

16  very top is Section 6, it says, Price Negotiations.

17      A.     (Indicating).

18      Q.     I will let you take a look at this section.

19      A.     (Reviewing.)

20      Q.     And we'll just stick on this page for a

21  moment.

22      A.     Okay.

23      Q.     My first question is, what are contingency

24  responsible parties?

25      A.     Well, contingency is plan B.

1      Q.    So what does contingency responsible

2   parties mean in this context?

3      A.    Subject matter expert.

4      Q.    And what subject matter were these

5   responsible parties expert in?

6      A.    What subject matter?

7      Q.    Yes.

8      A.    Well, I would be the subject matter expert

9   for sales, and Dr. Chmura would be the finance subject

10  matter expert.

11     Q.    And this page is labeled, Price

12  Negotiations.  It sets forth procedures with respect to

13  price negotiations, correct?

14     A.    Not just price, but everything about it.

15     Q.    What do you mean by that?

16     A.    Pricing matrix, pricing exceptions,

17  additional sales.

18     Q.    And Mr. Lombardo would have been -- let me

19  rephrase.

20          The account managers would have been

21  required to follow the standard operating procedures

22  with respect to price negotiations, correct?

23     A.    Correct.

24     Q.    And Mr. Lombardo also would have been

25  required to follow these standard operating procedures

Page 251

1    with respect to price negotiations, correct?

2         A.    So this is a perfect world, and we don't

3    live in a perfect world, so I can't make that -- I

4    can't say yes to that statement because you are asking

5    from paper, but then when it comes to reality, it often

6    changes.

7         Q.    Was Mr. Lombardo required to follow the

8    standard operating procedures set forth in Section 6?

9         A.    Yes.

10        Q.    I want to turn to the next page,

11   conferences and travel.

12        A.    (Reviewing.)

13        Q.    If you go up to just under Procedures --

14   let me rephrase.

15             These procedures pertain to standard

16   operating procedures regarding conferences and travel

17   at Chmura, right?

18        A.    Yes.

19        Q.    And under Procedures, it has, Responsible

20   Party and Action Step, Conference Selection.  Do you

21   see that?

22        A.    Yes.

23        Q.    And the Event Group comprised of CC.  Is CC

24   Dr. Chmura?

25        A.    Yes.

Page 252

1      Q.    And LP is you, correct?

2      A.    Yes.

3      Q.    And BK stands for bookkeeper?

4      A.    Yes.

5      Q.    And SM is for sales manager?

6      A.    Yes.

7      Q.    And is SS Ms. Simmons?

8      A.    Yes.

9      Q.    And KW would be Mr. West, correct?

10     A.    Correct.

11     Q.    And so Event Group under the standard

12  operating procedures was tasked with researching and

13  selecting conferences for Chmura employees to attend,

14  correct?

15     A.    Correct.

16     Q.    Was Mr. Lombardo part of that Event Group?

17     A.    No.  He invited himself out of it because

18  he had unethical travel behaviors.  So he was no longer

19  invited.  I think it was 2018, or is this the 2019

20  version?  Yes, he was not in it.  This would be -- most

21  of these exists because of Mr. Lombardo.

22     Q.    So your testimony is that the standard

23  operating procedures exist because of Mr. Lombardo?

24          MS. SIEGMUND:  Object to the form of the

25  question.

Page 253

1      A.    Some of the things that are in the standard

2  operating procedures under Conference/Travel are as a

3  result of mistakes by Mr. Lombardo.

4      Q.    Well, we weren't talking about the travel.

5  We were just talking about the conference selection.

6  Mr. Lombardo was not part of the event group selecting

7  conferences, at least as of April 2019, correct?

8      A.    Correct.

9      Q.    All right.  I want to turn to Exhibit T and

10  move away from Exhibit S. I think you earlier testified

11  that Mr. Auerbach prepared this version.  Tell me

12  again, are you aware whether this version was

13  implemented, Exhibit T?

14      A.    This must have been implemented because I

15  heard complaints about it, particularly from Finance.

16      Q.    Was there any other version after Exhibit

17  T's date, whether it was July -- I have to scroll back

18  up to know for sure -- July 10, 2019 --

19      A.    Well --

20      Q.    Let me finish my question, only so we have

21  a clear record, please.

22            Was there any other version after this

23  July 10, 2019 version that would have been implemented

24  at the time of Mr. Lombardo's employment?

25      A.    I'm not aware.

Page 254

1      Q.    What is it -- or, what complaints have you

2  heard about this particular version?

