# Exhibit B

1                           KYLE WEST

2           IN THE UNITED STATES DISTRICT COURT
                          FOR THE
3              EASTERN DISTRICT OF VIRGINIA

4
    CHMURA ECONOMICS &         )
5   ANALYTICS, LLC,            )
                               )
6              Plaintiff,      )
                               )
7   VS.                        )      CASE NO. 3:19cv813
                               )
8   RICHARD LOMBARDO,          )
                               )
9              Defendant.      )

10

11

12

13

14              TELEPHONIC DEPOSITION
                        OF
15                  KYLE WEST
                 MAY 14,2020
16                3:06 p.m.

17

18

19

20

21

22

23

24   Reported by:
    Monna J. Nickeson, CRR, CLR, RPR, CRR
25   Job No. 179923

1                          KYLE WEST

2

3

4

5                      May 14,2020

6                       3:06 p.m.

7

8

9

10

11          Telephonic deposition of KYLE WEST,

12    before Monna J. Nickeson, a Certified Court

13    Reporter, Certified Realtime Reporter,

14    Registered Professional Reporter, and Certified

15    Livenote Reporter.

16

17

18

19

20

21

22

23

24

25

1                          KYLE WEST

2      A P P E A R A N C E S

3

4              KOEHLER FITZGERALD
               Attorneys for the Plaintiff
5              1111 Superior Avenue East
               Cleveland, OH 44114
6              BY:  CHRISTINE COOPER, ESQ.

7

8
               MCGUIREWOODS
9              Attorneys for the Defendant
               800 East Canal Street
10             Richmond, VA 23219
               By:  CHRISTOPHER MICHALIK, ESQ.
11

12

13             ALSO PRESENT:

14             Richard Lombardo
               Leslie Peterson
15

16

17

18

19

20

21

22

23

24

25

1            KYLE WEST

2        IT IS HEREBY STIPULATED AND AGREED

3    by and between the attorneys for the respective

4    parties herein, that filing and sealing be and

5    the same are hereby waived.

6            IT IS FURTHER STIPULATED AND AGREED

7    that all objections, except as to the form of

8    the question, shall be reserved to the time of

9    the trial.

10            IT IS FURTHER STIPULATED AND AGREED

11    that the within deposition may be sworn to and

12    signed before any officer authorized to

13    administer and oath, with the same force and

14    effect as if signed and sworn to before the

15    Court.

16

17

18

19                    - - -

20

21            KYLE WEST

22    called as a witness, having been duly sworn by

23    the Court Reporter, was examined and testified

24    as follows:

25

```
1                    KYLE WEST

2                    EXAMINATION

3   BY MR. MICHALIK:

4        Q.    Good evening, Mr. -- I guess good

5   afternoon, where you're at, Mr. West.  My name

6   is Chris Michalik.  I'm an attorney for Chmura

7   Analytics, and I'll be taking your deposition

8   today in the litigation dispute between Rick

9   Lombardo and Chmura Analytics.

10             I'm going to go over some ground

11  rules so you understand how the deposition

12  process works.

13             First, have you ever given a

14  deposition before?

15       A.    No.

16       Q.    Okay.  Then just briefly, give you

17  some background, rules to keep in mind.  First

18  of all, you understand that you're under oath,

19  so this is like as if you were testifying in a

20  court of law?

21       A.    That's clear, yes.

22       Q.    And there's a court reporter who is

23  going to be taking down what you say and I say.

24  So it's going to be important, so that she can

25  get what we say down, that we don't talk over
```

```
1                    KYLE WEST
2   each other.  So if you will let me finish my
3   questions before you answer, and then I'll let
4   you finish your answer before I ask another
5   question, that way she'll be able to get
6   everything we say down; is that clear?
7        A.    Roger that.
8        Q.    And in that same vein, we naturally,
9   just in talking, sometimes will nod our heads
10   as a response up or down or say "uh-huh" or
11   "uh-uh."  That's difficult for the court
12   reporter to get down particularly in the
13   circumstances we are in today with the virtual
14   deposition.  So just answer audibly, okay?
15        A.    Yes.
16        Q.    And if you don't understand a
17   question -- a question that I say, just let me
18   know and I'll rephrase it.  If you respond, I'm
19   going to assume that you understood the
20   question that I asked.
21        A.    Roger that.
22        Q.    One last thing, I don't think we'll
23   be here overly long today, but this is not a
24   marathon, so if you need a break, just let me
25   know and we can take a break.  I may finish a
```

1                          KYLE WEST

2    line of questioning before we go into the

3    break, okay?

4        A.      Thank you.

5        Q.     A couple of other background

6    questions.  Did you review any documents in

7    preparation for your deposition today?

8        A.      I took a look at the declaration

9    that I signed.

10       Q.     Okay.

11       A.      I reviewed the subpoena, I believe

12   it was, that I received in the mail one or two

13   weeks ago.

14       Q.     Any other documents other than

15   those?

16       A.     No.  I was not aware of anything

17   that I was supposed to review.

18       Q.     Okay.  And did you talk to anyone in

19   preparation for your deposition today?

20       A.     Aside from Ms. Cooper three to four

21   weeks ago when I prepared the declaration, I

22   apologize if that's not the right term, but the

23   statement that I provided.

24       Q.     Okay.  And in your conversations

25   with Ms. Cooper, what did you and she discuss?

1                      KYLE WEST

2        A.    So she confirmed my employment with

3    Chmura in terms of the duration, the various

4    positions that I held, and she asked some, I

5    would say, high-level questions about the

6    extent to which I interacted with Richard

7    Lombardo.

8        Q.    And the declaration that you signed,

9    did you draft that declaration?

10       A.    I asked her if she could draft it

11   and send it to me for review, which she did,

12   and I made edits and returned it to her.  She

13   sent, I'll say, the edited version back to me,

14   I signed it and returned it to her.

15       Q.    Other than Ms. Cooper, have you

16   spoken with anybody else in preparation for

17   your deposition today?

18       A.    No.  My wife.

19       Q.    I'm sorry.  Go ahead.

20       A.    My wife.

21       Q.    Okay.  And anyone other than your

22   wife and Ms. Cooper, have you spoken to anybody

23   in preparation for your deposition today?

24       A.    No.  I wouldn't say "in

25   preparation."  I have a friend here in Spokane

1                   KYLE WEST

2   who is an attorney --

3        Q.    Okay.

4        A.    -- that I just asked questions

5   about.

6        Q.    I'm sorry.  I interrupted you.  Go

7   ahead.

8        A.    I asked my friend some basic

9   questions about what to expect, what precisely

10   a deposition was, of course the questions that

11   I asked you on the phone a few weeks on the

12   phone.

13        Q.    Anybody other than those individuals

14   that you spoke with in preparation for your

15   deposition?

16        A.    No.

17        Q.    Did you speak with Mr. Lombardo in

18   preparation for your deposition?

19        A.    No.

20        Q.    I'm going to ask some background

21   questions about your employment history

22   specifically with Chmura.  Do you recall when

23   you became employed with Chmura?

24        A.    I do.

25        Q.    And when was that?

```
 1                         KYLE WEST

 2        A.     July of 2015.

 3        Q.     And do you recall what position you

 4   were hired for?

 5        A.     I believe the initial title was West

 6   Coast Products Director.  It changed within my

 7   first week to Applied Economics and Technology

 8   Advisor.

 9        Q.     Okay.  And you said West Coast, I

10   understand that you're on the West Coast today.

11   Have you always been located on the West Coast?

12        A.     No.  I grew up in Illinois, and I've

13   been in the State of Washington since 2001.  I

14   lived in Richmond from roughly July to --

15   Richmond, Virginia, that is, from about July of

16   2015 through Septemberish of 2015.

17        Q.     Okay.  And when you were done living

18   in Richmond, that period, did you move back to

19   the State of Washington?

20        A.     Correct.

21        Q.     And have you been in -- at least

22   during your employment with Chmura, were you in

23   Washington for the rest of that time period?

24        A.     My residence has always been in

25   Washington.  I'm not sure the level of detail
```

1                    KYLE WEST

2   you want.  Outside of Spokane, my residence

3   address has always been Washington since 2001,

4   yes.

5        Q.    During your time that you were

6   employed by Chmura, except for the period that

7   you referenced -- the several month period that

8   you referenced when you were in Richmond,

9   Virginia, was your work -- your primary work

10  location located in the State of Washington?

11       A.    Yes, in terms of where I was

12  physically located, yes.

13       Q.    Yes.  Okay.  I just want some brief

14  background about your history before you came

15  to work for Chmura in 2015.

16            Did you attend post high school

17  education?  Did you go to college?

18       A.    I did.

19       Q.    And where did you go?

20       A.    St. Norbert College.

21       Q.    Do you recall what degree you

22  received?

23       A.    I do.

24       Q.    And what was that?

25       A.    I received a bachelor's degree with

```
 1                    KYLE WEST
 2   majors in economics and philosophy.
 3        Q.    And did you achieve -- go through
 4   any further education?  Did you receive a
 5   master's or a Ph.D. or any type of
 6   post-education degree like that?
 7        A.    I did.
 8        Q.    And what did you receive?
 9        A.    I received a master's of health
10   policy and administration.
11        Q.    And where was that from?
12        A.    Washington State University.
13        Q.    Any other degrees that you received?
14        A.    No.  I was enrolled for one year in
15   a graduate program in philosophy, applied
16   ethics at Gonzaga University, which is why I
17   moved here in the first place.  And I'm
18   currently enrolled in a master's of business
19   administration program also at Gonzaga.
20        Q.    Before you began working for Chmura,
21   where were you working immediately prior to
22   that?
23        A.    Spokane Area Workforce Development
24   Council.
25        Q.    And what position did you hold?
```

```
 1                   KYLE WEST

 2       A.    My title, if that's what you're

 3  asking, was Business and Development Manager.

 4       Q.    Can you just very briefly describe

 5  what your job duties entailed?

 6       A.    Yeah.  So I had two major pillars of

 7  my job description.  The development side was

 8  to, quote-unquote, develop resources.  We were

 9  a 501C-3 or a nonprofit organization.  So I led

10  efforts to develop and secure resources to

11  launch workforce programs, college and career

12  readiness type programs at local schools or

13  other nonprofit agencies.  That was roughly

14  half my job.

15            The other part of my job was to

16  prepare and deliver reports, make presentations

17  on labor market information for the greater

18  Spokane region, which, roughly, at the time was

19  considered a three county metro area in eastern

20  Washington.

21       Q.    And how long did you --

22            (Parties speaking simultaneously.)

23       Q.    I'm sorry.  Go ahead.  I thought

24  you were finished.

25       A.    Is that a sufficient description?
```

```
 1                    KYLE WEST
 2      Q.    Absolutely.
 3            How long did you hold that position?
 4      A.    October of 2013 through the time
 5  when I joined Chmura, so Junish of 2015.
 6      Q.    And your job that you had prior to
 7  that job, was it in a similar type of industry?
 8      A.    Yes, it was in the nonprofit sector
 9  in more education-related, but there were
10  overlaps with workforce and industry
11  engagement.
12      Q.    And who was that -- who were you
13  employed by at that time?
14      A.    Mobious Spokane, M-o-b-i-u-s.
15      Q.    And how long were you employed with
16  Mobious Spokane?
17      A.    I was an employee from -- I don't
18  recall.  Nearly two years prior to joining
19  their team.  They were a client of mine for
20  maybe three to four months.
21      Q.    Okay.  And a client of yours, what
22  was your position before you joined -- who did
23  you work for before you joined Mobious Spokane?
24      A.    I was a sole proprietor.
25      Q.    What kind of business did you
```

```
 1                    KYLE WEST
 2  operate?
 3      A.    Nonprofit consulting, proposal
 4  writing and research.
 5      Q.    And that would be writing proposals
 6  to get grants and sources of funding; is that
 7  what you were doing?
 8      A.    Correct.
 9      Q.    And is that what you did before
10  you -- so, up until the time you joined Mobious
11  Spokane, is that what you were doing, operating
12  your sole proprietorship?
13      A.    No.  I mean, that's what I was
14  doing, but I also worked at a local restaurant.
15      Q.    Turning now to your time with
16  Chmura, I believe, if I have this down
17  correctly, within roughly the first week or so,
18  your title in 2015 was applied economics -- and
19  did I hear this -- technology advisor?
20      A.    Correct.
21      Q.    Can you briefly describe what that
22  position entailed?
23      A.    Yes.
24      Q.    Would you do that for the record,
25  please?
```

1                    KYLE WEST

2       A.    Sure.  So at the time -- I'm going

3  to break this down into roughly the first few

4  months, the period of time that I was located

5  in Richmond, and then I'll describe what I did

6  when I returned to Spokane.

