# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| **CHMURA ECONOMICS &** | ) | **Case No. 3:19-cv-00813** |
| **ANALYTICS, LLC,** | ) | **Judge Robert E. Payne** |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RICHARD LOMBARDO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DECLARATION OF RICHARD A. LOMBARDO IN SUPPORT OF THE OPPOSITION TO CHMURA'S MOTION FOR SUMMARY JUDGMENT

Pursuant to 28 U.S.C. §1746, I hereby declare as follows:

1.      I am the Defendant in the above-captioned matter and am competent to give this declaration as I am over eighteen (18) years of age. I am a resident of Mentor, Ohio. The statements set forth in this Declaration are based upon my personal knowledge, and are true and correct to the best of my knowledge, information, and belief.

2.      I was employed at Chmura Economics & Analytics, LLC ("Chmura") from February 2015 through October 2019. In the approximately 4½ years that I was employed at Chmura, I had numerous direct supervisors – Leslie Peterson (February 2015-January 2017), Kyle West (February 2017-November 2017), Ethan Trombley and Greg Chmura (December 2017-

November 2018), Curtis Monk (December 2018-February 2019), Greg Chmura (March 2019), and Eli Auerbach (April 2019-October 2019).

3.      During my employment at Chmrua, my job duties did not change. My primary job responsibilities were to sell JobsEQ and obtain renewals from existing clients.

4.      Chmura had Standard Operating Procedures and an Employee Handbook. A copy of the Standard Operating Procedures in effect as of April 5, 2019 are attached as Exhibit 1 and a copy of the Employee Handbook in effect as of July 19, 2019 is attached as Exhibit 2. I was required to comply with the versions of the Standard Operating Procedures and Employee Handbook in effect during my employment at Chmura.

5.      On March 28, 2019, Chmura sent me an Amendment (the "Amendment") to the February 3, 2015 Letter. A copy of the February 3, 2015 Letter is attached as Exhibit 3 and the Amendment is attached as Exhibit 4. The Amendment provides:

> This letter is intended to amend the terms of your employment previously agreed to by you and Chmura Economics & Analytics, LLC in the company's offer letter you dated February 4, 2015.
>
> The following changes have been made:
>
> The reference to annual merit increases is hereby deleted. In addition, Chmura would like to clarify that commissions become payable once Chmura receives the payment on the sale.
>
> All other terms and conditions of the offer letter remain unchanged. Please indicate your willingness to accept these changes by signing below.

On April 18, 2019, I signed the Amendment.

6.      Despite the February 3, 2015 Letter and the Amendment, Chmura often modified the commissions I received. For example, in 2017, I closed a sale with the Oklahoma Department of Commerce, which required a perfunctory Request for Proposal ("RFP"). Not only was I not

permitted to complete the RFP, but I was not paid the full commission on the sale because Chmura stated after the deal was closed that it would not pay commissions on sales that required an RFP.

7.      On October 21, 2019, I (through my prior counsel) informed Chmura (through its counsel) that Chmura had violated the Fair Labor Standards Act and Ohio law by failing to pay me for all hours worked over forty. A copy of the October 21, 2019 Letter is attached to the Lombardo Dec. as Exhibit 5.

8.      As of October 21, 2019, Chmura had not terminated my employment, but placed me on unpaid leave.

9.      On October 31, 2019, in response to the October 21, 2019 Letter, Chmura sent a copy of a Complaint it had filed that same day and notified me that my employment was terminated because of the October 21, 2019 Letter:

> Finally, your letter stated that Chmura terminated Mr. Lombardo's employment on October 17. This is incorrect. The Company placed him on unpaid leave to afford him a reasonable opportunity to consider the proposed Separation Agreement. **Given your response on his behalf, that offer is withdrawn and he should consider his employment terminated effective today.**

A copy of the October 31, 2019 Letter is attached as Exhibit 6.

10.     I had personal effects at the Cleveland office when I was terminated. Although my employment was terminated on October 31, 2019, I have not received my personal property from Chmura.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _29_ day of May, 2020.

_Richard A. Lombardo_ (signature)

Richard A. Lombardo

3

Exhibit 1 to Declaration of Richard A. Lombardo in Support of the
Opposition to Chmura's Motion for Summary Judgment


Standard Operating Procedures


(Marked Confidential and Filed Under Seal)

Exhibit 2



# EMPLOYEE HANDBOOK

July 19, 2019



DEFENDANT'S DEPOSITION
EXHIBIT

Q

1309 E Cary Street, Richmond, VA 23219
1025 Huron Road East, Cleveland, OH 44115
1325 West First Avenue Suite 200, Spokane, WA 99201

chmuraecon.com

CHMURA000049

# Table of Contents

VISION, MISSION, VALUES ........................................................................................................ 4

    VISION .............................................................................................................................. 4
    MISSION ............................................................................................................................ 4
    BUSINESS VALUES ............................................................................................................ 4

CONFIDENTIALITY ................................................................................................................. 5

    CONFIDENTIAL INFORMATION AND CONFIDENTIAL WORK PRODUCT ................................ 5
    CONFIDENTIALITY, NON-COMPETITION, AND NON-SOLICITATION AGREEMENT ................ 5

COMPLIANCE WITH CLIENT'S TRAVEL POLICY ...................................................................... 5

TRAVEL EXPENSES ............................................................................................................... 5

    MILEAGE REIMBURSEMENT ............................................................................................. 5
    RENTAL VEHICLES ........................................................................................................... 6
    HOTELS ............................................................................................................................ 6
    MEALS ............................................................................................................................. 6
    TIPPING ........................................................................................................................... 6
    ENTERTAINMENT .............................................................................................................. 6
    COMPANY CREDIT CARDS ............................................................................................... 7
    EXPENSE REPORTS FOR REIMBURSABLE EXPENSES .......................................................... 7

WORK DAY ........................................................................................................................... 7

ABSENCES ............................................................................................................................ 7

VACATION ............................................................................................................................ 8

BEREAVEMENT LEAVE .......................................................................................................... 8

PAID HOLIDAY SCHEDULE .................................................................................................... 8

COMPUTER, EMAIL, AND INTERNET USAGE POLICY .............................................................. 9

    USE GUIDELINES .............................................................................................................. 9
    CHMURA'S RIGHT TO MONITOR AND CONSEQUENCES FOR MISUSE ............................... 10
    QUESTIONS REGARDING THE USE OF CHMURA TECHNOLOGY ....................................... 10

SOCIAL MEDIA POLICY ....................................................................................................... 10

    GUIDELINES .................................................................................................................... 10

DRESS FOR SUCCESS .......................................................................................................... 12

PERFORMANCE REVIEW ...................................................................................................... 13

COMPENSATION .................................................................................................................. 13

    SALARY .......................................................................................................................... 13
    BONUS ........................................................................................................................... 13



Benefits Package ........................................................................................................................... 13

**AFFIRMATIVE ACTION AND EQUAL EMPLOYMENT OPPORTUNITY** .................................................... **13**

**TITLE VI/NON-DISCRIMINATION POLICY** ............................................................................ **15**

**DRUG-FREE WORKPLACE** .................................................................................................... **15**

**ACKNOWLEDGEMENT OF RECEIPT OF EMPLOYEE HANDBOOK** ........................................................ **16**



# Vision, Mission, Values

## Vision

At Chmura, our vision is to be the nation's preferred provider of economic research, software, and data solutions.

## Mission

We combine timely, trusted, and targeted data with economic insights to enable our clients to create their future.

## Business Values

Honesty in all our professional relationship.

Sound business practices supporting a stable business environment.

Integrity for all colleagues and customers.

Leadership within the sphere of influence of Chmura.

Engagement with customers to create business relationships.

Employee satisfaction stemming from fairness and providing an environment stimulating motivation and loyalty.

Communication that informs, educates, instructs, and is open in structure.



CHMURA000052

# Confidentiality

## Confidential Information and Confidential Work Product

The definition of confidential is "intended to be kept secret." The work that Chmura performs for many clients is confidential. Clients share information with Chmura, and the client expects the information to be held in confidence. Chmura's work product for the client is confidential. Some clients require that Chmura execute a Confidentiality and Non-Disclosure Agreement. Even if Chmura is not requested to execute such an Agreement, the client's information and Chmura's work product is to be held in confidence.

## Confidentiality, Non-Competition, and Non-Solicitation Agreement

Employees are required to enter into a Confidentiality, Non-Competition, and Non-Solicitation Agreement, a copy of which is available for review. When an employee separates from Chmura, in the exit interview the employee will be reminded of the obligations of the employee under the Confidentiality, Non-Competition, and Non-Solicitation Agreement and the employee will be asked to acknowledge compliance with the Agreement.

# Compliance with Client's Travel Policy

Many of Chmura's clients have travel policies. As a consultant to the client, Chmura may be subject to the client's travel policy. The client's travel policies supersede the travel policies of Chmura and employees will comply with the client's travel policies.

