Exhibit C

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                  RICHMOND DIVISION

4          ~~~~~~~~~~~~~~~~~~~~

5   CHMURA ECONOMICS & ANALYTICS, LLC

              Plaintiff

6

            vs.              Case No.  3:19-CV-00813

7

8   RICHARD LOMBARDO

           Defendants

9

10           ~~~~~~~~~~~~~~~~~~~~

11

12          REMOTE VIDEO DEPOSITION OF:

13            CHRISTINE CHMURA, PH.D.

14

15                 Taken on:

16               May 1, 2020

                 11:00 a.m.

17

18                 Taken at:

            McGuire Woods, LLP

19              Gateway Plaza

            800 East Canal Street

20              Richmond, VA

21

22

23       Kelliann D. Linberg, RPR, Notary Public

24

25

Page 2

```
 1   APPEARANCES: (Via Videoconference)
 2   On behalf of the Plaintiffs:
 3        Koehler Fitzgerald, LLC
          CHRISTINE M. COOPER, ESQ.
 4        1111 Superior Avenue E
          Ste 2500
 5        Cleveland, OH, 44114
          Ccooper@koehler.law
 6        216-539-9370.
 7
 8   On behalf of the Defendants:
 9        McGuire Woods, LLP
          RODNEY A. SATTERWHITE, ESQ.
10        Gateway Plaza
          800 East Canal Street
11        Richmond, VA, 23219-3916
          Rsatterwhite@mcguirewoods.com
12        804-775-1000.
13
14   ALSO PRESENT:
15        RICHARD LOMBARDO
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                        TRANSCRIPT INDEX

2

3    APPEARANCES...............................2

4    INDEX OF EXHIBITS.........................4

5    STIPULATION...............................5

6

7    EXAMINATION OF CHRISTINE CHMURA, PH.D.:

8    BY MS. COOPER.............................6

9

10

11

12

13

14   REPORTER'S CERTIFICATE...............147

15

16

17   EXHIBIT CUSTODY:    RETAINED BY COURT REPORTER

18

19

20

21

22

23

24

25

Page 4

