1                        E. Auerbach

2   UNITED STATES DISTRICT COURT

3   FOR THE EASTERN DISTRICT OF VIRGINIA

4   RICHMOND DIVISION

5   ------------------------------x

6   CHMURA ECONOMICS & ANALYTICS,

7   LLC,

8        Plaintiff/Counterclaim,

9        Defendant                      Case No.

10            v.                        3:19-cv-813-REP

11  RICHARD LOMBARDO,

12       Defendant/Counterclaim

13       Plaintiff.

14  ------------------------------x

15

16                    VOLUME II

17

18          VIDEOCONFERENCE DEPOSITION OF

19          ELI AUERBACH (Via videoconference.)

20                Cleveland, Ohio

21              Thursday, May 7, 2020

22

23  Reported by:

24  DEBORAH C. FUREY, RPR, CLR, CRI

25  JOB NO. 179913

1                        E. Auerbach

2

3

4

5                     May 7, 2020

6                     9:58 a.m.

7

8

9          Videoconference deposition of ELI AUERBACH,

10  held via videoconference, before Deborah C. Furey, a

11  Registered Professional Reporter, Certified LiveNote

12  Reporter, and Notary Public of the states of Ohio and

13  Kentucky.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         E. Auerbach

 2   APPEARANCES:

 3   MCGUIREWOODS

 4   Attorneys for Plaintiff/Counterclaim Defendant

 5   Gateway Plaza

 6   800 East Canal Street

 7   Richmond, Virginia 23219

 8   BY:  HEIDI SIEGMUND, ESQUIRE

 9   (Via videoconference.)

10

11   KOEHLER FITZGERALD

12   Attorneys for Defendant/Counterclaim Plaintiff

13   1111 Superior Avenue East

14   Cleveland, Ohio 44114

15   BY:  CHRISTINE COOPER, ESQUIRE

16

17

18   GOTTSCHLICH & PORTUNE

19   Attorneys for the Witness

20   201 East 6th Street

21   Dayton, Ohio 45402

22   BY:  TERRY POSEY, ESQUIRE

23

24

25
```

1                     E. Auerbach

2          MS. SIEGMUND:  This is Heidi Siegmund

3     with McGuire Woods, representing the

4     plaintiff, Chmura.

5          I'm just noting for the record that all

6     counsel have stipulated that it's fine that

7     we're doing this remotely, and that the court

8     reporter and the witness are not in the same

9     room, and that no one objects to that

10    arrangement.

11         MR. POSEY:  This is Terry Posey for

12    Mr. Auerbach, we consent to that arrangement.

13         MS. COOPER:  Counsel for Mr. Lombardo,

14    Christine Cooper, and we consent, as well.

15 E L I   A U E R B A C H,

16         called as a witness, having been first

17    duly sworn by a Notary Public, was

18    examined and testified as follows:

19 EXAMINATION BY

20 BY MS. SIEGMUND:

21    Q.   Mr. Auerbach, I won't go over the rules

22  again, but, of course, this is all the same as

23  what we were going through on Tuesday, as far as

24  you being under oath, and we'll try not to talk

25  over each other and so forth.

```
 1                         E. Auerbach

 2            I just have a very little bit more to go

 3    over with you.

 4            I think when we left off on Tuesday we

 5    were going through your affidavit that you had

 6    executed before leaving Chmura, and making sure

 7    that we got on the record anything that you no

 8    longer think is totally accurate.

 9            So I'm going to submit that same exhibit

10    that we used the other day.

11                    (Exhibit A previously marked for

12                    identification was offered.)

13    Q.    Mr. Auerbach, hopefully these come

14    through a little bit more quickly today.  So just

15    let me know when that affidavit comes up for you.

16            I think we had gone through the first

17    page on the record the other day, so I am going to

18    go ahead and skip to Page 2.

19    A.    The computer is still loading.

20    Q.    Mr. Auerbach, has that affidavit come

21    through?

