**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

|  |  |  |
|---|---|---|
| CHMURA ECONOMICS & ANALYTICS, LLC, | ) ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) ) | Case No. 3:19-cv-813-REP |
| v. | ) ) | |
| RICHARD LOMBARDO, | ) ) | |
| Defendant/Counterclaim Plaintiff. | ) ) ) | |

**CHMURA ECONOMICS & ANALYTICS, LLC'S REPLY MEMORANDUM IN
FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Plaintiff and Counterclaim Defendant Chmura Economics & Analytics, LLC, by counsel,

submits this Memorandum in Further Support of its Motion for Summary Judgment (ECF No. 34.)

**INTRODUCTION**

Lombardo's opposition to Chmura's summary judgment motion ("Def. Opp.," ECF No.

51) neither disputes Chmura's key facts nor distinguishes its legal authority.  Instead, Lombardo

attempts to distract from Chmura's dispositive evidence by misstating the law and by copying

irrelevant facts from his own summary judgment brief.  The most telling features of Lombardo's

opposition are its omissions.  For example, nowhere does Lombardo mention that he made over

$150,000 per year at Chmura.  Nor does he mention any of the marketing, customer service, and

other administrative responsibilities that he frequently performed (and even highlighted in his

résumé).  Nor does he mention his own statements about threatening to "ruin" Chmura and accept

1

a job with a competitor.  Such omissions, and others like them, are fatal to Lombardo's efforts to create a genuine dispute for trial.

## ADMISSION OF UNDISPUTED FACTS

Lombardo's opposition brief fails to identify which individual facts in Chmura's brief he disputes, nor does he provide record support for doing so.[1]  Because of this failure, the Court may deem most of Chmura's material facts admitted.  (L.R. 56(B).)  Though Chmura does not repeat every such fact here, the following three categories are of particular importance to this motion.

## I.    Admissions Regarding Exempt Duties

First, Lombardo does not dispute Chmura's evidence in its Statement of Material Facts ("SMF," ECF No. 35 at 1-14) about the job duties that qualify him for the highly compensated employee exemption under the Fair Labor Standards Act ("FLSA").[2]  Specifically, Lombardo admits that he:

- "Provided all Salesforce training and product software training for new hires" (SMF ¶ 22) (quoting Lombardo's own résumé);

- "Developed and instructed Salesforce and selling best practices for [the] company" (*id.*);

- "Developed new marketing and sales processes to improve conference performance (including implementing new giveaways to generate more booth traffic)" (*id.*);

---

[1] Lombardo's opposition therefore fails to comply with Local Rule 56, which requires a party opposing summary judgment to provide "a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." (L.R. 56(B).)

[2] Rather than dispute Chmura's specific facts, Lombardo purports to dispute the "implication" of some of those facts.  (Def. Opp. at 9 n.6.)  Lombardo then provides several examples of tasks that his job did *not* include, without addressing Chmura's proof of the numerous duties that he frequently *did* perform.  (Def. Opp. at 9-12.)  Lombardo's response is insufficient under the Federal and Local Rules to create a genuine dispute for trial because Lombardo neither identifies the specific facts he is disputing nor provides record support for those disputes.

2

- Remained the primary point of contact for his clients long after the initial sale, which included answering client questions, providing guidance to clients on how to use various features of their software, providing troubleshooting advice, addressing quality control issues, and fielding complaints (SMF ¶¶ 23-24) (citing Lombardo's deposition testimony);

- Acted as the "voice of the customer" by providing suggestions and advice about Chmura's software product "roadmap" on a near-weekly basis (SMF ¶¶ 25-29), and "advocated for certain items to be placed on or prioritized within the Roadmap" (Def. Opp. at 11);[3]

- Actively contributed to Chmura's company-wide marketing strategy by (for example) providing feedback on, and content for, Chmura's promotional materials and on proposed benefits to attract certain categories of clients (SMF ¶ 30);

- Developed his own methods for identifying and approaching clients, and decided how to tailor his pitches to those clients' needs (SMF ¶ 32);

- Came up with the idea for Chmura's "sublicense model," which allowed affiliated entities to sublicense JobsEQ from a "parent" licensee for a lower overall price (SMF ¶ 35);

- Had authority to offer discounts off Chmura's products within certain parameters (SMF ¶¶ 33-35);[4]

---

[3] Lombardo's own record evidence contradicts his claim that he was merely a "pass through" for roadmap ideas. (Def. Opp. at 11.) John Chmura, on whose testimony Lombardo relies for this point, said Lombardo was a "strong advocate" for features he thought were important and that his input on how to prioritize roadmap items "was critical." (J. Chmura Dep. 97:2-8, 103:4-10 (ECF No. 35-15).)

