IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

CHMURA ECONOMICS & ANALYTICS, LLC,

     Plaintiff,

v.                               Civil Action No. 3:19-cv-813

RICHARD LOMBARDO,

     Defendant.

**MEMORANDUM OPINION**

This matter is before the Court on cross motions for summary judgment. Plaintiff/Counterclaim Defendant Chmura Economics & Analytics, LLC ("Chmura") filed PLAINTIFF AND COUNTERCLAIM DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ("Chmura Motion for Summary Judgment") (ECF No. 34) which requests that the Court enter an order in Chmura's favor on all four counts of the FIRST AMENDED COMPLAINT ("FAC") (ECF No. 12) and all of the counts (functionally, Counts II, III, and VI)[1] of DEFENDANT RICHARD A. LOMBARDO'S COUNTERCLAIM AGAINST PLAINTIFF CHMURA ECONOMICS & ANALYTICS, LLC

---

[1] The Court transferred Counterclaim Counts I, IV, and V to the Northern District of Ohio where related proceedings (1:20-cv-1971) are underway. The Northern District of Ohio transferred them back on March 9, 2021. The Court has not heard oral argument on those issues and will not rule on them in this Opinion. Therefore, with respect to the counts from the Counterclaim, Chmura's summary judgment motion is functionally only for Counts II, III, and VI of the Counterclaim and Lombardo's summary judgment motion is functionally only for Count VI of the Counterclaim.

("Counterclaim") (ECF No. 19). In response, Defendant/Counterclaim Plaintiff Richard Lombardo filed MOTION OF DEFENDANT RICHARD LOMBARDO FOR SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56 ("Lombardo Motion for Summary Judgment") (ECF No. 40). The Lombardo Motion for Summary Judgment requests that the Court enter an order for Lombardo on all four counts of the FAC and four counts of the Counterclaim (functionally only Count VI of the Counterclaim). For the reasons set forth below, the Court will grant Chmura's Motion for Summary judgment with respect to the confidentiality portions of FAC Count II and the Court will grant Lombardo's Motion for Summary Judgment with respect to the non-competition and non-solicitation portions of Counterclaim Count VI. The Court will further grant Chmura's Motion for Summary Judgment with respect to (1) FAC Count I, (2) FAC Count IV, and (3) the portions of Counterclaim Count II addressing the events of October 17, 2019. The Court reserves judgment on both parties' motions with respect to FAC Count III pending additional briefing. All other portions of the two motions will be denied.

## I. BACKGROUND

### A. INTRODUCTION

This case is, at its core, an employment dispute that arose after Richard A. Lombardo ("Lombardo") was terminated from his employment with Chmura Economics & Analytics, LLC ("Chmura") in the fall of 2019. It is beyond dispute that, after the termination

2

of his employment, Lombardo retained control over a work laptop which contained Lombardo's notes of meetings and interactions he had with potential customers at two trade conferences that he attended as an employee of Chmura. The parties dispute the true reason for Lombardo's termination and the legal effect of Lombardo's retention of the laptop and the conference notes.

## B. PARTIES' CLAIMS

Chmura is pursuing four claims against Lombardo:

- Count I is a breach of contract claim alleging that Lombardo violated his employment contract by failing to return his work laptop within the time limits set by his employment contract. FAC at 43-48, ECF No. 12.

- Count II seeks a declaration that the non-competition and non-solicitation provisions of Lombardo's employment contract are valid and enforceable and an injunction requiring that Lombardo comply with the non-solicitation and non-competition obligations. FAC ¶¶ 49-64, ECF No. 12.

- Count III is a claim under the Defend Trade Secrets Act (DTSA) alleging that Lombardo misappropriated Chmura's trade secrets by improperly retaining his work laptop. FAC ¶¶ 65-74, ECF No. 12.

- Count IV alleges that Lombardo converted his work laptop by improperly retaining it after his termination. FAC ¶¶ 75-81, ECF No. 12.

Lombardo, in turn, is pursuing six counterclaims against Chmura; however, only three remain within the jurisdiction of this Court:[2]

---

[2] See supra n.1.

3

- Count II alleges that Chmura violated the Fair Labor Standards Act (29 U.S.C. § 215(a)(3)) by terminating Lombardo after Lombardo notified Chmura that it had violated the FLSA by failing to pay him overtime. Countercl. ¶¶ 54-65, ECF No. 19.

- Count III alleges that Chmura violated Lombardo's employment contract (including an Offer Letter which contained a commissions schedule) by failing to pay him all of the commissions he is owed. Countercl. ¶¶ 66-72, ECF No. 19.

- Count VI seeks a declaration that the non-competition and non-solicitation provisions of Lombardo's employment contract are void and unenforceable. Countercl. ¶¶ 84-87, ECF No. 19.

## C.   STANDARD OF REVIEW

A district court should grant a party's motion for summary judgment where the moving party demonstrates that there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict for the non-moving party. Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015). A fact is "material" if, based on the governing law, it could affect the outcome of the suit. Id. "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotation marks omitted).

To successfully oppose a motion for summary judgment, the nonmoving party must show that there are specific facts that create

4

a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  "Conclusory or speculative allegations do not suffice to oppose a properly supported motion for summary judgment, nor does a mere scintilla of evidence."  Matherly v. Andrews, 859 F.3d 264, 280 (4th Cir. 2017) (quoting Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002)) (internal quotation marks omitted).  Consequently, summary judgment is appropriate where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . ."  United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

When evaluating a motion for summary judgment, the district court must view the evidence in the light most favorable to the non-moving party.  Jacobs, 780 F.3d at 568.  That includes drawing all reasonable inferences in favor of the non-moving party.  Ballinger v. North Carolina Agricultural Extension Service, 815 F.2d 1001, 1004 (4th Cir. 1987).  The court must also refrain from weighing the evidence or making credibility determinations.  Jacobs, 780 F.3d at 569.  "'Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits.'"  Jacobs, 780 F.3d at 568 (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedures § 2728 (3d ed. 1998)).

Of note for this case, when deciding cross-motions for summary judgment, the court must assess "each motion separately on its own merits." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003). Thus, for each individual motion, the facts must be viewed in the light most favorable to the party opposing the motion. Rossignol, 316 F.3d at 523. Moreover, "the admission of each party is limited to the purposes of his or her own motion; it may not be applied in connection with the adversary's similar motion." 73 Am. Jur. 2d Summary Judgment § 45.

Guided by these principles, the Court will assess each summary judgment motion in turn - except, as discussed in the next section, the parties' arguments on FAC Count II and Counterclaim Count VI, which are opposite sides of the same coin.

## I. Validity of the Confidentiality, Non-Competition & Non-Solicitation Agreement

In Count II of the FAC and Count VI of the Counterclaim, the parties essentially ask the Court to rule on the validity of the non-competition, non-solicitation, and confidentiality portions of Lombardo's employment contract ("the Agreement").[3] In Count II of the FAC, Chmura seeks to have the Court declare that the non-

---

[3] The Agreement contains a choice-of-law provision which says that any contract disputes arising under the agreement will be "construed and enforced in accordance with the laws of the Commonwealth of Virginia, without regard to the conflict of laws rules contained therein." Agreement at 6, ECF No. 12-1.

6

competition, non-solicitation, and confidentiality provisions of the Agreement are valid and enforceable and to issue an injunction requiring Lombardo to comply with the non-solicitation and non-competition obligations.   FAC ¶¶ 49-64, ECF No. 12.   In Count VI of the Counterclaim, Lombardo seeks to have the Court declare that all of the restrictive covenants in the Agreement are void and unenforceable.   Countercl. ¶¶ 84-87, ECF No. 19.   Thus, Count II of the FAC is essentially the mirror image of Count VI of the Counterclaim.

As noted above, strictly speaking, where parties file cross-motions for summary judgment, the district court should examine "each motion separately employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure."   Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011). But here, the parties have — quite literally — copy and pasted large swaths of their arguments about the validity of the Agreement in response to each other's arguments.[4]   Because there do not appear to be any material differences between the parties' arguments in both sets of motions nor any material facts in dispute, in the interest of efficiency, for the parties' motions

---

[4] Compare Chmura Summ. J. Resp. Mem. at 6-12, ECF No. 49 and Chmura Summ. J. Reply Mem. at 6-12, ECF No. 82 with Lombardo Summ. J. Mem. at 9-15, ECF No. 42 and Lombardo Summ. J. Resp. Mem. at 13-18, ECF No. 74.

for summary judgment on FAC Count II and Counterclaim Count VI, the Court will address the parties' arguments all at once.

For the following reasons, the Court will grant summary judgment in favor of Chmura with respect to the Confidentiality portion of the agreement and in favor of Lombardo with respect to the Non-Competition and Non-Solicitation portion of the Agreement.

## A. VALIDITY OF THE NON-COMPETITION AND NON-SOLICITATION PROVISIONS

### 1. Validity of Restrictive Covenants Generally

The validity (and thus, enforceability) of a restrictive covenant is a question of law. Simmons v. Miller, 544 S.E.2d 666, 678 (Va. 2001). A restrictive covenant "between an employer and an employee will be enforced if the contract [1] is narrowly drawn to protect the employer's legitimate business interest, [2] is not unduly burdensome on the employee's ability to earn a living, and [3] is not against public policy." Omniplex World Servs. Corp. v. US Investigations Servs., 618 S.E.2d 340, 342 (Va. 2005). In analyzing these three factors, a court should consider the function, geographic scope, and duration of the restrictive covenant. Simmons, 544 S.E.2d at 678.

## **2. Validity of the Provisions**

Neither party appears to dispute that Chmura would have been entitled to a non-competition agreement.[5]  And, indeed, Chmura almost certainly was entitled to some sort of restriction on Lombardo's future employment if for no other reason than that he repeatedly came into contact with Chmura's customers.  See Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick, 389 S.E.2d 467, 469 (Va. 1990).  However, the parties vehemently disagree about whether the terms of the agreement are "overbroad" and thus, unduly harsh and oppressive in curtailing Lombardo's legitimate efforts to earn a living.[6]

"Because such restrictive covenants are disfavored restraints on trade, the employer bears the burden of proof and any

---

[5] But see DEFENDANT RICHARD A. LOMBARDO'S COUNTERCLAIM AGAINST PLAINTIFF CHMURA ECONOMIC & ANALYTICS LLC ("Lombardo Counterclaim") ¶ 85, ECF No. 19 (appearing to argue that the Agreement is "not reasonably related to any legitimate protectable interest of the employer").   Nevertheless, Lombardo's summary judgment memoranda challenge the breadth of the Agreement, not whether an agreement was warranted in the first place. See Lombardo Summ. J. Mem. at 1-2, ECF No. 41; Lombardo Summ. J. Resp. Mem. at 13-15, ECF No. 74.

[6] Neither party delves into the "public policy" prong in any particularity.   See Omniplex World Servs. Corp. v. US Investigations Servs., 618 S.E.2d 340, 342 (Va. 2005) ("A restrictive covenant "between an employer and an employee will be enforced if the contract [1] is narrowly drawn to protect the employer's legitimate business interest, [2] is not unduly burdensome on the employee's ability to earn a living, and [3] is not against public policy.").

ambiguities in the contract will be construed in favor of the employee." Omniplex, 618 S.E.2d at 342. Importantly, all restrictive covenants must be evaluated on a case-by-case basis, "balancing the provisions of the contract with the circumstances of the businesses and employees involved." Omniplex, 618 S.E.2d at 342. In general, "covenants not to compete have been upheld only when employees are prohibited from competing directly with the former employer or through employment with a direct competitor." Omniplex, 618 S.E.2d at 342 (emphasis added).

Here, the non-competition and non-solicitation provisions at issue state that, for two years after his employment ends, Lombardo shall not:

> (b) directly or indirectly, perform, whether as an employee, independent contractor, consultant, agent, or owner, the same, similar, or substantially similar job duties or services as s/he performed for the Company on the date of his/her termination or within the one(1) year period preceding the date of his/her termination for or on behalf of any person or entity that **engages in the Company's Business** in **any** geographic areas serviced by Employee or in which Employee provided goods or services on behalf of the Company during his/her employment with the Company;

> (c) directly or indirectly, on behalf of himself or any other person, partnership, company, corporation or other entity, solicit or attempt to solicit for purposes of providing products or services that are the same or substantially similar to the **Company's Business any** individual or entity to whom Employee provided products or services at any time during the period of his/her employment with the Company, to whom Employee pursued on behalf of the Company, or of whom Employee had knowledge based on his/her employment with the Company because the Company provided products

10

> or services to or actively pursed [sic] the individual
> or entity during Employee's employment.

Agreement at 4, ECF No. 12-1 (emphasis added).  Notably, in the
FAC, Chmura explains that:

> Chmura is a leading software and consulting firm in
> the field of data analytics.  Chmura's proprietary
> software provides demographics and labor data, such as
> highly granular occupation forecasts and real-time
> data about job postings.  Chmura's teams of
> economists, data scientists, and statisticians also
> provide consulting services to help clients interpret
> and use the data available through its software
> products.

FAC ¶ 9, ECF No. 12.  However, the "Company's Business" is defined
in the Agreement as "the business of providing services in the
field(s) of economics, workforce development, economic
development, strategic planning, and software design and
licensing."  Agreement at 3, ECF No. 12-1 (emphasis added).
Moreover, the FAC notes that, "[a]lthough many of Lombardo's
customers were located in the Midwest, he sold to customers
nationwide" and "was responsible for creating interest, developing
opportunities, negotiating deals, managing client relationships,
and driving revenue by selling Chmura's software products and
consulting services."  FAC ¶ 11, ECF No. 12.  "Lombardo's
responsibilities also extended beyond merely making sales.  For
example, he regularly offered input and assistance on marketing
strategy, resolved client questions and complaints, administered
invoices and customer payments, and provided feedback on prospective
and existing product features."  FAC ¶ 12, ECF No. 12.