3      A.    So there is a lot of concern around how

4  invoices get generated from Salesforce information to

5  the finance managers.  So sloppy Best Practices are

6  existing, such as including an upsell, which is a

7  separate transaction from a JobsEQ license, bundling

8  those into one price.  And then you go into the record,

9  into Saas optics, and it shows up as two products with

10 one price, for example.

11     Q.    That sounds confusing, a little bit.

12           Okay, I want to turn to Mr. Lombardo's

13 termination.  You testified earlier that back in

14 March -- I am going to stop sharing so I can actually

15 see the screen.  You testified back in March that you

16 were prepared to fire Mr. Lombardo, correct?

17     A.    Yes.

18     Q.    And then you decided against doing that,

19 right?

20     A.    Yes.

21     Q.    What led to Mr. Lombardo's termination --

22 first of all, do you recall what date Mr. Lombardo was

23 terminated?

24     A.    October 30 or 31st, the last day of

25 October in 2017.

Page 255

1      Q.   Do you recall what --

2      A.   Let me correct that.  2019.

3      Q.   Do you recall what led to his termination?

4      A.   Yes.

5      Q.   And what was that?

6      A.   So the information that I have on that,

7  largely comes from Mr. Auerbach.

8      Q.   Okay.  Were you part of the decision to

9  terminate Mr. Lombardo?

10     A.   I was.

11     Q.   Was there a primary decision maker who

12 decided to terminate him?

13     A.   SEA Group decided to terminate him, and I

14 was the one that, I think I stated before, I was still

15 not ready to fire Rick.  I was the last holdout.

16     Q.   And what --

17     A.   And then Greg --

18     Q.   I'm sorry.  Go ahead.  Finish.

19     A.   Then Greg was -- I am not in Cleveland, so

20 I don't see the drama that's going on.  Greg felt very

21 strongly that the Sales Department had been through so

22 much with Mr. Lombardo, so much emotion and so much

23 drama and so much foul language and unnecessary

24 attempts to take management down.  And Mr. Auerbach was

25 part of that drama.

Page 256

1        Q.    And how was he part of that problem?

2        A.    I would describe him as a mark.

3        Q.    Okay.  Can you think of a specific example,

4    just so I understand?

5        A.    Yes.  I mean he is middle management,

6    right?  Middle management is supposed to be the

7    champion between account manager and management, a job

8    they are supposed to play.  And that job was never

9    clear to me, maybe because I wasn't in Cleveland, but

10   Mr. Auerbach seemed to play both sides against the

11   middle.

12       Q.    Prior to Mr. Lombardo's termination, did

13   you have any internal discussions regarding his

14   termination?

15       A.    Yes, we did.

16       Q.    What was the substance of those

17   discussions?

18       A.    Protecting the sales team that was in place

19   was the substance of those discussions.

20       Q.    Can you explain that a little bit further?

21       A.    So the sales team is very young and

22   Mr. Lombardo would take them one by one to lunch and

23   feed them with reasons to not want to respect

24   management.

25       Q.    Do you have any personal knowledge of the

Page 257

1   conversations that Mr. Lombardo had with those account

2   managers?

3          A.    I have information from one of the account

4   managers that I'm drawing from largely.

5          Q.    And which account manager is that?

6          A.    Stephanie Wiley.

7          Q.    Did Mr. Lombardo ever take Stephanie Wiley

8   to lunch, to your knowledge?

9          A.    Yes.

10         Q.    Do you know if he was directed to take the

11  account managers to lunch?

12         A.    No.  I got a call from Eli and he said, is

13  it okay if Rick takes Stephanie to lunch today?  And I

14  said, I would prefer another account manager be with

15  her, especially a female.

16         Q.    Okay.

17         A.    Just coming out of the Me Too movement, so

18  I did not want to put her in that situation.  And they

19  went by themselves.

20         Q.    Did Mr. Lombardo have a history of any

21  inappropriate contact?

22         A.    No, that's just the way that I was taught

23  at Eastman Kodak, you never put yourself in a situation

24  to be one-on-one, female to male.

25         Q.    So you were sensitive to what was going on

Page 258

1    in current events; is that fair?

2         A.    Yes.

3         Q.    Who did you have discussions with

4    regarding -- let me put a time frame on this.   In

5    October, who were you discussing Mr. Lombardo's

6    employment with, outside of counsel, if you had any

7    conversations with counsel?