7            So the time that I spent in Richmond

8  in those first few months, you know, aside from

9  getting oriented and acclimated to Chmura, I

10 worked on several proposals, competitive bids,

11 if you will.  From what I recall, they were all

12 to local governments and nonprofits.  I

13 remember one to Goodwill Industries, which

14 would be a nonprofit, and then several to local

15 governments or similar.

16           I spent a lot of time working with

17 the sales team because I was a user, I was a

18 client of Chmura for almost two years, I

19 believe, and I was a very active user of their

20 software.  Arguably, more importantly, I was a

21 client of Chmura's main competitor EMSI.  So I

22 spent a lot of time not just with the sales

23 team but with Chmura as a whole developing

24 approaches, what we describe as use cases, so,

25 you know, how does a prospective client or

```
 1                      KYLE WEST
 2   user, how would they apply mainly JobsEQ, also
 3   other products, LaborEQ and Career Concourse,
 4   but the bulk was related to job JobsEQ.
 5             Are you still there, Chris?
 6       Q.   I'm still here.  Christine saw this
 7   last week.  For whatever reason, we have --
 8   periodically my video will cut out, but I am
 9   here by audio the entire time.
10       A.   Great.  I just don't want to repeat
11   myself.
12       Q.   So you were describing --
13       A.   Thank you.
14             So I spent a lot of time developing
15   use cases, helping members of the team to
16   understand, I'll say, the value of the product
17   through the different audiences that we served,
18   mainly economic developers, workforce
19   developers, eventually a little bit of
20   education -- the education market.  And like I
21   said, I spent a lot of time writing proposals.
22             When I returned to Spokane, we --
23   the other thing I was doing quite a bit of,
24   probably after one month, was on onboarding new
25   clients.  So a member of the sales team would
```

1                       KYLE WEST

2    close a deal, and that new client would receive

3    training.  At the time we provided one-to-one

4    trainings, one Chmura staff to one client,

5    which could be four users, that was rare that

6    all the users would show up.  But all new

7    clients were either referred to me or to Greg

8    Chmura, who at the time -- you know, I don't

9    recall -- I don't -- I don't think he was the

10   chief quality officer, but he was really -- I

11   think historically, he and another colleague,

12   Allison, had been doing all the training.  So I

13   came in and took over -- if I recall correctly,

14   I think Allison stopped doing trainings, if she

15   was ever doing them in the first place.  But I

16   think just given Greg's bandwidth and his

17   increasing responsibilities, I probably started

18   to deliver the bulk of those trainings.

19              So when I returned to Spokane, I

20   continued to deliver trainings, of course, but

21   what we did was we -- you know, we -- it wasn't

22   a hard agreement, but between Greg and I, we

23   tried to arrange things so that I would do the

24   trainings for clients in the mountain and

25   Pacific time zone, maybe clients that weren't

```
 1                    KYLE WEST

 2   available, you know, I guess, at certain hours,

 3   I don't recall.

 4            But we also hired another inside

 5   salesperson in the Spokane office, and that

 6   position was more or less dedicated to

 7   prospecting western states, maybe some mountain

 8   time zone, I don't recall, but, you know,

 9   certainly west of the Mississippi.

10            And Richard -- maybe a gentleman --

11   I think his name was James, I forget -- they

12   had some clients in the western states.

13       Q.    Mr. West, let me just stop right

14   there so the record is clear, when you say

15   Richard, are you referring to Mr. Lombardo?

16       A.    Yes.  I'm sorry.  Rick.

17       Q.    And you mentioned James?

18       A.    Should I call him Mr. Lombardo or

19   Rick?

20       Q.    Either one of those is fine.  I just

21   wanted to make sure we knew who you were

22   referencing when you said Richard, and so the

23   record would reflect that.

24            You also mentioned a gentleman named

25   James.  Do you know his last name?
```

```
 1                    KYLE WEST
 2        A.    I believe it was James Donovan or
 3   Jim Donovan.
 4        Q.    Sorry to interrupt.  Go ahead.  I
 5   just wanted to make sure the record is clear.
 6        A.    So just -- so Jim, if I recall
 7   correctly, those two started the inside sales
 8   team.  They were the first two hires when
 9   Wesley laid out this -- you know, the inside
10   sales team.  So Jim was located in Cleveland,
11   alongside Rick.  And I think --
12        Q.    And was any -- were they already
13   employed when you became employed, or did they
14   become employed after you did?
15        A.    You know, they -- I believe they
16   came onboard roughly around February -- I think
17   they were hired at the same time because my
18   impression was the inside sales team was a new
19   thing and it was starting that year, and it was
20   roughly 2015.  And I remember this because the
21   first time I met him was at an event with --
22   where Chris and Leslie were, and I believe it
23   was both of them in March, at an event that's
24   always in March, and I think they were
25   brand-new, especially Jim, I remember he was
```

```
1                      KYLE WEST
2     just -- I think I'd given a presentation with
3     Chris, and Jim was just kind of excited and
4     eager to learn.
5            And at the time, of course, I wasn't
6     working for Chmura, but I don't even know if he
7     was doing demos yet.  I think he probably was,
8     but he just wanted to consume a lot of
9     information.  And I remember meeting Rick at
10    the time as well in the booth with -- I think
11    it was just Chris and Leslie at the time.
12         Q.    Okay.  And you described your -- you
13    were describing your job duties once you got to
14    Spokane and --
15         A.    Yes.
16         Q.    -- and with some interruption.
17            But were there other job duties you
18    had while you were the Applied Economics and
19    Technology Advisor?
20         A.    Yes.  So we hired another inside
21    salesperson to focus on the western states.
22    They were co-located with me here in Spokane.
23    That person's name was Dennis Shell.  And you
24    know, it was my job to train Dennis on how --
25    you know, on JobsEQ, so I spent a lot of time
```

```
1                    KYLE WEST

2   on training Dennis.

3              After Dennis, we hired another -- I

4   don't recall the sequence.  I think we hired a

5   gentleman named Doug Cey, C-e-y, the brother,

6   if you're a baseball fan, of Ron -- the

7   baseman, Ron Cey, so Doug is his brother, just

8   for the record, so you spell the last name

9   right.

10             And then we had a gentleman named

11  Brent, last name Keath, K-e-a-t-h, and I don't

12  know who came after Dennis.  But so all of

13  those individuals I trained on JobsEQ.  I

14  worked with them on their sales script.  I made

15  introductions, even though I wasn't a member,

16  per se, of the sales team.

17             They didn't report to me, and I

18  don't know that I was their supervisor, but I

19  certainly worked with them a lot.  We didn't

20  have a training program in place, I would say.

21  So I spent a lot of time working with the

22  different -- especially the new sales team

23  members and certainly in the Spokane office,

24  working on their demos and use cases and things

25  of that nature.
```

1                     KYLE WEST

2               And then I also worked on a few

3   projects, client-facing projects.  I traveled

4   to -- you know, so these would be things that

5   we would submit a proposal for, you know,

6   through a competitive solicitation process, and

7   we'd get awarded the contract, so I would

8   contribute to those projects.

9               Sometimes I would travel to

10  different client sites, for example, Dallas and

11  San Bernardino, California to engage clients

12  during a project or to present the findings for

13  a project.  Denver, Colorado, actually with a

14  gentleman from your firm, good guy, I forget

15  his name.  It was an impact study.

16              Anyway, so I would travel to

17  conferences.  I would attend conferences.

18  We -- you know, we tried to assign me to

19  conferences that were located in the western

20  states, for example, in California, but I often

21  attended conferences that were in other places

22  as well, especially if they were workforce

23  related, like the National Association of

24  Workforce Boards.

25              And I attended economic

```
 1                    KYLE WEST
 2   development-type conferences, a couple of
 3   education conferences.  So, you know, I feel
 4   like I certainly, you know, would represent
 5   Chmura at various types of events.
 6            I think that's -- that first job
 7   title, I would say that's kind of the general
 8   description.
 9       Q.    And you had referenced what you were
10   just saying, and I was trying to get it down, I
11   may not have gotten down the exact wording, but
12   particularly with new sales associates or
13   account managers, you helped them with their
14   sales pitch; did I hear that correctly?
15       A.    Correct.
16       Q.    And would each person have an
17   individual pitch that would work for them?
18       A.    I don't know if I would go that far.
19   I recall early on at all -- I believe all
20   email correspondence, the account managers were
21   to copy Leslie, and I see Leslie is here, so
22   she could corroborate this.  And she would, I
23   think, provide, you know, guidance on the way
24   scripts were.  So I don't know -- I wouldn't
25   say that everybody had their voice.
```

```
 1                    KYLE WEST
 2              Chmura certainly has a pretty rigid
 3   style, if you will, style, voice, identity, and
 4   I don't think -- I don't think people just kind
 5   of threw their own original scripts out there.
 6              What I did was I really contributed
 7   to the use cases, so a lot of the prospecting,
 8   if not all of it, is over the phone, through
 9   email, and you're making hundreds of calls or
10   emails every day.  The script isn't unique.  I
11   mean, every time you're really maybe modifying
12   an existing or underlying script.
13              So I think there -- you know, in the
14   moment, there was probably some flexibility
15   that something would reflect somebody's voice.
16   And, of course, everybody has unique
17   personalities, but I don't think they had free
18   rein to, you know, bend communication that just
19   reflected their own style and voice.
20        Q.    During this position, the Applied
21   Economics and Technology Advisor, how much --
22   what percent of your time would you say you
23   were spending on interacting with the sales
24   team?
25        A.    At least one-third.
```

```
1                         KYLE WEST
2        Q.    And at some point did you take on a
3   different position at Chmura?
4        A.    I did.
5        Q.    And do you recall when that was
6   roughly?
7        A.    Yeah.  So the next position I took
8   on was the managing director of sales roughly
9   February of 2017.
10       Q.    And how did that -- how did your job
11  duties in that position differ from the job
12  duties you had as an Applied Economics and
13  Technology Advisor?
14       A.    Well, I mean, they changed quite a
15  bit because I shifted my focus almost entirely
16  to managing a sales team.  And at the time we
17  had hired three new inside salespeople.  I
18  believe they were all -- I believe they were
19  all focused on education.  So there was Wilson,
20  Jennifer, and John.
21             So they were hired before I began,
22  but I recall we had limited bandwidth
23  internally to manage and train and get this
24  team up and running.  So, you know, it was a
25  lot of work to get everybody acclimated.  I
```

```
 1                    KYLE WEST

 2   recall every week we met, you know, virtually,

 3   because we had Jennifer was in Richmond, Wilson

 4   was in Richmond, John was in Cleveland, I was

 5   in Spokane, so we met multiple times per week

 6   to do trainings, to practice demos, to ask each

 7   other questions, do these things they call Rah

 8   Robins, et cetera.

 9             And I also started to really

10   leverage our customer relationship management

11   platform called SalesForce to get a clearer

12   idea of sales team activity, to compare the

13   performance and output of different sales team

14   members.

15             So I would prepare these weekly

16   dashboards and share them with the leadership

17   of Chmura, and I think the sales team was

18   probably on those, you know, correspondence as

19   well.

20             So I would meet with the sales team

21   probably two to three times per week.  And then

22   I believe I would meet -- and I met with Leslie

23   at least once -- scheduled at least once per

24   week, I think on Mondays.  You can look in the

25   Outlook records, I'm sure.  And then I think we
```