# Travel Expenses

All arrangements for airfare and hotels should be approved by your supervisor who will then send it outside of your department (i.e., to the Director of Operations) for final approval. Please provide an event agenda when submitting a potential itinerary.

## Mileage Reimbursement

When business travel necessitates use of a personal vehicle, the employee will be reimbursed for mileage at the current mileage reimbursement rate established by the Internal Revenue Service. The Accounting Department will provide the current mileage reimbursement rate. If the estimated total cost of renting a vehicle is less expensive than the estimated cost of using your personal vehicle, however, it is requested that you rent a vehicle.

For local travel, mileage is reimbursed when it is over and above an employee's normal commute. That is, reimbursable mileage is calculated by taking the distance traveled less the employee's daily commute. If the employee still comes into the office, then all mileage is reimbursable.



## Rental Vehicles

Chmura will pay for approved use of a rental vehicle when it is the most economical mode of transportation available. Please consider any applicable hotel parking fees when determining the most economical mode of transportation. Please compare the total cost for a rental vehicle (rental fee, gas, parking, etc.) to the cost for a taxi or other transportation network company (TNC) like Uber or Lyft. Employees should waive the loss-damage waiver and liability coverage offered by the car rental company as these are covered by Chmura's insurance policy.

## Hotels

When attending a conference, the employee is expected to stay at the conference hotel to minimize the need for transportation to and from the conference location. If the conference hotel is not available, the employee should seek a similarly priced hotel in the vicinity of the conference to minimize transportation to and from the conference location.

For non-conference overnight travel, the employee is expected to exercise good judgment and select a hotel that is convenient to the business location as well as cost effective. Hampton Inn and Holiday Inn Express are examples of cost-appropriate hotels.

When a hotel stay is associated with a government client, the client may have access to a government rate at a convenient hotel, and the client may be willing and able to book a hotel room at the government rate on behalf of Chmura.

## Meals

The company pays for employee meals during travel for business. Except as noted below, Chmura will not reimburse employees for the cost of alcoholic beverages consumed while traveling. Chmura recommends using the U.S. General Services Administration (GSA) Guidelines which vary by city location to determine the appropriate cost of meals while traveling. If a free meal is included in a conference registration fee or built into the standard hotel room rate, Chmura will not reimburse the employee for a paid meal.

The GSA per diem rates for meals can be found on the GSA's website: https://www.gsa.gov/travel/plan-book/per-diem-rates.

## Tipping

The guideline for tipping bellmen is $1 per bag. The guideline for tipping drivers is 10% of the meter. The guideline for tipping in full-service restaurants is 15% of the pre-tax bill.

## Entertainment

If a Chmura employee is entertaining a client, the employee is expected to exercise good judgement in the selection of a restaurant at a reasonable price point. If the client orders an alcoholic drink with the meal, the Chmura employee's alcoholic drink may be included in the entertainment expense.



## Company Credit Cards

Chmura employees with company credit cards for travel are requested to use the company credit card for all travel expenses to include airfare, hotel, meals, incidentals, etc. Employees are NOT to use personal credit cards for company related travel purchases of any kind. When an employee utilizes a company credit card, the receipt is to be provided within five business days of returning from travel to the Accounting Department with a notation of the reason for the expense (e.g., hotel room for conference).

## Expense Reports for Reimbursable Expenses

Employees are to complete expense reimbursement reports promptly within one week after incurring reimbursable expenses.  The Accounting Department maintains a form Reimbursable Business Expense to report expenses for reimbursement.  The employee is to provide a receipt for each expense. For small cash expenses, such as tips, tolls, and other nominal amounts under $10, a receipt is not required.

Submit the expense reimbursement report to your supervisor and copy the Director of Operations for approval before submitting to the Accounting Department for reimbursement.

# Work Day

Chmura operates on a 40-hour work week. An employee's work day may be 8am – 5pm, or 9am – 6pm, or another timeframe approved by the supervisor. Regardless of the typical timeframe of an employee's work day, flexibility on the part of the employee may be required as dictated by deadlines and client demands.  Supervisors are to communicate the expectation for the timeframe of the work day.  If the employee is unsure, seek confirmation from the supervisor.

If you have to leave early or come in late, please come in early or stay late to make sure that your work load does not suffer. This does not apply to medical or transportation appointments or family emergencies. Please work out these details with your direct supervisor. Also, when scheduling appointments which require your absence from work, please schedule the first available appointment in the morning or the last appointment in the afternoon in order to minimize the time you are out of the office.

# Absences

Employees are expected to communicate with their supervisor regarding absences.  For planned absences such as vacation, the employee is expected to notify his/her supervisor in advance.  For unplanned absences such as sickness, the employee should notify his/her supervisor about the unplanned absence as soon as the employee is able.



# Vacation

Vacation days are accrued over the course of the year based on hours worked. For example, three weeks of vacation equates to 120 hours of vacation (15 days X 8 hours per day = 120 hours). The 120 hours accrue to the employee at a rate of 10 hours per month worked (120 hours/12 months = 10 hours of vacation accrual per month). The Accounting Department maintains a record for each employee of the employee's accrual rate and the amount of vacation that the employee has taken. Employees are not allowed to borrow against future accrual. If an employee has a negative vacation balance, Chmura will deduct the amount of the unearned vacation time from the employee's next paycheck.

An employee is expected to notify his/her supervisor of requested vacation days. The employee's Outlook calendar should reflect vacation days requested and taken.

Employees are encouraged to utilize vacation days accrued in the calendar year accrued. This is to encourage employees to take vacation and to return to work refreshed. If an employee desires to carry over accrued vacation time in excess of 40 hours into the following calendar year, the employee is requested to review the plan to do so with his/her supervisor. Employees may not carry over more than 80 hours of vacation time into the next calendar year.

Note: This is a vacation policy, and days are accrued for the purpose of vacation. Chmura does not have a PTO policy (paid time off or personal time off). A PTO policy provides a bank of hours in which the employer pools sick days, vacation days, and personal days, allowing employees to use as the need or desire arises. At Chmura, if an employee is sick, the sick day does not count against accrued vacation days.

# Bereavement Leave

Full-time employees may take up to three days off with pay to attend the funeral or make funeral arrangements for their immediate family. Immediate family members are defined as an employee's spouse, parents or step-parents, siblings, children, stepchildren, grandparents, father-in-law, mother-in-law, son-in-law, daughter-in-law, or grandchild. Full-time employees may take up to one day off to attend the funeral of a non-immediate family member or loved one. Full-time employees may also to take one day off after the loss of their pet.

# Paid Holiday Schedule

Chmura observes the following ten holidays:

New Year's Day

Martin Luther King Jr. Day

Good Friday

Memorial Day



July 4th

Labor Day

Thanksgiving Day

The day after Thanksgiving Day

Christmas Eve

Christmas Day

If a holiday falls on a Saturday or Sunday, Chmura observes the holiday on the day that is a Federal holiday.


# Computer, Email, and Internet Usage Policy

## Use Guidelines

Chmura has established the following guidelines for employee use of the company's technology and communications networks, including the Internet and e-mail, in an appropriate, ethical and professional manner.

1. All technology provided by Chmura, including computer systems, communications networks, company-related work records and other information stored electronically, is the property of the company and not the employee. In general, use of the company's technology systems and electronic communications should be job-related and not for personal convenience.
2. Employees may not use Chmura's Internet, e-mail or other electronic communications to transmit, retrieve or store any communications or other content of a defamatory, discriminatory, harassing or pornographic nature. No messages with derogatory or inflammatory remarks about an individual's race, age, disability, religion, national origin, physical attributes or sexual preference may be transmitted. Harassment of any kind is prohibited.
3. Disparaging, abusive, profane or offensive language; materials that might adversely or negatively reflect on Chmura or be contrary to its legitimate business interests; and any illegal activities—including piracy, cracking, extortion, blackmail, copyright infringement and unauthorized access to any computers on the Internet or e-mail—are forbidden.
4. Copyrighted materials belonging to entities other than Chmura may not be transmitted by employees on the company's network without permission of the copyright holder. Employees must respect all copyrights and may not copy, retrieve, modify or forward copyrighted materials, except with permission or as a single copy for reference only. Saving copyright-protected information to a network drive without permission is prohibited. Sharing the URL (uniform resource locator or "address") of an Internet site with other interested persons for business reasons is permitted.
5. Employees may not use the system in a way that disrupts its use by others. This includes sending or receiving excessive numbers of large files and "spamming" (sending e-mail to thousands of users.)
6. To prevent contamination of Chmura technology and communications equipment and systems by harmful computer viruses, downloaded files should be checked for possible infection through



the IT department. Also, given that many browser add-on packages (called "plug-ins") may not be compatible with other programs and may cause problems for the systems, downloading plug-ins is prohibited without prior permission from IT.

7. Every employee of Chmura is responsible for the content of all text, audio or image files that he or she places or sends over the company's Internet and e-mail systems. No e-mail or other electronic communications may be sent that hide the identity of the sender or represent the sender as someone else. Chmura's corporate identity is attached to all outgoing e-mail communications, which should reflect corporate values and appropriate workplace language and conduct.