```
 1                    INDEX OF EXHIBITS
 2   Number              Description           Marked
 3   Defendant's
     Exhibit A   Previously Marked Copy of Notice    13
 4               of Deposition
 5   Exhibit D   Previously Marked Copy of Amended   17
                 Complaint
 6
     Exhibit E   Previously Marked Copy of Letter    34
 7               Dated 2/3/15 to Richard Lombardo,
                 Bates CHMURA000097
 8
     Exhibit B   Copy of Plaintiff's Designations    60
 9               and Objections to Richard
                 Lombardo's Notice of Deposition
10
     Exhibit Q   Copy of Chmura Employee Handbook    71
11               Dated 7/19/2019
12   Exhibit S   Copy of Standard Operating          78
                 Procedures Dated 4/5/2019
13
     Exhibit T   Copy of Email with Standard         80
14               Operating Procedures Dated
                 7/10/2019 Attached
15
     Exhibit X   Highly Confidential Copy of Email  104
16               Dated 10/2/2019 Bates
                 CHMURA0201264-269
17
     Exhibit C   Previously Marked Copy of          138
18               Articles of Organization for a
                 Domestic Limited Liability
19               Company, Ohio, Dated 9/2/2011
20
21
22
23
24
25
```

Page 5

1          COURT REPORTER:  The attorneys

2     participating in this deposition acknowledge that I am

3     not physically present in the deposition room and that

4     I will be reporting this deposition remotely. They

5     further acknowledge that, in lieu of an oath

6     administered in person, the witness will verbally

7     declare her testimony in this matter is under penalty

8     of perjury. The parties and their counsel consent to

9     this arrangement and waive any objections to this

10    manner of reporting.

11          Please indicate your agreement by stating

12    your name, firm name, party represented and your

13    agreement on the record.

14          MS. COOPER:  My name is Christine Cooper.

15    I represent Richard Lombardo, and I agree.

16          MR. SATTERWHITE:  Rob Satterwhite from

17    McGuire Woods representing Chmura, and we also agree.

18            CHRISTINE CHMURA, Ph.D., of lawful age,

19    called for examination, as provided by the Ohio Rules

20    of Civil Procedure, being by me first duly sworn, as

21    hereinafter certified, deposed and said as follows:

22          EXAMINATION OF CHRISTINE CHMURA, Ph.D..

23    BY MS. COOPER:

24       Q.    Good morning, Dr. Chmura.  I am Christine

25    Cooper.  I represent Mr. Lombardo in the case filed by

Page 6

1   Chmura in the Eastern District of Virginia.  I am going

2   to start with some background information.  Forgive me,

3   since we are doing this by video, my video is on one

4   screen, and my screen with you is on the other.  So if

5   I am looking in both discretions, that's why.

6            Can you please state your full name for the

7   record?

8        A.   Christine Chmura.

9        Q.   And what's your residential address?

10       A.   ████████████████████████████████████

11   ████████

12       Q.   Have you ever been deposed before?

13       A.   Yes.

14       Q.   When was the last time you were deposed?

15       A.   Probably a couple of years ago.

16       Q.   Have you been deposed more than once?

17       A.   Yes.

18       Q.   How many times have you been deposed?

19       A.   At least five.

20       Q.   Were those depositions in your individual

21   capacity?

22       A.   No, as an expert witness representing the

23   firm.

24       Q.   Do you recall the cases that you testified

25   in?

Page 7

1          A.     I do not.

2          Q.     And what was the subject matter that you

3     testified about?

4          A.     I recall one being a wrongful death,

5     another was related to the economy, or what the crux of

6     the economy was during a period of time, and another

7     one -- another one I had forgotten that just came to my

8     mind was for Dominion Power related to investments and

9     the economic impact of those investments.

10         Q.     Was your testimony -- sorry.  Was this --

11    and I will get to my ground rules. I am breaking my

12    ground rules now.  I apologize.  I jumped in.  I will

13    step back if you haven't completed your answer. It's a

14    little harder for me to pick up on the cues on the

15    video than if we were in the room together.

16              Was the subject matter of your testimony

17    related to damages in those cases?

18              MR. SATTERWHITE:  Object to the form.

19         Q.     You can go ahead and answer.

20         A.     Yes.

21         Q.     I am going to go over so some ground rules,

22    so I don't break them myself, since it's been a little

23    while since you have been deposed.  If you could

24    respond with a yes or no as opposed to an uh-huh or

25    uh-uh, or shaking of your head so that the court

Page 8

1  reporter can get your answer down.  I would ask that

2  you wait until I finish the question before answering

3  so we are not talking over each other.

4           I, in return, will take a long pause to

5  make sure that you are done answering before I ask my

6  next question.  If you don't understand a question,

7  please ask me to repeat it or rephrase it.  And if you

8  need a break, just ask at any time.  The only request I

9  would have is that if there is an open question

10  pending, that you provide an answer before we break.

11  Does that make sense?

12       A.    Yes.

13       Q.    Did you bring anything with you to the

14  deposition today, any documents with you to the

15  deposition today?

16       A.    No.

17       Q.    Can you tell me about your education, your

18  higher education?

19       A.    I have a B.S. Degree from Clemsen

20  University in Business, then I, for one year, went to a

21  bible college and got a one year certificate, Master's

22  in Missions.  I went back to Clemsen and got a Master's

23  Degree in Economics.  And more recently, went to

24  Virginia Commonwealth University and got a Ph.D. in

25  Business Administration with emphasis on Economics and

Page 9

1    Finance.

2         Q.   When did you earn that degree?

3         A.   It was several years ago.  I'm not good

4    with dates, I will just let you know that right now.

5         Q.   That's okay.  Was it within the last 10

6    years?

7         A.   No.  I started my company 20 years ago and

8    it was prior to that.

9         Q.   Are you the founder of Chmura Economics &

10   Analytics, LLC?

11        A.   Yes, I am.

12        Q.   When did you found Chmura?

13        A.   1998 is when we filed the SCC.  December.

14        Q.   At that point, was it called Chmura

15   Economics & Analytics, LLC?

16        A.   No, it was called Capital Research &

17   Analytics, LLC.

18        Q.   At what point did it become Chmura

19   Economics & Analytics?

20        A.   Probably a year later.

21        Q.   What was the reason for the name change?

22        A.   Capital -- we were in the capital, so that

23   -- Chmura is a stronger word, more rememberable, once

24   you can learn how to pronounce it correctly, so we

25   thought that was a better name.  Also, I had a good

1   reputation in the state and it would carry some weight.

2       Q.    Am I pronouncing it right when I say

3   Chmura?

4       A.    That's good enough.  Chmura.  Thank you for

5   asking.

6       Q.    Prior to the founding of Chmura, what did

7   you do?

8       A.    Prior to the company, I was the chief

9   economist at Crestar Bank, which was purchased by

10  Suntrust.  When they were purchased, they asked me to

11  go to Atlanta to be the chief economist.  By saying no,

12  I was given severance and able to take several large

13  projects with me to start the company.

14      Q.    When Chmura was founded, what type of

15  business was it?

16      A.    Consulting.  Economic consulting.

17      Q.    And has it changed over time?

18      A.    Yes, we do economic consulting.  We have

19  macro economic models that we run.  Most of our

20  customers, at first, were banking, and then we got more

21  into workforce.  We created JobsEQ in early 2000 and

22  have shifted over time to more software than consulting

23  work in terms of revenue.

24      Q.    Can you tell me a little about JobsEQ and

25  what it is?

Page 11

1          A.     JobsEQ is a S A A S product, so it is
2    software as a --
3                 (Reporter asked for clarification).
4                 S-A-A-S, software as a service.
5                 It provides demographic information, labor
6    market information to realtime job postings.  It gives
7    people the ability to see what's a forecast for a
8    particular region, whether that be a county, MSA, or a
9    zip code footprint so that they can see what sort of
10   courses should I teach, if I am an educator; if a firm
11   moves here, will they find the workers they need; if I
12   move to a certain place, will I find the workers that I
13   need and that type of thing.
14        Q.     Now, you are here today as a corporate
15   representative on behalf of Chmura, correct?
16        A.     Yes.
17        Q.     And you are also here in your individual
18   capacity?
19        A.     Yes.
20        Q.     I am going to start with your testimony
21   relating to your corporate representation, and we will
22   complete the individual stuff later in the deposition.
23   I am going to try to do a clean break on that to keep
24   it clear in the record where we are at.  What is --
25   pardon me.

Page 12

1           Are you a current owner of Chmura?

2      A.    Yes, I am.

3      Q.    And what is your title?

4      A.    Dr. Christine Chmura, CEO and Chief

5  Economist.

6      Q.    What is your ownership interest in Chmura?

7      A.    49%.

8      Q.    Who are the other owners?

9      A.    Leslie Peterson, John Chmura, Xiaobing

10  Shuai, Sharon Simmons, Greg Chmura.

11     Q.    What are their ownership interests,

12  starting with Ms. Peterson?

13     A.    Let me just tell you again I am not really

14  good with numbers like that.  When you ask me about the

15  economy and I will do fine.  So John Chmura is 5%.

16  Greg Chmura is 3%.  Leslie Peterson is the remainder.

17  Xiaobing Shuai, Sharon Simmons and Greg Chmura all have

18  profit interests.

19     Q.    Can you explain to me the idea of profit

20  interests?

21     A.    So let's say they were given this profit

22  business in 1999, that means if the company were worth

23  $1,000,000 in 1999, a valuation was done and let's say

24  it was worth $1,000,000, then if we sold the next day

25  for $2,000,000, then they would benefit from the

1  difference.  They would get a percentage of that

2  1,000,000, but they would not have -- get a percentage

3  of the total equity.

4      Q.    Okay.  I understand.  Thank you.  Now, I

5  notice there are some shared last names as far as the

6  owners.  What is your relationship to Greg Chmura?

7      A.    Greg Chmura is my brother.

8      Q.    And how are you related to John Chmura?

9      A.    John Chmura is my nephew.

10     Q.    Are there any other owners that you are

11  related to?

12     A.    No.

13     Q.    I am going to show you what's been marked

14  as Defendant's Exhibit A.

15                        -   -   -   -   -

16              (Thereupon, Previously Marked

17              Deposition Exhibit A, Copy of Notice of

18              Deposition, was shown for purposes of

19              identification.)

20                        -   -   -   -   -

21     Q.    I will give you control of this as well

22  (indicating).  So now you can scroll through this

23  document.

24              MR. SATTERWHITE:  Let me know if you want

25  me to go faster or slower.

1          A.    Is there a purpose for me to scroll through

2    this?  It might help to know while I am looking at it.

3          Q.    Just to know if you recognize this

4    document, if you have seen it before, and then we are

5    going to go through Exhibit A that is attached to it.

6          A.    (Reviewing).

7          Q.    Have you seen this document before?

8          A.    Yes, I believe I have seen it before.

9          Q.    And can you describe what it is?  If we

10   can, go back to the front of it.

11         A.    Chmura, Plaintiff, Notice of Deposition.

12   Okay.  So it -- is this the document that has questions

13   for the deposition today?

14         Q.    Yes, it is.

15         A.    Okay.

16         Q.    Have you reviewed this prior to your

17   deposition today?

18         A.    Oh, yeah.

19         Q.    And you are here to testify about certain

20   topics set forth in that notice, correct?

21         A.    That's correct.

22         Q.    Generally, how did you prepare for your

23   deposition today?

24         A.    Generally, I read the questions.  I

25   sometimes looked at some emails.  I read, you know, the

1   documents that have been submitted to the court.

2        Q.    Did you have -- did you speak with

3   anyone -- and let me caution, I am not looking for

4   communications with your attorney.  Did you speak with

5   anyone other than your attorney about your deposition

6   today?

7        A.    Yes.  Yes.

8        Q.    Who did you speak with?

9        A.    I spoke with Greg Chmura.  I spoke with

10  John Chmura.  I spoke with Leslie Peterson.  I spoke

11  with Sharon Simmons.  I spoke with Aisha.  I think

12  that's it.

13       Q.    Starting with Greg, what was the substance

14  of your conversation?

15       A.    I can't remember all my conversations.  I

16  have so many every day, but with Greg, I recall talking

17  to him about the estimate, the present value of the

18  loss related to the IEDC event.

19       Q.    How about with John Chmura?

20       A.    With John, we probably talked about the

21  times log we put together.

22       Q.    And what about with Ms. Peterson?

23       A.    We probably talked about everything.  We

24  talked about what -- some of what she was answering.  I

25  probably ran by her some of the thoughts to make sure

Page 16

1    my recollection was correct on some of these other

2    items.

3             I am sure we talked about that letter that

4    Rick falsified and lied about in terms of having a job

5    opportunity and the difficult situation that put us in

6    with a client that we were developing, or a vendor that

7    we were developing a relationship with.

8         Q.    And what about with Sharon Simmons?

9    Correct?

10        A.    Sharon Simmons?  I believe we were looking

11   at sales, historic sales -- we've talked about a lot of

12   things.  I mean, we work together.  But historic sales

13   and why Rick didn't get 15%, which was because he

14   didn't make the full sale.

15        Q.    And what was your conversation -- well, let

16   me step back.  You mentioned Aisha.  Is that Aisha

17   Ortiz?

18        A.    Yes.

19        Q.    And what was your conversation with

20   Ms. Ortiz?

21        A.    Just a quick conversation on when she put

22   the work from home policy together.  She actually

23   revised it.  A-I-S-H-A.

24        Q.    Is there anything else you did to prepare

25   for your deposition today?

Page 17

1          A.    I prayed about it.

2          Q.    All right.  I am going to turn your

3     attention to Exhibit A, Defense Exhibit A, the exhibit

4     attached to that.  And that's confusing.

5               Number 2, "The factual basis for all

6     allegations in the Amended Complaint and denials in the

7     Answer to the Counterclaim."

8               You have been designated as the corporate

9     representative to speak on that topic, correct?

10         A.    Correct.

11         Q.    I am going to show you what's been marked

12    as Defendant's Exhibit D, which I will represent to you

13    is the Amended Complaint.

14                         -   -   -   -   -

15               (Thereupon, Previously Marked

16               Deposition Exhibit D, Copy of Amended

17               Complaint, was shown for purposes of

18               identification.)

19                         -   -   -   -   -

20         Q.    I will give you control of that as well.

21    Go ahead and take a look at this.

22               THE WITNESS:  Too bad we can't have it in

23    our hands.  It would be a lot easier.

24               MR. SATTERWHITE:  I agree.

25         A.    I am familiar with the document if you want

1   to ask specific questions, we can go to that area.

2       Q.    Sure.   This is the First Amended Complaint

3   filed by Chmura against Richard Lombardo, correct?

4       A.    Yes.

5       Q.    I want to draw your attention first to

6   Paragraph 4 of the Complaint.

7       A.    Okay.

8       Q.    This paragraph is "The value of information

9   Lombardo has retained, and the customer contracts with

10  which Lombardo has threatened to interfere, is well

11  over $100,000."

12            With respect to that, what information does

13  this paragraph refer to?

14      A.    Okay.  So Mr. Lombardo had a computer of

15  ours that he used at a conference, IEDC conference, and

16  previous to that, a Texas conference.  And we go to

17  these conferences and sit in an exhibit booth for the

18  sole purpose of meeting people, getting their contact

19  information and then following up with a demo, which

20  needs to be done as soon as possible afterward.

21            And this is not at a small expense to us.

22  For example, the IEDC, we're a corporate sponsor, which

23  means we pay $25,000 a year to be called a sponsor, and

24  then we pay more money to send people to these

25  conferences.  This particular one, I believe in

Page 19

1    Indianapolis, I attended, Eli attended, Rick attended,

2    two other salespeople attended.

3                 I was a speaker at the conference.  I gave

4    a Ted Talk -- not a Ted Talk, sorry.  It was an Ed

5    Talk.  If it was a Ted Talk, then you have to pay Ted

6    money, so they call it an Ed Talk.

7                 And I was a speaker at the opening session,

8    and whenever I'm a speaker, that draws a lot more

9    people to our booth.  So the bottom line is, when we go

10   to these events, we are there to learn about other

11   people who would like to see JobsEQ.  Rick was taking

12   down everyone's name, and we had quite a long list.

13                When he returned, he refused to give us

14   that computer. I went through the list of names, and I

15   identified those who had requested a demo.  One person

16   was handed, or asked for a contract while we were at

17   the event which I didn't -- I assume that that was

18   probably before then.  I didn't assume that person

19   wanted a demo.

20                When we give demos, 24% of the people who

21   get a demo end up getting a license for the product.

22   Based on that, we should have had five -- at least five

23   licenses come out of that event.  On average, our --

24   our average sale is about 8,000.

25                And then we took that $3,000 amount in the

1   first year, and we did the present value going forward

2   for four additional years.  We used 2% inflation rate

3   to discount it, and we also assumed that we would have

4   some runoff; that is, in the first year, we lose -- or

5   83% of people don't sign up, but after that, 90%, 91%

6   sign up.  Taking all of those things into account, the

7   amount came to well over $100,000.  I believe it was

8   198,000.

9        Q.    So the information that you were referring

10  to in Paragraph 4 is the conference notes from the IEDC

11  conference, as well as the Texas conference; is that

12  correct?

13       A.    That's correct.

14       Q.    Is there any other information that the

15  paragraph refers to?

16       A.    Well, I don't know what Rick, or

17  Mr. Lombardo, did with those customer contacts that he

18  had, whether he has given them to someone else.  That's

19  not taken into account, that amount.

20       Q.    What customer contacts are you referring

21  to?

22       A.    Well, once we did get the computer back, he

23  had an Excel sheet that we sent out weekly to our

24  account managers that had every single user written

25  down on it, all the -- every institution that's using

Page 21

1  it, all the people within the institution that's using

2  it, when they last used the software, and how many

3  minutes of software time that they were using.

4       Q.    That's separate and apart from the

5  conference notes you just talked about?

6       A.    That is correct.

7       Q.    Do you have any basis for asserting that

8  Mr. Lombardo did anything with that Excel sheet?

9             MR. SATTERWHITE:  Object to the form.  Go

10  ahead.

11       A.    Eventually, over time, it became apparent

12  that Mr. Lombardo does not tell the truth.  Even when

13  pushed, you really have to push him to get him to tell

14  the truth.  And so I have no reason to believe that he

15  has not given that away.

16             He left the company saying that he was

17  going to destroy the firm, he was going to sell our

18  company list to the highest bidder.  Things like that

19  make me not trust his word.

20       Q.    Have any customers come to you and said

21  that their -- well, let me rephrase that.

22             Do you have any factual basis other than --

23  do you have any factual basis for believing

24  Mr. Lombardo retained the customer list?

25             MR. SATTERWHITE:  Object to the form.

Page 22

1      A.    Yes, it was on the computer that belonged

2   to us, and we also --

3      Q.    Did -- go ahead.  You were going to say,

4   and we also.  Go ahead and finish your thought.

5      A.    We were -- Mr. Lombardo provided to a

6   recruiter a list of our salespeople and the dollar

7   amounts of their sales, which we would consider

8   confidential.  And we understand that that recruiter

9   provided it to a software company; who knows where it

10  went after that.

11     Q.    Did that list have any customer contact --

12  customer information on it?

13     A.    That particular list did not.

14     Q.    Do you have any factual basis for believing

15  Mr. Lombardo distributed that Excel spreadsheet

16  mentioned a few minutes ago?

17          MR. SATTERWHITE:  Object to the form.

18     A.    Not at this point in time.

19     Q.    Is there any other information you are

20  referring to in paragraph -- or Chmura is referring to

21  in Paragraph 4 of the Amended Complaint?

22          MR. SATTERWHITE:  Object to the form.

23     A.    Not that I know of at this point.

24     Q.    I want to turn to Paragraph Number 11 and

25  12 of the Amended Complaint, Exhibit D.

Page 23

1              Can you tell me --

2       A.    I'm sorry. I am still reading.

3       Q.    Okay.  Sorry.

4       A.    (Reviewing).

5              Okay.  Thank you.

6       Q.    Paragraph Number 11 states, in part, that

7    Lombardo customers are located in the midwest --

8    although many -- let me say it properly.

9              "Although many of Lombardo's customers were

10   located in the Midwest, he sold to customers

11   nationwide."

12             With respect to Mr. Lombardo's sales, where

13   was he conducting his sales from?

14             MR. SATTERWHITE:  Christine, I am going to

15   object with respect to the designation because you also

16   identified in Category 13, his job duties and job

17   description, and that we have designated Ms. Peterson

18   for.  I have no problem with Dr. Chmura answering, but

19   I do object on the grounds that it is not a designated

20   topic.

21             MS. COOPER:  Okay.

22             MR. SATTERWHITE:  Go ahead.

23      A.    Can you ask the question again, please?

24      Q.    Yes, I can.

25             Primarily, where does Mr. Lombardo conduct

Page 24

1   his work?

2       A.    He conducted his work in exhibit booths.

3   That's where we got a lot of -- you are talking

4   physically, right?

5       Q.    Physically, yes.

6       A.    Yeah, exhibit booths.  That's where we got

7   a lot of our leads.  He sometimes went to customers,

8   for example, Cuyahoga County, Columbus -- I am trying

9   to win a very large contract with the State of Ohio --

10  and then from his office, from our office at 1025 Huron

11  Road.  And he worked from home over the last year he

12  was working for us as well.

13      Q.    If you know, what percentage of his time

14  was spent in the Huron Road office?

15          MR. SATTERWHITE:  If it is easier, I will

16  lodge a standing objection to this issue rather than

17  object every time, because I certainly don't want to do

18  that, but go ahead.

19          MS. COOPER:  Okay.

20      A.    I don't have a sense of that.

21      Q.    Turn to Paragraph 15.

22      A.    (Reviewing).

23          I'm finished.

24      Q.    And then -- Paragraph 15 refers to a

25  Confidential, Non-Competition and Non-Solicitation

Page 25

1    Agreement, correct?

2         A.    Correct.

3         Q.    And it states that, "A true and correct

4    copy of the Agreement is attached as Exhibit A"?

5         A.    Correct.

6         Q.    If you will, turn to Exhibit A.

7         A.    (Indicating).  That's fine, I am familiar

8    with this.

9         Q.    Is this a true and accurate of copy of the

10   Confidentiality, Non-Competition, Non-Solicitation

11   Agreement between Mr. Lombardo and Chmura?

12        A.    Yes.

13        Q.    Could you turn to Paragraph 24?

14              MR. SATTERWHITE:  Of the First Amended

15   Complaint?

16              MS. COOPER:  Of the First Amended

17   Complaint, yes.

18        A.    (Reviewing.)

19              MR. SATTERWHITE:  All set?

20              THE WITNESS:  Sorry, I didn't know you were

21   waiting.

22        Q.    That is part of the disconnect of not being

23   in the room together, so I apologize. I don't want to

24   speak over you.  I will wait for your cue.

25              With respect to Paragraph 24, it states

Page 26

1  that, "Chmura's sales have grown significantly over the

2  past four years."  What is the factual basis for that

3  statement?

4       A.   Are we talking about JobsEQ sales here, or

5  are we talking about revenue total?  I was --

6       Q.   You have --

7       A.   The JobsEQ sales.  They have grown

8  significantly over the past four years.  Well, we have

9  revenue numbers, so, yes, they have.  I don't

10  understand the state -- the question.  We went --

11       Q.   Was -- I'm sorry, go ahead.

12       A.   I was going to say, you know, we went from

13  maybe having 40 customers to over 500, and that also

14  reflects the sales.

15       Q.   And Mr. Lombardo was employed during that

16  four years at Chmura, right?

17       A.   That is correct.

18       Q.   How much of that growth in sales is

19  attributable to Mr. Lombardo?

20            MR. SATTERWHITE:  Object to the form.

21       A.   I don't have those numbers in front of me,

22  but he was our top salesperson, followed closely by

23  Austen Steele.

24       Q.   Is Mr. Steele still with Chmura?

25       A.   No, he is not.

Page 27

1      Q.    To your knowledge, did Mr. Lombardo's sales

2   percentage, based on revenues, exceed 30% of the total

3   sales over the period of his employment?

4      A.    I would really need to have the numbers in

5   front of me and work that out.

6      Q.    And what would you look at to derive those

7   numbers?

8      A.    I would look at total sales and total sales

9   from Mr. Lombardo, and I would back out a book of

10  business we handed to him when he came to the company.

11     Q.    Was Mr. Lombardo responsible for making a

12  client relationship with a book of business that was

13  handed to him?

14     A.    Yes, he was.

15     Q.    And did he have renewals for that book of

16  business?

17     A.    Sometimes.  We don't have a 100% renewal

18  rate.  It is more like 83%.

19     Q.    Do you know what Mr. Lombardo's renewal

20  rate was?

21     A.    I believe it was around that amount.

22     Q.    So is it fair to say that Mr. Lombardo

23  contributed significantly to that growth referenced in

24  Paragraph 24 of the Amended Complaint?

25     A.    Yes.

Page 28

1        Q.    Paragraph 24 also states, "Chmura is also

2   in the process of revising its commission structure for

3   sales representatives."  Do you see that?

4        A.    I do.

5        Q.    How is it changing the structure -- how was

6   Chmura changing the structure?

7        A.    Well, when you have a business such as the

8   one that we have, we are all about serving our clients,

9   making sure that they get what they need, and we want

10  to help as many people as we can.  So if you look at

11  having three salespeople, they can't possibly serve

12  well the client base that we expect to have years from

13  now.  So we were considering adding -- we are adding --

14  we are considering adding more people, more salespeople

15  so that we could serve a broader client base, and

16  support staff.

17        Q.    And it also references, "revising its

18  commission structure."  How was the commission

19  structure revised?

20        A.    Now, this was not revised before

21  Mr. Lombardo left, but the then sales manager at the

22  time wanted us to consider increasing individuals

23  salaries and decreasing the percent commissioned, and

24  the percent that they would get when someone else

25  signed up, or resigned a contract.  Part of this was,

Page 29

1  ultimately, necessary because additional work that the

2  sales staff was doing was pushed back to the accounting

3  group.

4       Q.   Now, you just testified that -- as part of

5  your last answer, that before Mr. Lombardo left.

6  Mr. Lombardo was terminated by Chmura, right?

7       A.   Yes, he was terminated.

8       Q.   He didn't voluntarily leave?

9       A.   No.  Sorry, I used the wrong word.  He was

10  terminated.  But left was -- the same as terminated.

11  But I'll use terminated in the future.

12       Q.   That's okay. I just wanted to clarify.

13            Can you look at Paragraph 25 for me?

14       A.   (Reviewing.)

15            Yes.

16       Q.   Do you see in Paragraph 25 it says that,

17  "Lombardo, dissatisfied with these perceived affronts,

18  became very negative and difficult to manage."

19            What perceived affront is the paragraph

20  referring to?

21       A.   Eli apparently was talking to the

22  salespeople about his proposed changes and sales

23  structure before he ran it by leadership for approval,

24  so, apparently, he -- Mr. Lombardo knew -- knew about

25  the potential changes, which were not enacted before he

1    was terminated.

2         Q.    And Eli?  You are referring to Eli Auerbach

3    who was a sales manager at Chmura at that time?

4         A.    Correct.  Correct.

5         Q.    And is it your testimony that at the time

6    Mr. Auerbach told Mr. Lombardo about this change, he

7    didn't have permission to do that?

8         A.    He did not have the approval.  What he was

9    sharing was not approved by leadership.

10        Q.    What approval -- oh, the revision part?

11        A.    Correct.  Right.  And, you know, one other

12   thing, Christine, Mr. Lombardo was negative and

13   difficult to manage not only at that point, but at

14   prior times.  He treated our accounting folks,

15   Christine Steigmann, as if they were a second class

16   citizen, to the degree Christine came just about crying

17   to me one day because she was afraid that Rick was

18   going to have her fired.  I assured her that that kind

19   behavior was not what Chmura stood for.

20        Q.    So Mr. Lombardo was difficult -- well, I

21   guess to restate that, he became very negative and

22   difficult to manage, but I think your testimony is that

23   he was already difficult to manage; is that correct?

24        A.    That is correct.

25        Q.    Now, this paragraph also states, "For

Page 31

1  example, when Lombardo did not receive a discretionary

2  merit based salary increase in 2019, he became incensed

3  and even falsified changes to a rescinded job offer

4  letter from a third party to try to bully Chmura into

5  increasing his salary."  What's the factual basis for

6  that statement?

7      A.    The factual basis for that statement is the

8  falsified letter, which was odd, or funny, in a bad

9  sense, because you can see that certain letters, or

10 certain words were not even in line with the text

11 around it.  It was clear that the date was changed.

12          So when we received this letter, of course,

13 the name of the offering company was taken off.  Leslie

14 and I talked about it, and it became apparent to us

15 very quickly who that company was, someone that we were

16 trying to work on a relationship with them being our

17 vendor.  And so Leslie picked up the phone, called the

18 person and he acknowledged that, yes, he had offered

19 Lombardo a job.

20          Interesting that it was probably at the

21 IEDC the former year, which we spent a lot of money to

22 send Mr. Lombardo to.  And he assured Leslie that that

23 offer was taken off the table at least a month prior to

24 Lombardo trying to convince us that he had a high

25 offer.

1      Q.    What parts of the letter do you contend

2   were falsified?

3      A.    The date, the amount of money.  When he --

4   the amount of time he had to give a response.  I don't

5   have the letter in front of me, but that's my

6   recollection at this point.

7      Q.    Does Chmura currently have a relationship

8   with GIS, that particular firm?

9      A.    It's strained, but, yes, we do.

10      Q.    Did GIS want to continue working with

11   Chmura?

12            MR. SATTERWHITE:  Object to the form.

13      A.    Yes, they do.  Our data are very valuable.

14      Q.    Can you explain how the relationship is

15   strained?

16      A.    There is a trust factor there.  When

17   someone offers an employee of yours a job, when that --

18   that is not ethical, that's not the way we work.  If we

19   were to try to employ someone, or offer someone a job

20   with, certainly, a customer of ours, we would do that

21   very cautiously and not without talking to that

22   customer first.

23      Q.    But Chmura is concerned about working with

24   GIS; is that fair?

25      A.    Well, for the trust issue there now, but

1   the real issue here is that we were given something to

2   bully us to try to get a pay increase.  We were lied

3   to.  It took -- it took several discussions.

4            In fact, we went up to Cleveland, Leslie

5   and I and Greg Chmura sat in the room for, I would say,

6   it was about an hour with Leslie talking to

7   Mr. Lombardo asking him if this was, in fact, a real

8   offer, if he doctored it.  And, finally, at the end of

9   the conversation, he said to Rick, Rick, if -- I can't

10  remember his last name -- when you and your wife have a

11  son and he comes to you and he lied, are you going to

12  just let him lie, or are you going to address that?

13           And then she took the piece of paper,

14  pushed it over to Rick and said, Rick, let me give you

15  one more chance, has this been doctored?  And he said,

16  yes.

17       Q.    Did Mr. Lombardo -- go ahead.

18       A.    We originally were -- went up there to fire

19  him because of that.

20       Q.    But you, ultimately, didn't fire him at

21  that point, correct?

22       A.    No, we did not.  Leslie said, Rick's a bad

23  boy, but he is my bad boy, and I am going to help him.

24       Q.    In your offer letter of employment,

25  Mr. Lombardo was entitled to annual merit increases,

Page 34

1    correct?

2              MR. SATTERWHITE:  I am going to object to

3    the form.  If you are talking about a specific

4    document, we will be glad to look at it.

5         A.    No one in this world is entitled to annual

6    merit increases, not even me.

7         Q.    I am going to show you what's been marked

8    Defendant's Exhibit E.

9                              -    -    -    -    -

10             (Thereupon, Previously Marked

11             Deposition Exhibit E, Copy Copy of

12             Letter Dated 2/3/15 to Richard

13             Lombardo, Bates CHMURA000097, was shown

14             for purposes of identification.)

15                              -    -    -    -    -

16        Q.    I will let you control and take a look at

17   that.

18        A.    (Reviewing.)

19        Q.    Do you recognize this document?

20        A.    Yes.

21        Q.    What is it?

22        A.    It's an offer letter, I believe.

23        Q.    And you will see right there in the center

24   it says, "After three months of employment, you will

25   also be eligible for annual merit increases upon

Page 35

1    approved performance by your management."  Do you see

2    that?

3         A.    I sure do.

4         Q.    Did Mr. Lombardo request an annual merit

5    increase during his employment there?

6         A.    Multiple times.

7         Q.    And did he ever receive one?

8         A.    I believe he did one year.  It wasn't a

9    merit increase.  It was a cost of living increase.  He

10   was compensated very well, and our expectation was that

11   he would be getting higher salary or higher pay as he

12   was successful as a salesperson.

13        Q.    Going back to the Paragraph 25 of

14   Exhibit D.  Now, what you called a falsified letter,

15   that occurred in March of 2019, correct?

16             MR. SATTERWHITE:  Sorry, Christine.  You

17   broke up a little bit on our end.

18        Q.    Sure.  The letter you referred to you said

19   Lombardo, according to you, falsified, that incident

20   occurred early 2019, correct?

21        A.    Correct.

22        Q.    Was it in -- do you recall what month that

23   happened?

24        A.    It was either February or March.  It was

25   cold in Cleveland.

                                                   Page 36

1          Q.     So that was well before Mr. Auerbach talked

2     to Mr. Lombardo about the change or revising the

3     commission structure, correct?

4          A.     Correct.

5          Q.     I want to turn to Paragraph 30 and 31 of

6     the Amended Complaint in Exhibit D.

7          A.     (Reviewing.)

8                 Yes, I have read 30 and 31.

9          Q.     Paragraph 30 says, "Second, Lombardo

10    threatened to accept a position with one of Chmura's

11    competitors, in violation of the Agreement."  What is

12    the factual basis for that sentence?

13         A.     Okay.  And going on it says, "Lombardo

14    indicated that this was not an idle threat because he

15    had already discussed employment with at least one

16    competitor."  And we have a letter from EMSI where --

17    once again, here this is Rick lying whenever it suits

18    his purpose.  So we have a letter from EMS that Rick

19    spoke to someone at that IEDC event; again, the event

20    that we pay all this money to attend where he is

21    supposed to bring us a return on investment from that.

22                 So Rick met with someone from IEDC and was

23    trying to talk to that person about whatever -- being

24    available to work there.  So, clearly, EMSI did not

25    offer him a job, as he said that they did, but -- so

Page 37

1   the fact of the matter is, we have an email that

2   validates this.

3         Q.    What is the date of that email?

4         A.    It was right after the conference, so it

5   was upwards towards October.  I believe the email

6   probably was dated whenever the conference ended,

7   October 2019 thereabout.

8         Q.    What's the substance of the -- the

9   substance of that email?

10        A.    Rick was trying to meet with the -- get a

11  phone call with the EMSI guy.

12        Q.    Does the email say anything about

13  employment?

14        A.    I don't recall that.

15        Q.    To your knowledge, did Mr. Lombardo ever

16  accept a position with one of Chmura's competitors?

17        A.    Not to my knowledge.

18        Q.    Paragraph 31 states that, "Third, Lombardo

19  threatened to contact all of Chmura's clients, despite

20  the Agreement's non-solicitation provisions, so that he

21  could persuade them to take their business elsewhere."

22              What's the factual basis for that

23  statement?

24        A.    He made that statement to Auerbach.  He

25  made that statement as well to other employees.

Page 38

1      Q.    What other employees?

2      A.    I believe, at least, Stephanie.  I am not

3   sure who else.

4      Q.    What's Stephanie's last name?

5      A.    Is it Wiley?  I am not good with names.  I

6   do well to get every one's first name right.  But she

7   is in Cleveland.  Sorry.

8      Q.    To your knowledge, did Mr. Lombardo contact

9   any of Chmura's clients to persuade them to take their

10  business elsewhere?

11     A.    Not to my knowledge at this point.

12     Q.    I want to turn to Paragraph 34 of the

13  Complaint, the Amended Complaint of Exhibit D.

14     A.    (Reviewing.)

15           Okay.

16     Q.    Paragraph 34 states that, "In that letter,

17  you made several requests to enable it to secure both

18  its confidential information and its customer

19  relationships."  Do you see that?

20     A.    Yes.

21     Q.    What letter is that referring to?

22     A.    Paragraph 33 might provide it.

23           Oh, it's the separation contract, the cease

24  and desist letter.  That's the letter.

25     Q.    And do you know when that cease and desist

Page 39

1    letter was sent?

2         A.    That would have been probably a day or two

3    after we told him to go home and not come back until he

4    heard from leadership.

5         Q.    Who sent the letter to Mr. Lombardo?

6         A.    I believe counsel would have sent that

7    letter, but I'm not sure.

8         Q.    Other than that letter, were any other

9    requests made?

10        A.    I'm sorry, were any other what's made?

11        Q.    Requests, that are referenced in Paragraph

12   34, made to Mr. Lombardo?

13        A.    Certainly, Mr. Auerbach requested that the

14   computer be returned previously.

15        Q.    Do you know when Mr. Auerbach made that

16   request?

17        A.    Not off the top of my head, but I believe

18   it's in his affidavit.

19        Q.    Other than the letter, the cease and desist

20   letter and the request my Mr. Auerbach, were there any

21   other requests made, to your knowledge?

22              MR. SATTERWHITE:   Object to the form.

23        A.    Not that's coming to my mind right now.

24        Q.    Did Mr. Lombardo ultimately return the

25   computer?

Page 40

1    A.    Ultimately, but the names were so stale, we

2  were not able to get any value out of it.

3    Q.    Do you recall when Mr. Lombardo returned

4  that computer?

5    A.    I believe it was sent as a Christmas gift.

6    Q.    Around December 25th; is that correct?

7    A.    That's correct.

8    Q.    Turn to Paragraph 37 and take a look at

9  that.

10    MR. SATTERWHITE:  Did you say 37?

11    MS. COOPER:  I did.  I did.

12    A.    (Reviewing.)

13    I'm done reading it.

14    Q.    Paragraph 37 states, "Further, despite

15  specific requests, Lombardo also failed to return a

16  Chmura computer which contained customer contacts,

17  pricing data, and other highly confidential Chmura

18  information." Do you see that?

19    A.    Yes.

20    Q.    How were -- when you received one of those,

21  how was the customer contact -- let me rephrase that.

22    How were custom contacts stored on the

23  computer?

24    A.    They were stored in an Excel document.

25  They were also stored in his Outlook -- his mail.

1     Q.    Was the Excel document you are referring to

2   on his desk top, his document folder?  Where was it on

3   the computer?

4     A.    That information I don't have.  We never

5   looked at the computer, but the counsel has taken care

6   of that and sent information to us from the laptop.

7     Q.    What about pricing data?  How was the

8   pricing data stored?

9     A.    That was most likely in an Excel

10   spreadsheet, our pricing spreadsheet.

11     Q.    You said most likely.  Do you know for sure

12   how it was stored?

13     A.    Well, that is how it was stored.  I don't

14   know if he took it out of the Excel sheet and copy and

15   pasted it into a Word document or PowerPoint.  I don't

16   know what he did with it.  In any case, it was there.

17     Q.    Do you have a Word document that shows he

18   copy and pasted any information?

19     A.    No, I don't.  I was just saying it could

20   have been in one of those forms, but my recollection is

21   that it is an Excel document. I guess the form doesn't

22   matter.  The fact that it was there is what's

23   important.

24     Q.    But those documents were there on a

25   computer issued by Chmura, correct?

Page 42

1          A.     That's correct.

2          Q.     What other highly confidential information