22    A.    No, it just shows me.  On the right side

23    it says, "Exhibit loading.  Please wait."

24            There's been no change.

25    Q.    Are you able to go to the exhibit files
```

1                         E. Auerbach

2   and see the submitted exhibit?

3       A.    I tried a few times now to do that.  I

4   can see that it's there, but when I go to look at

5   the preview, it says "Error."

6       Q.    Okay.  I did ask the LiveLitigation

7   folks about this, and they said it's just a

8   function of the internet connection.  So sorry for

9   the delay, but just let me know when it comes

10  through.

11              I just submitted it again, and I'll also

12  go ahead and e-mail this to you and Mr. Posey.

13              And I think we all know what we're

14  looking at and maybe that will be faster.

15              This is the only exhibit I'm going to

16  use today, so hopefully we won't take up too much

17  time with this.

18              I'm going to go ahead and send this by

19  e-mail.  This won't be the stamped version that's

20  in LiveLitigation, but just so we can move this

21  along.

22          MR. POSEY:  I'll be happy to review it

23      and stipulate that it's the same, once I see

24      your e-mail.

25          MS. SIEGMUND:  All right.  You should

1                          E. Auerbach

2          all be getting that exhibit by e-mail here in

3          a second.

4      BY MS. SIEGMUND:

5          Q.    Mr. Auerbach, let me know when you get

6      that e-mail, that might be faster.

7          A.    Sorry, I was on mute.  It has arrived.

8          Q.    Excellent.

9                MR. POSEY:  I would stipulate that the

10         document that you e-mailed to enter,

11         Chmura0000184 through 187, which I believe is

12         the same as the submitted Exhibit A.

13               MS. SIEGMUND:  Super.

14         Q.    Mr. Auerbach, do you have that e-mail,

15     Exhibit A in front of you?

16         A.    I do, yes.

17         Q.    Okay.  So let's look at Page 2.  Take a

18     look at Page 2 for me, please, and let me know if

19     you see anything on Page 2 that you now believe is

20     false.

21         A.    It looks correct to me.

22         Q.    Super.

23               Let's go to Page 3, take a look at

24     Page 3 and tell me if there's anything you see on

25     here that is false.

```
 1                        E. Auerbach

 2              And that's Chmura -- the number at the

 3      bottom is Chmura0000186?

 4         A.    This looks correct.

 5         Q.    Super.

 6              Let's go to Page 4, that's the last

 7      page, it has your signature on it.

 8              Let me know if you see anything on

 9      Page 4 that you now believe is false.

10         A.    That is correct.

11              MS. SIEGMUND:  Super.

12              That is all I have for you.  Thank you,

13      Mr. Auerbach.

14              I think Ms. Cooper will have some

15      questions for you.

16              MS. COOPER:  Thank you.

17      EXAMINATION

18      BY MS. COOPER:

19         Q.    Good morning, Mr. Auerbach, how are you?

20         A.    Good morning.  Well, thank you.

21         Q.    Good.  I want to ask you a few

22      background questions before I jump into a couple

23      of specifics and go down that path.