[4] It is true that Lombardo did not establish these parameters himself. (Def. Opp. at 11.) As discussed further below, however, authority need not be unfettered to constitute "discretion . . . on matters of significance" under the FLSA. Moreover, Lombardo's allegation that "the Account Managers had no independent discretion" in crafting prices finds no support in the deposition testimony he cites. (*Id.*) To the contrary, that testimony makes clear that Chmura gave Lombardo authority to offer a 30% discount because he "just was very good at getting that discount in a measured way" and "would not go from list to 30 [percent off full price]. He would ratchet it down"—in other words, that he used his discretion when exercising the authority he was given.

- Recommended the pricing he felt was necessary to close a deal when he wanted to provide a discount above his allotted authority, which recommendations Chmura almost always followed (SMF ¶¶ 36-37); and

- Made between $150,000 and $180,000 every year at Chmura since 2016 (SMF ¶ 20).

## II.   Admissions Regarding Termination

Nor does Lombardo genuinely dispute the most important facts surrounding his departure. He concedes that:

- He signed a Confidentiality, Non-Competition & Non-Solicitation Agreement (the "Agreement," ECF No. 35-8) that directed him to keep Chmura's confidential information secret and to return Chmura's property *immediately* upon his termination (SMF ¶¶ 15-17);

- He was almost fired for forging an offer letter from one of Chmura's potential business partners in March 2019, which significantly damaged Chmura's trust (SMF ¶¶ 38-40);

- He threatened to accept a position with a competitor, and discussed potential employment with that competitor (SMF ¶ 45-46);[5]

- In fact, he told his co-workers (albeit untruthfully) that he had already received an offer to

---

(Peterson Dep. 95:2-8 (ECF No. 35-2).).  Further, Lombardo admitted that he was given authority to offer up to a 30% discount.  (Lombardo Dep. 123:2-5 (ECF No. 35-4).)  He cannot create a dispute of fact by contradicting his own testimony.

[5] Lombardo purports to dispute these paragraphs of Chmura's SMF by claiming that Chmura has "misstate[d] Auerbach's understanding" of the conversation between him and Lombardo.  (Def. Opp. at 13 n.9.)  However, Lombardo does not dispute any of the specific factual statements in those paragraphs, as required by the Local Rules, and therefore has not created a genuine dispute. And, in any event, Chmura is not relying on Auerbach's understanding (which appears to have changed significantly between when he originally documented his conversation with Lombardo and his deposition, no doubt due to his intervening termination).  Rather, what matters is *Chmura's* understanding of this conversation, as evidenced by the contemporaneous written record Auerbach conveyed to Chmura's leadership, and as confirmed by Lombardo's own testimony.  These threats were further confirmed by Lombardo's similar statements to co-workers, which his opposition utterly fails to mention, much less refute.  (ECF No. 35-26 at 3, 4.)

work for that competitor (SMF ¶ 45);

- Lombardo threatened to sue Chmura for taking away "his" book of business (*id.*);

- He told his manager that, "either Chmura is going to pay me for those [customer] relationships or someone else will" (SMF ¶ 46);

- He simultaneously told his co-workers that he could "ruin" Chmura whenever he wanted by calling all his customers and telling them to transfer business to the competitor from whom he had allegedly received a job offer (SMF ¶ 43);

- After Lombardo made these threats, Chmura immediately sent him home and placed him on leave (SMF ¶ 48);

- The following week, Chmura sent Lombardo a cease-and-desist letter and a draft separation agreement (SMF ¶¶ 49, 51);

- By that point, Chmura had determined that its relationship with Lombardo was unsalvageable, but hoped that Lombardo would "do the right thing" by leaving voluntarily and signing the separation agreement (SMF ¶ 51);

- Chmura's leadership team (the "SEA Group") made the decision to terminate Lombardo (SMF ¶ 56); and

- Lombardo did not return Chmura's property until December 24, 2019 (SMF ¶¶ 57-58).

## III. Admissions Regarding Lack Of A Contract

Finally, Lombardo has failed to dispute any of the facts that foreclose his breach of contract claims. Specifically, Lombardo does not dispute that:

- The offer letter that forms the basis for Lombardo's contract claim (ECF No. 35-6) expressly states that it "should not be construed as an employment contract" (SMF ¶ 8);

- Within the first few weeks of his employment, Chmura informed Lombardo via e-mail that,

to earn a full 15% commission on an "initial sale" as specified in his offer letter, he had to (1) identify the prospect; (2) perform (or at least organize) one or more JobsEQ demos for that prospect; and (3) obtain a signed license agreement (SMF ¶ 10);

- Chmura also told Lombardo that when other Chmura employees contributed to a JobsEQ sale, commissions would be determined "on a judgment basis" (SMF ¶ 10 & ECF No. 35-7);[6] and

- Lombardo continued working at Chmura after receiving this information, and accepted less than 15% commissions on sales that fell within the categories enumerated in Chmura's e-mail explaining the commissions criteria (SMF ¶¶ 10, 12-14).