11

On these facts, the current draft of the Agreement is extremely broad. If we combine the definition of Company Business and the facts from the rest of the case into the Agreement provisions at issue, we get much fuller picture of the web of restrictions on Lombardo. For example, under the current draft of 3(b), Lombardo is prohibited, for two years, from:

> (b) directly or indirectly, perform[ing], whether as an employee, independent contractor, consultant, agent, or owner, the same, similar, or substantially similar job duties or services as s/he performed for the Company on the date of his/her termination or within the one(1) year period preceding the date of his/her termination [i.e., "creating interest, developing opportunities, negotiating deals, managing client relationships, and driving revenue by selling Chmura's software products and consulting services" but also "offer[ing] input and assistance on marketing strategy, resolv[ing] client questions and complaints, administer[ing] invoices and customer payments, and provid[ing] feedback on prospective and existing product features"] for or on behalf of any person or entity that engages in the Company's Business [i.e., the business of providing services in the field(s) of economics, workforce development, economic development, strategic planning, and software design and licensing"] in any geographic areas serviced by Employee or in which Employee provided goods or services on behalf of the Company during his/her employment with the Company [i.e., primarily "the Midwest" but also "nationwide"];

And under the current draft of 3(c), Lombardo is prohibited, for two years, from:

> (c) directly or indirectly, on behalf of himself or any other person, partnership, company, corporation or other entity, solicit[ing] or attempt[ing] to solicit for purposes of providing products or services that are the same or substantially similar to the Company's Business [i.e., the business of providing services in the field(s) of economics, workforce development, economic development, strategic

12

> planning, and software design and licensing"] any
> individual or entity to whom Employee provided
> products or services at any time during the period of
> his/her employment with the Company, to whom Employee
> pursued on behalf of the Company, or of whom Employee
> had knowledge based on his/her employment with the
> Company because the Company provided products or
> services to or actively pursed [sic] the individual or
> entity during Employee's employment.

Thus, contrary to Chmura's assertions, provisions 3(b) and 3(c), when properly contextualized, are extremely broad.

First, as to 3(c), Lombardo is not merely prevented from "pursuing customers that he served or solicited at Chmura." See Chmura Summ. J. Mem at 18, ECF No. 35 (emphasis added). Lombardo is actually prevented from soliciting any persons or entities that he knew about by virtue of his employment – whether customers he worked with directly, customers who worked with another Chmura salesperson, or simply persons or entities that Chmura actively pursued as customers. See Agreement at 4, ECF No. 12-1.

Further, Lombardo is restricted from more than just "selling products or services similar to JobsEQ." Chmura Summ. J. Mem at 18, ECF No. 35. He actually is restricted from selling "products or services that are the same or substantially similar to the Company's Business," see Agreement at 4, ECF No 12-1, which includes "the business of providing services in the field(s) of economics, workforce development, economic development, strategic planning, and software design and licensing," Agreement at 2, ECF No 12-1. And, in the FAC, Chmura notes that its "teams of economists, data scientists, and statisticians also provide consulting services to help clients interpret and use the data

13

available through its software products." FAC ¶ 9, ECF No. 12. If Chmura's goal was to simply limit Lombardo from "selling products or services similar to JobsEQ" "to competitor companies," it overshot that objective by quite a bit and restricted Lombardo from employment at a whole host of, if not all, data analytics firms.

Second, as to 3(b), the sheer scope of activities that Lombardo is prohibited from participating is overly broad. By Chmura's telling, Lombardo was a wonderkid who did not only all things sales related (including "creating interest, developing opportunities, negotiating deals, managing client relationships, and driving revenue by selling Chmura's software products and consulting services"), he also "regularly offered input and assistance on marketing strategy, resolved client questions and complaints, administered invoices and customer payments, and provided feedback on prospective and existing product features." FAC ¶¶ 11-12. Between the companies Lombardo is restricted from working for and the roles he is prohibited from taking at those companies, Lombardo would seem to be forced to switch fields entirely. Chmura has not dispelled that conclusion.

Moreover, there is no meaningful geographic limitation on 3(b). By Chmura's telling, Lombardo primarily served customers in the Midwest, but he also had customers nationwide. FAC ¶ 11, ECF No. 12. If he is prohibited from working "in any geographic areas

14

serviced by Employee or in which Employee provided goods or services on behalf of the Company," the prohibition operates nationwide. That is not to say that a nationwide restriction is never appropriate, only that it in this case, it compounds, rather than mitigates, the overbreadth issues already present in the language of the Agreement.

Thus, as Lombardo argues, the non-competition provision is not limited to employment that would actually be in direct competition with Chmura nor is it clearly geographically limited. Lombardo Summ. J. Resp. at 13, ECF No. 74. Chmura has not carried its burden to show that sections 3(b) and 3(c) of the "Covenants Not to Compete or Interfere" are narrowly drawn to protect its legitimate business interest and not unduly burdensome on the employee's ability to earn a living. Accordingly, the Court finds that sections 3(b) and 3(a), see Agreement at 4, ECF No. 12-1, are invalid as written.

### 3. Severability/Limiting Clause

The obvious next question is whether the invalidity of Sections 3(a) and 3(b) renders the entire Agreement invalid. But two provisions of the Agreement counsel against such a finding. First, the Agreement contains a severability clause: "If any provision of this Agreement is deemed void or unenforceable, such provision shall not be deemed part of this Agreement, which shall otherwise remain in full force and effect." Agreement at 6, ECF

No. 12-1. Second, the Agreement has a clause limiting its scope to the maximum extent according to law: "if any one or more of the provisions contained in this Agreement is held to be excessively broad as to duration, activity, or subject, such provision will be construed by limiting or reducing it so as to be enforceable to the maximum extent compatible with applicable law." Agreement at 6, ECF No. 12-1.

However, the Court need not pull out a blue pencil to limit the scope of Sections 3(a) and 3(b) in this case; finding that the overbroad provisions are severable will be sufficient to settle the parties' motions. Where the offending and non-offending provisions of a restrictive covenant address different concerns, a district court may sever the offending portions. See Roto-Die Co. v. Lesser, 899 F. Supp. 1515, 1522-23 (W.D. Va. 1995) (enforcing confidentiality and non-solicitation provisions of agreement while severing overly broad non-competition provision, despite no severability provision, because the provisions "clearly address" different concerns). Here, the case for severance is even stronger because, by the plain text of the document, the contracting parties (i.e., Chmura and Lombardo) agreed that severance would be appropriate if any provision was later deemed invalid.

## B. VALIDITY OF THE CONFIDENTIALITY PROVISIONS

Unlike the other restrictive covenants, the Confidentiality portion of the Agreement is not overbroad.  The Confidentiality Agreement states, in relevant part:

> Employee shall not, during the term of his/her employment and thereafter regardless of the reason for his/her termination, reveal or disclose to any person outside of the Company, or use for his/her own benefit or the benefit of any other person or entity, any confidential or proprietary information concerning the business or affairs of the Company, or concerning the Company's customers, clients or employees ("Confidential and Proprietary Information"). For purposes of this Agreement, Confidential and Proprietary Information includes, but is not limited to the Company's financial information or plans; sales and marketing information or plans; business or strategic plans; salary, bonus or other personnel information of any type; information concerning methods of operation; proprietary systems or software; legal or regulatory information; cost and pricing information or policies; information concerning new or potential products or markets; models, practices, procedures, strategies or related information; research and/or analysis; and information concerning new or potential investors, customers, or clients. Confidential and Proprietary Information does not include information already available to the public through no act of Employee, nor does it include salary, bonus or other personnel information specific to Employee.
>
> * * *
>
> Employee further understands and agrees that all Confidential and Proprietary Information, however or whenever produced, will be the Company's sole property. Upon the termination of Employee's employment, for whatever reason, Employee will promptly deliver to the Company all documents, equipment, property or materials of any type, including any copies thereof, in Employee's possession, custody or control that belong to the

17

Company, and/or that contain, in whole or in part, any
Confidential or Proprietary Information in accordance
with Section 3 of this Agreement.

Agreement at 3, ECF No. 12-1.

The test for whether a confidentiality provision is valid
(and therefore enforceable) is the same as for other restrictive
covenants.[7] GMS Indus. Supply, Inc. v. G & S Supply, LLC, 441 F.
Supp. 3d 221, 234 (E.D. Va. 2020). Therefore, a confidentiality
provision is valid if (1) it "is narrowly drawn to protect the
employer's legitimate business interest"; (2) it "is not unduly
harsh and oppressive in curtailing the employee's ability to earn

---

[7] At oral argument, Chmura disputed that this was the case on the
grounds that it derived from a "misapprehension" in the case of
Lasership, Inc. v. Watson, 79 Va. Cir. 205 (2009). Specially,
Chmura argued that confidentiality agreements should not be
construed as narrowly as non-competition and non-solicitation
agreements because confidentiality agreements are not as
burdensome on an employee's future employment options. Chmura's
point is well-taken, but even before Lasership, Virginia courts
used the same three-prong non-solicitation test for
confidentiality provisions. See Devnew v. Flagship Group, Ltd.,
75 Va. Cir. 436, 450 (2006) ("The court evaluates the validity of
confidentiality provisions of an employment agreement using the
same standards as for a non-solicitation provision."). And,
although the Court has not found an opinion of the Supreme Court
of Virginia addressing this issue, several Virginia Circuit Courts
have agreed with the Lasership court on this point. See, e.g.,
BB&T Ins. Servs. v. Thomas Rutherfoord, Inc., 80 Va. Cir. 174, 180
(2010); Shenandoah Women's Healthcare, P.C. v. Scheidt, 2017 Va.
Cir. LEXIS 631, *18 (Mar. 13, 2017). At this time, the Court will
apply the same test for all of the restrictive covenants in this
case.

a living;" and (3) it "is not against sound public policy." GMS,
441 F. Supp. 3d at 234.

In general, Virginia recognizes that an employer has an
interest in keeping its former employees from revealing the
employer's secrets to third parties. GMS, 441 F. Supp. 3d at 234.
And, the better reasoned view is that confidentiality agreements
can be valid even if they last in perpetuity.[8] GMS, 441 F. Supp.

---

[8] There has been some question of whether, under Virginia law, a
confidentiality agreement that purports to last in perpetuity can
be valid. The Supreme Court of Virginia does not appear to have
spoken on this issue. The parties have cited seemingly
contradictory Virginia case law in their memoranda, but the better
reasoned view seems to be that perpetual confidentiality
agreements can be valid under Virginia law as long as the rest of
the confidentiality agreement is sufficiently limited. In 2009,
the Circuit Court of Virginia in Fairfax explicitly challenged the
idea that a confidentiality provision could be valid in perpetuity,
but critically, the confidentiality agreement in that case
prohibited a former employee from disclosing to "**any** person, firm,
corporation or other entity in **any** manner whatsoever **any**
information concerning **any** matters affecting or relating to the
business of Company." Lasership, Inc. v. Watson, 79 Va. Cir. 205,
207 (2009) (emphasis added). Nevertheless, some courts took the
Lasership court to be saying that any confidentiality agreements
in perpetuity were invalid. See BB&T Ins. Servs., Inc. v. Thomas
Rutherford, Inc., 80 Va. Cir. 174 (2010). And several other
courts, citing to Lasership, found that a contract in perpetuity,
in conjunction with other factors, could be overbroad. See
Shenandoah Women's Healthcare, P.C. v. Scheidt, 2017 Va. Cir. LEXIS
631, *17 (Mar. 13, 2017) (finding confidentiality agreement
overbroad because it lasts in perpetuity and applies to all
information without limitation); Integrated Direct Marketing, LLC
v. May, 129 F. Supp. 3d 336, 341 (E.D. Va. 2015) (finding
confidentiality agreement overbroad because "it would prevent
[defendant] from ever disclosing information" and applied to "'any
and all information furnished by' [plaintiff] that is not publicly
known"). In 2019, the Circuit Court of Virginia in Fairfax - the
same court as in Lasership - held that a contract in perpetuity

3d at 234.  Where confidentiality agreements are limited to actual confidential/proprietary information, as opposed to "any information" related to the employer, the confidentiality agreement is enforceable.  See GMS, 441 F. Supp. 3d at 234.

Moreover, even in the absence of a formal agreement, "a former employee, after termination of his employment, may compete with his former employer, the only restraint being that he may not use confidential information or trade secrets obtained from the former employer, appropriating, in effect, to his competitive advantage what rightfully belongs to the employer."  12B Michie's Jurisprudence § 6 (Master and Servant) (2014).  Thus, even without a formal confidentiality agreement, an employee is inherently less free to disclose an employer's confidential information than to take a job with a competitor; a confidentiality agreement is, then, less burdensome on an employee's rights than a non-competition agreement.

Here, the Confidentiality portion of the Agreement is perpetual, but it is limited to confidential, non-public

---

could be valid.  Omnisec Int'l Investigations, Inc. v. Stone, 101 Va. Cir. 376, 384-85 (2019) (distinguishing Lasership on the grounds that the confidentiality agreement in Lasership was much broader).  And now, there is a case from the Eastern District of Virginia finding that a contract in perpetuity can be valid under Virginia law.  See GMS Indus. Supply, Inc. v. G & S Supply, LLC, 441 F. Supp. 3d 221, 234 (E.D. Va. 2020).

information that is related to Chmura's business.  See GMS, 441 F.
Supp. 3d at 234-35.   Notably, the Agreement has a specific
definition of "confidential information"[9] that is not simply "'any
and all information furnished by' [the employer]."  Cf. Integrated
Direct Marketing, LLC v. May, 129 F. Supp. 3d 336, 341 (E.D. Va.
2015).   For the foregoing reasons, the Court finds that the
Confidentiality provision is valid and enforceable.

## II. Chmura's Motion for Summary Judgment (ECF No. 34)

### A. STATEMENT OF FACTS[10]

Chmura is a data analytics company that specializes in labor
market data.  See Chmura Summ. J. Mem. ¶ 1, ECF No. 35.  "To help

---

[9] "For purposes of this Agreement, Confidential and Proprietary
Information includes, but is not limited to the Company's financial
information or plans; sales and marketing information or plans;
business or strategic plans; salary, bonus or other personnel
information of any type; information concerning methods of
operation; proprietary systems or software; legal or regulatory
information; cost and pricing information or policies; information
concerning new or potential products or markets; models,
practices, procedures, strategies or related information; research
and/or analysis; and information concerning new or potential
investors, customers, or clients. Confidential and Proprietary
Information does not include information already available to the
public through no act of Employee, nor does it include salary,
bonus or other personnel information specific to Employee."
Agreement at 2-3, ECF No. 12-1.