8         A.    SEA Group was meeting on it.

9         Q.    And tell me, again, who is in SEA Group?

10        A.    You want names or the number?

11        Q.    Names, please.

12        A.    Chris Chmura, Leslie Peterson, John Chmura,

13   Greg Chmura, Sharon Simmons, Xiaobing Shuai.

14        Q.    At the time Mr. Lombardo was terminated,

15   Chmura had an H.R. director, correct?

16        A.    Yes.

17        Q.    Was that Aisha Ortiz?

18        A.    Ortiz.   Yeah, Ortiz.

19        Q.    What was her role with respect to

20   Mr. Lombardo's termination?

21        A.    She was an adviser to SEA Group.

22        Q.    And what advice did she provide?

23        A.    We want to be able to separate from

24   Mr. Lombardo with the least amount of damage.

25        Q.    Okay.   And how did Chmura propose going

Page 259

1    about that?

2         A.    Didn't propose.  It came from Mr. Auerbach.

3         Q.    What Did Mr. Auerbach propose?

4         A.    He proposed a buyout.

5         Q.    And did the SEA Group take that advice?

6               MS. SIEGMUND:  Object to the form of the

7    question.  You can answer.

8         A.    We thought about it.

9         Q.    And what did you ultimately decide to do?

10        A.    Not do that.

11        Q.    And why?

12        A.    We had never given a buyout to anybody we

13   terminated, why would we do it for Mr. Lombardo?

14        Q.    Was there any discussion regarding trying

15   to get Mr. Lombardo to resign?

16        A.    No.

17        Q.    Were you involved in the decision to put

18   Mr. Lombardo on unpaid leave in October of 2019?

19        A.    I know about it, with a recommendation

20   between Aisha and Operation, Sharon.  I knew about it.

21   I was aware.

22        Q.    You were aware.  Did you have any further

23   involvement other than just aware of it?

24        A.    No.

25               MS. COOPER:  Can we take a short break ?

Page 260

1              MS. SIEGMUND:  Sure.  Five minutes, 10

2    minutes?

3              MS. COOPER:  Five minutes is good.

4                   -   -   -   -   -

5                   (Short recess taken).

6                   -   -   -   -   -

7              MS. COOPER:  Ms. Peterson, I do not have

8    any more questions for you.  I want to thank you for

9    your time.

10             THE WITNESS:  You're welcome.

11             MS. SIEGMUND:  I don't have any questions.

12   Rough for us, please.

13             MS. COOPER:  Standard transcript.

14             MS. SIEGMUND:  She will read.

15

16       (Whereupon, deposition was concluded at 1:46 p.m.)

17

18

19

20

21

22

23

24

25

Page 261

1    Whereupon, Counsel was requested to give instruction

2    regarding the witness's review of the transcript

3    pursuant to the Civil Rules.

4

5                        SIGNATURE:

6

7     Transcript review was requested pursuant to the

8    applicable Rules of Civil Procedure.

9

10                      TRANSCRIPT DELIVERY:

11   Counsel was requested to give instruction regarding

12   delivery date of transcript.

13                  Ms. Cooper, Original transcript, yes.

14                  Ms. Siegmund, Rough and Certified

15   transcript, yes.

16

17

18

19

20

21

22

23

24

25

Page 262

1                    REPORTER'S CERTIFICATE

2

3   The State of Ohio,    )

4                                    SS:

5   County of Cuyahoga.   )

6

7            I, KELLIANN D. LINBERG, RPR, a Notary Public

8   within and for the State of Ohio, duly commissioned and

9   qualified, do hereby certify that the within named

10  witness, LESLIE PETERSON, was by me first duly sworn to

11  testify the truth, the whole truth and nothing but the

12  truth in the cause aforesaid; that the testimony then

13  given by the above-referenced witness was by me reduced

14  to stenotypy in the presence of said witness;

15  afterwards transcribed, and that the foregoing is a

16  true and correct transcription of the testimony so

17  given by the above-referenced witness.

18            I do further certify that this deposition was

19  taken at the time and place in the foregoing caption

20  specified and was completed without adjournment.

21

22

23

24

25

Page 263

1          I do further certify that I am not a

2    relative, counsel or attorney for either party, or

3    otherwise interested in the event of this action.

4

5          IN WITNESS WHEREOF, I have hereunto set my

6    hand and affixed my seal of office at Cleveland, Ohio,

7    on this 14th day of May, 2020.

8

9

10

11

12

13          Kelliann D. Linberg, R.P.R.,

14          Notary Public within and for

15          the State of Ohio

16

17   My commission expires May 25, 2024.

18

19

20

21

22

23

24

25