Page 28

```
 1                    KYLE WEST

 2    had a monthly meeting with leadership and

 3    sales, I believe.  I'm sure that's in the

 4    records, too, but I don't recall.

 5            But I certainly focused a lot more

 6    of my time and energy on the sales team and

 7    getting them acclimated, up and running.  I

 8    still continued to work on a couple of

 9    projects.  I remember one in Dallas and then

10    one in California -- or two in Santa Cruz and

11    San Bernardino.  So maybe 75 percent of my time

12    was committed to managing the sales team, 75 to

13    90 percent, I would say.

14         Q.   And you were referencing getting the

15    sales team up and running, are those the three

16    individuals that you referenced that were hired

17    either right before you started in the position

18    or right after?

19         A.   They were hired before I started in

20    the position.  I have no doubt about that

21    because it -- there was just a lot of turmoil,

22    I would say, at the time.  And a lot of that

23    was related to these new persons not having

24    guidance or support, not knowing what to do.

25            So I spent most of my time with
```

```
 1                      KYLE WEST

 2   them, but I also spent a tremendous amount of

 3   time with Austin virtually, as well as Rick.

 4       Q.    And who is Austin again?  Just so

 5   the record is clear, do you know Austin's last

 6   name?

 7       A.    That's Austin Steele, S-t-e-e-l-e, I

 8   believe.

 9       Q.    And the three individuals that you

10   referenced to were hired shortly before you

11   took over the position or assumed the position,

12   did they have a sales background, do you know?

13       A.    Yes.  Well, yes.  So, yes, Wilson

14   did, John did -- John also had a background in

15   maybe a lab industry.  I don't know -- I

16   don't -- I don't recall specifically what he

17   did.  Jennifer, I never actually knew.  She was

18   hired, I believe, through like a temp agency.

19   I'm sure that she was, you know, an experienced

20   inside salesperson.  I don't -- I know that the

21   temp agencies do their vetting, and we would

22   create -- because we did this in Spokane, we'd

23   create a very specific profile of the kind of

24   candidate that we wanted, so I am certain that

25   they all had a sales background, yes.
```

```
 1                    KYLE WEST

 2        Q.    Did it take a lot of effort on your

 3   part to get those three individuals operating

 4   the way you wanted them to within the Chmura

 5   family?

 6        A.    Yes.

 7        Q.    Roughly, just so we know, is this a

 8   lot of effort over a week or two, or are we

 9   talking a month time framed to get them how you

10   thought they would?

11        A.    More than a month.

12        Q.    More than a month.  Okay.  And how

13   long were you in that position, do you recall?

14        A.    Well, I mean, I do recall, you know,

15   roughly September 2017.

16        Q.    So is when you switched to a new

17   position?

18        A.    Yeah.  I mean, it's not that

19   clear-cut.  I don't know that I had a title

20   change until January of 2018, but I -- my

21   duties changed.

22        Q.    Let's address that in two ways.

23   First of all, when you did get a title change,

24   whenever that was, what was your new title?

25        A.    Director of Workforce Development.
```

1                        KYLE WEST

2       Q.    And now the second part of that, you

3   referenced your job duties changed, how did

4   your job duties change?

5       A.    Well, I believe, and you could, of

6   course, confirm this, but I believe that Greg

7   Chmura began to kind of take over more of the

8   management of the sales team, and I recall that

9   I started to do some research and develop a

10  plan or blueprints or what would become a

11  web-based training platform for JobsEQ clients.

12            And I don't recall -- you know, it

13  wasn't immediate that I stopped, you know,

14  having interactions or, you know, management

15  responsibilities related to the sales, but Greg

16  certainly started to take things over, I would

17  say.  And I can't put a date on that.

18      Q.    Sometime roughly Septemberish -- it

19  began Septemberish of '17?

20      A.    September/October.

21      Q.    Okay.  And you mentioned the work

22  you were doing on the web-based JobsEQ, was

23  that a substantial project?

24      A.    Yes.

25      Q.    And were you successful in

```
 1                      KYLE WEST
 2   accomplishing that project?
 3        A.    Yes.
 4        Q.    And do you recall roughly how long
 5   it took you to get that project completed?
 6        A.    Yeah.  You mean in terms of duration
 7   or hours or --
 8        Q.    Duration.  Calendar duration.
 9        A.    Yeah.  So I delivered the project by
10   November of 2018.
11        Q.    So it was a yearlong project?
12        A.    Well, not quite, but looking at a
13   calendar year.
14              (Parties speaking simultaneously.)
15              THE COURT REPORTER:  You were
16        talking over each other.
17        Q.    Was it generally a yearlong project?
18        A.    Based on the calendar, yes.  But I
19   wasn't only working on that project in November
20   and December of 2017.  I was working on other
21   things, and I was gone for the month of
22   January, 2018, and I was gone for the month of
23   April 2018.
24              I also worked on a project during --
25   you know, other projects during that time, but
```

```
 1                   KYLE WEST
 2   if you look at calendar, yes, Novemberish to
 3   Novemberish.
 4        Q.    And I just want to make sure I
 5   understand, when you say you were gone in
 6   January of 2018, were you gone working on
 7   another project, or were you taking time off
 8   from work?
 9            What do you mean by you were gone
10   during that period?  It wasn't clear to me.
11        A.    Chmura extended me a leave of
12   absence for two months.
13        Q.    And that leave of absence was -- was
14   it a month of it in January of 2018, and then
15   the other period you said you were gone was
16   also part of the leave of absence?
17        A.    Correct.
18        Q.    And when was the -- just I'm clear,
19   when was the second period of that leave of
20   absence?
21        A.    The month of April, 2018.
22        Q.    And so you also referenced other
23   projects you were working on during that time.
24   Do you recall the types of projects?  And "by
25   that time," I mean from roughly September of
```

1                    KYLE WEST

2    2017 until November of '18, other types of

3    projects you were working on?

4         A.    Yes.  Well, at least one of them was

5    a project for an economic development agency in

6    California, San Bernardino county.

7         Q.    Anything else during this time

8    period that you were focusing your work

9    attention on?

10        A.    Not that I recall.  I mean, I'm sure

11   there were other things, but that was the

12   major -- those were the major things that

13   consumed my time.

14        Q.    The JobsEQ web-based project you

15   were doing and some of the other projects that

16   you mentioned that were interspersed in there;

17   is that correct?

18        A.    Correct.  I don't recall, but Career

19   Concourse might have been during that time.

20   That might have been when I was managing the

21   sales team.  I don't recall.  It was after -- I

22   believe after I was an applied technology and

23   whatever -- Applied Economics and Technology

24   Advisor.

25        Q.    So I'm clear, you mentioned Career

1                    KYLE WEST

2   Concourse, what is Career Concourse?

3        A.    It's a career exploration software.

4   Just another product in the suites of products.

5        Q.    And so you had a project to work on

6   Career Concourse or develop it, or what was

7   your project with Career Concourse?

8        A.    I was a contributor to its, I guess,

9   revamping or revitalization.  So John Chmura

10  provided me with mockups, if you will, like

11  examples, screen shots, and then Greg and I

12  worked on a questionnaire.  And I went out to

13  campuses, and I would ask students -- you know,

14  I would basically get their reaction to the

15  mock -- the different screen shots.  Just part

16  of product development.  I was a minor

17  contributor, but that was another product at

18  the time.

19       Q.    Were you involved in the decision to

20  revamp Career Concourse at all?

21       A.    Well, I was part of the

22  conversation, yes.  I wouldn't say I was

23  involved in the decision.  The decision was

24  made -- I forget the name at the time, but what

25  is now the SEA Group under the equity partners.

1              KYLE WEST

2              I remember a few conversations, one

3    specifically, because I was commuting to

4    conference -- I was driving down the freeway to

5    a state development conference, and we were

6    having the SEA Group meeting, and one of the

7    major topics in that meeting was Career

8    Concourse and what to do with it.

9         Q.    And do you recall John Chmura wanted

10   Career Concourse to be basically put out to

11   pasture; is that correct?

12        A.    I definitely had that impression,

13   yes.

14        Q.    Others involved, Mr. Lombardo, for

15   example, really thought Career Concourse was

16   necessary to further Chmura's sales goals,

17   correct?

18        A.    I don't recall that.  I don't recall

19   Rick being very involved in the education,

20   quote-unquote, vertical.  I couldn't say.  I

21   don't think -- I really couldn't say.  I

22   definitely don't recall him being involved in

23   conversations about Career Concourse.  I am

24   inclined to think he would rather not deal with

25   Career Concourse.

```
 1                    KYLE WEST
 2       Q.    And at some point, did your job
 3  title change again?
 4       A.    Yeah.  Where did we leave it?  It
 5  was Director of Development?
 6       Q.    Correct.
 7       A.    Yes, it did.
 8       Q.    And what did it change to?
 9       A.    Director of Business Development.
10       Q.    And when did that change occur?
11       A.    Again, it's not totally clear, but
12  I'm going to say January of 2019, I think it
13  was probably official.  January of -- December
14  2018, January 2019 -- I'm sure this is in, you
15  know, HR records or something like that, if
16  it's important.
17       Q.    And did your job duties change at
18  that time?
19       A.    They did, yes.
20       Q.    How did your job duties change?
21       A.    I mean, they changed dramatically --
22  you know, through November of 2018, I had
23  been -- you know, more than three-quarters of
24  my time was committed to this training program.
25  So when I changed positions, kind of the
```

1                    KYLE WEST

2   administration of this program -- are you still

3   there, Chris?

4        Q.    I'm still here.  I just had another

5   incidence where the video cut off.

6        A.    Yeah.  So you know, we were

7   enrolling clients in this program.  So there's

8   some back end kind of admin work besides the

9   troubleshooting because we used different types

10  of software.  We had platform that hosted --

11       Q.    Let me stop you there again just for

12  the record clarity.

13             When you say "this program," is this

14  the web-based JobsEQ?