8. E-mail and other electronic communications transmitted by Chmura equipment, systems and networks are not private or confidential, and they are the property of the company. Therefore, Chmura reserves the right to examine, monitor and regulate e-mail and other electronic communications, directories, files and all other content, including Internet use, transmitted by or stored in its technology systems, whether onsite or offsite.

9. Internal and external e-mail, voice mail, and text messages are considered business records and may be subject to discovery in the event of litigation. Employees must be aware of this possibility when communicating electronically within and outside the company.

## Chmura's Right to Monitor and Consequences for Misuse

All company-supplied technology, including computer systems, equipment and company-related work records, belongs to Chmura and not to the employee user. Employees understand the company routinely monitors use patterns, and employees should observe appropriate workplace discretion in their use and maintenance of such company property.

Because all the computer systems and software, as well as e-mail and Internet connections, are the property of Chmura, all company policies apply to their use and are in effect at all times. Any employee who abuses the company-provided access to e-mail, the Internet, or other electronic communications or networks, including social media, may be denied future access, and, if appropriate, be subject to disciplinary action up to and including termination, within the limitations of any applicable federal, state or local laws.

## Questions Regarding the Use of Chmura Technology

If you have questions regarding the appropriate use of Chmura electronic communications equipment or systems, including e-mail and the Internet, please contact your supervisor, manager or the IT department.

# Social Media Policy

At Chmura, we realize that social media can be a desirable way to share your life and opinions with family, friends, and co-workers. Use of social media, however, also presents certain risks and carries with it certain responsibilities. To assist you in making responsible decisions about your use of social media, we have established guidelines for appropriate use of social media.

## Guidelines

In the rapidly expanding world of electronic communication, social media can mean many things including all means of communicating or posting information or content of any sort on the internet, including to your own or someone else's web log or blog, journal, or diary, personal website, social



networking or affinity website, web bulletin board or chat room—whether or not associated or affiliated with Chmura, as well as any other form of electronic communication. Before creating online content, Chmura recommends you consider some of the risks and rewards that are involved. Any conduct that adversely affects your job performance, the performance of colleagues, or otherwise adversely impacts members, customer, suppliers, people who work on behalf of Chmura or Chmura's legitimate business interests may result in disciplinary action up to and including termination.

## Understand and Follow the Rules

Inappropriate postings that may include discriminatory remarks, harassment, and threats of violence or similar inappropriate or unlawful conduct will not be tolerated and may subject you to disciplinary action up to and including termination.



## Be Respectful

Always be fair and courteous to fellow associates, customers, members, suppliers or people who work on behalf of Chmura.

## Be Honest and Accurate

When posting information or news, make sure you are always honest and accurate. If you make a mistake, correct it quickly.

## Post Only Appropriate Content

Do not create a link from your blog, website, or other social networking site to a Chmura website without identifying yourself as a Chmura employee. Express only your personal opinions and never represent yourself as a spokesperson for Chmura.

## Social Media Use at Work

Refrain from using social media while on work time or on equipment we provide unless it is work related. Do not use your Chmura email address to register on social networks, blogs, or other online tools used for personal use.

# Dress for Success

"You visually represent your business, and what you wear can say as much about you as your LinkedIn profile." *Wall Street Journal, March 19, 2016 Nandini D'Souza Wolfe*

"What you have on is your business card." *LaQuishe Wright, Managing Partner of Q Social Media Ltd.*

Footwear not appropriate for the office: sandals, Tivas, Chacos, flip flops, open toe shoes, shoes that expose the foot, not even peep-toe pumps.   This is a 12-month a year policy.

Attire not appropriate for the office:  Shorts.  This is a 12-month a year policy.

Always: clean, neat, tidy, modest.

For meetings with clients and other customer contact, below is attire guidance for Business or Business Casual.  Please consult with your supervisor if you have questions about proper attire for client meetings.

> Business Casual (Men) – slacks, dress shirt, button-down shirt, open-collar or polo shirt with sports jacket, leather shoes with socks.

> Business Casual (Women) – slacks or skirt with jacket or sweater, dress, leather shoes.

> Business (Men) - suit, dress shirt, nice tie, leather dress shoes and dark dress socks.

> Business (Women) - suit, slacks or skirt with jacket, dress, leather shoes.



# Performance Review

New employees receive a performance review three months after their start date.

Supervisors conduct performance reviews of employees at least once per year, generally around the anniversary of the hire date.

# Compensation

## Salary

Salaries are determined based on the skill level required of the position and the skill level of the candidate for the position.

## Bonus

Salaries are adjusted annually based on the cost of living index as well as employee performance for all full-time employees during the annual review occurring within their full-time employment. Chmura may award performance bonuses based on the employee's performance.

## Benefits Package

Chmura offers a benefits package consisting of the following:

Health Insurance - Chmura pays ½ of the employee portion of the health care/vision plan. Chmura also pays ½ of the employee portion of the dental plan.

401(k) Plan - Chmura offers a SunTrust 401(k) Plan and makes the following contributions to the Plan on the employee's behalf, up to a maximum 4% of compensation: A Safe Harbor matching contribution of 100% of the employee's elective deferral contributions up to 3% of compensation plus 50% of the elective deferral contributions over 3% and up to 5% of compensation.

Examples:
Employee contributes 2%, Chmura contributes 2%.
Employee contributes 3%, Chmura contributes 3%.
Employee contributes 4%, Chmura contributes 3.5%.
Employee contributes 5%, Chmura contributes 4%.
Employee contributes 8%, Chmura contributes 4%.

# Affirmative Action and Equal Employment Opportunity

(Note: State governments sometimes require an Affirmative Action and Equal Employment Opportunity statement when submitting proposals in response to Requests for Proposals. The statement below was a



requirement of an RFP in the state of Ohio.  When Chmura is requested to submit a statement in a proposal, Chmura's statement below should satisfy the proposal requirement).

## Chmura Economics & Analytics LLC ("Chmura")
## Affirmative Action and Equal Employment Opportunity

**EEO Recruitment Strategies:**
Strategy: Chmura will make a good faith effort to recruit a diverse group of employees and provide equal opportunity for minorities, women and disabled persons to become competitive in state contracting opportunities. Chmura will advertise positions in media outlets that will provide information and access to the underserved populations.

**EEO Selection Strategies:**
Strategy: Chmura will utilize procedures, processes and techniques that are fair and do not have an adverse impact on minorities, women or disabled persons. Prospective employees will not be excluded from the hiring process due to race, color, religion, sex (including sexual harassment), national origin, disability, age (40 years old or more), military status, and veteran status.

**EEO Placement/Orientation:**
Strategy: Chmura will provide newly hired employees with basic employment information during the first couple weeks on the job. New employee position descriptions, fringe benefits information, policies, procedures and EEO are a few of the topics which should be covered. Employees will not be denied fringe benefits and/or opportunities for promotion based on race, color, religion, sex, national origin, disability, age (40 years old or more), military status and veteran status.

**EEO Performance Evaluation:**
Strategy: Chmura will evaluate the performance of their employees on an annual basis. It should provide the necessary supervisory feedback to identify areas to be improved as well as to reinforce those activities that meet or exceed standards. Performance appraisal will be evaluated without regard to race, color, religion, sex, national origin, disability, age (40 years old or more), military status and veteran status.

**EEO Training Strategies:**
Strategy: Chmura will attempt to diversify workforce by utilizing training and apprenticeship programs with diverse participants. Training and apprenticeship programs can increase the number of qualified minorities, women, disabled persons and veterans available for job placement.

**EEO Discipline Strategies:**
Strategy: Chmura will set clear disciplinary standards and warn of consequences for non-compliance. Discipline will be designed to rehabilitate employees who choose to correct their behavior as well as justify the termination of those who do not. The employer will not mistreat or unfairly discipline an employee based on race, color, religion, sex, national origin, disability, age (40 years old or more), military status and veteran status.

**EEO Separation Strategies/Exit Interviews:**
Strategy: Chmura will conduct exit interviews as a problem-solving tool in an attempt to reveal employee turnover. Exit interviews can provide the organization with information about how to correct the causes of discontent and reduce the costly problem of employee turnover.



**EEO Monitoring Strategies:**
Strategy: Chmura will ensure Human Resources managers and supervisors understand this plan and hold managers and supervisors accountable for the effective of this plan.

**Minority Business Enterprise Solicitation Strategies:**
Strategy: Chmura will make a good faith effort to solicit business from certified minority owned businesses (MBE).

# Title VI/Non-Discrimination Policy

It is the policy of Chmura Economics & Analytics (Chmura) to comply with the regulations of Title VI of the Civil Rights Act of 1964, as amended and other nondiscrimination laws and authorities, that include regulations relative to nondiscrimination in federally-assisted programs of the Department of Transportation (DOT) Title 49, Code of Federal Regulations (CFR) and the Federal Highway Administration's Title 23 Code of Federal Regulations 200.  Chmura does not discriminate against any person on the basis of race, color, national origin, sex, age, disability, or low-income.