3     does Paragraph 37 refer to?

4          A.     Well, he had -- in all of his emails, he

5     had licenses.  He had names of customers.  He had the

6     dollar amount of their contract.  He had information

7     about our road map, things that we're adding to JobsEQ

8     that we wouldn't want our competitors to know about.

9          Q.     Mr. Lombardo was placed on unpaid leave,

10    correct?

11         A.     Correct.

12         Q.     Do you recall when he was placed on unpaid

13    leave?

14         A.     Again, I don't have that date in front of

15    me.  That's one I should have looked up to have, but I

16    don't have that.  It was in October.  October 2019.

17    Correct.

18         Q.     When he was placed on unpaid leave, what

19    actions were taken to procure his computer?

20         A.     When he was -- when we made a phone call --

21    when we learned how belligerent Mr. Lombardo was being,

22    we asked Eli to walk him out of the office and tell him

23    not to come back until leadership discussed it.  At

24    that very moment, his access to JobsEQ was shut off.

25    His ability to get into any Chmura software was cut

Page 43

1   off.  And, of course, the reason for this was because

2   he was out of control, belligerent, and there was no

3   way for us to know what he would do next.

4         Q.    Chmura uses Office 365, correct?

5         A.    I believe so.

6         Q.    Did Chmura turn off access to Office 365?

7         A.    That would be a question for John Chmura,

8   but --

9         Q.    Did -- and this may be a question for John

10  as well, so just tell me if it is.  Did Chmura have any

11  software on the computer where it could log in remotely

12  to that computer?

13        A.    Yes, that will be John Chmura.

14        Q.    I will ask those questions of him, then.

15              If you look at paragraph -- just read

16  through Paragraph 38.

17        A.    (Reviewing.)

18              Yes.

19        Q.    This paragraph also references the notes on

20  the computer that you testified about earlier, correct?

21        A.    Correct.

22        Q.    Were the prospective customers that

23  attended those conferences be available to others to

24  speak to as well?

25              MR. SATTERWHITE:  We object to the form.

Page 44

1   Go ahead.

2        A.    Would the prospective customers be

3   available to others to speak to as well?  The answer

4   is, yes, but you can't speak to someone if you don't

5   know who their name is.  And we didn't have the names

6   of any of those people.  They were --

7        Q.    Did you have any -- sorry.  Were there --

8              MR. SATTERWHITE:  Were you finished your

9   answer?

10       A.    I am finished.  Go ahead.

11       Q.    Were Chmura competitors at the IEDC

12  conference?

13       A.    Yes, recall that Rick spoke to EMSI looking

14  for -- being available for a job.  This is where he

15  claims that they offered him a job.  He claimed that

16  when he was leaving the company, the day he was so

17  disgruntled.

18       Q.    But you have no basis for believing that he

19  was actually offered a job by EMSI, correct?

20       A.    No, oftentimes, Rick lied, as we found.

21       Q.    With respect to that -- well, in Paragraph

22  38, the third line from the end, it says that the

23  computer notes from those two conferences summarized

24  terms relating to Chmura's prospective relationship.

25  What is the summarized terms that this paragraph refers

Page 45

1    to, if you can just describe it for me?

2         A.    (Reviewing.)

3               Well, what we typically do is whoever is in

4    charge taking notes will have the name of the person,

5    would have who they work for, and then will have some

6    notes such as:  I gave Mr. So-and-So a demo of about 10

7    to 15 minutes.  They were very impressed with certain

8    analytics.  He asked us to follow up with him next week

9    to provide a full demo.

10        Q.    If you could, turn to Paragraph 63 of

11   Exhibit D.

12              MR. SATTERWHITE:  You did say 63, right?

13              MS. COOPER:  I did, yes.

14        A.    (Reviewing.)

15              Okay.  Yes.

16        Q.    Can you explain -- it states, "Further, it

17   would be inequitable for Lombardo to benefit from his

18   threatened breaches by diverting Chmura' customers to a

19   competitor during the restricted period."

20              What benefit did Mr. Lombardo obtain?

21              MR. SATTERWHITE:  Object to the form.

22        A.    Well, he threatened to sell our customer

23   client lists.  The benefit to him --

24        Q.    How did Mr. Lombardo -- I'm sorry. I

25   didn't mean to cut you off.  I wasn't looking at the

Page 46

1    video.  Go ahead.

2         A.    The benefit to him would be the sales

3    price.

4         Q.    But how did he benefit by having the sales

5    price?

6              MR. SATTERWHITE:  Same objection.

7              THE WITNESS:  Can we go further back up?  I

8    want to see what this is with regard to.

9              MR. SATTERWHITE:  Yeah.  Where do you

10   want --

11             THE WITNESS:  Is there like a statement at

12   the top of this?

13             MR. SATTERWHITE:  (Indicating).

14             THE WITNESS:  Okay, Declaratory Judgment.

15   Okay.

16             (Reviewing.)  All right.  Paragraph 63?

17             MR. SATTERWHITE:  She is asking you about

18   63.

19        A.    It was a threatened breach.  We do not know

20   if he benefitted or not.  Again, Rick is not one to be

21   honest.

22        Q.    Do you have any basis for believing that

23   Mr. Lombardo, in fact, diverted customers to a

24   competitor during the restricted period?

25        A.    Not at this point in time.

Page 47

1      Q.    Other than -- and we will get to this in

2  more detail later, but other than attorneys fees, does

3  the first Amended Complaint seek any monetary relief?

4            MR. SATTERWHITE:  Objection to form.

5      Q.    If you go to Page 14 and take a look at

6  Page 14.

7      A.    Now, where on Page 14 are we looking?

8      Q.    My question -- whatever you need to look

9  at, my question is, does the Amended Complaint seek

10  monetary -- any monetary relief other than attorneys

11  fees?

12     A.    That's a question for our counsel here.  I

13  am not an attorney, so I don't know how to answer that.

14            MS. COOPER:  I am going to move way from

15  this exhibit.  If we could, take a short restroom

16  break.

17                    -   -   -   -   -

18            (Short break off the record.)

19                    -   -   -   -   -

20            MS. COOPER:  Back on the record.

21  BY MS. COOPER:

22     Q.    I am going to close Exhibit D and go back

23  to Defendant's Exhibit A which is an exhibit to the

24  deposition.  You were also designated to testify

25  regarding Item Number 3, "The damage allegedly

Page 48

1   sustained by Chmura as a result of Mr. Lombardo's

2   purported actions"; is that correct?

3        A.    Correct.

4        Q.    Can you tell me, what is each type of

5   damage that Chmura is seeking?

6        A.    The damages that we refer to as that

7   greater than 100,000 that we already discussed:  The

8   five demos, or five contracts that we should have

9   gotten, at least, out of the IEDC and the Texas event,

10  times 8,000 average selling price, 40,000; then present

11  value of that four years from -- with a 2% discount

12  rate, and then some function about non-renewal.

13       Q.    Are there any other damages you are seeking

14  against Mr. Lombardo?

15       A.    The attorneys fees that are relative to the

16  Confidentiality Agreement breach.

17       Q.    Anything else?  Any other damages?

18       A.    Not at this point.

19       Q.    You have also been designated to talk about

20  "The calculation of each element of damage allegedly

21  sustained by Chmura as a result of Mr. Lombardo's

22  purported actions," Item Number 4 on the Notice of

23  Deposition, Exhibit A, correct?

24       A.    Correct.

25       Q.    And you have taken me through the

Page 49

1   calculation, but I'd like you to slow it down for me.

2   It's hard to get it all down.  What is the specific

3   amount of damages that Chmura is seeking with respect

4   to those five contracts?

5        A.   Well, you know, in addition to --

6             MR. SATTERWHITE:  Object to the form.  Go

7   ahead.  Sorry.

8        A.   In addition to that, we have, you know, the

9   $25,000 that we pay to be a sponsor.  So when we go to

10  these conferences and we get names and we follow-up on

11  them because they ask to do a demo, our historical demo

12  rate is about 24%.  So I looked at the number of people

13  who requested a demo, and then we assume that 24% would

14  become a licensee.  So that turned out to be five.  But

15  8,000 is the average selling price.  The 8,000 times

16  five I believe is 40,000.  So in year one, we had

17  $40,000.  In year two, we take that present value based

18  on 2% inflation rate.

19       Q.   What is that present value?

20       A.   I'm sorry?

21       Q.   What is the present value?  Can you explain

22  that for me?

23       A.   The present value is a financial term to

24  identify what a future string of earnings is worth

25  today.

1       Q.    So you have $40,000 in year one?

2       A.    Yes.

3       Q.    What is the present value dollar amount for

4  year two?

5       A.    For the second year, the formula of present

6  value equals the -- you know, the 40 thousand divided

7  by 1 plus .02, in the parentheses, raised to the second

8  power.  In the third year, you raise it to the third

9  power, et cetera.  Then you use some --

10      Q.    So what is the sum of those numbers?

11      A.    The number I gave earlier, I believe, was

12  197-$198,000.  Now, we are very conservative on this.

13  We are very conservative.  We could have used more

14  years, but we just used four years because the bulk of

15  our customers we've gotten in the last four years.

16  But, certainly, we have customers that have been with

17  us for 10 or 15 years, so we could have justified using

18  a much longer period of time, which would have made the

19  value higher.

20      Q.    That $8,000 average selling price that the

21  calculation is based, is that the same price that would

22  have been paid in year two and year three and year

23  four?

24      A.    That's a good point.  It would have been

25  higher because you raise it by the cost of living every

Page 51

1  year.  So we -- you just pointed out an error that

2  caused this number to be lower than it should have been

3  otherwise.  We can correct and revise.

4       Q.    My question is, is the renewal price the

5  same --

6       A.    No --

7       Q.    -- as the sales price?

8       A.    No, every year the renewal point goes up to

9  reflect the cost of living.  So I can't remember right

10  now if it was 2% or 3% that we used.  So every year --

11  if you paid 8,000 the first year, the next year you pay

12  8,000, you know, times 1.02.  So it would be 8,000, you

13  know, 2 or 300, whatever.

14       Q.    To your knowledge, have you produced the

15  documents that you are relying on for this calculation

16  in Discovery?

17       A.    Yes.  Yes.

18       Q.    Can you tell me specifically what those

19  documents were -- or are?

20       A.    It's an Excel spreadsheet.  That's, at

21  least, what I provided.  I would expect that's what was

22  sent on to you.

23            MS. COOPER:  Rod, can you confirm that that

24  spreadsheet was sent and provided?

25            MR. SATTERWHITE:  I cannot confirm sitting

Page 52

1   here today, but I will certainly check on it.

2              MS. COOPER:  If you would, that would be

3   great.

4              MR. SATTERWHITE:  Sure.

5   BY MS. COOPER:

6       Q.    Dr. Chmura, the numbers that you -- well,

7   let me ask this, did you create that Excel spreadsheet

8   you are referring to?

9       A.    Greg created that Excel spreadsheet for me.

10      Q.    I'm sorry, who did?

11      A.    Greg Chmura created the Excel spreadsheet

12  for me.

13      Q.    And was that at your direction?

14      A.    Yes.

15      Q.    Did you tell him how to do the calculation?

16      A.    No, it's a simple thing, and Greg is a very

17  smart guy.  He has a degree in math and physics, a dual

18  degree that he got in three years.  The present value

19  is a simple concept that any financial person would

20  use.

21      Q.    What documents were relied on to create

22  that spreadsheet?  I want to know what information was

23  relied on to make that spreadsheet?

24      A.    Well, the beginning documents were

25  eventually what we got from the computer that Rick was

1   holding on to.  So it was several pages of notes from

2   the two conferences we referred to.

3        Q.    Do you know if those notes were produced in

4   Discovery?

5        A.    Sorry, can you say that in English?

6        Q.    Did you turn over those notes to

7   Mr. Lombardo's counsel?

8        A.    Well, they were on Mr. Lombardo's computer.

9   I would think that they were turned over to you.

10       Q.    Now, you indicated that in your

11   calculation, you used 24% for the demo rate coming out

12   of a conference; is that correct?

13       A.    We used 24% at -- if we give the -- based

14   on the number of people that sign up for a tool, that

15   have seen a demo, yes, 24%.

16       Q.    What information did you use to come up

17   with that number, that percent?

18       A.    We are a data company, and so we keep track

19   of all of our sales, all of the demos.  And we have a

20   running rate of the demo-to-sales rate.

21       Q.    How is that tracked?  In what program is

22   that tracked?

23       A.    That is something that Greg Chmura does.  I

24   would -- I would expect he has an Excel file where he

25   is pulling that data into.

Page 54

1      Q.    So what is he pulling it from?

2      A.    Probably out of Salesforce.

3      Q.    Do you know how many people that ask for a

4   demo from a sales conference actually end up getting a

5   demo or having a demo?

6      A.    No.  I do know that at the last IEDC event

7   we went to -- I was looking at some data -- we didn't

8   have as many people there, and there were several.

9   Whenever I give a presentation, it would -- you know, a

10  primary opens a session, that typically bumps up the

11  number of people that end up asking for a demo and

12  buying the product, licensing the product.

13     Q.    The 8,000 average selling price that you

14  used in this calculation -- that was used in this

15  calculation, what documents did Chmura use to come up

16  with the $8,000 average selling price?

17     A.    Similar to what -- we take all this data,

18  so similar to us getting the demo-to-sale ratio, we

19  keep track of all of the sales over time, as well as

20  per month.

21     Q.    And is that information also kept in

22  Salesforce as well?

23     A.    I would expect that some of it is in

24  Salesforce, but I would expect that Greg pulled that

25  out and had an Excel sheet that he keeps it in because

Page 55

1    when he gives us his monthly sales team meeting, he

2    shows us historically what it looks like, so.  It is

3    also in Excel.

4         Q.    And why was the rate of 2% used in the

5    present value determination?

6         A.    Well, that's a good question, and we could

7    use it -- you can argue different rates.  2% is about

8    the rate of inflation, so that would be one likely

9    choice.  Another choice would be if you put the money

10   in a bank, what would be the interest rate you'd get?

11        Q.    Do you know whether Chmura had turned over

12   the Salesforce documentation that went into this

13   calculation, over to Mr. Lombardo -- or counsel for

14   Mr. Lombardo?

15        A.    I would expect that that has not been.

16        Q.    And do you know why it wouldn't have been?

17        A.    Because you didn't ask for it?  I'm not

18   sure.

19        Q.    Are there any other damages calculations --

20   sorry.

21             We covered the damages that Chmura is

22   taking.  Is Chmura taking any other -- we talked about

23   attorney fees, and we talked about the $198,000.  Are

24   there any other damages that Chmura is seeking?

25             MR. SATTERWHITE:  Object --

Page 56

1           Withdraw the objection.  Go ahead.

2      A.     Well, I guess that would be a discussion

3  that would have to have with our counsel if, you know,

4  we go over and end up in court.

5      Q.     Dr. Chmura, you were designated as the

6  witness to speak about the damages sustained by Chmura

7  and the calculation of each damage; therefore, I will

8  ask again.  Other than the $198,000 that you already

9  testified to and the attorneys fees, are there any

10  other monetary damages that Chmura is seeking, as you

11  sit here today?

12      A.     As we sit here today, no.

13      Q.     I am going to move into the customer list,

14  the two customer -- not -- sorry, the two conference

15  notes that had lists of potential customers on them.

16  Do you recall what customers, or potential customers,

17  were listed on those conference notes?

18      A.     There were like 50 names.  I don't recall.

19  I read it maybe two weeks ago.

20           MR. SATTERWHITE:  I will just note an

21  objection for the record.  We objected to that category

22  for that very reason, that she doesn't need to be

23  expected to memorize customer names at that volume.

24      Q.     Was that 50 names per conference or 50

25  names total, roughly?

Page 57

1      A.    If we are talking total -- I don't want to

2  to guess, but it -- I don't want to guess.  I want to

3  go back and look at it fully.

4      Q.    Did any of the customers, or potential

5  customers on that list, enter into a subscription

6  agreement or a license agreement with Chmura?

7      A.    There was one that I mentioned earlier that

8  walked up to Rick and said that -- asked Rick to send

9  the agreement for him to sign.  So that indicated to me

10 that it was a sale that came outside the IEDC.  I did

11 not include that as one of those that we did not get.

12     Q.    So that was not included in your

13 calculation that we just went over?

14     A.    That's correct.

15     Q.    And can you explain the reason for that

16 again, why it wasn't included?

17     A.    Because that was the not honest.  That

18 client -- it was clear that Rick already had a

19 relationship with that client and had been working with

20 that client, had given that client a demo prior to the

21 conference, and he was at the point where he was ready

22 to sign.  But just because he walked up to the

23 conference booth then, Rick put his name on the list

24 and did not think they were for us to suggest that that

25 wasn't attributed to him, or that it was attributed to

Page 58

1    the conference, not to him.

2        Q.    So in discriminating which potential

3    customers to include, did you review each individual

4    one?

5        A.    Did I -- I'm sorry, did I review each

6    individual what?

7        Q.    Review potential customer on the list

8    before including it in your calculation?

9        A.    Yes, I read that -- I read that list myself

10   and identified which ones wanted a demo, and then we

11   gave it to the salespeople to follow-up with.

12       Q.    And how did you determine which ones to

13   include in your calculation?

14       A.    They said, "Please call me back next week

15   to give me a demo," or "Please call me in one month to

16   give me a demo."

17       Q.    And upon receiving those customers notes,

18   did anyone from Chmura follow-up with those potential

19   customers?

20       A.    Yes.

21       Q.    And have any of those potential -- other

22   than the ones that we talked about, any of those other

23   potential customers entered into any contract with

24   Chmura?

25       A.    Not that I know of at this point in time.

Page 59

1    In fact, most of them wouldn't even return our phone

2    calls.

3         Q.    Do you know how frequently they were

4    called?  Let me rephrase that.

5              Do you know how frequently they were

6    contacted by Chmura after the notes were received?

7         A.    We call -- again, if this was an October

8    conference, we got it at the end of December.  Our

9    counsel had to make sure it was properly prepared for

10   us, so we got the list maybe mid January, pretty stale,

11   and they were contacted more than once.

12        Q.    You were designated as the witness to

13   testify to Topic Number 6, "Closing ratios for each

14   account manager, senior account manager or other sales

15   representative of Chmura from February 2015 through

16   December 31, 2019"; is that correct?

17        A.    I don't recall being designated for that

18   one.  That sounds more like Leslie Peterson.

19        Q.    Okay.  Let me show you -- while I am

20   opening up another exhibit, I will ask you a follow-up

21   question to one of my prior questions.  Do you know how

22   many contacts it typically takes to secure a demo?

23        A.    How many contacts?

24        Q.    Yes.  How many contacts would it take from

25   an initial contact to that contact asking for a demo?

Page 60

1              MR. SATTERWHITE:  Object to the form.

2         A.    It could take multiple contacts.  It could

3    take years to get a client.  For example, there are

4    some people that we have been talking to for 10, 15

5    years and then they finally decide to get a license.

6         Q.    I am going to show you what's been marked

7    Defendant's Exhibit B.

8                        -   -   -   -   -

9              (Thereupon, Deposition Exhibit B, Copy

10             of Plaintiff's Designations and

11             Objections to Richard Lombardo's Notice

12             of  Deposition, was marked for purposes

13             of identification.)

14                        -   -   -   -   -

15        A.    (Reviewing.)

16             Do you want us to scroll to something?

17        Q.    Yeah, you can go ahead and scroll through

18   and take a look at this.

19        A.    Okay.

20             MR. SATTERWHITE:  (Indicating).  I am just

21   guessing this is what she is going to ask you about.

22             MS. COOPER:  Yes, that's where I am going.

23        Q.    Have you seen this document before?

24        A.    Oh, yes.

25        Q.    And Exhibit B is, "Plaintiff's Designations

Page 61

1    and Objections to Richard Lombardo's Notice of

2    Deposition, Pursuant to Federal Rule Civil Procedure

3    30(b)6", correct?

4         A.    So closing ratio is what I have been giving

5    to you, that's 24%.  Of those people that we demo, on

6    average 24% of them end up getting a license or

7    requesting a license.

8         Q.    You are a little ahead of me.  You are a

9    little bit ahead of me.  You answered the question I

10   was going to ask, but let me ask the question and you

11   give me the answer, if you don't mind.

12             So the closing ratio, you will see, you

13   were designated as to the limited portion of Topic

14   Number 6, "Closing ratios for each account manager,

15   senior account manager or other sales representative of

16   Chmura from February 2015 through December 31, 2019",

17   correct?

18             MR. SATTERWHITE:  Object to the form.  I

19   mean, I don't understand the question.  She was

20   designated by a more limited basis than what you just

21   read, and maybe I just misheard you.  But she has

22   agreed to testify with respect to the overall ratio,

23   not with respect to individual account managers.

24             MS. COOPER:  Correct.

25   BY MS. COOPER:

Page 62

1      Q.    So, Dr. Chmura, you were designated to

2  testify to a limited portion of -- or a limited scope

3  of Topic Number 6, correct?

4      A.    Yes.

5      Q.    And it is your testimony that the 24%

6  figure that we have discussed is the closing ratio for

7  customers who request JobsEQ demos; is that correct?

8      A.    Correct.  It varies over time, but that is

9  the average.

10      Q.    And over what period of time did you look

11  at -- or did Chmura look at to come up with that 24%?

12      A.    From what I am seeing in mind is at least

13  one year.  Could be two years.

14      Q.    And what did you look at?

15      A.    Well, hold on, let me think.  Let me think.

16  I believe it's over, like, the past four years.  That's

17  my recollection.

18      Q.    And that would have been over the four

19  years that Mr. Lombardo was employed at Chmura,

20  correct?

21      A.    That would include that period.

22      Q.    And would it also include the period of

23  time Austen Steele was employed at Chmura?

24      A.    Yes.

25      Q.    Can you explain to me the difference

Page 63

1   between an account manager and a senior account

2   manager?

3        A.   A senior account manager has been there

4   longer than an account manager and probably has more

5   experience.

6        Q.   Upon Mr. Lombardo's termination, did

7   Chmura have any senior account managers?

8        A.   I believe Wilson Cox was a senior account

9   manager.

10       Q.   Do you know, and this is not going to

11   topic, but do you know how many account managers Chmura

12   had upon Mr. Lombardo's termination?

13       A.   I believe four.

14       Q.   When did -- or has -- has Chmura hired any

15   new account -- {audio distortion}.

16            (Reporter asked for clarification).

17            Since Mr. Lombardo's termination, has

18   Chmura hired any new account managers?

19            MR. SATTERWHITE:  Object to the scope.

20       A.   I believe we've hired two.

21       Q.   Do you know the current number of account

22   managers that Chmura has?

23       A.   I believe --

24            MR. SATTERWHITE:  Same objection.

25       A.   I believe we have six.

Page 64

1      Q.    Do you know -- let me strike that.

2            What is the overall renewal ratio for

3     JobsEQ?

4      A.    It's about 83%, but it varies based on how

5     long they have been with us.

6      Q.    What is -- over what period of time is that

7     83% calculated?

8      A.    That's been holding up for at least the

9     last couple of years.

10     Q.    What period of time are you looking at to

11    come up with that 83% figure?  Is it each year?  Is it

12    over the history of the company?

13     A.    No, 2019/2018.  And, again, it varies

14    because if someone has been with us for three years,

15    then the ratio of them staying is higher, than the

16    average --

17     Q.    The average is 83%.  Do you know what the

18    ratio is for those customers that is over three years,

19    or three years and above?

20     A.    I don't have that in my mind.

21     Q.    How about for two years?

22     A.    I don't have that in my mind.

23     Q.    I'll ask one year as well.

24     A.    83% is the average.

25     Q.    I want to go to Topic Number 14.  If you

Page 65

1    look at Exhibit A -- you can look at Exhibit A or B,

2    but we will look at Exhibit A.

3          A.    (Reviewing.)

4          Q.    Tell me when you are ready.

5          A.    I'm ready.

6          Q.    Topic Number 14 is, "Classification of

7    decisions related to the classification of account

8    managers and senior account managers prior to, during

9    and after Mr. Lombardo's employment at Chmura,

10   including the information and/or advice considered by

11   Chmura in classifying account managers and senior

12   account managers as exempt or non-exempt, and the

13   factors considered."

14              You are designated as the corporate

15   representative to testify on this topic, correct?

16         A.    Correct.

17              MR. SATTERWHITE:  I am going to object.  We

18   limited it.

19         Q.    Okay.  It was limited by counsel to,

20   "Decisions following Mr. Lombardo's departure are not

21   relevant to the claims or counterclaims in this

22   litigation".  However, you are still designated as the

23   corporate representative for decisions made prior.

24              During the time of Mr. Lombardo's

25   employment, how were account managers classified?  Were

Page 66

1    they classified as exempt or non-exempt?

2         A.    They were classified as exempt for most of

3    them.

4         Q.    And what about senior account managers?

5    How were they classified?

6         A.    The same.

7         Q.    Why did Chmura classify account managers

8    and senior account managers exempt?

9         A.    Because we saw them no different than we

10   saw the economists, the data scientists, the computer

11   technicians.  They are professionals who we require

12   them to have a B.S. Degree, so they are not someone

13   that comes off the street from high school and can

14   sell, you know, vacuum cleaners.  This is someone that

15   takes three to six months to learn JobsEQ.

16            They get a lot of training, and they sell

17   to a very sophisticated audience, and they provide a

18   lot of input.  There is a person between us and the

19   client, and we tell them that you need to have your

20   best foot forward because you often are the first face

21   of Chmura Economics & Analytics.  They bring

22   information to us from the client; for example, what

23   sort of analytics that they like, what needs to be

24   added.

25            They get very involved in conferences.

Page 67

1  They tell us which conferences that we should be

2  attending.  Once they have gone to them, they come back

3  and give us feedback.

4              They are -- they make a lot of

5  contributions.  They look at our marketing material.

6  They make suggestions on marketing.  They make their

7  suggestions on strategies.

8              Early on, Economic Development and

9  Workforce were some of the biggest areas of our

10  clients.  Our competitor, EMSI, started out in the

11  education sector, and Mr. Lombardo refused to -- he had

12  the ability to choose which markets he wanted to try to

13  sell into, and he refused to market to education

14  because he felt that our tool would not par with EMSI.

15  And so he continued to give us some feedback, and we

16  added a lot of analytics in that regard, to the degree

17  that we are now making great progress on the education

18  vertical.

19       Q.    Do you know where that feedback came from?

20       A.    I'm not sure what you mean.

21       Q.    Was Mr. Lombardo simply passing on what he

22  heard from Chmura customers?

23              MR. SATTERWHITE:  Object to the form.

24       A.    We expected him to provide feedback from

25  the customers.  We have a road map, so that is product

Page 68

1    that we are adding to JobsEQ.  And it was very

2    important for our account managers to obtain

3    information so that we could add it to the road map.

4              And every time another person asked for it,

5    we got another check.  So if plenty of people asked for

6    us to add block level data, then we pushed that higher

7    up on the road map than, say, changing our colors from

8    blue to green for only one person.

9         Q.   So you were counting on feedback from

10   outside sources, persons outside of Chmura, to make

11   those decisions, correct?

12        A.   Correct.

13        Q.   Did Chmura rely on any information in

14   making the decision to classify account managers,

15   senior account managers as exempt?

16        A.   No.

17        Q.   Did Chmura rely on the advice of counsel to

18   make that decision?

19        A.   No.

20        Q.   What factors did Chmura rely on making the

21   decision to classify the account managers and senior

22   account managers as exempt?

23             MR. SATTERWHITE:  Object to the form.

24        A.   Well, their duties.  We saw them no

25   differently than we saw someone who was a data

Page 69

1   scientist.

2       Q.   What degree does a data scientist require

3   to be employed at Chmura?

4       A.   A B.S. Degree.  Sometimes it is a Master's,

5   but a B.S. Degree.

6       Q.   And are the job duties different for an

7   account manager and senior account manager than for a

8   data scientist?

9       A.   Of course.  The account manager is dealing

10  with sales all day long, and the data scientist is

11  dealing with numbers and programs.

12      Q.   Just for my understanding, what does a data

13  scientist do?

14      A.   A data scientist would vary.  They could

15  look for standard deviations in errors in the JobsEQ.

16  They would test JobsEQ to see if there are any issues

17  with it.  They may -- they may write in blogs for us.

18  Right now we are running a lot of the blogs from

19  Covid-19 related to job postings.

20      Q.   Were any members of -- sorry.  Were any

21  account managers or senior account managers ever

22  classified as non-exempt prior to Mr. Lombardo's

23  termination?

24      A.   No.

25      Q.   Did Chmura have any employees that were

Page 70

1      classified as non-exempt during Mr. Lombardo's

2      employment?

3              A.      We had some interns who checked their time

4      sheet, and if worked over 40 hours, would receive

5      overtime.

6              Q.      Were there any other employees that were

7      classified as non-exempt?

8              A.      Not to my knowledge.

9              Q.      Mr. Lombardo was classified as an exempt

10     employee, correct?

11             A.      Correct.

12             Q.      Other than what you already testified to,

13     did Chmura rely on any other information in making a

14     decision to classify Mr. Lombardo as exempt?

15             A.      No.

16             Q.      Currently, how are your account managers

17     classified?

18                     MR. SATTERWHITE:   Object to the scope.

19             A.      Depends on their duties.

20             Q.      How do you determine which account manager

21     is classified as exempt and classified as non-exempt?

22                     MR. SATTERWHITE:   Object to the scope.

23             A.      Depends on their duties and their annual

24     earnings.

25             Q.      Are there certain account managers that are

Page 71

1    currently classified as exempt?

2              MR. SATTERWHITE:  Same objection.  Do you

3    just want to do a standing objection?  She can answer

4    in her individual capacity and I will be quiet that

5    way.

6              MS. COOPER:  Okay.

7              MR. SATTERWHITE:  Go ahead.

8         A.    Yes.

9         Q.    I am going to Topic 18, "Employee handbook

10   produced by Chmura in response to Mr. Lombardo's First

11   Set of Document Requests Directed to Chmura." You have

12   been designated as the corporate representative to

13   testify on this topic.  I am going to show you what's

14   been marked as Exhibit Q.

15                        -   -   -   -   -

16              (Thereupon, Deposition Exhibit Q, Copy

17              of Chmura Employee Handbook Dated

18              7/19/2019, was marked for purposes of

19              identification.)

20                        -   -   -   -   -

21        Q.    You can go ahead and take a look at that.

22        A.    (Reviewing.)

23              Okay, I am familiar with this.

24        Q.    Okay.  Give me a moment.

25              What is this document?

1       A.     The employee handbook.

2       Q.     And is it a true and accurate copy -- well,

3  it is dated July 19, 2019, correct?

4       A.     Correct.

5       Q.     And is it a true and accurate copy of the

6  handbook that existed as of July 19, 2019?

7       A.     Yes.

8       Q.     Were there other versions of the handbook

9  prior to July 19, 2019?

10      A.     I'm sure there were.

11      Q.     Does Chmura maintain copies of those?

12      A.     I don't have an answer to that.

13      Q.     Did Mr. Lombardo sign an acknowledgment of

14  receipt of this July 19, 2019 handbook?

15      A.     My -- I believe he did, yes.

16      Q.     And would that be in his personnel file?

17      A.     I would expect it would be, but I haven't

18  looked at his personnel file.

19      Q.     I want to turn your attention to Page 5.

20  It is marked Chmura 000053 at the bottom.

21             Let me ask the question before you get

22  there.  This handbook contains certain of Chmura's

23  employment policies, correct?

24      A.     Yes.

25      Q.     Does this contain all of the policies for

1   Chmura?

2            MR. SATTERWHITE:   Object to the form.   Go

3   ahead.

4        A.    I'm not certain if it does.

5        Q.    If you look at -- or scroll to the Travel

6   Policy Section, take a look at that and let me know

7   when you're ready.

8        A.    Okay.

9        Q.    It states that "All arrangements for

10  airfare and hotel should be approved by your supervisor

11  who will then send it outside of your department, i.e.,

12  to the director of operations for final approval."  Do

13  you see that?

14       A.    I certainly do.

15       Q.    Who is the director of operations?

16       A.     Sharon Simmons currently is.

17       Q.    And was she the director during the time of

18  Mr. Lombardo's employment?

19       A.    Not entirely.  Laura Leigh Savage preceded

20  her.

21       Q.    Did employees have to obtain approval prior

22  to -- according to this, employees had to obtain

23  approval prior to making travel arrangements, correct?

24       A.    We can thank Mr. Lombardo for this one as

25  well.  So when you make policies, you can't make it for

Page 74

1    just one person, but if you have one bad apple, you

2    have to make sure everyone falls under the same policy.

3    So Mr. Lombardo had the practice of wanting to make

4    sure that his, I believe it was American Airlines,

5    points were high so that, presumably, he could take

6    vacations at a lesser cost.

7             So he would go out and get a ticket for

8    $400, as an example, when all other employees flying

9    out of Cleveland were able to fly for 200.  So,

10   clearly, that's a practice that we like employees to,

11   you know, fly at reasonable times, but we also expect

12   them to not -- not take tickets that are excessive.

13        Q.   Do you have any documentation showing that

14   Mr. Lombardo booked flights that were more expensive

15   than his --

16        A.   Yes, I believe Sharon Simmons has the

17   documentation.

18        Q.   Was that documentation turned over in

19   Discovery?

20        A.   I don't believe you asked for it.

21        Q.   When was the travel expenses change made to

22   the employee handbook?

23        A.   I don't know off the top of my head.

24        Q.   Do you know what the prior language was

25   before whatever change was made?

Page 75

1      A.     There might not have been any prior

2   language.  It was, the account managers, the employees

3   would book their own flights, period.

4      Q.     Did they use a company credit card to book

5   -- get the flights?

6      A.     It depends on who they were.  If they had a

7   company credit card, we asked them to use a company

8   card.  And we have another interesting story around

9   company credit card.  So at that IEDC, this -- I think

10  this is important because it gives you a sense of

11  Mr. Lombardo's behavior and why we got to not trusting

12  him.

13          At that IEDC meeting, the last one that he

14  was at, Eli went and took two or three account

15  managers, new ones, that he wanted to learn.  They

16  stayed at, I believe it was, Embassy Suites.  Eli was

17  supposed to use the company credit card.

18          And so it -- we come to find out that Rick

19  put everyone's rooms on his credit card.  Eli said, you

20  can't do that, Rick.  So Eli went to the front desk,

21  gave them the Chmura credit card, had it all

22  transferred to Chmura, and guess what?  Mr. Lombardo

23  came behind him and had it all switched to his card, so

24  that, presumably, he could get some extra points on his

25  personal card, not Chmura's card.  So this is the kind

1    of behavior that is typical of Mr. Lombardo.

2         Q.    Regardless of whether he did that or not,

3    and I will ask if you have a factual basis for that in

4    a moment, what harm did that do to Chmura?

5         A.    What harm did that do to Chmura?  Well, we

6    certainly didn't get to collect our points.  We have a

7    Costco card, and just last year we received $6,000

8    because of rebates.  So he stole our rebate.

9         Q.    Was there a written policy that

10   Mr. Lombardo had to -- or, account managers had to use

11   the company card?

12        A.    It might have been written, but they

13   certainly had been told that.  They were told that time

14   and again.  And just by virtue of the fact that Eli

15   told Rick you can't put this on your personal card, you

16   got to put it on the credit card of the company.  Eli

17   changed it to the credit card of the company and Rick

18   came behind him and switched it back to his own

19   personal card.  What does that --

20        Q.    Were you present when that happened?

21        A.    I was not.  I was staying at a different

22   hotel.

23        Q.    Were they staying at the conference hotel?

24        A.    They signed up late, so it was an overflow

25   conference hotel.  The conference center was in the

Page 77

1    middle of two hotels.

2          Q.    Were you at the main conference hotel then?

3          A.    I believe I was.

4          Q.    I want to turn your attention to Page 7 in

5    the Work Day section.

6          A.    (Indicating).

7          Q.    And just tell me when you are ready.

8          A.    Okay.

9          Q.    Does anything in this section prevent an

10   account manager or senior account manager from working

11   more than 40 hours per week?

12         A.    This doesn't prevent anyone from working

13   more than 40 hours a week.

14         Q.    Okay.  Were the account managers or senior

15   account managers prevented from working more than 40

16   hours a week, including Mr. Lombardo?

17         A.    No.  No.

18         Q.    I want to show you what's been marked

19   Defendant's Exhibit S, as in Sam.

20                          -   -   -   -   -

21                (Thereupon, Deposition Exhibit S, Copy

22                of Standard Operating Procedures Dated

23                4/5/2019, was marked for purposes of

24                identification.)

25                          -   -   -   -   -

Page 78

1        A.     (Reviewing.)

2        Q.     I'll have you take a look at this.

3        A.     (Reviewing.)

4               THE WITNESS:  You can just keep on going.

5    I am not real familiar with this. Wherever she wants me

6    to go, we can just go there.

7        Q.     I am just going to have you take a look at

8    this one, generally.  There is another one that we'll

9    look at in more depth.

10              Do you recognize this document?

11       A.     Yes, Standard Operating Procedures.

12       Q.     And it is dated April 5, 2019, correct?

13       A.     Yes.

14       Q.     And does this standard operating

15   procedures, as of April 5, 2019, apply to account

16   managers and senior account managers?

17       A.     This -- I'm not as close to the sales team

18   as Leslie Peterson, but I would expect it does.

19       Q.     Were you involved in the preparation of the

20   standard operating procedure?

21       A.     No.  I might have been asked about some of

22   the items, but I was not involved in creating it.

23       Q.     Do you know who created it?

24       A.     Greg Chmura was the original.

25       Q.     Do you know when the first standard

Page 79

1    operating procedures was created?

2         A.    I do not know.

3         Q.    Would it have been before April 5, 2019?

4         A.    Yes.

5         Q.    Would it have been before Mr. Lombardo

6    started with the company?

7         A.    No, we didn't have standard operating

8    procedures before then.  For sales.

9         Q.    Do you know approximately when the first

10   standard operating procedure would have been created?

11        A.    I don't, but I would -- yeah, I don't.

12   Greg Chmura got a black belt and it was after that, I

13   believe.

14        Q.    Is this a true and accurate copy, to the

15   best of your knowledge, of the April 5, 2019 standard

16   operating procedures?

17        A.    Yes.

18        Q.    Let me show you what's been marked as

19   Defendant's Exhibit T.

20                         -   -   -   -   -

21             (Thereupon, Deposition Exhibit T, Copy

22             of Email with Standard Operating

23             Procedures Dated 7/10/2019 Attached,

24             was marked for purposes of

25             identification.)

Page 80