24              You were a sales manager at Chmura,

25      right?
```

1                          E. Auerbach

2        A.    That is correct.

3        Q.    Did you have any prior management

4    experience?

5        A.    I had, yes.

6        Q.    And can you tell me a little about your

7    management experience prior to joining Chmura?

8        A.    It was probably three specific positions

9    I think align closely to what I did at Chmura.

10              Probably mid 20's, about 15 years ago, I

11   was a sales manager for a steel company in

12   Cleveland.  I was there for a few years.

13              And then there was a position I held

14   over at the Council of Small Enterprises.

15              (Discussion held off the record.)

16       A.    The next position I think that most

17   closely aligns was a position with COSE, the

18   Counsel of Small Enterprises.  They were a large

19   regional Chamber of Commerce.  And I was there for

20   three years, and was a manager in their energy

21   program.

22              And then, after leaving there, I worked

23   for a company called Echo.  They were an energy

24   retrofit company, worked with mid- to medium-sized

25   businesses, and I was in management there, as

1                          E. Auerbach

2      well.

3          Q.     And approximately how many years of

4      management experience do you have?

5          A.     I'd say from my first experience until

6      now, about 15 years.

7          Q.     I want to turn your attention to your

8      work at Chmura.

9                 What were your job responsibilities?

10         A.     So primarily I was responsible for

11     working with the sales team to cultivate new sales

12     opportunities, new business; to get a high rate of

13     renewal for our existing client base; and also

14     work with account managers to most efficiently and

15     effectively cultivate these opportunities through

16     e-mail campaigns or calling or developing call

17     lists for them to work from; and then, preparing a

18     number of different reports, sometimes weekly,

19     sometimes monthly, to share with leadership to

20     keep them apprized of our progress.

21         Q.     Were you, during the time of your

22     employment, Mr. Lombardo's direct supervisor?

23         A.     I was, yes.

24         Q.     And do you know what his job title was

25     at the time you were his supervisor?

1                       E. Auerbach

2       A.    Senior account manager.

3       Q.    There's the account manager position and

4    the senior account manager position, correct?

5       A.    That is correct, yes.

6       Q.    What's your understanding of the

7    difference between the two?

8       A.    To be very honest, I don't see there

9    being a difference between the two.

10            My understanding was the increase in

11   that title was developed as a means to appease the

12   older account managers that were there, so that

13   they can be distinguished between newer account

14   managers coming in.

15      Q.    Mr. Lombardo would have been one of

16   those older account managers, right?

17      A.    That is correct, yes.

18      Q.    I want to talk about your observations

19   and your own personal knowledge of the hours

20   Mr. Lombardo worked.

21            First -- and we went through some of

22   this last weak.  I just want to drill down a

23   little bit.

24            Did you spend most workdays in the

25   office?

1                           E. Auerbach

2        A.    I did, yes.

3        Q.    And did you -- you didn't -- I'm sorry.

4    let me rephrase that.

5              You didn't travel as a substantial part

6    of your job responsibilities, did you?

7        A.    No, it wasn't a substantial part.

8        Q.    In your experience, did Mr. Lombardo

9    spend most of his workdays in the office?

10       A.    That is correct, yes.

11       Q.    Was Mr. Lombardo required to travel

12   substantially for work?

13             MS. SIEGMUND:  Object to the form of the

14        question.

15             You can answer.

16             THE WITNESS:  I think it was a regular

17        component, but I would not say substantial.

18       Q.    Can you put a number on that for me?  In

19   any given month, how frequently would Mr. Lombardo

20   travel?

21       A.    I think a fair representation would be

22   one trip a month for about three days each time.

23       Q.    And were those to -- where was he

24   traveling to?

25       A.    The primary reason for traveling would

1                          E. Auerbach

2    be to attend different conferences or trade shows.

3        Q.    Did you ever have to communicate with

4    Mr. Lombardo in the evenings, after leaving the

5    office?

6        A.    Yes, that was a pretty frequent

7    occurrence.

8        Q.    And approximately what time would you

9    communicate with him?

10       A.    If I had to put an average on it, it

11   would usually be somewhere probably between 7 or

12   8:00 at night.

13       Q.    And when you would call him at 7 or 8:00

14   at night, were you able to get ahold of him?

15       A.    Every time, yes.

16       Q.    Do you know how frequently those phone

17   calls would occur?

18       A.    I would say, just based on averages, it

19   was probably weekly.  There might be some weeks,

20   not at all, other weeks we had to talk regularly.

21   But, I would say probably average weekly.

22             I know that, when he would go to

23   conferences, as with all of the account managers,

24   we would touch base pretty often, just to get an

25   understanding of how things were going while they

1                        E. Auerbach

2    were there.

3        Q.    Would you ever have reason to call if

4    Mr. Lombardo wasn't at a conference?

5        A.    Absolutely, yes.

6        Q.    What was your understanding of

7    Mr. Lombardo's employment responsibilities while

8    as a senior account manager?

9        A.    The significant majority of his time

10   went toward pursuing new business opportunities,

11   and working very closely with his existing client

12   base, just to make sure the platform was working

13   for them the way that they wanted.  As well as

14   answering any questions they may have regarding

15   how to maximize the platform and their use of it.

16       Q.    Was Mr. Lombardo ever responsible for

17   supervising other employees?

18       A.    No.

19       Q.    Was he responsible for making decisions

20   about company strategy?

21       A.    No.

22             MS. SIEGMUND:  Object to the form of the

23       question.

24             You can answer.

25             THE WITNESS:  No, he was not.