As explained below, applying the correct legal standards to these facts demonstrates that the only issue remaining for trial is the extent of Lombardo's monetary liability to Chmura.

## ARGUMENT

### I.    Chmura Is Entitled To Summary Judgment On Lombardo's Liability

#### A.    Lombardo is Liable for Breach Of Contract

Lombardo does not dispute that he breached his Agreement with Chmura.  (Def. Opp. at 17-18.)  Instead, he claims there is a legal dispute about enforceability of the Agreement, and a factual dispute about damages.[7]  (*Id.*)  Both contentions are incorrect.  First, in disputing the Agreement's enforceability, Lombardo merely regurgitates his own mistaken summary judgment arguments, without addressing Chmura's.  As discussed in Chmura's prior pleadings, those

---

[6] The Oklahoma RFP referenced in Lombardo's opposition (Def. Opp. at 7-8) was one such example where multiple members of Chmura's team pitched in.  (*See* Lombardo Dep. 45:15-46:7.)

[7] Several times throughout his opposition, Lombardo identifies disputes that he claims warrant trial, even though his own summary judgment motion claims no such disputes exist.  (*Compare* Lombardo's Memorandum in Support of his Motion for Summary Judgment ("Def. Mem.," ECF No. 41) at 15-16, 18-20, 23 *with* Def. Opp. at 18, 19, 26.)  Lombardo cannot have it both ways.

arguments fail, and the cases on which they depend misstate Virginia law.  (*See* Plaintiff's Memorandum in Support of its Motion for Summary Judgment ("Pl. Mem.," ECF No. 35) at 15-16; *see also* Plaintiff's Memorandum in Opposition to Lombardo's Motion for Partial Summary Judgment ("Pl. Opp.," ECF No. 49) at 7-8.)

Second, to manufacture a factual dispute, Lombardo argues that Chmura did not lose any profits based on the conference summaries he took because no one at Chmura could have capitalized on those leads without him.  (Def. Opp. at 18.)  He does not (and cannot) dispute that the summaries contained valuable information about potential leads (ECF No. 38-1); that it is critical to follow up on such leads within days of returning from a conference (Lombardo Dep. 32:8-15; Auerbach Dep. 48:16-49:4 (ECF No. 35-11)); and that he kept the only copy of the materials (Lombardo Dep. 193:12-25), thus precluding Chmura from using them.  Rather, he says, Chmura's remaining sales representatives were so hopeless that they could not have sold any subscriptions based on his conference leads anyway.  (Def. Opp. at 18.)

This theory is baseless.  As a factual matter, Lombardo offers no evidence that Chmura's sales have dropped to zero since he left.[8]  To the contrary, the record shows that Chmura's historical close rate with prospects who request JobsEQ demos is 24%; that Chmura typically follows up on conference leads promptly; and that Chmura has been unable to sell subscriptions to any of the dozens of prospects identified in the conference materials who requested demos, despite its best efforts.  (SMF ¶ 58.)  Lombardo's unsupported speculation about Chmura's current sales performance is insufficient to avoid summary judgment.  *E.g.*, *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (affirming summary judgment where the

---

[8] Lombardo's claim that Chmura could make no sales without him reveals the hubris that sparked this dispute in the first place.  It also defies common sense—Chmura was successful for over 15 years before Lombardo arrived, and has survived for over seven months since he left.

plaintiff "failed to offer any nonspeculative evidence" to support his damages analysis).

Moreover, the evidence above is sufficient to prove that Lombardo's breach of the Agreement caused damages.[9] *Cf. Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 400 (2012) (noting that "calculation of lost profits based on the track record of profits in established companies has long been an accepted method of estimating damages awards"). Chmura seeks summary judgment only on the fact of damage, not the amount. (ECF No. 34; Pl. Mem. at 17 n.4.) The Court should therefore grant summary judgment in Chmura's favor on liability, and reserve the amount of damage for the jury.

### B.    Lombardo Is Liable For Misappropriation Of Trade Secrets

Lombardo has likewise failed to dispute his liability for misappropriation of trade secrets. His four arguments are uniformly unpersuasive.

First, Lombardo asserts that Chmura's "claim for misappropriation is solely based on the confidentiality provision in the Agreement." (Def. Opp. at 19.) That is incorrect. The Defend Trade Secrets Act ("DTSA") provides an independent statutory remedy for trade secret misappropriation, and supports Chmura's claim here.