[10] The recited facts are undisputed unless stated otherwise.  Under
E.D.V.A. Local Civil Rule 56(B), "[i]n determining a motion for
summary judgment, the Court may assume that facts identified by
the moving party in its listing of material facts are admitted,
unless such a fact is controverted in the statement of genuine
issues filed in opposition to the motion."

its customers understand and use those [labor market] data, Chmura packages the data in two primary ways: through software subscriptions and consulting services." Chmura Summ. J. Mem. ¶ 1, ECF No. 35. Chmura's primary "Software-as-a-Service platform" is called JobsEQ. Chmura Summ. J. Mem. ¶ 1, ECF No. 35. "JobsEQ is designed to allow Chmura's clients (such as economic developers, governmental entities, and education institutions) to identify workforce characteristics and trends within their communities." Chmura Summ. J. Mem. ¶ 1, ECF No. 35. Chmura's "main competitor" is Emsi. Chmura Summ. J. Mem. ¶ 29, ECF No. 35.

### *Lombardo's Hiring*

Lombardo began working as an Account Manager (Chmura's term for its sales representatives) in February 2015. Chmura Summ. J. Mem. ¶¶ 6, 3 ECF No. 35.

Lombardo was the first sales representative that Chmura had ever hired, and at that time, "Chmura very much had a 'start-up' mentality, and had to make decisions about how to structure the sales team as it went." Chmura Summ. J. Mem. ¶ 7, ECF No. 35. As part of the hiring process, Lombardo signed an Offer Letter that "outlined his proposed commissions and compensation structure"; however, the Offer Letter explicitly stated that it was not an employment contract. Chmura Summ. J. Mem. ¶ 8, ECF No. 35; Ex. 6 (the "Offer Letter"), ECF No. 35-6. His actual "employment agreement" was the "Confidentiality, Non-Complete and Non-

22

Solicitation Agreement" (the "Agreement"). Chmura Summ. J. Mem. ¶ 8 n.1., ECF No. 35. As part of the Agreement, Lombardo agreed that, if he was terminated from employment with Chmura for any reason, he would return all of the Company's property "immediately and without demand." Chmura Summ. J. Mem. ¶ 17, ECF No. 35. Lombardo understood "immediately and without demand" to mean "right away under any circumstance."[11] Chmura Summ. J. Mem. ¶ 17, ECF No. 35.

Lombardo had never sold software before he began working at Chmura. Chmura Summ. J. Mem. ¶ 11, ECF No. 35. To help Lombardo "jump-start his sales business, Chmura provided Lombardo a number of 'warm leads,' which were prospects that previous Chmura employees had identified and, in some cases, provided with demos." Chmura Summ. J. Mem. ¶ 11, ECF No. 35.

"When Lombardo started at Chmura, his primary duty was selling JobsEQ subscriptions." Chmura Summ. J. Mem. ¶ 19, ECF No. 35. Over time, Lombardo's responsibilities increased. Chmura Summ. J. Mem. ¶ 21, ECF No. 35. By the time Lombardo left Chmura, he (1) "[m]anaged clients after making the sale"; (2) "[p]rovided all salesforce training and product software training for new hires";

---

[11] Lombardo disputes this paragraph to the extent that it means he had an obligation to return the laptop immediately after he was terminated. Lombardo Summ. J. Resp. Mem. at 11, n.8; ECF No. 74. Part II.B.1 discusses the parties' arguments with respect to Lombardo's obligation to return the laptop.

23

(3) "[d]eveloped and instructed Salesforce and selling best practices for [the] company"; (4) "[m]anaged and operated 8-10 industry trade shows and conferences per year"; (5) "[d]eveloped new marketing and sales processes to improve conference performance (including implementing new giveaways to generate more booth traffic)"; (6) "answered client questions after a sale had been made"; (7) "provided guidance to clients on how to use and maximize various features of their software"; (8) "fielded client complaints"; (9) "addressed quality control issues"; (9) "provided troubleshooting advice"; and (10) "provided recommendations about product features he thought were beneficial or necessary for Chmura to stay competitive in the market."[12]   Chmura Summ. J. Mem. ¶¶ 22-23, 25, ECF No. 35.

"Lombardo was consistently the top performing Account Manager by every measure - sales, renewals and numbers of touches to prospects and existing customers."   Lombardo Summ. J. Resp. Mem. ¶ 18, ECF No. 74.   "Lombardo's book of business represented approximately 47% of all Chmura's new JobsEQ sales between 2015 and 3rd Quarter 2019."   Lombardo Summ. J. Resp. Mem. ¶ 18, ECF No. 74.

---

[12] In Lombardo's response memorandum, he states that his primary job duties were generating new business and getting existing clients to renew their subscriptions.   Lombardo Summ. J. Resp. Mem. ¶ 17, ECF No. 74.

In February 2019, Lombardo attempted to push Chmura into giving him a raise by altering an offer letter from "one of Chmura's potential business partners," GIS Webtech, and then presenting that letter to Chmura. Chmura Summ. J. Mem. ¶¶ 38-39, ECF No. 35. Lombardo's endeavor was found out when the president of Chmura reached out to GIS Webtech, and the company confirmed that Lombardo had doctored the document, including the proposed compensation amount. Chmura Summ. J. Mem. ¶¶ 38-39, ECF No. 35. Chmura ultimately decided not to fire Lombardo for forging the offer letter, but, understandably, "he had lost Chmura's trust." Chmura Summ. J. Mem. ¶ 40, ECF No. 35.

Later in 2019,[13] Chmura's new sales manager, Eli Auerbach, decided that Chmura would need to redistribute the "Account Managers' territories, raise their base salaries, and lower their commissions." Chmura Summ. J. Mem. ¶ 41, ECF No. 35. "Lombardo was very upset about these proposals because they would redistribute the large number of renewals he had amassed, which would lower his compensation." Chmura Summ. J. Mem. ¶ 41, ECF No. 35.

On October 3, 2019, Lombardo met with the Auerbach to complain about the proposed changes. Chmura Summ. J. Mem. ¶ 42, ECF No.

---

[13] The other set of memoranda state that the date was October 2, 2019.

35. Auerbach and Lombardo "then discussed whether Lombardo might leave voluntarily in exchange for a 'buyout.' Lombardo suggested that a $100,000 payment would be enough for him to willingly hand off his accounts." Chmura Summ. J. Mem. ¶ 42, ECF No. 35 (internal citations omitted).

Also on October 3, 2019, Lombardo texted colleagues expressing his dissatisfaction with the proposed compensation structure, stating that he could "f***" Chmura by calling all of his clients and telling them what Chmura did and that the clients should look at Emsi, Chmura's main competitor. Chmura Summ. J. Mem. ¶¶ 29, 43, ECF No. 35.

### The "Threats"

On October 17, 2019, Lombardo and Auerbach met again to discuss Lombardo's "buyout." Chmura Summ. J. Mem. ¶ 44, ECF No. 35. According to Lombardo, during this conversation,[14] Lombardo told Auerbach that Lombardo "was entitled to overtime for the hours he worked above forty hours a week." Lombardo Summ. J. Resp. Mem. ¶ 32, ECF No. 74. It is undisputed that Auerbach did not relay

---

[14] Lombardo's memorandum actually uses the phrase "during the second week of October 2019." The Court interprets that phrase to refer to the date of October 17, 2019 because Lombardo's Counterclaim only mentioned the dates of August 2019, October 17, 2019, and October 24, 2019 with respect to Counterclaim Count II. See Countercl. ¶¶ 54-65.

26

that demand to upper management. Lombardo Summ. J. Resp. Mem. ¶ 32, ECF No. 74.

According to Chmura, during the October 17 conversation, "Lombardo stated that if Chmura would not pay him $100,000 as part of a separation agreement, he was prepared to take several 'steps' to disrupt Chmura's business." Chmura Summ. J. Mem. ¶ 44, ECF No. 35. Chmura characterizes this conversation as a series of improper threats. Chmura Summ. J. Mem. ¶¶ 45-46, ECF No. 35. According to Chmura, Lombardo threatened to (1) "sue Chmura for taking away 'his' book of business"; (2) take a position with Emsi, Chmura's main competitor; and (3) take his clients with him to a competitor. Chmura Summ. J. Mem. ¶¶ 45-46, ECF No. 35. Lombardo, unsurprisingly, contests Chmura's retelling and characterizes his role more innocently. Lombardo Summ. J. Resp. Mem. ¶ 33, n.7, ECF No. 74. Lombardo says that the Sales Manager "believed that Lombardo would take two actions if he was not compensated appropriately: (1) file a lawsuit to recover the monies due to him; and (2) work for a competitor after the Agreement expired." Lombardo Summ. J. Resp. Mem. ¶ 33, n.7, ECF No. 74. Chmura responds that Lombardo has not created a genuine dispute because Lombardo only refers to the Sale Manager's understanding and does not dispute any specific facts. Chmura Summ. J. Reply Mem. at 4, n.4, ECF No. 82. There are several text messages corroborating Chmura's belief that Lombardo was planning to take a job at Emsi and to

call his customers to tell them to switch to Emsi. See Exs. 26 & 28, ECF Nos. 35-26 & 35-28. But, nevertheless, determining exactly what was said on October 17, 2019 would require a fact finder to make credibility determinations.

## *The Path to Termination*

In any case, "[f]earful that he would execute his threats, Chmura immediately placed Lombardo on leave." Chmura Summ. J. Mem. ¶ 48, ECF No. 35. After his meeting with Auerbach on October 17, 2019, Lombardo left the office with his work computer. Chmura Summ. J. Mem. ¶ 48, ECF No. 35. "Chmura terminated Lombardo's access to all material programs, including SalesForce, Office 365, and JobsEQ" the same day. Lombardo Summ. J. Resp. Mem. ¶ 40, ECF No. 74.

On October 21, 2019, "Chmura sent Lombardo a cease-and-desist letter reminding him of his obligations and warning him against the violations he had threatened." Chmura Summ. J. Mem. ¶ 49, ECF No. 35. On the same day, Auerbach discussed the letter with Lombardo by phone and said that Lombardo's personal effects would be returned "as soon as Lombardo returned Chmura's property, including its computer."[15] Chmura Summ. J. Mem. ¶ 50, ECF No. 35.

---

[15] Lombardo states that his personal effects were never returned. Lombardo Summ. J. Resp. Mem. ¶ 38, ECF No. 74.

28

Lombardo's work computer contained the only notes of meeting summaries from two conferences that Lombardo had recently attended, Chmura Summ. J. Mem. ¶ 53, ECF No. 35, as well as a spreadsheet that contained "all of Chmura's clients, the contact information for all authorized JobsEQ users, and data about each client's subscription usage." Chmura Summ. J. Mem. ¶ 54, ECF No. 35. The conference notes "described numerous meetings with current and prospective customers that had occurred at the conferences, including the names of the individuals with whom Chmura had met and information about which prospects were interested in receiving demos." Chmura Summ. J. Mem. ¶ 53, ECF No. 35. According to Chmura, its Account Managers would have typically followed up on those meetings within a few days of a conference. Chmura Summ. J. Mem. ¶ 53, ECF No. 35.

On "October 24, 2019, Lombardo (through counsel) informed Chmura (through counsel) that Chmura had violated the FLSA and Ohio law by failing to pay him for all hours worked over forty." Lombardo Summ. J. Resp. Mem. ¶ 33, ECF No. 74. Lombardo was on unpaid leave at the time. Lombardo Summ. J. Resp. Mem. ¶ 34, ECF No. 74.

Chmura then terminated Lombardo's employment effective October 31, 2019. Chmura Summ. J. Mem. ¶ 56, ECF No. 35.

Also on October 31, 2019, Chmura initiated this lawsuit to enforce the Agreement. Chmura Summ. J. Mem. ¶ 57, ECF No. 35.

And Chmura (through counsel) sent a letter to Lombardo (through counsel) responding to Lombardo's October 24 letter. Lombardo Summ. J. Resp. Mem. ¶ 35, ECF No. 74; Ex. B at 29-30, ECF No. 74-2. The October 31 letter concludes by stating:

> Finally, your letter stated that Chmura terminated Mr. Lombardo's employment on October 17. This is incorrect. The Company placed him on unpaid leave to afford him a reasonable opportunity to consider the terms of the proposed Separation Agreement. **Given your response on his behalf, that offer is withdrawn and he should consider his employment terminated effective today**.

Ex. B at 30-31, ECF No. 74-2 (emphasis in original); Lombardo Summ. J. Resp. Mem. ¶ 35, ECF No. 74. According to Lombardo, the "response on his behalf," was his (former) attorney's letter to Chmura stating that Chmura had violated the FLSA.[16] Lombardo Summ. J. Resp. Mem. ¶ 35, ECF No. 74.

Lombardo's work laptop was mailed to Chmura on December 24, 2019. Chmura Summ. J. Mem. ¶ 58, ECF No. 35. Once Chmura received the laptop, Chmura tried to have its Account Managers follow up on Lombardo's conference notes, but the Account Managers were unsuccessful. Chmura Summ. J. Mem. ¶ 58, ECF No. 35.

Chmura claims that it normally "closes deals with about 24% of prospective customers who receive demos." Chmura Summ. J. Mem.

---

[16] Churma, unsurprisingly, takes a different view and says it was responding to the portion of the letter declining Churma's proposed separation agreement.

¶ 58, ECF No. 35. Accordingly, Chmura is now seeking "damages and attorneys' fees arising out of Lombardo's breach of his Agreement and wrongful retention of Chmura's property." Chmura Summ. J. Mem. ¶ 58, ECF No. 35.

According to Lombardo, there is no evidence that he ever "sold, disclosed, copied, stole, altered, concealed, or unlawfully accessed, converted, or transferred the Notes [i.e., his conference notes] or any 'highly confidential and trade secret information.'" Lombardo Summ. J. Resp. Mem. ¶ 41, ECF No. 74.

Chmura's summary judgment motion must be decided in perspective of this record.

## B. DISCUSSION

### 1.  FAC Count I: Breach of the Agreement

FAC Count I is a breach of contract claim based on Chmura's allegation that Lombardo refused to return a laptop, issued to him while he was an employee at Chmura, that had "confidential and proprietary information about Chmura's customers and prospective customers."[17]   FAC ¶ 1.   To make out a claim for a breach of contract, the plaintiff must show that: (1) there was a legally enforceable obligation of the defendant to the plaintiff; (2) the

---

[17] There is nothing in the record to show that Lombardo used the information contained in the conference notes.  Chmura's claim is based only on the fact that Lombardo denied Chmura the ability to use the conference notes.  Hearing Tr. 39:13-24, ECF No. 94.

defendant violated or breached that obligation; and (3) the plaintiff suffered injury or damage as a result of the defendant's breach of obligation. Filak v. George, 594 S.E.2d 610, 614 (Va. 2004).