15       A.    Correct.  I believe it's called

16  JobsEQ FIT.  So I will refer to it as JobEQ

17  FIT, F-I-T.

18       Q.    Okay.

19       A.    So I developed the content.  I

20  loaded the content onto another vendor's

21  software, and then I would enroll users, and I

22  would, you know, assign them to courses, and

23  make sure that they -- you know, that they are

24  getting through the content, making sure they

25  are logging in.  We had a lot of credential

```
 1                    KYLE WEST
 2   password type issues.  Things like that.
 3           So at some point in the fall -- I
 4   think in the fall of 2018, we hired a
 5   gentleman -- I don't know if it was summer or
 6   fall -- Wesley Michaels was his name, and I
 7   forget what his title was.  I think he was on
 8   Greg's team.  I believe he was on data
 9   governance.  So it was decided that Wesley
10   would take over the administrative aspects of
11   JobsEQ FIT and updating content, things like
12   that.
13           So I probably spent the month of
14   December and part of January -- not the entire
15   four to six weeks, but a good chunk of it
16   working with Wesley kind of onboarding him,
17   helping him to get acclimated to the content,
18   how to update it, how to create new content,
19   manage the administration, you know, assigning
20   courses, all that stuff, right.
21           So when he was, I'll say, up and
22   running, I stopped doing all of that.  So you
23   know, my job description really changed quite a
24   bit.  I remember in the middle of January, I
25   believe, 2019, I traveled to Richmond.  There
```

```
 1                   KYLE WEST

 2   was a meeting.  I remember it was kind of put

 3   together hosted by a gentleman named Curtis

 4   Monk who I -- I don't know what his title was,

 5   but he was kind of an interim type, I mean, he

 6   managed the sales team, right.  So I think he

 7   was brought in, you know, kind of on a

 8   temporary basis.  He was retired, I believe,

 9   but I remember coming to Richmond in January,

10   and I had laid out kind of my plan, my business

11   development plan, and I had -- you know, I had

12   some feedback from Leslie because I recall I

13   shared elements of the plan beforehand.

14              So really in January, after that

15   meeting in January of 2018, I think you could

16   say I was just about fully committed to

17   business development.  And what that entailed

18   was prospecting for partners, vendors, the

19   partners including vendors and like

20   professional organizations, member-based

21   organizations, entities that, you know, we have

22   a potential synergy with, so a professional

23   association, let's just say of educators.

24              There may be a lack of awareness

25   amongst educators about our software.  So
```

```
 1                    KYLE WEST

 2   rather than try to engage thousands of

 3   educators, if we engage an association, we can

 4   leverage the association to make our products

 5   visible to their membership.  Vendors we had

 6   some -- you know, we had some historical

 7   correspondence with a couple of vendors, for

 8   example, GIS WebTech would be one, so, you

 9   know, they're a complement vendor, they are in

10   the same space serving a shared audience, but

11   not directly competitors with us.

12                    So vendors like that I approached

13   several basically as, you know, with the

14   exception of them, several others that I

15   prospected to see if they were interested in

16   possibly working together.

17                    We had plans, and we did execute --

18   we had plans for me to travel to different

19   parts of the country where we had a high

20   concentration of JobsEQ users.  So I remember,

21   you know, I went to the Carolinas, Charlotte,

22   North Carolina and the greater -- I went from

23   Charlotte to Raleigh and visited clients in

24   between.  I visited about ten clients on that

25   trip over four days.
```

```
 1                    KYLE WEST

 2            I did something similar in Dallas

 3   with a colleague, and I think that we had

 4   planned on doing three of those events, if I

 5   recall correctly.  We only did two.

 6            But the planning and the execution,

 7   you know, certainly was part of my job

 8   description.  I was involved in some aspects of

 9   the planning for the user conference in 2019.

10   That was in Orlando, working with another

11   colleague, Kim.

12            You know, I think that's roughly

13   about it.  I still prepared a few proposals --

14   project proposals or bids.  I don't recall -- I

15   was working on one before my last job change to

16   a community in Texas, Middle Rio Grande or

17   Grand, I forget.

18            But I really, I would say, focused

19   more on the -- and I still wrote proposals.  I

20   wrote a lot of proposals to present at

21   conferences, and I continued to travel to a few

22   conferences, and I would make presentations on

23   research that folks in Richmond had done.  But

24   I started to travel less.

25       Q.   Do you know who was managing the
```

```
 1                         KYLE WEST

 2   sales team at that time?

 3             THE COURT REPORTER:  You spoke over

 4        each other.

 5        Q.    Just so I'm clear on my question I

 6   know you mentioned Mr. Monk, but I thought you

 7   indicated that he was in a room or some type of

 8   position that.  Was Mr. Monk the manager, do

 9   you know, of the sales team at that time?

10        A.    For a period, yes.  I don't --

11        Q.    And that's -- you --

12        A.    You have to -- I'm sure there's a

13   record.  I don't know if he was hired as

14   interim.  That was my impression.  I can't say

15   for sure.  I believe it went from Mr. Monk back

16   to Greg, and then we hired Ely.  I forget his

17   last name.  I don't know if Greg was between

18   Ely and Mr. Monk.  I think Mr. Monk left

19   abruptly.  So I have to think that Greg took

20   over between Mr. Monk and Ely.

21        Q.    And were you -- was the Director of

22   Business Development, was that your job title

23   until the end of your employment with Chmura?

24        A.    No.

25        Q.    What was your next job position with
```

```
 1                    KYLE WEST

 2    Chmura?

 3        A.    Interim business analyst.  I don't

 4    recall.

 5        Q.    Do you recall roughly when --

 6    your --

 7              (Parties speaking simultaneously.)

 8        Q.    Do you recall roughly when your job

 9    title switched or changed?

10        A.    Maybe March.  The title changed

11    after the duties.

12        Q.    And when you say in March -- when

13    you say in March, would that be of 2019 or

14    2020?

15        A.    2020.

16        Q.    And how did you -- you referenced

17    before that your job duties a changed.  How did

18    your job duties change?

19        A.    Well, some of the things that I had

20    been working on were reassigned to other

21    people, you know, prior to the official change,

22    and I started to participate in some aspects of

23    a new job, but I don't believe my title was

24    actually changed.

25        Q.    What were those aspects of the new
```

```
 1                    KYLE WEST

 2   job that you were referring to?

 3       A.    For example, on Monday mornings,

 4   there's a standing meeting or a ceremony, we

 5   call it, a product communications team, and

 6   it's a -- you know, it's largely a product

 7   development ceremony that I started to

 8   participate in, you know, maybe mid January.  I

 9   don't recall.

10       Q.    Okay.  And at some point did your

11   employment with Chmura end?

12       A.    It did.

13       Q.    And do you recall when that was?

14       A.    So my resignation date was April

15   15th.

16       Q.    April 15th of 2020?  April 15th of

17   this year?

18       A.    Correct.

19       Q.    And you said your resignation date,

20   so it was a voluntary resignation?

21       A.    Yes.

22       Q.    And are you currently employed?

23       A.    Yes.

24       Q.    And where are you employed?  With

25   whom are you employed?
```

```
 1                    KYLE WEST
 2        A.    Big Brothers Big Sisters of the
 3   Inland Northwest.
 4        Q.    Of the Inland Northwest?
 5        A.    Correct.
 6        Q.    And what is your position with Big
 7   Brothers Big Sisters?
 8        A.    I'm the chief executive officer.
 9        Q.    And during your time when you were,
10   again, discounting or not including the time
11   that you spent in Richmond, Virginia, other
12   than that, you referenced a Spokane office,
13   were you always -- did you change offices?  Did
14   you work from home?  What was your work
15   arrangement like in Spokane?
16        A.    We had three different offices.
17        Q.    In different times?
18        A.    Correct.
19        Q.    Was there ever a time you were
20   working from home, or was there always a
21   physical office to go into?
22        A.    There was always a physical office
23   to go into.
24        Q.    And I know you've had a bunch of
25   different job titles with different job duties.
```

Page 47

1                    KYLE WEST

2    Was there a general normal workday while you

3    were employed with Chmura; in other words, a

4    time that you'd go into the office, a time that

5    you'd leave, or did it change depending on the

6    job title?

7        A.    Yeah.   I mean, it definitely

8    changed.   So the expectation was that I would

9    be at the office until 5:00 p.m. my time to

10   support virtual chat.   So if somebody's using

11   our software and they have a question,

12   everybody, you know, everybody else is in the

13   eastern time zone, so I'd be the last person

14   there Monday through Friday.   I typically

15   arrived between 7:00 and 8:00 a.m. local time.

16   Sometimes a lot earlier.

17               When I started working with the

18   product team this year, they were like, for

19   example, those Monday meetings, product

20   communication team meetings.   Those are 6:00

21   a.m. meetings for me, so every Monday, at least

22   for 2020, I started my workday at 6:00, and I

23   would leave at 3:00 p.m., which is not

24   something that, you know, historically had been

25   my schedule.   But, you know, roughly, say, 7:30

```
 1                      KYLE WEST
 2   or 8:00 to 5:00.
 3        Q.    Monday through Friday?
 4        A.    Correct.  And, you know, travel
 5   sometimes as needed on weekends -- if we
 6   traveled on a weekend, we could take -- I
 7   think, what's called a comp day.  We could take
 8   a weekday off to be with family or whatever,
 9   run errands.
10        Q.    I wanted to go back through -- you
11   talked about your different positions and
12   talked about your interaction with Mr. Lombardo
13   during each of those positions.
14              So if you'll bear with me, starting
15   when you were manager, director of sales, how
16   regularly were you interacting with Mr.
17   Lombardo?
18        A.    Gosh, between email and phone, maybe
19   20 times a business day.
20        Q.    Okay.  And was that primarily by
21   email, primarily by phone?  How would that
22   break down?
23        A.    Primarily by phone.  I don't -- you
24   know, I couldn't provide you a reliable
25   breakdown, but I would say primarily by phone.
```

Page 49

```
 1                    KYLE WEST

 2        Q.    And when you were interacting with

 3   him by phone, would that be -- you would use

 4   your office phone?  How would you communicate,

 5   or how would you call Mr. Lombardo?

 6        A.    Both office and mobile.

 7        Q.    And if you can break it down, would

 8   it be primarily one or primarily the other, or

 9   just depended?

10        A.    Well, definitely, you know, during

11   business hours, my office phone.  By he got to

12   the office or, you know, after he left the

13   office, my mobile phone generally.

14        Q.    And how often would there be --

15   would you have calls with him either before you

16   got to the office or after he left the office?

17        A.    Probably four days a week.

18        Q.    What would those calls consist of?

19   What would you guys be discussing on those

20   calls?

21        A.    Any number of things.

22        Q.    And do you know roughly how long the

23   calls would last?

24        A.    Well, when I moved my office, so

25   June of 2019, I shortened my commute, and, you
```

Page 50

1                          KYLE WEST

2      know, before that, I would talk to Rick

3      regularly probably for a bit longer, you know,

4      so I would talk to him pretty regularly on my

5      way to work.

6           Q.    Mr. West, let me stop you there so

7      we can have the record clear.  I'm talking

8      right now just solely about your time as

9      managing director of sales.  So that would be

10     February of '17 through I think it was roughly

11     September or October of '17.

12          A.    Oh, gosh.  I don't recall the

13     duration of calls, but I certainly talked to

14     him on a regular basis before and after work.

15          Q.    And would you talk to him about

16     social matters, in other words, non-work

17     matters?  Did you consider Rick a friend?

18          A.    Yeah.  I mean, you know, we're not

19     co-located, but we're colleagues and, you know,

20     we see each other once or twice a year.  But I

21     certainly considered him a friend, yeah.  We

22     talked about sports.  We talked about eating

23     quite a bit.  We talked about stuff that

24     friends talk about.

25          Q.    Again, during this roughly six,

```
 1                      KYLE WEST
 2   seven-month period in 2017, setting aside the
 3   non-work-related calls, how regularly would you
 4   speak with Mr. Lombardo by phone when -- after
 5   he had left the office?
 6        A.    I don't recall.  Two or three times
 7   a week, maybe.  I would think you could look at
 8   phone records.  I don't know, but I know that
 9   if he didn't -- you know, he would either call
10   me from his mobile or I would call; and if he's
11   not at the office, I would call his mobile,
12   vice versa, but I couldn't say.
13        Q.    And do you recall the standard type
14   of things work-related-wise that you would talk
15   about after -- basically during his after hours
16   when he'd left the office?
17        A.    Yeah.  I mean, he had most of the
18   clients in the western states.  So, you know,
19   there are some clients in the western states
20   that I might interact with in the virtual chat,
21   especially some that were high maintenance.
22   You know, and I would contact Rick certainly to
23   let him know that I spoke to a certain client
24   or something like that, you know, things of
25   that nature.
```

1                      KYLE WEST

2          Q.    Anything else or any other specific

3    types of work calls that you recall contacting

4    him after he left the office during -- again,

5    so we're clear, during this time that you were

6    the managing director of sales?

7          A.    I can't recall specifics, no.

8          Q.    Okay.  And now turning to --

9          A.    I can recall calls about clients.  I

10   can recall a number of calls.  I can't recall

11   specifics, other than client stuff.

12         Q.    Okay.  And by client stuff, you

13   don't recall specific names of clients; is that

14   correct?

15         A.    I mean, I can recall some names of

16   clients.  Do you want those?

17         Q.    Who do you recall?

18         A.    Well, definitely Soua Vang from San

19   Bernardino, S-o-u-a, last name Vang, V-a-n-g.

20   Definitely Ellie Chambers.

21         Q.    Are these individuals -- are these

22   individuals, or are they entities?

23         A.    Well, I'm giving you specific

24   individuals employed by entities who were

25   clients or prospects.