Chmura will not discriminate on the grounds of race, color, sex, national origin, age, or disability in the selection and retention of subconsultants, including procurements of materials and leases of equipment. (name of firm) will not participate either directly or indirectly in the discrimination prohibited by 49 CFR, Part 21.5.

In all solicitations, either by competitive bidding or negotiation made by Chmura for work to be performed under a subcontract, including procurements of materials or equipment, each potential subcontractor or supplier shall be notified of the contractor's obligations under the contract and the Regulations relative to nondiscrimination on the grounds of race, color, national origin, sex, age, disability, and low income. Chmura will include the necessary provisions in every subcontract; including procurements of materials and leases of equipment, unless exempt by the Regulations, or directives issued pursuant thereto.

Chmura ensures nondiscrimination and equal employment opportunity in all programs and activities in accordance with Title VI of the Civil Rights Act of 1964. If you need more information or special assistance for persons with disabilities or limited English proficiency, contact Sharon Simmons at 804-554-5400 ext. 104. Persons with hearing-and speech-impairments can contact Chmura by using the Virginia Relay Service, a toll-free telecommunication device for the deaf (TDD). Call 711 for TTY/TDD.

# Drug-free Workplace

Chmura provides a drug-free workplace for all employees.  The unlawful manufacture, sale, distribution, dispensation, possession, or use of a controlled substance or marijuana is prohibited and violation of such prohibition is grounds for dismissal.



# Acknowledgement of Receipt of Employee Handbook

My signature below indicates that I have received a copy of Chmura's *Employee Handbook*.

I understand that this manual contains information regarding Chmura's rules, regulations, and benefits which affect me as an employee.

I acknowledge that I have read and understood Chmura policies.

I also understand that Chmura may revise, supplement, or rescind policies, procedures, or benefits described in the handbook, with or without notice.

Print Name _____

Signature_____

Date _____



# Exhibit 3



Chmura Economics & Analytics
1309 E Cary St, FL 2
Richmond, VA 23219
804.554.5400
www.chmuraecon.com

February 3, 2015

Richard A Lombardo
27030 Forestview Ave
Euclid, OH 44132

Dear Rick,

It is our pleasure to detail an offer of employment as an Inside Sales Representative (ISR) with Chmura Economics & Analytics, LLC (Chmura) at our Cleveland, Ohio office, contingent on satisfactory review of your W2's. Chmura would like you to begin on Wednesday, February 18, 2015, or sooner, if possible.

Your offer is as follows:

1. Annual base salary plus commission structure (see below).
2. Eight paid holidays over a typical full calendar year (remaining holiday schedule for 2015).
3. Medical/Vision insurance provided by Anthem and dental insurance provided by MetLife. Chmura pays half of our employee's premium costs for both medical and dental monthly premiums.
4. A review after the first three months that will include input from Leslie Peterson, John Chmura, and Dr. Christine Chmura regarding your progress in acclimating to the portfolio of Chmura IT and data services.

After three months of employment, you will also be eligible for:

- Annual merit increases, upon approved performance by your management;
- Ten days paid vacation per year (vacation accrues at a rate of 0.83 days per month);
- Opportunity to contribute to a Simple IRA plan (Chmura matches up to 3% of salary based on your contribution);

Compensation Overview:

| | |
|---|---|
| Annual base salary | $55,000 (Year 1) and $50,000 (Year 2+) |
| Commission rate on JobsEQ sales | 15% of initial sale<br>3% of annual renewals |
| Quota | 3 sales per month<br>(after a 3-month ramp-up period) |

Rick, your individual sales quota will be monitored on a monthly basis. Every effort will be made to ensure you are equipped with the training you need to effectively demonstrate the features and benefits of our technology platform (JobsEQ) to your prospective clients. Please note, that failure to achieve the agreed upon sales quota levels could result in your employment termination. New sales commissions will transact as client signatures are secured to the JobsEQ license agreement by Chmura's accounting department; payment to you will occur the month following the transact date. While we believe the quota level outlined above is reasonable, Chmura may re-evaluate the quota metric after 6

1



CONFIDENTIAL

CHMURA000097



**Chmura Economics & Analytics**
1309 E Cary St, Fl. 2
Richmond, VA 23219
804.554.5400
www.chmuraecon.com

months and make adjustments, as we are a company of continuous process improvement. Sales territory will be determined after your hire is confirmed.

Rick, this offer is designed to allow you to demonstrate your competence and enthusiasm for a challenging position with a professional consulting firm. Chmura is a reputable and credible organization and as such, we employ only 'A-level' professionals who can produce quality results for our customers in a timely manner.

Chmura hopes this proposal meets your expectations. We believe you can make a strong contribution to the firm, and we look forward to working with you. This letter should not be construed as an employment contract. Please see the employment agreement attached.

Please call me at 804-649-1107 (work) or 804-512-7437 (mobile) if you have any questions.

Sincerely,

Leslie Peterson, Partner
President & Chief Strategy Officer

Signing below signifies acceptance of this employment offer:

Richard A Lombardo                                      2-4-2015
                                                       (date)

2

**CONFIDENTIAL**

# Exhibit 4

 **CHMURA**
Economics & Analytics

Chmura Economics & Analytics
1309 E Cary St, FL 2
Richmond, VA 23219
804.554.5400
www.chmuraecon.com

March 28, 2019

Richard A. Lombardo
8341 Sheltered Cove
Mentor, OH 44060

Dear Rick,

This letter is intended to amend the terms of your employment previously agreed to by you and Chmura Economics & Analytics, LLC in the company's offer letter you dated February 4, 2015.

The following changes have been made:

The reference to annual merit increases is hereby deleted. In addition, Chmura would like to clarify that commissions become payable once Chmura receives the payment on the sale.

All other terms and conditions of the offer letter remain unchanged. Please indicate your willingness to accept these changes by signing below.

Sincerely,

Leslie Peterson
President and Chief Strategy Officer

Signing below signifies acceptance of this amendment.

Rick Lombardo

4-18-2019
(date)



DEFENDANT'S DEPOSITION EXHIBIT
G

CHMURA000099

 **McCarthy, Lebit, Crystal & Liffman**

Ann-Marie Ahern
Attorney at Law
Writer's Ext.: 244
ama@mccarthylebit.com

 *OSBA Board Certified Specialist
in Labor and Employment Law*

# Exhibit 5

October 24, 2019

***Confidential: For Settlement Purposes Only
Protected From Disclosure Under Evid. R. 408***

**VIA FEDERAL EXPRESS TRACKING – 7768 0553 9273**

Rodney A. Satterwhite, Esq.
McGuireWoods LLP
800 East Canal Street
Richmond, VA  23219

RE:     **Termination of Rick Lombardo**

Dear Mr. Satterwhite:

As I noted in previous telephone and email correspondence, this office has been retained by Rick Lombardo ("Rick"), and I write here to offer a formal response to your October 21, 2019 letter.  In short, Rick will not be executing the proposed separation agreement that was presented to him.

Instead, we intend to pursue claims against Chmura Economics & Analytics, LLC ("Chmura") for violations of the Fair Labor Standards Act ("FLSA"), the Ohio Minimum Fair Wage Standards Act ("OMFWSA"), and the Ohio Prompt Pay Act.  I write in advance of filing suit because it is my hope that this matter can be resolved amicably before further escalation.

### Rick's Employment with Chmura

As you may know, Rick began his employment with Chmura in February 2015, making him the company's most-senior salesperson at the time of his termination.  As such, he was instrumental to the company's growth.  By persistently calling and emailing potential customers—including state agencies, real estate companies, and consulting firms—Rick built an impressive network of professional contacts, and he quickly became one of Chmura's most valuable employees.  In fact, he is individually responsible for securing 58 percent of Chmura's existing business accounts.

Rodney A. Satterwhite, Esq.
October 24, 2019
Page 2

Much of Rick's success can be attributed to his impressive work ethic. As I understand, Rick routinely worked more hours than Chmura's other salespeople—he was the first to arrive to work and the last to leave. In fact, his coworkers frequently joked with Rick about his diligence, remarking that they had never seen Rick take a lunch break. The quantity of Rick's work is simply staggering: he routinely worked well in excess of 40 hours per week, often ranging well above 50 hours and occasionally more than 60 hours per week.[1]

Despite Rick's contributions to the company, Chmura did not regard Rick as a valued employee. It did not, for example, provide Rick additional compensation for his extra hours of work. Moreover, Rick had expected to earn a merit increase this March, but Chmura sent him a letter, indicating that he would not be receiving a raise—in spite of the fact that his actual sales numbers had far exceeded his target numbers.