```
 1                    -    -    -    -    -
 2        Q.    There is a cover email, and then a document
 3   following.  I will let you scroll down and take a look
 4   at that.
 5        A.    (Reviewing.)
 6        Q.    Do you recognize this document?
 7        A.    I'm not copied on this email, but I see
 8   what -- I've read what you put in front of me.
 9        Q.    If you go to the second page of this, you
10   will see, Standard Operating Procedures dated
11   July 10, 2019, correct?
12        A.    Okay.
13        Q.    Have you seen that standard operating
14   procedures book?
15             THE WITNESS:  I'm sorry, could you scroll
16   over so I can see what this looks like?
17             MR. SATTERWHITE:  Sure.
18             THE WITNESS:  You can keep on going.  I am
19   interested in the text.
20             MR. SATTERWHITE:  (Indicating).
21             THE WITNESS:  Okay.
22        A.    So the reason why I am kind of scratching
23   my head here is, see, now this one I haven't read --
24   unfortunately, when Eli started with us, we had very
25   good standard operating procedures; like, Greg had put
```

Page 81

1  together very easy to read and understandable.  And Eli

2  was asked to bring them up to date and put in some new

3  things.  Instead of taking Greg's format, which was

4  standard for standard operating procedures, he took the

5  whole thing and turned it into a verbal paragraph,

6  which was hard to follow.

7            We are now in the process of going back to

8  Greg's approach, which was clearer for the account

9  managers.  So that's -- I have not read this one, and

10  it's -- go ahead.

11        Q.    I was going to ask you, do you know if the

12  July 10, 2019 version that's in front of us now was

13  implemented?

14        A.    I do not know.

15        Q.    Would Mr. Auerbach know that?

16        A.    He was the one who sent the letter, so I

17  would expect so.  The email.

18        Q.    Other than the employee handbook and

19  standard operating procedures, are there any other

20  policy and procedures documents that control -- or that

21  was provided to account managers or senior account

22  managers?

23        A.    Not that I'm aware of.

24        Q.    And does the implemented version of the

25  standard operating procedures apply to all account

Page 82

1    managers and senior account managers?

2          A.    I would expect they would.

3          Q.    Going back to Exhibit A.  You were

4    designated as the corporate representative regarding

5    Topic 19, "Training on employment policies and

6    procedures and/or the employee handbook between

7    February 1, 2015 and October 31, 2019, including any

8    training provided to Mr. Lombardo", correct?

9          A.    Correct.

10         Q.    What type of training did Chmura conduct

11   with respect to the standard operating procedures and

12   employee handbook?

13         A.    Well, they were all asked to read it, to

14   sign it, sometimes to kind of remind what they had

15   signed and agreed to.  Training would -- when I think

16   of training, I think of training on how to use JobsEQ

17   on the analytics behind it, how they were created.

18         Q.    Why don't we talk about that more

19   generally.  What type of training was provided to an

20   account manager?

21         A.    So when they first started working with us,

22   especially in the beginning with Rick and Austen, Greg

23   -- well, really, myself, John and Greg gave all the

24   demos.  So they would sit in on our demos and I would

25   give them PowerPoint presentations.  For example,

Page 83

1    Leslie gave them a PowerPoint presentation, how to do

2    sales, how to close sales.

3              They would listen in on a lot of demos

4    until we got to the point where we felt they could do

5    it on their own, then they would give us the demo as if

6    we were the customer.  And once they were finally able

7    to answer all the questions we thought were necessary,

8    then they were let loose to do their own demos.

9         Q.   What other training was provided to

10   Mr. Lombardo?

11        A.   We had -- again, like, Leslie Peterson's

12   background is from, you know, Fortune 500, Eastman

13   Chemical with Kodak, sales training, international

14   sales, and so she would give them PowerPoint

15   presentations and coach them through how to do sales

16   and close them.  And we've had Marvin in Cleveland, who

17   is a sales coach, give them some sessions.

18        Q.   Did Leslie -- or Ms. Peterson rather, did

19   Ms. Peterson provide that training during a period of

20   time, or did she provide -- let me ask a much more

21   simple question.

22              Did Ms. Peterson provide training

23   throughout Mr. Lombardo's employment?

24        A.   She did while she was the manager, but even

25   when she -- Kyle West took over doing sales, he

Page 84

1   referred to her.  And I recall an incident where --

2   again, this was a -- an issue where Rick did something

3   where they had to reprimand him something for it.  So

4   she was always involved, but she was only providing

5   sales training during the first part.  And when we get

6   new salespeople, for example, the newest people, she

7   provided some training to them as well.  And I did,

8   too.

9             The verticals are areas that we've worked

10  in for 20 years.  That's not a development work force.

11  So they had no clue, well, what do these people do, or

12  why they do they even need our product?  So we did a

13  lot of coaching and teaching for them to understand who

14  the client is and why our tool is real helpful to the

15  client.

16       Q.    Can you explain to me the vertical concept?

17       A.    Well, I guess we try to group our customers

18  in -- into what we call verticals.  So educators are a

19  vertical.  Like, educators, higher education, CTE,

20  technical community colleges.  So that's all --

21  education counts as one vertical.  Another vertical

22  would be educators -- I'm sorry, economic developers.

23            So Greater Richmond Partnership.  We may

24  have the chambers as another vertical, but it also

25  falls under economic development.  And then there is

Page 85

1    workforce development.

2              So there is something called, the Workforce

3    Investment Opportunity Act, which has been around in

4    different forms since the 1950's, where money comes

5    from the federal government and given to the state.

6    The state takes their 10% admin and then gives it to

7    different areas around the state for these workforce

8    groups to help displaced workers find new jobs.

9              The Trade Act, when we lost all these jobs

10   in Danville because of going overseas in textiles and

11   apparel, that's another vertical on the workforce side.

12   And then we have H.R., human resources, the

13   corporate -- corporate real estate, and then there is

14   probably all other work we have, you know -- we have

15   some consulting firms, large consulting firms that use

16   JobsEQ, and corporations.

17        Q.    How did -- well, I will come back to that

18   in your individual deposition because I know I'll draw

19   an objection.  I'm curious as to how JobsEQ works with

20   so much data as applied, but I will come back to that.

21              MR. SATTERWHITE:  I'm sorry, Christine.  We

22   are not hearing you very clearly.

23              MS. COOPER:  Oh.  I have my phone as close

24   to my face as I can without holding it up to it, so I

25   will do better to speak into it.

Page 86

1          MR. SATTERWHITE:  Sorry.

2          MS. COOPER:  No, it's technology.

3     Q.    Did -- and I think you testified to this

4     earlier.  Did Chmura keep a personnel file on

5     Mr. Lombardo?

6     A.    Yes.

7     Q.    Do you know what is contained in his

8     personnel file?

9          MR. SATTERWHITE:  Object to the scope.

10    A.    I have not looked at that file recently.

11    Q.    Did Chmura keep any -- let me take a step

12    back.  I am going to turn your attention back to

13    Defendant's Exhibit A and Paragraph 24.  If you will

14    take a look at that.

15    A.    (Reviewing.)

16          Yes.

17    Q.    You were designated as the corporate

18    representative to testify to this topic; is that

19    correct?

20    A.    Correct.

21    Q.    Did Chmura keep a record of the hours that

22    Mr. Lombardo worked each day?

23    A.    We had records such as when he used the key

24    fob to get into the office, when he was working on his

25    computer, and that type of information that gave us a

Page 87

 1   sense of his weekly hours.

 2        Q.    Did Chmura use any type of time clock

 3   software, like to punch in and punch out?

 4        A.    No.

 5        Q.    Was Mr. Lombardo required to log his time

 6   in any form or fashion?

 7        A.    I'm sorry, can you say that again?  Was

 8   Mr. Lombardo --

 9        Q.    Required to log his time?

10        A.    No.

11        Q.    I am going to turn your attention to Topic

12   Number 27, "Complaints made by Mr. Lombardo regarding

13   overtime pay and unpaid commissions."  You are

14   designated as the corporate representative to speak on

15   this topic, correct?

16        A.    Correct.

17        Q.    Are you aware of any complaints

18   Mr. Lombardo made regarding overtime pay to Chmura?

19        A.    Unequivocally, unequivocally, never.

20        Q.    What about with respect to unpaid

21   commissions?

22        A.    Unpaid commissions?  You know, Rick was a

23   complainer.  You know, for someone who made over

24   $150,000, it is amazing that he would complain over

25   $100.  So I am sure he had complained, and I am aware

Page 88

1  of some of them.  I believe Leslie Peterson is the one

2  who can explain to you why he did not get what he

3  thought he was due.

4       Q.   Well, you were designated as the corporate

5  representative on this topic.  Did you prepare for this

6  topic?

7       A.   Well, let's see.  What number are we at

8  again?

9       Q.   27, unpaid commissions.

10      A.   Well, I talk to Leslie about what she was

11 finding and those where he felt he was not paid

12 commissions, were those where he should not have been

13 paid full commission.  The guy who preceded him, Rob I

14 believe his name was, had some sales that were just

15 about done.  I mean, all Rick had to do was get the

16 signature.  That did not warrant 15%.

17           So in any case where he had -- he claims he

18 had unpaid commissions, it would be a situation like

19 that where he wasn't warranted the full amount.

20      Q.   Can you explain again why he wasn't

21 warranted the full amount?  Let's use the very same

22 example, you mentioned Rob.  Using that example, can

23 you walk me through that a little slower?

24      A.   Sure.  Okay, so when -- you know, it takes

25 a lot of work.  We appreciate our salespeople.  It

1  takes a lot of work to get a sale.  You have to call

2  someone on the phone.

3           You may have to call them 10 times, and

4  they hang up on you the first 9 times.  They finally

5  get an answer and you say, Hey, can I give you a demo,

6  and they say, sure.  They put up a time, and then guess

7  what, oh, I am not available now, let's make it next

8  week.

9           So you got all prepared.  You have to go

10 another week, call them on the phone.  You give them

11 the demo, they really like it, and then they say, we

12 really like this, but we're not the decision maker.

13          We need to give another demo to the

14 decision maker.  So then they get in, they get it to

15 the decision maker, and they give another demo, and

16 they say, this is great, how much is it going to cost?

17 I'm really going to have push on the budget.

18          And then the salesperson continues to call

19 every couple of weeks to say, Hey, have you gotten this

20 through the budget?  They finally get it through the

21 budget and then they say, now we need the contracts.

22 We send them the contracts, and often times they will

23 come back and they will make changes to it, or -- and

24 we have to -- you know, our good attorneys here have

25 taught us things we can accept and things we can't.

Page 90

1          Sometimes we have to run it by the

2     attorney, and you know that cost a little bit of money.

3     So now at this point, we have an agreement that has

4     already been signed -- not already been signed -- that

5     the client is ready to sign, it gets handed to Rick and

6     Rick calls this guy on the phone -- calls him on the

7     phone, he picks up first time, and he says, I'm

8     emailing this to you.  He emails it to him and it gets

9     signed.

10         Q.    And so what commission -- that makes sense.

11     What commission would have been paid on instances like

12    that?

13         A.    On that one, I think it might have been 5%

14    or 3%.  I'm not sure off the top of my head.

15         Q.    The scenario you just laid out, the calling

16    10 times, the doing the demos, or setting up a new time

17    for a demo, giving the demo, was that all -- is that

18    all work done in house while the account manager was in

19    their office?

20              MR. SATTERWHITE:  I'm sorry.  I didn't hear

21    the middle part of that question, Christine.

22         Q.    Let me say it again.  The scenario that you

23    just took us through, Dr. Chmura, that scenario, were

24    those calls made while -- would those calls be made

25    while in the Chmura office?

Page 91

1          A.     In that particular scenario, they were.

2     With Rob, we went up to the pentagon several times.  He

3     was former military, so we were trying to make some

4     sales to the military.  So, you know, it varies.

5          Q.     Did -- were there ever instances in which a

6     similar scenario would play out, the account manager

7     would receive the full commission?

8                 MR. SATTERWHITE:  I'm going to object to

9     the scope to the extent this overlaps with the

10    calculations and commissions topic that we've

11    designated Ms. Peterson for.  She can answer, but in

12    her individual capacity.

13                MS. COOPER:  Okay.

14         A.     Can you ask the question again?

15         Q.     Yes, I can.  The scenario that you just set

16    out for us, were there ever instances in which account

17    managers would have received the full commission as

18    opposed to reduced commission?

19         A.     There shouldn't have been.

20         Q.     To your knowledge, or do you know if there

21    ever were?

22         A.     To my knowledge, yeah, based on my personal

23    experience, I don't know of any.

24         Q.     Do you know how many complaints

25    Mr. Lombardo made regarding unpaid commission?

Page 92

1        A.    How many complaints?  I do not know.  I

2    didn't keep track of that.

3        Q.    Do you know whether Chmura owes

4    Mr. Lombardo any unpaid commissions?

5             MR. SATTERWHITE:  Object to the form.

6        A.    I would -- I don't expect that we owe him

7    anything regarding unpaid commissions.

8        Q.    Do you have any factual basis for that

9    belief or expectation?

10       A.    We are very --

11            MR. SATTERWHITE:  Object to the form.

12       A.    We are very careful about what we do, and

13   once again, integrity is important to us.  So even when

14   there is someone that we had to dismiss, we look

15   carefully to make sure that we are dealing honestly.

16       Q.    I am going to turn your attention to Topic

17   Number 28, "Mr. Lombardo's termination, including the

18   decision to terminate, reason for termination, meetings

19   regarding termination, and notice to Mr. Lombardo of

20   his termination."  You were designated the corporate

21   representative on that topic, correct?

22       A.    Correct.

23       Q.    When was the decision to terminate

24   Mr. Lombardo made?

25       A.    Well, backing up.  I was at the Governors

Page 93

1   Advisory Board of Economists, which once a year I am

2   supposed to go to these meetings to help Virginia look

3   at its forecast.  And around 10 o'clock, I got an email

4   from Leslie Peterson asking if I could step out to talk

5   to her.

6          And then it ended up, given what was going

7   on; that is, Rick running around telling people he was

8   going to sue the company, he was going to put us under,

9   he was going to sell our lists to the highest bidder,

10  he was saying all kinds of things about leadership that

11  was untrue about them personally, I had to dismiss

12  myself from that meeting.

13          As I was walking back to the office,

14  Leslie, Greg and Sharon already had Rod on the line to

15  discuss our next steps --

16          MR. SATTERWHITE:  And I don't want --

17          MS. COOPER:  I don't want to hear about

18  your --

19          MR. SATTERWHITE:  -- any part of that

20  conversation.

21          THE WITNESS:  Okay.  Thanks for stopping

22  me.

23          MS. COOPER:  I was going to say the same

24  thing, Rod.

25  BY MS. COOPER:

Page 94

1      Q.    When was that?  You were at a meeting.
2  When was that meeting?
3      A.    I should have written down that date.  It
4  was in the middle of October.
5      Q.    Did you actually hear Mr. Lombardo say any
6  of the statements that you just testified he stated?
7      A.    No, I was in Richmond, Virginia and he was
8  in Cleveland, Ohio.
9      Q.    What statements did Mr. Lombardo -- or do
10 you believe Mr. Lombardo made?  Let me restate that.
11         Did Ms. Peterson tell you that Mr. Lombardo
12 was making untrue statements about leadership?
13     A.    I think she did.  I got this information as
14 well from Greg and Eli, I believe.
15     Q.    And was it at the same time he was making
16 the other statements you mentioned?
17     A.    Yes.
18     Q.    What were those -- what were the statements
19 that were untrue?
20         THE WITNESS:  Do I need to tell her?
21         MR. SATTERWHITE:  Yes.
22     A.    That Leslie hated men.  That his wife --
23 her husband slept with the neighbor's wife; that both
24 Leslie and I hated men; that we didn't want to pay them
25 commissions.

Page 95

1    Q.    Okay.  So what occurred after you talked to

2    -- after you had your conversation with counsel, what

3    occurred next?

4    A.    I believe the letter went out to Rick

5    requesting that he send back the information.  I

6    believe we offered him maybe 10,000 as a severance.

7    Q.    At that point, was Mr. Lombardo on unpaid

8    leave?

9    A.    He was not -- I don't remember if it was

10   unpaid or not, but he certainly wasn't working.  But he

11   was still -- he had not been fired yet.

12   Q.    Why did Chmura decide to terminate

13   Mr. Lombardo's employment?

14   A.    Well, certainly, we saw from the pattern of

15   his work relationship with us, that, one, greater

16   distrust was occurring over time.  But when you get to

17   the point that someone says, "I am going to take your

18   book of business and sell it to the competition, I am

19   going to put you out of business, I am going to screw

20   you," I think any reasonable minded person would fire

21   someone at that point.

22   Q.    In the days leading up to those reported

23   statements, what had occurred?

24   A.    Can you be more --

25   MR. SATTERWHITE:  Object to the form.

Page 96

1      A.    Can you be more specific than that?

2      Q.    Well, did Mr. Lombardo just wake up one

3  morning, talking to himself in his head, or did

4  something occur prior to --

5            MR. SATTERWHITE:   Same objection.

6      A.    I don't have a timeline of what set him

7  off.

8      Q.    I believe in the Complaint that we have

9  gone through, it was stated that Mr. Lombardo was upset

10  that the commission structure was going to change; is

11  that correct?

12            MR. SATTERWHITE:   Object to the form.

13      A.    That's speculation.  It could be that's why

14  he was upset.  But then again what I said earlier was

15  that -- that change in commission structure had not

16  been put in place.  It had not been approved by

17  leadership.

18      Q.    When was it approved -- let me ask.  Was it

19  approved by leadership?

20      A.    It was not approved by leadership prior to

21  Rick's dismissal.

22      Q.    Was it approved after Mr. Lombardo's

23  dismissal?

24      A.    A change was made.  Obviously, a change had

25  to be made, but I am not sure that it was -- in fact, I

Page 97

1    am sure it wasn't exactly what was proposed by

2    Mr. Auerbach -- Mr. Auerbach, Eli.

3         Q.    Did Chmura have any meetings regarding --

4    without counsel -- meetings regarding Mr. Lombardo's

5    termination?

6         A.    I'm sure we did.  I mean, it was a very

7    disruptive thing to happen to someone, to have one of

8    your employees come in and tell you, basically, that

9    they are going to destroy what you had created in the

10   prior 19 years; that they are going to destroy the 45

11   people that you are employing.  Oh, yes, we had many

12   conversations, I am sure.

13        Q.    But, again, you didn't personally hear him

14   make any statements, correct?

15        A.    No, I did not.

16        Q.    Do you know how much time passed between

17   when Mr. Lombardo was put on unpaid leave and when he

18   was terminated?

19        A.    I guess in the letter, we gave him a little

20   time to decide if he was going to take the $10,000 and

21   sign that document.  So when he refused to sign it,

22   that probably was the point where we dismissed him.

23        Q.    Why didn't Chmura just fire him that day

24   that he purportedly made those comments?

25        A.    Well, we wanted to look -- we wanted to

Page 98

1  make sure that we considered our options.  We wanted to

2  give him the opportunity to say that he was going to

3  abide by the confidentiality agreement he had signed.

4  We needed that confidence first.  We were giving him,

5  like we always are and have been, giving him the

6  opportunity to do the right thing.

7       Q.   So his options -- were there additional

8  options other than signing the severance agreement that

9  you provided -- that Chmura provided or being

10  terminated?

11      A.   Not after what he said.  No, there were no

12  other options.

13      Q.   Were you present when Mr. Lombardo was sent

14  home from the office in October?

15      A.   No.  As I previously stated, I was in

16  Richmond, Virginia and he was in Cleveland, Ohio.

17      Q.   Did you have any communications with

18  Mr. Lombardo on that day?

19      A.   I don't recall.  I would say, no, I did

20  not.

21      Q.   Did you have any communications with

22  Mr. Lombardo after that time?

23      A.   No.

24      Q.   Did Chmura inform -- let me restate that.

25           Did Mr. Auerbach know that Mr. Lombardo

Page 99

1    would either be terminated or have to sign -- I'm sorry

2    let me restate that.

3              Did Mr. Auerbach know that Mr. Lombardo

4    would either be terminated or sign the agreement that

5    was handed to him that day or sent to him?

6              MR. SATTERWHITE:  Object to the form.

7         A.    Yes.

8         Q.    At the time of Mr. Lombardo's termination,

9    he was one of the top producing account managers,

10   correct?

11        A.    Correct.

12        Q.    And at the time he was terminated, he had

13   been informed by Mr. Auerbach that the commission

14   structure at Chmura was going to change; is that

15   correct?

16        A.    Apparently.  I don't know that Auerbach

17   told him for sure it would be happen, but that it was

18   being presented to leadership.  And it did make the

19   change.  We have to be able to -- we have to be able to

20   service our client.

21        Q.    Up to that point, up to this incident -- I

22   want to understand.  The reason the changes were made

23   were to better provide for the client.  How were the

24   clients not being provided for prior to making the

25   changes within the sales structure, the commission

Page 100

1   structure?

2        A.   To better provide for the clients and to

3   enable us to use the -- their account managers' skills.

4   Both Austen and Rick were very good at prospecting and

5   bringing in new clients.  If you are spending all of

6   your time calling on the client that you already have,

7   then you are not out there prospecting.  So the new

8   business brought in would be less.

9             In terms of the clients, if you have, you

10  know, 300 clients, it is pretty hard to call all of

11  them and get their input on whether JobsEQ is going

12  well for them, whether they need to see things added to

13  JobsEQ and that type of thing.

14       Q.   With respect to that, was Mr. Lombardo

15  hitting the quotas at that time?

16       A.   Yes, he was.

17       Q.   And Mr. Lombardo was incentivized to obtain

18  the sales because the commission was 15%, correct?

19       A.   Correct.

20       Q.   And a renewal sales commission was 3%,

21  correct?

22       A.   Correct.

23       Q.   In going back to how the clients were

24  better served, how were the clients not being served

25  prior to the change in the commission structure?

Page 101

1      A.    That's a --

2            MR. SATTERWHITE:  Object to the form.

3      A.    -- particular question that I can't answer.

4      Q.    Well, a decision was made by Chmura, and

5   you testified that the reason the decision was made to

6   change the structure was to better service the client.

7   What -- how were clients not being serviced better

8   before?  What -- let me re-ask it.

9            What deficiencies were there on the service

10   of the client that was solved by making the change?

11      A.    They weren't getting their touch points.

12   They weren't getting phone calls from the account

13   manager.  They weren't having a half hour conversation

14   to find out, "Are you having any issues with JobsEQ?

15   Are there things we need to do for you?"

16      Q.    Was Chmura getting complaints from the

17   clients about this?

18      A.     I don't recall.

19      Q.    All of this information is tracked within

20   Salesforce, correct?  The touch points are tracked

21   within Salesforce, correct?

22      A.    Correct.

23      Q.    Did you review the Salesforce data to see

24   if the touch points had changed -- the number of touch

25   points had changed?

1      A.    I don't even have a password to Salesforce.

2      Q.    Did anyone at Chmura track Salesforce to

3  determine if the number of touch points per client has

4  changed?

5      A.    Now, I see this line of discussion as being

6  kind of odd because we are talking about a company --

7  we are talking about a company that serves the client

8  because they have JobsEQ.  We have a competitor.  We

9  believe our data are better than the competitors.

10          If we are going to reach out and give

11  people this better data, we can't do it with two super

12  stars.  We've got to have more than that.  The company

13  is going to evolve over time.  It is just -- it is how,

14  you know, companies grow.

15          So I -- you know, certainly, we are serving

16  the clients better when we have them distributed.

17  There are a lot of different models that can be used.

18  You've got the hunter, you've got the farmer, the --

19  you know, it is all business strategy.  Nothing against

20  Rick, nothing against the clients -- you know, the

21  account managers that we had, it is just a matter of

22  business evolving.

23      Q.    At the time that Mr. Lombardo was put on

24  unpaid leave, or immediately prior to that, did he have

25  the highest renewal rate?

1      A.    From -- I believe he did, but not by much,

2   maybe 3 percentage points.

3      Q.    Who would have been behind him?

4      A.    Austen Steele.

5      Q.    Was there anyone else as far, any other

6   account managers close?

7      A.    I don't know Wilson's numbers.

8      Q.    I want to go over another exhibit, but it

9   is marked highly confidential, so I need to excuse Rick

10   from the room before I bring that up.

11                    -   -   -   -   -

12            (Short break off the record.)

13            (Mr. Lombardo left the room).

14                    -   -   -   -   -

15   BY MS. COOPER:

16      Q.    Moving on to Topic Number 30, "The changes

17   to the operations of the the sales team in October

18   2019, including the reason for the changes."

19            Dr. Chmura, you were designated as the

20   corporate representative of this topic, correct?

21      A.    Correct.

22      Q.    I want to show you what's been marked

23   Defendant's Exhibit X.

24                    -   -   -   -   -

25            (Thereupon, Deposition Exhibit X,

Page 104

1              Highly Confidential Copy of Email Dated

2              10/2/2019 Bates CHMURA0201264-269, was

3              marked for purposes of identification.)

4                           -   -   -   -   -

5      Q.    You might have to manipulate this to --

6      A.    Yes, I am familiar with this.

7      Q.    What is it?

8      A.    This is -- I believe this is that proposed

9   organization structure change that Eli was presenting

10  to us.

11     Q.    And was any of this proposal adopted?

12     A.    Not before Rick was dismissed, and some of

13  it was adopted afterwards.

14     Q.    Would this have been a proposal that Eli

15  talked to Mr. Lombardo about?

16          MR. SATTERWHITE:  Object to the form.

17     A.    I have no clue.

18     Q.    If you page down just a couple pages to one

19  which is Bates labled Chmura 0201266, the chart with

20  Sales Manager at the top.

21          MR. SATTERWHITE:  (Indicating).

22     Q.    That page there.

23          MR. SATTERWHITE:  Sorry.  Very sensitive.

24          Okay (indicating), there.

25     Q.    And this page shows a diagram of the

Page 105

1    proposed structure for the sales team, correct?

2         A.    Correct.

3         Q.    Ignoring the commission and salaries on

4    there, the structure itself, this structure has

5    actually been on that list quite a while?

6         A.    No.

7         Q.    What is the current structure of the sales

8    team if you know?

9              MR. SATTERWHITE:  I am going to object to

10   the scope, subject to the objection that we made in the

11   30(b)6 designation, but she can answer.

12        A.    We certainly had a sales manager, and we

13   have account executives, or account managers.  The

14   account managers and account executives all report to

15   the sales manager.  There is no territory manager, so

16   it is very flat.

17        Q.    What is an account executive?

18        A.    Someone who has more experience and more

19   responsibilities than the account manager.

20        Q.    Was it a renaming of the senior account

21   manager position?

22        A.    It could be.  I don't even know if we use

23   an account executive or if we just use senior account

24   manager, to be honest.

25        Q.    If you flip to the next page here.  I guess

Page 106

1    I am going to ask you so scroll --

2              MR. SATTERWHITE:  (Indicating).

3         Q.    This shows, or purports to be the 2020

4    sales presentation plan under the existing structure.

5    Do you see that?

6         A.    Yes.

7         Q.    And in this existing structure -- is this

8    -- well let me ask you this, do you know who prepared

9    this?

10        A.    I read the email documents.  I am not sure,

11   actually, if Eli did or Greg, but I -- I think it

12   probably was Eli, but Greg reviewed it.

13        Q.    But you did not create it, correct?

14        A.    Oh, no.

15        Q.    If you would turn to the next page of this

16   document -- wait, before you do, go to the last one.

17   I'm sorry.  It has, a total compensation of $215,000

18   for Mr. Lombardo on that first line.  Do you see that?

19        A.    Yes.

20        Q.    What's your understanding of what the

21   number represents?

22        A.    It would -- it would be an estimate for

23   2020, what Eli thought Rick would bring in.

24        Q.    Okay.  You can scroll to the next chart.

25             MR. SATTERWHITE:  (Indicating).

Page 107

1      Q.    The top of it says, 2020 Sales Compensation

2   Plan - Proposed Structure, correct?

3      A.    Correct.

4      Q.    And on that same line with Mr. Lombardo's

5   name, Rick, on there, it has nothing in the base

6   salary, correct?

7      A.    Correct.

8      Q.    Nothing in New Business?

9      A.    Correct.

10     Q.    Nothing in Commission Rate?

11     A.    Correct.

12     Q.    Nothing in New Business Commission?

13     A.    Correct.

14     Q.    Or Renewal Business?

15     A.    Correct.

16     Q.    Or in Commission Rate?

17     A.    Correct.

18     Q.    Or in Renewal Commission?

19     A.    Correct.

20     Q.    But it has a total compensation of $80,000,

21   correct?

22     A.    Correct.

23     Q.    Do you know what that $80,000 represented?

24     A.    My recollection is that Eli was trying to

25   come up with an alternative scenario if the plan -- if

Page 108

1    the plan was rolled out, if the change in sales

2    structure was laid out as he proposed, he felt Rick

3    would be unhappy.  And Eli was proposing -- Eli

4    believed that Rick would not leave without drama and

5    was proposing that we give him $80,000 to leave without

6    drama.

7         Q.    And what did leadership decide to do?

8         A.    Well, we didn't roll out the plan, for one

9    thing.  But we certainly were reticent to pay him

10   $80,000 to do what we had already paid him to do, to --

11   we didn't want to pay someone -- we thought it was

12   unethical and not honest to pay someone to do what they

13   should have done under the confidentiality agreement

14   that they signed with us.

15        Q.    So this email was dated -- well, let me --

16   this email was dated on -- the email attaching this

17   information behind it was dated October 2, 2019,

18   correct?

19        A.    Correct.

20        Q.    At that point, had it been decided that

21   Mr. Lombardo would be terminated from employment?

22        A.    No.  We did not decide to terminate him

23   until he started running around the office saying he

24   was going to sue us and put us under.

25        Q.    Then why would Mr. Auerbach -- let me

Page 109

1   strike that.

2           At this point on October 2, 2019, did

3   Chmura intend to keep Mr. Lombardo as an employee?

4       A.    Yes.

5       Q.    So why -- did Mr. Auerbach prepare this

6   proposed structure at someone's direction?

7       A.    I don't believe so, no.  I think he did

8   this on his own.

9       Q.    If you would turn to -- page down and you

10  will see a sheet not too far down there that has a pie

11  chart and a graph on it.

12          MR. SATTERWHITE:  Can you give me a Bates

13  number?

14          MS. COOPER:  Oh, yes, I can.  No, I can't

15  because it is a native document.  It is the very next

16  one after the pay schedule.  You will see it attached

17  to the right.

18          MR. SATTERWHITE:  (Indicating).

19          MS. COOPER:  There you go.

20      Q.    And can you describe for me what this page

21  on Exhibit X is showing?

22      A.    If I could see it.  I am going to have to

23  walk up.  You are --

24          MR. SATTERWHITE:  Kelli, can you still hear

25  her?

Page 110

1            COURT REPORTER:  So far, yes.

2       A.    It is showing sales by account manager over

3   time.

4       Q.    From 2015 through 2019, correct?

5       A.    Quarter Three, correct.

6       Q.    And there is a pie chart there that shows

7   JobsEQ New Sales 2015 to 2019, Q3, correct?

8       A.    Correct.

9       Q.    Mr. Lombardo makes up 47% of those new

10  sales, correct?

11      A.    That's what it is showing.

12      Q.    Do you have any reason to believe that

13  number is not accurate?

14      A.    Well, those are his current clients.  That

15  probably -- that could have taken into account the

16  clients that were handed to him when he first came to

17  work with us.  So there should be, instead of -- there

18  should be another category that are called, either,

19  book of business given from prior sales.

20            And that would be not just Chris and Leslie

21  sales, but whenever an account manager left, we would

22  divvy up their sales.  So John Grebenc, for example,

23  when he left, we divvied up his sales to give them to

24  the other account managers.  So that would reduce

25  everyone's piece of the pie a little bit.

1    Q.    But that still doesn't add up to 100%,

2    right?

3    A.    Oh, yes, but I'm just saying it is going it

4    reduce everyone's piece of the pie because you are

5    going to have a pie there from maybe 10% JobsEQ clients

6    won by different sales persons, but then handed off to

7    Rick or handed off to Austen.

8    Q.    And then they would have to maintain that

9    relationship, correct?

10    A.    Correct.  Going forward, correct.

11    Q.    What are -- what changes were made -- let

12    me -- so this proposal was not adopted in its entirety,

13    correct?

14    A.    Correct.

15    Q.    I am going to put this document away and go

16    get Mr. Lombardo and then continue, if that's all

17    right?

18    A.    Okay.

19         MR. SATTERWHITE:  Fine by me.

20              -   -   -   -   -

21         (Short pause off the record.)

22         (Mr. Lombardo rejoined the deposition.)

23              -   -   -   -   -

24         MS. COOPER:  Back on.

25

Page 112

1   BY MS. COOPER:

2       Q.   Ultimately, what changes were adopted to

3   the structure of the sales team?

4       A.   At what point in time?

5       Q.   After --

6            MR. SATTERWHITE:  Sorry, can I stop you?

7   If Mr. Lombardo's coming back in the room, can we get

8   rid of this document from the screen?

9            MS. COOPER:  Oh, my goodness, yes.  I am

10  sorry.  Thank you.  I put the hard copy away, but ...

11  BY MS. COOPER:

12      Q.   After Mr. Lombardo's termination, what

13  changes were made to the structure of the sales team?

14      A.   Well, we added a couple of people.  We

15  changed the rates to increase their salary.

16      Q.   How much did you increase -- what was the

17  prior base salary?

18      A.   I believe it was 55, but I'm not the person

19  in charge of their salaries.

20      Q.   Who is?

21      A.   Leslie Peterson would have a better idea of

22  what it is.

23      Q.   And after the change, what was the new base

24  salary?

25      A.   I believe it was 60,000 but I'm not sure.

Page 113

1       Q.    Would the commission --

2       A.    It would vary by -- I'm sorry.

3             It varied by person as well, account

4   manager or -- either account manager or account

5   executive, whatever the titles we are using.

6       Q.    Was the senior account manager paid a

7   higher base salary than an account manager?

8       A.    Yes.

9       Q.    Do you know how much more that a senior

10  account manager --

11      A.    I'm sorry, I don't.  I'm sorry, I don't.

12      Q.    Did the commission percentage change?

13      A.    Yes, it went down -- again, I am not sure

14  how much.  I believe the renewal went from 5 to 3.  And

15  the new ones, I think, went from 15 to 13, but I'm not

16  sure.

17      Q.    And would Ms. Peterson also know that?

18      A.    Yes.

19      Q.    Were there any other changes?

20      A.    Not that I recall.

21      Q.    Switching gears.  I don't know if you would

22  like to take a break.  I am about to move on to a

23  completely different topic, or if you just want to keep

24  charging ahead?

25      A.    It's up to all of you.  I'm fine.

Page 114

1             MR. SATTERWHITE:  We are good to go.

2             MS. COOPER:  Okay.  Good.

3        Q.    If you would look at Exhibit A, Topic

4   Number 33.  You were designated to testify about "The

5   confidential and trade secret information purportedly

6   retained by Mr. Lombardo, including a description and

7   itemization of each purported trade sheet, and all

8   purportedly confidential information," correct?

9        A.    Correct.

10       Q.    And I think we covered a lot of this, but I

11   believe earlier you testified that there were the notes

12   from the two conferences, correct?

13       A.    Correct.

14       Q.    And then, perhaps, an Excel spreadsheet

15   with client information on it, correct?

16       A.    Correct.

17       Q.    Is there anything else that you allege

18   Mr. Lombardo retained that was confidential or trade

19   secret information -- or contained confidential or

20   trade secret information?

21             MR. SATTERWHITE:  I object to the form.

22       A.    Certainly the pipeline of -- or the road

23   map of what's being added to JobsEQ is confidential.

24   Our licenses are confidential.  The pricing sheet is

25   confidential.  That's all that comes to mind off the

Page 115

1   top of my head.

2        Q.   Can you explain what the pipeline/road map

3   is?

4        A.   Sure.  So our clients ask us to add things

5   to JobsEQ.  They say, Wouldn't it be nice if we could,

6   instead of being able to look at a footprint by the zip

7   code level, wouldn't it be nice if we could do it by

8   the block level, down to the city block level.

9            So that would be an example that's in our

10  road map.  Or, Can you add a report related to Section

11  5, that they can automatically pull out.  Can you add

12  more detail on growth development products.  Can you

13  add housing permits?

14           So all of those items are things that are

15  on our pipeline road.  We are trying to get ahead of

16  our competition.  So if EMSI were to know -- so if EMSI

17  were to know what was on our pipeline, they could put

18  some of their workers -- I.T. workers on creating the

19  same thing, maybe even faster than we did.

20       Q.   Where was that information stored?

21       A.   That information is in an Excel file.  It

22  is also in our -- when we give our monthly sales

23  meetings, we discuss what's coming up on the pipeline.

24       Q.   Do you have any reason to believe that

25  Mr. Lombardo had access to that information after he

Page 116

1   was put on unpaid leave?

2        A.    Just as far as his behavior, we don't know

3   what he kept and what he hasn't disclosed; what he

4   still has in his computer and what he has in his house.

5   I have no idea of knowing.

6        Q.    So you are speculating as to what may be

7   out there?

8        A.    You can say it that way.

9        Q.    Essentially, you are giving me a list of

10  the confidential information that Chmura has; is that

11  correct?

12       A.    I am giving you a partial list, yes.

13       Q.    But not necessarily a list of what you know

14  Mr. Lombardo retained?

15       A.    That's correct.  We don't know what he

16  retained.

17       Q.    You have since received a computer back

18  that you allege Mr. Lombardo retained, correct?

19       A.    That's correct.

20       Q.    And you had a chance -- Chmura had an

21  opportunity to look at that computer, correct?

22       A.    No, we have not.  The attorneys have.

23       Q.    Is the computer still in the possession of

24  the attorneys?

25       A.    I believe it is.

Page 117

1      Q.      What process -- turning now to Topic Number

2  36.  You were designated as the corporate

3  representative to testify regarding, "Chmura's process

4  and procedures for the protection of highly

5  confidential information and trade secrets, including

6  the confidential and trade secret information

7  purportedly retained by Mr. Lombardo," correct?

8      A.      Correct.

9      Q.      What processes did Chmura have in place to

10 protect it's confidential information?

11     A.      Well, clearly, they sign a confidentiality

12 agreement.  So that's one item.  We have passwords so

13 that they can't get that information.  So not

14 everything is accessible through the account managers.

15 But the --

16     Q.      What gets a password?

17     A.      Well, with Salesforce, there is a password.

18 There are some documents that John Chmura, for example,

19 gives us access to and then we have our own passwords

20 that we use to access it.

21     Q.      I think what you are describing, and

22 correct me if I'm wrong, but there are -- Salesforce

23 has different -- or different people have different

24 access levels to the information that is in Salesforce;

25 is that correct?

Page 118

1        A.    Correct.

2        Q.    Are you asserting that Mr. Lombardo

3  accessed information, but not -- he did not have

4  permission to access within Salesforce during his

5  employment?

6             MR. SATTERWHITE:  Christine, you are

7  cutting out again.  I lost --

8             MS. COOPER:  Sorry.

9        Q.    Are you asserting that Mr. Lombardo

10  accessed information that he did not have permission to

11  access within Salesforce during his employment?

12        A.    No, the question is that he is using

13  them -- he is using them incorrectly by giving it to

14  other people.

15        Q.    And when you say, "them", what are you

16  referring to?  "Using them?"

17        A.    He -- the confidential information, whether

18  it be the list of our customers, whether it be how much

19  money each of our sales managers make, how many sales

20  that they make, what our sales had been over time --

21        Q.    But he did not -- let me restate that.

22             At the time he was employed, he had access

23  to that information, correct?

24        A.    Correct.

25        Q.    Does Chmura use a multi-factor

Page 119

1   authentication within Salesforce?

2        A.    I don't have access to Salesforce, so I am

3   not sure what -- we do use multi-factor in some cases.

4   That would be a John question.

5        Q.    Okay.  What other process does Chmura have

6   in place to protect it's highly confidential

7   information and trade secrets?

8        A.    Well, if it's a paper copy, it is locked up

9   some place.  If it's either information on how to

10  create our JobsEQ product, then access is limited to

11  only need-to-know basis.

12       Q.    With respect to -- well, with respect to

13  Number 37, you were designated as the corporate

14  representative to testify, "A description of all

15  resources, including time and money, invested in the

16  development of the purport trade secrets retained by

17  Mr. Lombardo, as alleged in the Complaint," correct?

18       A.    Correct.

19       Q.    Can you tell me what time and money

20  resources were invested in generating the two -- the

21  notes from the two conferences that you testified about

22  earlier?

23       A.    So you are limiting it to something very

24  discreet now.

25       Q.    I am starting -- yes, we will go through

Page 120

1   it.

2       A.   Okay.  All right.  So that -- IEDC is a

3   very big event for us.  We are a corporate sponsor at

4   $25,000 per year.  They have four meetings, and the

5   other three are very small, like 2 to 300 people, if

6   that.  The one that -- the last one Rick attended had a

7   couple thousand people that attend.

8           We pay for the salespeople to go to that

9   meeting, so their travel costs, their hotel bills, the

10  food that they eat there.  And we have a booth that we

11  have paid good money, and they cost maybe 5 - $600 to

12  ship those things around.  And then, certainly, my time

13  in preparing that Ed Talk should be thrown in there.

14  So I'm sitting -- I sit in the booth for three days.

15      Q.   What about the other conference?  So you

16  talked about the IEDC.  The conference down in Texas.

17      A.   The conference down in Texas, we sent only

18  Mr. Lombardo.  I am not sure what the sponsorship fee,

19  if there was one for that.  And, of course, the

20  opportunity cost that we are paying for Mr. Lombardo to

21  sit there and talk to our competitors, look for other

22  job opportunities on our time behind us.

23      Q.   Did everyone that attended the IEDC

24  conference have the same access to the attendees?

25      A.   Yes and no.  Mr. Lombardo was supposed to

Page 121

1   be, you know, the guy with all the experience, training

2   the other ones.  So he pretty much snatched up all the

3   cards and took notes.

4        Q.    What about the other attendees, and not

5   Chmura's attendees?  The other attendees at the

6   conference?

7        A.    I'm sorry, I don't understand the question.

8        Q.    Was there -- was an attendee list provided

9   for this conference?

10       A.    Yes, there was.

11       Q.    And did anyone in attendance have access to

12  that attendee list?

13       A.    No.  Only those who were -- I believe only

14  those who were corporate sponsors or, you know, bigger

15  sponsors.

16       Q.    And I apologize.  I am going to repeat my

17  question only because I just want to make sure I am

18  clear on the answer.

19            Well, actually, I will go here.  EMSI was

20  present at the IEDC conference, correct?

21       A.    The IEDC conference, correct.

22       Q.    Was it a sponsor as well?

23       A.    It was.  I believe -- I think they were a

24  corporate sponsor.

25       Q.    So would they have had the same access to

Page 122

1    the attendees that Chmura had?

2        A.    If they were a corporate sponsor, then they

3    would have been given an attendee list.

4        Q.    Was the attendee list made available once

5    you were at the conference?  Did other attendees -- for

6    example, if I just showed up at that conference, would

7    I get an attendee list?

8        A.    No.

9            MR. SATTERWHITE:  Object to the form of the

10   question.

11       A.    No, you would not get it.

12       Q.    Was the attendee list emailed prior to the

13   conference?

14       A.    Typically, yes.

15       Q.    So the information contained on those

16   notes, were, one, customer names, correct?  Potential

17   customer names, rather, correct?

18       A.    Potential customer names?  Yes.

19       Q.    And those potential customer names could

20   have been known by other attendees at the time,

21   correct?

22       A.    They could have, but they -- we only knew

23   of their interest because they stopped by our booth.

24       Q.    And how many companies had booths at the

25   conference?

Page 123

1      A.    Oh, I don't know, 20/30, maybe a little

2   more.

3      Q.    How many competitors of Chmura were

4   present?  And you may have already answered this.  But

5   how many competitors of Chmura were at the conference?

6      A.    Oh, EMSI is the only closely related that

7   would have a full suite like we do.

8      Q.    What was the economic value of those notes,

9   if different than, like, the damages calculation you

10  gave earlier?

11     A.    I would say it was, at minimum, the damages

12  I gave you earlier.

13     Q.    You said, "at minimum."  What else would be

14  added to that, or could be added to that?

15     A.    Well, as I said, we did the present value

16  for four years.  We could have done the present value

17  for six years or seven years.  More people who came by

18  the booth that did not request a demo might have agreed

19  to a demo after another phone call was provided.

20     Q.    Who are the competitors of Chmura?

21     A.    If we are just talking the JobsEQ, then the

22  main competitor is EMSI, Burning Glass to some degree.

23  At this point those are the main ones, maybe Headlight,

24  but, you know, not so much.  Maybe StateBook would be

25  considered a competitor, but they are kind of

Page 124

1    different.

2         Q.    Chmura has a client list, correct?

3         A.    Yes.

4         Q.    Does it also haves a prospective client

5    list?

6         A.    Well, I guess you could call it prospective

7    client list.  I mean, anyone who has been contacted

8    would be considered a prospective client.

9         Q.    And is it your belief that MC, or EMSI does

10   not have the same client list that Chmura has?

11        A.    I am sure they have a different client

12   list.  I mean, they don't -- unless someone handed them

13   our client list.  We probably go -- I'm sure we go

14   after some clients that they go after, but I would not

15   assume that they -- that we both have the same client

16   list, no.

17        Q.    And what facts support that contention?

18        A.    Well, when people come up to you at a booth

19   and they never knew that the data that we provide were

20   even available.  There are a lot of people out there

21   that don't know what we can offer them.  So if we are

22   finding new clients every week because they don't have

23   a tool similar to what we have, and that says to me

24   that they are not on EMSI's client list.

25        Q.    Can you describe for me who Chmura targets

Page 125

1    as a prospective client that EMSI does not target?

2            MR. SATTERWHITE:  Object to the form.

3        A.    It is kind of hard to say.  I believe we

4    appear to be going after a lot more of the CTE,

5    continuing technical education, because we are picking

6    those up right and left.  And it seems like EMSI just

7    doesn't know about the market, or they are not

8    interested in servicing that market.

9        Q.    Going back to the competitor list, can you

10   describe for me how EMSI competes with Chmura?

11       A.    Can you be more specific about that?

12       Q.    Sure.  Is it selling a similar product?  Is

13   EMSI selling a similar product?

14       A.    Right.  So they -- I am having a hard time

15   trying to figure out how to answer that.  They will

16   come show a demo.  They will undercut our price

17   sometimes.  They will emphasize, maybe, a feature that

18   they think they have better than ours.

19            They will identify, perhaps, some analytics

20   that we don't have.  The same thing that we would do,

21   ideally, to them, or in competing with them.

22       Q.    And what does -- I think you said it was

23   Burning Glass; is that correct?

24       A.    Correct.

25       Q.    What do they sell?

Page 126

1       A.    Well, they do a lot of things in the H.R.

2    area, but where they compete with us is job postings.

3    So they do duplicate.  They crawl all these websites.

4    They do duplicate it, and then they provide it as a

5    tool.  And we do the same, but we do a lot more than

6    that.  So they just have one little piece where we

7    compete.

8       Q.    And what about Headlight?

9       A.    Headlight is a firm out of Texas that they

10   put something together similar to us.  It is

11   occupational data, but it is not robust.  It is not --

12   there are a lot of holes in it.  We do a lot of work to

13   make sure that our data, whether -- information is not

14   disclosed that use other sources to create an estimate.

15      Q.    And StateBook?

16      A.    StateBook.  Again, it seems like more of a

17   data dump from, you know, I want a bunch of different

18   demographics, or occupations at a high level from a

19   particular region.

20      Q.    What measures have Chmura taken to ensure

21   that it's confidential information remains unknown to

22   EMSI, Burning Glass, Headlight and StateBook?

23           MR. SATTERWHITE:  Object to the form.

24      A.    We have our employees sign a

25   confidentiality agreement.  We don't put it anywhere on

1   the internet.  We protect stuff, confidential

2   information as a need-to-know basis.  If we are letting

3   a large company, for example, a consulting firm, do a

4   demo trial of JobsEQ, we make them sign a non-compete,

5   or I think that's what you call it, NDA ahead of time.

6          Q.    Did Chmura ever specifically request the

7   notes that he made from the IEDC conference and that

8   Texas conference?

9          A.    Well, as a matter of course, typically, the

10  account managers will get it to us the next day or as

11  they were flying home.  It was requested by Eli, and

12  then the attorneys requested it.

13         Q.    When did Eli request it?

14         A.    I don't know when the first time was.  It

15  is in his affidavit, but he certainly requested it

16  after Rick was dismissed.

17         Q.    IEDC conference, did Mr. Lombardo fly home

18  from that conference?

19         A.    No, he drove.  He drove.

20         Q.    And do you know the date that -- do you

21  know the day that the conference ended, what date that

22  was?

23         A.    I'm sorry. I don't have it off the top of

24  my head.  It was in October.  It was early October, I

25  believe.

Page 128

1          MS. COOPER:  If we take just a short break

2     so I can look over the topic and make sure I have

3     covered everything before we start the individual

4     deposition?

5          MR. SATTERWHITE:  Christine, how long do

6     you think you are going to have on the individual

7     piece?

8          MS. COOPER:  Not terribly long.  I just

9     have a few questions.

10         MR. SATTERWHITE:  Okay.  Thank you.

11         MS. COOPER:  Do you want a long break or --

12         MR. SATTERWHITE:  Well, that's why I asked

13    the question.  If you are going another hour, hour and

14    a half, I don't think we need one.  If you are going to

15    go beyond that, we probably ought to talk about it.

16         MS. COOPER:  We can go off the record.

17               -   -   -   -   -

18         (Discussion had off the record.)

19               -   -   -   -   -

20         MS. COOPER:  Back on the record.

21    BY MS. COOPER:

22      Q.    Dr. Chmura, I do not have any more

23    questions for you as it pertains to your designation as

24    a corporate representative.  We are leaving the

25    corporate representative deposition open, but I've

                                                              Page 129

1    asked all the questions that I need to ask of you for

2    that.

3                So moving to the individual deposition

4    portion.  I want to get some clarification on some

5    things and just better understand a few topics.

6                Mr. Lombardo was hired as an inside sales

7    representative, correct?

8        A.    An account manager.

9        Q.    And was an account manager an inside sales

10   representative?

11       A.    I am unfamiliar with the industry.  I

12   couldn't tell you.

13       Q.    Okay.  Over his tenure at Chmura, how did

14   Mr. Lombardo's sales performance compare to the other

15   account managers?

16       A.    He was the best performer.  Austen Steele

17   was close behind him.

18       Q.    And I believe you answered this already,

19   but what is the difference between an account manager

20   and a senior account manager?

21             MR. SATTERWHITE:  Objection.  Asked and

22   answered, but go ahead.

23       A.    More experience, therefore, more

24   responsibility.

25       Q.    Currently, since Mr. Lombardo has been

Page 130

1    terminated, how are account managers classified?

2         A.    Some of them are exempt.  Some of them are

3    not exempt.  Again, the title is -- I am not sure of

4    what their exact titles are, exempt versus non-exempt.

5         Q.    Why did Chmura change from having all of

6    their sales -- well, all of the account managers be

7    exempt to some of them being non-exempt?

8              MR. SATTERWHITE:  Objection to the extent

9    it calls for privileged information, but, otherwise,

10   you can answer.

11        A.    Well, we were provided additional

12   information to make that assessment.

13        Q.    How involved are you in the day-to-day

14   operations of the sales team?

15        A.    Not all that involved.  I mean, you know,

16   we'll -- I know when sales come in because I get copied

17   on a sale and I will congratulate them.  But I try to

18   spend some time with them when we are up in Cleveland

19   or they are down in Richmond, but I'm not involved

20   unless there are issues or problems that someone brings

21   to my attention.

22        Q.    How often would you communicate directly

23   with Mr. Lombardo?

24        A.    Not very often.  He might have a customer

25   that had a question or that we're doing some consulting

Page 131

1    work, but, no, not at all very often.

2         Q.    You provided testimony as a corporate

3    representative regarding IEDC conferences, correct?

4         A.    Yes.

5         Q.    Who attends that conference on behalf of

6    Chmura?

7         A.    I was there, Rick -- Mr. Lombardo was

8    there.  Eli Auerbach was there.  Stephanie was there.

9    Logan -- Stephanie Wiley I believe it is.  Logan, whose

10   last name is slipping me, and I believe Avery Simmons

11   was there for just one day because he had a side party

12   at the event place nearby, sports related.

13        Q.    Of the individuals you just named, are any

14   of those, other than Mr. Lombardo, an account manager

15   or senior account manager?

16             MR. SATTERWHITE:  Object to the form.

17        A.    Stephanie and Logan.

18        Q.    Did Stephanie take any notes at the

19   conference, to your knowledge?

20        A.    Not to my knowledge.

21        Q.    And what about Logan?  Did he take any

22   notes that you know of?

23        A.    Not to my knowledge, however, when the

24   attorneys provided us the documents from Rick's

25   computer, there was a very short document called,

Page 132

1   Logan's Notes, I think something like that.  So that

2   sort of implies he had a few notes.

3          Q.    Do you know whether or not Logan followed

4   up with any of the -- well, let me ask a different way.

5               Did Logan's notes contain any potential

6   customers?

7          A.    I didn't cross reference those to the list.

8   My suspicion is that Rick took Logan's notes and fused

9   them into his documents.

10         Q.    Do you know whether Logan followed up with

11  any of the prospective clients from the conference?

12         A.    I do not.

13         Q.    Do you know whether Stephanie followed up

14  with any prospective clients from the conference?

15         A.    I do not.

16         Q.    Who is Avery Simmons?

17         A.    Avery Simmons is our market -- I say

18  marketing associate.  She is a new graduate, works

19  under Leslie Peterson.

20         Q.    Would she have been expected to take notes

21  at the conference?

22         A.    No, she would not have.

23         Q.    What about Mr. Auerbach?  Would he have

24  been expected to take notes from the conference?

25         A.    No, he would not.  And, in fact, now that

1    you are bringing this up, another expense that we had

2    at that conference that I had forgotten about is that

3    we, along with maybe four other firms, rented a -- it's

4    a space where you go to and they have all these awards

5    for different colleges for football, baseball,

6    whatever.  And they have -- you can play basketball,

7    you can shoot hoops, you can, you know, jump, see how

8    high you can jump for a basket.

9            And so we spent money, a couple thousand --

10   I'm sure a couple thousand, several thousand dollars to

11   then invite maybe 20 of our customers.  So each of us

12   invited -- that's another expense that we didn't recoup

13   anything from the notes that would have been with

14   Rick's documents.

15        Q.   Was the full purpose of going to this

16   conference to obtain new clients?

17        A.    That's how we survive.  We go to 12 to 20

18   conferences and exhibits per year.  That's where we get

19   our lists.

20        Q.    Would it have -- is it -- let me ask it

21   this way:  At the IEDC conference, were there existing

22   customers of Chmura in attendance?

23        A.    Absolutely.

24        Q.    Did Chmura, or any representative of

25   Chmura, meet with those clients while at that

Page 134

1    conference?

2         A.    Absolutely.

3         Q.    So was another purpose of that conference

4    to have some face time with existing clients?

5         A.    Yes, face time is important.

6         Q.    And you testified in your -- as a corporate

7    representative, that one of the reasons to change the

8    commission structure and sales structure was to work on

9    -- to -- I don't want to put words in your mouth, so

10   let me strike that and just ask you.

11              In your individual deposition here, why did

12   Chmura choose to change the commissions and sales

13   payment structure?

14        A.    Oh, we -- it was important to us to be able

15   to serve our clients, and it is important for us to

16   grow and serve more people.  So -- you know, when we

17   first hired two salespeople, they told us, don't worry

18   about it, we will have the whole nation locked down in

19   two days.  You know, Rick used to tell us, In one year

20   from now, there is not going to be another economic

21   developer out there who I haven't touched to buy our

22   software product.

23              So, you know, we are these numbers people.

24   So we go out and do our research and we find out there

25   is a market just for that kind of workforce, education,

Page 135

1    that's about 60 million.  If we stick with these two

2    salespeople, we are going to be just at the very bottom

3    of serving all those clients.  So in order to serve the

4    number of clients that are out there, from a business

5    perspective, we have to increase our staff.

6         Q.    Earlier you also testified that it was to

7    provide better service to your existing clients,

8    correct?

9         A.    Correct.  Yes, you can't possibly serve 500

10   people and follow-up with them and make sure that they

11   are getting the greatest value out of the product that

12   they can.

13        Q.    So did Chmura receive any benefit by going

14   to the IEDC and interfacing with existing clients?

15        A.    We certainly got some benefit there.

16   Whenever I stand up in front of 400 people and talk

17   about the economy, or about our software, that gives us

18   more -- more marketing opportunities.  That gives us

19   more name recognition.

20        Q.    And I believe your earlier testimony was

21   that Chmura wanted the sales team to put more emphasis

22   on its existing client base, correct?

23             MR. SATTERWHITE:  Object to the form.

24        A.    Yeah, but -- I don't know that I said we

25   wanted them to put more emphasis on the current client

Page 136

1    base, but when they have such a large book of business,

2    they are not going out and looking for new clients

3    because they're having to spend more time with their

4    current clients.

5         Q.    Well, I hear you saying two conflicting

6    things.  One of those is this, that the reason for the

7    restructuring of the sales team was to provide better

8    service to existing clients -- strike that.

9         A.    But --

10        Q.    I don't have a pending question.  Don't

11   give me an answer to something that's not out there.

12              How many conferences a year do you attend

13   personally?

14        A.    Me personally?  I have tried to cut back on

15   the number that I attend.  I'd rather be at home than

16   flying around the country, unless, of course, it is a

17   nice place like Monterey or something like that.  But,

18   unfortunately, I am getting requested to give speeches

19   more, so I'll end up maybe going to five or six or

20   seven and just give my speech and then hang out at the

21   booth a little while and leave.

22        Q.    How many conferences does Chmura have a

23   booth at each year?

24        A.    Again, it varies, but I'd say anywhere

25   between 12 and 20.

Page 137

1          Q.    Who attends those conferences -- let me

2      rephrase.  That was very broad.

3                Who from Chmura attends those conferences?

4          A.    It depends on the vertical.  If it is

5      education, it would be Wilson.  Currently, Bryan Shelly

6      do on the education side.  It used to be that we had

7      salespeople for specific verticals, like economic

8      development and workforce, but now the salespeople are

9      going across all verticals.  Going to all verticals.

10         Q.    Sorry.  How many conferences each year did

11     Mr. Lombardo attend?

12               MR. SATTERWHITE:  Object to the form.

13         A.    I would have to look at our -- I would have

14     to look at the past history of it, but we try to -- we

15     are talking about the salespeople opportunities to go

16     to conferences.

17         Q.    That would be reflected in his calendar I

18     assume, correct?

19         A.    Yes, yes.

20         Q.    How frequently, do you know, did

21     Mr. Lombardo visit client sites?

22         A.    Not very often.

23         Q.    How about potential clients?

24         A.    Not very often as well.

25         Q.    Chmura is a Virginia company -- Virginia

                                        Page 138

1    limited liability company, correct?

2         A.    Correct.

3         Q.    I am going to show you an exhibit marked as

4    Exhibit C.  If you could, take a look at it.

5                         -   -   -   -   -

6               (Thereupon, Previously Marked

7               Deposition Exhibit C, Copy of Articles

8               of Organization for a Domestic Limited

9               Liability Company, Ohio, Dated

10              9/2/2011, was shown for purposes of

11              identification.)

12                        -   -   -   -   -

13        A.    (Reviewing.)

14              Okay.

15        Q.    Do you recognize this document?

16        A.    No, I don't recognize it.

17        Q.    It purports to be an Articles of

18   Organization for Domestic Limited Liability Company

19   called, Chmura Economics & Analytics, LLC in Ohio.  Are

20   you aware of whether Chmura Economics & Analytics, LLC

21   also has an Ohio limited liability company?

22        A.    So I think we moved it up to Ohio for one

23   or two years and decided to bring it back here.

24        Q.    Is the Ohio company still active?

25        A.    No, it shouldn't be.

Page 139

1     Q.    Was Mr. Lombardo ever employed by the Ohio

2  company?

3     A.    No, that's 2011.  He came on 2016, correct?

4     Q.    Were you involved with Mr. Lombardo's

5  annual review?

6     A.    This year?

7     Q.    Any year.

8     A.    I believe I was this year because we went

9  up to Cleveland to talk to him about that falsified

10  letter.  So I was in that annual review.  In the past,

11  I don't believe I was.

12     Q.    When was Mr. --

13     A.    To the best of my recollection.

14     Q.    And when were you -- when were you up to

15  see him, Mr. Lombardo, approximately?

16     A.    February, March 2019.

17     Q.    And would the annual reviews routinely be

18  conducted in March of that year -- of a year?

19     A.    It would have been on his anniversary.

20  This was a special, peculiar one, though, because he

21  presented that offer letter to us that we had to do

22  some research on to make sure that we understood where

23  it came from.  So it might have been late.

24                    -   -   -   -   -

25                    (Short recess taken).

Page 140