```
1                        E. Auerbach

2      Q.     Was he responsible for setting spending

3   priorities?

4      A.     No.

5      Q.     Was he responsible for establishing

6   policies or procedures for the company?

7            MS. SIEGMUND:  Object to the form of the

8       question.

9            You may answer.

10            THE WITNESS:  No.

11      Q.     Was he responsible for any form of

12   compliance?

13      A.     Can you define "compliance," please?

14      Q.     Sure.  Was he -- fair question.

15            Was he responsible for any legal

16   compliance activities at Chmura?

17      A.     The one singular thing that I think

18   might qualify is submitting to the client, and

19   then providing to leadership, the contract for the

20   platform itself.  But I think the best way to

21   describe that was an intermediary between the two

22   parties.

23      Q.     Okay.  Did Mr. Lombardo ever decide what

24   conferences or trade shows he would attend?

25      A.     No.
```

1                          E. Auerbach

2        Q.    Was Mr. Lombardo allowed to decide

3    whether he would drive or fly to the conferences?

4        A.    I would say the best way to explain that

5    is he was permitted to give input, and sometimes

6    leadership would agree with it, other times not.

7        Q.    Who decided which conferences and trade

8    shows Mr. Lombardo would attend?

9        A.    I would say leadership was largely

10   responsible.

11       Q.    Who made decisions on -- let me go back

12   for a second.

13             Who made the ultimate decision on how

14   Mr. Lombardo would travel?

15       A.    I would say that was leadership.

16       Q.    Did Mr. Lombardo ever visit clients on

17   site?

18       A.    Not to my knowledge, no.

19       Q.    Can you describe what it was like

20   managing Mr. Lombardo?

21       A.    I would say overall it was a very good

22   experience.  I think we had some growing to do

23   together in the first weeks I was there, but I

24   think afterwards, we had excellent communication

25   with each other.

1          E. Auerbach

2          Mr. Lombardo was always very helpful,

3   not just to me when I was first coming on, but he

4   always took a vested interest in helping to guide

5   and mentor some of the newer account managers that

6   came on.

7          But, he was always someone I could count

8   on to produce at a high level every month.  He did

9   just about everything I would ask him to do.  He

10  took suggestions very well.  He was a very good

11  quality account manager for the organization.

12     Q.    Would you have described him as

13  difficult to manage?

14     A.    No.

15     Q.    I'm going to show you what has been

16  marked previously as -- bear with me while I pull

17  it up here -- as Plaintiff's Exhibit I.  I'll try

18  to submit it through this.  I have not done this

19  before and perhaps I should e-mail it to everybody

20  as well, since we're having some difficulty.  Let

21  me see if I can.

22          That did not work.  Okay.

23          Did I lose -- I think I lost everybody.

24          If you can hear me, you can't see me?

25          MS. COOPER:  If we could go off the

```
 1                        E. Auerbach

 2        record one minute while I hook myself back up.

 3                   (Recess taken from 10:24 a.m. to

 4        10:27 a.m.)

 5                   (Exhibit I Plaintiff's previously

 6                    marked for identification was

 7                    offered.)

 8  BY MS. COOPER:

 9        Q.    Mr. Auerbach, I believe you were shown

10   this document the last -- the other day.  It's

11   marked as Plaintiff's Exhibit I.