Second, Lombardo claims that the conference summaries are not a trade secret because Chmura could have recreated them by individually calling over a thousand attendees at the two conferences in question. (Def. Opp. at 19.) This argument misses the point.[10] Chmura invested time and money to attend those conferences so that its Account Managers could interact with current and prospective clients face-to-face and gather individualized intelligence about market

---

[9] Chmura's claimed damages also include attorneys' fees, which Lombardo does not address.

[10] Lombardo's position also ignores the awkwardness of requiring Chmura to call prospective clients and admit that it did not know what (if anything) they had requested during a conversation that had occurred just days earlier.

demands. Information about those customers' and prospects' preferences, usage patterns, interests, and requests—gathered at considerable expense to Chmura—is just the sort of valuable information that the DTSA protects. *E.g.*, *Uhlig LLC v. Shirley*, 2012 WL 2923242, at *6 (D.S.C. July 17, 2012) (finding that compilations that included customer service information, sales and ordering information, and projection and sales prospect information were trade secrets).

Third, Chmura's efforts to protect its trade secrets are reasonable as a matter of law. (Def. Opp. at 19-20.) Lombardo does not dispute that Chmura protects its trade secrets by requiring employees to sign confidentiality agreements; protecting network information with passwords; limiting office access by requiring employees to swipe in; requiring employees to review and acknowledge its information security policy; and limiting access to customer sales data to those with a business need to know. (SMF ¶ 55.) Instead, he argues (with no legal support) that Chmura cannot obtain summary judgment because it could have done more. (Def. Opp. at 20.)

The question, however, is not whether Chmura could have done more to protect its confidential information, but whether the steps it did take are reasonable. "Reasonable efforts to maintain secrecy need not be overly extravagant, and absolute secrecy is not required." *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 974 (8th Cir. 2011). Here, the measures Chmura implemented are reasonable as a matter of law. *E.g.*, *First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 843 (C.D. Ill. 2014) (granting summary judgment to a plaintiff-employer who protected its trade secrets by "limiting [network] access to those with company-provided access codes," "employing confidentiality agreements," and making sure employees understood their confidentiality obligations); *APC Filtration, Inc. v. Becker*, 2008 WL 3008032, at *10 (N.D. Ill. Aug. 4, 2008), *reconsidered in part on other grounds*, 646 F Supp. 2d 1000 (N.D. Ill. 2009) (finding trade secret protection reasonable as a matter of law where the plaintiff required

employees to sign non-disclosure agreements, enacted a confidentiality policy, restricted network access, and used password protection for electronic information).

Finally, as noted above, Lombardo cannot escape summary judgment by casting uncorroborated aspersions on Chmura's current sales team.  (Def. Opp. at 20.)  Those aspersions are entirely speculative and do not create a genuine dispute.  *Cf. Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (noting that "[c]onclusory or speculative allegations do not suffice [to avoid summary judgment], nor does a mere scintilla of evidence") (internal quotations omitted).  For all of these reasons, and those explained in Chmura's opening Memorandum, Chmura has proven that Lombardo misappropriated its trade secrets as a matter of law.[11]

## II.    Chmura Is Entitled To Summary Judgment On Lombardo's Counterclaims

### A.    Lombardo Is A Highly Compensated Employee Under The FLSA

Lombardo concedes that his compensation far exceeded the threshold for highly compensated employees under the FLSA and Ohio law.  He likewise admits that his primary duty did not involve manual labor.  Thus, the only question remaining on his overtime claims is whether he "customarily and regularly perform[ed] any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee[.]"  29 C.F.R. § 541.601.  Lombardo does not dispute the evidence that proves he had at least one administrative responsibility, which is enough to satisfy the highly compensated exemption.  Instead, he asserts that Chmura must satisfy *every* element of the administrative exemption to prevail on summary judgment.  (Def. Opp. at 22-24.)  He is simply mistaken.  Viewing the evidence through the correct legal lens confirms that summary judgment in Chmura's favor is appropriate.

---

[11] Lombardo offers only token opposition to Chmura's conversion claim, the last claim in the Amended Complaint.  Because his opposition presents no new arguments, Chmura incorporates the discussions in its previous pleadings.  (Pl. Mem. at 19-20; Pl. Opp. at 18-19.)

### 1.      Lombardo Applies The Incorrect Legal Standard

Lombardo's opposition correctly states the governing rules for administrative employees. (Def. Opp. at 22 ("To qualify as an exempt administrative employee . . . .")).  But that exemption is not at issue.  Because he has applied the wrong exemption, Lombardo's opposition ignores two key differences between the administrative exemption and the highly compensated exemption, both of which are fatal to his overtime claims.