Chmura's Motion for Summary Judgment argues that the Court should grant summary judgment in favor of Chmura on Count I because: (1) the confidentiality portions of Lombardo's employment agreement (the "Agreement") are enforceable - and thus Lombardo had a duty to Chmura; and (2) there is no genuine dispute that Lombardo breached the Agreement, violating his duty to Chmura. Chmura argues that it suffered damages in the form of attorneys' fees[18] and lost profits because Lombardo did not return the laptop soon after he was terminated, but Chmura is not trying to prove its exact damages on summary judgment, only Lombardo's liability. Chmura Summ. J. Mem. at 23-24, ECF No. 35.

Lombardo responds that: (1) the confidentiality portion of the Agreement is not enforceable; and (2) even if it were enforceable, according to Lombardo, there is a genuine issue of material fact as to whether Chmura was damaged by Lombardo's

---

[18] The Agreement contains a provision which would allow Chmura to recover any attorneys' fees caused by Lombardo's breach of the Agreement. Agreement at 5, ECF No. 12-1.

retention of the laptop, including the conference notes. Lombardo Summ. J. Resp. Mem. at 19, ECF No. 74.

Thus, notably, in this set of memoranda, Lombardo is not arguing that there was no breach of the Confidentiality provision.[19] See Lombardo Summ. J. Resp. Mem. at 19. Nor does Lombardo appear to challenge Chmura's assertion that, as a result of the Agreement, including the Confidentiality provision, Lombardo had an obligation to return both the laptop and the conference notes. Id. As explained above, the Confidentiality Provision of the Agreement is enforceable as written. Thus, the only issue left for the Court to address is Lombardo's argument that Chmura was not damaged by the breach.

### a. Chmura's Injury

To reiterate, Chmura is not seeking summary judgment on the exact measure of its damages, only that Lombardo had a duty to return the laptop and the conference notes and he breached that duty. Lombardo is arguing that there is a genuine issue of material fact as to whether Chmura's damages were greater than zero.[20] See Lombardo Summ. J. Resp. Mem. at 19, ECF No. 74; see

---

[19] As discussed in Part III.B.1, Lombardo does make this argument in the other set of memoranda. The Court's conclusions in that section are consistent with its conclusions this section.

[20] At oral argument, Lombardo also argued, for the first time, that Chmura's claim for breach of contract is barred because Chmura failed to take any steps to mitigate its damages (and thus, there

also Filak v. George, 594 S.E.2d 610, 614 (Va. 2004) (stating that an element of a breach of contract action is injury or damage to the plaintiff caused by the breach of obligation). That argument is not enough to prevent the Court from granting summary judgment in Chmura's favor on the question of Lombardo's liability. Thus, Chmura has presented sufficient evidence to show that it sustained damages as a result of Lombardo's beach of the Agreement. See Chmura Summ. J. Mem. at 17, ECF No. 35. First, Chmura cited to deposition testimony from Chmura's CEO, Dr. Christine Chmura, that Chmura historically has made sales on approximately 24% of leads like those in Lombardo's conference notes. Chmura Summ. J. Mem. at 17, ECF No. 35; Ex. 3 ("Chmura Deposition") at 19:13-20:8, 62:5-8, ECF No. 74-3. That, according to Dr. Chmura, translates to a net present value of over $100,000. Chmura Summ. J. Mem. at 17, ECF No. 35; see also Ex. 3 ("Chmura Deposition") at 19:13-20:8, ECF No. 74-3. Moreover, Chmura asserted that it had suffered damages in the form of attorneys' fees to which Lombardo did not respond. The Court finds that Chmura has provided enough

---

is a diminution of the damages in full). Hearing Tr. 59:14-60:17, ECF No. 94. Arguments raised for the first time at oral argument will not be considered. First Tennessee Bank Nat. Ass'n v. Global Title, LLC, 3:09-cv-550, 2010 WL 5187834, *1 (Nov. 16, 2010) (citing North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dept. Of Transp., 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010)).

34

information about damages to show that it was injured as a result of the breach of contract.

Because the relevant provisions of the Agreement are enforceable, because Lombardo did not contest that he breached the Agreement, and because Chmura has presented sufficient evidence to show that there is a genuine dispute of material fact as to its damages, the Court will grant Chmura's Summary Judgment Motion with respect to Count I on the issue of Lombardo's liability for breach of contract.  The only question for a fact finder is what Chmura's damages are.

### 2.   FAC Count III: Defend Trade Secrets Act

Count III essentially alleges that Lombardo violated the Defend Trade Secrets Act (DTSA), 18 U.SC. § 1832 et seq., by retaining the laptop — which contained "highly unique (i) information concerning the pricing and other contractual terms offered to current and prospective customers; (ii) the identities and contact information of the individual authorized users of Chmura's software; and (iii) information concerning Chmura's negotiations of its subscription agreements."[21]  FAC ¶ 66, ECF No. 12.

---

[21] Notwithstanding this broad language, Chmura's Summary Judgment Memorandum only provides evidence of two forms of alleged trade secrets: (1) Lombardo's notes from the two conferences he attended and (2) "a list of authorized users of Chmura's software, including detailed information on the customers' usage of the software." Chmura Summ. J. Mem. at 21, ECF No. 35.  This Opinion is silent as to any other alleged trade secrets.

A private party can make out a claim under the DTSA, if the private party can show that "(1) it owns a trade secret; (2) the trade secret was misappropriated; and (3) the trade secret implicates interstate or foreign commerce." Space Sys./Loral, LLC v. Orbital ATK, Inc., 306 F. Supp. 845, 853 (E.D. Va. 2018).

Chmura's basic argument is that there are no genuine issues of material fact that: (1) the documents on the laptop that Lombardo retained were "trade secrets" under the DTSA; and (2) Lombardo "misappropriated" those trade secrets.[22] Chmura Summ. J. Mem. at 20-24, ECF No. 35. Lombardo responds that Chmura's Motion for Summary Judgment fails for five reasons: (1) the confidentiality provision in the Agreement is invalid; (2) there is a genuine issue of material fact as to whether the notes were "trade secrets" under the DTSA; (3) there is a genuine issue as to whether Chmura took reasonable steps to maintain the secrecy of the information in question; (4) there is no evidence that Lombardo misappropriated anything because he did not acquire Chmura's trade secrets through improper means; and (5) there is a genuine issue as to whether Chmura was actually damaged by

---

[22] The FAC also alleges that "Lombardo's actions were willful, malicious, and intended to injure Chmura and its business." FAC ¶ 73, ECF No. 12. In its summary judgment memorandum, Chmura only provided evidence related to the fact that it owned a trade secret and that the trade secret was misappropriated. See Chmura Summ. J. Mem. at 20, ECF No. 35. Accordingly, at this time, the Court takes no position with respect to whether Lombardo's actions were willful, malicious, and intended to injure Chmura and its business.

Lombardo's actions.  Lombardo Summ. J. Resp. Mem. at 19-22, ECF No. 74.

The Court has already found the Confidentiality provision in the Agreement to be valid, so Lombardo's argument on that point is rejected.  The remainder of Lombardo's arguments warrant more discussion.

### a. **Trade Secrets**

For DTSA purposes, "[t]he case law is clear that just about anything can constitute a trade secret under the right set of facts." MicroStrategy, Inc. v. Bus. Objects, S.A., 331 F. Supp. 2d 396, 416 (E.D. Va. 2004);[23] see also 18 U.S.C. § 1839(3) ("[T]he term 'trade secret' means all forms and types of financial, business, scientific, technical, economic, or engineering information . . . ."). But, to prove a claim under the DTSA, the plaintiff must prove that (1) the owner of the alleged trade secret "has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not

---

[23] MicroStrategy was decided under the Virginia Uniform Trade Secrets Act.  The federal Defend Trade Secrets Act was modeled on "states' versions of the Uniform Trade Secrets Act." Steves & Sons, Inc. v. Jeld-Wen, Inc., 988 F.3d 690, 726 (4th Cir. 2021). It can, therefore, sometimes be helpful to look to cases interpreting state statutes modeled on the Uniform Trade Secrets Act.  Steves & Sons, Inc. v. Jeld-Wen, Inc., 988 F.3d 690, 726-27 (4th Cir. 2021).  Accordingly, in this section, the Court cites to several decisions interpreting state versions of Uniform Trade Secrets Act.

being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

Chmura argues that two sets of documents on Lombardo's work laptop constitute trade secrets: (1) "a list of authorized users for Chmura's software, including detailed information on the customer's usage of the software" and (2) Lombardo's "notes from two conferences that Lombardo had recently attended, which identified prospective customers who had requested JobsEQ demonstrations and described their software needs." Chmura Summ. J. Mem. at 21, ECF No. 35. Lombardo responds that there is a genuine issue of material fact as to whether the notes are "trade secrets" under the DTSA given that the information "could have been recreated with the use of an attendee list from the two conferences." Lombardo Summ. J. Resp. Mem. at 21-22, ECF No. 74. The Court interprets Lombardo's challenge to mean that there is a genuine issue of material fact as to whether the conference notes have any "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). Accordingly, the Court will address whether the conference notes are "trade secrets" in the next section.

Nevertheless, it is immediately apparent that Lombardo has not responded to Chmura's argument that list of authorized users for Chmura's software is a "trade secret" under the DTSA. "Failure to respond to an argument made in a dispositive pleading results in a concession of that claim." United Supreme Council v. United Supreme Council of the Ancient Accepted Scottish Rite for 33 Degree of Freemasonry, 329 F. Supp. 3d 283, 292 (E.D. Va. 2018). Lombardo does, however, lodge a general challenge to the reasonableness of the steps Chmura took to maintain the secrecy of all of the information on Lombardo's laptop. Accordingly, the Court will accept, without deciding, that the "list of authorized users for Chmura's software, including detailed information on the customer's usage of the software" would be a trade secret so long as Chmura took reasonable steps to maintain the secrecy of that information.

### i. Independent Economic Value

Information can only constitute a "trade secret" if "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). In other words, "a trade secret must not be readily ascertainable through legitimate means. If a competitor could easily discover the information

39

legitimately, the inference is that the information was either essentially 'public' or is of de minimus economic value." MicroStrategy, Inc. v. Bus. Objects, S.A., 331 F. Supp. 2d 396, 416-17 (E.D. Va. 2004). "What constitutes readily ascertainable through proper means is heavily fact-dependent and simply boils down to assessing the ease with which a trade secret could have been independently discovered." MicroStrategy, 331 F. Supp. 2d at 417 (emphasis in original). That said, under some circumstances, a "compilation of public facts can also constitute a trade secret" but only "if the compilation itself has remained confidential." MicroStrategy, Inc. v. Bus. Objects, S.A., 331 F. Supp. 2d 396, 417 (E.D. Va. 2004).

Chmura believes that the notes, which were filed under seal, "identified prospective customers who had requested JobsEQ demonstrations and described their software needs." Chmura Summ. J. Mem. at 21, ECF No. 35. Chmura then argues that "[a] competitor with access to those notes would know not only which prospective customers Chmura had identified, but to whom specifically Chmura had spoken, who the 'decision-makers' were, what their specific labor data needs were, and details of their budgetary constraints." Chmura Summ. J. Mem. at 21, ECF No. 35. That could be true, but the Court does not find it self-evident on the face of the notes themselves (which is all that Chmura cited to supports its beliefs about the economic value of the notes).

The Court would characterize the notes, as Lombardo did, i.e., notes of short conversations with various conference attendees. Some do mention setting up "demos" of JobsEQ; others just describe the conversations that were had.   The Court has no real way of understanding how that information has any independent economic value.   Moreover, to an industry outsider, it is not clear why the information in the notes would not be "readily ascertainable through proper means by, another person," like an employee of Chmura's reported main competitor, Emsi, just contacting conference attendees that are likely to need help ascertaining and interpreting labor market data (e.g., economic development corporations, chambers of commerce, etc.).   See Lombardo Summ. J. Resp. Mem. at 22, ECF No. 74 (suggesting just that).

Chmura responds that it would not have been feasible to call over a thousand conference attendees and that Chmura spent the money for its Account Managers to go to the conference so that they "could interact with current and prospective clients face-to-face and gather individualized intelligence about market demands." Chmura Summ. J. Reply Mem. at 14-15, ECF No. 82.   Those responses may be relevant,[24] but they do not solve the fundamental issue which is that the Court needs more information on this issue.

_____

[24] The Restatement suggests six factors "to be considered in determining" whether something is a trade secret:

At this time, the Court cannot rule on whether Lombardo's conference notes had independent economic value.

### ii. Secrecy

Lombardo argues that there is a genuine issue of material fact as to whether Chmura took reasonable steps to maintain the secrecy of the information stored on Lombardo's work laptop. Lombardo Summ. J. Resp. Mem. at 22, ECF No. 74. According to Lombardo, "[a]nyone at Chmura could walk out with the Laptop and all the information contained thereon. There was no multifactor authentication to access the desktop, but rather just a simple password. Chmura did not have any remote management software on the Laptop to control it when out of the office." Lombardo Summ. J. Resp. Mem. at 22, ECF No. 74. In response, Chmura notes that it protected its trade secrets "by requiring employees to sign confidentiality agreements; protecting network information with passwords; limiting office access by requiring employees to swipe

---

(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Restatement (First) of Torts § 757, cmt. b.

in; requiring employees to review and acknowledge its information security police; and limiting access to customer sales data to those with a business need to know." Chmura Summ. J. Resp. Mem. at 15, ECF No. 82.

Notably, "[r]easonable efforts to maintain secrecy need not be overly extravagant, and absolute secrecy is not required." AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp., 663 F.3d 966, 974 (8th Cir. 2011). Moreover, the Court is mindful that the reasonable effort inquiry is ultimately a means of assessing whether an alleged "trade secret" is, in fact, a secret, not an end in itself. "Restricting access to information, implementing confidentiality agreements, and providing physical barriers to access are all reasonable efforts." MicroStrategy, Inc. v. Business Objects, S.A., 331 F. Supp. 2d 396, 416 (E.D. Va. 2004) (citation omitted).