1                    KYLE WEST

2        Q.    Okay.

3        A.    What's your question?

4        Q.    So for Ms. Vang, what do you recall

5    talking with Mr. Lombardo about?

6        A.    So Ms. Vang might come into chat, or

7    she would actually call my desk phone, and she

8    would have an issue:  She doesn't know how to

9    run a query in one of our analytics, so I would

10   help her.  I'd spend time on the phone, maybe

11   I'd set up a virtual screen share to show her

12   how to do something.  And then I would call

13   Rick and tell him what happened so that he

14   could -- obviously, it's his client, so he's

15   aware and he could record those things in

16   SalesForce, our relationship management

17   platform.

18       Q.    And are those the type of calls that

19   you were referring to that you recall?

20       A.    Yes, generally.

21       Q.    Do you recall -- and I know every

22   call is different -- do you recall roughly how

23   long the call you just mentioned -- roughly how

24   long that call would last?

25       A.    I don't know.  I mean, we would, you

```
 1                    KYLE WEST
 2   know, talk about all kinds of other stuff.
 3       Q.    And once you switched jobs and job
 4   responsibilities to Director of Workforce
 5   Development, I understood your testimony at
 6   that time you were focused on developing JobEQ
 7   FIT and a few other projects.
 8             Did your interaction with Mr.
 9   Lombardo decrease when you were in that
10   position?
11       A.    It definitely decreased but it was
12   still consistent.
13       Q.    And would you still speak with him
14   after he left the office from time to time?
15       A.    Yes.
16       Q.    Would that be less frequently than
17   you were speaking with him when you were direct
18   manager of sales?
19       A.    Yes, I think so.
20       Q.    And why would you be speaking work
21   related-wise?  I don't need to know any
22   personal conversations you had, but why would
23   you be speaking with Mr. Lombardo on a regular
24   basis in your new position?  When I say in your
25   new position, when you were Director of
```

KYLE WEST

1

2  Workforce Development.

3      A.     I mean, you've got to understand

4  that Rick and Austin had more clients than

5  anyone else.  So not only am I reporting to

6  them about my interactions with their clients,

7  with our clients, but I'm also getting

8  information from them because I'm working on a

9  training platform.  "So, hey, who is a good

10  resource to talk about supply chain?"  "You

11  know, how -- what do you hear from your users

12  about X, Y, Z?"  "How does this sound?"

13          I think, you know, I was really kind

14  of on an island working on these project, so

15  the sales team was a good resource for me to,

16  you know, maybe get an introduction to a user

17  or to bounce an idea off of.

18          You know, plus, members of the sales

19  team are people that I had worked with on a

20  pretty intense level the year prior, so, you

21  know, they had become my friends, so you could

22  talk about music, you could talk about

23  football.  We're remote.  So it's a way of

24  breaking up the day.

25          So, I mean, I continued to talk to

1                     KYLE WEST

2    Rick, you know, on a regular basis, as well as

3    other members of the sales team.

4         Q.    You mentioned --

5         A.    I continued to work like virtual

6    chat, for example, and had a lot of

7    interactions with clients and users.

8         Q.    And you mentioned Rick, Mr.

9    Lombardo, he was a senior account manager,

10   correct?

11        A.    Yeah.  I think he became the senior

12   account manager around -- I believe that

13   happened when I was managing the sales team, I

14   believe, that him and Austin became the senior

15   account managers.

16        Q.    And during your time managing the

17   sales team, were you able to observe Mr.

18   Lombardo's performance as an account manager?

19        A.    Yeah.  I mean, that's what I did.

20        Q.    Did you consider him to be a good

21   account manager?

22        A.    Well, I thought Mr. Lombardo was the

23   best account manager, yes.

24        Q.    He understood the best way to sell

25   Chmura's products, in your view?

1                    KYLE WEST

2       A.    Well, I don't know if he understood

3    the best way to sell Chmura's products.  I

4    think that depends on your perspective.  But he

5    knew how to -- he knew how to perform at a high

6    level.  I mean, Rick consistently recorded more

7    activities than his peers.

8              So he was -- I always called him a

9    freak.  I mean, the guy was like an automaton.

10   It was really, when you looked --

11      Q.    Mr. West, I'll let you know that

12   your screen -- your screen has popped off.

13   There you go.

14      A.    So, you know, every week, I would

15   prepare these dashboards, and they were bar

16   charts, basically every account manager, the

17   volume of total activity, the type of activity,

18   whether it's a phone call or an email; and

19   Rick's bars were consistently well to the right

20   of other members of the sales team.

21             The only person that ever came close

22   to matching his output in terms of activities

23   was Mr. Steele.  But in -- you know, let's say,

24   in the 40 weeks that I -- I'm sorry, what is --

25      Q.    I don't know.  Let's continue.

```
 1                      KYLE WEST

 2        A.    Okay.  So the -- you know, in the

 3   40ish weeks that I prepared these dashboards, I

 4   recall maybe twice that Austin either matched

 5   or surpassed Rick, and I suspect that's

 6   probably because Rick was, you know, on

 7   vacation or basically wasn't in the office

 8   performing his usual routine.

 9            The other account managers at the

10   time maybe hit half to three-quarters the

11   output as Rick.  So he was the high performer,

12   absolutely.

13            I would not say that, you know,

14   he -- you know, it was clear to me that

15   leadership didn't like Rick's style.  So I

16   would never say that he knew the best way to

17   sell products the Chmura way.

18        Q.    Did you trust his judgment when it

19   came to selling?

20        A.    Absolutely.

21        Q.    And -- I apologize.  Hang on.  Now

22   it's my computer.  Bear with me for a second.

23   Can you guys hear me?

24        A.    Yes.

25            THE COURT REPORTER:  The court
```

```
 1                    KYLE WEST

 2      reporter can.

 3           MR. MICHALIK:  We have a problem

 4      here.  It is not letting me plug back in.

 5      Can we take a five-minute break?  Is

 6      everybody okay with that while I try to

 7      figure out what is going on?

 8           (A recess was taken.)

 9  BY MR. MICHALIK:

10      Q.   Before we had the technology

11  interruption, you were talking about, and I

12  don't want to put words in your mouth, it was

13  something to trusting Rick's --  Mr. Lombardo's

14  judgment with regards to sales.

15           Did you take advantage of his

16  expertise in that area when you were working on

17  the JobsEQ FIT?

18      A.   Advantage of his expertise in sales?

19      Q.   Well, you indicated -- as I recall,

20  you were testifying when you had the new

21  position, the Director of Workforce

22  Development, you were still bouncing stuff off

23  of Mr. Lombardo and Mr. Steele.

24           Was that based off of their

25  knowledge and expertise as salespeople that you
```

```
 1                    KYLE WEST

 2   had observed when you managed them?

 3        A.    I'm sorry.  I don't understand your

 4   question.

 5        Q.    So you were -- you testified earlier

 6   that when you were Director of Workforce

 7   Development, you were still interacting with

 8   Mr. Lombardo, correct?

 9        A.    Correct.

10        Q.    And some of that interaction was of

11   a personal and friendly nature, correct?

12        A.    Correct.

13        Q.    And you indicated that you were also

14   kind of an on island, so you would bounce ideas

15   off of Mr. Lombardo and Mr. Steele, correct?

16        A.    Amongst other people, yes.

17        Q.    And my question was:  In bouncing

18   ideas off of Mr. Steele and Mr. Lombardo, did

19   you decide to bounce ideas off of them because

20   of their expertise or what you observed in

21   their ability to complete sales?

22        A.    No.

23        Q.    Why did you bounce ideas off of

24   those two individuals?

25        A.    Well, one, because they were
```

```
 1                         KYLE WEST
 2    accessible; and two, because I felt they were
 3    the closest to the client, so I felt like they
 4    were a good resource to bounce ideas off of
 5    because they have the most correspondence with
 6    our clients.
 7         Q.    And were these ideas related to the
 8    JobsEQ FIT project that you were working on?
 9         A.    Sometimes, yes.
10         Q.    And some of the other projects you
11    were working on during that roughly year
12    period?
13         A.    Yes, I suppose so.  I don't -- I'm
14    not clear what you mean by their sales
15    expertise.  I don't understand how -- I wasn't
16    selling anything.  So JobsEQ FIT, I would
17    argue, is a more technical product, you know,
18    demonstrating how to use something, not trying
19    to sell anything.
20         Q.    As I understand your testimony, you
21    would bounce things off those two individuals
22    because they had the -- they were closest to
23    the customers, something to that effect.  I
24    understood it wasn't their sales expertise.  It
25    was their interaction and relationship with the
```

1               KYLE WEST

2    customers; is that correct?

3        A.    Correct.  They were also tasked with

4    selling enrollments to the program for

5    registrations.

6        Q.    And so I understood your testimony

7    there, and I'd asked if you were bouncing ideas

8    off of those individuals related to the work

9    you were doing on JobsEQ; and I understood that

10   you said you were, correct?

11       A.    Correct.  Amongst other people.

12       Q.    And then the line of questioning

13   that I was asking was:  Were you also doing

14   that bouncing ideas off of those individuals

15   related to other projects you were working on

16   besides JobsEQ?

17       A.    Not that I recall.

18       Q.    Go ahead.

19       A.    I just -- I don't -- you know, the

20   inside sales team didn't have a lot of -- they

21   would refer projects to us, like opportunities,

22   say, but they weren't in a position to -- they

23   really weren't involved with consulting

24   projects, you know, aside from just, you know,

25   referring their client to us because their

1                          KYLE WEST

2    client had a question or they've got a, you

3    know, a bid that they are going to release,

4    they regularly did that, but they didn't have

5    any kind of -- they were never involved in

6    executing a project.

7         Q.    Mr. West, that wasn't my question.

8              I had simply -- you had testified,

9    as I understood it, and I just want to make

10   sure that I was clear on your testimony, that

11   you would bounce ideas off of Mr. Steele and

12   Mr. Lombardo; do I understand your testimony

13   correctly?

14        A.    Correct, with respect to JobsEQ.

15   And perhaps I misunderstood, but I thought I

16   heard you ask if I would consult with them on

17   projects outside of JobsEQ.

18        Q.    I did.  So -- I didn't use the word

19   "consult."  I used your words.

20             Would you bounce ideas off of those

21   two individuals related to other projects

22   beside JobsEQ FIT?

23        A.    No.  Only if it was a referral from

24   an account manager.

25        Q.    Now, moving to, essentially, your

1                    KYLE WEST

2   last position.  I know you held a position as

3   Senior Business Analyst for a short period of

4   time.

5             But your position as Director of

6   Business Development, how regularly would you

7   interact with Mr. Lombardo for work purposes in

8   that position?

9       A.    I couldn't say on a daily basis.

10  But on a weekly basis, I would estimate 10 to

11  15 times per week.

12      Q.    What would you be interacting with

13  Mr. Lombardo about on those occasions?

14      A.    I don't recall specific details,

15  but, you know, generally, we may have clients

16  or prospects who are using a product from a

17  prospective partner or maybe, you know, they

18  was a conference where -- we wanted to

19  attend -- one of the things I asked of the

20  account managers was to send me -- you know,

21  and this was mainly Austin and Rick, but send

22  me -- you know, we'd look at a map of users and

23  we'd pin locations of accounts.  They have high

24  a concentration of users in the state of

25  Florida or in the Carolinas or in Texas, so I

```
 1                    KYLE WEST

 2   would rely heavily on the account managers --

 3   you know, I'd send, like, Rick, for example, a

 4   list of 60 accounts in Texas and ask him, you

 5   know, "Of these accounts, who are the high

 6   value accounts?  Who should I try to prioritize

 7   reaching if we're going to be in the greater

 8   Dallas metro or in the greater Charlotte

 9   region?"

10             This month, May of 2020, I was

11   supposed to be in Florida, which was, you know,

12   another state where account -- account managers

13   have 50-plus clients, so I would have regular

14   interaction.  They may have questions about how

15   is the -- how is the fact that JobsEQ data are

16   featured in this other vendor's product?  What

17   does the client get from that product that they

18   also get from JobsEQ, or how are they

19   different, how can I describe the relationship

20   with this vendor?

21             You know, sometimes they might ask

22   me to do -- to take a call or do a demo for

23   specialized clients, but I couldn't say -- I

24   couldn't get much more specific than that.

25        Q.   Thank you.
```

1                      KYLE WEST

2              And during this time -- so, again,

3    while you're Director of Business Development,

4    would you interact with Mr. Lombardo after he

5    had left for the office for the day or left the

6    office for the day?