By Fall of this year, Rick began to fear that Chmura would terminate his employment. To be specific, Rick deduced that the company did not want to continue paying him commissions on his customers' renewals. Instead, Chmura decided to hire several additional salespeople, who, as I understand, are paid substantially less than Rick (largely because they are not owed commissions for existing customers' renewals). Shortly after adding these new hires, Chmura terminated Rick's employment on October 17, 2019. Days later, on October 21, 2019, Chmura sent him a proposed separation agreement.

That same day, your office transmitted a letter to Rick, in which you recapped the circumstances surrounding Rick's departure and highlighted a number of provisions in Rick's Confidentiality, Non-Competition & Non-Solicitation Agreement. After extensive conversations with my client, I find it necessary to provide clarification on a few matters. When Chmura terminated Rick's employment on October 17, 2019, he neither threatened to violate his post-employment restrictive covenants nor expressed an intent to disrupt Chmura's business. Instead, Eli Auerbach ("Auerbach"), Chmura's Sales Manager, expressly asked Rick whether he intended to sue the company. Rick merely replied that he would discuss the matter with legal counsel. Auerbach also specifically asked Rick whether he intended to work for a Chmura competitor. Rick explained that he has no immediate plans for his future employment but that he was confident, given his skills as a salesperson, that he would find another opportunity.

## Rick's Claims against Chmura

Chmura's failure to pay Rick for all hours worked over 40 is a violation of 29 U.S.C. § 207, which states "no employer shall employ any of his employees...for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is

---

[1] Rick has maintained his parking receipts, which reflect the amount of time Rick spent at work on a daily basis. These receipts confirm that Rick regularly worked 10 to 11-hour days.

Rodney A. Satterwhite, Esq.
October 24, 2019
Page 3

employed."[2]   Rick can show that he regularly worked overtime hours nearly every week throughout his tenure with Chmura. Importantly, I understand that Chmura does not have records of Rick's start and end times, allowing Rick to approximate his hours, even if just by reasonable inference. *U.S. DOL v. Cole Enters.*, 62 F.3d 775, 779 (6th Cir. 1995). Despite his compensable work, Chmura failed to pay any premium to Rick for these additional hours. All told, and based on Rick's salary, Chmura's FLSA and state law exposure is considerable.

Chmura's exposure is compounded by 29 U.S.C. § 216(b), which provides that "[a]ny employer who violates the provisions of…section 207 of this title shall be liable to the employee…affected in the amount of…their unpaid overtime compensation…and in an additional equal amount as liquidated damages." Thus, in addition to his unpaid wages, Rick is also entitled to an equal amount in liquidated damages. Rick cannot waive this right and an employer is liable for liquidated damages even after satisfying its liability for the unpaid overtime wages. *Schulte v. Gangi*, 328 U.S. 108 (1946) (an employee cannot waive or release his right to liquidated damages under the FLSA); *McConnell v. Applied Performance Technologies, Inc.*, No. C2-01-1273, 2002 U.S. Dist. LEXIS 27598, at *13 (S.D. Ohio March 18, 2002) (same). Given Chmura's history of mistreating Rick (by denying him a raise this Spring and terminating him in exchange for more affordable salespeople), we are confident that Chmura will not be able to claim any "good faith" safe harbor that might otherwise be attributable to such liquidated damages.

To be clear, based on the nature of his employment, we are confident that Rick was not exempt from the protections of the FLSA. Although he was a salesperson, he worked entirely inside Chmura's place of business, he did not exercise independent discretion, and he did not oversee other employees. To the extent Chmura intends to offer that Rick was exempt under the "retail or service establishments" exemption, federal regulations make clear that Chmura—which collects labor data for governmental agencies and other firms—does not provide "retail services." *See* 29 C.F.R. 779.318 (defining a retail establishment as "one which sells goods or services to the general public," "serves the everyday needs of the community, and distributes its products in "small quantities").

Importantly, 29 U.S.C. § 216 further states that "[t]he court in such action **shall**, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant." (Emphasis added.) Awards of attorneys' fees and costs to successful FLSA plaintiffs are thus mandatory under § 216(b). Such fees are recoverable regardless of whether the employee recovers a relatively small amount in lost wages. See, e.g. *Lucio-Cantu v. Vela*, 239 Fed. Appx. 866 (5th Cir. Tex. 2007) (plaintiffs recovered $50,000 in attorneys' fees in action that resulted in approximately $4,500 in lost wages damages); *Cain v. Almeco USA, Inc.*, 2014 U.S. Dist. LEXIS 70900 (N.D. Ga. May 23, 2014) (attorneys' fees in the amount of $173,300.50 awarded to plaintiffs despite that amount being more than ten times the actual statutory damages). As it stands right now, our attorneys' fees on this matter are fairly minimal. Failure to resolve the matter at an early juncture, however, will inevitably lead to a dramatic increase in attorneys' fees

---

[2] Claims for unpaid overtime under the OMFWSA mirror claims under the FLSA. Ohio Revised Code § 4111.03(A). Thus, this letter's explanation of HSM's liability under the FLSA also applies to HSM's liability under the OMFWSA.

Rodney A. Satterwhite, Esq.
October 24, 2019
Page 4

and costs as we pursue this case into litigation, in which our fees will quickly and substantially increase.

As a final note, Rick can also assert a claim under Ohio's Prompt Pay Act, which provides that when an employer fails to promptly pay (within thirty days) an employee's earned wages, the employee has a cause of action against the employer. *See* R.C. 4113.15. Here, Rick earned overtime wages throughout his employment, and these wages have gone unpaid for far longer than thirty days.

Considering the strength of Rick's claims, we believe that Chmura has exposed itself to substantial liability. If a jury were to see the burden imposed on him, we have little doubt that it would not hesitate to find in Rick's favor and also award him considerable damages. As such, the severance currently offered is inadequate consideration for a release of Rick's claims, and we believe there is value to Chmura in resolving this matter prior to Rick formally filing it in a public forum. We anticipate that you will want to share this letter with appropriate personnel. After you have had an opportunity to do so, I hope that you will contact me so that we may discuss a resolution of Rick's claims. If we do not receive a response from you by October 31, 2019 however, we plan to pursue any and all remedies available at law on Rick's behalf.

Sincerely,

Ann-Marie Ahern

AMA/jsm



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

**McGuireWoods LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Phone: 804.775.1000
Fax: 804.775.1061
www.mcguirewoods.com

**Exhibit 6**

**Rodney A. Satterwhite**
Direct: 804.775.1098  **McGuireWoods**

rsatterwhite@mcguirewoods.com
Fax: 804.698.2163

October 31, 2019

VIA EMAIL and U.S. MAIL - ama@mccarthylebit.com

Ann-Marie Ahern
McCarthy, Lebit, Crystal & Liffman Co., LPA
101 W. Prospect Avenue
Suite 1800
Cleveland, OH  44115-1088

Re:  Chmura Economics & Analytics, LLC and Rick Lombardo

Dear Ms. Ahern:

This responds to your October 24 letter.

First, after further investigation, we disagree with your characterization of the conversation between Mr. Lombardo and Mr. Auerbach.  This conversation was not limited to whether Mr. Lombardo intended to file suit, but instead Mr. Lombardo listed multiple steps he would take if he did not receive a sufficient payment.  These "steps" included soliciting all of Chmura's clients and diverting them to a competitor, with whom he had already met at a recent conference.  Mr. Lombardo concluded his conversation by stating that "either Chmura would pay for 'his' book of business, or someone else would."

Importantly, Mr. Lombardo made similar statements to other Chmura employees.  He told one such employee that he would be "collateral damage" when Mr. Lombardo diverted Chmura's customers to a competitor.  These employees will corroborate that Mr. Lombardo made clear and explicit threats to violate his restrictive covenants.  His threats are especially troubling in light of Mr. Lombardo's failure to return electronic equipment (including a laptop computer), information about prospective customers that Mr. Lombardo prepared on Chmura's behalf at various conferences he attended, and other Chmura sales materials.

These events have left Chmura with no choice but to protect its interests by filing the attached complaint.  Please let me know if you are authorized to accept service of process on Mr. Lombardo's behalf.

October 31, 2019
Page 2

Next, we are surprised that Mr. Lombardo has attempted to raise overtime claims. Although your letter did not mention it, I am sure you are aware his total annual compensation exceeded $150,000 for the last three years.   Chmura provided him this significant compensation package in exchange for his performance of duties that place him squarely within the highly compensated employee exemption of the Fair Labor Standards Act.  *See* 29 CFR §541.601.  The Company is not inclined to pay him for the same work twice.

Finally, your letter stated that Chmura terminated Mr. Lombardo's employment on October 17.  This is incorrect.  The Company placed him on unpaid leave to afford him a reasonable opportunity to consider the terms of the proposed Separation Agreement.  Given your response on his behalf, that offer is withdrawn and he should consider his employment terminated effective today.

Best regards,

*Rodney A. Satterwhite*

Rodney A. Satterwhite

Enclosure

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| CHMURA ECONOMICS & ANALYTICS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | |
| RICHARD LOMBARDO, | ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiff Chmura Economics & Analytics, LLC, by counsel, files this Complaint against Defendant Richard Lombardo.