```
 1                      -   -   -   -   -
 2   BY MS. COOPER:
 3        Q.    Dr. Chmura, how does Chmura document the --
 4        A.    How does Chmura document?
 5        Q.    Annual reviews.
 6        A.    We haven't had a very formal process in the
 7   past, so it could be handwritten notes.  It could be an
 8   email.  So, historically, it was just handwritten
 9   notes.
10        Q.    Would those be placed in the personnel file
11   of the employee?
12        A.    It should be, yes.
13        Q.    And if they weren't in the personnel file,
14   then there would have been no notes written up; is that
15   correct?
16              MR. SATTERWHITE:  Object to the form.
17        A.    I would suspect that there were -- well,
18   actually, someone might have kept it in their folder.
19   I can see Laura Leigh having done that, you know,
20   because she keeps a notebook and left notes in that
21   notebook.
22        Q.    Do you believe any of Mr. Lombardo's annual
23   reviews are in that folder?
24        A.    I don't know; however, I will tell you that
25   if it was Laura Leigh's, we had a flood at the office
```

1   and it was -- her desk area was kind of destroyed and

2   was thrown out.

3        Q.    So there would be no way of knowing?

4        A.    Correct.

5        Q.    Were you involved with Mr. Auerbach's

6   termination?

7        A.    Yes, I believe I was.

8        Q.    What was your involvement?

9        A.    Greg Chmura recommended that he be let go,

10  and so I was -- my involvement was in agreeing.

11       Q.    What was the reason provided for that

12  recommendation?

13       A.    Well, it was one of those situations

14  where -- here, Rick is an example.  Where he was

15  providing information to salespeople before bringing it

16  to us, and then when we say no and he has to take it

17  back to the salespeople and say, Oh, I'm sorry they

18  didn't agree to it, he put us in an awkward position.

19            So he was creating a position where he was

20  pitting the salespeople against the leadership.  And,

21  certainly, we are a team.  We don't need that to

22  happen.  He was also pitting salespeople against each

23  other.

24            So there were some salespeople he seemed to

25  show favor to, and others that he did not.  He just was

Page 142

1   not a good manager.  So when we had changes in some

2   people getting higher salaries and others not, he sent

3   that information out in an email to the one person who

4   wasn't available to be at a meeting, and at the

5   meeting, he presented this information to various

6   people.

7            You just don't -- you don't have group

8   meetings for making decisions on who gets promoted and

9   who isn't.

10       Q.    What meetings are you referring?

11       A.    I am referring to the meeting where he told

12  the sales staff -- Rick was not there.  This was after

13  Rick was gone.  He told sales staff that two of them

14  were going to get, basically, promotions, the other two

15  were not, or two or three, or whatever.

16            So he just was not a good manager.  He

17  wasn't good at communicating.  He was causing more

18  destruction than good.

19       Q.    That meeting you just referred to occurred

20  after Mr. Lombardo's termination?

21       A.    Correct.

22       Q.    Do you recall approximately the date

23  Mr. Auerbach was terminated?

24       A.    No, I'm sorry, I don't.

25       Q.    Were you present during his termination?

Page 143

1      A.    No, I was not.  I was in Richmond.  Greg

2   Chmura terminated him in Cleveland.

3      Q.    The day he was terminated, did he send in

4   an affidavit signed by him to Chmura?

5      A.    Yes, he did.

6      Q.    And was he terminated -- is it your

7   understanding he was terminated at the same time or

8   concurrently with handing that affidavit in?

9      A.    After turning it in.

10     Q.    How long after?

11     A.    I don't know.  You would have to ask Greg

12   Chmura.

13     Q.    Was it the same day?

14     A.    I believe it was the same day.

15          MS. COOPER:  Off the record for a moment.

16               -   -   -   -   -

17          (Discussion had off the record.)

18               -   -   -   -   -

19          MS. COOPER:  Back on.

20   BY MS. COOPER:

21     Q.    To your knowledge, was there a written job

22   description for account managers?

23     A.    Not to my knowledge.

24     Q.    Were there any job descriptions for any

25   positions, written, at Chmura?

Page 144

1      A.    At that time, probably not, maybe just

2  bullet points.

3      Q.    Are there now job descriptions for

4  different positions?

5      A.    We are moving along that way, yes.

6      Q.    But not while Mr. Lombardo was employed,

7  correct?

8      A.    That's correct.

9            MS. COOPER:  If we can take a short break?

10  I think I am finished, but I want to just look over my

11  notes.

12                     -   -   -   -   -

13                  (Short recess taken).

14                     -   -   -   -   -

15            MS. COOPER:  I do have another question.

16  BY MS. COOPER:

17      Q.    Very simply this, Chmura -- everyone I've

18  spoken to so far from Chmura, is using "the

19  leadership."  Can you tell me who is, the leadership?

20      A.    Yeah.  You know, I think it was Eli that

21  started using that term, the leadership, but we have

22  something called SEA Group, Strategic Enterprise

23  alliance -- no, Strategic Enterprise Advisers that

24  would be made up of the CEO, myself; the CTO, John

25  Chmura; the President, Leslie Peterson; the Director of

Page 145

1   Operations, Sharon Simmons; and Director of Research,

2   Xiaobing Shuai.

3        Q.    Okay.  Of those five people, is there a

4   primary decision maker in that group?

5        A.    It depends on what the decision is to be

6   made.

7        Q.    Can you tell me how decisions are made

8   within that group, who takes the lead on what

9   decisions?

10        A.    Well, if it's I.T., that would be John

11   Chmura.  If it was state and government, that would be

12   Greg Chmura.  Sales is Leslie through Brian Shelly

13   right now.  If it is operational related, finance or

14   H.R., that would come up through Sharon.  But

15   oftentimes, it is Leslie or myself making the final

16   decision.

17             MS. COOPER:  Okay.  I don't have any other

18   questions at this point.  I thank you very much for

19   your time, Dr. Chmura.

20             THE WITNESS:  You're welcome.  And you

21   resemble your brother, but you are the prettier one.

22             MS. COOPER:  Thank you.

23             MR. SATTERWHITE:  I have no questions, but

24   we will read and sign.

25     (Whereupon, deposition was concluded at 3:35 p.m.)

Page 146

1    Whereupon, Counsel was requested to give instruction

2   regarding the witness's review of the transcript

3   pursuant to the Civil Rules.

4

5                        SIGNATURE:

6

7    Transcript review was requested pursuant to the

8   applicable Rules of Civil Procedure.

9

10                     TRANSCRIPT DELIVERY:

11   Counsel was requested to give instruction regarding

12   delivery date of transcript.

13            Ms. Cooper, Original transcript, yes.

14            Mr. Satterwhite, Certified transcript, and

15   rough transcript, yes.

16

17

18

19

20

21

22

23

24

25

Page 147

1                    REPORTER'S CERTIFICATE

2

3    The State of Ohio,    )

4                                      SS:

5    County of Cuyahoga.   )

6

7            I, KELLIANN D. LINBERG, RPR, a Notary Public

8    within and for the State of Ohio, duly commissioned and

9    qualified, do hereby certify that the within named

10   witness, CHRISTINE CHMURA, PH.D., was by me first duly

11   sworn to testify the truth, the whole truth and nothing

12   but the truth in the cause aforesaid; that the

13   testimony then given by the above-referenced witness

14   was by me reduced to stenotypy in the presence of said

15   witness; afterwards transcribed, and that the foregoing

16   is a true and correct transcription of the testimony so

17   given by the above-referenced witness.

18           I do further certify that this deposition was

19   taken at the time and place in the foregoing caption

20   specified and was completed without adjournment.

21

22

23

24

25

Page 148

1          I do further certify that I am not a

2     relative, counsel or attorney for either party, or

3     otherwise interested in the event of this action.

4

5          IN WITNESS WHEREOF, I have hereunto set my

6     hand and affixed my seal of office at Cleveland, Ohio,

7     on this 12th day of May, 2020.

8

9

10

11

12

13               Kelliann D. Linberg, R.P.R.,

14               Notary Public within and for

15               the State of Ohio

16

17    My commission expires May 25, 2024.

18

19

20

21

22

23

24

25