12             Can you identify this document?

13        A.    Yes, this was a phone conversation I was

14   asked to document by leadership at Chmura.

15        Q.    And did you prepare this document?

16        A.    I did, yes.

17        Q.    And it pertains to a phone conversation

18   you had with Mr. Lombardo, correct?

19        A.    That is correct.

20        Q.    And when was the phone conversation?

21        A.    I believe it is correctly stated as

22   October 21st.

23        Q.    Do you recall when you prepared the

24   notes?

25        A.    I do not recall the exact date.
```

1                        E. Auerbach

2              If I had to venture a guess, I would

3    probably say within a week of this conversation

4    happening.

5         Q.    Did you prepare these notes in the

6    ordinary course of your responsibilities at

7    Chmura?

8         A.    I certainly interpret it that way.

9         Q.    And did you maintain this document with

10   the other business documents you maintained for

11   Chmura?

12        A.    No, I did not.

13        Q.    How did you keep this document?

14              Let me ask, did you keep this document?

15        A.    I believe I did, and I believe there was

16   a separate folder I created specific to everything

17   related to the separation of Mr. Lombardo from

18   Chmura.

19        Q.    Did you provide this document to others

20   at Chmura?

21        A.    I only gave it to leadership.

22        Q.    To your knowledge, was this document

23   relied upon at Chmura, at least in part, to make

24   business decisions with respect to Mr. Lombardo's

25   employment status?

```
1                         E. Auerbach
2      A.     I do not know.  I'm not sure what
3  leadership -- how they interpreted this
4  conversation.
5      Q.     To your knowledge, when you spoke to
6  Mr. Lombardo on October 21st, 2019, had he already
7  received a cease and desist letter from Chmura's
8  attorneys?
9      A.     Yes, I believe that was what the impetus
10 of the conversation was.
11     Q.     I want to look at the last full
12 paragraph above where it says "That was the end of
13 our call."
14            If you could just take a quick read
15 through that paragraph.
16     A.     Okay.
17     Q.     And it says that -- I'll put the quote
18 in there, "I reminded Rick that we would need to
19 make a handoff to provide him his personal effects
20 from the Cleveland office in exchange for the
21 items that belonged to Chmura, such as the
22 conference materials, laptop, and conference
23 notes."
24            Do you see that?
25     A.     I do, yes.
```

1                          E. Auerbach

2      Q.    Do you recall the specifics of that part

3  of the conversation, exactly what was said?

4      A.    I remember in a very general sense.

5  But, I know that because Rick was asked to leave

6  very abruptly, none of his personal effects at his

7  desk did he take with him.

8            After he was officially fired, I was

9  told to pack up his desk and set it aside.

10           And then, the leadership team said that

11  Rick would be able to get his personal effects

12  when he signed off on their termination agreement

13  and settlement amount, as well as him returning

14  the -- any materials that belonged to Chmura.

15      Q.    To your knowledge did Mr. Lombardo ever

16  receive his personal effects back?

17      A.    No, not that I know of.

18      Q.    And it is stated, the -- the second

19  sentence in that paragraph says, "I reminded him

20  that none of that could be discussed until he had

21  finished reviewing the legal documentation and

22  signed off on the agreement."

23           Do you see that?

24      A.    Yes.

25      Q.    What did you mean by that?

1                      E. Auerbach

2      A.     It was my understanding that the

3  leadership team wasn't going to make the exchange

4  of his personal effects, first and foremost

5  because Rick still had property that they felt

6  belonged to Chmura.

7           But, in addition, leadership concluded

8  that if he were to sign off on the agreement and

9  return the belongings, they would also immediately

10  return his personal effects.

11      Q.     Did you instruct him during that call to

12  return the laptop or the conference notes or the

13  conference material?

14      A.     I did not instruct him to do so.   I

15  simply reiterated for him what leadership was

16  asking about.

17      Q.     Was it your understanding that it would

18  be a mutual exchange, he would get his personal

19  effects back and the laptop would be exchanged at

20  the same time?

21      A.     That would have been my understanding,

22  yes.

23      Q.     Do you recall -- changing topics a

24  little bit here.

25           Do you recall a conversation you had

```
 1                          E. Auerbach

 2   with Mr. Lombardo regarding him notifying you that

 3   he was entitled to any overtime compensation?