First, the highly compensated exemption allows much more flexibility in the employee's "primary duty."  The applicable regulation provides that the highly compensated exemption "applies only to employees whose primary duty includes performing office or non-manual work." 29 C.F.R. § 541.601(d).  Thus, as long as a highly compensated employee is not performing manual labor, the nature of his "primary" duty is irrelevant.  DOL Opinion Letter FLSA 2019-8 (July 1, 2019) (noting that when an employee is highly compensated, "an exempt duty need not be the employee's 'primary duty.'").   The administrative exemption, by contrast, applies only to employees "whose *primary* duty is the performance of office or non-manual work *directly related to the management or general business operations of the employer or the employer's customers*[.]" 29 C.F.R. § 541.200(a)(2) (emphasis added); *see also* Def. Opp. at 22, 24-25.

Second, the highly compensated exemption lowers the threshold with respect to employee duties, and requires only that the employee "regularly" perform "one or more" exempt duties.  29 C.F.R. § 541.601; *see also Coppage v. Bradshaw*, 665 F. Supp. 2d 1361, 1369 (N.D. Ga. 2009) (noting that "29 C.F.R. § 541.601(c) makes clear that a highly compensated employee need not satisfy each requirement stated in" the administrative exemption, but must only satisfy one of those requirements).  By contrast, an exempt administrative employee's duties must include "work directly related to the management or general business operations of the employer or the

employer's customers; *and* . . . the exercise of discretion and independent judgment with respect to matters of significance."  C.F.R. § 541.200 (emphasis added).  Here, contrary to Lombardo's assertion, proof of either one of these elements will satisfy the exemption.  *Compare* Def. Opp. at 22 *with* DOL Opinion Letter 2019-8 (noting that because highly compensated employees performed work related to their employer's "general business operations," the "'discretion and independent judgment' element need not be satisfied").

These differences follow directly from the FLSA's fundamental purpose:  "to secure for the lowest paid segment of the nation's workers a subsistence wage[.]"  *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 116 (1946).  The FLSA was not intended to protect employees like Lombardo, who have white-collar jobs and make six-figure money.  The exemption analysis in this case is far less rigorous than that applicable to purely administrative employees because Lombardo's "high level of compensation is a strong indicator of [his] exempt status[.]"  29 C.F.R. § 541.601(c).

In sum, Lombardo is exempt if he "regularly" performed at least one exempt function, regardless of whether his "primary duty" was sales.  (*Cf.* Def. Opp. at 22.)  Applying this standard to the undisputed facts reveals two independent grounds for summary judgment.

### 2.    Lombardo Regularly Performed Work Directly Related To Chmura's And Its Clients' General Business Operations

First, Lombardo's job "regularly" included post-sale customer service, quality control, input on product development, and marketing.  (*See* SMF ¶¶ 22-31.)  All of these responsibilities are "related to . . . general business operations" under the applicable regulations and interpreting authority.  (*See* Pl. Mem. at 26-27.)  Not only does Lombardo ignore that authority, but he does not dispute *any* of the facts on which Chmura relies to support this aspect of the highly compensated exemption.  More specifically, as noted above, he does not dispute that he regularly:

- "Provided all Salesforce training and product software training for new hires" (SMF ¶ 22);

- "Developed and instructed Salesforce and selling best practices for [the] company" (*id.*);

- "Developed new marketing and sales processes to improve conference performance (including implementing new giveaways to generate more booth traffic)" (*id.*);

- Remained the primary point of contact for clients long after making an initial sale, which included answering client questions, providing guidance to clients on how to use and maximize various features of their software, providing troubleshooting advice, addressing quality control issues, and fielding client complaints (SMF ¶¶ 23-24);

- Acted as the "voice of the customer" by providing suggestions and advice about Chmura's "roadmap" on a near-weekly basis (SMF ¶¶ 25-29); and

- Actively contributed to Chmura's company-wide marketing strategy by (for example) advising on Chmura's advertising materials and client promotions (SMF ¶ 30).

By failing to dispute these facts, Lombardo has conceded the exemption. *E.g.*, *Hines v. State Room, Inc.*, 665 F.3d 235, 243 (1st Cir. 2011) (affirming summary judgment because the plaintiffs "worked to establish long-term relationships, to keep clients happy and to maintain the overall reputation of their employers"); *Verkuilen v. MediaBank, LLC*, 646 F.3d 979, 982 (7th Cir. 2011) (finding that account managers' duties satisfied the "directly related to the general business operations" requirement because of their customer service responsibilities, including answering questions and helping customers implement the employer's software); *Darveau v. Detecon, Inc.*, 515 F.3d 334, 339 (4th Cir. 2008) (holding that a high-level sales employee was exempt in part because he "recommended strategies to develop additional business in the telecommunications market"). For these reasons alone, summary judgment in Chmura's favor is warranted.