It is not lost on the Court that, had the additional secrecy measures that Lombardo mentions been in place, (1) Lombardo might not have been able to take his laptop out of the office when he was sent home on October 17, 2019, and (2) even if he had, he would have possessed a laptop-sized paper weight, not any of Chmura's allegedly proprietary information. But, "[m]isplaced trust in a third party who breaches a duty of confidentiality does not necessarily negate efforts to maintain secrecy." AvidAir, 663 F.3d at 974. Further, Lombardo has not cited any facts or case

43

law that would suggest that the steps that Chmura did take were not reasonable; the fact that Chmura could have done more to protect its data does not mean that what it did do was not reasonable.

Thus, while in hindsight, it might have been prudent for Chmura to take additional steps to curtail Lombardo's access to Chmura's proprietary information, the Court, nevertheless, finds that, on this record, no reasonable jury could say that Chmura did not a make reasonable effort to maintain the secrecy of the information on its company-owned laptops.

### b. Misappropriation

Under the FAC, Chmura alleged that Lombardo misappropriated Chmura's trade secrets by retaining them by breaching his obligations under the confidentiality portions of the Agreement. FAC ¶ 70. There is no allegation in the FAC that Lombardo actually disclosed any alleged trade secrets. FAC ¶¶ 65-74. Therefore, the relevant definition of "misappropriation" under the DTSA is the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[.]"[25] 18 U.S.C. § 1839(5)(A) (emphasis added). The

---

[25] See also Chmura Summ. J. Mem. at 22, ECF No. 35 ("Misappropriation includes acquisition of a trade secret through "improper means," which, in turn, include theft or breach of a duty to maintain secrecy. . . . That is precisely what happened here.") (citation omitted).

44

term "improper means" as opposed to "proper means," is defined under the DTSA to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" but does not include "reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

Chmura argues that Lombardo misappropriated trade secrets by retaining information, including the only copy of the conference notes. Chmura Summ. J. Mem. at 23, ECF No. 35. Lombardo responds that "misappropriation" requires more than just retaining documents that were initially acquired lawfully. Lombardo Summ. J. Resp. Mem. at 29, ECF No. 74.

It is beyond dispute that Lombardo initially came into contact with Chmura's alleged trade secrets lawfully in his role as an Account Manager. The only question, then, is whether Lombardo's retention of the trade secrets, allegedly in violation of the Agreement, can constitute the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[.]" 18 U.S.C. § 1839(5)(A) (emphasis added).

Somewhat confusingly, some cases, including a recent Fourth Circuit opinion regarding the Maryland Uniform Trade Secrets Act, seem to treat the phrase "acquired by improper means" to refer to the broader circumstances surrounding a person's access to, use

45

of, and intentions regarding the information – not how the information first came into a person's possession. <u>See, e.g.</u>, <u>AirFacts, Inc. v. de Amezaga</u>, 909 F.3d 84, 98 (4th Cir. 2018);[26] <u>but see</u> <u>Prominence Advisors, Inc v. Dalton</u>, No. 17 C 4369, 2017 WL 6988661, *4 (N.D. Ill. Dec. 18, 2017) (interpreting the improper acquisition prong of the DTSA to address how information was first acquired). This different approach seems to be at least partially responsible for the seemingly conflicting federal case law cited by the parties. <u>Compare</u> <u>Packaging Corporation of America, Inc. v. Croner</u>, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020) ("[T]he failure to return lawfully acquired information does not constitute 'misappropriation' of that information under the DTSA.") <u>with</u> <u>JetSmarter Inc. v. Benson</u>, 17-62541-CIV-MORENO/SELTZER, 2018 WL 2694598, 2018 U.S. Dist. LEXIS 60122, at *5 (S.D. Fla. Apr. 6, 2018) (finding misappropriation plausibly

---

[26] "Even if an employee does not disclose trade secrets to a third party, he can misappropriate those trade secrets if he knows or has reason to know he acquired them 'by improper means.' . . . Consequently, we must consider the facts surrounding Mr. de Amezaga's acquisition of the Proration Documents: he helped to create them and worked on them through his final day at AirFacts; AirFacts employees occasionally worked remotely and used their personal email accounts to send and save company documents; Mr. de Amezaga's superiors asked him to be available to answer questions after he resigned; the AirFacts employees who contacted Mr. de Amezaga after he resigned did not ask questions about the proration project; and Mr. de Amezaga never accessed the Proration Documents in his personal email account after he resigned." <u>AirFacts, Inc. v. de Amezaga</u>, 909 F.3d 84, 98 (4th Cir. 2018).

pled where employer alleged that a terminated employee retained a customer list in violation of a confidentiality agreement).   The Court will follow the lead of the Fourth Circuit in AirFacts.

There are at least two relevant cases in the Eastern District of Virginia which seem to follow the same approach as the Fourth Circuit.[27]   See OROS, Inc. v. Dajani, No. 119CV351LMBIDD, 2019 WL 2361047, *5 (E.D. Va. June 4, 2019) (Brinkema, J.) (looking to the Restatement (Third) of Unfair Competition § 42 to find that "misappropriation" under the DTSA could include circumstances in which a company entrusted an employee with information during the course of employment but which the employee would be misappropriating by keeping once the employment relationship ended);   Apollo Enter. Imaging Corp. v. Conyers, No. 119CV1603LMBMSN, 2020 WL 1896706, *4 (E.D. Va. Jan. 10, 2020) (Brinkema, J.).

---

[27] Chmura also cites Haught v. Louis Berkman LLC, 417 F. Supp. 2d 777, 783-84 (N.D.W. Va. 2006) for the proposition that "[c]ourts in the Fourth Circuit have therefore found 'misappropriation' where, as here, the employee unlawfully retained his employer's property after the end of his employment."   Chmura Summ. J. Resp. Mem. at 16, ECF No. 49.   However, Haught was decided based on the disclosure prong of West Virginia's Uniform Trade Secrets Act not the acquisition prong;   the statutory language is materially different.   See 417 F. Supp. 2d 777, 782-84 (N.D.W. Va. 2006) (i.e., "'Misappropriation' means: . . . (2) Disclosure or use of another person's trade secret without the other's express or implied consent by a person who: (B) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.").

But, upon closer inspection, these cases seem to be decided on facts beyond simply that an employee retained alleged trade secrets after his or her employment ends. For example, in OROS, Inc. v. Dajani, a company's board voted to terminate the company president for unsatisfactory performance; however, the president refused to "cede" his position and instead "retained control" over the company's "computer server, equipment, financial records, and bank accounts, as well as the access codes to cloud-based services." OROS, Inc. v. Dajani, No. 119CV351LMBIDD, 2019 WL 2361047, *2 (E.D. Va. June 4, 2019). The company brought suit for, among other things, a violation of the DTSA. Id. at *1. The OROS court found that the company had plausibly alleged that the president had misappropriated the information. Id. at *5. But, as Lombardo notes in his other set of memoranda, the plaintiff in OROS alleged that "[t]he defendant refused to return the information to maximize the price of the buy-back of his 20% interest in the company. . . . Furthermore, in denying the motion to dismiss, the [c]ourt noted 'it bears emphasizing that Oros, Inc's complaint deals not with an isolated set of documents or information but rather with the entire contents of a company's office.'" Lombardo Summ. J. Reply Mem. at 11, ECF No. 59. And, in Apollo, which was in the context of a preliminary injunction order, the court found that a failure to return alleged trade secrets could constitute misappropriation where an employee took

48

a job with a direct competitor, lied to former employer about compliance with a confidentiality agreement, and apparently had been copying the employer's confidential data onto external devices for months before resigning. Apollo Enter. Imaging Corp. v. Conyers, No. 119CV1603LMBMSN, 2020 WL 1896706, *4 (E.D. Va. Jan. 10, 2020).

The Court is not prepared to rule on the question of misappropriation at this time. If parties wish to pursue summary judgment on FAC Count III, the Court needs more concrete briefing, from both parties, (1) explaining which cases the court should look to (or not) in deciding this issue; (2) connecting all undisputed, relevant facts to law; and (3) comparing and/or contrasting undisputed facts in the summary judgment record directly to the case law the parties believe is relevant. Ideally, this new briefing would include a larger selection of cases examining what it means to acquire trade secrets by improper means.

Because misappropriation is an element of a DTSA claim, the Court reserves judgment on Chmura's summary judgment motion with respect to FAC Count III.

### c. Chmura's Damages

Lombardo asserts that there is a genuine issue of fact as to whether Chmura was damaged because (1) Chmura's alleged lost profits are too speculative and (2) Chmura did not allege any damages "arising out of the list of authorized users it purports

49

was contained on the Laptop." Lombardo Summ. J. Resp. Mem. at 22, ECF No. 74. However, this argument will not defeat Chmura's motion for summary judgment because Chmura need not prove the dollar amount of its damages at this stage. First, damages are not an element of a DTSA claim. See Space Sys./Loral, LLC v. Orbital ATK, Inc., 306 F. Supp. 845, 853 (E.D. Va. 2018); Steves & Sons, Inc. v. JELD-WEN, Inc., 2019 U.S. Dist. LEXIS 139818, 2019 WL 3860198, *9 (E.D. Va. Aug. 16, 2019); see also 18 U.S.C. § 1836(b)(3) (providing for injunctive relief in addition to damages for the misappropriation of a trade secret). And, second, Chmura is only requesting summary judgment on the issue of whether Lombardo is liable under the DTSA, not whether and what damages Chmura is owed. Chmura Mot. Summ. J., ECF No. 34.

### 3. FAC Count IV: Conversion

Like FAC Count I, FAC Count IV is based on Lombardo's failure to return Chmura's computer, including the information on the computer, within the time limits outlined in the Agreement. FAC ¶ 76. Neither party disputes that the laptop was mailed to Chmura on December 24, 2019 - 54 days after the termination of Lombardo's employment and the date this suit was filed.

Chmura argues that summary judgment is appropriate because there is no dispute that Lombardo retained a laptop that belonged to Chmura, which he knew Chmura wanted back, and failed to immediately return it. Chmura Summ. J. Mem. at 19-20, ECF No. 35.

Lombardo responds that he returned the laptop so any claim for conversion fails.  Lombardo Summ. J. Resp. Mem. at 22-23, ECF No. 74.

In general, to make out a claim for conversion, a plaintiff must prove that the defendant wrongfully exercised or assumed authority over the plaintiff's goods, deprived the plaintiff of possession, or committed any act which wrongfully exerted dominion over plaintiff's property in denial of, or inconsistent with, plaintiff's ownership rights.  See Simmons v. Miller, 544 S.E.2d 666, 679 (Va. 2001).

Neither the Court nor the parties have been able to find any Virginia decision specifically addresses whether a claim for conversion can lie when the property at issue was returned.  But several sources of information suggest that that is indeed the case.  First, under the Restatement, where a person is liable for conversion, the return of the property at issue is not a defense, only a way of mitigating damages.  Restatement (First) of Torts § 247, cmt. a; see also Restatement (Second) of Torts § 922 ("The amount of damages for the conversion of a chattel is diminished by its recover or acceptance by a person entitled to its possession.").  Second, a federal court in Virginia has found that, at least under some conditions, a claim for conversion can lie even if the property was returned before suit was filed.  Cardoza v. Med. Device Bus. Servs., 389 F. Supp. 3d 399, 403, 408 (W.D.

Va. 2019). And, finally, in West Virginia, with which Virginia shares some precedent, "an action for trover[28] may be maintained although the property may have been returned to the owner before the institution of his suit." 19 Michie's Jurisprudence Trover and Conversion § 4 Conversion (2014) (citing Arnold v. Kelly, 4. W. Va. 642, 647 (1871)).

Where, as here, there is no authoritative decision on an issue of state law, the district courts are obligated to predict the proper state law rule by using such sources as are available. See Federal Ins. Co. v. Smith, 63 Fed. Appx. 630, 632 (4th Cir. 2003). Because the Court finds that a Virginia court would find that a claim for conversion can lie even when the property was returned, Chmura's Motion for Summary Judgment will be granted with respect to FAC Count IV, as to the issue of liability.

### 4. Counterclaim Count II: FLSA Retaliation

Counterclaim Count II is a retaliation claim under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 215(a)(3). Lombardo maintains that he asserted that he was due overtime on

---

[28] "Trover and conversion (frequently called trover) is a species of the class of actions at law known as trespass on the case. The gist of the action is the unlawful conversion of a chattel of the plaintiff by the defendant, but the action is to recover damages for the conversion, not to recover the specific property." 19 Michie's Jurisprudence Trover and Conversion § 2 (General Consideration) (2014).

three occasions: August 2019,[29] October 17, 2019, and October 24, 2019. Countercl. ¶ 56-57, 60, ECF No. 19. Lombardo then asserts that his termination was because of his overtime complaints. Countercl. ¶ 61, ECF No. 19.

Chmura seeks summary judgment on Counterclaim Count II on the grounds that: (1) Lombardo did not engage in any protected activity; and even if he had, (2) Chmura did not terminate Lombardo because he complained about overtime. Chmura Summ. J. Mem. at 34-37.

Lombardo responds that there is a genuine issue of material fact regarding Lombardo's retaliation claim (specifically: why Lombardo was fired). Lombardo Summ. J. Resp. Mem. at 28, ECF No. 74. Notably, Lombardo argues that there are two occasions that could be treated as his request for overtime. Lombardo Summ. J. Resp. Mem. at 29, ECF No. 74. The first would be his conversation with the sales manager, Eli Auerbach. Lombardo Summ. J. Resp. Mem. at 29, ECF No. 74. The second would be when his previous counsel sent a formal letter to Chmura on October 24, 2019 demanding overtime pay. Lombardo Summ. J. Resp. Mem. at 29, ECF No. 74.

---

[29] None of the parties' subsequent papers mention any event that occurred on August 2019; the Court will, therefore, disregard Lombardo's retaliation claim with respect to that date.

Unlike earlier claims, Lombardo is <u>not</u> seeking summary judgment on Counterclaim Counts II. Lombardo Summ. J. Mot., ECF No. 41. Rather, Lombardo is arguing that summary judgment in favor of Chmura is not appropriate on Counterclaim Count II because there are genuine issues of material facts. <u>See</u> Lombardo Summ. J. Resp. Mot., ECF No. 74.

### a. FLSA Retaliation Generally

Under the FLSA, it is illegal for an employer "'to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter.'" <u>Darveau v. Detecon, Inc.</u>, 515 F.3d 334, 340 (4th Cir. 2008) (quoting 29 U.S.C. § 215(a)(3)).