7        A.    Sometimes.  Not nearly as much.  I

8    did continue to support the virtual chat, but,

9    you know, I didn't talk to him anywhere near as

10   much as I had historically.

11       Q.    At some point, did you become aware

12   that Mr. Lombardo's employment with Chmura had

13   terminated?

14       A.    Yeah.  I don't know the official

15   termination date.  It wasn't clear to me if he

16   was terminated or if he quit -- it wasn't

17   clear, but I did become aware that he was --

18   actually, I guess I wasn't sure that he was

19   terminated.

20              My impression was that he didn't

21   sign an employment offer or something.  I

22   don't -- at some point I became aware, but it

23   wasn't clear to me, I'd say, for a number of

24   weeks.

25       Q.    Regardless of how it terminated, but

1                    KYLE WEST

2   you became aware that his employment with

3   Chmura ended, correct?

4        A.    Correct.

5        Q.    And at some point did Mr. Lombardo

6   ask you to provide him with a letter of

7   reference?

8        A.    Yes.

9        Q.    And did you understand that the

10  purpose of that letter was to go to prospective

11  employers that he was looking to obtain

12  employment with?

13       A.    Well, I assume that was the case,

14  just that's what we typically use those letters

15  of recommendations for.  That was my

16  impression, yes.

17       Q.    And did you provide him with a

18  letter of recommendation -- or a reference

19  letter?

20       A.    I did.

21            (WHEREUPON, West Deposition Exhibit

22       A:  Email (CHMURA0151954) was marked for

23       identification.)

24       Q.    And bear with me.  We get to see if

25  technology works again.  I'm going to hopefully

```
 1                       KYLE WEST
 2   get this to pop up on the screen, so bear with
 3   me.
 4             Hopefully, do you see a document on
 5   the screen now?
 6       A.   I see it.  The font is very small so
 7   I'll try to enlarge it.
 8       Q.   I'm going to try to blow it up for
 9   you there.
10       A.   I think I can do it.  Yep.
11       Q.   It's been marked as Kyle West
12   Exhibit A.  And just so we have it for the
13   record, it has a Bates Number at the bottom
14   CHMURA0151954.  And please take a moment and
15   review this document.
16       A.   What -- what is it -- what am I
17   looking for?  Oh, I see it.
18       Q.   Yeah, this is -- I'll just ask you
19   about this and move on to the document I was
20   going to -- intended to ask you about.  Do you
21   recognize this document?
22       A.   Do I recognize it?  Yes.  It appears
23   to be an email.
24       Q.   Yes.  It appears to be an email from
25   you to Austin Steele dated February 18, 2019?
```

```
 1                      KYLE WEST
 2        A.    Yeah, that's clear.
 3        Q.    And so do you recognize this
 4   document?
 5              THE COURT REPORTER:  You spoke over
 6        each other.
 7        Q.    Do you remember sending this email?
 8        A.    Well, I mean, I trust you that I
 9   sent this email, yes.
10        Q.    Okay.
11        A.    I mean, it's certainly my signature
12   and I've got a whole bunch of people -- you
13   know, the people -- yes, I recognize it.  I
14   don't recall writing it.  It's more than, you
15   know, a year ago, but...
16        Q.    I'm going to --
17        A.    But --
18              (Parties speaking simultaneously.)
19              THE COURT REPORTER:  I'm sorry.  I
20        didn't hear -- I didn't understand you.
21        A.    I recognize it.  I don't think it's
22   not mine.
23        Q.    Just so we're clear, Mr. West, you
24   used a double negative.  You don't think it's
25   not yours, meaning you think it was an email
```

Page 70

```
1                        KYLE WEST

2   that was sent by you?

3        A.    Correct.  I don't understand why

4   you're asking me if I recognize it.

5        Q.    Okay.

6        A.    I mean, it's obvious that it's an

7   email that I sent.

8        Q.    Bear with me.  I'll try to pull up

9   the document that I wanted.  Hang on, guys, it

10  did it again.  Bear with me.  Our IT is coming.

11  It will just be a moment.

12              (WHEREUPON, West Deposition Exhibit

13        B:  Reference letter dated November 24,

14        2019 was marked for identification.)

15        Q.    Mr. West, I now have a document that

16  has been marked as West Exhibit B.  I'm doing

17  to try to blow it up so hopefully you can see

18  it.

19        A.    I can expand it.

20        Q.    Can you see that?

21        A.    Yes.

22        Q.    And do you recognize this document?

23        A.    Yes.

24        Q.    And is this the reference letter

25  that you drafted for Mr. Lombardo?
```

```
1                         KYLE WEST

2         A.    It certainly looks like it.

3         Q.    If you scroll down to the bottom, is

4    that your signature at the bottom?

5         A.    Yes.

6         Q.    In drafting this letter, did you --

7    is everything in that letter true, to the best

8    of your knowledge?

9         A.    Yes.

10        Q.    From time to time, did you engage in

11   text messages with Mr. Lombardo?

12        A.    Yes.

13        Q.    Again, so the record is clear, your

14   letter -- moving to the next --

15             Mr. MICHALIK:  Let's take a

16        five-minute break while I get the technical

17        person in here so I can get the document on

18        the screen.

19             (A recess was taken.)

20             (WHEREUPON, West Deposition Exhibit

21        C:  Text messages (Lombardo000508-512) were

22        marked for identification.)

23        Q.    Mr. West, you should now have on

24   your screen a document that has been marked as

25   West Exhibit C.  And it's a five-page document.
```

```
 1                    KYLE WEST
 2   Are you able to see that?
 3        A.    Yes.
 4        Q.    And if you take a moment and look
 5   through the pages, tell me if you recognize
 6   this document.
 7        A.    Well, it looks like a text message,
 8   and I have one page.
 9        Q.    Okay.
10        A.    Can you point anything out specific?
11        Q.    I'm trying to get it -- okay.  So
12   here's the second page.
13        A.    Yeah.
14        Q.    And --
15        A.    Go ahead.
16        Q.    And do you recall texting with
17   Mr. Lombardo on Saturday, November 23rd and
18   Sunday, November 24th?
19        A.    I don't recall, but if that's what
20   this is, clearly, it happened.
21        Q.    And if you will look at the second
22   page, the page we're on now, you see at the top
23   it has To.Kylewest@gmail.com.  It says, "No, I
24   have to type it at work.  Midafternoon probably
25   unless our 9:00 a.m. gets canceled, then I
```

```
 1                    KYLE WEST
 2   could type it at that time and have it to you
 3   by noon."
 4             Is that the reference letter --
 5        A.   Yes.
 6        Q.   -- that you just reviewed?
 7        A.   That would make sense to me, yes.
 8        Q.   And then if you scroll down on this
 9   page, there's a text from Mr. Lombardo that
10   says, "Other letter went out."
11             Do you know what letter he's
12   referring to?
13        A.   "Other letter went out."  I do not,
14   and I don't know who Butch is.
15        Q.   Okay.  And then from your tag -- I'm
16   going to call it your tag line, the
17   To.Kylewest@gmail.com says, "Nice.  I'm on the
18   phone again."
19             And then there's a response from
20   that that says, "Check your email."
21             Do you recall receiving an email
22   from Mr. Lombardo at this time?
23        A.   No.
24        Q.   And then we'll go to the next page,
25   and this is a text stream dated Friday, January
```

```
 1                    KYLE WEST

 2   31, 2020, and there is "got our court date" in

 3   blue, and then under your identifier, it's,

 4   "Oh, wow, does that mean LP and the others will

 5   get deposed?"

 6            Do you recall texting with Mr.

 7   Lombardo -- specifically texting with Mr.

 8   Lombardo at that time?

 9       A.    I don't recall.  But, again,

10   clearly, it happened.

11       Q.    Going to Page 4, it goes down to a

12   date of Friday, February 7, 2020, and there's

13   the text that says, "How did it go?"  And a

14   response from you, "Just dropped the mic.

15   Check your email."

16       A.    Yes.

17       Q.    Do you recall that exchange with

18   Mr. Lombardo?

19       A.    Yes.

20       Q.    Before we get to that, at the top --

21   there we go -- at the top, this is back to the

22   January 31st date or 30th date where it was

23   referencing a text about, "We got our court

24   date," and you said, "I could call you back in

25   a few minutes."  And the text in blue says,
```

1                     KYLE WEST

2    "Just call me in a few."

3              Do you recall having a conversation

4    with Mr. Lombardo on the date that he announced

5    he got his court date?

6        A.    No.

7              (WHEREUPON, West Deposition Exhibit

8        D:   Test messages (Lombardo000480-489) were

9        marked for identification.)

10       Q.    Mr. West, I now have a 10-page

11   document in front of you that's been marked as

12   West Exhibit D.  Do you recognize -- I'll let

13   you look through this document.

14             Do you recognize this document, the

15   first page of this document?

16       A.    Well, again, it appears to be a text

17   message.

18       Q.    And we're on -- I'm sorry.

19             So do you recall texting with

20   Mr. Lombardo on October 2nd of 2019?

21       A.    No.

22       Q.    Do you recall him informing you that

23   he believed Wilson and he were not going to be

24   treated well -- I don't need to say the word

25   that's on there -- related to a restructuring

1                          KYLE WEST

2    in the sales team?

3         A.    Yes.

4         Q.    And before he informed you of that,

5    were you aware that Chmura was considering

6    restructuring the salespeople?

7         A.    Yeah, in some ways.  You know,

8    again, it was vague.  Roughly summer of 2019,

9    maybe even spring of 2019, there were kind of,

10   I'll say, conversations about updating the

11   different sales territories.  I don't recall if

12   we'd already hired new staff, but certainly

13   there were plans, I believe, to hire additional

14   staff.  But I don't recall all the specifics.

15   There were definitely conversations around

16   that, yes.

17        Q.    Were you involved in the decisions

18   on what to do with the sales team?

19        A.    No.

20        Q.    Okay.  And did Mr. Lombardo let it

21   be known to you that he was unhappy with the

22   potential changes?