### Introduction

1.  Chmura brings this action for injunctive relief to prevent Lombardo from carrying out his threats to intentionally destroy its business. Despite his contractual and fiduciary obligations, Lombardo threatened to steal Chmura's customers and take them to a competitor if Chmura did not offer him compensation commensurate with his perceived self-worth. Chmura declined to succumb to Lombardo's threatened extortion, and therefore sues to enforce Lombardo's restrictive covenants.

### Parties, Jurisdiction, and Venue

2.  Chmura Economics & Analytics, LLC is a Virginia limited liability company with its principal place of business in Richmond, Virginia.

3.  Lombardo is a citizen and resident of the state of Ohio.

1

4.   The value of the customer contracts with which Lombardo has threatened to interfere is well over $100,000.

5.   Because the parties in this case are citizens of different states, and the amount in controversy exceeds $75,000, this Court has diversity jurisdiction over the matter pursuant to 28 U.S.C. § 1332.

6.   This Court has personal jurisdiction over Lombardo because he "irrevocably and unconditionally consent[ed] to the exclusive jurisdiction and venue of . . . the United States District Court for the Eastern District of Virginia, Richmond Division in connection with any suit, action or proceeding relating to" his "Confidentiality, Non-Competition & Non-Solicitation Agreement" (the "Agreement") with Chmura, on which this action is based.  (Ex. A § 8.)

7.   Venue is proper in the Eastern District of Virginia and this division based on the Agreement's forum selection provision, which names the federal and state courts in Richmond, Virginia as the exclusive forum for this dispute.  *Id.*

## FACTUAL ALLEGATIONS

### A.   Chmura's Business and Lombardo's Employment

8.   Chmura is a leading software and consulting firm in the field of data analytics.  Chmura's proprietary software provides demographics and labor data, such as highly granular occupation forecasts and real-time data about job postings.  Chmura's team of economists, data scientists, and statisticians also provide consulting services to help clients interpret and use the data available through its software products.

9.   Lombardo began his employment with Chmura in 2015.  At that time, Lombardo was one of only two Chmura sales representatives in the Ohio area.

2

10. Lombardo marketed and sold Chmura's software products to customers in his territory. Although many of Lombardo's customers were located in the Midwest, he sold to customers nationwide. Thus, Lombardo was responsible for creating interest, developing opportunities, negotiating deals, managing client relationships, and driving revenue by selling Chmura's software products and consulting services.

11. Lombardo's responsibilities also extended beyond merely making sales. For example, he regularly offered input and assistance on marketing strategy, resolved client questions and complaints, administered invoices and customer payments, and provided feedback on prospective and existing product features.

12. Over the course of his employment, Lombardo had access to, and used, Chmura's confidential customer and target information, business platform, reputation, resources, and goodwill to expand and service Chmura's existing client relationships and to develop new ones.

13. Lombardo brought no client relationships with him to Chmura. Rather, Lombardo developed new client relationships exclusively through the resources and training he received from Chmura.

**B. Lombardo's Restrictive Covenant Agreement with Chmura**

14. When Lombardo began his employment with Chmura, he signed a Confidentiality, Non-Competition, and Non-Solicitation Agreement with Chmura, dated February 4, 2015. A true and correct copy of the Agreement is attached as Exhibit A.

15. In that Agreement, Lombardo agreed that he would not "reveal or disclose to any person outside of the Company, or use for his[] own benefit or the benefit of any other person or entity, any confidential or proprietary information concerning the business or affairs of the Company, or concerning the Company's customers, clients or employees." (Ex. A § 1.)

16. In addition, Lombardo's Agreement contained "Covenants Not to Compete or Interfere."

Those covenants stated that Lombardo would not:

> directly or indirectly, perform, whether as an employee, independent contractor, consultant, agent, or owner, the same, similar, or substantially similar job duties or services as s/he performed for the Company on the date of his/her termination or within the one (1) year period preceding the date of his/her termination for or on behalf of any person or entity that engages in the Company's Business in any geographic areas serviced by Employee or in which Employee provided goods or services on behalf of the Company during his/her employment with the Company.

*Id.* § 3(b).

17. Lombardo also agreed that he would not:

> directly or indirectly, on behalf of himself or any other person, partnership, company, corporation or other entity, solicit or attempt to solicit for purposes of providing products or services that are the same or substantially similar to the Company's Business any individual or entity to whom Employee provided products or services at any time during the period of his/her employment with the Company, to whom Employee pursued on behalf of the Company, or of whom Employee had knowledge based on his/her employment with the Company because the Company provided products or services to or actively pursued the individual or entity during Employee's employment.

*Id.* § 3(c).

18. Lombardo further acknowledged that the Agreement's restrictions are "reasonable, fair and equitable in terms of duration and scope, are necessary to protect the legitimate business interests of the company, and are a material inducement to the Company to enter into this Agreement." *Id.* § 3(e).

19. In addition, Lombardo agreed that:

> a breach of any of the covenants set forth in Sections 1, 2, and 3 [including those quoted above] would result in immediate irreparable injury and damage to the Company for which the Company would have no adequate remedy at law. In the event of a breach or threatened breach by [Lombardo] of any of the provisions of Sections 1, 2, or 3 of this Agreement, the Company shall be entitled to a temporary restraining order and/or a preliminary or permanent injunction restraining Employee from breaching the same.

*Id.* § 10.

20. Finally, the Agreement provides that, in the event of any breach, Chmura "shall be entitled to all costs and expenses incurred as a result, including reasonable attorney's fees, in addition to any other remedies to which Company may be entitled." *Id.*

### C. Lombardo's Threatened Breaches

21. Chmura's sales have grown significantly over the past four years. Therefore, Chmura has hired additional sales representatives to assist with sales in Lombardo's territory. Chmura is also in the process of revising its commissions structure for sales representatives.

22. Lombardo, dissatisfied with these perceived affronts, became very negative and difficult to manage. For example, when Lombardo did not receive a discretionary merit-based salary increase in 2019, he became incensed, and even altered a rescinded offer letter from a prospective business partner of Chmura to try to bully Chmura into increasing his salary.

23. On October 3, 2019, Lombardo met with his manager, Eli Auerbach, to discuss these issues. When Auerbach explained the upcoming changes to Lombardo's sales territory and commissions structure, Lombardo became agitated, stating that it was "obvious" that Chmura's leadership wanted to "get rid of" him. Lombardo therefore raised the possibility of leaving voluntarily in exchange for a separation payment. Lombardo suggested that he viewed a separation payment of $100,000 as an appropriate amount to compensate him for "his" book of business.

24. On October 17th, Lombardo and Auerbach met again to discuss Lombardo's potential separation from Chmura.

25. During that conversation, Lombardo stated that if Chmura would not pay him $100,000 as part of a separation agreement, he was prepared to take several steps to disrupt Chmura's business.

26. First, Lombardo stated that he would immediately file a lawsuit against the company because Chmura was attempting to take away "his" book of business—*i.e.*, Chmura's customers, with whom Lombardo worked only by virtue of his employment with Chmura.

27. Second, Lombardo threatened to accept a position with one of Chmura's competitors, in violation of the Agreement. Lombardo indicated that this was not an idle threat because he had already discussed employment with at least one competitor.

28. Third, Lombardo threatened to contact all of Chmura's clients (despite the Agreement's non-solicitation provisions) so that he could persuade them to take their business elsewhere. Lombardo warned Auerbach, "either Chmura is going to pay me for those relationships, or someone else will."

29. Chmura refused to succumb to Lombardo's attempted extortion. Therefore, the following Monday, Chmura offered Lombardo a $10,000 separation contract. Fearful that Lombardo may have already put his plans in motion, Chmura also placed Lombardo on unpaid leave. In addition, Chmura sent Lombardo a cease and desist letter reminding him of his obligations under the Agreement and warning him against the violations he had threatened.

30. In that letter, Chmura asked Lombardo to (i) identify Chmura's clients with whom he had communicated regarding his possible departure; (ii) identify Chmura's clients with whom Lombardo had communicated after Chmura placed him on leave; (iii) identify the competitors with whom he had discussed employment in the past six months; (iv) confirm that he had returned all Chmura property and information; and (v) agree to refrain from defaming Chmura.

31. Lombardo, by counsel, responded to Chmura's cease and desist letter on October 25, 2019. In that letter, however, Lombardo failed to provide any of the information Chmura had requested, and offered no assurance that he would comply with Chmura's demands.

32. Lombardo also continued to retain a Chmura computer, which contained customer contacts, pricing data, and other highly confidential Chmura information.

33. Lombardo's actions pose a continuing threat to Chmura and its business. The violations that Lombardo has threatened would cause Chmura irreparable harm in the form of, among other things, lost revenue and lost goodwill from the long-standing customer relationships in which it has substantially invested.