```
                                                           Page 149
 1                       Veritext Legal Solutions
                            1100 Superior Ave
 2                            Suite 1820
                          Cleveland, Ohio 44114
 3                        Phone: 216-523-1313
 4
     May 12, 2020
 5
     To: Rodney A. Satterwhite, Esq.
 6
     Case Name: Chmura Economics & Analytics, LLC v. Lombardo, Richard
 7
     Veritext Reference Number: 4095526
 8
     Witness:  Christine Chmura, Ph.D.   Deposition Date:  5/1/2020
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

Page 150

1              DEPOSITION REVIEW
          CERTIFICATION OF WITNESS

2

          ASSIGNMENT REFERENCE NO: 4095526
3         CASE NAME: Chmura Economics & Analytics, LLC v. Lombardo,
     Richard
          DATE OF DEPOSITION: 5/1/2020
4         WITNESS' NAME: Christine Chmura, Ph.D.
5              In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7              I have made no changes to the testimony
     as transcribed by the court reporter.

8

     _____          _____
9    Date                     Christine Chmura, Ph.D.
10        Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:

12

          They have read the transcript;
13        They signed the foregoing Sworn
               Statement; and
14        Their execution of this Statement is of
               their free act and deed.

15

          I have affixed my name and official seal

16

     this _____ day of_____, 20_____.
17

          _____
18        Notary Public
19        _____
     Commission Expiration Date
20
21
22
23
24
25

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
         ASSIGNMENT REFERENCE NO: 4095526
 3       CASE NAME: Chmura Economics & Analytics, LLC v. Lombardo,
    Richard
         DATE OF DEPOSITION: 5/1/2020
 4       WITNESS' NAME: Christine Chmura, Ph.D.
 5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7       I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9       I request that these changes be entered
    as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____          _____
    Date                     Christine Chmura, Ph.D.
14
         Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18           in the appended Errata Sheet;
         They signed the foregoing Sworn
19           Statement; and
         Their execution of this Statement is of
20           their free act and deed.
21       I have affixed my name and official seal
22  this _____ day of_____, 20____.
23       _____
         Notary Public
24
         _____
25       Commission Expiration Date
```

Page 152

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 4095526

PAGE/LINE(S) /        CHANGE        /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


_____      _____

Date                   Christine Chmura, Ph.D.

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

          _____

          Notary Public


          _____

          Commission Expiration Date

| & | | | |
|---|---|---|---|
| **&**   1:5 9:9,15,16,19 66:21 138:19,20 149:6 150:3 151:3 | **147**   3:14<br>**15**   16:13 24:21,24<br>  45:7 50:17 60:4<br>  88:16 100:18<br>  113:15 | 103:18 108:17<br>  109:2 110:4,7<br>  139:16<br>**2019/2018**   64:13<br>**2020**   1:16 106:3,23 | **34**   4:6 38:12,16<br>  39:12<br>**36**   117:2<br>**365**   43:4,6<br>**37**   40:8,10,14 42:3 |

**0**

**000053**   72:20
**00813**   1:6
**02**   50:7
**0201266**   104:19

**1**

**1**   1:16 50:7 82:7
**1,000,000**   12:23,24
  13:2
**1.02.**   51:12
**10**   9:5 45:6 50:17
  60:4 80:11 81:12
  85:6 89:3 90:16
  93:3 111:5
**10,000**   95:6 97:20
**10/2/2019**   4:16
  104:2
**100**   27:17 87:25
  111:1
**100,000**   18:11 20:7
  48:7
**1025**   24:10
**104**   4:15
**10418**   6:10
**11**   22:24 23:6
**1100**   149:1
**1111**   2:4
**11:00**   1:16
**12**   22:25 133:17
  136:25 149:4
**12th**   148:7
**13**   4:3 23:16
  113:15
**138**   4:17
**14**   47:5,6,7 64:25
  65:6

**150,000**   87:24
**17**   4:5
**18**   71:9
**1820**   149:2
**19**   69:19 72:3,6,9
  72:14 82:5 97:10
**1950's**   85:4
**197**   50:12
**198,000**   20:8 50:12
  55:23 56:8
**1998**   9:13
**1999**   12:22,23

**2**

**2**   3:3 17:5 20:2
  48:11 49:18 51:10
  51:13 55:4,7
  108:17 109:2
  120:5
**2,000,000**   12:25
**2/3/15**   4:7 34:12
**20**   9:7 84:10
  133:11,17 136:25
  150:16 151:22
  152:22
**20/30**   123:1
**200**   74:9
**2000**   10:21
**2011**   139:3
**2015**   59:15 61:16
  82:7 110:4,7
**2016**   139:3
**2019**   31:2 35:15,20
  37:7 42:16 59:16
  61:16 72:3,6,9,14
  78:12,15 79:3,15
  80:11 81:12 82:7

  107:1 148:7 149:4
**2024**   148:17
**215,000**   106:17
**216-523-1313**
  149:3
**216-539-9370**   2:6
**2225**   148:12
**23219-3916**   2:11
**24**   19:20 25:13,25
  27:24 28:1 49:12
  49:13 53:11,13,15
  61:5,6 62:5,11
  86:13
**25**   29:13,16 35:13
  148:17
**25,000**   18:23 49:9
  120:4
**2500**   2:4
**25th**   40:6
**27**   87:12 88:9
**28**   92:17

**3**

**3**   12:16 47:25
  51:10 90:14
  100:20 103:2
  113:14
**3,000**   19:25
**30**   27:2 36:5,8,9
  61:3 103:16
  105:11
**300**   51:13 100:10
  120:5
**31**   36:5,8 37:18
  59:16 61:16 82:7
**33**   38:22 114:4

  119:13
**38**   43:16 44:22
**3:19**   1:6
**3:35**   145:25

**4**

**4**   3:4 18:6 20:10
  22:21 48:22
**4/5/2019**   4:12
  77:23
**40**   26:13 50:6 70:4
  77:11,13,15
**40,000**   48:10 49:16
  49:17 50:1
**400**   74:8 135:16
**4095526**   149:7
  150:2 151:2 152:2
**44114**   2:5 149:2
**45**   97:10
**47**   110:9
**49**   12:7

**5**

**5**   3:5 12:15 72:19
  78:12,15 79:3,15
  90:13 113:14
  115:11 120:11
**5/1/2020**   149:8
  150:3 151:3
**50**   56:18,24,24
**500**   26:13 83:12
  135:9
**55**   112:18

**6**

**6**   3:8 59:13 61:3
  61:14 62:3 105:11

**[6,000 - allen]**                                                          Page 2

**6,000**  76:7
**60**  4:8 135:1
**60,000**  112:25
**600**  120:11
**63**  45:10,12 46:16
  46:18

**7**

**7**  77:4
**7/10/2019**  4:14
  79:23
**7/19/2019**  4:11
  71:18
**71**  4:10
**78**  4:12

**8**

**8,000**  19:24 48:10
  49:15,15 50:20
  51:11,12,12 54:13
  54:16
**80**  4:13
**80,000**  107:20,23
  108:5,10
**800**  1:19 2:10
**804-775-1000**  2:12
**83**  20:5 27:18 64:4
  64:7,11,17,24

**9**

**9**  89:4
**9/2/2011**  4:19
  138:10
**90**  20:5
**91**  20:5

**a**

**a.m.**  1:16
**abide**  98:3
**ability**  11:7 42:25
  67:12
**able**  10:12 40:2
  74:9 83:6 99:19

99:19 115:6
  134:14
**absolutely**  133:23
  134:2
**accept**  36:10 37:16
  89:25
**access**  42:24 43:6
  115:25 117:19,20
  117:24 118:4,11
  118:22 119:2,10
  120:24 121:11,25
**accessed**  118:3,10
**accessible**  117:14
**account**  20:6,19
  20:24 59:14,14
  61:14,15,23 63:1,1
  63:3,4,7,8,11,15
  63:18,21 65:7,8,11
  65:12,25 66:4,7,8
  68:2,14,15,21,22
  69:7,7,9,21,21
  70:16,20,25 75:2
  75:14 76:10 77:10
  77:10,14,15 78:15
  78:16 81:8,21,21
  81:25 82:1,20
  90:18 91:6,16
  99:9 100:3 101:12
  102:21 103:6
  105:13,13,14,14
  105:17,19,20,23
  105:23 110:2,15
  110:21,24 113:3,4
  113:4,6,7,10
  117:14 127:10
  129:8,9,15,19,20
  130:1,6 131:14,15
  143:22
**accounting**  29:2
  30:14

**accurate**  25:9 72:2
  72:5 79:14 110:13
**acknowledge**  5:2,5
  150:11 151:16
**acknowledged**
  31:18
**acknowledgment**
  72:13
**act**  85:3,9 150:14
  151:20
**action**  148:3
**actions**  42:19 48:2
  48:22
**active**  138:24
**add**  68:3,6 111:1
  115:4,10,11,13
**added**  66:24 67:16
  100:12 112:14
  114:23 123:14,14
**adding**  28:13,13
  28:14 42:7 68:1
**addition**  49:5,8
**additional**  20:2
  29:1 98:7 130:11
**address**  6:9 33:12
  149:15
**adjournment**
  147:20
**admin**  85:6
**administered**  5:6
**administration**
  8:25
**adopted**  104:11,13
  111:12 112:2
**advice**  65:10 68:17
**advisers**  144:23
**advisory**  93:1
**affidavit**  39:18
  127:15 143:4,8
**affixed**  148:6
  150:15 151:21

**affront**  29:19
**affronts**  29:17
**aforesaid**  147:12
**afraid**  30:17
**afterward**  18:20
**age**  5:18
**ago**  6:15 9:3,7
  22:16 56:19
**agree**  5:15,17
  17:24 141:18
**agreed**  61:22
  82:15 123:18
**agreeing**  141:10
**agreement**  5:11,13
  25:1,4,11 36:11
  48:16 57:6,6,9
  90:3 98:3,8 99:4
  108:13 117:12
  126:25
**agreement's**  37:20
**ahead**  7:19 17:21
  21:10 22:3,4
  23:22 24:18 26:11
  33:17 44:1,10
  46:1 49:7 56:1
  60:17 61:8,9 71:7
  71:21 73:3 81:10
  113:24 115:15
  127:5 129:22
**airfare**  73:10
**airlines**  74:4
**aisha**  15:11 16:16
  16:16
**allegations**  17:6
**allege**  114:17
  116:18
**alleged**  119:17
**allegedly**  47:25
  48:20
**allen**  6:10

alliance 144:23
alternative 107:25
amazing 87:24
amended 4:5 17:6
  17:13,16 18:2
  22:21,25 25:14,16
  27:24 36:6 38:13
  47:3,9
american 74:4
amount 19:25
  20:7,19 27:21
  32:3,4 42:6 49:3
  50:3 88:19,21
amounts 22:7
analytics 1:5 9:10
  9:15,17,19 45:8
  66:21,23 67:16
  82:17 125:19
  138:19,20 149:6
  150:3 151:3
anniversary
  139:19
annual 33:25 34:5
  34:25 35:4 70:23
  139:5,10,17 140:5
  140:22
answer 7:13,19
  8:1,10 17:7 29:5
  44:3,9 47:13
  61:11 71:3 72:12
  83:7 89:5 91:11
  101:3 105:11
  121:18 125:15
  130:10 136:11
answered 61:9
  123:4 129:18,22
answering 8:2,5
  15:24 23:18
apart 21:4
apologize 7:12
  25:23 121:16

apparel 85:11
apparent 21:11
  31:14
apparently 29:21
  29:24 99:16
appear 125:4
  150:11 151:15
appearances 2:1
  3:3
appended 151:11
  151:18
apple 74:1
applicable 146:8
applied 85:20
apply 78:15 81:25
appreciate 88:25
approach 81:8
approval 29:23
  30:8,10 73:12,21
  73:23
approved 30:9
  35:1 73:10 96:16
  96:18,19,20,22
approximately
  79:9 139:15
  142:22
april 78:12,15
  79:3,15
area 18:1 126:2
  141:1
areas 67:9 84:9
  85:7
argue 55:7
arrangement 5:9
arrangements
  73:9,23
articles 4:18 138:7
  138:17
asked 10:10 11:3
  19:16 42:22 45:8
  57:8 63:16 68:4,5

74:20 75:7 78:21
  81:2 82:13 128:12
  129:1,21
asking 10:5 33:7
  46:17 54:11 59:25
  93:4
asserting 21:7
  118:2,9
assessment 130:12
assignment 150:2
  151:2 152:2
associate 132:18
assume 19:17,18
  49:13 124:15
  137:18
assumed 20:3
assured 30:18
  31:22
atlanta 10:11
attached 4:14 14:5
  17:4 25:4 79:23
  109:16 151:7
attaching 108:16
attend 36:20 120:7
  136:12,15 137:11
attendance 121:11
  133:22
attended 19:1,1,1
  19:2 43:23 120:6
  120:23
attendee 121:8,12
  122:3,4,7,12
attendees 120:24
  121:4,5,5 122:1,5
  122:20
attending 67:2
attends 131:5
  137:1,3
attention 17:3
  18:5 72:19 77:4
  86:12 87:11 92:16

130:21
attorney 15:4,5
  47:13 55:23 90:2
  148:2
attorneys 5:1 47:2
  47:10 48:15 56:9
  89:24 116:22,24
  127:12 131:24
attributable 26:19
attributed 57:25
  57:25
audience 66:17
audio 63:15
auerbach 30:2,6
  36:1 37:24 39:13
  39:15,20 81:15
  97:2,2 98:25 99:3
  99:13,16 108:25
  109:5 131:8
  132:23 142:23
auerbach's 141:5
austen 26:23
  62:23 82:22 100:4
  103:4 111:7
  129:16
authentication
  119:1
authorize 151:11
automatically
  115:11
available 36:24
  43:23 44:3,14
  89:7 122:4 124:20
  142:4
ave 149:1
avenue 2:4
average 19:23,24
  48:10 49:15 50:20
  54:13,16 61:6
  62:9 64:16,17,24

**avery** 131:10
132:16,17
**awards** 133:4
**aware** 81:23 87:17
87:25 138:20
**awkward** 141:18

**b**

**b** 4:8 60:7,9,25
61:3 65:1 105:11
**b.s.** 8:19 66:12
69:4,5
**back** 7:13 8:22
14:10 16:16 20:22
27:9 29:2 35:13
39:3 42:23 46:7
47:20,22 57:3
58:14 67:2 76:18
81:7 82:3 85:17
85:20 86:12,12
89:23 93:13 95:5
100:23 111:24
112:7 116:17
125:9 128:20
136:14 138:23
141:17 143:19
149:15
**background** 6:2
83:12
**backing** 92:25
**bad** 17:22 31:8
33:22,23 74:1
**bank** 10:9 55:10
**banking** 10:20
**base** 28:12,15
107:5 112:17,23
113:7 135:22
136:1
**baseball** 133:5
**based** 19:22 27:2
31:2 49:17 50:21
53:13 64:4 91:22

**basically** 97:8
142:14
**basis** 17:5 21:7,22
21:23 22:14 26:2
31:5,7 36:12
37:22 44:18 46:22
61:20 76:3 92:8
119:11 127:2
**basket** 133:8
**basketball** 133:6
**bates** 4:7,16 34:13
104:2,19 109:12
**beginning** 52:24
82:22
**behalf** 2:2,8 11:15
131:5
**behavior** 30:19
75:11 76:1 116:2
**belief** 92:9 124:9
**believe** 14:8 16:10
18:25 20:7 21:14
27:21 34:22 35:8
37:5 38:2 39:6,17
40:5 43:5 49:16
50:11 62:16 63:8
63:13,20,23,25
72:15 74:4,16,20
75:16 77:3 79:13
88:1,14 94:10,14
95:4,6 96:8 102:9
103:1 104:8 109:7
110:12 112:18,25
113:14 114:11
115:24 116:25
121:13,23 125:3
127:25 129:18
131:9,10 135:20
139:8,11 140:22
141:7 143:14
**believed** 108:4

**believing** 21:23
22:14 44:18 46:22
**belligerent** 42:21
43:2
**belonged** 22:1
**belt** 79:12
**benefit** 12:25
45:17,20,23 46:2,4
135:13,15
**benefitted** 46:20
**best** 66:20 79:15
129:16 139:13
**better** 9:25 85:25
99:23 100:2,24
101:6,7 102:9,11
102:16 112:21
125:18 129:5
135:7 136:7
**beyond** 128:15
**bible** 8:21
**bidder** 21:18 93:9
**big** 120:3
**bigger** 121:14
**biggest** 67:9
**bills** 120:9
**bit** 35:17 61:9 90:2
110:25
**black** 79:12
**block** 68:6 115:8,8
**blogs** 69:17,18
**blue** 68:8
**board** 93:1
**book** 27:9,12,15
75:3,4 80:14
95:18 110:19
136:1
**booked** 74:14
**booth** 18:17 19:9
57:23 120:10,14
122:23 123:18
124:18 136:21,23

**booths** 24:2,6
122:24
**bottom** 19:9 72:20
135:2
**boy** 33:23,23
**breach** 46:19
48:16
**breaches** 45:18
**break** 7:22 8:8,10
11:23 47:16,18
103:12 113:22
128:1,11 144:9
**breaking** 7:11
**brian** 145:12
**bring** 8:13 36:21
66:21 81:2 103:10
106:23 138:23
**bringing** 100:5
133:1 141:15
**brings** 130:20
**broad** 137:2
**broader** 28:15
**broke** 35:17
**brother** 13:7
145:21
**brought** 100:8
**bryan** 137:5
**budget** 89:17,20
89:21
**bulk** 50:14
**bullet** 144:2
**bully** 31:4 33:2
**bumps** 54:10
**bunch** 126:17
**burning** 123:22
125:23 126:22
**business** 8:20,25
10:15 12:22 27:10
27:12,16 28:7
37:21 38:10 95:18
95:19 100:8

102:19,22 107:8
107:12,14 110:19
135:4 136:1
**buy** 134:21
**buying** 54:12

**c**

**c** 4:17 138:4,7
**ca** 149:25
**calculated** 64:7
**calculation** 48:20
49:1 50:21 51:15
52:15 53:11 54:14
54:15 55:13 56:7
57:13 58:8,13
123:9
**calculations** 55:19
91:10
**calendar** 137:17
**call** 19:6 37:11
42:20 58:14,15
59:7 84:18 89:1,3
89:10,18 100:10
123:19 124:6
127:5
**called** 5:19 9:14,16
18:23 31:17 35:14
59:4 85:2 110:18
131:25 138:19
144:22
**calling** 90:15
100:6
**calls** 59:2 90:6,6
90:24,24 101:12
130:9
**canal** 1:19 2:10
**capacity** 6:21
11:18 71:4 91:12
**capital** 9:16,22,22
**caption** 147:19
**card** 75:4,7,8,9,17
75:19,21,23,25,25

76:7,11,15,16,17
76:19
**cards** 121:3
**care** 41:5
**careful** 92:12
**carefully** 92:15
**carry** 10:1
**case** 1:6 5:25
41:16 88:17 149:6
150:3 151:3
**cases** 6:24 7:17
119:3
**category** 23:16
56:21 110:18
**cause** 147:12
**caused** 51:2
**causing** 142:17
**caution** 15:3
**cautiously** 32:21
**ccooper** 2:5
**cease** 38:23,25
39:19
**center** 34:23 76:25
**ceo** 12:4 144:24
**certain** 11:12
14:19 31:9,10
45:7 70:25 72:22
73:4
**certainly** 24:17
32:20 39:13 50:16
52:1 73:14 76:6
76:13 95:10,14
102:15 105:12
108:9 114:22
120:12 127:15
135:15 141:21
**certificate** 3:14
8:21 147:1 151:11
**certification** 150:1
151:1

**certified** 5:21
146:14
**certify** 147:9,18
148:1
**cetera** 50:9
**chambers** 84:24
**chance** 33:15
116:20
**change** 9:21 30:6
36:2 74:21,25
96:10,15,24,24
99:14,19 100:25
101:6,10 104:9
108:1 112:23
113:12 130:5
134:7,12 149:13
149:14 151:8
152:3
**changed** 10:17
31:11 76:17
101:24,25 102:4
112:15
**changes** 29:22,25
31:3 89:23 99:22
99:25 103:16,18
111:11 112:2,13
113:19 142:1
149:12 150:7
151:7,9
**changing** 28:5,6
68:7
**charge** 45:4
112:19
**charging** 113:24
**chart** 104:19
106:24 109:11
110:6
**check** 52:1 68:5
**checked** 70:3
**chemical** 83:13

**chief** 10:8,11 12:4
**chmura** 1:5,13 3:7
4:10 5:17,18,22,24
6:1,8 9:9,12,14,18
9:23 10:3,4,6,14
11:15 12:1,4,6,9
12:10,15,16,17
13:6,7,8,9 14:11
15:9,10,19 18:3
22:20 23:18 25:11
26:16,24 28:1,6
29:6 30:3,19 31:4
32:7,11,23 33:5
40:16,17 41:25
42:25 43:4,6,7,10
43:13 44:11 45:18
48:1,5,21 49:3
52:6,11 53:23
54:15 55:11,21,22
55:24 56:5,6,10
57:6 58:18,24
59:6,15 61:16
62:1,11,19,23 63:7
63:11,14,18,22
65:9,11 66:7,21
67:22 68:10,13,17
68:20 69:3,25
70:13 71:10,11,17
72:11,20 73:1
75:21,22 76:4,5
78:24 79:12 82:10
86:4,11,21 87:2,18
90:23,25 92:3
95:12 97:3,23
98:9,24 99:14
101:4,16 102:2
103:19 104:19
109:3 116:10,20
117:9,18 118:25
119:5 122:1 123:3
123:5,20 124:2,10

124:25 125:10
126:20 127:6
128:22 129:13
130:5 131:6
133:22,24,25
134:12 135:13,21
136:22 137:3,25
138:19,20 140:3,3
140:4 141:9 143:2
143:4,12,25
144:17,18,25
145:11,12,19
147:10 149:6,8
150:3,4,9 151:3,4
151:13 152:20
**chmura's** 26:1
36:10 37:16,19
38:9 44:24 72:22
75:25 117:3 121:5
**chmura000097**
4:7 34:13
**chmura0201264...**
4:16 104:2
**choice** 55:9,9
**choose** 67:12
134:12
**chris** 110:20
**christine** 1:13 2:3
3:7 5:14,18,22,24
6:8 12:4 23:14
30:12,15,16 35:16
85:21 90:21 118:6
128:5 147:10
149:8 150:4,9
151:4,13 152:20
**christmas** 40:5
**citizen** 30:16
**city** 115:8
**civil** 5:20 61:2
146:3,8 150:5
151:5

**claimed** 44:15
**claims** 44:15 65:21
88:17
**clarification** 11:3
63:16 129:4
**clarify** 29:12
**class** 30:15
**classification** 65:6
65:7
**classified** 65:25
66:1,2,5 69:22
70:1,7,9,17,21,21
71:1 130:1
**classify** 66:7 68:14
68:21 70:14
**classifying** 65:11
**clean** 11:23
**cleaners** 66:14
**clear** 11:24 31:11
57:18 121:18
**clearer** 81:8
**clearly** 36:24
74:10 85:22
117:11
**clemsen** 8:19,22
**cleveland** 2:5 33:4
35:25 38:7 74:9
83:16 94:8 98:16
130:18 139:9
143:2 148:6 149:2
**client** 16:6 27:12
28:12,15 45:23
57:18,19,20,20
60:3 66:19,22
84:14,15 90:5
99:20,23 100:6
101:6,10 102:3,7
114:15 124:2,4,7,8
124:10,11,13,15
124:24 125:1
135:22,25 137:21

**clients** 28:8 37:19
38:9 67:10 99:24
100:2,5,9,10,23,24
101:7,17 102:16
102:20 110:14,16
111:5 115:4
124:14,22 132:11
132:14 133:16,25
134:4,15 135:3,4,7
135:14 136:2,4,8
137:23
**clock** 87:2
**close** 47:22 78:17
83:2,16 85:23
103:6 129:17
**closely** 26:22
123:6
**closing** 59:13 61:4
61:12,14 62:6
**clue** 84:11 104:17
**coach** 83:15,17
**coaching** 84:13
**code** 11:9 115:7
**cold** 35:25
**collect** 76:6
**college** 8:21
**colleges** 84:20
133:5
**colors** 68:7
**columbus** 24:8
**come** 19:23 21:20
39:3 42:23 53:16
54:15 62:11 64:11
67:2 75:18 85:17
85:20 89:23 97:8
107:25 124:18
125:16 130:16
145:14
**comes** 33:11 66:13
85:4 114:25

**coming** 39:23
53:11 112:7
115:23
**comments** 97:24
**commission** 28:2
28:18,18 36:3
88:13 90:10,11
91:7,17,18,25
96:10,15 99:13,25
100:18,20,25
105:3 107:10,12
107:16,18 113:1
113:12 134:8
148:17 150:19
151:25 152:25
**commissioned**
28:23 147:8
**commissions**
87:13,21,22 88:9
88:12,18 91:10
92:4,7 94:25
134:12
**commonwealth**
8:24
**communicate**
130:22
**communicating**
142:17
**communications**
15:4 98:17,21
**community** 84:20
**companies** 102:14
122:24
**company** 4:19 9:7
10:8,13 12:22
21:16,18 22:9
27:10 31:13,15
44:16 53:18 64:12
75:4,7,7,9,17
76:11,16,17 79:6
93:8 102:6,7,12

127:3 137:25
138:1,9,18,21,24
139:2
**compare** 129:14
**compensated**
35:10
**compensation**
106:17 107:1,20
**compete** 126:2,7
127:4
**competes** 125:10
**competing** 125:21
**competition** 24:25
25:10 95:18
115:16
**competitor** 36:16
45:19 46:24 67:10
102:8 123:22,25
125:9
**competitors** 36:11
37:16 42:8 44:11
102:9 120:21
123:3,5,20
**complain** 87:24
**complained** 87:25
**complainer** 87:23
**complaint** 4:5
17:6,13,17 18:2,6
22:21,25 25:15,17
27:24 36:6 38:13
38:13 47:3,9 96:8
119:17
**complaints** 87:12
87:17 91:24 92:1
101:16
**complete** 11:22
**completed** 7:13
147:20 149:15
**completely** 113:23
**computer** 18:14
19:14 20:22 22:1

39:14,25 40:4,16
40:23 41:3,5,25
42:19 43:11,12,20
44:23 52:25 53:8
66:10 86:25 116:4
116:17,21,23
131:25
**concept** 52:19
84:16
**concerned** 32:23
**concluded** 145:25
**concurrently**
143:8
**conduct** 23:25
82:10
**conducted** 24:2
139:18
**conducting** 23:13
**conference** 18:15
18:15,16 19:3
20:10,11,11 21:5
37:4,6 44:12
53:12 54:4 56:14
56:17,24 57:21,23
58:1 59:8 76:23
76:25,25 77:2
120:15,16,17,24
121:6,9,20,21
122:5,6,13,25
123:5 127:7,8,17
127:18,21 131:5
131:19 132:11,14
132:21,24 133:2
133:16,21 134:1,3
**conferences** 18:17
18:25 43:23 44:23
49:10 53:2 66:25
67:1 114:12
119:21 131:3
133:18 136:12,22
137:1,3,10,16

**confidence** 98:4
**confidential** 4:15
22:8 24:25 38:18
40:17 42:2 103:9
104:1 114:5,8,18
114:19,23,24,25
116:10 117:5,6,10
118:17 119:6
126:21 127:1
**confidentiality**
25:10 48:16 98:3
108:13 117:11
126:25
**confirm** 51:23,25
**conflicting** 136:5
**confusing** 17:4
**congratulate**
130:17
**consent** 5:8
**conservative**
50:12,13
**consider** 22:7
28:22
**considered** 65:10
65:13 98:1 123:25
124:8
**considering** 28:13
28:14
**consulting** 10:16
10:16,18,22 85:15
85:15 127:3
130:25
**contact** 18:18
22:11 37:19 38:8
40:21 59:25,25
**contacted** 59:6,11
124:7
**contacts** 20:17,20
40:16,22 59:22,23
59:24 60:2

**contain** 72:25
132:5
**contained** 40:16
86:7 114:19
122:15
**contains** 72:22
**contend** 32:1
**contention** 124:17
**continue** 32:10
111:16
**continued** 67:15
**continues** 89:18
**continuing** 125:5
**contract** 19:16
24:9 28:25 38:23
42:6 58:23
**contracts** 18:9
48:8 49:4 89:21
89:22
**contributed** 27:23
**contributions** 67:5
**control** 13:21
17:20 34:16 43:2
81:20
**conversation**
15:14 16:15,19,21
33:9 93:20 95:2
101:13
**conversations**
15:15 97:12
**convince** 31:24
**cooper** 2:3 3:8
5:14,14,23,25
23:21 24:19 25:16
40:11 45:13 47:14
47:20,21 51:23
52:2,5 60:22
61:24,25 71:6
85:23 86:2 91:13
93:17,23,25
103:15 109:14,19

111:24 112:1,9,11
114:2 118:8 128:1
128:8,11,16,20,21
140:2 143:15,19
143:20 144:9,15
144:16 145:17,22
146:13
**copied**  80:7
130:16
**copies**  72:11
**copy**  4:3,5,6,8,10
4:12,13,15,17
13:17 17:16 25:4
25:9 34:11,11
41:14,18 60:9
71:16 72:2,5
77:21 79:14,21
104:1 112:10
119:8 138:7
**corporate**  11:14
11:21 17:8 18:22
65:14,23 71:12
82:4 85:13,13
86:17 87:14 88:4
92:20 103:20
117:2 119:13
120:3 121:14,24
122:2 128:24,25
131:2 134:6
**corporations**
85:16
**correct**  11:15
14:20,21 16:1,9
17:9,10 18:3
20:12,13 21:6
25:1,2,3,5 26:17
30:4,4,11,23,24
33:21 34:1 35:15
35:20,21 36:3,4
40:6,7 41:25 42:1
42:10,11,17 43:4

43:20,21 44:19
48:2,3,23,24 51:3
53:12 57:14 59:16
61:3,17,24 62:3,7
62:8,20 65:15,16
68:11,12 70:10,11
72:3,4,23 73:23
78:12 80:11 82:8
82:9 86:19,20
87:15,16 92:21,22
96:11 97:14 99:10
99:11,15 100:18
100:19,21,22
101:20,21,22
103:20,21 105:1,2
106:13 107:2,3,6,7
107:9,11,13,15,17
107:19,21,22
108:18,19 110:4,5
110:7,8,10 111:9
111:10,10,13,14
114:8,9,12,13,15
114:16 116:11,15
116:18,19,21
117:7,8,22,25
118:1,23,24
119:17,18 121:20
121:21 122:16,17
122:21 124:2
125:23,24 129:7
131:3 135:8,9,22
137:18 138:1,2
139:3 140:15
141:4 142:21
144:7,8 147:16
**corrections**  149:12
151:17
**correctly**  9:24
**cost**  35:9 50:25
51:9 74:6 89:16
90:2 120:11,20

**costco**  76:7
**costs**  120:9
**counsel**  5:8 39:6
41:5 47:12 53:7
55:13 56:3 59:9
65:19 68:17 95:2
97:4 146:1,11
148:2
**counterclaim**  17:7
**counterclaims**
65:21
**counting**  68:9
**country**  136:16
**counts**  84:21
**county**  11:8 24:8
147:5 150:10
151:15
**couple**  6:15 64:9
89:19 104:18
112:14 120:7
133:9,10
**course**  31:12 43:1
69:9 120:19 127:9
136:16
**courses**  11:10
**court**  1:1 3:17 5:1
7:25 15:1 56:4
110:1 150:7
**cover**  80:2
**covered**  55:21
114:10 128:3
**covid**  69:19
**cox**  63:8
**crawl**  126:3
**create**  52:7,21
106:13 119:10
126:14
**created**  10:21 52:9
52:11 78:23 79:1
79:10 82:17 97:9

**creating**  78:22
115:18 141:19
**credit**  75:4,7,9,17
75:19,21 76:16,17
**crestar**  10:9
**cross**  132:7
**crux**  7:5
**crying**  30:16
**cte**  84:19 125:4
**cto**  144:24
**cue**  25:24
**cues**  7:14
**curious**  85:19
**current**  12:1 63:21
105:7 110:14
135:25 136:4
**currently**  32:7
70:16 71:1 73:16
129:25 137:5
**custody**  3:17
**custom**  40:22
**customer**  18:9
20:17,20 21:24
22:11,12 32:20,22
38:18 40:16,21
45:22 56:13,14,23
58:7 83:6 122:16
122:17,18,19
130:24
**customers**  10:20
21:20 23:7,9,10
24:7 26:13 42:5
43:22 44:2 45:18
46:23 50:15,16
56:15,16,16 57:4,5
58:3,17,19,23 62:7
64:18 67:22,25
84:17 118:18
132:6 133:11,22
**cut**  42:25 45:25
136:14

cutting   118:7
cuyahoga   24:8
  147:5
cv   1:6

**d**

d   1:23 4:5 17:12
  17:16 22:25 35:14
  36:6 38:13 45:11
  47:22 147:7
  148:13
damage   47:25
  48:5,20 56:7
damages   7:17 48:6
  48:13,17 49:3
  55:19,21,24 56:6
  56:10 123:9,11
danville   85:10
data   32:13 40:17
  41:7,8 53:18,25
  54:7,17 66:10
  68:6,25 69:2,8,10
  69:12,14 85:20
  101:23 102:9,11
  124:19 126:11,13
  126:17
date   31:11 32:3
  37:3 42:14 81:2
  94:3 127:20,21
  142:22 146:12
  149:8 150:3,9,19
  151:3,13,25
  152:20,25
dated   4:7,11,12,14
  4:16,19 34:12
  37:6 71:17 72:3
  77:22 78:12 79:23
  80:10 104:1
  108:15,16,17
  138:9
dates   9:4

day   12:24 15:16
  30:17 39:2 44:16
  69:10 77:5 86:22
  97:23 98:18 99:5
  127:10,21 130:13
  130:13 131:11
  143:3,13,14 148:7
  150:16 151:22
  152:22
days   95:22 120:14
  134:19 149:18
dealing   69:9,11
  92:15
dear   149:10
death   7:4
december   9:13
  40:6 59:8,16
  61:16
decide   60:5 95:12
  97:20 108:7,22
decided   108:20
  138:23
decision   68:14,18
  68:21 70:14 89:12
  89:14,15 92:18,23
  101:4,5 145:4,5,16
decisions   65:7,20
  65:23 68:11 142:8
  145:7,9
declaratory   46:14
declare   5:7
decreasing   28:23
deed   150:14
  151:20
deemed   149:19
defendant's   4:3
  13:14 17:12 34:8
  47:23 60:7 77:19
  79:19 86:13
  103:23

defendants   1:8 2:8
defense   17:3
deficiencies   101:9
degree   8:19,23 9:2
  30:16 52:17,18
  66:12 67:16 69:2
  69:4,5 123:22
delivery   146:10,12
demo   18:19 19:15
  19:19,21 45:6,9
  49:11,11,13 53:11
  53:15,20 54:4,5,5
  54:11,18 57:20
  58:10,15,16 59:22
  59:25 61:5 83:5
  89:5,11,13,15
  90:17,17 123:18
  123:19 125:16
  127:4
demographic   11:5
demographics
  126:18
demos   19:20 48:8
  53:19 62:7 82:24
  82:24 83:3,8
  90:16
denials   17:6
department   73:11
  149:22
departure   65:20
depends   70:19,23
  75:6 137:4 145:5
deposed   5:21 6:12
  6:14,16,18 7:23
deposition   1:12
  4:4,9 5:2,3,4 8:14
  8:15 11:22 13:17
  13:18 14:11,13,17
  14:23 15:5 16:25
  17:16 34:11 47:24
  48:23 60:9,12

61:2 71:16 77:21
  79:21 85:18
  103:25 111:22
  128:4,25 129:3
  134:11 138:7
  145:25 147:18
  149:8,11 150:1,3
  151:1,3
depositions   6:20
depth   78:9
derive   27:6
describe   14:9 45:1
  109:20 124:25
  125:10
describing   117:21
description   4:2
  23:17 114:6
  119:14 143:22
descriptions
  143:24 144:3
designated   17:8
  23:17,19 47:24
  48:19 56:5 59:12
  59:17 61:13,20
  62:1 65:14,22
  71:12 82:4 86:17
  87:14 88:4 91:11
  92:20 103:19
  114:4 117:2
  119:13
designation   23:15
  105:11 128:23
designations   4:8
  60:10,25
desist   38:24,25
  39:19
desk   41:2 75:20
  141:1
despite   37:19
  40:14

**destroy** 21:17 97:9 97:10
**destroyed** 141:1
**destruction** 142:18
**detail** 47:2 115:12
**determination** 55:5
**determine** 58:12 70:20 102:3
**developer** 134:21
**developers** 84:22
**developing** 16:6,7
**development** 67:8 84:10,25 85:1 115:12 119:16 137:8
**deviations** 69:15
**diagram** 104:25
**difference** 13:1 62:25 129:19
**different** 55:7 66:9 69:6 76:21 85:4,7 102:17 111:6 113:23 117:23,23 117:23 123:9 124:1,11 126:17 132:4 133:5 144:4
**differently** 68:25
**difficult** 16:5 29:18 30:13,20,22 30:23
**directed** 71:11
**direction** 52:13 109:6
**directly** 130:22
**director** 73:12,15 73:17 144:25 145:1
**disclosed** 116:3 126:14

**disconnect** 25:22
**discount** 20:3 48:11
**discovery** 51:16 53:4 74:19
**discreet** 119:24
**discretionary** 31:1
**discretions** 6:5
**discriminating** 58:2
**discuss** 93:15 115:23
**discussed** 36:15 42:23 48:7 62:6
**discussion** 56:2 102:5 128:18 143:17
**discussions** 33:3
**disgruntled** 44:17
**dismiss** 92:14 93:11
**dismissal** 96:21,23
**dismissed** 97:22 104:12 127:16
**displaced** 85:8
**disruptive** 97:7
**dissatisfied** 29:17
**distortion** 63:15
**distributed** 22:15 102:16
**district** 1:1,2 6:1
**distrust** 95:16
**diverted** 46:23
**diverting** 45:18
**divided** 50:6
**division** 1:3
**divvied** 110:23
**divvy** 110:22
**doctored** 33:8,15
**document** 13:23 14:4,7,12 17:25

34:4,19 40:24 41:1,2,15,17,21 60:23 71:11,25 78:10 80:2,6 97:21 106:16 109:15 111:15 112:8 131:25 138:15 140:3,4