 4        A.    Yeah.  This was a question I was asked a

 5   couple days ago, that I did not recall.

 6              But I remember, after thinking it

 7   over -- I don't remember exactly when, I believe

 8   it was definitely before the Indianapolis trip --

 9   well, it had to have been prior to the trip to

10   Indianapolis -- but I remember him saying

11   something in passing about having been owed

12   overtime.

13        Q.    When was the Indianapolis trip?

14        A.    I think roughly it was the second week

15   of October.

16        Q.    Okay.  Do you recall any specifics about

17   the conversation?

18        A.    It was something -- I recall the concept

19   of what he was presenting, but it was something

20   that I didn't clearly understand, it didn't

21   resinate with me, so I really quickly forgot it.

22              The extent of the content of what I

23   remember was just that he felt there was a

24   substantial amount of overtime he had worked, that

25   he was never compensated for.
```

1                        E. Auerbach

2      Q.    Did you tell anybody about that

3   conversation at Chmura?

4      A.    I did not, no.

5      Q.    And why not?

6      A.    It was not at the time something that I

7   thought was a consequential statement that he had

8   made.

9      Q.    Okay.  Did you -- I think you stated

10  this the other day in your testimony -- did you

11  look at the information coming out of Salesforce?

12     A.    While I was at Chmura?

13     Q.    Yes.

14     A.    Yes, on a very regular basis.  It was

15  one of the primary components of my job.

16     Q.    And did it track the account managers'

17  and senior account managers' activities?

18     A.    In detail, yes.

19     Q.    And of the sales -- I'm sorry -- of the

20  account managers and senior account managers who

21  were there at the time of your employment, did

22  Mr. Lombardo have the highest level of activity?

23     A.    Yes, he consistently out performed all

24  other members of the sales team.

25     Q.    Do you know how -- if you could put a

1                         E. Auerbach

2    number on it, say calls, for example, how many

3    more calls was Mr. Lombardo making, on average,

4    than the other account managers or senior account

5    managers?

6         A.    I think if we're talking about the

7    number of phone calls, it would be easy a 2 to 1

8    margin in favor of Mr. Lombardo.

9         Q.    What about any e-mails sent?

10        A.    I would say e-mails, because

11   Mr. Lombardo, the majority of his time were phone

12   calls, I would say he was either even with or

13   maybe slightly behind some of the other account

14   managers.

15        Q.    Okay.  With respect to -- I want to turn

16   to just a few last questions.  I just want to turn

17   back to the laptop for a moment and Mr. Lombardo's

18   departure.

19             Who instructed him to leave the office?

20   I believe it was -- well, let me ask this:  Was

21   Mr. Lombardo's last day present in the office

22   October 17th of 2019?

23        A.    I believe that's correct.

24        Q.    And were you present there that day?

25        A.    I was, yes.

1                          E. Auerbach

2       Q.    Who instructed Mr. Lombardo to leave?

3       A.    I received a phone call from Chris

4  Chmura who instructed me to have Mr. Lombardo

5  leave immediately.

6       Q.    Did Mr. Lombardo take a laptop with him

7  that day?

8       A.    To the best of my recollection, I

9  believe the laptop was in his car, which it might

10  have very well been at home, I don't recall.  But

11  I believe, to my recollection, he left with

12  nothing in his hands.

13       Q.    Did you instruct him to bring the laptop

14  back that day?

15       A.    I did not, no.

16       Q.    Were you at all concerned about the

17  laptop that day?

18       A.    In truth, I do not recall if that was a

19  concern being discussed.

20            I know that at the time I asked him to

21  leave, I wasn't aware that there was a laptop in

22  his possession.

23       Q.    Did leadership, prior to instructing you

24  to have him leave for the day, did they tell you

25  to get back any possessions of Chmura's from

Page 186

```
 1                      E. Auerbach

 2    Mr. Lombardo?

 3        A.    I don't have a recollection of them

 4    asking me to do that.