### 3.      Lombardo Exercised Discretion On Matters Of Significance

The discretion that Lombardo exercised in performing his job duties provides a second,

independent ground for application of the highly compensated exemption.  Here again, Lombardo concedes the dispositive facts.  Specifically, he does not dispute that he (1) developed his own methods for identifying and approaching clients, and decided how to tailor his pitches to those clients' needs (SMF ¶ 32); (2) served as the primary point of contact for his clients, which included handling client questions on his own and coordinating responses to those questions on clients' behalf when he could not answer them (SMF ¶ 23, ECF No. 35-10); (3) provided advice and feedback to management on conference choices, marketing materials, and product strategy (SMF ¶¶ 25-31); (4) had authority to offer discounts off Chmura's standard pricing without supervisor approval (SMF ¶¶ 33-35); and (5) recommended pricing he felt was necessary to close a deal when he wanted to provide a discount above his allotted authority, and Chmura almost always followed his recommendations (SMF ¶¶ 36-37).  Nor does Lombardo dispute that the development and sale of JobsEQ, and the satisfaction of the customers who use it, are matters of paramount importance to Chmura.  *Cf. Hines*, 665 F.3d at 246 (noting that "the sales and customer service position that each plaintiff occupied is integral to the functioning of the employers' businesses").

Regardless of any other aspects of Lombardo's job, these undisputed facts prove that he exercised discretion on matters of significance.  *E.g.*, *Klein v. Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 429 (S.D.N.Y. 2013) (finding that the plaintiff had significant discretion because he was "responsible for analyzing the particular needs of individual customers, the history of sales to those customers, and the options available . . . to generate an array of possible product solutions," even though his proposals required supervisor approval); *Jackson v. Alpharma, Inc.*, 2010 WL 2869530, at *2, 4 (D.N.J. July 19, 2010) (holding sales representatives exempt as a matter of law, despite their complaints of "micro-managing," where they had discretion to decide how to develop business in their territory and how to tailor their pitches to individual clients).

14

Rather than distinguish this authority or dispute the key facts, Lombardo argues that he did not exercise sufficient discretion because (1) he was bound by Chmura's Employee Handbook, Standard Operating Procedures, and pricing matrixes; and (2) he lacked final decision-making authority over several aspects of Chmura's business.  (Def. Opp. at 24-26.)  Both arguments fail.

First, Chmura's standard operating procedures ("SOPs") and guidelines do not undermine Lombardo's discretion.   The SOPs did not tell Lombardo (for example) which prospective customers to contact, how to contact them, what to say, how to research customers' specific needs and tailor his proposals accordingly, how to teach new Account Managers how to give those demos, or how and when to answer clients' follow-up questions.  Lombardo decided all of these things on his own.  (And, in any event, Lombardo did not always follow the SOPs to the letter.  (Peterson 2d Dep. 251:2-6.))  The SOPs do, however, expressly note that Lombardo was free to offer the discounts available in Chmura's pricing matrixes "independently without further approval."  (ECF No. 58-1 at 16.)  Because Lombardo exercised discretion in performing his job duties both within and beyond the parameters established by the SOPs, he satisfies this component of the highly compensated exemption.  *E.g.*, *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 14 (1st Cir. 1997) (holding that marketing representatives were not "simply applying sales techniques" within "a given set of parameters" because the representatives "d[id] not use prepared scripts or read from a required verbatim statement," but could dictate the content of sales conversations, determine which products would interest which customers, and "fashion[] bid proposals that meet the needs" of those customers); *Schaefer-LaRose v. Eli Lilly & Co.*, 663 F. Supp. 2d 674, 697 (S.D. Ind. 2009) (holding that the plaintiff "exercised discretion when promoting Lilly's pharmaceuticals to physicians, *despite being restricted to using Lilly's pre-approved promotional materials and messages*" because she testified that she "tailored her message to each physician she visited")

15

(emphasis in original).

Second, Lombardo cannot create a triable dispute by cataloguing things that he did not have authority to do. For example, Lombardo makes much of the fact that he could not drink at a bar with a client without permission. (Def. Opp. at 10-12, 25-26.) He also lists a few internal committees of which he was not a member, and policies that he did not write. (*Id.*)

But "limitations upon his authority are not enough to create a genuine factual dispute as to whether [Lombardo's] discretion . . . extended to matters of significance." *Coppage*, 665 F. Supp. 2d at 1368 (rejecting the argument that the plaintiff lacked substantial discretion because he could not enter a contract on the company's behalf, represent the company in major disputes, or make hiring and firing decisions). Any employee—from Lombardo to the Vice President of the United States—can identify others to whom he must answer, and who have authority to make decisions where he does not. Accountability and review do not eliminate discretion. *Cf.* 29 C.F.R. 541.202(c) (providing that discretionary actions need not "have a finality that goes with unlimited authority and a complete absence of review"). In this case, Lombardo's discretion is legally sufficient. *See Darveau*, 515 F.3d at 339 (holding that the plaintiff exercised discretion in identifying target markets and tailoring customer proposals); *see also Cash v. Cycle Craft Co.*, 508 F.3d 680, 686 (1st Cir. 2007) (holding that a customer service representative exercised discretion in communicating with customers concerning their orders and ensuring customer satisfaction); *Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1067 (D. Minn. 2011) (holding that the plaintiffs used "independent judgment in how to train and address the client's needs and problems with the software"). Summary judgment on his overtime claims[12] is therefore appropriate.