To make out a <u>prima facie</u> claim for retaliation under the FLSA, a party must show that (1) he or she "engaged in an activity protected by the FLSA;" (2) he or she "suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action." <u>Darveau</u>, 515 F.3d at 340.

If the employee can make out the <u>prima facie</u> case, the burden would then shift to the employer to articulate a legitimate reason for the termination other than retaliation for the employee's protected activity. <u>Adair v. Charter County of Wayne</u>, 452 F.3d

482, 489 (6th Cir. 2006); accord Chmura Summ. J. Mem. at 34, ECF No. 35.  If the employer carries that burden, then the employee must prove by a preponderance of the evidence that the employer's explanation was only a pre-text for illegal retaliation.  Adair, 452 F.3d at 489.

Lombardo bears the initial responsibility to show that (1) he "engaged in an activity protected by the FLSA;" (2) he suffered an adverse action that was "subsequent to or contemporaneous with" that protected activity; and (3) the protected activity was the cause of the adverse action that Lombardo suffered.  Darveau, 515 F.3d at 340.  One form of protected activity is "fil[ing] any complaint" alleging an FLSA violation.  Minor v. Bostwick Labs., Inc., 669 F.3d 428, 433 (4th Cir. 2012); see also 29 U.S.C. § 215(a)(3).

### b. October 17, 2019

As a matter of law, Lombardo's October 17, 2019 conversation with sales manager Eli Auerbach cannot form the basis for an FLSA retaliation claim.  An oral complaint regarding an FLSA violation can trigger the FLSA's anti-retaliation provision.  Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 17 (2011).  And, an internal complaint of an FLSA violation can trigger the FLSA's anti-retaliation provision.  Minor v. Bostwick Labs., Inc., 669 F.3d 428, 438 (4th Cir. 2012).  But, in either case, the employee's complaint must give the employer fair notice.  Kasten,

563 U.S. at 14; Minor, 669 F.3d at 439.   The complaint must have "some degree of formality" and "must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the [FLSA] and a call for their protection." Kasten, 563 U.S. at 14; Minor, 669 F.3d at 439.

An employee merely "letting off steam" to an employer will not constitute protected activity. Minor, 669 F.3d at 439.   For example, in Minor, the employee "expressed her concerns regarding FLSA violations to the chief operating officer of her company in a meeting specifically called for" the purpose of discussing alleged FLSA violations, and the COO agreed to investigate the employee's claims. Minor, 669 F.3d at 439.   The Minor court found that the employee's FLSA complaint was sufficient to survive a motion to dismiss.

In contrast, in Sanchez v. Caregivers Staffing Services, Inc., the employee requested overtime pay – and suggested the employer was breaking the law by not providing it – but did not mention the FLSA or any other statute that would have entitled the employee to receive overtime pay.   No. 1:15-cv-01579, 2017 WL 380912, *3 (E.D. Va. Jan. 26, 2017).   "A mere request for overtime pay without more details or reasoning as to why the employee is entitled to overtime compensation is not protected activity." Id. Similarly, in Romero v. Granite Ctr., LLC, although the employee

complained several times that he was not paid for all of the hours that he worked, the employee never stated that a specific statute was violated by the employer's actions.  No. 1:16-cv-01039, 2017 WL 2642971, *3 (E.D. Va. June 19, 2017).

Here, there is no allegation that Lombardo made any reference to the FLSA or any other statute before October 24, 2019.  There is also no record evidence that Lombardo ever articulated why he was due overtime prior to October 24, 2019.  See Chmura Summ. J. Mem. at 35, ECF No. 35.  Thus, on this record, Chmura is entitled to summary judgment with respect to the events of October 17, because Lombardo cannot make out a prima facie case under the FLSA's anti-retaliation provision.[30]

### c. October 24, 2019

In contrast, Lombardo's October 24, 2019 letter is clearly a formal declaration of his assertion of rights under the FLSA.  It is also undisputed that Lombardo was formally terminated on October 31, 2019 (i.e., subsequent to the protected activity).  For this claim, then, the only question is whether there is a genuine issue of material fact that Lombardo was terminated because of the October 24, 2019 letter.

---

[30] There is, therefore, no need to address Chmura's arguments that Auerbach never raised Lombardo's October 17 complaints to upper management.

Lombardo argues that there is a genuine issue of material fact for four reasons: (1) Lombardo twice demanded overtime payment in October 2019; (2) Chmura "knew" Lombardo was requesting overtime "as the demand went to his direct supervisor and to Chmura's counsel"; (3) Chmura terminated Lombardo after it received his October 24, 2019 letter;[31] and (4) the termination letter that Chmura sent on October 31, 2019 stated that "[g]iven your [i.e., Lombardo's counsel] response on his behalf, that offer [of a severance agreement] is withdrawn, and he should consider his employment terminated effective today."  Lombardo Summ. J. Resp. at 29, ECF No. 74.

Lombardo's first two arguments conflate the facts from the October 17, 2019 conversation that Lombardo had with Eli Auerbach and the October 24, 2019 letter that Lombardo's counsel sent to Chmura's counsel.  As explained above, Lombardo's October 17 assertion that he was due overtime was not protected activity under the FLSA nor is there any evidence that that conversation was elevated to Chmura's upper management.  Lombardo's only truly protected activity was the October 24 letter, which was indisputably sent before he was terminated.  Thus, again, the only issue is whether Lombardo was terminated because of his October 24

_____

[31] Lombardo makes no allegation that Chmura's lawsuit against him was retaliation for his raising the FLSA claim on October 24, 2019.

letter. It is, therefore, appropriate to now review the facts surrounding the October 24 letter.

On October 21, 2019, while Lombardo was on unpaid leave, Chmura sent Lombardo a document titled "SEPARATION AND RELEASE AGREEMENT." Ex. A, ECF No. 82-1. As the title suggests, the proposed Separation and Release Agreement states that its goal is to end Chmura's business relationship with Lombardo "amicably" while resolving "all issues between them in a mutually satisfactory manner." See Ex. A at 2, ECF No. 82-1. Notably, the Separation and Release Agreement proposes that "Lombardo's employment relationship with Chmura will cease on October 28, 2019 or the Execution Date of this Agreement, whichever is earlier[.]" See Ex. A at 2, ECF No. 82-1.

On October 24, 2019, Lombardo, through counsel, sent Chmura a letter, through counsel, regarding the "Termination of Rick Lombardo." Ex. 33, ECF No. 35-33. In that October 24 letter (which was received by counsel for Chmura on October 25, 2019), Lombardo states that he will not accept the proposed separation agreement, and he intends to pursue claims against Chmura for, inter alia, violations of the FLSA. Ex. 33, ECF No. 35-33. Perplexingly, the October 24 letter states that "Chmura terminated [Lombardo's] employment on October 17, 2019." Ex. 33 at 3, ECF No. 35-33.

In response, on October 31, 2019, Chmura, through its attorney, sent a letter to Lombardo's attorney that denies the accusations in the October 24 letter and states, in the concluding paragraph:

> Finally, your letter stated that Chmura terminated Mr. Lombardo's employment on October 17. This is incorrect. The Company placed him on unpaid leave to afford him a reasonable opportunity to consider the terms of the proposed Separation Agreement. Given your response on his behalf, the offer is withdrawn and he should consider his employment terminated effective today."

Ex. B-6 at 29-30, ECF No. 74-2 (emphasis added).

Lombardo reads the phrase "given your response" in the the October 31 letter to refer to the fact that Lombardo asserted an FLSA claim and not the fact that Lombardo stated that he would not accept Chmura's severance agreement. Chmura responds that "Chmura's October 31 response to Lombardo's letter merely confirmed what the separation agreement had already conveyed: Lombardo's employment was over." Chmura Summ. J. Reply Mem. at 26, ECF No. 82. According to Chmura, by October 21, 2019, steps were already being taken to terminate Lombardo's employment; Lombardo was on unpaid leave, and Chmura was outright offering him a severance package. Thus, by Chmura's telling, Lombardo was all but terminated before he ever referenced the FLSA.

Moreover, even if the October 31 letter were evidence of possible FLSA retaliation, Chmura has articulated a host of

legitimate, not retaliatory reasons why Lombardo was terminated, including that Chmura's leadership was already concerned by Lombardo's conduct in forging an offer letter from a competitor and "spreading rumors among the sales team," and by Chmura's interpretation of events, Lombardo was threatening to damage Chmura by stealing customers or going to work for a competitor.[32]

Given the timing of the events leading up to Lombardo's termination, the Court finds Lombardo's arguments with respect to the October 24 letter highly specious, but the Court cannot conclude that, as a matter of law, no reasonable jury could find that Lombardo was terminated because of the October 24 letter.

For the foregoing reasons, Chmura's Summary Judgment Motion will be granted with respect to the events of October 17, 2019 and denied with respect to the events surrounding the October 24 letter.

### 5. Counterclaim Count III: Breach of Contract

Lombardo's Counterclaim Count III is a breach of contract claim that asserts that "Lombardo has not been paid all of the commissions he is owed for the initial sales or the annual renewals he procedure." Countercl. ¶ 69, ECF No. 19. According to

---

[32] Chmura cites Holland v. Washington Homes, Inc., a Title VII discrimination case, to support the proposition that an employer's belief that an employee has threatened the company is a legitimate reason for termination. 487 F.3d 208, 214 (4th Cir. 2007).

Lombardo, Chmura was contractually obligated to pay him "commissions for the sale of JobsEQ at the rate of 15% of the initial sale and 3% of the annual renewals." Countercl. ¶ 67, ECF No. 19. Notably, the "contract" on which Lombardo bases his claim is a combination of (1) the Offer Letter (ECF No. 19-1) to which Chmura had attached the Agreement (i.e., the "Confidentiality, Non-Competition & Non-Solicitation Agreement") (ECF No. 19-2) and (2) the March 28, 2019 amendment to the Offer Letter. Hearing Tr. 101:22-102:20, ECF No. 94. Until March 28, 2019, Lombardo historically received his commissions the month after the transaction date. Countercl. ¶ 67, ECF No. 19. On March 28, 2019, Chmura amended the payment terms so that commission would only be paid once Chmura received payment for the sale. Countercl. ¶ 68, ECF No. 19. As a result of this change, Lombardo alleges Chmura materially breached the contract on which he bases this claim (the Offer Letter and the March 28 amendment), and as a result, he lost out on $25,000 worth of commissions which he is now due. Countercl. ¶¶ 68-72, ECF No. 19.

Chmura asserts that Lombardo's argument is flawed because: (1) the Offer Letter is not part of a contract; and (2) even if it were, Chmura would be free to modify it. Chmura Summ. J. Mem. at 37-40, ECF No. 35.

As with Chmura's Motion for Summary Judgment on Counterclaim Count II, Lombardo is not seeking summary judgment on Counterclaim

Count III (breach of contract). Lombardo Mot. Summ. J. at 2, ECF No. 40. Rather, Lombardo is contesting that summary judgment is appropriate for this count because there are genuinely disputed issues of issues of material fact. See Lombardo Summ. J. Resp. Mem. at 30, ECF No. 74.

"The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Filak v. George, 594 S.E.2d 610, 614 (Va. 2004). Lombardo's entire breach of contract claim rests on the assumption that there was, indeed, a contract, and specifically, that the Offer Letter was part of the contract. Hearing Tr. 101:22-102:20, ECF No. 94. However, the Offer Letter clearly says "[t]his letter should not be construed as an employment contract" and refers the prospective employee to the "employment agreement attached" - which happened to be the Agreement (i.e., the Confidentiality, Non-Competition & Non-Solicitation Agreement). Ex. A, ECF No. 19-1. As Chmura rightly points out, under Ohio law,[33] if a document "disclaims

---

[33] Churma asserts that the Offer Letter should be evaluated using Ohio law rather than Virginia law. Chmura Summ. J. Mem. at 45, n.13, ECF No. 35. Lombardo does not appear to contest this point. See Lombardo Summ. J. Resp. Mem. at 30, ECF No. 74 (citing to an Ohio case).

intent to create a contract," there is no mutual assent to be bound by the terms of the document and no contract is created.  Senter v. Hillside Acres Nursing Ctr. of Willard, Inc., 335 F. Supp. 2d 836, 843 (N.D. Ohio 2004).

But, in response, Lombardo contests that the Agreement is an "employment agreement" even though it was the only document attached to the Offer Letter.  Hearing Tr. 101:22-102:20, ECF No. 94.  This argument derives from the fact that the March 28, 2019 amendment to the Offer Letter states:

> This letter is intended to amend the terms of your employment previously agreed to by you and Chmura Economics & Analytics, LLC, and the company's offer letter you dated February 4th, 2015.

Ex. A at 2, ECF No. 19-1.  However, the commission terms were never modified.  Lombardo Summ. J. Resp. Mem. at 30, ECF No. 74.  So, says Lombardo, Chmura is still obligated to pay Lombardo "15% commissions on initial sales and 3% commissions on renewals." Lombardo Summ. J. Resp. Mem. at 30, ECF No. 74.

Chmura responds that Lombardo was aware, from early in his employment, that there were circumstances under which Lombardo would not receive a full 15% commission.  Chmura Summ. J. Reply. Mem. at 26-27, ECF No. 82; see also Ex. 7, ECF No. 35-7.  And, Chmura adds that both an at-will employee and an at-will employer "may propose to change the terms of their employment relationship at any time. If, for instance, an employer notifies an employee

that the employee's compensation will be reduced, the employee's remedy, if dissatisfied, is to quit." Lake Land Emp. Grp. of Akron, LLC v. Columber, 804 N.E. 2d 27, 32 (Ohio 2004).

Lombardo cites Watkins v. Universal Chemicals & Coatings, Inc., No. 92AP-893, 1992 Ohio App. LEXIS 5835, *9 (Ohio Ct. App. Nov. 19, 1992), for the proposition that, whether an employee is at-will or not, "a contract for paying commissions at a defined rate is enforceable and cannot be modified at the will of the employer." Lombardo Summ. J. Resp. Mem. at 30, ECF No. 74. That interpretation of Watkins is not well-founded. Nevertheless, the Court finds that Lombardo has shown that there is a genuine issue of material fact as to whether there was any legally enforceable obligation of Chmura to Lombardo regarding the commissions and what the terms of that understanding were.

Therefore, summary judgment cannot be granted on Counterclaim Count III.