23        A.    I don't think it was clear -- I

24   don't recollect, you know, obviously what does

25   he say?  "We're going to get fucked."  So I

```
 1                    KYLE WEST
 2   would interpret that as being unhappy.  That's
 3   pretty clear.
 4        Q.    And I'm just going to ask -- make
 5   sure you recognize that the subsequent pages
 6   are texts between you and Mr. Lombardo.  Do you
 7   recognize the second page?
 8        A.    Page 67?
 9        Q.    Yes.
10        A.    With the dogs?
11        Q.    Yes.  Kyle West:  "WTF."  And then
12   Butch:  "That's what we post online."
13        A.    Yes.
14        Q.    And same thing, and maybe if -- do
15   you recognize the third page of these documents
16   as being texts between you and Mr. Lombardo?
17        A.    I don't.
18        Q.    Okay.  And you recall Mr. Lombardo
19   texting you -- I'm now on Page 4, at the bottom
20   it has Page 72, Lombardo 000483, texting you,
21   "They shut off" -- they being Chmura -- "shut
22   off my JobsEQ email and SalesForce."
23        A.    Yes, I do.
24        Q.    Same question with number -- the
25   next page, do you recognize this page?
```

```
 1                      KYLE WEST

 2      A.    Page 73?

 3      Q.    Yes, sir.

 4      A.    Sorry.  I'm scrolling.  Yes.

 5      Q.    And do you have the ability to

 6  scroll to the next page, or do I need to do

 7  that for you?

 8      A.    I can't get past Page 73.

 9      Q.    All right.  We'll just do it this

10  way.

11            Same question, I just want to know

12  if this is more of the same text thread between

13  you and Mr. Lombardo.

14      A.    Okay.

15      Q.    Do you recognize this as being an

16  additional text thread between you and

17  Mr. Lombardo?

18      A.    Well, it sure looks like it.  I

19  mean, I don't believe that you fabricated this.

20      Q.    And so the record is clear, I'm

21  going to ask you the same question with regard

22  to Page 7.

23      A.    What's the question?

24      Q.    Is this part of a -- more of a text

25  thread between you and Mr. Lombardo?
```

Page 79

```
 1                      KYLE WEST

 2       A.    It looks like it, yes.

 3       Q.    Again, same question with Page 8,

 4   just so we have a clear record?

 5       A.    It looks like it, yes.

 6       Q.    And Page 9?

 7       A.    Yes.

 8       Q.    And then the last page, Page 10?

 9       A.    Yes.

10       Q.    Now, earlier in your testimony you

11   referenced a declaration that you gave to Ms.

12   Cooper.  Do you recall your testimony regarding

13   a declaration?

14       A.    Yes.  I can't hear you, Chris.

15             (WHEREUPON, West Deposition Exhibit

16        E:  Declaration of Kyle West was marked for

17        identification.)

18       Q.    I'm bringing it up on the screen.

19   Can you see the document that's now been marked

20   as West Exhibit E?

21       A.    Yes.

22       Q.    And take -- I'm going to turn to

23   Page -- we've gone through page 2 and we're now

24   on Page 3, and you see paragraph 17?

25       A.    Yes.
```

Page 80

```
 1                    KYLE WEST
 2        Q.    And it says, "I never had a
 3   discussion with Mr. Lombardo regarding limiting
 4   his work hours or not exceeding a certain
 5   number of hours.  Mr. Lombardo was permitted to
 6   work as many hours as he wanted."
 7        A.    Yes.
 8        Q.    Did you ever have any conversations
 9   with Mr. Lombardo while he was a Chmura
10   employee about overtime or his receiving
11   overtime?
12        A.    Not that I recall.  There were
13   conversations about overtime, but I don't
14   recall having one with Rick.
15        Q.    Okay.  And when you say there were
16   conversations about overtime, there were
17   conversations -- what conversations do you
18   recall about overtime?
19        A.    We had an inside salesperson, her
20   name was Jennifer Ludvik, L-u-d-v-i-k, I
21   believe, who was, at least my impression, she
22   was terminated for working overtime and billing
23   us, you know, for time and a half or double
24   time, I don't recall, but we -- you know, it
25   was an issue at the time.
```

1                      KYLE WEST

2              And then it came up, I believe, in

3    the wake of Rick's departure or maybe before

4    Rick's departure, limiting the hours of sales

5    team members not to exceed 40 hours, and I

6    think they were prohibited from traveling.

7              You know, so I don't know if that

8    was the summer of 2019 or the fall of -- again,

9    I don't know if it was before or after Rick

10   left, but...

11        Q.    Okay.  And were you involved in the

12   decision regarding the individual you just

13   referenced?  Jennifer -- I didn't catch her

14   last name.

15        A.    No, not at all.  I don't recall if I

16   had already become the manager of sales, but

17   that was a Richmond issue.  It was handled in

18   Richmond from what I recall.

19        Q.    You had no involvement with that

20   matter?

21        A.    Not the decision to -- I had very

22   limited information.  I just remember that

23   there was an issue with the contract from the

24   temp agency and us not knowing that she was

25   going to earn overtime.  I'm not -- you know,

```
 1                     KYLE WEST
 2   I'm not certain of the specifics.
 3        Q.    Okay.  And with regard to other
 4   salespeople, you don't recall if the company's
 5   decision on how to portion out hours for those
 6   salespeople, if that was when Rick was employed
 7   or after he left?  When I say Rick, I mean,
 8   Mr. Lombardo.
 9        A.    I don't recall and I don't even know
10   what ultimately was decided.  I'm not sure.
11        Q.    I apologize.  You kind of went very
12   quiet.  I -- you couldn't hear very good, the
13   last part.  What did you say?
14        A.    I don't know -- I don't recall what
15   was ultimately decided.
16        Q.    Okay.
17        A.    Can I turn Leslie's screen off?
18        Q.    I think it's just up there.
19              So I'm going to go through and
20   introduce a few more exhibits and just see if
21   you recognize them.  So bear with me.
22              (WHEREUPON, West Deposition Exhibit
23        F:  Email (CHAMURA0054889-5492) was marked
24        for identification.)
25        Q.    You should have a document on your
```

                          KYLE WEST

1

2    screen that's been marked as West Exhibit F.

3    Do you see that document, Mr. West?

4         A.    Yes.

5         Q.    And I know we have to go page by

6    page, but do you recognize the first page?

7         A.    Well, I can't seem to expand this

8    page to zoom in, like I could the others, so --

9    but it does look like an email.

10        Q.    Can you see it now?  Did it expand

11   for you?

12        A.    It did not.

13        Q.    Still no luck in getting it to

14   expanding?

15        A.    No.  It's the same, but I'm okay if

16   you want to read the first few lines for some

17   context.

18        Q.    Sure.  It's from Kyle West at

19   Kyle.west@chmuraecon.com, Monday, June 5, 2017,

20   to Greg Chmura, Leslie Peterson, Chris Chmura,

21   et cetera --

22        A.    You don't have to read.  I can see

23   the names.  I just can't really read the

24   sentences.

25        Q.    It says, "Rick, please see the

1                    KYLE WEST

2   string below for some background.  If you feel

3   there's an appetite for this, then would you

4   please reach out to the Omaha Chamber and the

5   Charlotte Regional Partnership to discover if

6   they would be willing to provide us with some

7   feedback developing our widget solution?  If

8   so, then you can just coordinate with Greg

9   and/or John but please keep me in the loop.

10  Thanks, Kyle."

11            Do you recall a situation working

12  with widgets and having Mr. Lombardo reach out

13  to the Omaha Chamber and the Charlotte Regional

14  Partnership?

15      A.    I do recall asking Mr. Lombardo to

16  reach out to different clients.  I don't recall

17  this specific instance.

18      Q.    You have no reason to dispute that

19  this is an email that was sent by you?

20      A.    No.

21            (WHEREUPON, West Deposition Exhibit

22      G: (Email (CHMURA0068218-68220) was marked

23      for identification.)

24      Q.    We have one last one.  So bear with

25  me.  You should now have in front of you a

```
 1                    KYLE WEST

 2   document -- an email that's been marked as West

 3   Exhibit G.

 4        A.    Yeah.   I mean, again, I can see it.

 5   It's very small, so if you wouldn't mind

 6   reading the sentence, that would helpful.

 7        Q.    Sure.   You can see the people.   It's

 8   from Rick Lombardo to you.   Subject is "RE:

 9   Follow-up."   And it just says, "Good morning,

10   sir.   I was just trying to send you the

11   conferences that we can add to our list and

12   make the decision on which one to attend.   I

13   would prefer Texas, but it is three days after

14   the CareerSource Conference in Florida."

15             And that was a response to your

16   email dated February 24, 2017 to Rick saying,

17   "Good morning to you, too, Rick.   I imagine

18   Texas is a better event for us than the Ohio

19   one?   Or would you recommend we send reps to

20   both?"

21             Do you recall making a decision on

22   where to send -- what conferences to send reps

23   to, whether Texas or Ohio?

24        A.    Okay.   I'm sure we wound up in

25   Texas, but we would convene as a committee.   I
```

```
 1                    KYLE WEST
 2   think it was called a conference planning
 3   committee.  So, you know, I don't recall the
 4   specific decision, but, yes, I asked these
 5   sorts of questions of the account managers, you
 6   know, maybe twice a year.
 7        Q.   Okay.  And any reason --
 8        A.   I've been on -- I'm sorry.  I
 9   participated in the conference planning
10   committee for probably at least three years, I
11   believe.
12        Q.   No reason to dispute that this is an
13   email chain between you and Mr. Lombardo?
14        A.   No.
15        Q.   Okay.
16             Mr. MICHALIK:  I think I have no
17        further questions subject to rebuttal.
18             THE WITNESS:  Thanks.
19             MS. COOPER:  I have a few questions.
20        This is Christine Cooper.
21                    EXAMINATION
22   BY MS. COOPER:
23        Q.   And just picking up where we left
24   off here, can you describe what the conference
25   planning committee is or was?
```

1                     KYLE WEST

2        A.    Sure.  So, you know, I can recall

3   back to Lauralee Savage, who I believe was the

4   Director of Operations.  I think she left in

5   2017, but I don't recollect precisely.  I bring

6   Lauralee up because I remember we -- as far

7   back as I can remember convening this group.

8   It was Leslie, myself, Lauralee, who eventually

9   became Sharon Simmons.  I don't recall if

10  Sharon was always part of committee, but

11  definitely the core group of Leslie, myself and

12  then recently Avery Simmons, no relation to

13  Sharon.  She came onboard sometime last year

14  and kind of joined this committee.

15            And roughly we might meet in the

16  fall and then maybe in the spring roughly.  And

17  there's a Google Doc going back at least four

18  years.  I think it even goes back further than

19  that.  And it's basically an inventory of all

20  conferences that we were aware of, conferences

21  that we either attended or chose not to attend

22  and, you know, there's some notes like the size

23  of the event, the audience that attends the

24  event, maybe it's real estate or workforce or

25  economic development, who is the POC for the

```
 1                     KYLE WEST

 2   event, is there an opportunity to submit a

 3   proposal to present, et cetera, et cetera.

 4   It's a pretty robust document.

 5             So we would huddle through a

 6   virtual -- for me a virtual meeting and review

 7   upcoming conferences, evaluate, you know, kind

 8   of pros and cons of different conferences and

 9   decide what to attend and update the document.

10   If we submitted a proposal to attend a

11   conference and it was accepted, great, you

12   know, it's more likely that we may attend that,

13   or it will affect who we send, because we have

14   to send somebody that can present.  If it's not

15   accepted, maybe, you know, we'll send somebody

16   else.

17             So that was kind of the platform for

18   discussion, I would say, is that, you know,

19   Google Doc.  And I think -- I don't recall a

20   specific -- we didn't meet every month.  We

21   didn't meet once a quarter, but we met twice a

22   year, I would say, and we would revisit it

23   based on maybe budgetary constraints or new

24   conferences that we became aware of.

25             So pretty common for an account
```

```
 1                    KYLE WEST
 2   manager to send us, you know, an email, maybe
 3   forward an email from one of their prospects or
 4   clients inviting us to a different conference
 5   generally in their region, or maybe it's for an
 6   association that the client belongs to, or
 7   maybe they think, "This would be a good
 8   association that's been hard for us to target.
 9   They have 10,000 educators that belong," et
10   cetera, et cetera, et cetera.
11             So we would kind of discuss all
12   those things and take it into consideration to,
13   you know, make decisions around what to attend,
14   who to send, how long to stay there.
15        Q.    Was Mr. Lombardo on that committee
16   at any point in time?
17        A.    No, no.
18        Q.    Would he ever decide what convention
19   or conference to attend?
20        A.    I mean, not that I was part of.  I
21   think he was certainly -- you know, the sales
22   team definitely was, again, a resource to make
23   us aware of certain opportunities or
24   conferences, but I don't -- he didn't have
25   decision-making, I don't know, authority.  You
```

```
 1                    KYLE WEST
 2   know, you couldn't just like book a conference.
 3   It definitely went to the conference committee
 4   or maybe directly to Leslie or something.
 5        Q.   I want to ask you about a couple of,
 6   I'm going to say, products.  But that's
 7   probably not the right word, so you can correct
 8   my language.
 9             There's been some testimony in the
10   deposition so far about Mr. Lombardo's
11   involvement with several different products.
12   And I'm going to start with one that I think
13   was brought up today, which is Career
14   Concourse.
15             Do you know whether Mr. Lombardo had
16   any involvement in developing Career Concourse?
17        A.   Not to my knowledge.  I was -- I
18   contributed to, you know, certain aspects of
19   that, and I never -- I don't recall interacting
20   with Rick.  It was mainly with John and -- John
21   Chmura and Greg Chmura.
22        Q.   What about a -- tell me if this is
23   not a product -- but a program or product
24   called Clippy?
25        A.   So Clippy tool is a feature.  Well,
```

1                    KYLE WEST

2    I should say a -- it's a potential feature.

3    It's on what we call the Roadmap.  So this is

4    a, you know, a large inventory of features to

5    be developed.  And it got, you know -- my audio

6    is -- so the Clippy tool is, you know, one

7    amongst probably more than 150 product features

8    that are in our Roadmap.