## COUNT I

### Injunctive Relief for Threatened Breach of Contract

34. Chmura incorporates Paragraphs 1 through 33 of this Complaint by reference.

35. The Agreement is a binding and enforceable contract between Lombardo and Chmura, which prohibits Lombardo from, among other things, soliciting the customers with whom he worked during his last year at Chmura for two years after leaving Chmura.

36. The Agreement also prohibits Lombardo from competing against Chmura by providing the same or similar services he performed for Chmura within the specified geographic area for two years after his employment.

37. The Agreement is supported by adequate consideration, namely, Lombardo's offer of employment with Chmura, and Lombardo's access to Chmura's resources, training, customer goodwill, and confidential information.

38. Chmura has performed all of its obligations under the Agreement.

39. Lombardo has threatened to materially breach his non-solicitation obligations through his stated plans to contact Chmura's customers to divert that business from Chmura.

40. Lombardo has also threatened to materially breach his non-competition obligations through his stated plans to take Chmura's customers to a competitor.

41. As expressly reflected in the Agreement he signed, there is no adequate remedy at law that would make Chmura whole if Lombardo breached the Agreement, and Chmura is therefore entitled to an injunction to prevent Lombardo's threatened breaches.

42. The terms of the Agreement entitle Chmura to specific performance in the form of an order requiring Lombardo to abide by his non-solicitation and non-compete obligations and enjoining him from soliciting Chmura customers or unlawfully competing against Chmura.

43. The balance of equities weighs in Chmura's favor, and the likely injury to Chmura greatly outweighs any potential harm to Lombardo if an injunction is granted, because Chmura is entitled to protect the goodwill it has built with its customers and to protect its business.

44. Further, it would be inequitable for Lombardo to benefit from his threatened breaches by diverting Chmura's customers to a competitor during the restricted period.

45. An injunction would vindicate the strong public interest in holding parties to their contractual obligations.

## **PRAYER FOR RELIEF**

For the reasons above, Chmura respectfully seeks judgment against Lombardo as follows:

1. For an order of a preliminary and permanent injunction prohibiting Lombardo, directly or indirectly, from: (a) providing any future competing services, for the restricted two-year period, to a competing organization in the geographic area that Lombardo serviced on Chmura's behalf, as set forth in the Agreement; (b) further soliciting or encouraging others to solicit, for the restricted two-year period, any Chmura customer or prospective customer with whom Lombardo worked during his employment with Chmura for the purpose of diverting business from Chmura; and (c) accessing or using any Chmura confidential information, including, without limitation, any client contact lists;

2.  For an award of attorneys' fees and costs; and

3.  For any other such relief against Lombardo as the Court may deem appropriate.

Dated:  October 31, 2019

_____/s/_____

Rodney A. Satterwhite (VA Bar No. 32907)
Heidi E. Siegmund (VA Bar No. 89569)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia  23219
(Office) (804) 775-1000
(Fax) (804) 698-2158
rsatterwhite@mcguirewoods.com
hsiegmund@mcguirewoods.com

*Counsel for Plaintiff*

## CONFIDENTIALITY, NON-COMPETITION & NON-SOLICITATION AGREEMENT

This Confidentiality, Invention & Non-Competition Agreement ("Agreement") is made by and between Chmura Economics & Analytics, LLC ("the Company") and Richard A Lombardo (employee) (27030 Forestview Ave, Euclid, OH 44132) (together "the Parties").

### REASONS FOR AGREEMENT

1.     The Company is engaged in the business of providing services in the field(s) of economics, workforce development, economic development, strategic planning, and software design and licensing (hereinafter, the "Company's Business").

2.     Employee is about to begin or continue his/her employment with the Company and understands its need to limit to some extent Employee's freedom to disclose and use certain information which may come to his/her attention during Employee's employment and to engage in certain activities during employment and certain post-employment activities.

3.     These restrictions are for the purpose of enabling the Company to preserve its competitive status in the industry and to protect the integrity and future of the Company and to protect the employment opportunities of Employee's fellow employees by protecting the Company's confidential and/or proprietary information, its goodwill and its trade secrets.

NOW, THEREFORE, in consideration of the employment of Employee (including any continuation of employment of Employee with the Company) and other good and valuable consideration, the adequacy and sufficiency of which are hereby acknowledged, the parties agree as follows:

### TERMS OF AGREEMENT

1.     **Confidentiality.**  Employee recognizes that, by virtue of his/her employment with the Company, s/he will have access to confidential and/or proprietary information relating to the Company's business.  Employee agrees that this information is a valuable and unique asset of the Company and, if divulged to others, could cause irreparable harm to the Company's business. Employee recognizes and acknowledges that such information may include data or material that may not technically qualify as a trade secret, but in which the Company nevertheless has a legitimate business interest in protecting its confidentiality.

Accordingly, Employee shall not, during the term of his/her employment and thereafter regardless of the reason for his/her termination, reveal or disclose to any person outside of the Company, or use for his/her own benefit or the benefit of any other person or entity, any confidential or proprietary information concerning the business or affairs of the Company, or concerning the Company's customers, clients or employees ("Confidential and Proprietary Information").  For purposes of this Agreement, Confidential and Proprietary Information includes, but is not limited to the Company's financial information or plans; sales and marketing information or plans; business or strategic plans; salary, bonus or other personnel information of any type; information concerning methods of operation; proprietary systems or software; legal or regulatory information; cost and pricing information or policies; information concerning new or potential products or markets; models, practices, procedures, strategies or related information; research and/or analysis; and information concerning new or potential investors, customers, or

Exhibit A

clients.  Confidential and Proprietary Information does not include information already available to the public through no act of Employee, nor does it include salary, bonus or other personnel information specific to Employee.  Notwithstanding the above, the use or disclosure of Confidential and Proprietary Information shall not be deemed a violation of this Section of the Agreement if such use or disclosure is made in the ordinary course of business, within the usual scope of Employee's duties and serves the best interests of the Company.

Employee further understands and agrees that all Confidential and Proprietary Information, however or whenever produced, will be the Company's sole property.  Upon the termination of Employee's employment, for whatever reason, Employee will promptly deliver to the Company all documents, equipment, property or materials of any type, including any copies thereof, in Employee's possession, custody or control that belong to the Company, and/or that contain, in whole or in part, any Confidential or Proprietary Information in accordance with Section 3 of this Agreement.

2.  <u>**Work Related Intellectual Property**</u>.  Employee shall disclose fully to the Company any and all intellectual property (including, without limitation, designs, inventions, mask works, ideas, processes, operating and production methods and efficiencies, pricing, customer lists, formulae, data and computer programs (including source and object codes), patents, trademarks, trade secrets, know-how, improvements and enhancements to any of the foregoing, related documentation and all other forms of copyrightable subject matter) which Employee conceives, develops or makes or is exposed to during the term of his/her employment or for six (6) months thereafter and which in whole or in part result from or relate to Employee's work for the Company (collectively, "Work Related Intellectual Property").  Any such disclosure shall be made promptly after each item of Work Related Intellectual Property is conceived, developed or made by Employee, whichever is sooner.  Employee covenants and agrees that s/he shall not, at any time during or following the term of his/her employment, directly or indirectly, divulge or disclose any of such Work Related Intellectual Property, or any of the Confidential and Proprietary Information, which has been obtained by or disclosed to him as a result of employment by the Company.

Employee agrees that all Work Related Intellectual Property shall be owned by the Company and that Employee shall execute and deliver any and all documents (including, without limitation, assignments and patent applications), take all actions and render any and all assistance which may be reasonably requested by the Company to establish, evidence or perfect the Company's ownership of, or to enable the Company to obtain patents or register copyrights with respect to Work Related Intellectual Property, provided, however, that the Company shall bear all expenses related thereto.

Employee acknowledges that all Work Related Intellectual Property that is copyrightable subject matter and which qualifies as "work made for hire" shall be automatically owned by the Company.  Further, Employee hereby assigns to the Company any and all rights which Employee has or may have in Work Related Intellectual Property which is copyrightable subject matter and which, for any reason, does not qualify as "work made for hire."  If any Work Related Intellectual Property embodies or reflects any preexisting rights of Employee, Employee shall promptly disclose such preexisting rights to Company.  Employee hereby grants to the Company the irrevocable, perpetual, nonexclusive, worldwide, and royalty-free license to

2

use, reproduce, display, perform, distribute copies of and prepare derivative works based upon the preexisting rights described in the preceding sentence and to authorize others to do any or all of the foregoing.

For the avoidance of doubt, Employee agrees and acknowledges that the trademarks and the brands of the Company and its parent, affiliates and subsidiaries are valuable assets and the promotion, management and use of such trademarks and brands will be an important part of his/her duties and responsibilities. Employee agrees to use his/her best efforts to protect the trademarks and brands of the Company and its parent, affiliates and subsidiaries and will conduct himself and his/her business activities in compliance with the Company's policies and procedures as they relate to such brands and trademarks.