**documentation** 55:12 74:13,17,18
**documents** 8:14 15:1 41:24 51:15 51:19 52:21,24 54:15 81:20 106:10 117:18 131:24 132:9 133:14
**doing** 6:3 29:2 83:25 90:16 130:25
**dollar** 22:6 42:6 50:3
**dollars** 133:10
**domestic** 4:18 138:8,18
**dominion** 7:8
**dr** 5:24 12:4 23:18 52:6 56:5 62:1 90:23 103:19 128:22 140:3 145:19
**drama** 108:4,6
**draw** 18:5 85:18
**draws** 19:8
**drove** 127:19,19
**dual** 52:17
**due** 88:3
**duly** 5:20 147:8,10
**dump** 126:17
**duplicate** 126:3,4

**duties** 23:16 68:24 69:6 70:19,23

## e

**e** 2:4 4:6 34:8,11
**earlier** 43:20 50:11 57:7 86:4 96:14 114:11 119:22 123:10,12 135:6,20
**early** 10:21 35:20 67:8 127:24
**earn** 9:2
**earnings** 49:24 70:24
**easier** 17:23 24:15
**east** 1:19 2:10
**eastern** 1:2 6:1
**eastman** 83:12
**easy** 81:1
**eat** 120:10
**economic** 7:9 10:16,18,19 67:8 84:22,25 123:8 134:20 137:7
**economics** 1:5 8:23,25 9:9,15,19 66:21 138:19,20 149:6 150:3 151:3
**economist** 10:9,11 12:5
**economists** 66:10 93:1
**economy** 7:5,6 12:15 135:17
**ed** 19:4,6 120:13
**education** 8:17,18 67:11,13,17 84:19 84:21 125:5 134:25 137:5,6
**educator** 11:10

| | | | |
|---|---|---|---|
| **educators** 84:18 | **employees** 37:25 | **errata** 149:13,18 | 115:21 |
| 84:19,22 | 38:1 69:25 70:6 | 151:7,10,18 152:1 | **excessive** 74:12 |
| **either** 35:24 99:1,4 | 73:21,22 74:8,10 | **error** 51:1 | **excuse** 103:9 |
| 110:18 113:4 | 75:2 97:8 126:24 | **errors** 69:15 | **executed** 151:10 |
| 119:9 148:2 | **employing** 97:11 | **especially** 82:22 | **execution** 150:14 |
| **element** 48:20 | **employment** 27:3 | **esq** 2:3,9 149:5 | 151:19 |
| **eli** 19:1 29:21 30:2 | 33:24 34:24 35:5 | **essentially** 116:9 | **executive** 105:17 |
| 30:2 42:22 75:14 | 36:15 37:13 65:9 | **estate** 85:13 | 105:23 113:5 |
| 75:16,19,20 76:14 | 65:25 70:2 72:23 | **estimate** 15:17 | **executives** 105:13 |
| 76:16 80:24 81:1 | 73:18 82:5 83:23 | 106:22 126:14 | 105:14 |
| 94:14 97:2 104:9 | 95:13 108:21 | **et** 50:9 | **exempt** 65:12,12 |
| 104:14 106:11,12 | 118:5,11 | **ethical** 32:18 | 66:1,1,2,8 68:15 |
| 106:23 107:24 | **ems** 36:18 | **event** 15:18 19:17 | 68:22 69:22 70:1 |
| 108:3,23 127:11,13 | **emsi** 36:16,24 | 19:23 36:19,19 | 70:7,9,14,21,21 |
| 131:8 144:20 | 37:11 44:13,19 | 48:9 54:6 120:3 | 71:1 130:2,3,4,4,7 |
| **eligible** 34:25 | 67:10,14 115:16 | 131:12 148:3 | 130:7 |
| **email** 4:13,15 37:1 | 115:16 121:19 | **events** 19:10 | **exhibit** 3:17 4:3,5 |
| 37:3,5,9,12 79:22 | 123:6,22 124:9 | **eventually** 21:11 | 4:6,8,10,12,13,15 |
| 80:2,7 81:17 93:3 | 125:1,6,10,13 | 52:25 | 4:17 13:14,17 |
| 104:1 106:10 | 126:22 | **everyone's** 19:12 | 14:5 17:3,3,3,12 |
| 108:15,16,16 | **emsi's** 124:24 | 75:19 110:25 | 17:16 18:17 22:25 |
| 140:8 142:3 | **enable** 38:17 | 111:4 | 24:2,6 25:4,6 34:8 |
| 149:17 | 100:3 | **evolve** 102:13 | 34:11 35:14 36:6 |
| **emailed** 122:12 | **enacted** 29:25 | **evolving** 102:22 | 38:13 45:11 47:15 |
| **emailing** 90:8 | **enclosed** 149:11 | **exact** 130:4 | 47:22,23,23 48:23 |
| **emails** 14:25 42:4 | **ended** 37:6 93:6 | **exactly** 97:1 | 59:20 60:7,9,25 |
| 90:8 | 127:21 | **examination** 3:7 | 65:1,1,2 71:14,16 |
| **embassy** 75:16 | **english** 53:5 | 5:19,22 | 77:19,21 79:19,21 |
| **emphasis** 8:25 | **ensure** 126:20 | **example** 18:22 | 82:3 86:13 103:8 |
| 135:21,25 | **enter** 57:5 | 24:8 31:1 60:3 | 103:23,25 109:21 |
| **emphasize** 125:17 | **entered** 58:23 | 66:22 74:8 82:25 | 114:3 138:3,4,7 |
| **employ** 32:19 | 151:9 | 84:6 88:22,22 | **exhibits** 3:4 4:1 |
| **employed** 26:15 | **enterprise** 144:22 | 110:22 115:9 | 133:18 |
| 62:19,23 69:3 | 144:23 | 117:18 122:6 | **existed** 72:6 |
| 118:22 139:1 | **entire** 150:5 151:5 | 127:3 141:14 | **existing** 106:4,7 |
| 144:6 | **entirely** 73:19 | **exceed** 27:2 | 133:21 134:4 |
| **employee** 4:10 | **entirety** 111:12 | **excel** 20:23 21:8 | 135:7,14,22 136:8 |
| 32:17 70:10 71:9 | **entitled** 33:25 34:5 | 22:15 40:24 41:1 | **expect** 28:12 51:21 |
| 71:17 72:1 74:22 | **equals** 50:6 | 41:9,14,21 51:20 | 53:24 54:23,24 |
| 81:18 82:6,12 | **equity** 13:3 | 52:7,9,11 53:24 | 55:15 72:17 74:11 |
| 109:3 140:11 | | 54:25 55:3 114:14 | 78:18 81:17 82:2 |

92:6
**expectation** 35:10
92:9
**expected** 56:23
67:24 132:20,24
**expense** 18:21
133:1,12
**expenses** 74:21
**expensive** 74:14
**experience** 63:5
91:23 105:18
121:1 129:23
**expert** 6:22
**expiration** 150:19
151:25 152:25
**expires** 148:17
**explain** 12:19
32:14 45:16 49:21
57:15 62:25 84:16
88:2,20 115:2
**extent** 91:9 130:8
**extra** 75:24

**f**

**face** 66:20 85:24
134:4,5
**fact** 33:4,7 37:1
41:22 46:23 59:1
76:14 96:25
132:25
**factor** 32:16
118:25 119:3
**factors** 65:13
68:20
**facts** 124:17
**factual** 17:5 21:22
21:23 22:14 26:2
31:5,7 36:12
37:22 76:3 92:8
**failed** 40:15
**fair** 27:22 32:24

**falls** 74:2 84:25
**falsified** 16:4 31:3
31:8 32:2 35:14
35:19 139:9
**familiar** 17:25
25:7 71:23 78:5
104:6
**far** 13:5 103:5
109:10 110:1
116:2 144:18
**farmer** 102:18
**fashion** 87:6
**faster** 13:25
115:19
**favor** 141:25
**feature** 125:17
**february** 35:24
59:15 61:16 82:7
139:16
**federal** 61:2 85:5
**fee** 120:18
**feedback** 67:3,15
67:19,24 68:9
**fees** 47:2,11 48:15
55:23 56:9
**felt** 67:14 83:4
88:11 108:2
**figure** 62:6 64:11
125:15
**file** 53:24 72:16,18
86:4,8,10 115:21
140:10,13
**filed** 5:25 9:13
18:3
**final** 73:12 145:15
**finally** 33:8 60:5
83:6 89:4,20
**finance** 9:1 145:13
**financial** 49:23
52:19

**find** 11:11,12
75:18 85:8 101:14
134:24 149:11
**finding** 88:11
124:22
**fine** 12:15 25:7
111:19 113:25
**finish** 8:2 22:4
**finished** 24:23
44:8,10 144:10
**fire** 33:18,20 95:20
97:23
**fired** 30:18 95:11
**firm** 5:12 6:23
11:10 21:17 32:8
126:9 127:3
**firms** 85:15,15
133:3
**first** 5:20 10:20
18:2,5 20:1,4
25:14,16 32:22
38:6 47:3 51:11
66:20 71:10 78:25
79:9 82:21 84:5
89:4 90:7 98:4
106:18 110:16
127:14 134:17
147:10
**fitzgerald** 2:3
**five** 6:19 19:22,22
48:8,8 49:4,14,16
136:19 145:3
**flat** 105:16
**flights** 74:14 75:3
75:5
**flip** 105:25
**flood** 140:25
**fly** 74:9,11 127:17
**flying** 74:8 127:11
136:16

**fob** 86:24
**folder** 41:2 140:18
140:23
**folks** 30:14
**follow** 45:8 49:10
58:11,18 59:20
81:6 135:10
**followed** 26:22
132:3,10,13
**following** 18:19
65:20 80:3
**follows** 5:21
**food** 120:10
**foot** 66:20
**football** 133:5
**footprint** 11:9
115:6
**force** 84:10
**forecast** 11:7 93:3
**foregoing** 147:15
147:19 150:13
151:18
**forgive** 6:2
**forgotten** 7:7
133:2
**form** 7:18 21:9,25
22:17,22 26:20
32:12 34:3 39:22
41:21 43:25 45:21
47:4 49:6 60:1
61:18 67:23 68:23
73:2 87:6 92:5,11
95:25 96:12 99:6
101:2 104:16
114:21 122:9
125:2 126:23
131:16 135:23
137:12 140:16
**formal** 140:6
**format** 81:3

**former** 31:21 91:3
**forms** 41:20 85:4
**formula** 50:5
**forth** 14:20
**fortune** 83:12
**forward** 20:1
  66:20 111:10
  149:15
**found** 9:12 44:20
**founded** 10:14
**founder** 9:9
**founding** 10:6
**four** 20:2 26:2,8
  26:16 48:11 50:14
  50:15,23 62:16,18
  63:13 120:4
  123:16 133:3
**free** 150:14 151:20
**frequently** 59:3,5
  137:20
**front** 14:10 26:21
  27:5 32:5 42:14
  75:20 80:8 81:12
  135:16
**full** 6:6 16:14 45:9
  88:13,19,21 91:7
  91:17 123:7
  133:15
**fully** 57:3
**function** 48:12
**funny** 31:8
**further** 5:5 40:14
  45:16 46:7 147:18
  148:1
**fused** 132:8
**future** 29:11 49:24

**g**

**gateway** 1:19 2:10
**gears** 113:21
**generally** 14:22,24
  78:8 82:19

**generating** 119:20
**getting** 18:18
  19:21 35:11 54:4
  54:18 61:6 101:11
  101:12,16 135:11
  136:18 142:2
**gift** 40:5
**gis** 32:8,10,24
**give** 13:21 17:20
  19:13,20 32:4
  33:14 53:13 54:9
  58:15,16 61:11
  67:3,15 71:24
  82:25 83:5,14,17
  89:5,10,13,15 98:2
  102:10 108:5
  109:12 110:23
  115:22 136:11,18
  136:20 146:1,11
**given** 10:12 12:21
  20:18 21:15 33:1
  57:20 85:5 93:6
  110:19 122:3
  147:13,17
**gives** 11:6 55:1
  75:10 85:6 117:19
  135:17,18
**giving** 61:4 90:17
  98:4,5 116:9,12
  118:13
**glad** 34:4
**glass** 123:22
  125:23 126:22
**glen** 6:10
**go** 7:19,21 10:11
  13:25 14:5,10
  17:21 18:1,16
  19:9 21:9 22:3,4
  23:22 24:18 26:11
  33:17 39:3 44:1
  44:10 46:1,7 47:5

47:22 49:6,9 56:1
56:4 57:3 60:17
64:25 71:7,21
73:2 74:7 78:6,6
80:9 81:10 89:9
93:2 103:8 106:16
109:19 111:15
114:1 119:25
120:8 121:19
124:13,13,14
128:15,16 129:22
133:4,17 134:24
137:15 141:9
**goes** 51:8
**going** 6:1 7:21
  11:20,23 13:13
  14:5 17:2,11 20:1
  21:17,17 22:3
  23:14 26:12 30:18
  33:11,12,23 34:2,7
  35:13 36:13 47:14
  47:22 56:13 60:6
  60:21,22 61:10
  63:10 65:17 71:9
  71:13 78:4,7
  80:18 81:7,11
  82:3 85:10 86:12
  87:11 89:16,17
  91:8 92:16 93:6,8
  93:8,9,23 95:17,19
  95:19 96:10 97:9
  97:10,20 98:2
  99:14 100:11,23
  102:10,13 105:9
  106:1 108:24
  109:22 111:3,5,10
  111:15 121:16
  125:4,9 128:6,13
  128:14 133:15
  134:20 135:2,13
  136:2,19 137:9,9

138:3 142:14
**good** 5:24 9:3,25
  10:4 12:14 38:5
  50:24 55:6 80:25
  89:24 100:4 114:1
  114:2 120:11
  142:1,16,17,18
**goodness** 112:9
**gotten** 48:9 50:15
  89:19
**government** 85:5
  145:11
**governors** 92:25
**graduate** 132:18
**graph** 109:11
**great** 52:3 67:17
  89:16
**greater** 48:7 84:23
  95:15
**greatest** 135:11
**grebenc** 110:22
**green** 68:8
**greg** 12:10,16,17
  13:6,7 15:9,13,16
  33:5 52:9,11,16
  53:23 54:24 78:24
  79:12 80:25 82:22
  82:23 93:14 94:14
  106:11,12 141:9
  143:1,11 145:12
**greg's** 81:3,8
**ground** 7:11,12,21
**grounds** 23:19
**group** 29:3 84:17
  142:7 144:22
  145:4,8
**groups** 85:8
**grow** 102:14
  134:16
**grown** 26:1,7

**growth** 26:18
  27:23 115:12
**guess** 30:21 41:21
  56:2 57:2,2 75:22
  84:17 89:6 97:19
  105:25 124:6
**guessing** 60:21
**guy** 37:11 52:17
  88:13 90:6 121:1

**h**

**h** 16:23
**h.r.** 85:12 126:1
  145:14
**half** 101:13 128:14
**hand** 148:6
**handbook** 4:10
  71:9,17 72:1,6,8
  72:14,22 74:22
  81:18 82:6,12
**handed** 19:16
  27:10,13 90:5
  99:5 110:16 111:6
  111:7 124:12
**handing** 143:8
**hands** 17:23
**handwritten**
  140:7,8
**hang** 89:4 136:20
**happen** 97:7 99:17
  141:22
**happened** 35:23
  76:20
**hard** 49:2 81:6
  100:10 112:10
  125:3,14
**harder** 7:14
**harm** 76:4,5
**hated** 94:22,24
**haves** 124:4
**head** 7:25 39:17
  74:23 80:23 90:14

96:3 115:1 127:24
**headlight** 123:23
  126:8,9,22
**hear** 90:20 93:17
  94:5 97:13 109:24
  136:5
**heard** 39:4 67:22
**hearing** 85:22
**help** 14:2 28:10
  33:23 85:8 93:2
**helpful** 84:14
**hereinafter** 5:21
**hereunto** 148:5
**hey** 89:5,19
**high** 31:24 66:13
  74:5 126:18 133:8
**higher** 8:18 35:11
  35:11 50:19,25
  64:15 68:6 84:19
  113:7 142:2
**highest** 21:18 93:9
  102:25
**highly** 4:15 40:17
  42:2 103:9 104:1
  117:4 119:6
**highway** 6:10
**hired** 63:14,18,20
  129:6 134:17
**historic** 16:11,12
**historical** 49:11
**historically** 55:2
  140:8
**history** 64:12
  137:14
**hitting** 100:15
**hold** 62:15
**holding** 53:1 64:8
  85:24
**holes** 126:12
**home** 16:22 24:11
  39:3 98:14 127:11

127:17 136:15
**honest** 46:21
  57:17 105:24
  108:12
**honestly** 92:15
**hoops** 133:7
**hotel** 73:10 76:22
  76:23,25 77:2
  120:9
**hotels** 77:1
**hour** 33:6 101:13
  128:13,13
**hours** 70:4 77:11
  77:13,16 86:21
  87:1
**house** 90:18 116:4
**housing** 115:13
**huh** 7:24
**human** 85:12
**hunter** 102:18
**huron** 24:10,14
**husband** 94:23

**i**

**i.e.** 73:11
**i.t.** 115:18 145:10
**idea** 12:19 112:21
  116:5
**ideally** 125:21
**identification**
  13:19 17:18 34:14
  60:13 71:19 77:24
  79:25 104:3
  138:11
**identified** 19:15
  23:16 58:10
**identify** 49:24
  125:19
**idle** 36:14
**iedc** 15:18 18:15
  18:22 20:10 31:21
  36:19,22 44:11

48:9 54:6 57:10
  75:9,13 120:2,16
  120:23 121:20,21
  127:7,17 131:3
  133:21 135:14
**ignoring** 105:3
**immediately**
  102:24
**impact** 7:9
**implemented**
  81:13,24
**implies** 132:2
**important** 41:23
  68:2 75:10 92:13
  134:5,14,15
**impressed** 45:7
**incensed** 31:2
**incentivized**
  100:17
**incident** 35:19
  84:1 99:21
**include** 57:11 58:3
  58:13 62:21,22
**included** 57:12,16
  149:13
**including** 58:8
  65:10 77:16 82:7
  92:17 103:18
  114:6 117:5
  119:15
**incorporated**
  151:12
**incorrectly** 118:13
**increase** 31:2 33:2
  35:5,9,9 112:15,16
  135:5
**increases** 33:25
  34:6,25
**increasing** 28:22
  31:5

**index** 3:1,4 4:1
**indianapolis** 19:1
**indicate** 5:11
**indicated** 36:14
53:10 57:9
**indicating** 13:22
25:7 46:13 60:20
77:6 80:20 104:21
104:24 106:2,25
109:18 149:13
**individual** 6:20
11:17,22 58:3,6
61:23 71:4 85:18
91:12 128:3,6
129:3 134:11
**individuals** 28:22
131:13
**industry** 129:11
**inequitable** 45:17
**inflation** 20:2
49:18 55:8
**inform** 98:24
**information** 6:2
11:5,6 18:8,12,19
20:9,14 22:12,19
38:18 40:18 41:4
41:6,18 42:2,6
52:22 53:16 54:21
65:10 66:22 68:3
68:13 70:13 86:25
94:13 95:5 101:19
108:17 114:5,8,15
114:19,20 115:20
115:21,25 116:10
117:5,6,10,13,24
118:3,10,17,23
119:7,9 122:15
126:13,21 127:2
130:9,12 141:15
142:3,5

**informed** 99:13
**initial** 59:25
**input** 66:18
100:11
**inside** 129:6,9
**instances** 90:11
91:5,16
**institution** 20:25
21:1
**instruction** 146:1
146:11
**integrity** 92:13
**intend** 109:3
**interest** 12:6 55:10
122:23
**interested** 80:19
125:8 148:3
**interesting** 31:20
75:8
**interests** 12:11,18
12:20
**interfacing** 135:14
**interfere** 18:10
**international**
83:13
**internet** 127:1
**interns** 70:3
**invested** 119:15,20
**investment** 36:21
85:3
**investments** 7:8,9
**invite** 133:11
**invited** 133:12
**involved** 66:25
78:19,22 84:4
130:13,15,19
139:4 141:5
**involvement** 141:8
141:10
**issue** 24:16 32:25
33:1 84:2

**issued** 41:25
**issues** 69:16
101:14 130:20
**item** 47:25 48:22
117:12
**itemization** 114:7
**items** 16:2 78:22
115:14

**j**

**january** 59:10
**job** 11:6 16:4
23:16,16 31:3,19
32:17,19 36:25
44:14,15,19 69:6
69:19 120:22
126:2 143:21,24
144:3
**jobs** 85:8,9
**jobseq** 10:21,24
11:1 19:11 26:4,7
42:7,24 62:7 64:3
66:15 68:1 69:15
69:16 82:16 85:16
85:19 100:11,13
101:14 102:8
110:7 111:5
114:23 115:5
119:10 123:21
127:4
**john** 12:9,15 13:8
13:9 15:10,19,20
43:7,9,13 82:23
110:22 117:18
119:4 144:24
145:10
**judgment** 46:14
**july** 72:3,6,9,14
80:11 81:12
**jump** 133:7,8
**jumped** 7:12

**justified** 50:17

**k**

**keep** 11:23 53:18
54:19 78:4 80:18
86:4,11,21 92:2
109:3 113:23
**keeps** 54:25
140:20
**kelli** 109:24
**kelliann** 1:23
147:7 148:13
**kept** 54:21 116:3
140:18
**key** 86:23
**kind** 30:18 75:25
80:22 82:14 102:6
123:25 125:3
134:25 141:1
**kinds** 93:10
**knew** 29:24,24
122:22 124:19
**know** 9:4 13:24
14:2,3,25 20:16
22:23 24:13 25:20
26:12 27:19 30:11
38:25 39:15 41:11
41:14,16 42:8
43:3 44:5 46:19
47:13 49:5,8 50:6
51:12,13 52:22
53:3 54:3,6,9
55:11,16 56:3
58:25 59:3,5,21
63:10,11,21 64:1
64:17 66:14 67:19
73:6 74:11,23,24
78:23,25 79:2,9
81:11,14,15 83:12
85:14,18 86:7
87:22,23 88:24
89:24 90:2 91:4

91:20,23,24 92:1,3
97:16 98:25 99:3
99:16 100:10
102:14,15,19,20
103:7 105:8,22
106:8 107:23
113:9,17,21
115:16,17 116:2
116:13,15 119:11
121:1,14 123:1,24
124:21 125:7
126:17 127:2,14
127:20,21 130:15
130:16 131:22
132:3,10,13 133:7
134:16,19,23
135:24 137:20
140:19,24 143:11
144:20
**knowing** 116:5
141:3
**knowledge** 27:1
37:15,17 38:8,11
39:21 51:14 70:8
79:15 91:20,22
131:19,20,23
143:21,23
**known** 122:20
**knows** 22:9
**kodak** 83:13
**koehler** 2:3
**koehler.law** 2:5
**kyle** 83:25

**l**

**labled** 104:19
**labor** 11:5
**laid** 90:15 108:2
**language** 74:24
75:2
**laptop** 41:6

**large** 10:12 24:9
85:15 127:3 136:1
**late** 76:24 139:23
**laura** 73:19
140:19,25
**lawful** 5:18
**lead** 145:8
**leadership** 29:23
30:9 39:4 42:23
93:10 94:12 96:17
96:19,20 99:18
108:7 141:20
144:19,19,21
**leading** 95:22
**leads** 24:7
**learn** 9:24 19:10
66:15 75:15
**learned** 42:21
**leave** 29:8 42:9,13
42:18 95:8 97:17
102:24 108:4,5
116:1 136:21
**leaving** 44:16
128:24
**left** 21:16 28:21
29:5,10 103:13
110:21,23 125:6
140:20
**legal** 149:1 152:1
**leigh** 73:19 140:19
**leigh's** 140:25
**leslie** 12:9,16
15:10 31:13,17,22
33:4,6,22 59:18
78:18 83:1,11,18
88:1,10 93:4,14
94:22,24 110:20
112:21 132:19
144:25 145:12,15
**lesser** 74:6

**letter** 4:6 16:3
31:4,8,12 32:1,5
33:24 34:12,22
35:14,18 36:16,18
38:16,21,24,24
39:1,5,7,8,19,20
81:16 95:4 97:19
139:10,21 149:19
**letters** 31:9
**letting** 127:2
**level** 68:6 115:7,8
115:8 126:18
**levels** 117:24
**liability** 4:18
138:1,9,18,21
**license** 19:21 57:6
60:5 61:6,7
**licensee** 49:14
**licenses** 19:23 42:5
114:24
**licensing** 54:12
**lie** 33:12
**lied** 16:4 33:2,11
44:20
**lieu** 5:5
**limited** 4:18 61:13
61:20 62:2,2
65:18,19 119:10
138:1,8,18,21
**limiting** 119:23
**linberg** 1:23 147:7
148:13
**line** 19:9 31:10
44:22 93:14 102:5
106:18 107:4
149:13 151:7
152:3
**list** 19:12,14 21:18
21:24 22:6,11,13
56:13 57:5,23
58:7,9 59:10

105:5 116:9,12,13
118:18 121:8,12
122:3,4,7,12 124:2
124:5,7,10,12,13
124:16,24 125:9
132:7
**listed** 56:17 151:7
151:17
**listen** 83:3
**listing** 151:7
**lists** 45:23 56:15
93:9 133:19
**litigation** 65:22
**little** 7:14,22 10:24
35:17 61:8,9
88:23 90:2 97:19
110:25 123:1
126:6 136:21
**living** 35:9 50:25
51:9
**llc** 1:5 2:3 9:10,15
9:17 138:19,20
149:6 150:3 151:3
**llp** 1:18 2:9
**located** 23:7,10
**locked** 119:8
134:18
**lodge** 24:16
**log** 15:21 43:11
87:5,9
**logan** 131:9,9,17
131:21 132:3,10
**logan's** 132:1,5,8
**lombardo** 1:8 2:15
4:7 5:15,25 18:3,9
18:10,14 20:17
21:8,12,24 22:5,15
23:7,25 25:11
26:15,19 27:9,11
27:22 28:21 29:5
29:6,17,24 30:6,12

30:20 31:1,19,22
31:24 33:7,17,25
34:13 35:4,19
36:2,9,13 37:15,18
38:8 39:5,12,24
40:3,15 42:9,21
45:17,20,24 46:23
48:14 55:13,14
62:19 67:11,21
70:9,14 72:13
73:24 74:3,14
75:22 76:1,10
77:16 79:5 82:8
83:10 86:5,22
87:5,8,12,18 91:25
92:4,19,24 94:5,9
94:10,11 95:7
96:2,9 97:17
98:13,18,22,25
99:3 100:14,17
102:23 103:13
104:15 106:18
108:21 109:3
110:9 111:16,22
114:6,18 115:25
116:14,18 117:7
118:2,9 119:17
120:18,20,25
127:17 129:6,25
130:23 131:7,14
137:11,21 139:1
139:15 144:6
149:6 150:3 151:3
**lombardo's** 4:9
23:9,12 27:1,19
48:1,21 53:7,8
60:11 61:1 63:6
63:12,17 65:9,20
65:24 69:22 70:1
71:10 73:18 75:11
83:23 92:17 95:13

96:22 97:4 99:8
107:4 112:7,12
129:14 139:4
140:22 142:20
**long** 8:4 19:12
64:5 69:10 128:5
62:8,11 143:10
**longer** 50:18 63:4
**look** 17:21 27:6,8
28:10 29:13 34:4
34:16 40:8 43:15
47:5,8 57:3 60:18
62:10,11,14 65:1,1
65:2 67:5 69:15
71:21 73:5,6 78:2
78:7,9 80:3 86:14
92:14 93:2 97:25
114:3 115:6
116:21 120:21
128:2 137:13,14
138:4 144:10
**looked** 14:25 41:5
42:15 49:12 72:18
86:10
**looking** 6:5 14:2
15:3 16:10 44:13
45:25 47:7 54:7
64:10 136:2
**looks** 55:2 80:16
**loose** 83:8
**lose** 20:4
**loss** 15:18
**lost** 85:9 118:7
**lot** 16:11 17:23
19:8 24:3,7 31:21
66:16,18 67:4,16
69:18 83:3 84:13
88:25 89:1 102:17
114:10 124:20
125:4 126:1,5,12
126:12

**lower** 51:2
**lying** 36:17

**m**

**m** 2:3
**macro** 10:19
**madam** 149:10
**mail** 40:25
**main** 77:2 123:22
123:23
**maintain** 72:11
111:8
**maker** 89:12,14,15
145:4
**making** 27:11 28:9
67:17 68:14,20
70:13 73:23 94:12
94:15 99:24
101:10 142:8
145:15
**manage** 29:18
30:13,22,23
**management** 35:1
**manager** 28:21
30:3 59:14,14
61:14,15 63:1,2,3
63:4,9 69:7,7,9
70:20 77:10,10
82:20 83:24 90:18
91:6 101:13
104:20 105:12,15
105:15,19,21,24
110:2,21 113:4,4,6
113:7,10 129:8,9
129:19,20 131:14
131:15 142:1,16
**managers** 20:24
61:23 63:7,11,18
63:22 65:8,8,11,12
65:25 66:4,7,8
68:2,14,15,21,22
69:21,21 70:16,25

75:2,15 76:10
77:14,15 78:16,16
81:9,21,22 82:1,1
91:17 99:9 100:3
102:21 103:6
105:13,14 110:24
117:14 118:19
127:10 129:15
130:1,6 143:22
**manipulate** 104:5
**manner** 5:10
**map** 42:7 67:25
68:3,7 114:23
115:2,10
**march** 35:15,24
139:16,18
**marked** 4:2,3,5,6
4:17 13:13,16
17:11,15 34:7,10
60:6,12 71:14,18
72:20 77:18,23
79:18,24 103:9,22
104:3 138:3,6
**market** 11:6 67:13
125:7,8 132:17
134:25
**marketing** 67:5,6
132:18 135:18
**markets** 67:12
**marvin** 83:16
**master's** 8:21,22
69:4
**material** 67:5
**math** 52:17
**matter** 5:7 7:2,16
37:1 41:22 102:21
127:9
**mc** 124:9
**mcguire** 1:18 2:9
5:17

mcguirewoods.c... 2:11
mean   16:12 45:25 61:19 67:20 88:15 97:6 124:7,12 130:15
means   12:22 18:23
measures   126:20
meet   37:10 133:25
meeting   18:18 55:1 75:13 93:12 94:1,2 120:9 142:4,5,11,19
meetings   92:18 93:2 97:3,4 115:23 120:4 142:8,10
members   69:20
memorize   56:23
men   94:22,24
mentioned   16:16 22:16 57:7 88:22 94:16
merit   31:2 33:25 34:6,25 35:4,9
met   36:22
mid   59:10
middle   77:1 90:21 94:4
midwest   23:7,10 149:17 152:1
military   91:3,4
million   135:1
mind   7:8 39:23 61:11 62:12 64:20 64:22 114:25
minded   95:20
minimum   123:11 123:13
minutes   21:3 22:16 45:7

misheard   61:21
missions   8:22
models   10:19 102:17
moment   42:24 71:24 76:4 143:15
monetary   47:3,10 47:10 56:10
money   18:24 19:6 31:21 32:3 36:20 55:9 85:4 90:2 118:19 119:15,19 120:11 133:9
monterey   136:17
month   31:23 35:22 54:20 58:15
monthly   55:1 115:22
months   34:24 66:15
morning   5:24 96:3
mouth   134:9
move   11:12 47:14 56:13 113:22
moved   138:22
moves   11:11
moving   103:16 129:3 144:5
msa   11:8
multi   118:25 119:3
multiple   35:6 60:2

**n**

name   5:12,12,14 6:6 9:21,25 19:12 31:13 33:10 38:4 38:6 44:5 45:4 57:23 88:14 107:5 131:10 135:19 149:6 150:3,4,15 151:3,4,21

named   131:13 147:9
names   13:5 19:14 38:5 40:1 42:5 44:5 49:10 56:18 56:23,24,25 122:16,17,18,19
nation   134:18
nationwide   23:11
native   109:15
nda   127:5
nearby   131:12
necessarily   116:13
necessary   29:1 83:7
need   8:8 11:11,13 27:4 28:9 47:8 56:22 66:19 84:12 89:13,21 94:20 100:12 101:15 103:9 119:11 127:2 128:14 129:1 141:21
needed   98:4
needs   18:20 66:23
negative   29:18 30:12,21
neighbor's   94:23
nephew   13:9
never   41:4 87:19 124:19
new   63:15,18 75:15 81:2 84:6 85:8 90:16 100:5 100:7 107:8,12 110:7,9 112:23 113:15 124:22 132:18 133:16 136:2
newest   84:6

nice   115:5,7 136:17
non   24:25,25 25:10,10 37:20 48:12 65:12 66:1 69:22 70:1,7,21 127:4 130:4,7
notarized   149:14
notary   1:23 147:7 148:14 149:25 150:10,18 151:15 151:23 152:23
note   56:20 149:12
notebook   140:20 140:21
notes   20:10 21:5 43:19 44:23 45:4 45:6 53:1,3,6 56:15,17 58:17 59:6 114:11 119:21 121:3 122:16 123:8 127:7 131:18,22 132:1,2,5,8,20,24 133:13 140:7,9,14 140:20 144:11
notice   4:3,9 13:5 13:17 14:11,20 48:22 60:11 61:1 92:19
number   4:2 17:5 22:24 23:6 47:25 48:22 49:12 50:11 51:2 53:14,17 54:11 59:13 61:14 62:3 63:21 64:25 65:6 87:12 88:7 92:17 101:24 102:3 103:16 106:21 109:13 110:13 114:4

117:1 119:13
135:4 136:15
149:7,13
**numbers**  12:14
26:9,21 27:4,7
50:10 52:6 69:11
103:7 134:23
151:7

**o**

**o'clock**  93:3
**oath**  5:5
**object**  7:18 21:9
21:25 22:17,22
23:15,19 24:17
26:20 32:12 34:2
39:22 43:25 45:21
49:6 55:25 60:1
61:18 63:19 65:17
67:23 68:23 70:18
70:22 73:2 86:9
91:8 92:5,11
95:25 96:12 99:6
101:2 104:16
105:9 114:21
122:9 125:2
126:23 131:16
135:23 137:12
140:16
**objected**  56:21
**objection**  24:16
46:6 47:4 56:1,21
63:24 71:2,3
85:19 96:5 105:10
129:21 130:8
**objections**  4:9 5:9
60:11 61:1
**obtain**  45:20 68:2
73:21,22 100:17
133:16
**obviously**  96:24

**occupational**
126:11
**occupations**
126:18
**occur**  96:4
**occurred**  35:15,20
95:1,3,23 142:19
**occurring**  95:16
**october**  37:5,7
42:16,16 59:7
82:7 94:4 98:14
103:17 108:17
109:2 127:24,24
**odd**  31:8 102:6
**offer**  31:3,23,25
32:19 33:8,24
34:22 36:25
124:21 139:21
**offered**  31:18
44:15,19 95:6
**offering**  31:13
**offers**  32:17
**office**  24:10,10,14
42:22 43:4,6
86:24 90:19,25
93:13 98:14
108:23 140:25
148:6
**official**  150:15
151:21
**oftentimes**  44:20
145:15
**oh**  2:5 14:18 30:10
38:23 60:24 85:23
89:7 97:11 106:14
109:14 111:3
112:9 123:1,6
134:14 141:17
**ohio**  4:19 5:19
24:9 94:8 98:16
138:9,19,21,22,24

139:1 147:3,8
148:6,15 149:2
**okay**  9:5 13:4
14:12,15 18:7,14
23:3,5,21 24:19
29:12 36:13 38:15
45:15 46:14,15
59:19 60:19 65:19
71:6,23,24 73:8
77:8,14 80:12,21
88:24 91:13 93:21
95:1 104:24
106:24 111:18
114:2 119:5 120:2
128:10 129:13
138:14 145:3,17
**old**  6:10
**once**  6:16 9:23
20:22 36:17 59:11
67:2 83:6 92:13
93:1 122:4
**one's**  38:6
**ones**  58:10,12,22
75:15 113:15
121:2 123:23
**open**  8:9 128:25
**opening**  19:7
59:20
**opens**  54:10
**operating**  4:12,14
77:22 78:11,14,20
79:1,7,10,16,22
80:10,13,25 81:4
81:19,25 82:11
**operational**
145:13
**operations**  73:12
73:15 103:17
130:14 145:1
**opportunities**
120:22 135:18

137:15
**opportunity**  16:5
85:3 98:2,6
116:21 120:20
**opposed**  7:24
91:18
**options**  98:1,7,8
98:12
**order**  135:3
**organization**  4:18
104:9 138:8,18
**original**  78:24
146:13
**originally**  33:18
**ortiz**  16:17,20
**ought**  128:15
**outlook**  40:25
**outside**  57:10
68:10,10 73:11
**overall**  61:22 64:2
**overflow**  76:24
**overlaps**  91:9
**overseas**  85:10
**overtime**  70:5
87:13,18
**owe**  92:6
**owes**  92:3
**owner**  12:1
**owners**  12:8 13:6
13:10
**ownership**  12:6,11

**p**

**p.m.**  145:25
**page**  47:5,6,7
72:19 77:4 80:9
104:18,22,25
105:25 106:15
109:9,20 149:13
149:15 151:7
152:3

pages   53:1 104:18
paid   50:22 51:11
  88:11,13 90:11
  108:10 113:6
  120:11
paper   33:13 119:8
par   67:14
paragraph   18:6,8
  18:13 20:10,15
  22:20,21,24 23:6
  24:21,24 25:13,25
  27:24 28:1 29:13
  29:16,19 30:25
  35:13 36:5,9
  37:18 38:12,16,22
  39:11 40:8,14
  42:3 43:15,16,19
  44:21,25 45:10
  46:16 81:5 86:13
pardon   11:25
parentheses   50:7
part   23:6 25:22
  28:25 29:4 30:10
  84:5 90:21 93:19
  151:9
partial   116:12
participating   5:2
particular   11:8
  18:25 22:13 32:8
  91:1 101:3 126:19
parties   5:8
partnership   84:23
parts   32:1
party   5:12 31:4
  131:11 148:2
passed   97:16
passing   67:21
password   102:1
  117:16,17
passwords   117:12
  117:19

pasted   41:15,18
pattern   95:14
pause   8:4 111:21
pay   18:23,24 19:5
  33:2 35:11 36:20
  49:9 51:11 87:13
  87:18 94:24 108:9
  108:11,12 109:16
  120:8
paying   120:20
payment   134:13
peculiar   139:20
penalty   5:7
pending   8:10
  136:10
pentagon   91:2
people   11:7 18:18
  18:24 19:9,11,20
  20:5 21:1 28:10
  28:14 44:6 49:12
  53:14 54:3,8,11
  60:4 61:5 68:5
  84:6,11 93:7
  97:11 102:11
  112:14 117:23
  118:14 120:5,7
  123:17 124:18,20
  134:16,23 135:10
  135:16 142:2,6
  145:3
perceived   29:17
  29:19
percent   28:23,24
  53:17
percentage   13:1,2
  24:13 27:2 103:2
  113:12
performance   35:1
  129:14
performer   129:16

period   7:6 27:3
  45:19 46:24 50:18
  62:10,21,22 64:6
  64:10 75:3 83:19
perjury   5:8
permission   30:7
  118:4,10
permits   115:13
person   5:6 19:15
  19:18 31:18 36:23
  45:4 52:19 66:18
  68:4,8 74:1 95:20
  112:18 113:3
  142:3
personal   75:25
  76:15,19 91:22
personally   93:11
  97:13 136:13,14
  150:11 151:15
personnel   72:16
  72:18 86:4,8
  140:10,13
persons   68:10
  111:6
perspective   135:5
persuade   37:21
  38:9
pertains   128:23
peterson   12:9,12
  12:16 15:10,22
  23:17 59:18 78:18
  83:18,19,22 88:1
  91:11 93:4 94:11
  112:21 113:17
  132:19 144:25
peterson's   83:11
ph.d.   1:13 3:7 5:18
  8:24 147:10 149:8
  150:4,9 151:4,13
  152:20

ph.d..   5:22
phone   31:17 37:11
  42:20 59:1 85:23
  89:2,10 90:6,7
  101:12 123:19
  149:3
physically   5:3
  24:4,5
physics   52:17
pick   7:14
picked   31:17
picking   125:5
picks   90:7
pie   109:10 110:6
  110:25 111:4,5
piece   33:13 110:25
  111:4 126:6 128:7
pipeline   114:22
  115:2,15,17,23
pitting   141:20,22
place   11:12 96:16
  117:9 119:6,9
  131:12 136:17
  147:19
placed   42:9,12,18
  140:10
plaintiff   1:5 14:11
  60:10,25
plaintiff's   4:8