 5        Q.    Okay.

 6            MS. COOPER:  Those are all of the

 7        questions that I have.  Thank you,

 8        Mr. Auerbach.

 9            MS. SIEGMUND:  Do you mind if we take a

10        quick break?  I don't think I have anything

11        further, but I just want to make sure I have

12        all of my notes in order.

13            MR. POSEY:  Sure thing.

14            MS. SIEGMUND:  Let's take five minutes.

15                (Recess taken from 10:39 a.m. to

16        10:44 a.m.)

17    EXAMINATION

18    BY MS. SIEGMUND:

19        Q.    This is very quick, couple of additional

20    questions, Mr. Auerbach.

21            I know when we spoke on Tuesday you did

22    not recall Mr. Lombardo ever mentioning anything

23    about overtime, but you thought it over since

24    Tuesday and now you do recall him saying something

25    about overtime.
```

1                        E. Auerbach

2            Was there anything in particular that

3    prompted you to remember that conversation?

4        A.    No.  I was just reviewing the questions

5    I had been asked.  And it was, I would say, a

6    fleeting recollection from all of the different

7    conversations I had had over the last five or six

8    weeks that Mr. Lombardo was at Chmura.

9        Q.    Did you review any documents that helped

10   you remember that conversation?

11       A.    I did not.

12       Q.    Did you review the statement that you

13   had provided to Ms. Cooper?

14       A.    I did not.

15       Q.    But, there was nothing in the affidavit

16   that you provided to Chmura about this

17   conversation, correct?

18       A.    That is correct.

19       Q.    And you provided that affidavit to

20   Chmura a few weeks after Mr. Lombardo is

21   terminated, correct?

22       A.    Yes, that is correct.

23       Q.    And you provided the affidavit to

24   Ms. Cooper after you were fired from Chmura,

25   correct?

1                        E. Auerbach

2       A.      That is correct.

3               MS. SIEGMUND:  That's all I have.  Thank

4       you.

5               MR. POSEY:  We will read, just to make

6       sure the exhibits are properly included.

7               COURT REPORTER:  I have McGuire Woods

8       has a standing order.

9               Do you still want your standing order?

10              MS. SIEGMUND:  I don't know about a

11      standing order, but we would like a rough

12      draft.

13              COURT REPORTER:  Yeah, that's in the

14      standing order.

15              MS. SIEGMUND:  That's good then.

16              COURT REPORTER:  Ms. Cooper, do you want

17      a copy of this transcript?

18              MS. COOPER:  Yes, please.

19      (Continued to following page to include jurat.)

20

21

22

23

24

25

1                    E. Auerbach

2        COURT REPORTER:  Do you know what format

3    you want it in?

4        MS. COOPER:  Just the mini-script or the

5    ordinary electronic transcript.

6        COURT REPORTER:  Mr. Posey, do you want

7    a copy this transcript?

8        MR. POSEY:  No, thank you.

9            (Signature not waived.)

10

11

12

13

14

15

16

17

18                 _____

19                 ELI AUERBACH

20   Subscribed and sworn to

21   before me this     day

22   of          , 2020.

23

24   _____

25

```
 1                        E. Auerbach

 2  -------------------I N D E X---------------------

 3  WITNESS                EXAMINATION BY         PAGE

 4  ELI AUERBACH           MS. SIEGMUND        163/186

 5                         MS. COOPER              167

 6  ------------PREVIOUSLY MARKED EXHIBITS------------

 7  EXHIBIT                                    OFFERED

 8  Exhibit A. . . . . . . . . . . . . . . . . 164

 9  Exhibit I. . . . . . . . . . . . . . . . . 177

10                        -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1                         E. Auerbach

 2                 * * *ERRATA SHEET* * *

 3   NAME OF CASE:  Chmura Economics & Analytics, LLC. vs

 4   Richard Lombardo

 5   DATE OF DEPOSITION:  May 7, 2020

 6   NAME OF WITNESS:  ELI AUERBACH, VOLUME II

 7   Reason codes:

 8       1. To clarify the record.
         2. To conform to the facts.
 9       3. To correct transcription errors.