---

[12] Lombardo agrees that the outcome of his FLSA claim in Count One of the Counterclaim dictates the outcome of his Ohio wage claims in Counts Four and Five. Because his FLSA overtime claim fails, so too do his derivative Ohio law claims.

### B.      Chmura Did Not Willfully Violate The FLSA

Even imagining that a reasonable jury could find that Lombardo is entitled to overtime, he cannot show that Chmura's choice not to pay him overtime was willful.  To support his willfulness allegations, Lombardo points to an incident in 2017 (which he incorrectly identifies as having occurred in 2015) when SLAIT, a staffing agency, submitted a bill to Chmura that included overtime charges for Jennifer Ludvik, a SLAIT employee.  (Def. Opp. at 26-27.)  This incident is insufficient to carry Lombardo's burden of proof, for several reasons.

First, Ludvik was never a Chmura employee—she was merely a contractor.  (Peterson 2d Dep. 152:22-24 (ECF No. 49-1).)  Second, when Chmura questioned the invoice from SLAIT, the agency admitted it had made a mistake.  (*Id.* 153:5-7.)  There is no evidence in the record that either Ludvik or SLAIT advised Chmura that it was wrongfully depriving its employees of overtime pay—quite the opposite.  (*Id.* 153:12-15.)  In any event, the question is not whether Chmura "knew it should pay overtime to Account Managers" (Def. Opp. at 27), but rather, whether it should pay overtime to Lombardo specifically.  As Lombardo's own account of his accomplishments makes clear, he was not just any Account Manager.  When Ludvik started working for Chmura, Lombardo was already making more than three times the normal Account Manager starting salary.  He was a trusted advisor to his clients and to Chmura's leadership, whereas Ludvik had not even completed basic JobsEQ training.  (SMF ¶¶ 25-31; Peterson 2d Dep. 152:22-153:11.)

Because of these differences, Ludvik's compensation is irrelevant, and Chmura's encounter with her falls far short of the types of evidence that may justify a finding of willfulness. *Cf. Treadway v. Otero*, 2020 WL 806669, at *3 (S.D. Tex. Jan. 29, 2020) (granting summary judgment to the employer on willfulness and noting that employees' "general complaints . . . that

17

they are entitled to more pay" did not present a genuine factual dispute).  Lombardo has therefore

presented no triable issue of fact on his willfulness allegations.

### C.      Lombardo Has No Evidence To Support His Retaliation Claim

Lombardo has similarly admitted away his FLSA retaliation claim.   In particular,

Lombardo concedes that (1) he threatened to accept employment with a competitor and "ruin"

Chmura by taking his clients with him (SMF ¶¶ 43, 45-46); (2) immediately after Lombardo's

manager conveyed these threats to Chmura's leadership team (the "SEA Group"), Chmura sent

Lombardo home, placed him on leave, and cut off his network access (SMF ¶¶ 47-48); (3) when

the SEA Group placed Lombardo on leave on October 17, not one of them knew that he had

allegedly told his manager he was "due overtime" (Pl. Mem. at 34-36); (4) Chmura then sent

Lombardo a draft separation agreement (SMF ¶ 51); and (5) Lombardo's counsel responded by

rejecting the separation agreement and demanding overtime (SMF ¶ 52 & ECF No. 35-33).

Faced with this mounting evidence confirming the legitimate reasons for his termination,

Lombardo changes gears.   Apparently recognizing that his alleged verbal complaints to his

supervisor had no consequences, Lombardo now asserts that Chmura retaliated against him

because of his October 25 demand letter to Chmura's counsel.  (Def. Opp. at 27-28.)

Again, Lombardo misses the point.   By the time his counsel sent that demand letter,

Lombardo's employment with Chmura was effectively over.  He had already threatened to destroy

Chmura's business, and in response, Chmura had already sent him home and decided to sever ties

with him.  (C. Chmura Dep. 95:12-21, 97:16-98:12 (ECF No. 35-29).)  The separation agreement

that Chmura offered Lombardo on October 21 makes this unmistakably clear:  the first page states,

"Lombardo's employment relationship with Chmura will cease on October 28, 2019 or the

Execution Date of this Agreement, whichever is earlier[.]"   (Exhibit A.)   Lombardo's demand

18

letter rejected Chmura's proposal.  (ECF No. 35-33 at 2 (stating that "the severance currently offered is inadequate consideration for a release of Rick's claims").)