### III. LOMBARDO'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 40)

The arguments in Lombardo's Motion for Summary Judgment and the accompanying memoranda are extremely similar to those in Chmura's Motion for Summary Judgment and accompanying memoranda; but, nevertheless, where parties file cross-motions for summary judgment, the district court should examine "each motion separately employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town

Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011). Lombardo requests summary judgment in his favor on all four counts of Chmura's FAC. Count II has already been dealt with, see supra Part I, so the Court will now address Lombardo's summary judgment arguments with respect to FAC Counts I, II, and IV.

## A. STATEMENT OF FACTS

Because Lombardo is the moving party, all facts be viewed in the light most favorable to the party opposing the motion, namely Chmura. Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003). The relevant facts[34] are as follows.

Chmura is a Richmond-based "'software and consulting firm in the field of data analytics.'" Lombardo Summ. J. Mem. ¶ 1, ECF No. 41 (quoting FAC ¶ 9, ECF No. 12). Chmura's main product is a software program called JobsEQ which "'provides demographics and labor data such as highly granular occupation forecasts and real-time data about job postings.'" Lombardo Summ. J. Mem. ¶ 1, ECF No. 41 (quoting FAC ¶ 9, ECF No. 12).

Richard A. Lombardo ("Lombardo"), a former Chmura employee, is a resident of Ohio. Lombardo Summ. J. Mem. ¶ 2, ECF No. 41. Although Lombardo was based out of Cleveland, Ohio, he "marketed

---

[34] Facts that relate only to claims that were transferred to the Northern District of Ohio (Counterclaim Counts I, IV, and V) will not be recited.

and sold Chmura's software products nationwide," Lombardo Summ. J. Mem. ¶ 2, ECF No. 41, and he "frequently traveled to conferences and/or to meetings in Richmond." Chmura Summ. J. Resp. Mem. ¶ 2, ECF No. 49.

On February 3, 2015, Chmura sent Lombardo a letter offering him a job as an "Inside Sales Representative," Lombardo Summ. J. Mem. ¶ 3, ECF No. 41, though that was not his actual title. Chmura Summ. J. Resp. Mem. ¶ 3, ECF No. 49.

Lombardo was hired to sell subscriptions to Chmura's JobsEQ software program, Lombardo Summ. J. Mem. ¶ 4, ECF No. 41, but that was not his only job responsibility. Chmura Summ. J. Resp. Mem. ¶ 4, ECF No. 49.

On or about February 4, 2015, Lombardo and Chmura executed a document titled "Confidentiality, Non-Competition & Non-Solicitation Agreement" (the "Agreement").[35] Lombardo Summ. J. Mem. ¶ 5, ECF No. 41

On February 18, 2015, Lombardo began his job with Chmura. His initial title was "Account Manager." Lombardo Summ. J. Mem. ¶ 11, ECF No. 41. And, on May 15, 2017, Lombardo's title became "Senior Account Manager." Lombardo Summ. J. Mem. ¶ 11, ECF No. 41. "Lombardo was consistently the top performing Account Manager

---

[35] That Agreement was filed multiple times in this case. For simplicity, the Court will refer to the copy of the Agreement filed at ECF No. 12-1.

and Senior Account Manager by every measure - sales, renewals and number of touches to prospects and existing customers." Lombardo Summ. J. Mem. ¶ 12, ECF No. 41.

In early October 2019, Chmura began considering "operational changes to the sales team and changes to the commission structure." Lombardo Summ. J. Mem. ¶ 13, ECF No. 41. Lombardo was unhappy with the changes under consideration, Lombardo Summ. J. Mem. ¶ 14, ECF No. 41; Chmura Summ. J. Resp. Mem. ¶ 16, ECF No. 49, because he believed that the changes under consideration would have materially disadvantaged him. Lombardo Summ. J. Mem. ¶ 13, ECF No. 41. As a result, Lombardo spoke with his direct supervisor, Eli Auerbach, on at least two occasions in October: once on October 3, 2019 and once on October 17, 2019. Lombardo Summ. J. Mem. ¶ 14, ECF No. 41; Chmura Summ. J. Resp. Mem. ¶ 14, ECF No. 49.

After meeting with Auerbach at approximately 10:00 AM on Thursday, October 17, 2019, Lombardo was instructed to leave the office for the day. Lombardo Summ. J. Mem. ¶ 15, ECF No. 41. Lombardo was subsequently placed on unpaid leave.[36] See Lombardo

---

[36] According to Chmura, Lombardo was placed on unpaid leave immediately after his conversation with Auerbach on October 17, 2021. Chmura Summ. J. Resp. Mem. ¶ 16, ECF No. 49. According to Lombardo, he was not placed on unpaid leave until Monday, October 21, 2021. Lombardo Summ. J. Mem. ¶ 16, ECF No. 41. Neither party makes an issue out of the discrepancy.

Summ. J. Mem. ¶ 16, ECF No. 41; Chmura Summ. J. Resp. Mem. ¶ 16, ECF No. 49.  Chmura also quickly cut off Lombardo's access to Salesforce and JobsEQ.  Chmura Summ. J. Resp. Mem. ¶ 16, ECF No. 49.

On October 31, 2019, Chmura formally terminated Lombardo. Lombardo Summ. J. Mem. ¶ 17, ECF No. 41.

As part of Lombardo's job, he was issued a work laptop that belonged to Chmura.  Lombardo Summ. J. Mem. ¶ 18, ECF No. 41.  When Lombardo left the office on October 17, 2021, he took that laptop with him.  Chmura Summ. J. Resp. Mem. ¶ 20, ECF No. 49.  The laptop was not retuned to Chmura until December 24, 2019 when Lombardo's counsel mailed the laptop to Chmura.  Lombardo Summ. J. Mem. ¶ 19, ECF No. 41; Chmura Summ. J. Resp. Mem. ¶ 19, ECF No. 49.  At the time of Lombardo's termination, the laptop contained notes from two conferences, including notes of conversations that Lombardo had with clients and perspective customers at those conferences. Lombardo Summ. J. Mem. ¶ 20, ECF No. 41.

Lombardo's position is that there is "no evidence that Lombardo sold, disclosed, copied, stole, altered, concealed, or unlawfully accessed, converted, or transferred the [conference

notes] or any 'highly confidential and trade secret information.'"[37] Lombardo Summ. J. Mem. ¶ 21, ECF No. 41.

Lombardo's Motion for Summary Judgment must be decided in perspective of this record.

**B. DISCUSSION**

### 1. FAC I: Breach of Employment Contract

In Lombardo's Motion for Summary Judgment, Lombardo argues, in a rather conclusory fashion, that he is entitled to summary judgment on Count I of the FAC because Chmura cannot satisfy any of the elements of a breach of contract action (i.e., duty, breach, and injury). Lombardo Summ. J. Mem. at 15, ECF No. 41; see also Filak v. George, 594 S.E.2d 610, 614 (Va. 2004) ("The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's

---

[37] According to Chmura, "Lombardo disclosed highly confidential Chmura revenue information to at least one third-party recruiter in his efforts to find a new job, even after he submitted a sworn declaration and interrogatory responses affirming that he had no confidential Chmura information in his possession." Chmura Summ. J. Resp. Mem. ¶ 21, ECF No. 49. Lombardo's position is that there is "no evidence that Lombardo sold, disclosed, copied, stole, altered, concealed, or unlawfully accessed, converted, or transferred the [conference notes] or any 'highly confidential and trade secret information.'" Lombardo Summ. J. Mem. ¶ 21, ECF No. 41. Although the Court must view the facts in the light most favorable to Chmura, what Chmura is describing is not behavior that was alleged in the FAC. Therefore, any highly confidential information that Lombardo may have disclosed is not relevant to Chmura's claims as currently pled.

violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.").

First, Lombardo argues that, because the Agreement is unenforceable, Lombardo did not have a contractual duty to return his laptop "or any alleged confidential or trade secret information." Lombardo Summ. J. Mem. at 15, ECF No. 41. Second, Lombardo contends that, because the laptop was returned on December 24, 2019, he did not breach the contract.[38] See Lombardo Summ. J. Mem. at 15-16, ECF No. 41. Third, Lombardo states that "Chmura has failed to allege any damage caused by Lombardo due to the retention of the Laptop." Lombardo Summ. J. Mem. at 16, ECF No. 41.

Chmura responds that (1) the confidentiality agreement is, in fact valid, Chmura Summ. J. Resp. Mem. at 11-13, ECF No. 49; (2) Lombardo breached the Agreement by failing to return the laptop for approximately two months when he himself understood the Agreement to mean that he had an obligation to return Chmura's property immediately and without demand, id. at 13; see also Ex. 4 ("Lombardo Deposition"), ECF No. 35-4; and (3) Chmura did in

---

[38] Lombardo's second "argument" is technically only a sentence stating that the laptop was ultimately returned; the Court is inferring from context that Lombardo means to say that because the laptop was returned, he was not in breach of the Agreement.

fact allege damages in the form of lost profits and attorneys' fees, Chmura Summ. J. Resp. Mem. at 13, ECF No. 49.

In reply, Lombardo reiterates that the Agreement is unenforceable and then makes two additional arguments: (1) the laptop is not confidential and proprietary information or work related intellectual property (nor did Lombardo have access to such information after his termination) and (2) Chmura cannot prove damages because Chmura's alleged lost profit damages are "speculative at best." Lombardo Summ. J. Reply Mem. at 7-8, ECF No. 59.

Viewing the facts in the light most favorable to Chmura, the Court finds that Lombardo is not entitled to summary judgment on Count I of the FAC.

### a. Duty

First, the Court finds that Lombardo did have a duty to return Chmura's laptop before December 24, 2019. Under the Agreement, there are two separate, enforceable provisions that speak to whether Lombardo had an obligation to return his work laptop: the "Confidentiality" provision and the "Termination and Return of Property" provision. Agreement at 2, 4, ECF No. 12-1. The final sentence under the "Confidentiality" provision states:

> Upon the termination of Employee's employment, for whatever reason, Employee will **promptly** deliver to the Company all documents, equipment, property or materials of any type, including any copies thereof, in Employee's possession, custody or control that

> belong to the Company, and/or that contain, whole or
> in part, any Confidential or Proprietary Information
> . . . .

Agreement at 2, ECF No. 12-1 (emphasis added). Then, the

"Termination and Return of Property" provision contains two sub-

provisions calling for the return of (a) all confidential and

proprietary information as well as all work-related intellectual

property and (b) all tangible property. Agreement at 4, ECF No.

12-1. These provisions state:

> (a) <u>Return of Confidential and Proprietary Information</u>
> <u>and Work Related Intellectual Property Upon</u>
> <u>Termination.</u> Employee understands and agrees that all
> printed and electronic files, records, documents,
> reports, audits, projections, forecasts, business
> plans, correspondence, manuals, computer code, pricing
> data, sources of supply, customer lists, databases,
> and similar items relating to the business of the
> Company, the Confidential and Proprietary Information
> and/or the Work Related Intellectual Property, whether
> prepared by Employee or otherwise coming into
> Employee's possession, shall remain the exclusive
> property of the Company, whether in original or
> reproduced form. Upon the termination of Employee's
> employment for any reason whatsoever, Employee **shall**
> **immediately and without demand** return to the Company
> all of the aforementioned information in Employee's
> possession or under Employee's control belonging to
> the Company, and immediately thereafter Employee shall
> have no further right of access to or any right to
> obtain any of such records and materials or copies
> thereof, or any information contained therein.
>
> (b) <u>Return of Tangible Property.</u> Upon termination of
> Employee's employment for any reason whatsoever,
> Employee shall **immediately and without demand** return
> to the Company all tangible property in his/her
> possession belonging to the Company (including without
> limitation electronic equipment), in good condition,
> ordinary wear and tear excepted.

Agreement at 4, ECF No. 12-1 (emphasis added). Based on these provisions, the Court finds that Lombardo had an obligation to return the laptop and the conference notes to Chmura in a timely manner.

The laptop itself falls squarely under the "Return of Tangible Property" sub-provision. Lombardo has never disputed that Chmura is the owner of the laptop. And, under the "Return of Tangible Property" provision, the laptop should have been returned to Chmura "immediately and without demand." Agreement at 4, ECF No. 12-1.

The conference notes arguably fall under both the "Confidentiality" provision and the "Return of Confidential and Proprietary Information and Work Related Intellectual Property Upon Termination" sub-provision. But, the conference notes certainly fall within the "Return of Confidential and Proprietary Information and Work Related Intellectual Property Upon Termination" sub-provision.[39] That sub-provision specifically

---

[39] In either case, the conference notes should have been returned to Chmura "promptly" or "immediately and without demand." Agreement at 2,4, ECF No. 12-1. At oral argument, counsel for Lombardo raised the issue of whether there's a conflict in the words "promptly" and "immediately." Hearing Tr. 48:5–49:3, 50:11-24, ECF No. 94. Then counsel for Lombardo argued that delivering the laptop within two months of Lombardo's termination was "prompt." Hearing Tr. 49:22-50:4, ECF No. 94. On the facts of this case, the Court does not find this argument persuasive because Lombardo had an independent and unambiguous obligation to return Chmura's tangible property, including the laptop – which contained the conference notes – "immediately and without demand." Agreement at 4, ECF No. 12-1.

states, in relevant part, that "all . . . electronic files . . .
documents . . . correspondence . . . customer lists . . . and
similar items relating to the business of the Company . . . whether
prepared by Employee or otherwise coming into Employee's
possession, shall remain the exclusive property of the Company."
Agreement at 4, ECF No. 12-1.  Thus, the conference notes are, at
minimum, electronic documents relating to the business of the
Company,[40] even though the notes were prepared by Lombardo.
Agreement at 4, ECF No. 12-1.  Thus, once his employment was
terminated, Lombardo had an obligation to return them "immediately
and without demand."  Agreement at 4, ECF No. 12-1.

But, even if that were not the case, Lombardo's argument that
the notes were not confidential and proprietary information or
work-related intellectual property would be unavailing.
"Confidential and Proprietary Information" is defined earlier in
the Agreement to include, inter alia, "information concerning new
or potential investors, customers, or clients."  Agreement at 2,

---

[40] The Court reads the "Return of Confidential and Proprietary
Information and Work Related Intellectual Property Upon
Termination" sub-provision to apply to up to three categories of
information: items relating to the business of the Company, items
relating to Confidential and Proprietary Information, "and/or"
items relating to Work Related Intellectual Property.  Thus,
information relating to the business of the Chmura should have
been returned to Chmura even if it was not "Confidential and
Proprietary" or "Work Related Intellectual Property."