9               And what the Roadmap is doing, it's

10   based on feedback from clients and internal

11   staff, including the sales team, chat team

12   members.  So if I'm monitoring chat and I get a

13   request from a client, like, "Hey, why can't I

14   get historical occupation wages", for example,

15   then I can tag that chat, because it's a

16   product request, right, so I can tag that,

17   export it and it will go to the product

18   development team, or it will go to a few

19   different people.  I think it goes to Greg, who

20   technically might not be in product

21   development.  I'm not sure.

22               But, anyway, Clippy tool is a -- you

23   know, it's a potential feature, and to my

24   knowledge it's still -- it's definitely still

25   on the Roadmap.  And it's been, gosh, there for

1                    KYLE WEST

2    at least three years, maybe.

3              We developed something called a

4    QuickLink that was a kind of a holdover to

5    Clippy tool.  That's probably way too much

6    information.

7              But, yes, I'm aware of the Clippy

8    tool.  It's a feature of a product -- of

9    JobsEQ, a potential feature.

10        Q.    Do you know how Clippy ended up on

11   the Roadmap?

12        A.    I've got a good idea.  I mean, it's

13   a -- it's what we would call a competitive gap.

14   So it's a feature that we know our main

15   competitor, EMSI in this case, has in their --

16   in whatever their platform is called, a

17   competitor to JobsEQ Analyst, at least that's

18   what it was called when I used it.

19              So it's been a competitive gap since

20   I used the products side by side more than five

21   years ago.  So, you know, I mean, there's any

22   number of -- if I look at the product

23   Roadmap -- so we have a software called Prod

24   Pad, and it's relatively new in the past few

25   months when I joined the product development

```
1                    KYLE WEST

2   team.  We had this inventory of product

3   features that we aimed to develop.  And there's

4   a column for feedback.  So you've got the

5   number of persons, whether internal or

6   external, who have requested that feature, or

7   at least we have interpreted their request.

8   And this could be by email, it could be by

9   phone, it could be by chat.

10              We have interpreted their request as

11  a request for historic wages or Clippy.  So I

12  do know, I mean, I clearly recall that Clippy

13  had -- you know, it's a -- it's one of those

14  product features with more requests in terms of

15  the volume of feedback than the vast majority.

16              I would make a very educated guess

17  that it's in the top 20 of more than 150

18  features on the Roadmap in terms of volume of

19  feedback.

20      Q.   Do you know what Mr. Lombardo's

21  involvement, if any, was in getting Clippy on

22  the Roadmap?

23      A.   I don't know, but I think -- I would

24  assume that he, you know, shared amongst the X

25  number of feedbacks, he -- you know, he is
```

```
 1                    KYLE WEST

 2   represented in that pool of feedback given all

 3   the clients that he served, basically.  I'm

 4   sure of that.

 5        Q.    Would he have any decision making

 6   authority in terms of developing or producing

 7   Clippy?

 8        A.    Not to my knowledge.  Absolutely

 9   not.

10        Q.    With respect to the Roadmap, did

11   Mr. Lombardo have any input into prioritizing

12   what's at the top of that list?

13        A.    I mean, based on my understanding of

14   how things get prioritized, no, aside from

15   contributing to feedback and informing what we

16   call or what we refer to as the use case.  So

17   if he, you know, or somebody has a prospect or

18   a client who says, "Hey, we really like your

19   tool, but what we really need is wages by

20   ethnicity," or something like that, so, you

21   know, Rick would -- it would be incumbent on

22   Rick or the account manager, whoever it may be,

23   to get more information to answer the question

24   of, "Well, why do they want this, why does it

25   serve economic developers," et cetera, et
```

```
 1                     KYLE WEST
 2   cetera, et cetera.  So I think you could say
 3   that by contributing to the content that is
 4   recorded in our -- you know, literally archived
 5   in Prod Pad on product management software, he
 6   has influenced the -- what features make the
 7   Roadmap, but there is an actual process --
 8   well, kind of.
 9             We have a process for assigning
10   scores based on the impact, the level of effort
11   and the value of a feature.  So it's a very
12   specific process.  And it's a group.
13        Q.   So, I'm sorry.  Go ahead.
14        A.   There's a group that assigns values.
15   I shouldn't say values, just -- I don't want to
16   create confusion, but there's a team that
17   assigns values linked to the level of effort
18   required and the value of the feature.  So that
19   group makes decisions.
20             However, the Roadmap gets presented,
21   I believe, on a quarterly basis to the SEA
22   Group, and the priorities that come through the
23   SEA Group don't always align to the priorities
24   assigned by the product development team.
25             Does that make sense?
```

```
 1                    KYLE WEST

 2      Q.    Yes.

 3            Was Mr. Lombardo ever part of the

 4   group that assigns values?

 5      A.    I don't believe so, but you'd

 6   have -- you know, well, I -- I don't believe

 7   so, not when I was involved.

 8      Q.    Was Mr. Lombardo ever part of the

 9   SEA Group?

10      A.    Definitely not.

11      Q.    Can you describe -- well, first of

12   all, the term leadership has been used quite a

13   bit throughout this matter.  Can you describe

14   for me who constitutes leadership?

15      A.    Well, from my perspective, I think

16   of leadership as the SEA Group.  I forget what

17   the acronym stands for.  That's who I think of

18   as Chmura's leadership.  I don't know, you

19   know, behind the scenes whether they vote or

20   how many -- how votes are weighted.  I have no

21   idea.  But that is certainly my impression, is

22   that that's where decisions get made, and I

23   believe that Chris has the most influence.

24            My impression is that even if a

25   majority of the SEA Group did not agree with
```

```
1                        KYLE WEST
2    something or want to pursue something, my
3    impression is that Chris could override that,
4    but I am not certain.
5         Q.    And by Chris, you're referring to
6    Dr. Chris Chmura; is that correct?
7         A.    Chris Chmura, yes, yes.
8         Q.    Were you on SEA Group or part of SEA
9    Group?
10        A.    No.
11        Q.    Bear with me for one second.
12              As far as leadership management
13   style or SEA Group's management style, can you
14   describe that?
15        A.    Off the cuff, no, I can't.
16   Inconsistency, intimidating, threatening,
17   insecure.  I mean, I could go on with --  I'd
18   be happy to prepare something in writing, but I
19   think I would just be rambling.  I could go on
20   with easily 15 or 20 descriptors.
21              MS. COOPER:  I don't have any more
22         questions for you, Mr. West.  I appreciate
23         your time.
24                       EXAMINATION
25   BY MR. MICHALIK:
```

```
 1                   KYLE WEST

 2        Q.    Mr. West, I have just a real quick

 3   follow-up.

 4        A.    Okay.

 5        Q.    Can everybody hear me okay?  I was

 6   getting some feedback.

 7        A.    Okay.

 8        Q.    You were talking about this group or

 9   team that assigns values for the Roadmap.  Were

10   you ever on that team?

11        A.    Yes.

12        Q.    And what period of time were you on

13   that team?

14        A.    Roughly mid February to my

15   resignation, early April.

16        Q.    So just so we're clear, so mid

17   February of 2020, you submitted your

18   resignation?

19        A.    Correct, when I became the Senior

20   Business Analyst.

21        Q.    And I'm taking it from what you were

22   just saying in response to opposing counsel's

23   questions, would it be fair to say you're not a

24   fan of -- were not a fan of Chmura Analytics at

25   the time you resigned your employment?
```

```
 1                    KYLE WEST
 2       A.    I don't think that would be fair.
 3       Q.    Were you unhappy with Chmura's
 4  leadership at that time?
 5       A.    I do feel like leadership failed,
 6  yes, but Chmura leadership is -- I would
 7  characterize it as dichotomous.  So I really
 8  enjoyed working with certain members of
 9  leadership, and I really did not enjoy working
10  with others.
11            So I experienced a string of
12  specific incidents that led me to a tipping
13  point.  And when I reported that to Chris, the
14  CEO, she told me to move on, and I didn't
15  appreciate that, but I wouldn't say -- I
16  wouldn't say it made me unhappy, you know, the
17  style is such over time that I wasn't surprised
18  by her response.
19            But I definitely felt like it was
20  time for me to move on, which I felt for, you
21  know, probably more than a year, but I think to
22  their credit, maybe they sensed that maybe they
23  really wanted to keep me around, but as you can
24  tell, I rotated jobs quite a bit.  But, you
25  know, I had some -- I think had at the latest
```

1                       KYLE WEST

2    transition occurred a few months beforehand, I

3    would still be employed.

4              But, you know, the string of

5    incidents that I experienced just kind of

6    hardened my resolve to move on, and my mind was

7    made up.  So I wouldn't say I was unhappy.  I

8    think I was pretty well over it by the time I

9    resigned.  But I don't feel like I was unhappy.

10             I think if you asked me colleagues

11   if I was unhappy, I don't think anybody

12   would -- any honest person would say that they

13   detected that in my mood or persona.

14             Mr. MICHALIK:  No further questions.

15             (Time noted 5:40 p.m.)

16

17

18        _____

         KYLE WEST
19

20   Subscribed and sworn to before me

21   this_____ day of _____ 2020.

22

23   _____

24

25

```
 1                    KYLE WEST

 2               C E R T I F I C A T E

 3    STATE OF WASHINGTON        )
                                 )
 4    COUNTY OF BENTON           )

 5              I, Monna J. Nickeson, a Certified

 6    Court Reporter within and for the State of

 7    Washington, do hereby certify:

 8              KYLE WEST, the witness whose

 9    deposition is hereinbefore set forth, was duly

10    sworn by me and that such deposition is a true

11    record of the testimony given by such witness.

12              I further certify that I am not

13    related to any of the parties to this action by

14    blood or marriage; and that I am in no way

15    interested in the outcome of this matter.

16              IN WITNESS WHEREOF, I have hereunto

17    set my hand this day, May 26, 2020.

18

19

20            Monna Nickeson

21    _____

      MONNA J. NICKESON, CRR, RPR, CLR
22    CCR #3322

23

24

25
```

```
 1                        KYLE WEST

 2                      I N D E X

 3             LOMBARDO VS. CHMURA
               No. 3:19cv813
 4             May 14,2020

 5    WITNESS:  KYLE WEST                      PAGE

 6   EXAMINATION BY MR. MICHALIK:              4
     EXAMINATION BY MS. COOPER:                86
 7   EXAMINATION BY MR. MICHALIK:              97

 8

 9                      EXHIBITS

10   NUMBER                DESCRIPTION         PAGE

11   Exhibit A    Email (CHMURA0151954)        67
     Exhibit B    Reference letter dated November  70
12                24, 2019
     Exhibit C    Text messages                71
13                (Lombardo000508-512)
     Exhibit D    Test messages                75
14                (Lombardo000480-489)
     Exhibit E    Declaration of Kyle West     79
15   Exhibit F    Email (CHAMURA0054889-5492)  82
     Exhibit G    (Email (CHMURA0068218-68220) 84
16

17

18

19

20

21

22

23

24

25
```