3. **Covenants Not to Compete or Interfere**. For a period beginning on the Effective Date of this Agreement and ending two (2) years after the employment relationship between Employee and the Company terminates for any reason whatsoever ("the Restricted Period"), Employee shall not:

(a) own or acquire an interest in or participate in the management or control of any entity that competes against the Company by engaging in the Company's Business in geographic areas in which the Company does business;

(b) directly or indirectly, perform, whether as an employee, independent contractor, consultant, agent, or owner, the same, similar, or substantially similar job duties or services as s/he performed for the Company on the date of his/her termination or within the one (1) year period preceding the date of his/her termination for or on behalf of any person or entity that engages in the Company's Business in any geographic areas serviced by Employee or in which Employee provided goods or services on behalf of the Company during his/her employment with the Company;

(c) directly or indirectly, on behalf of himself or any other person, partnership, company, corporation or other entity, solicit or attempt to solicit for purposes of providing products or services that are the same or substantially similar to the Company's Business any individual or entity to whom Employee provided products or services at any time during the period of his/her employment with the Company, to whom Employee pursued on behalf of the Company, or of whom Employee had knowledge based on his/her employment with the Company because the Company provided products or services to or actively pursed the individual or entity during Employee's employment;

(d) directly or indirectly, on behalf of himself/herself or any other person, partnership, company, corporation or other entity, divert, take away, or interfere with or attempt to divert, take away or interfere with the Company's business relationship with its then existing suppliers, licensors, licensees, franchisees or other business relations; or

(e) directly or indirectly, on behalf of himself or any other person or entity, recruit, solicit, or hire any employee of the Company, or attempt to do the same, or induce or encourage any employee, contractor, or supplier of the Company to terminate their employment or other business relationship with the Company.

Notwithstanding the foregoing, Employee may own not more than five percent (5%) of any class of securities registered pursuant to the Securities Exchange Act of 1934, as amended, of any corporation engaged in competition with the Company, so long as Employee does not otherwise (i) participate in the management or operation of any such business, or (ii) violate any other provision of this Agreement.

Employee acknowledges that the restrictions, prohibitions and other provisions herein, including, without limitation, the Restricted Period, are reasonable, fair and equitable in terms of duration and scope, are necessary to protect the legitimate business interests of the Company, and are a material inducement to the Company to enter into this Agreement.

4.  **Termination and Return of Property**.

(a)  Return of Confidential and Proprietary Information and Work Related Intellectual Property Upon Termination.  Employee understands and agrees that all printed and electronic files, records, documents, reports, audits, projections, forecasts, business plans, correspondence, manuals, computer code, pricing data, sources of supply, customer lists, databases, and similar items relating to the business of the Company, the Confidential and Proprietary Information and/or the Work Related Intellectual Property, whether prepared by Employee or otherwise coming into Employee's possession, shall remain the exclusive property of the Company, whether in original or reproduced form.  Upon the termination of Employee's employment for any reason whatsoever, Employee shall immediately and without demand return to the Company all of the aforementioned information in Employee's possession or under Employee's control belonging to the Company, and immediately thereafter Employee shall have no further right of access to or any right to obtain any of such records and materials or copies thereof, or any information contained therein.

(b)  Return of Tangible Property.  Upon termination of Employee's employment for any reason whatsoever, Employee shall immediately and without demand return to the Company all tangible property in his/her possession belonging to the Company (including without limitation electronic equipment), in good condition, ordinary wear and tear excepted.

5.  **Survival of Obligations**.  Employee's obligations under Sections 1, 2 and 3 of this Agreement shall survive the termination of his/her employment, regardless of the reason for or method of termination.  Each of the provisions in these Sections shall be enforceable independently of every other provision, and the existence of any claim or cause of action Employee may have against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of these Sections of the Agreement by the Company.

6.  **Representations and Warranties**.  Employee represents and warrants to the Company: (a) that s/he has the full power and authority to enter into this Agreement without the consent or approval of any other person, including any present or previous employer; (b) that his/her execution, delivery and performance of this Agreement will not violate or cause a breach of any existing employment or any other agreement, covenant, promise or any other duties by which Employee is bound, including confidentiality obligations or covenants not to compete; and (c) that there are no pending or threatened claims of breach of contract, misappropriation of

intellectual property or misappropriation of confidential information against Employee and, to the best of Employee's knowledge, no events or conduct that would give rise to such a claim.

7.  **Governing Law.**  This Agreement, and all disputes arising under or related to it, shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Virginia, without regard to the conflict of laws rules contained therein.

8.  **Jurisdiction and Venue.**  The parties irrevocably and unconditionally consent to the exclusive jurisdiction and venue of the Circuit Court for the City of Richmond, Virginia and/or the United States District Court for the Eastern District of Virginia, Richmond Division in connection with any suit, action or proceeding relating to this Agreement and agree not to commence any suit, action or proceeding relating thereto except in such courts.

9.  **Assignment.**  This Agreement may be assigned by the Company to a successor in interest, including but not limited to a wholly owned subsidiary or parent of the Company, or in connection with the sale to any person, partnership, corporation or other entity of the assets of the Company.  Employee's rights hereunder are personal and non-assignable.

10.  **Enforcement and Severability.**  Employee agrees that a breach of any of the covenants set forth in Sections 1, 2 and 3 would result in immediate irreparable injury and damage to the Company for which the Company would have no adequate remedy at law.  In the event of a breach or a threatened breach by Employee of any of the provisions of Sections 1, 2, or 3 of this Agreement, the Company shall be entitled to a temporary restraining order and/or a preliminary or permanent injunction restraining Employee from breaching the same.  However, nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach, including the recovery of damages from Employee. Employee further agrees that in the event of any such breach, Company shall be entitled to all costs and expenses incurred as a result, including reasonable attorney's fees, in addition to any other remedies to which Company may be entitled.  If Employee breaches Section 3 of this Agreement, the duration of the Restricted Period shall be computed from the date s/he resumes compliance with the covenant or from the date the Company is granted injunctive or other equitable relief by a court of competent jurisdiction enforcing the covenant, whichever shall first occur, reduced by either the number of days Employee was not in breach of the covenant after termination of employment, or any delay in filing suit, whichever is greater.

If any provision of this Agreement is deemed void or unenforceable, such provision shall not be deemed part of this Agreement, which otherwise shall remain in full force and effect. Moreover, if any one or more of the provisions contained in this Agreement is held to be excessively broad as to duration, activity or subject, such provision will be construed by limiting or reducing it so as to be enforceable to the maximum extent compatible with applicable law.  A waiver by the Company or Employee of a breach of any provision of this agreement by the other party shall not operate or be construed as a waiver of any subsequent breach by the other party. Employee shall pay the Company all reasonable attorneys' fees incurred in enforcing its rights under this Agreement.

11.  **Remedies.**  In the event of a breach or a threatened breach of this Agreement by Employee, the Company shall be entitled to an injunction restraining Employee from breaching

5

the same. Nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or threat of breach. This includes, but is not limited to, the recovery of any monetary damages caused by Employee's breach or threatened breach.

12. **Consultation with Counsel; No Representations**. Employee acknowledges and agrees that s/he has had a full and complete opportunity to consult with counsel of his/her own choosing concerning the terms of this Agreement, and that the Company has made no representations or warranties to Employee concerning the terms of this Agreement other than as are reflected in this Agreement.

13. **Entire Agreement**. This instrument contains the entire agreement between the Parties, supersedes any prior or other agreement between the Parties and may be changed only by an agreement in writing signed by the party against whom the enforcement of any waiver, change, modification, extension or discharge is sought. Both Parties agree and acknowledge that they have read these terms, have had the opportunity to consult counsel, and fully understand and freely and voluntarily agree to the provisions set forth herein.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the dates shown below.

EMPLOYEE            CHMURA ECONOMICS & ANALYTICS, LLC

 

By: _____
Richard A Lombardo        Leslie Peterson
President and Chief Strategist

Date: 2-4-2015          February 3, 2015

Date: _____

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Chmura Economics & Analytics, LLC

### DEFENDANTS

Richard Lombardo

**(b)** County of Residence of First Listed Plaintiff    City of Richmond, VA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Cuyahoga, OH
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Rodney A. Satterwhite & Heidi E. Siegmund, McGuireWoods LLP, 800 East Canal Street, Richmond, VA 23219; 804-775-1049

Attorneys *(If Known)*
Ann-Marie Ahern, McCarthy, Lebit, Crystal & Liffman, 101 W. Prospect Ave., Suite 1800, Cleveland, OH 44115; 216-696-1422

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question
*(U.S. Government Not a Party)*

☒ 4 Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent – Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 485 Telephone Consumer |
| ☒ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | Exchange |
| | Medical Malpractice | | Leave Act | | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee – | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332

Brief description of cause:
Threatened breach of restrictive covenants

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*     JUDGE _____     DOCKET NUMBER _____

DATE
10/31/2019

SIGNATURE OF ATTORNEY OF RECORD
/s/ Heidi E. Siegmund

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____