  60:10,25
plaintiffs   2:2
plan   106:4 107:2
  107:25 108:1,8
play   91:6 133:6
plaza   1:19 2:10
please   5:11 6:6 8:7
  23:23 58:14,15
  149:11,11
plenty   68:5
plus   50:7
point   9:14,18
  22:18,23 30:13

32:6 33:21 38:11
46:25 48:18 50:24
51:8 57:21 58:25
83:4 90:3 95:7,17
95:21 97:22 99:21
108:20 109:2
112:4 123:23
145:18
**pointed** 51:1
**points** 74:5 75:24
76:6 101:11,20,24
101:25 102:3
103:2 144:2
**policies** 72:23,25
73:25 82:5
**policy** 16:22 73:6
74:2 76:9 81:20
**portion** 61:13 62:2
129:4
**position** 36:10
37:16 105:21
141:18,19
**positions** 143:25
144:4
**possession** 116:23
**possible** 18:20
**possibly** 28:11
135:9
**postings** 11:6
69:19 126:2
**potential** 29:25
56:15,16 57:4
58:2,7,18,21,23
122:16,18,19
132:5 137:23
**power** 7:8 50:8,9
**powerpoint** 41:15
82:25 83:1,14
**practice** 74:3,10
**prayed** 17:1

**preceded** 73:19
88:13
**preparation** 78:19
**prepare** 14:22
16:24 88:5 109:5
**prepared** 59:9
89:9 106:8
**preparing** 120:13
**presence** 147:14
**present** 2:14 5:3
15:17 20:1 48:10
49:17,19,21,23
50:3,5 52:18 55:5
76:20 98:13
121:20 123:4,15
123:16 142:25
**presentation** 54:9
83:1 106:4
**presentations**
82:25 83:15
**presented** 99:18
139:21 142:5
**presenting** 104:9
**president** 144:25
**presumably** 74:5
75:24
**prettier** 145:21
**pretty** 59:10
100:10 121:2
**prevent** 77:9,12
**prevented** 77:15
**previous** 18:16
**previously** 4:3,5,6
4:17 13:16 17:15
34:10 39:14 98:15
138:6
**price** 46:3,5 48:10
49:15 50:20,21
51:4,7 54:13,16
125:16

**pricing** 40:17 41:7
41:8,10 114:24
**primarily** 23:25
**primary** 54:10
145:4
**prior** 9:8 10:6,8
14:16 30:14 31:23
57:20 59:21 65:8
65:23 69:22 72:9
73:21,23 74:24
75:1 96:4,20
97:10 99:24
100:25 102:24
110:19 112:17
122:12
**privileged** 130:9
**probably** 6:15
9:20 15:20,23,25
19:18 31:20 37:6
39:2 54:2 63:4
85:14 97:22
106:12 110:15
124:13 128:15
144:1
**problem** 23:18
**problems** 130:20
**procedure** 5:20
61:2 78:20 79:10
146:8 150:5 151:5
**procedures** 4:12
4:14 77:22 78:11
78:15 79:1,8,16,23
80:10,14,25 81:4
81:19,20,25 82:6
82:11 117:4
**process** 28:2 81:7
117:1,3 119:5
140:6
**processes** 117:9
**procure** 42:19

**produced** 51:14
53:3 71:10
**producing** 99:9
**product** 11:1
19:21 54:12,12
67:25 84:12
119:10 125:12,13
134:22 135:11
**production** 149:15
149:17,22
**products** 115:12
**professionals**
66:11
**profit** 12:18,19,21
**program** 53:21
**programs** 69:11
**progress** 67:17
**projects** 10:13
**promoted** 142:8
**promotions**
142:14
**pronounce** 9:24
**pronouncing** 10:2
**properly** 23:8 59:9
**proposal** 104:11
104:14 111:12
**proposed** 29:22
97:1 104:8 105:1
107:2 108:2 109:6
**proposing** 108:3,5
**prospecting** 100:4
100:7
**prospective** 43:22
44:2,24 124:4,6,8
125:1 132:11,14
**protect** 117:10
119:6 127:1
**protection** 117:4
**provide** 8:10
38:22 45:9 66:17
67:24 83:19,20,22

99:23 100:2
124:19 126:4
135:7 136:7
**provided**  5:19
22:5,9 51:21,24
81:21 82:8,19
83:9 84:7 98:9,9
99:24 121:8
123:19 130:11
131:2,24 141:11
**provides**  11:5
**providing**  84:4
141:15
**provisions**  37:20
**public**  1:23 147:7
148:14 150:10,18
151:15,23 152:23
**pull**  115:11
**pulled**  54:24
**pulling**  53:25 54:1
**punch**  87:3,3
**purchased**  10:9,10
**purport**  119:16
**purported**  48:2,22
114:7
**purportedly**  97:24
114:5,8 117:7
**purports**  106:3
138:17
**purpose**  14:1
18:18 36:18
133:15 134:3
**purposes**  13:18
17:17 34:14 60:12
71:18 77:23 79:24
104:3 138:10
**pursuant**  61:2
146:3,7
**push**  21:13 89:17
**pushed**  21:13 29:2
33:14 68:6

**put**  15:21 16:5,21
55:9 57:23 75:19
76:15,16 80:8,25
81:2 89:6 93:8
95:19 96:16 97:17
102:23 108:24
111:15 112:10
115:17 116:1
126:10,25 134:9
135:21,25 141:18

**q**

**q3**  110:7
**qualified**  147:9
**quarter**  110:5
**question**  8:2,6,6,9
23:23 26:10 43:7
43:9 47:8,9,12
51:4 55:6 59:21
61:9,10,19 72:21
83:21 90:21 91:14
101:3 118:12
119:4 121:7,17
122:10 128:13
130:25 136:10
144:15
**questions**  14:12,24
18:1 43:14 59:21
83:7 128:9,23
129:1 145:18,23
**quick**  16:21
**quickly**  31:15
**quiet**  71:4
**quite**  19:12 105:5
**quotas**  100:15

**r**

**r.p.r.**  148:13
**raise**  50:8,25
**raised**  50:7
**ran**  15:25 29:23

**rate**  20:2 27:18,20
48:12 49:12,18
53:11,20,20 55:4,8
55:10 102:25
107:10,16
**rates**  55:7 112:15
**ratio**  54:18 61:4
61:12,22 62:6
64:2,15,18
**ratios**  59:13 61:14
**reach**  102:10
**read**  14:24,25 36:8
43:15 56:19 58:9
58:9 61:21 80:8
80:23 81:1,9
82:13 106:10
145:24 150:5,6,12
151:5,6,17
**reading**  23:2
40:13 149:19
**ready**  57:21 65:4,5
73:7 77:7 90:5
**real**  33:1,7 78:5
84:14 85:13
**really**  12:13 21:13
27:4 82:23 89:11
89:12,17
**realtime**  11:6
**reason**  9:21 21:14
43:1 56:22 57:15
80:22 92:18 99:22
101:5 103:18
110:12 115:24
136:6 141:11
149:14 151:8
152:3
**reasonable**  74:11
95:20
**reasons**  134:7
**rebate**  76:8

**rebates**  76:8
**recall**  6:24 7:4
15:16 35:22 37:14
40:3 42:12 44:13
56:16,18 59:17
84:1 98:19 101:18
113:20 142:22
**receipt**  72:14
149:18
**receive**  31:1 35:7
70:4 91:7 135:13
**received**  31:12
40:20 59:6 76:7
91:17 116:17
**receiving**  58:17
**recess**  139:25
144:13
**recognition**
135:19
**recognize**  14:3
34:19 78:10 80:6
138:15,16
**recollection**  16:1
32:6 41:20 62:17
107:24 139:13
**recommendation**
141:12
**recommended**
141:9
**record**  5:13 6:7
11:24 47:18,20
56:21 86:21
103:12 111:21
128:16,18,20
143:15,17 151:9
**records**  86:23
**recoup**  133:12
**recruiter**  22:6,8
**reduce**  110:24
111:4

**reduced** 91:18
  147:14
**refer** 18:13 42:3
  48:6
**reference** 132:7
  149:7 150:2 151:2
**referenced** 27:23
  39:11 147:13,17
  150:11 151:15
**references** 28:17
  43:19
**referred** 35:18
  53:2 84:1 142:19
**referring** 20:9,20
  22:20,20 29:20
  30:2 38:21 41:1
  52:8 118:16
  142:10,11
**refers** 20:15 24:24
  44:25
**reflect** 51:9
**reflected** 137:17
**reflects** 26:14
**refused** 19:13
  67:11,13 97:21
**regard** 46:8 67:16
**regarding** 47:25
  82:4 87:12,18
  91:25 92:7,19
  97:3,4 117:3
  131:3 146:2,11
**regardless** 76:2
**region** 11:8 126:19
**rejoined** 111:22
**related** 7:5,8,17
  13:8,11 15:18
  65:7 69:19 115:10
  123:6 131:12
  145:13
**relating** 11:21
  44:24

**relationship** 13:6
  16:7 27:12 31:16
  32:7,14 44:24
  57:19 95:15 111:9
**relationships**
  38:19
**relative** 48:15
  148:2
**relevant** 65:21
**relied** 52:21,23
**relief** 47:3,10
**rely** 68:13,17,20
  70:13
**relying** 51:15
**remainder** 12:16
**remains** 126:21
**remember** 15:15
  33:10 51:9 95:9
**rememberable**
  9:23
**remind** 82:14
**remote** 1:12
**remotely** 5:4
  43:11
**renaming** 105:20
**renewal** 27:17,19
  48:12 51:4,8 64:2
  100:20 102:25
  107:14,18 113:14
**renewals** 27:15
**rented** 133:3
**repeat** 8:7 121:16
**rephrase** 8:7
  21:21 40:21 59:4
  137:2
**report** 105:14
  115:10
**reported** 95:22
**reporter** 3:17 5:1
  8:1 11:3 63:16
  110:1 150:7

**reporter's** 3:14
  147:1
**reporting** 5:4,10
**represent** 5:15,25
  17:12
**representation**
  11:21
**representative**
  11:15 17:9 59:15
  61:15 65:15,23
  71:12 82:4 86:18
  87:14 88:5 92:21
  103:20 117:3
  119:14 128:24,25
  129:7,10 131:3
  133:24 134:7
**representatives**
  28:3
**represented** 5:12
  107:23
**representing** 5:17
  6:22
**represents** 106:21
**reprimand** 84:3
**reputation** 10:1
**request** 8:8 35:4
  39:16,20 62:7
  123:18 127:6,13
  151:9,11
**requested** 19:15
  39:13 49:13
  127:11,12,15
  136:18 146:1,7,11
**requesting** 61:7
  95:5
**requests** 38:17
  39:9,11,21 40:15
  71:11
**require** 66:11 69:2
**required** 87:5,9
  149:25

**rescinded** 31:3
**research** 9:16
  134:24 139:22
  145:1
**resemble** 145:21
**residential** 6:9
**resigned** 28:25
**resources** 85:12
  119:15,20
**respect** 18:12
  23:12,15 25:25
  44:21 49:3 61:22
  61:23 82:11 87:20
  100:14 119:12,12
**respond** 7:24
**response** 32:4
  71:10
**responsibilities**
  105:19
**responsibility**
  129:24
**responsible** 27:11
**restate** 30:21
  94:10 98:24 99:2
  118:21
**restricted** 45:19
  46:24
**restroom** 47:15
**restructuring**
  136:7
**result** 48:1,21
**retained** 3:17 18:9
  21:24 114:6,18
  116:14,16,18
  117:7 119:16
**reticent** 108:9
**return** 8:4 36:21
  39:24 40:15 59:1
**returned** 19:13
  39:14 40:3 149:18

revenue   10:23
  26:5,9
revenues   27:2
review   58:3,5,7
  101:23 139:5,10
  146:2,7 149:12
  150:1 151:1
reviewed   14:16
  106:12
reviewing   14:6
  23:4 24:22 25:18
  29:14 34:18 36:7
  38:14 40:12 43:17
  45:2,14 46:16
  60:15 65:3 71:22
  78:1,3 80:5 86:15
  138:13
reviews   139:17
  140:5,23
revise   51:3
revised   16:23
  28:19,20
revising   28:2,17
  36:2
revision   30:10
richard   1:8 2:15
  4:7,9 5:15 18:3
  34:12 60:11 61:1
  149:6 150:3 151:3
richmond   1:3,20
  2:11 84:23 94:7
  98:16 130:19
  143:1
rick   16:4,13 19:1
  19:11 20:16 30:17
  33:9,9,14,14 36:17
  36:18,22 37:10
  44:13,20 46:20
  52:25 57:8,8,18,23
  75:18,20 76:15,17
  82:22 84:2 87:22

88:15 90:5,6 93:7
  95:4 100:4 102:20
  103:9 104:12
  106:23 107:5
  108:2,4 111:7
  120:6 127:16
  131:7 132:8
  134:19 141:14
  142:12,13
rick's   33:22 96:21
  131:24 133:14
rid   112:8
right   9:4 10:2 17:2
  24:4 26:16 29:6
  30:11 34:23 37:4
  38:6 39:23 45:12
  46:16 51:9 69:18
  98:6 109:17 111:2
  111:17 120:2
  125:6,14 145:13
road   24:11,14 42:7
  67:25 68:3,7
  114:22 115:2,10
  115:15
rob   5:16 88:13,22
  91:2
robust   126:11
rod   51:23 93:14,24
rodney   2:9 149:5
roll   108:8
rolled   108:1
room   5:3 7:15
  25:23 33:5 103:10
  103:13 112:7
rooms   75:19
rough   146:15
roughly   56:25
routinely   139:17
rpr   1:23 147:7
rsatterwhite   2:11

rule   61:2
rules   5:19 7:11,12
  7:21 146:3,8
  150:5 151:5
run   10:19 90:1
running   53:20
  69:18 93:7 108:23
runoff   20:4

s

s   4:12 11:1,1,4,4
  16:23 77:19,21
  149:15 151:8,8
  152:3
salaries   28:23
  105:3 112:19
  142:2
salary   31:2,5
  35:11 107:6
  112:15,17,24
  113:7
sale   16:14 19:24
  54:18 57:10 89:1
  130:17
sales   16:11,11,12
  22:7 23:12,13
  26:1,4,7,14,18
  27:1,3,8,8 28:3,21
  29:2,22 30:3 46:2
  46:4 51:7 53:19
  53:20 54:4,19
  55:1 59:14 61:15
  69:10 78:17 79:8
  83:2,2,13,14,15,17
  83:25 84:5 88:14
  91:4 99:25 100:18
  100:20 103:17
  104:20 105:1,7,12
  105:15 106:4
  107:1 108:1 110:2
  110:7,10,19,21,22
  110:23 111:6

112:3,13 115:22
  118:19,19,20
  129:6,9,14 130:6
  130:14,16 134:8
  134:12 135:21
  136:7 142:12,13
  145:12
salesforce   54:2,22
  54:24 55:12
  101:20,21,23
  102:1,2 117:17,22
  117:24 118:4,11
  119:1,2
salespeople   19:2
  22:6 28:11,14
  29:22 58:11 84:6
  88:25 120:8
  134:17 135:2
  137:7,8,15 141:15
  141:17,20,22,24
salesperson   26:22
  35:12 89:18
sam   77:19
sat   33:5
satterwhite   2:9
  5:16,16 7:18
  13:24 17:24 21:9
  21:25 22:17,22
  23:14,22 24:15
  25:14,19 26:20
  32:12 34:2 35:16
  39:22 40:10 43:25
  44:8 45:12,21
  46:6,9,13,17 47:4
  49:6 51:25 52:4
  55:25 56:20 60:1
  60:20 61:18 63:19
  63:24 65:17 67:23
  68:23 70:18,22
  71:2,7 73:2 80:17
  80:20 85:21 86:1

86:9 90:20 91:8
92:5,11 93:16,19
94:21 95:25 96:5
96:12 99:6 101:2
104:16,21,23
105:9 106:2,25
109:12,18,24
111:19 112:6
114:1,21 118:6
122:9 125:2
126:23 128:5,10
128:12 129:21
130:8 131:16
135:23 137:12
140:16 145:23
146:14 149:5
**savage** 73:19
**saw** 66:9,10 68:24
68:25 95:14
**saying** 10:11 21:16
41:19 93:10
108:23 111:3
136:5
**says** 29:16 34:24
36:9,13 44:22
90:7 95:17 107:1
124:23
**scc** 9:13
**scenario** 90:15,22
90:23 91:1,6,15
107:25
**schedule** 109:16
**school** 66:13
**scientist** 69:1,2,8
69:10,13,14
**scientists** 66:10
**scope** 62:2 63:19
70:18,22 86:9
91:9 105:10
**scratching** 80:22

**screen** 6:4,4 112:8
**screw** 95:19
**scroll** 13:22 14:1
60:16,17 73:5
80:3,15 106:1,24
**sea** 144:22
**seal** 148:6 150:15
151:21
**second** 30:15 36:9
50:5,7 80:9
**secret** 114:5,19,20
117:6
**secrets** 117:5
119:7,16
**section** 73:6 77:5,9
115:10
**sector** 67:11
**secure** 38:17 59:22
**see** 11:7,9 19:11
28:3 29:16 31:9
34:23 35:1 38:19
40:18 46:8 61:12
69:16 73:13 80:7
80:10,16,23 88:7
100:12 101:23
102:5 106:5,18
109:10,16,22
133:7 139:15
140:19
**seeing** 62:12
**seek** 47:3,9
**seeking** 48:5,13
49:3 55:24 56:10
**seen** 14:4,7,8
53:15 60:23 80:13
**sell** 21:17 45:22
66:14,16 67:13
93:9 95:18 125:25
**selling** 48:10 49:15
50:20 54:13,16
125:12,13

**send** 18:24 31:22
57:8 73:11 89:22
95:5 143:3
**senior** 59:14 61:15
63:1,3,7,8 65:8,11
66:4,8 68:15,21
69:7,21 77:10,14
78:16 81:21 82:1
105:20,23 113:6,9
129:20 131:15
**sense** 8:11 24:20
31:9 75:10 87:1
90:10
**sensitive** 104:23
**sent** 20:23 39:1,5,6
40:5 41:6 51:22
51:24 81:16 98:13
99:5 120:17 142:2
**sentence** 36:12
**separate** 21:4
**separation** 38:23
**serve** 28:11,15
134:15,16 135:3,9
**served** 100:24,24
**serves** 102:7
**service** 11:4 99:20
101:6,9 135:7
136:8
**serviced** 101:7
**servicing** 125:8
**serving** 28:8
102:15 135:3
**session** 19:7 54:10
**sessions** 83:17
**set** 14:20 25:19
71:11 91:15 96:6
148:5
**setting** 90:16
**seven** 123:17
136:20

**severance** 10:12
95:6 98:8
**shaking** 7:25
**shared** 13:5
**sharing** 30:9
**sharon** 12:10,17
15:11 16:8,10
73:16 74:16 93:14
145:1,14
**sheet** 20:23 21:8
41:14 54:25 70:4
109:10 114:7,24
149:13 151:7,10
151:18 152:1
**shelly** 137:5
145:12
**shifted** 10:22
**ship** 120:12
**shoot** 133:7
**short** 47:15,18
103:12 111:21
128:1 131:25
139:25 144:9,13
**show** 13:13 17:11
34:7 59:19 60:6
71:13 77:18 79:18
103:22 125:16
138:3 141:25
**showed** 122:6
**showing** 74:13
109:21 110:2,11
**shown** 13:18 17:17
34:13 138:10
149:16
**shows** 41:17 55:2
104:25 106:3
110:6
**shuai** 12:10,17
145:2
**shut** 42:24

**side** 85:11 131:11
  137:6
**sign** 20:5,6 53:14
  57:9,22 72:13
  82:14 90:5 97:21
  97:21 99:1,4
  117:11 126:24
  127:4 145:24
**signature** 88:16
  146:5 148:12
  149:14
**signed** 28:25 76:24
  82:15 90:4,4,9
  98:3 108:14 143:4
  150:13 151:18
**significantly** 26:1
  26:8 27:23
**signing** 98:8
  149:19
**similar** 54:17,18
  91:6 124:23
  125:12,13 126:10
**simmons** 12:10,17
  15:11 16:8,10
  73:16 74:16
  131:10 132:16,17
  145:1
**simple** 52:16,19
  83:21
**simply** 67:21
  144:17
**sincerely** 149:21
**single** 20:24
**sir** 149:10
**sit** 18:17 56:11,12
  82:24 120:14,21
**sites** 137:21
**sitting** 51:25
  120:14
**situation** 16:5
  88:18

**situations** 141:13
**six** 63:25 66:15
  123:17 136:19
**skills** 100:3
**slept** 94:23
**slipping** 131:10
**slow** 49:1
**slower** 13:25
  88:23
**small** 18:21 120:5
**smart** 52:17
**snatched** 121:2
**software** 10:22
  11:2,4 21:2,3 22:9
  42:25 43:11 87:3
  134:22 135:17
**sold** 12:24 23:10
**sole** 18:18
**solicitation** 24:25
  25:10 37:20
**solutions** 149:1
  152:1
**solved** 101:10
**someone's** 109:6
**son** 33:11
**soon** 18:20
**sophisticated**
  66:17
**sorry** 7:10 19:4
  23:2,3 25:20
  26:11 29:9 35:16
  38:7 39:10 44:7
  45:24 49:7,20
  52:10 53:5 55:20
  56:14 58:5 69:20
  80:15 84:22 85:21
  86:1 87:7 90:20
  99:1 104:23
  106:17 112:6,10
  113:2,11,11 118:8
  121:7 127:23

**137:10 141:17**
  142:24
**sort** 11:9 66:23
  132:2
**sounds** 59:18
**sources** 68:10
  126:14
**space** 133:4
**speak** 15:2,4,8
  17:9 25:24 43:24
  44:3,4 56:6 85:25
  87:14
**speaker** 19:3,7,8
**special** 139:20
**specific** 18:1 34:3
  40:15 49:2 96:1
  125:11 137:7
**specifically** 51:18
  127:6
**specified** 147:20
**speculating** 116:6
**speculation** 96:13
**speech** 136:20
**speeches** 136:18
**spend** 130:18
  136:3
**spending** 100:5
**spent** 24:14 31:21
  133:9
**spoke** 15:9,9,10,10
  15:11 36:19 44:13
**spoken** 144:18
**sponsor** 18:22,23
  49:9 120:3 121:22
  121:24 122:2
**sponsors** 121:14
  121:15
**sponsorship**
  120:18
**sports** 131:12

**spreadsheet** 22:15
  41:10,10 51:20,24
  52:7,9,11,22,23
  114:14
**ss** 147:4
**staff** 28:16 29:2
  135:5 142:12,13
**stale** 40:1 59:10
**stand** 135:16
**standard** 4:12,13
  69:15 77:22 78:11
  78:14,20,25 79:7
  79:10,15,22 80:10
  80:13,25 81:4,4,19
  81:25 82:11
**standing** 24:16
  71:3
**stars** 102:12
**start** 6:2 10:13
  11:20 128:3
**started** 9:7 67:10
  79:6 80:24 82:21
  108:23 144:21
**starting** 12:12
  15:13 119:25
**state** 6:6 10:1 24:9
  26:10 85:5,6,7
  145:11 147:3,8
  148:15 150:10
  151:15
**statebook** 123:24
  126:15,16,22
**stated** 94:6 96:9
  98:15
**statement** 26:3
  31:6,7 37:23,24,25
  46:11 150:13,14
  151:19,19
**statements** 94:6,9
  94:12,16,18 95:23
  97:14

| | | | |
|---|---|---|---|
| **states** 1:1 23:6 25:3,25 28:1 30:25 37:18 38:16 40:14 45:16 73:9 | **string** 49:24 | 41:11 52:4 55:18 59:9 67:20 72:10 | **taken** 1:15,17 20:19 31:13,23 |
| **stating** 5:11 | **stronger** 9:23 | 74:2,4 80:17 | 41:5 42:19 48:25 |
| **stayed** 75:16 | **structure** 28:2,5,6 28:18,19 29:23 | 87:25 88:24 89:6 | 110:15 126:20 |
| **staying** 64:15 76:21,23 | 36:3 96:10,15 | 90:14 92:15 96:25 97:1,6,12 98:1 | 139:25 144:13 147:19 |
| **ste** 2:4 | 99:14,25 100:1,25 101:6 104:9 105:1 | 99:17 106:10 | **takes** 59:22 66:15 |
| **steele** 26:23,24 62:23 103:4 | 105:4,4,7 106:4,7 107:2 108:2 109:6 | 112:25 113:13,16 115:4 119:3 | 85:6 88:24 89:1 145:8 |
| 129:16 | 112:3,13 134:8,8 134:13 | 120:18 121:17 124:11,13 125:12 | **talk** 19:4,4,5,5,6 36:23 48:19 82:18 |
| **steigmann** 30:15 | **stuff** 11:22 127:1 | 126:13 128:2 | 88:10 93:4 120:13 |
| **stenotypy** 147:14 | **subject** 7:2,16 | 130:3 133:10 135:10 139:22 | 120:21 128:15 |
| **step** 7:13 16:16 86:11 93:4 | 105:10 | **survive** 133:17 | 135:16 139:9 |
| **stephanie** 38:2 131:8,9,17,18 | **submitted** 15:1 | **suspect** 140:17 | **talked** 15:20,23,24 16:3,11 21:5 |
| 132:13 | **subscribed** 150:10 151:14 152:21 | **suspicion** 132:8 | 31:14 36:1 55:22 |
| **stephanie's** 38:4 | **subscription** 57:5 | **sustained** 48:1,21 56:6 | 55:23 58:22 95:1 104:15 120:16 |
| **steps** 93:15 | **substance** 15:13 | **switched** 75:23 76:18 | **talking** 8:3 15:16 |
| **stick** 135:1 | 37:8,9 | **switching** 113:21 | 24:3 26:4,5 29:21 |
| **stipulation** 3:5 | **successful** 35:12 | **sworn** 5:20 147:11 150:10,13 151:14 | 32:21 33:6 34:3 |
| **stole** 76:8 | **sue** 93:8 108:24 | 151:18 152:21 | 57:1 60:4 96:3 102:6,7 123:21 |
| **stood** 30:19 | **suggest** 57:24 | | 137:15 |
| **stop** 112:6 | **suggestions** 67:6,7 | **t** | **target** 125:1 |
| **stopped** 122:23 | **suite** 123:7 149:2 | **t** 4:13 79:19,21 | **targets** 124:25 |
| **stopping** 93:21 | **suites** 75:16 | **table** 31:23 | **taught** 89:25 |
| **stored** 40:22,24,25 41:8,12,13 115:20 | **suits** 36:17 | **take** 8:4 10:12 17:21 34:16 37:21 | **teach** 11:10 |
| **story** 75:8 | **sum** 50:10 | 38:9 40:8 47:5,15 | **teaching** 84:13 |
| **strained** 32:9,15 | **summarized** 44:23 44:25 | 49:17 54:17 59:24 | **team** 55:1 78:17 103:17 105:1,8 |
| **strategic** 144:22 144:23 | **suntrust** 10:10 | 60:2,3,18 71:21 73:6 74:5,12 78:2 | 112:3,13 130:14 |
| **strategies** 67:7 | **super** 102:11 | 78:7 80:3 86:11 | 135:21 136:7 141:21 |
| **strategy** 102:19 | **superior** 2:4 149:1 | 86:14 95:17 97:20 | **technical** 84:20 |
| **street** 1:19 2:10 66:13 | **supervisor** 73:10 | 113:22 128:1 131:18,21 132:20 | 125:5 |
| **strike** 64:1 109:1 134:10 136:8 | **support** 28:16 124:17 | 132:24 138:4 141:16 144:9 | **technicians** 66:11 |
| | **supposed** 36:21 75:17 93:2 120:25 | | **technology** 86:2 |
| | **sure** 8:5 15:25 16:3 18:2 28:9 35:3,18 38:3 39:7 | | **ted** 19:4,4,5,5 |

**tell** 8:17 10:24
  12:13 21:12,13
  23:1 42:22 43:10
  48:4 51:18 52:15
  65:4 66:19 67:1
  77:7 94:11,20
  97:8 119:19
  129:12 134:19
  140:24 144:19
  145:7
**telling** 93:7
**tenure** 129:13
**term** 49:23 144:21
**terminate** 92:18
  92:23 95:12
  108:22
**terminated** 29:6,7
  29:10,10,11 30:1
  97:18 98:10 99:1
  99:4,12 108:21
  130:1 142:23
  143:2,3,6,7
**termination** 63:6
  63:12,17 69:23
  92:17,18,19,20
  97:5 99:8 112:12
  141:6 142:20,25
**terms** 10:23 16:4
  44:24,25 100:9
**terribly** 128:8
**territory** 105:15
**test** 69:16
**testified** 6:24 7:3
  29:4 43:20 56:9
  70:12 86:3 94:6
  101:5 114:11
  119:21 134:6
  135:6
**testify** 14:19 47:24
  59:13 61:22 62:2
  65:15 71:13 86:18

114:4 117:3
  119:14 147:11
**testimony** 5:7 7:10
  7:16 11:20 30:5
  30:22 62:5 131:2
  135:20 147:13,16
  150:6,7 151:6,9,12
**texas** 18:16 20:11
  48:9 120:16,17
  126:9 127:8
**text** 31:10 80:19
**textiles** 85:10
**thank** 10:4 13:4
  23:5 73:24 112:10
  128:10 145:18,22
**thanks** 93:21
**thereabout** 37:7
**thing** 11:13 30:12
  52:16 81:5 93:24
  97:7 98:6 100:13
  108:9 115:19
  125:20
**things** 16:12 20:6
  21:18 42:7 81:3
  89:25,25 93:10
  100:12 101:15
  115:4,14 120:12
  126:1 129:5 136:6
**think** 15:11 30:22
  53:9 57:24 62:15
  62:15 75:9 82:15
  82:16 86:3 90:13
  94:13 95:20
  106:11 109:7
  113:15 114:10
  117:21 121:23
  125:18,22 127:5
  128:6,14 132:1
  138:22 144:10,20
**third** 31:4 37:18
  44:22 50:8,8

**thirty** 149:18
**thought** 9:25 22:4
  83:7 88:3 106:23
  108:11
**thoughts** 15:25
**thousand** 50:6
  120:7 133:9,10,10
**threat** 36:14
**threatened** 18:10
  36:10 37:19 45:18
  45:22 46:19
**three** 28:11 34:24
  50:22 52:18 64:14
  64:18,19 66:15
  75:14 110:5 120:5
  120:14 142:15
**thrown** 120:13
  141:2
**ticket** 74:7
**tickets** 74:12
**time** 6:14 7:6 8:8
  10:17,22 21:3,11
  22:18 24:13,17
  28:22 30:3,5 32:4
  46:25 50:18 54:19
  58:25 62:8,10,23
  64:6,10 65:24
  68:4 70:3 73:17
  76:13 83:20 87:2
  87:5,9 89:6 90:7
  90:16 94:15 95:16
  97:16,20 98:22
  99:8,12 100:6,15
  102:13,23 110:3
  112:4 118:20,22
  119:15,19 120:12
  120:22 122:20
  125:14 127:5,14
  130:18 134:4,5
  136:3 143:7 144:1
  145:19 147:19

**timeline** 96:6
**times** 6:18 15:21
  30:14 35:6 48:10
  49:15 51:12 74:11
  89:3,4,22 90:16
  91:2
**title** 12:3 130:3
**titles** 113:5 130:4
**today** 8:14,15
  11:14 14:13,17,23
  15:6 16:25 49:25
  52:1 56:11,12
**told** 30:6 39:3
  76:13,13,15 99:17
  134:17 142:11,13
**tool** 53:14 67:14
  84:14 124:23
  126:5
**top** 26:22 39:17
  41:2 46:12 74:23
  90:14 99:9 104:20
  107:1 115:1
  127:23
**topic** 17:9 23:20
  59:13 61:13 62:3
  63:11 64:25 65:6
  65:15 71:9,13
  82:5 86:18 87:11
  87:15 88:5,6
  91:10 92:16,21
  103:16,20 113:23
  114:3 117:1 128:2
**topics** 14:20 129:5
**total** 13:3 26:5
  27:2,8,8 56:25
  57:1 106:17
  107:20
**touch** 101:11,20
  101:24,24 102:3
**touched** 134:21

**track** 53:18 54:19
92:2 102:2
**tracked** 53:21,22
101:19,20
**trade** 85:9 114:5,7
114:18,20 117:5,6
119:7,16
**training** 66:16
82:5,8,10,15,16,16
82:19 83:9,13,19
83:22 84:5,7
121:1
**transcribed**
147:15 150:7
**transcript** 3:1
146:2,7,10,12,13
146:14,15 149:11
149:12 150:5,12
151:5,11,17
**transcription**
147:16
**transferred** 75:22
**travel** 73:5,23
74:21 120:9
**treated** 30:14
**trial** 127:4
**tried** 136:14
**true** 25:3,9 72:2,5
79:14 147:16
**trust** 21:19 32:16
32:25
**trusting** 75:11
**truth** 21:12,14
147:11,11,12
**try** 11:23 31:4
32:19 33:2 67:12
84:17 130:17
137:14
**trying** 24:8 31:16
31:24 36:23 37:10
91:3 107:24

115:15 125:15
**turn** 17:2 22:24
24:21 25:6,13
36:5 38:12 40:8
43:6 45:10 53:6
72:19 77:4 86:12
87:11 92:16
106:15 109:9
**turned** 49:14 53:9
55:11 74:18 81:5
**turning** 117:1
143:9
**two** 19:2 39:2
44:23 49:17 50:4
50:22 53:2 56:14
56:14,19 62:13
63:20 64:21 75:14
77:1 102:11
114:12 119:20,21
134:17,19 135:1
136:5 138:23
142:13,14,15
**type** 10:14 11:13
48:4 82:10,19
86:25 87:2 100:13
**typical** 76:1
**typically** 45:3
54:10 59:22
122:14 127:9

**u**

**uh** 7:24,25,25
**ultimately** 29:1
33:20 39:24 40:1
112:2
**undercut** 125:16
**understand** 8:6
13:4 22:8 26:10
61:19 84:13 99:22
121:7 129:5
**understandable**
81:1

**understanding**
69:12 106:20
143:7
**understood**
139:22
**unequivocally**
87:19,19
**unethical** 108:12
**unfamiliar** 129:11
**unfortunately**
80:24 136:18
**unhappy** 108:3
**united** 1:1
**university** 8:20,24
**unknown** 126:21
**unpaid** 42:9,12,18
87:13,20,22 88:9
88:18 91:25 92:4
92:7 95:7,10
97:17 102:24
116:1
**untrue** 93:11
94:12,19
**upset** 96:9,14
**upwards** 37:5
**use** 29:11 50:9
52:20 53:16 54:15
55:7 75:4,7,17
76:10 82:16 85:15
87:2 88:21 100:3
105:22,23 117:20
118:25 119:3
126:14
**user** 20:24
**uses** 43:4

**v**

**v** 149:6 150:3
151:3
**va** 1:20 2:11
**vacations** 74:6

**vacuum** 66:14
**validates** 37:2
**valuable** 32:13
**valuation** 12:23
**value** 15:17 18:8
20:1 40:2 48:11
49:17,19,21,23
50:3,6,19 52:18
55:5 123:8,15,16
135:11
**varied** 113:3
**varies** 62:8 64:4
64:13 91:4 136:24
**various** 142:5
**vary** 69:14 113:2
**vendor** 16:6 31:17
**verbal** 81:5
**verbally** 5:6
**veritext** 149:1,7
152:1
**veritext.com.**
149:17
**version** 81:12,24
**versions** 72:8
**versus** 130:4
**vertical** 67:18
84:16,19,21,21,24
85:11 137:4
**verticals** 84:9,18
137:7,9,9
**video** 1:12 6:3,3
7:15 46:1
**videoconference**
2:1
**violation** 36:11
**virginia** 1:2 6:1,11
8:24 93:2 94:7
98:16 137:25,25
**virtue** 76:14
**visit** 137:21

| | | | |
|---|---|---|---|
| **volume** 56:23<br>**voluntarily** 29:8<br>**vs** 1:6 | 132:4 133:21<br>141:3 144:5<br>**we've** 16:11 50:15<br>63:20 83:16 84:9<br>91:10 102:12 | **witness'** 149:14<br>**won** 111:6<br>**woods** 1:18 2:9<br>5:17<br>**word** 9:23 21:19 | **x** |
| **w** | **websites** 126:3<br>**week** 45:8 58:14 | 29:9 41:15,17<br>**words** 31:10 134:9 | **x** 4:15 103:23,25<br>109:21<br>**xiaobing** 12:9,17<br>145:2 |

**volume** 56:23
**voluntarily** 29:8
**vs** 1:6

**w**

**wait** 8:2 25:24
 106:16
**waiting** 25:21
**waive** 5:9
**waived** 149:19
**wake** 96:2
**walk** 42:22 88:23
 109:23
**walked** 57:8,22
**walking** 93:13
**want** 13:24 17:25
 18:5 22:24 24:17
 25:23 28:9 32:10
 36:5 38:12 42:8
 46:8,10 52:22
 57:1,2,2 60:16
 64:25 71:3 72:19
 77:4,18 93:16,17
 94:24 99:22 103:8
 103:22 108:11
 113:23 121:17
 126:17 128:11
 129:4 134:9
 144:10
**wanted** 19:19
 28:22 29:12 58:10
 67:12 75:15 97:25
 97:25 98:1 135:21
 135:25
**wanting** 74:3
**wants** 78:5
**warrant** 88:16
**warranted** 88:19
 88:21
**washington** 6:10
**way** 32:18 43:3
 47:14 71:5 116:8

132:4 133:21
141:3 144:5
**we've** 16:11 50:15
 63:20 83:16 84:9
 91:10 102:12
**websites** 126:3
**week** 45:8 58:14
 77:11,13,16 89:8
 89:10 124:22
**weekly** 20:23 87:1
**weeks** 56:19 89:19
**weight** 10:1
**welcome** 145:20
**went** 8:20,22,23
 19:14 22:10 24:7
 26:10,12 33:4,18
 54:7 55:12 57:13
 75:14,20 91:2
 95:4 113:13,14,15
 139:8
**west** 83:25
**whereof** 148:5
**wife** 33:10 94:22
 94:23
**wiley** 38:5 131:9
**wilson** 63:8 137:5
**wilson's** 103:7
**win** 24:9
**withdraw** 56:1
**witness** 5:6 6:22
 17:22 25:20 46:7
 46:11,14 56:6
 59:12 78:4 80:15
 80:18,21 93:21
 94:20 145:20
 147:10,13,15,17
 148:5 149:8,11
 150:1,4,11 151:1,4
 151:15
**witness's** 146:2

**witness'** 149:14
**won** 111:6
**woods** 1:18 2:9
 5:17
**word** 9:23 21:19
 29:9 41:15,17
**words** 31:10 134:9
**work** 10:23 16:12
 16:22 24:1,2 27:5
 29:1 31:16 32:18
 36:24 45:5 77:5
 84:10 85:14 88:25
 89:1 90:18 95:15
 110:17 126:12
 131:1 134:8
**worked** 24:11 70:4
 84:9 86:22
**workers** 11:11,12
 85:8 115:18,18
**workforce** 10:21
 67:9 85:1,2,7,11
 134:25 137:8
**working** 24:12
 32:10,23 57:19
 77:10,12,15 82:21
 86:24 95:10
**works** 85:19
 132:18
**world** 34:5
**worry** 134:17
**worth** 12:22,24
 49:24
**write** 69:17
**written** 20:24 76:9
 76:12 94:3 140:14
 143:21,25
**wrong** 29:9 117:22
**wrongful** 7:4

**x**

**x** 4:15 103:23,25
 109:21
**xiaobing** 12:9,17
 145:2

**y**

**yeah** 14:18 24:6
 46:9 60:17 79:11
 91:22 135:24
 144:20
**year** 8:20,21 9:20
 18:23 20:1,4
 24:11 31:21 35:8
 49:16,17 50:1,4,5
 50:8,22,22,22 51:1
 51:8,10,11,11
 62:13 64:11,23
 76:7 93:1 120:4
 133:18 134:19
 136:12,23 137:10
 139:6,7,8,18,18
**years** 6:15 9:3,6,7
 20:2 26:2,8,16
 28:12 48:11 50:14
 50:14,15,17 52:18
 60:3,5 62:13,16,19
 64:9,14,18,19,21
 84:10 97:10
 123:16,17,17
 138:23

**z**

**zip** 11:9 115:6

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Deposition of Christine Chmura, Exhibit X

E-mail and Presentation

(Marked Highly Confidential – Attorneys Eyes Only and Filed Under
Seal)