10   Page _____ Line _____ Reason_____

11   From _____ to_____

12   Page _____ Line _____ Reason_____

13   From _____ to_____

14   Page _____ Line _____ Reason_____

15   From _____ to_____

16   Page _____ Line _____ Reason_____

17   From _____ to_____

18   Page _____ Line _____ Reason_____

19   From _____ to_____

20   Page _____ Line _____ Reason_____

21   From _____ to_____

22   Page _____ Line _____ Reason_____

23   From _____ to_____

24                         _____

25                         ELI AUERBACH

1                           E. Auerbach

2    CERTIFICATE

3    STATE OF OHIO      )

4                       )ss:

5    COUNTY OF HAMILTON)

6               I, Deborah C. Furey, Registered

7    Reporter, Certified LiveNote Reporter, and Notary

8    Public within and for the State of Ohio do hereby

9    certify:

10              That ELI AUERBACH, the

11   witness whose deposition is hereinbefore set forth,

12   was duly sworn by me and that such deposition is a

13   true record of the testimony given by such witness.

14              I further certify that I am not related to

15   any of the parties to this action by blood or marriage

16   and that I am in no way interested in the outcome of

17   this matter.

18              In witness whereof, I have hereunto

19   set my hand this 18th day of May, 2020.

20                    *Deborah Furey*

21   _____

22              DEBORAH C. FUREY, RPR, CLR

23              My commission expires 1-11-21

24

25

*Phone conversation with Rick Lombardo on 10/21/19 at 1:45 pm*

Rick called me following receipt of his separation letter and the cease and desist letter from McGuire Woods. Rick expressed a bit of shock over the strong content in letter. Specifically, he struggled to understand how Chmura was able to view the conversation he and I had on Thursday October 17 as extortion.

I asked Rick if he could explain how else it could be perceived. He requested a $100,000 payment in exchange for not attempting to solicit our clients to go to a competitor or calling our clients to badmouth Chmura. Rick was unable to explain another way to frame that.

I followed up by asking Rick what he intended to do now. He responded that he was going to forward everything he has received to his attorney for their review. Rick said he intended to wait until he was given feedback by his attorneys before taking next steps.

Rick expressed being disappointed at the small buyout number he was offered ($10,000). I asked if he understood from Aisha and the separation agreement what he was fully entitled to. He said he did not read the agreement and was unclear from Aisha what he was going to get. I walked him through the logistics and shared that he would receive the commissions that he had earned based on the deals that both close and pay prior to the end of October.

I used this as an opportunity to explain to Rick that the possibly still existed for this to have a positive outcome for all parties involved. Specifically, I reminded him that he still has outstanding opportunities that could conceivably close. If he were willing to work amicable with me and Chmura, we can try to salvage those deals and increase his potential commission payment.

We walked through several potential deals. The first three were opportunities I was already involved with, but the fourth (Wayne County Ohio) was a new one I was not aware of. I told Rick if he thought of any additional accounts worth noting, to email me and let me know.

Lastly, I reminded Rick that we would need to make a handoff to provide him his personal effects from the Cleveland office in exchange for the items that belong to Chmura such as the conference materials, laptop, and conference notes. I reminded him that none of that could be discussed until he has finished reviewing the legal documentation and signed off on the agreement.

That was the end of the call.


Eli Auerbach

Sales Manager

Ex_I_10-21_Call_Notes
Defendant
Eli Auerbach - 179590
05/05/2020(HS)