Thus, Chmura's October 31 response to Lombardo's letter merely confirmed what the separation agreement had already conveyed:  Lombardo's employment was over.  Under these circumstances, declining to continue futile negotiations with an employee slated for certain termination is not retaliation—it is not even adverse action.  *David v. Winchester Med. Ctr.*, 759 F. App'x 166, 169 (4th Cir. 2019) (holding that where an employer had already "expressed its intent to sever the[] employment relationship[,]" its "decision not to persist in negotiations" following the plaintiff's rejection of its severance offer was not adverse action, and therefore not retaliatory, because the employer was not revoking any otherwise available benefit).

In short, the undisputed facts show that Chmura decided to end Lombardo's employment because he attempted to extort Chmura and destroy its business—and it did so before anyone involved in that decision had any idea Lombardo was asking for overtime.  Those facts warrant summary judgment in Chmura's favor.

### D.    Chmura Is Entitled To Summary Judgment On Lombardo's Breach Of Contract Claim

Finally, Lombardo cannot create a genuine dispute of fact on his contract claim merely by declaring that one exists.  (Def. Opp. at 29-30.)  Again, his opposition ignores all of the material undisputed facts and legal rules.

First, Lombardo does not dispute that the Offer Letter expressly says it is not a contract. Second, he fails to refute the black-letter law confirming that this disclaimer is enforceable.  *E.g.*, *Senter v. Hillside Acres Nursing Ctr. of Willard, Inc.*, 335 F. Supp. 2d 836, 843 (N.D. Ohio 2004) (noting that disclaimers in employment documents demonstrate "a lack of intent on the part of [the employer] to be bound by their terms" and therefore "create no contractual liability").

Third, Lombardo ignores the undisputed evidence that within the first six weeks of his employment, Chmura informed him, in writing, that there were circumstances in which he would not receive a full 15% commission, and clarified the criteria for earning those commissions. (ECF No. 35-7.)  Lombardo does not claim that Chmura failed to abide by these criteria, nor does he offer any legal authority to support his apparent belief that Chmura lacked the right to impose such standards—he does not even mention them.  Fourth, Lombardo overlooks the well-settled rule that "either an employer or an employee in an at-will relationship may propose to change the terms of their employment relationship at any time.  If, for instance, an employer notifies an employee that the employee's compensation will be reduced, the employee's remedy, if dissatisfied, is to quit." *Lake Land Emp. Grp. of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 247 (2004).  Lombardo, of course, did not quit—he undisputedly continued working at Chmura after it clarified the terms of the Offer Letter, and accepted lesser commissions in accordance with the terms of that clarification. (SMF ¶¶ 10, 12-14.)

These facts and legal principles are dispositive.[13]  Therefore, summary judgment in Chmura's favor on Lombardo's breach of contract claim is appropriate.

## CONCLUSION

For the reasons above, and in Chmura's opening Memorandum, Chmura requests that the Court grant Chmura's Motion for Summary Judgment.

---

[13] The amendment to the Offer Letter that Lombardo signed in March 2019 is a red herring.  (Def. Opp. at 29 (citing ECF No. 51-2 at 23).)  Chmura asked Lombardo to sign this amendment because "Mr. Lombardo falsified a letter from GIS Web Tech offering him certain job benefits and, I think, overall, [Chmura was] real tired of hearing about his requests for a merit increase." (Peterson 2d Dep. 162:18-23.)  The Amendment does not purport to rescind or otherwise undermine the disclaimer in the Offer Letter.  Indeed, the Amendment notes that "all other terms" of the Offer Letter, necessarily including the contract disclaimer, remain in effect.

Dated:  June 4, 2020

_____/s/_____

Rodney A. Satterwhite (VA Bar No. 32907)
Christopher M. Michalik (VA Bar No. 47817)
Heidi E. Siegmund (VA Bar No. 89569)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia  23219
(Office) (804) 775-1000
(Fax) (804) 698-2158
rsatterwhite@mcguirewoods.com
cmichalik@mcguirewoods.com
hsiegmund@mcguirewoods.com

*Counsel for Plaintiff/Counterclaim Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of June, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send a notification of such filing (NEF) to all counsel of record.

_____/s/_____
Heidi E. Siegmund (VSB No. 89569)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel:    (804) 775-1000
Fax:    (804) 775-1061
hsiegmund@mcguirewoods.com

*Counsel for Plaintiff/Counterclaim Defendant*