ECF No. 12-1. Non-public information on new or potential customers, such as Lombardo's notes of his meetings with possible clients, is "information concerning new or potential investors, customers, or clients" and, thus, Confidential and Proprietary Information. Lombardo, therefore, had an obligation to return the conference notes to Chmura.

### b. Breach

Whether Lombardo breached the Agreement turns on the meaning of "immediately and without demand." The phrase "immediately and without demand" is not defined in the Agreement; the Court must, therefore, look to the common and ordinary meaning the term, which can include referring to dictionary definitions. <u>Nationwide Mut. Ins. Co. v. Overlook, LLC</u>, 785 F. Supp. 2d 502, 518 (E.D. Va. 2011). "Immediately" is commonly understood to mean "without interval of time: STRAIGHTWAY."[41] And, Lombardo himself testified that he "would assume" that the phrase "immediately and without demand" meant "right away under any circumstance." Ex. 3 ("Lombardo Deposition") at 18:16-22, ECF No. 35-4. With this understanding of "immediately," the following facts must be evaluated.

---

[41] <u>Immediately</u>, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/entity (last visited July 22, 2021).

At approximately 10:00 AM on Thursday, October 17, 2019, Lombardo was told to leave the office for the day, and he took his laptop with him.[42]  Lombardo Summ. J. Mem. ¶ 15, ECF No. 41; Chmura Summ. J. Resp. Mem. ¶ 15, ECF No. 49.  That same day, Lombardo was placed on unpaid leave.[43]  Chmura Summ. J. Resp. Mem. ¶ 15, ECF No. 49.  On October 31, 2019, Lombardo was terminated from Chmura. Lombardo Summ. J. Mem. ¶ 17, ECF No. 41; Chmura Summ. J. Resp.

---

[42] None of the parties' briefs addressing Lombardo's Motion for Summary Judgment make this clear, but from the other set of papers, the reason that there was any ambiguity at all regarding when Lombardo had an obligation to return his laptop is because his immediate supervisor, Eli Auerbach, told Lombardo to return the laptop when Lombardo signed the proposed separation agreement, which never happened.  At oral argument, Chmura took the position that any ambiguity introduced by Lombardo's conversation with Auerbach was put to rest on October 21, 2021 when Chmura sent Lombardo a cease-and-desist letter requesting that Lombardo confirm that he had returned all of Chmura's property, including any confidential information. Hearing Tr. 40:16–42:2, ECF No. 94. Lombardo took the position that, because of Auerbach's instructions to Lombardo, there was a genuine issue of material fact as to whether Lombardo promptly returned the laptop.  Hearing Tr. 52:6–14, ECF No. 94.  Counsel for Lombardo also suggested, for the first time, that the fact that Lombardo's former attorney instructed Lombardo to keep the laptop could create a fact issue as to whether Lombardo returned the laptop promptly.  Hearing Tr. 52:6–14, ECF No. 94.  The Court will not consider arguments raised for the first time at oral argument.  First Tennessee Bank Nat. Ass'n v. Global Title, LLC, 3:09-cv-550, 2010 WL 5187834, *1 (Nov. 16, 2010) (citing North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dept. Of Transp., 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010)).  And, in any case, the Court finds that the relevant timeframe was "immediately" not "promptly."

[43] Lombardo reported that he was placed on unpaid leave on Monday, October 21, 2019, but neither party made an issue of the discrepancy.

Mem. ¶ 17, ECF No. 49.  And, on December 24, 2019, Lombardo mailed the laptop to Chmura.  Lombardo Summ. J. Mem. ¶ 19, ECF No. 41; Chmura Summ. J. Resp. Mem. ¶ 17, ECF No. 49.

When pressed at oral argument, counsel for Chmura took the position that Lombardo had an obligation to return the laptop on October 31, 2019, the date of his termination.  Hearing Tr. 41:12-15, ECF No. 94.  That understanding is consistent with the terms of the Agreement which state that an employee's termination triggers the employee's obligation to return various forms of company property.  Agreement at 4, ECF No. 12-1.  When similarly pressed, counsel for Lombardo took the somewhat perplexing position that "there's no question that Mr. Lombardo should have returned the laptop sometime between October 31st and December 24th when he did."  Hearing Tr. 61:5-17, ECF No. 94.  Based on those arguments – and on the definition of the word "immediately" – the Court finds that Lombardo breached his obligation to return his work laptop, which contained the only copy of the conference notes, at some point between October 31, 2019 and December 24, 2019.  Given the parties' factual disputes over what Auerbach said to Lombardo during their October 17, 2019 meeting and how that information should have been interpreted in the broader context of Lombardo's termination, the Court will leave it to the fact finder to determine the exact date that Lombardo was in breach of his contract.

#### c. Injury

Finally, the Court finds that Chmura has provided enough information about damages to allow the breach of contract claim to proceed to a jury. Lombardo's basic argument is that Chmura's damages are non-existent or too speculative to the point that Chmura cannot meet a necessary element of a breach of contract claim.[44] At the summary judgment stage, if the non-moving party (here Chmura) has the burden of proof on an issue at trial, the moving party (here Lombardo) "need only demonstrate that there is a lack of evidence to support the non-movant's claim." Nat'l Org. for Marriage, Inc. v. United States, IRS, 24 F. Supp. 3d 518, 522 (E.D. Va. 2014). The non-moving party, Chmura, in turn, must show that there is evidence on which a reasonably jury could find for Chmura. Id. The Court finds that Chmura has met that burden. Dr. Christine Chmura testified to Chmura's lost profits at her deposition. See, e.g., Ex. C ("Chmura Deposition") at 48:6-12, 49:8-51:13, ECF No. 74-3. And, Chmura has alleged its attorney's

---

[44] At oral argument, Lombardo also argued, for the first time, that Chmura's claim for breach of contract is barred because Chmura failed to take any steps to mitigate its damages (and thus, there is a diminution of the damages in full). Hearing Tr. 59:14-60:17, ECF No. 94. Arguments raised for the first time at oral argument will not be considered. First Tennessee Bank Nat. Ass'n v. Global Title, LLC, 3:09-cv-550, 2010 WL 5187834, *1 (Nov. 16, 2010) (citing North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dept. Of Transp., 713 F. Supp. 2d 491, 510 (M.D.N.C. 2010)).

fees as damages.[45]   Thus, Chmura has put forth sufficient evidence
for a reasonable jury to find that Chmura was indeed damaged by
Lombardo's failure to turn over the laptop with the conference
notes.   Whether Chmura can actually recover anything at trial is
a matter for the jury.

Accordingly, Lombardo is not entitled to summary judgment on
Count I.

### 2. FAC III: Defense of Trade Secrets Act

Count III alleges that Lombardo misappropriated trade secrets
belong to Chmura by retaining them after his termination.[46]   See

---

[45] Under Virginia law, the default rule is that attorney's fees
cannot be treated as direct damages.   Long v. Abbruzzetti, 487
S.E.2d 217, 219-20 (Va. 1997).   However, attorney's fees can
constitute damages if the parties have agreed, by contract, that
attorney's fees will be recoverable.   See East Texas Salvage &
Machine v. Duncan, 306 S.E.2d 896, 897 (Va. 1983); see also Zen42
LLC v. Wash. & Lee Univ., 2018 U.S. Dist LEXIS 165739, *7-8 (W.D.
Va. Sept. 26, 2018).   The Agreement states, in relevant part,
"Employee shall pay the Company all reasonable attorneys' fees
incurred in enforcing its rights under this Agreement," Agreement
at 6, ECF No. 12-1; however, the parties have not briefed the issue
of whether the Agreement requires Lombardo to pay Chmura's legal
fees in this instance.   The Court will not rule on it at this time.

[46] Later, Chmura stated that "Lombardo disclosed highly
confidential Chmura revenue information to at least one third-
party recruiter in his efforts to find a new job, even after he
submitted a sworn declaration and interrogatory responses
affirming that he had no confidential Chmura information in his
possession." Chmura Summ. J. Resp. Mem. ¶ 21, ECF No. 49. Notably,
this assertion only exists in this set of memoranda, and Lombardo
never responds to Chmura's assertion. See Lombardo Summ. J. Reply
at 2, ECF No. 59.   However, Chmura's original articulation of its
DTSA claim only referred to Lombardo "improperly retaining" trade
secrets or failing to return them.   FAC ¶ 71, ECF No. 12.

FAC ¶¶ 65-74.  Lombardo argues that, as a matter of law, (1) he did not misappropriate anything and (2) the information on the laptop did not constitute trade secrets.  Lombardo Summ. J. Mem. at 16, ECF No. 41.  Chmura takes the exact opposite position. Chmura Summ. J. Resp. at 14-17, ECF No. 49.

For the same reasons outlined in Part II.B.2, the Court will not rule on the independent economic value of the conference notes or the issue of "misappropriation."

### 3. FAC IV: Conversion

Like FAC Count I above, FAC Count IV is also based on Lombardo's failure to quickly return Chmura's computer.  FAC ¶ 76. Neither party disputes that the laptop was returned on December 24, 2019.

Lombardo's motion for summary judgment argues that the Court should grant summary judgment in his favor because: (1) Lombardo no longer has possession of the laptop; (2) the Agreement is unenforceable; (3) the Virginia Uniform Trade Secrets Act (VUTSA) preempts any common law claim for conversion; and (4) the conference notes cannot constitute the basis for a conversion claim (because they constitute potential future contracts).  Lombardo

---

Therefore, any highly confidential information that Lombardo may have disclosed is not relevant to Chmura's claims as currently pled.

Summ. J. Mem. at 18-20, ECF No. 41.  The Court has already found that the Agreement is enforceable and that a claim for conversion can lie even where the property at issue was returned; the other two arguments necessitate more discussion.

### a. Effect of the Virginia Uniform Trade Secrets Act (VUTSA)

The VUTSA explicitly preempts "conflicting" tort law that provides a civil remedy for the misappropriation of a trade secret.[47]  Va. Code Ann. § 59.1-341; E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc., 688 F. Supp. 2d 443, 450 (E.D. Va. 2009). The VUTSA preemption provision does not apply to "[o]ther civil remedies that are not based upon misappropriation of a trade secret."  Va. Code Ann. § 59.1-341(B)(2).  And the preemption provision applies only to common law claims "premised entirely on a claim for misappropriation of a trade secret."  Kolon, 688 F. Supp. 2d at 450 (quoting Smithfield Ham & Prods. Co. v. Portion Pac., 905 F. Supp. 346, 348 (E.D. Va. 1995)).  A conversion claim

----

[47] As Chmura notes in its response memorandum, Chmura Summ. J. Resp. Mem. at 19, n.5, ECF No. 49, Lombardo is functionally taking a somewhat contradictory position to his arguments on Count III. With respect to Count III (the DTSA count), Lombardo argues that the material on the laptop is not trade secret. See Lombardo Summ. J. Resp. Mem. at 21-22, ECF No. 74.  If that is true (or there is a genuine issue of material fact about whether the material is a "trade secret"), then the preemptive effect of the VUTSA could not be determined on the current record and summary judgment on the basis of VUTSA preemption would need to be denied for that reason alone.  See E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc., 688 F. Supp. 2d 443, 451 (E.D. Va. 2009).

premised on the conversion of confidential information and some physical item (e.g., paper copies of confidential information) is not preempted by the VUTSA.  Kolon, 688 F. Supp. 2d at 450, 451, 554-55.  In contrast, a conversion claim premised entirely on the wrongful appropriation and exercise of authority over confidential information that is also alleged to be a trade secret, is entirely premised on the misappropriation of trade secrets and is, therefore, preempted.  Space Systems/Loral, LLC v. Orbital ATK, Inc., 306 F. Supp. 3d 845, 849, 856 (E.D. Va. 2018) (finding preemption where employee conducted a data breach of the employer and viewed four confidential electronic files).

Here, Chmura's conversion claim is based on Lombardo's tardy return of his work laptop which also had confidential information on it.  The hardware portion of the conversion claim saves it from VUTSA preemption.  See AWP, Inc. v. Commonwealth Excavating, Inc., 2013 WL 3830500, *7 (W.D. Va. July 24, 2013) (declining to find VUTSA preemption at the motion to dismiss stage because allegation was for misappropriation of a trade secret and the conversion of physical equipment).

### b. The Conference Notes as "Potential Future Contracts"

Chmura does not appear to have responded to Lombardo's argument that the conference notes cannot constitute the basis for a conversion claim, but that is immaterial because Lombardo's argument mischaracterizes Chmura's position.  Chmura's conversion

claim was always based on the fact that Chmura was the rightful owner of the computer and the copies of the information stored on the computer - specifically the conference notes. FAC ¶ 76, ECF No. 12; see also Kolon, 688 F. Supp. 2d at 455 ("[U]nder Virginia law, a conversion claim does not fail merely because the property at issue is 'an electronic version of [the] list rather than a hard copy.'") (citation omitted). Whether "the potential future contracts constitute the only economic value of the notes" misses the point because the question of damages generated by conversion is separate from whether there was conversion.

The Court will deny Lombardo's request for summary judgment on Count IV of the FAC.

### IV. CONCLUSION

For the foregoing reasons, the Court will grant Chmura's Motion for Summary Judgment with respect to the confidentiality portions of FAC Count II and the Court will grant Lombardo's Motion for Summary Judgment with respect to the non-competition portions of Counterclaim Count VI. The Court will further grant Chmura's Motion for Summary Judgment with respect to (1) FAC Count I, (2) FAC Count IV, and (3) the portions of Counterclaim Count II addressing the events of October 17, 2019. The Court reserves judgment on both parties' motions with respect to FAC Count III pending additional briefing. All other portions of the two motions will be denied. That leaves the following issues to be decided:

(1) the appropriate damages for FAC Count I (breach of contract), including the exact date that Lombardo breached the Agreement; (2) whether Lombardo is liable under FAC Count III (DTSA); (3) the appropriate damages for FAC Count IV (conversion); (4) with respect to Counterclaim Count II (FLSA retaliation), whether Lombardo's termination following the events of October 24, 2019 constitutes retaliation under the FLSA; and (5) with respect to Counterclaim Count III, whether Chmura is liable to Lombardo.

It is so ORDERED.

_____ /s/  REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July 29, 2021

85